AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) Case No. 10-[_____] (__) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**DECLARATION OF CHRISTOPHER POLIMENI,**
**EXECUTIVE VICE PRESIDENT, CHIEF FINANCIAL OFFICER AND TREASURER**
**OF AMERICAN MEDIA, INC., IN SUPPORT OF THE DEBTORS' CHAPTER 11**
**PETITIONS AND REQUEST FOR FIRST DAY RELIEF**

1.      My name is Christopher Polimeni.  I am the Executive Vice President for Finance

and Planning, Chief Financial Officer and Treasurer of American Media, Inc. ("***AMI***" and,

together with its subsidiaries and affiliates, "***American Media***"), a corporation organized under

the laws of Delaware and one of the above captioned debtors and debtors in possessions (each a

"***Debtor***" and, collectively, the "***Debtors***").  In my capacity as Executive Vice President for

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).

Finance and Planning, Chief Financial Officer and Treasurer, I am familiar with the day-to-day operations, business, and financial affairs of American Media. American Media is a publisher in the field of celebrity journalism and health and fitness magazines. American Media's headquarters are located in Boca Raton, Florida.

2.        On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with this Court under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"). The Debtors are operating their businesses and managing their property as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Concurrently with the filing of this declaration (the "***Declaration***"), the Debtors have sought procedural consolidation and joint administration of the Debtors' chapter 11 cases (the "***Chapter 11 Cases***").

3.        To minimize the adverse effects of the commencement of these Chapter 11 Cases on their businesses, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "***First Day Pleading***" and, collectively, the "***First Day Pleadings***"), filed concurrently herewith. I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings. In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

4.        This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "***Local Rules***") and I am authorized to submit

it on behalf of the Debtors.  No one individual at American Media has personal knowledge of all

of the facts set forth in this Declaration.  All facts set forth herein are based upon my personal

knowledge of the Debtors' operations and finances, information learned from my review of

relevant documents, and/or information supplied to me by other members of the Debtors'

management and the Debtors' advisors.  If called upon to testify, I would testify to the facts set

forth herein on that basis.

5.     This Declaration is divided into four parts.  Part I provides background

information with respect to the Debtors' corporate history and their business operations, as well

as a summary of the Debtors' prepetition capital structure.  Part II describes the circumstances

leading to the commencement of these Chapter 11 Cases.  Part III describes the relief sought by

the Debtors in each of the First Day Pleadings.  Part IV provides an overview of <u>Schedules 1-12</u>

attached hereto, which in turn set forth certain additional information about the Debtors, as

required by Local Rules 1007-2(a) and (b).  Except as otherwise indicated, all facts set forth in

this Declaration are based upon my personal knowledge, my discussions with other members of

the Debtors' senior management team, my review of relevant documents, or my opinion based

upon experience, knowledge and information concerning the Debtors' operations and financial

affairs.  If called upon to testify, I would testify competently to the facts set forth in this

Declaration.  Each of the Debtors has authorized me to submit this Declaration on their behalf.

## I.

## <u>OVERVIEW OF THE DEBTORS' BUSINESSES</u>

6.     The Debtors are a leading publisher of magazines in the celebrity journalism and

health and fitness categories.  The Debtors' publications include *National Enquirer*, *Star*, *Globe*,

*National Examiner*, *Country Weekly*, *Mira!*, *Sun*, *Shape*, *Muscle & Fitness*, *Flex*, *Men's Fitness*,

*Muscle & Fitness Hers*, *Fit Pregnancy*, *Natural Health*, *UFC Magazine* and other publications. The Debtors also provide publishing services to other publishers, including *Playboy* Enterprises, Inc., World Wrestling Entertainment, Inc. and others.

7.      Many of the Debtors' publications have a long history.  For example, the *National Enquirer* dates to the 1926 founding of the *New York Evening Enquirer*, a Sunday afternoon paper distributed in New York City by a protégé of William Randolph Hearst.  The *New York Evening Enquirer* was acquired from its original publisher by Generoso Pope, Jr., in 1952, and renamed *National Enquirer* in 1957.  *National Enquirer* gradually acquired a more national focus and by the mid-1960s had reached a circulation of more than one million copies.  Pope died in 1988, and *National Enquirer* was acquired by GP Group Acquisition Limited Partnership.

8.      In 1990, GP Group Acquisition Limited Partnership acquired *Star*, *National Enquirer*'s rival publication, from Rupert Murdoch's New America Publishing Inc., and took the name Enquirer/Star Group, Inc.  *Country Weekly* was launched in 1994.  Also in 1994, Enquirer/Star Group, Inc., acquired the name American Media, Inc., and changed its name thereto.  AMI was acquired by Evercore Partners LLP in 1999, which then also acquired Globe Communications Corp., the publisher of *Globe*, *National Examiner*, and *Sun*.  In 2003, AMI acquired Weider Publications, LLC, a leading publisher of health and fitness magazines, which currently includes the Debtors' publications *Muscle & Fitness*, *Muscle & Fitness Hers*, *Shape*, *Men's Fitness*, *Flex*, *Fit Pregnancy*, and *Natural Health*.

9.      Over recent years, the Debtors have grown to become one of the largest publishers of consumer magazines in the United States.  As of September 30, 2010, the Debtors' magazines comprised approximately 21% of total newsstand circulation for Audit Bureau of Circulations audited weekly publications in the United States and Canada.  Total average

newsstand and subscription circulation per issue for all of the Debtors' current publications that are published more than six times per year was approximately 6.0 million copies for the six months ended September 30, 2010.

10.     For fiscal year 2010, the Debtors derived approximately 55% of their revenues from the circulation of their magazines, including single-copy sales in retail outlets and subscription sales (subscription fulfillment services are outsourced to a third party).  The remainder of the Debtors' revenue was derived from advertising (approximately 37%) and from other sources.[2]  Advertising revenue arises from customer advertisements placed in the Debtors' publications, principally by national advertisers, including sports nutrition products, entertainment, packaged goods, pharmaceutical, sports apparel, beauty and cosmetics, fashion, and direct response.

11.     The Debtors' primary operating costs and expenses are comprised of editorial, production, distribution, circulation and other costs of sales, and general and administrative expenses.  The Debtors' largest cost components are related to production, including printing, paper expenses, and circulation.  Circulation costs primarily include the costs associated with fulfillment of subscriptions, subscription postage, and newsstand transportation.  Editorial costs include salaries and costs associated with freelancers, manuscripts, and photographs.

**A.     The Debtors' Organizational Structure and Business Operations**

(a)     <u>Debtor Affiliates</u>

12.     AMI is the holding-company parent and 100% shareholder of operating entity American Media Operations, Inc. ("***AMO***"), which—directly or indirectly—is the parent and 100%

---

[2]     No one category of "other" reflects a significant percentage of revenues.  "Other" includes rental of subscriber lists, syndicating owned photos and/or stories to other entities, distribution and publishing services, merchandise from a mail order group with respect to fitness products/fashion, website subscription fees, etc.

shareholder of each of the remaining Debtors.  A chart reflecting the Debtors' corporate organization is attached hereto as <u>Exhibit A</u>.

13.     The Debtors' headquarters and principal executive offices are located at 1000 American Media Way, Boca Raton, Florida 33464.  The Debtors also lease office space in (i) West Palm Beach, Florida, (ii) Nashville, Tennessee, (iii) Woodland Hills, California, (iv) Los Angeles, California, (v) New York, New York, (vi) Chicago, Illinois, and (vii) Troy, Michigan. The Debtors lease warehouse space in Boca Raton, Florida, and Lake Worth, Florida.

14.     As of the Petition Date, the Debtors employed approximately 638 full-time and 1,246 part-time employees in hourly, salaried, supervisory, management, administrative, and commissioned positions to perform the functions necessary to effectively and efficiently operate the Debtors' businesses.  None of the employees are represented by a union or other labor organization.

15.     The Debtors' businesses are aggregated into five reporting divisions:

(a)     **Celebrity Publications**.  The Debtors' Celebrity Publications segment includes the publications *Star* and *Country Weekly*.  *Star* is a weekly celebrity news-based glossy magazine dedicated to covering the stars of movies, television and music.  For fiscal year 2010, *Star* sold on average 570,000 single copies per week and had a total average weekly circulation of approximately 1 million copies, including subscriptions, and an estimated total weekly readership of 9.1 million.  *Country Weekly* is a weekly entertainment magazine devoted to country music celebrities and their lifestyles, events and personalities.  For fiscal year 2010, *Country Weekly* had an average single copy circulation of 73,000 copies and an estimated total readership of 0.8 million.

(b)     **Tabloid Publications.**  The Debtors' Tabloid Publications segment includes the publications *National Enquirer*, *Globe* and *National Examiner*.  *National Enquirer* is a weekly general interest publication devoted to celebrities, investigative reporting, human interest stories and articles covering lifestyle topics such as crime, health, fashion and beauty. For fiscal year 2010, *National Enquirer* sold approximately 560,000 single copies per week and had a total average weekly circulation of approximately 784,000 copies, with an estimated total weekly readership of 9.2 million.  *Globe* is a weekly tabloid that focuses on political scandals and investigative crime stories that are less time-sensitive and mainstream than those published in *National Enquirer*, with an average weekly single copy circulation of 304,000 copies, a total average weekly circulation of approximately 352,000 copies and an estimated total weekly readership of 1.0 million for fiscal year 2010.  *National Examiner* is a weekly celebrity and human-interest tabloid differentiated from the other publications in the Debtors' tabloid publications segment by its upbeat positioning as the gossip, contests, women's service and good news tabloid, with an average single copy circulation of 110,000, an average weekly circulation of approximately 125,000 copies, including subscriptions, and an estimated readership of 1.0 million for fiscal year 2010.

(c)     **Women's Health and Fitness Publications.**  The Debtors' Women's Health and Fitness Publications segment includes the publications *Shape* and *Fit Pregnancy*. *Shape* is a monthly magazine devoted to women's health issues, including exercise, nutrition, psychology, and other inspirational topics, and also offers beauty and fashion reporting.  The average monthly circulation of *Shape* is approximately 1.7 million copies, including subscriptions.  *Fit Pregnancy*, which was spun off from *Shape* in 1995, is a bi-monthly lifestyle magazine devoted to health, fashion, food and fitness for women during pregnancy and the post-

partum period. The average bi-weekly circulation of *Fit Pregnancy* is approximately 508,000 copies, including subscriptions

   (d)  **Distribution Services**. The Debtors' Distribution Services segment provides placement, marketing, and management of publications for the other divisions and for third-party clients, as described more fully below.

   (e)  **Corporate/Other**. The Debtors' Corporate/Other segment includes the publications *Muscle & Fitness*, *Men's Fitness*, *Muscle & Fitness Hers*, *Flex*, *Natural Health*, *Sun*, and *Mira!*, and also includes ancillary sales (licensing, syndication, and web sites) and corporate overhead. *Muscle & Fitness* is a monthly fitness magazine with a monthly circulation of approximately 440,000 copies, including subscriptions. *Men's Fitness* is a men's health and fitness magazine for men of ages 18 to 34, is published 10 times per year and has a per-issue circulation of approximately 614,000, including subscriptions. *Muscle & Fitness Hers* is a bi-monthly magazine for active women and has a circulation of approximately 107,000 copies, including subscriptions. *Flex*, which was spun off from *Muscle & Fitness* in 1983, is a monthly magazine devoted to professional bodybuilding, with an average monthly circulation of 101,000 copies, including subscriptions. *Natural Health* is a wellness magazine published 10 times per year and has a per-issue circulation of approximately 365,000, including subscriptions. *Sun* is a weekly tabloid directed to an older target audience and focuses on religion, health, holistic remedies, and predictions and prophecies; it has a weekly circulation of approximately 60,000 copies, including subscriptions. *Mira!* is a Spanish language, bi-weekly entertainment tabloid launched in June 2000 with a circulation of approximately 119,000 copies, including subscriptions.

16.     Distribution Services, performed under the aegis of Distribution Services, Inc. ("***DSI***," also a Debtor in these Chapter 11 Cases), includes numerous functions that are critical to the Debtors' businesses.  As an initial matter, DSI arranges for the placement of the Debtors' and third-party publications with retailers, primarily including national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Pathmark, Winn Dixie, and Food Lion.  DSI also monitors these retailers through its network of regional managers and merchandising staff to ensure that the Debtors' publications are properly displayed.  Further, DSI coordinates the racking of magazine fixtures for certain retailers.  Finally, DSI provides sales, marketing, and merchandising services for third parties, including non-magazine clients.

17.     The printing and distribution of the Debtors' publications is outsourced.  Outside vendors also perform pre-press operations—finalization of manuscripts for publication—for substantially all publications and transmit the files electronically to third-party printing plants. R.R. Donnelly & Sons Company prints *National Enquirer*, *Globe*, *Shape*, *Men's Fitness*, *Fit Pregnancy*, *Muscle & Fitness*, *Muscle & Fitness Hers*, *Flex*, *Natural Health*, *National Examiner*, *Sun, Mira!*, and *Country Weekly*.  Quad/Graphics, Inc., prints *Star*.  In addition, the Debtors have pre-press agreements with R.R. Donnelly & Sons Company with respect to *Shape*, *Men's Fitness*, *Muscle & Fitness*, *Muscle & Fitness Hers*, *Fit Pregnancy*, *Flex*, and *Natural Health*.  All of the Debtors' other publications are the subject of pre-press agreements with Vertis, Inc.

18.     The Debtors' retail publications are distributed principally by three major wholesalers—The News Group, L.P, Source Interlink Companies, Inc., and Hudson News Company—which represent  approximately 81% of the distribution market, and by several smaller wholesalers who represent the balance of the distribution market.  The wholesalers

handle the physical aspect of delivering the Debtors' publications from the printers through the distribution chain and down to the retail level. The wholesalers also process returns of the Debtors' publications, bill and collect from the retailers, and make payments to national distributors. Wholesalers distribute the Debtors' publications to approximately 110,000 retail outlets in the United States and Canada, which distribution provides substantially complete coverage of periodical outlets. The Debtors' publications, with the exception of one of the smaller wholesalers, are generally distributed to wholesalers with a full right of return and, in turn, the wholesalers generally sell those publications to retailers with a full right of return.

19.    The Debtors' national distributors are Curtis Circulation Company, WorldWide Media Services, and Associated Newspapers Limited. The primary function of the national distributors, as distinct from the wholesalers, is to bill and collect funds from wholesalers and to remit those funds to the Debtors. The national distributors advance to the Debtors 85% of the anticipated net single copy sales for an issue on its on-sale date. In sum, the national distributors handle all the paperwork and payments in the publisher-wholesaler chain.

20.    Although all sales of publications occur through the wholesaler system, the Debtors do have direct relationships with retailers. In order to foster and maintain retail relationships, retailers are typically paid one or more of the following expenses: (a) Rack Costs—a fee paid in exchange for the retailer selling the Debtors' publications in the checkout section; (b) Display Continuity Allowances—a fee paid to the retailer that is similar to slotting fees paid by other industries to supermarkets; (c) Retail Display Allowance—a fee paid based on quarterly claim forms from the retailer, which is generally equal to 10% of the cover price for each magazine sold; and (d) Retail Display Pockets—a fee paid that is fixed per pocket the

retailer devotes to the Debtors' publications. A retailer may be paid either a Retail Display Allowance or for Retail Display Pockets, but not both.

21.     Finally, a portion of the circulation of some of the Debtors' publications occurs through subscription. Subscription services are all performed by a third party, Communications Data Services, Inc. ("**CDS**"). CDS maintains all of the Debtors' subscription data, sends labels to the printers to mail to customers, sends renewal notices, receives and processes subscriber payments, and performs related functions.

22.     For the fiscal year ended March 31, 2009, the Debtors' adjusted EBITDA was $121,747,000; for the fiscal year ended March 30, 2010, the Debtors' adjusted EBITDA was $113,987,000. For the fiscal quarter ended September 30, 2010, the Debtors' total operating revenues were $104,358,000 and their total operating expenses were $78,998,000; after accounting for other income and expenses, the Debtors' net income for the fiscal quarter ended September 30, 2010 was approximately $10,029,000.

**B.     Principal Debt and Capital Structure**

23.     As noted above, AMI holds 100% of the shares of AMO, which directly or indirectly holds 100% of the shares of the other Debtors. The common stock of AMI is privately held primarily by: (a) American High-Income Trust and certain related funds and other entities managed by Capital Research and Management Company, Capital Guardian Trust Company, and Capital International, Inc. (collectively, "**Capital Research**"), which hold approximately 27.2%; (b) Angelo, Gordon & Co. L.P. and certain affiliates ("**Angelo Gordon**"), which hold approximately 17.3%; (c) Avenue Capital Management II, L.P. and certain affiliates ("**Avenue**"), which hold approximately 17.9%; (d) Credit Suisse Securities (USA) LLC ("**Credit Suisse**"), which holds approximately 7.8%; (e) Regiment Capital Ltd. and certain affiliates, which hold 6.3%; and (f) twenty-eight other institutional investors, each of whom hold less than 5%, which

collectively hold approximately 18.6%. The remaining common stock of AMI is held by certain AMO directors and employees.

24.      As of the Petition Date, AMO's total principal amount of outstanding debt was approximately $878.7 million, which consisted of approximately (i) $490.6 million principal amount of debt under the 2009 Credit Agreement, (ii) $7.5 million principal amount of 2011 Notes, (iii) $24.8 million principal amount of PIK Notes, and (iv) $355.8 million principal amount of Subordinated Notes (each as defined below).

(a)      <u>2009 Credit Agreement</u>

25.      On December 31, 2008, AMO amended and restated that certain secured credit agreement dated as of January 30, 2006, among AMO, AMI, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Deutsche Bank Securities Inc., as Syndication Agent (the "***2009 Credit Agreement***"). On January 30, 2009, the 2009 Credit Agreement became effective. The 2009 Credit Agreement includes a $450.0 million term loan facility (the "***Term Facility***"), which matures in January 2013. As of the Petition Date, the balance outstanding under the Term Facility was $430.6 million. The effective interest rate applicable to the Term Facility under the 2009 Credit Agreement was 10% as of September 30, 2010.

26.      The 2009 Credit Agreement also includes a $60 million revolving credit facility (the "***Revolving Facility***"). The Revolving Facility matures in January 2012. As of the Petition Date, the balance outstanding under the Revolving Facility was $60 million. The effective interest rate applicable to the Revolving Facility under the 2009 Credit Agreement was 10% as of September 30, 2010. The borrower under the 2009 Credit Agreement is AMO and the guarantors under the 2009 Credit Agreement consist of each of the Debtors other than AMO.

(b)    2011 Notes

27.    On January 23, 2003, AMO issued $150 million aggregate principal amount of
unsecured 8 7/8% notes due 2011 (the "**2011 Notes**").  Under the indenture governing the 2011
Notes, as of January 15, 2010, the 2011 Notes became redeemable at par, plus accrued and
unpaid interest.  As of the Petition Date, approximately $7.5 million of the principal amount of
the 2011 Notes remained outstanding.  Interest on the 2011 Notes accrues at a rate of 8 7/8%.
The guarantors of the 2011 Notes are each of the Debtors other than AMI and AMO.

(c)    PIK Notes

28.    On January 30, 2009, AMO issued $21.2 million aggregate principal amount of 9%
unsecured senior PIK notes (the "**PIK Notes**").  The PIK Notes are unsecured senior obligations
of AMO and are effectively subordinated to all of AMO's existing and future secured debt,
including obligations under the 2009 Credit Agreement.  The PIK Notes will mature on May 1,
2013.  As of the Petition Date, approximately $24.8 million remained outstanding on the PIK
Notes.  Interest on the PIK Notes accrues at the rate of 9% per annum based upon the
outstanding principal amount.  The 2009 Credit Agreement prohibits the payment of cash interest
on the PIK Notes.  The guarantors of the PIK Notes are each of the Debtors other than AMI and
AMO.

(d)    Subordinated Notes

29.    On January 30, 2009, AMO issued $299.7 million aggregate principal amount of
unsecured 14% senior subordinated notes (the "**Subordinated Notes**" and, together with the 2011
Notes and the PIK Notes, the "**Notes**").  The Subordinated Notes are unsecured senior
subordinated obligations of AMO and are subordinated in right of payment to AMO's existing
and future senior debt, including obligations under the 2009 Credit Agreement and the PIK
Notes.  The Subordinated Notes will mature on November 1, 2013.  Interest on the Subordinated

Notes accrues at the rate of 14% per annum based upon the outstanding principal amount.  As of the Petition Date, approximately $355.8 million of the principal amount of the Subordinated Notes remained outstanding.  The guarantors of the Subordinated Notes are each of the Debtors other than AMI and AMO.

30.  In addition, the Debtors estimate that, over the anticipated duration of these Chapter 11 Cases, they will owe approximately $20.4 million on account of undisputed trade claims for prepetition goods and services that become due and payable after the Petition Date.

31.  In total, the Debtors estimate the book value of their consolidated assets to be approximately $668,110,000 (including $501,209,000 of goodwill and other intangibles) and the book value of their liabilities to be approximately $1,229,096,000, which amount includes, among other things, the principal amount of the Debtors' outstanding indebtedness, accounts payable, accrued expenses, deferred revenue, and deferred income taxes.

## II.

## Events Leading to Bankruptcy

### A.  Adverse Market Conditions

32.  The Debtors' businesses are affected by discretionary consumer spending patterns, which in turn are influenced by political circumstances and economic conditions such as recessionary and inflationary environments.  Notably, recent increases in the retail price of gasoline, increases in credit card, home mortgage, and other borrowing costs, and declines in housing values have contributed to declines in overall consumer confidence and discretionary spending.  The resulting decline in consumer spending on publications sold at retailers' checkout counters, which target demographics that happen to be predominantly affected by challenging economic conditions, has adversely affected the Debtors' businesses, operating results and profitability.

33. On a macroeconomic level, the Debtors' businesses are adversely affected by increases in the price of fuel, paper and postage. Increased fuel costs have translated into increased costs of the materials and services the Debtors receive from third-party suppliers, and increased distribution costs for their products. Moreover, paper and postage costs represent significant components of the Debtors' total cost to produce and distribute printed products.

34. In fiscal year 2010, 92% of the Debtors' total operating revenues came from the Debtors' advertising and circulation revenues. Advertising revenues are subject to the risks arising from adverse changes in domestic and global market conditions, the shift in advertising spending from print to Internet, and an overall decrease in advertising budgets. The principal factors contributing to the declines in the Debtors' single copy circulations include:

(a) the current economic slowdown;

(b) increased competition from other publications and forms of media concentrating on celebrity news;

(c) an industry-wide decline in single copy circulation of individual publications due to an increase in the number of alternative publications in the industry; and

(d) diminished service levels from wholesalers (who fill the pockets at checkout counters) as a result of efforts to cut expenses.

35. The Debtors operate in a highly competitive industry, with the number of publications sold at retailers' checkout counters, television shows and radio programs that concentrate on celebrity news growing faster than ever. Increased competition from rival publications and other media has, in large part, been the cause of the declines in the Debtors' single copy circulation and advertising revenues. Certain of the Debtors' competitors have substantially larger operating staffs, greater capital resources and greater revenues from their publications. Moreover, as use of the Internet and new online ventures focusing on celebrity news has increased, the Debtors have faced additional competition.

36.     As a result of, among other things, the adverse impact current market conditions have had on the Debtors' businesses, the Debtors' free cash flow and ability to satisfy their ongoing obligations under the 2009 Credit Agreement and the indentures governing each of the Notes have been restricted.  For example, the Debtors have accrued but not paid cash interest on any of the Notes since they were issued in January 2009.  Moreover, the Debtors' leverage ratio is higher than that of their competitors.  Based on information available to me, the Debtors are among the most highly levered companies (if not the highest levered company) in the publishing industry.

37.     In order to delever their balance sheet and improve free cash flow, the Debtors engaged in a number of restructuring initiatives prior to the Petition Date, which are described below.  Although these initiatives were to varying degrees successful, the Debtors have commenced these Chapter 11 Cases to consummate the balance sheet restructuring that began in 2008, increase liquidity, and maintain their position as a leading publisher of periodicals and web-based content.

**B.      The 2008/2009 Restructuring**

38.     On January 30, 2009, AMO successfully completed cash tender offers and received the requisite consents for related consent solicitations in respect of AMO's then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 10 1/4% Series B Subordinated Notes due 2009 (the "***2009 Notes***") and (2) the 2011 Notes (together with the 2009 Notes, the "***Prior Notes***").  $400.5 million in aggregate principal amount of the 2009 Notes and $148.0 million in aggregate principal amount of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

39. On December 31, 2008, AMO amended and restated its Credit Agreement dated as of January 30, 2006, among AMO, AMI, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Deutsche Bank Securities Inc., as Syndication Agent. On January 30, 2009, concurrently with the consummation of AMO's cash tender offers, the 2009 Credit Agreement became effective. The 2009 Credit Agreement provided for the Term Facility and the Revolving Facility.

40. On January 29, 2009, AMO amended and restated its certificate of incorporation to increase the number of shares authorized to be issued from 10,000 to 7,500,000, and changed the par value of such common stock from $0.20 to $0.0001. In addition, AMO exchanged 5,994,411 shares of common stock for 7,508 shares of common stock previously owned by AMI.

41. On January 30, 2009, AMO issued the Subordinated Notes and the PIK Notes. Concurrently with the notes offering, AMI sold 5,688,891 shares of common stock in AMI (valued at approximately $1.0 million) (the "***AMI Common Stock***" and, together with the Subordinated Notes and the PIK Notes, the "***Restructuring Securities***") for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement, dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering of the Restructuring Securities, together with AMO's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to such offering and the tender offers and consent solicitations.[3] In addition, on January 30, 2009, AMI issued an aggregate of 305,520 shares of AMI Common Stock to AMI's equityholders prior to the restructuring (the "***Prior Equityholders***") in exchange for the AMI Common Stock then held by the Prior Equityholders.

---

[3] For U.S. federal income tax purposes, AMO treated the tender offers for the Prior Notes and the issuance of the Restructuring Securities as an exchange of the Prior Notes for the Restructuring Securities.

42.     As a result of the restructuring of AMO's capital structure and the issuance of AMI Common Stock to the bondholders who participated in the cash tender offers completed on January 30, 2009 and receipt of requisite consents in the related consent solicitations (the "***Prior Tendering Bondholders***"), the Prior Tendering Bondholders acquired approximately 94.9% of AMI Common Stock. The Prior Equityholders retained approximately 5.1% of the AMI Common Stock.

**C.     The 2010 Exchange Offer and Tender Offer**

43.     On July 15, 2010, AMI launched an exchange offer for the Subordinated Notes (the "***Exchange Offer***"), and a cash tender offer for the PIK Notes (the "***Tender Offer***"). In the Exchange Offer, holders of Subordinated Notes were offered $269.52 in cash and 335.62 shares of AMI Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, AMI offered to purchase each $1,000 principal amount of outstanding PIK Notes for $1,020. Concurrently with the Exchange Offer and the Tender Offer, AMI solicited consents to amend the indenture governing the Subordinated Notes and the indenture governing the PIK Notes to remove substantially all of the restrictive covenants and certain events of default from each indenture. Both the Exchange Offer and the Tender Offer were initially scheduled to expire on August 11, 2010 (the "***Expiration Time***"). The Expiration Time was subsequently extended to November 1, 2010. The Exchange Offer and the Tender Offer were unsuccessful and were terminated on November 1, 2010. All tendered PIK Notes and Subordinated Notes were returned to holders.

**D.     Prepetition Negotiations**

44.     In September 2010, American Media (along with its legal and financial advisors) began discussions with an ad hoc committee comprised of certain holders of Subordinated Notes and PIK Notes (the "***Committee***"), the administrative agent under the 2009 Credit Facility (the

"**_Administrative Agent_**"), the lenders under the Term Facility (the "**_Term Facility Lenders_**"), and the lenders under the Revolving Facility (the "**_Revolver Lenders_**").  American Media actively negotiated with all groups to create a consensus on the appropriate restructuring (and/or repayment) of American Media's outstanding debt.  Ultimately, as further discussed below, American Media was able to reach a consensual resolution with the members of the Committee and certain of the Term Facility Lenders and Revolver Lenders on the terms of a comprehensive balance sheet restructuring and entered into a restructuring support agreement (as discussed below) with such parties to document the parties' support of the proposed restructuring.

45.       As part of the negotiations with the Committee, AMO commenced, on October 12, 2010, a consent solicitation (the "**_Interest Deferral Consent Solicitation_**") to solicit consents from eligible holders of Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Subordinated Notes to January 3, 2011 (such deferred payment of interest, the "**_Deferred Interest Payment_**").  At least 75% of eligible holders of outstanding principal amount of Subordinated Notes were required to deliver consents to the Deferred Interest Payment.  Among others, the Committee, which holds approximately 78% of the aggregate outstanding principal amount of Subordinated Notes, provided consents to the Deferred Interest Payment in the Interest Deferral Consent Solicitation.  On October 28, 2010 AMO executed the Third Supplemental Indenture to the Subordinated Note Indenture (the "**_Deferred Interest Supplemental Indenture_**"), and the Deferred Interest Supplemental Indenture became operative immediately upon execution.  The Deferred Interest Payment and the Deferred Interest Supplemental Indenture are applicable to all of the holders of the currently outstanding Subordinated Notes, whether or not the holder consented to the Interest Deferral Consent Solicitation.

**E.     The Financial Restructuring Transaction**

   *1.     Restructuring Support Agreement*

46.     On October 30, 2010, American Media entered into a restructuring support agreement (the "***Restructuring Support Agreement***") with the members of the Committee and certain Term Facility Lenders and Revolver Lenders.  Pursuant to the Restructuring Support Agreement, the signatories thereto agreed to support a restructuring of American Media's indebtedness on the terms set forth therein (the "***Financial Restructuring***").  American Media agreed to implement the Financial Restructuring by soliciting of votes to accept or reject the Debtors' plan of reorganization (the "***Plan***") through a "prepackaged" bankruptcy and the commencement of the Chapter 11 Cases.  As of November 9, 2010, institutions holding in the aggregate at least 70% of the Term Facility claims, approximately 77.6% of the Subordinated Notes claims, and approximately 89% of the PIK Notes claims agreed to support the Financial Restructuring by executing the Restructuring Support Agreement.

47.     The Plan sets forth the Debtors' post-effective date capital structure and the distribution that each class of the Debtors' creditors is to receive under the Plan.  Specifically, upon consummation of the Plan, among other things:[4]

> (a)     holders of Term Facility claims will receive their *pro rata* share of the following, in an aggregate amount equal to the allowed amount of all Term Facility claims:  (i) cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all allowed Term Facility claims; and (ii) new second lien notes (the "***New Second Lien Notes***"); *provided however*, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the commitment under that certain backstop agreement to purchase such New Second Lien Notes (as amended and restated on November 17, 2010, the "***Backstop Agreement***"); *provided further, however*, that notwithstanding the foregoing, the unpaid reasonable and

---

[4]     The summary of Plan provisions contained herein is subject in its entirety to the terms and provisions in the Plan or other documents referenced therein.

documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the effective date shall be paid in full, in cash to the Administrative Agent.  In addition, and pursuant to the Plan, each holder of a Term Facility claim shall have the right to require that the parties to the Backstop Agreement (collectively, the "***Backstop Parties***") purchase from such holder, on the effective date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to the Plan for the face amount of such holder's New Second Lien Notes, which face amount such holder shall receive in cash;

(b)     holders of Revolver Facility claims shall receive payment in full, in cash;

(c)     holders of allowed Subordinated Notes claims will receive 98% of the common shares in the capital of reorganized AMI authorized for issuance in accordance with the terms of the Plan on the effective date (the "***New Common Stock***"), subject to dilution for the equity incentive plan (holders of allowed Subordinated Notes claims other than the Backstop Parties will also be diluted by the shares the Backstop Parties receive pursuant to the Backstop Agreement (the "***Backstop Shares***"));

(d)     holders of allowed PIK Notes claims will receive, at the Debtors' option, but with the Committee's consent, (i) New Second Lien Notes, (ii) new PIK notes, (iii) new preferred stock, or (iv) a combination of the foregoing;

(e)     holders of allowed 2011 Notes claims will receive approximately 2% of the New Common Stock, subject to dilution for the equity incentive plan (holders of allowed 2011 Notes claims other than the Backstop Parties will also be diluted by the Backstop Shares);

(f)     holders of allowed general unsecured claims will be unimpaired; and

(g)     equity interests in AMI, including warrants, will be cancelled.

### 2.     *New Financing, Escrow Issuer, and Backstop Agreement*

48.     Contemporaneously with negotiating the Restructuring Support Agreement, the Debtors also engaged in negotiations with various financial institutions, including potential arrangers and underwriters, with respect to the terms of new financing the Debtors would require to consummate their restructuring and fund ongoing working capital needs.  In connection therewith, the Debtors contacted five banks and requested proposals for $525 million in new first lien financing in an effort to secure sufficient capital to refinance their total outstanding

indebtedness under the 2009 Credit Agreement. Notwithstanding the Debtors' efforts, none of the banks contacted by the Debtors were able to generate enough market interest to fund a facility of the requested magnitude. The Debtors, faced with the reality that they would not be able to raise more than $385 million in first lien financing and would thus be unable to pay all of their prepetition secured lenders in full, in cash, entered into discussion with certain of their bondholders with respect to the terms of potential second lien financing.

49.     As a result of these discussions and as set forth in greater detail below, the Debtors and such bondholders (who had also agreed to execute the Restructuring Support Agreement) negotiated a backstop agreement that would provide holders of Term Facility claims with a mechanism, should they wish, to receive payment in full, in cash of their claims under a plan of reorganization. While the Debtors continued to negotiate with the banks during this time, the Debtors ultimately could not secure a commitment from the banks to place the new second lien financing, and thus executed the Backstop Agreement to ensure the successful consummation of the consensual restructuring described in the Plan. Indeed, without the agreement of the Backstop Parties, the Debtors would likely have been unable to propose a plan of reorganization acceptable to the prepetition secured lenders.

50.     The financing package selected by the Debtors, in their business judgment and in consultation with their advisors, as representing the most favorable financing for the Debtors through the restructuring will consist of: (i) new first lien secured financing in a principal amount of approximately $385 million (the "*New First Lien Financing*"), (ii) new second lien secured financing in a principal amount of up to approximately $140 million (the "*New Second Lien Financing*"), and (iii) an approximately $40 million new first lien secured revolving credit facility (the "*New Revolver Facility*").

51.     Prior to the Petition Date, the Debtors and their advisors determined that, in light of market conditions, the Debtors would receive the best financing terms for the new financing by engaging in a first and second lien notes offering (the "***New First Lien Notes Offering***" and the "***New Second Lien Notes Offering***," respectively and, collectively the "***Notes Offerings***") to raise the New First Lien Financing and the New Second Lien Financing, respectively.  In order to take advantage of favorable market conditions in the weeks leading up to the Petition Date, the new first lien notes (the "***New First Lien Notes***") and the New Second Lien Notes were marketed to potential investors prior to the Petition Date.  On November 16, 2010, the Escrow Issuer (as defined below) entered into a purchase agreement related to the pricing of the New First Lien Notes but, due to market conditions on or around November 16, was unable to price the New Second Lien Notes.  Subject to Court approval of the Financing Motion (as defined herein),[5] the New First Lien Notes Offering will close into escrow into the Escrow Issuer after the Petition Date.  To the extent market conditions permit in the future, the Escrow Issuer may market to interested investors and price a portion of the New Second Lien Notes after the Petition Date.  In order to facilitate the closing of the New First Lien Notes and the New Second Lien Notes (to the extent sold after the Petition Date) and to ensure that the Debtors' stay in chapter 11 is as short as possible, the Debtors have requested an order from the Court stating that such newly established non-Debtor Delaware entities ("***New LLC***" and the "***Escrow Issuer***"), are non-Debtor entities and that any proceeds or assets they have or will have will not be property of the Debtors' estates and will not be consolidated with the Debtors' assets or estates. [6]

---

[5]     On the date hereof, the Debtors have filed the New Financing Motion (as defined below) that seeks an order authorizing the Debtors to (i) assume certain agreements related to the New First Lien Financing, New Second Lien Financing and New Revolver Facility and (ii) transfer certain funds into escrow in order to pay fees, costs and interests related to the New First Lien Financing and New Second Lien Financing, if applicable.

[6]     A summary of the relief requested in the New Financing Motion (as defined below) is discussed in section III.B.

52.     At the confirmation hearing for the Plan and as further set forth herein, the Debtors will then seek approval for the Debtors to enter into the new financing and consummation thereof.  As referenced above and pursuant to the Backstop Agreement, the Backstop Parties committed, severally and not jointly, to purchase their allocable share of any New Second Lien Notes that will be distributed to the holders of the allowed Term Facility claims as further described in the Plan (the "***Backstop Commitment***"), to the extent such holders elect to have the Backstop Parties purchase their *pro rata* share of the New Second Lien Notes for the face amount of such New Second Lien Notes, which face amount shall be paid to such holders in cash.[7]

53.     Thus, upon emergence from chapter 11, the Debtors will have substantially de-levered their balance sheet and simplified their debt structure.

**F.**     **Solicitation and Voting Results**

54.     In accordance with the Restructuring Support Agreement, on October 30, 2010, the Debtors distributed solicitation materials including, among other things, their Plan and disclosure statement (the "***Disclosure Statement***") to all holders of impaired claims entitled to vote on the Plan.  Also on October 30, 2010, the Debtors sent a letter to all of their equity security holders informing them of the solicitation on the prepackaged Plan and notifying them that the Debtors were going to seek the relief requested in the New Financing Motion.

55.     The solicitation materials provided that the deadline to vote to accept or reject the Plan was November 15, 2010 at 5 p.m. (ET) (the "***Voting Deadline***").  I have been informed by my advisors that at the conclusion of the Voting Deadline, the Debtors had received 200 votes, with 198 votes in favor of the Plan and 2 votes against.  Specifically, (i) all holders of claims

---

[7]     A summary of the relief requested in the New Financing Motion, which seeks to assume the Backstop Agreement, is discussed in section III.B

entitled to vote in classes 2, 5 and 6, overwhelmingly voted to approve the Plan and (ii) two of the four holders of claims entitled to vote in class 7 (holding approximately 41% of the claims in that class) voted to reject the Plan. Notwithstanding the fact that class 7 voted to reject the Plan, the Debtors believe they will be able to confirm the Plan in accordance with Bankruptcy Code section 1129 on their proposed timeline (as discussed in more detail below).

56. Based on representations made to me by counsel, I believe that the solicitation process was conducted in accordance with applicable rules and further believe that all creditors and parties in interest have received sufficient notice of these prepackaged cases and the substantive relief requested in connection with the First Day Pleadings.

## III.

## THE CHAPTER 11 CASES

57. As described below, through the First Day Pleadings, the Debtors seek to ensure the continuation of their business operations without interruption. The Debtors are also seeking authorization to use cash collateral, which will provide the Debtors' businesses with ample liquidity.

58. The Debtors believe it is in the best interests of all stakeholders to commence the Chapter 11 Cases. In the short-term, chapter 11 will facilitate the reorganization of the Debtors' capital structure. In the long-term, the Financial Restructuring will better position the Debtors to continue operating successfully. Further, completion of the Financial Restructuring will allow management to focus its attention on operations and long-term planning rather than on short-term financial management.

59. I am generally familiar with the contents of each First Day Pleading (including the exhibits thereto) described in further detail herein, and based upon that general familiarity

and the information provided to me by other members of the Debtors' management team and my colleagues who provide information to me in the ordinary course of the Debtors' businesses, I believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption, (b) constitutes a critical element to achieving a successful reorganization of the Debtors and (c) best serves the Debtors' estates and creditors' interests. Moreover, I believe that the failure to grant the relief requested in the First Day Pleadings described herein would have an immediate and irreparable effect on the Debtors' businesses taken as a whole.

**A.     Use of Cash Collateral and Adequate Protection**

60.     As stated above, the Debtors have negotiated and reached agreement with the Administrative Agent, on behalf of the Term Facility Lenders and the Revolver Lenders, to use cash on hand and cash generated postpetition to, among other things, (i) pay present operating expenses, including payroll and vendors, and (ii) ensure a continued supply of goods and services essential to the Debtors' continued viability. The Administrative Agent and Term Facility Lenders and Revolver Lenders constituting "Required Lenders" as defined in the 2009 Credit Agreement (the "***Required Lenders***") have consented to the Debtors' use of cash collateral in the ordinary course of business, and for the payment of (i) certain professional fees and expenses, (ii) certain adequate protection payments to the Administrative Agent, Term Facility Lenders and Revolver Lenders, (iii) non-ordinary course expenses not to exceed $5 million in the aggregate and (iv) fees and interest for the New Financing (as defined below), not to exceed $15 million in the aggregate. The Administrative Agent, the Term Facility Lenders and the Revolver Lenders have granted the Debtors' use of cash collateral for a three month period, at the end of which time it is my understanding that the Debtors may request further use of cash collateral and the Administrative Agent may decide not to agree to the continued use of cash collateral.

61.     To the extent the use of cash collateral causes any diminution in the value of the prepetition lenders' collateral, the Administrative Agent, the Term Facility Lenders and the Revolver Lenders will be granted (i) replacement liens on postpetition collateral, (ii) a superpriority administrative expense claim, (iii) the payment of fees and expenses of the Administrative Agent, and (iv) the payment of interest (at the non-default rate), fees and other amounts owed under certain credit documents executed in connection with the 2009 Credit Agreement on a current basis at the times specified in the 2009 Credit Agreement.

62.     The Debtors believe that the proposed adequate protection is necessary and appropriate to ensure that the Debtors can continue to use the cash collateral.  Without the use of cash collateral, the Debtors will not have adequate cash to pay, among other things, their creditors.  The Debtors' ability to finance their operations and the availability to the Debtors of sufficient working capital and liquidity through the use of cash collateral is critical to the confidence of the Debtors' employees, major suppliers, and customers.

63.     I believe that the foregoing is necessary and appropriate to ensure the Debtors' ability to continue their operations postpetition without unnecessary disruption.  Moreover, the Administrative Agent, at the direction of the Required Lenders, has consented to the use of cash collateral on the terms described herein and in the *Debtors' Motion Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 507 for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing*.

**B.      New Financing**

64.     As discussed above, in order to make distributions contemplated by the Plan and successfully emerge from chapter 11, the Debtors require new financing (the "***New Financing***"). The New Financing is comprised of the New First Lien Financing, the New Second Lien

Financing and the New Revolver Facility. While approval of the New Financing will occur at confirmation, I believe that, it is in the best interests of the Debtors' estates to lock in the terms of the New Financing, to the extent possible, prior to confirmation of the Plan. Accordingly, by the *Debtors' Motion Pursuant to Bankruptcy Code Sections 363(b), 365 and 503(b)(1) and Bankruptcy Rules 2002 and 6004 for an Order Authorizing the Debtors to (I) Assume and Enter Into Certain Agreements in Connection with the New Financing and Backstop Commitment, (II) Incur and Pay Related Fees and Expenses As Administrative Expenses, (III) Transfer Certain Funds Into Escrow, and (IV) Establish Special Purpose Entities as a Non-Debtor Entities* (the "**New Financing Motion**"), the Debtors seek to assume or enter into, as applicable, the agreements related to the New Financing, pay any related fees and establish certain special purpose entities as non-Debtor entities.

### 1. *The New First Lien Financing and the New Second Lien Financing*

65. Prior to the Petition Date, the Debtors and their advisors determined that the Debtors would receive the best financing terms by engaging in the New First Lien Notes Offering and the New Second Lien Offering to raise the New First Lien Financing and the New Second Lien Financing, respectively. In order to take advantage of favorable market conditions in the weeks leading up to the Petition Date, the New First Lien Notes and the New Second Lien Notes were marketed to potential investors prior to the Petition Date. On November 16, 2010, the Escrow Issuer entered into a purchase agreement related to the pricing of the New First Lien Notes but, due to market conditions on or around November 16, was unable to price the New Second Lien Notes. The New First Lien Notes Offering will close into escrow into the Escrow Issuer after the Petition Date. To the extent market conditions permit in the future, the Escrow

Issuer may market to interested investors and price a portion of the New Second Lien Notes after the Petition Date.

66.     In order to facilitate the closing of the Notes Offerings (to the extent New Second Lien Notes are sold prior to confirmation), the Debtors established New LLC and the Escrow Issuer.[8]  The Escrow Issuer will enter into the initial agreements relating to the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan).[9] The Debtors created the Escrow Issuer solely to issue the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan).  The cash proceeds (the "***Cash Proceeds***") of the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan) will be held in escrow until certain conditions, including confirmation and effectiveness of the Plan, are satisfied (the "***Release Conditions***").  If the Release Conditions are satisfied, the Escrow Issuer will merge into reorganized Debtor American Media Operations, Inc. ("***Reorganized AMO***"), with Reorganized AMO as the surviving entity, and the Cash Proceeds will be released to Reorganized AMO.  In such case, the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan) will be assumed by, and thus will become, obligations of Reorganized AMO.

---

[8]     The Debtors also contemplate that AMO will enter into the First Lien Escrow Agreement and the Second Lien Escrow Agreement, if necessary, at the time of the closing of the Notes Offerings to facilitate the transactions. The New First Lien Escrow Agreement and the New Second Lien Escrow Agreement will be filed in connection with the Plan Supplement (as defined in the Plan).

[9]     The Escrow Issuer will also (i) enter into related escrow agreements, pursuant to which the proceeds of the New First Lien Notes Offering, that portion of the New Second Lien Financing provided by third-party investors (excluding, for the avoidance of doubt, the Backstop Parties) and other amounts relating to other payment obligations in respect of the New First Lien Financing and New Second Lien Financing will be held pending consummation of the Plan, (ii) grant a lien for the benefit of the holders of New First Lien Notes on the proceeds from the New First Lien Notes Offering and all other assets in the applicable escrow account and (iii) grant a lien for the benefit of the holders of New Second Lien Notes on the proceeds from the New Second Lien Notes Offering (if any) and all other assets in the applicable escrow account.

67.    It is also my understanding that during the escrow period, the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan) will be secured by a lien on the Cash Proceeds and all other assets held by the Escrow Issuer, if any. Subject to the approval of the New Financing Motion, the Cash Proceeds and assets held by the Escrow Issuer, whether or not in the escrow, shall not constitute property of the Debtors' estates. The Debtors conversely will have no obligations under the New First Lien Notes or the New Second Lien Notes (other than the fee, expense reimbursement, interest and indemnity obligations as specified below). In the event that the Release Conditions are not satisfied, the New First Lien Notes and the New Second Lien Notes (to the extent sold prior to confirmation of the Plan) will be subject to a special mandatory redemption at a price for each series of notes that is equal to 100% of the issue price of such notes, plus accrued and unpaid interest from the issue date up to, but not including, the date of redemption.

68.    In connection with the Notes Offerings, and prior to the Petition Date, the Debtors reached an agreement, on an uncommitted basis, with certain financial institutions to be lead underwriters, initial purchasers and/or placement agents (in such capacities, the "***Lead Managers***") for the Notes Offerings.[10] By the New Financing Motion, the Debtors seek authority to assume the Engagement Letter and related fee letters.

### 2.    *The New Revolver Facility*

69.    In addition to the New First Lien Financing and the New Second Lien Financing, the Debtors intend to enter into the New Revolver Facility. The Debtors will use the New Revolver Facility for, among other things, working capital and other corporate purposes, including, without limitation, effecting permitted acquisitions and investments. The principal

---

[10]    The Lead Managers are JPMorgan Securities LLC ("***JPM***"), Deutsche Bank Securities Inc. ("***DBSI***") and Credit Suisse Securities (USA) LLC ("***CS Securities***").

terms of the New Revolver Facility are set forth in the commitment letter (the "***Commitment Letter***") among the Debtors and certain financial institutions (the "***Initial Lenders***") with respect to the New Revolver Facility.[11]

70. It is my understanding that the Debtors will not enter into the New Revolver Facility until the effective date of the Plan, and no borrowing will occur under the New Revolver Facility until that time. Accordingly, by the New Financing Motion, the Debtors only seek authority to assume the Commitment Letter and the related fee letter.

### *3.* *The Offer to Purchase the New Second Lien Notes*

71. As discussed above, holders of allowed Term Facility claims will have the option to put any New Second Lien Notes they receive pursuant to the Plan (such right, the "***Put Right***") to the Backstop Parties. The Put Right and the commitment of the Backstop Parties to purchase the New Second Lien Notes are integral components of the Plan. In order to facilitate confirmation of the Plan, the Debtors and the Backstop Parties entered into the Backstop Agreement on October 30, 2010, which Agreement was subsequently amended on November 17, 2010. By the New Financing Motion, the Debtors seek to assume the Backstop Agreement as amended and pay all related fees.

72. I believe that the relief requested in the New Financing Motion is necessary and appropriate to effectuate the Plan and ensure the Debtors' successful reorganization efforts.

### C. The Restructuring Support Agreement

73. As set forth above, in September of 2010, the Debtors began discussions with certain of their major creditors and other parties regarding a restructuring (and/or repayment) of their outstanding debt obligations. Ultimately, as a result of extensive, arm's-length negotiations,

---

[11] The Initial Lenders are JPMorgan Chase Bank, N.A., JPM, Deutsche Bank Trust Company Americas, DBSI, CS Securities and Credit Suisse AG.

the Debtors were able to reach an agreement on the terms of a comprehensive balance sheet restructuring with (i) the Committee, (ii) certain Term Facility Lenders and (iii) certain Revolver Lenders (collectively, the "***RSA Parties***").

74.     On October 30, 2010, in order to document the agreement reached between the Debtors and the RSA Parties, the Debtors and the RSA Parties entered into the Restructuring Support Agreement.[12]  The Restructuring Support Agreement contemplates that the Debtors will implement a restructuring of their prepetition indebtedness through a "prepackaged" bankruptcy and the commencement of these Chapter 11 Cases.  In addition, pursuant to the Restructuring Support Agreement, the RSA Parties have committed to support the Plan, at the appropriate time and consistent with applicable law.  The restructuring contemplated by the Restructuring Support Agreement provides the Debtors with a clear exit strategy for these Chapter 11 Cases and provides for a comprehensive balance sheet restructuring that will improve the Debtors' financial position and enable the Debtors to maximize their enterprise value going forward.  Significantly, the RSA Parties collectively hold at least 70% of the Term Facility, approximately 77.6% of the Subordinated Notes and approximately 89% of the PIK Notes.

75.     Importantly, the Restructuring Support Agreement contains a "fiduciary out" provision that will allow the Debtors to take any actions that are necessary to comply with their fiduciary duties.  Given the significant benefits to be garnered, as well as the overwhelming number and amount of their creditors who have agreed to the consensual restructuring, the Debtors determined, in the exercise of their reasonable business judgment, that the Restructuring Support Agreement and the Plan contemplated therein represent the best opportunity to maximize the value of their estates and, thereby, maximize creditor recoveries.

---

[12]     Additional RSA Parties signed the Restructuring Support Agreement between October 30, 2010 and November 9, 2010.

76.     By the RSA Assumption Motion, the Debtors are seeking this Court's approval to assume the Restructuring Support Agreement, which will help pave the way for the Debtors to improve their financial position and strengthen their businesses for the benefit of all parties in interest.  I believe that the relief requested in the RSA Assumption Motion is appropriate and necessary to facilitate the Debtors' expedited restructuring efforts.

**D.     Summary of Other First Day Pleadings[13]**

77.     As discussed above, concurrently with the filing of their chapter 11 petitions, the Debtors filed various First Day Pleadings, which they believe are necessary to enable them to operate with minimal disruption and loss of productivity.  Through the First Day Pleadings, the Debtors seek to, among other things, pay their employees' wages and continue all employee benefits in the ordinary course of business, continue their cash management system, and make certain other payments that are critical to the Debtors' ongoing operations.  It is my understanding that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Petition Date.  Certain First Day Pleadings request that the Court authorize the Debtors to pay prepetition claims prior to confirmation of the Debtors' Plan.  As set forth in more detail below, in such instances, I believe the relief sought is necessary to avoid immediate and irreparable harm to the Debtors.  It is also my understanding that the motions reflect the comments of the United States Trustee for the Southern District of New York.

---

[13]     Unless otherwise defined, terms defined herein have the meaning ascribed to them in the respective First Day Pleading described.

**Operations Motions**

**Cash Management Motion.** **Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority and (C) Authorizing Continued Intercompany Transactions.**

78.     In the ordinary course of their businesses, and as is common with businesses of this kind, the Debtors maintain an integrated cash management system that provides well-established mechanisms for the collection, management, disbursement and investment of funds used in their operations (the "***Cash Management System***").  Such a system provides numerous benefits, including the ability to: (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds; (b) ensure cash availability; and (c) reduce administrative costs by facilitating the efficient movement of funds. If the Debtors were required to comply with the Guidelines of the Office of the United States Trustee (the "***U.S. Trustee***"), the burden of opening new accounts, revising cash management procedures, and immediately reordering new checks with a "debtor in possession" legend, would disrupt the Debtors' businesses at this critical juncture.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System.

79.     In addition, in the ordinary course of business, the Debtors and certain non-Debtor entities utilize a cost allocation system, through which expenses initially paid by a Debtor or a non-Debtor affiliate for the benefit of other Debtors or non-Debtor affiliates are allocated to the appropriate entities in proportion to the benefits received by such entities (the "***Intercompany***

*Transactions*").  As a result of the Intercompany Transactions, intercompany receivables and payables are created in the ordinary course of business (the "***Intercompany Claims***").[14]

80.     The Debtors maintain records of all transfers and can ascertain, trace and account for all Intercompany Transactions and will continue to do so during the Debtors' Chapter 11 Cases.  Discontinuing the Intercompany Transactions would disrupt the Cash Management System and related administrative controls to the detriment of the Debtors' estates, their creditors, and other parties in interest.  Indeed, the Intercompany Transactions provide the only mechanism for payment of expenses incurred by those Debtors that do not have bank accounts.  By allowing the Debtors to continue Intercompany Transactions and providing administrative priority to postpetition Intercompany Claims, the Court will ensure that (a) the Debtors without bank accounts can continue operating, (b) no Debtor or non-Debtor affiliate permanently funds the operations of other Debtors or non-Debtor affiliates and (c) each entity utilizing funds flowing through the Cash Management System continues to bear ultimate repayment responsibility for such ordinary course transactions.

81.     The relief requested in the Cash Management Motion is critical to ensuring that the Debtors' operations are not disrupted postpetition.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will facilitate the Debtors' ability to continue their operations postpetition without unnecessary disruption.

---

[14]     Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Bankruptcy Code section 363(c)(1) and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses as debtors in possession.

**Wages Motion.** **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but Not Directing, the Debtors to (I) Pay and/or Honor Prepetition Employee Payroll and Reimbursement Obligations, (II) Pay, Honor and Continue All Employee Benefits, and (III) Pay and/or Honor All Other Workforce Obligations and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests.**

82.     As explained above, the Debtors employ a total of approximately 638 full-time and 1,246 part-time employees, 633 of which are employed by the Debtors on a full-time salaried basis and the balance of which are employed by the Debtors on an hourly basis (collectively, the "*Employees*").  The Debtors also supplement their work force with consultants and freelancers depending on the Debtors' business needs.  The Employees perform a variety of critical functions, including: accounting, administrative support, accounts payable, billing operations, compliance, human resources, information technology, legal, marketing, advertising, payroll, advertising sales, distribution, editorial, marketing, production, logistics, and circulation.

83.     The Debtors incur and pay a number of obligations related to their Employees such as payroll, federal and state withholding taxes and other withheld amounts (including wage garnishments, Employees' share of insurance premiums, taxes and 401(k) contributions), health benefits, retirement benefits, workers' compensation benefits, vacation time, life and accidental dismemberment insurance, short and long-term disability coverage, various reimbursable expenses and other benefits that the Debtors have historically provided in the ordinary course of business (collectively, the "*Employee Obligations*").  In an effort to minimize the personal hardship to Employees and to maintain morale and stability in the Debtors' business operations, the Debtors seek authority to continue these programs and pay and honor amounts arising under or in connection with the Employee Obligations.

84.     As further described in the Wages Motion, the Debtors believe that substantially all prepetition Employee Obligations have been satisfied.  However, certain amounts may remain

outstanding due to a number of factors, including (a) discrepancies that exist between amounts paid prepetition and the amounts that should have been paid, (b) the possibility some prepetition checks or other payments may not have cleared before the Petition Date, and (c) the fact that certain accrued obligations may not yet have become due and payable as of the Petition Date. Additionally, certain prepetition amounts owed to the Employees may have accrued but remain outstanding as of the Petition Date because such amounts are pending approval or they have not yet been submitted.

85.     The Debtors also request authority to continue certain other benefit programs including, among others, programs related to employee incentive bonuses, paid-time-off, leaves of absence, transportation assistance and flexible healthcare spending (the "***Employee Benefit Programs***"), which the Debtors provide as a service to their Employees.

86.     In the ordinary course of business, the Debtors also rely on consultants freelancers, sources, commissioned non-Employees (together, with the Employees, the "***Workforce***") to provide, among other things, editorial and advertising services.  The Workforce is critical to the Debtors' operations.  The Debtors request authority to pay each member of the Workforce any prepetition amounts owed up to $11,725.

87.     I believe that the payment of the Employee Obligations, Employee Benefit Programs and any prepetition amounts owed to the remaining members of the Workforce is essential to the preservation of the Debtors' businesses.  As an initial matter, it is important to ensure that the morale of our Workforce does not diminish in light of the filing of these Chapter 11 Cases.  Additionally, the failure to pay our Workforce and continue the Employee Benefit Programs could lead many employees to terminate their employment with the Debtors, leaving the Debtors unable to operate their businesses.  Moreover, as set forth in greater detail in the

Wages Motion, no member of the Workforce will be paid in excess of the $11,725 statutory amount. I have also been informed that the Debtors must continue certain of the programs mentioned above, including the workers' compensation program, in order to maintain the legal right to operate their businesses. Accordingly, I believe that the relief requested in the Wages Motion is appropriate and necessary for the Debtors.

**Taxes Motion.** **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing, but not Directing, the Debtors to Pay Taxes and Fees and (B) Authorizing Financial Institutions to Honor All Checks and Electronic Payment Requests.**

88.     In the ordinary course of business, the Debtors: (a) collect and incur taxes, including certain sales and use, real and personal property, business, franchise and other taxes in operating their businesses (collectively, the "***Taxes***"); and (b) pay fees and other similar charges and assessments (collectively, the "***Fees***") to various taxing, licensing and other governmental authorities (collectively, the "***Authorities***") for licenses and permits required to conduct the Debtors' businesses in the ordinary course. The Debtors pay the Taxes and Fees monthly, quarterly or annually to the respective Authorities, in each case as required by applicable laws and regulations.

89.     It is my understanding from various members of the Debtors' tax and legal departments that the Debtors' failure to pay the Taxes and Fees could materially and adversely impact the Debtors' business operations in several ways. The Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the tasks required by the reorganization process at a critical time for the Debtors' businesses. The Authorities may also attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will be administratively burdensome to the estates. Furthermore, certain directors and officers could be subject to personal liability, which would likely distract those key personnel from their duties related to the Debtors' restructuring. Moreover, with

respect to the Fees, the Debtors' failure to pay such Fees to the Authorities and other relevant third parties would cause the Debtors to incur late fees, penalties and other charges in addition to the Fees.

90.     The Debtors remit sales taxes in connection with the sale of products to their customers. The Debtors are also responsible for remitting use taxes on account of the purchase of goods used in the Debtors' businesses. Use taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes. The Debtors remit sales and use taxes on a monthly or quarterly basis, and the Debtors remit approximately $350,000 in the aggregate in sales and use taxes per year to certain Authorities. Based on historical monthly payments, I believe that, as of the date hereof, the Debtors may owe approximately $75,000 to the Authorities for prepetition sales and use taxes.

91.     Under applicable law, state and local governments in jurisdictions where the Debtors' operations are located, including California, Florida, Michigan, Illinois, New York and Tennessee, are granted the authority to levy property taxes against real and personal property. The Debtors generally do not own real property but typically pay approximately $55,000 per year in property taxes on their personal property in the ordinary course of business as such taxes are invoiced. I believe that, as of the Petition Date, the Debtors have approximately $1,000 in accrued, unpaid property taxes that will come due in 2010.

92.     Certain states require the Debtors to pay various business taxes. These taxes may be based on gross receipts or other bases determined by the taxing jurisdiction. Further, certain states require the Debtors to pay annual reporting fees to state governments to remain in good standing for purposes of conducting business within the state. The Debtors pay approximately $175,000 per year with respect to these various business taxes and annual reporting fees. It is

my understanding that, as of the date hereof, the Debtors owe approximately $35,000 to the various Authorities with respect to prepetition business taxes and annual reporting fees. In addition, I have been informed that some of these business taxes and annual reporting fees may, under applicable law, be entitled to a priority claim.

93.     The Debtors pay franchise taxes to certain of the Authorities to operate their businesses in the applicable taxing jurisdiction. States assess franchise taxes in one of the following manners: (a) a flat franchise tax on all businesses; (b) a franchise tax based on net operating income; and (c) a franchise tax on capital employed in the businesses. The Debtors pay franchise taxes on a quarterly and annual basis, and the Debtors remit approximately $60,000 in franchise taxes per year to certain of the Authorities. It is my understanding that, as of the date hereof, the Debtors may owe approximately $11,000 to the Authorities on account of prepetition franchise taxes.

94.     Various state and local laws require the Debtors to obtain and pay fees for a wide range of licenses and permits from a number of local, state and federal regulatory agencies. In addition, the Debtors are also required by applicable law to pay certain foreign taxes and fees, import/export fees, customs fees and duties. My understanding is that the method for calculating amounts due under such licenses and permits and the deadlines for paying such amounts varies by jurisdiction.

95.     I believe that the relief requested in the Taxes Motion is appropriate, necessary and in the best interests of the Debtors' estates. At the U.S. Trustee's request, the Debtors are seeking this relief on an interim basis and will only pay taxes that are owed in the first twenty days after the Petition Date until the Final Hearing.

**Utilities Motion.  Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services.**

96.     The Debtors incur utility expenses for electric, water, telephone, internet, fuel and other similar utility services.  Approximately 40 utility providers (collectively, the "*Utility Providers*") provide these services through approximately 75 accounts.  On average, the Debtors spend approximately $275,000 each month on utility costs.

97.     The Utility Providers service the Debtors' corporate headquarters, other corporate offices and warehouses.  Preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  I believe that such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, the Debtors' value and their creditors' recoveries.  It is therefore critical that utility services continue uninterrupted during these Chapter 11 Cases.  Accordingly, by the Utilities Motion, the Debtors seek to provide the Utility Providers with adequate assurance and have established adequate assurance procedures to ensure that the Utility Providers are prohibited from altering, refusing or discontinuing services on account of prepetition amounts outstanding.  Specifically, the Debtors have agreed to set aside $137,000 (the average amount owed for two weeks' worth of utility services) as adequate assurance for Utility Providers.

**Customer Programs Motion.  Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Honor Prepetition Obligations to Customers and Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests.**

98.     In the ordinary course of business, the Debtors engage in certain practices to develop and sustain a positive reputation in the marketplace for their publications and maximize their sales and advertising revenues.  These practices include, *inter alia*, (1) rebates, credits and

warranties to advertisers that purchase advertising in the Debtors' publications, (2) refunds paid or credited to wholesalers and distributors of the Debtors' publications for unsold copies, (3) honoring subscriptions paid in advance by subscribers to the Debtors' publications, and (4) the payment of prizes to winners of contests run by the Debtors in the Debtors' publications (collectively, the "***Customer and Distribution Programs***").  The goals of the Customer and Distribution Programs have been and are to meet competitive pressures, ensure customer satisfaction, maximize sales, and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones, and ultimately enhancing net revenues.

99.     The Debtors' ability to continue their Customer and Distribution Programs in the ordinary course of business is necessary to retain and grow their customer base and relationships with advertisers, wholesalers, and distributors.  I believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue their operations in chapter 11 without disruption.

**Shippers Motion.  Debtors' Motion for Interim and Final Orders (A) Authorizing, but Not Directing, Debtors to Pay Prepetition Claims of Shippers, Warehousemen and Logistics Coordinators and (B) Authorizing Financial Institutions to Honor All Related Checks and Electronic Payment Requests.**

100.     The Debtors' businesses depend entirely upon the timely printing and distribution of their celebrity journalism and health and fitness publications.  With respect to the production of the Debtors' publications, the Debtors direct the delivery of raw paper from paper mills or purchasing agents to their contracted third-party printers.  The Debtors purchase paper supplies in two different methods: (i) the Debtors purchase approximately 15% of their paper supplies directly from paper mills selected for location and ability to handle the Debtors' high-volume requests and (ii) the Debtors purchase approximately 85% of their paper supplies through

purchasing agents who are able to obtain the most favorable price by soliciting bids from many different smaller paper mills.

101.　　After production, the delivery of time-sensitive news and information contained in the Debtors' publications to the Debtors' customers is even more critical.  The Debtors' publications are distributed to newsstands primarily by three wholesalers, which represent 81% of the newsstand distribution market, as well as several smaller wholesalers who represent the remaining 19% (collectively, the "***Wholesalers***").  The Wholesalers obtain the finished publications directly from the Debtors' printers and distribute the finished products to retail outlets in the United States and Canada.

102.　　The Debtors' businesses therefore depend on two separate and equally important transportation processes:  (a) the frequent delivery of paper products in support of printing operations and (b) the frequent, sometimes daily, delivery of finished publications to approximately 103,000 retail outlets and subscribers.  The Debtors contract with shippers including, without limitation, the Wholesalers, railroads, truckers, and short-distance delivery personnel (the "***Shippers***"), to ship, transport, store, and deliver paper and other printing raw materials, as well as finished publications, to and from the Debtors' vendors, the Debtors' printers, and the Debtors' customers.

103.　　When necessary, the Debtors and the Debtors' agents also utilize certain third-party warehousemen (the "***Warehousemen***") to store paper supplies and finished publications while in transit.  Pursuant to agreements between the Debtors and their printers, the Debtors' paper supplies are stored on-site at the printers.  At any given time, it is my understanding that the Debtors' printers store approximately $10 to $15 million in paper supplies locally and in temporary transit storage facilities to support their high-volume printing operation.  In addition,

the Debtors maintain an emergency supply of paper in a single warehouse located in Wisconsin. The Debtors' back-up warehouse is paid for directly by the Debtors and stores approximately $130,000 in paper. All warehousing of finished publications is controlled directly by the Shippers.

104.     The Debtors also employ third-party logistics coordinators (the "***Logistics Coordinators***" and, together with the Shippers and Warehousemen, the "***Shipping and Warehousing Parties***") for the in-bound, out-bound, and inter-facility transport of goods and finished products. The Logistics Coordinators manage the logistics of the Debtors' supply and delivery system, including the Shippers and Warehousemen by, among other things, auditing the Shippers' and Warehousemen's invoices and then billing the Debtors for their services. It is my understanding that the Debtors pay the Logistics Coordinators first, and they, in turn, pay the Shippers and Warehousemen. Occasionally, the Logistics Coordinators will advance funds to the Shippers and Warehousemen and then invoice the Debtors. The Logistics Coordinators exact a percentage fee from all transport transactions managed for the Debtors.

105.     The Debtors ship the vast majority of materials and finished goods within the United States. However, the Debtors receive a small amount of paper from international sources and ship approximately 15% of finished publications to Canada (the "***International Shipments***"). The Debtors pay storage and demurrage charges to various custom facilities in connection with the offloading and/or storage of International Shipments. I have been informed that the international Shippers and Warehousemen may assert liens on the goods in their possession to secure the expenses incurred in connection with the offloading and storage of the goods.

106.     It is my understanding that, as of the Petition Date, certain Shipping and Warehousing Parties may have outstanding invoices for goods delivered to the Debtors, the

Wholesalers, or the Debtors' customers prior to the Petition Date or stored for the Debtors on the Petition Date (collectively, the "***Prepetition Shipping Charges***").  I believe that paying the Prepetition Shipping Charges will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption because, without such payment, the Shippers and Warehousemen may be unwilling to release the goods in their possession.

**Trade Claims Motion.  Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Requiring, Payment of Prepetition Claims of Trade Creditors in the Ordinary Course of Business.**

107.    In the ordinary course of business, the Debtors incur numerous fixed, liquidated and undisputed obligations to their general unsecured trade creditors (the "***Trade Creditors***")[15] who provide, among other things, delivery of the materials necessary to produce time-sensitive weekly and monthly publications, the space to display the publications, delivery of those publications before their content becomes obsolete, printing services, and office supplies. Without such Trade Creditors, the value of the Debtors' business operations would be significantly diminished and, in some cases, operations may arrest altogether.  Allowing the payment of these trade claims (the "***Trade Claims***") on the terms set forth herein will minimize any disruption to the Debtors' businesses and will therefore allow for a smooth transition into these Chapter 11 Cases.

108.    Among the most important Trade Claims sought to be paid are those relating to rack costs as described below.  The Debtors' publications at supermarkets, convenience stores, pharmacies, newsstands and other retail outlets are sold from racks, displays and retail display pockets placed at specific locations at the retailers' businesses.  Certain charges payable to these

---

[15]    By the Trade Claims Motion, the Debtors seek entry of an order authorizing, but not requiring, payment of prepetition claims other than those claims requested to be paid in connection with any other First Day Pleading described herein.

retailers, specifically retail display allowances ("**RDAs**") and retail display pocket charges ("**RDPs**"), are paid in arrears three to nine months following the end of each calendar quarter based on the volume of the sales made from those displays, racks and pockets or based on the displays dedicated to the specific magazine title.

109.     The Debtors' distribution of their publications in supermarkets, convenience stores, pharmacies, newsstands and other retail outlets is essential to the Debtors' ability to maintain and maximize sales at those locations, and collect advertising revenues that are based on circulation levels.  Any interruption in the arrangements with retailers for the display and sale of the Debtors' publications from such retail outlets will reduce those sales, circulation levels and revenues, resulting in immediate and irreparable harm to the Debtors.

110.     The Debtors estimate that over the anticipated duration of these Chapter 11 Cases, they will owe approximately $20.4 million on account of undisputed Trade Claims for prepetition goods and services that become due and payable after the Petition Date.  Of that, the Debtors are seeking to pay approximately $7.3 million to Trade Creditors within the first 20 days of these Chapter 11 Cases.  The Debtors are not seeking to pay these amounts in the aggregate, but only such amounts as they become due and payable in the ordinary course and in the Debtors' sole discretion.  The Debtors believe that payment of the Trade Claims will not create an imbalance of their cash flows because such obligations have customary payment terms and will not be immediately payable.  The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral, which their prepetition lenders have already consented to.

111.     The Plan provides for all holders of allowed general unsecured claims to be paid in full.  As such, the Trade Claims are unimpaired and will be paid in full under the Plan in any event.  In addition, the Administrative Agent supports paying the Trade Claims because any disruption to the Debtors' businesses could negatively impact the prepetition lenders' collateral. The Debtors believe that the payment of the Trade Claims will allow them to continue their operations with minimal disruption and preserve their enterprise value for the benefit of their estates.

**Procedural Motions**

**Confirmation Scheduling Motion. Debtors' Motion for (I) an Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Solicitation and Election Procedures and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement, the Solicitation and Election Procedures and the Plan, and (C) Approving the Form and Manner of the Notice of Combined Hearing.**

112.     As discussed herein, prior to the Petition Date, the Debtors solicited votes on the Plan.  By the Confirmation Schedule Motion, the Debtors seek to (a) schedule a combined hearing (the "***Combined Hearing***") to consider the adequacy of the Disclosure Statement, the adequacy of the solicitation and election procedures (the "***Solicitation and Election Procedures***") and confirmation of the Plan, (b) establish deadlines and procedures to file objections to the Disclosure Statement, the Solicitation and Election Procedures and the Plan, and (c) approve the form and manner of notice of the Combined Hearing and commencement of the  Chapter 11 Cases.

113.     I believe that the scheduling of the Combined Hearing on the adequacy of the Disclosure Statement, the Solicitation and Election Procedures and confirmation of the Plan is in the best interests of the Debtors' estates, as such relief will assist the Debtors' expedited emergence from chapter 11.  Moreover, the Confirmation Schedule Motion establishes a timeline

that I believe provides sufficient notice of the Debtors' confirmation hearing to all parties in interest.

**Joint Administration Motion.  Debtors' Motion for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases.**

114.     As discussed herein above, the 17 Debtors in these Chapter 11 Cases include AMI, AMO and 15 of AMO's wholly-owned affiliates.  The Debtors have common ownership, and they share key financial and operational systems.  By the Joint Administration Motion, the Debtors seek joint administration of the Chapter 11 Cases for procedural purposes only.

115.     The joint administration of these Chapter 11 Cases, to the best of my knowledge, will not give rise to any conflict of interest among the Debtors' estates.  Nor will joint administration adversely affect the Debtors' respective creditors because the Joint Administration Motion requests only administrative, not substantive, consolidation of the estates. Thus, I believe individual creditors' rights should not be harmed by the relief requested; by contrast, non-Debtor parties in interest will benefit from the cost reductions associated with the joint administration of these cases.

**Schedules and Statements Motion.  Motion of the Debtors for an Order (I) Granting an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Lists of Equity Security Holdings, Schedules of Current Income and Expenditures and Statements of Financial Affairs, and (II) Permanently Waiving the Requirements to File the Same Upon Confirmation of the Plan.**

116.     By the Schedules and Statements Motion, the Debtors seek entry of an order (a) extending the time within which to file their Schedules and Statements (as defined below) for an additional thirty (30) days (for a total of forty-five (45) days from the Petition Date), and (b) permanently waiving the requirement to file the Schedules and Statements upon the confirmation of the Plan.

117. Given the unique nature of the Debtors' Chapter 11 Cases, I believe an additional extension of thirty (30) days and a permanent waiver of the requirement to file the statements of financial affairs, schedules of assets and liabilities, schedules of current income and expenditures, statements of executory contracts and unexpired leases and lists of equity security holders (collectively, the "**Schedules and Statements**") upon the confirmation of a plan of reorganization is appropriate. Under the circumstances of these prepackaged Chapter 11 Cases, the purposes of filing the Schedules and Statements have generally been fulfilled by other means – i.e. the Plan contemplates the unimpairment of all general unsecured claimants, other than those claimants holdings claims in classes 2, 5, 6 and 7. Such relief will allow the Debtors to focus the attention of key accounting and legal personnel on vital operational and restructuring issues and ensure the Debtors' expedited emergence from chapter 11.

**KCC Retention Application. Debtors' Motion for Entry of an Order Authorizing and Approving the Employment and Retention of Kurtzman Carson Consultants LLC as Notice and Claims Agent.**

118. The Debtors propose to engage Kurtzman Carson Consultants LLC ("**KCC**") to act as notice and claims agent in these Chapter 11 Cases, and they respectfully submit that this retention will maximize efficiency in administering these cases and will ease administrative burdens such as providing notice to all creditors and parties in interest in these cases, that otherwise would fall upon the Court and the United States Trustee for the Southern District of New York.

**Creditor Matrix/Administrative Procedures Motion. Debtors' Motion for an Order (A) Waiving the Requirement that Each Debtor File a List of Creditors, (B) Authorizing Filing a Consolidated List of Top 50 Unsecured Creditors, (C) Approving Notice, Case Management, and Administrative Procedures, and (D) Authorizing Maintenance of Consolidated List of Creditors in Lieu of Matrix.**

119. By the Creditor Matrix/Administrative Procedures Motion, the Debtors seek the entry of an order (a) waiving the requirement that each Debtor file a list of creditors, (b)

authorizing the filing of a single, consolidated list of the 50 largest unsecured creditors in lieu of filing separate lists of the 20 largest unsecured creditors of each Debtor, (c) approving certain procedures for the Debtors to supply notice to creditors and parties in interest, certain procedures for case management, and certain other administrative procedures, and (d) authorizing the Debtors to maintain a consolidated list of creditors in lieu of a matrix.

120. The Debtors have retained KCC as notice and claims agent in connection with the Debtors' Chapter 11 Cases to assist the Debtors in preparing creditor lists and mailing initial notices. Because KCC, if retained by this Bankruptcy Court, will serve all required notices, filing a list of creditors with the Court serves no independent purpose and should be waived in these Chapter 11 Cases.

121. In addition, KCC will assist with compiling a creditor database from the Debtors' records and will complete the mailing of relevant notices as set forth above. The Debtors believe that providing KCC with a list of creditors in the electronic format used in the Debtors' ordinary course of business will be sufficient to allow timely notice to all creditors. The Debtors do not believe that they could efficiently and accurately convert their own records into matrix format more quickly than a consolidated list could be completed by KCC. The Debtors believe they would incur unnecessary expense were they to try to make such a conversion. Allowing the Debtors to maintain a creditor list in electronic form would be in the best interests of all parties.

**Akin Gump Retention Application. Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Akin Gump Strauss Hauer & Feld LLP as Attorneys for the Debtors Effective *Nunc Pro Tunc* to the Petition Date.**

122. The Debtors seek to retain Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") as their attorneys because Akin Gump has extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code. Akin Gump has been working with the Debtors since September 2010 with respect to

50

various corporate, tax, regulatory, securities, restructuring, and other related matters. I believe the relief requested in the Akin Gump Retention Application is appropriate, necessary and will facilitate the Debtors' transition into chapter 11.

**Interim Compensation Motion. Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals.**

123. By the Interim Compensation Motion, the Debtors request the entry of an order establishing an orderly, regular process for the allowance and payment of compensation and reimbursement of expenses for professionals who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to Bankruptcy Code sections 330 and 331. Such an order would enable the Court, the U.S. Trustee and all other parties to monitor effectively the Professionals' fees and expenses incurred in these cases.

124. I believe that establishing orderly procedures for payment of Akin Gump and any other professionals retained in these Chapter 11 Cases (collectively, the "*Professionals*") will streamline the administration of these Chapter 11 Cases by facilitating efficient review of the Professionals' fees and expenses while saving the Debtors unnecessary copying and mailing expenses.

**OCP Motion. Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business.**

125. The Debtors employ various attorneys in the ordinary course of their businesses (each, an "*OCP*" and, collectively, the "*OCPs*"). The OCPs provide services for the Debtors in a variety of matters unrelated to these Chapter 11 Cases, including legal services with regard to specialized areas of the law and litigation.

126. In the ordinary course of business, the Debtors also employ professional service providers (the "*Service Providers*"). Although some of the Service Providers have professional degrees and certifications, they provide services to the Debtors that are integral to the day-to-day

operation of the Debtors' businesses and do not directly relate to or materially affect the administration of these Chapter 11 Cases.

127.     I believe that although the OCPs and Service Providers will wish to continue to represent the Debtors during these Chapter 11 Cases, many would not be in a position to do so if the Debtors cannot pay them on a regular basis. Without the background knowledge, expertise and familiarity that the OCPs and Service Providers have relative to the Debtors and their operations, the Debtors undoubtedly would incur additional and unnecessary expenses in educating and retaining replacement professionals.  Accordingly, I believe that the Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business.  Moreover, in light of the substantial number of OCPs and Service Providers, and the significant costs associated with the preparation of employment applications and fee applications for professionals who will receive relatively modest fees, I believe that it would be impractical, inefficient and extremely costly for the Debtors and their legal advisors to prepare and submit individual applications and proposed retention orders for each OCP and Service Provider.  Accordingly through the OCP Motion, the Debtors request authority to continue, in their sole discretion, to retain and compensate the OCPs on a postpetition basis and to pay each OCP up to $50,000 per month and up to $300,000 for the entirety of the Chapter 11 Cases.

128.     I am aware that some of the OCPs and Service Providers may hold relatively small unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition; I do not believe that such claims would cause any of the OCPs or Service Providers to have an interest materially adverse to the Debtors, their creditors or other parties in interest, especially in light of the fact that such claims will be unimpaired under the Plan.

# IV.

## Information Required by Local Bankruptcy Rule 1007-2

129. Local Bankruptcy Rule 1007-2 requires certain information related to the Debtors, which is set forth below. The information requested in Local Bankruptcy Rule 1007-2(a)(1) is set forth in Sections I and IV above.

130. Pursuant to Local Bankruptcy Rule 1007-2 (a)(3), <u>Schedule 1</u> hereto lists the names and addresses of the members of, and attorneys for, the Committee.

131. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), <u>Schedule 2</u> hereto lists the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts; the amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

132. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), <u>Schedule 3</u> hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address); the amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral; and whether the claim or lien is disputed.

133. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), <u>Schedule 4</u> hereto provides a summary of the Debtors' assets and liabilities on a consolidated basis.

134. Pursuant to Local Bankruptcy Rule 1007-2(a)(7), <u>Schedule 5</u> provides a summary of the Debtors' stock, debentures, or other securities that are publicly held.

135. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), <u>Schedule 6</u> hereto provides a list of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of such entity and the location of the court in which any proceeding relating thereto is pending.

136. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), <u>Schedule 7</u> hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

137. Pursuant to Local Bankruptcy Rule 1007-2(a)(10), <u>Schedule 8</u> hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

138. Pursuant to Local Bankruptcy Rule 1007-2(a)(11), <u>Schedule 9</u> hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

139. Pursuant to Local Bankruptcy Rule 1007-2(a)(12), <u>Schedule 10</u> hereto provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

140. Pursuant to Local Bankruptcy Rule 1007-2(b)(1)-(2)(A), <u>Schedule 11</u> hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including

officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors and financial partners, and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' chapter 11 petitions.

141.     Pursuant to Local Bankruptcy Rule 1007-2(b)(3), <u>Schedule 12</u> hereto provides, for the 30-day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

[remainder of page intentionally left blank]

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17ᵀʰ day of November, 2010.

By: _____

Christopher Polimeni
Chief Financial Officer
American Media, Inc.
American Media Operations, Inc.
American Media Consumer Entertainment, Inc.
American Media Consumer Magazine Group, Inc.
American Media Distribution & Marketing Group, Inc.
American Media Mini Mags, Inc.
American Media Newspaper Group, Inc.
American Media Property Group, Inc.
Country Music Media Group, Inc.
Distribution Services, Inc.
Globe Communications Corp.
Globe Editorial, Inc.
Mira! Editorial, Inc.
National Enquirer, Inc.
National Examiner, Inc.
Star Editorial, Inc.
Weider Publications, LLC

# EXHIBIT A

## Corporate Organization Chart



**<u>EXHIBIT B</u>**

**Additional Information Required Pursuant to Local Rule 1007-2**

## Schedule 1 – Committee

Pursuant to Local Rule 1007-2(a)(3), the following is a list of the members of and attorneys for the *ad hoc* committee of holders of the Debtors' PIK Notes and Subordinated Notes organized prior to the Petition Date (the "***Committee***"), with their respective addresses.

| Committee Member | Address |
|---|---|
| Angelo Gordon & Co., L.P. | 245 Park Avenue, 26th Floor<br>New York, NY 10167 |
| Avenue Capital Group | 399 Park Avenue, 6th Floor<br>New York, NY 10022 |
| Capital Research and Management Company | 11100 Santa Monica Boulevard<br>Los Angeles, CA 90025 |
| Credit Suisse Securities (USA) LLC | 11 Madison Avenue<br>New York, NY 10010 |

| Category | Professional | Address |
|---|---|---|
| Attorney | Paul, Weiss, Rifkind, Wharton & Garrison LLP | 1285 Avenue of the Americas<br>New York, NY 10019 |

## Description

The Committee was formed to engage in negotiations regarding restructuring the Debtors' obligations under the PIK Notes and Subordinated Notes. The Committee retained counsel to represent them solely in their capacity as holders thereunder and not with regard to any other claim or interest they may hold in any of the Debtors. The Committee was formed in September 2010.

**Schedule 2 – Holders of the Debtors' 50 Largest Unsecured Claims on a Consolidated Basis**

Pursuant to Local Rule 1007-2(a)(4), the following provides information with respect to the holders of the 50 largest unsecured claims against the Debtors on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of November 5, 2010.

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| 1 | Wilmington Trust FSB as Indenture Trustee under the 14% senior subordinated notes due 2013 ("*Subordinated Notes*") | 520 Madison Avenue, 33rd Floor, New York, NY 10022 | $355,800,000.00 | Notes | Contingent |
| 2 | Wilmington Trust FSB as Indenture Trustee under the 9% senior PIK notes due 2013 ("*PIK Notes*") | 520 Madison Avenue 33rd Floor New York, NY 10022 | $24,800,000.00 | Notes | Contingent |
| 3 | HSBC Bank USA as Indenture Trustee under the 8 7/8% notes ("*2011 Notes*") | 452 Fifth Avenue New York, NY 10018 | $7,500,000.00 | Notes | Contingent |
| 4 | Gould Paper Corporation | Jeff Hart 25 East Street Winchester, MA 01890 800-882-2781, x.301 | $2,081,580.09 | Vendor | Contingent |
| 5 | RR Donnelley | Al Dupont 99 Park Avenue New York, NY 10016 212-503-1461 | $1,357,110.35 | Vendor | Contingent |
| 6 | CDS Global Inc | Ellen Heater | $502,434.10 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| | | 1901 Bell Avenue Des Moines IA, 50315 515-246-6937 | | | |
| 7 | Vertis Inc | Jerry Hunt 250 West Pratt Street 18th floor Baltimore, MD 21201 410-949-2243 x.243 | $260,369.18 | Vendor | Contingent |
| 8 | Quad Graphics 01 | Mike Vechart N63 W23075 State Hwy 74 Sussex, WI 53089 414-566-6000 | $242,628.16 | Vendor | Contingent |
| 9 | Source Interlink Media LLC | Michelle Heinbaugh 6375 Flank Drive Harrisburg, PA 17112 | $166,667.00 | Vendor | Contingent |
| 10 | Trend Offset Printing Services Inc | Jeff Sweetman 3791 Catalina Street, Los Alamitos CA 90720 562-598-2446 | $132,260.75 | Vendor | Contingent |
| 11 | North Pacific Paper Corp | Curt Ransom 3001 Industrial Way Longview, WA 98632 1-800-426-0866 | $116,920.59 | Vendor | Contingent |
| 12 | Subco Inc | Kelly Vuchvich 3585 W Beechwood Ave., Ste 106 Fresno, CA 93711 800-258-3350 | $42,480.00 | Vendor | Contingent |
| 13 | Neighborhood Periodical Club | Claudia Tooley 524 N Salina St. Syracuse NY 13208 315-233-1114 | $35,017.50 | Vendor | |
| 14 | Nielsen Inc | 150 N Martingale Rd | $33,084.50 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| | | Schaumburg, IL 60173 866-563-2804 ext 7382 | | | |
| 15 | Agora Marketing Solutions Inc | Laura Bess dba National Publishers Exchange 8285 Bryan Dairy Road Largo, FL 33777 727-369-2700 | $30,226.50 | Vendor | Contingent |
| 16 | Priority One Clearing Services Inc | Dawn Daugherty 1208 Myrtle Ave S. Clearwater, FL 33756 727-443-4200 | $29,730.00 | Vendor | Contingent |
| 17 | M2 Media Group | Dave Rock 5 High Ridge Park 2nd Floor Stamford, CT 06905 203-276-9070 | $25,573.25 | Vendor | Contingent |
| 18 | Splash News & Picture Agency Inc | Miki Jelicic 333 W Washington Blvd Ste#508 Marina Del Rey, CA 90292 310-581-2667 | $17,759.04 | Vendor | Contingent |
| 19 | Lexis Nexis | Bonnie Hendrix Customer Acctg H-24 1000 Alderman Dr. Alpharetta, GA 30005 678-694-3431 | $15,307.75 | Vendor | Contingent |
| 20 | Ricoh Corporation (13583) | 5 Dedrick Place West Caldwell, NJ 07006 | $11,096.56 | Vendor | Contingent |
| 21 | Value Mags | John Curtis 212 West Superior St. Suite 202 Chicago, IL 60654 267-250-5376 | $10,091.00 | Vendor | Contingent |
| 22 | Federal Express | Susan R. Nemia | $9,519.88 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| | Corp | 500 Ross Street Room 154-0444 Pittsburgh, PA 15262 718-873-3016 | | | |
| 23 | The News Group | dba Great Atlantic News LL 1955 Lake Park Drive, Suite 400 Smyrna, GA 30080 866-466-7231 | $9,428.26 | Vendor | Contingent |
| 24 | Dell | Cythia Meyners 1 Dell Way Roundrock, TX 78682 800-274-3355 | $8,256.62 | Vendor | Contingent |
| 25 | Clark Worldwide Transportation Inc | 121 New York Ave Trenton, NJ 08603 609-396-1100 | $6,827.50 | Vendor | Contingent |
| 26 | Upside Software, Inc. | Adrienne Hui 10180-101 Street Suite 310 Edmonton, AB T5J 3S4 780-702-1432 x.311 | $5,814.00 | Vendor | Contingent |
| 27 | Getty Images Inc | Doug De Groot 601 North 34th Street Seattle, WA 98103 206-925-5000 | $5,774.00 | Vendor | Contingent |
| 28 | R C S Customs Serv Ltd | 120-176th St Suite 104 Surrey, BC V3S 9S2 | $5,219.11 | Vendor | Contingent |
| 29 | Strategic Media Llc | Marti Schiff 34 Oxford Rd Scarsdale, NY 10583 914-584-2868 | $5,164.00 | Vendor | Contingent |
| 30 | Lapointe Rosenstein Marchand Melancon | 1250 Rene Levesque Blvd W, Ste 1400 Montreal, QC H3B5E9 | $4,756.82 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| 31 | Rivington Media Llc | Diane Rivera 10301 SW 18 St. Davie, FL 33324 954-635-6186 | $4,693.25 | Vendor | Contingent |
| 32 | Hudson News Company | Hasena Hurley 1305 Paterson Plank Rd North Bergen, NJ 07047 201-867-3600 | $4,600.00 | Vendor | Contingent |
| 33 | Intercall | 1211 O.G. Skanner Drive West Point, GA 31833 877-211-6858 | $4,457.11 | Vendor | Contingent |
| 34 | Wyman & Isaacs Llp | 5757 Wilshire Blvd. Suite 475 Los Angeles, CA 90036 | $4,256.75 | Vendor | Contingent |
| 35 | Stockland Martel Inc | 343 E 18th St. Lower Level New York, NY 10003 212-727-1400 | $3,865.46 | Vendor | Contingent |
| 36 | SAVVIS | Web Hosting 13339 Collections Center Drive Chicago, IL 60693 877-728-8477 | $3,734.64 | Vendor | Contingent |
| 37 | Halsey & Griffith Inc | 1000 Park Centre Blvd Suite 128 Miami Gardens, FL 33169 305-623-1921 | $3,638.52 | Vendor | Contingent |
| 38 | Bond Staffing | Marie Randolph 1601 Broadway 11th Floor New York, NY 10019 212-277-7600 | $3,327.00 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| 39 | Radar Online LLC | 16545 Collections Center Drive Chicago, IL 60693 561-997-7393 | $3,164.50 | Vendor | Contingent |
| 40 | Zinio LLC | 114 Sansome St. 10th Floor San Francisco, CA 94104 415-494-2751 | $2,862.88 | Vendor | Contingent |
| 41 | Scanlynx Technologies | Kevin Keohane 1040 Bayview Dr. Ste 426 Fort Lauderdale, FL 33304 954-267-1819 | $2,662.71 | Vendor | Contingent |
| 42 | Audit Bureau of Circulations | 48 W. Seegers Road Arlington Heights, IL 60005 224-366-6939 | $2,398.81 | Vendor | Contingent |
| 43 | Mediarazzi Inc | c/o Darryl C. Wrobal 180 NE 4th Ave #301 Delray Beach, FL 33483 | $2,307.69 | Vendor | Contingent |
| 44 | Centex Periodicals Inc | dba The News Group Central Division 5130 Commerce Pkwy San Antonio, TX 78218 | $2,240.00 | Vendor | Contingent |
| 45 | Epiphany Artist Group Inc | 405 N Daisy Ave Pasadena, CA 91107 626-792-4427 | $2,180.00 | Vendor | Contingent |
| 46 | Philip Ramey Photography LLC | Philip Ramey 23852 Pacific Coast Highway #910 Malibu, CA 90265 310-828-3445 | $1,950.00 | Vendor | Contingent |
| 47 | Gourmet Caterers Inc | 3867 Washington St Roslindale, MA 02131 | $1,914.33 | Vendor | Contingent |

| No. | Holder of Claim | Person Familiar with Debtors' Account | Amount of Claim | Nature of Claim | Contingent / Unliquidated / Disputed Claim |
|---|---|---|---|---|---|
| 48 | PR Newswire Association LLC | 602 Plaza Three Harborside Financial Jersey City, NJ 07311 800-801-2147 | $1,885.00 | Vendor | Contingent |
| 49 | Sonomait | Mark Gordon 1083 Vine St # 354 Healdsburg, CA 95448 707-237-2745 x.202 | $1,796.25 | Vendor | Contingent |
| 50 | Digital Fusion LLC | 3542 Hayden Ave Culver City, CA 90232 310-253-9008 | $1,774.87 | Vendor | Contingent |

**Schedule 3 – Holders of the Debtors' Five Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following lists the Debtors' five largest secured claims on a consolidated basis.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of October 29, 2010.

| No. | Creditor | Contact | Amount of Claim | Collateral |
|---|---|---|---|---|
| 1 | JP Morgan Chase Bank, N.A. as administrative agent and the lenders under the term facility ("***Term Facility***") | Loan and Agency Services Group 1111 Fannin Street Houston, Texas 77002 Attention: Gloria Javier Fax: (713) 750-2878<br><br>270 Park Avenue New York, New York 10017 Attention: Peter Thauer Fax: (212)270-5127 | $439,233,420 in principal and prepayment penalties, plus accrued and unpaid interest, fees (including the deferred fees), costs and expenses | All of the existing and future property and assets in which liens are purported to be granted to secure the Term Facility and the guarantees of the Term Facility, other than certain excluded assets. |
| 2 | JPMorgan Chase Bank, N.A. as administrative agent and the lenders under the revolving facility ("***Revolving Facility***") | JPMorgan Chase Bank, N.A. Loan and Agency Services Group 1111 Fannin Street Houston, Texas 77002 Attention: Gloria Javier Fax: (713) 750-2878<br><br>270 Park Avenue New York, New York 10017 Attention: Peter Thauer Fax: (212)270-5127 | $60,000,000 in principal, plus accrued and unpaid interest, fees (including the deferred fees), costs and expenses | All of the existing and future property and assets in which liens are purported to be granted to secure the Revolving Facility and the guarantees of the Revolving Credit, other than certain excluded assets. |

| | No others | | | |
|---|---|---|---|---|

**Schedule 4 – Summary of Debtors' Assets and Liabilities**

Pursuant to Local Rule 1007-2(a)(6), the following financial data is the latest available information and reflects the Debtors' financial condition as of September 30, 2010. The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt or challenge the priority, nature, amount, or status of any claim or debt.

<u>Total Assets</u>: $668,110,000

<u>Total Liabilities</u>: $1,229,096,000

These numbers exclude the assets and liabilities of non-Debtors Mr. Olympia, LLC; Radar Online, LLC; Weider Publications Group, Ltd. (UK); and Weider Publishing, Ltd. (UK).

## Schedule 5 – Publicly Held Securities

None.

**Schedule 6 – Debtors' Property Not in the Debtors' Possession**

None.

## Schedule 7 – Debtors' Property

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

| Address | City | State | Country | Zip Code | Status |
|---|---|---|---|---|---|
| 1665 Palm Beach Lakes Blvd. Suites 401 & 409 | West Palm Beach | Florida | USA | 33401 | Lease |
| Space 305 1801 Hypoluxo Road | Lantana | Florida | USA | 33462 | Lease |
| 118 16th Avenue South STE. 230, 240D, 240E, 250E, 250C & 250D | Nashville | Tennessee | USA | 37203 | Lease |
| 1932 & 1934 7th Court North | Lake Work | Florida | USA | 33460 | Lease |
| 4950 Communication Drive | Boca Raton | Florida | USA | 33431 | Lease |
| 4950 Communication Drive | Boca Raton | Florida | USA | 33431 | Lease |
| 21100 Erwin Street East | Woodland Hills | California | USA | 91367 | Lease |
| One Park Avenue 3rd Floor Suite 301 | New York | New York | USA | 10016 | Lease |
| One Park Avenue 3rd Floor Suite 301 | New York | New York | USA | 10016 | Lease |
| One Park Avenue 10th Floor | New York | New York | USA | 10016 | Lease |
| One Park Avenue 10th Floor | New York | New York | USA | 10016 | Lease |
| One Park Avenue Storage Basement N | New York | New York | USA | 10016 | Lease |
| One Park Avenue 3rd Floor | New York | New York | USA | 10016 | Lease |
| One Park Avenue 3rd Floor | New York | New York | USA | 10016 | Lease |
| 680 North Lake Shore Drive 15th Floor | Chicago | Illinois | USA | 60611 | Lease |
| Address | City | State | Country | Zip Code | Status |

| | | | | | |
|---|---|---|---|---|---|
| 296 Town Center Drive | Troy | Michigan | USA | 48084 | Lease |
| 6420 Wilshire Boulevard 15th Floor | Los Angeles | California | USA | 90025 | Lease |
| Holland Dr. Industrial Park - Space 121 1020 Holland Drive | Boca Raton | Florida | USA | 33487 | Lease |
| 901 Avenue S | Grand Prairie | Texas | USA | 75050 | Lease |
| 27500 Riverview Center Blvd. | Bonita Springs | Florida | USA | 34134 | Lease |

## Schedule 8 – Location of the Debtors' Assets, Books and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of the Debtors' Books and Records

American Media, Inc.
1000 American Media Way
Boca Raton, FL 33464-1000

### Location of the Debtors' Substantial Assets

The Debtors maintain bank accounts at various institutions. The Debtors' main bank account is with JPMorgan Chase Bank, NA in New York, New York.

### Nature, Location, and Value of Assets Located Outside of the United States

The Debtors maintain a limited number of bank accounts outside of the United States in the United Kingdom and Canada. These accounts hold approximately $1,600,000 and $1,204,190, respectively, for a total of $2,804,190.

**Schedule 9 – Litigation**

Pursuant to Local Rule 1007-2(a)(11), the following is a list of the nature and present status of each action or proceeding, pending, or threatened against the Debtors or their properties. This list reflects all actions or proceedings currently pending against the Debtors; however, the Debtors reserve the right, if necessary, to supplement this list.

| Matter | Jurisdiction | Status |
|---|---|---|
| Anderson News, L.L.C. and Anderson Services, L.L.C. v. Distribution Services, Inc. ("***DSI***") | U.S. District Court for the Southern District of New York | Anderson's complaint alleged that DSI violated Section 1 of the Sherman Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Anderson also purported to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint did not specify the amount of damages sought. On August 2, 2010, the U.S. District Court for the Southern District of New York dismissed the action in its entirety with prejudice and without leave to replead, and on October 25, 2010, denied Anderson's motion for reconsideration of the dismissal decision. Anderson has until November 24, 2010 to file an appeal, but it has publically stated that it intends to do so. While it is not possible to predict with certainty the outcome of an appeal, if any, or to estimate the impact on the Debtors of a final judgment against Debtor DSI, if that were to occur, the Debtors will continue to vigorously defend the case. |
| Marenda, et al. v. Distribution Services, Inc. | U.S. District Court for the Eastern District of New York | Plaintiffs, DSI part-time "merchandisers," purport to bring a class action on behalf of themselves and others similarly situated for failure to pay them minimum wage for hours worked in violation of state and federal law. The Debtors have retained Jones Day to defend them in connection therewith. The Debtors have begun assembling materials from DSI to assist in fighting this claim across several fronts. The Debtors believe that it is too soon to evaluate DSI's exposure, if any, in this matter. |
| Vera Baker v. American Media, Inc. and Globe Communications Corp. | Dade County Circuit Court, Florida | Plaintiff, Vera Baker, alleges personal injury from published statements in multiple issues of Globe magazine, which she alleges to be libelous statements. Process was served on the Debtors on November 11, 2010. |

In addition to the matter above, because the focus of some of the Company's publications often involves celebrities and controversial subjects, the risk of defamation or invasion of privacy litigation exists. The Debtors' experience indicates that the claims for damages made in such lawsuits are usually inflated and the lawsuits are usually defensible and, in any event, any reasonably foreseeable material liability or settlement would likely be covered by insurance. The Debtors also periodically evaluate and assesses the risks and uncertainties associated with such litigation, disregarding the existence of insurance that would cover liability for such litigation. At present, in the opinion of management, after consultation with outside legal counsel, the liability resulting from such litigation, even if insurance was not available, is not expected to have a material effect on the Debtors' consolidated financial statements.

**Schedule 10 – Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management and a brief summary of their relevant responsibilities and experience.

| Name | Title | Tenure | Prior Experience |
|------|-------|--------|------------------|
| David J. Pecker | Chairman, Chief Executive Officer, President, Director | May 7, 1999 | David J. Pecker became Chairman, Chief Executive Officer, President and a Director on May 7, 1999. Prior to that, Mr. Pecker had been the Chief Executive Officer since 1992, and President since 1991, of Hachette. Prior to 1991, he was Executive Vice President/Publishing and Chief Operating and Chief Financial Officer of Hachette. Mr. Pecker has 29 years of publishing industry experience having worked as the Director of Financial Reporting at CBS, Inc. Magazine Group and as the Vice President and Controller of Diamandis Communications Inc. Mr. Pecker currently serves as a director of the Magazine Publishers' Association of America, as a director of the Madison Square Boys and Girls Club of New York, and was appointed to the Board of Trustees of Pace University in February 2009. Mr. Pecker holds a B.B.A. from Pace University, received an honorary doctorate degree in Commercial Science from Pace University in 1998, and is Founder, past President and a current director of the Federal Drug Enforcement Foundation. |
| Christopher Polimeni | Executive Vice President, Chief Financial Officer and Treasurer | January 2009 | Christopher Polimeni is Executive Vice President for Finance and Planning, Chief Financial Officer and Treasurer. Prior to being appointed Chief Financial Officer of AMO in March 2010, Mr. Polimeni served as Executive Vice President, Chief Accounting Officer and Treasurer from July 2009 and Senior Vice President of Finance and Treasurer of AMO from September 2008 and as Senior Vice President of Process Improvement from the time he joined AMO in February 2007 until September 2008. Prior to joining AMO, he formed his own consulting firm in 2003 and provided services in areas such as SEC reporting, mergers and acquisitions, internal control evaluations, chapter 11 reorganizations, and technology strategic planning and implementation. From 1994 to 2003 |

| | | | |
|---|---|---|---|
| | | | Mr. Polimeni served as Vice President of Finance and Corporate Controller of GE Supply Logistics, LLC (formerly Questron Technology, Inc.), the leading provider of inventory logistics management services. He practiced as a certified public accountant between 1987 and 1994. Mr. Polimeni has a B.B.A. in Accounting and Business Computer Information Systems from Hofstra University. |
| Kevin Hyson | Executive Vice President and Chief Marketing Officer | May 1999 | Kevin Hyson is Executive Vice President and Chief Marketing Officer. Mr. Hyson joined AMO as a Senior Vice President and was promoted to Executive Vice President in 2001. Prior to joining AMO, Mr. Hyson was President of Hylen Sharp Inc., a Greenwich, Connecticut based marketing firm whose clients included Hachette, JVC and Sony. |
| David Leckey | Executive Vice President, Consumer Marketing | February 2006 | David Leckey became Executive Vice President, Consumer Marketing in February 2006. From 2001 to 2006, Mr. Leckey was Senior Vice President, Consumer Marketing at Hachette, where he spent 28 years. Prior to that, he was at Hearst Publications. Mr. Leckey has served on the Board of Directors of the Audit Bureau of Circulations since 1988, where he is Chairman of the Magazine Committee, which addresses issues confronting the media industry, especially those concerning circulation reporting and measurement standards. He was the 2002 recipient of the Lee C. Williams Lifetime Achievement Award by the Fulfillment Management Association. |
| John Swider | Executive Vice President, Operations | May 2006 | John Swider is the President and Chief Executive Officer of DSI. Prior to being appointed President and Chief Executive Officer of DSI, Mr. Swider served as Executive Vice President, Operations from November 1999 to October 2010. Prior to joining AMO in November 1999, Mr. Swider was an Executive Vice President for *Globe* Communications Corp. His current responsibilities include production, manufacturing, newsstand circulation, corporate library/archives, customer service and the Mini Mag division. Mr. Swider holds a B.A. in Education from Wake Forest |

| | | | |
|---|---|---|---|
| | | | University. |
| Jeffrey Laymon | Senior Vice President, Controller and Chief Accounting Officer | March 2010 | Jeffrey Laymon is Senior Vice President, Controller and Chief Accounting Officer. Prior to being appointed Chief Accounting Officer in March 2010, Mr. Laymon served as Vice President, Internal Audit from May 2007, when he joined AMO, to January 2009 and was Vice President, Controller from January 2009. Prior to joining AMO, Mr. Laymon served as Vice President – Accounting at First Data Corporation, a provider of electronic payment processing solutions, from 1995 to 2006, and from 1984 to 1993, Mr. Laymon was Director of International Finance at Gulf + Western Corporation, a conglomerate corporation with a diversified business. Mr. Laymon has a B.A. in Accounting from Wake Forest University. |

**Schedule 11 – Payroll**

Pursuant to Local Rules 1007-2(b)(1)-(2)(a) and (c), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, directors, and stockholders and financial consultants retained by the Debtors, for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees** | Approximately $2,977,750 weekly; $5,955,500 for a 30-day period[16] |
| **Payments to Officers, Directors, and Stockholders** | Approximately $254,985 for the 30-day period |

---

[16] The Debtors calculate their payroll biweekly, with ten paydays in a biweekly pay cycle. Thus, this number is for 20 paydays in a four week cycle, or an average calendar month.

### Schedule 12 – Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides the estimated aggregated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid (other than professional fees) for the 30-day period following the Petition Date.

| | |
|---|---|
| **Cash Receipts** | Approximately $35,828,000 |
| **Cash Disbursements (excluding professional fees)** | Approximately ($48,324,000)[17] |
| **Net Cash Loss** | Approximately ($12,496,000) |
| **Unpaid Obligations (excluding professional fees)** | Approximately $56,766,000[18] |
| **Unpaid Receivables (excluding professional fees)** | Approximately $48,538,000 |

---

[17]     This amount includes approximately $9,304,000 of fees in connection with the new financing.

[18]     Unpaid obligations includes projected trade accounts payable and projected accrued expenses.