AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) | Case No. 10-[_____] (__) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT RELATING TO**
**THE DEBTORS' JOINT PREPACKAGED PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated:  October 30, 2010

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).  The address for all Debtors is 1000 American Media Way, Boca Raton, FL, 33464.

October 30, 2010

To:      Holders of Term Facility Claims
Holders of PIK Notes Claims
Holders of Subordinated Notes Claims
Holders of 2011 Notes Claims

American Media, Inc. and certain of its affiliates (collectively, the "***Company***") are providing you with this letter and the accompanying materials because records indicate that you may be a creditor entitled to vote to approve the *Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated October 30, 2010 (as it may be amended from time to time, the "***Plan***").   The Company is commencing the solicitation of votes to approve the Plan in advance of the Company filing voluntary cases for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***").

If the required votes to approve the Plan are received and if certain other pre-filing conditions are met, the Company intends to file voluntary cases under chapter 11 of the Bankruptcy Code to implement the Plan (the "***Chapter 11 Cases***").   Because the Chapter 11 Cases have not been commenced at this time, the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "***Disclosure Statement***") has not been approved by the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") as containing "adequate information" within the meaning of Bankruptcy Code section 1125(a).  If the Company files the Chapter 11 Cases, it will promptly seek orders of the Bankruptcy Court, among other things, (a) scheduling a combined hearing on the adequacy of the Disclosure Statement and confirmation of the Plan, (b) approving the procedures employed for soliciting votes on the Plan, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures beyond those contained in the Disclosure Statement provided to you at this time.

**YOU HAVE RECEIVED THIS LETTER AND THE ENCLOSED MATERIALS BECAUSE YOU MAY BE ENTITLED TO VOTE ON THE PLAN.**

The enclosed materials constitute the Company's "***Solicitation Package***" and consist of the following:

(a)      this cover letter;

(b)      an appropriate form of ballot (a "***Ballot***") or master ballot (the "***Master Ballot***") and instructions with respect thereto, as applicable (with a pre-addressed, postage-prepaid return envelope);

(c)      the solicitation version of the Disclosure Statement; and

(d)      the solicitation version of the Plan.

The Company's board of directors has approved the solicitation of votes on the Plan.  The Company believes that the acceptance of the Plan is in the best interests of the Holders of Claims against the Company.

**THE COMPANY THEREFORE RECOMMENDS THAT ALL PARTIES ENTITLED TO VOTE SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN.**

The materials in this Solicitation Package are intended to be self-explanatory. If you have any questions, however, please feel free to contact the Company's Voting Agent, Kurtzman Carson Consultants LLC, by (a) writing to American Media Ballot Processing Center, 599 Lexington Avenue, 39th Floor, New York, NY 10022 or (b) calling (877) 833-4150.

**THIS SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN BEFORE THE FILING OF VOLUNTARY CASES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. BECAUSE THE CHAPTER 11 CASES HAVE NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1125(a). FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, THE DEBTORS EXPECT TO PROMPTLY SEEK ORDERS OF THE BANKRUPTCY COURT, AMONG OTHER THINGS, (i) APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (ii) APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH BANKRUPTCY CODE SECTIONS 1125 AND 1126(b), AND (iii) CONFIRMING THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "*PLAN*").**

## DISCLOSURE STATEMENT, DATED OCTOBER 30, 2010

### Solicitation of Votes on the Joint
### Prepackaged Plan of Reorganization of

# AMERICAN MEDIA, INC., *ETAL.*

### from the holders of outstanding

**TERM FACILITY CLAIMS
PIK NOTES CLAIMS
SUBORDINATED NOTES CLAIMS
2011 NOTES CLAIMS**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT PREPACKAGED PLAN OF REORGANIZATION IS 5:00 P.M., EASTERN TIME, ON NOVEMBER 15, 2010, UNLESS EXTENDED BY AMERICAN MEDIA, INC.**

---

> **RECOMMENDATION BY THE DEBTORS**
> The boards of directors of each of the debtors (collectively, the "***Debtors***") [2] have approved the solicitation, the Plan, and the transactions contemplated thereby, and recommend that all creditors whose votes are being solicited submit Ballots to accept the Plan.  Holders of more than two-thirds (2/3) in outstanding principal amount of certain of the Classes (as defined in the Plan) of Claims (as defined in the Plan) entitled to vote on the Plan have already agreed to vote in favor of the Plan.

**NEITHER THIS DISCLOSURE STATEMENT (THE "*DISCLOSURE STATEMENT*") NOR THE PLAN HAS BEEN FILED WITH OR REVIEWED BY THE BANKRUPTCY COURT, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAW"). THE DEBTORS ARE RELYING ON SECTIONS 3(A)(9) AND 4(2) OF THE SECURITIES ACT AND SIMILAR BLUE SKY LAW PROVISIONS, AS WELL AS, TO THE EXTENT APPLICABLE, THE EXEMPTION FROM THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE, TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAW THE OFFER AND SALE OF CERTAIN NEW SECURITIES IN CONNECTION WITH THE SOLICITATION AND THE PLAN.**

**THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. NEITHER THE SOLICITATION NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.**

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

**THE NEW COMMON STOCK, THE NEW SECOND LIEN NOTES, THE NEW PIK NOTES AND/OR THE NEW PREFERRED STOCK, IF APPLICABLE, TO BE ISSUED ON THE**

---

[2] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).  The address for all Debtors is 1000 American Media Way, Boca Raton, FL, 33464.

EFFECTIVE DATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS.  THE ISSUANCE OF SUCH SECURITIES UNDER THE PLAN IS BEING EFFECTED PURSUANT TO THE EXEMPTION UNDER BANKRUPTCY CODE SECTION 1145.

THE NEW COMMON STOCK, THE NEW SECOND LIEN NOTES, THE NEW PIK NOTES AND/OR THE NEW PREFERRED STOCK, IF APPLICABLE, TO BE ISSUED ON THE EFFECTIVE DATE HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORECASTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS INCLUDING, BUT NOT LIMITED TO, EACH OF THE OTHER RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF PREPETITION TRADE CLAIMS, CUSTOMERS AND EMPLOYEES WILL NOT BE IMPAIRED BY THE PLAN, AND AS A RESULT THE RIGHT TO RECEIVE PAYMENT IN FULL ON ACCOUNT OF EXISTING OBLIGATIONS IS NOT ALTERED BY THE PLAN.  DURING THE CHAPTER 11 CASES, THE DEBTORS INTEND TO OPERATE THEIR BUSINESSES IN THE ORDINARY COURSE AND WILL SEEK AUTHORIZATION FROM THE BANKRUPTCY COURT TO MAKE PAYMENT IN FULL ON A TIMELY BASIS TO ALL TRADE CREDITORS, CUSTOMERS AND EMPLOYEES OF ALL AMOUNTS DUE PRIOR TO AND DURING THE CHAPTER 11 CASES.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL FORECASTS OR THE LIQUIDATION ANALYSIS HEREIN.

**THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN AND THIS DISCLOSURE STATEMENT.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO PURCHASE FOR CASH ANY OF THE NEW FIRST LIEN NOTES OR THE NEW SECOND LIEN NOTES.  ANY OFFERS OF THE NEW FIRST LIEN NOTES AND THE NEW SECOND LIEN NOTES FOR CASH WILL BE MADE ONLY BY MEANS OF A PRIVATE OFFERING MEMORANDUM.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR PRECONFIRMATION EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND PRECONFIRMATION EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## INTRODUCTION

## IMPORTANT — PLEASE READ

The Debtors submit this Disclosure Statement in connection with (i) the solicitation from eligible holders of acceptances ("*Acceptances*") of the Plan to be filed by the Debtors with the Bankruptcy Court and (ii) the hearing to consider confirmation of the Plan (the "*Confirmation Hearing*"), which will be scheduled by the Bankruptcy Court after the commencement of the Chapter 11 Cases. The date on which the Clerk of the Bankruptcy Court enters the order confirming the Plan pursuant to Bankruptcy Code section 1129 (the "*Confirmation Order*") shall be the "*Confirmation Date*." The date on which the Plan is consummated shall be the "*Effective Date*."

This solicitation of votes is being conducted at this time in order to obtain sufficient votes to enable the Plan to be confirmed by the Bankruptcy Court. Capitalized terms used in this Disclosure Statement but not defined herein have the meanings ascribed to them in the Plan. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan shall govern.**

The Debtors are commencing this solicitation after extensive discussions among the Debtors and certain of their major creditors. On October 30, 2010, the Debtors entered into the Restructuring Support Agreement (as defined below) with certain holders of their prepetition unsecured issuances (such holders, the "*Committee*") as well as certain other prepetition Term Facility Lenders and Revolver Lenders. The parties to the Restructuring Support Agreement hold more than two-thirds (2/3) in amount of the Claims in Class 6, as well as nearly one-half (1/2) in amount of the Claims in Class 2.[3]

Pursuant to the Restructuring Support Agreement, the Committee agreed to support the restructuring of the Debtors' various debt obligations on the terms set forth herein and in the Plan (the "*Financial Restructuring*"). The Debtors agreed to seek to implement the Financial Restructuring through the solicitation of votes to accept or reject the Plan and the commencement of the Chapter 11 Cases, all in accordance with the Bankruptcy Code (including, without limitation, section 1125 thereof).

The Plan is premised upon the limited substantive consolidation of the Debtors only for purposes of voting on, and distributions under, the Plan. The Debtors propose procedural substantive consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of entity-specific claims. Accordingly, on the Effective Date, all of the Debtors and their estates shall, only for purposes of the Plan, be deemed merged and (a) all assets and liabilities of the Debtors are treated only for purposes of the Plan as though they were merged, (b) all guarantees of the Debtors of payment, performance or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations, and all multiple Claims against the Debtors, shall be considered a single claim against the Debtors, and (d) any Claim filed in the Debtors' Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date. Unless otherwise set forth in the Plan, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors, (ii) any intercompany claims, or (iii) the substantive rights of

---

[3] Between October 30, 2010 and the Petition Date, the Debtors anticipate that additional Holders of Class 2 Claims will execute and become parties to the Restructuring Support Agreement.

1

any creditor.  If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only Holders of Claims or Interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such Holders are deemed to accept or reject the Plan).  Under Bankruptcy Code section 1124, a Class of Claims or Interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Interest entitles the Holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Interest as it existed before the default.

Through this vote, the Debtors' goal is to consummate a financial restructuring transaction that will significantly reduce the Debtors' outstanding debt and put the Debtors in a stronger financial position for future growth and stability.

Pursuant to the Plan, and as discussed more fully below, on the Effective Date, the Reorganized Debtors shall issue the following: (i) New First Lien Notes; (ii) New Second Lien Notes; and (iii) New Common Stock.  In addition, to the extent applicable, the Debtors may also issue New PIK Notes and/or New Preferred Stock.

The following table summarizes the treatment and estimated recovery for creditors and stockholders under the Plan.  For a complete explanation, please refer to the discussion in Section IV below, entitled "THE PLAN," and the Plan itself:

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| Class 1 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the Holder of such Claim. | No (deemed to accept). | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| Class 2 | Term Facility Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each Holder of an Allowed Term Facility Claim shall receive its *pro rata* share, on a dollar for dollar basis of the following in an aggregate amount equal to the Allowed amount of all Term Facility Claims: (i) Cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims; and (ii) New Second Lien Notes; provided however, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; provided further however, that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in full, in Cash to the Administrative Agent.  In addition, and pursuant to the provisions of Section 5.4 of the Plan, each Holder of a Term Facility Claim (other than a Backstop Party) shall have the right to require that the Backstop Parties purchase in Cash from such Holder, on the Effective Date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to Section 4.2(b) of the Plan for the face amount of such Holder's New Second Lien Notes. | Yes. | 100% |
| Class 3 | Revolver Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, each Holder of an Allowed Revolver Claim shall receive payment in full, in Cash. | No (deemed to accept). | 100% |
| Class 4 | Other Secured Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim, each Holder of an Allowed Other Secured Claim shall, at the Debtors' option, (i) receive payment in full, in Cash, (ii) be reinstated pursuant to Bankruptcy Code section 1124, or (iii) receive such other recovery to be determined by the Debtors in their sole discretion. | No (deemed to accept). | 100% |

3

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| Class 5 | PIK Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 5 Claim, each Holder of an Allowed PIK Notes Claim shall receive, at the Debtors' option, but with the Committee's consent, as described in the succeeding sentence, its *pro rata* share of $24,790,102, plus accrued and unpaid interest, in the form of either (i) New Second Lien Notes, (ii) New PIK Notes, (iii) New Preferred Stock, or (iv) a combination of the foregoing. The Debtors shall require the consent of the Committee (which consent shall not be unreasonably withheld or delayed) in determining the form of consideration to be distributed pursuant to Section 4.5(b) of the Plan; *provided, however*, that (i) the Committee may not require the Debtors to issue a security or debt instrument to the extent that the terms thereof violate the terms of any Plan Supplement Document and (ii) the consent of the members of the Committee holding two-thirds in principal amount of the Allowed PIK Notes Claims held by the Committee at the time the determination is made as to the form of the PIK Notes Claims distribution shall be required in connection with Section 4.5(b) of the Plan. | Yes. | 100% |
| Class 6 | Subordinated Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 6 Claim, each Holder of a Subordinated Notes Claim shall receive its *pro rata* share of the Class 6 Distribution Pool. | Yes. | 53.5% |
| Class 7 | 2011 Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 7 Claim, each Holder of an Allowed 2011 Notes Claim shall receive its *pro rata* share of the Class 7 Distribution Pool. | Yes. | 53.5% |
| Class 8 | General Unsecured Claims | In full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full, in Cash of the unpaid portion of its Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the | No (deemed to accept). | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| | | date on which such Claim becomes Allowed or would otherwise be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the Holder of such Claim; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date. | | |
| Class 9 | Intercompany Claims | On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 9 Claim, all Allowed Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors. | No (deemed to accept). | N/A |
| Class 10 | Interests | On the Effective Date, all Interests in AMI shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise. Holders of Interests in AMI shall neither receive distributions nor retain any property under the Plan on account of such Interests in AMI. | No (deemed to reject). | 0% |

**WHERE TO FIND ADDITIONAL INFORMATION**: For detailed historical and forecasted financial information and financial estimates, see Section VII below, entitled "FINANCIAL INFORMATION, FORECASTS, AND VALUATION ANALYSIS" and the Pro Forma Financial Forecast Analysis (the "*Forecast*") attached hereto as Exhibit "G".

The Debtors' legal advisor is Akin Gump Strauss Hauer & Feld LLP, and their financial advisor is Moelis & Company LLC. The Debtors' legal advisor can be contacted at:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
(212) 872-1000
Attn:    Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

**Summary of Voting Procedures**

To be counted, your vote (or the Master Ballot) cast on your behalf) must be received, pursuant to the following instructions, by Kurtzman Carson Consultants LLC (the "***Voting Agent***") at the following address, before the Voting Deadline of 5:00 P.M. (Eastern Time) on November 15, 2010 (the "***Voting Deadline***"):

American Media Ballot Processing Center
Kurtzman Carson Consultants LLC
599 Lexington Avenue, 39th Floor
New York, NY 10022

Confirm by Telephone: (877) 833-4150.

***ONLY CERTAIN HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ELIGIBLE TO VOTE ON THE PLAN, ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT "A," AND SUMMARIZED BELOW UNDER THE SECTION ENTITLED "THE PLAN."*** **IT IS IMPORTANT THAT THE HOLDERS OF CLAIMS IN CLASS 2 (TERM FACILITY CLAIMS), CLASS 5 (PIK NOTES CLAIMS), CLASS 6 (SUBORDINATED NOTES CLAIMS) AND CLASS 7 (2011 NOTES CLAIMS) EXERCISE THEIR RIGHTS TO VOTE TO ACCEPT OR REJECT THE PLAN.**

Please complete the information requested on the Ballot, sign, date and indicate your vote on the Ballot, and return your completed Ballot in the enclosed pre-addressed postage-paid envelope so that it is actually received by the Voting Agent before the Voting Deadline.

If the return envelope provided with your Ballot is addressed to your brokerage firm or bank or its agent (each, a "*Nominee*"), you must allow sufficient time for your Nominee to cast your vote on a Master Ballot so that it is actually received by the Voting Agent on or before the Voting Deadline **(5:00 P.M., Eastern Time, on November 15, 2010).**

**The Company is relying on sections 3(a)(9) and 4(2) of the Securities Act and similar "blue sky" law provisions, as well as, to the extent applicable, the exemption from the Securities Act and equivalent state law registration requirements provided by section 1145(a)(1) of the Bankruptcy Code, to exempt from registration under the Securities Act and "blue sky" laws the offer and sale of New Common Stock and New Preferred Stock, if applicable, in connection with the solicitation and the Plan.**

**IF YOU ARE ENTITLED TO VOTE AND YOU HAVE RETURNED YOUR BALLOT BUT FAILED TO INDICATE ON THE BALLOT WHETHER YOU ACCEPT OR REJECT THE PLAN, YOUR BALLOT WILL NOT BE COUNTED.**

\* \* \*

 For detailed voting instructions, see Section IX below, entitled "VOTING PROCEDURES AND REQUIREMENTS," and the instructions on your Ballot.

# TABLE OF CONTENTS

**Page**

I. General Information ....................................................................................................................... 1
    A.    Description of the Debtors ................................................................................... 1
        1.    Business .................................................................................................. 1
        2.    Corporate History and Structure ........................................................... 3
        3.    Selected Financial Information .............................................................. 4
    B.    Prepetition Indebtedness and Capital Structure ................................................ 4
        1.    Equity ..................................................................................................... 4
        2.    Prepetition Indebtedness ........................................................................ 4
            (a)    2009 Credit Agreement ............................................................. 4
            (b)    2011 Notes ................................................................................. 4
            (c)    PIK Notes .................................................................................. 5
            (d)    Subordinated Notes ................................................................... 5

II. Events Leading to the Commencement of the chapter 11 cases ................................................ 5
    A.    Industry-Specific Events .................................................................................... 5
    B.    The 2008/2009 Restructuring ............................................................................ 6
    C.    The Exchange Offer and the Tender Offer ........................................................ 7
    D.    Prepetition Negotiations .................................................................................... 7
    E.    The Financial Restructuring Transaction ........................................................... 8
        1.    Restructuring Support Agreement ......................................................... 8
        2.    New Financing ....................................................................................... 9
        3.    Purpose of the Financial Restructuring ............................................... 12
        4.    Distributions in Connection with the Financial Restructuring ............ 12

III. Anticipated Events During the Chapter 11 Cases ................................................................. 12
    A.    Administration of the Plan ............................................................................... 12
    B.    Confirmation Hearing ...................................................................................... 14
    C.    Timetable for the Chapter 11 Cases ................................................................ 14

IV. The Plan ................................................................................................................................. 14
    A.    Classification and Treatment of Claims and Equity Interests Under the Plan ................ 14
        1.    Description of Unclassified Claims ..................................................... 17

i

| | (a) | Administrative Expense Claims | 18 |
| | (b) | Professional Compensation and Reimbursement Claims | 18 |
| | (c) | Priority Tax Claims | 18 |
| 2. | | Description of Classified Claims | 19 |
| | (a) | Priority Non-Tax Claims (Class 1) | 19 |
| | (b) | Term Facility Claims (Class 2) | 19 |
| | (c) | Revolver Claims (Class 3) | 20 |
| | (d) | Other Secured Claims (Class 4) | 20 |
| | (e) | PIK Notes Claims (Class 5) | 20 |
| | (f) | Subordinated Notes Claims (Class 6) | 21 |
| | (g) | 2011 Notes Claims (Class 7) | 21 |
| | (h) | General Unsecured Claims (Class 8) | 21 |
| | (i) | Intercompany Claims (Class 9) | 22 |
| | (j) | Equity Interests in AMI (Class 10) | 22 |

V. MEANS FOR IMPLEMENTATION OF THE PLAN ........................ 22

| A. | | Substantive Consolidation | 23 |
| B. | | Corporate Action | 23 |
| | 1. | General | 23 |
| | 2. | Restated Certificate of Incorporation, New Preferred Stock Certificate of Designation (if Applicable) and Restated Bylaws of Reorganized AMI and the Other Reorganized Debtors | 24 |
| | 3. | Boards of Directors of Reorganized AMI and the Other Reorganized Debtors | 24 |
| | 4. | Officers of Reorganized AMI and the Other Reorganized Debtors | 25 |
| | 5. | Escrow Issuer for the New First Lien Financing and the New Second Lien Financing, if applicable | 25 |
| C. | | Distribution of New Second Lien Financing | 25 |
| D. | | Offer to Purchase New Second Lien Notes | 26 |
| E. | | Issuance of New Common Stock and New Preferred Stock (If Applicable) | 26 |
| F. | | Merger/Dissolution/Consolidation | 27 |
| G. | | Cancellation of Existing Securities and Agreements | 27 |
| H. | | Surrender of Existing Securities | 27 |
| I. | | Equity Incentive Plan | 27 |
| J. | | Director Severance Plan | 27 |
| K. | | Cancellation of Liens | 28 |

ii

L.     Compromise of Controversies .................................................................28

M.     Stockholders Agreement ........................................................................28

N.     Listing of New Common Stock and Transfer Restrictions .............................28

O.     Exemption from Securities Laws.............................................................28

P.     Exemption from Transfer Taxes ..............................................................29

Q.     D&O Insurance Policy..........................................................................29

VI. Other Aspects of the Plan ....................................................................................30

A.     Distributions......................................................................................30

       1.     Voting of Claims ......................................................................30

       2.     Cramdown and No Unfair Discrimination.......................................30

       3.     Timing and Conditions of Distributions .........................................30

              (a)    Distribution Record Date...................................................30

              (b)    Date of Distributions........................................................30

              (c)    Sources of Cash for Distribution ..........................................31

              (d)    Disbursement Agent ........................................................31

              (e)    Rights and Powers of the Disbursement Agent ........................31

              (f)    Expenses of the Disbursement Agent ....................................31

              (g)    Delivery of Distributions ...................................................31

              (h)    Manner of Payment Under the Plan.......................................32

              (i)    No Fractional Shares of New Common Stock or New
                     Preferred Stock, if Any .....................................................32

              (j)    Setoffs and Recoupment ...................................................33

              (k)    Distribution After Effective Date ..........................................33

              (l)    Cash Distributions ...........................................................33

              (m)    Allocations Between Principal and Interest...............................33

              (n)    No Postpetition Interest on Claims .......................................33

       4.     Procedures for Disputed Claims Under the Plan ................................33

              (a)    Disputed Claims/Process ...................................................33

              (b)    Objections to Claims.........................................................34

              (c)    Estimation of Claims ........................................................34

              (d)    No Distributions Pending Allowance .....................................34

              (e)    Distribution After Allowance ..............................................34

              (f)    Preservation of Claims and Rights to Settle Claims .............................34

B.     Treatment of Executory Contracts and Unexpired Leases.............................35

iii

1.    Assumption and Rejection of Contracts and Leases .......................................... 35

2.    Cure of Defaults .......................................................................................... 35

3.    Rejection Claims .......................................................................................... 35

4.    Survival of the Debtors' Indemnification Obligations ....................................... 36

5.    Survival of Management Agreements and Other Employment
      Arrangements .............................................................................................. 36

6.    Insurance Policies ........................................................................................ 36

C.    Conditions Precedent to the Effective Date ............................................................. 36

1.    Conditions Precedent to Effective Date of the Plan ......................................... 36

      (a)    Confirmation Order. .......................................................................... 37

      (b)    Execution and Delivery of Other Documents. ....................................... 37

      (c)    Regulatory Approvals. ....................................................................... 37

      (d)    Consents. ........................................................................................ 37

      (e)    Corporate Formalities. ...................................................................... 37

      (f)    Other Acts. ...................................................................................... 37

2.    Waiver of Conditions Precedent ..................................................................... 37

3.    Effect of Failure of Conditions ...................................................................... 37

D.    Effect of Confirmation. ....................................................................................... 38

1.    Vesting of Assets ......................................................................................... 38

2.    Binding Effect .............................................................................................. 38

3.    Discharge of the Debtors ............................................................................... 38

4.    Exculpation ................................................................................................. 38

5.    Term of Injunctions or Stays ......................................................................... 39

6.    Injunction Against Interference with the Plan .................................................. 39

7.    Preservation of Claims .................................................................................. 39

8.    Reservation of Rights .................................................................................... 39

9.    Plan Supplement .......................................................................................... 40

10.   Plan Financing Supplement ........................................................................... 40

E.    Releases. ........................................................................................................... 40

1.    Releases by Debtors ..................................................................................... 40

2.    Releases by Holders of Claims ....................................................................... 40

VII. Financial Information, Forecast, and Valuation Analysis ................................................ 41

A.    Historical Financial Information ............................................................................ 41

      (a)    General .......................................................................................... 41

(b)      Selected Financial Data .........................................................42

(c)      Management's Discussion and Analysis of Financial
         Condition and Results of Operations ......................................42

(d)      Recent Financial Performance ................................................42

B.      Forecast...........................................................................................42

C.      Reorganization Value Analysis.......................................................42

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................43

A.      Certain Bankruptcy Considerations. ................................................43

        1.       Parties in Interest May Object to the Debtors' Classification of
                 Claims. ................................................................................43

        2.       In Certain Instances, Any Chapter 11 Case May be Converted to a
                 Case under Chapter 7 of the Bankruptcy Code....................................44

        3.       The Bankruptcy Court May Not Confirm the Plan............................................44

        4.       The Debtors May Fail to Meet All Conditions Precedent to
                 Effectiveness of the Plan..............................................................45

        5.       The Debtors May Be Unsuccessful in Obtaining First Day Orders to
                 Authorize Payment to Key Creditors in the Ordinary Course of
                 Business. ..............................................................................45

        6.       The Debtors Cannot Predict the Amount of Time Needed in
                 Bankruptcy to Implement the Plan, and a Lengthy Bankruptcy Case
                 Could Disrupt the Business, as well as Impair the Prospect for
                 Reorganization on the Terms Contained in the Plan and Possibly
                 Provide an Opportunity for Other Plans to be Proposed....................46

        7.       The Debtors' actual financial results may vary significantly from the
                 Forecast filed with the Bankruptcy Court.............................................46

        8.       The Debtors cannot be assured that the Bankruptcy Court will
                 approve of the Debtors' First and Second Lien Financing Raises, or
                 that such approval will be obtained in a timely manner. ...................47

        9.       The Plan may not be consummated due to the failure of the Backstop
                 Parties to comply with their obligations under the Backstop
                 Commitment Letter...................................................................47

        10.      Consummation of the Plan may affect the Debtors' liability for U.S.
                 federal income taxes currently or in the future. ..................................47

B.      Risks to Recovery By Holders of Allowed Term Facility Claims, Allowed
        PIK Notes Claims, Allowed Subordinated Notes Claims and Allowed 2011
        Notes Claims................................................................................48

        1.       Variances from Forecasts................................................................48

        2.       Holders of Subordinated Notes Claims and Management's
                 Ownership of the Reorganized Debtors...............................................48

        3.       Unforeseen Events. .....................................................................49

C.    Risks Associated with the Debtors' Business and the Industry .........................49

1.    The Debtors' substantial debt could impair their ability to operate
and expose them to certain risks. ........................................................49

2.    Future acquisitions, partnerships, publishing services agreements and
joint ventures may require significant resources and/or result in
significant unanticipated losses, costs or liabilities. ............................50

3.    The Debtors' performance could be adversely affected if they lose
their key personnel.................................................................................51

4.    If the Debtors fail to implement their strategy, their businesses will
be adversely affected. ...........................................................................51

5.    The Debtors' businesses and results of operations are affected by and
dependent upon discretionary consumer spending patterns...................51

6.    General economic trends, as well as trends in advertising spending
and competition, along with declines in single copy circulation, may
reduce the Debtors' advertising and circulation revenues which
represent the vast majority of their revenues. .......................................52

7.    The Debtors operate in a very competitive business environment. ....................52

8.    The Debtors' businesses and results of operations may be adversely
affected by increases in fuel costs and increases in the price of paper
or postage................................................................................................53

9.    The Debtors' businesses may be adversely affected if they lose one
or more of their vendors.........................................................................53

10.    Terrorist attacks and other acts of violence or war may affect the
financial markets and the Debtors' businesses, results of operations
and financial condition...........................................................................54

11.    Pending and future litigation or regulatory proceedings could
materially affect the Debtors' operations...............................................54

12.    If the Debtors' goodwill or other identifiable intangible assets
become impaired, the Debtors may be required to record a significant
charge to earnings. .................................................................................54

13.    Some provisions of Delaware law and AMI's amended and restated
certificate of incorporation may deter third parties from acquiring
AMI..........................................................................................................55

14.    Because of the concentration of ownership among a few
stockholders, such stockholders will be able to exercise control over
significant transactions involving AMI, including a change in control
transaction, and the interests of such stockholders may differ from
those of Reorganized AMI's other stockholders. .................................55

15.    The Debtors may not be able to maintain an effective system of
internal control over financial reporting and disclosure controls.........55

16.    The Debtors may suffer credit losses that could adversely affect their
results of operation.................................................................................56

17.    The Debtors' single copy revenues consist of copies sold primarily to three wholesalers......................................................................................56

18.    Employee benefit costs are increasing significantly. .............................................56

IX. Voting Procedures and Requirements.....................................................................................56

A.    Vote Required for Acceptance by a Class .....................................................................57

B.    Classes Not Entitled to Vote .........................................................................................57

C.    Voting Record Date ........................................................................................................57

D.    Voting on the Plan ..........................................................................................................57

E.    Beneficial Owners...........................................................................................................58

F.    Nominees ........................................................................................................................58

1.    Master Ballots......................................................................................................58

2.    Miscellaneous .....................................................................................................59

3.    Fiduciaries And Other Representatives ...............................................................59

4.    Agreements Upon Furnishing Ballots or Master Ballots....................................59

5.    Change of Vote ....................................................................................................60

G.    Waivers of Defects, Irregularities, Etc.........................................................................60

H.    Further Information, Additional Copies ........................................................................60

X. Confirmation of the Plan ........................................................................................................60

A.    Confirmation Hearing ....................................................................................................60

B.    General Requirements of Bankruptcy Code Section 1129 ............................................61

C.    Confirmation Without Acceptance of All Impaired Classes .........................................61

1.    No Unfair Discrimination. ...................................................................................61

2.    Fair and Equitable Test. .......................................................................................61

D.    Best Interests Test ..........................................................................................................62

E.    Liquidation Analysis.......................................................................................................63

F.    Feasibility........................................................................................................................63

XI. Alternatives to Confirmation and Consummation of the Plan ...............................................63

A.    Liquidation Under Chapter 7 or Chapter 11 .................................................................63

B.    Alternative Plan .............................................................................................................64

XII. Certain United States Federal Income Tax Consequences of the Plan .................................64

A.    U.S. Federal Income Consequences to the Debtors ......................................................65

1.    COD Income of the Debtors ................................................................................65

2.    Limitation of NOLs and Other Tax Attributes ...................................................66

3.    Treatment of the New PIK Notes as Applicable High Yield Discount Obligations...........................................................................................................68

|     | 4.  | Alternative Minimum Tax | 68 |

| B. | U.S. Federal Income Tax Consequences to U.S. Holders Under the Plan | 68 |
|    | 1. | Consequences to U.S. Holders of Class 2 Term Facility Claims | 69 |
|    | 2. | Consequences to U.S. Holders of Class 5 PIK Notes Claims | 70 |
|    | 3. | Consequences to U.S. Holders of Class 6 Subordinated Notes Claims | 72 |
|    | 4. | Consequences to U.S. Holders of Class 7 2011 Notes Claims | 73 |
|    | 5. | Ownership and Disposition of the New Second Lien Financing | 73 |
|    | 6. | Ownership and Disposition of the New PIK Notes | 74 |
|    | 7. | Ownership and Disposition of New Common Stock and New Preferred Stock, if Any | 75 |
|    | 8. | Accrued Interest | 75 |
|    | 9. | OID | 76 |
|    | 10. | Applicable High Yield Interest Obligations | 77 |
|    | 11. | Market Discount | 77 |
|    | 12. | Backup Withholding for U.S. Holders | 78 |

| C. | General U.S. Federal Income Tax Consequences to Non-U.S. Holders | 78 |
|    | 1. | Tax Consequences to Non-U.S. Holders of Plan | 78 |
|    |    | (a) Tax Consequences of Non-U.S. Holders Under the Plan | 79 |
|    |    | (b) Non-U.S. Holders of New Common Stock or New Preferred Stock | 79 |
|    |    | (c) Non-U.S. Holders of New Second Lien Financing and New PIK Notes | 79 |
|    |    | (d) Effectively Connected Income and Loss | 80 |
|    |    | (e) Sale, Exchange or Disposition of New Common Stock, New Preferred Stock, New Second Lien Financing, Subordinated Notes or New PIK Notes | 80 |
|    |    | (f) Information Reporting and Backup Withholding | 81 |

| XIII. Conclusion | | 82 |

| Exhibit A | Joint Prepackaged Plan of Reorganization |
| Exhibit B | Restructuring Support Agreement |
| Exhibit C | Annual Report |
| Exhibit D | Audited Financial Statements |
| Exhibit E | Quarterly Report |
| Exhibit F | Quarterly Financial Statements |
| Exhibit G | Pro Forma Financial Forecast Analysis |
| Exhibit H | Reorganization Value Analysis |
| Exhibit I | Liquidation Analysis |

AGSH & BREA PRELIMINARY WORKING DRAFT-10/29/2010
PRIVILEGED & CONFIDENTIAL
NOT FOR PUBLIC RELEASE
SUBJECT TO FRE 408

**I.**

**<u>GENERAL INFORMATION</u>**

**A.    Description of the Debtors**

The Debtors, which are privately owned, operate their businesses through a group of affiliated entities.  The Debtors in these Chapter 11 Cases are:

American Media, Inc.
American Media Operations, Inc.
American Media Consumer Entertainment, Inc.
American Media Consumer Magazine Group, Inc.
American Media Distribution & Marketing Group, Inc.
American Media Mini Mags, Inc.
American Media Newspaper Group, Inc.
American Media Property Group, Inc.
Country Music Media Group, Inc.
Distribution Services, Inc.
Globe Communications Corp.
Globe Editorial, Inc.
Mira! Editorial, Inc.
National Enquirer, Inc.
National Examiner, Inc.
Star Editorial, Inc.
Weider Publications, LLC

1.    ***<u>Business</u>***

The Company is a leading publisher in the field of celebrity journalism and health and fitness magazines.  Its publications include *Star*, *Shape*, *Men's Fitness*, *Fit Pregnancy*, *Natural Health*, *Muscle & Fitness*, *Muscle & Fitness Hers*, *Flex*, *UFC Magazine*, *National Enquirer*, *Globe*, *Country Weekly*, *Mira!*, *Sun*, *National Examiner*, and other publications.

The Company also provides publishing services to other publishers, including *Playboy Enterprises, Inc.*, *World Wrestling Entertainment, Inc.* and others.  Additionally, the Company's wholly-owned subsidiary, Distribution Services, Inc. ("***DSI***"), which is also a Debtor, arranges for the placement of its publications and third-party publications with retailers.  DSI monitors through its regional managers and merchandising staff that these publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great A&P Tea Company and Winn Dixie.  DSI coordinates (also known as acting as a "***category manager/front-end advisor***") the racking of magazine fixtures for selected retailers.  In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients.  Some of DSI's third-party publishing clients include Hachette Filipachi Media U.S., which publishes *Woman's Day* and *Elle*; Newsweek, Inc., which publishes *Newsweek*; Bauer Publishing, which publishes *First for Women*, *Woman's World*, *Life & Style* and *In Touch*; Rodale, Inc., which publishes *Prevention*, *Men's Health* and *Woman's Health*; General Mills, which publishes *Pillsbury* and *Betty Crocker*; Typhoon Media Corporation, which publishes various dictionary and reference books, medical and health encyclopedias, classical fiction, cookbooks and

homeopathic health titles; and New York Media LLC, which publishes *New York Magazine* and specials.  Some of DSI's third-party non-publishing clients include Kroger, Safeway, Random House, Blackhawk Network and Frontline Marketing, Inc.

As of March 31, 2009, March 31, 2010 and June 30, 2010, the Company's magazines comprised approximately 21% of total U.S. and Canadian newsstand circulation for weekly publications audited by the Audit Bureau of Circulators.  Total average newsstand and subscription circulation per issue for all of the Company's publications that are currently published and have a publishing frequency of six or more times per year was approximately 5.9 million copies for the fiscal quarter ended June 30, 2010, as compared to 6.1 million copies for fiscal year 2010.

For the fiscal quarters ended June 30, 2010 and 2009, approximately 59% and 62%, respectively, of the Company's total operating revenues were derived from circulation.  Single copy sales accounted for approximately 81% and 83% of such circulation revenues in fiscal quarters ended June 30, 2010 and 2009, respectively, and the remainder was from subscription sales.  The Company's advertising revenues are generated by national advertisers, including packaged goods, sports nutrition products, automotive, entertainment, pharmaceutical, sports apparel, beauty and cosmetics, fashion and direct response.  For the fiscal quarters ended June 30, 2010 and 2009, approximately 34% and 32%, respectively, of the Company's total operating revenues were from advertising.

As of June 30, 2010 and 2009, the Company's publications were distributed to newsstands primarily by three wholesalers, which the Company estimates represent approximately 81% of the newsstand distribution market, as well as several smaller wholesalers who represent the remaining approximately 19%.  For both fiscal years 2010 and 2009, wholesalers distribute the copies to approximately 110,000 retail outlets in the United States and Canada, representing, in the opinion of management, substantially complete coverage of periodical outlets in North America.  The wholesalers also process returns of the Company's publications, bill and collect from the retailers, and make payments to national distributors.  The Company distributes its publications to the wholesalers with a full right of return, who in turn sell them to retailers with a full right of return. The Company's national distributors' primary function is to bill and collect funds from wholesalers and remit these funds to the Company.

In addition to the Company's relationships with national distributors and wholesalers, it also has relationships with retailers, to which the Company pays one or more of the following:

- Rack Costs – the Company pays a fee to retailers to sell the Company's publications in the display racks in the checkout section of supermarkets and other large retailers, typically for three year periods.

- Display Continuity Allowances ("**DCA**") – DCA is a payment that the Company makes directly to the retailer and is similar to slotting fees paid by other industries to supermarkets.

- Retail Display Allowance ("**RDA**") – the Company makes this payment directly to the retailers based upon quarterly claim forms that they submit to us. On average, RDA payments are equal to approximately 10% of the cover price for each magazine sold.

- Retail Display Pockets ("**RDP**") – the Company pays this fixed per pocket fee directly to retailers. This fee is similar to RDA, except that the amount is fixed per pocket.  The Company pays either RDA or RDP to a particular retailer, but not both.

Subscription revenues are derived from copies mailed to the Company's subscribers. The Company outsources its subscription fulfillment services to a third-party. Advertising revenues are derived primarily from customer advertisements placed in the Company's publications.

As of March 31, 2010, the Company employed approximately 654 persons equivalent to full-time employees, excluding part-time employees of DSI. In addition, as of March 31, 2010, the Company employed approximately 1,350 part-time merchandising employees in its Distribution Services segment. None of the Company's employees is represented by any union or other labor organization. The Company has had no strikes or work stoppages during the last five years.

2. ***Corporate History and Structure***

American Media Operations, Inc. ("***AMO***") was incorporated under the laws of Delaware in 1981 and is a wholly-owned subsidiary of American Media, Inc. ("***AMI***"). AMO conducts all of AMI's operations and represents substantially all of AMI's assets.

The chart below summarizes AMI's current corporate structure (all entities other than those incorporated outside of the United States and the Company's joint ventures are Debtors in the Chapter 11 Cases):



3.        *Selected Financial Information*

For the twelve month period ending June 30, 2010, the Debtors, on a consolidated basis, generated $400 million in operating revenue.  As of June 30, 2010, the Debtors had total assets of $618.4 million and total liabilities of $1.2 billion.

**B.        Prepetition Indebtedness and Capital Structure**

1.        *Equity*

The common stock of AMI is privately held primarily by (a) American High-Income Trust and certain related funds and other entities managed by Capital Research and Management Company, Capital Guardian Trust Company, and Capital International, Inc. (collectively, "***Capital Research***"), which holds approximately 27.2%; (b) Angelo, Gordon & Co. L.P. and certain affiliates ("***Angelo Gordon***"), which hold approximately 17.3%; (c) Avenue Capital Management II, L.P. and certain affiliates ("***Avenue***"), which hold approximately 17.9%; (d) Credit Suisse Securities (USA) LLC ("***Credit Suisse***"), which holds approximately 7.8%; (e) Regiment Capital Ltd. and certain affiliates, which hold 6.3%; and (f) twenty-eight other institutional investors, each of whom hold less than 5%, collectively hold approximately 18.6%.  The remaining common stock of AMI is held by certain AMO directors and employees.

2.        *Prepetition Indebtedness*

As of the Petition Date, AMO's total principal amount of outstanding debt is expected to be approximately $878.7 million, which will consist of approximately $490.6 million principal amount of debt under the 2009 Credit Agreement, $7.5 million principal amount of 2011 Notes, $24.8 million principal amount of PIK Notes, and $355.8 million principal amount of Subordinated Notes.

(a)        2009 Credit Agreement

On December 31, 2008, AMO amended and restated its Credit Agreement dated as of January 30, 2006, among AMO, AMI, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Deutsche Bank Securities Inc., as Syndication Agent (the "***2009 Credit Agreement***").  On January 30, 2009, the 2009 Credit Agreement became effective.  The 2009 Credit Agreement includes a $450.0 million term facility (the "***Term Facility***"), which matures in January 2013.  As of the Petition Date, the balance outstanding under the Term Facility is expected to be $430.6 million.  The effective interest rate applicable to the Term Facility under the 2009 Credit Agreement, as of June 30, 2010, was 10%.

The 2009 Credit Agreement also includes a $60 million revolving facility (the "***Revolving Facility***").  The Revolving Facility matures in January 2012.  As of the Petition Date, the balance outstanding under the Revolving Facility is expected to be $60 million.  The effective interest rate applicable to the Revolving Facility under the 2009 Credit Agreement, as of June 30, 2010, was 10%.  The guarantors under the 2009 Credit Agreement consist of AMI and the Debtor Subsidiaries.

(b)        2011 Notes

On January 23, 2003 AMO issued $150 million aggregate principal amount of the 2011 Notes (the "***2011 Notes***").  Under the indenture governing the 2011 Notes, as of January 15, 2010, the 2011 Notes became redeemable at par, plus accrued and unpaid interest.  As of the Petition Date, the Debtors' expect that approximately $7.5 million of the principal amount of the 2011 Notes will

remain outstanding. Interest on the 2011 Notes accrues at a rate of 8 7/8%. The guarantors of the 2011 Notes are the Debtor Subsidiaries.

        (c)     PIK Notes

On January 30, 2009, AMO issued $21.2 million aggregate principal amount of PIK Notes. The PIK Notes are unsecured senior obligations of AMO and are effectively subordinated to all of AMO's existing and future secured debt, including obligations under the 2009 Credit Agreement. The PIK Notes will mature on May 1, 2013. As of the Petition Date, the Debtors expect that approximately $24.8 million will remain outstanding on the PIK Notes. Interest on the PIK Notes accrues at the rate of 9% per annum based upon the outstanding principal amount. The 2009 Credit Agreement prohibits the payment of cash interest on the PIK Notes. The guarantors of the PIK Notes are the Debtor Subsidiaries.

        (d)     Subordinated Notes

On January 30, 2009, AMO issued $299.7 million aggregate principal amount of Subordinated Notes. The Subordinated Notes are unsecured senior subordinated obligations of AMO and are subordinated in right of payment to AMO's existing and future senior debt, including obligations under the 2009 Credit Agreement and the PIK Notes. The Subordinated Notes will mature on November 1, 2013. Interest on the Subordinated Notes accrues at the rate of 14% per annum based upon the outstanding principal amount. As of the Petition Date, the Debtors expect that approximately $355.8 million of the principal amount of the Subordinated Notes will remain outstanding. The guarantors of the Subordinated Notes are Debtor Subsidiaries.

**II.**

**EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

**A.**     **Industry-Specific Events**

The Company's business and results of operations are affected by and dependent upon discretionary consumer spending patterns. The Company's business is sensitive to a number of factors that influence the level of discretionary consumer spending, including political and economic conditions, such as recessionary and inflationary environments. Notably, recent increases in the retail price of gasoline and the potential for further increases in gasoline and other energy costs, increases in credit card, home mortgage, and other borrowing costs, and declines in housing values have contributed to declines in overall consumer confidence and discretionary spending. A decline in discretionary consumer spending on publications, particularly those sold at retailers' checkout counters and those targeting certain demographics particularly affected by challenging economic conditions, adversely effects on the Company's business, operating results and profitability.

General economic trends, as well as trends in advertising spending and competition, along with declines in single copy circulation, have reduced the Company's advertising and circulation revenues, which represent the vast majority of the Company's revenues. The Company's advertising and circulation revenues, which accounted for 92% of the Company's total operating revenues in fiscal year 2010, are subject to the risks arising from adverse changes in domestic and global market conditions (i.e., recessionary environments or increases in gas prices and interest rates) and possible shifting of advertising spending from print to Internet or other media or decreases in advertising budgets. The Company believes that the principal factors contributing to the declines in its single copy circulation include: (i) the current economic slowdown; (ii) increased competition from other

5

publications and forms of media, such as certain newspapers, television and radio programs and Internet sites concentrating on celebrity news; (iii) a general industry-wide decline in single copy circulation of individual publications due to an increasing number of publications in the industry; and (iv) diminished service levels from wholesalers who distribute our magazines to retailers and fill the pockets at checkout counters as a result of consolidation among wholesalers and their related efforts to cut expenses.

The Company operates in a very competitive business environment. *Star*, *National Enquirer*, *Globe*, *National Examiner*, *Sun*, *Mira!* and *Country Weekly* compete in varying degrees with other publications sold at retailers' checkout counters, as well as forms of media concentrating on celebrity news, such as certain tabloids, magazines and television and radio programs. The Company believes that historical declines in single copy circulation of *National Enquirer*, *Globe* and *National Examiner* have resulted in part from increased competition from these publications and forms of media. Competition for circulation is largely based upon the content of the publication, its placement in retail outlets and its price. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price, and advertising results. Certain of the Company's competitors have substantially larger operating staffs, greater capital resources and greater revenues from their publications. In this respect, the Company may be at a competitive disadvantage with such entities. As use of the Internet and new on-line ventures focusing on celebrity news has increased, the Company has faced additional competition. Certain of the Company's competitors have substantially larger operating staffs and greater capital resources. Increased competition may have resulted in less demand for the Company's products and services.

The Company's business and results of operations may be adversely affected by increases in fuel costs and increases in the price of paper or postage. Many aspects of the Company's business have been directly affected by increases in the cost of fuel. Increased fuel costs have translated into increased costs for the products and services the Company receives from its third-party suppliers including, but not limited to, increased production and distribution costs for our products. In particular, paper and postage represent significant components of the Company's total cost to produce and distribute the Company's printed products. Paper is a commodity and its price has been subject to significant volatility. Furthermore, because the United States Postal Service and Canada Post Corporation distribute substantially all of the Company's subscription publications and many of the Company's marketing materials, increases in the cost of postage to mail the Company's subscription publications have an adverse effect on the Company's business.

## B.    The 2008/2009 Restructuring

On January 30, 2009, AMO successfully completed its cash tender offers and received the requisite consents in the related consent solicitations in respect of AMO's then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 10 1/4% Series B Subordinated Notes due 2009 (the "***2009 Notes***") and (2) the 2011 Notes (together with the 2009 Notes, the "***Prior Notes***"). $400.5 million in aggregate principal amount of the 2009 Notes and $148.0 million in aggregate principal amount of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

On December 31, 2008, AMO amended and restated its Credit Agreement dated as of January 30, 2006, among AMO, AMI, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent and Deutsche Bank Securities Inc., as Syndication Agent. On January 30, 2009, concurrently with the consummation of AMO's cash tender offers, the 2009 Credit Agreement became effective. The 2009 Credit Agreement provided for the Term Facility and the Revolving Facility.

On January 29, 2009, AMO amended and restated its certificate of incorporation to increase the number of shares authorized to be issued from 10,000 to 7,500,000 and changed the par value of such common stock from $0.20 to $0.0001. In addition, AMO exchanged 5,994,411 shares of common stock for 7,508 shares of common stock previously owned by AMI.

On January 30, 2009, AMO issued the Subordinated Notes and the PIK Notes. Concurrently with the notes offering, AMI sold 5,688,891 shares of common stock in AMI (valued at approximately $1.0 million) (the "**AMI Common Stock**" and, together with the Subordinated Notes and the PIK Notes, the "**Restructuring Securities**") for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement, dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering of the Restructuring Securities, together with AMO's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to such offering and the tender offers and consent solicitations. (For U.S. federal income tax purposes, AMO treated the tender offers for the Prior Notes and the issuance of the Restructuring Securities as an exchange of the Prior Notes for the Restructuring Securities.) In addition, on January 30, 2009, AMI issued an aggregate of 305,520 shares of AMI Common Stock to AMI's equityholders prior to the financial restructuring (the "**Prior Equityholders**") in exchange for the AMI Common Stock they owned prior to the restructuring.

As a result of the restructuring of AMO's capital structure and the issuance of AMI Common Stock to the bondholders who participated in the cash tender offers completed on January 30, 2009 and receipt of requisite consents in the related consent solicitations (the "**Prior Tendering Bondholders**"), the Prior Tendering Bondholders acquired approximately 94.9% of AMI's Common Stock. The Prior Equityholders retained approximately 5.1% of the AMI Common Stock.

These transactions are referred to collectively as the "**Prior Restructuring**" in this Disclosure Statement.

## C.    The Exchange Offer and the Tender Offer

On July 15, 2010, AMI launched an exchange offer for the Subordinated Notes (the "**Exchange Offer**"), and a cash tender offer for the PIK Notes (the "**Tender Offer**"). In the Exchange Offer, holders of Subordinated Notes were offered $269.52 in cash and 335.62 shares of AMI Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, AMI offered to purchase each $1,000 principal amount of outstanding PIK Notes for $1,020. Concurrently with the Exchange Offer and the Tender Offer, AMI solicited consents to amend the Subordinated Notes Indenture and the PIK Notes Indenture to remove substantially all of the restrictive covenants and certain events of default from each indenture. Both the Exchange Offer and the Tender Offer were initially scheduled to expire on August 11, 2010 (the "**Expiration Time**"). The Expiration Time was subsequently extended to November 1, 2010. Neither the Exchange Offer nor the Tender Offer is expected to be successfully consummated, and the Debtors anticipate that they will terminate the Exchange Offer and the Tender Offer.

## D.    Prepetition Negotiations

In September 2010, and in order to address many of the issues set forth below in the subsection entitled "Purposes of the Financial Restructuring," the Company (along with its legal and financial advisors) began discussions with the Committee, the Administrative Agent, the Term Facility Lenders, the Revolver Lenders, and potential new financing lenders. The Company actively negotiated with all groups to create a consensus on the appropriate restructuring (and/or repayment)

of the Company's outstanding debt. Ultimately, as further discussed below, the Company was able to reach a consensual resolution with the members of the Committee and certain of the Term Facility Lenders and Revolver Lenders on the terms of a comprehensive balance sheet restructuring and entered into a restructuring support agreement with such parties to document the parties' support of such restructuring.

As part of the negotiations with the Committee, AMO commenced, on October 12, 2010, a consent solicitation (the "***Interest Deferral Consent Solicitation***") to solicit consents from eligible holders of Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Subordinated Notes to January 3, 2011 (such deferred payment of interest, the "***Deferred Interest Payment***"). At least 75% of eligible holders of outstanding principal amount of Subordinated Notes were required to deliver consents to the Deferred Interest Payment. Among others, the Committee, which holds approximately 77% of the aggregate outstanding principal amount of Subordinated Notes, provided consents to the Deferred Interest Payment in the Interest Deferral Consent Solicitation. On October 28, 2010 AMO executed the Third Supplemental Indenture to the Subordinated Note Indenture (the "***Deferred Interest Supplemental Indenture***"), and the Deferred Interest Supplemental Indenture became operative immediately upon execution. The Deferred Interest Payment and the Deferred Interest Supplemental Indenture is applicable to all of the holders of the currently outstanding Subordinated Notes, whether or not the holder consented to the Interest Deferral Consent Solicitation.

**E.    The Financial Restructuring Transaction**

　　1.    ***Restructuring Support Agreement***

On October 30, 2010, the Company entered into the Restructuring Support Agreement, a copy of which is attached to this Disclosure Statement as Exhibit "B" (the "***RSA***"), with the members of the Committee. Pursuant to the Restructuring Support Agreement, the signatories thereto agreed to support a restructuring of the Company's indebtedness on the terms set forth therein (the "***Financial Restructuring***"). The Company agreed to implement the Financial Restructuring through the solicitation of votes to accept or reject the Plan through a "prepackaged" bankruptcy and the commencement of the Chapter 11 Cases. Institutions holding in the aggregate at least 35% of the Term Facility Claims, approximately 77.6% of the Subordinated Notes Claims, and approximately 89% of the PIK Notes Claims have agreed to support the Financial Restructuring by executing the RSA. Further, it is anticipated that additional Term Facility Lenders and/or Revolver Lenders will execute the RSA prior to the commencement of the Chapter 11 Cases.

The Plan sets forth the Debtors' post-Effective Date capital structure and the distribution that each Class of the Debtors' creditors is to receive under the Plan. Specifically, upon the Effective Date, among other things, as more fully set forth in the Plan:

　　(a)    the Holders of Term Facility Claims will receive (i) Cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims and (ii) New Second Lien Notes; provided however, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; provided further however, that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in Cash to the Administrative Agent. In addition, the Holders of Term Facility Claims will have the right to require that the Backstop Parties purchase

from such Holders the New Second Lien Notes received in accordance with the terms of the Plan.

(b)     the Holders of Allowed Revolver Claims shall receive payment in full, in Cash.

(c)     the Holders of Allowed Subordinated Notes Claims will receive 98% of the New Common Stock, subject to dilution for the Equity Incentive Plan (Holders of Allowed Subordinated Notes Claims other than the Backstop Parties will also be diluted by the Backstop Shares);

(c)     the Holders of Allowed PIK Notes Claims will receive, at the Debtors' option (but subject to the consent of the Committee, as set forth in the Plan) (i) New Second Lien Notes, (ii) New PIK Notes, (iii) New Preferred Stock, or (iv) a combination of the foregoing;

(d)     the Holders of Allowed 2011 Notes Claims will receive (i) approximately 2% of the New Common Stock, subject to dilution for the Equity Incentive Plan and (ii) Backstop Shares (unless such Holders are Backstop Parties);

(e)     the Holders of Allowed General Unsecured Claims will be unimpaired; and

(f)     the Holders of Interests in AMI will be cancelled.

2.     ***New Financing***

For the Financial Restructuring to be consummated pursuant to the Plan, the Debtors intend to enter into new first lien secured financing in a principal amount of approximately $385 million (the "***New First Lien Financing***"), new second lien secured financing in a principal amount of approximately $140 million (the "***New Second Lien Financing***"), and an approximately $40 million new first lien secured revolving credit facility (the "***New Revolver Facility***"). The documents relating to each of the foregoing shall be filed in draft form as part of the Plan Supplement, and the material terms of the New First Lien Financing and the New Second Lien Financing will be filed as part of the Plan Financing Supplement.

**a.    The New First Lien Financing and the New Second Lien Financing**

After several weeks of negotiations with various financial institutions, including potential arrangers and underwriters, the Debtors and their advisors determined that a first and second lien notes offering (the "***New First Lien Notes Offering***" and the "***New Second Lien Notes Offering***," respectively) provided the Debtors with the best financing terms available to fund the New First Lien Financing and the New Second Lien Financing. In connection therewith, the Debtors entered into an engagement letter (the "***Engagement Letter***"), with certain financial institutions to be lead underwriters, initial purchasers and/or placement agents (in such capacities, the "***Lead Managers***") for the New First Lien Notes Offering and the New Second Lien Notes Offering, which offerings shall be made on an uncommitted basis. Among other things, the Engagement Letter provides that the Debtors may not issue more than $140 million of New Second Lien Notes.

**b.    The Escrow Issuer**

The Debtors have determined, in their business judgment, to market the New First Lien Notes and New Second Lien Notes to potential investors and determine the pricing for the New First Lien

Notes and New Second Lien Notes, as close as practicable, prior to the date the Debtors file for chapter 11 relief, but intend to close the New First Lien Notes Offering and New Second Lien Notes Offering after the Petition Date.  In order to facilitate the closing of the New First Lien Notes and the New Second Lien Notes after the Petition Date and to ensure that the Debtors' stay in chapter 11 is as short as possible, the Debtors will request an order from the Bankruptcy Court, as soon as practicable after the filing of the Chapter 11 Cases, stating that a newly established non-Debtor Delaware company (the "***New LLC***") and its subsidiary, AMO Escrow Corporation, a new non-Debtor Delaware company (the "***Escrow Issuer***"), are non-Debtor entities and that any proceeds or assets they have will not be property of the Debtors' estates and will not be consolidated with the Debtors' assets or estates.  The Escrow Issuer will enter into (i) a binding purchase agreement prior to the Petition Date, pursuant to which the Escrow Issuer will agree to sell, and the lead managers will agree to purchase, the New First Lien Notes and the New Second Lien Notes at the price specified therein, (ii) related escrow agreements, pursuant to which the proceeds of the New First Lien Financing, the proceeds of the New Second Lien Financing and other amounts relating to other payment obligations in respect of the New First Lien Financing and Second Lien Financing will be held pending consummation of the Plan and (iii) grant a lien on the proceeds from the New First Lien Notes, proceeds from the New Second Lien Notes and all other assets it holds (if any).  Upon the Effective Date, the Escrow Issuer will merge into one of the Reorganized Debtors, which will assume the on-going liability for the New First Lien Notes and the New Second Lien Notes, and the proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering (and any other amounts held in escrow) will be released from escrow.  In addition, on the Petition Date, the Debtors will request that the Bankruptcy Court authorize them to transfer approximately $15 million into escrow to pay fees and interest associated with the New First Lien Financing, and the New Second Lien Financing (if New Second Lien Notes are issued for cash), and will request that the Bankruptcy Court deem such proceeds not to be property of the Debtors' estates or otherwise assets of the Debtors.

### c.    The Offer to Purchase the New Second Lien Notes

In addition to the New Second Lien Notes Offering, (i) $25 million in New Second Lien Financing plus any amount of New Second Lien Notes that is not purchased in the New Second Lien Notes Offering will be distributed to the Holders of Allowed Term Facility Claims and (ii) $24,790,102, plus accrued and unpaid interest, in New Second Lien Notes may be distributed, at the Debtors' option, but subject to the consent of the Committee, as set forth in the Plan, to Holders of Allowed PIK Notes Claims.  As described in Section 5.4 of the Plan (as well as Section V.D hereof), Holders of Allowed Term Facility Claims (other than the Backstop Parties) will have the option to put any New Second Lien Notes they receive pursuant to the Plan (such right, the "***Put Right***") to the Backstop Parties.  Specifically, as set forth in Section 5.4 of the Plan, pursuant to and in accordance with the terms of the Backstop Agreement, the Backstop Parties have, severally and not jointly, committed to purchase their *pro rata* share (based upon their *pro rata* share of all Subordinated Notes held collectively by the Backstop Parties) of any New Second Lien Notes that would otherwise be distributed to the Holders of the Allowed Term Facility Claims (excluding any Backstop Party) pursuant to Section 4.2(b) hereof (the "***Backstop Commitment***") to the extent such Holders have made the election described in the next sentence.  Holders of Allowed Term Facility Claims other than the Backstop Parties may elect to have the Backstop Parties purchase their *pro rata* share of the New Second Lien Notes for the face amount of such New Second Lien Notes pursuant to an election form that, subject to Bankruptcy Court approval, will be distributed to such Holders no later than 10 days after the Petition Date.  Any Holder of an Allowed Term Facility Claim electing to have the Backstop Parties purchase their share of the New Second Lien Notes must do so by noting its election on such Holder's supplemental election form and returning same to the Debtors by no later than 10 Business Days after the date the election form is distributed.  The mechanism by which electing Holders of Allowed Term Facility Claims will exercise their put option to ensure that such Holders

will obtain Cash in exchange for their allocation of New Second Lien Notes will be set forth in the supplemental election form.  Consummation of the purchase of such New Second Lien Notes shall occur on the Effective Date.  If one or more Term Facility Lenders exercises its option to put its *pro rata* allocation of New Second Lien Notes to the Backstop Parties, the Backstop Parties shall receive from the Debtors a fee equal to 5% of the aggregate principal amount of New Second Lien Notes put to the Backstop Parties by the Term Facility Lenders, which fee shall be payable in Cash.

In addition, pursuant to and in accordance with the terms of the Backstop Agreement, in consideration for undertaking their commitments under the Backstop Agreement, the Backstop Parties shall be entitled to a fully earned and nonrefundable fee payable in fully-paid and non-assessable New Common Stock, representing 5% (the "***Backstop Percentage Interest***") of the New Common Stock to be issued and outstanding on the Effective Date, which 5% shall be calculated after giving effect to the issuance of New Common Stock to the Backstop Parties on account of any Subordinated Notes they hold and without dilution in respect of the Additional Shares (as defined below) (collectively, the "***Initial Shares***"); provided that, if the Backstop Parties are not required to purchase (or elect to receive) a portion of the New Second Lien Notes pursuant to the terms of the Backstop Agreement, then the Backstop Percentage Interest shall be reduced to 3.5%.  In addition, on the Effective Date, each Backstop Party shall be entitled to such additional fully-paid and non-assessable shares of New Common Stock (collectively, the "***Additional Shares***" and, together with the Initial Shares, the "***Backstop Shares***") as are required so that its Initial Percentage Ownership shall not be diluted by the issuance of the Initial Shares.  The issuance of Backstop Shares to the Backstop Parties shall be subject to dilution by the Equity Incentive Plan.  The Backstop Agreement provides for the execution of a registration rights agreement, on commercially reasonable terms to be mutually agreed upon, to be entered into between the Reorganized Debtors and the Backstop Parties.

### d.  The New Revolver Facility

In addition, the Debtors intend to enter into the New Revolver Facility on the Effective Date, which will include the terms set forth below.

The Debtors intend to use the New Revolver Facility for, among other things, working capital and other general corporate purposes, including, without limitation, effecting permitted acquisitions and investments.  The following is a summary of the New Revolver Facility and does not purport to be a complete description of the terms and conditions thereof.

| Borrower | AMO |
|---|---|
| Administrative Agent | JP Morgan Chase, N.A. |
| Fees | Subject to step-downs, 0.75% per annum on the undrawn portion of the commitments in respect of the New Revolver Facility. |
| Principal Amount | $40 million, of which $10 million will be available through a subfacility in the form of letters of credit. |
| Maturity | Five years after the Effective Date. |
| Interest Rate | Subject to step-downs, the interest rates will be at the option of the Borrower, Adjusted LIBOR plus 6.00% or Alternate Base Rate plus 5.00%. |
| Guarantees | Guaranteed by AMI and each of AMO's existing domestic subsidiaries and subsequently acquired or organized domestic subsidiaries, subject to certain exceptions. |

| Collateral | Substantially all of the assets of AMI, AMO and the Debtor Subsidiaries. |
| Covenants | Contains financial, affirmative and negative covenants that the Debtors believe are usual and customary for a senior secured credit agreement |

### 3. *Purpose of the Financial Restructuring*

The purpose of the Financial Restructuring is to reduce the Company's leverage and to enhance its long-term growth and competitive position. Specifically, the Financial Restructuring is designed to accomplish the following:

- reduce the Company's outstanding indebtedness and interest expense;
- improve the Company's capital structure;
- better position the Company to enter into value enhancing and other strategic transactions;
- improve the Company's ability to restructure and/or refinance other outstanding indebtedness to reduce leverage, interest expense and ease covenant requirements;
- provide suppliers, customers and employees with more confidence in the Company and enable the Company to capitalize on available opportunities to expand its publishing services business as a result of an improved capital structure;
- enhance the Company's enterprise value in excess of the principal amount of its debt; and
- mitigate the Company's refinancing risks, given the significant amount of its debt that is scheduled to mature in 2013.

### 4. *Distributions in Connection with the Financial Restructuring*

In connection with the Financial Restructuring, upon the Effective Date, the Debtors will make the distributions to holders of Term Facility Claims, PIK Notes Claims, Subordinated Notes Claims and 2011 Notes Claims as set forth in Section IV.A.2 hereof.

## III.

## ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES

### A.    Administration of the Plan

Each of the Debtors intends to continue to operate their businesses in the ordinary course throughout their Chapter 11 Cases as they had prior to the Petition Date. On the Petition Date, the Debtors intend to have their Chapter 11 Cases jointly administered for procedural purposes. In addition, the Debtors will be filing on the first day of their Chapter 11 Cases motions requesting a series of orders from the Bankruptcy Court to facilitate their reorganization. These requests include, but are not limited to, the following:

(a)    The Restructuring Support Agreement, the Backstop Agreement and the Commitment Letters and Related Fees in Connection with the New Revolver Facility. The Debtors intend to seek approval from the Bankruptcy Court to assume (i) the Restructuring Support Agreement between the Company and the Committee and, if applicable, the Term Facility Lenders and the Revolver Lenders, (ii) the Backstop Agreement between the Company and the Backstop Parties, and (iii) the commitment agreements between the Debtors and the lenders/agents under the New Revolver Facility, and the fees associated with such commitment agreements. A description of each of these agreements (as well as the New Revolver Facility) is set forth in the Section titled "The

Financial Restructuring Transaction – New Financing." Assumption of these agreements will facilitate the Debtors' successful emergence from chapter 11.

(b)    The Escrow Issuer. The Debtors intend to seek an order from the Bankruptcy Court on shortened notice (and, to the extent practicable, as part of the relief granted by the Bankruptcy Court on the first day of the Chapter 11 Cases) finding that New LLC and Escrow Issuer are non-Debtor entities and that any proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering or other assets held by New LLC and Escrow issuer will not be deemed property of the Debtors' Estates and will not be consolidated with the Debtors' assets or Estates. In addition, the Debtors will request that the Bankruptcy Court authorize them to transfer $15 million to the Escrow Issuer to pay fees and interest associated with the New First Lien Financing and New Second Lien Financing and will request that the Bankruptcy Court deem such proceeds not to be property of the Debtors' estates or otherwise consolidated with the Debtors assets or estates. The Debtors submit that such relief is necessary to successfully consummate the Plan. **PLEASE NOTE THAT THE DEBTORS INTEND TO SEEK APPROVAL OF THE FOREGOING ON SHORTENED NOTICE (AND TO THE EXTENT PRACTICABLE, AS PART OF THE RELIEF GRANTED BY THE COURT ON THE FIRST DAY OF THE CHAPTER 11 CASES).**

(c)    Trade Vendor Matters. The Debtors consider good relations with their trade, shippers and other business vendors to be essential to the continued operation of their businesses during the pendency of their respective Chapter 11 Cases. Accordingly, and in light of the anticipated distribution to general unsecured creditors of 100% of their Allowed Claims, the Debtors intend to file motions requesting an order from the Bankruptcy Court (the "***Vendor Motions***") authorizing payments to their respective trade vendors as they become due in the ordinary course of business, including any amounts that may relate to claims arising prior to the Petition Date, as long as the vendors who receive such payments continue to provide the Debtors with customary shipments and credit terms. The Vendor Motions will also address any possessory lien holders and holders of claims under Bankruptcy Code section 503(b).

(d)    Employee Matters. The Debtors believe that they have a valuable asset in their work force and that any delay in paying prepetition compensation or benefits to their employees would significantly damage their relationships with employees and irreparably harm employee morale at a time when the continued dedication, confidence and cooperation of their employees is most critical. The Debtors are grateful to their employees for their help, without which a restructuring would not be possible. Accordingly, the Debtors will seek authority to pay compensation and benefits in the Chapter 11 Cases which were accrued but unpaid as of the Petition Date.

(e)    Use of Cash Collateral. The Debtors will require the use of cash on hand and cash generated postpetition to, among other things, pay present operating expenses, including payroll and vendors, to ensure a continued supply of goods and services essential to the Debtors' continued viability. Accordingly, the Debtors will seek authority to use cash collateral under certain terms and conditions. The Debtors anticipate that, pursuant to the RSA, the lenders under the Term Facility and the Revolver Facility will support such use of cash collateral and direct the Administrative Agent to support such use of cash collateral, and the proposed order to be presented to the Bankruptcy Court on the first day of the Chapter 11 Cases will be pre-agreed with such parties.

(f)    Operation of Business. The Debtors also will seek various other orders to effectuate a smooth transition through the chapter 11 process. These include, but are not limited to, orders permitting them to continue their respective customer programs and to maintain their cash management system.

13

B.        **Confirmation Hearing**

The Debtors anticipate that as soon as practicable after commencing their Chapter 11 Cases, they will seek an order of the Bankruptcy Court scheduling the Confirmation Hearing to consider (i) the adequacy of the Disclosure Statement and the solicitation of votes in connection therewith and (ii) confirmation of the Plan.  The Debtors anticipate that notice of these hearings will be published in the *New York Times*, *USA Today* and the *Miami Herald* and will be mailed to all known holders of Claims and Interests at least 10 days prior to the date by which objections must be filed with the Bankruptcy Court.

C.        **Timetable for the Chapter 11 Cases**

Assuming that the Bankruptcy Court approves the scheduling motion with respect to the Confirmation Hearing, the Debtors anticipate that the Confirmation Hearing will occur within approximately 30 days of the Petition Date.  The Debtors do not currently anticipate any significant objections to confirmation.  If such objections were to be raised, the anticipated timing for the Confirmation Hearing could be delayed, perhaps substantially.

## IV.

## THE PLAN

A.        **Classification and Treatment of Claims and Equity Interests Under the Plan**

The Plan is premised upon the substantive consolidation of the Debtors for the purposes of the Plan only.  Accordingly, for purposes of the Plan, the assets and liabilities of the Debtors are deemed the assets and liabilities of a single, consolidated entity.

The following table designates the Classes of Claims against, and the Interests in, the Debtors, and specifies which of those Classes of Claims and Interests are (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with Bankruptcy Code section 1126, and (c) deemed to accept or reject the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|--------------------|
| Class 1 | Priority Non-Tax Claims | Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the Holder of such Claim. | No (deemed to accept). | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| Class 2 | Term Facility Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each Holder of an Allowed Term Facility Claim shall receive its *pro rata* share, on a dollar for dollar basis of the following in an aggregate amount equal to the Allowed amount of all Term Facility Claims: (i) Cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims; and (ii) New Second Lien Notes; provided however, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; provided further however, that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in full, in Cash to the Administrative Agent.  In addition, and pursuant to the provisions of Section 5.4 of the Plan, each Holder of a Term Facility Claim (other than a Backstop Party) shall have the right to require that the Backstop Parties purchase in Cash from such Holder, on the Effective Date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to Section 4.2(b) of the Plan for the face amount of such Holder's New Second Lien Notes. | Yes. | 100% |
| Class 3 | Revolver Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, each Holder of an Allowed Revolver Claim shall receive payment in full, in Cash. | No (deemed to accept). | 100% |
| Class 4 | Other Secured Claims | On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim, each Holder of an Allowed Other Secured Claim shall, at the Debtors' option, (i) receive payment in full, in Cash, (ii) be reinstated pursuant to Bankruptcy Code section 1124, or (iii) receive such other recovery to be determined by the Debtors in their sole discretion. | No (deemed to accept). | 100% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|
| Class 5 | PIK Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 5 Claim, each Holder of an Allowed PIK Notes Claim shall receive, at the Debtors' option, but with the Committee's consent, as described in the succeeding sentence, its *pro rata* share of $24,790,102, plus accrued and unpaid interest, in the form of either (i) New Second Lien Notes, (ii) New PIK Notes, (iii) New Preferred Stock, or (iv) a combination of the foregoing.  The Debtors shall require the consent of the Committee (which consent shall not be unreasonably withheld or delayed) in determining the form of consideration to be distributed pursuant to Section 4.5(b) of the Plan; *provided, however,* that (i) the Committee may not require the Debtors to issue a security or debt instrument to the extent that the terms thereof violate the terms of any Plan Supplement Document and (ii) the consent of the members of the Committee holding two-thirds in principal amount of the Allowed PIK Notes Claims held by the Committee at the time the determination is made as to the form of the PIK Notes Claims distribution shall be required in connection with Section 4.5(b) of the Plan. | Yes. | 100% |
| Class 6 | Subordinated Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 6 Claim, each Holder of a Subordinated Notes Claim shall receive its *pro rata* share of the Class 6 Distribution Pool. | Yes. | 53.5% |
| Class 7 | 2011 Notes Claims | On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 7 Claim, each Holder of an Allowed 2011 Notes Claim shall receive its *pro rata* share of the Class 7 Distribution Pool. | Yes. | 53.5% |

| Class | Description | Treatment | Entitled to Vote | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------|
| Class 8 | General Unsecured Claims | In full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full, in Cash of the unpaid portion of its Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim becomes Allowed or would otherwise be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the Holder of such Claim; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date. | No (deemed to accept). | 100% |
| Class 9 | Intercompany Claims | On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 9 Claim, all Allowed Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors. | No (deemed to accept). | N/A |
| Class 10 | Interests | On the Effective Date, all Interests in AMI shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Interests in AMI shall neither receive distributions nor retain any property under the Plan on account of such Interests in AMI. | No (deemed to reject). | 0% |

1.    ***Description of Unclassified Claims***

Generally, the Plan provides for the payment in full of Administrative Expense Claims and Priority Tax Claims.  The Debtors estimate that the amount of such Claims will be approximately $30 million in Administrative Expense Claims and approximately TBD in Priority Tax Claims, assuming the Plan becomes effective within 45 days after the Petition Date.  Delays in the case due to litigation, regulatory approvals, or unforeseen events could materially increase the amount of such Claims.

      (a)       Administrative Expense Claims

Administrative Expense Claims include any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases Allowed under and in accordance with, as applicable, Bankruptcy Code sections 330, 364(c)(1), 365, 503(b), 507(a)(2) and 507(b), including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates or operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to Bankruptcy Code section 503(b), and (d) the Indenture Trustee Fee Claims.

Except with respect to Administrative Expense Claims that are for professional compensation and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Expense Claim shall be paid in full, in Cash, on the later of: (a) on or as soon as reasonably practicable after the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however,* that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such transactions.

      (b)       Professional Compensation and Reimbursement Claims

Except as provided in Section 2.1 of the Plan, all entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Bankruptcy Code sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred, and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.   The Reorganized Debtors shall pay all reasonable fees, costs and expenses of the Committee's counsel incurred through and including the Confirmation Date without the need for approval by the Bankruptcy Court.

      (c)       Priority Tax Claims

Priority Tax Claims consist of any Claim of a governmental unit of the kind entitled to priority in payment as specified in Bankruptcy Code sections 502(i) and 507(a)(8).

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim, (a) to the extent that such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date, or (b) to the extent that such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business.

2. ***Description of Classified Claims***

(a)    Priority Non-Tax Claims (Class 1)

The Claims in Class 1 are Claims against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Bankruptcy Code sections 507(a)(3), (4), (5), (6), (7) or (9).

Impairment and Voting.  Class 1 is unimpaired by the Plan.  No Holder of an Allowed Priority Non-Tax Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the Holder of such Claim.

(b)    Term Facility Claims (Class 2)

The Claims in Class 2 include any Claims arising under the Term Facility, which shall include, without limitation, any and all obligations of the Debtors under the Term Facility, due and owing on the Effective Date.

Impairment and Voting.  Class 2 is impaired by the Plan.  The Term Facility Claims shall be Allowed in the aggregate amount of (i) $445,675,713.80 (for the avoidance of doubt, such amount includes the principal amount outstanding, any prepayment penalties due and owing, and that portion of the deferred consent fee allocable to the Term Facility Claims), plus (ii) (a) all accrued and unpaid interest thereon (including all accrued and unpaid interest on any prepayment penalties due and owing and the deferred consent fee) at the non-default contract rate under the 2009 Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied and (b) all unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date, which fees and expenses shall be paid in full, in Cash.  Each Holder of an Allowed Term Facility Claim is entitled to vote to accept or reject the Plan.

Distributions.    On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each Holder of an Allowed Term Facility Claim shall receive its *pro rata* share, on a dollar for dollar basis of the following in an aggregate amount equal to the Allowed amount of all Term Facility Claims: (i) Cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims; and (ii) New Second Lien Notes; provided however, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; provided further however, that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in full, in Cash to the Administrative Agent.  In addition, and pursuant to the provisions of Section 5.4 of the Plan, each Holder of a Term Facility Claim (other than a Backstop Party) shall have the right to require that the

19

Backstop Parties purchase in Cash from such Holder, on the Effective Date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to Section 4.2(b) of the Plan for the face amount of such Holder's New Second Lien Notes.

        (c)        Revolver Claims (Class 3)

The Claims in Class 3 include any Claims arising under the Revolving Facility.

Impairment and Voting.  Class 3 is unimpaired by the Plan.  The Revolver Claims shall be allowed in the aggregate amount of (i) $60,822,634.69 (for the avoidance of doubt, such amount includes the principal amount outstanding and that portion of the deferred consent fee allocable to the Revolver Claims), plus (ii) all accrued and unpaid interest thereon (including all accrued and unpaid interest on the deferred consent fee) at the non-default contract rate under the 2009 Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied and (b) all unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date.  No Holder of an Allowed Revolver Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Distributions.  On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, each Holder of an Allowed Revolver Claim shall receive payment in full, in Cash.

        (d)        Other Secured Claims (Class 4)

The Claims in Class 4 include any Secured Claim other than a Term Facility Claim or a Revolver Claim.

Impairment and Voting.  Class 4 is unimpaired by the Plan.  No Holder of an Allowed Other Secured Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Distributions.  On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim, each Holder of an Allowed Other Secured Claim shall, at the Debtors' option, (i) receive payment in full, in Cash, (ii) be reinstated pursuant to Bankruptcy Code section 1124, or (iii) receive such other recovery to be determined by the Debtors in their sole discretion.

        (e)        PIK Notes Claims (Class 5)

The Claims in Class 5 include any Claim arising under the PIK Notes Indenture.

Impairment and Voting.  Class 5 is impaired by the Plan.  The PIK Notes Claims shall be Allowed in the aggregate amount of $24,790,102, plus accrued and unpaid interest thereon as of the Petition Date.  Each Holder of an Allowed PIK Notes Claim is entitled to vote to accept or reject the Plan.

Distributions.  On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 5 Claim, each Holder of an Allowed PIK Notes Claim shall receive, at the Debtors'

option, but with the Committee's consent, as described in the succeeding sentence, its *pro rata* share of $24,790,102, plus accrued and unpaid interest, in the form of either (i) New Second Lien Notes, (ii) New PIK Notes, (iii) New Preferred Stock, or (iv) a combination of the foregoing. The Debtors shall require the consent of the Committee (which consent shall not be unreasonably withheld or delayed) in determining the form of consideration to be distributed pursuant to Section 4.5(b) of the Plan; *provided, however*, that (i) the Committee may not require the Debtors to issue a security or debt instrument to the extent that the terms thereof violate the terms of any Plan Supplement Document and (ii) the consent of the members of the Committee holding two-thirds in principal amount of the Allowed PIK Notes Claims held by the Committee at the time the determination is made as to the form of the PIK Notes Claims distribution shall be required in connection with Section 4.5(b) of the Plan.

(f)    Subordinated Notes Claims (Class 6)

The Claims in Class 6 include any Claim arising from the Subordinated Notes Indenture.

<u>Impairment and Voting</u>. Class 6 is impaired by the Plan. The Subordinated Notes Claims shall be Allowed in the aggregate amount of $355,756,041, plus accrued and unpaid interest thereon as of the Petition Date. Each Holder of an Allowed Subordinated Notes Claim is entitled to vote to accept or reject the Plan.

<u>Distributions</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 6 Claim, each Holder of a Subordinated Notes Claim shall receive its *pro rata* share of the Class 6 Distribution Pool.

(g)    2011 Notes Claims (Class 7)

The Claims in Class 7 include any Claim arising under the 2011 Notes Indenture.

<u>Impairment and Voting</u>. Class 7 is impaired by the Plan. The 2011 Notes Claims shall be Allowed in the aggregate amount of $7,501,676, plus accrued and unpaid interest thereon as of the Petition Date. Each Holder of an Allowed 2011 Notes Claim is entitled to vote to accept or reject the Plan.

<u>Distributions</u>. On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 7 Claim, each Holder of an Allowed 2011 Notes Claim shall receive its *pro rata* share of the Class 7 Distribution Pool.

(h)    General Unsecured Claims (Class 8)

The Claims in Class 8 include any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Term Facility Claim, Revolver Claim, Other Secured Claim, PIK Notes Claim, Subordinated Notes Claim, 2011 Notes Claim, or Intercompany Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

<u>Impairment and Voting</u>. Class 8 is unimpaired by the Plan. No Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Distributions.  In full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed General Unsecured Claim shall receive payment in full, in Cash of the unpaid portion of its Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim becomes Allowed or would otherwise be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the Holder of such Claim; provided, however, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

(i)    Intercompany Claims (Class 9)

The Claims in Class 9 include any Claim held by (i) a Debtor against another Debtor or (ii) a non-Debtor subsidiary against a Debtor.

Impairment and Voting.  Class 9 is impaired by the Plan.  No Holder of an Allowed Intercompany Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Distributions.  On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 9 Claim, all Allowed Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors.

(j)    Equity Interests in AMI (Class 10)

The Equity Interests in Class 10 include any equity security in AMI as defined in Bankruptcy Code section 101(16), including all issued, unissued, authorized or outstanding shares of capital stock of AMI together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, including, without limitation, rights to purchase restricted stock or interests.

Impairment and Voting.  Class 10 is impaired by the Plan.  No Holder of an Allowed Interest in AMI is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

Distributions.  On the Effective Date, all Interests in AMI shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Interests in AMI shall neither receive distributions nor retain any property under the Plan on account of such Interests in AMI.

## V.

## MEANS FOR IMPLEMENTATION OF THE PLAN

The transactions described in this Section V constitute the "***Means for Implementation***" provided for in the Plan.

A.    **Substantive Consolidation**

Substantive consolidation is an equitable remedy that the Court may be asked to apply in chapter 11 cases involving affiliated debtors.  Substantive consolidation involves the pooling and merging of the assets and liabilities of the affected debtors.  All of the debtors in the substantively consolidated group are treated as if they were a single corporate and economic entity.  Consequently, a creditor of one of the substantively consolidated group of debtors and issues of individual corporate ownership of property and individual corporate liability on obligations are ignored.

Substantive consolidation of two or more debtors' estates generally results in the deemed consolidation of the assets and liabilities of the debtors, the deemed elimination of intercompany claims, subsidiary equity or ownership interests, multiple and duplicative creditor claims, joint and several liability claims and guarantees, and the payment of allowed claims from a common fund.

The Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only.  The Debtors propose procedural substantive consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of Entity-specific claims.  Accordingly, on the Effective Date, all of the Debtors and their Estates shall, for purposes of the Plan only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two (2) or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the Debtors on and after the Effective Date.  Unless otherwise set forth herein, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the Debtor Subsidiaries), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor.  If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an Entity-by-Entity basis.

Unless the Court has approved the substantive consolidation of the Debtors' estates by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Debtors' estates.  If no objection to substantive consolidation is timely filed and served, then the Substantive Consolidation Order may be entered by the Court.  If any such objection(s) is timely filed and served, a hearing with respect to the substantive consolidation of the Debtors' estates and the objections thereto shall be scheduled by the Court, which hearing may coincide with the Confirmation Hearing.

B.    **Corporate Action**

1.    ***General***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) assumption of the Management Agreements, (ii) selection of the directors and officers for the Reorganized Debtors, (iii) issuance of the New Common Stock by Reorganized AMI, (iv) incurrence of the New First Lien Notes and the New Second Lien Notes, (v) release of the proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering from escrow, (vi) execution of the New Revolver Facility Credit Agreement, (vii) issuance of the New Preferred Stock, if applicable, (viii) issuance of the New PIK Notes, if applicable, (ix) adoption of the Equity Incentive Plan, (x) adoption of the Director Severance Plan, and (xi) all other

actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall occur in accordance with the Plan and any governing agreements or transfer documents shall be in effect, without any requirement of further action by the security Holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (i) the New PIK Notes Indenture, if applicable, (ii) the New First Lien Indenture, (iii) the New Second Lien Indenture, (iv) the New Revolver Facility Credit Agreement, (v) the Stockholders Agreement, (vi) the Intercreditor Agreements, (vii) the registration rights agreements relating to the New First Lien Notes and the New Second Lien Notes, and (viii) any and all other agreements, documents, securities and instruments relating to the foregoing (including, without limitation, security documents). The authorizations and approvals contemplated by Section 5.2(a) of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

2.      ***Restated Certificate of Incorporation, New Preferred Stock Certificate of Designation (if Applicable) and Restated Bylaws of Reorganized AMI and the Other Reorganized Debtors***

On the Effective Date, Reorganized AMI shall adopt the Restated Certificate of Incorporation, the New Preferred Stock Certification of Designation (if applicable) and the Restated Bylaws, and shall file the Restated Certificate of Incorporation and the New Preferred Stock Certification of Designation (if applicable) with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by Bankruptcy Code section 1123(a)(6), the Restated Certificate of Incorporation, the New Preferred Stock Certification of Designation (if applicable), the certificates of incorporation of the Debtors that are corporations, and the organization documents for the Debtors that are limited liability companies shall also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision increasing the number of authorized shares of Reorganized AMI, (ii) a provision prohibiting the issuance of non-voting equity securities and (iii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the New Boards of each corporate Reorganized Debtor shall be deemed to have adopted the restated certificate of incorporation and restated bylaws for such Reorganized Debtor.

3.      ***Boards of Directors of Reorganized AMI and the Other Reorganized Debtors***

On the Effective Date, the operation of Reorganized AMI and AMO shall become the general responsibility of their respective boards of directors, subject to, and in accordance with, the Restated Certificate of Incorporation and Restated Bylaws. On the Effective Date, the operation of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors or board of managers, as applicable, subject to and in accordance with its respective restated certificates of incorporation and restated bylaws or other organizational documents. The initial boards of directors of Reorganized AMI, Reorganized AMO and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The initial boards of directors of Reorganized AMI and Reorganized AMO shall be composed of nine members, eight of whom shall be selected by members

of the Committee consistent with the terms outlined in the Stockholders Agreement, and one of whom shall be the post-Effective Date chief executive officer of AMI and AMO.

4.    ***Officers of Reorganized AMI and the Other Reorganized Debtors***

The initial officers of Reorganized AMI and the other Reorganized Debtors shall be disclosed in the Plan Supplement. The selection of officers of Reorganized AMI and the other Reorganized Debtors after the Effective Date shall be as provided in the respective restated certificates of incorporation and restated bylaws or other organizational documents of Reorganized AMI or the applicable Reorganized Debtor.

5.    ***Escrow Issuer for the New First Lien Financing and the New Second Lien Financing, if applicable***

On the Petition Date, or as soon as practicable thereafter, the Debtors will file a motion (the "***Escrow Motion***") requesting an order from the Bankruptcy Court finding that New LLC and the Escrow Issuer are non-Debtor entities and that any proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering or other assets held by New LLC and Escrow Issuer will not be deemed property of the Debtors' Estates and will not be consolidated with the Debtors' assets or Estates. In addition, the Debtors will request Bankruptcy Court approval for authority to transfer approximately $15 million into escrow to pay fees, interest and other amounts associated with (y) the New First Lien Financing and (z) the New Second Lien Financing, to the extent the New Second Lien Notes are issued to third-party investors for Cash. Upon Bankruptcy Court approval of the Escrow Motion, the Escrow Issuer will (i) enter into related escrow agreements, pursuant to which the proceeds of the New First Lien Notes Offering, that portion of the New Second Lien Financing provided by third-party investors (if any) and other amounts relating to other payment obligations in respect of the New First Lien Financing and New Second Lien Financing will be held pending consummation of the Plan; (ii) grant a lien for the benefit of the New First Lien Holders on the proceeds from the New First Lien Notes Offering and all other assets in the applicable escrow account; and (iii) grant a lien for the benefit of the New Second Lien Holders on the proceeds from the New Second Lien Notes Offering (if any) who purchased their New Second Lien Notes for Cash and all other assets in the applicable escrow account. On the Effective Date, (a) the Escrow Issuer will merge into Reorganized AMO, which will assume the ongoing liability for the New First Lien Notes and New Second Lien Notes under the New First Lien Indenture and the New Second Lien Indenture, respectively, and the related registration rights agreements; (b) Reorganized AMO shall be authorized to distribute the New Second Lien Notes; (c) Reorganized AMO and the Reorganized Debtors shall be authorized to execute, deliver and enter into, *inter alia*, the Intercreditor Agreements and collateral documents without the need for any further corporate action and without further action by the Holders of Claims or Interests; and (d) the proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering (and any other amounts held in escrow) will be released from escrow.

**C.    Distribution of New Second Lien Financing**

On the Effective Date, the New Second Lien Notes that were not issued for Cash in the New Second Lien Notes Offering shall be distributed on behalf of Reorganized AMO to (a) Holders of Allowed Term Facility Claims to the extent provided in Section 4.2 hereof, (b) at the election of the Debtors, Holders of Allowed PIK Notes Claims, to the extent provided in Section 4.5 hereof, and (c) the Backstop Parties as set forth in Section 4.2(b), 4.5(b) and 5.4 of the Plan.

D.    **Offer to Purchase New Second Lien Notes**

Pursuant to and in accordance with the terms of the Backstop Agreement, the Backstop Parties have, severally and not jointly, committed to purchase their *pro rata* share (based upon their *pro rata* share of all Subordinated Notes held collectively by the Backstop Parties) of any New Second **Lien** Notes that would otherwise be distributed to the Holders of the Allowed Term Facility Claims (excluding any Backstop Party) pursuant to Section 4.2(b) hereof (the "***Backstop Commitment***") to the extent such Holders have made the election described in the next sentence. Holders of Allowed Term Facility Claims other than the Backstop Parties may elect to have the Backstop Parties purchase their *pro rata* share of the New Second Lien Notes for the face amount of such New Second Lien Notes pursuant to an election form that, subject to Bankruptcy Court approval, will be distributed to such Holders no later than 10 days after the Petition Date.  Any Holder of an Allowed Term Facility Claim electing to have the Backstop Parties purchase their share of the New Second Lien Notes must do so by noting its election on such Holder's supplemental election form and returning same to the Debtors by no later than 10 Business Days after the date the election form is distributed.  The mechanism by which electing Holders of Allowed Term Facility Claims will exercise their put option to ensure that such Holders will obtain Cash in exchange for their allocation of New Second Lien Notes shall be set forth in the supplemental election form.  Consummation of the purchase of such New Second Lien Notes shall occur on the Effective Date.  If one or more Term Facility Lenders exercises its option to put its *pro rata* allocation of New Second Lien Notes to the Backstop Parties, the Backstop Parties shall receive from the Debtors a fee equal to 5% of the aggregate principal amount of New Second Lien Notes put to the Backstop Parties by the Term Facility Lenders, which fee shall be payable in Cash.

In addition, pursuant to and in accordance with the terms of the Backstop Agreement, in consideration for undertaking their commitments under the Backstop Agreement, the Backstop Parties shall be entitled to a fully earned and nonrefundable fee payable in fully-paid and non-assessable New Common Stock, representing 5% (the "***Backstop Percentage Interest***") of the New Common Stock to be issued and outstanding on the Effective Date, which 5% shall be calculated after giving effect to the issuance of New Common Stock to the Backstop Parties on account of any Subordinated Notes they hold and without dilution in respect of the Additional Shares (as defined below) (collectively, the "***Initial Shares***"); provided that, if the Backstop Parties are not required to purchase (or elect to receive) a portion of the New Second Lien Notes pursuant to the terms of the Backstop Agreement, then the Backstop Percentage Interest shall be reduced to 3.5%.  In addition, on the Effective Date, each Backstop Party shall be entitled to such additional fully-paid and non-assessable shares of New Common Stock (collectively, the "***Additional Shares***" and, together with the Initial Shares, the "***Backstop Shares***") as are required so that its Initial Percentage Ownership shall not be diluted by the issuance of the Initial Shares.  The issuance of Backstop Shares to the Backstop Parties shall be subject to dilution by the Equity Incentive Plan.  The Backstop Agreement provides for the execution of a registration rights agreement, on commercially reasonable terms to be mutually agreed upon, to be entered into between the Reorganized Debtors and the Backstop Parties.

E.    **Issuance of New Common Stock and New Preferred Stock (If Applicable)**

The issuance of New Common Stock and the New Preferred Stock (if applicable) by Reorganized AMI shall be authorized without the need for any further corporate action.  On the Effective Date, Reorganized AMI shall issue the New Common Stock and the New Preferred Stock (if applicable).  Reorganized AMI shall:

(a)    issue the shares of New Common Stock to the Holders of Allowed 2011 Notes and Subordinated Notes as set forth herein;

(b)       issue the New Preferred Stock to the Holders of Allowed PIK Notes, if applicable;

(c)       pursuant to the Equity Incentive Plan described in Section 5.9 of the Plan, issue up to 6.5% of the shares of New Common Stock to certain employees, directors and consultants of the Reorganized Debtors and such employees, directors and consultants will be deemed parties to the Stockholders Agreement; and

(d)       issue the Backstop Shares to the Backstop Parties pursuant to the Backstop Agreement.

## F.    Merger/Dissolution/Consolidation

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may (i) cause any or all of the Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any other transaction in furtherance of the Plan. In addition, as of the Effective Date, the Escrow Issuer will merge into Reorganized AMO.

## G.    Cancellation of Existing Securities and Agreements

Except for purposes of evidencing a right to distributions under the Plan with respect to executory contracts or unexpired leases that have not been assumed by the Debtors or as otherwise provided hereunder, on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any Holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims, (b) the Interests in AMI, and (c) any options or warrants to purchase Interests of AMI, or obligating such Debtors to issue, transfer or sell Interests or any other capital stock of such Debtors, shall be cancelled.

## H.    Surrender of Existing Securities

As a condition precedent to receiving any distribution on account of the Notes, each record Holder of any such securities shall be deemed to have surrendered such securities or other underlying documentation and all such surrendered securities and other documentation shall be deemed to be cancelled in accordance with Section 5.7 of the Plan.

## I.    Equity Incentive Plan

As of the Effective Date, Reorganized AMI shall establish the Equity Incentive Plan, which will provide for up to 10% of the New Common Stock on a fully diluted basis, of which no more than 6.5% shall be immediately issued to the officers and key employees of the Reorganized Debtors and their affiliates as determined by the New Boards of Reorganized AMI and Reorganized AMO after the Effective Date.

## J.    Director Severance Plan

As of the Effective Date, the Reorganized Debtors shall establish the Director Severance Plan. Pursuant to the Director Severance Plan, the Debtors provide severance benefits to certain directors of AMI upon certain terminations of their service as members of the board. Upon the termination of the service of certain non-employee directors as a member of the board, such directors shall be entitled to receive a lump sum cash payment in an amount equal to $35,000 for each year and

27

partial year during which such director served on the board, payable within thirty (30) days following the date of termination.

**K.        Cancellation of Liens**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, any lien securing any Secured Claim shall be deemed released, and the Holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any Cash Collateral) held by such Holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such lien, including the execution, delivery and filing or recording of such releases.

**L.        Compromise of Controversies**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

**M.        Stockholders Agreement**

On the Effective Date, creditors, directors, officers and consultants who receive New Common Stock pursuant to the Plan will be deemed to become parties to the Stockholders Agreement as a result of the distribution they receive under the Plan.  The Stockholders Agreement shall contain certain customary rights and obligations, including director designation rights, right of first offer, registration rights, drag rights, tag rights, minority transfer rights and rights to receive certain information concerning the Debtor's at a party's option and limits on the number of record holders. Each creditor, director, officer and consultant who receives New Common Stock pursuant to the Plan may be requested to execute the Stockholders Agreement as a result of the distribution they receive under the Plan.

**N.        Listing of New Common Stock and Transfer Restrictions**

Other than as provided in the Stockholders Agreement, the Reorganized Debtors shall not be obligated, and do not intend, to list the New Common Stock on a national securities exchange.  In order to ensure that Reorganized AMI will not become subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Certificate of Incorporation and the Stockholders Agreement will impose certain trading restrictions to limit the number of record holders thereof. The New Common Stock will be subject to certain transfer and other restrictions pursuant to the Stockholders Agreement and the New Certificate of Incorporation.

**O.        Exemption from Securities Laws**

Section 3(a)(9) of the Securities Act provides that, except for securities exchanged in a case under chapter 11 of the Bankruptcy Code, the registration requirements of section 5 of the Securities Act shall not apply to securities exchanged by an issuer with its existing security Holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. By virtue of section 18 of the Securities Act, section 3(a)(9) also provides that any state "blue sky" law requirements shall not apply to such exchange.

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering.  By virtue of section 18 of the Securities Act, section 4(2) also provides that any state "blue sky" law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the distribution pursuant to the Plan of the New Common Stock, New Preferred Stock, if applicable, New PIK Notes, if applicable, and New Second Lien Notes to Holders will not be registered under the Securities Act or any state "blue sky" law requirements.

**P.      Exemption from Transfer Taxes**

Pursuant to Bankruptcy Code section 1146(a), any issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the Consummation of the Plan and the Plan Supplement Documents) pursuant to Bankruptcy Code sections 1146(a), 505(a), 106 and 1141.

**Q.      D&O Insurance Policy**

As of the Effective Date, the Reorganized Debtors will assume the D&O Insurance Policy pursuant to Bankruptcy Code section 365(a).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of the D&O Insurance Policy. Until the sixth anniversary of the Effective Date, Reorganized AMI shall, and shall cause Reorganized AMO, to cause the individuals serving as directors of the Reorganized Debtors to be covered by the D&O Insurance Policy (provided that Reorganized AMI and/or Reorganized AMO may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous in any material respect than the D&O Insurance Policy); provided that in no event shall Reorganized AMI or Reorganized AMO be required to expend annually in the aggregate an amount in excess of 150.0% of the annual premiums currently paid by AMI for such insurance (the "***Insurance Amount***"), and provided further that if Reorganized AMI is unable to maintain the D&O Insurance Policy (or such substitute policy) as a result of the preceding

proviso, Reorganized AMI shall obtain as much comparable insurance as is available for the Insurance Amount.

## VI.

## OTHER ASPECTS OF THE PLAN

### A.    Distributions

1.    *Voting of Claims*

Each Holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Sections 3 and 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court approving procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

2.    *Cramdown and No Unfair Discrimination*

In the event that any impaired Class of Claims or Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, and/or (b) amend the Plan in accordance with Section 12.6 of the Plan.

3.    *Timing and Conditions of Distributions*

(a)    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims. The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors or any party responsible for making distributions pursuant to Section 6 of the Plan shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

(b)    Date of Distributions

Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is reasonably practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(c)    Sources of Cash for Distribution

Except as otherwise provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations, Cash on hand, the New Revolver Facility, New First Lien Financing, and that portion, if any, of the New Second Lien Financing that is issued for Cash.

(d)    Disbursement Agent

Unless otherwise specified herein, all distributions under this Plan shall be made by AMO as Disbursement Agent or such other Entity designated by AMO as a Disbursement Agent on the Effective Date.  No Disbursement Agent hereunder, including, without limitation, the Administrative Agent and the Indenture Trustees, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(e)    Rights and Powers of the Disbursement Agent

Each Disbursement Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions hereof.

(f)    Expenses of the Disbursement Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

(g)    Delivery of Distributions

(i)    Last Known Address. Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim shall be made to the address of such Holder as set forth in the books and records of the Debtors, unless the applicable Reorganized Debtor has been notified in writing of a change of address.  In the event that any distribution to any Holder is returned as undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursement Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of one (1) year from the Effective Date.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

(ii)    Distributions by Administrative Agent. The Administrative Agent shall be the Disbursement Agent for the Term Facility Claims.  Distributions under the Plan to Holders of such Allowed Term Facility Claims shall be made by the Reorganized Debtors to the Administrative Agent, which, in turn, shall make the distributions to the Holders of such Allowed

Claims. The Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions. Upon delivery by the Reorganized Debtors of the distributions to the Administrative Agent in conformity with Section 4.2(b) and 4.3(b) of the Plan, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

(iii)    <u>Distributions by Indenture Trustee</u>. The Indenture Trustees shall be the Disbursement Agent for the Allowed Notes Claims. Distributions under the Plan to Holders of Allowed Notes Claims shall be made by Reorganized Debtors to, or at the direction of, the Indenture Trustees, which, in turn, shall make or direct the distributions to the Holders of such Allowed Notes Claims and, upon completion thereof, shall be discharged from all of their obligations associated with the 2011 Notes, Subordinated Notes and the PIK Notes. Upon delivery of the distribution or at the direction of, the Indenture Trustees, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions. The Indenture Trustees shall not be required to give any bond, surety or other security for the performance of their duties with respect to their administration of distributions.

(h)    Manner of Payment Under the Plan

(i)    All distributions of New Second Lien Notes to the Holders of Claims under the Plan shall be made by, or at the direction of, the applicable Disbursement Agent on behalf of Reorganized AMO.

(ii)    All distributions of New Common Stock to the Holders of Claims and the Backstop Parties under the Plan shall be made by the Disbursement Agent on behalf of Reorganized AMI.

(iii)    All distributions of New Common Stock to employees, directors and consultants made on account of the Equity Incentive Plan shall be made by Reorganized AMI.

(iv)    All distributions of New Preferred Stock, if any, to Holders of Claims under the Plan shall be made by the Disbursement Agent on behalf of Reorganized AMI.

(v)    All distributions of Cash under the Plan shall be made by the applicable Disbursement Agent on behalf of the applicable Debtor.

(vi)    At the option of the applicable Disbursement Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

(i)    No Fractional Shares of New Common Stock or New Preferred Stock, if Any

No fractional shares of New Common Stock or New Preferred Stock, if any, shall be issued or distributed under the Plan and no Cash shall be distributed in lieu of such fractional shares. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or New Preferred Stock, if any, that is not a whole number, the actual distribution of shares of New Common Stock or New Preferred Stock, if any, shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next

higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Stock or New Preferred Stock, if any, to be distributed to Holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

(j)    Setoffs and Recoupment

The Debtors and the Reorganized Debtors may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

(k)    Distribution After Effective Date

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(l)    Cash Distributions

No payment of Cash of less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the appropriate Disbursement Agent.

(m)    Allocations Between Principal and Interest

In the case of distributions with respect to any Notes Claim pursuant to this Plan, the fair market value of any distribution received by the Holder of such Notes Claim will be allocable first to the principal amount of such Notes Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Notes Claim.

(n)    No Postpetition Interest on Claims

Unless otherwise specifically provided for in this Plan or the Confirmation Order, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

4.    ***Procedures for Disputed Claims Under the Plan***

(a)    Disputed Claims/Process

On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtors. Except insofar as a Claim is Allowed pursuant to the Plan, the Debtors may dispute Claims, and if the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced. Notwithstanding Bankruptcy Code section 502(a), and considering the unimpaired treatment of all holders of General Unsecured Claims under this Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors. Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the

time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn.  The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under Section 7.1 of the Plan to assert their claims in any forum as though the Chapter 11 Cases had not been commenced.

>(b)    Objections to Claims

Except insofar as a Claim is Allowed under the Plan and notwithstanding Section 7.1 of the Plan, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims, if necessary.

>(c)    Estimation of Claims

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

>(d)    No Distributions Pending Allowance

Notwithstanding any provision otherwise in the Plan: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claim has been Allowed.

>(e)    Distribution After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursement Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

>(f)    Preservation of Claims and Rights to Settle Claims

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with Bankruptcy

Code section 1123(b), the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 of the Plan, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

**B.**     **Treatment of Executory Contracts and Unexpired Leases**

    1.     _**Assumption and Rejection of Contracts and Leases**_

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with this Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which they are a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b) approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises and any other interests in real estate or rights in rem related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

    2.     _**Cure of Defaults**_

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under Bankruptcy Code section 365(b)(1), by the Debtors upon assumption thereof or as soon as practicable thereafter.  If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

    3.     _**Rejection Claims**_

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of

the Bankruptcy Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, and their property.

### 4.    *Survival of the Debtors' Indemnification Obligations*

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws or organizational documents, as applicable, or any other agreements entered into by any Debtor at any time prior to the Effective Date, to indemnify current and former directors, officers, agents and/or employees with respect to all present and future actions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date, shall not be discharged or impaired by confirmation of the Plan.  Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of Bankruptcy Code section 502(e)(1)(B).

### 5.    *Survival of Management Agreements and Other Employment Arrangements*

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date,  all Management Agreements entered into before or after the Petition Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan.  In addition, except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans (other than the existing incentive plans to be replaced by the Equity Incentive Plan) entered into before or after the Petition Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan. The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate Bankruptcy Code sections 1114 and 1129(a)(13)) and (b) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

### 6.    *Insurance Policies*

Except as set forth herein, all insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.  All other insurance policies shall re-vest in the Reorganized Debtors.

## C.    **Conditions Precedent to the Effective Date**

### 1.    *Conditions Precedent to Effective Date of the Plan*

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

(a)      <u>Confirmation Order</u>.

The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors and the Committee (which consent shall not be unreasonably withheld or delayed) and shall be in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)      <u>Execution and Delivery of Other Documents</u>.

All other actions and all agreements, instruments or other documents necessary to implement the Plan, including the New First Lien Indenture, the New Second Lien Indenture, the New Revolver Facility Credit Agreement and all other documents comprising the Plan Supplement and Plan Financing Supplement all of which shall be in form and substance reasonably acceptable to the Debtors and the Committee (which consent shall not be unreasonably withheld or delayed), shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

(c)      <u>Regulatory Approvals</u>.

The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation, or order.

(d)      <u>Consents</u>.

All authorizations, consents and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

(e)      <u>Corporate Formalities</u>.

The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

(f)      <u>Other Acts</u>.

Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

2.      ***<u>Waiver of Conditions Precedent</u>***

Each of the conditions precedent in Section 9.1 of the Plan may be waived, in whole or in part, by the Debtors without notice or order of the Bankruptcy Court, with the consent of the Committee (which consent shall not be unreasonably withheld or delayed).

3.      ***<u>Effect of Failure of Conditions</u>***

If the conditions specified in Section 9.1 of the Plan have not been satisfied or waived in the manner provided in Section 9.2 of the Plan by the date that is sixty (60) days after the Confirmation Date, then:  (a) the Confirmation Order shall be of no further force or effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all Holders of Claims and Interests in the Debtors shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as

though the Confirmation Date had never occurred; (d) all of the Debtors' obligations with respect to the Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; and (e) the Plan shall be deemed withdrawn.

**D.      Effect of Confirmation.**

1.      *Vesting of Assets*

On the Effective Date, except as otherwise provided in the Plan, pursuant to Bankruptcy Code sections 1141(b) and (c), all property of the Debtors' Estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests. Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law. On and after the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets, without supervision or approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

2.      *Binding Effect*

Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

3.      *Discharge of the Debtors*

Except to the extent otherwise provided in the Plan, the treatment of all Claims against or Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estate or properties or interests in property. Except as otherwise provided in the Plan, upon the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan. Except as otherwise provided in the Plan, all Persons shall be precluded from asserting against the Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

4.      *Exculpation*

Notwithstanding anything provided herein, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, Consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or

delivered thereunder; provided, however, that the foregoing shall be subject to a limited carve-out solely for gross negligence, willful misconduct, criminal acts and fraud.

5.  *Term of Injunctions or Stays*

**Except as otherwise expressly provided herein, all Persons who have held, hold or may hold Claims against or Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against any Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim or Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Interest, and (v) pursuing any Claim released pursuant to Section 10.7 of the Plan.**

**Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.**

6.  *Injunction Against Interference with the Plan*

**Upon the entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.**

7.  *Preservation of Claims*

Except as otherwise provided in the Plan, including Sections 10.6, 10.7 and 10.8, as of the Effective Date, pursuant to Bankruptcy Code section 1123(b)(3)(B), any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise, accruing to the Debtors shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such causes of action for the benefit of the Estates of the Debtors. After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such causes of action without approval of the Bankruptcy Court.

8.  *Reservation of Rights*

The Plan shall have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Interests or any other matter.

39

9.      **_Plan Supplement_**

A draft form of the Plan Supplement Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court five days prior to the Confirmation Hearing.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

10.     **_Plan Financing Supplement_**

The Plan Financing Supplement will be filed with the Clerk of the Bankruptcy Court on the Petition Date, or as soon thereafter as is practicable.  Upon its filing with the Bankruptcy Court, the Plan Financing Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

E.      **Releases.**

1.      **_Releases by Debtors_**

**Pursuant to Bankruptcy Code section 1123(b) and to the extent permitted by applicable law, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors and the Estates and their Affiliates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and the Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, however, such releases shall not apply to (i) any act or omission that constitutes gross negligence, willful misconduct, criminal acts or fraud and (ii) Claims that arise in the ordinary course of the Debtors' businesses and contractual obligations that are not otherwise being satisfied or discharged under the Plan (the "_Release Carve-Out_"). For the avoidance of doubt, none of the foregoing releases shall include releases of any claims, demands, causes of action and the like, in each case, solely to the extent these arise from or relate to acts or omissions occurring after the Effective Date or which arise under the Plan.**

2.      **_Releases by Holders of Claims_**

**To the extent permitted by applicable law, as of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors, the**

Estates and their Affiliates and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Plan Financing Supplement or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, however, such releases shall be subject to the Release Carve-Out. For the avoidance of doubt, none of the foregoing releases shall include releases of any claims, demands, causes of action and the like, in each case, solely to the extent these arise from or relate to acts or omissions occurring after the Effective Date or which arise under the Plan.

**VII.**

**FINANCIAL INFORMATION, FORECAST, AND VALUATION ANALYSIS**

**A.    Historical Financial Information**

    (a)    <u>General</u>

A copy of the Debtors' annual report (the "**_Annual Report_**") for the fiscal year ended March 31, 2010, excluding the audited financial statements therein, is attached hereto as Exhibit "C." A copy of AMO's audited consolidated financial statements for the three-year period ended March 31, 2010 (the "**_Audited Financial Statements_**") is attached hereto as Exhibit "D" and supercede the audited financial statements that previously appeared in the Annual Report. The Audited Financial Statements have been prepared assuming AMO is a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business. The Annual Report and the Audited Financial Statements include, among other things, data regarding the Debtors' financial performance over the last three fiscal years. A copy of the quarterly report (the "**_Quarterly Report_**") for the quarter ended June 30, 2010, excluding the unaudited financial statements therein, is attached hereto as Exhibit "E." A copy of AMO's unaudited financial statements for the three month period ended June 30, 2010 (the "**_Quarterly Financial Statements_**") is attached hereto as Exhibit "F" and supercede the unaudited financial statements that previously appeared in the Quarterly Report. The Quarterly Financial Statements have been prepared assuming AMO is a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business. The Annual Report, the Audited Financial Statements, the Quarterly Report (as defined below) and the Quarterly Financial Statements (as defined below) are provided to permit Holders of Claims and Interest against the Debtors to better understand the Debtors' historical business performance and the impact of the Chapter 11 Cases on the Debtors' businesses.

(b)        Selected Financial Data

See Item 6 – "Selected Financial Data" set forth in the Annual Report, a copy of which is attached hereto as Exhibit "C."

(c)        Management's Discussion and Analysis of Financial Condition and Results of Operations

See (i) Item 7 – "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in the Annual Report, a copy of which is attached hereto as Exhibit "C" and (ii) Item 2 – "Management's Discussion and Analysis of Financial Condition and Results of Operations" set forth in the Quarterly Report, a copy of which is attached hereto as Exhibit "E."

(d)        Recent Financial Performance

A copy of the Debtors' Quarterly Report is attached hereto as Exhibit "E" and a copy of the Debtors' Quarterly Financial Statements is attached hereto as Exhibit "F."

**B.    Forecast**

The Debtors' Forecast is attached hereto as Exhibit "G."

**C.    Reorganization Value Analysis**

The Debtors' reorganization value analysis is attached hereto as Exhibit "H."

## VIII.

## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF ALLOWED TERM FACILITY CLAIMS, ALLOWED PIK NOTES CLAIMS, ALLOWED SUBORDINATED NOTES CLAIMS, AND ALLOWED 2011 NOTES CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

A.      **Certain Bankruptcy Considerations.**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.  Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  In the event the conditions precedent described in Section 9 of the Plan have not been satisfied, or waived (to the extent possible) by the Debtors or, if applicable, the Committee (whose consent shall not be unreasonably withheld) as of the Effective Date, then the Confirmation Order will be vacated, no distributions under the Plan will be made, and the Debtors and all holders of Claims and Interests will be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

The Plan provides for no distribution to Class 10.  The Bankruptcy Code conclusively deems this Class to have rejected the Plan.  Notwithstanding the fact that this Class is deemed to have rejected the Plan, the Bankruptcy Court may confirm the Plan if at least one impaired Class votes to accept the Plan (with such acceptance being determined without including the vote of any "insider" in such Class).  Thus, for the Plan to be confirmed with respect to each Debtor, one impaired Class, among Classes 2, 5, 6 and 7 must vote to accept the Plan.  As to each impaired Class that has not accepted the Plan, the Plan may be confirmed if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to these Classes.  The Debtors believe that the Plan satisfies these requirements.  For more information, see Section X below.  The confirmation of the Plan is subject to a number of material risks, including, but not limited to, those specified below.

1.      ***Parties in Interest May Object to the Debtors' Classification of Claims.***

Bankruptcy Code section 1122 provides that a chapter 11 plan of reorganization may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  After the Petition Date, however, a claim or interest holder could challenge the classification.  In such event, the cost of the Plan and the time needed to confirm the Plan could increase and the Bankruptcy Court may not agree with the Debtors' classification of Claims and Interests, as applicable.  If the Bankruptcy Court concludes that the classification of Claims and Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors

may need to modify their Plan. Such modification could require a resolicitation of votes on the Plan. If the Bankruptcy Court determines that the Debtors' classification of Claims and Interests was not appropriate or if the Bankruptcy Court determines that the different treatment provided to Claim or Interest holders was unfair or inappropriate, the Plan may not be confirmed. If this occurs, the amended plan of reorganization that would ultimately be confirmed may be less attractive to certain classes of the Debtors' Claim and Interest holders than the Plan.

2.    ***In Certain Instances, Any Chapter 11 Case May be Converted to a Case under Chapter 7 of the Bankruptcy Code.***

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors, any of the Debtors' Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in no distributions being made to equity security holders and smaller distributions being made to the Debtors' creditors than those provided for in the Plan because of: (i) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing the Debtors' business as a going concern; (ii) additional administrative expenses involved in the appointment of a trustee; and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the operations.

3.    ***The Bankruptcy Court May Not Confirm the Plan.***

Although the Debtors believe that their Plan will satisfy all requirements necessary for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes. In the event that the Bankruptcy Court refuses to confirm the Plan, the Debtors may be required to seek an alternative restructuring of their obligations to their creditors and equity holders. There can be no assurance that the terms of any such alternative restructuring would be similar to or as favorable to the Companies' creditors and shareholders as those proposed in the Plan.

The confirmation of the Plan is subject to certain conditions and requirements of the Bankruptcy Code. If the Plan is filed, the Bankruptcy Court may determine that one or more of those requirements is not satisfied.

For example, the Bankruptcy Court might determine that the Plan is not "feasible" pursuant to Bankruptcy Code section 1129(a)(11). For the Plan to be feasible, the Debtors must establish that the confirmation of their Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor of the Debtors under the Plan unless such liquidation or reorganization is proposed in the Plan. While the feasibility requirement is not rigorous, it does require the Debtors to put forth concrete evidence indicating that they have a reasonable likelihood of meeting their obligations under the Plan and remaining a commercially viable entity. The Debtors believe that their forecasts demonstrate that the Plan is feasible in that they will be able to satisfy all of their obligations under the Plan and confirmation of the Plan is not likely to be followed by a liquidation or the need for a further financial reorganization. An objecting creditor may argue, and the Bankruptcy Court may find, however, that the Plan is not feasible.

44

In most instances, a plan of reorganization is filed and votes to accept or reject the plan are solicited after the filing of a petition commencing a chapter 11 case. Where a debtor proposes a prepackaged plan as the Debtors are here, the Debtors may solicit votes prior to the Petition Date in accordance with Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018(b). The Bankruptcy Court could conclude, however, that this Disclosure Statement does not meet the disclosure requirements set forth therein.

With regard to the solicitation of votes prior to the Petition Date, if the Bankruptcy Court concludes that the requirements of Bankruptcy Code section 1126(b) and/or Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, and the Plan would not be confirmed without a resolicitation of votes to accept or reject the Plan. While the Debtors believe that the requirements of Bankruptcy Code section 1126(b) and Bankruptcy Rule 3018 will be met, the Bankruptcy Court may not reach the same conclusion. The United States Trustee or other parties in interest could move the Bankruptcy Court to "designate" the votes of the holders of Claims that are signatories to the Restructuring Support Agreement pursuant to Bankruptcy Code section 1126(e), which permits a bankruptcy court to designate – and nullify for purposes of determining acceptances and rejections of the subject plan – an entity whose acceptance or rejection of a plan was not in good faith or was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. In addition, the United States Trustee or other parties in interest could move the Bankruptcy Court to "designate" the votes of any holder of Claims otherwise, pursuant to Bankruptcy Code section 1126(e), which, if successful, could render any accepting votes invalid.

If the Bankruptcy Court were to find any of these deficiencies, the Debtors could be required to restart the process of filing another plan and disclosure statement by (i) seeking Bankruptcy Court approval of a disclosure statement, (ii) soliciting votes from classes of debt and equity holders, and (iii) seeking Bankruptcy Court confirmation of the newly proposed plan of reorganization. A resolicitation of acceptances of the Plan likely could not take place within a sufficiently short period of time to prevent the release of the signatories to the Restructuring Agreement from their obligations to support the Plan. If this occurs, confirmation of the Plan would be delayed and possibly jeopardized. Additionally, as discussed below in greater detail, should the Plan fail to be approved, confirmed, or consummated, parties with an interest against the Debtors may be in a position to propose alternative plans of reorganization. Therefore, any failure to confirm the Plan would likely entail significantly greater risk of delay, expense and uncertainty, which would likely have a material adverse effect upon the Debtors' business and financial condition.

4.    _**The Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan.**_

Although the Debtors believe that the Effective Date may occur very shortly after the Confirmation Date, there can be no assurance as to such timing. Moreover, if the conditions precedent to the Effective Date have not occurred, the Plan may be vacated by the Bankruptcy Court.

5.    _**The Debtors May Be Unsuccessful in Obtaining First Day Orders to Authorize Payment to Key Creditors in the Ordinary Course of Business.**_

There can be no guaranty that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court to authorize payment of accounts payable to key creditors in the ordinary course of business. As a result, the Debtors may be unable to make certain prepetition payments to customers, vendors, employees and other key creditors, in which case the businesses may suffer.

45

6.    ***The Debtors Cannot Predict the Amount of Time Needed in Bankruptcy to Implement the Plan, and a Lengthy Bankruptcy Case Could Disrupt the Business, as well as Impair the Prospect for Reorganization on the Terms Contained in the Plan and Possibly Provide an Opportunity for Other Plans to be Proposed.***

The Debtors cannot be certain their Chapter 11 Cases will be of relatively short duration (*e.g.*, 30 to 90 days) and will not unduly disrupt their business. It is impossible to predict with certainty the amount of time needed in bankruptcy, and the Debtors cannot be certain that their Plan will be confirmed. Moreover, time limitations exist for which the Debtors have an exclusive right to file a plan before other proponents can propose and file their own plan.

A lengthy chapter 11 case would also involve additional expenses and divert the attention of management from operation of the businesses, as well as create concerns for employees, vendors and customers. The disruption that a chapter 11 case would inflict upon the business would increase with the length of time it takes to complete the proceeding and the severity of that disruption would depend upon the attractiveness and feasibility of the Plan from the perspective of the constituent parties, including essential vendors, employees, and customers.

The Debtors are also obligated to meet certain milestones under the Restructuring Support Agreement. If the Debtors do not meet such milestones, the other parties thereto will not be obligated to comply with the terms of the Restructuring Support Agreement. This would potentially lead to lengthy Chapter 11 Cases and the inability to confirm the Plan.

If the Debtors are unable to obtain confirmation of their Plan on a timely basis, because of a challenge to a Plan or a failure to satisfy the conditions to the effectiveness of the Plan, the Debtors may be forced to operate in bankruptcy for an extended period while trying to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case would increase both the probability and the magnitude of the adverse effects described above.

7.    ***The Debtors' actual financial results may vary significantly from the Forecast filed with the Bankruptcy Court.***

This Disclosure Statement, which the Debtors are required to prepare in connection with the Plan, contains forecasted financial information and estimates of value that demonstrate the feasibility of the Plan and the Debtors' ability to continue operations upon their emergence from proceedings under the Bankruptcy Code. The information in the Disclosure Statement was prepared for the limited purpose of furnishing recipients of the Disclosure Statement with adequate information to make an informed judgment regarding acceptance of the Plan and was not prepared for the purpose of providing the basis for an investment decision relating to the New Common Stock or the New Preferred Stock, to the extent applicable. The forecasts and estimates of value, as well as the other information in the Disclosure Statement, have not been, and will not be, updated on an ongoing basis, and they were not audited or reviewed by independent accountants. They reflect numerous assumptions concerning the Debtors' anticipated future performance and with respect to prevailing and anticipated market and economic conditions that were, and remain, beyond the Debtors' control. Forecasts and estimates of value are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks, and the assumptions underlying the forecasts and/or valuation estimates may be wrong in any material respect. Actual results may vary and may continue to vary significantly from those contemplated by the forecasts and/or valuation estimates.

8.      **_The Debtors cannot be assured that the Bankruptcy Court will approve of the Debtors' First and Second Lien Financing Raises, or that such approval will be obtained in a timely manner._**

The Debtors' Plan is premised upon the raise of approximately $385 million in New First Lien Financing and approximately $140 million in New Second Lien Financing, as well as approximately $40 million in commitments for a New Revolving Credit Facility. On the first day of the Chapter 11 Cases, the Debtors will be seeking approval from the Bankruptcy Court that the Debtors can close both the First Lien and Second Lien Financing into escrow within a short time after the petition date, and that such closing can occur at certain non-Debtor entities whose assets will be deemed not to be property of the estate, and whose assets will be not be consolidated with the Debtors' assets. Further, the Debtors will be concurrently seeking approval to transfer approximately $15 million to such non-debtor entities to pay for fees and interest associated with the New First and New Second Lien Financing, and the Debtors will be seeking an order deeming such amounts not to be property of the estate. The Debtors believe that there is ample authority for consummating the financing transaction in this way, but can make no assurance that the Bankruptcy Court will issue the orders which the Debtors request. Further, to the extent the Bankruptcy Court issues the order, but fails to do so in a timely manner, such failure could result in a failure to close the First and Second Lien Financing, or a failure to close such financing on terms that are favorable to the Debtors.

9.      **_The Plan may not be consummated due to the failure of the Backstop Parties to comply with their obligations under the Backstop Commitment Letter._**

The Plan contemplates the right of the Term Facility Lenders to require that the Backstop Parties purchase the New Second Lien Notes distributed to the First Lien Lenders for cash. In that regard, the Backstop Parties have executed a Backstop Agreement pursuant to which they have agreed to fund their backstop commitment. The obligations of the Backstop Parties under the Backstop Commitment are several and not joint. The Debtors can make no assurances that each Backstop Party will perform its obligations under the Backstop Agreement. To the extent one of the Backstop Parties fails to fund its obligations under the Backstop Agreement, the Debtors can make no assurances that they will be able to locate financing to replace such funding. The failure of such funding could result in the Debtors' inability to consummate the Plan.

10.      **_Consummation of the Plan may affect the Debtors' liability for U.S. federal income taxes currently or in the future._**

The Debtors currently estimate that they have U.S. federal income tax net operating loss carryforwards of approximately $40.0 million, and they forecast an additional $35 million of net operating loss carryforwards in the current fiscal year. Subject to certain limitations, net operating loss carryforwards may be used to offset future taxable income and thereby reduce U.S. federal income taxes otherwise payable. For U.S. federal income tax purposes, a corporation that undergoes an "ownership change" is limited in its ability to utilize its net operating loss carryforwards in existence at the time of such change to offset taxable income arising after such ownership change. Generally, an ownership change occurs if there is an increase of more than 50 percentage points in the ownership of a corporation's issued and outstanding stock (based on value) by one or more "5-percent shareholders" during the applicable testing period which is usually the three-year period ending on the date on which a transaction is tested for an ownership change. Following an ownership change, the loss limitation for any post-change year is an amount equal to the value of the loss corporation immediately prior to the change multiplied by the long-term tax-exempt rate in effect at the time of such change. Currently, none of the Debtors' net operating loss carryforwards is limited by these rules. The Debtors may experience an ownership change as a result of the Plan. Whether or not the

Plan results in an ownership change, it is possible that the Debtors will undergo an ownership change in the future. As a result, the Debtors' ability to use that portion of their net operating losses and other tax attributes attributable to periods prior to any such ownership change to offset taxable income in taxable periods after such an ownership change may be limited as described above. In addition, any net operating losses and other tax attributes that are currently limited may be limited further.

The Debtors believe that, based on the terms of the Plan, they will not recognize any substantial amounts of income for U.S. federal income tax purposes from the retirement of the Subordinated Notes, the 2011 Notes and the PIK Notes. However, the Debtors are likely to utilize some or all of their net operating losses and may also be required to reduce other tax attributes, such as their tax basis in certain assets, as a result of the Plan. This view is based on an analysis of the history of the Subordinated Notes and the 2011 Notes (including the Prior Restructuring); there can be no assurance that the U.S. Internal Revenue Service (the "***IRS***") will not challenge this result or, if challenged, that a court will uphold such result.

**B.      Risks to Recovery By Holders of Allowed Term Facility Claims, Allowed PIK Notes Claims, Allowed Subordinated Notes Claims and Allowed 2011 Notes Claims.**

The ultimate recoveries under the Plan to Holders of Allowed Term Facility Claims, Allowed PIK Notes Claims, Allowed Subordinated Notes Claims and Allowed 2011 Notes Claims depend upon several factors. To the extent the actual value of the New Common Stock, the New Preferred Stock (to the extent applicable), the New PIK Notes (to the extent applicable), the New First Lien Financing, the New Revolver Facility and the New Second Lien Financing varies from the amounts estimated, the recoveries of Holders of Allowed Term Facility Claims, Allowed PIK Notes Claims, Allowed Subordinated Notes Claims and Allowed 2011 Notes Claims may be higher or lower. New Common Stock, the New First Lien Financing, the New Revolver Facility and the New Second Lien Financing to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below.

1.      *<u>Variances from Forecasts.</u>*

The forecasts for the Reorganized Debtors included herein are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Factors that could cause actual results to differ materially include, but are not limited to, the Reorganized Debtors' ability to operate their business consistent with the forecasts, comply with the covenants of their financing agreements, attract and retain key executives, account representatives and customers, comply with the terms of their existing contracts and leases, and respond to adverse regulatory actions taken by the federal and state governments. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the forecasts may affect the actual financial results of the Reorganized Debtors. Although the Debtors believe that the forecasts are reasonably attainable, variations between the actual financial results and those forecasted will occur and these variances may be material.

2.      *<u>Holders of Subordinated Notes Claims and Management's Ownership of the Reorganized Debtors.</u>*

Under the Plan, the (i) Holders of Allowed Subordinated Notes Claims, (ii) Holders of Allowed 2011 Notes Claims, (iii) certain employees receiving distributions under the Employee Incentive Plan, (iv) the Backstop Parties and possibly (v) Holders of Allowed PIK Notes Claims will own, as of the Effective Date, all of the outstanding shares of the New Common Stock and New Preferred Stock, if any.

On the Effective Date, all entities receiving a distribution of New Common Stock under the Plan will be deemed parties to a stockholders agreement (the "***Stockholders Agreement***").  The Stockholders Agreement generally will provide for, among other things, (i) certain transfer restrictions and buy-sell arrangements and (ii) certain arrangements between Avenue, Angelo Gordon and Capital Research (collectively, the "***Stockholders***") regarding the election of their designees to the board of directors of the Reorganized Debtors.  In light of their ownership, in the aggregate, of more than a majority of the New Common Stock as of the Effective Date, the Stockholders will have considerable influence over the management and operation of Reorganized Debtors.

     3.     ***Unforeseen Events.***

Future performance of the Reorganized Debtors is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond their control.  While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flows described in the Forecast, the Debtors believe that cash flow from operations and available Cash will be adequate to fund the Plan and meet their future liquidity needs.

**C.**     **Risks Associated with the Debtors' Business and the Industry**

     1.     ***The Debtors' substantial debt could impair their ability to operate and expose them to certain risks.***

The Debtors' future performance could be affected by their substantial amount of debt.  As of June 30, 2010, the Debtors total principal amount of outstanding debt was approximately $878.7 million, consisting of approximately $490.6 million principal amount of debt under the 2009 Credit Agreement, $7.5 million remaining principal amount of 2011 Notes, approximately $24.8 million principal amount of PIK Notes and approximately $355.8 million principal amount of Subordinated Notes.

Following the consummation of the Plan, the Debtors' total principal amount of outstanding debt is expected to be approximately $525 million, consisting of approximately $385 million principal amount of New First Lien Financing and approximately $140 million principal amount of New Second Lien Financing.

In addition, subject to certain exceptions, the covenants in the 2009 Credit Agreement restrict us from paying dividends in cash, securities or other property, incurring additional debt, entering into certain mergers or consolidations, making acquisitions, investments or capital expenditures and selling or otherwise disposing of assets.  It is anticipated that the proposed new financing will contain similar covenants.

Although the consummation of the Plan would reduce the Debtors' debt level and improve their capital structure and operating flexibility, the Debtors' remaining level of debt could have important consequences for their business and operations, including the following:

     (a)     the Debtors' debt level requires that a substantial portion of their cash flow from operations be used for the payment of interest on debt, reducing their ability to use their cash flow to fund working capital, capital expenditures and general corporate requirements and to pay dividends on their outstanding shares of New Common Stock and New Preferred Stock, to the extent applicable;

(b)      the Debtors may have a much higher level of debt than certain of their competitors, which may put them at a competitive disadvantage;

(c)      the Debtors' debt level makes them more vulnerable to economic downturns and adverse developments in their business;

(d)      the Debtors' debt level reduces their flexibility in responding to changing business and economic conditions, including increased competition in the publishing industry; and

(e)      the Debtors' debt level limits their ability to pursue other business opportunities, borrow more money for operations or capital in the future and implement their business strategy.

Under the 2009 Credit Agreement, the Debtors also must comply with certain specified financial ratios and tests. The New Revolver Facility is expected to contain a financial ratio and test. The Debtors' ability to satisfy such ratio and test is dependent on their business performing in accordance with their forecasts. If the performance of their business deviates from their forecasts, the Debtors may not be able to satisfy such ratio and test. If the Debtors do not comply with these or other covenants and restrictions under the New Revolver Facility, the New First Lien Financing and the New Second Lien Financing, the Debtors could default under such facilities. The Debtors' ability to comply with such provisions may be affected by events beyond their control. The Debtors' outstanding debt under such facilities, together with accrued interest, could then be declared immediately due and payable. Moreover, the proposed Plan Financing Documents are expected to contain, cross-acceleration provisions so that an acceleration under any of their debt may result in a default under their other debt instruments. If a cross-acceleration occurs, the maturity of almost all of the Debtors' debt could be accelerated and become immediately due and payable. If that happens, the Debtors would not be able to satisfy their debt obligations, which would have a substantial adverse effect on their ability to continue as a going concern.

2.      ***Future acquisitions, partnerships, publishing services agreements and joint ventures may require significant resources and/or result in significant unanticipated losses, costs or liabilities.***

In the future, the Debtors may seek to grow their businesses by making acquisitions or entering into partnerships, publishing services agreements or joint ventures, including pursuing opportunities with their affiliates or companies controlled by their affiliates. Any future acquisition, partnership, publishing service agreement or joint venture may require that the Debtors make a significant cash investment, issue stock or incur substantial debt. In addition, acquisitions, partnerships, publishing services agreements or joint ventures may require significant managerial attention, which may be diverted from the Debtors' other operations. These capital, equity and managerial commitments may impair the operation of their businesses. Furthermore, any future acquisitions of businesses or facilities could entail a number of additional risks, including:

(a)      problems with effective integration of operations;

(b)      the inability to maintain key pre-acquisition business relationships;

(c)      increased operating costs;

(d)      exposure to unanticipated liabilities; and

(e)        difficulties in realizing forecasted efficiencies, synergies and cost savings.

The Debtors have incurred indebtedness to finance past acquisitions.  The Debtors may finance future acquisitions with additional indebtedness, subject to limits in our debt agreements.  As a result, the Debtors could face the financial risks associated with incurring additional indebtedness such as reducing our liquidity and access to financing markets and increasing the amount of cash flow required to service such indebtedness.

3. ***The Debtors' performance could be adversely affected if they lose their key personnel.***

The Debtors believe that their success is largely dependent on the abilities and experience of their senior management team.  The loss of the services of one or more of these senior executives could adversely affect the Debtors' ability to effectively manage their overall operations or successfully execute current or future business strategies.  The Debtors do not maintain key man life insurance on the lives of their senior management.  The Debtors have entered into employment contracts with their senior management team, all of which contain non-compete provisions.  While the Debtors believe that they could find replacements for these key personnel, the loss of their services could have a significant adverse effect on the Debtors' operations.

4. ***If the Debtors fail to implement their strategy, their businesses will be adversely affected.***

The Debtors' future financial performance and success are dependent in large part upon their ability to successfully implement their business strategy.  The Debtors cannot assure you that they will be able to successfully implement their business strategy or be able to improve their operating results. In particular, the Debtors cannot assure you that they will be able to increase circulation of their publications, obtain new sources of advertising revenues, generate additional revenues by building on the brand names of their publications, attract new clients for DSI or raise the cover prices of their publications without causing a decline in circulation.  Furthermore, any growth through acquisitions and investments will be dependent upon identifying suitable acquisition or investment candidates and successfully consummating such transactions and integrating the acquired operations at reasonable costs.  The Debtors may not successfully integrate any acquired businesses or publishing services client and may not be able to achieve anticipated revenue and cost benefits.

Such acquisitions and investments may require additional funding which may be provided in the form of additional debt, equity financing or a combination thereof.  The Debtors cannot assure you that any such additional financing will be available to them on acceptable terms or at all or the proposed new financing (or any replacement thereof).

Any failure to successfully implement their business strategy may adversely affect the Debtors' ability to service their indebtedness, including their ability to make principal and interest payments on the debt.  The Debtors may, in addition, decide to alter or discontinue certain aspects of their business strategy at any time.

5. ***The Debtors' businesses and results of operations are affected by and dependent upon discretionary consumer spending patterns.***

The Debtors' businesses are sensitive to a number of factors that influence the level of discretionary consumer spending, including political and economic conditions, such as recessionary and inflationary environments.  Notably, recent increases in the retail price of gasoline and the

potential for further increases in gasoline and other energy costs, increases in credit card, home mortgage, and other borrowing costs, and declines in housing values could lead to declines in overall consumer confidence and discretionary spending. A decline in discretionary consumer spending on publications, particularly those sold at retailers' checkout counters and those targeting certain demographics particularly affected by challenging economic conditions, could have a material adverse effect on the Debtors' businesses, operating results and profitability.

6. ***General economic trends, as well as trends in advertising spending and competition, along with declines in single copy circulation, may reduce the Debtors' advertising and circulation revenues which represent the vast majority of their revenues.***

The Debtors' advertising and circulation revenues, which accounted for 92% of their total operating revenues in fiscal year 2010, are subject to the risks arising from adverse changes in domestic and global market conditions (i.e., recessionary environments or increases in gas prices and interest rates) and possible shifting of advertising spending from print to Internet or other media or decreases in advertising budgets. Extraordinary weather conditions, such as hurricanes (i.e., Hurricane Katrina in fiscal year 2006), can impact newsstand sales, advertising revenues and other revenues like distribution. Any adverse impact of economic conditions on the Debtors' business may result in reductions in advertising and circulation revenue.

The Debtors' circulation revenues are subject to the risks arising from their ability to institute price increases for their print products and are affected by competition from other publications and other forms of media available in their various markets, changing consumer lifestyles resulting in decreasing amounts of free time, declining frequency of regular magazine buying among young people, and increasing costs of circulation acquisition.

The Debtors believe that the principal factors contributing to the declines in their single copy circulation include: (i) the current economic slowdown; (ii) increased competition from other publications and forms of media, such as certain newspapers, television and radio programs and Internet sites concentrating on celebrity news; (iii) a general industry-wide decline in single copy circulation of individual publications due to an increasing number of publications in the industry; and (iv) diminished service levels from wholesalers who distribute our magazines to retailers and fill the pockets at checkout counters as a result of consolidation among wholesalers and their related efforts to cut expenses.

Historically, the Debtors have been able to offset some of the declines in single copy circulation, in part, through increases in cover prices and cost reductions. The Debtors cannot assure you that they will be able to increase cover prices without decreasing circulation, or be able to take other measures, such as increasing advertising revenue rates or pages, and decrease promotion expenses of their titles to offset such circulation declines, or that the single copy circulation declines described above will be reversed. Continued declines in circulation could have a material adverse effect on their business and financial performance and condition.

7. ***The Debtors operate in a very competitive business environment.***

*Star*, *National Enquirer*, *Globe*, *National Examiner*, *Sun*, *Mira!* and *Country Weekly* compete in varying degrees with other publications sold at retailers' checkout counters, as well as forms of media concentrating on celebrity news, such as certain tabloids, magazines and television and radio programs. The Debtors believe that historical declines in single copy circulation of *National Enquirer*, *Globe* and *National Examiner* have resulted in part from increased competition from these

publications and forms of media. Competition for circulation is largely based upon the content of the publication, its placement in retail outlets and its price. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price, and advertising results. Certain of the Debtors' competitors have substantially larger operating staffs, greater capital resources and greater revenues from their publications. In this respect, the Debtors may be at a competitive disadvantage with such entities. The Debtors believe that currently their most significant direct competitors in the print media are Time Warner Inc. (which publishes *People*, *People's Country*, *In Style* and *Entertainment Weekly*), Wenner Media, Inc. (which publishes *US Weekly* and *Men's Journal*), Rodale Inc. (which publishes *Men's Health* and *Woman's Health*), Bauer Publishing (which publishes *In Touch and Life & Style*), Condé Nast Publications, Inc. (which publishes *Self*) and Northern & Shell North America Ltd. (which publishes *OK!*). As use of the Internet and new on-line ventures focusing on celebrity news has increased, the Debtors have faced additional competition.

In addition, the Debtors compete with many other companies providing marketing and distribution services, such as full-service national distributors, wholesalers and publishers with their own marketing organizations. Certain of the Debtors' competitors have substantially larger operating staffs and greater capital resources. In this respect, the Debtors may be at a competitive disadvantage with such entities.

Increased competition may result in less demand for our products and services which may have a material adverse effect on our business, results of operations and financial condition.

8.    ***The Debtors' businesses and results of operations may be adversely affected by increases in fuel costs and increases in the price of paper or postage.***

Many aspects of the Debtors' businesses have been directly affected by increases in the cost of fuel. Increased fuel costs have translated into increased costs for the products and services the Debtors receive from their third-party suppliers including, but not limited to, increased production and distribution costs for their products. In particular, paper and postage represent significant components of the Debtors' total cost to produce and distribute their printed products. Paper is a commodity and its price has been subject to significant volatility. Furthermore, because the United States Postal Service and Canada Post Corporation distribute substantially all of the Debtors' subscription publications and many of their marketing materials, increases in the cost of postage to mail their subscription publications may have an adverse effect on their business. The Debtors cannot predict with certainty the magnitude of future price changes in paper and postage or how increases in fuel costs will affect the Debtors' third-party suppliers and the rates they charge. If fuel, paper or postage prices increase, and the Debtors cannot pass these costs on to their customers, such increases may have a material adverse effect on their businesses, results of operations and financial condition.

9.    ***The Debtors' businesses may be adversely affected if they lose one or more of their vendors.***

A loss of one or more of the Debtors' vendors related to production or circulation or a disruption in one of those vendors' businesses or a failure by one of them to meet their production or circulation needs on a timely basis could cause temporary shortages in needed materials or services which could have a negative effect on their businesses and results of operations.

10.    ***Terrorist attacks and other acts of violence or war may affect the financial markets and the Debtors' businesses, results of operations and financial condition.***

Terrorist attacks may negatively affect the Debtors' operations and financial condition. There can be no assurance that there will not be further terrorist attacks against the United States or U.S. businesses. These attacks or armed conflicts may directly impact the Debtors' physical facilities or those of their retailers and customers. These events could cause consumer confidence and spending to decrease or result in increased volatility in the U.S. and world financial markets and economy. They could result in an economic recession in the United States or abroad. Any of these occurrences could have a material adverse impact on the Debtors' businesses, results of operations and financial condition.

11.    ***Pending and future litigation or regulatory proceedings could materially affect the Debtors' operations.***

Because the focus of some of the Debtors' publications often involves celebrities or controversial subjects and because of the Debtors' news gathering techniques, the risk of defamation or invasion of privacy litigation or the filing of criminal charges exists. While the Debtors have not historically experienced any difficulty obtaining insurance coverage, the Debtors cannot assure you that they will be able to do so in the future at rates acceptable to them or at all. There are currently no such claims pending that the Debtors believe would have a material adverse effect on their operations. The Debtors cannot assure you that any pending or future litigation, if adversely determined, would not have a material adverse effect on our business, results of operations and financial condition.

In addition, on March 10, 2009, Anderson News, L.L.C. and Anderson Services, L.L.C., magazine wholesalers, (collectively, "***Anderson***") filed a lawsuit against AMI, DSI and various magazine publishers, wholesalers and distributors in the Federal District Court (the "***District Court***") for the Southern District of New York (the "***Anderson Action***"). The complaint alleges that the defendants violated Section 1 of the Sherman Antitrust Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Plaintiffs also purport to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint does not specify the amount of damages sought. On August 2, 2010, the District Court dismissed the complaint in its entirety with prejudice and without leave to replead. While it is not possible to predict with certainty the final outcome of an appeal, if any, of the Anderson Action or to estimate the impact of such appeal on the Debtors, the Debtors intend to continue to vigorously defend the case. An adverse determination in this action could have an adverse effect on the Debtors' business.

12.    ***If the Debtors' goodwill or other identifiable intangible assets become impaired, the Debtors may be required to record a significant charge to earnings.***

As of June 30, 2010, the net book value of the Debtors' goodwill and other intangible assets was approximately $501.9 million. Accounting rules require the Debtors to record a charge against their earnings to the extent that any of these assets are impaired, including a change that may occur as a result of any bankruptcy filing the Debtors may make. Accordingly, impairment of the Debtors' goodwill, tradenames, covenants not to compete, subscriber lists, advertising relationships, non-subscriber customer relationships or the impairment of other intangible assets due to litigation, obsolescence, competitive factors, bankruptcy or other reasons could result in a material charge against the Debtors' earnings and have a material adverse effect on their results of operations.

13.    ***Some provisions of Delaware law and AMI's amended and restated certificate of incorporation may deter third parties from acquiring AMI.***

Provisions contained in AMI's amended and restated certificate of and the laws of Delaware, the state in which AMI is incorporated, could make it more difficult for a third-party to acquire AMI, even if doing so might be beneficial to AMI's stockholders.    Provisions of AMI's amended and restated certificate of incorporation impose various procedural and other requirements, which could make it more difficult for stockholders to affect certain corporate actions. These anti-takeover defenses could discourage, delay or prevent a transaction involving a change in control.    These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and cause AMI to take other corporate actions that AMI's stockholders desire.

14.    ***Because of the concentration of ownership among a few stockholders, such stockholders will be able to exercise control over significant transactions involving AMI, including a change in control transaction, and the interests of such stockholders may differ from those of Reorganized AMI's other stockholders.***

As of October 22, 2010, affiliates of Capital Research, Angelo Gordon, Avenue and Credit Suisse collectively own approximately 70% of the outstanding AMI Common Stock.    Certain of these stockholders also own approximately 78% of the outstanding aggregate principal amount of Subordinated Notes.    The Financial Restructuring would further concentrate the ownership among these large holders.    In the event that the Plan is consummated, affiliates of Capital Research, Angelo Gordon, Avenue and Credit Suisse would collectively own approximately 79% of the outstanding New Common Stock.    As a result, such stockholders will be able to exercise control over significant transactions involving Reorganized AMI, including a change in control transaction, even after the consummation of the Plan.    Further, the interests of such stockholders (who in most cases also hold PIK Notes) may differ from those of AMI's other stockholders.    For example, in the event that the Plan is consummated, the PIK Notes may be exchanged into New Second Lien Notes, which will be on terms that are more favorable to holders thereof than the existing PIK Notes.

15.    ***The Debtors may not be able to maintain an effective system of internal control over financial reporting and disclosure controls.***

Effective internal control over financial reporting and disclosure controls are necessary for the Debtors to provide reliable financial reports, effectively prevent fraud and operate successfully.    If the Debtors cannot provide reliable financial reports or prevent fraud, their operating results and reputation would be harmed.    As part of their ongoing monitoring, the Debtors may discover material weaknesses or significant deficiencies in our internal control over financial reporting that require remediation.

The Debtors cannot assure you that internal control over financial reporting or disclosure control deficiencies might not be identified in the future.    Any failure to maintain effective controls or timely effect any necessary improvement of their internal control over financial reporting and disclosure controls could, among other things, result in losses from fraud or error, cause the Debtors to not satisfy our reporting obligations, cause investors to lose confidence in the Debtors' reported financial information or harm our reputation, all of which could have a material adverse effect on the Debtors' results of operations and financial condition.

16.     ***The Debtors may suffer credit losses that could adversely affect their results of operation.***

The Debtors extend unsecured credit to most of their customers.  The Debtors recognize that extending credit and setting appropriate reserves for receivables is largely a subjective decision based on knowledge of the customer and the industry.  Credit exposure also includes the amount of estimated unbilled sales.  The level of credit is influenced by the customer's credit history with the Debtors and other available information, including industry-specific data.

The Debtors share partially in the credit risk for sales to their wholesalers under their agreement with their largest national distributor.

The Debtors maintain a reserve account for estimated losses resulting from the inability of our customers to make required payments.  If the financial condition of the Debtors' customers were to deteriorate, resulting in an impairment of their ability to pay, additional allowances might be required.

17.     ***The Debtors' single copy revenues consist of copies sold primarily to three wholesalers.***

As of June 30, 2010, single copy revenues consisted of copies distributed to newsstands primarily by three wholesalers, which the Debtors estimate represented approximately 81% of the newsstand distribution market, as well as several smaller wholesalers who represented the remaining approximately 19%.  In fiscal year 2010, two wholesalers each accounted for greater than 10% of the Debtors' total operating revenue and in the aggregate accounted for approximately 45% of our total operating revenue.  The Debtors have service agreements with these wholesalers, which provide incentives to maintain certain levels of service.  When these agreements expire, the Debtors cannot assure you that their wholesalers will renew these agreements on favorable terms, extend the terms of these agreements or extend their relationship with the Debtors at all.  The Debtors operating results could be materially affected by disruption of the distribution of their magazines through the wholesalers.

18.     ***Employee benefit costs are increasing significantly.***

Health insurance costs have increased significantly faster than inflation on an annual basis during the past few years.  The Debtors also anticipate that in coming years, the cost of health care will continue to escalate, causing an increase to their expenses and employee contributions.

## IX.

## VOTING PROCEDURES AND REQUIREMENTS

Voting instructions are provided with the Ballot or Master Ballot, as applicable, accompanying this Disclosure Statement.  For purposes of the Plan, only Classes 2, 5, 6 and 7, which are comprised of the Term Facility Claims, PIK Notes Claims, Subordinated Notes Claims and 2011 Notes Claims, are entitled to vote.  If your Claim is not in one of these Classes, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If your Claim is in one of these Classes, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

> **IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE VOTING AGENT AT (877) 833-4150.**

A.       **Vote Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the amount of claims voting to accept, based on the actual total allowed claims voting.  Acceptance requires an affirmative vote of more than one-half of the total allowed claims voting and two-thirds in amount of the total allowed claims voting.

B.       **Classes Not Entitled to Vote**

Under the Bankruptcy Code, creditors are not entitled to vote and are deemed to have accepted the plan if their contractual rights are left unimpaired by the plan.  In addition, classes of Claims or interests that are not entitled to receive property under the plan are not entitled to vote and deemed not to have accepted the plan.  Based on this standard, the Holders of Claims in Classes, 1, 3, 4, 8 and 9, which are comprised of Priority Non-Tax Claims, Revolver Claims, Other Secured Claims, General Unsecured Claims are not entitled to vote and deemed to have accepted the Plan because their rights are left unimpaired under the Plan.  In addition, Holders of Intercompany Claims are impaired, but deemed to have accept the Plan.  Finally, Holders of Interests in Class 10, which is comprised of Interests in AMI, are not entitled to receive vote on the Plan because they are not entitled to receive a distribution under the Plan.

C.       **Voting Record Date**

**The voting record date (the "*Voting Record Date*") is October 29, 2010.**  The Voting Record Date is the used to determine whether Holders of Claims in Classes 2, 5, 6 and 7 are entitled to vote to accept or reject the Plan.

D.       **Voting on the Plan**

The solicitation period for eligible creditors to vote to accept or reject the Plan will commence prior to the Petition Date.  In order for your vote to be counted, your vote must be actually **_received_** by the Voting Agent at the following address before the Voting Deadline of 5:00 P.M., (Eastern Time), on November 15, 2010:

---

**Voting Agent For Voting Classes 2, 5, 6 and 7:**

American Media Ballot Processing Center
Kurtzman Carson Consultants LLC
599 Lexington Avenue, 39th Floor
New York, NY 10022

---

**If your vote is received by the Voting Agent after the Voting Deadline, the Debtors, in their sole discretion, will decide whether or not your vote will be counted.**

If the return envelope provided with your Ballot is addressed to your Nominee, you must allow sufficient time for your Nominee to cast your vote on a Master Ballot so that it is actually received by the Voting Agent on or before the Voting Deadline (5:00 P.M., Eastern Time, on November 15, 2010).

**A BENEFICIAL OWNER HOLDING EXISTING NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.**

**IF YOU MUST RETURN YOUR BALLOT TO A NOMINEE, OR TO A NOMINEE'S AGENT, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN THE MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

**IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH ABOVE.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.**

E.      **Beneficial Owners**

A beneficial owner holding existing notes as record holder in its own name should vote on the Plan by completing and signing a Ballot and returning it to its Nominee.

Complete and sign the enclosed Ballot.  Return the Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed Master Ballot to the Voting Agent by the Voting Deadline.

Any Ballot returned to a Nominee by a beneficial owner will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent that Ballot casting the vote of such beneficial owner.

If any beneficial owner owns existing notes through more than one Nominee, such beneficial owner may receive multiple mailings containing the Ballots.  The beneficial owner should execute a separate Ballot for each block of existing notes that it holds through any particular Nominee and return each Ballot to the respective Nominee in the return envelope provided therewith.

F.      **Nominees**

A Nominee that, on the Record Date, is the registered holder of existing notes for one or more beneficial owners can obtain the votes of the beneficial owners of such existing notes, consistent with customary practices for obtaining the votes of securities held in "street name," in the following manner.

1.      ***Master Ballots***

The Nominee may obtain the votes of beneficial owners by forwarding to the beneficial owners the unsigned Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to the Nominee, and other materials requested to be forwarded in accordance with the instructions set forth on the Master Ballots.  Each such beneficial owner must then indicate his, her or its vote on the Ballot, complete the information requested on the Ballot, review the certifications contained on the Ballot, execute the Ballot and return the Ballot to the Nominee.  After collecting the Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is ACTUALLY RECEIVED by the Voting Agent on or before the Voting Deadline.  All Ballots returned by beneficial owners should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by Nominees for inspection for at least

one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL OWNERS TO RETURN THEIR BENEFICIAL OWNER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

2.    *__Miscellaneous__*

All Ballots must be signed by the holder of existing notes of record or any person who has obtained a properly completed Ballot proxy from the record holder of the existing notes on such date. For purposes of voting to accept or reject the Plan, the beneficial owners of existing notes will be deemed to be the "Holders" of the Claims represented by such existing notes. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. Where applicable, the Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Holders of existing notes who actually vote will be counted. The failure of a Holder to deliver a duly executed Ballot to the Voting Agent or its Nominee will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless a Ballot or Master Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot or Master Ballot, the Debtors may, in their sole discretion, reject such Ballot or Master Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

3.    *__Fiduciaries And Other Representatives__*

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing, and may be required, upon request, to submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

**UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST OF THE BANKRUPTCY COURT THAT ANY SUCH BALLOT OR MASTER BALLOT BE COUNTED.**

4.    *__Agreements Upon Furnishing Ballots or Master Ballots__*

The delivery of an accepting Ballot or Master Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor(s) with respect to such Ballot or Master Ballot to accept (i) all of the terms of, and conditions to, this solicitation of votes to accept or reject the Plan; and (ii) the terms of the Plan including the releases or exculpations set forth in Section 10.4 and 10.7 therein. All parties in interest retain their right to object to confirmation of the Plan pursuant

to Bankruptcy Code section 1128, subject to any applicable terms of the Restructuring Support Agreement.

5. ***Change of Vote***

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot or Master Ballot may revoke such Ballot or Master Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot or Master Ballot for acceptance or rejection of the Plan.

**G.    Waivers of Defects, Irregularities, Etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots or Master Ballots will be determined by the Debtors in their sole discretion, which determination will be final and binding.  Effective withdrawals of Ballots or Master Ballots must be delivered to the Voting Agent prior to the Voting Deadline.  The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all Ballots or Master Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot or Master Ballot.  The interpretation (including the Ballots and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.   Unless waived, any defects or irregularities in connection with deliveries of Ballots or Master Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots or Master Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots or Master Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots or Master Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**H.    Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this offering memorandum, or any exhibits to such documents, please contact the Voting Agent.

**X.**

**CONFIRMATION OF THE PLAN**

**A.    Confirmation Hearing**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan.  On or as promptly as practicable after the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors, equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without

further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Bankruptcy Code section 1128(b) provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (i) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 (Attn: Ira Dizengoff, Esq., Arik Preis, Esq. and Meredith A. Lahaie, Esq.), attorneys for the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, (iii) Paul, Weiss, Rifkin, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019 (Attn: Andrew N. Rosenberg, Esq. and Diane Meyers, Esq.), attorneys for the Committee, (iv) Wachtell, Lipton, Rosen & Katz LLP, 51 West 52nd Street, New York, New York 10019 (Attn: Richard G. Mason, Esq. and Jennifer S. Nam, Esq.), attorneys for the Administrative Agent and (v) such other parties as the Bankruptcy Court may order.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### B.    General Requirements of Bankruptcy Code Section 1129

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in Bankruptcy Code section 1129 have been satisfied. Among other requirements for confirmation of a plan are that the plan (i) is accepted by all impaired classes of claims or equity interests or, if rejected by an impaired class, that the plan satisfy the "cram down" requirements of Bankruptcy Code section 1129(b), (ii) is feasible and (iii) is in the "best interests" of creditors and holders of interests.

### C.    Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or equity interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

1.    ***No Unfair Discrimination.***

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

2.    ***Fair and Equitable Test.***

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or equity interests in such class:

- *Secured Creditors*.  Each holder of an impaired secured claim either (i) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- *Unsecured Creditors*.  Either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.

- *Equity Interests*.  Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to the equity interests of the dissenting class will not receive any property under the plan of reorganization.

The Debtors believe the Plan will satisfy the "fair and equitable" requirement.

## D.    Best Interests Test

The Bankruptcy Code requires that each holder of an impaired claim or interest either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage.  Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 case, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals for the Debtors, as well as other claims for the compensation and reimbursement of professionals.  In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.

The foregoing types of Claims, costs, expenses, fees and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-chapter 11 priority and unsecured claims.  The Debtors believe that in a chapter 7 liquidation, the Holders of Claims or Interests would receive significantly less distribution of property, if any.

The Debtors' liquidation analysis is an estimate of the proceeds that may be generated as a result of a hypothetical chapter 7 liquidation of the Debtors.  The analysis is based on a number of significant assumptions that are described below.  The liquidation analysis does not purport to be a valuation of the Debtors' assets and is not necessarily indicative of the values that may be realized in an actual litigation.

**E.       Liquidation Analysis**

The Debtors liquidation analysis is attached hereto as Exhibit "I."

**F.       Feasibility**

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Forecast described in Section VII above and attached as Exhibit "G" hereto.  Based upon such Forecast, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**XI.**

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.       Liquidation Under Chapter 7 or Chapter 11**

If no plan is confirmed, the Debtors may be forced to liquidate under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effect that a chapter 7 liquidation would have on the recoveries of holders of Claims is set forth in Section X.E of this Disclosure Statement.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that other assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, (c) additional expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.  In a chapter 7 liquidation, the Debtors believe that there would be no distribution to Holders of Allowed Claims in Classes 1, 4, 5, 6, 7, 8, 9 and 10  and the distribution to holders of Allowed Claims in Classes 2 and 3 would be materially less.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of liquidation.  In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a longer period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed.  Any distribution to the Holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

The Debtors believe that any alternative liquidation under chapter 7 or chapter 11 is a much less attractive alternative to creditors than the Plan because of the greater return the Debtors believe is provided to creditors under the Plan.

B.      **Alternative Plan**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or any other party in interest (if the Debtors' exclusive period in which to file a plan has expired), may attempt to formulate and propose a different plan or plans of reorganization. Such a plan or plan(s) might involve either a reorganization and continuation of the Debtors' businesses or an orderly liquidation of the Debtors' assets under chapter 11.

The Debtors' businesses could suffer from increased costs, erosion of customer confidence and liquidity difficulties if the Debtors remained Debtors in possession during a lengthy chapter 11 process while trying to negotiate a different plan.

The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances and that, compared to any later alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## XII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

EACH HOLDER OF TERM FACILITY CLAIMS, PIK NOTES CLAIMS, SUBORDINATED NOTE CLAIMS OR 2011 NOTES CLAIMS SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO SUCH HOLDER OF THE PLAN, IF CONSUMMATED, INCLUDING THE APPLICABILITY OF U.S. FEDERAL, STATE, OR LOCAL TAX LAWS OR NON-U.S. TAX LAWS.

The following is a summary of certain U.S. federal income tax consequences to U.S. Holders and Non-U.S. Holders (each as defined below) of Term Facility Claims, PIK Notes Claims, Subordinated Notes Claims, and 2011 Notes Claims (each as defined in the Plan) ("*Claims*") under the Plan.

The following discussion is based upon the U.S. Internal Revenue Code of 1986, as amended (the "*Tax Code*"), U.S. judicial decisions, administrative pronouncements and final, temporary and proposed Treasury regulations promulgated under the Tax Code ("*Treasury Regulations*"), all as in effect as of the date hereof. All of the preceding authorities are subject to change, possibly with retroactive effect, which may result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding on the IRS or such other authorities. In addition, a significant amount of time may elapse between the date of this Disclosure Statement and the consummation of the Plan. Events occurring after the date of this Disclosure Statement, including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

With respect to the Plan, unless otherwise stated, this summary deals with debt and stock held as capital assets (generally, assets held for investment) by U.S. Holders. In addition, this summary assumes that the Term Facility, the PIK Notes, Subordinated Notes, and the 2011 Notes are classified for U.S. federal income tax purposes as indebtedness of AMO. The U.S. federal income tax treatment

of a U.S. Holder may vary depending on such U.S. Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to U.S. Holders subject to special tax treatment such as, for example, insurance companies, broker dealers, tax-exempt organizations, regulated investment companies, expatriates, persons holding the Claims as part of a straddle, hedge, conversion transaction or other integrated investment and persons whose functional currency is not the U.S. dollar.  This summary is based on U.S. federal income tax law in effect as of the date hereof, which is subject to change or differing interpretation, possibly on a retroactive basis. This summary does not address any aspects of U.S. federal tax law other than income tax law, or any aspects of U.S. state or local, or Non-U.S. tax laws.

For purposes of this summary, a "*U.S. Holder*" means a holder of Claims that, in any case, is, for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.  A "*Non-U.S. Holder*" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity.  Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims or of the New Second Lien Financing, New Common Stock, and New PIK Notes or New Preferred Stock, if any.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS UNDER THE PLAN ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE TAX CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY US OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **U.S. Federal Income Consequences to the Debtors**

1.    ***COD Income of the Debtors***

In general, absent an exception, a company will recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income generally is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, and (y) the fair market value of any consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

A company will not be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income under section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits and capital loss carryovers; (c) tax basis in assets; and (d) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets under section 108(b)(5) of the Tax Code.

The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. For the purpose of attribute reduction, any limitations on the use of NOLs, as discussed below, are disregarded. In the context of a consolidated group of corporations, the Tax Code provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the COD Income of another member.

With respect to transactions giving rise to COD Income occurring in 2010, a debtor may elect to defer the recognition of the COD Income, and thus the requirement to pay tax currently, until 2014. If the debtor defers such COD Income until 2014, the COD Income is then included in income ratably over the five (5) taxable year period beginning in 2014. In certain cases, debtors may make the deferral election on a protective basis.

As discussed in more detail below, the adjusted issue price of the Subordinated Notes is approximately $105 million less than the face amount. Accordingly, in determining the amount of COD Income realized under the Plan, this adjusted issue price would be considered the principal amount of Subordinated Notes outstanding for U.S. federal income tax purposes. Moreover, the amount of COD Income, if any, realized by the Debtors will depend on the value of the New Common Stock, the New Preferred Stock, if any, and the adjusted issue price (determined as described below) of the New Second Lien Financing and New PIK Notes, if any. If the Debtors realize COD Income that is not taxable under the bankruptcy exception, they will be required to reduce their tax attributes, including their NOLs. The exact amount of such reduction would depend on the amount of the COD Income realized, whether the Debtors exclude COD Income under the bankruptcy exception, and whether the Debtors elect to defer the recognition of any COD Income realized.

2.      *__Limitation of NOLs and Other Tax Attributes__*

The Debtors will have NOL carryovers and other tax attributes at the time of the exchange of approximately $40.0 million, none of which is subject to limitations, as discussed below, from a prior ownership change. The Debtors forecast an additional $35 million of losses in current fiscal year. The precise amount of NOL carryovers that will be available to the Debtors after emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available NOLs include: the amount of tax losses incurred by the Debtors in 2010; the value of the New Common Stock and the New Preferred Stock, if any; the issue price of the New Second Lien Financing and New PIK Notes, if any; and the amount of COD Income, if any, realized by the Debtors under the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally is subject to an annual limitation. In light of the large overlap between current holders of AMI Common Stock and Holders of Subordinated Notes (the same parties own 70% of the AMI Common Stock and approximately 78% of the Subordinated Notes), the Debtors anticipate that the

issuance of the New Common Stock and, if applicable, the New Preferred Stock, under the Plan are not likely to result in an "ownership change" of the Debtors for these purposes, and that the Debtors' use of their pre-change losses is not likely to be subject to limitation unless an exception to the general rules of sections 382 and 383 of the Tax Code applies.

*General Section 382 Annual Limitation*.  In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (i) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs; 3.86% for November 2010).  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.

*Special Bankruptcy Exceptions*.  An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***").  Under the 382(l)(5) Exception, a debtor's pre-change losses are not limited on an annual basis but, instead, are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Debtors undergo another "ownership change" within two (2) years after consummation of the Plan, then the Debtors' annual limitation to use their pre-change losses against their future income would be reduced to zero.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***").  Under the 382(l)(6) Exception, the limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under the 382(l)(6) Exception the debtor corporation is not required to reduce its NOLs by the amount of interest deductions claimed during the current year and three preceding years with respect to the debt converted to equity, and the debtor may undergo a change of ownership within two (2) years without reducing the annual limitation on its NOLs to zero.

The issuance under the Plan of New Common Stock and, if applicable, the New Preferred Stock, along with the cancellation of existing stock of the Debtors, is not expected to cause an ownership change with respect to the Debtors.  If, however, an ownership changes does occur, the Debtors' pre-change losses would be subject to the Section 382 limitation (as described above).  The Debtors anticipate that any limitation arising under the Plan will be calculated according to the Section 382(l)(6) Rule.  If an ownership change occurs contrary to expectation, the Debtors are uncertain, at this time, whether they would qualify for the Section 382(l)(5) Rule, and whether the consequences of that rule would be favorable relative to those under the Section 382(l)(6) Rule.

If the merger of AMI into AMO were to occur, AMO would become the successor parent to the old AMI consolidated group, the group's NOLs would remain intact, and the change in control

67

rules would apply to AMO in substantially the same manner as if AMI had continued in existence the shareholders held AMI Common Stock instead of AMO common stock.

3.    ***Treatment of the New PIK Notes as Applicable High Yield Discount Obligations***

The New PIK Notes may be subject to the provisions of the Tax Code dealing with applicable high yield discount obligations, see discussion below.  If the New PIK Notes are subject to the applicable high yield discount obligations, any interest deductions with respect to any original issue discount ("***OID***") relating to the New PIK Notes will be deferred until paid in cash or in other property (other than stock or debt issued by the Debtors or by a person deemed to be related to the Debtors under section 453(f)(1) of the Tax Code), and will be disallowed to the extent the yield to maturity on the New PIK Notes exceeds six percentage points over the applicable federal rate.

4.    ***Alternative Minimum Tax***

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carry-forwards, only 90% of a corporation's taxable income from AMT purposes may be offset by available NOL carry-forwards (as computed for AMT purposes).

In addition, if a corporation undergoes an ownership change, within the meaning of section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

## B.    U.S. Federal Income Tax Consequences to U.S. Holders Under the Plan

The following discussion describes certain U.S. federal income tax consequences to U.S. Holders under the Plan.

The U.S. federal income tax consequences of the Plan to a U.S. Holder and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for or by the Plan generally will depend upon, among other things, (i) the manner in which a U.S. Holder acquired the Claim, (ii) the length of time the Claim has been held, (iii) whether the Claim was acquired at a discount, (iv) whether the U.S. Holder has taken a bad debt deduction in the current or prior years, (v) whether the U.S. Holder has previously included accrued but unpaid interest with respect to the Claim, (vi) the U.S. Holder's method of tax accounting, (vii) whether the U.S. Holder will realize foreign currency exchange gain or loss with respect to the Claim, (viii) whether the Claim is an installment obligation for U.S. federal income tax purposes, and (ix) whether the transaction is treated as a "closed transaction" or an "open transaction."  Therefore, U.S. Holders of Claims are urged to consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such U.S. Holders as a result thereof.

1.    ***Consequences to U.S. Holders of Class 2 Term Facility Claims***

Pursuant to the Plan, Holders of Class 2 Term Facility Claims will receive, in full satisfaction of their Claims, their *pro rata* share of Cash and New Second Lien Notes.  They will also have the right to sell their New Second Lien Notes for the face amount of such notes.  The U.S. federal income tax consequences of the Plan to such U.S. Holders will depend, in part, on whether both the Allowed Term Facility Claim surrendered and the New Second Lien Notes constitute "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" is determined based on all the facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten (10) years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued.  The Debtors expect that the New Revolver Facility will have a term of approximately five (5) years, the New First Lien Financing will have a term of approximately seven (7) years and the New Second Lien Financing will have a term of approximately seven and a half (7.5) years.  For purposes of the following discussion, the Debtors will take the position that the Term Facility Claims do not constitute a security.

If the Term Facility is not treated as a "security" for U.S. federal income tax purposes, a U.S. Holder is likely to be treated as exchanging its Term Facility Claim for Cash and New Second Lien Notes in a fully taxable exchange.  In that case, the U.S. Holder would recognize gain or loss equal to the difference between (1) the sum of the amount of Cash and the "issue price" of the New Second Lien Notes as of the date that the New Second Lien Notes are received (except for any such stock or notes that are allocable to accrued interest), and (2) the U.S. Holder's adjusted tax basis in the Term Facility Claim surrendered.  The determination of the New Second Lien Notes' issue price, in turn, depends, in part, on whether the Term Facility Claim or the New Second Lien Notes are traded on an "established securities market" (i.e., publicly traded) at any time during the sixty (60) day period ending thirty (30) days after the date of the exchange.  In general, for these purposes, a debt instrument (or the property exchanged therefor) will be treated as traded on an established market if (a) it is listed on (i) a qualifying national securities exchange, (ii) certain qualifying interdealer quotation systems or (iii) certain qualifying foreign securities exchanges; (b) it appears on a "quotation medium," within the meaning of the applicable regulations; or (c) subject to certain exceptions, price quotations are readily available from dealers, brokers or traders.  For this purpose, the issue price of the New Second Lien Notes will equal its fair market value if the New Second Lien Notes are considered to be "publicly traded" for U.S. federal income tax purposes, and if the Term Facility Claim but not the New Second Lien Notes are considered to be publicly traded, then the issue price of the New Second Lien Notes will be the fair market value of the Term Facility Claim.  If neither the Term Facility Claim nor the New Second Lien Notes are considered to be publicly traded, then the issue price of the New Second Lien Notes will be its principal amount.

Although not free from doubt, in determining a U.S. Holder's gain or loss under the Plan, we believe that the U.S. Holder's basis in the Term Facility should be apportioned between the Cash and New Second Lien Notes received based on the relative amount of cash and the fair market value of the New Second Lien Notes.  If, instead, the exchange is treated as a recapitalization for tax purposes,

gain would be recognized to the extent of the cash received, but the basis likely would be allocated in the same manner.    A U.S. Holder's holding period for the New Second Lien Notes should begin on the day following the date that the New Second Lien Notes are received.

If a U.S. Holder sells his New Second Lien Notes to the Backstop Parties, the U.S. Holder will recognize gain such sale.  Generally, a U.S. Holder should recognize capital gain or loss if the New Second Lien Notes are a capital asset in the U.S. Holder's hands.

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the U.S. Holder, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to the Claim, and the U.S. Holder's holding period of the Claim.  This income or loss may be ordinary if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the U.S. Holder's trade or business for the performance of services or for the sale of goods or merchandise.  Generally, a U.S. Holder should recognize capital gain or loss (which capital gain or loss would be long-term capital gain or loss to the extent that the U.S. Holder has held the debt instrument underlying its Claim for more than one year) if the Claim is a capital asset in the U.S. Holder's hands.  To the extent that a portion of the Cash received represents accrued but unpaid interest that the U.S. Holder has not already taken into income, the U.S. Holder should recognize ordinary interest income.  See discussion of accrued interest below.

If, however, both a U.S. Holder's New Second Lien Notes and Term Facility are treated as "securities," the exchange of the Term Facility Claim for the New Second Lien Notes should be treated as a "recapitalization" under the Tax Code.  In general, this means that a U.S. Holder of the Term Facility Claim would not recognize loss with respect to the exchange and would recognize gain to the extent of (x) the Cash received, and (y) if it puts its New Second Lien Notes to the Backstop Parties, the gain on such New Second Lien Notes.  In addition, it would recognize ordinary income to the extent of any accrued but unpaid interest on the Term Facility Claim.  If the exchange is treated as a recapitalization, a U.S. Holder should obtain a tax basis in the New Second Lien Notes equal to the tax basis of the Term Facility Claim surrendered under the Plan and a holding period for the New Second Lien Notes that includes the holding period for the Term Facility Claim; provided that the tax basis of any New Second Lien Financing treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Second Lien Financing should not include the holding period of the Term Facility Claim.

2.    ***Consequences to U.S. Holders of Class 5 PIK Notes Claims***

Pursuant to the Plan, at its election, a holder of a Class 5 PIK Notes Claim will receive, at the election of Debtors, but subject to the consent of the Committee, as set forth in the Plan, its *pro rata* share of either (a) New Second Lien Notes, (b) New PIK Notes, (c) New Preferred Stock, or (d) a combination of the foregoing.

Generally, under applicable Treasury Regulations, a "significant modification" of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument for U.S. federal income tax purposes upon which gain or loss may be recognized, even if no actual exchange of the debt instrument occurs.  A modification means any alteration, including any deletion or addition of a legal obligation of the issuer of a debt instrument.  A modification is a significant modification only if, based on all facts and circumstances and taking into account all modifications of the debt instrument collectively, the legal rights or obligations that are altered and the degree to which they are altered are economically significant.  The receipt of New Second Lien Financing would constitute a taxable exchange under this Treasury Regulation.  Moreover, the terms of the New PIK

Notes, if issued, would be treated as a significant modification of the PIK Notes because the period of the extension exceeds the safe harbor provided in the applicable Treasury Regulations. Finally, the exchange by AMO of PIK Notes Claims of AMO for New Preferred Stock issued by AMI would constitute a taxable exchange because the stock would be issued by a different issuer than the PIK Notes underlying the Claims.

Since the consideration to be received for the PIK Notes under the Plan would be taxable absent another rule under the Tax Code, the U.S. federal income tax consequences of the Plan to a U.S. Holder will largely depend on whether the PIK Notes Claims surrendered constitute "securities" for U.S. federal income tax purposes, as described above. The PIK Notes have a term of approximately four (4) years. The Debtors expect to take the position that PIK Notes Claims do not constitute securities.

If a U.S. Holder's PIK Notes Claims are not treated as "securities" for U.S. federal income tax purposes, a U.S. Holder who receives New Second Lien Financing, New PIK Notes or New Preferred Stock (or a combination thereof) should be treated as exchanging its PIK Notes Claims for such consideration in a fully taxable exchange. In that case, the U.S. Holder would recognize gain or loss equal to the difference between (1) the "issue price" of the New Second Lien Financing or New PIK Notes, or the fair market value of the New Preferred Stock as of the Effective Date (except for any such stock or notes that are allocable to accrued interest), and (2) the U.S. Holder's adjusted tax basis in the PIK Notes Claims surrendered. For this purpose, the issue price of the New Second Lien Financing or New PIK Notes will equal its fair market value if the New Second Lien Financing or New PIK Notes are considered to be "publicly traded" for U.S. federal income tax purposes, and if the PIK Notes Claims but not the New Second Lien Financing or New PIK Notes, as applicable, are considered to be publicly traded, then the issue price of the New Second Lien Financing or New PIK Notes will be the fair market value of the PIK Notes Claims. If none of the PIK Notes Claims, New Second Lien Financing or New PIK Notes (if applicable) is considered to be publicly traded, then the issue price of the New Second Lien Financing will be its stated principal amount and the issue price of the New PIK Notes, as they have a constant yield maturity, will be considered to be its stated principal amount, unless such New PIK Notes are issued at a discount

In the case of a fully taxable exchange, subject to the market discount rules described below, gain or loss should be capital in nature and should be long-term capital gain or loss if the PIK Notes Claims were held for more than one year by the U.S. Holder. To the extent that a portion of the New Second Lien Financing, New PIK Notes or New Preferred Stock received is allocable to accrued interest, discussed below, the U.S. Holder may recognize ordinary interest income. A U.S. Holder's tax basis in the New Second Lien Financing or New PIK Notes should equal the issue price of such debt instrument as of the Effective Date. A U.S. Holder's holding period for the New Second Lien Financing, New PIK Notes or New Preferred Stock should begin on the day following the Effective Date.

If both a U.S. Holder's (x) PIK Notes Claims, on the one hand, and (y) New Second Lien Financing or New PIK Notes, on the other hand, are treated as "securities," the exchange of the PIK Notes Claims for the New Second Lien Financing and, if applicable, New PIK Notes should be treated as a "recapitalization" under the Tax Code. In general, this means that a U.S. Holder of the PIK Notes Claims would not recognize loss with respect to the exchange and would not recognize gain except (a) with respect to the value of any New Preferred Stock received, if received from AMO, and (b) as discussed below with respect to any accrued but unpaid interest on the PIK Notes Claims. If the exchange is treated as a recapitalization, a U.S. Holder should obtain a tax basis in the New Second Lien Financing and/or New PIK Notes received equal to the tax basis of the PIK Notes Claims surrendered under the Plan, plus any gain recognized, less the amount deemed distributed

(*i.e.*, the value of the New Preferred Stock and of any amount deemed paid for accrued and unpaid interest). That basis likely would be apportioned among the New Second Lien Financing based on the relative fair market value of the two debt instruments. A U.S. Holder should have a holding period for the New Second Lien Financing or New PIK Notes that includes the holding period for the PIK Notes Claims; provided that the tax basis of any asset treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such New Second Lien Financing should not include the holding period of the PIK Notes Claims.

If the exchange under the Plan is treated as a recapitalization for U.S. federal income tax purposes, a U.S. Holder will recognize gain to the extent of the fair market value on the Effective Date of the New Preferred Stock received from AMO.

To the extent that a U.S. Holder receives New Preferred Stock, the U.S. Holder should recognize gain or loss equal to the difference between (1) the fair market value of the New Preferred Stock that is not allocable to accrued interest and (2) the allocable portion of the U.S. Holder's tax basis in the PIK Notes Claims exchanged for such New Preferred Stock. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the PIK Notes were held for more than one year by the U.S. Holder. To the extent that a portion of the New Preferred Stock received in the exchange is allocable to accrued interest, the U.S. Holder may recognize ordinary income. See the discussion of accrued interest below. Additionally, any loss will be treated as ordinary loss to the extent of a U.S. Holder's prior net inclusions of original issue discount. The deductibility of any capital loss is subject to limitations. A U.S. Holder's tax basis in the New Preferred Stock should equal its fair market value as determined upon the consummation of the Plan. A U.S. Holder's holding period for the New Preferred Stock should begin on the day following the Effective Date.

3.    ***Consequences to U.S. Holders of Class 6 Subordinated Notes Claims***

Pursuant to the Plan, in full satisfaction and discharge of their Claims, holders of Class 6 Subordinated Notes Claims will receive New Common Stock. The U.S. federal income tax consequences of the Plan to such Holders of Subordinated Notes Claims will depend, in part, on whether AMI or AMO will exchange New Common Stock for Subordinated Notes.

If AMO exchanges New Common Stock for Subordinated Notes Claims, a U.S. Holder who will be treated as having exchanged its Subordinated Notes Claims for New Common Stock in a taxable transaction. In that case, the U.S. Holder should recognize gain or loss equal to the difference between (1) the fair market value of the New Common Stock that is not allocable to accrued interest and (2) the U.S. Holder's tax basis in the Claims exchanged by the U.S. Holder. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Subordinated Notes were held for more than one year by the U.S. Holder. To the extent that a portion of the New Common Stock received in the exchange is allocable to accrued interest, the U.S. Holder may recognize ordinary income. See the discussion of accrued interest below. Additionally, any loss will be treated as ordinary loss to the extent of a U.S. Holder's prior net inclusions of original issue discount. The deductibility of any capital loss is subject to limitations.

A U.S. Holder's tax basis in the New Common Stock should equal its fair market value as determined on the Effective Date. A U.S. Holder's holding period for the New Common Stock should begin on the day following the Effective Date. In the event of a merger of AMI into AMO, these consequences should not change.

If, instead, AMI exchanges New Common Stock for Subordinated Notes Claims, the exchange of the Subordinated Notes Claims for New Common Stock is likely to be treated under the Tax Code as a tax-free capital contribution to a corporation controlled by the transferors. In general, this means that a U.S. Holder will not recognize loss with respect to the exchange and will not recognize gain except with respect to accrued but unpaid interest on the Subordinated Notes. In such an exchange, a U.S. Holder's tax basis and holding period in its Subordinated Notes Claims would carry over to the New Common Stock received in exchange therefor; provided that the tax basis of any share of New Common Stock treated as received in satisfaction of accrued interest should equal the amount of such accrued interest, and the holding period for such share of New Common Stock would not include the holding period of the Subordinated Notes. If the merger of AMI into AMO were to occur, the issuance of AMO common stock in exchange for the Subordinated Notes would be treated as a taxable exchange, assuming the Subordinated Notes would not be treated as "securities", with the same consequences as described in the two prior paragraphs dealing with an exchange by AMO of its Subordinated Notes for AMI Common Stock.

*Basis of Original Holders of Subordinated Notes*. The adjusted basis of a U.S. Holder who acquired its Subordinated Notes when they were issued in January 2009 will be significantly below the face value of such notes. When the Subordinated Notes were issued in January 2009, they initially traded at a significant discount and were treated for federal tax purposes as being issued with OID equal to the difference between the initial deemed issue price and their stated principal amount, which accrued on a yield-to-maturity basis between the issue date and maturity date. See the OID discussion below for additional details. The adjusted issue price has increased to reflect accreted OID for tax purposes, but it is still approximately $105 million less than the face amount in the aggregate.

4.    **<u>Consequences to U.S. Holders of Class 7 2011 Notes Claims</u>**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, holders of Class 7 2011 Notes Claims will receive New Common Stock. Unlike the Subordinated Notes Claims, a 2011 Note likely constitutes a "security" for U.S. federal income tax purposes because it was issued in 2003 with an eight (8) year maturity. Nonetheless, the U.S. federal income tax consequences of the Plan to such Holders of Subordinated Notes Claims will depend, in part, on whether AMI or AMO will exchange New Common Stock for Subordinated Notes. Accordingly, the tax consequences to a U.S Holder of a Class 7 2011 Notes Claim should be the same as to a Class 6 Subordinated Notes Claim.

5.    **<u>Ownership and Disposition of the New Second Lien Financing</u>**

If the stated redemption at maturity (the sum of all payments to be made on the note) exceeds the "issue price" of the New Second Lien Financing, the New Second Lien Financing may be issued with OID in an amount equal to such difference. Assuming that the Term Facility and (as discussed below) the PIK Notes Claims were not, and the New Second Lien Financing is not and will not be, "publicly traded" for purposes of section 1273 of the Tax Code as described above, the "issue price" of the New Second Lien Financing will be its stated principal amount. Otherwise, the issue price of the New Second Lien Financing would be the fair market value of the Term Facility Claims or the PIK Notes Claims on the Effective date. A U.S. Holder of New Second Lien Financing generally must include OID in gross income in advance of the receipt of cash attributable to that income. Each payment made in cash on the New Second Lien Financing will be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal (which is not includible in income). For additional detail, see OID discussion below.

6.        ***Ownership and Disposition of the New PIK Notes***

The New PIK Notes will be treated as issued with OID in an amount equal to the difference between their "stated redemption price at maturity" (the sum of all payments to be made on the notes other than "qualified stated interest") and their "issue price." The issue price of the New PIK Notes will be determined in the manner as discussed above under "Consequences to U.S. Holders of Class 5 PIK Notes Claims." A U.S. holder must generally include OID in its gross income as it accrues over the term of the New PIK Notes without regard to its regular method of accounting for U.S. federal income tax purposes and in advance of the receipt of cash payments attributable to that income. See OID discussion below for discussion of consequences of holding a debt instrument issued with OID.

The issuance of New PIK Notes is generally not treated as a payment of interest for U.S. federal income tax purposes. Instead, a New PIK Note and any New PIK Notes issued in respect of PIK interest thereon are treated as a single debt instrument under the OID rules. For U.S. federal income tax purposes, increasing the principal amount of the New PIK Notes will generally be treated the same as the issuance of New PIK Notes.

The OID rules provide that, solely for purposes of the accrual of OID, if the issuer of a debt instrument has an unconditional option to defer the payment of interest, including as a result of paying PIK interest, the issuer will be presumed to exercise such option in the manner that minimizes the yield on the debt instrument. Depending on the issue price of the New PIK Notes, in certain circumstances, the payment of PIK interest will minimize the yield on the New PIK Notes.

If AMI is assumed to exercise its option to pay PIK interest in respect of a New PIK Note, with respect to any interest payment period for which that option is exercised, a U.S. Holder will not be required to adjust its OID calculation on the notes for future periods. If AMI in fact elects to pay a portion of that interest in cash, such cash portion would be treated not as a payment of accrued interest, but instead as a pro rata prepayment, which may result in a gain or loss to a U.S. Holder. Generally, the gain or loss would be calculated by assuming that the New PIK Note consists of two instruments, one that is retired and one that remains outstanding. The adjusted issue price would be allocated between those two instruments based on the portion of the New PIK Note that would be treated as retired by the pro rata prepayment.

If the New PIK Notes are issued for a a price other than at par and if AMI is assumed not to exercise its option to defer the cash interest, with respect to any interest payment period for which that option is not exercised, a U.S. Holder would not be required to adjust its OID calculation for future periods. If AMI in fact elects to pay PIK interest in respect of a New PIK Note, a U.S. holder would be required to adjust its OID calculation for future periods by treating such New PIK Note as if it had been retired and then reissued for an amount equal to its adjusted issue price on the date preceding the first date of such interest payment period, and recalculating the yield to maturity of the reissued New PIK Note by treating the amount of PIK interest that would otherwise have been paid in cash as a payment that will be made on the maturity date of such New PIK Note.

Each payment made in cash with respect to the New PIK Notes, other than a pro rata prepayment, will be treated first as a payment of any accrued OID that has not been allocated to prior payments and second as a payment of principal. A U.S. Holder generally will not be required to include separately in income cash payments received on the notes to the extent such payments constitute payments of previously accrued OID.

The rules regarding OID are complex and the rules described above may not apply in all cases.  Accordingly, U.S. Holders should consult their own tax advisors regarding the application of these rules.

*Sale, exchange or retirement of New PIK Notes*.  Upon the sale, exchange, retirement, or other taxable disposition of a New PIK Note, a U.S. Holder generally will recognize gain or loss equal to the difference between the amount realized upon the sale, exchange, retirement, or other taxable disposition and the adjusted tax basis of the New PIK Note.  A U.S. Holder's adjusted tax basis in a New PIK Note will, in general, be its initial basis in the New PIK Note increased by OID previously included in income, and reduced by any cash payments on the New PIK Note.  Although not free from doubt, a U.S. Holder's adjusted tax basis in a New PIK Note should be allocated between the original New PIK Note and any PIK Notes received in respect of PIK interest thereon in proportion to their relative principal amounts. A U.S. Holder's holding period in any PIK Note received in respect of PIK interest would likely be identical to its holding period for the original New PIK Note with respect to which the PIK Note was received.

Any gain or loss a U.S. Holder recognizes will be capital gain or loss and will be long-term capital gain or loss if at the time of sale, exchange, retirement or other disposition, the New PIK Note has been held for more than one year.  Capital gains of noncorporate U.S. holders (including individuals) derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitations.

7.  **Ownership and Disposition of New Common Stock and New Preferred Stock, if Any**

*Dividends on New Common Stock and New Preferred Stock*.  Distributions made with respect to New Common Stock or New Preferred Stock received under the Plan generally will be treated as dividends to a U.S. Holder to the extent of current and accumulated earnings and profits of AMI as determined under U.S. federal income tax principles, at the end of the tax year of the distribution. To the extent the distributions exceed the current and accumulated earnings and profits of AMI, the excess will be treated first as a tax-free return of capital to the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock and thereafter as capital gain.  Corporate U.S. Holders generally will be entitled to claim the dividends received deduction with respect to dividends paid on New Common Stock or New Preferred Stock, subject to applicable restrictions, including satisfaction of applicable holding period requirements.  These rules apply to dividends paid in kind by the New Preferred Stock, based on the amount of such New Preferred Stock paid in kind.

*Sale or Other Disposition of New Common Stock or New Preferred Stock*.  Upon the sale or other disposition of New Common Stock or New Preferred Stock received under the Plan, a U.S. Holder generally will recognize capital gain or loss equal to the difference between (i) the amount of cash and the fair market value of any property received upon the sale or other disposition and (ii) the U.S. Holder's adjusted tax basis in the New Common Stock or New Preferred Stock.  Such capital gain or loss will be long-term if the U.S. Holder's holding period in respect of such New Common Stock or New Preferred Stock is more than one year.  The deductibility of capital losses is subject to limitations.

8.  **Accrued Interest**

A portion of the consideration received by participating U.S. Holders may be attributable to accrued but unpaid interest with respect to their Claims.  Such amount should be taxable to the U.S. Holders as ordinary interest income if the accrued interest has not been previously included in the

U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder generally recognizes a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full. If the Plan is consummated, the Debtors will allocate for U.S. federal income tax purposes all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest, pursuant to the Plan. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the U.S. Holder's gross income. U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

9.    ***OID***

A debt instrument with a term that exceeds one year will constitute a discount note issued with OID if the stated redemption price at maturity of the note exceeds its issue price by the *de minimis* amount (¼ of 1 percent of the "stated redemption price at maturity" multiplied by the number of complete years from the issue date of the note to its maturity) or more. The "issue price" of a debt instrument is determined as described above. The "stated redemption price at maturity" of a debt instrument is the total of all payments provided for under the debt instrument other than payments of "qualified stated interest." The term "qualified stated interest" means stated interest that is unconditionally payable in cash or in property (other than debt instruments of the issuer) at least annually at a single fixed rate or, subject to certain conditions, based on one or more interest indices. Cash interest payments on a debt instrument constitute qualified stated interest. PIK interest is not qualified stated interest and the sum of all PIK payments will be included in the stated redemption price at maturity of the notes (and thus taxable to a U.S. Holder as OID on an economic accrual basis). Generally, a U.S. Holder of a debt instrument issued with OID must accrue such OID into income on an annual basis (as described in more detail below), regardless of the U.S. Holder's general method of accounting.

If the original debt instrument exchanged (or deemed exchanged) and the new debt instrument were to be publicly traded for the applicable period surrounding the exchange, the new debt instrument will be issued with OID if it is traded at a discount to its stated principal amount.

If the applicable debt instrument has OID, regardless of a U.S. Holder's regular method of accounting for U.S. federal income tax purposes, the U.S. Holder would be required to include in taxable income for each taxable year the daily portion of OID, if any, that accrues on the debt instrument, for each day in such taxable year in which the Holder owns the debt instrument. Thus, a U.S. Holder would be required to include OID in income in advance of the receipt of the cash to which such OID is attributable. The daily portion of OID is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that would accrue during an accrual period is the product of the "adjusted issue price" of the debt instrument at the beginning of the accrual period multiplied by the "yield-to-maturity" of the debt instrument. The "adjusted issue price" of the debt instrument at the beginning of an accrual period would equal its issue price, increased by the aggregate amount of OID that has accrued on the debt instrument in all prior accrual periods, and decreased by any payments made during all prior accrual periods of amounts included in the stated redemption price at maturity of the debt instrument.

*Special OID Considerations for the Subordinated Notes.* As discussed above, the adjusted issue price of the Subordinated Notes is approximately $105 million less than the face amount. Absent the proposed exchange, the Subordinated Notes would have $105 million of OID to be accrued between now and maturity, attributable to the difference in the face amount and adjusted issue price of the original Subordinated Notes.

10.    ***Applicable High Yield Interest Obligations***

Any interest or OID on the New PIK Notes generally would be deductible by the Debtors, unless the New PIK Notes are treated as applicable high yield discount obligations ("***AHYDOs***") within the meaning of section 163(e)(5) of the Tax Code. If the AHYDO rules apply, the Debtors may claim an interest deduction only up to the amount of OID that is paid. To the extent that the Debtors are denied a deduction for a portion of the interest or OID, that portion may be treated as a dividend to corporate holders of such notes, which may be entitled to a dividends-received deduction for such amount. In general, an AHYDO is any debt instrument with "significant original issue discount," a maturity date that is more than five years from the issue date and a yield to maturity that is at least five percentage points higher than the applicable federal rate on the issue date. The current applicable federal rate for November 2011 is 1.58% per annum and the interest rate on the New PIK Notes is 9%. For this purpose, OID is significant if, immediately before the close of any accrual period ending more than five years after issue, "the aggregate amount" that has been included "in gross income with respect to such instrument" will exceed the sum of (1) all interest paid on the instrument and (2) the product of the instrument's issue price and yield to maturity. For purposes of the latter test, it is assumed that each interest payment will be made on the last day permitted under the instrument. A payment in the form of stock or another obligation of the issuer or a related person is treated as made only when the stock or other obligation is required to be redeemed for cash or property other than stock and debt.

In addition, if notes are treated as AHYDOs, then the issuer may permanently be denied a deduction for a portion of the original issue discount on such notes and may claim an interest deduction as to the remainder of the original issue discount only when such portion is paid. To the extent that the issuer is denied a deduction for a portion of the original issue discount, that portion may be treated as a dividend, to the extent it is deemed to have been paid out of AMO's current or accumulated earnings and profits, to corporate holders of such notes, which may be entitled to a dividends-received deduction for such amount. If the portion of interest exceeds AMO's current and accumulated earnings and profits, the excess will continue to be subject to tax as ordinary OID income in accordance with the OID rules described above.

The determination of whether the AHYDO rules will apply is complex. It is not yet possible to determine whether the AHYDO rules will apply to the New PIK Notes. Moreover, since the applicable federal rate to likely to be different if and when additional New PIK Notes might be issued, it is impossible to determine how the AHYDO rules will apply to each such note, when issued. An exception to the AHYDO rules was provided in the American Recovery and Reinvestment Act of 2009, but currently it is uncertain whether the New PIK Notes will qualify for the exception.

11.    ***Market Discount***

If a U.S. Holder acquired Term Facility, PIK Notes, Subordinated Notes, or the 2011 Notes after the original issuance, such debt instruments may have market discount. Subject to a de minimis threshold, market discount generally is the excess, if any, of the principal amount of the debt

instrument (or, in the case of a debt instrument issued with original issue discount, its adjusted issue price) over the cost of the debt instrument to its holder.

If a U.S. Holder has elected to include market discount in gross income currently, the market discount generally accrues as ordinary income on a constant yield method specified in Treasury Regulations, and the amount of market discount a U.S. Holder has included in income increases such U.S. Holder's adjusted tax basis in its debt instrument. If a U.S. Holder acquired a debt instrument at a market discount but has not made the election to include market discount in gross income as it accrued, any gain realized by such U.S. Holder on the disposition of the debt instrument pursuant to the Plan will be treated as ordinary income to the extent of the market discount that has accrued with respect to such debt instrument while such U.S. Holder held such debt instrument.

12.    ***Backup Withholding for U.S. Holders***

In general, U.S. Holders (other than corporations and other exempt holders) will be subject to information reporting requirements with respect to dividends and other taxable distributions paid in respect of, and the proceeds from a sale, redemption or other disposition of, the New Common Stock or New Preferred Stock, if applicable. In addition, such U.S. Holders may be subject to backup withholding on such payments if such U.S. Holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its U.S. federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements.

Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against a U.S. Holder's U.S. federal income tax liability, provided that the required information is furnished to the IRS on a timely basis. A U.S. Holder should consult its tax advisors regarding the application of information reporting and backup withholding rules in their particular situations, the availability of an exemption therefrom, and the procedure for obtaining such an exemption, if applicable.

**C.    General U.S. Federal Income Tax Consequences to Non-U.S. Holders**

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Term Facility, Subordinated Notes, PIK Notes, 2011 Notes, New Common Stock, New Preferred Stock, New Second Lien Financing, or New PIK Notes.

1.    ***Tax Consequences to Non-U.S. Holders of Plan***

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to property (including money) received in the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met. Nonetheless, a Non-U.S. Holder who is not eligible for the portfolio interest exception (see "Non-U.S. Holders of New Second Lien Financing") receiving consideration for accrued but unpaid interest may be subject to interest withholding.

(a)      Tax Consequences of Non-U.S. Holders Under the Plan

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to property (including money) received in the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.   Nonetheless, a Non-U.S. Holder who is not eligible for the portfolio interest exception (see "Non-U.S. Holders of New Second Lien Financing") receiving consideration for accrued but unpaid interest may be subject to interest withholding.

(b)      Non-U.S. Holders of New Common Stock or New Preferred Stock

If a Non-U.S. Holder receives New Common Stock or New Preferred Stock under the Plan, distributions of cash and property that AMI makes in respect of New Common Stock or New Preferred Stock will constitute dividends for U.S. federal income tax purposes to the extent of its current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions of cash and property that constitute dividends for U.S. federal income tax purposes generally will be subject to U.S. federal withholding at a 30% rate unless a reduced rate is prescribed by an applicable income tax treaty.   If the amount of a distribution exceeds AMI's current and accumulated earnings and profits, such excess first will be treated as a return of capital to the extent of a Non-U.S. Holder's tax basis in the New Common Stock or New Preferred Stock and thereafter will be treated as gain from the disposition of such New Common Stock or New Preferred Stock, subject to tax as described below in "*Sale, Exchange or Disposition of New Common Stock, New Preferred Stock or New Second Lien Financing*."

In order to obtain a reduced rate of U.S. withholding tax under an applicable income tax treaty, a Non-U.S. Holder will be required to provide a properly executed IRS Form W-8BEN certifying its entitlement to benefits under the treaty.   If a Non-U.S. Holder is eligible for a reduced rate of U.S. withholding tax under a treaty, the Non-U.S. Holder may obtain a refund or credit of any excess amounts withheld by filing an appropriate claim for a refund with the IRS.   Each Non-U.S. Holder should consult its own tax advisor regarding its possible entitlement to benefits under a treaty.

The U.S. federal withholding tax described above will not apply to dividends paid to a Non-U.S. Holder if such dividends represent U.S. trade or business income for the Non-U.S. Holder and the Non-U.S. Holder provides a properly executed IRS Form W-8ECI certifying that the dividends are effectively connected with the Non-U.S. Holder's conduct of a trade or business within the U.S., as the dividends will be subject to tax.

(c)      Non-U.S. Holders of New Second Lien Financing and New PIK Notes

Subject to the discussion below concerning backup withholding, payments of interest (including OID) on the the New Second Lien Financing and the New PIK Notes to a Non-U.S. Holder generally will not be subject to U.S. federal income tax or withholding tax, if the Non-U.S. Holder:

- does not own, actually or constructively, for U.S. federal income tax purposes, ten (10) percent or more of the total combined voting power of all classes of the voting stock of AMO;

- is not, for U.S. federal income tax purposes, a "controlled foreign corporation" related, directly or indirectly, to AMO through stock ownership under applicable rules of the Code;

- is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; and

- in each case, the certification requirement, as described below, is fulfilled with respect to the beneficial owner of the New Second Lien Financing and New PIK Notes.

The certification requirement referred to generally will be fulfilled if the Non-U.S. Holder provides to the Debtors or their paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status. Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances.

In general, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty (30) percent unless (A) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN (or successor form) claiming an exemption from or reduction in withholding under an applicable tax treaty, or (B) such interest is effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and the Non-U.S. Holder provides a properly completed IRS Form W-8ECI (or successor form).

(d)     Effectively Connected Income and Loss

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if interest (including OID) on the New Second Lien Financing or the New PIK Notes, dividends received in respect of New Common Stock or New Preferred Stock, or gain or loss realized on the disposition of New Common Stock, New Preferred Stock, New Second Lien Financing, or New PIK Notes are "effectively connected" with the conduct of such U.S. trade or business, any such interest, dividends, gain or loss realized by the Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise.  In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty.  Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above.  Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

(e)     Sale, Exchange or Disposition of New Common Stock, New Preferred Stock, New Second Lien Financing, Subordinated Notes or New PIK Notes

Subject to the discussion below concerning backup withholding, if a Non-U.S. Holder owns New Common Stock, New Preferred Stock, New Second Lien Financing or New PIK Notes, the Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain or loss realized on the sale, exchange or other taxable disposition of such New Common Stock, New Preferred Stock, New Second Lien Financing, or New PIK Notes, unless:

a.    the Non-U.S. Holder is an individual who is present in the U.S. for 183 days or more in the taxable year of disposition, and certain other conditions are met;

b.    such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the U.S.

Any amounts in respect of accrued interest recognized on the sale or exchange of New Second Lien Financing or New PIK Notes will not be subject to U.S. federal withholding tax, unless the sale or exchange is part of a plan the principal purpose of which is to avoid tax and the withholding agent has actual knowledge or reason to know of such plan.

(f)    Information Reporting and Backup Withholding

Unless certain exceptions apply, the Debtors must report annually to the IRS and to each Non-U.S. Holder any interest paid during the taxable year, as well as the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of dividends or interest by the Debtors or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Debtors or their paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Withholding and backup withholding are not an additional taxes. Any amounts withheld from a payment to a Non-U.S. Holder under the withholding or backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting, withholding and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

Under legislation recently enacted into law, certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. Payments subject to such requirements include interest and dividends on (as applicable) and the gross proceeds from the sale or other disposition of New Common Stock, New Preferred Stock, New Second Lien Financing, and New PIK Notes. These requirements are different from, and in addition to, the withholding tax requirements described above. Non-U.S. Holders should consult their tax advisors concerning the application of this legislation to their particular circumstances.

**X.**

**CONCLUSION**

The Debtors believe the Plan is in the best interests of all creditors and urge the holders of impaired Claims in Classes 2, 5, 6 and 7 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by the Voting Agent no later than 5:00 P.M., Eastern time, on November 15, 2010.

Dated: _October 30_____, 2010
New York, New York

> American Media Operations, Inc.
> American Media, Inc.
> American Media Consumer Entertainment, Inc.
> American Media Consumer Magazine Group, Inc.
> American Media Distribution & Marketing Group, Inc.
> American Media Mini Mags, Inc.
> American Media Newspaper Group, Inc.
> American Media Property Group, Inc.
> Country Music Media Group, Inc.
> Distribution Services, Inc.
> Globe Communications Corp.
> Globe Editorial, Inc.
> Mira! Editorial, Inc.
> National Enquirer, Inc.
> National Examiner, Inc.
> Star Editorial, Inc.
> Weider Publications, LLC
>
> By:  _____
> Name: Christopher Polimeni
> Title:    Executive Vice President, Chief Financial
>           Officer and Treasurer