Page 1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10-16140-MG

5   - - - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   AMERICAN MEDIA, INC., et al.,

9

10            Debtors.

11

12   - - - - - - - - - - - - - - - - - - - - - -x

13

14                United States Bankruptcy Court

15                One Bowling Green

16                New York, New York

17

18                November 19, 2010

19                2:01 PM

20

21   B E F O R E:

22   HON. MARTIN GLENN

23   U.S. BANKRUPTCY JUDGE

24

25

Page 2

1

2    HEARING re Debtors' Motion Requesting Joint Administration of

3    Chapter 11 Cases filed by Ira S. Dizengoff on Behalf of

4    American Media, Inc.

5

6    HEARING re Debtors' Motion Pursuant to Bankruptcy Code Sections

7    105, 361, 362, 363 and 507 for Entry of Interim and Final

8    Orders (I) Authorizing the Use of Cash Collateral, (II)

9    Granting Adequate Protection, (III) Modifying the Automatic

10   Stay, and (IV) Scheduling a Final Hearing.

11

12   HEARING re Motion Pursuant to Bankruptcy Code Sections 363(b),

13   365 and 503(b)(1) and Bankruptcy Rules 2002 and 6004 for an

14   Order Authorizing the Debtors to (I) Assume or Enter into

15   Certain Agreements in Connection with the New Financing and

16   Backstop Commitment, (II) Incur and Pay Related Fees and

17   Expenses as Administrative Expenses, (III) Transfer Certain

18   Funds into Escrow and (IV) Establish Special Purpose Entities

19   as Non-Debtor Entities filed by Ira S. Dizengoff on Behalf of

20   American Media, Inc.

21

22   HEARING re Debtors' Motion for an Order (A) Authorizing the

23   Debtors to Assume a Restructuring Support Agreement and (B)

24   Granting Related Relief filed by Ira S. Dizengoff on Behalf of

25   American Media, Inc.

Page 3

1

2    HEARING re Debtors' Motion for Order (A) Authorizing the

3    Debtors to Assume a Restructuring Support Agreement and (B)

4    Granting Related Relief Filed by Ira S. Dizengoff on Behalf of

5    American Media, Inc.

6

7    HEARING re Debtors' Motion for an Order (A) Scheduling a

8    Combined Hearing to Consider the Adequacy of the Disclosure

9    Statement and Solicitation and Election Procedures and

10   Confirmation of the Plan, (B) Establishing Deadlines and

11   Procedures to File Objections to the Disclosure Statement, the

12   Solicitation and Election Procedures and the Plan, and (C)

13   Approving the Form and Manner of the Notice of Combined

14   Hearing.

15

16   HEARING re Debtors' Motion for Entry of Interim and Final

17   Orders Authorizing the Debtors to Honor Prepetition Obligations

18   to Customers and Authorizing Financial Institutions to Honor

19   All Related Checks and Electronic Payment Requests filed by Ira

20   S. Dizengoff on Behalf of American Media, Inc.

21

22   HEARING re Debtors' Motion for an Order (I) Granting an

23   Extension of Time to File Schedules of Assets and Liabilities,

24   Schedules of Executory Contracts and Unexpired Leases, Lists of

25   Equity Security Holders, Schedules of Current Income and

Page 4

1    Expenditures and Statements of Financial Affairs, and (II)

2    Permanently Waiving the Requirements to File the Same Upon

3    Confirmation of the Plan filed by Ira S. Dizengoff on Behalf of

4    American Media, Inc.

5

6    HEARING re Debtors' Application for Entry of an Order

7    Authorizing and Approving the Employment and Retention of

8    Kurtzman Carson Consultants LLC as Notice and Claims Agent for

9    the Debtors Filed by Ira S. Dizengoff on Behalf of American

10   Media, Inc.

11

12   HEARING re Debtors' Motion for Entry of an Order (A)

13   Authorizing the Debtors to Continue Their Existing Cash

14   Management System, Bank Accounts and Business Forms, (B)

15   Granting Postpetition Intercompany Claims Administrative

16   Expense Priority Status and (C) Authorizing Continued

17   Intercompany Transactions Filed by Ira S. Dizengoff on Behalf

18   of American Media, Inc.

19

20

21

22

23

24

25

Page 5

1

2    HEARING re Debtors' Motion for Entry of Interim and Final

3    Orders (A) Authorizing, But Not Directing, the Debtors to (I)

4    Pay and/or Honor Prepetition Employee Payroll Obligations and

5    Reimbursement Obligations, (II) Pay, Honor and Continue All

6    Employee Benefits, and (III) Pay and/or Honor All Other

7    Workforce Obligations; and (B) Authorizing Financial

8    Institutions to Honor All Related Checks and Electronic Payment

9    Requests Filed by Ira S. Dizengoff on Behalf of American Media,

10   Inc.

11

12   HEARING re Debtors' Motion for Entry of Interim and Final

13   Orders (A) Authorizing, But Not Directing, the Debtors to Pay

14   Taxes and Fees and (B) Authorizing Financial Institutions to

15   Honor All Related Checks and Electronic Payment Requests Filed

16   by Ira S. Dizengoff on Behalf of American Media, Inc.

17

18   HEARING re Debtors' Motion for Entry of Interim and Final

19   Orders Authorizing the Debtors to Honor Prepetition Obligations

20   to Customers and Authorizing Financial Institutions to Honor

21   All Related Checks and Electronic Payment Requests Filed by Ira

22   S. Dizengoff on Behalf of American Media, Inc.

23

24

25

Page 6

1

2    HEARING re Debtors' Motion for Interim and Final Orders (A)

3    Authorizing, But Not Directing, Debtors to Pay Prepetition

4    Claims of Shippers, Warehousemen and Logistics Coordinators and

5    (B) Authorizing Financial Institutions to Honor All Related

6    Checks and Electronic Payment Requests Filed by Ira S.

7    Dizengoff on Behalf of American Media, Inc.

8

9    HEARING re Debtors' Motion for Entry of Interim and Final

10   Orders Authorizing, But Not Requiring, Payment of Prepetition

11   Claims of Trade Creditors in the Ordinary Course of Business,

12   Filed by Ira S. Dizengoff on Behalf of American Media, Inc.

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Pnina Eilberg

25

Page 7

1

2    A P P E A R A N C E S :

3    AKIN GUMP STRAUSS HAUER & FELD LLP

4            Attorneys for Debtors

5            One Bryant Park

6            New York, NY 10036

7

8    BY:   IRA S. DIZENGOFF, ESQ.

9            MEREDITH A. LEHAIE, ESQ.

10           ARIK PREIS, ESQ.

11           SEAN E. O'DONNELL, ESQ.

12

13

14   WACHTELL, LIPTON, ROSEN & KATZ

15           Attorneys for JPMorgan Chase Bank N.A. as Agent

16           51 West 52nd Street

17           New York, NY 10019

18

19   BY:   RICHARD G. MASON, ESQ.

20           JENNIFER S. NAM, ESQ.

21

22

23

24

25

Page 8

1

2    PILLSBURY WINTHROM SHAVY PITTMAN LLP

3          Attorneys for Wilmington Trust Company FSB

4              as Indenture Trustee

5          1540 Broadway

6          New York, NY 10036

7

8    BY:   LEO T. CROWLEY, ESQ.

9          BRANDON R. JOHNSON, ESQ.

10

11

12   UNITED STATES DEPARTMENT OF JUSTICE

13          Office of the United States Trustee

14          31 Whitehall Street

15          21st Floor

16          New York, NY 10004

17

18   BY:   SUSAN D. GOLDEN, ESQ.

19          RICHARD C. MORRISSEY, ESQ.

20

21

22

23

24

25

Page 9

1

2    PAUL, WEISS, RIFKING, WHARTON & GARRISON LLP

3          1285 Avenue of the Americas

4          New York, NY 10019

5

6    BY:   ANDREW M. ROSENBERG, ESQ.

7

8

9    LOWENSTEIN SANDLER PC

10         Attorneys for Gould Paper

11         65 Livingston Avenue

12         Roseland, NJ 07068

13

14   BY:   TIMOTHY R. WHEELER, ESQ.

15

16

17   ALSO PRESENT TELEPHONICALLY:

18         Gavin Baiera, Interested Party

19

20

21

22

23

24

25

Page 10

1              P R O C E E D I N G S

2          THE COURT:  Please be seated.

3      (Pause)

4          THE COURT:  All right.  I have a list of appearances

5   in front of me so we'll just move right ahead.

6          MR. DIZENGOFF:  Yes, Your Honor.  Ira Dizengoff, Akin

7   Gump Strauss Hauer & Feld.  We are proposed counsel for the

8   debtors.  I'm here with my two colleagues, Arik Preis and

9   Meredith Lahaie.

10      (Pause)

11          THE COURT:  Good.  Go ahead.

12          MR. DIZENGOFF:  Oh, thank you.  Good afternoon, Your

13   Honor.  Again, Ira Dizengoff, for the record, from Akin Gump on

14   behalf of the American Media Inc. family of companies and its

15   affiliated debtors.

16          Your Honor, with me today in the courtroom is an

17   officer of the company, Mr. Chris Polimeni, let me just point

18   him out to you, right there.  Chris is the executive vice

19   president, CFO and treasurer and he is the first day declarant.

20          In addition, in the courtroom is Zuhl Jamal (ph.) from

21   Moelis who's the company's financial advisor.  Zuhl is over

22   there.

23          Your Honor, thank you for taking the time to see us

24   and making some time on your calendar for us.

25          After months and months of negotiations, Your Honor,

Page 11

1   with our largest creditor constituencies, with the goal of

2   effectuating a consensual Chapter 11 plan and consensual

3   reorganization of the company's balance sheet, it's my

4   privilege to present you with a prepackaged plan of

5   reorganization for American Media that substantially delevers

6   this company and it's supported by the vast majority of our

7   creditors.  All but one single creditor voted in favor of the

8   plan and I'll get to that in a second.

9           THE COURT:  I thought it was two?

10          MR. DIZENGOFF:  It's actually one.  There was a

11  mistake in the report and now it's only one.

12          Your Honor, of the 197 creditors that voted one voted

13  against the plan.  The aggregate claims voting in favor were

14  722 million and three million dollars voted against.  It

15  happens that that three million dollars is in a separate class,

16  we'll discuss that in a second, but we're confident that we can

17  proceed under 1129 to confirm the plan.

18          Your Honor, I'd like to take a few minutes to provide

19  you with background about American Media and what we do, the

20  events that led us to commencing these prepackaged proceedings,

21  and our expectations for the case going forward.  So with your

22  permission, Your Honor, I'd like to just give you the structure

23  of what I want to do and then proceed.

24          I'll explain the corporate organization and its

25  capital structure.  I will discuss what the company does.  I

Page 12

1    will explain the restructuring and how we got here today and

2    then what we hope to achieve in the Chapter 11.  Specifically,

3    I'll explain the plan support agreement that we have and the

4    plan structure and the payments and then we'll get to the first

5    day motions, etcetera.

6           So Your Honor, I have an org chart which I'd like to

7    hand up to you so you can just briefly see it.

8           THE COURT:  Okay.

9           MR. DIZENGOFF:  May I approach?

10          THE COURT:  Please.

11      (Pause)

12          MR. DIZENGOFF:  Your Honor, the other thing that I

13   brought for you today, not that this is a show and tell, but

14   just so you could actually see physically what we do; I brought

15   you some of our leading publications and you can make use as

16   you want with them, but I'd like to hand those up to you as

17   well.

18          THE COURT:  Okay.

19      (Pause)

20          THE COURT:  Thank you.

21      (Pause)

22          MR. DIZENGOFF:  Your Honor, American Media is a

23   leading publisher of magazines whose titles include National

24   Inquirer, Star, Globe, National Examiner, Country Weekly, Shape

25   Muscle & Fitness, Men's Fitness, etcetera.  And we also provide

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
AMERICAN MEDIA, INC., et al.
Pg 13 of 49

Page 13

1   publishing services to other periodicals and publishers, namely

2   Playboy Entertainment, Enterprises and World Wrestling

3   Entertainment.  Over the years we've become one of the largest

4   publishers of consumer magazines in the United States.

5          If I could reference the chart that I just handed to

6   you, and if anybody else wants a copy in the courtroom we have

7   that for you as well.  On the chart, Your Honor, American

8   Media, Inc. is the direct parent or indirect parent of all the

9   debtor entities.  Those are the entities that are in blue.

10          Certain of the debtor -- certain non-debtor entities

11  are not in bankruptcy, that's the green and the yellows.  Those

12  are joint ventures or foreign subsidiaries.

13          Your Honor, our businesses are segregated aggregate

14  into five reporting divisions.  We have celebrity publications,

15  which includes Star and Country Weekly; tabloid publications

16  which include the National Enquirer, Globe and National

17  Examiner; women's health and fitness publications including

18  Shape and Fit Pregnancy; distribution services, that's where we

19  provide placement marketing and management for other

20  publications and for third-party clients.  And then corporate

21  which includes Muscle & Fitness, Men's Fitness, etcetera.

22          Your Honor, we derive the bulk of our revenue from the

23  sale of our periodicals and as such we're highly dependent upon

24  a small number of vendors to produce these publications in a

25  timely manner.  These vendors mostly include paper suppliers,

AMERICAN MEDIA, INC., et al.

Page 14

1    as you can imagine, printers, distributors and retailers.  And

2    we're dependent upon them to operate our business -- to help us

3    operate our businesses and to generate revenue.  As you'll hear

4    in connection with the summaries of the first day relief that

5    we're seeking, to meet the demands in a time sensitive news

6    arena we require -- we're interdependent upon a lot of these

7    vendors.

8         So Your Honor, let me just highlight for you our

9    prepetition indebtedness and I'll go through that quickly.  The

10   common stock of American Media, the ultimate parent, as a

11   result of the last restructuring which I'm sure you referenced

12   in our first day declaration that concluded in January of '09,

13   is held by effectively five entities and then scattered smaller

14   shareholders.

15        American High Income Trust, which is managed by

16   Capital Re, we call it Cap Re.  Angela Gordon, Avenue Capital,

17   Credit Suisse and Regimen, that's the vast bulk of our

18   shareholders.  The remaining is held by some officers and

19   directors and then miscellaneous funds.

20        We are among the most highly levered magazine

21   publishing companies in the industry and our goal in commencing

22   these cases was to delever that balance sheet and increase our

23   cash flow.  In the aggregate, Your Honor, we have about 900

24   million dollars of debt that consists of 490 million dollars of

25   senior secured debt that's broken into two pieces, a term loan

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
AMERICAN MEDIA, INC., et al.
Pg 15 of 49

Page 15

1    of 430 million dollars and a sixty million dollar revolving

2    credit facility, of which we've drawn the whole amount.  Seven

3    and a half million dollars of 2011 notes, those were the old

4    notes from the last exchange who held out in the last

5    restructuring, that was the out-of-court restructuring that we

6    did in -- consummated in January of '09.  Twenty-five million

7    dollars, roughly, of unsecured PIC notes and 356 million

8    dollars of unsecured subordinated notes.  Each of the debtor

9    entities, Your Honor, other than the ultimate parent, is on the

10   hook for all the debt and the parent also guarantees the bank

11   debt obligations.

12          Your Honor, our businesses are directly affected by

13   discretionary consumer spending and the decline in consumer

14   spending, particularly at retailers checkout counters, has

15   dramatically impacted our business and our operating results

16   and our profitability.  On a macro-economic level, Your Honor,

17   increased prices of fuel, paper and postage have hurt our

18   profitability and as a result we've had the need to

19   restructure.

20          We operate in a highly, highly competitive business.

21   Our competitors are other publications that are sold at

22   checkout counters, television shows and radio programs that

23   concentrate on celebrity news.

24          Your Honor, our competitors are mostly capitalized

25   than us and they have greater capital resources and they have

AMERICAN MEDIA, INC., et al.

Page 16

1    greater revenues.  And as a result it's a very cut throat world

2    in the celebrity news market and they take advantage of that.

3              As a result, Your Honor, of the adverse market

4    conditions and our free cash flow and our ability to satisfy

5    our obligations under our 2009 credit agreement and our bonds,

6    we needed to restructure our obligations.  So to delever our

7    balance sheet and improve our cash flow we engaged in a number

8    of restructuring initiatives which were all highlighted in Mr.

9    Polimeni's declaration.

10             Since 2008, the fall of 2008 after Lehman had filed

11   for bankruptcy, we were in restructuring negotiations and then

12   on January 30th, 2009 we consummated an out-of-court exchange

13   for the then outstanding 550 million dollars of notes that were

14   outstanding.  In addition, at that time we rejiggered our

15   credit agreement and entered into an amended and restated

16   credit agreement.

17             This summer, commencing on or around July 15th, we

18   tried an out-of-court exchange for the subnotes, which is the

19   355 that I referenced, and a cash tender for the twenty-five

20   million dollars of the PIC notes and that was set to expire on

21   August 11th.  We extended it multiple times through November

22   1st and ultimately we terminated it because the requisite

23   tenders were not going to be received in a timely basis.

24             So while we were hopeful that the exchanges would be

25   consummated out of court, at the same time, in a prudent manner

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
Pg 17 of 49
AMERICAN MEDIA, INC., et al.

Page 17

1    and business planning on the debtors part we entered into

2    discussions with a group of subordinated noteholders and PIC

3    holders that are represented by the Paul Weiss firm, Mr.

4    Rosenberg is here, and I'll refer to them as the committee just

5    for ease of reference.  And we also started discussions with

6    our administrative agent under the credit facility, represented

7    by Mr. Mason, that's JPMorgan Chase.

8         Then on October 30th, Your Honor, we entered into a

9    restructuring support agreement with the committee and certain

10   of the term loan and revolving lenders.  That restructuring

11   support agreement set forth a plan of reorganization which was

12   the basis for our prepackaged plan, which we then commenced

13   solicitation on.

14        At a high level, Your Honor, and if you want detail

15   I'll go into detail for you, but at a high level the treatment

16   under that plan and the restructuring support agreement

17   provided that the term facility claims would be paid cash in an

18   amount in the plan that said no less than seventy cents, it'll

19   be closer to eighty cents as a result of the exit financing we

20   were able to line up, and we'll talk about that a little later,

21   and then new second lien notes.

22        The new second lien notes have a feature in it that if

23   a term lender does not want those second lien notes, although

24   the debtor is actually giving it to them, they have an

25   obligation -- not an obligation, an option to put it to two of

Page 18

1   our bondholders who said we'll take the credit risk as a show

2   of support for the company and they could put it to them for

3   the par amount of the second lien notes that they would

4   otherwise get.  And that backstop agreement is also referenced

5   in the materials and in the prepackaged plan.

6        The holders of the revolver claims are paid in full in

7   cash.  The subordinated notes get ninety-eight percent of the

8   equity of the company, that's subject to dilution on account of

9   an equity incentive plan and the fee that is paid to the

10  backstop parties.

11       The PIC notes, Your Honor, is a Chinese menu which the

12  debtor will make its choice in connection with the committee

13  and we'll discuss with them, they can get either second lien

14  notes, either new PIC notes or they can get preferred stock and

15  we'll make that election before the confirmation.  But just so

16  you know, the PIC notes have voted in favor of that, so they

17  know exactly the treatment -- actually they don't know but

18  they're okay with the Chinese menu.

19       The 2011 notes, Your Honor, that's the one rejecting

20  class, they're getting two percent of the equity of the

21  company.  It just so happens that that class, which is seven

22  and a half million dollars in the aggregate and one holder who

23  holds three million dollars voted against --

24       THE COURT:  How many holders in that class?

25       MR. DIZENGOFF:  I would say --

AMERICAN MEDIA, INC., et al.

Page 19

1          THE COURT:  Because originally your papers had said

2    four that had voted against.

3          MR. DIZENGOFF:  Yeah.  It's three that voted in favor.

4    There was one that was, like,  1,300 dollar claim that voted.

5    That was a mistake in the balloting.  I don't know, in the

6    aggregate, how many people there are.  Maybe there's five,

7    maybe there's six, I don't know.  It's not that many.  These

8    are the people who were the holdouts from the last exchange.

9    So consistent with not want to the deal last time, they voted

10   against this plan.  That in the aggregate is one vote against

11   it and it's three million dollars.

12          Importantly, from a structural perspective, they're

13   treated exactly identical to the subordinated noteholders that

14   are in a separate class.  And in theory we could have

15   classified them together because they have the exact same legal

16   rights, but we didn't.  We broke it out by issuance of the

17   debt.

18          And lastly, Your Honor -- oh, I'm sorry, Your Honor.

19   The holders of general unsecured claims, which is our trade,

20   they're going to be unimpaired under the plan and be paid in

21   full in accordance with their ordinary business terms.  And

22   then the interest in American Media, Inc., the parent, will be

23   cancelled, that includes warrants and any other rights to

24   equity.

25          THE COURT:  What's the amount of the general unsecured

Page 20

1    claims?

2           MR. DIZENGOFF:  Roughly twenty million dollars, give

3    or take.

4           THE COURT:  Because I saw in your papers you talked

5    about, by the time of confirmation you expected it to be 20.5

6    million dollars.

7           MR. DIZENGOFF:  Right.

8           THE COURT:  But I didn't see anything about what it as

9    the day of the filing.

10          MR. DIZENGOFF:  If you give me -- when I pause I'll

11   get the answer for you from Mr. Polimeni and we'll give you an

12   exact number.

13          So Your Honor, as we entered into the restructuring

14   support agreement we then commenced solicitation on the plan of

15   reorganization.  And as I mentioned, the plan was

16   overwhelmingly voted in favor by its creditor constituencies.

17   There were four classes that voted, we talked about the one

18   seven and a half, the 2011 notes.  The other are the term

19   lenders; every single vote that was cast was voted in favor.

20   And of the aggregate of 430 million dollars, about 402 actually

21   voted and voted in favor of the plan.

22          And then the subordinated noteholders, again every

23   single vote that was cast was voted in favor.  And then PIC

24   notes, which is twenty-five million dollars, every single vote

25   that was cast was voted in favor.  So three of the four

AMERICAN MEDIA, INC., et al.

Page 21

1    classes, one hundred percent of the creditors voting and one

2    hundred percent of the dollar amounts voting voted in favor of

3    the plan.  So we think we enjoy broad support for this

4    restructuring.

5              Your Honor, in order to effectuate the plan we've

6    entered into a number of financing arrangements to repay our

7    first lien lenders, and this is what I referenced earlier.  We

8    have basically three facilities.  We have a new first lien

9    facility, and this is subject of a motion to put the proceeds

10   in escrow and we'll talk about the reasons for that in a little

11   bit, in the aggregate amount of 385 million dollars.  That

12   doesn't, obviously, satisfy all of them, that's why they were

13   getting the second lien notes.

14             And then there's a second lien note facility that is

15   up to 140 million dollars.  Whether it's 140 million dollars or

16   not all depends, it depends on whether people keep it or not

17   and it also depends on the treatment of the PIC notes.  And

18   then there's a new revolving facility of forty million dollars.

19             Your Honor, in order to take advantage of the capital

20   markets, and I'm sure Your Honor has seen in the New York Times

21   and the Wall Street Journal in the last couple days about the

22   choppiness in the high yield markets, so in the period of time

23   when we commenced our restructuring, with commitments in hand

24   we went out to the marketplace to line up that financing and

25   hopefully get it as quickly as we could.

10-16140-mg    Doc 61    Filed 11/23/10    Entered 11/24/10 11:58:08    Main Document
AMERICAN MEDIA, INC., et al.
Pg 22 of 49

Page 22

1           We took advantage of it.  We were very successful in

2     it and we secured the agreements as I outlined, the 385, the

3     140 and the forty million dollars.

4           What we propose to do is have a non-debtor escrow

5     subsidiary take the proceeds of those loans, hold them in

6     escrow during the course of the case and then as we consummate

7     the plan, if we're fortunate enough to confirm the plan,

8     that'll get merged into the existing reorganized entities and

9     the proceeds will get released.  There's conditions, obviously,

10    consummation of the plan, confirmation of the plan and that's

11    what we proposed to do.

12          Your Honor, cobbled together this exit financing of

13    the first lien and then the second lien and then the revolver

14    is enough to give us the means to implement our plan.  And it's

15    important, each of these agreements are important and that you

16    couldn't just say well let's wait and it's important because

17    the markets, as you saw, have all seized up and there's a lot

18    of news banter about that the high yield pipeline was

19    dramatically overstacked and now it's loosened up and people

20    are concerned that they couldn't get the deals done.

21          We got our deal done and now we want to take advantage

22    of that and put those proceeds into escrow.

23          THE COURT:  The drop dead deadline for --

24          MR. DIZENGOFF:  We have ten days in order to get an

25    order from Your Honor that says --

Page 23

1          THE COURT:  Ten days from when?

2          MR. DIZENGOFF:  I think December 1st is the drop dead

3    date.

4          THE COURT:  Go ahead.

5          MR. DIZENGOFF:  Your Honor, over the past two months

6    we have worked tirelessly to insure that we have the sufficient

7    financing to effectuate our plan, that it was supported by all

8    of our creditor constituencies that substantially delevers the

9    plan and provides that all general unsecured trade creditors

10   are paid in full.

11         Your Honor, that's my introduction to the company and

12   what it does.  I want to pause here to see if you have any

13   questions because then we're going to get to the substantive

14   first day relief.

15         THE COURT:  I'll have questions as you go through.

16         MR. DIZENGOFF:  Okay.  So I have a question on how

17   you'd like to proceed.  We've worked through, I think, the vast

18   bulk of all our issues with the United States Trustee.  We

19   obviously have shared this with both JPMorgan and the committee

20   of our bondholders and we have broad consensus on all the

21   orders.  So it's up to you, Your Honor.  We have a presentation

22   on each and every one.

23         THE COURT:  Let me tell you one of the things that's

24   bothering, not substantively but procedurally with respect to

25   two of the motions.  The restructuring support agreement and

Page 24

1     the financing agreement, neither of which seem appropriate for

2     a first day hearing.  The prepack guidelines for the district,

3     in general order M-387, identify a list of appropriate first

4     day motions and nothing like the assumption of the

5     restructuring support agreement or the financing agreement are

6     included there.  And I'll tell you right now, I'm not going to

7     approve either of those today.  I think the issue is when

8     you're going to get a hearing on them, I'm prepared to give you

9     a prompt hearing but I have not been through every page of the

10    financing agreements and, you know, you start out with

11    basically those are not ordinary first day motions.  I don't

12    understand why you need -- I don't think you need either of

13    those on the first day, you may like them but it doesn't seem

14    to me appropriate for me to consider them and I'm not ready to

15    consider them because of the amount of fees that will be paid

16    if I approve those agreements.

17          That isn't to say that I have any substantive problem

18    about either of them.  It just seems to me that neither is

19    appropriate for first day treatment.

20          MR. DIZENGOFF:  Can I spend five minutes trying to

21    convince --

22          THE COURT:  That was my question about the drop dead

23    date on the financing.

24          MR. DIZENGOFF:  Okay.  Your Honor, if I could address

25    just your substantive issues for two seconds and then obviously

AMERICAN MEDIA, INC., et al.

Page 25

1   if you are -- would like to give us a date we have a drop dead

2   date and we'd like to come back to you early next week, if we

3   could and I understand it's a holiday week, but come back next

4   week.

5        Two things I want to just highlight for you.  One, the

6   aggregate fees that are both in the JPMorgan facility, that's

7   the 385 plus the backstop agreement, have been advertised to

8   the world.  So all of our creditor constituencies know what the

9   aggregate fees that will be paid.

10       Now I understand it's virtually impossible in the two

11  days that you've had the pleadings to understand all the

12  nuances of it and months of negotiation went into each and

13  every thing, and that's totally fair.  I get that.  But the

14  people with the economic stake in the outcome know exactly what

15  they signed up for and they voted on it and they are supportive

16  of those things.

17       Now that said, I get it and we're about transparency

18  and trying to make sure everybody's comfortable with it.  But,

19  you know, in the backdrop the people who are impacted by it

20  have said okay to it.

21       THE COURT:  Well you filed your motions yesterday.

22  They trickled in as the day went along.  I was on the bench all

23  day.  There's been no objection deadline.  Now it may be that

24  anybody with an interest in objecting, obviously there's been

25  plenty of notoriety of about what you've been doing, you

AMERICAN MEDIA, INC., et al.

Page 26

1    solicited, you got the votes except for the one class, but, you

2    know, I've already expressed my concerns about atypical first

3    day motions.  It's more than just that, it's that the relief

4    you're seeking has real long-term consequences.  My approach

5    is, deal with those things that need to be dealt with on the

6    first day basis because they have to be done, wages, things

7    like that, people expect to be paid; cash collateral, I

8    understand you need money to operate, but you have the votes.

9    What is the significance of the assumption of the restructuring

10   support agreement?  Why does that even have to be assumed prior

11   to confirmation?  With the financing, I don't like being

12   crammed down by lenders who set a drop dead deadline that falls

13   -- that would require, in a holiday week, for me to have a

14   hearing.  So I want to make all of that very clear.  I don't

15   like to be put in the position of -- where people are trying to

16   force me to take action before there's time for if there are

17   going to be objections.

18          I understand and prepack guidelines anticipate the

19   case will move quickly and I hope this does move quickly.  But

20   I don't intend to be railroaded.

21          MR. DIZENGOFF:  All fair, Your Honor.  We get all that

22   and we were sensitive to all that.  Two small comments; we

23   started solicitation on October 30th so the creditor party at

24   large, and there's -- the solicitation document is effectively

25   a disclosure statement and we believe it satisfies the 1125

Page 27

1    requirements.  All of this is laid out in gory detail to the

2    entire creditor body.  So they've known about the financing,

3    they've known about the restructuring support agreement,

4    they've known exactly the treatment that they're going to get.

5            And it's not a typical first day case where I'm coming

6    in, I filed on Wednesday and I have a hearing on Friday and

7    people have had thirty-six hours to digest it.  In this case

8    the creditors have had twenty days, twenty-one days to digest

9    it.  So at a normal procedural, if I filed a motion and I was

10   following normal procedures, twenty days to digest exactly what

11   is happening is a lot of time.  That doesn't mean I'm going to

12   push you into that, I just want to note that that's how we

13   think we've addressed the issue in terms of adequate notice for

14   all the creditor constituencies.

15           The second thing Your Honor, you raised on the

16   restructuring support agreement, the benefit that we get the

17   estate, I understand I have the support of the other people and

18   they're all happy with the deal, the benefit that we get from

19   the estate is I now know if you approve it and I've assumed

20   that obligation, I don't have any objections from that creditor

21   constituency.  Yes, I have an agreement but it's a prepetition

22   agreement and they could sell their claims if they wanted to

23   and then I could be arguing about, with some other creditor

24   constituency, whether they're going to support the plan or not.

25           So from our perspective we would like to know that

Page 28

```
 1   we're locked and loaded and headed down towards a prepackaged -
 2   - hopefully the only next hearing would be the confirmation
 3   hearing.  I understand we might have one in between and that's
 4   totally fine.  But that's the reason why, in our mind, a first
 5   day relief issue.  And I get the concerns, Your Honor, and
 6   notice and not trying to rush things through is important in
 7   this case.  And the reason why it's in this case --
 8            THE COURT:  Till I have an opportunity to read every
 9   page of that financing package you're not getting it.
10            MR. DIZENGOFF:  That's fair.
11            THE COURT:  It's really as simple as that.
12            MR. DIZENGOFF:  No problem.  I just wanted you to
13   understand our perspective on why we asked for it.  No problem.
14            THE COURT:  I've got binders galore that have been
15   trickling into my chambers over the last two days and I've read
16   a lot of it.  But I have not had the opportunity to study those
17   documents and without that happening it isn't going to happen.
18            MR. DIZENGOFF:  Okay.  That's fair enough, Your Honor.
19   What we'd ask for then, in light of that, is if we can have a
20   hearing --
21            THE COURT:  Let's go through the ones that we're going
22   to get through today and then we'll talk about scheduling.
23            MR. DIZENGOFF:  Okay.  That's fine as well.  At this
24   point I'm going to cede the podium to one of my colleagues who
25   will take you through some of the other pleadings.
```

Page 29

1          THE COURT:  That's fine.  Thank you.

2      (Pause)

3          MS. LAHAIE:  Good afternoon, Your Honor.  Meredith

4    Lahaie, Akin Gump, for the debtors.

5          Your Honor, before I begin moving through the first

6    say motions I'd like to first move in Mr. Polimeni's first day

7    declaration and the supplemental declaration we submitted in

8    connection with the trade claims motions.

9          THE COURT:  Any objections to the Court admitting

10   either of those declarations?

11     (No response)

12         THE COURT:  Hearing no objection both of those

13   declarations are admitted.

14   (Declaration and Supplemental Declaration of Mr. Polimeni was

15   hereby received as Debtors' Exhibit 1, as of this date.)

16         MS. LAHAIE:  Thank you, Your Honor.

17         I'm going to proceed in a little bit of a slightly

18   unorthodox order just so that the Court is aware JPMorgan, who

19   obviously is administering the debtors' cash, has raised their

20   concerns with respect to our ability to honor prepetition

21   checks.  And so, Your Honor, they've told us they have a 3:30

22   deadline today to clear those checks.

23         THE COURT:  Okay.  Let's deal with it.

24         MS. LAHAIE:  So Your Honor, first I would ask for

25   joint administration.

AMERICAN MEDIA, INC., et al.

Page 30

1         THE COURT:  Any objections to the motion for joint

2    administration?

3         (No response)

4         THE COURT:  The motion is granted.

5         MS. LAHAIE:  Thank you, Your Honor.  And next the

6    motion with respect to the creditor matrix, so that we don't

7    have to file those.

8         THE COURT:  Any objection to the motion on the

9    creditor matrix?

10        (No response)

11        MS. LAHAIE:  Thank you, Your Honor.

12        THE COURT:  Granted as well.

13        MS. LAHAIE:  Thank you.  The first substantive motion

14   I'd like to seek your relief from is the cash collateral

15   motion.  Your Honor, do you have specific questions or concerns

16   or do you have issues on the order you'd like to go through.

17        THE COURT:  Just give me a second.  I don't think so.

18        (Pause)

19        THE COURT:  There's no budget.

20        MS. LAHAIE:  There is not, Your Honor.

21        THE COURT:  Why not?

22        MS. LAHAIE:  Your Honor, it was part of the consensual

23   deal we negotiated with JPMorgan.  Given the, what we expect to

24   be very brief duration of these cases and JPMorgan's

25   involvement to date, they were comfortable authorizing us to

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
AMERICAN MEDIA, INC., et al.
Pg 31 of 49

Page 31

1   use cash collateral without a budget.

2           THE COURT:  Okay.  Your motion to use cash collateral,

3   you fail to comply with Local Rule 4001-2 in Bankruptcy Rule

4   4001.  The following are missing or deficient in the proposed

5   order:  Local Rule 4001-2(a)(1) requires the motion for cash

6   collateral to state the amount of the cash collateral that the

7   debtor seeks permission to use and you've not done that.

8           Moreover, in paragraph 7 of the motion it doesn't

9   specify the total amount requested.  It merely states certain

10  dollar caps associated with the particular use of cash

11  collateral.  And for the same reason, Local Rule 4001-2(g) is

12  violated.  The local rule requires, "A motion that seeks entry

13  in an emergency or interim order before a final hearing," I'll

14  leave some words out, "shall describe the amount and purpose of

15  the funds sought to be borrowed on an emergency basis", and you

16  haven't done any of that.

17          MS. LAHAIE:  Understood, Your Honor.  If I could

18  attempt to address those concerns orally and then we could

19  modify the order accordingly.

20          Your Honor, it's my understanding that there's

21  approximately sixty-five million dollars of cash collateral

22  currently in the possession of the company.  And based on what

23  the company estimates it will need during the first twenty days

24  of the case, I understand that twenty-five million would be

25  appropriate for the interim period.

Page 32

1         THE COURT:  Mr. Morrissey and Ms. Golden, was this an

2    issue that either of you addressed with debtors' counsel?

3         MS. GOLDEN:  For the record, Susan Golden for the

4    United States Trustee.  Which issues, Your Honor?

5         THE COURT:  Well, just focusing on cash collateral.  I

6    mean, I -- there's no budget.  There's nothing that I saw,

7    unless I missed it, that says how much cash collateral they

8    want to use in this interim period.

9         MS. GOLDEN:  Well, first let me say that we've had a

10   very good working relationship with Akin Gump in this case, all

11   along, from when we found out that the case was in the pipeline

12   and going to file, and we've had many discussions.  So while

13   our office may have been privy to the amounts being sought, we

14   realize that it is isn't in the document.

15        THE COURT:  Were representations made to your office

16   about what the amount being sought was and for what period?

17        MS. GOLDEN:  Yes, Your Honor.

18        THE COURT:  All right.  So tell me again, what is the

19   representation as to the amount of the cash collateral that'll

20   be used in the first twenty-one days of the case?

21        MS. LAHAIE:  It's approximately twenty-five million

22   dollars, Your Honor.  And obviously, Your Honor, we can

23   annotate the order accordingly.

24        THE COURT:  Does anybody wish to be heard with respect

25   to the debtor's motion for use of cash collateral?

Page 33

1        (No response)

2            THE COURT:  All right.  Subject to the order being

3    modified to reflect a twenty-five million dollar limitation on

4    the use of cash collateral in the first twenty-one days of the

5    case, the motion is granted.

6            MS. LAHAIE:  Thank you, Your Honor.

7            Your Honor, the next motion on the agenda is the cash

8    management motion.  Your Honor, would you like a present --

9            THE COURT:  Just give me a second.

10        (Pause)

11           THE COURT:  Go ahead.

12           MS. LAHAIE:  Your Honor, would you like a presentation

13   on this or would you like to address any questions on the

14   order?

15           THE COURT:  Does anybody wish to be heard with respect

16   to the cash management motion?  Ms. Golden?

17           MS. GOLDEN:  Yes, Your Honor.  We only have one issue

18   with the cash management order.  For the most part all of the

19   debtors' accounts are in JPMorgan Chase, which is an authorized

20   depository in the southern district.

21           `I think there were three accounts where there were

22   checks outstanding.  Two of them are also authorized, even

23   though they're not, you know, the big typical banks that we

24   often see and the other one, I think, is going to be close.  So

25   we have no issue with that.

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
AMERICAN MEDIA, INC., et al.
Pg 34 of 49

Page 34

1          The only issue we have is with Chase Canada.  Because

2     it's in Canada it's not an authorized depository in the

3     Southern District of New York so the U.S. Trustee can't consent

4     to having the funds remain in that bank without bonding.  So on

5     that score we will defer to the Court.  We understand there is

6     about a million dollars, a little under a million dollars in

7     that account.

8          MS. LAHAIE:  That's right, Your Honor.  May I be heard

9     briefly on that?

10          THE COURT:  Go ahead.

11          MS. LAHAIE:  Your Honor, I've spoken with the company

12     with respect to this bank account and from what I understand,

13     as Ms. Golden represents, it does have less than a million

14     dollars in it and its purpose is to pay payroll with respect to

15     the company's Canadian employees.

16          I did discuss with the company of either closing down

17     the account and moving into an account that might be approved

18     by the U.S. Trustee's office.  We also approached the bank

19     about bonding that account; both of those requests don't seem

20     particularly feasible.

21          THE COURT:  Yeah, that's not a surprise.

22          MS. LAHAIE:  Your Honor, with that I'd ask --

23          THE COURT:  Ms. Golden, let me ask you, because this

24     kind of issues recurs, it comes up often and oftentimes your

25     office is willing to provide a grace period for this to get

Page 35

1   resolved.  Now this case may be out of here before there is --

2   the grace period expires.

3          MS. GOLDEN:  We would certainly provide a grace period

4   to allow them to attempt to comply.  They didn't ask for a 345

5   waiver in their documents but certainly we often, almost

6   always, will grant a grace period at the request of counsel.

7          THE COURT:  This is one by the time an ordinary grace

8   period would expire, this case may be confirmed and out of

9   here.

10         MS. GOLDEN:  That's understood, Your Honor.  The U.S.

11  Trustee just isn't in a position to be able to pass on the

12  financial wherewithal of a foreign bank.

13         THE COURT:  All right.  So what I'm going to do is,

14  I'm going to grant the cash management motion with the

15  understanding, and you don't have to reflect this in the order

16  it's on the record here, that issues with the Canadian Chase

17  account will be resolved by December 31, 2010.  Okay?  It

18  doesn't -- you don't need to amend the order, I'm so ordering

19  the transcript on it.  So you've got approval and subject to if

20  you need to work with the U.S. Trustee's office in satisfying

21  them, okay?

22         MS. LAHAIE:  Understood.  Thank you, Your Honor.

23         Your Honor, next on the agenda is the wages motion.

24  Two comments on this.  The first, as I'm sure you noted, there

25  is no one that's contemplated to be paid in excess of the cap.

AMERICAN MEDIA, INC., et al.

Page 36

1   The other thing I did want to note for Your Honor is that

2   pursuant to my discussions with the U.S. Trustee, they

3   typically request that the reimbursement of expenses not exceed

4   1,000 dollars per individual.  But with respect to this company

5   I understand there is a universe of about thirty employees that

6   work for DSI, one of the debtor entities, and as I understand

7   it these employees, who are relatively modestly compensated,

8   actually go to the various locations where the publications are

9   sold and then are subsequently reimbursed for travel expenses.

10  And I understand that this runs somewhere in the range of 2,000

11  per employee.

12          And it's my understanding that the U.S. Trustee is

13  amenable to allowing those individuals to be compensated.

14          MS. GOLDEN:  Under the circumstances and what these

15  individuals do and they're just, you know, regular folks who

16  are driving and dropping things off.  We have no objection.

17          THE COURT:  All right.  Anybody else wish to be heard

18  with respect to the wages motion?

19      (No response)

20          THE COURT:  All right.  The motion is granted.

21          MS. LAHAIE:  Thank you, Your Honor.

22          Your Honor, the next motion on the agenda is the

23  shipper's motion.  As I communicated to your chambers this

24  morning, there was one discrepancy in the motion that was

25  actually filed with respect to the order that we're submitting

Page 37

1    for you today.  That discrepancy is as follows:  with respect

2    to what we originally requested, we thought we only needed to

3    seek authority to pay about 80,000 of our shippers and

4    warehousemen, but based on subsequent conversations with the

5    company, after we filed that motion, I understand that number

6    is closer to the 300,000 dollar range.  And then I think, it

7    may be clear to you, the debtors also have on file today a

8    motion to seek payment of all their trade claims and that

9    motion, for the interim period, is seeking somewhere around 7.3

10   million dollars.  And so from what I understand 7.3 million

11   included the 200-some odd thousand that is being now shifted

12   over to the shipper's motion.  So it's still the same amount in

13   the aggregate it's just being allocated differently between the

14   two motions.

15          THE COURT:  Anybody wish to be heard with respect to

16   the shipper's motion?  Ms. Golden?

17          MS. GOLDEN:  Yes.  Counsel has given us a list of all

18   of the -- all of the shippers and the amounts that are due as

19   well as all of, I believe, the trade claims and the amounts

20   that are due.  In the interim, the U.S. Trustee doesn't have

21   any objection.

22          THE COURT:  All right.

23          MS. GOLDEN:  As long as Ms. Lahaie is to make her 6003

24   imminent harm declaration.

25          THE COURT:  Yeah, because usually the shippers have

AMERICAN MEDIA, INC., et al.

Page 38

1    the right to assert a lien against the materials.  If you can't

2    deliver your magazines, I assume that that's the imminent harm

3    that the debtors will suffer if this motion is not granted.

4              MS. LAHAIE:  That's correct, Your Honor.

5              THE COURT:  All right.  The motion is granted.

6              MS. LAHAIE:  And Your Honor, that brings me to the

7    trade claims motion.  As I indicated at the outset of my

8    presentation, we did submit a supplemental declaration on that

9    from the CFO.  As Mr. Dizengoff reflected, he is available here

10   to testify in connection with that declaration.

11             Your Honor, I defer to you on how to proceed.  Do you

12   want me to make a presentation on this motion and walk through

13   some of the vendors?

14             THE COURT:  Well first let me ask, Ms. Golden, have

15   you gone over it with the debtors' counsel?

16             MS. GOLDEN:  Yes, we've gone over this motion back and

17   forth extensively, it's had several iterations.  And the U.S.

18   Trustee at least is satisfied that in the interim period we

19   have no objection.

20             THE COURT:  What's the total that you anticipate would

21   be paid in the interim period?

22             MS. LAHAIE:  It's approximately seven million dollars,

23   after backing out the shippers, Your Honor.

24             THE COURT:  All right.  Does anybody wish to be heard

25   with respect to the trade creditors' motion?

10-16140-mg   Doc 61   Filed 11/23/10   Entered 11/24/10 11:58:08   Main Document
AMERICAN MEDIA, INC., et al.
Pg 39 of 49

Page 39

1       (No response)

2              THE COURT:  All right.  The court is satisfied that

3    you've satisfied the standards for paying those during the

4    first twenty-one days of the case.  So that motion is granted.

5              MS. LAHAIE:  Thank you, Your Honor.

6              Next up is the customer programs motion.  Again, this

7    has also been previewed with the U.S. Trustee's office and I

8    understand that Ms. Golden has no objection.  I can walk

9    through this as well, if you'd like, Your Honor.

10             THE COURT:  Let me ask, does anybody else wish to be

11   heard with respect to the customer program motion?

12             MS. GOLDEN:  The U.S. Trustee has no objection, Your

13   Honor.

14             THE COURT:  All right.  The Court has reviewed the

15   motion as well and concludes that it's well taken, good cause

16   appearing, the motion is granted.

17             MS. LAHAIE:  Your Honor, next up is the tax motion.  I

18   understand there are no objections to this either.

19             MS. GOLDEN:  The U.S. Trustee doesn't object but only

20   taxes that are owing in the first twenty days.

21             MS. LAHAIE:  That's correct.

22             THE COURT:  I doubt whether they're paying taxes.

23             MS. LAHAIE:  I can confirm that they're not, Your

24   Honor.

25             THE COURT:  I always like to see the tax authorities

Page 40

1    get their money so that motion is granted.

2         MS. LAHAIE:  Thank you, Your Honor.

3         Your Honor, the next two motions on the agenda I

4    understand we're going to skip over, which are the escrow

5    motion and the RSA and we'll come back to schedule those at the

6    end of the hearing.

7         The next matter on the agenda is the confirmation

8    hearing scheduling motion.  As Mr. Dizengoff indicated in his

9    presentation, we are hoping to proceed relatively quickly with

10   confirmation in these cases.  And by that motion we're seeking

11   to set confirmation somewhere around December 15th, subject to

12   your schedule.

13        THE COURT:  Well, not quite that.  Here is -- let me

14   give you the schedule.

15        MS. LAHAIE:  Okay.

16        THE COURT:  November 24th for distribution of election

17   forms to Class II claims; 5 p.m. December 13th objection

18   deadline for disclosure statement plan and solicitation

19   procedures.  Reply deadline 5 p.m. December 17; confirmation

20   hearing 10 a.m. December 20th.

21        MS. LAHAIE:  I'll just turn to my colleagues, Your

22   Honor.

23      (Pause)

24        MS. LAHAIE:  I'm informed that that's acceptable, Your

25   Honor.

AMERICAN MEDIA, INC., et al.

Page 41

1          THE COURT:  Okay.

2          MS. LAHAIE:  Did Your Honor have any other questions

3      or comments on that motion?

4          THE COURT:  No.  So the scheduling motion, with the

5      dates that I've provided, is granted.

6          MS. LAHAIE:  Thank you, Your Honor.

7          Next up is the schedules and statements motion

8      pursuant to which we seek an extension and then a waiver of our

9      obligation to file schedules and statements.

10         THE COURT:  Anybody?  Ms. Golden?

11         MS. GOLDEN:  We have no objection, Your Honor.

12     Obviously if confirmation doesn't happen or something

13     intervenes then counsel has -- the debtors have the right to

14     request a further extension and we'll take it from there.  But

15     we agree to a thirty-day extension.

16         THE COURT:  Okay.  That motion is granted as well.

17         MS. LAHAIE:  Thank you, Your Honor.

18         Last on today's agenda is the motion to retain KCC as

19     our noticing and claims agent, to the extent there are any

20     claims, Your Honor.

21         THE COURT:  All right.  Did you solicit bids from two

22     or more?

23         MS. LAHAIE:  We solicited bids from two, Your Honor.

24         THE COURT:  Okay.  Ms. Golden?

25         MS. GOLDEN:  Your Honor, the U.S. Trustee has no

AMERICAN MEDIA, INC., et al.

Page 42

1   objection to KCC being noticing and claims agent.  We do

2   request that if they want to expand their scope to exceed

3   noticing and claims, which are traditionally clerk's office

4   activities, that they would file a supplemental application to

5   be retained in an expanded scope that our office would be able

6   to pass over.

7           MS. LAHAIE:  And that's fine, Your Honor.  The only

8   thing I anticipate KCC would do in addition to that would be to

9   collect and process the election forms.

10          THE COURT:  All right.  Anybody else wish to be heard

11  on that motion?

12      (No response)

13          THE COURT:  All right.  The motion is granted on the

14  basis of Ms. Golden's comments, okay?

15          MS. LAHAIE:  Thank you, Your Honor.

16          You'll note on the agenda there are a few extra

17  motions that we filed, utilities, interim compensation, OCP,

18  that we'll be seeking in connection with the coming days.  But

19  I believe that's all we have on the agenda today, which leaves

20  us to, I believe, to scheduling our next hearings, Your Honor.

21          THE COURT:  Okay.

22      (Pause)

23          MS. LAHAIE:  Your Honor, my colleagues are informing

24  me that the drop dead deadline for the escrow is November 29th.

25  I'm sorry; they're requesting a hearing on the 29th.  I

Page 43

1    apologize.

2        (Pause)

3            THE COURT:  Who voted against?  Who in Class VII voted

4    against?

5            MR. DIZENGOFF:  Your Honor, let me just address it for

6    a second.

7            It's hard to speculate who it is but I could tell you

8    from the last exchange it was one bondholder that was in a fund

9    that was acquired by a subsequent fund manager.  His fund is

10   wound down so he actually doesn't work at that fund any more

11   but he still has, kind of, control over those assets.  That's

12   the person we think.

13           Now it's hard for us to tell because the votes come in

14   through street name and we only see, for example, JPMorgan as

15   custodian.  While it's not JPMorgan's it's ultimately who that

16   beneficial holder is.  So we have a theory of who it is, but

17   we're not sure.

18           THE COURT:  Anybody representing the one vote against

19   here today?

20       (No response)

21           MS. LAHAIE:  Your Honor, on that note I would like to

22   note that we did make sure that we served notice of this

23   hearing with respect to the name that we do have, who is the

24   nominee that holds for that individual.  So we did make sure

25   and we have an affidavit of service, if Your Honor would like,

Page 44

1    with respect to the service on that person.

2         (Pause)

3              THE COURT:  Tell me, on your utilities motion when

4    were you contemplating bringing that on?

5              MS. LAHAIE:  Your Honor, we were contemplating

6    bringing it on by notice of presentment, unless Your Honor has

7    any issues with proceeding in that fashion.

8              THE COURT:  I don't know how many utilities we're

9    dealing with.

10             MS. LAHAIE:  I can tell you that the deposit in

11   connection with that motion is somewhere in the range of

12   175,000 dollars.  It's not a particularly large number.

13             THE COURT:  You know, I didn't read that motion

14   because I knew it wasn't on for today.  I actually just read a

15   snippet of it.

16             So you're proposing 175,000 deposit but you were just

17   going to use that as a single lump?

18             MS. LAHAIE:  Your Honor, I'm being informed it's --

19             THE COURT:  Because I've got to tell you, I have never

20   approved that.  I usually required two weeks.

21             MS. LAHAIE:  Your Honor, it is approximately two

22   weeks.

23             THE COURT:  Yes, but two weeks for each utility not --

24   because what happens is when you do it as a simple fund that in

25   the aggregate would be two weeks, then they come in and scream

Page 45

1    because if somebody else gets to use it there's not enough left

2    for them.

3           So I don't know how many -- I can't imagine you have

4    that many utilities you're dealing with so I'll just tell you

5    now that what I typically require is a deposit equal to two

6    weeks of the average over the prior twelve months deposited

7    with each utility.  That's, sort of, the standard that my

8    colleagues do, is what I've done because as soon as you try and

9    do it as a single fund then they come in screaming that well we

10   have no assurance that we're going to see our money because if

11   somebody else draws down on it --

12          MS. LAHAIE:  Your Honor, I will say this with respect

13   to the utilities motion; it's not contemplated in the motion

14   that we're going to be setting up a separate account for the

15   deposit.  The debtors are proposing to earmark those funds in

16   connection with their global cash management policy.  And as I

17   stated earlier, with respect to the cash collateral motion, we

18   have about sixty-five million dollars of cash on hand.

19          The company would prefer to earmark funds in whatever

20   fashion the Court deems appropriate.

21          THE COURT:  Okay.  Well, when you make your proposal,

22   I just -- experience has shown when you propose to do it as a

23   single lump sum that brings the -- the utilities should be that

24   big a deal, when they are then they come out of the woodwork,

25   that's not acceptable to them.  Usually they want a month but

Page 46

1    the standard that I've always done is the two weeks but some

2    assurance that the money's there for them, that it's set aside

3    for them, whether it's on your -- sixty-five million you

4    shouldn't have to worry about it.  Hopefully you'll never hear

5    from them.

6         (Pause)

7             THE COURT:  All right.  I'm going to set the hearing

8    on the restructuring support agreement, on the escrow/backstop

9    for Monday, November 29th at 2 p.m.  Objection deadline, make

10   everybody really happy, Wednesday, November 24th at 4 p.m.

11            Please serve notice of the hearing with those

12   deadlines.

13            MS. LAHAIE:  We will, Your Honor.

14            If I could impose upon you for one additional hearing

15   date, which would be in connection with the final usage of cash

16   collateral, approximately twenty days out.

17            THE COURT:  It only has to be fourteen days, I

18   thought.  Am I right or wrong on that?  I think it's fourteen

19   days.

20            MS. LAHAIE:  Oh, okay.

21            THE COURT:  For a DIP loan it's got to be the twenty-

22   one but for use of cash collateral it's only fourteen days.

23            MS. LAHAIE:  Okay.

24        (Pause)

25            THE COURT:  Who did you serve the motion on?

Page 47

1          (Pause)

2              MS. LAHAIE:  Your Honor, we served it, among others,

3      on the fifty largest creditors, the indentured trustee for the

4      note issuances, the admin agent.

5          (Pause)

6              MS. LAHAIE:  I do have a copy of our affidavit of

7      service, Your Honor, if you'd like it.

8          (Pause)

9              THE COURT:  All right.  The hearing is December 6th,

10     Monday, December 6th at 2 p.m. and the objection deadline is

11     Monday, November 29th at 5 p.m.

12             MS. LAHAIE:  Thank you, Your Honor.  We'll notice that

13     as well.

14         (Pause)

15             THE COURT:  Okay.  Anything else for today?

16             MS. LAHAIE:  I believe that's it, Your Honor.  Thank

17     you very much for your time.

18             THE COURT:  Okay.  Thank you.  We're adjourned.

19         (Whereupon these proceedings were concluded at 2:50 PM)

20

21

22

23

24

25

Page 48

1                              I N D E X

2

3                          E X H I B I T S

4    OTHER'S              DESCRIPTION                      PAGE

5    1                    Declaration and Supplemental       29

6                         Declaration of Mr. Polimeni

7

8                               RULINGS

9                                        Page        Line

10   Motion for Joint Administration, Granted      30          4

11   Scheduling Motion, Granted as Modified        41          5

12   Schedules and Statements Motions, Granted     41         17

13   Motion to Retain KCC as Claims and Noticing   42         14

14   Agent, Granted

15   Creditor Matrix Motion, Granted              30         12

16   Cash Collateral Motion, Granted as Modified  33          7

17   Cash Collateral Motion, Granted              35         15

18   Wages Motion, Granted                        36         21

19   Shippers' Motion, Granted                    38          6

20   Trade Creditors Motion, Granted              39          5

21   Customer Programs Motion, Granted            39         17

22   Tax Motion, Granted                          40          2

23

24

25

Page 49

1

2                    C E R T I F I C A T I O N

3

4    I, Pnina Eilberg, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    Pnina Eilberg    Digitally signed by Pnina Eilberg
                      DN: cn=Pnina Eilberg, c=US
                      Reason: I am the author of this document
8    _____    Date: 2010.11.23 14:35:09 -05'00'

9    PNINA EILBERG (CET**D-488)

10   AAERT Certified Electronic Transcriber

11

12   Veritext

13   200 Old Country Road

14   Suite 580

15   Mineola, NY 11501

16

17   Date: November 23, 2010

18

19

20

21

22

23

24

25