AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN MEDIA, INC., *et al.*,[1] | Case No. 10-16140 (MG) |
| Debtors. | (Jointly Administered) |

**PLAN SUPPLEMENT TO THE DEBTORS' AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).

This is the Plan Supplement of the above-captioned debtors and debtors in possession

(each, a "**Debtor**" and, collectively, the "**Debtors**") filed as part of the *Debtors' Amended Joint*

*Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated

December 15, 2010 [Docket No. 115] (as amended, supplemented or modified from time to time,

the "**Plan**").  The hearing to consider confirmation of the Plan is scheduled for December 20,

2010 at 10:00 a.m. (EST).

The Plan Supplement is also available on the website of Kurtzman Carson Consultants,

LLC at www.kccllc.net/AMI and/or may be obtained upon written request from American Media,

c/o Kurtzman Carson Consultants, LLC, 599 Lexington Avenue, 39th Floor, New York, New

York, 10022.

New York, New York
Dated: December 15, 2010

/s/ *Ira S. Dizengoff*
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002

Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*

# PLAN SUPPLEMENT DOCUMENTS[2]

| | |
|---|---|
| Exhibit A | New First Lien Indenture |
| Exhibit B | New Second Lien Indenture |
| Exhibit C | Purchase Agreement for New First Lien Notes |
| Exhibit D | Registration Rights Agreement for New First Lien Notes |
| Exhibit E | Registration Rights Agreement for New Second Lien Notes |
| Exhibit F | Escrow Agreement for New First Lien Notes |
| Exhibit G | Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for the New Revolver Facility Lenders, Trustee and Collateral Agent for New First Lien Note Holders, and Trustee and Collateral Agent for New Second Lien Note Holders |
| Exhibit H | Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for New Revolver Facility Lenders, and Trustee and Collateral Agent for New First Lien Note Holders |
| Exhibit I | Stockholders' Agreement |
| Exhibit J | Restated Bylaws |
| Exhibit K | Restated Certificates of Incorporation |
| Exhibit L | Equity Incentive Plan |
| Exhibit M | Director Severance Plan |
| Exhibit N | Emergence Incentive Plan |
| Exhibit O | Identity of members of the New Boards and the initial officers of the Reorganized Debtors |
| Exhibit P | New Revolver Credit Facility Credit Agreement |

---

[2]     Each Plan Supplement document (other than Exhibits A, C, D and F) remains subject to ongoing negotiations.

**<u>EXHIBIT A</u>**

**New First Lien Indenture**

EXECUTION VERSION

---

INDENTURE

Dated as of December 1, 2010

Between

AMO ESCROW CORPORATION,

and

WILMINGTON TRUST FSB,
as Trustee and Collateral Agent

11½% FIRST LIEN SENIOR SECURED NOTES DUE 2017

---

CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | 10.03 |
| (b)(2) | 7.06; 7.07; 10.12 |
| (c) | 7.06; 13.02 |
| (d) | 7.06 |
| 314(a) | 4.03; 13.02; 13.05 |
| (b) | N.A. |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | N.A. |
| (e) | 14.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 13.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.14 |
| 316(a)(last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12; 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.12 |
| (b) | 2.04 |
| 318(a) | 13.01 |
| (b) | N.A. |
| (c) | 13.01 |

N.A. means not applicable.
*  This Cross-Reference Table is not part of the Indenture.

# TABLE OF CONTENTS

Page

## ARTICLE 1

### DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions ..................................................................................................... 1
Section 1.02    Other Definitions .......................................................................................... 31
Section 1.03    Incorporation by Reference of Trust Indenture Act ...................................... 32
Section 1.04    Rules of Construction .................................................................................... 33
Section 1.05    Acts of Holders .............................................................................................. 33

## ARTICLE 2

### THE NOTES

Section 2.01    Form and Dating; Terms ............................................................................... 34
Section 2.02    Execution and Authentication ....................................................................... 36
Section 2.03    Registrar and Paying Agent ........................................................................... 37
Section 2.04    Paying Agent To Hold Money in Trust ......................................................... 37
Section 2.05    Holder Lists .................................................................................................... 37
Section 2.06    Transfer and Exchange ................................................................................... 38
Section 2.07    Replacement Notes ......................................................................................... 50
Section 2.08    Outstanding Notes .......................................................................................... 50
Section 2.09    Treasury Notes ............................................................................................... 51
Section 2.10    Temporary Notes ........................................................................................... 51
Section 2.11    Cancellation .................................................................................................... 51
Section 2.12    Defaulted Interest .......................................................................................... 52
Section 2.13    CUSIP and ISIN Numbers ............................................................................ 52

## ARTICLE 3

### REDEMPTION

Section 3.01    Notices to Trustee .......................................................................................... 52
Section 3.02    Selection of Notes To Be Redeemed or Purchased ....................................... 53
Section 3.03    Notice of Redemption .................................................................................... 53
Section 3.04    Effect of Notice of Redemption .................................................................... 54
Section 3.05    Deposit of Redemption or Purchase Price ..................................................... 54
Section 3.06    Notes Redeemed or Purchased in Part .......................................................... 55
Section 3.07    Optional Redemption ..................................................................................... 55
Section 3.08    Mandatory Redemption .................................................................................. 56
Section 3.09    Offers to Repurchase by Application of Excess Proceeds ............................ 56
Section 3.10    Special Mandatory Redemption ..................................................................... 57

Page

# ARTICLE 4

## COVENANTS

Section 4.01    Payment of Notes ................................................................................. 58
Section 4.02    Maintenance of Office or Agency .......................................................... 58
Section 4.03    Reports and Other Information .............................................................. 59
Section 4.04    Compliance Certificate .......................................................................... 60
Section 4.05    Taxes ..................................................................................................... 60
Section 4.06    Stay, Extension and Usury Laws ........................................................... 61
Section 4.07    Limitation on Restricted Payments ........................................................ 61
Section 4.08    Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries .............. 66
Section 4.09    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock
                and Preferred Stock ............................................................................... 68
Section 4.10    Asset Sales ............................................................................................ 73
Section 4.11    Transactions with Affiliates ................................................................... 75
Section 4.12    Liens ..................................................................................................... 77
Section 4.13    Changes in Covenants When Notes Rated Investment Grade ................ 78
Section 4.14    Offer To Repurchase upon Change of Control ...................................... 79
Section 4.15    Limitation on Guarantees of Indebtedness by Restricted Subsidiaries ......... 81
Section 4.16    Escrow of Proceeds ............................................................................... 82
Section 4.17    Tax Treatment of the Notes ................................................................... 82
Section 4.18    Non-Impairment of Security Interest ..................................................... 83
Section 4.19    Activities of the Escrow Issuer prior to the Release Date and Assumption ........... 83
Section 4.20    After-Acquired Collateral; Further Assurances ..................................... 83
Section 4.21    Information Regarding Collateral ........................................................... 84
Section 4.22    Maintenance of Property; Insurance ....................................................... 84

# ARTICLE 5

## SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of All or Substantially All Assets ................ 84
Section 5.02    Successor Corporation Substituted ........................................................ 86

# ARTICLE 6

## DEFAULTS AND REMEDIES

Section 6.01    Events of Default ................................................................................... 86
Section 6.02    Acceleration .......................................................................................... 89
Section 6.03    Other Remedies ..................................................................................... 89
Section 6.04    Waiver of Past Defaults ......................................................................... 89
Section 6.05    Control by Majority ............................................................................... 90
Section 6.06    Limitation on Suits ................................................................................ 90
Section 6.07    Rights of Holders of Notes To Receive Payment ................................. 90
Section 6.08    Collection Suit by Trustee ..................................................................... 90
Section 6.09    Restoration of Rights and Remedies ...................................................... 91
Section 6.10    Rights and Remedies Cumulative .......................................................... 91
Section 6.11    Delay or Omission Not Waiver .............................................................. 91

Page

Section 6.12    Trustee May File Proofs of Claim ........................................................................... 91
Section 6.13    Priorities ............................................................................................................... 92
Section 6.14    Undertaking for Costs ........................................................................................... 92

ARTICLE 7

TRUSTEE

Section 7.01    Duties of Trustee .................................................................................................. 92
Section 7.02    Rights of Trustee .................................................................................................. 93
Section 7.03    Individual Rights of Trustee .................................................................................. 95
Section 7.04    Trustee's Disclaimer ............................................................................................. 95
Section 7.05    Notice of Defaults ................................................................................................. 95
Section 7.06    Reports by Trustee to Holders of the Notes ........................................................... 95
Section 7.07    Compensation and Indemnity ................................................................................ 96
Section 7.08    Replacement of Trustee ........................................................................................ 96
Section 7.09    Successor Trustee by Merger, etc. ......................................................................... 97
Section 7.10    Eligibility; Disqualification ................................................................................... 97
Section 7.11    Preferential Collection of Claims Against Issuer ..................................................... 98
Section 7.12    Escrow Authorization ........................................................................................... 98
Section 7.13    Authorization of Security Documents; Intercreditor Agreements ............................... 98

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance ..................................... 98
Section 8.02    Legal Defeasance and Discharge ........................................................................... 99
Section 8.03    Covenant Defeasance ........................................................................................... 99
Section 8.04    Conditions to Legal or Covenant Defeasance ......................................................... 100
Section 8.05    Deposited Money and Government Securities to Be Held in Trust; Other
                Miscellaneous Provisions ...................................................................................... 101
Section 8.06    Repayment to Issuer ............................................................................................. 101
Section 8.07    Reinstatement ...................................................................................................... 102

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes ..................................................................... 102
Section 9.02    With Consent of Holders of Notes ......................................................................... 103
Section 9.03    Compliance with Trust Indenture Act .................................................................... 106
Section 9.04    Revocation and Effect of Consents ........................................................................ 106
Section 9.05    Notation on or Exchange of Notes ......................................................................... 106
Section 9.06    Trustee To Sign Amendments, etc. ........................................................................ 106
Section 9.07    Payment for Consent ............................................................................................ 107

Page

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01   Collateral and Security Documents ........................................................................ 107
Section 10.02   Recordings and Opinion ...................................................................................... 108
Section 10.03   Release of Collateral ........................................................................................... 108
Section 10.04   Suits To Protect the Collateral ............................................................................ 110
Section 10.05   Authorization of Receipt of Funds by the Trustee Under the Security
                Documents ............................................................................................................. 110
Section 10.06   Purchaser Protected ............................................................................................. 110
Section 10.07   Powers Exercisable by Receiver or Trustee ....................................................... 110
Section 10.08   Release Upon Termination of the Issuer's Obligations ....................................... 110
Section 10.09   Collateral Agent ................................................................................................... 111
Section 10.10   Designations ......................................................................................................... 117

ARTICLE 11

GUARANTEES

Section 11.01   Guarantee ............................................................................................................. 117
Section 11.02   Limitation on Guarantor Liability ....................................................................... 119
Section 11.03   Execution and Delivery ....................................................................................... 119
Section 11.04   Subrogation .......................................................................................................... 120
Section 11.05   Benefits Acknowledged ....................................................................................... 120
Section 11.06   Release of Guarantees .......................................................................................... 120

ARTICLE 12

SATISFACTION AND DISCHARGE

Section 12.01   Satisfaction and Discharge .................................................................................. 120
Section 12.02   Application of Trust Money ................................................................................. 121

ARTICLE 13

MISCELLANEOUS

Section 13.01   Trust Indenture Act Controls ............................................................................... 122
Section 13.02   Notices .................................................................................................................. 122
Section 13.03   Communication by Holders of Notes with Other Holders of Notes .................... 123
Section 13.04   Certificate and Opinion as to Conditions Precedent ........................................... 123
Section 13.05   Statements Required in Certificate or Opinion .................................................... 123
Section 13.06   Rules by Trustee and Agents ............................................................................... 124
Section 13.07   No Personal Liability of Directors, Officers, Employees and Stockholders ....... 124
Section 13.08   Governing Law ..................................................................................................... 124
Section 13.09   Waiver of Jury Trial ............................................................................................ 124
Section 13.10   Force Majeure ...................................................................................................... 124
Section 13.11   No Adverse Interpretation of Other Agreements ................................................ 124
Section 13.12   Successors ............................................................................................................ 125
Section 13.13   Severability .......................................................................................................... 125

-iv-

Page

Section 13.14    Counterpart Originals ................................................................................. 125
Section 13.15    Table of Contents, Headings, etc. ........................................................... 125
Section 13.16    Qualification of Indenture ....................................................................... 125
Section 13.17    Direction by Holders to Enter into Security Documents, the First Lien
                 Intercreditor Agreement and any Second Lien Intercreditor Agreement ............... 125

EXHIBITS

Exhibit A    Form of Note
Exhibit B    Form of Certificate of Transfer
Exhibit C    Form of Certificate of Exchange
Exhibit D    Form of Supplemental Indenture to Be Delivered by Subsequent Guarantors
Exhibit E    Form of Supplemental Indenture Relating to the Assumption
Exhibit F    Form of Certificate from Acquiring Accredited Investor

INDENTURE, dated as of December 1, 2010, between AMO Escrow Corporation, a Delaware corporation (the "*Escrow Issuer*") and Wilmington Trust FSB, as trustee (together with its successors and assigns, in such capacity, the "*Trustee*") and as collateral agent (together with its successors and assigns, in such capacity, the "*Collateral Agent*").  For purposes of this Indenture prior to the Assumption (as defined herein), references to the "*Issuer*" in this Indenture refer only to the Escrow Issuer, and for purposes of this Indenture following the Assumption, references to the "*Issuer*" in this Indenture refer only to American Media Operations, Inc., a Delaware corporation, and not any of its Subsidiaries.

W I T N E S S E T H:

WHEREAS, the Issuer has duly authorized the creation of an issue of $385,000,000 aggregate principal amount of 11½% First Lien Senior Secured Notes due 2017 ("*Initial Notes*");

WHEREAS, the Issuer has duly authorized the execution and delivery of this Indenture.

NOW, THEREFORE, the Issuer, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes.

ARTICLE 1

DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto, bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that shall be issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of Notes sold in reliance on Rule 144A.

"*Accredited Investor*" means an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act).

"*Acquired Indebtedness*" means, with respect to any specified Person, Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Interest*" means all additional interest, if any, then owing with respect to the Notes pursuant to the Registration Rights Agreement.

"*Additional Notes*" means additional Notes (other than the Initial Notes and Exchange Notes) issued from time to time under this Indenture in accordance with Sections 2.01 and 4.09 hereof.

"*Additional Pari Passu Lien Indebtedness*" means Indebtedness permitted to be incurred under Section 4.09 hereof and under the Credit Agreement which is by its terms intended to be secured on a *pari passu* basis with the Liens securing the Notes; *provided* such Lien is permitted to be incurred under this Indenture and the Credit Agreement and such Indebtedness has a stated maturity that is no earlier than the stated maturity of the Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar or Paying Agent.

"*AMI*" means American Media, Inc., a Delaware corporation, and its successors and assigns.

"*AMO*" means American Media Operations, Inc., a Delaware corporation, and its successors and assigns.

"*Applicable Premium*" means, with respect to any Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Note; and

(2)    the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at December 15, 2013 (such redemption price being set forth in the table appearing in Section 3.07 hereof), plus (ii) all required interest payments due on such Note through December 15, 2013 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and/or Clearstream that apply to such transfer or exchange.

"*Asset Sale*" means:

(1)    the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Leaseback Transaction) of the Issuer or any of the Restricted Subsidiaries (each referred to in this definition as a "disposition"); or

(2)    the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 4.09);

in each case, other than:

(a)    any disposition of Cash Equivalents or obsolete or worn out equipment in the ordinary course of business or any disposition of inventory or goods (or other assets) in the ordinary course of business;

(b)    the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 hereof or any disposition that constitutes a Change of Control pursuant to this Indenture;

(c)        the making of any Restricted Payment or any Permitted Investment that is permitted to be made, and is made, pursuant to Section 4.07 hereof;

(d)        any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $7.5 million;

(e)        any disposition of property or assets or issuance of securities (i) by a Guarantor to the Issuer or by the Issuer or a Guarantor to another Guarantor or (ii) by a Restricted Subsidiary that is not a Guarantor to the Issuer, a Guarantor or to another Restricted Subsidiary that is not a Guarantor;

(f)        to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)        the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(h)        any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary other than to the extent that the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder;

(i)        solely for the purposes of clauses (1) and (2) of Section 4.10(a), foreclosures, condemnation or any similar action on assets;

(j)        the granting of Liens not prohibited by this Indenture;

(k)        the licensing or sublicensing of intellectual property or other general intangibles in the ordinary course of business; and

(l)        solely for the purposes of clauses (1) and (2) of Section 4.10(a), any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business.

"*Assumption*" means the consummation of the transactions whereby (a) AMO will assume all of the obligations of the Escrow Issuer under this Indenture, the Registration Rights Agreement, the Security Documents and the Intercreditor Agreements, (b) each of the Guarantors will guarantee the Notes and become a party to the Registration Rights Agreement, the Security Documents and the Intercreditor Agreements and (c) to the extent AMO assumes the obligations of the Escrow Issuer other than by merger, the Escrow Issuer is released from the obligations under this Indenture.  The Assumption is to be effected by the execution and delivery of a supplemental indenture in the form of Exhibit E attached hereto (which shall be accompanied by the delivery of the Officers' Certificate and Opinion of Counsel required by Section 9.06 hereof).

"*Bankruptcy Code*" means Title 11 of the U.S. Code.

"*Bankruptcy Law*" means Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors.

"*Board of Directors*" means:

-3-

(1)      with respect to a corporation, the board of directors of the corporation;

(2)      with respect to a partnership, the board of directors of the general partner of the partnership; and

(3)      with respect to any other Person, the board or committee of such Person serving a similar function.

"*Board Resolution*" means, with respect to the Issuer, a duly adopted resolution of the Board of Directors of the Issuer or any committee thereof.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

(1)      in the case of a corporation, corporate stock;

(2)      in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)      in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)      any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Equivalents*" means:

(1)      United States dollars;

(2)      (a) euro, or any national currency of any participating member of the EMU; or (b) in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

(3)      securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or issued by any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(4)      certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

-4-

(5)    repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6)    commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8)    investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)    Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above, *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Cash Management Bank*" means any Credit Agreement Lender or an Affiliate of a Credit Agreement Lender (together with its successors and assigns) providing Cash Management Services to the Issuer or any Guarantor.

"*Cash Management Obligations*" means all obligations owing by the Issuer or any Guarantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documents governing the Cash Management Services, whether or not a claim for post-petition interest or fees is allowed or allowable in any such Insolvency or Liquidation Proceeding), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Issuer or such Guarantor with the terms, conditions and agreements of such Cash Management Services.

"*Cash Management Services*" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

"*Change of Control*" means the occurrence of any of the following:

(1)      the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, other than to a Permitted Holder or to a Person with respect to which the Permitted Holders have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of such Person or any direct or indirect holding company of such Person;

(2)      (A) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), other than the Permitted Holders, has become the "beneficial owner" (as defined in Rules 13d-3 of the Exchange Act, or any successor provision), by way of merger, consolidation or other business combination or purchase, of 50% or more of the total voting power of the Voting Stock of the Issuer or any direct or indirect parent company holding directly or indirectly 100% of the total voting power of the Voting Stock of the Issuer and (B) the Permitted Holders do not have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the Board of Directors of the Issuer or such parent company; or

(3)      the adoption by the stockholders of the Issuer of a plan or proposal for the liquidation or dissolution of the Issuer.

"*Clearstream*" means Clearstream Banking, Société Anonyme, and its successors.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor statute.

"*Collateral*" means all of the property and assets whether now owned or hereafter acquired, in each case, in which Liens are, from time to time, purported to be granted to secure the Obligations under the Notes and the Guarantees pursuant to the Security Documents, other than Excluded Assets.

"*Collateral Agent*" has the meaning assigned to such term in the preamble to this Indenture.

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Issuer and its consolidated Restricted Subsidiaries (other than with respect to interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense), plus, to the extent incurred by the Issuer and its Restricted Subsidiaries in such period but not included in such interest expense:

(a)      interest expense attributable to Capitalized Lease Obligations and the interest expense attributable to leases constituting part of a Sale and Lease-back Transaction,

(b)      amortization of debt discount and debt issuance costs,

(c)      capitalized interest,

(d)      commissions, discounts and other fees and charges attributable to letters of credit and bankers' acceptance financing,

(e)      interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is guaranteed by (or secured by the assets of) the Issuer or any Restricted Subsidiary,

(f)      net costs associated with Hedging Obligations,

-6-

(g)    dividends in respect of all Disqualified Stock of the Issuer and all Preferred Stock of any of the Restricted Subsidiaries of the Issuer, to the extent held by Persons other than the Issuer or a Wholly Owned Subsidiary,

(h)    interest incurred in connection with investments in discontinued operations, and

(i)    the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Issuer) in connection with Indebtedness incurred by such plan or trust.

Notwithstanding anything to the contrary contained herein, commissions, discounts, yield and other fees and charges incurred in connection with any transaction pursuant to which the Issuer or any Subsidiary of the Issuer may sell, convey or otherwise transfer or grant a security interest in any accounts receivable or related assets shall be included in Consolidated Interest Expense.

"*Consolidated Leverage Ratio*" as of any date of determination means the ratio of:

(a)    Total Consolidated Indebtedness as of the date of determination to

(b)    the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters ending at the end of the most recent fiscal quarter for which internal financial statements are available,

*provided*, *however*, that

(i)    if the Issuer or any Restricted Subsidiary has incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is an incurrence of Indebtedness, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving effect on a pro forma basis to such Indebtedness as if such Indebtedness had been incurred on the first day of such period and the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the date of such calculation shall be deemed to be (i) the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation, in each case, *provided* that such average daily balance shall take into account any repayment of Indebtedness under such facility as provided in clause (ii)),

(ii)    if the Issuer or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Leverage Ratio, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated on a pro forma basis as if such discharge had occurred on the first day of such period and as if the Issuer or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness,

(iii)    if since the beginning of such period the Issuer or any Restricted Subsidiary shall have made any Asset Sale, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets that were the subject of such Asset Sale for such period or increased by an amount equal to EBITDA (if negative) directly attributable thereto for such period and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Issuer or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Issuer and its continuing Restricted Subsidiaries in connection with such Asset Sale for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Issuer and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale),

(iv)    if since the beginning of such period the Issuer or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto (including the incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period, and

(v)    if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by the Issuer or a Restricted Subsidiary during such period, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto as if such Asset Sale, Investment or acquisition of assets had occurred on the first day of such period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness incurred in connection therewith, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Issuer; *provided* that any such pro forma calculations with respect to cost savings, operating expense reductions or synergies for such period shall be limited to those resulting from the transaction which is being given pro forma effect that in the reasonable determination of a responsible financial or accounting Officer of the Issuer (a) are reasonably identifiable and factually supportable and (b) such actions have been realized or for which the steps necessary for realization have been taken or are reasonably expected to be taken within twelve months following any such transaction, including, but not limited to, the execution or termination of any contracts, the termination of any personnel or the closing (or approval by the Board of Directors of any closing) of any facility, as applicable. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness).

"*Consolidated Net Income*" means, for any period, the net income (excluding non-controlling interest) of the Issuer and its Restricted Subsidiaries for such period; *provided, however,* that there shall not be included in such Consolidated Net Income:

(a)    any net income of any Person (other than the Issuer) if such Person is not a Restricted Subsidiary, except that

(i)    subject to the limitations contained in clause (d) below, the Issuer's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Person during such period to the Issuer or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to a Restricted Subsidiary (other than a Guarantor), to the limitations contained in clause (b) below) and

(ii)    the Issuer's equity in a net loss of any such Person for such period shall be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Issuer or a Restricted Subsidiary;

(b)    except for the purposes of calculating Consolidated Leverage Ratio, any net income (or loss) of any Restricted Subsidiary (other than any Guarantor) if such Restricted Subsidiary is not permitted by restrictions, directly or indirectly, to pay dividends or make distributions (unless legally waived) to the Issuer, except that

(i)    the net income of any such Restricted Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Restricted Subsidiary during such period to the Issuer or another Restricted Subsidiary as a dividend, debt repayment or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to another Restricted Subsidiary (other than a Guarantor), to the limitation contained in this clause) and

(ii)    the net loss of any such Restricted Subsidiary for such period shall be included in determining such Consolidated Net Income;

(c)    any gain (loss) realized (less all fees and expenses related thereto) upon the sale or other disposition of any asset of the Issuer or its consolidated Subsidiaries (including pursuant to any Sale and Lease-back Transaction) that is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(d)    any extraordinary, non-recurring or unusual gain or loss or expense (less all fees and expenses related thereto);

(e)    the cumulative effect of a change in accounting principles;

(f)    effects of adjustments (including the effects of such adjustments pushed down to the Issuer and its Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill and other intangible assets and in process research and development, deferred revenue and debt line items in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes;

(g)    any net after-tax income (loss) from the early extinguishment of (i) Indebtedness, (ii) Hedging Obligations or (iii) other derivative instruments;

-9-

(h)    any net after-tax income or loss from abandoned, closed or discontinued operations and any net after-tax gains or losses on disposal of abandoned, closed or discontinued operations;

(i)    any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in the law or regulation, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP; and

(j)    any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, disposition, recapitalization, Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any other such transaction consummated prior to the Release Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)    to advance or supply funds

(a)    for the purchase or payment of any such primary obligation, or

(b)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Corporate Trust Office of the Trustee*" shall be at the address of the Trustee specified in Section 13.02 hereof or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"*Covenant Suspension*" means, during any period of time following the issuance of the Notes, that (i) the Notes have Investment Grade Ratings from both Rating Agencies and (ii) no Default has occurred and is continuing under this Indenture.

"*Credit Agreement*" means the credit agreement to be entered into on or about the Release Date, among AMI, the Issuer, the lenders and the administrative agent for such lenders, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or

-10-

indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under Section 4.09 hereof).

"*Credit Agreement Lenders*" means the "Lenders" from time to time party to, and as defined in, the Credit Agreement, together with their respective successors and assigns; *provided* that the term "Credit Agreement Lender" shall in any event also include each letter of credit issuer and swingline lender under the Credit Agreement, including, without limitation, the "Issuing Bank," the "Swingline Lender" and any "Agent" under (and each as defined in) the Credit Agreement.

"*Custodian*" means the Trustee, as custodian with respect to the Global Notes, or any successor entity thereto.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06(c) hereof, substantially in the form of Exhibit A hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto.

"*Depositary*" means, with respect to the Global Notes, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Issuer, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided*, *however*, that if such Capital Stock is issued to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Capital Stock held by any future, current or former employee, director, manager or consultant (or their respective trusts, estates, investment funds, investment vehicles or immediate family members) of the Issuer, any of its Subsidiaries or any direct or indirect parent entity of the Issuer in each case upon the termination of employment or death of such person pursuant to any stockholders' agreement, management equity plan, stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries.

"*EBITDA*" for any period means the Consolidated Net Income of the Issuer and its Restricted Subsidiaries for such period, *plus*, without duplication, the following to the extent deducted in calculating such Consolidated Net Income:

(a)    Consolidated income tax expense,

(b)    Consolidated Interest Expense,

(c)    Consolidated depreciation expense,

(d)    Consolidated amortization expense (including amortization associated with capitalized or short-term display rack costs and the recognition of such costs as a deferred cost asset amortized as contra-revenue),

(e)    any interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense,

(f)    any expenses or charges related to any Equity Offering, Permitted Investment, acquisition or Indebtedness permitted to be incurred by this Indenture (whether or not successful),

(g)    any expense or charge incurred or recorded by the Issuer or any of its Subsidiaries in connection with (i) Asset Sales or (ii) reorganization and other cost cutting efforts, including, without limitation, expenses and charges relating to severance, relocation and the discontinuation of titles,

(h)    any non-cash charges (including any non-cash compensation charge or expense) reducing Consolidated Net Income for such period (excluding any such charge which consists of or requires an accrual of, or cash reserve for, any anticipated cash charges for any prior or in any future period),

(i)    any charges or credits relating to the adoption of fresh start accounting principles; and

(j)    solely for purposes of calculating the Consolidated Leverage Ratio, the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income.

"*Emergence Transactions*" means all transactions relating to the Reorganization Plan and AMO's emergence from Chapter 11 of the Bankruptcy Code, including, but not limited to, closing of the Exit Financing.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Enforcement Notice*" shall have the meaning assigned to such term in the First Lien Intercreditor Agreement.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of the Issuer or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)      public offerings with respect to the Issuer's or any direct or indirect parent company's common stock registered on Form S-8;

(2)      issuances to any Subsidiary of the Issuer; and

(3)      any such public or private sale that constitutes an Excluded Contribution.

"*Escrow Agent*" means Wilmington Trust FSB, as escrow agent under the Escrow Agreement or any successor escrow agent as set forth in the Escrow Agreement.

"*Escrow Agreement*" means the Escrow Agreement to be dated as of the Issue Date, among the Escrow Issuer, AMO, the Trustee and the Escrow Agent, as amended, supplemented, modified, extended, renewed, restated or replaced in whole or in part from time to time.

"*Escrow End Date*" means January 30, 2011; *provided* that the Escrow Issuer may elect to extend the Escrow End Date to March 6, 2011 so long as, not later than five Business Days prior to January 30, 2011, (i) it provides prior written notice to the Escrow Agent and the Trustee and has issued a press release stating that it has extended the Escrow End Date and (ii) AMO or the Escrow Issuer has deposited cash or Escrow Investments into escrow with the Escrow Agent, to be held pursuant to the terms of the Escrow Agreement, in an amount sufficient to fund the redemption price due on the latest permitted date for the revised Special Mandatory Redemption in respect of all outstanding Notes and has certified in writing that such amounts will be satisfactory for such purpose.

"*Escrow Investment*" means (1) Government Securities, (2) investments in time deposit accounts, certificates of deposit and money market deposits maturing no later than the Escrow End Date in each case, entitled to U.S. Federal deposit insurance for the full amount thereof or issued by a bank or trust company (including the Escrow Agent or an affiliate of the Escrow Agent) which is organized under the laws of the United States of America or any State thereof having capital, surplus and undivided profits aggregating in excess of $500.0 million and (3) repurchase obligations maturing no later than the Escrow End Date entered into with a nationally recognized broker-dealer, with respect to which the purchase securities are Obligations issued or guaranteed by the United States government or any agency thereof, which repurchase Obligations shall be entered into pursuant to written agreements.

"*Escrow Issuer*" has the meaning assigned to such term in the preamble to this Indenture.

"*euro*" means the single currency of participating member states of the EMU.

"*Euroclear*" means Euroclear Bank S.A./N.V., as operator of the Euroclear system, and its successors.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Exchange Notes*" means any Notes issued in exchange for Notes pursuant to the Registration Rights Agreement or similar agreement.

"*Exchange Offer*" has the meaning set forth in the Registration Rights Agreement.

"*Excluded Contribution*" means the amount of net cash proceeds, marketable securities or Qualified Proceeds received by the Issuer after the Release Date from (1) contributions to its common equity capital and (2) the sale (other than to a Subsidiary of the Issuer or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Issuer or any of its direct or indirect parents) of Capital Stock (other than Disqualified Stock) of the Issuer, in each case designated as an Excluded Contribution pursuant to an Officers' Certificate on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of Section 4.07(a)(IV) hereof.

"*Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be comprised of the Credit Agreement, the Notes and the Second Lien Notes.

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Issuer in good faith; *provided* that if the fair market value is equal to or exceeds $25.0 million, such determination shall be made by the Board of Directors of the Issuer.

"*First Lien Credit Documents*" means the Credit Agreement, the other Loan Documents (as defined in the Credit Agreement), and each of the other agreements, documents, and instruments providing for or evidencing any other First Lien Obligation and any other document or instrument executed or delivered at any time in connection with any First Lien Obligation (including any intercreditor or joinder agreement among holders of First Lien Obligations but excluding Secured Hedge Agreements and the documents governing the Cash Management Obligations), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from time to time.

"*First Lien Documents*" means this Indenture, the First Lien Credit Documents, the Secured Hedge Agreements, and any and all documents governing the Cash Management Obligations.

"*First Lien Intercreditor Agreement*" means the First Lien Intercreditor Agreement dated on or about the Release Date among the Collateral Agent, the collateral agent in respect of the Credit Agreement, the Issuer, AMI and each other Guarantor named therein, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*First Lien Leverage Ratio*" means the ratio of (1) the aggregate principal amount of Pari Passu Lien Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "*Consolidated Leverage Ratio*" in performing a calculation thereof.

"*First Lien Obligations*" means (i) all Obligations arising under (and as defined in) the Credit Agreement of the Issuer and the Guarantors, under any other document relating to the Credit Agreement incurred under Section 4.09(b)(1) hereof, (ii) all Obligations under this Indenture, (iii) all Secured Hedging Obligations and (iv) all Cash Management Obligations; *provided* that the aggregate principal amount of, without duplication, revolving credit loans, letters of credit, term loans, other loans, notes or similar instruments (excluding, in any event, Cash Management Obligations and Secured Hedging Obligations) provided for under the Credit Agreement or any other document relating to the Credit Agreement (or any refinancing thereof) in excess of the amount permitted under Section 4.09(b)(1) hereof and any interest relating to such excess amount, shall not constitute First Lien Obligations for purposes of this Indenture. "First Lien Obligations" shall in any event include (a) all interest accrued or accruing, or

which would accrue, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), on or after the commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Document, whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the First Lien Representative and the First Lien Secured Parties on or after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed or allowable under Section 502 or 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors as a claim in such Insolvency or Liquidation Proceeding, and (c) all obligations and liabilities of the Issuer and each Guarantor under each First Lien Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due and payable.

"*First Lien Representative*" means, as between collateral agents representing different series of First Lien Obligations, the collateral agent representing the series of First Lien Obligations with the greatest outstanding principal amount.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Issue Date. At any time after the Issue Date, the Issuer may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Indenture); *provided* that any such election, once made, shall be irrevocable; *provided*, *further*, any calculation or determination in this Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Issuer's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Issuer shall give written notice of any such election made in accordance with this definition to the Trustee and the Holders of the Notes.

"*Global Note Legend*" means the legend set forth in Section 2.06(g)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, substantially in the form of <u>Exhibit A</u> hereto, issued in accordance with Section 2.01, 2.06(b), 2.06(d), 2.06(f) or 2.07 hereof.

"*Government Securities*" means securities that are:

      (1)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

      (2)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository

receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*Grantors*" means the Issuer and the Guarantors.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under this Indenture and the Notes.

"*Guarantor*" means each Restricted Subsidiary that guarantees the Notes in accordance with the terms of this Indenture.

"*Hedge Bank*" means any Person that is a Credit Agreement Lender or an Affiliate of a Credit Agreement Lender at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, and such Person's successors and assigns.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate or currency risks either generally or under specific contingencies.

"*Holder*" means the Person in whose name a Note is registered on the Registrar's books.

"*IAI Global Note*" means a global note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of Initial Notes sold to Accredited Investors.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1)    any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)    in respect of borrowed money;

(b)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)    representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in

-16-

the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d)        representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)        to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3)        to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person but only to the extent of the fair market value of the assets subject to such Lien;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include Contingent Obligations incurred in the ordinary course of business.

"*IFRS*" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" shall have the meaning given to it in the recitals hereto.

"*Initial Purchasers*" means J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Credit Suisse Securities (USA) LLC.

"*Insolvency or Liquidation Proceeding*" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to the Issuer or any Guarantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to the Issuer or any Guarantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of the Issuer or any Guarantor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Issuer or any Guarantor.

"*Intercreditor Agreements*" means the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

-17-

"*Interest Payment Date*" means June 15 and December 15 of each year to stated maturity (*provided* that if any such day is not a Business Day, interest shall be paid on the next succeeding Business Day and no interest shall accrue for the intervening period in respect of such Interest Payment Date).

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, in each case, with a stable or better outlook, or an equivalent rating by any other Rating Agency.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.07 hereof:

(1)    "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Issuer's "Investment" in such Subsidiary at the time of such redesignation; *less*

(b)    the portion (proportionate to the Issuer equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

"*Issue Date*" means the date Initial Notes are issued under this Indenture.

"*Issuer*" has the meaning assigned to such term in the preamble to this Indenture.

"*Issuer Order*" means a written request or order signed on behalf of the Issuer by any Officer of the Issuer and delivered to the Trustee.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the States of New York, Minnesota and Delaware. If a payment date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period in respect of such payment date.

"*Letter of Transmittal*" means the letter of transmittal to be prepared by the Issuer and sent to all Holders of the Notes for use by such Holders in connection with the Exchange Offer.

-18-

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for informational purposes); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Proceeds*" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale, including any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale, net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness required (other than required by clause (1) of Section 4.10(b) hereof) to be paid as a result of such transaction, amounts required to be paid to minority interest holders in Restricted Subsidiaries as a result of such Asset Sale, any portion of the purchase price from such Asset Sale placed in escrow as a requirement of such Asset Sale (but only for the duration of such escrow), and any deduction of appropriate amounts to be provided by the Issuer or any of the Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer or any of the Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

"*Notes*" means the Initial Notes, any Exchange Notes and any Additional Notes issued under this Indenture.

"*Obligations*" means any principal (including any accretion), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal (including accretion), interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the final offering memorandum, dated November 16, 2010, relating to the sale of the Initial Notes.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"*Officers' Certificate*" means a certificate signed on behalf of the Issuer by any two Officers of the Issuer, one of whom must be one of the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, that meets the requirements set forth in this Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer.

"*Pari Passu Lien Indebtedness*" means (i) the Notes, (ii) Indebtedness under the Credit Agreement and (iii) Additional Pari Passu Lien Indebtedness.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Participating Broker-Dealer*" has the meaning set forth in the Registration Rights Agreement.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with Section 4.10 hereof.

"*Permitted Holders*" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Management II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) Regiment Capital Management, LLC, (vi) [reserved], (vii) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any successor provision) of which any of the Permitted Holders specified in clauses (i)-(v) above are members, and (viii) the respective Affiliates of each of the foregoing; *provided* that in the case of any group specified in clause (vii) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(v) above and their respective Affiliates must collectively beneficially own a greater amount of the total voting power of the Voting Stock of AMI than the amount of the total voting power of the Voting Stock of AMI beneficially owned by any other member of such group.

"*Permitted Investments*" means:

(1)    any Investment in the Issuer or any of its Restricted Subsidiaries;

(2)    any Investment in cash and Cash Equivalents;

(3)    any Investment by the Issuer or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)    such Person becomes a Restricted Subsidiary; or

(b)    such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

-20-

(4)    any Investment in securities or other assets not constituting cash or Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.10 hereof or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on the Release Date;

(6)    any Investment acquired by the Issuer or any of its Restricted Subsidiaries:

(a)    in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b)    as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)    Hedging Obligations permitted under clause (10) of Section 4.09(b) hereof;

(8)    any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed the greater of (x) $25.0 million and (y) 3.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)    Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer, or any of its direct or indirect parent companies; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of Section 4.07(a) hereof;

(10)    guarantees of Indebtedness permitted under Section 4.09 hereof;

(11)    any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of Section 4.11 hereof (except transactions described in clauses (2), (5) and (16) of Section 4.11(b) hereof);

(12)    additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (12) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed the greater of (x) $40.0 million and (y) 5.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(13)    loans and advances to, or guarantees of Indebtedness of, officers, directors and employees in an amount not to exceed $5.0 million at any time outstanding;

(14)    loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business; and

(15)     prepaid expenses, deposits, advances, loans or extensions of trade credit in the ordinary course of business by the Issuer or any Restricted Subsidiaries.

"*Permitted Liens*" means, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(2)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental, to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)     (i) Liens securing Indebtedness under the Credit Agreement incurred pursuant to clause (1) of Section 4.09(b) hereof (and the related guarantees) and (ii) Liens securing Indebtedness permitted to be incurred pursuant to clause (4) of Section 4.09(b) hereof covering only the property (real or personal) or equipment (other than software), whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, in each case, financed by or acquired with such Indebtedness;

(7)     Liens existing on the Release Date (other than Liens in favor of secured parties under the Credit Agreement) including Liens securing the Second Lien Notes issued on or prior to the Release Date; *provided* that such Second Lien Notes are subject to the Second Lien Intercreditor Agreement;

(8)     Liens on property or shares of stock or other assets of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, such Liens are not created or incurred in con-

-22-

nection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property or assets owned by the Issuer or any of its Restricted Subsidiaries;

(9)    Liens on property or other assets at the time the Issuer or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided*, *however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided*, *further*, *however*, that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with Section 4.09 hereof;

(11)    Liens securing Hedging Obligations;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries and do not secure any Indebtedness;

(14)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15)    Liens in favor of the Issuer or any Guarantor;

(16)    Liens on equipment of the Issuer or any of its Restricted Subsidiaries granted in the ordinary course of business to the Issuer's clients not related to Indebtedness;

(17)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided*, *however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under the foregoing clauses (6), (7), (8) and (9) at the time the original Lien became a Permitted Lien under this Indenture, and (ii) an amount necessary to pay any accrued interest and fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(18)    deposits made in the ordinary course of business to secure liability to insurance carriers;

-23-

(19)    other Liens that are not on Collateral securing obligations incurred in the ordinary course of business which obligations do not exceed $10.0 million at any one time outstanding;

(20)    Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) of Section 6.01(a) hereof, so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(21)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(22)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or any comparable or successor provision) on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(23)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 4.09 hereof; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(24)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(25)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(28)    Liens arising under this Indenture in favor of the Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred or outstanding under this Indenture, *provided* that such Liens are solely for the benefit of the trustees, agents and representatives in their capacities as such and not for the benefit of the holders of such Indebtedness;

(29)    Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under Section 4.07 hereof;

(30)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(31)    Liens on the Collateral securing the Notes issued on the Issue Date, the Guarantees thereof and other Obligations under this Indenture and in respect thereof and any obligations owing to the Trustee or the Collateral Agent under this Indenture or the Security Documents;

(32)    Liens on assets of Foreign Subsidiaries to secure Indebtedness of Foreign Subsidiaries;

(33)    Liens on the Collateral securing Additional Pari Passu Lien Indebtedness; *provided* that (x) at the time of incurrence of such Additional Pari Passu Lien Indebtedness and on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Issuer and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction is equal to or less than 2.75 to 1.0; and (y) if at the time of incurrence of such Additional Pari Passu Lien Indebtedness and on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Issuer and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction exceeds 2.75 to 1.0, such Additional Pari Passu Lien Indebtedness does not exceed $5.0 million at any time outstanding; and

(34)    Liens on the Collateral securing on a junior priority basis Indebtedness incurred pursuant to Section 4.09(a) hereof; *provided* that any such Indebtedness and guarantees shall be subject to a Second Lien Intercreditor Agreement.

In each case set forth above, notwithstanding any stated limitation on the assets that may be subject to such Lien, a Permitted Lien on a specified asset or group or type of assets may include Liens on all improvements, additions, and accessions thereto and all products and proceeds thereof, including dividends, distributions, interest and increases in respect thereof.

For purposes of this definition, the term "*Indebtedness*" shall be deemed to include interest on such Indebtedness.

"*Permitted Second Lien Obligations*" means the Second Lien Notes and any Indebtedness secured by a Lien incurred under clause (34) of the definition of "*Permitted Liens*."

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"*Priority Payment Lien Obligations*" means (i) any Indebtedness incurred pursuant to clause (1) of Section 4.09(b) hereof, (ii) Cash Management Obligations with a Cash Management Bank and (iii) Secured Hedging Obligations, in each case, so designated by the Issuer.

"*Private Placement Legend*" means the legend set forth in Section 2.06(g)(i) hereof to be placed on all Notes issued under this Indenture, except where otherwise permitted by the provisions of this Indenture.

"*Purchase Agreement*" means the purchase agreement in respect of the Initial Notes, dated as of November 16, 2010, by and between the Escrow Issuer and the Initial Purchasers.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"*Rating Agencies*" means Moody's and S&P or, if Moody's or S&P or both shall not make a rating on the Notes publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Issuer which shall be substituted for Moody's or S&P or both, as the case may be.

"*Record Date*" for the interest or Additional Interest, if any, payable on any applicable Interest Payment Date means June 1 or December 1 (whether or not a Business Day) next preceding such Interest Payment Date.

"*Registration Rights Agreement*" means the Registration Rights Agreement in respect of the Notes, to be dated as of the Issue Date, among the Initial Purchasers and the Escrow Issuer, as amended from time to time and as supplemented by the joinder to the Registration Rights Agreement to be dated as of the Release Date, among AMO and the Guarantors.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as applicable.

"*Regulation S Permanent Global Note*" means a permanent Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period.

"*Regulation S Temporary Global Note*" means a temporary Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and the Regulation S Temporary Global Note Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of the Notes initially sold in reliance on Rule 903.

"*Regulation S Temporary Global Note Legend*" means the legend set forth in Section 2.06(g)(iii) hereof.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business, *provided* that any assets received by the Issuer or a Restricted Subsidiary in exchange for assets transferred by the Issuer or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Related Person*" means, with respect to any specified Person, such Person's Affiliates, and the respective officers, directors, employees, agents, advisors and attorneys-in-fact of such Person and its Affiliates.

"*Reorganization Plan*" means the Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code of AMI and its debtor Subsidiaries (which does not include the Escrow Issuer and its direct parent) substantially consistent with the description of the Plan (as set forth in the Offering Memorandum).

"*Responsible Officer*" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture, or any other officer to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such subsidiary shall be included in the definition of "Restricted Subsidiary."

"*Reversion Date*" means, during any period of time during which the Issuer and the Restricted Subsidiaries are not subject to the covenants listed in Section 4.13(a) hereof (the "*Suspended Covenants*") as a result of a Covenant Suspension, the date on which one or both of the Rating Agencies withdraws its Investment Grade Rating or downgrades the rating assigned to the Notes below an Investment Grade Rating or a Default or Event of Default occurs and is continuing, and after which date the Suspended Covenants will thereafter be reinstated.

"*Rule 144*" means Rule 144 promulgated under the Securities Act (or any successor rule).

"*Rule 144A*" means Rule 144A promulgated under the Securities Act(or any successor rule).

"*Rule 903*" means Rule 903 promulgated under the Securities Act (or any successor rule).

"*Rule 904*" means Rule 904 promulgated under the Securities Act (or any successor rule).

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-back Transaction*" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Second Lien Collateral Agent*" means Wilmington Trust FSB, as collateral agent under the Second Lien Indenture.

"*Second Lien Indenture*" means the indenture in respect of the Second Lien Notes dated as of a date on or before the Release Date among the Issuer and the Second Lien Trustee, as amended or supplemented from time to time.

"*Second Lien Intercreditor Agreement*" means an intercreditor agreement dated as of the Release Date among the Collateral Agent, the collateral agent under the Credit Agreement, the Issuer, AMI and each other Guarantor and the Second Lien Collateral Agent.

"*Second Lien Notes*" means the up to $140,000,000 in aggregate principal amount of the Issuer's Second Lien Secured Notes due 2018 issued on or prior to the Release Date pursuant to the Second Lien Indenture.

"*Second Lien Trustee*" means Wilmington Trust FSB, as trustee for the holders of Second Lien Notes.

"*Secured Hedge Agreements*" means each agreement that governs Hedging Obligations by and between the Issuer or any Guarantor, on the one hand, and any Hedge Bank from time to time, but only to the extent such agreement is permitted under the Credit Agreement and constitutes an "Obligation" (as such term is defined under the Credit Agreement); *provided*, *however*, that such Hedging Obligations shall not, solely by virtue of constituting an "Obligation" (as so defined), also constitute Indebtedness under the Credit Agreement.

"*Secured Hedging Obligations*" means (i) obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective Secured Hedge Agreement, whether or not a claim for post-petition interest or fees is allowed in any such Insolvency or Liquidation Proceeding), of the Issuer or any Guarantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising out of or in connection with, any Secured Hedge Agreement (including all such obligations and indebtedness under any guarantee of any such Secured Hedge Agreement to which the Issuer or such Guarantor is a party) and (ii) all performance and compliance obligations by the Issuer or any Guarantor under any Secured Hedge Agreement.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the security documents granting a security interest in any assets of any Person to secure the Obligations under the Notes and the Guarantees as each may be amended, restated, supplemented or otherwise modified from time to time.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Release Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Issuer and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Subsidiary*" means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

(2)    any partnership, joint venture, limited liability company or similar entity of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and (y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TIA*" or "*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Total Assets*" means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer.

"*Total Consolidated Indebtedness*" means the aggregate amount of all Indebtedness of the Issuer and its Restricted Subsidiaries, outstanding as of such date of determination, determined on a consolidated basis, after giving effect to any incurrence of Indebtedness and the application of the proceeds therefrom giving rise to such determination (but excluding Indebtedness of the type described in clause (d) of the definition thereof and Indebtedness issued in payment of interest obligations), less up to $20.0 million of unrestricted cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of such date of determination.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 15, 2013; *provided*, *however*, that if the period from the Redemption Date to December 15, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trustee*" shall have the meaning given to it in the recitals hereto.

"*Unrestricted Definitive Note*" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a permanent Global Note, substantially in the form of Exhibit A attached hereto, that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing Notes that do not bear and are not required to bear the Private Placement Legend.

"*Unrestricted Subsidiary*" means:

(1)      any Subsidiary of the Issuer which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(2)      any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1)      any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(2)      such designation complies with Section 4.07 hereof; and

(3)      each of:

(a)      the Subsidiary to be so designated; and

(b)      its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary (other than a pledge of the Equity Interests of such Unrestricted Subsidiary).

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and the Issuer could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a) hereof.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors of the Issuer or any committee thereof giving effect to such designation (which resolution must be certified by the Secretary or an Assistant Secretary of the Issuer) and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*Unsecured Indebtedness*" means Indebtedness that is not Secured Indebtedness.

"*U.S. Person*" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)    the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2)    the sum of all such payments.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "*Action*" | 10.09 |
| "*Affiliate Transaction*" | 4.11 |
| "*Application Period*" | 4.10 |
| "*Asset Sale Offer*" | 4.10 |
| "*Asset Sale Proceeds Account*" | 4.10 |
| "*Authentication Order*" | 2.02 |
| "*Change of Control Offer*" | 4.14 |
| "*Change of Control Payment*" | 4.14 |
| "*Change of Control Payment Date*" | 4.14 |
| "*Covenant Defeasance*" | 8.03 |
| "*DTC*" | 2.03 |
| "*Escrow Account*" | 4.16 |
| "*Escrow Issuer Proceeds*" | 4.16 |
| "*Escrow Proceeds*" | 4.16 |
| "*Event of Default*" | 6.01 |

| Term | Defined in Section |
|---|---|
| "*Excess Proceeds*" | 4.10 |
| "*Exchange Offer Registration Statement*" | 4.03 |
| "*First Lien Secured Parties*" | 9.02 |
| "*incur*" or "*incurrence*" | 4.09 |
| "*Initial Lien*" | 4.12 |
| "*Legal Defeasance*" | 8.02 |
| "*Note Register*" | 2.03 |
| "*Offer Amount*" | 3.09 |
| "*Offer Period*" | 3.09 |
| "*Pari Passu Indebtedness*" | 4.10 |
| "*Paying Agent*" | 2.03 |
| "*Purchase Date*" | 3.09 |
| "*Redemption Date*" | 3.07 |
| "*Refinancing Indebtedness*" | 4.09 |
| "*Registrar*" | 2.03 |
| "*Release Date*" | 4.16 |
| "*Replacement Assets*" | 4.09 |
| "*Restricted Payments*" | 4.07 |
| "*Security Document Order*" | 10.09 |
| "*Shelf Registration Statement*" | 4.03 |
| "*Special Mandatory Redemption*" | 3.10 |
| "*Special Mandatory Redemption Date*" | 3.10 |
| "*Successor Company*" | 5.01 |
| "*Successor Person*" | 5.01 |
| "*Suspended Covenants*" | 1.01 |
| "*Treasury Capital Stock*" | 4.07 |
| "*Trigger Date*" | 3.10 |

Section 1.03    Incorporation by Reference of Trust Indenture Act.

Except as otherwise expressly provided herein prior to the qualification of this Indenture under the Trust Indenture Act, whenever this Indenture refers to a provision of the Trust Indenture Act, the provision is incorporated by reference in and made a part of this Indenture.

The following Trust Indenture Act terms used in this Indenture have the following meanings:

"indenture securities" means the Notes;

"indenture security holder" means a Holder of a Note;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Notes and the Guarantees means the Issuer and the Guarantors, respectively, and any successor obligor upon the Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the Trust Indenture Act, defined by Trust Indenture Act reference to another statute or defined by SEC rule under the Trust Indenture Act have the meanings so assigned to them.

Section 1.04    Rules of Construction.

Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    "or" is not exclusive;

(d)    words in the singular include the plural, and in the plural include the singular;

(e)    "will" shall be interpreted to express a command;

(f)    provisions apply to successive events and transactions;

(g)    references to sections of, or rules under, the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(h)    unless the context otherwise requires, any reference to an "Article," "Section" or "clause" refers to an Article, Section or clause, as the case may be, of this Indenture; and

(i)    the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision.

Section 1.05    Acts of Holders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01 hereof) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.05.

(b)    The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)	The ownership of Notes shall be proved by the Note Register.

(d)	Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(e)	The Issuer may, in the circumstances permitted by the Trust Indenture Act, set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders.  Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

(f)	Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount.  Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

(g)	Without limiting the generality of the foregoing, a Holder, including DTC that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and DTC that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

(h)	The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders.  If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date.  No such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

ARTICLE 2

THE NOTES

Section 2.01	Form and Dating; Terms.

(a)	General.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A hereto.  The Notes may have notations, legends or endorsements re-

-34-

quired by law, stock exchange rules or usage.  Each Note shall be dated the date of its authentication.  The Notes shall be in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

(b)        The terms and provisions contained in the Notes, a form of which is annexed hereto as <u>Exhibit A</u>, shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Issuer and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  Upon the consummation of the Assumption, the terms and provisions of the Guarantees will constitute, and shall expressly be made, a part of this Indenture and AMO, the Guarantors and the Trustee, by their execution and delivery of the supplemental indenture substantially in the form of <u>Exhibit E</u> hereto, shall expressly agree to such terms and provisions and to be bound thereby. Any reference to a Guarantor herein shall be deemed to be a reference thereto solely from and after the date of its execution and delivery of a supplemental indenture hereto in the form of <u>Exhibit D</u> or <u>Exhibit E</u> hereto.

(c)        <u>Global Notes</u>.  Notes issued in global form shall be substantially in the form of <u>Exhibit A</u> hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto). Notes issued in definitive form shall be substantially in the form of <u>Exhibit A</u> hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto).  Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto and each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(d)        <u>Temporary Global Notes</u>.  Notes offered and sold in reliance on Regulation S shall be issued initially in the form of the Regulation S Temporary Global Note, which shall be deposited on behalf of the purchasers of the Notes represented thereby with the Trustee, as custodian for the Depositary, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.  The Restricted Period shall be terminated upon the receipt by the Trustee of:

(i)        a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Private Placement Legend, all as contemplated by Section 2.06(b) hereof); and

(ii)        an Officers' Certificate from the Issuer.

Following the termination of the Restricted Period, beneficial interests in the Regulation S Temporary Global Note shall be exchanged for beneficial interests in the Regulation S Permanent Global Note pursuant to the Applicable Procedures.  Simultaneously with the authentication of the Regu-

lation S Permanent Global Note, the Trustee shall cancel the Regulation S Temporary Global Note.  The aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(e)  Terms.  The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is unlimited.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes shall be subject to repurchase by the Issuer pursuant to an Asset Sale Offer as provided in Section 4.10 hereof or a Change of Control Offer as provided in Section 4.14 hereof.  The Notes shall not be redeemable, other than as provided in Article 3 hereof.

Additional Notes ranking *pari passu* with the Initial Notes may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Notes and shall have the same terms as to status, redemption or otherwise as the Initial Notes; *provided* that the Issuer's ability to issue Additional Notes shall be subject to the Issuer's compliance with Section 4.09 hereof.  The Initial Notes and any Additional Notes subsequently issued under this Indenture will be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture include any Additional Notes that are actually issued.

(f)  Euroclear and Clearstream Procedures Applicable.  The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Notes that are held by Participants through Euroclear or Clearstream.

Section 2.02    Execution and Authentication.

At least one Officer shall execute the Notes on behalf of the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A hereto by the manual signature of the Trustee.  The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "*Authentication Order*"), authenticate and deliver the Initial Notes.  In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any (i) Additional Notes and

(ii) Exchange Notes for issue only in an Exchange Offer pursuant to an Exchange Offer, for a like principal amount of Notes being exchanged in such Exchange Offer. Such Authentication Order for such Additional Notes or Exchange Notes shall specify the amount of the Notes to be authenticated and, in the case of any issuance of Additional Notes pursuant to Section 2.01 hereof, shall certify that such issuance is in compliance with Section 4.09 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

Section 2.03    Registrar and Paying Agent.

The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar shall keep a register of the Notes ("*Note Register*") and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without prior notice to any Holder.

The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such Paying Agent or Registrar. The Issuer or any of its Subsidiaries may act as Paying Agent or Registrar.

The Issuer initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes. The Issuer initially appoints the Trustee to act as the Paying Agent and Registrar for the Notes and to act as Custodian with respect to the Global Notes.

Section 2.04    Paying Agent To Hold Money in Trust.

The Issuer shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or cash Additional Interest, if any, or without duplication, cash interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee. The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than the Issuer or a Subsidiary) shall have no further liability for the money. If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with Section 312(a) of the Trust Indenture Act. If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of

-37-

the names and addresses of the Holders of Notes and the Issuer shall otherwise comply with Section 312(a) of the Trust Indenture Act.

Section 2.06      Transfer and Exchange.

(a)      Transfer and Exchange of Global Notes.  Except as otherwise set forth in this Section 2.06, a Global Note may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor Depositary or a nominee of such successor Depositary.  A beneficial interest in a Global Note may not be exchanged for a Definitive Note unless (i) the Depositary (x) notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Issuer within 120 days (ii) there shall have occurred and be continuing a Default with respect to the Notes or (iii) the Issuer, in its sole discretion notifies the Trustee in writing that it elects to cause the issuance of Definitive Notes under this Indenture.  Upon the occurrence of any of the preceding events in (i), (ii) or (iii) above, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures).  Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i), (ii) or (iii) above and pursuant to Section 2.06(c) hereof.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); *provided*, *however*, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

(b)      Transfer and Exchange of Beneficial Interests in the Global Notes.  The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures.  Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act.  Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)      Transfer of Beneficial Interests in the Same Global Note.  Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person (other than the Initial Purchasers).  Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note.  No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)      All Other Transfers and Exchanges of Beneficial Interests in Global Notes.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures con-

taining information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above; *provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903.  Upon consummation of an Exchange Offer by the Issuer in accordance with Section 2.06(f) hereof, the requirements of this Section 2.06(b)(ii) shall be deemed to have been satisfied upon receipt by the Registrar of the instructions contained in the Letter of Transmittal delivered by the holder of such beneficial interests in the Restricted Global Notes.  Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(iii)    Transfer of Beneficial Interests to Another Restricted Global Note.  A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) hereof and the Registrar receives the following:

(A)    if the transferee shall take delivery in the form of a beneficial interest in a 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)    if the transferee shall take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; or

(C)    if the transferee shall take delivery in the form of a beneficial interest in an IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (3) thereof, and the transferee must deliver a certificate in the form of Exhibit F hereto, together with the legal opinion, if any, required thereby.

(iv)    Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.  A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) hereof and:

(A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of the beneficial interest to be transferred, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Participating Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)      such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)      such transfer is effected by a Participating Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)      the Registrar receives the following:

(1)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(a) thereof; or

(2)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

(c)      <u>Transfer or Exchange of Beneficial Interests for Definitive Notes</u>.

(i)      <u>Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes</u>.  If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in clauses (i), (ii) or (iii) of Section 2.06(a) hereof and receipt by the Registrar of the following documentation:

(A)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (2)(a) thereof;

(B)      if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(C)      if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof;

(D)      if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(a) thereof;

(E)      if such beneficial interest is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(b) thereof;

(F)      if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(c) thereof; or

(G)      if such beneficial interest is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form of <u>Exhibit F</u> hereto, including the certifications, certificates and legal opinion, if applicable,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)      <u>Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes</u>. Notwithstanding Sections 2.06(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)      <u>Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes</u>. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who

takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in clauses (i) or (ii) of Section 2.06(a) hereof and if:

(A)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the holder of such beneficial interest, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Participating Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)    such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)    such transfer is effected by a Participating Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)    the Registrar receives the following:

(1)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)    Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in clauses (i), (ii) or (iii) of Section 2.06(a) hereof and satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the Depositary and the Participant or Indirect Participant. The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall not bear the Private Placement Legend.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes. If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof;

(F)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof; or

(G)    if such Restricted Definitive Note is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form of Exhibit F hereto, including the certifications, certificates and legal opinion, if applicable,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of clause (B) above, the applicable 144A Global Note, in the case of clause (C) above, the applicable Regulation S Global Note and in the case of clause (G) above, the applicable IAI Global Note.

(ii)    Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A)      such exchange or transfer is effected pursuant to an Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Participating Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

(B)      such transfer is effected pursuant to a Shelf Registration Statement in accordance with the Registration Rights Agreement;

(C)      such transfer is effected by a Participating Broker-Dealer pursuant to an Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

(D)      the Registrar receives the following:

(1)      if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (1)(c) thereof; or

(2)      if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(ii), the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)      <u>Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes</u>.  A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraph (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

(e)      <u>Transfer and Exchange of Definitive Notes for Definitive Notes</u>.  Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e),

the Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e):

    (i)    <u>Restricted Definitive Notes to Restricted Definitive Notes</u>.  Any Restricted De-finitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

    (A)    if the transfer shall be made pursuant to a QIB in accordance with Rule 144A, then the transferor must deliver a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

    (B)    if the transfer shall be made pursuant to Rule 903 or Rule 904 then the transferor must deliver a certificate in the form of <u>Exhibit B</u> hereto, including the certifi-cations in item (2) thereof;

    (C)    if the transfer shall be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certifi-cate in the form of <u>Exhibit B</u> hereto, including the certifications required by item (3) thereof, if applicable; or

    (D)    if such Restricted Definitive Note is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) and (C) above, a certificate from such holder in the form of <u>Exhibit F</u> hereto, including the certifications, certificates and legal opinion, if applicable.

    (E)    (ii)    <u>Restricted Definitive Notes to Unrestricted Definitive Notes</u>. Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unre-stricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

    (F)    such exchange or transfer is effected pursuant to the Exchange Offer in accordance with the Registration Rights Agreement and the Holder, in the case of an ex-change, or the transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (1) a Participating Broker-Dealer, (2) a Person participating in the distribution of the Exchange Notes or (3) a Person who is an affiliate (as defined in Rule 144) of the Issuer;

    (G)    any such transfer is effected pursuant to the Shelf Registration Statement in accordance with the Registration Rights Agreement;

    (H)    any such transfer is effected by a Participating Broker-Dealer pursuant to the Exchange Offer Registration Statement in accordance with the Registration Rights Agreement; or

    (I)    the Registrar receives the following:

(1)        if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(2)        if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(ii)        (iii)        Unrestricted Definitive Notes to Unrestricted Definitive Notes. A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)        Exchange Offer.  Upon the occurrence of the Exchange Offer in accordance with the Registration Rights Agreement, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate (i) one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial interests in the Restricted Global Notes tendered for acceptance by Persons that certify in the applicable Letters of Transmittal that (x) they are not Participating Broker-Dealers, (y) they are not participating in a distribution of the Exchange Notes and (z) they are not affiliates (as defined in Rule 144) of the Issuer, and accepted for exchange in the Exchange Offer and (ii) Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive Notes tendered for acceptance by Persons that certify in the applicable Letters of Transmittal that (x) they are not Participating Broker-Dealers, (y) they are not participating in a distribution of the Exchange Notes and (z) they are not affiliates (as defined in Rule 144) of the Issuer, and accepted for exchange in the Exchange Offer.  Concurrently with the issuance of such Notes, the Trustee shall cause the aggregate principal amount of the applicable Restricted Global Notes to be reduced accordingly, and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Persons designated by the Holders of Definitive Notes so accepted Unrestricted Definitive Notes in the applicable principal amount.  Any Notes that remain outstanding after the consummation of the Exchange Offer, and Exchange Notes issued in connection with the Exchange Offer, shall be treated as a single class of securities under this Indenture.

(g)        Legends.  The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)        Private Placement Legend.

(A)        Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution therefor) shall bear the legend in substantially the following form:

-46-

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR OR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "*RESALE RESTRICTION TERMINATION DATE*") THAT IS 40 DAYS IN THE CASE OF REGULATION S SECURITIES, AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF THE SECURITIES AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "*QUALIFIED INSTITUTIONAL BUYER*" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE, ASSIGNMENT, TRANSFER OR OTHER DISPOSITION TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE."

(B)     Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), (e)(iii) or (f) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(ii)     <u>Global Note Legend</u>.  Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(h) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SEC-

TION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EX-CHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRE-SENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSI-TORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("*DTC*") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE IS-SUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTA-TIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REP-RESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)    Regulation S Temporary Global Note Legend.  The Regulation S Temporary Global Note shall bear a legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERN-ING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

(h)    Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be re-turned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accord-ingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such in-crease.

(i)    General Provisions Relating to Transfers and Exchanges.

(i)    To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentica-tion Order in accordance with Section 2.02 hereof or at the Registrar's request.

(ii)      No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.07, 2.10, 3.06, 3.09, 4.10, 4.14 and 9.05 hereof).

(iii)      Neither the Registrar, the Trustee nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)      All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)      Neither the Issuer, the Registrar nor the Trustee shall be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi)      Prior to due presentment for the registration of a transfer of any Note, the Trustee, the Registrar any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and, without duplication, interest (including Additional Interest, if any) on such Notes and for all other purposes, and none of the Trustee, the Registrar, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)      Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to Section 4.02 hereof, the Issuer shall execute, and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)      At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Section 2.02 hereof.

(ix)      All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(x)      Each Holder of a Note agrees to indemnify the Issuer and Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in viola-

-49-

tion of any provision of this Indenture and/or applicable United States federal or state securities laws.

(xi)      Neither the Trustee nor any agent of the Trustee shall have any responsibility for any actions taken or not taken by the Depositary.

(xii)      The Trustee shall have no responsibility or obligation to any Participant or Indirect Participant or any other Person with respect to the accuracy of the books or records, or the acts or omissions, of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Participant or Indirect Participant or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders under the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the customary procedures of the Depositary. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Participants or Indirect Participants.

(xiii)      The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Participants or Indirect Participants in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.07      Replacement Notes.

If any mutilated Note is surrendered to the Trustee, the Registrar or the Issuer and the Trustee receives evidence to its satisfaction of the ownership and destruction, loss or theft of any Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met.  If required by the Trustee or the Issuer, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee determined for itself and the Issuer determined for itself to protect the Issuer, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Issuer and/or the Trustee may charge for its expenses in replacing a Note.

Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08      Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    <u>Treasury Notes</u>.

Prior to the qualification of this Indenture under the Trust Indenture Act, in determining whether the Holders of the required principal amount of the Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Affiliate of the Issuer shall be considered as outstanding. Following the qualification of this Indenture under the Trust Indenture Act, in determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned shall be so disregarded.  Notes so owned which have been pledged in good faith shall not be disregarded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Notes and that the pledgee is not the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.  Upon request of the Trustee, the Issuer shall furnish to the Trustee promptly an Officers' Certificate listing and identifying all Notes, if any, known by the Issuer to be owned or held by or for the account of any of the Issuer or any Affiliate of the Issuer, and the Trustee shall be entitled to accept and rely upon such Officers' Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any determination.

Section 2.10    <u>Temporary Notes</u>.

Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee.  Without unreasonable delay, the Issuer shall prepare and the Trustee shall, upon receipt of an Authentication Order, authenticate definitive Notes in exchange for temporary Notes.

Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

Section 2.11    <u>Cancellation</u>.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall destroy cancelled Notes (subject to the record retention requirement

of the Exchange Act).  Certification of the destruction of all cancelled Notes shall be delivered to the Issuer upon the Issuer's written request.  The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    <u>Defaulted Interest</u>.

        If the Issuer defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof.  The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment, and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted interest as provided in this Section 2.12.  The Issuer shall fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest.  The Trustee shall promptly notify the Issuer of such special record date.  At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or cause to be mailed, first-class postage prepaid, to each Holder a notice at his or her address as it appears in the Note Register that states the special record date, the related payment date and the amount of such interest to be paid.

        Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Note.

Section 2.13    <u>CUSIP and ISIN Numbers</u>.

        The Issuer in issuing the Notes may use CUSIP and/or ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and/or ISIN numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer shall as promptly as practicable notify the Trustee of any change in the CUSIP and/or ISIN numbers.

ARTICLE 3

REDEMPTION

Section 3.01    <u>Notices to Trustee</u>.

        If the Issuer elects to redeem Notes pursuant to Section 3.07 hereof, it shall furnish to the Trustee, at least 2 Business Days before notice of redemption is required to be mailed or caused to be mailed to Holders pursuant to Section 3.03 hereof but not more than 60 days before a Redemption Date, an Officers' Certificate setting forth (i) the paragraph or subparagraph of such Note and/or Section of this Indenture pursuant to which the redemption shall occur, (ii) the Redemption Date, (iii) the principal amount of the Notes to be redeemed and (iv) the redemption price.

Section 3.02     Selection of Notes To Be Redeemed or Purchased.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee shall select the Notes to be redeemed or purchased (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) if the Notes are not so listed, on a *pro rata* basis to the extent practicable or (c) by lot or by such other similar method in accordance with the procedures of DTC.  In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased shall be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the Redemption Date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee shall promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected shall be in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed or purchased.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03     Notice of Redemption.

Subject to Section 3.09 hereof, notices of redemption shall be mailed by the Issuer by first-class mail, postage prepaid, at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address, except that notices of redemption may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 12 hereof.

The notice shall be prepared by the Issuer, shall identify the Notes to be redeemed and shall state:

(a)     the Redemption Date;

(b)     the redemption price;

(c)     if any Note is to be redeemed in part only, the portion of the principal amount of that Note that is to be redeemed and that, after the Redemption Date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion of the original Note representing the same indebtedness to the extent not redeemed shall be issued in the name of the Holder of the Notes upon cancellation of the original Note;

(d)     the name and address of the Paying Agent;

(e)     that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)     that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

-53-

(g)    the paragraph or subparagraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)    that no representation is made as to the correctness or accuracy of the CUSIP and/or ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at its expense; *provided* that the Issuer shall have delivered to the Trustee, at least 2 Business Days before notice of redemption is required to be mailed or caused to be mailed to Holders pursuant to this Section 3.03 (unless a shorter notice shall be agreed to by the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04    Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the Redemption Date at the redemption price (except (i) when given in connection with a transaction (or series of related transactions) that constitutes a Change of Control, in which case such notice of redemption may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the Change of Control or (ii) as provided for in Section 3.07(e) hereof).  The notice, if mailed in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice.  In any case, failure to give such notice by mail or any defect in the notice to the Holder of any Note designated for redemption in whole or in part shall not affect the validity of the proceedings for the redemption of any other Note.  Subject to Section 3.05 hereof, on and after the Redemption Date, interest ceases to accrue on Notes or portions of Notes called for redemption.

Section 3.05    Deposit of Redemption or Purchase Price.

Prior to 10:00 a.m. (New York City time) on the redemption or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest (including Additional Interest, if any) on all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent shall promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest on, all Notes to be redeemed or purchased.

If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then, without duplication, any accrued and unpaid interest to the redemption or purchase date shall be paid to the Person in whose name such Note was registered at the close of business on such Record Date.  If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal amount, from the redemption or purchase date until such principal amount is paid, and to the extent lawful on any interest accrued to the redemption or purchase date not paid on such unpaid principal amount, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    Notes Redeemed or Purchased in Part.

Upon surrender of a Note that is redeemed or purchased in part, the Issuer shall issue and the Trustee shall, upon receipt of an Authentication Order, authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered representing the same indebtedness to the extent not redeemed or purchased; *provided* that each new Note shall be in a minimum principal amount of $2,000 and integral multiples of $1,000 in excess thereof.  It is understood that, notwithstanding anything in this Indenture to the contrary, only an Authentication Order and not an Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate such new Note.

Section 3.07    Optional Redemption.

(a)    At any time and from time to time prior to December 15, 2013, the Issuer may redeem up to 35% of the original principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 111.500% of the principal amount thereof plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* that

(1)    at least 65% of the original principal amount of the Notes remains outstanding after each such redemption; and

(2)    the redemption occurs within 90 days after the closing of such Equity Offering.

(b)    At any time prior to December 15, 2013 the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest thereon, if any, to the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

(c)    During any 12-month period prior to December 15, 2013, the Issuer will be entitled to redeem up to 10% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 103.000% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, to the Redemption Date, subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment date.

(d)    On or after December 15, 2013, the Issuer may redeem the Notes, in whole or in part, upon notice as described in Section 3.03 hereof, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest, if any, to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2013 | 108.625% |
| 2014 | 105.750% |
| 2015 | 102.875% |
| 2016 and thereafter | 100.000% |

(e)     Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

Section 3.08     Mandatory Redemption.

The Issuer shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes, except pursuant to a Special Mandatory Redemption under Section 3.10 hereof.  However, (a) the Issuer may be required to offer to purchase the Notes pursuant to Sections 4.10 and 4.14 hereof and (b) the Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

Section 3.09     Offers to Repurchase by Application of Excess Proceeds.

(a)     In the event that, pursuant to Section 4.10 hereof, the Issuer shall be required to commence an Asset Sale Offer, it shall follow the procedures specified below.

(b)     The Asset Sale Offer shall remain open for a period of 20 Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the "*Offer Period*").  No later than five Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Issuer shall apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes and, if required, Pari Passu Indebtedness (on a *pro rata* basis, if applicable), or, if less than the Offer Amount has been tendered, all Notes and Pari Passu Indebtedness tendered in response to the Asset Sale Offer.  Payment for any Notes so purchased shall be made in the same manner as cash interest payments are made.

(c)     If the Purchase Date is on or after a Record Date and on or before the related Interest Payment Date, any accrued and unpaid interest and Additional Interest, if any, up to but excluding the Purchase Date, shall be paid to the Person in whose name a Note is registered at the close of business on such Record Date, and no additional interest shall be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

(d)     Upon the commencement of an Asset Sale Offer, the Issuer shall send, by first-class mail, a notice to each of the Holders, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The Asset Sale Offer shall be made to all Holders and, if required, holders of Pari Passu Indebtedness. The notice, which shall govern the terms of the Asset Sale Offer, shall state:

(i)     that the Asset Sale Offer is being made pursuant to this Section 3.09 and Section 4.10 hereof and the length of time the Asset Sale Offer shall remain open;

(ii)     the Offer Amount, the purchase price and the Purchase Date;

(iii)     that any Note not tendered or accepted for payment shall continue to accrue interest;

(iv)     that, unless the Issuer defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest after the Purchase Date;

(v)     that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in denominations of $2,000 or integral multiples of $1,000 in excess thereof;

-56-

(vi)    that Holders electing to have a Note purchased pursuant to any Asset Sale Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Note completed, or transfer by book-entry transfer, to the Issuer, the Depositary, if appointed by the Issuer, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(vii)    that Holders shall be entitled to withdraw their election if the Issuer, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(viii)    that, if the aggregate principal amount of Notes and Pari Passu Indebtedness surrendered by the holders thereof exceeds the Offer Amount, the Issuer shall select the Notes and such Pari Passu Indebtedness to be purchased on a *pro rata* basis based on the principal amount of the Notes or such Pari Passu Indebtedness tendered (with such adjustments as may be deemed appropriate by the Issuer so that only Notes in denominations of $2,000 or integral multiples of $1,000 in excess thereof, shall be purchased); and

(ix)    that Holders whose Notes were purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer) representing the same indebtedness to the extent not repurchased.

(e)    On or before the Purchase Date, the Issuer shall, to the extent lawful, (1) accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof validly tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been tendered, all Notes tendered and (2) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof so tendered.

(f)    The Issuer, the Depositary or the Paying Agent, as the case may be, shall promptly mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes properly tendered by such Holder and accepted by the Issuer for purchase, and the Issuer shall promptly issue a new Note, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail or deliver (or cause to be transferred by book-entry) such new Note to such Holder (it being understood that, notwithstanding anything in this Indenture to the contrary, no Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate and mail or deliver such new Note) in a principal amount equal to any unpurchased portion of the Note surrendered representing the same indebtedness to the extent not repurchased; *provided* that each such new Note shall be in denominations of $2,000 or integral multiples of $1,000 in excess thereof.  Any Note not so accepted shall be promptly mailed or delivered by the Issuer to the Holder thereof.  The Issuer shall publicly announce the results of the Asset Sale Offer on or as soon as practicable after the Purchase Date.

Other than as specifically provided in this Section 3.09 or Section 4.10 hereof, any purchase pursuant to this Section 3.09 shall be made pursuant to the applicable provisions of Sections 3.01 through 3.06 hereof.

Section 3.10    Special Mandatory Redemption.

(a)    The Notes will be subject to a mandatory redemption (a "*Special Mandatory Redemption*") in the event that either (i) the Release Date has not occurred on or prior to the Escrow End

Date or (ii) prior to the Escrow End Date, the Issuer has determined, in its reasonable discretion, that the escrow conditions cannot be satisfied by such date (any such date, a "*Trigger Date*"). The Issuer will cause the notice of Special Mandatory Redemption to be mailed to the Escrow Agent, the Trustee and the Holders of the Notes no later than the next Business Day following the Trigger Date and will redeem the Notes no later than five Business Days following the date of the notice of Special Mandatory Redemption (the "*Special Mandatory Redemption Date*"). The redemption price for any Special Mandatory Redemption will be 100% of the issue price of the Notes as set forth on the cover of the Offering Memorandum, together with accrued and unpaid interest on the Notes from the Issue Date up to but not including the Special Mandatory Redemption Date.

(b)    If the Escrow Agent receives a notice of a Special Mandatory Redemption pursuant to the Escrow Agreement, the Escrow Agent will liquidate all Escrow Proceeds then held by it not later than the last Business Day prior to the Special Mandatory Redemption Date. Concurrently with release of the amounts necessary to fund the Special Mandatory Redemption to the Paying Agent, the Escrow Agent will release any excess of Escrow Proceeds over the mandatory redemption price to the Issuer, and the Issuer will be permitted to use such excess Escrow Proceeds at its discretion.

ARTICLE 4

COVENANTS

Section 4.01    Payment of Notes.

The Issuer shall pay or cause to be paid the principal of, premium, if any, Additional Interest, if any, and, without duplication, interest on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, cash Additional Interest, if any, and cash interest shall be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary, holds as of 10:00 a.m. (New York City time) on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and Cash Interest then due.

The Issuer shall pay all Additional Interest, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02    Maintenance of Office or Agency.

The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03 hereof.

Section 4.03    <u>Reports and Other Information</u>.

(a)    From and after the Release Date, whether or not the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Issuer will file with the SEC (subject to the next sentence) and provide the Trustee and Holders of the Notes with such annual and other reports as are specified in Sections 13 and 15(d) of the Exchange Act and applicable to a U.S. corporation subject to such Sections, such reports to be so filed and provided within the times specified for the filings of such reports for non-accelerated filers under such Sections and containing, in all material respects, all the information, audit reports and exhibits required for such reports. If at any time, the Issuer is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Issuer will nevertheless continue filing the reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such a filing. The Issuer agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Issuer will post the reports specified in the preceding sentence on its website within the time periods that would apply for non-accelerated filers if the Issuer were required to file those reports with the SEC (it being expressly understood that prior to the effectiveness of the Exchange Offer Registration Statement or the Shelf Registration Statement  (each as defined below) that the SEC will not accept such filings by the Issuer and that the Issuer shall therefor be able to satisfy its obligations under this Section 4.03 by posting such reports on a publicly accessible page on its website). Notwithstanding the foregoing, the Issuer may satisfy such requirements prior to the effectiveness of a registration statement (the "*Exchange Offer Registration Statement*") filed with the SEC with respect to a registered offer to exchange the Notes for new notes of the Issuer having terms substantially identical in all material respects to the Notes exchanged therefor (except that the Exchange Notes will not contain terms with respect to transfer restrictions) or a shelf registration statement (a "*Shelf Registration Statement*") filed with the SEC covering resales of Notes or Exchange Notes, as the case may be, by filing with the SEC the Exchange Offer Registration Statement or Shelf Registration Statement, to the extent that any such registration statement contains substantially the same information as would be required to be filed by the Issuer if it were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, and by providing the Trustee and Holders of Notes with such registration statement (and any amendments thereto) promptly following the filing thereof.

(b)    In addition, in the event that:

(1)    the rules and regulations of the SEC permit a parent entity that becomes a Guarantor to report at such parent entity's level on a consolidated basis; and

(2)    such parent entity is not engaged in any business in any material respect other than incidental to its ownership of the capital stock of the Issuer,

such consolidated reporting by such parent entity in a manner consistent with this Section 4.03 for the Issuer will satisfy this Section 4.03.

(c)    Notwithstanding the foregoing, prior to the effectiveness of the Exchange Offer Registration Statement or Shelf Registration Statement with respect to the Notes, the Issuer will not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K or Item 3-10 of Regulation S-X.

(d)    In addition, the Issuer will furnish to the Holders of Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

(e)    In addition, such requirements of this Section 4.03 shall be deemed satisfied prior to the commencement of the Exchange Offer or the effectiveness of the Shelf Registration Statement by the filing with the SEC of the Exchange Offer Registration Statement or Shelf Registration Statement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act and such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in the first paragraph of this Section 4.03.

(f)    Notwithstanding anything herein to the contrary, the Issuer will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under Section 6.01(a) hereof until 120 days after the date any report hereunder is required to be made available to the Trustee and the Holders pursuant to this Section 4.03.

Section 4.04    Compliance Certificate.

(a)    The Issuer and each Guarantor (to the extent that such Guarantor is so required under the Trust Indenture Act) shall deliver to the Trustee, within 90 days after the end of each fiscal year ending after the Issue Date commencing with the fiscal year ending March 31, 2011, a certificate from the principal executive officer, principal financial officer or principal accounting officer stating that a review of the activities of the Issuer and its Restricted Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officer with a view to determining whether the Issuer has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to such Officer signing such certificate, that to the best of his or her knowledge the Issuer has kept, observed, performed and fulfilled each and every condition and covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions, covenants and conditions of this Indenture (or, if a Default shall have occurred, describing all such Defaults of which he or she may have knowledge and what action the Issuer is taking or proposes to take with respect thereto).

(b)    When any Default has occurred and is continuing under this Indenture, or if the Trustee or the holder of any other evidence of Indebtedness of the Issuer or any Subsidiary gives any notice or takes any other action with respect to a claimed Default, the Issuer shall promptly (which shall be no more than five (5) Business Days) deliver to the Trustee by registered or certified mail or by facsimile transmission an Officers' Certificate specifying such event and what action the Issuer is taking or proposes to take with respect thereto.

Section 4.05    Taxes.

The Issuer shall pay, and shall cause each of their respective Restricted Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate negotiations or proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06     Stay, Extension and Usury Laws.

The Issuer and each of the Guarantors covenant (to the extent that they may lawfully do so) that they shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit of or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer and each of the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they shall not, by resort to any such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07     Limitation on Restricted Payments.

(a)     After the Release Date, the Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I)     declare or pay any dividend or make any payment or distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a)     dividends, payments or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or

(b)     dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend payment or distribution in accordance with its Equity Interests in such class or series of securities;

(II)     purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer, including in connection with any merger or consolidation, other than purchases, redemptions, defeasances and other acquisitions and retirements of Equity Interests of the Issuer or any direct or indirect parent of the Issuer held by a Restricted Subsidiary of the Issuer);

(III)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value or give any irrevocable notice of redemption with respect thereto, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Indebtedness, other than:

(a)     Indebtedness permitted under clauses (7) and (8) of Section 4.09(b);

(b)     the payment, redemption, repurchase, defeasance or other acquisition or retirement for value of Indebtedness made in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance or other acquisition or retirement for value;

(c)     the giving of an irrevocable notice of redemption with respect to the transactions described in clauses (a) and (b) above and (2) and (3) of Section 4.07(b); or

(d)       Pari Passu Lien Indebtedness; or

(IV)      make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) (other than any exception thereto in clauses (I) and (III) above being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1)       no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)       immediately after giving effect to such transaction on a pro forma basis, the Issuer could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a); and

(3)       such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Release Date (including Restricted Payments permitted by clauses (1) and (10) of Section 4.07(b), but excluding all other Restricted Payments permitted by Section 4.07(b)), is less than the sum of (without duplication):

(a)       EBITDA of the Issuer and its Restricted Subsidiaries on a consolidated basis for the period (taken as one accounting period) beginning on the first day of the first fiscal quarter beginning after the Release Date, to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, less the product of 1.4 times the Consolidated Interest Expense of the Issuer and its Restricted Subsidiaries for the same period; *provided* that the amount, if positive, of this clause (a) shall only be included in the calculation for this clause (3) when the First Lien Leverage Ratio for the Issuer and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction would have been less than 2.75 to 1.00; *plus*

(b)       100% of the aggregate net cash proceeds and the fair market value of marketable securities or other property or assets received by the Issuer since immediately after the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of Section 4.09(b) hereof) from the sale of:

(i)       (A) Equity Interests of the Issuer, including Treasury Capital Stock, but excluding cash proceeds and the fair market value of marketable securities or other property or assets received from the sale of Equity Interests to members of management, directors or consultants of the Issuer, any direct or indirect parent company of the Issuer and the Issuer's Subsidiaries after the Release Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of Section 4.07(b) hereof; and

(B)       to the extent such net cash proceeds are actually contributed to the Issuer, Equity Interests of the Issuer's direct or indirect parent companies (excluding contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) Section 4.07(b) hereof); or

(ii)    debt securities of the Issuer that have been converted into or ex-changed for such Equity Interests of the Issuer (or any direct or indirect parent company of the Issuer);

*provided, however,* that this clause (b) shall not include the proceeds from (X) Equity Interests or convertible debt securities of the Issuer sold to a Restricted Subsidiary, as the case may be, (Y) Disqualified Stock or debt securities that have been converted into Disqualified Stock or (Z) Excluded Contributions; plus

(c)    100% of the aggregate amount of cash and the fair market value of marketable securities or other property contributed to the capital of the Issuer following the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of Section 4.09(b) hereof) (other than by a Restricted Subsidiary and other than by any Excluded Contributions); plus

(d)    100% of the aggregate amount received in cash and the fair market value of marketable securities or other property received after the Release Date by means of:

(i)    the sale or other disposition (other than to the Issuer or a Restricted Subsidiary) of Restricted Investments made by the Issuer or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Issuer or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Restricted Subsidiaries, in each case after the Release Date; or

(ii)    the sale (other than to the Issuer or a Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary (other than in each case to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment) or a dividend from an Unrestricted Subsidiary after the Release Date; plus

(e)    in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Release Date, the fair market value of the Investment in such Unrestricted Subsidiary (which, if the fair market value of such Investment may exceed $50.0 million, shall be set forth in writing by an Independent Financial Advisor) at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary, other than an Unrestricted Subsidiary to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder.

(b)    The foregoing provisions shall not prohibit:

(1)    the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration thereof or the giving of the irrevocable redemption notice, as applicable, if at the date of declaration or notice such payment would have complied with the provisions of this Indenture;

(2)    the redemption, repurchase, defeasance, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Indebtedness that is not Pari Passu Lien Indebtedness of the Issuer or a Guarantor in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Issuer or any of its

direct or indirect parent companies (in each case, other than any Disqualified Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement or other acquisition will be excluded from clause (3)(b) of Section 4.07(a) above;

(3)    the redemption, repurchase, defeasance or other acquisition or retirement of Indebtedness that is not Pari Passu Lien Indebtedness of the Issuer or a Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness that is not Pari Passu Lien Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with Section 4.09 hereof so long as:

(a)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, if any, on the Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value, plus the amount of any reasonable premium paid (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

(b)    such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Indebtedness being so redeemed, repurchased, defeased, acquired or retired; and

(c)    such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Indebtedness being so redeemed, repurchased, defeased, acquired or retired;

(4)    a Restricted Payment to pay for the repurchase, redemption, defeasance or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Issuer or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies (or any permitted transferee of any of the foregoing) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement; *provided*, *however*, that the aggregate amounts paid under this clause (4) do not exceed in any calendar year $5.0 million (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $10.0 million in any calendar year); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a)    the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Issuer and, to the extent contributed to the Issuer, Equity Interests of any of the Issuer's direct or indirect parent companies, in each case to members of management, directors or consultants of the Issuer, any of its direct or indirect parent companies or any of its Subsidiaries that occurs after the Release Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of Section 4.07(a) hereof; plus

(b)    the cash proceeds of key man life insurance policies received by the Issuer or its Restricted Subsidiaries after the Release Date; less

(c)    the amount of any Restricted Payments made in any prior fiscal year pursuant to clauses (a) and (b) of this clause (4);

(5)      the declaration and payment of dividends to holders of, and any redemption or repurchase at maturity or upon any mandatory redemption event of, any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or any class or series of Preferred Stock of a Restricted Subsidiary issued in accordance with Section 4.09 hereof to the extent such dividends are included in the definition of "Consolidated Interest Expense";

(6)      repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(7)      the declaration and payment of dividends on the Issuer's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on the Issuer's common stock), following the consummation of the first public offering of the Issuer's common stock or the common stock of any of its direct or indirect parent companies after the Release Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Issuer in or from any such public offering, other than public offerings with respect to the Issuer's common stock registered on Form S-8 and other than any public sale constituting an Excluded Contribution;

(8)      other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (8) not to exceed $15.0 million;

(9)      Restricted Payments that are made with Excluded Contributions;

(10)      the payment, repurchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness required in accordance with provisions applicable thereto similar to those described under Sections 4.10 and 4.14 hereof; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(11)      any Restricted Payments in connection with the Emergence Transactions; and

(12)      the declaration and payment of dividends by the Issuer or a Restricted Subsidiary to, or the making of loans to, any of their respective direct or indirect parents in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a)      franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b)      federal, foreign, state and local income taxes to the extent such income taxes are attributable to the income of the Issuer and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries; *provided* that, in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer and its Restricted Subsidiaries would be required to pay in respect of federal, foreign, state and local income taxes for such fiscal year were the Issuer, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any parent entity at the highest combined applicable, federal, foreign, state and local tax rate for such fiscal year;

(c)       customary salary, bonus and other benefits payable to officers and em-
ployees of any direct or indirect parent company of the Issuer and its Restricted Subsidi-
aries to the extent such salaries, bonuses and other benefits are attributable to the owner-
ship or operation of the Issuer and its Restricted Subsidiaries;

(d)       general corporate operating and overhead costs and expenses of any di-
rect or indirect parent company of the Issuer and its Restricted Subsidiaries to the extent
such costs and expenses are attributable to the ownership or operation of the Issuer and
its Restricted Subsidiaries; and

(e)       fees and expenses other than to Affiliates of the Issuer related to any un-
successful equity or debt offering of such parent entity;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under
clauses (8) and (10) of this Section 4.07(b), no Default shall have occurred and be continuing or would
occur as a consequence thereof.

As of the Release Date, all of the Issuer's Subsidiaries shall be Restricted Subsidiaries.
The Issuer shall not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursu-
ant to the definition of "*Unrestricted Subsidiary*." For purposes of designating any Restricted Subsidiary
as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries
(except to the extent repaid) in the Subsidiary so designated shall be deemed to be Investments in an
amount determined as set forth in the last sentence of the definition of "*Investment*." Such designation
shall be permitted only if a Restricted Payment in such amount would be permitted at such time, whether
pursuant to Section 4.07(a) hereof or under clause (8) of Section 4.07(b) hereof, or pursuant to the defini-
tion of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted
Subsidiary. Unrestricted Subsidiaries shall not be subject to any of the restrictive covenants set forth in
this Indenture.

Section 4.08      Dividend and Other Payment Restrictions Affecting Restricted
                         Subsidiaries.

(a)       After the Release Date, the Issuer shall not, and shall not permit any of its Re-
stricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to
exist or become effective any consensual encumbrance or consensual restriction on the ability of any such
Restricted Subsidiary that is not a Guarantor to:

(1)       (A)  pay dividends or make any other distributions to the Issuer or any of the Re-
stricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in,
or measured by, its profits, or

(B)  pay any Indebtedness owed to the Issuer or any of the Restricted Subsidiar-
ies;

(2)       make loans or advances to the Issuer or any of the Restricted Subsidiaries; or

(3)       sell, lease or transfer any of its properties or assets to the Issuer or any of the Re-
stricted Subsidiaries.

(b)     The restrictions in Section 4.08(a) hereof shall not apply to encumbrances or restrictions existing under or by reason of:

(1)     contractual encumbrances or restrictions in effect on the Release Date, including pursuant to the Credit Agreement, the Second Lien Notes and the related documentation;

(2)     this Indenture, the Notes and the Guarantees;

(3)     Purchase Money Obligations for property acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) of Section 4.08(a) hereof on the property so acquired and related assets;

(4)     applicable law or any applicable rule, regulation or order;

(5)     any agreement or other instrument of a Person acquired by the Issuer or any of its Restricted Subsidiaries in existence at the time of such acquisition or at the time it merges with or into the Issuer or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or the property or assets so assumed and related assets;

(6)     contracts for the sale of assets or Capital Stock, including customary restrictions with respect to a Subsidiary of the Issuer pursuant to an agreement that has been entered into for the sale or disposition of the Capital Stock or assets of such Subsidiary, that impose restrictions on the assets to be sold or the assets of such Subsidiary;

(7)     Secured Indebtedness otherwise permitted to be incurred pursuant to Section 4.09 hereof and Section 4.12 hereof that limits the right of the debtor to dispose of the assets securing such Indebtedness;

(8)     restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(9)     other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Release Date pursuant to the provisions of Section 4.09 hereof that imposes restrictions solely on Foreign Subsidiaries or their Subsidiaries party thereto;

(10)     customary provisions in joint venture agreements and other similar agreements or arrangements relating solely to such joint venture;

(11)     customary provisions contained in leases or licenses of intellectual property and other agreements, in each case, entered into in the ordinary course of business;

(12)     other Indebtedness or Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or Preferred Stock of any Restricted Subsidiary that is incurred subsequent to the Release Date and permitted pursuant to Section 4.09 hereof; *provided* that such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Issuer's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by senior management or the Board of Directors of the Issuer);

(13)    any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) of Section 4.08(a) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (12) of this Section 4.08(b); *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; and

(14)    restrictions or conditions of the type contained in clause (3) of Section 4.08(a) hereof contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Issuer or any Restricted Subsidiary is a party entered into in the ordinary course of business; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Issuer or such Restricted Subsidiary that is the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of such Restricted Subsidiary or the assets or property of the Issuer or any other Restricted Subsidiary.

Section 4.09    <u>Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock</u>.

(a)    From and after the Release Date, the Issuer shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness) and the Issuer shall not issue any shares of Disqualified Stock and shall not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that the Issuer may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any Restricted Subsidiary may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Consolidated Leverage Ratio on a consolidated basis for the Issuer and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been less than 4.50 to 1.00, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that the amount of Indebtedness (including Acquired Indebtedness) that may be incurred and Disqualified Stock or Preferred Stock that may be issued pursuant to this Section 4.09(a) by Restricted Subsidiaries that are not Guarantors shall not exceed $10.0 million at any one time outstanding.

(b)    The provisions of Section 4.09(a) hereof shall not apply to:

(1)    Indebtedness under the Credit Agreement incurred in an aggregate principal amount not to exceed $40.0 million outstanding at any one time;

(2)    the incurrence by the Issuer and any Guarantor of Indebtedness represented by (a) the First Lien Notes (excluding Additional Notes), (b) the Second Lien Notes and (c) any guarantee by a Guarantor of any of the foregoing in this clause (2);

(3)     Indebtedness of the Issuer and its Restricted Subsidiaries in existence on the Release Date after giving effect to the consummation of the Reorganization Plan (other than Indebtedness described in clauses (1) and (2) of this Section 4.09(b));

(4)     Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock and Preferred Stock incurred by the Issuer or any of its Restricted Subsidiaries to finance the purchase, lease or improvement of property (real or personal) or equipment (other than software) that is used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, *provided* that the aggregate amount of Indebtedness, Disqualified Stock and Preferred Stock incurred pursuant to this clause (4) when aggregated with then outstanding amount of Indebtedness under clause (13) below incurred to refinance Indebtedness initially incurred in reliance on this clause (4) does not exceed $15.0 million at any one time outstanding;

(5)     Indebtedness incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims; *provided*, *however*, that such letters of credit are not drawn;

(6)     Indebtedness arising from agreements of the Issuer or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided*, *however*, that the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by the Issuer and its Restricted Subsidiaries in connection with such disposition;

(7)     Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8)     Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9)     shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Issuer or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock or Disqualified Stock not permitted by this clause (9);

(10)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) for the purpose of limiting interest rate risk, exchange rate risk or commodity pricing risk;

(11)    obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(12)    (a) Indebtedness or Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer in an aggregate principal amount or liquidation preference equal to 100.0% of the net cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Release Date from the issue or sale of Equity Interests of the Issuer or any direct or indirect parent entity of the Issuer (which proceeds are contributed to the Issuer or a Restricted Subsidiary) or cash contributed to the capital of the Issuer (in each case, other than proceeds of Disqualified Stock or sales of Equity Interests or contributions received from the Issuer or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of Section 4.07(a) to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.07(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $25.0 million;

(13)    the incurrence by the Issuer or any Restricted Subsidiary of the Issuer of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance (whether by payment, purchase, redemption, defeasance or other acquisition or retirement) any Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding as permitted under Section 4.09(a) hereof and clauses (2), (3), (4), (6), (10) and (12)(a) above and this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock including additional Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding to pay accrued interest; premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

(a)     has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b)      to the extent such Refinancing Indebtedness refinances (i) Unsecured Indebtedness or constitutes Permitted Second Lien Obligations, such Refinancing Indebtedness also constitutes Unsecured Indebtedness or constitutes Permitted Second Lien Obligations, as the case may be, or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c)      shall not include:

(i)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer;

(ii)      Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer, that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(iii)      Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary;

and *provided, further* that subclause (a) of this clause (13) shall not apply to any refunding or refinancing of any Pari Passu Lien Indebtedness;

(14)      Indebtedness, Disqualified Stock or Preferred Stock of a Person incurred and outstanding on or prior to the date on which such Person was acquired by the Issuer or any Restricted Subsidiary or merged into the Issuer or a Restricted Subsidiary in accordance with the terms of this Indenture; *provided* that such Indebtedness, Disqualified Stock or Preferred Stock is not incurred in connection with or in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, such acquisition or merger; and *provided, further,* that after giving effect to such acquisition or merger, either

(a)      the First Lien Leverage Ratio for the Issuer and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 2.75 to 1.00, or

(b)      (i) the First Lien Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger;

(15)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16)      Indebtedness of the Issuer or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(17)    (a)    any guarantee by the Issuer or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of this Indenture, or

(b)    any guarantee by a Restricted Subsidiary of Indebtedness of the Issuer; *provided* that such guarantee is incurred in accordance with Section 4.15;

(18)    Indebtedness of the Issuer or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business;

(19)    Indebtedness consisting of Indebtedness issued by the Issuer or any of the Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer, a Restricted Subsidiary or any of their direct or indirect parent companies to the extent described in clause (4) of Section 4.07(b);

(20)    customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(21)    Indebtedness owed on a short term basis of no longer than 30 days to banks and other financial institutions incurred in the ordinary course of business of the Issuer and the Restricted Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances of the Issuer and the Restricted Subsidiaries.

For purposes of determining compliance with this Section 4.09:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (21) of Section 4.09(b) hereof or is entitled to be incurred pursuant to Section 4.09(a) hereof, the Issuer, in its sole discretion, shall classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and shall only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock under Section 4.09(a) hereof or in one of the above clauses under Section 4.09(b) hereof; *provided* that all Indebtedness outstanding under the Credit Agreement on the Release Date shall be treated as incurred on the Release Date under clause (1) of Section 4.09(b) hereof; and

(2)    at the time of incurrence, the Issuer shall be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 4.09(a) and (b) hereof.

Accrual of interest, the accretion of accreted value or original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, shall not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.09.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving

credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

For the purpose of this Indenture, (1) Unsecured Indebtedness shall not be deemed to be subordinated or junior to Secured Indebtedness merely because it is unsecured, (2) senior Indebtedness that is Secured Indebtedness shall not be deemed to be subordinated or junior to any other senior Indebtedness that is Secured Indebtedness merely because it has a junior priority with respect to the same collateral, (3) any Indebtedness shall not be deemed to be subordinated to any other Indebtedness merely because of maturity date, order of payment or order of application of funds or (4) Indebtedness that is not guaranteed shall not be deemed to be subordinated to Indebtedness that is guaranteed merely because of such guarantee.

Section 4.10    <u>Asset Sales</u>.

(a)    From and after the Release Date, the Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause, make or suffer to exist an Asset Sale, unless:

(1)    the Issuer or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (such fair market value to be determined in good faith by the Issuer on the date of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of; and

(2)    except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a)    any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent internal balance sheet or in the footnotes thereto) of the Issuer or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes, that are assumed by the transferee of any such assets and for which the Issuer and all of its Restricted Subsidiaries have been validly released by all creditors in writing;

(b)    any securities received by the Issuer or such Restricted Subsidiary from such transferee that are converted by the Issuer or such Restricted Subsidiary into cash (to the extent of the cash received) within 90 days following the closing of such Asset Sale; and

(c)    any Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this

clause (c) and assets (other than securities received and not yet liquidated pursuant to clause (b)) that are at that time outstanding, not to exceed 3.0% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this provision and for no other purpose.

(b)      Within 12 months after the receipt of any Net Proceeds of any Asset Sale consummated after the Release Date (the "*Application Period*"), the Issuer or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale

(1)      to permanently reduce:

(a)      Indebtedness constituting Pari Passu Lien Indebtedness (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) (*provided* that (x) to the extent that the terms of Pari Passu Lien Obligations other than the Obligations in respect of the Notes or this Indenture require that such Pari Passu Lien Obligations are repaid with the Net Proceeds of Asset Sales prior to repayment of other Indebtedness, the Issuer and its Restricted Subsidiaries shall be entitled to repay such other Pari Passu Lien Obligations prior to repaying the Obligations under the Notes and (y) subject to the foregoing clause (x), if the Issuer or any Guarantor shall so reduce Pari Passu Lien Obligations, the Issuer will equally and ratably reduce Obligations under the Notes as provided in Section 3.09 hereof, through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth under Sections 3.09 and 4.10(c) hereof) to all Holders of Notes to purchase at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, the pro rata principal amount of the Notes); or

(b)      Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Issuer or another Restricted Subsidiary; or

(2)      to make (a) an Investment in any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets (other than current amounts), in each of clauses (a), (b) and (c), used or useful in a Similar Business or that replace the businesses, properties and/or assets that are the subject of such Asset Sale ("*Replacement Assets*"); *provided* that to the extent that the assets disposed of in such Asset Sale were Collateral, such assets are pledged as Collateral under the Security Documents with the Lien on such Collateral securing the Notes being of the same priority with respect to the Notes as the Lien on the assets disposed of.

(c)      Any Net Proceeds from the Asset Sale that are not invested or applied in accordance with Section 4.10(b) hereof within 12 months from the date of the receipt of such Net Proceeds shall be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $20.0 million, the Issuer shall make an offer to (x) in the case of Net Proceeds from Collateral, all Holders of the Notes and, if required by the terms of any Additional Pari Passu Lien Indebtedness, the holders of such Additional Pari Passu Lien Indebtedness and (y) in the case of any other Net Proceeds, all Holders of the Notes and all holders of other Indebtedness that ranks *pari passu* in right of payment with

the Notes containing provisions similar to those set forth in Section 3.09 and Section 4.10 hereof with respect to offers to purchase or redeem with the proceeds of sales of assets ("*Pari Passu Indebtedness*"), in each case (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such Pari Passu Lien Indebtedness, as applicable that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus (without duplication) accrued and unpaid interest and Additional Interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Indenture.  The Issuer shall commence an Asset Sale Offer with respect to Excess Proceeds within ten Business Days after the date that Excess Proceeds exceed $20.0 million by mailing the notice to Holders required pursuant to the terms of this Indenture, with a copy to the Trustee as set forth in Section 3.09 hereof.  The Issuer may satisfy the foregoing obligations with respect to any Excess Proceeds from an Asset Sale by making an Asset Sale Offer with respect to such Excess Proceeds prior to the expiration of the Application Period.

To the extent that the aggregate principal amount of Notes and such Pari Passu Lien Indebtedness or Pari Passu Indebtedness, as applicable, tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for general corporate purposes, subject to the other covenants contained in this Indenture.  If the aggregate principal amount of Notes and Pari Passu Lien Indebtedness (in the case of Net Proceeds from Collateral) and such Pari Passu Indebtedness (in the case of any other Net Proceeds) surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Issuer shall select the Notes and such Pari Passu Lien Indebtedness or Pari Passu Indebtedness, as applicable, to be purchased on a pro rata basis based on the principal amount of the Notes, Pari Passu Lien Indebtedness or such Pari Passu Indebtedness, as applicable, tendered.  Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

Pending the final application of any Net Proceeds pursuant to this Section 4.10, the Issuer or such Restricted Subsidiary shall either apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility that constitutes Pari Passu Lien Indebtedness or provide such Net Proceeds to the Collateral Agent to be held in trust in an account maintained with, or subject to the dominion of, the Collateral Agent subject to terms and conditions usual and customary for accounts of the type contemplated hereby and otherwise satisfactory to the Collateral Agent (such account, an "*Asset Sale Proceeds Account*"), for application in accordance with this Section 4.10 provided that Net Proceeds need not be provided to the Collateral Agent to be held in an Asset Sale Proceeds Account except to the extent that the aggregate amount of Net Proceeds from Asset Sales not held therein or otherwise previously applied in accordance with this Section 4.10 exceed $20.0 million.

The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

Section 4.11    <u>Transactions with Affiliates.</u>

(a)    After the Release Date, the Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $2.0 million, unless:

(1)        such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(2)        the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $10.0 million, a Board Resolution adopted by the majority of the Board of Directors of the Issuer approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) of this Section 4.11(a); and

(3)        the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $40.0 million, a written opinion to the Issuer or such Restricted Subsidiary from an Independent Financial Advisor stating that the terms of such transaction are not materially less favorable to the Issuer or the Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary at such time with an unrelated Person on an arm's-length basis.

(b)        The foregoing provisions of Section 4.11(a) hereof shall not apply to the following:

(1)        transactions between or among the Issuer or any of its Restricted Subsidiaries;

(2)        Restricted Payments permitted by Section 4.07 hereof and transactions constituting "Permitted Investments";

(3)        [Reserved];

(4)        the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5)        transactions in which the Issuer or any Restricted Subsidiary, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Issuer or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Issuer or such Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6)        any agreement or arrangement as in effect as of the Release Date, or any amendment thereto (so long as any such amendment is not materially disadvantageous to the Holders when taken as a whole as compared to the applicable agreement or arrangement as in effect on the Release Date);

(7)        the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which the Issuer or any such Restricted Subsidiary is a party as of the Release Date and any similar agreements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing

-76-

agreement or under any similar agreement entered into after the Release Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise materially disadvantageous to the Holders when taken as a whole;

(8)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture which are fair to the Issuer and its Restricted Subsidiaries, in the reasonable determination of the Board of Directors of the Issuer or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(9)    the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Person and any contribution to the capital of the Issuer;

(10)    payments by the Issuer or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which payments are approved by a majority of the Board of Directors of the Issuer in good faith;

(11)    the Emergence Transactions, including the payments of fees and expenses in connection therewith;

(12)    payments or loans (or cancellation of loans) to employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Issuer in good faith;

(13)    transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer or any direct or indirect parent of the Issuer; *provided*, *however*, that such director abstains from voting as a director of the Issuer or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(14)    transactions permitted by, and complying with, the provisions of Section 5.01;

(15)    the pledge of Equity Interests of an Unrestricted Subsidiary to lenders of such Unrestricted Subsidiary to support the Indebtedness of such Unrestricted Subsidiary owed to such lenders; and

(16)    any transaction with (or for the benefit of) a Person that would constitute an Affiliate Transaction solely because the Issuer or a Restricted Subsidiary owns an equity interest in or otherwise controls such Person.

Section 4.12    Liens.

After the Release Date, the Issuer will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, affirm or suffer to exist any Lien of any kind upon any of its property or assets (including any intercompany notes) constituting Collateral, now owned or acquired after the Release Date, or any income or profits therefrom, securing Indebtedness excluding, however, from the operation of the foregoing any Permitted Liens. Additionally, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, incur or suffer to exist any Lien (the "*Initial Lien*") on any property or

assets that are not Collateral securing Indebtedness unless (a) the Issuer or such Restricted Subsidiary (i) equally and ratably secures the Notes (or on a senior basis to) the obligations secured by such Initial Lien or (ii) provides that such Initial Lien is expressly junior in ranking relative to the Notes and related Guarantees pursuant to a Second Lien Intercreditor Agreement or (b) such Initial Lien is a Permitted Lien; *provided, however*, that any such Lien created to secure the Notes pursuant to this sentence of this Section 4.12 shall provide by its terms that upon the release and discharge of the Initial Lien on such assets by the collateral agent for the Indebtedness secured by such Initial Lien, the Lien on such assets securing the Notes shall be automatically and unconditionally released and discharged and the Issuer may take any action necessary to effectuate such release or discharge.

Section 4.13      Changes in Covenants When Notes Rated Investment Grade.

(a)      After the Release Date, beginning on the first date of a Covenant Suspension and ending on a Reversion Date (such period, a "*Suspension Period*"), the following covenants will not be applicable to the Notes:

(1)      Section 4.07;

(2)      Section 4.08;

(3)      Section 4.09;

(4)      Section 4.10;

(5)      Section 4.11;

(6)      Section 4.15; and

(7)      clause (4) of Section 5.01(a).

(b)      On each Reversion Date, all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been incurred or issued pursuant to Section 4.09(a) hereof or one of the clauses set forth in Section 4.09(b) hereof (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be incurred or issued pursuant to Section 4.09(a) hereof or 4.09(b) hereof, such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Release Date, so that it is classified as permitted under Section 4.09(b)(3) hereof.

(c)      Calculations made after the Reversion Date of the amount available to be made as Restricted Payments pursuant to Section 4.07 hereof will be made as though Section 4.07 hereof had been in effect since the Release Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.07(a) hereof; *provided, however*, that no Default or Event of Default will be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions taken or the performance of obligations under agreements entered into by the Issuer or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

(d)    In addition, for purposes of Section 4.11 hereof, all agreements and arrangements entered into by the Issuer or any Restricted Subsidiary with an Affiliate of the Issuer during the Suspension Period prior to the Reversion Date will be deemed to have been entered into on or prior to the Release Date and for purposes of Section 4.08 hereof, all contracts entered into during the Suspension Period prior to such Reversion Date that contain any of the restrictions contemplated by Section 4.08 hereof will be deemed to have been existing on the Release Date.  For purposes of Section 4.10 hereof, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

(e)    During any Suspension Period, no Restricted Subsidiary may be designated as an Unrestricted Subsidiary by the Board of Directors of the Issuer.

(f)    Upon the occurrence of a Covenant Suspension or a Reversion Date, the Issuer shall provide written notice to the Trustee, and file with the Trustee an Officers' Certificate certifying that such suspension or reversion complied with the foregoing provisions.  In the case of a Covenant Suspension, such notice shall list the Suspended Covenants.

Section 4.14    Offer To Repurchase upon Change of Control.

(a)    If, after the Release Date, a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under Section 3.07 hereof, the Issuer shall make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus, without duplication, accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.  Within 30 days following any Change of Control, the Issuer shall send notice of such Change of Control Offer by first class mail, with a copy to the Trustee, to each Holder to the address of such Holder appearing in the security register with the following information:

(1)    a Change of Control Offer is being made pursuant to this Section 4.14 and that all Notes properly tendered pursuant to such Change of Control Offer shall be accepted for payment by the Issuer;

(2)    the purchase price and the purchase date, which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3)    any Note not properly tendered shall remain outstanding and continue to accrue interest;

(4)    unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest on the Change of Control Payment Date;

(5)    Holders electing to have any Notes purchased pursuant to a Change of Control Offer shall be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)      Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the Paying Agent receives, not later than the close of business on the Business Day prior to the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)      if such notice is mailed prior to the occurrence of a Change of Control, stating that the Change of Control Offer is conditional on the occurrence of such Change of Control; and

(8)      the other instructions, as determined by the Issuer, consistent with this Section 4.14, that a Holder must follow.

(b)      While the Notes are in global form and the Issuer makes an offer to purchase all of the Notes pursuant to the Change of Control Offer, a Holder may exercise its option to elect for the purchase of the Notes through the facilities of DTC, subject to its rules and regulations.

The notice, if mailed in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice.  If (a) the notice is mailed in a manner herein provided and (b) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such notice without defect.  The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.14, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.14 by virtue thereof.

(c)      On the Change of Control Payment Date, the Issuer shall, to the extent permitted by law,

(1)      accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer,

(2)      deposit with the Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered, and

(3)      deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officers' Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(d)      The Paying Agent shall promptly mail to each Holder the Change of Control Payment for such Notes, and the Trustee shall, upon receipt of an Authentication Order, promptly authenticate and mail to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note shall be in denominations of $2,000 and integral multiples of $1,000 in excess thereof.  The Issuer shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(e)      The Issuer shall not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the time and oth-

erwise in compliance with the requirements set forth in this Section 4.14 applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f)    Other than as specifically provided in this Section 4.14, any purchase pursuant to this Section 4.14 shall be made pursuant to the provisions of Sections 3.02, 3.05 and 3.06 hereof.

(g)    In the event a Change of Control occurs at a time when the Issuer is prohibited by the terms of any Pari Passu Lien Indebtedness from purchasing the Notes, then prior to the mailing of the notice of a Change of Control to Holders of Notes, but in any event within 30 days following any Change of Control, the Issuer shall (1) repay in full all Obligations, and terminate all commitments, under Pari Passu Lien Indebtedness or offer to repay in full all Obligations, and terminate all commitments, under Pari Passu Lien Indebtedness and to repay the Obligations owed to (and terminate all commitments of) each lender which has accepted such offer or (2) obtain the requisite consents under the agreements governing such Pari Passu Lien Indebtedness to permit the repurchase of the Notes. If such a consent is not obtained or borrowings repaid, the Issuer shall remain prohibited from purchasing the Notes. The Issuer shall first comply with this clause (g) before it shall be required to repurchase the Notes pursuant to the other provisions of this Section 4.14. The Issuer's failure to comply with this clause (g) (and any failure to send a notice of a Change of Control as a result of the prohibition in this clause (g)) may (with notice and lapse of time) constitute an Event of Default described in clause (3) of Section 6.01(a) hereof, but shall not constitute an Event of Default described in clause (1) of Section 6.01(a) hereof.

Section 4.15    <u>Limitation on Guarantees of Indebtedness by Restricted Subsidiaries</u>.

After the Release Date, the Issuer shall not permit any of its Restricted Subsidiaries, other than a Guarantor, to guarantee the payment of any Indebtedness of the Issuer or any other Guarantor unless:

(1)    such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to this Indenture, the form of which is attached as <u>Exhibit D</u> hereto, providing for a Guarantee by such Restricted Subsidiary, except, if such Indebtedness is by its express terms subordinated in right of payment to the Notes or such Guarantor's Guarantee, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the Notes or such Guarantor's Guarantee;

(2)    such Restricted Subsidiary within 30 days executes and delivers a joinder to the applicable Security Documents or new Security Documents and takes all actions necessary to perfect the Liens created thereunder (to the extent required by such Security Documents), all of such Liens to be junior to the Liens in favor of the holders of the Pari Passu Lien Indebtedness and to be subject to the First Lien Intercreditor Agreement; and

(3)    such Restricted Subsidiary waives and shall not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Issuer or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee;

*provided* that this Section 4.15 shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

Each Guarantee shall be released in accordance with Article 11 hereof.

Section 4.16    Escrow of Proceeds.

(a)    The cash proceeds to the Escrow Issuer of the offering of the Notes (the "*Escrow Issuer Proceeds*") will be placed in escrow until the Release Date or a Special Mandatory Redemption (each as defined below). The terms of the escrow will be set forth in the Escrow Agreement, pursuant to which the Escrow Issuer will deposit with the Escrow Agent on the Issue Date, the Escrow Issuer Proceeds, and AMO will deposit on the Issue Date sufficient cash or Escrow Investments, in an amount sufficient to redeem, for cash, the Notes at a redemption price equal to the sum of 100% of their issue price together with accrued and unpaid interest on the Notes from the Issue Date up to but not including the date of the Special Mandatory Redemption described below (collectively, the "*Escrow Proceeds*"). The Escrow Issuer will grant the Trustee, for its benefit and for the benefit of the Collateral Agent and the Holders of the Notes, a first priority security interest in the escrow account (the "*Escrow Account*") and all deposits therein to secure the Special Mandatory Redemption.  Prior to the release of the Escrow Proceeds (either on the Release Date or in connection with the Special Mandatory Redemption), the Notes will be secured only by a pledge of the Escrow Proceeds.

(b)    The Issuer shall only be entitled to direct the Escrow Agent to release to it the Escrow Proceeds upon satisfaction of the conditions set forth in the form of Officers' Certificate included as Exhibit A to the Escrow Agreement, which shall be certified in writing by AMO in such Officers' Certificate delivered to the Escrow Agent contemporaneously with the release of the Escrow Proceeds on or prior to the Escrow End Date (such date, the "*Release Date*")

(c)    To the extent the Issuer or any Restricted Subsidiary has incurred Indebtedness (treating Indebtedness not discharged pursuant to the Reorganization Plan and remaining outstanding on the Release Date as having been incurred as of the Release Date), made any Restricted Payments, consummated any Asset Sale or otherwise taken any action or engaged in any activities during the period beginning on the Issue Date and ending on the Release Date, such actions and activities shall be treated and classified under this Indenture (including but not limited to impacting relevant baskets and determining whether a Default or Event of Default would have occurred as of the Release Date for purposes of the release conditions above), as if this Indenture and the covenants set forth herein had applied to the Issuer and the Restricted Subsidiaries during such period.  For purposes of the foregoing, (i) the Issuer will be deemed to have been the direct or indirect owner of all of the Restricted Subsidiaries of the Issuer for all relevant periods and (ii) all Subsidiaries of the Issuer shall be deemed to be Restricted Subsidiaries for the period from the Issue Date through the Release Date.

Section 4.17    Tax Treatment of the Notes.

The Issuer agrees and, by acceptance of a beneficial ownership interest in the Notes, each Holder is deemed to have agreed, to treat the Notes as indebtedness of the Issuer for U.S. federal income tax purposes.  The Issuer and the Holder will not take any position on a tax return inconsistent with such treatment, unless required by applicable law.

Section 4.18    Non-Impairment of Security Interest.

From and after the Release Date and subject to the rights of the holders of Permitted Liens that are existing on the Release Date or incurred after the Release Date, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission could reasonably be expected to have the result of materially impairing the Lien with respect to the Collateral in favor of the holders of First Lien Obligations; *provided* that this Section 4.18 shall not prohibit the release of Guarantors pursuant to Section 11.06 hereof or the release of Collateral pursuant to Section 4.12 or Article 10 hereof.

Section 4.19    Activities of the Escrow Issuer prior to the Release Date and Assumption.

Prior to the Release Date and Assumption, the Issuer will be a corporation whose primary activities are restricted to issuing the Notes and the Second Lien Notes (if offered prior to the Release Date), issuing capital stock to, and receiving capital contributions from its direct or indirect parent, performing its obligations in respect of the Notes under this Indenture, the Second Lien Notes under the Second Lien Indenture, the Escrow Agreement and the Purchase Agreement, consummating the Assumption or redeeming the Notes and the Second Lien Notes (if offered prior to the Release Date) in connection with any Special Mandatory Redemption, and conducting such other activities as are necessary or appropriate to carry out the activities described in this Section 4.19 and maintain its corporate existence (including the payment of customary director's fees). Prior to the Assumption, the Issuer will not issue any debt other than the Notes and the Second Lien Notes or own, hold or otherwise have any interest in any assets other than the Escrow Account and the Escrow Proceeds therein.

Section 4.20    After-Acquired Collateral; Further Assurances.

(a)    From and after the Release Date and subject to certain limitations and exceptions (including the exclusion of any securities or other equity interests of any of the Issuer's Subsidiaries), if the Issuer or any Guarantor creates any additional security interest upon any property or asset to secure any Pari Passu Lien Obligations (which include Obligations in respect of the Credit Agreement), it must concurrently grant a first-priority security interest (subject to Permitted Liens) upon such property as security for the Indebtedness and Obligations under the Notes. In addition, if granting a security interest in such property requires the consent of a third party, the Issuer will use commercially reasonable efforts to obtain such consent with respect to the first-priority security interest for the benefit of the Collateral Agent. If such third party does not consent to the granting of the first-priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest.

(b)    The Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Security Documents in the Collateral. In addition, from time to time, the Issuer will reasonably promptly secure the obligations under this Indenture, Security Documents and First Lien Intercreditor Agreement by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral. Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents as may be reasonably required.

Section 4.21    <u>Information Regarding Collateral</u>.

(a)    The Issuer will furnish to the Collateral Agent, with respect to the Issuer or any Guarantor, prompt written notice of any change in such Person's (i) legal name, (ii) jurisdiction of organization or formation, (iii) identity or corporate structure or (iv) Organizational Identification Number. The Issuer and the Guarantors will agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

(b)    Each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 4.03 hereof, the Issuer shall deliver to the Trustee a certificate of a financial officer of the Issuer setting forth the information required pursuant to the schedules required by the Security Documents or confirming that there has been no change in such information since the date of the prior annual financial statements.

Section 4.22    <u>Maintenance of Property; Insurance</u>.

(a)    The Issuer shall cause all material properties owned by or leased by it or any of its Restricted Subsidiaries used or useful to the conduct of its business or the business of any of its Restricted Subsidiaries to be maintained and kept in normal condition, repair and working order and supplied with all reasonably necessary equipment and shall cause to be made all repairs, renewals, replacements, and betterments thereof, all as in its judgment may be reasonably necessary, so that the business carried on in connection therewith may be properly conducted at all times; *provided, however*, that nothing in this Section 4.22 shall prevent the Issuer or any of its Restricted Subsidiaries from discontinuing the use, operation or maintenance of any of such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the management of the Issuer or any such Restricted Subsidiary, necessary or desirable in the conduct of the business of the Issuer or any such Restricted Subsidiary; *provided further* that nothing in this Section 4.22 shall prevent the Issuer or any of its Restricted Subsidiaries from discontinuing or disposing of any properties to the extent otherwise permitted by this Indenture.

(b)    The Issuer shall maintain, and shall cause its Restricted Subsidiaries to maintain, insurance with responsible carriers against such risks and in such amounts, and with such deductibles, retentions, self-insured amounts and co-insurance provisions, as are customarily carried by similar businesses of similar size, including property and casualty loss, workers' compensation and interruption of business insurance.

ARTICLE 5

SUCCESSORS

Section 5.01    <u>Merger, Consolidation or Sale of All or Substantially All Assets</u>.

(a)    After the Release Date, the Issuer shall not consolidate or merge with or into or wind up into (whether or not the Issuer is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)    the Issuer is the surviving corporation or limited liability company or the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which

-84-

such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation or limited liability company organized or existing under the laws of the jurisdiction of organization of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2)     the Successor Company, if other than the Issuer, expressly assumes all the obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures, supplements to the Security Documents and any other documents or instruments in form reasonably satisfactory to the Trustee;

(3)     immediately after such transaction, no Default exists;

(4)     immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period, either:

(a)     the First Lien Leverage Ratio for the Successor Company and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 2.75 to 1.00, or

(b)     (i) the First Lien Leverage Ratio is equal to or less than such ratio immediately prior to such transaction and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such transaction; and

(5)     the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and supplements to the Security Documents comply with this Indenture.

(b)     The Successor Company shall succeed to, and be substituted for the Issuer, as the case may be, under this Indenture, the Guarantees and the Notes, as applicable.  Notwithstanding clauses (3), (4) and (5) of Section 5.01(a) hereof,

(1)     any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Issuer, and

(2)     the Issuer may merge with an Affiliate of the Issuer solely for the purpose of re-incorporating the Issuer in a State of the United States of America, so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby.

(c)     Subject to certain limitations described in this Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, no Guarantor shall, and the Issuer shall not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Issuer or Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)     (a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the

United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b)    the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under this Indenture and the Security Documents and such Guarantor's related Guarantee pursuant to supplemental indentures, supplements to the Security Documents or other documents or instruments in form reasonably satisfactory to the Trustee;

(c)    immediately after such transaction, no Default exists; and

(d)    the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and supplements to the Security Documents comply with this Indenture; or

(2)    the transaction is made in compliance with Section 4.10 hereof.

(d)    Subject to certain limitations described in this Indenture, in the case of clause (1) of Section 5.01(c) hereof, the Successor Person shall succeed to, and be substituted for, such Guarantor under this Indenture and such Guarantor's Guarantee.  Notwithstanding the foregoing, any Guarantor may merge into or transfer all or part of its properties and assets to another Guarantor or the Issuer.

(e)    Notwithstanding the foregoing, (i) the Assumption and related transactions shall be permitted under this Indenture and (ii) the merger of AMI with and into the AMO with AMO being the surviving corporation on the Release Date in connection with the Emergence Transactions shall be permitted under this Indenture.

Section 5.02    Successor Corporation Substituted.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Issuer in accordance with Section 5.01 hereof, the successor corporation formed by such consolidation or into or with which the Issuer is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Indenture referring to the Issuer shall refer instead to the successor corporation and not to the Issuer), and may exercise every right and power of the Issuer under this Indenture with the same effect as if such successor Person had been named as the Issuer herein; *provided* that the predecessor Issuer shall not be relieved from the obligation to pay the principal of and interest and Additional Interest, if any, on the Notes except in the case of a sale, assignment, transfer, conveyance or other disposition of all of the Issuer's assets that meets the requirements of Section 5.01 hereof.

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01    Events of Default.

(a)    An "*Event of Default*" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or

-86-

be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(1)     default in payment when due and payable, upon redemption, upon a Special Mandatory Redemption, upon acceleration or otherwise, of principal of, or premium, if any, on the Notes;

(2)     default for 30 days or more in the payment when due of interest or Additional Interest on or with respect to the Notes;

(3)     failure by the Issuer or any Guarantor for 60 days after receipt of written notice by the Trustee or the Holders of not less than 25% in principal amount of the Notes issued under this Indenture to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) in this Indenture or the Notes;

(4)     default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Issuer or any of its Restricted Subsidiaries, other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if both:

(a)     such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

(b)     the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $35.0 million or more at any one time outstanding;

(5)     failure by the Issuer or any Significant Subsidiary (or group of Restricted Subsidiaries that taken together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $35.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)     the Issuer or any Significant Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(a)     commences proceedings to be adjudicated bankrupt or insolvent;

(b)     consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under applicable Bankruptcy law;

(c)     consents to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property;

-87-

(d)        makes a general assignment for the benefit of its creditors; or

(e)        generally is not paying its debts as they become due;

(7)        a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(a)        is for relief against the Issuer or any Significant Subsidiary in a proceeding in which the Issuer or any such Significant Subsidiary is to be adjudicated bankrupt or insolvent;

(b)        appoints a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or any Significant Subsidiary, for all or substantially all of the property of the Issuer or any Significant Subsidiary; or

(c)        orders the liquidation of the Issuer or any Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(8)        the Guarantee of any Significant Subsidiary (or group of Guarantors that taken together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of such Guarantor, as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of this Indenture or the release of any such Guarantee in accordance with this Indenture; or

(9)        (a) with respect to any Collateral having a fair market value in excess of $20.0 million, individually or in the aggregate, (i) the security interest under any Security Document, at any time, ceases to be in full force and effect for any reason other than in accordance with the terms of this Indenture, the Security Documents and the First Lien Intercreditor Agreement or (ii) any security interest created thereunder or under this Indenture is declared invalid or unenforceable by a court of competent jurisdiction or (b) the Issuer or any Guarantor asserts, in any pleading in any court of competent jurisdiction, that any security interest in any Collateral is invalid or unenforceable.

(b)        In the event of any Event of Default specified in clause (4) of Section 6.01(a) hereof, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded automatically and without any action by the Trustee or the Holders if, within 20 days after such Event of Default arose:

(1)        the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2)        the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3)        the default that is the basis for such Event of Default has been cured.

-88-

Section 6.02      Acceleration.

If any Event of Default (other than, with respect to the Issuer, an Event of Default specified in clause (6) or (7) of Section 6.01(a) hereof) occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in principal amount of the then total outstanding Notes may declare the principal, premium, if any, (without duplication) interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest shall be due and payable immediately.  The Trustee may withhold from Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest on the Notes, if it determines that withholding notice is in the interests of the Holders.

Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof, all outstanding Notes shall be due and payable without further action or notice.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest, Additional Interest, if any, or premium that has become due solely because of the acceleration) have been cured or waived and all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and other amounts due the Trustee under Section 7.07 hereof have been paid.

If an Event of Default occurs and is continuing that results in an acceleration, the Trustee and Collateral Agent shall provide an Enforcement Notice pursuant to the terms of the First Lien Intercreditor Agreement.

Section 6.03      Other Remedies.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04      Waiver of Past Defaults.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default and its consequences under this Indenture and the Notes, except a continuing Default in the payment of the principal of, premium, if any, Additional Interest, if any, or interest on, any Note held by a non-consenting Holder (including in connection with an Asset Sale Offer, a Change of Control Offer or a Special Mandatory Redemption); *provided*, subject to Section 6.02 hereof, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such

-89-

waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05     Control by Majority.

Subject to the terms of the Security Documents, Holders of a majority in principal amount of the outstanding Notes issued hereunder shall have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  The Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder of a Note or that would involve the Trustee in personal liability.

Section 6.06     Limitation on Suits.

Subject to Section 6.07 hereof, no Holder of a Note may pursue any remedy with respect to this Indenture or the Notes unless:

(1)     such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2)     Holders of at least 25% in principal amount of the total outstanding Notes have requested the Trustee to pursue the remedy;

(3)     Holders of the Notes have offered the Trustee security or indemnity against any loss, liability or expense satisfactory to the Trustee;

(4)     the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of such satisfactory security or indemnity; and

(5)     Holders of a majority in principal amount of the total outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07     Rights of Holders of Notes To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, and Additional Interest, if any, interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an Asset Sale Offer or a Change of Control Offer), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.08     Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a)(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium, if any, and Additional Interest, if any, and, without duplication, interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and, without duplication, such further amount as shall be sufficient to cover the

costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09    <u>Restoration of Rights and Remedies</u>.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

Section 6.10    <u>Rights and Remedies Cumulative</u>.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07 hereof, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.11    <u>Delay or Omission Not Waiver</u>.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12    <u>Trustee May File Proofs of Claim</u>.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes including the Guarantors), its creditors or its property and shall be entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee and the Collateral Agent any amount due to them for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee or the Collateral Agent to authorize or consent

to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.13    Priorities.

Subject to the terms of the Security Documents and the Intercreditor Agreements with respect to any proceeds of Collateral, if the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

(a)    to the Trustee and the Collateral Agent and their agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the Collateral Agent and the costs and expenses of collection;

(b)    to Holders of Notes for amounts due and unpaid on the Notes for principal, premium, if any, and Additional Interest, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and, without duplication, Additional Interest, if any, and interest, respectively; and

(c)    to the Issuer or to such party as a court of competent jurisdiction shall direct including a Guarantor, if applicable.

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.13.

Section 6.14    Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then outstanding Notes.

## ARTICLE 7

## TRUSTEE

Section 7.01    Duties of Trustee.

(a)    If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture, the Notes, the Security Documents and the Intercreditor Agreements and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)    in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

(d)    Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e)    The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture at the request of any Holder of the Notes unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f)    The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02    Rights of Trustee.

(a)    The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)    Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be

full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)    The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer shall be sufficient if signed by an Officer of the Issuer.

(f)    None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(g)    The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)    In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)    In the event the Issuer is required to pay Additional Interest, the Issuer shall provide written notice to the Trustee of the Issuer's obligation to pay Additional Interest no later than 15 days prior to the next Interest Payment Date, which notice shall set forth the amount of the Additional Interest to be paid by the Issuer.  The Trustee shall not at any time be under any duty or responsibility to any Holders to determine whether the Additional Interest is payable and the amount thereof.

(k)    The permissive rights of the Trustee enumerated herein shall not be construed as duties.

(l)    The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

(m)    The Issuer shall provide prompt written notice to the Trustee of any change to its fiscal year (it being expressly understood that the failure to provide such notice to the Trustee shall not be deemed a Default or Event of Default under this Indenture).

Section 7.03       Individual Rights of Trustee.

         The Trustee in its individual or any other capacity may become the owner or pledgee of
Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would
have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest it
must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if this
Indenture has been qualified under the Trust Indenture Act) or resign.  Any Agent may do the same with
like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04       Trustee's Disclaimer.

         The Trustee shall not be responsible for and makes no representation as to the validity or
adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds
from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this
Indenture, it shall not be responsible for the use or application of any money received by any Paying
Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any
statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this
Indenture other than its certificate of authentication.

Section 7.05       Notice of Defaults.

         If a Default occurs and is continuing and if it is known to the Trustee, the Trustee shall
mail to Holders of Notes a notice of the Default within 90 days after it occurs or if known to the Trustee
later than 90 days after it occurs, as soon as practicable.  Except in the case of a Default relating to the
payment of principal, premium, if any, or interest on any Note, the Trustee may withhold from the Hold-
ers notice of any continuing Default if and so long as a committee of its Responsible Officers in good
faith determines that withholding the notice is in the interests of the Holders of the Notes.  The Trustee
shall not be deemed to know of any Default unless a Responsible Officer of the Trustee has actual knowl-
edge thereof or unless written notice of any event which is such a Default is received by the Trustee at the
Corporate Trust Office of the Trustee.

Section 7.06       Reports by Trustee to Holders of the Notes.

         Within 60 days after each May 15, beginning with the May 15 following the date of this
Indenture, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes
a brief report dated as of such reporting date that complies with Trust Indenture Act Section 313(a) (but if
no event described in Trust Indenture Act Section 313(a) has occurred within the twelve months preced-
ing the reporting date, no report need be transmitted).  The Trustee also shall comply with Trust Indenture
Act Section 313(b)(2).  The Trustee shall also transmit by mail all reports as required by Trust Indenture
Act Section 313(c).

         A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to
the Issuer and filed with the SEC (to the extent that the Issuer is subject to the reporting requirements of
Section 13 or Section 15(d) of the Exchange Act or otherwise voluntarily filing periodic reports with the
SEC) and each stock exchange on which the Notes are listed in accordance with Trust Indenture Act Sec-
tion 313(d).  The Issuer shall promptly notify the Trustee, in writing, when the Notes are listed on any
stock exchange.

Section 7.07     Compensation and Indemnity.

The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time.  The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust.  The Issuer and the Guarantors, jointly and severally, shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services.  Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents, professional advisors and counsel.

The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee for, and hold the Trustee harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any of the Guarantors (including this Section 7.07) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder).  The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity.  Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder.  The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel.  The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct, negligence or bad faith as determined by a court of competent jurisdiction in a final and non-appealable decision.

The obligations of the Issuer under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee.

Notwithstanding anything to the contrary in Section 4.12 hereof, to secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes.  Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(6) or (7) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of Trust Indenture Act Section 313(b)(2) to the extent applicable.

Section 7.08     Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.  The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer.  The Holders of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing.  The Issuer may remove the Trustee if:

(a)     the Trustee fails to comply with Section 7.10 hereof;

-96-

(b)   the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)   a custodian or public officer takes charge of the Trustee or its property; or

(d)   the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee. Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer. Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture. The successor Trustee shall mail a notice of its succession to Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof. Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09   <u>Successor Trustee by Merger, etc</u>.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

Section 7.10   <u>Eligibility; Disqualification</u>.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5). The Trustee is subject to Trust Indenture Act Section 310(b).

Section 7.11    <u>Preferential Collection of Claims Against Issuer</u>.

The Trustee is subject to Trust Indenture Act Section 311(a), excluding any creditor relationship listed in Trust Indenture Act Section 311(b).  A Trustee who has resigned or been removed shall be subject to Trust Indenture Act Section 311(a) to the extent indicated therein.

Section 7.12    <u>Escrow Authorization</u>.

Each Holder, by its acceptance of a Note, consents and agrees to the terms of the Escrow Agreement, including related documents thereto, as the same may be in effect or may be amended from time to time in writing by the parties thereto (*provided* that no amendment that would materially adversely affect the rights of the Holders may be effected without the consent of each Holder of Notes affected thereby), and authorizes and directs the Trustee to enter into the Escrow Agreement and to perform its obligations and exercise its rights thereunder in accordance therewith.  The Issuer shall do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Escrow Agreement, to assure and confirm to the Trustee the security interest contemplated by the Escrow Agreement or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes and Guarantees secured hereby, according to the intent and purpose herein expressed.  The Issuer shall take, or shall cause to be taken, any and all actions reasonably required to cause the Escrow Agreement to create and maintain, as security for the obligations of the Issuer under this Indenture, the Notes and the Guarantees as provided in the Escrow Agreement, valid and enforceable first priority perfected liens in and on all the Escrow Proceeds, in favor of the Trustee for its benefit, the benefit of the Collateral Agent and the ratable benefit of the Holders, superior to and prior to the rights of third Persons and subject to no other Liens.

Section 7.13    <u>Authorization of Security Documents; Intercreditor Agreements</u>.

By their acceptance of the Notes, the Holders hereby authorize and direct the Trustee and Collateral Agent, as the case may be, to execute and deliver the Security Documents, the First Lien Intercreditor Agreement, any Second Lien Intercreditor Agreement and any other document purporting to create a security interest in favor of the Trustee or the Collateral Agent, as applicable, for the benefit of the Holders of the Notes, including any Security Documents executed after the Release Date.  It is hereby expressly acknowledged and agreed that, in doing so, the Trustee and the Collateral Agent are not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose.  Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under pursuant to, the Security Documents, the First Lien Intercreditor Agreement, any Second Lien Intercreditor Agreement or any other document purporting to create a security interest in favor of the Trustee and/or the Collateral Agent for their benefit and the benefit of the Holders of the Notes, each shall have all of the rights, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    <u>Option to Effect Legal Defeasance or Covenant Defeasance</u>.

The Issuer may, at its option and at any time, elect to have either Section 8.02 or 8.03 hereof applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

-98-

Section 8.02      Legal Defeasance and Discharge.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) and this Indenture on the date the conditions set forth below are satisfied ("*Legal Defeasance*").  For this purpose, Legal Defeasance means that the Issuer and the Guarantors shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Guarantees), which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes, the Guarantees, this Indenture and the Security Documents (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same) and to have caused the release of all Liens on the Collateral granted under the Security Documents, except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

(a)      the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and, without duplication, interest on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in Section 8.04 hereof;

(b)      the Issuer's obligations with respect to Notes concerning issuing temporary Notes, registration of the transfer or exchange of Notes, replacement of mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c)      the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's obligations in connection therewith; and

(d)      this Section 8.02.

Subject to compliance with this Article 8, the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03      Covenant Defeasance.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in Sections 3.09, 4.03, 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15, 4.18, 4.19, 4.20, 4.21 and 4.22 hereof and clauses (4) and (5) of Section 5.01(a), Sections 5.01(c) and 5.01(d) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied ("*Covenant Defeasance*"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Issuer may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected

thereby. In addition, upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, (x) Sections 6.01(a)(3), 6.01(a)(4), 6.01(a)(5), 6.01(a)(8) and 6.01(a)(9) hereof shall not constitute Events of Default with respect to the Notes and (y) Sections 6.01(a)(1), 6.01(a)(2), 6.01(a)(6) (solely with respect to Significant Subsidiaries) and 6.01(a)(7) (solely with respect to Significant Subsidiaries) shall continue to constitute an Event of Default with respect to the Notes.

Section 8.04    <u>Conditions to Legal or Covenant Defeasance</u>.

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the outstanding Notes:

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, in the opinion of a nationally recognized firm of independent public accountants (or, if two or more nationally recognized firms of independent public accountants decline to issue such opinion as a matter of policy, in the opinion of the Issuer's chief financial officer), to pay the principal amount of, premium, if any, and (without duplication), interest due on the Notes on the stated maturity date or on the Redemption Date, as the case may be, of such principal, premium, if any, or interest on such Notes, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular Redemption Date;

(2)    in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a)    the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b)    since the issuance of the Notes, there has been a change in the applicable U.S. Federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes shall not recognize income, gain or loss for U.S. Federal income tax purposes, as a result of such Legal Defeasance and shall be subject to U.S. Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(1)    in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes shall not recognize income, gain or loss for U.S. Federal income tax purposes as a result of such Covenant Defeasance and shall be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(2)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(3)        such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any Pari Passu Lien Indebtedness or any other material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make such deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(4)        the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds shall not be subject to the effect of Section 547 of the Bankruptcy Law;

(5)        the Issuer shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(6)        the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 8.05        Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.

Subject to Section 8.06 hereof, all money and Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer or a Guarantor acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium and Additional Interest, if any, and, without duplication, interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time upon the request of the Issuer any money or Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06        Repayment to Issuer.

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium and Additional Interest, if any, or, without duplication,

interest on any Note and remaining unclaimed for two years after such principal, and premium and Additional Interest, if any, or interest has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, shall thereupon cease.

Section 8.07    Reinstatement.

If the Trustee or Paying Agent is unable to apply any United States dollars or Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided* that, if the Issuer makes any payment of principal of, premium and Additional Interest, if any, or, without duplication, interest on any Note following the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes.

Notwithstanding Section 9.02 hereof, the Issuer, any Guarantor (with respect to its Guarantee or this Indenture), the Collateral Agent and the Trustee may amend or supplement this Indenture, the Security Documents, the First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement and any Guarantee or Notes without the consent of any Holder:

(1)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)    to provide for the Assumption and to comply with Section 5.01 hereof;

(4)    to provide the assumption of the Issuer's or any Guarantor's obligations to the Holders;

(5)    to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights under this Indenture of any such Holder;

(6)    to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(7)    to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(8)    to evidence and provide for the acceptance and appointment (x) under this Indenture of a successor Trustee hereunder pursuant to the requirements hereof or (y) under the Security Documents of a successor Collateral Agent thereunder pursuant to the requirements thereof;

-102-

(9)    to make changes related to the transfer and legending of the Notes as permitted by this Indenture or applicable law;

(10)    to add a Guarantor under this Indenture;

(11)    to conform the text of this Indenture, the Guarantees, the Notes, the Security Documents, the First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement to any provision of the "Description of first lien notes" section of the Offering Memorandum;

(12)    to make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation to facilitate the issuance and administration of the Notes; *provided*, *however*, that (i) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(13)    to provide for the issuance of Exchange Notes in accordance with the terms of this Indenture and the Registration Rights Agreement;

(14)    to add security to or for the benefit of the Notes and, in the case of the Security Documents, to or for the benefit of the other secured parties named therein or to confirm and evidence the release, termination or discharge of any Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture and the Security Documents or as required by the First Lien Intercreditor Agreement; or

(15)    to modify the Security Documents, the First Lien Intercreditor Agreement and/or the Second Lien Intercreditor Agreement to secure additional extensions of credit and additional secured creditors holding Additional Pari Passu Lien Indebtedness or Permitted Second Lien Obligations, as applicable, so long as such Additional Pari Passu Lien Indebtedness or Permitted Second Lien Obligations, as applicable, are not prohibited by this Indenture or the Credit Agreement.

Upon the request of the Issuer accompanied by a Board Resolution authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee and the Collateral Agent shall join with the Issuer and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and the Collateral Agent shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.  Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor, the Collateral Agent and the Trustee of a supplemental indenture to this Indenture, the form of which is attached as <u>Exhibit D</u> hereto, and delivery of an Officers' Certificate.

Section 9.02    <u>With Consent of Holders of Notes</u>.

Except as provided below in this Section 9.02, the Issuer, the Collateral Agent and the Trustee may amend or supplement this Indenture, the Security Documents, the First Lien Intercreditor Agreement, any Second Lien Intercreditor Agreement, any related Guarantee and the Notes with the consent of the Holders of at least a majority in principal amount of the Notes (including Additional Notes, if any) then outstanding voting as a single class including, without limitation, so long as this Indenture has

not been qualified under the TIA, any Notes beneficially owned by the Issuer's Affiliates (including, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) and, subject to Sections 6.04 and 6.07 hereof, any existing Default or compliance with any provision of this Indenture, the Security Documents, the First Lien Intercreditor Agreement, any Second Lien Intercreditor Agreement, the Guarantees or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including Additional Notes, if any) voting as a single class (including consents obtained in connection with a purchase of or tender offer or exchange offer for, Notes. Subject to the preceding sentence, Section 2.08 hereof and Section 2.09 hereof shall determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02).

Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amended or supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Issuer in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each affected Holder of Notes, an amendment or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)    reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal amount of or change the fixed final maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (other than provisions relating to Section 3.09, Section 4.10 and Section 4.14 hereof to the extent that any such amendment or waiver does not have the effect of reducing the principal of or changing the fixed final maturity of any such Note or altering or waiving the provisions with respect to the redemption of such Notes);

(3)    reduce the rate of or change the time for payment of interest on any Note;

(4)    waive a Default in the payment of principal of or premium, if any, or (without duplication) interest on the Notes, except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in this Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5)    make any Note payable in a currency other than U.S. dollars;

(6)    make any change in the provisions of this Indenture relating to the rights of Holders to receive payments of principal of or premium, if any, or (without duplication) interest on the Notes including in connection with a defeasance or discharge;

(7)    make any change in these amendment and waiver provisions;

(8)    impair the right of any Holder to receive payment of principal of, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9)    make any change to or otherwise modify the ranking of the Notes that would adversely affect the Holders; or

(10)    except as expressly permitted by this Indenture, modify the Guarantee of any Guarantor in any manner adverse to the Holders of the Notes.

(11)    Notwithstanding the foregoing, without the consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding, no amendment or waiver may make any change to, or extend the time for performance under, Section 3.10 hereof (including the definition of "Escrow End Date").

(12)    In addition, any amendment to, or waiver of, the provisions of this Indenture, any Security Document, the First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement that has the effect of releasing all or substantially all of the Collateral or modifies such documents insofar as such documents relates to Collateral in a manner adverse to the Holders of the Notes in any material respect will require consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes).

No amendment of, or supplement or waiver to, this Indenture, the Notes or the Security Documents (other than the First Lien Intercreditor Agreement) shall be permitted to be effected which is in violation of or inconsistent with the terms of the First Lien Intercreditor Agreement. No amendment of, or supplement to, the First Lien Intercreditor Agreement shall be permitted to be effected without the consent of the Collateral Agent and the collateral agent under the Credit Agreement.

Prior to the payment in full of the Priority Payment Lien Obligations, (i) the First Lien Intercreditor Agreement may be amended, without the consent of the Holders of the Notes, the Collateral Agent, the collateral agent under the Credit Agreement or the Trustee (collectively, the "*First Lien Secured Parties*") or the Credit Agreement Lenders or Agent, to add additional secured creditors holding any Additional Pari Passu Lien Indebtedness permitted by the Credit Agreement and this Indenture and (ii) the Agent (with the requisite consent of the Credit Agreement Lenders) may change, waive, modify or vary the security documents without the consent of the First Lien Secured Parties; *provided* that any such change, waiver or modification does not materially adversely affect the rights of the First Lien Secured Parties and the additional secured creditors holding Additional Pari Passu Lien Indebtedness. Any consent to the use of cash collateral satisfactory to the Agent or debtor–in–possession financing on a priming basis (whether or not provided by the holders of Priority Payment Lien Obligations) not to exceed twenty percent of the aggregate secured debt subject to the First Lien Intercreditor Agreement shall not be deemed to be materially adverse to the rights of the First Lien Secured Parties or the additional secured creditors holding Additional Pari Passu Lien Indebtedness. Any provider of Additional Pari Passu Lien Indebtedness shall be entitled to rely on the determination of officers of the Issuer that such modifications do not expressly violate the provisions of the Credit Agreement or this Indenture if such determination is

set forth in an Officers' Certificate signed by an officer of the Issuer and meeting the requirements set forth in this Indenture delivered to such provider; *provided*, *however*, that such determination will not affect whether or not the Issuer has complied with its undertakings in the Credit Agreement, this Indenture, any agreement governing any Additional Pari Passu Lien Indebtedness, any related security documents or the First Lien Intercreditor Agreement.

Section 9.03    Compliance with Trust Indenture Act.

After the qualification of this Indenture under the Trust Indenture Act, every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the Trust Indenture Act as then in effect.

Section 9.04    Revocation and Effect of Consents.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective.  Subject to Section 9.02 hereof, an amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver.  If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

Section 9.05    Notation on or Exchange of Notes.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06    Trustee To Sign Amendments, etc.

The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  The Issuer may not sign an amendment, supplement or waiver until the Board of Directors approves it.  In executing any amendment, supplement or waiver, the Trustee shall be entitled to receive and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.04 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Guarantors party thereto, enforceable against them in accordance with its terms, subject to cus-

tomary exceptions, and complies with the provisions hereof (including Section 9.03).  Notwithstanding the foregoing, no Opinion of Counsel shall be required for the Trustee to execute any amendment or supplement adding a new Guarantor under this Indenture.

Section 9.07    Payment for Consent.

(a)  Neither the Issuer nor any Restricted Subsidiary of the Issuer shall, directly or indirectly, pay or cause to be paid, and (b) the Issuer shall use commercially reasonable efforts to prevent any Affiliate of the Issuer from, directly or indirectly, paying or causing to be paid, any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01    Collateral and Security Documents.

(a)    In accordance with Section 4.16 hereof, prior to a Special Mandatory Redemption or Release Date, payment of the principal of and any premium and interest on the Notes when and as the same shall be due and payable pursuant to a Special Mandatory Redemption under Section 3.10 shall be secured by a pledge of the Escrow Proceeds as described in the Escrow Agreement, pursuant to which the Issuer will grant the Trustee, for its benefit, the benefit of the Collateral Agent and the benefit of the holders of the Notes, a first priority security interest in the escrow account and all deposits therein to secure the Special Mandatory Redemption.  Upon release of the funds from escrow after the Assumption on the Release Date, the Issuer, the Guarantors, the Trustee and the Collateral Agent shall enter into one or more Security Documents.  Following the Assumption on the Release Date, the due and punctual payment of the principal of and interest on the Notes when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest on the Notes and performance of all other Obligations of the Issuer and the Guarantors to the secured parties under this Indenture, the Notes, the Guarantees, the Intercreditor Agreements and the Security Documents, according to the terms hereunder or thereunder, shall be secured as provided in the Security Documents, which define the terms of the Liens that secure the Obligations, subject to the terms of the Intercreditor Agreements.

(b)    The Trustee and the Issuer hereby acknowledge and agree that the Collateral Agent holds the Collateral in trust for the benefit of the secured parties pursuant to the terms of the Security Documents and the Intercreditor Agreements.

(c)    Each Holder, by accepting a Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the possession, use, release and foreclosure of Collateral) and the Intercreditor Agreements as the same may be in effect or may be amended from time to time in accordance with their terms and this Indenture and the Intercreditor Agreements, and authorizes and directs the Collateral Agent to enter into the Security Documents and the Intercreditor Agreements and to perform its obligations and exercise its rights thereunder in accordance therewith; *provided, however,* that if any of the provisions of the Security Documents limit, qualify or conflict with the duties imposed by the provisions of the TIA, the TIA shall control.

(d)        The Issuer shall deliver to the Collateral Agent copies of all documents required to be filed pursuant to the Security Documents, and will do or cause to be done all such acts and things as may be reasonably required by the next sentence of this Section 10.01, to assure and confirm to the Collateral Agent the security interest in the Collateral contemplated hereby, by the Security Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed.

(e)        The Issuer shall, and shall cause the Guarantors to, take any and all actions and make all filings (including the filing of UCC financing statements, continuation statements and amendments thereto) reasonably required to cause the Security Documents to create and maintain, as security for the Obligations of the Issuer and the Guarantors to the secured parties under this Indenture, the Notes, the Guarantees, the Intercreditor Agreements and the Security Documents, a valid and enforceable perfected Lien and security interest in and on all of the Collateral (subject to the terms of the Intercreditor Agreements and the Security Documents), in favor of the Collateral Agent for the benefit of the secured parties subject to no Liens other than Permitted Liens.

Section 10.02        Recordings and Opinions.

(a)        To the extent applicable, the Issuer will cause TIA § 313(b), relating to reports, to be complied with.  So long as the Indenture is not qualified under the TIA, the Issuer shall not be required to comply with TIA § 314.  The Issuer shall deliver to the Trustee and Collateral Agent, within 30 calendar days following the end of each fiscal year, an Officers' Certificate to the effect that all releases and withdrawals during such fiscal year in respect of which the Issuer did not comply with TIA § 314(d) in reliance on this Section 10.02(a) were made in the ordinary course of business and not prohibited by this Indenture.  Any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert. Notwithstanding anything to the contrary in this paragraph, the Issuer will not be required to comply with all or any portion of TIA § 314(d) if the Issuer determines, in good faith based on advice of counsel, that under the terms of TIA § 314(d) and/or any interpretation or guidance as to the meaning thereof of the Commission and its staff, including "no action" letters or exemptive orders, all or any portion of TIA § 314(d) is inapplicable to the released Collateral.

(b)        Any release of Collateral permitted by Section 10.03 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof.

(c)        Following the qualification of the Indenture under the TIA, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to December 1st of each year.

Section 10.03        Release of Collateral.

(a)        Subject to Section 10.03(b) hereof, Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents, the Intercreditor Agreements and this Indenture.  The Issuer and the Guarantors will be entitled to a release of property and other assets included in the Collateral from the Liens securing the Notes, and the Trustee (subject to its receipt of an Officers' Certificate and Opinion of Counsel as provided below) shall release, or instruct the Collateral Agent to release, as applicable, the same from such Liens at the Issuer's sole cost and expense, under one or more of the following circumstances:

(1)     to enable the Issuer or any Guarantor to sell, exchange or otherwise dispose of any of the Collateral to the extent not prohibited under Section 4.10;

(2)     to release Excess Proceeds to the Issuer that remain unexpended after the conclusion of an Asset Sale Offer conducted in accordance with this Indenture and not required to be made part of the Collateral;

(3)     in the case of a Guarantor that is released from its Guarantee with respect to the Notes, the release of the property and assets of such Guarantor;

(4)     pursuant to an amendment or waiver in accordance with Article 9 hereof; or

(5)     if the Notes have been discharged or defeased pursuant to Article 8 or Article 12 hereof.

(b)     With respect to any release of Collateral, upon receipt of an Officers' Certificate and an Opinion of Counsel each stating that all conditions precedent under this Indenture and the Security Documents and the Intercreditor Agreements, if any, to such release have been met and that it is proper for the Trustee or Collateral Agent to execute and deliver the documents requested by the Issuer in connection with such release, and any necessary or proper instruments of termination, satisfaction or release prepared by the Issuer, the Trustee shall, or shall cause the Collateral Agent to, execute, deliver or acknowledge (at the Issuer's expense) such instruments or releases to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Security Documents or the Intercreditor Agreements.  Neither the Trustee nor the Collateral Agent shall be liable for any such release undertaken in reliance upon any such Officers' Certificate or Opinion of Counsel, and the Trustee and the Collateral Agent shall not be under any obligation to release any such Lien and security interest, or execute and deliver any such instrument of release, satisfaction or termination, unless and until (i) it receives such Officers' Certificate and Opinion of Counsel or (ii) the Intercreditor Agreements expressly provide for automatic release of Collateral under this Indenture with no further action required by the Trustee or the Collateral Agent.

(c)     To the extent that Rule 3-16 of Regulation S-X under the Securities Act requires or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary of the Issuer due to the fact that such Subsidiary's Equity Interests secure the Notes, then the Equity Interests of such Subsidiary will automatically be deemed not to be part of the Collateral securing the Notes but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement.  In such event, the Security Documents may be amended or modified, without the consent of any Holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Equity Interests of such Subsidiary that are so deemed to no longer constitute part of the Collateral, all at the written request and certification by the Issuer, upon which the Trustee may conclusively rely.  In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Equity Interests  to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Equity Interests of such Subsidiary will automatically be deemed to be a part of the Collateral. In such event, the Security Documents may be amended or modified, without the consent of any Holder of such Notes, to the extent necessary to subject such Equity Interests to the Liens under the Security Documents.

Section 10.04    <u>Suits To Protect the Collateral</u>.

        Subject to the provisions of Article 7 hereof and the Security Documents and the Intercreditor Agreements, the Trustee, without the consent of the Holders, on behalf of the Holders, may or may direct the Collateral Agent to take all actions it determines in order to:

        (a)      enforce any of the terms of the Security Documents; and

        (b)      collect and receive any and all amounts payable in respect of the Obligations hereunder.

        Subject to the provisions of the Security Documents and the Intercreditor Agreements, the Trustee and the Collateral Agent shall have power to institute and to maintain such suits and proceedings as the Trustee may determine to prevent any impairment of the Collateral by any acts which may be unlawful or in violation of any of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may determine to preserve or protect its interests and the interests of the Holders in the Collateral.  Nothing in this Section 10.04 shall be considered to impose any such duty or obligation to act on the part of the Trustee or the Collateral Agent.

Section 10.05    <u>Authorization of Receipt of Funds by the Trustee Under the Security Documents</u>.

        Subject to the provisions of the Intercreditor Agreements, the Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Security Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

Section 10.06    <u>Purchaser Protected</u>.

        In no event shall any purchaser in good faith of any property purported to be released hereunder be bound to ascertain the authority of the Collateral Agent or the Trustee to execute the release or to inquire as to the satisfaction of any conditions required by the provisions hereof for the exercise of such authority or to see to the application of any consideration given by such purchaser or other transferee; nor shall any purchaser or other transferee of any property or rights permitted by this Article 10 to be sold be under any obligation to ascertain or inquire into the authority of the Issuer or the applicable Guarantor to make any such sale or other transfer.

Section 10.07    <u>Powers Exercisable by Receiver or Trustee</u>.

        In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article 10 upon the Issuer or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or a Guarantor or of any Officer or Officers thereof required by the provisions of this Article 10; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

Section 10.08    <u>Release Upon Termination of the Issuer's Obligations</u>.

        In the event that the Issuer delivers to the Trustee (a) an Officers' Certificate certifying that (i) payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Obligations under this Indenture, the Notes, the Guarantees and the Security Documents that are

due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid or (ii) the Issuer shall have exercised its Legal Defeasance option or its Covenant Defeasance option, in each case in compliance with the provisions of Article 8 hereof, and (b) an Opinion of Counsel stating that all conditions precedent to the execution and delivery of such notice by the Trustee have been satisfied, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral (other than with respect to funds held by the Trustee pursuant to Article 8 hereof), and any rights it has under the Security Documents, or, if applicable, under the Escrow Agreement if a Special Mandatory Redemption has occurred and the obligations under the Escrow Agreement have also been met, and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

Section 10.09    Collateral Agent.

(a)    The Trustee and each of the Holders by acceptance of the Notes hereby designates and appoints the Collateral Agent as its agent under this Indenture, the Security Documents and the Intercreditor Agreements and the Trustee and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Collateral Agent to take such action on its behalf under the provisions of this Indenture, the Security Documents and the Intercreditor Agreements and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture, the Security Documents and the Intercreditor Agreements, and consents and agrees to the terms of the Intercreditor Agreements and each Security Document, as the same may be in effect or may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms. The Collateral Agent agrees to act as such on the express conditions contained in this Section 10.09. The provisions of this Section 10.09 are solely for the benefit of the Collateral Agent and none of the Trustee, any of the Holders nor any of the Grantors shall have any rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in Section 10.03 hereof. Each Holder agrees that any action taken by the Collateral Agent in accordance with the provision of this Indenture, the Intercreditor Agreements and the Security Documents, and the exercise by the Collateral Agent of any rights or remedies set forth herein and therein shall be authorized and binding upon all Holders. Notwithstanding any provision to the contrary contained elsewhere in this Indenture, the Security Documents and the Intercreditor Agreements, the duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other documents to which the Collateral Agent is a party, nor shall the Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder or any Grantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Indenture, the Security Documents and the Intercreditor Agreements or otherwise exist against the Collateral Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    The Collateral Agent may perform any of its duties under this Indenture, the Security Documents or the Intercreditor Agreements by or through receivers, agents, employees, attorneys-in-fact or through its Related Persons and shall be entitled to advice of counsel concerning all matters pertaining to such duties, and shall be entitled to act upon, and shall be fully protected in taking action in reliance upon any advice or opinion given by legal counsel. The Collateral Agent shall not be responsible for the negligence or willful misconduct of any receiver, agent, employee, attorney-in-fact or Related Person that it selects as long as such selection was made in good faith.

(c)    None of the Collateral Agent or any of its respective Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision) or under or in connection with any Security Document or Intercreditor Agreement or the transactions contemplated thereby (except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Issuer or any Grantor or Affiliate of any Grantor, or any Officer or Related Person thereof, contained in this Indenture, the Security Documents or the Intercreditor Agreements, or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture, the Security Documents or the Intercreditor Agreements, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture, the Security Documents or the Intercreditor Agreements, or for any failure of any Grantor or any other party to this Indenture, the Security Documents or the Intercreditor Agreements to perform its obligations hereunder or thereunder. None of the Collateral Agent or any of its respective Related Persons shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture, the Security Documents or the Intercreditor Agreements or to inspect the properties, books, or records of any Grantor or any Grantor's Affiliates.

(d)    The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, certification, telephone message, statement, or other communication, document or conversation (including those by telephone or e-mail) believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Issuer or any Grantor), independent accountants and other experts and advisors selected by the Collateral Agent. The Collateral Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document. The Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture, the Security Documents or the Intercreditor Agreements unless it shall first receive such advice or concurrence of the Trustee or the Holders of a majority in aggregate principal amount of the Notes as it determines and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Security Documents or the Intercreditor Agreements in accordance with a request, direction, instruction or consent of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)    The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless a Responsible Officer of the Collateral Agent shall have received written notice from the Trustee or the Issuer referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." The Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article 6 hereof or the Holders of a majority in aggregate principal amount of the Notes (subject to this Section 10.09).

(f)    Wilmington Trust FSB and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Grantor and its

Affiliates as though it was not the Collateral Agent hereunder and without notice to or consent of the Trustee. The Trustee and the Holders acknowledge that, pursuant to such activities, Wilmington Trust FSB or its respective Affiliates may receive information regarding any Grantor or its Affiliates (including information that may be subject to confidentiality obligations in favor of any such Grantor or such Affiliate) and acknowledge that the Collateral Agent shall not be under any obligation to provide such information to the Trustee or the Holders. Nothing herein shall impose or imply any obligation on the part of the Wilmington Trust FSB to advance funds.

(g)     The Collateral Agent may resign at any time by notice to the Trustee and the Issuer, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent. If the Collateral Agent resigns under this Indenture, the Issuer shall appoint a successor collateral agent. If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Collateral Agent (as stated in the notice of resignation), the Collateral Agent may appoint, after consulting with the Trustee, subject to the consent of the Issuer (which shall not be unreasonably withheld and which shall not be required during a continuing Event of Default), a successor collateral agent. If no successor collateral agent is appointed and consented to by the Issuer pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor. Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated. After the retiring Collateral Agent's resignation hereunder, the provisions of this Section 10.09 (and Section 7.07 hereof) shall continue to inure to its benefit and the retiring Collateral Agent shall not by reason of such resignation be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(h)     The Trustee shall initially act as Collateral Agent and shall be authorized to appoint co- Collateral Agents as necessary in its sole discretion. Except as otherwise explicitly provided herein or in the Security Documents or the Intercreditor Agreements, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other Related Persons shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The Collateral Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision.

(i)     The Collateral Agent is authorized and directed to (i) enter into the Security Documents to which it is party, whether executed on or after the Release Date, (ii) enter into the Intercreditor Agreements, (iii) bind the Holders on the terms as set forth in the Security Documents and the Intercreditor Agreements and (iv) perform and observe its obligations under the Security Documents and the Intercreditor Agreements.

(j)     The Trustee agrees that it shall not (and shall not be obliged to), and shall not instruct the Collateral Agent to, unless specifically requested to do so by the Holders of a majority in aggregate principal amount of the Notes, take or cause to be taken any action to enforce its rights under this Indenture, the Security Documents or the Intercreditor Agreements or against any Grantor, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 6 hereof, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent such proceeds to be applied by the Collateral Agent pursuant to the terms of this Indenture, the Security Documents and the Intercreditor Agreements.

(k)    The Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession. Should the Trustee obtain possession of any such Collateral, upon request from the Issuer, the Trustee shall notify the Collateral Agent thereof and promptly shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(l)    The Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Grantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all or the Grantor's property constituting collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture, any Security Document or the Intercreditor Agreements other than pursuant to the instructions of the Trustee or the Holders of a majority in aggregate principal amount of the Notes or as otherwise provided in the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Collateral Agent shall have no other duty or liability whatsoever to the Trustee or any Holder as to any of the foregoing.

(m)    If the Issuer (i) incurs any obligations in respect of Secured Indebtedness at any time when no intercreditor agreement is in effect or at any time when Indebtedness constituting Secured Indebtedness entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officers' Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the applicable Intercreditor Agreement) in favor of a designated agent or representative for the holders of the Secured Indebtedness so incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement (at the sole expense and cost of the Issuer, including legal fees and expenses of the Collateral Agent), bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

(n)    No provision of this Indenture, the Intercreditor Agreements or any Security Document shall require the Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Collateral Agent) if it shall have received indemnity satisfactory to the Collateral Agent against potential costs and liabilities incurred by the Collateral Agent relating thereto. Notwithstanding anything to the contrary contained in this Indenture, the Intercreditor Agreements or the Security Documents, in the event the Collateral Agent is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Collat-

-114-

eral Agent shall not be required to commence any such action or exercise any remedy or to inspect or conduct any studies of any property under the mortgages or take any such other action if the Collateral Agent has determined that the Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances unless the Collateral Agent has received security or indemnity from the Holders in an amount and in a form all satisfactory to the Collateral Agent in its sole discretion, protecting the Collateral Agent from all such liability. The Collateral Agent shall at any time be entitled to cease taking any action described above if it no longer reasonably deems any indemnity, security or undertaking from the Issuer or the Holders to be sufficient.

(o)     The Collateral Agent (i) shall not be liable for any action taken or omitted to be taken by it in connection with this Indenture, the Intercreditor Agreements and the Security Documents or instrument referred to herein or therein, except to the extent that any of the foregoing are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from its own gross negligence or willful misconduct, (ii) shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Issuer (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel. The grant of permissive rights or powers to the Collateral Agent shall not be construed to impose duties to act.

(p)     Neither the Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters. Neither the Collateral Agent nor the Trustee shall be liable for any indirect, special, punitive, incidental or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

(q)     The Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by the Issuer or any other Grantor under this Indenture, the Intercreditor Agreements and the Security Documents. The Collateral Agent shall not be responsible to the Holders or any other Person for any recitals, statements, information, representations or warranties contained in this Indenture, the Intercreditor Agreements, the Security Documents or in any certificate, report, statement, or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture, the Intercreditor Agreements or any Security Document; the execution, validity, genuineness, effectiveness or enforceability of the Intercreditor Agreements and any Security Documents of any other party thereto; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Obligations under this Indenture, the Intercreditor Agreements and the Security Documents. The Collateral Agent shall have no obligation to any Holder or any other Person to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any obligor of any terms of this Indenture, the Intercreditor Agreements and the Security Documents, or the satisfaction of any conditions precedent contained in this Indenture, the Intercreditor Agreements and any Security Documents. The Collateral Agent shall not be required to initiate or conduct any litigation or collection or other proceeding under this Indenture, the Intercreditor Agreements and the Security Documents unless expressly set forth hereunder or thereunder. The Collateral Agent shall have the right at any time to seek instructions from the Holders with respect to the administra-

tion of this Indenture, the Intercreditor Agreements, the Security Documents or any certificate, report, statement, or other document referred to or provided for therein.

(r)    The parties hereto and the Holders hereby agree and acknowledge that the Collateral Agent shall not assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including but not limited to, any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, the Intercreditor Agreements, the Security Documents or any actions taken pursuant hereto or thereto. Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, the Intercreditor Agreements and the Security Documents, the Collateral Agent may hold or obtain indicia of ownership primarily to protect the security interest of the Collateral Agent in the Collateral and that any such actions taken by the Collateral Agent shall not be construed as or otherwise constitute any participation in the management of such Collateral.

(s)    Upon the receipt by the Collateral Agent of a written request of the Issuer signed by two Officers (a "*Security Document Order*"), the Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Security Document to be executed after the Release Date. Such Security Document Order shall (i) state that it is being delivered to the Collateral Agent pursuant to, and is a Security Document Order referred to in, this Section 10.09(s), and (ii) instruct the Collateral Agent to execute and enter into such Security Document. Any such execution of a Security Document shall be at the direction and expense of the Issuer, upon delivery to the Collateral Agent of an Officers' Certificate and Opinion of Counsel stating that all conditions precedent to the execution and delivery of the Security Document have been satisfied. The Holders, by their acceptance of the Notes, hereby authorize and direct the Collateral Agent to execute such Security Documents.

(t)    Subject to the provisions of the applicable Security Documents and the Intercreditor Agreements, each Holder, by acceptance of the Notes, agrees that the Collateral Agent shall execute and deliver the Intercreditor Agreements and the Security Documents to which it is a party and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof. For the avoidance of doubt, the Collateral Agent shall have no discretion under this Indenture, the Intercreditor Agreements or the Security Documents and shall not be required to make or give any determination, consent, approval, request or direction without the written direction of the Holders of a majority in aggregate principal amount of the then outstanding Notes or the Trustee, as applicable.

(u)    After the occurrence of an Event of Default, the Trustee may direct the Collateral Agent in connection with any action required or permitted by this Indenture, the Security Documents or the Intercreditor Agreements.

(v)    The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents or the Intercreditor Agreement and to the extent not prohibited under the Intercreditor Agreement, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Section 6.10 hereof and the other provisions of this Indenture.

(w)    In each case that Collateral Agent may or is required hereunder or under any other Notes Document to take any action (an "*Action*"), including without limitation to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or other-

-116-

wise to act hereunder or under the Security Documents or the Intercreditor Agreements, the Collateral Agent may seek direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes.  The Collateral Agent shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes.  If the Collateral Agent shall request direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with respect to any Action, the Collateral Agent shall be entitled to refrain from such Action unless and until the Collateral Agent shall have received direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes, and the Collateral Agent shall not incur liability to any Person by reason of so refraining.

(x)      Notwithstanding anything to the contrary in this Indenture, the Security Documents or the Intercreditor Agreements, in no event shall the Collateral Agent be responsible for, or have any duty or obligation with respect to, the, recording, filing, registering, perfection, protection or maintenance of the security interests or Liens intended to be created by this Indenture, the Security Documents or the Intercreditor Agreements (including without limitation the filing or continuation of any UCC financing or continuation statements or similar documents or instruments), nor shall the Collateral Agent be responsible for, and the Collateral Agent makes no representation regarding, the, validity, effectiveness or priority of any of the Security Documents or the security interests or Liens intended to be created thereby.

(y)      Before the Collateral Agent acts or refrains from acting in each case at the request or direction of the Issuer or the Guarantors, it may require an Officers' Certificate and an Opinion of Counsel, which shall conform to the provisions of Section 13.05 hereof.  The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(z)      Notwithstanding anything to the contrary contained herein, the Collateral Agent shall act pursuant to the instructions of the secured parties solely with respect to the Security Documents and the Collateral.

Section 10.10    Designations.

Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreements requiring the Issuer to designate Indebtedness for the purposes of the terms "Pari Passu Lien Obligations," "Additional Pari Passu Lien Obligations," "Priority Payment Lien Obligations" or any other such designations hereunder or under the Intercreditor Agreements, any such designation shall be sufficient if the relevant designation is set forth in writing, signed on behalf of the Issuer by an Officer and delivered to the Trustee, the Collateral Agent and the collateral agent under the Credit Agreement.  For all purposes hereof and the Intercreditor Agreements, the Issuer hereby designates the Obligations pursuant to the Credit Agreement as "Pari Passu Lien Obligations."

ARTICLE 11

GUARANTEES

Section 11.01    Guarantee.

Subject to this Article 11, upon the consummation of the Assumption, each of the Guarantors hereby, jointly and severally, fully and unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:  (a) the principal of, interest, premium and Additional Interest, if any, on the Notes shall be promptly paid in full when due, whether, by acceleration, redemption or otherwise, and interest on the

overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Issuer to the Holders or the Trustee or the Collateral Agent hereunder or thereunder shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise. Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately. Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor. Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that this Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee or any Holder in enforcing any rights under this Section 11.01.

If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby. Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Guarantee. The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantees.

Each Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made. In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

In case any provision of any Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

The Guarantee issued by any Guarantor shall be a general senior secured obligation of such Guarantor and shall be *pari passu* in right of payment with all existing and future senior Indebtedness of such Guarantor, if any.

Each payment to be made by a Guarantor in respect of its Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Notwithstanding anything to the contrary, any direct or indirect parent company of the Issuer may guarantee the Notes and become a Guarantor hereunder.

Section 11.02    <u>Limitation on Guarantor Liability</u>.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee.  To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment under its Guarantee shall be entitled upon payment in full of all guaranteed obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

Section 11.03    <u>Execution and Delivery</u>.

To evidence its Guarantee set forth in Section 11.01 hereof, each Guarantor hereby agrees that this Indenture or any supplemental indenture with respect hereto shall be executed on behalf of such Guarantor by its President, one of its Vice Presidents or one of its Assistant Vice Presidents.

Each Guarantor hereby agrees that its Guarantee set forth in Section 11.01 hereof shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

If an Officer whose signature is on this Indenture or any supplemental indenture with respect hereto no longer holds that office at the time the Trustee authenticates the Note, the Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

If required by Section 4.15 hereof, the Issuer shall cause any newly created or acquired Restricted Subsidiary to comply with the provisions of Section 4.15 hereof and this Article 11, to the extent applicable.

Section 11.04    <u>Subrogation</u>.

Each Guarantor shall be subrogated to all rights of Holders of Notes against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01 hereof; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05    <u>Benefits Acknowledged</u>.

Each Guarantor acknowledges that it shall receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Guarantee are knowingly made in contemplation of such benefits.

Section 11.06    <u>Release of Guarantees</u>.

A Guarantee by a Guarantor shall be automatically and unconditionally released and discharged upon:

(a)    any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or all or substantially all the assets of such Guarantor which sale, exchange or transfer is made in compliance with the applicable provisions of this Indenture;

(b)    the release or discharge of the guarantee by such Guarantor of all Pari Passu Lien Indebtedness or such other guarantee that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c)    the proper designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of this Indenture; or

(d)    the Issuer exercising its Legal Defeasance option or Covenant Defeasance option in accordance with Article 8 hereof or the Issuer's obligations under this Indenture being discharged in accordance with Article 13 hereof.

## ARTICLE 12

## SATISFACTION AND DISCHARGE

Section 12.01    <u>Satisfaction and Discharge</u>.

This Indenture shall be discharged and shall cease to be of further effect as to all Notes, when either:

(1)    all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)    (A)  all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, shall become due and payable within one year or are to be called for redemption and redeemed within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer and the Issuer or any Guarantor shall irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal amount, premium, if any, and (without duplication) accrued interest to the date of maturity or redemption, as the case may be;

(B)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to this Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under any Pari Passu Lien Indebtedness or any other material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(C)    the Issuer has paid or caused to be paid all sums payable by it under this Indenture; and

(D)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes or the Redemption Date, as the case may be.

In addition, the Issuer must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (A) of clause (2) of this Section 12.01, the provisions of Section 12.02 and Section 8.06 hereof shall survive.

Section 12.02    Application of Trust Money.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium and Additional Interest, if any) or interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; *provided* that if the Issuer has made any payment of principal of, premium and Additional Interest, if any, or interest on any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

## ARTICLE 13

## MISCELLANEOUS

Section 13.01    <u>Trust Indenture Act Controls</u>.

Except as expressly provided for herein prior to the qualification of this Indenture under the Trust Indenture Act, if any provision of this Indenture limits, qualifies or conflicts with the duties imposed by Trust Indenture Act Section 318(c), the imposed duties shall control.

Section 13.02    <u>Notices</u>.

Any notice or communication by the Issuer, any Guarantor or the Trustee to the others is duly given if in writing and delivered in person or mailed by first-class mail (registered or certified, return receipt requested), fax or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer and/or any Guarantor:

c/o American Media Operations, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

If to the Trustee or Collateral Agent:

Wilmington Trust FSB, as Trustee and Collateral Agent:
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Attention: Corporate Client Services
Fax No.: 612-217-5651

The Issuer, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five calendar days after being deposited in the mail, postage prepaid, if mailed by first-class mail; when receipt acknowledged, if faxed; and the next Business Day after timely delivery to the courier, if sent by overnight air courier

guaranteeing next day delivery; *provided* that any notice or communication delivered to the Trustee shall be deemed effective upon actual receipt thereof.

Any notice or communication to a Holder shall be mailed by first-class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar.  Any notice or communication shall also be so mailed to any Person described in Trust Indenture Act Section 313(c), to the extent required by the Trust Indenture Act.  Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within  the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Paying Agent at the same time.

Section 13.03    Communication by Holders of Notes with Other Holders of Notes.

Holders may communicate pursuant to Trust Indenture Act Section 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Trustee, the Registrar and anyone else shall have the protection of Trust Indenture Act Section 312(c).

Section 13.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any of the Guarantors to the Trustee to take any action under this Indenture or the Notes, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee:

(a)    An Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture or the Notes, relating to the proposed action have been satisfied; and

(b)    An Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 13.05    Statements Required in Certificate or Opinion.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or the Notes (other than a certificate provided pursuant to Section 4.04 hereof or Trust Indenture Act Section 314(a)(4)) shall comply with the provisions of Trust Indenture Act Section 314(e) and shall include:

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition;

(b)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)      a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officers' Certificate as to matters of fact); and

(d)      a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

Section 13.06      Rules by Trustee and Agents.

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.07      No Personal Liability of Directors, Officers, Employees and Stockholders.

No director, officer, employee, incorporator or stockholder, member or limited partner of the Issuer or any Guarantor or any of their parent companies shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees, the Security Documents, the Intercreditor Agreements or this Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 13.08      Governing Law.

THIS INDENTURE, THE NOTES AND ANY GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

Section 13.09      Waiver of Jury Trial.

EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.10      Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 13.11      No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Restricted Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.12    <u>Successors</u>.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind its successors.  All agreements of each Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.05 hereof.

Section 13.13    <u>Severability</u>.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.14    <u>Counterpart Originals</u>.

The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.15    <u>Table of Contents, Headings, etc</u>.

The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.16    <u>Qualification of Indenture</u>.

The Issuer and the Guarantors shall qualify this Indenture under the Trust Indenture Act in accordance with the terms and conditions of the Registration Rights Agreement and shall pay all reasonable costs and expenses (including attorneys' fees and expenses for the Issuer, the Guarantors and the Trustee) incurred in connection therewith, including, but not limited to, costs and expenses of qualification of this Indenture and the Notes and printing this Indenture and the Notes.  The Trustee shall be entitled to receive from the Issuer and the Guarantors any such Officers' Certificates, Opinions of Counsel or other documentation as it may reasonably request in connection with any such qualification of this Indenture under the Trust Indenture Act.

Section 13.17    <u>Direction by Holders to Enter into Security Documents, the First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement</u>.

By accepting a Note, each Holder is deemed to have authorized and directed the Trustee and the Collateral Agent, as applicable, to enter into the Security Documents, the First Lien Intercreditor Agreement and any Second Lien Intercreditor Agreement.

[Signatures on following page]

AMO ESCROW CORPORATION

By: _____

Name:    Christopher Polimeni
Title:    Executive Vice President, Chief
          Financial Officer and Treasurer

Signature Page to Indenture

WILMINGTON TRUST FSB,
as Trustee and Collateral Agent

By: _____

Name:  Jane Schweiger
Title:   Vice President

Signature Page to Indenture

<u>EXHIBIT A</u>

[Face of Note]

[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Regulation S Temporary Global Note Legend, if applicable pursuant to the provisions of the Indenture]

A-1

CUSIP  [                    ]<sup>1</sup>
ISIN  [                    ]

[RULE 144A][REGULATION S] [IAI][GLOBAL] NOTE

11½% First Lien Senior Secured Notes due 2017

No. ___                                                                                        [$_____]

AMO ESCROW CORPORATION

promises to pay to Cede & Co. or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note attached hereto] [of _____ United States Dollars] on December 15, 2017.

Interest Payment Dates:  June 15 and December 15

Record Dates:  June 1 and December 1

---

[1]      Rule 144A Note CUSIP: 00175KAA2
Rule 144A Note ISIN: US00175KAA25
Regulation S Note CUSIP: U03193AA4
Regulation S Note ISIN: USU03193AA44
IAI Note CUSIP: 00175KAB0
IAI Note ISIN: US00175KAB08

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

AMO ESCROW CORPORATION

By: _____
Name:
Title:

This is one of the Notes referred to in the within-mentioned Indenture:

Dated:  [_____]

WILMINGTON TRUST FSB,
    as Trustee

By: _____
Authorized Signatory

A-3

[Back of Note]

11½% First Lien Senior Secured Notes due 2017

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

1.    INTEREST.  Prior to the consummation of the Assumption (as defined in the Indenture), the references in this Note to the "*Issuer*" refers to AMO Escrow Corporation, a Delaware corporation.  After the consummation of the Assumption, the references in this Note to the "*Issuer*" refer only to American Media Operations, Inc., a Delaware corporation.  The Issuer promises to pay interest on the principal amount of this Security at the rate per annum shown above.  The Issuer will pay interest semiannually on June 15 and December 15 of each year, commencing on June 15, 2011, or if any such day is not a Business Day, on the next succeeding Business Day.  Interest on the Notes shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the issue date of the Notes.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.    METHOD OF PAYMENT.  The Issuer shall pay interest on the Notes and Additional Interest, if any, to the Persons who are registered Holders of Notes at the close of business on the June 1 and December 1 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  Payment of interest and Additional Interest, if any, may be made by check mailed to the Holders at their addresses set forth in the Register of the Holders, *provided* that [all payments of principal, premium, if any, and interest on this Notes will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof][2] [all payments of principal, premium, if any, and interest on, this Note will be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion)][3].  Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

3.    PAYING AGENT AND REGISTRAR.  Initially, Wilmington Trust FSB, the Trustee under the Indenture, shall act as Paying Agent and Registrar.  The Issuer may change any Paying Agent or Registrar without notice to the Holders.  The Issuer or any of its Subsidiaries may act in any such capacity.

4.    INDENTURE.  The Issuer issued the Notes under an Indenture, dated as of December 1, 2010 (as amended, modified or supplemented from time to time, the "*Indenture*"), among AMO Escrow Corporation, the Trustee and the Collateral Agent.  This Note is one of a duly authorized issue of notes of the Issuer designated as its 11½% First Lien Senior Secured Notes due 2017.  The Issuer

---

[2]    Applicable if this Note is represented by a Global Note registered in the name of or held by DTC or its nominee on the relevant record date.

[3]    Applicable if this Note is represented by a Definitive Note.

A-4

shall be entitled to issue Additional Notes pursuant to Section 2.01 and 4.09 of the Indenture. The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "*Trust Indenture Act*"). The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.    OPTIONAL REDEMPTION.

(a)    At any time and from time to time prior to December 15, 2013, the Issuer may redeem up to 35% of the original principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 111.500% of the principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* that

(1)    at least 65% of the original principal amount of the Notes remains outstanding after each such redemption; and

(2)    the redemption occurs within 90 days after the closing of such Equity Offering.

(b)    At any time prior to December 15, 2013 the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest thereon, if any, to the Redemption Date, subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

(c)    During any 12-month period prior to December 15, 2013, the Issuer will be entitled to redeem up to 10% of the aggregate principal amount of the Notes issued under this Indenture at a redemption price equal to 103.000% of the aggregate principal amount thereof, plus accrued and unpaid interest and Additional Interest thereon, if any, to the Redemption Date, subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment date.

(d)    On or after December 15, 2013, the Issuer may redeem the Notes, in whole or in part, upon notice as described in Section 3.03 of the Indenture, at the redemption prices (expressed as percentages of principal amount of the Notes to be redeemed) set forth below, plus accrued and unpaid interest and Additional Interest thereon, if any, to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
|---|---|
| 2013 | 108.625% |
| 2014 | 105.750% |
| 2015 | 102.875% |
| 2016 and thereafter | 100.000% |

Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

6.    MANDATORY REDEMPTION.  The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes, except pursuant to a Special Mandatory Redemption pursuant to Section 3.10 of the Indenture.  However, the Issuer may be required to offer to purchase the Notes pursuant to Sections 4.10 and 4.14 of the Indenture.  The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

7.    SPECIAL MANDATORY REDEMPTION.

(a)    The Notes will be subject to a mandatory redemption (a "*Special Mandatory Redemption*") in the event that either (i) the Release Date has not occurred on or prior to the Escrow End Date or (ii) prior to the Escrow End Date, the Issuer has determined, in its reasonable discretion, that the escrow conditions cannot be satisfied by such date (any such date, a "*Trigger Date*"). The Issuer will cause the notice of Special Mandatory Redemption to be mailed to the Escrow Agent, the Trustee and the Holders of the Notes no later than the next Business Day following the Trigger Date and will redeem the Notes no later than five Business Days following the date of the notice of Special Mandatory Redemption (the "*Special Mandatory Redemption Date*"). The redemption price for any Special Mandatory Redemption will be 100% of the issue price of the Notes as set forth on the cover of the Offering Memorandum, together with accrued and unpaid interest on the Notes from the Issue Date up to but not including the Special Mandatory Redemption Date.

(b)    If the Escrow Agent receives a notice of a Special Mandatory Redemption pursuant to the terms of the Notes and the Escrow Agreement, the Escrow Agent will liquidate all Escrow Proceeds then held by it not later than the last Business Day prior to the Special Mandatory Redemption Date.  Concurrently with release of the amounts necessary to fund the Special Mandatory Redemption to the paying agent, the Escrow Agent will release any excess of Escrow Proceeds over the mandatory redemption price to the Issuer, and the Issuer will be permitted to use such excess Escrow Proceeds at its discretion

8.    NOTICE OF REDEMPTION.  Subject to Section 3.03 of the Indenture, notice of redemption shall be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 13 of the Indenture) to each Holder whose Notes are to be redeemed at its registered address.  Notes shall be redeemed in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof; no Notes of $2,000 or less may be redeemed in part unless all of the Notes held by a Holder are to be redeemed.  On and after the Redemption Date interest ceases to accrue on Notes or portions thereof called for redemption.

9.    OFFERS TO REPURCHASE.

(a)    Upon the occurrence of a Change of Control after the Release Date, the Issuer shall make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest thereon, if any, to the date of purchase (the "*Change of Control Payment*").  The Change of Control Offer shall be made in accordance with Section 4.14 of the Indenture.

(b)    Upon the occurrence of Asset Sales, the Issuer may be obligated pursuant to Section 4.10 of the Indenture to make offers to purchase Notes and redeem Pari Passu Indebtedness of the Issuer with a portion of the Net Proceeds of such Asset Sales at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase.

A-6

10.    DENOMINATIONS, TRANSFER, EXCHANGE.  The Notes are issued initially in registered form without coupons in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.  The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture.  The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture.  The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part.  Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed.

11.    PERSONS DEEMED OWNERS.  The registered Holder of a Note may be treated as its owner for all purposes.

12.    AMENDMENT, SUPPLEMENT AND WAIVER.  The Indenture, the Security Documents, the Intercreditor Agreements, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

13.    DEFAULTS AND REMEDIES.  The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture.  If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.  Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes shall become due and payable immediately without further action or notice.  Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture.  Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, Additional Interest, if any, or, without duplication, interest) if it determines that withholding notice is in their interest.  The Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or and its consequences under the Indenture except a continuing Default in payment of the principal of, premium, if any, Additional Interest, if any, or interest on, any of the Notes held by a non-consenting Holder.  The Issuer is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Issuer is required within five (5) Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action the Issuer is taking proposes to take with respect thereto.

14.    AUTHENTICATION.  This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

15.    ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.  In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of December 1, 2010, between AMO Escrow Corporation and the Initial Purchasers (the "*Registration Rights Agreement*"), including the right to receive Additional Interest (as defined in the Registration Rights Agreement).

16.    GOVERNING LAW.  THE INDENTURE, THIS NOTE AND ANY GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

17.    CUSIP NUMBERS.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement.  Requests may be made to the Issuer at the following address:

c/o American Media Operations, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

### ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____
(Insert assignee's legal name)

_____
(Insert assignee's Soc. Sec. or tax I.D. no.)

_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____
(Sign exactly as your name appears on
the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other
signature guarantor acceptable to the Trustee).

A-9

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.10 or 4.14 of the Indenture, check the appropriate box below:

[  ] Section 4.10          [  ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.10 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE OR
INCREASE/DECREASE IN THE PRINCIPAL AMOUNT OF THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____. The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note or increase/decrease in the principal amount of this Global Note, have been made:

| Date of Exchange or Increase/Decrease | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |

_____
*This schedule should be included only if the Note is issued in global form.

<u>EXHIBIT B</u>

FORM OF CERTIFICATE OF TRANSFER

AMO Escrow Corporation
American Media Operations, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Attention: Corporate Client Services
Fax No.: 612-217-5651

Re:  11½% First Lien Senior Secured Notes due 2017

Reference is hereby made to the Indenture, dated as of December 1, 2010 (the "<u>Inden-ture</u>"), between AMO Escrow Corporation, the Collateral Agent and the Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "<u>Transferor</u>") owns and proposes to transfer the Note[s] or inter-est in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "<u>Transfer</u>"), to _____ (the "<u>Transferee</u>"), as further specified in Annex A hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.      [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE 144A GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO RULE 144A. The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Se-curities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transac-tion meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.

2.      [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE REGULATION S GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO REGULATION S.  The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasona-bly believed and believes that the Transferee was outside the United States or (y) the transaction was exe-

cuted in, on or through the facilities of a designated offshore securities market and neither such Trans-feror nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person (other than an Initial Purchaser).  Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall be subject to the restrictions on Transfer enumerated in the Indenture and the Secu-rities Act.

        3.      [ ] CHECK AND COMPLETE IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE OR A RESTRICTED DEFINI-TIVE NOTE PURSUANT TO ANY PROVISION OF THE SECURITIES ACT OTHER THAN RULE 144A OR REGULATION S.  The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

        (a)      [ ] such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

                      or

        (b)      [ ] such Transfer is being effected to the Issuer or a subsidiary thereof;

                      or

        (c)      [ ] such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Se-curities Act;

                      or

        (d)      [ ] such Transfer is being effect to an institutional "accredited investor" (as de-fined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements, in the form which is at-tached to the Indenture.

        4.      [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE OR OF AN UNRESTRICTED DEFINITIVE NOTE.

        (a)      [ ] CHECK IF TRANSFER IS PURSUANT TO RULE 144. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon con-summation of the proposed Transfer in accordance with the terms of the Indenture, the transferred benefi-cial interest or Definitive Note shall no longer be subject to the restrictions on transfer enumerated in the

Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b)　　　[ ] CHECK IF TRANSFER IS PURSUANT TO REGULATION S. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)　　　[ ] CHECK IF TRANSFER IS PURSUANT TO OTHER EXEMPTION.  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

ANNEX A TO CERTIFICATE OF TRANSFER

1.      The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)     [  ] a beneficial interest in the:

     (i)     [  ] 144A Global Note (CUSIP 00175KAA2), or

     (ii)     [  ] Regulation S Global Note (CUSIP U03193AA4), or

     (iii)     [  ] IAI Global Note (CUSIP 00175KAB0), or

(b)     [  ] a Restricted Definitive Note.

2.      After the Transfer the Transferee shall hold:

[CHECK ONE]

(a)     [  ] a beneficial interest in the:

     (i)     [  ] 144A Global Note (CUSIP 00175KAA2), or

     (ii)     [  ] Regulation S Global Note (CUSIP U03193AA4), or

     (iii)     [  ] IAI Global Note (CUSIP 00175KAB0), or

     (iv)     [  ] Unrestricted Global Note; or

(b)     [  ] a Restricted Definitive Note; or

(c)     [  ] an Unrestricted Definitive Note,
in accordance with the terms of the Indenture.

<u>EXHIBIT C</u>

FORM OF CERTIFICATE OF EXCHANGE

AMO Escrow Corporation
American Media Operations, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Attention: Corporate Client Services
Fax No.: 612-217-5651

   Re:  11½% First Lien Senior Secured Notes due 2017

   Reference is hereby made to the Indenture, dated as of December 1, 2010 (the "<u>Inden-ture</u>"), between AMO Escrow Corporation, the Collateral Agent and the Trustee.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

   _____ (the "<u>Owner</u>") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "<u>Exchange</u>").  In connection with the Exchange, the Owner hereby certifies that:

   1)  EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL IN-TERESTS IN A RESTRICTED GLOBAL NOTE FOR UNRESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN AN UNRESTRICTED GLOBAL NOTE

   a)  [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RE-STRICTED GLOBAL NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Re-stricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the trans-fer restrictions applicable to the Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

   b)  [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RE-STRICTED GLOBAL NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the

Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

c)        [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE.  In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

d)        [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2)        EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES FOR RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES

a)        [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO RESTRICTED DEFINITIVE NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued shall continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

b)        [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE.  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] [ ] 144A Global Note  [ ] Regulation S Global Note [  ] IAI Global Note, with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws

of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued shall be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

      This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer and are dated _____.

      [Insert Name of Transferor]

By:  _____
     Name:
     Title:

Dated:  _____

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ], among [GUARANTOR] (the "Guaranteeing Subsidiary"), AMO ESCROW CORPORA-TION, a Delaware corporation (to be merged with and into AMERICAN MEDIA OPERATIONS, INC., a Delaware corporation, as the surviving entity) (the "Issuer"),[1] and WILMINGTON TRUST FSB, as trustee and collateral agent under the indenture referred to below (collectively in such capacities, the "Trustee").

W I T N E S S E T H :

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December 1, 2010, providing for the initial issuance of $385,000,000 aggregate principal amount of 11½% First Lien Senior Secured Notes due 2017 (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "Guarantee"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

(1)    Capitalized Terms.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

(2)    Agreement to Guarantee.  The Guaranteeing Subsidiary hereby agrees as follows:

(a)    The Guaranteeing Subsidiary hereby becomes a party to the Indenture as a Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture.  The Guaranteeing Subsidiary agrees to be bound by all of the provisions of the Indenture applicable to a Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

---

[1]    Delete this reference if supplemental indenture Exhibit E is signed prior to signing of this Supplemental Indenture.

(b)    The Guaranteeing Subsidiary agrees, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 11 of the Indenture on a senior basis.

(3)    <u>Execution and Delivery</u>.  The Guaranteeing Subsidiary agrees that the Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

(4)    <u>Governing Law</u>.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK

(5)    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

(6)    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(7)    <u>The Trustee</u>.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

D-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[GUARANTEEING SUBSIDIARY]

By: _____
     Name:
     Title:

WILMINGTON TRUST FSB, as Trustee and Collateral Agent

By: _____
     Name:
     Title:

Acknowledged by:

AMERICAN MEDIA OPERATIONS, INC.

By: _____
     Name:
     Title:

EXHIBIT E

[FORM OF SUPPLEMENTAL INDENTURE RELATED TO ASSUMPTION]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ], 201[  ], among AMERICAN MEDIA OPERATIONS, INC., a Delaware corporation (the "New Company"), the subsidiaries of the New Company set forth on the signature page hereto (the "Guarantors") and WILMINGTON TRUST FSB, as trustee and collateral agent under the indenture referred to below (collectively in such capacities, the "Trustee").

W I T N E S S E T H:

WHEREAS, AMO Escrow Corporation (the "Company") has heretofore executed and delivered to the Trustee an indenture (as amended, supplemented or otherwise modified, the "Indenture") dated as of December 1, 2010, providing for the issuance of the Company's (i) $385,000,000 aggregate principal amount of the 11½% First Lien Senior Secured Notes due 2017 (the "Notes");

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee, the New Company and the Guarantors are authorized to execute and deliver this Supplemental Indenture;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the New Company, the Guarantors and the Trustee mutually covenant and agree for the equal and ratable benefit of the holders of the Notes as follows:

1.      Defined Terms.  As used in this Supplemental Indenture, terms defined in the Indenture or in the preamble or recital hereto are used herein as therein defined, except that the term "Holders" in this Supplemental Indenture shall refer to the term "Holders" as defined in the Indenture and the Trustee acting on behalf of and for the benefit of such Holders.  The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2.      Agreement to Assume Obligations.  The New Company hereby agrees to unconditionally assume the Company's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in the Indenture and to be bound by all applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of the Company under the Indenture.

3.      Agreement to Guarantee.  The Guarantors hereby agree, jointly and severally, with all existing guarantors (if any), to unconditionally guarantee the New Company's Obligations under the Notes and the Indenture on the terms and subject to the conditions set forth in Article 11 of the Indenture and to be bound by all other applicable provisions of the Indenture and the Notes and to perform all of the obligations and agreements of a guarantor under the Indenture.

4.      Notices.  All notices or other communications to the New Company and the Guarantors shall be given as provided in Section 13.02 of the Indenture.

5.      Ratification of Indenture; Supplemental Indentures Part of Indenture.  Except as expressly amended hereby, the Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental

E-1

Indenture shall form a part of the Indenture for all purposes, and every Holder of Notes heretofore or hereafter authenticated and delivered shall be bound hereby.

   6. <u>Release of Obligations of Escrow Company</u>.  Upon execution of this Supplemental Indenture by the New Company and the Trustee, AMO Escrow Corporation is released and discharged from all obligations under the Indenture and the Notes.

   7. <u>Governing Law</u>.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

   8. <u>Trustee Makes No Representation</u>.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the New Company.

   9. <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

   10. <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not effect the construction thereof.

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed as of the date first above written.

AMERICAN MEDIA OPERATIONS, INC.

By:  _____
      Name:
      Title:


[GUARANTORS]

By:  _____
      Name:
      Title:


WILMINGTON TRUST FSB, as Trustee and Collateral
   Agent

By:  _____
      Name:
      Title:

## FORM OF CERTIFICATE FROM
## ACQUIRING ACCREDITED INVESTOR

AMO Escrow Corporation
American Media Operations, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Attention: Corporate Client Services
Fax No.: 612-217-5651

Re:  11½% First Lien Senior Secured Notes due 2017

Reference is hereby made to the Indenture, dated as of December 1, 2010 (the "Indenture"), between AMO Escrow Corporation, a Delaware corporation (the "Company"), and Wilmington Trust FSB, as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(i)        ☐  a beneficial interest in a Global Note, or

(ii)       ☐  a Definitive Note,

we confirm that:

1.        We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture, and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

2.        We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (a) to the Company (b) so long as the Notes are eligible for resale pursuant to Rule 144A under the Securities Act to a person whom we reasonably believe is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account of a qualified institutional buyer, in each case, to whom notice is given that the offer, resale, pledge or other transfer is being made in reliance on

F-1

Rule 144A, (c) to non-U.S. persons in offshore transactions in accordance with Rule 904 of Regulation S under the Securities Act, (d) pursuant to Rule 144 under the Securities Act, (e) pursuant to an effective registration statement under the Securities Act or (f) in any other transaction that does not require registration under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of any of clauses (a) through (f) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

6.      We are acquiring a minimum principal amount of $250,000 of the Notes for investment purposes and not with a view to or for offer or sale in connection with any distribution in violation of the Securities Act.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____
[Insert Name of Transferor]

By:  _____
     Name:
     Title:

Dated: _____

**<u>EXHIBIT B</u>**

**New Second Lien Indenture**

AGSH&F
December 15, 2010

INDENTURE

Dated as of December [ ], 2010

Among

AMERICAN MEDIA, INC.,

THE GUARANTORS NAMED ON THE SIGNATURE PAGES HERETO

and

WILMINGTON TRUST FSB,
as Trustee and Collateral Agent

13½% SECOND LIEN SENIOR SECURED NOTES DUE 2018

CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(1) | 10.03 |
| (b)(2) | 7.06; 7.07; 10.02 |
| (c) | 7.06; 13.02; 10.02 |
| (d) | 7.06 |
| 314(a) | 4.03; 13.02; 13.05 |
| (b) | 10.02 |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (d) | 10.02 |
| (e) | 13.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 13.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.14 |
| 316(a)(last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12; 9.04 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.12 |
| (b) | 2.04 |
| 318(a) | 13.01 |
| (b) | N.A. |
| (c) | 13.01 |

N.A. means not applicable.
* This Cross-Reference Table is not part of the Indenture.

# TABLE OF CONTENTS

Page

## ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    Definitions ........................................................................................................ 2
Section 1.02    Other Definitions ............................................................................................. 31
Section 1.03    Incorporation by Reference of Trust Indenture Act .......................................... 32
Section 1.04    Rules of Construction ...................................................................................... 32
Section 1.05    Acts of Holders ............................................................................................... 33

## ARTICLE 2

## THE NOTES

Section 2.01    Form and Dating; Terms .................................................................................. 34
Section 2.02    Execution and Authentication .......................................................................... 36
Section 2.03    Registrar and Paying Agent ............................................................................. 36
Section 2.04    Paying Agent To Hold Money in Trust ............................................................ 37
Section 2.05    Holder Lists ..................................................................................................... 37
Section 2.06    Transfer and Exchange .................................................................................... 37
Section 2.07    Replacement Notes .......................................................................................... 49
Section 2.08    Outstanding Notes ........................................................................................... 49
Section 2.09    Treasury Notes ................................................................................................ 49
Section 2.10    Temporary Notes ............................................................................................. 50
Section 2.11    Cancellation ..................................................................................................... 50
Section 2.12    Defaulted Interest ............................................................................................ 50
Section 2.13    CUSIP and ISIN Numbers ............................................................................... 51

## ARTICLE 3

## REDEMPTION

Section 3.01    Notices to Trustee ........................................................................................... 51
Section 3.02    Selection of Notes To Be Redeemed or Purchased ........................................... 51
Section 3.03    Notice of Redemption ...................................................................................... 52
Section 3.04    Effect of Notice of Redemption ....................................................................... 52
Section 3.05    Deposit of Redemption or Purchase Price ........................................................ 53
Section 3.06    Notes Redeemed or Purchased in Part .............................................................. 53
Section 3.07    Optional Redemption ....................................................................................... 53
Section 3.08    Mandatory Redemption .................................................................................... 54
Section 3.09    Offers to Repurchase by Application of Excess Proceeds ................................. 54

## ARTICLE 4

## COVENANTS

Section 4.01    Payment of Notes ............................................................................................ 56

100432088 v3

Page

Section 4.02    Maintenance of Office or Agency ............................................................................ 56
Section 4.03    Reports and Other Information ................................................................................ 57
Section 4.04    Compliance Certificate ........................................................................................... 58
Section 4.05    Taxes ....................................................................................................................... 58
Section 4.06    Stay, Extension and Usury Laws ............................................................................ 58
Section 4.07    Limitation on Restricted Payments ........................................................................ 59
Section 4.08    Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries ............. 64
Section 4.09    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock
                         and Preferred Stock ....................................................................................... 66
Section 4.10    Asset Sales ............................................................................................................. 71
Section 4.11    Transactions with Affiliates ................................................................................... 73
Section 4.12    Liens ....................................................................................................................... 75
Section 4.13    Changes in Covenants When Notes Rated Investment Grade ................................. 75
Section 4.14    Offer To Repurchase upon Change of Control ....................................................... 77
Section 4.15    Limitation on Guarantees of Indebtedness by Restricted Subsidiaries ................... 79
Section 4.16    [Reserved] ............................................................................................................... 79
Section 4.17    Tax Treatment of the Notes .................................................................................... 79
Section 4.18    Non-Impairment of Security Interest ..................................................................... 79
Section 4.19    [Reserved] ............................................................................................................... 80
Section 4.20    After-Acquired Collateral; Further Assurances ...................................................... 80
Section 4.21    Information Regarding Collateral ........................................................................... 80
Section 4.22    Maintenance of Property; Insurance ....................................................................... 81

ARTICLE 5

SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of All or Substantially All Assets ............................. 81
Section 5.02    Successor Corporation Substituted ......................................................................... 83

ARTICLE 6

DEFAULTS AND REMEDIES

Section 6.01    Events of Default .................................................................................................... 83
Section 6.02    Acceleration ........................................................................................................... 85
Section 6.03    Other Remedies ...................................................................................................... 86
Section 6.04    Waiver of Past Defaults .......................................................................................... 86
Section 6.05    Control by Majority ................................................................................................ 86
Section 6.06    Limitation on Suits ................................................................................................. 86
Section 6.07    Rights of Holders of Notes To Receive Payment ................................................... 87
Section 6.08    Collection Suit by Trustee ...................................................................................... 87
Section 6.09    Restoration of Rights and Remedies ...................................................................... 87
Section 6.10    Rights and Remedies Cumulative ........................................................................... 87
Section 6.11    Delay or Omission Not Waiver .............................................................................. 88
Section 6.12    Trustee May File Proofs of Claim .......................................................................... 88
Section 6.13    Priorities ................................................................................................................. 88
Section 6.14    Undertaking for Costs ............................................................................................ 89

Page

ARTICLE 7

TRUSTEE

Section 7.01    Duties of Trustee ..................................................................................... 89
Section 7.02    Rights of Trustee ..................................................................................... 90
Section 7.03    Individual Rights of Trustee .................................................................... 91
Section 7.04    Trustee's Disclaimer ............................................................................... 91
Section 7.05    Notice of Defaults ................................................................................... 91
Section 7.06    Reports by Trustee to Holders of the Notes ............................................ 92
Section 7.07    Compensation and Indemnity .................................................................. 92
Section 7.08    Replacement of Trustee ........................................................................... 93
Section 7.09    Successor Trustee by Merger, etc. ........................................................... 94
Section 7.10    Eligibility; Disqualification ..................................................................... 94
Section 7.11    Preferential Collection of Claims Against Issuer ..................................... 94
Section 7.12    [Reserved] ............................................................................................... 94
Section 7.13    Authorization of Security Documents; Intercreditor Agreement ................ 94

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    Option to Effect Legal Defeasance or Covenant Defeasance ..................... 95
Section 8.02    Legal Defeasance and Discharge .............................................................. 95
Section 8.03    Covenant Defeasance .............................................................................. 95
Section 8.04    Conditions to Legal or Covenant Defeasance ........................................... 96
Section 8.05    Deposited Money and Government Securities to Be Held in Trust; Other
                Miscellaneous Provisions ........................................................................ 97
Section 8.06    Repayment to Issuer ................................................................................ 98
Section 8.07    Reinstatement .......................................................................................... 98

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    Without Consent of Holders of Notes ....................................................... 98
Section 9.02    With Consent of Holders of Notes ........................................................... 100
Section 9.03    Compliance with Trust Indenture Act ...................................................... 102
Section 9.04    Revocation and Effect of Consents .......................................................... 102
Section 9.05    Notation on or Exchange of Notes ........................................................... 102
Section 9.06    Trustee To Sign Amendments, etc. .......................................................... 102
Section 9.07    Payment for Consent ............................................................................... 103

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01    Collateral and Security Documents .......................................................... 103
Section 10.02    Recordings and Opinions ........................................................................ 104
Section 10.03    Release of Collateral ............................................................................... 104
Section 10.04    Suits To Protect the Collateral ................................................................ 106

100432088 v3

Page

Section 10.05    Authorization of Receipt of Funds by the Trustee Under the Security
                 Documents .................................................................................................. 106
Section 10.06    Purchaser Protected ........................................................................................ 106
Section 10.07    Powers Exercisable by Receiver or Trustee ................................................... 107
Section 10.08    Release Upon Termination of the Issuer's Obligations .................................. 107
Section 10.09    Collateral Agent ............................................................................................. 107
Section 10.10    Designations ................................................................................................... 114

## ARTICLE 11

### GUARANTEES

Section 11.01    Guarantee ........................................................................................................ 114
Section 11.02    Limitation on Guarantor Liability ................................................................... 115
Section 11.03    Execution and Delivery .................................................................................. 116
Section 11.04    Subrogation .................................................................................................... 116
Section 11.05    Benefits Acknowledged ................................................................................. 116
Section 11.06    Release of Guarantees .................................................................................... 116

## ARTICLE 12

### SATISFACTION AND DISCHARGE

Section 12.01    Satisfaction and Discharge ............................................................................. 117
Section 12.02    Application of Trust Money ............................................................................ 118

## ARTICLE 13

### MISCELLANEOUS

Section 13.01    Trust Indenture Act Controls .......................................................................... 118
Section 13.02    Notices ............................................................................................................ 118
Section 13.03    Communication by Holders of Notes with Other Holders of Notes ............... 119
Section 13.04    Certificate and Opinion as to Conditions Precedent ...................................... 119
Section 13.05    Statements Required in Certificate or Opinion ............................................... 120
Section 13.06    Rules by Trustee and Agents .......................................................................... 120
Section 13.07    No Personal Liability of Directors, Officers, Employees and Stockholders ... 120
Section 13.08    Governing Law ............................................................................................... 120
Section 13.09    Waiver of Jury Trial ....................................................................................... 121
Section 13.10    Force Majeure ................................................................................................ 121
Section 13.11    No Adverse Interpretation of Other Agreements ........................................... 121
Section 13.12    Successors ...................................................................................................... 121
Section 13.13    Severability .................................................................................................... 121
Section 13.14    Counterpart Originals ..................................................................................... 121
Section 13.15    Table of Contents, Headings, etc. ................................................................... 121
Section 13.16    Qualification of Indenture .............................................................................. 121
Section 13.17    Direction by Holders to Enter into Security Documents and the Intercreditor
                 Agreement ...................................................................................................... 122

EXHIBITS

Exhibit A          Form of Note
Exhibit B          Form of Certificate of Transfer
Exhibit C          Form of Certificate of Exchange
Exhibit D          Form of Supplemental Indenture to Be Delivered by Subsequent Guarantors
Exhibit E          Form of Certificate from Acquiring Accredited Investor

100432088 v3

INDENTURE, dated as of December [ ], 2010, among American Media, Inc. (as successor by merger to American Media Operations, Inc.), a Delaware corporation, the Guarantors listed on the signature pages hereto and Wilmington Trust FSB, as trustee (together with its successors and assigns, in such capacity, the "*Trustee*") and as collateral agent (together with its successors and assigns, in such capacity, the "*Collateral Agent*").  References to the "*Issuer*" in this Indenture refer only to American Media, Inc. and not any of its Subsidiaries.

W I T N E S S E T H :

WHEREAS, on November 17, 2010, American Media, Inc., American Media Operations, Inc. and certain subsidiaries of American Media, Inc. filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101-1532, as amended, the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), jointly administered as Case No. [  ] and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on December [  ], 2010, American Media, Inc., American Media Operations, Inc. and certain subsidiaries of American Media, Inc. filed their Amended Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "*Reorganization Plan*"), and the Bankruptcy Court entered the order confirming the Reorganization Plan on December [20], 2010;

WHEREAS, the Reorganization Plan proposes, among other things, and the Issuer and Guarantors have duly authorized, the issuance of [up to $140,000,000] aggregate principal amount of 13½% Second Lien Senior Secured Notes due 2018 ("*Initial Notes*");[1]

WHEREAS, on November 17, 2010, American Media, Inc., American Media Operations, Inc. and the backstop purchasers party thereto (the "*Backstop Parties*") entered into an agreement pursuant to which, among other things, the Backstop Parties, in order to facilitate the Reorganization Plan, agreed to purchase certain amounts of the Initial Notes;

WHEREAS, American Media, Inc., immediately prior to entering into this Indenture, merged with its subsidiary, American Media Operations, Inc., with American Media, Inc. being the surviving entity in the merger,

WHEREAS, the Issuer and the Guarantors have duly authorized the execution and delivery of this Indenture.

NOW, THEREFORE, the Issuer, the Guarantors, the Trustee and the Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders of the Notes.

---

[1] All Initial Notes to be issued on the Issue Date are expected to be issued under a Rule 144A CUSIP.

# ARTICLE 1

## DEFINITIONS AND INCORPORATION BY REFERENCE

Section 1.01    <u>Definitions</u>.

"*144A Global Note*" means a Global Note substantially in the form of <u>Exhibit A</u> hereto, bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that shall be issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of Notes issued or sold in reliance on Rule 144A.

"*Accredited Investor*" means an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act).

"*Acquired Indebtedness*" means, with respect to any specified Person, Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Interest*" means all additional interest, if any, then owing with respect to the Notes pursuant to the Registration Rights Agreement.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued from time to time under this Indenture in accordance with Sections 2.01, 4.09 and 4.12 hereof.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*Agent*" means any Registrar or Paying Agent.

"*Applicable Premium*" means, with respect to any Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Note; and

(2)    the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Note at December 15, 2013 (such redemption price being set forth in the table appearing in Section 3.07 hereof), plus (ii) all required interest payments due on such Note through December 15, 2013 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Note.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of the Depositary, Euroclear and/or Clearstream that apply to such transfer or exchange.

-2-

100432088 v3

"*Asset Sale*" means:

(1)        the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-back Transaction) of the Issuer or any of the Restricted Subsidiaries (each referred to in this definition as a "disposition"); or

(2)        the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with Section 4.09);

in each case, other than:

(a)        any disposition of Cash Equivalents or obsolete or worn out equipment in the ordinary course of business or any disposition of inventory or goods (or other assets) in the ordinary course of business;

(b)        the disposition of all or substantially all of the assets of the Issuer in a manner permitted pursuant to Section 5.01 hereof or any disposition that constitutes a Change of Control pursuant to this Indenture;

(c)        the making of any Restricted Payment or any Permitted Investment that is permitted to be made, and is made, pursuant to Section 4.07 hereof;

(d)        any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $7.5 million;

(e)        any disposition of property or assets or issuance of securities (i) by a Guarantor to the Issuer or by the Issuer or a Guarantor to another Guarantor or (ii) by a Restricted Subsidiary that is not a Guarantor to the Issuer, a Guarantor or to another Restricted Subsidiary that is not a Guarantor;

(f)        to the extent allowable under Section 1031 of the Code, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)        the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(h)        any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary other than to the extent that the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder;

(i)        solely for the purposes of clauses (1) and (2) of Section 4.10(a), foreclosures, condemnation or any similar action on assets;

(j)        the granting of Liens not prohibited by this Indenture;

(k)        the licensing or sublicensing of intellectual property or other general intangibles in the ordinary course of business; and

-3-

(l)        solely for the purposes of clauses (1) and (2) of Section 4.10(a), any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business.

"*Backstop Parties*" shall have the meaning given to it in the recitals hereto.

"*Bankruptcy Code*" shall have the meaning given to it in the recitals hereto.

"*Bankruptcy Law*" means Title 11 of the U.S. Code or any similar federal or state law for the relief of debtors.

"*Board of Directors*" means:

(1)        with respect to a corporation, the board of directors of the corporation;

(2)        with respect to a partnership, the board of directors of the general partner of the partnership; and

(3)        with respect to any other Person, the board or committee of such Person serving a similar function.

"*Board Resolution*" means, with respect to the Issuer, a duly adopted resolution of the Board of Directors of the Issuer or any committee thereof.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

(1)        in the case of a corporation, corporate stock;

(2)        in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)        in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)        any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Equivalents*" means:

(1)        United States dollars;

(2)        (a) euro, or any national currency of any participating member of the EMU; or (b) in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

-4-

(3)     securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or issued by any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(4)     certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(5)     repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6)     commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7)     marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8)     investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)     readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)     Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)     Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above, *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Cash Management Bank*" means any Credit Agreement Lender or an Affiliate of a Credit Agreement Lender (together with its successors and assigns) providing Cash Management Services to the Issuer or any Guarantor.

"*Cash Management Obligations*" means all obligations owing by the Issuer or any Guarantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the com-

100432088 v3

mencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documents governing the Cash Management Services, whether or not a claim for post-petition interest or fees is allowed or allowable in any such Insolvency or Liquidation Proceeding), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Issuer or such Guarantor with the terms, conditions and agreements of such Cash Management Services.

"*Cash Management Services*" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

"*Change of Control*" means the occurrence of any of the following:

(1)      the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Subsidiaries, taken as a whole, other than to a Permitted Holder or to a Person with respect to which the Permitted Holders have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of such Person or any direct or indirect holding company of such Person;

(2)      (A) the Issuer becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), other than the Permitted Holders, has become the "beneficial owner" (as defined in Rules 13d-3 of the Exchange Act, or any successor provision), by way of merger, consolidation or other business combination or purchase, of 50% or more of the total voting power of the Voting Stock of the Issuer or any direct or indirect parent company holding directly or indirectly 100% of the total voting power of the Voting Stock of the Issuer and (B) the Permitted Holders do not have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the Board of Directors of the Issuer or such parent company; or

(3)      the adoption by the stockholders of the Issuer of a plan or proposal for the liquidation or dissolution of the Issuer.

"*Clearstream*" means Clearstream Banking, Société Anonyme, and its successors.

"*Code*" means the Internal Revenue Code of 1986, as amended, or any successor statute.

"*Collateral*" means all of the property and assets whether now owned or hereafter acquired, in each case, in which Liens are, from time to time, purported to be granted to secure the Obligations under the Notes and the Guarantees pursuant to the Security Documents, other than Excluded Assets.

"*Collateral Agent*" has the meaning assigned to such term in the preamble to this Indenture.

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Issuer and its consolidated Restricted Subsidiaries (other than with respect to interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense), plus, to the extent incurred by the Issuer and its Restricted Subsidiaries in such period but not included in such interest expense:

(a)      interest expense attributable to Capitalized Lease Obligations and the interest expense attributable to leases constituting part of a Sale and Lease-back Transaction,

100432088 v3

(b)      amortization of debt discount and debt issuance costs,

(c)      capitalized interest,

(d)      commissions, discounts and other fees and charges attributable to letters of credit and bankers' acceptance financing,

(e)      interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is guaranteed by (or secured by the assets of) the Issuer or any Restricted Subsidiary,

(f)      net costs associated with Hedging Obligations,

(g)      dividends in respect of all Disqualified Stock of the Issuer and all Preferred Stock of any of the Restricted Subsidiaries of the Issuer, to the extent held by Persons other than the Issuer or a Wholly Owned Subsidiary,

(h)      interest incurred in connection with investments in discontinued operations, and

(i)      the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Issuer) in connection with Indebtedness incurred by such plan or trust.

Notwithstanding anything to the contrary contained herein, commissions, discounts, yield and other fees and charges incurred in connection with any transaction pursuant to which the Issuer or any Subsidiary of the Issuer may sell, convey or otherwise transfer or grant a security interest in any accounts receivable or related assets shall be included in Consolidated Interest Expense.

"*Consolidated Leverage Ratio*" as of any date of determination means the ratio of:

(a)      Total Consolidated Indebtedness as of the date of determination to

(b)      the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters ending at the end of the most recent fiscal quarter for which internal financial statements are available,

*provided*, *however*, that

(i)      if the Issuer or any Restricted Subsidiary has incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is an incurrence of Indebtedness, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving effect on a pro forma basis to such Indebtedness as if such Indebtedness had been incurred on the first day of such period and the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the date of such calculation shall be deemed to be (i) the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such fa-

-7-

cility to the date of such calculation, in each case, *provided* that such average daily balance shall take into account any repayment of Indebtedness under such facility as provided in clause (ii)),

      (ii)     if the Issuer or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Leverage Ratio, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated on a pro forma basis as if such discharge had occurred on the first day of such period and as if the Issuer or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness,

      (iii)     if since the beginning of such period the Issuer or any Restricted Subsidiary shall have made any Asset Sale, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets that were the subject of such Asset Sale for such period or increased by an amount equal to EBITDA (if negative) directly attributable thereto for such period and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Issuer or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Issuer and its continuing Restricted Subsidiaries in connection with such Asset Sale for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Issuer and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale),

      (iv)     if since the beginning of such period the Issuer or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto (including the incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period, and

      (v)     if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by the Issuer or a Restricted Subsidiary during such period, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving pro forma effect thereto as if such Asset Sale, Investment or acquisition of assets had occurred on the first day of such period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness incurred in connection therewith, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Issuer; *provided* that any such pro forma calculations with respect to cost savings, operating expense reductions or synergies for such period shall be

limited to those resulting from the transaction which is being given pro forma effect that in the reasonable determination of a responsible financial or accounting Officer of the Issuer (a) are reasonably identifiable and factually supportable and (b) such actions have been realized or for which the steps necessary for realization have been taken or are reasonably expected to be taken within twelve months following any such transaction, including, but not limited to, the execution or termination of any contracts, the termination of any personnel or the closing (or approval by the Board of Directors of any closing) of any facility, as applicable. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness).

"*Consolidated Net Income*" means, for any period, the net income (excluding non-controlling interest) of the Issuer and its Restricted Subsidiaries for such period; *provided, however,* that there shall not be included in such Consolidated Net Income:

(a)    any net income of any Person (other than the Issuer) if such Person is not a Restricted Subsidiary, except that

(i)    subject to the limitations contained in clause (d) below, the Issuer's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Person during such period to the Issuer or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to a Restricted Subsidiary (other than a Guarantor), to the limitations contained in clause (b) below) and

(ii)    the Issuer's equity in a net loss of any such Person for such period shall be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Issuer or a Restricted Subsidiary;

(b)    except for the purposes of calculating Consolidated Leverage Ratio, any net income (or loss) of any Restricted Subsidiary (other than any Guarantor) if such Restricted Subsidiary is not permitted by restrictions, directly or indirectly, to pay dividends or make distributions (unless legally waived) to the Issuer, except that

(i)    the net income of any such Restricted Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Restricted Subsidiary during such period to the Issuer or another Restricted Subsidiary as a dividend, debt repayment or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to another Restricted Subsidiary (other than a Guarantor), to the limitation contained in this clause) and

(ii)    the net loss of any such Restricted Subsidiary for such period shall be included in determining such Consolidated Net Income;

(c)    any gain (loss) realized (less all fees and expenses related thereto) upon the sale or other disposition of any asset of the Issuer or its consolidated Subsidiaries (including pursuant to any Sale and Lease-back Transaction) that is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sale or other disposition of any Capital Stock of any Person;

-9-

(d)        any extraordinary, non-recurring or unusual gain or loss or expense (less all fees and expenses related thereto);

(e)        the cumulative effect of a change in accounting principles;

(f)        effects of adjustments (including the effects of such adjustments pushed down to the Issuer and its Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill and other intangible assets and in process research and development, deferred revenue and debt line items in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes;

(g)        any net after-tax income (loss) from the early extinguishment of (i) Indebtedness, (ii) Hedging Obligations or (iii) other derivative instruments;

(h)        any net after-tax income or loss from abandoned, closed or discontinued operations and any net after-tax gains or losses on disposal of abandoned, closed or discontinued operations;

(i)        any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in the law or regulation, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP; and

(j)        any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, disposition, recapitalization, Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any other such transaction consummated prior to the Issue Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction.

"*Consolidated Secured Leverage Ratio*" means the ratio of (1) the aggregate principal amount of Secured Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "Consolidated Leverage Ratio" in performing a calculation thereof.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1)        to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)        to advance or supply funds

(a)        for the purchase or payment of any such primary obligation, or

-10-

(b)        to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3)        to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Corporate Trust Office of the Trustee*" shall be at the address of the Trustee specified in Section 13.02 hereof or such other address as to which the Trustee may give notice to the Holders and the Issuer.

"*Covenant Suspension*" means, during any period of time following the issuance of the Notes, that (i) the Notes have Investment Grade Ratings from both Rating Agencies and (ii) no Default has occurred and is continuing under this Indenture.

"*Credit Agreement*" means the credit agreement to be entered into on or about the Issue Date, among the Issuer, the lenders and the administrative agent for such lenders, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under Section 4.09 hereof).

"*Credit Agreement Lenders*" means the "Lenders" from time to time party to, and as defined in, the Credit Agreement, together with their respective successors and assigns; *provided* that the term "Credit Agreement Lender" shall in any event also include each letter of credit issuer and swingline lender under the Credit Agreement, including, without limitation, the "Issuing Bank," the "Swingline Lender" and any "Agent" under (and each as defined in) the Credit Agreement.

"*Custodian*" means the Trustee, as custodian with respect to the Global Notes, or any successor entity thereto.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06(c) hereof, substantially in the form of <u>Exhibit A</u> hereto, except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto.

"*Depositary*" means, with respect to the Global Notes, the Person specified in Section 2.03 hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having become such pursuant to the applicable provision of this Indenture.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Issuer, less the amount of cash or Cash

-11-

Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Discharge of First Lien Obligations*" means, subject to any reinstatement of First Lien Obligations in accordance with the First Lien Intercreditor Agreement, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective First Lien Document, whether or not such interest would be allowed in any such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness under the First Lien Documents and termination of all commitments of the Credit Agreement Lenders to lend or otherwise extend credit under the First Lien Documents, (b) payment in full in cash of all other First Lien Obligations (including letter of credit reimbursement obligations) that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest, and premium are paid (other than Cash Management Obligations and Secured Hedging Obligations so long as arrangements satisfactory to the applicable Cash Management Bank or Hedge Bank shall have been made), and (c) termination or cash collateralization (in an amount and manner, and on terms, reasonably satisfactory to the First Lien Representative) of all letters of credit issued under the First Lien Credit Documents.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date of the Notes or the date the Notes are no longer outstanding; *provided, however,* that if such Capital Stock is issued to any plan for the benefit of employees of the Issuer or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided, further,* that any Capital Stock held by any future, current or former employee, director, manager or consultant (or their respective trusts, estates, investment funds, investment vehicles or immediate family members) of the Issuer, any of its Subsidiaries or any direct or indirect parent entity of the Issuer in each case upon the termination of employment or death of such person pursuant to any stockholders' agreement, management equity plan, stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Issuer or its Subsidiaries.

"*EBITDA*" for any period means the Consolidated Net Income of the Issuer and its Restricted Subsidiaries for such period, *plus,* without duplication, the following to the extent deducted in calculating such Consolidated Net Income:

(a)    Consolidated income tax expense,

(b)    Consolidated Interest Expense,

(c)    Consolidated depreciation expense,

(d)    Consolidated amortization expense (including amortization associated with capitalized or short-term display rack costs and the recognition of such costs as a deferred cost asset amortized as contra-revenue),

-12-

(e)    any interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense,

(f)    any expenses or charges related to any Equity Offering, Permitted Investment, acquisition or Indebtedness permitted to be incurred by this Indenture (whether or not successful),

(g)    any expense or charge incurred or recorded by the Issuer or any of its Subsidiaries in connection with (i) Asset Sales or (ii) reorganization and other cost cutting efforts, including, without limitation, expenses and charges relating to severance, relocation and the discontinuation of titles,

(h)    any non-cash charges (including any non-cash compensation charge or expense) reducing Consolidated Net Income for such period (excluding any such charge which consists of or requires an accrual of, or cash reserve for, any anticipated cash charges for any prior or in any future period),

(i)    any charges or credits relating to the adoption of fresh start accounting principles; and

(j)    solely for purposes of calculating the Consolidated Leverage Ratio, the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income.

"*Emergence Transactions*" means all transactions relating to the Reorganization Plan and the Issuer's emergence from Chapter 11 of the Bankruptcy Code, including, but not limited to, closing of the Exit Financing.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Enforcement Notice*" shall have the meaning assigned to such term in the First Lien Intercreditor Agreement.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of the Issuer or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)    public offerings with respect to the Issuer's or any direct or indirect parent company's common stock registered on Form S-8;

(2)    issuances to any Subsidiary of the Issuer; and

(3)    any such public or private sale that constitutes an Excluded Contribution.

"*euro*" means the single currency of participating member states of the EMU.

"*Euroclear*" means Euroclear Bank S.A./N.V., as operator of the Euroclear system, and its successors.

-13-

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Excluded Contribution*" means the amount of net cash proceeds, marketable securities or Qualified Proceeds received by the Issuer after the Issue Date from (1) contributions to its common equity capital and (2) the sale (other than to a Subsidiary of the Issuer or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Issuer or any of its direct or indirect parents) of Capital Stock (other than Disqualified Stock) of the Issuer, in each case designated as an Excluded Contribution pursuant to an Officers' Certificate on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of Section 4.07(a)(IV) hereof.

"*Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be comprised of the Credit Agreement, the Notes and the First Lien Notes.

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Issuer in good faith; *provided* that if the fair market value is equal to or exceeds $25.0 million, such determination shall be made by the Board of Directors of the Issuer.

"*First Lien Collateral Agent*" means Wilmington Trust FSB, as collateral agent under the First Lien Indenture.

"*First Lien Credit Documents*" means the Credit Agreement, the other Loan Documents (as defined in the Credit Agreement), and each of the other agreements, documents, and instruments providing for or evidencing any other First Lien Obligation and any other document or instrument executed or delivered at any time in connection with any First Lien Obligation (including any intercreditor or joinder agreement among holders of First Lien Obligations but excluding Secured Hedge Agreements and the documents governing the Cash Management Obligations), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from time to time.

"*First Lien Documents*" means the First Lien Indenture, the First Lien Credit Documents, the Secured Hedge Agreements, and any and all documents governing the Cash Management Obligations.

"*First Lien Indebtedness*" means (i) the First Lien Notes, (ii) Indebtedness under the Credit Agreement and (iii) additional Indebtedness that is secured by a Lien senior to the Lien securing the Notes.

"*First Lien Indenture*" means the indenture in respect of the First Lien Notes dated as of December 1, 2010 between AMO Escrow Corporation, a Delaware corporation (subsequently merged with and into the Issuer) and the First Lien Trustee, as amended or supplemented from time to time.

"*First Lien Intercreditor Agreement*" means the First Lien Intercreditor Agreement dated on or about the Issue Date among the First Lien Collateral Agent, the collateral agent in respect of the Credit Agreement, the Issuer and each other Guarantor named therein, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*First Lien Leverage Ratio*" means the ratio of (1) the aggregate principal amount of First Lien Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of the

Issuer and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "Consolidated Leverage Ratio" in performing a calculation thereof.

"*First Lien Notes*" means the $385,000,000 in aggregate principal amount of First Lien Secured Notes due 2017 issued on December 1, 2010 pursuant to the First Lien Indenture.

"*First Lien Obligations*" means (i) all Obligations arising under (and as defined in) the Credit Agreement of the Issuer and the Guarantors, under any other document relating to the Credit Agreement incurred under Section 4.09(b)(1) hereof, (ii) all Obligations under the First Lien Indenture, (iii) all Secured Hedging Obligations and (iv) all Cash Management Obligations; *provided* that the aggregate principal amount of, without duplication, revolving credit loans, letters of credit, term loans, other loans, notes or similar instruments (excluding, in any event, Cash Management Obligations and Secured Hedging Obligations) provided for under the Credit Agreement or any other document relating to the Credit Agreement (or any refinancing thereof) in excess of the amount permitted under Section 4.09(b)(1) hereof and any interest relating to such excess amount, shall not constitute First Lien Obligations for purposes of this Indenture. "First Lien Obligations" shall in any event include (a) all interest accrued or accruing, or which would accrue, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), on or after the commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Document, whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the First Lien Representative, the Holders of the First Lien Notes, the First Lien Collateral Agent, the collateral agent under the Credit Agreement, the administrative agent under the Credit Agreement, the lenders under the Credit Agreement and the First Lien Trustee on or after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed or allowable under Section 502 or 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors as a claim in such Insolvency or Liquidation Proceeding, and (c) all obligations and liabilities of the Issuer and each Guarantor under each First Lien Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due and payable.

"*First Lien Representative*" means, as between collateral agents representing different series of First Lien Obligations, the collateral agent representing the series of First Lien Obligations with the greatest outstanding principal amount.

"*First Lien Trustee*" means Wilmington Trust FSB, as trustee for the holders of First Lien Notes.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Issue Date.  At any time after the Issue Date, the Issuer may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Indenture); *provided* that any such election, once made, shall be irrevocable; *provided*, *further*, any calculation or determination in this Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Issuer's elec-

-15-

tion to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Issuer shall give written notice of any such election made in accordance with this definition to the Trustee and the Holders of the Notes.

"*Global Note Legend*" means the legend set forth in Section 2.06(g)(ii) hereof, which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes, substantially in the form of Exhibit A hereto, issued in accordance with Section 2.01, 2.06(b), 2.06(d), 2.06(f) or 2.07 hereof.

"*Government Securities*" means securities that are:

(1)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*Grantors*" means the Issuer and the Guarantors.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Issuer's Obligations under this Indenture and the Notes.

"*Guarantor*" means each Restricted Subsidiary that guarantees the Notes in accordance with the terms of this Indenture.

"*Hedge Bank*" means any Person that is a Credit Agreement Lender or an Affiliate of a Credit Agreement Lender at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, and such Person's successors and assigns.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate or currency risks either generally or under specific contingencies.

-16-

"*Holder*" means the Person in whose name a Note is registered on the Registrar's books.

"*IAI Global Note*" means a global note substantially in the form of <u>Exhibit A</u> hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued  or sold (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of Initial Notes issued to Accredited Investors.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1)    any indebtedness (including principal and premium) of such Person, whether or not contingent:

(a)    in respect of borrowed money;

(b)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

(c)    representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

(d)    representing any Hedging Obligations;

if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)    to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3)    to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person but only to the extent of the fair market value of the assets subject to such Lien;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include Contingent Obligations incurred in the ordinary course of business.

"*IFRS*" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

100432088 v3

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Issuer, qualified to perform the task for which it has been engaged.

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" shall have the meaning given to it in the recitals hereto.

"*Insolvency or Liquidation Proceeding*" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to the Issuer or any Guarantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to the Issuer or any Guarantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of the Issuer or any Guarantor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Issuer or any Guarantor.

"*Intercreditor Agreement*" means the Second Lien Intercreditor Agreement dated on or about the Issue Date among the Collateral Agent, the First Lien Collateral Agent, the collateral agent in respect of the Credit Agreement, the Issuer and each Guarantor, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*Interest Payment Date*" means June 15 and December 15 of each year to stated maturity (*provided* that if any such day is not a Business Day, interest shall be paid on the next succeeding Business Day and no interest shall accrue for the intervening period in respect of such Interest Payment Date).

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, in each case, with a stable or better outlook, or an equivalent rating by any other Rating Agency.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commissions, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Issuer in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and Section 4.07 hereof:

(1)    "Investments" shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Issuer's "Investment" in such Subsidiary at the time of such redesignation; *less*

-18-

(b)      the portion (proportionate to the Issuer equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)      any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

"*Issue Date*" means the date Initial Notes are issued under this Indenture.

"*Issuer*" has the meaning assigned to such term in the preamble to this Indenture.

"*Issuer Order*" means a written request or order signed on behalf of the Issuer by any Officer of the Issuer and delivered to the Trustee.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the States of New York, Minnesota and Delaware.  If a payment date is a Legal Holiday, payment shall be made on the next succeeding day that is not a Legal Holiday, and no interest shall accrue for the intervening period in respect of such payment date.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for informational purposes); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Proceeds*" means the aggregate cash proceeds received by the Issuer or any of its Restricted Subsidiaries in respect of any Asset Sale, including any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale, net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness required (other than required by clause (1) of Section 4.10(b) hereof) to be paid as a result of such transaction, amounts required to be paid to minority interest holders in Restricted Subsidiaries as a result of such Asset Sale, any portion of the purchase price from such Asset Sale placed in escrow as a requirement of such Asset Sale (but only for the duration of such escrow), and any deduction of appropriate amounts to be provided by the Issuer or any of the Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Issuer or any of the Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

100432088 v3

"*Notes*" means the Initial Notes issued under this Indenture. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture include any Additional Notes that are actually issued.

"*Obligations*" means any principal (including any accretion), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal (including accretion), interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the final offering memorandum, dated November 16, 2010, relating to the sale of the First Lien Notes.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the Chief Financial Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Issuer.

"*Officers' Certificate*" means a certificate signed on behalf of the Issuer by any two Officers of the Issuer, one of whom must be one of the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Issuer, that meets the requirements set forth in this Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Trustee. The counsel may be an employee of or counsel to the Issuer.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Participating Broker-Dealer*" has the meaning set forth in the Registration Rights Agreement.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Issuer or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with Section 4.10 hereof.

"*Permitted Holders*" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Management II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) Regiment Capital Management, LLC, (vi) [reserved], (vii) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any successor provision) of which any of the Permitted Holders specified in clauses (i)-(v) above are members, and (viii) the respective Affiliates of each of the foregoing; *provided* that in the case of any group specified in clause (vii) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(v) above and their respective Affiliates must collectively beneficially own a greater amount of the total voting power of the Voting Stock of the Issuer than the amount of the total voting power of the Voting Stock of the Issuer beneficially owned by any other member of such group.

-20-

"*Permitted Investments*" means:

(1)    any Investment in the Issuer or any of its Restricted Subsidiaries;

(2)    any Investment in cash and Cash Equivalents;

(3)    any Investment by the Issuer or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)    such Person becomes a Restricted Subsidiary; or

(b)    such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Issuer or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided* that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4)    any Investment in securities or other assets not constituting cash or Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of Section 4.10 hereof or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on the Issue Date;

(6)    any Investment acquired by the Issuer or any of its Restricted Subsidiaries:

(a)    in exchange for any other Investment or accounts receivable held by the Issuer or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b)    as a result of a foreclosure by the Issuer or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)    Hedging Obligations permitted under clause (10) of Section 4.09(b) hereof;

(8)    any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed the greater of (x) $25.0 million and (y) 3.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)    Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Issuer, or any of its direct or indirect parent companies; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of Section 4.07(a) hereof;

(10)    guarantees of Indebtedness permitted under Section 4.09 hereof;

100432088 v3

(11)     any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of Section 4.11(b) hereof (except transactions described in clauses (2), (5) and (16) of Section 4.11(b) hereof);

(12)     additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (12) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed the greater of (x) $40.0 million and (y) 5.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(13)     loans and advances to, or guarantees of Indebtedness of, officers, directors and employees in an amount not to exceed $5.0 million at any time outstanding;

(14)     loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business; and

(15)     prepaid expenses, deposits, advances, loans or extensions of trade credit in the ordinary course of business by the Issuer or any Restricted Subsidiaries.

"*Permitted Liens*" means, with respect to any Person:

(1)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(2)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens

-22-

100432088 v3

incidental, to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)    (i) Liens securing Indebtedness under the Credit Agreement incurred pursuant to clause (1) of Section 4.09(b) hereof (and the related guarantees) and (ii) Liens securing Indebtedness permitted to be incurred pursuant to clause (4) of Section 4.09(b) hereof covering only the property (real or personal) or equipment (other than software), whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, in each case, financed by or acquired with such Indebtedness;

(7)    Liens existing on the Issue Date (other than Liens in favor of secured parties under the Credit Agreement and Liens under clause (33) of this definition);

(8)    Liens on property or shares of stock or other assets of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property or assets owned by the Issuer or any of its Restricted Subsidiaries;

(9)    Liens on property or other assets at the time the Issuer or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger or consolidation with or into the Issuer or any of its Restricted Subsidiaries; *provided*, *however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided*, *further*, *however*, that the Liens may not extend to any other property owned by the Issuer or any of its Restricted Subsidiaries;

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Issuer or another Restricted Subsidiary permitted to be incurred in accordance with Section 4.09 hereof;

(11)    Liens securing Hedging Obligations;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries and do not secure any Indebtedness;

(14)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Issuer and its Restricted Subsidiaries in the ordinary course of business;

(15)    Liens in favor of the Issuer or any Guarantor;

(16)    Liens on equipment of the Issuer or any of its Restricted Subsidiaries granted in the ordinary course of business to the Issuer's clients not related to Indebtedness;

-23-

(17)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9) and the succeeding clause (33) (provided, that, with respect to Liens incurred to refinance Liens under clause (33), the Lien pursuant to such refinancing shall have the same relative priority as the Lien being refinanced); *provided*, *however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under the foregoing clauses (6), (7), (8), (9) and (33) at the time the original Lien became a Permitted Lien under this Indenture, and (ii) an amount necessary to pay any accrued interest and fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(18)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(19)    other Liens that are not on Collateral securing obligations incurred in the ordinary course of business which obligations do not exceed $10.0 million at any one time outstanding;

(20)    Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) of Section 6.01(a) hereof, so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(21)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(22)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or any comparable or successor provision) on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(23)    Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 4.09 hereof; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(24)    Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(25)    Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Issuer or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Issuer and its Restricted Subsidiaries or (iii) relating to purchase orders and other

-24-

agreements entered into with customers of the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(28)    Liens arising under this Indenture in favor of the Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred or outstanding under this Indenture, *provided* that such Liens are solely for the benefit of the trustees, agents and representatives in their capacities as such and not for the benefit of the holders of such Indebtedness;

(29)    Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under Section 4.07 hereof;

(30)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(31)    Liens on assets of Foreign Subsidiaries to secure Indebtedness of Foreign Subsidiaries;

(32)    Liens incurred to secure First Lien Obligations or Permitted Second Lien Obligations permitted to be incurred pursuant to Section 4.09(a) or clause (12)(b) of Section 4.09(b); *provided*, that such Indebtedness may only be First Lien Obligations if, on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Issuer and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction is equal to or less than 2.75 to 1.0; *provided further*, that such Indebtedness may be Permitted Second Lien Obligations if, at the time of incurrence and after giving pro forma effect thereto, the Consolidated Secured Leverage Ratio would be no greater than 4.0 to 1.0; and

(33)    Liens on the Collateral securing:

(a)    the Notes (other than Additional Notes), the Guarantees thereof and other Obligations under this Indenture and in respect thereof and any obligations owing to the Trustee or the Collateral Agent under this Indenture or the Security Documents; and

(b)    obligations under the First Lien Notes outstanding on the Issue Date and under clause (iii) or clause (iv) of the definition of "First Lien Obligations".

In each case set forth above, notwithstanding any stated limitation on the assets that may be subject to such Lien, a Permitted Lien on a specified asset or group or type of assets may include Liens on all improvements, additions, and accessions thereto and all products and proceeds thereof, including dividends, distributions, interest and increases in respect thereof.

-25-

For purposes of this definition, the term "*Indebtedness*" shall be deemed to include interest on such Indebtedness.

"*Permitted Second Lien Obligations*" means the Notes and any Indebtedness secured by a Lien ranking *pari passu* with the Lien security the Notes and incurred under clause (32) of the definition of "*Permitted Liens*."

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"*Private Placement Legend*" means the legend set forth in Section 2.06(g)(i) hereof to be placed on all Notes issued under this Indenture, except where otherwise permitted by the provisions of this Indenture.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Issuer in good faith.

"*Rating Agencies*" means Moody's and S&P or, if Moody's or S&P or both shall not make a rating on the Notes publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Issuer which shall be substituted for Moody's or S&P or both, as the case may be.

"*Record Date*" for the interest or Additional Interest, if any, payable on any applicable Interest Payment Date means June 1 or December 1 (whether or not a Business Day) next preceding such Interest Payment Date.

"*Registration Rights Agreement*" means the Registration Rights Agreement in respect of the Notes, dated on or about the Issue Date, among the Issuer, the Guarantors, the Backstop Parties and the other Holders named on the signature pages thereof, as amended from time to time and as supplemented by any joinders to the Registration Rights Agreement.

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as applicable.

"*Regulation S Permanent Global Note*" means a permanent Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, issued (or the

principal amount of which will be increased) in a denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Period.

"*Regulation S Temporary Global Note*" means a temporary Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and the Regulation S Temporary Global Note Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee, issued (or the principal amount of which will be increased) in a denomination equal to the outstanding principal amount of the Notes initially issued or sold in reliance on Rule 903.

"*Regulation S Temporary Global Note Legend*" means the legend set forth in Section 2.06(g)(iii) hereof.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business, *provided* that any assets received by the Issuer or a Restricted Subsidiary in exchange for assets transferred by the Issuer or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Related Person*" means, with respect to any specified Person, such Person's Affiliates, and the respective officers, directors, employees, agents, advisors and attorneys-in-fact of such Person and its Affiliates.

"*Reorganization Plan*" shall have the meaning given to it in the recitals hereto.

"*Responsible Officer*" means, when used with respect to the Trustee, any officer within the corporate trust department of the Trustee having direct responsibility for the administration of this Indenture, or any other officer to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Indenture.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Issuer (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*Reversion Date*" means, during any period of time during which the Issuer and the Restricted Subsidiaries are not subject to the covenants listed in Section 4.13(a) hereof (the "*Suspended Covenants*") as a result of a Covenant Suspension, the date on which one or both of the Rating Agencies withdraws its Investment Grade Rating or downgrades the rating assigned to the Notes below an Invest-

-27-

ment Grade Rating or a Default or Event of Default occurs and is continuing, and after which date the Suspended Covenants will thereafter be reinstated.

"*Rule 144*" means Rule 144 promulgated under the Securities Act (or any successor rule).

"*Rule 144A*" means Rule 144A promulgated under the Securities Act (or any successor rule).

"*Rule 903*" means Rule 903 promulgated under the Securities Act (or any successor rule).

"*Rule 904*" means Rule 904 promulgated under the Securities Act (or any successor rule).

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-back Transaction*" means any arrangement providing for the leasing by the Issuer or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Issuer or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Secured Hedge Agreements*" means each agreement that governs Hedging Obligations by and between the Issuer or any Guarantor, on the one hand, and any Hedge Bank from time to time, but only to the extent such agreement is permitted under the Credit Agreement and constitutes an "Obligation" (as such term is defined under the Credit Agreement); *provided*, *however*, that such Hedging Obligations shall not, solely by virtue of constituting an "Obligation" (as so defined), also constitute Indebtedness under the Credit Agreement.

"*Secured Hedging Obligations*" means (i) obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective Secured Hedge Agreement, whether or not a claim for post-petition interest or fees is allowed in any such Insolvency or Liquidation Proceeding), of the Issuer or any Guarantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising out of or in connection with, any Secured Hedge Agreement (including all such obligations and indebtedness under any guarantee of any such Secured Hedge Agreement to which the Issuer or such Guarantor is a party) and (ii) all performance and compliance obligations by the Issuer or any Guarantor under any Secured Hedge Agreement.

"*Secured Indebtedness*" means any Indebtedness of the Issuer or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the security documents granting a security interest in any assets of any Person to secure the Obligations under the Notes and the Guarantees as each may be amended, restated, supplemented or otherwise modified from time to time.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Issue Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Issuer and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Subsidiary*" means, with respect to any Person:

(1)     any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

(2)     any partnership, joint venture, limited liability company or similar entity of which (x) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and (y) such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TIA*" or "*Trust Indenture Act*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Total Assets*" means the total consolidated assets of the Issuer and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Issuer.

"*Total Consolidated Indebtedness*" means the aggregate amount of all Indebtedness of the Issuer and its Restricted Subsidiaries, outstanding as of such date of determination, determined on a consolidated basis, after giving effect to any incurrence of Indebtedness and the application of the proceeds therefrom giving rise to such determination (but excluding Indebtedness of the type described in clause (d) of the definition thereof and Indebtedness issued in payment of interest obligations), less up to $20.0 million of unrestricted cash and Cash Equivalents of the Issuer and its Restricted Subsidiaries as of such date of determination.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 15, 2013; *provided*, *however*, that if the period from the Redemption Date to December 15, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trustee*" shall have the meaning given to it in the recitals hereto.

-29-

"*Unrestricted Definitive Note*" means one or more Definitive Notes that do not bear and are not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a permanent Global Note, substantially in the form of Exhibit A attached hereto, that bears the Global Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto, and that is deposited with or on behalf of and registered in the name of the Depositary, representing Notes that do not bear and are not required to bear the Private Placement Legend.

"*Unrestricted Subsidiary*" means:

(1)    any Subsidiary of the Issuer which at the time of determination is an Unrestricted Subsidiary (as designated by the Issuer, as provided below); and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Issuer may designate any Subsidiary of the Issuer (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Issuer or any Subsidiary of the Issuer (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1)    any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Issuer;

(2)    such designation complies with Section 4.07 hereof; and

(3)    each of:

(a)    the Subsidiary to be so designated; and

(b)    its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Issuer or any Restricted Subsidiary (other than a pledge of the Equity Interests of such Unrestricted Subsidiary).

The Issuer may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and the Issuer could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a) hereof.

Any such designation by the Issuer shall be notified by the Issuer to the Trustee by promptly filing with the Trustee a copy of the resolution of the Board of Directors of the Issuer or any committee thereof giving effect to such designation (which resolution must be certified by the Secretary or an Assistant Secretary of the Issuer) and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

100432088 v3

"*Unsecured Indebtedness*" means Indebtedness that is not Secured Indebtedness.

"*U.S. Person*" means a U.S. person as defined in Rule 902(k) under the Securities Act.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

    (1)    the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

    (2)    the sum of all such payments.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

Section 1.02    Other Definitions.

| Term | Defined in Section |
|---|---|
| "*Action*" | 10.09 |
| "*Affiliate Transaction*" | 4.11 |
| "*Application Period*" | 4.10 |
| "*Asset Sale Offer*" | 4.10 |
| "*Authentication Order*" | 2.02 |
| "*Change of Control Offer*" | 4.14 |
| "*Change of Control Payment*" | 4.14 |
| "*Change of Control Payment Date*" | 4.14 |
| "*Covenant Defeasance*" | 8.03 |
| "*DTC*" | 2.03 |
| "*Event of Default*" | 6.01 |
| "*Excess Proceeds*" | 4.10 |
| "*incur*" or "*incurrence*" | 4.09 |
| "*Initial Lien*" | 4.12 |
| "*Legal Defeasance*" | 8.02 |
| "*Note Register*" | 2.03 |
| "*Offer Amount*" | 3.09 |
| "*Offer Period*" | 3.09 |
| "*Pari Passu Indebtedness*" | 4.10 |
| "*Paying Agent*" | 2.03 |
| "*Purchase Date*" | 3.09 |
| "*Redemption Date*" | 3.07 |
| "*Refinancing Indebtedness*" | 4.09 |
| "*Registrar*" | 2.03 |
| "*Registration Statement*" | 4.03 |

-31-

| Term | Defined in Section |
|---|---|
| "*Replacement Assets*" ........................................................................................ | 4.09 |
| "*Restricted Payments*" ....................................................................................... | 4.07 |
| "*Security Document Order*" ............................................................................... | 10.09 |
| "*Successor Company*" ........................................................................................ | 5.01 |
| "*Successor Person*" ............................................................................................ | 5.01 |
| "*Suspended Covenants*" ..................................................................................... | 1.01 |
| "*Treasury Capital Stock*" ................................................................................... | 4.07 |

Section 1.03    <u>Incorporation by Reference of Trust Indenture Act</u>.

Except as otherwise expressly provided herein prior to the qualification of this Indenture under the Trust Indenture Act, whenever this Indenture refers to a provision of the Trust Indenture Act, the provision is incorporated by reference in and made a part of this Indenture.

The following Trust Indenture Act terms used in this Indenture have the following meanings:

"indenture securities" means the Notes;

"indenture security holder" means a Holder of a Note;

"indenture to be qualified" means this Indenture;

"indenture trustee" or "institutional trustee" means the Trustee; and

"obligor" on the Notes and the Guarantees means the Issuer and the Guarantors, respectively, and any successor obligor upon the Notes and the Guarantees, respectively.

All other terms used in this Indenture that are defined by the Trust Indenture Act, defined by Trust Indenture Act reference to another statute or defined by SEC rule under the Trust Indenture Act have the meanings so assigned to them.

Section 1.04    <u>Rules of Construction</u>.

Unless the context otherwise requires:

(a)    a term has the meaning assigned to it;

(b)    an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    "or" is not exclusive;

(d)    words in the singular include the plural, and in the plural include the singular;

(e)    "will" shall be interpreted to express a command;

(f)    provisions apply to successive events and transactions;

-32-

100432088 v3

(g)     references to sections of, or rules under, the Securities Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the SEC from time to time;

(h)     unless the context otherwise requires, any reference to an "Article," "Section" or "clause" refers to an Article, Section or clause, as the case may be, of this Indenture;

(i)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Indenture as a whole and not any particular Article, Section, clause or other subdivision; and

(j)     references to "interest" shall also be deemed to be references to "Additional Interest," unless the context otherwise requires.

Section 1.05    Acts of Holders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by an agent duly appointed in writing.  Except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments or record or both are delivered to the Trustee and, where it is hereby expressly required, to the Issuer.  Proof of execution of any such instrument or of a writing appointing any such agent, or the holding by any Person of a Note, shall be sufficient for any purpose of this Indenture and (subject to Section 7.01 hereof) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 1.05.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved by the affidavit of a witness of such execution or by the certificate of any notary public or other officer authorized by law to take acknowledgments of deeds, certifying that the individual signing such instrument or writing acknowledged to him the execution thereof.  Where such execution is by or on behalf of any legal entity other than an individual, such certificate or affidavit shall also constitute proof of the authority of the Person executing the same.  The fact and date of the execution of any such instrument or writing, or the authority of the Person executing the same, may also be proved in any other manner that the Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Note shall bind every future Holder of the same Note and the Holder of every Note issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of any action taken, suffered or omitted by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

(e)     The Issuer may, in the circumstances permitted by the Trust Indenture Act, set a record date for purposes of determining the identity of Holders entitled to give any request, demand, authorization, direction, notice, consent, waiver or take any other act, or to vote or consent to any action by vote or consent authorized or permitted to be given or taken by Holders.  Unless otherwise specified, if not set by the Issuer prior to the first solicitation of a Holder made by any Person in respect of any such action, or in the case of any such vote, prior to such vote, any such record date shall be the later of 30 days prior to the first solicitation of such consent or the date of the most recent list of Holders furnished to the Trustee prior to such solicitation.

-33-

(f)        Without limiting the foregoing, a Holder entitled to take any action hereunder with regard to any particular Note may do so with regard to all or any part of the principal amount of such Note or by one or more duly appointed agents, each of which may do so pursuant to such appointment with regard to all or any part of such principal amount.  Any notice given or action taken by a Holder or its agents with regard to different parts of such principal amount pursuant to this paragraph shall have the same effect as if given or taken by separate Holders of each such different part.

(g)        Without limiting the generality of the foregoing, a Holder, including DTC that is the Holder of a Global Note, may make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders, and DTC that is the Holder of a Global Note may provide its proxy or proxies to the beneficial owners of interests in any such Global Note through such depositary's standing instructions and customary practices.

(h)        The Issuer may fix a record date for the purpose of determining the Persons who are beneficial owners of interests in any Global Note held by DTC entitled under the procedures of such depositary to make, give or take, by a proxy or proxies duly appointed in writing, any request, demand, authorization, direction, notice, consent, waiver or other action provided in this Indenture to be made, given or taken by Holders.  If such a record date is fixed, the Holders on such record date or their duly appointed proxy or proxies, and only such Persons, shall be entitled to make, give or take such request, demand, authorization, direction, notice, consent, waiver or other action, whether or not such Holders remain Holders after such record date.  No such request, demand, authorization, direction, notice, consent, waiver or other action shall be valid or effective if made, given or taken more than 90 days after such record date.

ARTICLE 2

THE NOTES

Section 2.01        Form and Dating; Terms.

(a)        General.  The Notes and the Trustee's certificate of authentication shall be substantially in the form of Exhibit A hereto.  The Notes may have notations, legends or endorsements required by law, stock exchange rules or usage.  Each Note shall be dated the date of its authentication.  The Notes shall be in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof.

(b)        The terms and provisions contained in the Notes, a form of which is annexed hereto as Exhibit A, shall constitute, and are hereby expressly made, a part of this Indenture and, to the extent applicable, the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby.  Any reference to a Guarantor herein shall be deemed to be a reference thereto solely from and after the date of its execution and delivery of this Indenture or a supplemental indenture hereto in the form of Exhibit D hereto.

(c)        Global Notes.  Notes issued in global form shall be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto).  Notes issued in definitive form shall be substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto).  Each Global Note shall represent such of the outstanding Notes as shall be specified in the "Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note" attached thereto and

-34-

each shall provide that it shall represent up to the aggregate principal amount of Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as applicable, to reflect exchanges and redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby shall be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions given by the Holder thereof as required by Section 2.06 hereof.

(d)    Temporary Global Notes.  Notes issued in reliance on Regulation S shall be issued initially in the form of the Regulation S Temporary Global Note, which shall be deposited on behalf of the purchasers of the Notes represented thereby with the Trustee, as custodian for the Depositary, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding on behalf of Euroclear or Clearstream, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided. The Restricted Period shall be terminated upon the receipt by the Trustee of:

(i)    a written certificate from the Depositary, together with copies of certificates from Euroclear and Clearstream certifying that they have received certification of non-United States beneficial ownership of 100% of the aggregate principal amount of the Regulation S Temporary Global Note (except to the extent of any beneficial owners thereof who acquired an interest therein during the Restricted Period pursuant to another exemption from registration under the Securities Act and who shall take delivery of a beneficial ownership interest in a 144A Global Note bearing a Private Placement Legend, all as contemplated by Section 2.06(b) hereof); and

(ii)    an Officers' Certificate from the Issuer.

Following the termination of the Restricted Period, beneficial interests in the Regulation S Temporary Global Note shall be exchanged for beneficial interests in the Regulation S Permanent Global Note pursuant to the Applicable Procedures. Simultaneously with the authentication of the Regulation S Permanent Global Note, the Trustee shall cancel the Regulation S Temporary Global Note. The aggregate principal amount of the Regulation S Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided.

(e)    Terms.  The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is unlimited.

The terms and provisions contained in the Notes shall constitute, and are hereby expressly made, a part of this Indenture and the Issuer, the Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

The Notes shall be subject to repurchase by the Issuer pursuant to an Asset Sale Offer as provided in Section 4.10 hereof or a Change of Control Offer as provided in Section 4.14 hereof. The Notes shall not be redeemable, other than as provided in Article 3 hereof.

Additional Notes ranking *pari passu* with the Initial Notes may be created and issued from time to time by the Issuer without notice to or consent of the Holders and shall be consolidated with and form a single class with the Initial Notes and shall have the same terms as to status, redemption or

-35-

otherwise as the Initial Notes; *provided* that the Issuer's ability to issue Additional Notes shall be subject to the Issuer's compliance with Section 4.09 hereof. The Initial Notes and any Additional Notes subsequently issued under this Indenture will be treated as a single class for all purposes under this Indenture, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "Notes" for all purposes of this Indenture include any Additional Notes that are actually issued.

(f)     Euroclear and Clearstream Procedures Applicable. The provisions of the "Operating Procedures of the Euroclear System" and "Terms and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handbook" of Clearstream shall be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Permanent Global Notes that are held by Participants through Euroclear or Clearstream.

Section 2.02     Execution and Authentication.

At least one Officer shall execute the Notes on behalf of the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note shall nevertheless be valid.

A Note shall not be entitled to any benefit under this Indenture or be valid or obligatory for any purpose until authenticated substantially in the form of Exhibit A hereto by the manual signature of the Trustee. The signature shall be conclusive evidence that the Note has been duly authenticated and delivered under this Indenture.

On the Issue Date, the Trustee shall, upon receipt of an Issuer Order (an "*Authentication Order*"), authenticate and deliver the Initial Notes. In addition, at any time, from time to time, the Trustee shall upon receipt of an Authentication Order authenticate and deliver any Additional Notes. Such Authentication Order for such Additional Notes shall specify the amount of the Notes to be authenticated and shall certify that such issuance is in compliance with Sections 4.09 and 4.12 hereof.

The Trustee may appoint an authenticating agent acceptable to the Issuer to authenticate Notes. An authenticating agent may authenticate Notes whenever the Trustee may do so. Each reference in this Indenture to authentication by the Trustee includes authentication by such agent. An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.

Section 2.03     Registrar and Paying Agent.

The Issuer shall maintain an office or agency where Notes may be presented for registration of transfer or for exchange ("*Registrar*") and an office or agency where Notes may be presented for payment ("*Paying Agent*"). The Registrar shall keep a register of the Notes ("*Note Register*") and of their transfer and exchange. The Issuer may appoint one or more co-registrars and one or more additional paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issuer may change any Paying Agent or Registrar without prior notice to any Holder.

The Issuer shall notify the Trustee in writing of the name and address of any Agent not a party to this Indenture. If the Issuer fails to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as such Paying Agent or Registrar. The Issuer or any of its Subsidiaries may act as Paying Agent or Registrar.

-36-

The Issuer initially appoints The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.  The Issuer initially appoints the Trustee to act as the Paying Agent and Registrar for the Notes and to act as Custodian with respect to the Global Notes.

Section 2.04    Paying Agent To Hold Money in Trust.

The Issuer shall require each Paying Agent other than the Trustee to agree in writing that the Paying Agent shall hold in trust for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium, if any, or cash Additional Interest, if any, or without duplication, cash interest on the Notes, and shall notify the Trustee of any default by the Issuer in making any such payment. While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee, the Paying Agent (if other than the Issuer or a Subsidiary) shall have no further liability for the money.  If the Issuer or a Subsidiary acts as Paying Agent, it shall segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.  Upon any bankruptcy or reorganization proceedings relating to the Issuer, the Trustee shall serve as Paying Agent for the Notes.

Section 2.05    Holder Lists.

The Trustee shall preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders and shall otherwise comply with Section 312(a) of the Trust Indenture Act.  If the Trustee is not the Registrar, the Issuer shall furnish to the Trustee at least seven Business Days before each Interest Payment Date and at such other times as the Trustee may request in writing, a list in such form and as of such date as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Issuer shall otherwise comply with Section 312(a) of the Trust Indenture Act.

Section 2.06    Transfer and Exchange.

(a)    Transfer and Exchange of Global Notes.  Except as otherwise set forth in this Section 2.06, a Global Note may be transferred, in whole and not in part, only to another nominee of the Depositary or to a successor Depositary or a nominee of such successor Depositary.  A beneficial interest in a Global Note may not be exchanged for a Definitive Note unless (i) the Depositary (x) notifies the Issuer that it is unwilling or unable to continue as Depositary for such Global Note or (y) has ceased to be a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the Issuer within 120 days (ii) there shall have occurred and be continuing a Default with respect to the Notes or (iii) the Issuer, in its sole discretion notifies the Trustee in writing that it elects to cause the issuance of Definitive Notes under this Indenture.  Upon the occurrence of any of the preceding events in (i), (ii) or (iii) above, Definitive Notes delivered in exchange for any Global Note or beneficial interests therein shall be registered in the names, and issued in any approved denominations, requested by or on behalf of the Depositary (in accordance with its customary procedures).  Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof.  Every Note authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section 2.07 or 2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note, except for Definitive Notes issued subsequent to any of the preceding events in (i), (ii) or (iii) above and pursuant to Section 2.06(c) hereof.  A Global Note may not be exchanged for another Note other than as provided in this Section 2.06(a); *provided*, *however*, beneficial interests in a Global Note may be transferred and exchanged as provided in Section 2.06(b), (c) or (f) hereof.

-37-

(b)        Transfer and Exchange of Beneficial Interests in the Global Notes.  The transfer and exchange of beneficial interests in the Global Notes shall be effected through the Depositary, in accordance with the provisions of this Indenture and the Applicable Procedures.  Beneficial interests in the Restricted Global Notes shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the Securities Act.  Transfers of beneficial interests in the Global Notes also shall require compliance with either subparagraph (i) or (ii) below, as applicable, as well as one or more of the other following subparagraphs, as applicable:

(i)        Transfer of Beneficial Interests in the Same Global Note.  Beneficial interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend; *provided*, *however*, that prior to the expiration of the Restricted Period, transfers of beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefit of a U.S. Person.  Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note.  No written orders or instructions shall be required to be delivered to the Registrar to effect the transfers described in this Section 2.06(b)(i).

(ii)        All Other Transfers and Exchanges of Beneficial Interests in Global Notes.  In connection with all transfers and exchanges of beneficial interests that are not subject to Section 2.06(b)(i) hereof, the transferor of such beneficial interest must deliver to the Registrar either (A) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase or (B) (1) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Applicable Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial interest to be transferred or exchanged and (2) instructions given by the Depositary to the Registrar containing information regarding the Person in whose name such Definitive Note shall be registered to effect the transfer or exchange referred to in (1) above; *provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regulation S Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903.  Upon satisfaction of all of the requirements for transfer or exchange of beneficial interests in Global Notes contained in this Indenture and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the principal amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(iii)        Transfer of Beneficial Interests to Another Restricted Global Note.  A beneficial interest in any Restricted Global Note may be transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if the transfer complies with the requirements of Section 2.06(b)(ii) hereof and the Registrar receives the following:

(A)        if the transferee shall take delivery in the form of a beneficial interest in a 144A Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

-38-

(B)      if the transferee shall take delivery in the form of a beneficial interest in a Regulation S Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof; or

(C)      if the transferee shall take delivery in the form of a beneficial interest in an IAI Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (3) thereof, and the transferee must deliver a certificate in the form of Exhibit E hereto, together with the legal opinion, if any, required thereby.

(iv)      Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Global Note.  A beneficial interest in any Restricted Global Note may be exchanged by any holder thereof for a beneficial interest in an Unrestricted Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note if the exchange or transfer complies with the requirements of Section 2.06(b)(ii) hereof and:

(A)      [reserved];

(B)      such transfer is effected pursuant to a Registration Statement in accordance with the Registration Rights Agreement;

(C)      [reserved]; or

(D)      the Registrar receives the following:

(1)      if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a beneficial interest in an Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(a) thereof; or

(2)      if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from such holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests transferred pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in the form of, a beneficial interest in a Restricted Global Note.

-39-

(c)    <u>Transfer or Exchange of Beneficial Interests for Definitive Notes</u>.

(i)    <u>Beneficial Interests in Restricted Global Notes to Restricted Definitive Notes</u>.  If any holder of a beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Restricted Definitive Note, then, upon the occurrence of any of the events in clauses (i), (ii) or (iii) of Section 2.06(a) hereof and receipt by the Registrar of the following documentation:

(A)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for a Restricted Definitive Note, a certificate from such holder substantially in the form of <u>Exhibit C</u> hereto, including the certifications in item (2)(a) thereof;

(B)    if such beneficial interest is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (1) thereof;

(C)    if such beneficial interest is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (2) thereof;

(D)    if such beneficial interest is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(a) thereof;

(E)    if such beneficial interest is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(b) thereof;

(F)    if such beneficial interest is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of <u>Exhibit B</u> hereto, including the certifications in item (3)(c) thereof; or

(G)    if such beneficial interest is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form of <u>Exhibit E</u> hereto, including the certifications, certificates and legal opinion, if applicable,

the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal amount.  Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to this Section 2.06(c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from the Depositary and the Participant or Indirect Participant.  The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered. Any Definitive Note issued in exchange for a beneficial interest in a Restricted Global Note pursuant to

100432088 v3

this Section 2.06(c)(i) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(ii)    Beneficial Interests in Regulation S Temporary Global Note to Definitive Notes. Notwithstanding Sections 2.06(c)(i)(A) and (C) hereof, a beneficial interest in the Regulation S Temporary Global Note may not be exchanged for a Definitive Note or transferred to a Person who takes delivery thereof in the form of a Definitive Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904.

(iii)    Beneficial Interests in Restricted Global Notes to Unrestricted Definitive Notes. A holder of a beneficial interest in a Restricted Global Note may exchange such beneficial interest for an Unrestricted Definitive Note or may transfer such beneficial interest to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note only upon the occurrence of any of the events in clauses (i) or (ii) of Section 2.06(a) hereof and if:

(A)    [reserved];

(B)    such transfer is effected pursuant to a Registration Statement in accordance with the Registration Rights Agreement;

(C)    [reserved]; or

(D)    the Registrar receives the following:

(1)    if the holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial interest for an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(b) thereof; or

(2)    if the holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial interest to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iv)    Beneficial Interests in Unrestricted Global Notes to Unrestricted Definitive Notes. If any holder of a beneficial interest in an Unrestricted Global Note proposes to exchange such beneficial interest for a Definitive Note or to transfer such beneficial interest to a Person who takes delivery thereof in the form of a Definitive Note, then, upon the occurrence of any of the events in clauses (i), (ii) or (iii) of Section 2.06(a) hereof and satisfaction of the conditions set forth in Section 2.06(b)(ii) hereof, the Trustee shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h) hereof, and the Issuer shall execute and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail to the Person designated in the instructions a Definitive Note in the applicable principal

-41-

amount.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such beneficial interest shall instruct the Registrar through instructions from or through the Depositary and the Participant or Indirect Participant.  The Trustee shall mail such Definitive Notes to the Persons in whose names such Notes are so registered.  Any Definitive Note issued in exchange for a beneficial interest pursuant to this Section 2.06(c)(iv) shall not bear the Private Placement Legend.

(d)    Transfer and Exchange of Definitive Notes for Beneficial Interests.

(i)    Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.  If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the following documentation:

(A)    if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B)    if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(C)    if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(D)    if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requirements of the Securities Act in accordance with Rule 144, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(a) thereof;

(E)    if such Restricted Definitive Note is being transferred to the Issuer or any of its Restricted Subsidiaries, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(b) thereof;

(F)    if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securities Act, a certificate substantially in the form of Exhibit B hereto, including the certifications in item (3)(c) thereof; or

(G)    if such Restricted Definitive Note is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certificate from such holder in the form of Exhibit E hereto, including the certifications, certificates and legal opinion, if applicable,

the Trustee shall cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in the case of clause (A) above, the applicable Restricted Global Note, in the case of

-42-

100432088 v3

clause (B) above, the applicable 144A Global Note, in the case of clause (C) above, the applicable Regulation S Global Note and in the case of clause (G) above, the applicable IAI Global Note.

(ii)    Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A)    [reserved];

(B)    such transfer is effected pursuant to a Registration Statement in accordance with the Registration Rights Agreement;

(C)    [reserved]; or

(D)    the Registrar receives the following:

(1)    if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(c) thereof; or

(2)    if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests or if the Applicable Procedures so require, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(ii), the Trustee shall cancel the Definitive Notes and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(iii)    Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes. A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exchange or transfer, the Trustee shall cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate principal amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraph (ii)(B), (ii)(D) or (iii) above at a time when an Unrestricted Global Note has not yet been issued, the Issuer shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall authenticate one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of Definitive Notes so transferred.

100432088 v3

(e)      Transfer and Exchange of Definitive Notes for Definitive Notes.  Upon request by a Holder of Definitive Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Registrar shall register the transfer or exchange of Definitive Notes.  Prior to such registration of transfer or exchange, the requesting Holder shall present or surrender to the Registrar the Definitive Notes duly endorsed or accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e):

(i)      Restricted Definitive Notes to Restricted Definitive Notes.  Any Restricted Definitive Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A)      if the transfer shall be made pursuant to a QIB in accordance with Rule 144A, then the transferor must deliver a certificate substantially in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B)      if the transfer shall be made pursuant to Rule 903 or Rule 904 then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof;

(C)      if the transfer shall be made pursuant to any other exemption from the registration requirements of the Securities Act, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications required by item (3) thereof, if applicable; or

(D)      if such Restricted Definitive Note is being transferred to an institutional Accredited Investor in reliance on an exemption from the registration requirements of the Securities Act other than those listed in subparagraphs (B) and (C) above, a certificate from such holder in the form of Exhibit E hereto, including the certifications, certificates and legal opinion, if applicable.

(ii)      Restricted Definitive Notes to Unrestricted Definitive Notes.  Any Restricted Definitive Note may be exchanged by the Holder thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unrestricted Definitive Note if:

(A)      [reserved];

(B)      any such transfer is effected pursuant to a Registration Statement in accordance with the Registration Rights Agreement;

(C)      [reserved]; or

(D)      the Registrar receives the following:

(1)      if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

-44-

(2)        if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take delivery thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder substantially in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Issuer so requests, an Opinion of Counsel in form reasonably acceptable to the Issuer to the effect that such exchange or transfer is in compliance with the Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance with the Securities Act.

(iii)        Unrestricted Definitive Notes to Unrestricted Definitive Notes.  A Holder of Unrestricted Definitive Notes may transfer such Notes to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note.  Upon receipt of a request to register such a transfer, the Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f)        [Reserved]

(g)        Legends.  The following legends shall appear on the face of all Global Notes and Definitive Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture:

(i)        Private Placement Legend.

(A)        Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes issued in exchange therefor or substitution therefor) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION. THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR OR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "*RESALE RESTRICTION TERMINATION DATE*") THAT IS 40 DAYS IN THE CASE OF REGULATION S SECURITIES, AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF THE SECURITIES AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "*QUALIFIED INSTITUTIONAL BUYER*" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF

-45-

A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE, ASSIGNMENT, TRANSFER OR OTHER DISPOSITION TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE."

(B)     Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraph (b)(iv), (c)(iii), (c)(iv), (d)(ii), (d)(iii), (e)(ii), (e)(iii) or (f) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) shall not bear the Private Placement Legend.

(ii)     <u>Global Note Legend</u>.  Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (I) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06(h) OF THE INDENTURE, (II) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (III) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (IV) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE ISSUER.  UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY.  UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("*DTC*") TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS

-46-

WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."

(iii)     Regulation S Temporary Global Note Legend.  The Regulation S Temporary Global Note shall bear a legend in substantially the following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

(h)     Cancellation and/or Adjustment of Global Notes.  At such time as all beneficial interests in a particular Global Note have been exchanged for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note shall be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof.  At any time prior to such cancellation, if any beneficial interest in a Global Note is exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note shall be reduced accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reduction; and if the beneficial interest is being exchanged for or transferred to a Person who shall take delivery thereof in the form of a beneficial interest in another Global Note, such other Global Note shall be increased accordingly and an endorsement shall be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such increase.

(i)     General Provisions Relating to Transfers and Exchanges.

(i)     To permit registrations of transfers and exchanges, the Issuer shall execute and the Trustee shall authenticate Global Notes and Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(ii)     No service charge shall be made to a holder of a beneficial interest in a Global Note or to a Holder of a Definitive Note for any registration of transfer or exchange, but the Issuer or the Trustee may require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Sections 2.07, 2.10, 3.06, 3.09, 4.10, 4.14 and 9.05 hereof).

(iii)     Neither the Registrar, the Trustee nor the Issuer shall be required to register the transfer of or exchange any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(iv)     All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Notes surrendered upon such registration of transfer or exchange.

(v)     Neither the Issuer, the Registrar nor the Trustee shall be required (A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of business 15 days before the day of any selection of Notes for redemption under Section 3.02 hereof and ending at the close of business on the day of selection, (B) to register the transfer of or to exchange any Note so selected for redemption in whole or in part, except the unredeemed portion

-47-

of any Note being redeemed in part or (C) to register the transfer of or to exchange a Note between a Record Date and the next succeeding Interest Payment Date.

(vi)    Prior to due presentment for the registration of a transfer of any Note, the Trustee, the Registrar any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of (and premium, if any) and, without duplication, interest (including Additional Interest, if any) on such Notes and for all other purposes, and none of the Trustee, the Registrar, any Agent or the Issuer shall be affected by notice to the contrary.

(vii)    Upon surrender for registration of transfer of any Note at the office or agency of the Issuer designated pursuant to Section 4.02 hereof, the Issuer shall execute, and the Trustee shall, upon receipt of an Authentication Order, authenticate and mail, in the name of the designated transferee or transferees, one or more replacement Notes of any authorized denomination or denominations of a like aggregate principal amount.

(viii)    At the option of the Holder, Notes may be exchanged for other Notes of any authorized denomination or denominations of a like aggregate principal amount upon surrender of the Notes to be exchanged at such office or agency.  Whenever any Global Notes or Definitive Notes are so surrendered for exchange, the Issuer shall execute, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail, the replacement Global Notes and Definitive Notes which the Holder making the exchange is entitled to in accordance with the provisions of Section 2.02 hereof.

(ix)    All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile.

(x)    Each Holder of a Note agrees to indemnify the Issuer and Trustee against any liability that may result from the transfer, exchange or assignment of such Holder's Note in violation of any provision of this Indenture and/or applicable United States federal or state securities laws.

(xi)    Neither the Trustee nor any agent of the Trustee shall have any responsibility for any actions taken or not taken by the Depositary.

(xii)    The Trustee shall have no responsibility or obligation to any Participant or Indirect Participant or any other Person with respect to the accuracy of the books or records, or the acts or omissions, of the Depositary or its nominee or of any participant or member thereof, with respect to any ownership interest in the Notes or with respect to the delivery to any Participant or Indirect Participant or other Person (other than the Depositary) of any notice (including any notice of redemption) or the payment of any amount, under or with respect to such Notes. All notices and communications to be given to the Holders and all payments to be made to Holders under the Notes shall be given or made only to or upon the order of the registered Holders (which shall be the Depositary or its nominee in the case of a Global Note). The rights of beneficial owners in any Global Note shall be exercised only through the Depositary subject to the customary procedures of the Depositary. The Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Participants or Indirect Participants.

(xiii)    The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or under applicable

-48-

law with respect to any transfer of any interest in any Note (including any transfers between or among Participants or Indirect Participants in any Global Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, the terms of this Indenture, and to examine the same to determine substantial compliance as to form with the express requirements hereof.

Section 2.07    Replacement Notes.

If any mutilated Note is surrendered to the Trustee, the Registrar or the Issuer and the Trustee receives evidence to its satisfaction of the ownership and destruction, loss or theft of any Note, the Issuer shall issue and the Trustee, upon receipt of an Authentication Order, shall authenticate a replacement Note if the Trustee's requirements are met.  If required by the Trustee or the Issuer, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Trustee determined for itself and the Issuer determined for itself to protect the Issuer, the Trustee, any Agent and any authenticating agent from any loss that any of them may suffer if a Note is replaced.  The Issuer and/or the Trustee may charge for its expenses in replacing a Note.

Every replacement Note is a contractual obligation of the Issuer and shall be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08    Outstanding Notes.

The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivered to it for cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the Issuer or an Affiliate of the Issuer holds the Note.

If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to it that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01 hereof, it ceases to be outstanding and interest on it ceases to accrue.

If the Paying Agent (other than the Issuer, a Subsidiary or an Affiliate of any thereof) holds, on a Redemption Date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes shall be deemed to be no longer outstanding and shall cease to accrue interest.

Section 2.09    Treasury Notes.

Prior to the qualification of this Indenture under the Trust Indenture Act, in determining whether the Holders of the required principal amount of the Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Affiliate of the Issuer shall be considered as outstanding. Following the qualification of this Indenture under the Trust Indenture Act, in determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, or by any Affiliate of the Issuer, shall be considered as though not outstanding, except that for the purposes of determining whether the Trustee shall be protected in relying on any such direction, waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned shall be so disregarded.  Notes so owned which have been pledged in good faith shall not be disre-

100432088 v3

garded if the pledgee establishes to the satisfaction of the Trustee the pledgee's right to deliver any such direction, waiver or consent with respect to the Notes and that the pledgee is not the Issuer or any obligor upon the Notes or any Affiliate of the Issuer or of such other obligor.  Upon request of the Trustee, the Issuer shall furnish to the Trustee promptly an Officers' Certificate listing and identifying all Notes, if any, known by the Issuer to be owned or held by or for the account of any of the Issuer or any Affiliate of the Issuer, and the Trustee shall be entitled to accept and rely upon such Officers' Certificate as conclusive evidence of the facts therein set forth and of the fact that all Notes not listed therein are outstanding for the purpose of any determination.

Section 2.10    Temporary Notes.

Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, shall authenticate temporary Notes.  Temporary Notes shall be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as shall be reasonably acceptable to the Trustee.  Without unreasonable delay, the Issuer shall prepare and the Trustee shall, upon receipt of an Authentication Order, authenticate definitive Notes in exchange for temporary Notes.

Holders and beneficial holders, as the case may be, of temporary Notes shall be entitled to all of the benefits accorded to Holders, or beneficial holders, respectively, of Notes under this Indenture.

Section 2.11    Cancellation.

The Issuer at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent shall forward to the Trustee any Notes surrendered to them for registration of transfer, exchange or payment.  The Trustee or, at the direction of the Trustee, the Registrar or the Paying Agent and no one else shall cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and shall destroy cancelled Notes (subject to the record retention requirement of the Exchange Act).  Certification of the destruction of all cancelled Notes shall be delivered to the Issuer upon the Issuer's written request.  The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Trustee for cancellation.

Section 2.12    Defaulted Interest.

If the Issuer defaults in a payment of interest on the Notes, it shall pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01 hereof.  The Issuer shall notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment, and at the same time the Issuer shall deposit with the Trustee an amount of money equal to the aggregate amount proposed to be paid in respect of such defaulted interest or shall make arrangements satisfactory to the Trustee for such deposit prior to the date of the proposed payment, such money when deposited to be held in trust for the benefit of the Persons entitled to such defaulted interest as provided in this Section 2.12.  The Issuer shall fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date shall be less than 10 days prior to the related payment date for such defaulted interest.  The Issuer shall promptly notify the Trustee in writing of such special record date.  At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) shall mail or cause to be mailed, first-class postage prepaid, to each Holder a notice at his or her address as it appears in the Note Register that states the special record date, the related payment date and the amount of such interest to be paid.

-50-

Subject to the foregoing provisions of this Section 2.12 and for greater certainty, each Note delivered under this Indenture upon registration of transfer of or in exchange for or in lieu of any other Note shall carry the rights to interest accrued and unpaid, and to accrue, which were carried by such other Note.

Section 2.13    CUSIP and ISIN Numbers.

The Issuer in issuing the Notes may use CUSIP and/or ISIN numbers (if then generally in use) and, if so, the Trustee shall use CUSIP and/or ISIN numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of redemption and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by any defect in or omission of such numbers.  The Issuer shall as promptly as practicable notify the Trustee of any change in the CUSIP and/or ISIN numbers.

ARTICLE 3

REDEMPTION

Section 3.01    Notices to Trustee.

If the Issuer elects to redeem Notes pursuant to Section 3.07 hereof, it shall furnish to the Trustee, at least 2 Business Days before notice of redemption is required to be mailed or caused to be mailed to Holders pursuant to Section 3.03 hereof but not more than 60 days before a Redemption Date, an Officers' Certificate setting forth (i) the paragraph or subparagraph of such Note and/or Section of this Indenture pursuant to which the redemption shall occur, (ii) the Redemption Date, (iii) the principal amount of the Notes to be redeemed and (iv) the redemption price.

Section 3.02    Selection of Notes To Be Redeemed or Purchased.

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee shall select the Notes to be redeemed or purchased (a) if the Notes are listed on any national securities exchange, in compliance with the requirements of the principal national securities exchange on which the Notes are listed, (b) if the Notes are not so listed, on a *pro rata* basis to the extent practicable or (c) by lot or by such other similar method in accordance with the procedures of DTC.  In the event of partial redemption or purchase by lot, the particular Notes to be redeemed or purchased shall be selected, unless otherwise provided herein, not less than 30 nor more than 60 days prior to the Redemption Date by the Trustee from the outstanding Notes not previously called for redemption or purchase.

The Trustee shall promptly notify the Issuer in writing of the Notes selected for redemption or purchase and, in the case of any Note selected for partial redemption or purchase, the principal amount thereof to be redeemed or purchased.  Notes and portions of Notes selected shall be in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof; except that if all of the Notes of a Holder are to be redeemed or purchased, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1,000, shall be redeemed or purchased.  Except as provided in the preceding sentence, provisions of this Indenture that apply to Notes called for redemption or purchase also apply to portions of Notes called for redemption or purchase.

Section 3.03      Notice of Redemption.

Subject to Section 3.09 hereof, notices of redemption shall be mailed by the Issuer by first-class mail, postage prepaid, at least 30 days but not more than 60 days before the Redemption Date to each Holder of Notes to be redeemed at such Holder's registered address, except that notices of redemption may be mailed more than 60 days prior to a Redemption Date if the notice is issued in connection with Article 8 or Article 12 hereof.

The notice shall be prepared by the Issuer, shall identify the Notes to be redeemed and shall state:

(a)      the Redemption Date;

(b)      the redemption price;

(c)      if any Note is to be redeemed in part only, the portion of the principal amount of that Note that is to be redeemed and that, after the Redemption Date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion of the original Note representing the same indebtedness to the extent not redeemed shall be issued in the name of the Holder of the Notes upon cancellation of the original Note;

(d)      the name and address of the Paying Agent;

(e)      that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

(f)      that, unless the Issuer defaults in making such redemption payment, interest on Notes called for redemption ceases to accrue on and after the Redemption Date;

(g)      the paragraph or subparagraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(h)      that no representation is made as to the correctness or accuracy of the CUSIP and/or ISIN number, if any, listed in such notice or printed on the Notes.

At the Issuer's request, the Trustee shall give the notice of redemption in the Issuer's name and at its expense; *provided* that the Issuer shall have delivered to the Trustee, at least 2 Business Days before notice of redemption is required to be mailed or caused to be mailed to Holders pursuant to this Section 3.03 (unless a shorter notice shall be agreed to by the Trustee), an Officers' Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in the preceding paragraph.

Section 3.04      Effect of Notice of Redemption.

Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocably due and payable on the Redemption Date at the redemption price (except (i) when given in connection with a transaction (or series of related transactions) that constitutes a Change of Control, in which case such notice of redemption may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the Change of Control or (ii) as provided for in Section 3.07(e) hereof). The notice, if mailed in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice. In any case,

-52-

failure to give such notice by mail or any defect in the notice to the Holder of any Note designated for redemption in whole or in part shall not affect the validity of the proceedings for the redemption of any other Note.  Subject to Section 3.05 hereof, on and after the Redemption Date, interest ceases to accrue on Notes or portions of Notes called for redemption.

Section 3.05    Deposit of Redemption or Purchase Price.

Prior to 10:00 a.m. (New York City time) on the redemption or purchase date, the Issuer shall deposit with the Trustee or with the Paying Agent money sufficient to pay the redemption or purchase price of and accrued and unpaid interest (including Additional Interest, if any) on all Notes to be redeemed or purchased on that date.  The Trustee or the Paying Agent shall promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption price of, and accrued and unpaid interest on, all Notes to be redeemed or purchased.

If the Issuer complies with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest shall cease to accrue on the Notes or the portions of Notes called for redemption or purchase.  If a Note is redeemed or purchased on or after a Record Date but on or prior to the related Interest Payment Date, then, without duplication, any accrued and unpaid interest to the redemption or purchase date shall be paid to the Person in whose name such Note was registered at the close of business on such Record Date.  If any Note called for redemption or purchase shall not be so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal amount, from the redemption or purchase date until such principal amount is paid, and to the extent lawful on any interest accrued to the redemption or purchase date not paid on such unpaid principal amount, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06    Notes Redeemed or Purchased in Part.

Upon surrender of a Note that is redeemed or purchased in part, the Issuer shall issue and the Trustee shall, upon receipt of an Authentication Order, authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered representing the same indebtedness to the extent not redeemed or purchased; *provided* that each new Note shall be in a minimum principal amount of $2,000 and integral multiples of $1,000 in excess thereof.  It is understood that, notwithstanding anything in this Indenture to the contrary, only an Authentication Order and not an Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate such new Note.

Section 3.07    Optional Redemption.

(a)    At any time and from time to time prior to December 15, 2013, the Issuer may redeem up to 35% of the original principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 113.500% of the principal amount thereof plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date); *provided* that

(1)    at least 65% of the original principal amount of the Notes remains outstanding after each such redemption; and

(2)    the redemption occurs within 90 days after the closing of such Equity Offering.

100432088 v3

(b)        At any time prior to December 15, 2013 the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest thereon, if any, to the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of Notes on the relevant Record Date to receive interest due on the relevant Interest Payment Date.

(c)        [Reserved].

(d)        On or after December 15, 2013, the Issuer may redeem the Notes, in whole or in part, upon notice as described in Section 3.03 hereof, at the redemption prices (expressed as percentages of the principal amount of the Notes to be redeemed) set forth below plus accrued and unpaid interest, if any, to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2013 | 110.125% |
| 2014 | 106.750% |
| 2015 | 103.375% |
| 2016 and thereafter | 100.000% |

(e)        Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

Section 3.08        Mandatory Redemption.

The Issuer shall not be required to make any mandatory redemption or sinking fund payments with respect to the Notes.  However, (a) the Issuer may be required to offer to purchase the Notes pursuant to Sections 4.10 and 4.14 hereof and (b) the Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

Section 3.09        Offers to Repurchase by Application of Excess Proceeds.

(a)        In the event that, pursuant to Section 4.10 hereof, the Issuer shall be required to commence an Asset Sale Offer, it shall follow the procedures specified below.

(b)        The Asset Sale Offer shall remain open for a period of 20 Business Days following its commencement and no longer, except to the extent that a longer period is required by applicable law (the "*Offer Period*").  No later than five Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Issuer shall apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes and, if required, Pari Passu Indebtedness (on a *pro rata* basis, if applicable), or, if less than the Offer Amount has been tendered, all Notes and Pari Passu Indebtedness tendered in response to the Asset Sale Offer.  Payment for any Notes so purchased shall be made in the same manner as cash interest payments are made.

(c)        If the Purchase Date is on or after a Record Date and on or before the related Interest Payment Date, any accrued and unpaid interest and Additional Interest, if any, up to but excluding the Purchase Date, shall be paid to the Person in whose name a Note is registered at the close of business on such Record Date, and no additional interest shall be payable to Holders who tender Notes pursuant to the Asset Sale Offer.

-54-

(d)      Upon the commencement of an Asset Sale Offer, the Issuer shall send, by first-class mail, a notice to each of the Holders, with a copy to the Trustee. The notice shall contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer. The Asset Sale Offer shall be made to all Holders and, if required, holders of Pari Passu Indebtedness. The notice, which shall govern the terms of the Asset Sale Offer, shall state:

(i)      that the Asset Sale Offer is being made pursuant to this Section 3.09 and Section 4.10 hereof and the length of time the Asset Sale Offer shall remain open;

(ii)      the Offer Amount, the purchase price and the Purchase Date;

(iii)      that any Note not tendered or accepted for payment shall continue to accrue interest;

(iv)      that, unless the Issuer defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer shall cease to accrue interest after the Purchase Date;

(v)      that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in denominations of $2,000 or integral multiples of $1,000 in excess thereof;

(vi)      that Holders electing to have a Note purchased pursuant to any Asset Sale Offer shall be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Note completed, or transfer by book-entry transfer, to the Issuer, the Depositary, if appointed by the Issuer, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(vii)      that Holders shall be entitled to withdraw their election if the Issuer, the Depositary or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a telegram, facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(viii)      that, if the aggregate principal amount of Notes and Pari Passu Indebtedness surrendered by the holders thereof exceeds the Offer Amount, the Issuer shall select the Notes and such Pari Passu Indebtedness to be purchased on a *pro rata* basis based on the principal amount of the Notes or such Pari Passu Indebtedness tendered (with such adjustments as may be deemed appropriate by the Issuer so that only Notes in denominations of $2,000 or integral multiples of $1,000 in excess thereof, shall be purchased); and

(ix)      that Holders whose Notes were purchased only in part shall be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer) representing the same indebtedness to the extent not repurchased.

(e)      On or before the Purchase Date, the Issuer shall, to the extent lawful, (1) accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof validly tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been tendered, all Notes tendered and (2) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate stating the aggregate principal amount of Notes or portions thereof so tendered.

-55-

(f)      The Issuer, the Depositary or the Paying Agent, as the case may be, shall promptly mail or deliver to each tendering Holder an amount equal to the purchase price of the Notes properly tendered by such Holder and accepted by the Issuer for purchase, and the Issuer shall promptly issue a new Note, and the Trustee, upon receipt of an Authentication Order, shall authenticate and mail or deliver (or cause to be transferred by book-entry) such new Note to such Holder (it being understood that, notwithstanding anything in this Indenture to the contrary, no Opinion of Counsel or Officers' Certificate is required for the Trustee to authenticate and mail or deliver such new Note) in a principal amount equal to any unpurchased portion of the Note surrendered representing the same indebtedness to the extent not repurchased; *provided* that each such new Note shall be in denominations of $2,000 or integral multiples of $1,000 in excess thereof.  Any Note not so accepted shall be promptly mailed or delivered by the Issuer to the Holder thereof.  The Issuer shall publicly announce the results of the Asset Sale Offer on or as soon as practicable after the Purchase Date.

Other than as specifically provided in this Section 3.09 or Section 4.10 hereof, any purchase pursuant to this Section 3.09 shall be made pursuant to the applicable provisions of Sections 3.01 through 3.06 hereof.

## ARTICLE 4

## COVENANTS

Section 4.01    <u>Payment of Notes</u>.

The Issuer shall pay or cause to be paid the principal of, premium, if any, Additional Interest, if any, and, without duplication, interest on the Notes on the dates and in the manner provided in the Notes.  Principal, premium, if any, cash Additional Interest, if any, and cash interest shall be considered paid on the date due if the Paying Agent, if other than the Issuer or a Subsidiary, holds as of 10:00 a.m. (New York City time) on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and cash interest then due.

The Issuer shall pay all Additional Interest, if any, in the same manner on the dates and in the amounts set forth in the Registration Rights Agreement.

The Issuer shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at the rate equal to the then applicable interest rate on the Notes to the extent lawful; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regard to any applicable grace period) at the same rate to the extent lawful.

Section 4.02    <u>Maintenance of Office or Agency</u>.

The Issuer shall maintain an office or agency (which may be an office of the Trustee or an affiliate of the Trustee, Registrar or co-registrar) where Notes may be surrendered for registration of transfer or for exchange and where notices and demands to or upon the Issuer in respect of the Notes and this Indenture may be served.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer shall fail to maintain any such required office or agency or shall fail to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations.  The Issuer shall give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Corporate Trust Office of the Trustee as one such office or agency of the Issuer in accordance with Section 2.03 hereof.

Section 4.03      Reports and Other Information.

(a)      Whether or not the Issuer is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Issuer will file with the SEC (subject to the next sentence) and provide the Trustee and Holders of the Notes with such annual and other reports as are specified in Sections 13 and 15(d) of the Exchange Act and applicable to a U.S. corporation subject to such Sections, such reports to be so filed and provided within the times specified for the filings of such reports for non-accelerated filers under such Sections and containing, in all material respects, all the information, audit reports and exhibits required for such reports. If at any time, the Issuer is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Issuer will nevertheless continue filing the reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such a filing. The Issuer agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Issuer will post the reports specified in the preceding sentence on its website within the time periods that would apply for non-accelerated filers if the Issuer were required to file those reports with the SEC (it being expressly understood that prior to the effectiveness of a Registration Statement (as defined in the Registration Rights Agreement, a "*Registration Statement*") covering resales of Notes that the SEC will not accept such filings by the Issuer and that the Issuer shall therefor be able to satisfy its obligations under this Section 4.03 by posting such reports on a publicly accessible page on its website). Notwithstanding the foregoing, the Issuer may satisfy such requirements prior to the effectiveness of such Registration Statement covering resales of Notes by filing with the SEC such Registration Statement to the extent that such Registration Statement contains substantially the same information as would be required to be filed by the Issuer if it were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, and by providing the Trustee and Holders of Notes with such Registration Statement (and any amendments thereto) promptly following the filing thereof.

(b)      In addition, in the event that:

(1)      the rules and regulations of the SEC permit a parent entity that becomes a Guarantor to report at such parent entity's level on a consolidated basis; and

(2)      such parent entity is not engaged in any business in any material respect other than incidental to its ownership of the capital stock of the Issuer,

such consolidated reporting by such parent entity in a manner consistent with this Section 4.03 for the Issuer will satisfy this Section 4.03.

(c)      Notwithstanding the foregoing, prior to the effectiveness of a Registration Statement with respect to the Notes, the Issuer will not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K or Item 3-10 of Regulation S-X.

(d)      In addition, the Issuer will furnish to the Holders of Notes and to prospective investors, upon the requests of such Holders, any information required to be delivered pursuant to

-57-

Rule 144A(d)(4) under the Securities Act so long as the Notes are not freely transferable under the Securities Act.

(e)  In addition, such requirements of this Section 4.03 shall be deemed satisfied prior to the effectiveness of a Registration Statement by the filing with the SEC such Registration Statement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act and such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in the first paragraph of this Section 4.03.

(f)  Notwithstanding anything herein to the contrary, the Issuer will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under Section 6.01(a) hereof until 120 days after the date any report hereunder is required to be made available to the Trustee and the Holders pursuant to this Section 4.03.

Section 4.04    Compliance Certificate.

(a)  The Issuer and each Guarantor (to the extent that such Guarantor is so required under the Trust Indenture Act) shall deliver to the Trustee, within 90 days after the end of each fiscal year ending after the Issue Date commencing with the fiscal year ending March 31, 2011, a certificate from the principal executive officer, principal financial officer or principal accounting officer stating that a review of the activities of the Issuer and its Restricted Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officer with a view to determining whether the Issuer has kept, observed, performed and fulfilled its obligations under this Indenture, and further stating, as to such Officer signing such certificate, that to the best of his or her knowledge the Issuer has kept, observed, performed and fulfilled each and every condition and covenant contained in this Indenture and is not in default in the performance or observance of any of the terms, provisions, covenants and conditions of this Indenture (or, if a Default shall have occurred, describing all such Defaults of which he or she may have knowledge and what action the Issuer is taking or proposes to take with respect thereto).

(b)  When any Default has occurred and is continuing under this Indenture, or if the Trustee or the holder of any other evidence of Indebtedness of the Issuer or any Subsidiary gives any notice or takes any other action with respect to a claimed Default, the Issuer shall promptly (which shall be no more than five (5) Business Days) deliver to the Trustee by registered or certified mail or by facsimile transmission an Officers' Certificate specifying such event and what action the Issuer is taking or proposes to take with respect thereto.

Section 4.05    Taxes.

The Issuer shall pay, and shall cause each of their respective Restricted Subsidiaries to pay, prior to delinquency, all material taxes, assessments, and governmental levies except such as are contested in good faith and by appropriate negotiations or proceedings or where the failure to effect such payment is not adverse in any material respect to the Holders of the Notes.

Section 4.06    Stay, Extension and Usury Laws.

The Issuer and each of the Guarantors covenant (to the extent that they may lawfully do so) that they shall not at any time insist upon, plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuer and each of the Guarantors (to the extent that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they shall not, by resort to any such law, hinder, delay or impede the ex-

-58-

ecution of any power herein granted to the Trustee, but shall suffer and permit the execution of every such power as though no such law has been enacted.

Section 4.07        Limitation on Restricted Payments.

(a)        The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I)        declare or pay any dividend or make any payment or distribution on account of the Issuer's or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a)        dividends, payments or distributions by the Issuer payable solely in Equity Interests (other than Disqualified Stock) of the Issuer; or

(b)        dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, the Issuer or a Restricted Subsidiary receives at least its pro rata share of such dividend payment or distribution in accordance with its Equity Interests in such class or series of securities;

(II)        purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Issuer or any direct or indirect parent of the Issuer, including in connection with any merger or consolidation, other than purchases, redemptions, defeasances and other acquisitions and retirements of Equity Interests of the Issuer or any direct or indirect parent of the Issuer held by a Restricted Subsidiary of the Issuer);

(III)        make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value or give any irrevocable notice of redemption with respect thereto, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Unsecured Indebtedness, other than:

(a)        Indebtedness permitted under clauses (7) and (8) of Section 4.09(b);

(b)        the payment, redemption, repurchase, defeasance or other acquisition or retirement for value of Unsecured Indebtedness made in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance or other acquisition or retirement for value; or

(c)        the giving of an irrevocable notice of redemption with respect to the transactions described in clauses (a) and (b) above and (2) and (3) of Section 4.07(b); or

(IV)        make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) (other than any exception thereto in clauses (I) and (III)) above being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

-59-

(1)　　no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)　　immediately after giving effect to such transaction on a pro forma basis, the Issuer could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test set forth in Section 4.09(a); and

(3)　　such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Issuer and its Restricted Subsidiaries after the Issue Date (including Restricted Payments permitted by clauses (1) and (10) of Section 4.07(b), but excluding all other Restricted Payments permitted by Section 4.07(b)), is less than the sum of (without duplication):

(a)　　EBITDA of the Issuer and its Restricted Subsidiaries on a consolidated basis for the period (taken as one accounting period) beginning on the first day of the first fiscal quarter beginning after the Issue Date, to the end of the Issuer's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, less the product of 1.4 times the Consolidated Interest Expense of the Issuer and its Restricted Subsidiaries for the same period; *provided* that the amount, if positive, of this clause (a) shall only be included in the calculation for this clause (3) when the Consolidated Secured Leverage Ratio for the Issuer and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction would have been less than 4.00 to 1.00; *plus*

(b)　　100% of the aggregate net cash proceeds and the fair market value of marketable securities or other property or assets received by the Issuer since immediately after the Issue Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of Section 4.09(b) hereof) from the sale of:

(i)　　(A) Equity Interests of the Issuer, including Treasury Capital Stock, but excluding cash proceeds and the fair market value of marketable securities or other property or assets received from the sale of Equity Interests to members of management, directors or consultants of the Issuer, any direct or indirect parent company of the Issuer and the Issuer's Subsidiaries after the Issue Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of Section 4.07(b) hereof; and

(B)　　to the extent such net cash proceeds are actually contributed to the Issuer, Equity Interests of the Issuer's direct or indirect parent companies (excluding contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) Section 4.07(b) hereof); or

(ii)　　debt securities of the Issuer that have been converted into or exchanged for such Equity Interests of the Issuer (or any direct or indirect parent company of the Issuer);

*provided, however*, that this clause (b) shall not include the proceeds from (X) Equity Interests or convertible debt securities of the Issuer sold to a Restricted Subsidiary, as the

-60-

case may be, (Y) Disqualified Stock or debt securities that have been converted into Disqualified Stock or (Z) Excluded Contributions; plus

(c)      100% of the aggregate amount of cash and the fair market value of marketable securities or other property contributed to the capital of the Issuer following the Issue Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of Section 4.09(b) hereof) (other than by a Restricted Subsidiary and other than by any Excluded Contributions); plus

(d)      100% of the aggregate amount received in cash and the fair market value of marketable securities or other property received after the Issue Date by means of:

(i)      the sale or other disposition (other than to the Issuer or a Restricted Subsidiary) of Restricted Investments made by the Issuer or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Issuer or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Issuer or its Restricted Subsidiaries, in each case after the Issue Date; or

(ii)      the sale (other than to the Issuer or a Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary (other than in each case to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment) or a dividend from an Unrestricted Subsidiary after the Issue Date; plus

(e)      in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Issue Date, the fair market value of the Investment in such Unrestricted Subsidiary (which, if the fair market value of such Investment may exceed $50.0 million, shall be set forth in writing by an Independent Financial Advisor) at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary, other than an Unrestricted Subsidiary to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder.

(b)      The foregoing provisions shall not prohibit:

(1)      the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration thereof or the giving of the irrevocable redemption notice, as applicable, if at the date of declaration or notice such payment would have complied with the provisions of this Indenture;

(2)      the redemption, repurchase, defeasance, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Unsecured Indebtedness of the Issuer or a Guarantor in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Issuer or any of its direct or indirect parent companies (in each case, other than any Disqualified Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement or other acquisition will be excluded from clause (3)(b) of Section 4.07(a) above;

(3)      the redemption, repurchase, defeasance or other acquisition or retirement of Unsecured Indebtedness of the Issuer or a Guarantor made by exchange for, or out of the proceeds of

-61-

the substantially concurrent sale of, new Unsecured Indebtedness of the Issuer or a Guarantor, as the case may be, which is incurred in compliance with Section 4.09 hereof so long as:

(a)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, if any, on the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value, plus the amount of any reasonable premium paid (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Unsecured Indebtedness;

(b)    such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired; and

(c)    such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired;

(4)    a Restricted Payment to pay for the repurchase, redemption, defeasance or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Issuer or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Issuer, any of its Subsidiaries or any of its direct or indirect parent companies (or any permitted transferee of any of the foregoing) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement; *provided*, *however*, that the aggregate amounts paid under this clause (4) do not exceed in any calendar year $5.0 million (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $10.0 million in any calendar year); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a)    the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Issuer and, to the extent contributed to the Issuer, Equity Interests of any of the Issuer's direct or indirect parent companies, in each case to members of management, directors or consultants of the Issuer, any of its direct or indirect parent companies or any of its Subsidiaries that occurs after the Issue Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of Section 4.07(a) hereof; plus

(b)    the cash proceeds of key man life insurance policies received by the Issuer or its Restricted Subsidiaries after the Issue Date; less

(c)    the amount of any Restricted Payments made in any prior fiscal year pursuant to clauses (a) and (b) of this clause (4);

(5)    the declaration and payment of dividends to holders of, and any redemption or repurchase at maturity or upon any mandatory redemption event of, any class or series of Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or any class or series of Preferred Stock of a Restricted Subsidiary issued in accordance with Section 4.09 hereof to the extent such dividends are included in the definition of "Consolidated Interest Expense";

-62-

(6)    repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(7)    the declaration and payment of dividends on the Issuer's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on the Issuer's common stock), following the consummation of the first public offering of the Issuer's common stock or the common stock of any of its direct or indirect parent companies after the Issue Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Issuer in or from any such public offering, other than public offerings with respect to the Issuer's common stock registered on Form S-8 and other than any public sale constituting an Excluded Contribution;

(8)    other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (8) not to exceed $15.0 million;

(9)    Restricted Payments that are made with Excluded Contributions;

(10)    the payment, repurchase, redemption, defeasance or other acquisition or retirement for value of any Unsecured Indebtedness required in accordance with provisions applicable thereto similar to those described under Sections 4.10 and 4.14 hereof; *provided* that all Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(11)    any Restricted Payments in connection with the Emergence Transactions; and

(12)    the declaration and payment of dividends by the Issuer or a Restricted Subsidiary to, or the making of loans to, any of their respective direct or indirect parents in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a)    franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b)    federal, foreign, state and local income taxes to the extent such income taxes are attributable to the income of the Issuer and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries; *provided* that, in each case the amount of such payments in any fiscal year does not exceed the amount that the Issuer and its Restricted Subsidiaries would be required to pay in respect of federal, foreign, state and local income taxes for such fiscal year were the Issuer, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any parent entity at the highest combined applicable, federal, foreign, state and local tax rate for such fiscal year;

(c)    customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of the Issuer and its Restricted Subsidiaries to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Issuer and its Restricted Subsidiaries;

(d)    general corporate operating and overhead costs and expenses of any direct or indirect parent company of the Issuer and its Restricted Subsidiaries to the extent

-63-

such costs and expenses are attributable to the ownership or operation of the Issuer and its Restricted Subsidiaries; and

(e)    fees and expenses other than to Affiliates of the Issuer related to any unsuccessful equity or debt offering of such parent entity;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (8) and (10) of this Section 4.07(b), no Default shall have occurred and be continuing or would occur as a consequence thereof.

All of the Issuer's Subsidiaries shall be Restricted Subsidiaries. The Issuer shall not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "*Unrestricted Subsidiary*." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Issuer and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated shall be deemed to be Investments in an amount determined as set forth in the last sentence of the definition of "*Investment*." Such designation shall be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to Section 4.07(a) hereof or under clause (8) of Section 4.07(b) hereof, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries shall not be subject to any of the restrictive covenants set forth in this Indenture.

Section 4.08    <u>Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries</u>.

(a)    The Issuer shall not, and shall not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary that is not a Guarantor to:

(1)    (A)  pay dividends or make any other distributions to the Issuer or any of the Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

(B)  pay any Indebtedness owed to the Issuer or any of the Restricted Subsidiaries;

(2)    make loans or advances to the Issuer or any of the Restricted Subsidiaries; or

(3)    sell, lease or transfer any of its properties or assets to the Issuer or any of the Restricted Subsidiaries.

(b)    The restrictions in Section 4.08(a) hereof shall not apply to encumbrances or restrictions existing under or by reason of:

(1)    contractual encumbrances or restrictions in effect on the Issue Date, including pursuant to the Credit Agreement, the First Lien Notes and the related documentation;

(2)    this Indenture, the Notes and the Guarantees;

-64-

(3)    Purchase Money Obligations for property acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) of Section 4.08(a) hereof on the property so acquired and related assets;

(4)    applicable law or any applicable rule, regulation or order;

(5)    any agreement or other instrument of a Person acquired by the Issuer or any of its Restricted Subsidiaries in existence at the time of such acquisition or at the time it merges with or into the Issuer or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or the property or assets so assumed and related assets;

(6)    contracts for the sale of assets or Capital Stock, including customary restrictions with respect to a Subsidiary of the Issuer pursuant to an agreement that has been entered into for the sale or disposition of the Capital Stock or assets of such Subsidiary, that impose restrictions on the assets to be sold or the assets of such Subsidiary;

(7)    Secured Indebtedness otherwise permitted to be incurred pursuant to Section 4.09 hereof and Section 4.12 hereof that limits the right of the debtor to dispose of the assets securing such Indebtedness;

(8)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(9)    other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Issue Date pursuant to the provisions of Section 4.09 hereof that imposes restrictions solely on Foreign Subsidiaries or their Subsidiaries party thereto;

(10)    customary provisions in joint venture agreements and other similar agreements or arrangements relating solely to such joint venture;

(11)    customary provisions contained in leases or licenses of intellectual property and other agreements, in each case, entered into in the ordinary course of business;

(12)    other Indebtedness or Disqualified Stock of the Issuer or any of its Restricted Subsidiaries or Preferred Stock of any Restricted Subsidiary that is incurred subsequent to the Issue Date and permitted pursuant to Section 4.09 hereof; *provided* that such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Issuer's ability to make anticipated principal or interest payments on the Notes (as determined in good faith by senior management or the Board of Directors of the Issuer);

(13)    any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) of Section 4.08(a) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (1) through (12) of this Section 4.08(b); *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Issuer, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such

-65-

amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; and

(14)    restrictions or conditions of the type contained in clause (3) of Section 4.08(a) hereof contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Issuer or any Restricted Subsidiary is a party entered into in the ordinary course of business; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Issuer or such Restricted Subsidiary that is the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of such Restricted Subsidiary or the assets or property of the Issuer or any other Restricted Subsidiary.

Section 4.09    Limitation on Incurrence of Indebtedness and Issuance of Disqualified Stock and Preferred Stock.

(a)    The Issuer shall not, and shall not permit any of the Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness) and the Issuer shall not issue any shares of Disqualified Stock and shall not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that the Issuer may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any Restricted Subsidiary may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Consolidated Leverage Ratio on a consolidated basis for the Issuer and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been less than 4.50 to 1.00, determined on a pro forma basis (including a pro forma application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that the amount of Indebtedness (including Acquired Indebtedness) that may be incurred and Disqualified Stock or Preferred Stock that may be issued pursuant to this Section 4.09(a) by Restricted Subsidiaries that are not Guarantors shall not exceed $10.0 million at any one time outstanding.

(b)    The provisions of Section 4.09(a) hereof shall not apply to:

(1)    Indebtedness under the Credit Agreement incurred in an aggregate principal amount not to exceed $40.0 million outstanding at any one time;

(2)    the incurrence by the Issuer and any Guarantor of Indebtedness represented by (a) the First Lien Notes, (b) the Notes (excluding Additional Notes) and (c) any guarantee by a Guarantor of any of the foregoing in this clause (2);

(3)    Indebtedness of the Issuer and its Restricted Subsidiaries in existence on the Issue Date after giving effect to the consummation of the Reorganization Plan (other than Indebtedness described in clauses (1) and (2) of this Section 4.09(b));

(4)    Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock and Preferred Stock incurred by the Issuer or any of its Restricted Subsidiaries to finance the purchase, lease or improvement of property (real or personal) or equipment (other than software) that is used or useful in a Similar Business, whether through the

-66-

direct purchase of assets or the Capital Stock of any Person owning such assets, *provided* that the aggregate amount of Indebtedness, Disqualified Stock and Preferred Stock incurred pursuant to this clause (4) when aggregated with then outstanding amount of Indebtedness under clause (13) below incurred to refinance Indebtedness initially incurred in reliance on this clause (4) does not exceed $15.0 million at any one time outstanding;

(5)     Indebtedness incurred by the Issuer or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims; *provided*, *however*, that such letters of credit are not drawn;

(6)     Indebtedness arising from agreements of the Issuer or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided*, *however*, that the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by the Issuer and its Restricted Subsidiaries in connection with such disposition;

(7)     Indebtedness of the Issuer to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8)     Indebtedness of a Restricted Subsidiary to the Issuer or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Notes of such Guarantor; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except to the Issuer or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9)     shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Issuer or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Issuer or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock or Disqualified Stock not permitted by this clause (9);

-67-

(10)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) for the purpose of limiting interest rate risk, exchange rate risk or commodity pricing risk;

(11)    obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Issuer or any of its Restricted Subsidiaries in the ordinary course of business;

(12)    (a) Indebtedness or Disqualified Stock of the Issuer or any Restricted Subsidiary of the Issuer in an aggregate principal amount or liquidation preference equal to 100.0% of the net cash proceeds received by the Issuer and its Restricted Subsidiaries since immediately after the Issue Date from the issue or sale of Equity Interests of the Issuer or any direct or indirect parent entity of the Issuer (which proceeds are contributed to the Issuer or a Restricted Subsidiary) or cash contributed to the capital of the Issuer (in each case, other than proceeds of Disqualified Stock or sales of Equity Interests or contributions received from the Issuer or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of Section 4.07(a) to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to Section 4.07(b) or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of the Issuer and Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $25.0 million;

(13)    the incurrence by the Issuer or any Restricted Subsidiary of the Issuer of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance (whether by payment, purchase, redemption, defeasance or other acquisition or retirement) any Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding as permitted under Section 4.09(a) hereof and clauses (2), (3), (4), (6), (10) and (12)(a) above and this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock including additional Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding to pay accrued interest; premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided*, *however*, that such Refinancing Indebtedness:

(a)    has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b)    to the extent such Refinancing Indebtedness refinances (i) Unsecured Indebtedness or constitutes other Permitted Second Lien Obligations, such Refinancing Indebtedness also constitutes Unsecured Indebtedness or constitutes other Permitted Second Lien Obligations, as the case may be, or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

-68-

(c)    shall not include:

(i)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Issuer;

(ii)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Issuer, that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(iii)    Indebtedness, Disqualified Stock or Preferred Stock of the Issuer or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary;

and *provided*, *further* that subclause (a) of this clause (13) shall not apply to any refunding or refinancing of any First Lien Obligations;

(14)    Indebtedness, Disqualified Stock or Preferred Stock of a Person incurred and outstanding on or prior to the date on which such Person was acquired by the Issuer or any Restricted Subsidiary or merged into the Issuer or a Restricted Subsidiary in accordance with the terms of this Indenture; *provided* that such Indebtedness, Disqualified Stock or Preferred Stock is not incurred in connection with or in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, such acquisition or merger; and *provided, further*, that after giving effect to such acquisition or merger, either

(a)    the Consolidated Secured Leverage Ratio for the Issuer and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 4.00 to 1.00, or

(b)    (i) the Consolidated Secured Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger;

(15)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16)    Indebtedness of the Issuer or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(17)    (a)    any guarantee by the Issuer or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of this Indenture, or

(b)    any guarantee by a Restricted Subsidiary of Indebtedness of the Issuer; *provided* that such guarantee is incurred in accordance with Section 4.15;

(18)    Indebtedness of the Issuer or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business;

(19)    Indebtedness consisting of Indebtedness issued by the Issuer or any of the Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Issuer, a Restricted Subsidiary or any of their direct or indirect parent companies to the extent described in clause (4) of Section 4.07(b);

(20)    customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(21)    Indebtedness owed on a short term basis of no longer than 30 days to banks and other financial institutions incurred in the ordinary course of business of the Issuer and the Restricted Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances of the Issuer and the Restricted Subsidiaries.

For purposes of determining compliance with this Section 4.09:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (21) of Section 4.09(b) hereof or is entitled to be incurred pursuant to Section 4.09(a) hereof, the Issuer, in its sole discretion, shall classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and shall only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock under Section 4.09(a) hereof or in one of the above clauses under Section 4.09(b) hereof; *provided* that all Indebtedness outstanding under the Credit Agreement on the Issue Date shall be treated as incurred on the Issue Date under clause (1) of Section 4.09(b) hereof; and

(2)    at the time of incurrence, the Issuer shall be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in Section 4.09(a) and (b) hereof.

Accrual of interest, the accretion of accreted value or original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, shall not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this Section 4.09.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced plus the amount of any reasonable premium (including reasonable tender premiums),

-70-

defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

For the purpose of this Indenture, (1) Unsecured Indebtedness shall not be deemed to be subordinated or junior to Secured Indebtedness merely because it is unsecured, (2) senior Indebtedness that is Secured Indebtedness shall not be deemed to be subordinated or junior to any other senior Indebtedness that is Secured Indebtedness merely because it has a junior priority with respect to the same collateral, (3) any Indebtedness shall not be deemed to be subordinated to any other Indebtedness merely because of maturity date, order of payment or order of application of funds or (4) Indebtedness that is not guaranteed shall not be deemed to be subordinated to Indebtedness that is guaranteed merely because of such guarantee.

Section 4.10    <u>Asset Sales</u>.

(a)    The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, cause, make or suffer to exist an Asset Sale, unless:

(1)    the Issuer or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (such fair market value to be determined in good faith by the Issuer on the date of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of; and

(2)    except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Issuer or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a)    any liabilities (as shown on the Issuer's or such Restricted Subsidiary's most recent internal balance sheet or in the footnotes thereto) of the Issuer or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Notes, that are assumed by the transferee of any such assets and for which the Issuer and all of its Restricted Subsidiaries have been validly released by all creditors in writing;

(b)    any securities received by the Issuer or such Restricted Subsidiary from such transferee that are converted by the Issuer or such Restricted Subsidiary into cash (to the extent of the cash received) within 90 days following the closing of such Asset Sale; and

(c)    any Designated Non-cash Consideration received by the Issuer or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) and assets (other than securities received and not yet liquidated pursuant to clause (b)) that are at that time outstanding, not to exceed 3.0% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

-71-

shall be deemed to be cash for purposes of this provision and for no other purpose.

(b)        Within 12 months after the receipt of any Net Proceeds of any Asset Sale con-summated after the Issue Date (the "*Application Period*"), the Issuer or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale

(1)        to permanently reduce:

(a)        Indebtedness constituting First Lien Obligations (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with re-spect thereto); or

(b)        Obligations under other Permitted Second Lien Obligations (and to cor-respondingly reduce commitments with respect thereto); provided that the Issuer shall equally and ratably (based on the aggregate principal amounts thereof) reduce Obliga-tions under the Notes as provided under Section 3.07 through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Of-fer) to all Holders to purchase their Notes at 100% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any, on the amount of Notes that would oth-erwise be prepaid; or

(c)        Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Issuer or another Restricted Subsidiary; or

(2)        to make (a) an Investment in any one or more businesses, *provided* that such In-vestment in any business is in the form of the acquisition of Capital Stock and results in the Issuer or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets (other than current amounts), in each of clauses (a), (b) and (c), used or useful in a Similar Business or that replace the businesses, properties and/or assets that are the subject of such Asset Sale ("*Replacement Assets*"); *provided* that to the extent that the as-sets disposed of in such Asset Sale were Collateral, such assets are pledged as Collateral under the Security Documents with the Lien on such Collateral securing the Notes being of the same priority with respect to the Notes as the Lien on the assets disposed of.

(c)        Any Net Proceeds from the Asset Sale that are not invested or applied in accor-dance with Section 4.10(b) hereof within the Application Period shall be deemed to constitute "*Excess Proceeds.*"  When the aggregate amount of Excess Proceeds exceeds $20.0 million, the Issuer shall make an offer to (x) in the case of Net Proceeds from Collateral, all Holders of the Notes and, if required by the terms of any other Permitted Second Lien Obligations, the holders of such Permitted Second Lien Obliga-tions and (y) in the case of any other Net Proceeds, all Holders of the Notes and all holders of other In-debtedness that ranks *pari passu* in right of payment with the Notes containing provisions similar to those set forth in Section 3.09 and Section 4.10 hereof with respect to offers to purchase or redeem with the proceeds of sales of assets ("*Pari Passu Indebtedness*"), in each case (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Notes and such other Permitted Second Lien Obligations that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus (without duplication) accrued and unpaid interest and Additional Inter-est, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in this Indenture.  The Issuer shall commence an Asset Sale Offer with respect to Excess Proceeds within ten Business Days after the date that Excess Proceeds exceed $20.0 million by mailing the notice to Holders

-72-

required pursuant to the terms of this Indenture, with a copy to the Trustee as set forth in Section 3.09 hereof.  The Issuer may satisfy the foregoing obligations with respect to any Excess Proceeds from an Asset Sale by making an Asset Sale Offer with respect to such Excess Proceeds prior to the expiration of the Application Period.

To the extent that the aggregate principal amount of Notes and such other Permitted Second Lien Obligations or Pari Passu Indebtedness, as applicable, tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Issuer may use any remaining Excess Proceeds for general corporate purposes, subject to the other covenants contained in this Indenture.  If the aggregate principal amount of Notes and other Permitted Second Lien Obligations (in the case of Net Proceeds from Collateral) and such Pari Passu Indebtedness (in the case of any other Net Proceeds) surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Notes and such other Permitted Second Lien Obligations or Pari Passu Indebtedness, as applicable, shall be purchased on a pro rata basis based on the principal amount of the Notes, other Permitted Second Lien Obligations or such Pari Passu Indebtedness, as applicable, tendered.  Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

Pending the final application of any Net Proceeds pursuant to this Section 4.10, the Issuer or such Restricted Subsidiary may apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by this Indenture (including investing in a trust account maintained by the First Lien Collateral Agent).

The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Notes pursuant to an Asset Sale Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in this Indenture by virtue thereof.

Section 4.11    Transactions with Affiliates.

(a)    The Issuer shall not, and shall not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Issuer (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $2.0 million, unless:

(1)    such Affiliate Transaction is on terms that are not materially less favorable to the Issuer or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(2)    the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $10.0 million, a Board Resolution adopted by the majority of the Board of Directors of the Issuer approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) of this Section 4.11(a); and

(3)    the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of

-73-

$40.0 million, a written opinion to the Issuer or such Restricted Subsidiary from an Independent Financial Advisor stating that the terms of such transaction are not materially less favorable to the Issuer or the Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Issuer or such Restricted Subsidiary at such time with an unrelated Person on an arm's-length basis.

(b)    The foregoing provisions of Section 4.11(a) hereof shall not apply to the follow-ing:

(1)    transactions between or among the Issuer or any of its Restricted Subsidiaries;

(2)    Restricted Payments permitted by Section 4.07 hereof and transactions constitut-ing "Permitted Investments";

(3)    [Reserved];

(4)    the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Issuer, any of its direct or indi-rect parent companies or any of its Restricted Subsidiaries;

(5)    transactions in which the Issuer or any Restricted Subsidiary, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that such transac-tion is fair to the Issuer or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Issuer or such Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Issuer or such Re-stricted Subsidiary with an unrelated Person on an arm's-length basis;

(6)    any agreement or arrangement as in effect as of the Issue Date, or any amend-ment thereto (so long as any such amendment is not materially disadvantageous to the Holders when taken as a whole as compared to the applicable agreement or arrangement as in effect on the Issue Date);

(7)    the existence of, or the performance by the Issuer or any of its Restricted Subsid-iaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which the Issuer or any such Re-stricted Subsidiary is a party as of the Issue Date and any similar agreements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Issuer or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Issue Date shall only be permit-ted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise materially disadvantageous to the Holders when taken as a whole;

(8)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Indenture which are fair to the Issuer and its Restricted Subsidiaries, in the reasona-ble determination of the Board of Directors of the Issuer or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaf-filiated party;

(9)    the issuance of Equity Interests (other than Disqualified Stock) of the Issuer to any Person and any contribution to the capital of the Issuer;

-74-

(10)    payments by the Issuer or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which payments are approved by a majority of the Board of Directors of the Issuer in good faith;

(11)    the Emergence Transactions, including the payments of fees and expenses in connection therewith;

(12)    payments or loans (or cancellation of loans) to employees or consultants of the Issuer, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Issuer in good faith;

(13)    transactions between the Issuer or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Issuer or any direct or indirect parent of the Issuer; *provided*, *however*, that such director abstains from voting as a director of the Issuer or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(14)    transactions permitted by, and complying with, the provisions of Section 5.01;

(15)    the pledge of Equity Interests of an Unrestricted Subsidiary to lenders of such Unrestricted Subsidiary to support the Indebtedness of such Unrestricted Subsidiary owed to such lenders; and

(16)    any transaction with (or for the benefit of) a Person that would constitute an Affiliate Transaction solely because the Issuer or a Restricted Subsidiary owns an equity interest in or otherwise controls such Person.

Section 4.12    Liens.

The Issuer will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, affirm or suffer to exist any Lien of any kind upon any of its property or assets (including any intercompany notes) constituting Collateral, now owned or acquired after the Issue Date, or any income or profits therefrom, securing Indebtedness excluding, however, from the operation of the foregoing any Permitted Liens. Additionally, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, incur or suffer to exist any Lien (the "*Initial Lien*") on any property or assets that are not Collateral securing Indebtedness unless (a) the Issuer or such Restricted Subsidiary (i) equally and ratably secures the Notes (or on a senior basis to) the obligations secured by such Initial Lien or (ii) provides that such Initial Lien is expressly junior in ranking relative to the Notes and related Guarantees pursuant to a junior lien intercreditor agreement or (b) such Initial Lien is a Permitted Lien; *provided*, *however*, that any such Lien created to secure the Notes pursuant to this sentence of this Section 4.12 shall provide by its terms that upon the release and discharge of the Initial Lien on such assets by the collateral agent for the Indebtedness secured by such Initial Lien, the Lien on such assets securing the Notes shall be automatically and unconditionally released and discharged and the Issuer may take any action necessary to effectuate such release or discharge.

Section 4.13    Changes in Covenants When Notes Rated Investment Grade.

(a)    Beginning on the first date of a Covenant Suspension and ending on a Reversion Date (such period, a "*Suspension Period*"), the following covenants will not be applicable to the Notes:

-75-

(1)    Section 4.07;

(2)    Section 4.08;

(3)    Section 4.09;

(4)    Section 4.10;

(5)    Section 4.11;

(6)    Section 4.15; and

(7)    clause (4) of Section 5.01(a).

(b)    On each Reversion Date, all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been incurred or issued pursuant to Section 4.09(a) hereof or one of the clauses set forth in Section 4.09(b) hereof (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be incurred or issued pursuant to Section 4.09(a) hereof or Section 4.09(b) hereof, such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Issue Date, so that it is classified as permitted under Section 4.09(b)(3) hereof.

(c)    Calculations made after the Reversion Date of the amount available to be made as Restricted Payments pursuant to Section 4.07 hereof will be made as though Section 4.07 hereof had been in effect since the Issue Date and throughout the Suspension Period.  Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under Section 4.07(a) hereof; *provided*, *however*, that no Default or Event of Default will be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions taken or the performance of obligations under agreements entered into by the Issuer or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

(d)    In addition, for purposes of Section 4.11 hereof, all agreements and arrangements entered into by the Issuer or any Restricted Subsidiary with an Affiliate of the Issuer during the Suspension Period prior to the Reversion Date will be deemed to have been entered into on or prior to the Issue Date and for purposes of Section 4.08 hereof, all contracts entered into during the Suspension Period prior to such Reversion Date that contain any of the restrictions contemplated by Section 4.08 hereof will be deemed to have been existing on the Issue Date.  For purposes of Section 4.10 hereof, on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

(e)    During any Suspension Period, no Restricted Subsidiary may be designated as an Unrestricted Subsidiary by the Board of Directors of the Issuer.

(f)    Upon the occurrence of a Covenant Suspension or a Reversion Date, the Issuer shall provide written notice to the Trustee, and file with the Trustee an Officers' Certificate certifying that such suspension or reversion complied with the foregoing provisions.  In the case of a Covenant Suspension, such notice shall list the Suspended Covenants.

-76-

Section 4.14        Offer To Repurchase upon Change of Control.

(a)        If a Change of Control occurs, unless the Issuer has previously or concurrently mailed a redemption notice with respect to all the outstanding Notes as described under Section 3.07 hereof, the Issuer shall make an offer to purchase all of the Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus, without duplication, accrued and unpaid interest and Additional Interest, if any, to the date of purchase, subject to the right of Holders of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date.  Within 30 days following any Change of Control, the Issuer shall send notice of such Change of Control Offer by first class mail, with a copy to the Trustee, to each Holder to the address of such Holder appearing in the security register with the following information:

(1)        a Change of Control Offer is being made pursuant to this Section 4.14 and that all Notes properly tendered pursuant to such Change of Control Offer shall be accepted for payment by the Issuer;

(2)        the purchase price and the purchase date, which shall be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3)        any Note not properly tendered shall remain outstanding and continue to accrue interest;

(4)        unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer shall cease to accrue interest on the Change of Control Payment Date;

(5)        Holders electing to have any Notes purchased pursuant to a Change of Control Offer shall be required to surrender such Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)        Holders shall be entitled to withdraw their tendered Notes and their election to require the Issuer to purchase such Notes; *provided* that the Paying Agent receives, not later than the close of business on the Business Day prior to the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Notes and its election to have such Notes purchased;

(7)        if such notice is mailed prior to the occurrence of a Change of Control, stating that the Change of Control Offer is conditional on the occurrence of such Change of Control; and

(8)        the other instructions, as determined by the Issuer, consistent with this Section 4.14, that a Holder must follow.

(b)        While the Notes are in global form and the Issuer makes an offer to purchase all of the Notes pursuant to the Change of Control Offer, a Holder may exercise its option to elect for the purchase of the Notes through the facilities of DTC, subject to its rules and regulations.

-77-

The notice, if mailed in a manner herein provided, shall be conclusively presumed to have been given, whether or not the Holder receives such notice.  If (a) the notice is mailed in a manner herein provided and (b) any Holder fails to receive such notice or a Holder receives such notice but it is defective, such Holder's failure to receive such notice or such defect shall not affect the validity of the proceedings for the purchase of the Notes as to all other Holders that properly received such notice without defect.  The Issuer shall comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Notes pursuant to a Change of Control Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.14, the Issuer shall comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations under this Section 4.14 by virtue thereof.

(c)    On the Change of Control Payment Date, the Issuer shall, to the extent permitted by law,

(1)    accept for payment all Notes or portions thereof properly tendered pursuant to the Change of Control Offer,

(2)    deposit with the Paying Agent an amount equal to the aggregate Change of Control Payment in respect of all Notes or portions thereof so tendered, and

(3)    deliver, or cause to be delivered, to the Trustee for cancellation the Notes so accepted together with an Officers' Certificate to the Trustee stating that such Notes or portions thereof have been tendered to and purchased by the Issuer.

(d)    The Paying Agent shall promptly mail to each Holder the Change of Control Payment for such Notes, and the Trustee shall, upon receipt of an Authentication Order, promptly authenticate and mail to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each such new Note shall be in denominations of $2,000 and integral multiples of $1,000 in excess thereof.  The Issuer shall publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

(e)    The Issuer shall not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the time and otherwise in compliance with the requirements set forth in this Section 4.14 applicable to a Change of Control Offer made by the Issuer and purchases all Notes validly tendered and not withdrawn under such Change of Control Offer.  Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

(f)    Other than as specifically provided in this Section 4.14, any purchase pursuant to this Section 4.14 shall be made pursuant to the provisions of Sections 3.02, 3.05 and 3.06 hereof.

(g)    In the event a Change of Control occurs at a time when the Issuer is prohibited by the terms of any First Lien Obligation from purchasing the Notes, then prior to the mailing of the notice of a Change of Control to Holders of Notes, but in any event within 30 days following any Change of Control, the Issuer shall (1) repay in full all Obligations, and terminate all commitments, under such First Lien Obligations or offer to repay in full all Obligations, and terminate all commitments, under such First Lien Obligations and to repay the Obligations owed to (and terminate all commitments of) each lender which has accepted such offer or (2) obtain the requisite consents under the agreements governing such First Lien Obligations to permit the repurchase of the Notes. If such a consent is not obtained or borrow-

-78-

ings repaid, the Issuer shall remain prohibited from purchasing the Notes.  The Issuer shall first comply with this clause (g) before it shall be required to repurchase the Notes pursuant to the other provisions of this Section 4.14. The Issuer's failure to comply with this clause (g) (and any failure to send a notice of a Change of Control as a result of the prohibition in this clause (g)) may (with notice and lapse of time) constitute an Event of Default described in clause (3) of Section 6.01(a) hereof, but shall not constitute an Event of Default described in clause (1) of Section 6.01(a) hereof.

Section 4.15    <u>Limitation on Guarantees of Indebtedness by Restricted Subsidiaries</u>.

The Issuer shall not permit any of its Restricted Subsidiaries, other than a Guarantor, to guarantee the payment of any Indebtedness of the Issuer or any other Guarantor unless:

(1)    such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to this Indenture, the form of which is attached as <u>Exhibit D</u> hereto, providing for a Guarantee by such Restricted Subsidiary, except, if such Indebtedness is by its express terms sub-ordinated in right of payment to the Notes or such Guarantor's Guarantee, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the Notes or such Guarantor's Guarantee;

(2)    such Restricted Subsidiary within 30 days executes and delivers a joinder to the applicable Security Documents or new Security Documents and takes all actions necessary to per-fect the Liens created thereunder (to the extent required by such Security Documents), all of such Liens to be junior to the Liens in favor of the holders of the Permitted Second Lien Obligations and to be subject to the Intercreditor Agreement; and

(3)    such Restricted Subsidiary waives and shall not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Issuer or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee;

*provided* that this Section 4.15 shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

Each Guarantee shall be released in accordance with Article 11 hereof.

Section 4.16    <u>[Reserved]</u>.

Section 4.17    <u>Tax Treatment of the Notes</u>.

The Issuer agrees and, by acceptance of a beneficial ownership interest in the Notes, each Holder is deemed to have agreed, to treat the Notes as indebtedness of the Issuer for U.S. federal income tax purposes.  The Issuer and the Holder will not take any position on a tax return inconsistent with such treatment, unless required by applicable law.

Section 4.18    <u>Non-Impairment of Security Interest</u>.

Subject to the rights of the holders of Permitted Liens that are existing on the Issue Date or incurred after the Issue Date, the Issuer will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission could reasonably

-79-

be expected to have the result of materially impairing the Lien with respect to the Collateral in favor of the holders of Permitted Second Lien Obligations; *provided* that this Section 4.18 shall not prohibit the release of Guarantors pursuant to Section 11.06 hereof or the release of Collateral pursuant to Section 4.12 or Article 10 hereof.

Section 4.19    [Reserved].


Section 4.20    After-Acquired Collateral; Further Assurances.

(a)    Subject to certain limitations and exceptions (including the exclusion of any securities or other equity interests of any of the Issuer's Subsidiaries), if the Issuer or any Guarantor creates any additional security interest upon any property or asset to secure any First Lien Obligations (which include Obligations in respect of the Credit Agreement and the First Lien Notes), it must concurrently grant a second-priority security interest (subject to Permitted Liens) upon such property as security for the Indebtedness and Obligations under the Notes. In addition, if granting a security interest in such property requires the consent of a third party, the Issuer will use commercially reasonable efforts to obtain such consent with respect to the second-priority security interest for the benefit of the Collateral Agent. If such third party does not consent to the granting of the second-priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest.

(b)    The Issuer and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Security Documents in the Collateral. In addition, from time to time, the Issuer will reasonably promptly secure the obligations under this Indenture, Security Documents and Intercreditor Agreement by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral. Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents as may be reasonably required.

Section 4.21    Information Regarding Collateral.

(a)    The Issuer will furnish to the Collateral Agent, with respect to the Issuer or any Guarantor, prompt written notice of any change in such Person's (i) legal name, (ii) jurisdiction of organization or formation, (iii) identity or corporate structure or (iv) Organizational Identification Number. The Issuer and the Guarantors will agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

(b)    Each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 4.03 hereof, the Issuer shall deliver to the Trustee a certificate of a financial officer of the Issuer setting forth the information required pursuant to the schedules required by the Security Documents or confirming that there has been no change in such information since the date of the prior annual financial statements.

100432088 v3

Section 4.22    Maintenance of Property; Insurance.

(a)    The Issuer shall cause all material properties owned by or leased by it or any of its Restricted Subsidiaries used or useful to the conduct of its business or the business of any of its Restricted Subsidiaries to be maintained and kept in normal condition, repair and working order and supplied with all reasonably necessary equipment and shall cause to be made all repairs, renewals, replacements, and betterments thereof, all as in its judgment may be reasonably necessary, so that the business carried on in connection therewith may be properly conducted at all times; *provided*, *however*, that nothing in this Section 4.22 shall prevent the Issuer or any of its Restricted Subsidiaries from discontinuing the use, operation or maintenance of any of such properties, or disposing of any of them, if such discontinuance or disposal is, in the judgment of the management of the Issuer or any such Restricted Subsidiary, necessary or desirable in the conduct of the business of the Issuer or any such Restricted Subsidiary; *provided further* that nothing in this Section 4.22 shall prevent the Issuer or any of its Restricted Subsidiaries from discontinuing or disposing of any properties to the extent otherwise permitted by this Indenture.

(b)    The Issuer shall maintain, and shall cause its Restricted Subsidiaries to maintain, insurance with responsible carriers against such risks and in such amounts, and with such deductibles, retentions, self-insured amounts and co-insurance provisions, as are customarily carried by similar businesses of similar size, including property and casualty loss, workers' compensation and interruption of business insurance.

ARTICLE 5

SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of All or Substantially All Assets.

(a)    The Issuer shall not consolidate or merge with or into or wind up into (whether or not the Issuer is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)    the Issuer is the surviving corporation or limited liability company or the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation or limited liability company organized or existing under the laws of the jurisdiction of organization of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2)    the Successor Company, if other than the Issuer, expressly assumes all the obligations of the Issuer under this Indenture and the Notes pursuant to supplemental indentures, supplements to the Security Documents and any other documents or instruments in form reasonably satisfactory to the Trustee;

(3)    immediately after such transaction, no Default exists;

(4)    immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period, either:

(a)    the Consolidated Secured Leverage Ratio for the Successor Company and its Restricted Subsidiaries on a consolidated basis for the most recently ended four

-81-

fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 4.00 to 1.00, or

(b)      (i) the Consolidated Secured Leverage Ratio is equal to or less than such ratio immediately prior to such transaction and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such transaction; and

(5)      the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and supplements to the Security Documents comply with this Indenture.

(b)      The Successor Company shall succeed to, and be substituted for the Issuer, as the case may be, under this Indenture, the Guarantees and the Notes, as applicable.  Notwithstanding clauses (3), (4) and (5) of Section 5.01(a) hereof,

(1)      any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Issuer, and

(2)      the Issuer may merge with an Affiliate of the Issuer solely for the purpose of reincorporating the Issuer in a State of the United States of America, so long as the amount of Indebtedness of the Issuer and its Restricted Subsidiaries is not increased thereby.

(c)      Subject to certain limitations described in this Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, no Guarantor shall, and the Issuer shall not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Issuer or Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)      (a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition shall have been made is a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b)      the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under this Indenture and the Security Documents and such Guarantor's related Guarantee pursuant to supplemental indentures, supplements to the Security Documents or other documents or instruments in form reasonably satisfactory to the Trustee;

(c)      immediately after such transaction, no Default exists; and

(d)      the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and supplements to the Security Documents comply with this Indenture; or

(2)      the transaction is made in compliance with Section 4.10 hereof.

-82-

(d)    Subject to certain limitations described in this Indenture, in the case of clause (1) of Section 5.01(c) hereof, the Successor Person shall succeed to, and be substituted for, such Guarantor under this Indenture and such Guarantor's Guarantee.  Notwithstanding the foregoing, any Guarantor may merge into or transfer all or part of its properties and assets to another Guarantor or the Issuer.

Section 5.02    <u>Successor Corporation Substituted</u>.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the assets of the Issuer in accordance with Section 5.01 hereof, the successor corporation formed by such consolidation or into or with which the Issuer is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, lease, conveyance or other disposition, the provisions of this Indenture referring to the Issuer shall refer instead to the successor corporation and not to the Issuer), and may exercise every right and power of the Issuer under this Indenture with the same effect as if such successor Person had been named as the Issuer herein; *provided* that the predecessor Issuer shall not be relieved from the obligation to pay the principal of and interest and Additional Interest, if any, on the Notes except in the case of a sale, assignment, transfer, conveyance or other disposition of all of the Issuer's assets that meets the requirements of Section 5.01 hereof.

## ARTICLE 6

## DEFAULTS AND REMEDIES

Section 6.01    <u>Events of Default</u>.

(a)    An "*Event of Default*" wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(1)    default in payment when due and payable, upon redemption, upon acceleration or otherwise, of principal of, or premium, if any, on the Notes;

(2)    default for 30 days or more in the payment when due of interest or Additional Interest on or with respect to the Notes;

(3)    failure by the Issuer or any Guarantor for 60 days after receipt of written notice by the Trustee or the Holders of not less than 25% in principal amount of the Notes issued under this Indenture to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) in this Indenture or the Notes;

(4)    default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Issuer or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Issuer or any of its Restricted Subsidiaries, other than Indebtedness owed to the Issuer or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Notes, if both:

(a)    such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace pe-

riods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

(b)    the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $35.0 million or more at any one time outstanding;

(5)    failure by the Issuer or any Significant Subsidiary (or group of Restricted Subsidiaries that taken together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $35.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)    the Issuer or any Significant Subsidiary, pursuant to or within the meaning of any Bankruptcy Law:

(a)    commences proceedings to be adjudicated bankrupt or insolvent;

(b)    consents to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization or relief under applicable Bankruptcy law;

(c)    consents to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or substantially all of its property;

(d)    makes a general assignment for the benefit of its creditors; or

(e)    generally is not paying its debts as they become due;

(7)    a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(a)    is for relief against the Issuer or any Significant Subsidiary in a proceeding in which the Issuer or any such Significant Subsidiary is to be adjudicated bankrupt or insolvent;

(b)    appoints a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer or any Significant Subsidiary, for all or substantially all of the property of the Issuer or any Significant Subsidiary; or

(c)    orders the liquidation of the Issuer or any Significant Subsidiary;

and the order or decree remains unstayed and in effect for 60 consecutive days;

(8)    the Guarantee of any Significant Subsidiary (or group of Guarantors that taken together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of such Guarantor, as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect,

-84-

other than by reason of the termination of this Indenture or the release of any such Guarantee in accordance with this Indenture; or

(9)     (a) with respect to any Collateral having a fair market value in excess of $20.0 million, individually or in the aggregate, (i) the security interest under any Security Document, at any time, ceases to be in full force and effect for any reason other than in accordance with the terms of this Indenture, the Security Documents and the Intercreditor Agreement or (ii) any security interest created thereunder or under this Indenture is declared invalid or unenforceable by a court of competent jurisdiction or (b) the Issuer or any Guarantor asserts, in any pleading in any court of competent jurisdiction, that any security interest in any Collateral is invalid or unenforceable.

(b)     In the event of any Event of Default specified in clause (4) of Section 6.01(a) hereof, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded automatically and without any action by the Trustee or the Holders if, within 20 days after such Event of Default arose:

(1)     the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2)     the holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3)     the default that is the basis for such Event of Default has been cured.

Section 6.02     Acceleration.

If any Event of Default (other than, with respect to the Issuer, an Event of Default specified in clause (6) or (7) of Section 6.01(a) hereof) occurs and is continuing under this Indenture, the Trustee or the Holders of at least 25% in principal amount of the then total outstanding Notes may declare the principal, premium, if any, (without duplication) interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest shall be due and payable immediately.  The Trustee may withhold from Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest on the Notes, if it determines that withholding notice is in the interests of the Holders.

Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) or (7) of Section 6.01(a) hereof, all outstanding Notes shall be due and payable without further action or notice.

The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders, rescind an acceleration and its consequences if the rescission would not conflict with any judgment or decree and if all existing Events of Default (except nonpayment of principal, interest, Additional Interest, if any, or premium that has become due solely because of the acceleration) have been cured or waived and all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel and other amounts due the Trustee under Section 7.07 hereof have been paid.

-85-

If an Event of Default occurs and is continuing that results in an acceleration, the Trustee and Collateral Agent shall provide an Enforcement Notice pursuant to the terms of the First Lien Inter-creditor Agreement.

Section 6.03    <u>Other Remedies</u>.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding.  A delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default.  All remedies are cumulative to the extent permitted by law.

Section 6.04    <u>Waiver of Past Defaults</u>.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default and its consequences under this Indenture and the Notes, except a continuing Default in the payment of the principal of, premium, if any, Additional Interest, if any, or interest on, any Note held by a non-consenting Holder (including in connection with an Asset Sale Offer or a Change of Control Offer); *provided*, subject to Section 6.02 hereof, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.05    <u>Control by Majority</u>.

Subject to the terms of the Security Documents, Holders of a majority in principal amount of the outstanding Notes issued hereunder shall have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or of exercising any trust or power conferred on the Trustee.  The Trustee, however, may refuse to follow any direction that conflicts with law or this Indenture or that the Trustee determines is unduly prejudicial to the rights of any other Holder of a Note or that would involve the Trustee in personal liability.

Section 6.06    <u>Limitation on Suits</u>.

Subject to Section 6.07 hereof, no Holder of a Note may pursue any remedy with respect to this Indenture or the Notes unless:

(1)    such Holder has previously given the Trustee notice that an Event of Default is continuing;

(2)    Holders of at least 25% in principal amount of the total outstanding Notes have requested the Trustee to pursue the remedy;

-86-

(3)     Holders of the Notes have offered the Trustee security or indemnity against any loss, liability or expense satisfactory to the Trustee;

(4)     the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of such satisfactory security or indemnity; and

(5)     Holders of a majority in principal amount of the total outstanding Notes have not given the Trustee a direction inconsistent with such request within such 60-day period.

A Holder of a Note may not use this Indenture to prejudice the rights of another Holder of a Note or to obtain a preference or priority over another Holder of a Note.

Section 6.07     Rights of Holders of Notes To Receive Payment.

Notwithstanding any other provision of this Indenture, the right of any Holder of a Note to receive payment of principal, premium, if any, and Additional Interest, if any, interest on the Note, on or after the respective due dates expressed in the Note (including in connection with an Asset Sale Offer or a Change of Control Offer), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder.

Section 6.08     Collection Suit by Trustee.

If an Event of Default specified in Section 6.01(a)(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium, if any, and Additional Interest, if any, and, without duplication, interest remaining unpaid on the Notes and interest on overdue principal and, to the extent lawful, interest and, without duplication, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.09     Restoration of Rights and Remedies.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceedings, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding has been instituted.

Section 6.10     Rights and Remedies Cumulative.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 2.07 hereof, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

-87-

Section 6.11      Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.12      Trustee May File Proofs of Claim.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee and the Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their agents and counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes including the Guarantors), its creditors or its property and shall be entitled and empowered to participate as a member in any official committee of creditors appointed in such matter and to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee and the Collateral Agent any amount due to them for the reasonable compensation, expenses, disbursements and advances of the Trustee, the Collateral Agent and their agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof.  To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.07 hereof out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.  Nothing herein contained shall be deemed to authorize the Trustee or the Collateral Agent to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.13      Priorities.

Subject to the terms of the Security Documents and the Intercreditor Agreement with respect to any proceeds of Collateral, if the Trustee collects any money or property pursuant to this Article 6, it shall pay out the money or property in the following order:

(a)      to the Trustee and the Collateral Agent and their agents and attorneys for amounts due under Section 7.07 hereof, including payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee and the Collateral Agent and the costs and expenses of collection;

(b)      to Holders of Notes for amounts due and unpaid on the Notes for principal, premium, if any, and Additional Interest, if any, and interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, and, without duplication, Additional Interest, if any, and interest, respectively; and

(c)      to the Issuer or to such party as a court of competent jurisdiction shall direct including a Guarantor, if applicable.

-88-

100432088 v3

The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.13.

Section 6.14     Undertaking for Costs.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 6.14 does not apply to a suit by the Trustee, a suit by a Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in principal amount of the then outstanding Notes.

ARTICLE 7

TRUSTEE

Section 7.01     Duties of Trustee.

(a)     If an Event of Default has occurred and is continuing, the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     Except during the continuance of an Event of Default:

(i)     the duties of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee need perform only those duties that are specifically set forth in this Indenture, the Notes, the Security Documents and the Intercreditor Agreement and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)     The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)     this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved in a court of competent jurisdiction that the Trustee was negligent in ascertaining the pertinent facts; and

(iii)     the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.05 hereof.

100432088 v3

(d)      Whether or not therein expressly so provided, every provision of this Indenture that in any way relates to the Trustee is subject to paragraphs (a), (b) and (c) of this Section 7.01.

(e)      The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture at the request of any Holder of the Notes unless such Holder shall have offered to the Trustee security and indemnity satisfactory to it against any loss, liability or expense.

(f)      The Trustee shall not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02      Rights of Trustee.

(a)      The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b)      Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both.  The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel.  The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)      The Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any agent or attorney appointed with due care.

(d)      The Trustee shall not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture.

(e)      Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer shall be sufficient if signed by an Officer of the Issuer.

(f)      None of the provisions of this Indenture shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

(g)      The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust Office of the Trustee, and such notice references the Notes and this Indenture.

(h)      In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespec-

100432088 v3

tive of whether the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

(j)     In the event the Issuer is required to pay Additional Interest, the Issuer shall provide written notice to the Trustee of the Issuer's obligation to pay Additional Interest no later than 15 days prior to the next Interest Payment Date, which notice shall set forth the amount of the Additional Interest to be paid by the Issuer.  The Trustee shall not at any time be under any duty or responsibility to any Holders to determine whether the Additional Interest is payable and the amount thereof.

(k)     The permissive rights of the Trustee enumerated herein shall not be construed as duties.

(l)     The Trustee may request that the Issuer deliver an Officers' Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture.

(m)     The Issuer shall provide prompt written notice to the Trustee of any change to its fiscal year (it being expressly understood that the failure to provide such notice to the Trustee shall not be deemed a Default or Event of Default under this Indenture).

Section 7.03     Individual Rights of Trustee.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as trustee (if this Indenture has been qualified under the Trust Indenture Act) or resign.  Any Agent may do the same with like rights and duties.  The Trustee is also subject to Sections 7.10 and 7.11 hereof.

Section 7.04     Trustee's Disclaimer.

The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it shall not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it shall not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05     Notice of Defaults.

If a Default occurs and is continuing and if it is known to the Trustee, the Trustee shall mail to Holders of Notes a notice of the Default within 90 days after it occurs or if known to the Trustee later than 90 days after it occurs, as soon as practicable.  Except in the case of a Default relating to the payment of principal, premium, if any, or interest on any Note, the Trustee may withhold from the Holders notice of any continuing Default if and so long as a committee of its Responsible Officers in good

100432088 v3

faith determines that withholding the notice is in the interests of the Holders of the Notes. The Trustee shall not be deemed to know of any Default unless a Responsible Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is such a Default is received by the Trustee at the Corporate Trust Office of the Trustee.

Section 7.06        Reports by Trustee to Holders of the Notes.

          Within 60 days after each May 15, beginning with the May 15 following the date of this Indenture, and for so long as Notes remain outstanding, the Trustee shall mail to the Holders of the Notes a brief report dated as of such reporting date that complies with Trust Indenture Act Section 313(a) (but if no event described in Trust Indenture Act Section 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The Trustee also shall comply with Trust Indenture Act Section 313(b)(2). The Trustee shall also transmit by mail all reports as required by Trust Indenture Act Section 313(c).

          A copy of each report at the time of its mailing to the Holders of Notes shall be mailed to the Issuer and filed with the SEC (to the extent that the Issuer is subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act or otherwise voluntarily filing periodic reports with the SEC) and each stock exchange on which the Notes are listed in accordance with Trust Indenture Act Section 313(d). The Issuer shall promptly notify the Trustee, in writing, when the Notes are listed on any stock exchange.

Section 7.07        Compensation and Indemnity.

          The Issuer and the Guarantors, jointly and severally, shall pay to the Trustee from time to time such compensation for its acceptance of this Indenture and services hereunder as the parties shall agree in writing from time to time. The Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Issuer and the Guarantors, jointly and severally, shall reimburse the Trustee promptly upon request for all reasonable disbursements, advances and expenses incurred or made by it in addition to the compensation for its services. Such expenses shall include the reasonable compensation, disbursements and expenses of the Trustee's agents, professional advisors and counsel.

          The Issuer and the Guarantors, jointly and severally, shall indemnify the Trustee for, and hold the Trustee harmless against, any and all loss, damage, claims, liability or expense (including attorneys' fees) incurred by it in connection with the acceptance or administration of this trust and the performance of its duties hereunder (including the costs and expenses of enforcing this Indenture against the Issuer or any of the Guarantors (including this Section 7.07) or defending itself against any claim whether asserted by any Holder, the Issuer or any Guarantor, or liability in connection with the acceptance, exercise or performance of any of its powers or duties hereunder). The Trustee shall notify the Issuer promptly of any claim for which it may seek indemnity. Failure by the Trustee to so notify the Issuer shall not relieve the Issuer of its obligations hereunder. The Issuer shall defend the claim and the Trustee may have separate counsel and the Issuer shall pay the fees and expenses of such counsel. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misconduct, negligence or bad faith as determined by a court of competent jurisdiction in a final and non-appealable decision.

          The obligations of the Issuer under this Section 7.07 shall survive the satisfaction and discharge of this Indenture or the earlier resignation or removal of the Trustee.

Notwithstanding anything to the contrary in Section 4.12 hereof, to secure the payment obligations of the Issuer and the Guarantors in this Section 7.07, the Trustee shall have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on particular Notes.  Such Lien shall survive the satisfaction and discharge of this Indenture.

When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(a)(6) or (7) hereof occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

The Trustee shall comply with the provisions of Trust Indenture Act Section 313(b)(2) to the extent applicable.

Section 7.08    Replacement of Trustee.

A resignation or removal of the Trustee and appointment of a successor Trustee shall become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.  The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer.  The Holders of a majority in principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing.  The Issuer may remove the Trustee if:

(a)    the Trustee fails to comply with Section 7.10 hereof;

(b)    the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(c)    a custodian or public officer takes charge of the Trustee or its property; or

(d)    the Trustee becomes incapable of acting.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer shall promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, the retiring Trustee (at the Issuer's expense), the Issuer or the Holders of at least 10% in principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee.

If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10 hereof, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee shall mail a notice of its succession to Holders.  The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee; *provided* all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.07 hereof.

-93-

Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.07 hereof shall continue for the benefit of the retiring Trustee.

Section 7.09    <u>Successor Trustee by Merger, etc.</u>

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee.

Section 7.10    <u>Eligibility; Disqualification</u>.

There shall at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, that is subject to supervision or examination by federal or state authorities and that has a combined capital and surplus of at least $50,000,000 as set forth in its most recent published annual report of condition.

This Indenture shall always have a Trustee who satisfies the requirements of Trust Indenture Act Sections 310(a)(1), (2) and (5).  The Trustee is subject to Trust Indenture Act Section 310(b).

Section 7.11    <u>Preferential Collection of Claims Against Issuer</u>.

The Trustee is subject to Trust Indenture Act Section 311(a), excluding any creditor relationship listed in Trust Indenture Act Section 311(b).  A Trustee who has resigned or been removed shall be subject to Trust Indenture Act Section 311(a) to the extent indicated therein.

Section 7.12    <u>[Reserved]</u>.

Section 7.13    <u>Authorization of Security Documents; Intercreditor Agreement</u>.

By their acceptance of the Notes, the Holders hereby authorize and direct the Trustee and Collateral Agent, as the case may be, to execute and deliver the Security Documents, the Intercreditor Agreement and any other document purporting to create a security interest in favor of the Trustee or the Collateral Agent, as applicable, for the benefit of the Holders of the Notes, including any Security Documents executed after the Issue Date.  It is hereby expressly acknowledged and agreed that, in doing so, the Trustee and the Collateral Agent are not responsible for the terms or contents of such agreements, or for the validity or enforceability thereof, or the sufficiency thereof for any purpose.  Whether or not so expressly stated therein, in entering into, or taking (or forbearing from) any action under pursuant to, the Security Documents, the Intercreditor Agreement or any other document purporting to create a security interest in favor of the Trustee and/or the Collateral Agent for their benefit and the benefit of the Holders of the Notes, each shall have all of the rights, immunities, indemnities and other protections granted to it under this Indenture (in addition to those that may be granted to it under the terms of such other agreement or agreements).

ARTICLE 8

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01    <u>Option to Effect Legal Defeasance or Covenant Defeasance</u>.

The Issuer may, at its option and at any time, elect to have either Section 8.02 or 8.03 hereof applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

Section 8.02    <u>Legal Defeasance and Discharge</u>.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.02, the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) and this Indenture on the date the conditions set forth below are satisfied ("*Legal Defeasance*").  For this purpose, Legal Defeasance means that the Issuer and the Guarantors shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Guarantees), which shall thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 hereof and the other Sections of this Indenture referred to in (a) and (b) below, and to have satisfied all its other obligations under such Notes, the Guarantees, this Indenture and the Security Documents (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same) and to have caused the release of all Liens on the Collateral granted under the Security Documents, except for the following provisions which shall survive until otherwise terminated or discharged hereunder:

(a)    the rights of Holders of Notes to receive payments in respect of the principal of, premium, if any, and, without duplication, interest on the Notes when such payments are due solely out of the trust created pursuant to this Indenture referred to in Section 8.04 hereof;

(b)    the Issuer's obligations with respect to Notes concerning issuing temporary Notes, registration of the transfer or exchange of Notes, replacement of mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(c)    the rights, powers, trusts, duties and immunities of the Trustee, and the Issuer's obligations in connection therewith; and

(d)    this Section 8.02.

Subject to compliance with this Article 8, the Issuer may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03 hereof.

Section 8.03    <u>Covenant Defeasance</u>.

Upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, the Issuer and the Guarantors shall, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from their obligations under the covenants contained in Sections 3.09, 4.03, 4.04, 4.05, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.14, 4.15, 4.18, 4.20, 4.21 and 4.22 hereof and clauses (4) and (5) of Section 5.01(a), Sections 5.01(c) and 5.01(d) hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied ("*Covenant Defeas-*

-95-

*ance*"), and the Notes shall thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but shall continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes shall not be deemed outstanding for accounting purposes).  For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Issuer may omit to comply with and shall have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of any reference in any such covenant to any other provision herein or in any other document and such omission to comply shall not constitute a Default or an Event of Default under Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes shall be unaffected thereby.  In addition, upon the Issuer's exercise under Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, (x) Sections 6.01(a)(3), 6.01(a)(4), 6.01(a)(5), 6.01(a)(8) and 6.01(a)(9) hereof shall not constitute Events of Default with respect to the Notes and (y) Sections 6.01(a)(1), 6.01(a)(2), 6.01(a)(6) and 6.01(a)(7) shall continue to constitute an Event of Default with respect to the Notes.

Section 8.04    <u>Conditions to Legal or Covenant Defeasance</u>.

The following shall be the conditions to the application of either Section 8.02 or 8.03 hereof to the outstanding Notes:

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Notes:

(1)    the Issuer must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient, in the opinion of a nationally recognized firm of independent public accountants (or, if two or more nationally recognized firms of independent public accountants decline to issue such opinion as a matter of policy, in the opinion of the Issuer's chief financial officer), to pay the principal amount of, premium, if any, and (without duplication), interest due on the Notes on the stated maturity date or on the Redemption Date, as the case may be, of such principal, premium, if any, or interest on such Notes, and the Issuer must specify whether such Notes are being defeased to maturity or to a particular Redemption Date;

(2)    in the case of Legal Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions,

(a)    the Issuer has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

(b)    since the issuance of the Notes, there has been a change in the applicable U.S. Federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Notes shall not recognize income, gain or loss for U.S. Federal income tax purposes, as a result of such Legal Defeasance and shall be subject to U.S. Federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

-96-

(3)      in the case of Covenant Defeasance, the Issuer shall have delivered to the Trustee an Opinion of Counsel reasonably acceptable to the Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Notes shall not recognize income, gain or loss for U.S. Federal income tax purposes as a result of such Covenant Defeasance and shall be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)      no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)      such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any First Lien Obligations or any other material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make such deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6)      the Issuer shall have delivered to the Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds shall not be subject to the effect of Section 547 of the Bankruptcy Law;

(7)      the Issuer shall have delivered to the Trustee an Officers' Certificate stating that the deposit was not made by the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or any Guarantor or others; and

(8)      the Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 8.05    <u>Deposited Money and Government Securities to Be Held in Trust; Other Miscellaneous Provisions.</u>

Subject to Section 8.06 hereof, all money and Government Securities (including the proceeds thereof) deposited with the Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 hereof in respect of the outstanding Notes shall be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer or a Guarantor acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium and Additional Interest, if any, and, without duplication, interest, but such money need not be segregated from other funds except to the extent required by law.

The Issuer shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash or Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

-97-

Anything in this Article 8 to the contrary notwithstanding, the Trustee shall deliver or pay to the Issuer from time to time upon the request of the Issuer any money or Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under Section 8.04(a) hereof), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06    <u>Repayment to Issuer</u>.

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium and Additional Interest, if any, or, without duplication, interest on any Note and remaining unclaimed for two years after such principal, and premium and Additional Interest, if any, or interest has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) shall be discharged from such trust; and the Holder of such Note shall thereafter look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, shall thereupon cease.

Section 8.07    <u>Reinstatement</u>.

If the Trustee or Paying Agent is unable to apply any United States dollars or Government Securities in accordance with Section 8.02 or 8.03 hereof, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided* that, if the Issuer makes any payment of principal of, premium and Additional Interest, if any, or, without duplication, interest on any Note following the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

ARTICLE 9

AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01    <u>Without Consent of Holders of Notes</u>.

Notwithstanding Section 9.02 hereof, the Issuer, any Guarantor (with respect to its Guarantee or this Indenture), the Collateral Agent and the Trustee may amend or supplement this Indenture, the Security Documents, the Intercreditor Agreement and any Guarantee or Notes without the consent of any Holder:

(1)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3)    to comply with Section 5.01 hereof;

(4)    to provide the assumption of the Issuer's or any Guarantor's obligations to the Holders;

-98-

(5)    to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights under this Indenture of any such Holder;

(6)    to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any Guarantor;

(7)    to comply with requirements of the SEC in order to effect or maintain the qualification of this Indenture under the Trust Indenture Act;

(8)    to evidence and provide for the acceptance and appointment (x) under this Indenture of a successor Trustee hereunder pursuant to the requirements hereof or (y) under the Security Documents of a successor Collateral Agent thereunder pursuant to the requirements thereof;

(9)    to make changes related to the transfer and legending of the Notes as permitted by this Indenture or applicable law;

(10)    to add a Guarantor under this Indenture;

(11)    [reserved];

(12)    to make any amendment to the provisions of this Indenture relating to the transfer and legending of Notes as permitted by this Indenture, including, without limitation to facilitate the issuance and administration of the Notes; *provided*, *however*, that (i) compliance with this Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Notes;

(13)    [reserved];

(14)    to add security to or for the benefit of the Notes and, in the case of the Security Documents, to or for the benefit of the other secured parties named therein or to confirm and evidence the release, termination or discharge of any Guarantee of or Lien securing the Notes when such release, termination or discharge is permitted by this Indenture and the Security Documents or as required by the Intercreditor Agreement; or

(15)    to modify the Security Documents and/or the Intercreditor Agreement to secure additional extensions of credit and additional secured creditors holding First Lien Obligations or other Permitted Second Lien Obligations, so long as such First Lien Obligations or other Permitted Second Lien Obligations are not prohibited by this Indenture, the First Lien Indenture or the Credit Agreement.

Upon the request of the Issuer accompanied by a Board Resolution authorizing the execution of any such amended or supplemental indenture, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee and the Collateral Agent shall join with the Issuer and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee and the Collateral Agent shall not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.  Notwithstanding the foregoing, no Opinion of Counsel shall be required in connection with the addition of a Guarantor under this Indenture upon execution and delivery by such Guarantor, the Col-

-99-

lateral Agent and the Trustee of a supplemental indenture to this Indenture, the form of which is attached as <u>Exhibit D</u> hereto, and delivery of an Officers' Certificate.

Section 9.02    <u>With Consent of Holders of Notes</u>.

Except as provided below in this Section 9.02, the Issuer, the Collateral Agent and the Trustee may amend or supplement this Indenture, the Security Documents, the Intercreditor Agreement, any related Guarantee and the Notes with the consent of the Holders of at least a majority in principal amount of the Notes (including Additional Notes, if any) then outstanding voting as a single class including, without limitation, so long as this Indenture has not been qualified under the TIA, any Notes beneficially owned by the Issuer's Affiliates (including, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes) and, subject to Sections 6.04 and 6.07 hereof, any existing Default or compliance with any provision of this Indenture, the Security Documents, the Intercreditor Agreement, the Guarantees or the Notes may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Notes (including Additional Notes, if any) voting as a single class (including consents obtained in connection with a purchase of or tender offer or exchange offer for, Notes. Subject to the preceding sentence, Section 2.08 hereof and Section 2.09 hereof shall determine which Notes are considered to be "outstanding" for the purposes of this Section 9.02).

Upon the request of the Issuer accompanied by a resolution of its Board of Directors authorizing the execution of any such amended and supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of Notes as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02 hereof, the Trustee shall join with the Issuer in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but shall not be obligated to, enter into such amended or supplemental indenture.

It shall not be necessary for the consent of the Holders of Notes under this Section 9.02 to approve the particular form of any proposed amendment or waiver, but it shall be sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer shall mail to the Holders of Notes affected thereby a notice briefly describing the amendment, supplement or waiver.  Any failure of the Issuer to mail such notice, or any defect therein, shall not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver.

Without the consent of each affected Holder of Notes, an amendment or waiver under this Section 9.02 may not (with respect to any Notes held by a non-consenting Holder):

(1)    reduce the principal amount of such Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal amount of or change the fixed final maturity of any such Note or alter or waive the provisions with respect to the redemption of such Notes (other than provisions relating to Section 3.09, Section 4.10 and Section 4.14 hereof to the extent that any such amendment or waiver does not have the effect of reducing the principal of or changing the fixed final maturity of any such Note or altering or waiving the provisions with respect to the redemption of such Notes);

(3)    reduce the rate of or change the time for payment of interest on any Note;

-100-

(4)    waive a Default in the payment of principal of or premium, if any, or (without duplication) interest on the Notes, except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in this Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5)    make any Note payable in a currency other than U.S. dollars;

(6)    make any change in the provisions of this Indenture relating to the rights of Holders to receive payments of principal of or premium, if any, or (without duplication) interest on the Notes including in connection with a defeasance or discharge;

(7)    make any change in these amendment and waiver provisions;

(8)    impair the right of any Holder to receive payment of principal of, or interest on such Holder's Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Notes;

(9)    make any change to or otherwise modify the ranking of the Notes that would adversely affect the Holders; or

(10)    except as expressly permitted by this Indenture, modify the Guarantee of any Guarantor in any manner adverse to the Holders of the Notes.

In addition, any amendment to, or waiver of, the provisions of this Indenture, any Security Document or the Intercreditor Agreement that has the effect of releasing all or substantially all of the Collateral or modifies such documents insofar as such documents relates to Collateral in a manner adverse to the Holders of the Notes in any material respect will require consent of the Holders of at least 75% in aggregate principal amount of the Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Notes).

No amendment of, or supplement or waiver to, this Indenture, the Notes or the Security Documents (other than the Intercreditor Agreement) shall be permitted to be effected which is in violation of or inconsistent with the terms of the Intercreditor Agreement. No amendment of, or supplement to, the Intercreditor Agreement shall be permitted to be effected without the consent of the Collateral Agent, the First Lien Collateral Agent and the collateral agent under the Credit Agreement.

Until the Discharge of First Lien Obligations has occurred, the holders of the First Priority Liens (as defined in the Intercreditor Agreement)  may change, waive, modify or vary the security documents of such holders and, pursuant to the Intercreditor Agreement, such changes will automatically apply to the Security Documents; provided that any such change, waiver, modification or variance that is prejudicial to the rights of the Holders of the Notes and does not affect the holders of the First Priority Liens in a like or similar manner shall not apply to the Security Documents without the consent of the Collateral Agent and the Trustee (acting at the direction of the Holders of a majority of the aggregate principal amount of the Notes). Notice of such amendment, waiver or consent shall be given to the Trustee by the Issuer, but any failure to provide such notice will not affect the validity or effectiveness of any such amendment, waiver or consent.

100432088 v3

Section 9.03        Compliance with Trust Indenture Act.

            After the qualification of this Indenture under the Trust Indenture Act, every amendment or supplement to this Indenture or the Notes shall be set forth in an amended or supplemental indenture that complies with the Trust Indenture Act as then in effect.

Section 9.04        Revocation and Effect of Consents.

            Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Holder of a Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note.  However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the waiver, supplement or amendment becomes effective.  Subject to Section 9.02 hereof, an amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

            The Issuer may, but shall not be obligated to, fix a record date for the purpose of determining the Holders entitled to consent to any amendment, supplement, or waiver.  If a record date is fixed, then, notwithstanding the preceding paragraph, those Persons who were Holders at such record date (or their duly designated proxies), and only such Persons, shall be entitled to consent to such amendment, supplement, or waiver or to revoke any consent previously given, whether or not such Persons continue to be Holders after such record date.  No such consent shall be valid or effective for more than 120 days after such record date unless the consent of the requisite number of Holders has been obtained.

Section 9.05        Notation on or Exchange of Notes.

            The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated.  The Issuer in exchange for all Notes may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

            Failure to make the appropriate notation or issue a new Note shall not affect the validity and effect of such amendment, supplement or waiver.

Section 9.06        Trustee To Sign Amendments, etc.

            The Trustee shall sign any amendment, supplement or waiver authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee.  The Issuer may not sign an amendment, supplement or waiver until the Board of Directors approves it.  In executing any amendment, supplement or waiver, the Trustee shall be entitled to receive and (subject to Section 7.01 hereof) shall be fully protected in relying upon, in addition to the documents required by Section 13.04 hereof, an Officers' Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture and that such amendment, supplement or waiver is the legal, valid and binding obligation of the Issuer and any Guarantors party thereto, enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions hereof (including Section 9.03).  Notwithstanding the foregoing, no Opinion of Counsel shall be required for the Trustee to execute any amendment or supplement adding a new Guarantor under this Indenture.

100432088 v3

Section 9.07     Payment for Consent.

(a) Neither the Issuer nor any Restricted Subsidiary of the Issuer shall, directly or indirectly, pay or cause to be paid, and (b) the Issuer shall use commercially reasonable efforts to prevent any Affiliate of the Issuer from, directly or indirectly, paying or causing to be paid, any consideration, whether by way of interest, fee or otherwise, to any Holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of this Indenture or the Notes unless such consideration is offered to all Holders and is paid to all Holders that so consent, waive or agree to amend in the time frame set forth in solicitation documents relating to such consent, waiver or agreement.

ARTICLE 10

COLLATERAL AND SECURITY

Section 10.01     Collateral and Security Documents.

(a)     The Issuer, the Guarantors, the Trustee and the Collateral Agent shall enter into one or more Security Documents.  The due and punctual payment of the principal of and interest on the Notes when and as the same shall be due and payable, whether on an Interest Payment Date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest on the Notes and performance of all other Obligations of the Issuer and the Guarantors to the secured parties under this Indenture, the Notes, the Guarantees, the Intercreditor Agreement and the Security Documents, according to the terms hereunder or thereunder, shall be secured as provided in the Security Documents, which define the terms of the Liens that secure the Obligations, subject to the terms of the Intercreditor Agreement.

(b)     The Trustee and the Issuer hereby acknowledge and agree that the Collateral Agent holds the Collateral in trust for the benefit of the secured parties pursuant to the terms of the Security Documents and the Intercreditor Agreement.

(c)     Each Holder, by accepting a Note, consents and agrees to the terms of the Security Documents (including the provisions providing for the possession, use, release and foreclosure of Collateral) and the Intercreditor Agreement as the same may be in effect or may be amended from time to time in accordance with their terms and this Indenture and the Intercreditor Agreement, and authorizes and directs the Collateral Agent to enter into the Security Documents and the Intercreditor Agreement and to perform its obligations and exercise its rights thereunder in accordance therewith; *provided*, *however*, that if any of the provisions of the Security Documents limit, qualify or conflict with the duties imposed by the provisions of the TIA, the TIA shall control.

(d)     The Issuer shall deliver to the Collateral Agent copies of all documents required to be filed pursuant to the Security Documents, and will do or cause to be done all such acts and things as may be reasonably required by the next sentence of this Section 10.01, to assure and confirm to the Collateral Agent the security interest in the Collateral contemplated hereby, by the Security Documents or any part thereof, as from time to time constituted, so as to render the same available for the security and benefit of this Indenture and of the Notes secured hereby, according to the intent and purposes herein expressed.

(e)     The Issuer shall, and shall cause the Guarantors to, take any and all actions and make all filings (including the filing of UCC financing statements, continuation statements and amendments thereto) reasonably required to cause the Security Documents to create and maintain, as security for the Obligations of the Issuer and the Guarantors to the secured parties under this Indenture, the Notes, the

-103-

Guarantees, the Intercreditor Agreement and the Security Documents, a valid and enforceable perfected Lien and security interest in and on all of the Collateral (subject to the terms of the Intercreditor Agreement and the Security Documents), in favor of the Collateral Agent for the benefit of the secured parties subject to no Liens other than Permitted Liens.

Section 10.02    Recordings and Opinions.

(a)    To the extent applicable, the Issuer will cause TIA § 313(b), relating to reports, to be complied with.  So long as the Indenture is not qualified under the TIA, the Issuer shall not be required to comply with TIA § 314.  The Issuer shall deliver to the Trustee and Collateral Agent, within 30 calendar days following the end of each fiscal year, an Officers' Certificate to the effect that all releases and withdrawals during such fiscal year in respect of which the Issuer did not comply with TIA § 314(d) in reliance on this Section 10.02(a) were made in the ordinary course of business and not prohibited by this Indenture.  Any certificate or opinion required by TIA § 314(d) may be made by an Officer of the Issuer except in cases where TIA § 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert. Notwithstanding anything to the contrary in this paragraph, the Issuer will not be required to comply with all or any portion of TIA § 314(d) if the Issuer determines, in good faith based on advice of counsel, that under the terms of TIA § 314(d) and/or any interpretation or guidance as to the meaning thereof of the Commission and its staff, including "no action" letters or exemptive orders, all or any portion of TIA § 314(d) is inapplicable to the released Collateral.

(b)    Any release of Collateral permitted by Section 10.03 hereof will be deemed not to impair the Liens under this Indenture and the Security Documents in contravention thereof.

(c)    Following the qualification of the Indenture under the TIA, to the extent the Issuer is required to furnish to the Trustee an Opinion of Counsel pursuant to TIA Section 314(b)(2), the Issuer will furnish such opinion not more than 60 but not less than 30 days prior to December 1st of each year.

Section 10.03    Release of Collateral.

(a)    Subject to Section 10.03(b) hereof, Collateral may be released from the Lien and security interest created by the Security Documents at any time or from time to time in accordance with the provisions of the Security Documents, the Intercreditor Agreement and this Indenture.  The Issuer and the Guarantors will be entitled to a release of property and other assets included in the Collateral from the Liens securing the Notes, and the Trustee (subject to its receipt of an Officers' Certificate and Opinion of Counsel as provided below) shall release, or instruct the Collateral Agent to release, as applicable, the same from such Liens at the Issuer's sole cost and expense, under one or more of the following circumstances:

(1)    upon the Discharge of First Lien Obligations and concurrent release of all other Liens on such property or assets securing First Lien Obligations (including all commitments and letters of credit thereunder); *provided*, *however*, that if the Issuer or any Guarantor subsequently incurs First Lien Obligations that are secured by Liens on property or assets of the Issuer or any Guarantor of the type constituting the Collateral and the related Liens are incurred in reliance on clauses 6(i) or 33(b) of the definition of "Permitted Liens," then the Issuer and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Notes, which, in the case of any such subsequent First Lien Obligations, will be second priority Liens on the Collateral securing such First Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Lien Obligations, with the second priority Lien held either by the adminis-

-104-

trative agent, collateral agent or other representative for such First Lien Obligations or by a colla-
teral agent or other representative designated by the Issuer to hold the second priority Liens for
the benefit of the Holders of the Notes and subject to an intercreditor agreement that provides the
administrative agent or collateral agent substantially the same rights and powers as afforded un-
der the Intercreditor Agreement;

(2)    to enable the Issuer or any Guarantor to sell, exchange or otherwise dispose of
any of the Collateral to the extent not prohibited under Section 4.10;

(3)    to release Excess Proceeds to the Issuer that remain unexpended after the conclu-
sion of an Asset Sale Offer conducted in accordance with this Indenture and not required to be
made part of the Collateral;

(4)    in the case of a Guarantor that is released from its Guarantee with respect to the
Notes, the release of the property and assets of such Guarantor;

(5)    pursuant to an amendment or waiver in accordance with Article 9 hereof; or

(6)    if the Notes have been discharged or defeased pursuant to Article 8 or Article 12
hereof.

If an Event of Default under the Indenture exists on the date of Discharge of First Lien Obliga-
tions, the second priority Liens on the Collateral securing the Notes will not be released, except to the
extent the Collateral or any portion thereof was disposed of in order to repay the First Lien Obligations
secured by the Collateral, and thereafter the Collateral Agent (or another designated representative acting
at the direction of the Holders of a majority of outstanding principal amount of the Notes and other Per-
mitted Second Lien Obligations) will have the right to direct the Collateral Agent to foreclose upon the
Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such
Event of Default and all other Events of Default under this Indenture cease to exist but will be reinstituted
upon any subsequent incurrence of First Lien Obligations to the extent provided in the proviso to clause
(a)(1) of this Section 10.03).

(b)    With respect to any release of Collateral, upon receipt of an Officers' Certificate
and an Opinion of Counsel each stating that all conditions precedent under this Indenture and the Security
Documents and the Intercreditor Agreement to such release have been met and that it is proper for the
Trustee or Collateral Agent to execute and deliver the documents requested by the Issuer in connection
with such release, and any necessary or proper instruments of termination, satisfaction or release prepared
by the Issuer, the Trustee shall, or shall cause the Collateral Agent to, execute, deliver or acknowledge (at
the Issuer's expense) such instruments or releases to evidence the release of any Collateral permitted to be
released pursuant to this Indenture or the Security Documents or the Intercreditor Agreement.  Neither the
Trustee nor the Collateral Agent shall be liable for any such release undertaken in reliance upon any such
Officers' Certificate or Opinion of Counsel, and the Trustee and the Collateral Agent shall not be under
any obligation to release any such Lien and security interest, or execute and deliver any such instrument
of release, satisfaction or termination, unless and until (i) it receives such Officers' Certificate and Opi-
nion of Counsel or (ii) the Intercreditor Agreement expressly provides for automatic release of Collateral
under this Indenture with no further action required by the Trustee or the Collateral Agent.

(c)    To the extent that Rule 3-16 of Regulation S-X under the Securities Act requires
or would require (or is replaced with another rule or regulation, or any other law, rule or regulation is
adopted, that would require) the filing with the SEC (or any other governmental agency) of separate fi-
nancial statements of any Subsidiary of the Issuer due to the fact that such Subsidiary's Equity Interests

-105-

secure the Notes, then the Equity Interests of such Subsidiary will automatically be deemed not to be part of the Collateral securing the Notes but only to the extent necessary to not be subject to such requirement and only for so long as required to not be subject to such requirement.  In such event, the Security Documents may be amended or modified, without the consent of any Holder of such Notes, to the extent necessary to release the security interests in favor of the Collateral Agent on the shares of Equity Interests of such Subsidiary that are so deemed to no longer constitute part of the Collateral, all at the written request and certification by the Issuer, upon which the Trustee may conclusively rely.  In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would permit) such Subsidiary's Equity Interests  to secure the Notes in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Equity Interests of such Subsidiary will automatically be deemed to be a part of the Collateral. In such event, the Security Documents may be amended or modified, without the consent of any Holder of such Notes, to the extent necessary to subject such Equity Interests to the Liens under the Security Documents.

Section 10.04    Suits To Protect the Collateral.

Subject to the provisions of Article 7 hereof and the Security Documents and the Intercreditor Agreement, the Trustee, without the consent of the Holders, on behalf of the Holders, may or may direct the Collateral Agent to take all actions it determines in order to:

(a)    enforce any of the terms of the Security Documents; and

(b)    collect and receive any and all amounts payable in respect of the Obligations hereunder.

Subject to the provisions of the Security Documents and the Intercreditor Agreement, the Trustee and the Collateral Agent shall have power to institute and to maintain such suits and proceedings as the Trustee may determine to prevent any impairment of the Collateral by any acts which may be unlawful or in violation of any of the Security Documents or this Indenture, and such suits and proceedings as the Trustee may determine to preserve or protect its interests and the interests of the Holders in the Collateral.  Nothing in this Section 10.04 shall be considered to impose any such duty or obligation to act on the part of the Trustee or the Collateral Agent.

Section 10.05    Authorization of Receipt of Funds by the Trustee Under the Security Documents.

Subject to the provisions of the Intercreditor Agreement, the Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Security Documents, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

Section 10.06    Purchaser Protected.

In no event shall any purchaser in good faith of any property purported to be released hereunder be bound to ascertain the authority of the Collateral Agent or the Trustee to execute the release or to inquire as to the satisfaction of any conditions required by the provisions hereof for the exercise of such authority or to see to the application of any consideration given by such purchaser or other transferee; nor shall any purchaser or other transferee of any property or rights permitted by this Article 10 to be sold be under any obligation to ascertain or inquire into the authority of the Issuer or the applicable Guarantor to make any such sale or other transfer.

100432088 v3

Section 10.07    <u>Powers Exercisable by Receiver or Trustee</u>.

In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article 10 upon the Issuer or a Guarantor with respect to the release, sale or other disposition of such property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Issuer or a Guarantor or of any Officer or Officers thereof required by the provisions of this Article 10; and if the Trustee shall be in the possession of the Collateral under any provision of this Indenture, then such powers may be exercised by the Trustee.

Section 10.08    <u>Release Upon Termination of the Issuer's Obligations</u>.

In the event that the Issuer delivers to the Trustee (a) an Officers' Certificate certifying that (i) payment in full of the principal of, together with accrued and unpaid interest on, the Notes and all other Obligations under this Indenture, the Notes, the Guarantees and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid or (ii) the Issuer shall have exercised its Legal Defeasance option or its Covenant Defeasance option, in each case in compliance with the provisions of Article 8 hereof, and (b) an Opinion of Counsel stating that all conditions precedent to the execution and delivery of such notice by the Trustee have been satisfied, the Trustee shall deliver to the Issuer and the Collateral Agent a notice stating that the Trustee, on behalf of the Holders, disclaims and gives up any and all rights it has in or to the Collateral (other than with respect to funds held by the Trustee pursuant to Article 8 hereof) and upon receipt by the Collateral Agent of such notice, the Collateral Agent shall be deemed not to hold a Lien in the Collateral on behalf of the Trustee and shall do or cause to be done all acts reasonably necessary to release such Lien as soon as is reasonably practicable.

Section 10.09    <u>Collateral Agent</u>.

(a)    The Trustee and each of the Holders by acceptance of the Notes hereby designates and appoints the Collateral Agent as its agent under this Indenture, the Security Documents and the Intercreditor Agreement and the Trustee and each of the Holders by acceptance of the Notes hereby irrevocably authorizes the Collateral Agent to take such action on its behalf under the provisions of this Indenture, the Security Documents and the Intercreditor Agreement and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Indenture, the Security Documents and the Intercreditor Agreement, and consents and agrees to the terms of the Intercreditor Agreement and each Security Document, as the same may be in effect or may be amended, restated, supplemented or otherwise modified from time to time in accordance with their respective terms.  The Collateral Agent agrees to act as such on the express conditions contained in this Section 10.09.  The provisions of this Section 10.09 are solely for the benefit of the Collateral Agent and none of the Trustee, any of the Holders nor any of the Grantors shall have any rights as a third party beneficiary of any of the provisions contained herein other than as expressly provided in Section 10.03 hereof.  Each Holder agrees that any action taken by the Collateral Agent in accordance with the provision of this Indenture, the Intercreditor Agreement and the Security Documents, and the exercise by the Collateral Agent of any rights or remedies set forth herein and therein shall be authorized and binding upon all Holders.  Notwithstanding any provision to the contrary contained elsewhere in this Indenture, the Security Documents and the Intercreditor Agreement, the duties of the Collateral Agent shall be ministerial and administrative in nature, and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other documents to which the Collateral Agent is a party, nor shall the Collateral Agent have or be deemed to have any trust or other fiduciary relationship with the Trustee, any Holder or any Grantor, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be

-107-

read into this Indenture, the Security Documents and the Intercreditor Agreement or otherwise exist against the Collateral Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" in this Indenture with reference to the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     The Collateral Agent may perform any of its duties under this Indenture, the Security Documents or the Intercreditor Agreement by or through receivers, agents, employees, attorneys-in-fact or through its Related Persons and shall be entitled to advice of counsel concerning all matters pertaining to such duties, and shall be entitled to act upon, and shall be fully protected in taking action in reliance upon any advice or opinion given by legal counsel.  The Collateral Agent shall not be responsible for the negligence or willful misconduct of any receiver, agent, employee, attorney-in-fact or Related Person that it selects as long as such selection was made in good faith.

(c)     None of the Collateral Agent or any of its respective Related Persons shall (i) be liable for any action taken or omitted to be taken by any of them under or in connection with this Indenture or the transactions contemplated hereby (except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision) or under or in connection with any Security Document or the Intercreditor Agreement or the transactions contemplated thereby (except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision), or (ii) be responsible in any manner to any of the Trustee or any Holder for any recital, statement, representation, warranty, covenant or agreement made by the Issuer or any Grantor or Affiliate of any Grantor, or any Officer or Related Person thereof, contained in this Indenture, the Security Documents or the Intercreditor Agreement, or in any certificate, report, statement or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture, the Security Documents or the Intercreditor Agreement, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Indenture, the Security Documents or the Intercreditor Agreement, or for any failure of any Grantor or any other party to this Indenture, the Security Documents or the Intercreditor Agreement to perform its obligations hereunder or thereunder.  None of the Collateral Agent or any of its respective Related Persons shall be under any obligation to the Trustee or any Holder to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Indenture, the Security Documents or the Intercreditor Agreement or to inspect the properties, books, or records of any Grantor or any Grantor's Affiliates.

(d)     The Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, certification, telephone message, statement, or other communication, document or conversation (including those by telephone or e-mail) believed by it to be genuine and correct and to have been signed, sent, or made by the proper Person or Persons, and upon advice and statements of legal counsel (including, without limitation, counsel to the Issuer or any Grantor), independent accountants and other experts and advisors selected by the Collateral Agent.  The Collateral Agent shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document.  The Collateral Agent shall be fully justified in failing or refusing to take any action under this Indenture, the Security Documents or the Intercreditor Agreement unless it shall first receive such advice or concurrence of the Trustee or the Holders of a majority in aggregate principal amount of the Notes as it determines and, if it so requests, it shall first be indemnified to its satisfaction by the Holders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Indenture, the Securi-

-108-

ty Documents or the Intercreditor Agreement in accordance with a request, direction, instruction or consent of the Trustee or the Holders of a majority in aggregate principal amount of the then outstanding Notes and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Holders.

(e)    The Collateral Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, unless a Responsible Officer of the Collateral Agent shall have received written notice from the Trustee or the Issuer referring to this Indenture, describing such Default or Event of Default and stating that such notice is a "notice of default." The Collateral Agent shall take such action with respect to such Default or Event of Default as may be requested by the Trustee in accordance with Article 6 hereof or the Holders of a majority in aggregate principal amount of the Notes (subject to this Section 10.09).

(f)    Wilmington Trust FSB and its respective Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting, or other business with any Grantor and its Affiliates as though it was not the Collateral Agent hereunder and without notice to or consent of the Trustee. The Trustee and the Holders acknowledge that, pursuant to such activities, Wilmington Trust FSB or its respective Affiliates may receive information regarding any Grantor or its Affiliates (including information that may be subject to confidentiality obligations in favor of any such Grantor or such Affiliate) and acknowledge that the Collateral Agent shall not be under any obligation to provide such information to the Trustee or the Holders. Nothing herein shall impose or imply any obligation on the part of the Wilmington Trust FSB to advance funds.

(g)    The Collateral Agent may resign at any time by notice to the Trustee and the Issuer, such resignation to be effective upon the acceptance of a successor agent to its appointment as Collateral Agent. If the Collateral Agent resigns under this Indenture, the Issuer shall appoint a successor collateral agent. If no successor collateral agent is appointed prior to the intended effective date of the resignation of the Collateral Agent (as stated in the notice of resignation), the Collateral Agent may appoint, after consulting with the Trustee, subject to the consent of the Issuer (which shall not be unreasonably withheld and which shall not be required during a continuing Event of Default), a successor collateral agent. If no successor collateral agent is appointed and consented to by the Issuer pursuant to the preceding sentence within thirty (30) days after the intended effective date of resignation (as stated in the notice of resignation) the Collateral Agent shall be entitled to petition a court of competent jurisdiction to appoint a successor. Upon the acceptance of its appointment as successor collateral agent hereunder, such successor collateral agent shall succeed to all the rights, powers and duties of the retiring Collateral Agent, and the term "Collateral Agent" shall mean such successor collateral agent, and the retiring Collateral Agent's appointment, powers and duties as the Collateral Agent shall be terminated. After the retiring Collateral Agent's resignation hereunder, the provisions of this Section 10.09 (and Section 7.07 hereof) shall continue to inure to its benefit and the retiring Collateral Agent shall not by reason of such resignation be deemed to be released from liability as to any actions taken or omitted to be taken by it while it was the Collateral Agent under this Indenture.

(h)    The Trustee shall initially act as Collateral Agent and shall be authorized to appoint co- Collateral Agents as necessary in its sole discretion. Except as otherwise explicitly provided herein or in the Security Documents or the Intercreditor Agreement, neither the Collateral Agent nor any of its respective officers, directors, employees or agents or other Related Persons shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The Collateral Agent shall

100432088 v3

be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither the Collateral Agent nor any of its officers, directors, employees or agents shall be responsible for any act or failure to act hereunder, except for its own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final and non-appealable decision.

(i)      The Collateral Agent is authorized and directed to (i) enter into the Security Documents to which it is party, whether executed on or after the Issue Date, (ii) enter into the Intercreditor Agreement, (iii) bind the Holders on the terms as set forth in the Security Documents and the Intercreditor Agreement and (iv) perform and observe its obligations under the Security Documents and the Intercreditor Agreement.

(j)      The Trustee agrees that it shall not (and shall not be obliged to), and shall not instruct the Collateral Agent to, unless specifically requested to do so by the Holders of a majority in aggregate principal amount of the Notes, take or cause to be taken any action to enforce its rights under this Indenture, the Security Documents or the Intercreditor Agreement or against any Grantor, including the commencement of any legal or equitable proceedings, to foreclose any Lien on, or otherwise enforce any security interest in, any of the Collateral.

If at any time or times the Trustee shall receive (i) by payment, foreclosure, set-off or otherwise, any proceeds of Collateral or any payments with respect to the Obligations arising under, or relating to, this Indenture, except for any such proceeds or payments received by the Trustee from the Collateral Agent pursuant to the terms of this Indenture, or (ii) payments from the Collateral Agent in excess of the amount required to be paid to the Trustee pursuant to Article 7 hereof, the Trustee shall promptly turn the same over to the Collateral Agent, in kind, and with such endorsements as may be required to negotiate the same to the Collateral Agent such proceeds to be applied by the Collateral Agent pursuant to the terms of this Indenture, the Security Documents and the Intercreditor Agreement.

(k)      The Collateral Agent is each Holder's agent for the purpose of perfecting the Holders' security interest in assets which, in accordance with Article 9 of the Uniform Commercial Code can be perfected only by possession.  Should the Trustee obtain possession of any such Collateral, upon request from the Issuer, the Trustee shall notify the Collateral Agent thereof and promptly shall deliver such Collateral to the Collateral Agent or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

(l)      The Collateral Agent shall have no obligation whatsoever to the Trustee or any of the Holders to assure that the Collateral exists or is owned by any Grantor or is cared for, protected, or insured or has been encumbered, or that the Collateral Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained or enforced or are entitled to any particular priority, or to determine whether all or the Grantor's property constituting collateral intended to be subject to the Lien and security interest of the Security Documents has been properly and completely listed or delivered, as the case may be, or the genuineness, validity, marketability or sufficiency thereof or title thereto, or to exercise at all or in any particular manner or under any duty of care, disclosure, or fidelity, or to continue exercising, any of the rights, authorities, and powers granted or available to the Collateral Agent pursuant to this Indenture, any Security Document or the Intercreditor Agreement other than pursuant to the instructions of the Trustee or the Holders of a majority in aggregate principal amount of the Notes or as otherwise provided in the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, the Collateral Agent shall have no other duty or liability whatsoever to the Trustee or any Holder as to any of the foregoing.

-110-

(m)      If the Issuer (i) incurs any obligations in respect of Secured Indebtedness at any time when no intercreditor agreement is in effect or at any time when Indebtedness constituting Secured Indebtedness entitled to the benefit of an existing Intercreditor Agreement is concurrently retired, and (ii) delivers to the Collateral Agent an Officers' Certificate so stating and requesting the Collateral Agent to enter into an intercreditor agreement (on substantially the same terms as the applicable Intercreditor Agreement) in favor of a designated agent or representative for the holders of the Secured Indebtedness so incurred, the Collateral Agent shall (and is hereby authorized and directed to) enter into such intercreditor agreement (at the sole expense and cost of the Issuer, including legal fees and expenses of the Collateral Agent), bind the Holders on the terms set forth therein and perform and observe its obligations thereunder.

(n)      No provision of this Indenture, the Intercreditor Agreement or any Security Document shall require the Collateral Agent (or the Trustee) to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or thereunder or to take or omit to take any action hereunder or thereunder or take any action at the request or direction of Holders (or the Trustee in the case of the Collateral Agent) if it shall have received indemnity satisfactory to the Collateral Agent against potential costs and liabilities incurred by the Collateral Agent relating thereto. Notwithstanding anything to the contrary contained in this Indenture, the Intercreditor Agreement or the Security Documents, in the event the Collateral Agent is entitled or required to commence an action to foreclose or otherwise exercise its remedies to acquire control or possession of the Collateral, the Collateral Agent shall not be required to commence any such action or exercise  any remedy or to inspect or conduct any studies of any property under the mortgages or take any such other action if the Collateral Agent has determined that the Collateral Agent may incur personal liability as a result of the presence at, or release on or from, the Collateral or such property, of any hazardous substances unless the Collateral Agent has received security or indemnity from the Holders in an amount and in a form all satisfactory to the Collateral Agent in its sole discretion, protecting the Collateral Agent from all such liability.  The Collateral Agent shall at any time be entitled to cease taking any action described above if it no longer reasonably deems any indemnity, security or undertaking from the Issuer or the Holders to be sufficient.

(o)      The Collateral Agent (i) shall not be liable for any action taken or omitted to be taken by it in connection with this Indenture, the Intercreditor Agreement and the Security Documents or instrument referred to herein or therein, except to the extent that any of the foregoing are found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from its own gross negligence or willful misconduct, (ii) shall not be liable for interest on any money received by it except as the Collateral Agent may agree in writing with the Issuer (and money held in trust by the Collateral Agent need not be segregated from other funds except to the extent required by law) and (iii) may consult with counsel of its selection and the advice or opinion of such counsel as to matters of law shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it in good faith and in accordance with the advice or opinion of such counsel.  The grant of permissive rights or powers to the Collateral Agent shall not be construed to impose duties to act.

(p)      Neither the Collateral Agent nor the Trustee shall be liable for delays or failures in performance resulting from acts beyond its control.  Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes or other disasters.  Neither the Collateral Agent nor the Trustee shall be liable for any indirect, special, punitive, incidental or consequential damages (included but not limited to lost profits) whatsoever, even if it has been informed of the likelihood thereof and regardless of the form of action.

100432088 v3

(q)      The Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by the Issuer or any other Grantor under this Indenture, the Intercreditor Agreement and the Security Documents.  The Collateral Agent shall not be responsible to the Holders or any other Person for any recitals, statements, information, representations or warranties contained in this Indenture, the Intercreditor Agreement, the Security Documents or in any certificate, report, statement, or other document referred to or provided for in, or received by the Collateral Agent under or in connection with, this Indenture, the Intercreditor Agreement or any Security Document; the execution, validity, genuineness, effectiveness or enforceability of the Intercreditor Agreement and any Security Documents of any other party thereto; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, effectiveness, enforceability, sufficiency, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any obligor; or for any failure of any obligor to perform its Obligations under this Indenture, the Intercreditor Agreement and the Security Documents.  The Collateral Agent shall have no obligation to any Holder or any other Person to ascertain or inquire into the existence of any Default or Event of Default, the observance or performance by any obligor of any terms of this Indenture, the Intercreditor Agreement and the Security Documents, or the satisfaction of any conditions precedent contained in this Indenture, the Intercreditor Agreement and any Security Documents.  The Collateral Agent shall not be required to initiate or conduct any litigation or collection or other proceeding under this Indenture, the Intercreditor Agreement and the Security Documents unless expressly set forth hereunder or thereunder.  The Collateral Agent shall have the right at any time to seek instructions from the Holders with respect to the administration of this Indenture, the Intercreditor Agreement, the Security Documents or any certificate, report, statement, or other document referred to or provided for therein.

(r)      The parties hereto and the Holders hereby agree and acknowledge that the Collateral Agent shall not assume, be responsible for or otherwise be obligated for any liabilities, claims, causes of action, suits, losses, allegations, requests, demands, penalties, fines, settlements, damages (including foreseeable and unforeseeable), judgments, expenses and costs (including but not limited to, any remediation, corrective action, response, removal or remedial action, or investigation, operations and maintenance or monitoring costs, for personal injury or property damages, real or personal) of any kind whatsoever, pursuant to any environmental law as a result of this Indenture, the Intercreditor Agreement, the Security Documents or any actions taken pursuant hereto or thereto.  Further, the parties hereto and the Holders hereby agree and acknowledge that in the exercise of its rights under this Indenture, the Intercreditor Agreement and the Security Documents, the Collateral Agent may hold or obtain indicia of ownership primarily to protect the security interest of the Collateral Agent in the Collateral and that any such actions taken by the Collateral Agent shall not be construed as or otherwise constitute any participation in the management of such Collateral.

(s)      Upon the receipt by the Collateral Agent of a written request of the Issuer signed by two Officers (a "*Security Document Order*"), the Collateral Agent is hereby authorized to execute and enter into, and shall execute and enter into, without the further consent of any Holder or the Trustee, any Security Document to be executed after the Issue Date.  Such Security Document Order shall (i) state that it is being delivered to the Collateral Agent pursuant to, and is a Security Document Order referred to in, this Section 10.09(s), and (ii) instruct the Collateral Agent to execute and enter into such Security Document.  Any such execution of a Security Document shall be at the direction and expense of the Issuer, upon delivery to the Collateral Agent of an Officers' Certificate and Opinion of Counsel stating that all conditions precedent to the execution and delivery of the Security Document have been satisfied.  The Holders, by their acceptance of the Notes, hereby authorize and direct the Collateral Agent to execute such Security Documents.

-112-

(t)        Subject to the provisions of the applicable Security Documents and the Inter-creditor Agreement, each Holder, by acceptance of the Notes, agrees that the Collateral Agent shall ex-ecute and deliver the Intercreditor Agreement and the Security Documents to which it is a party and all agreements, documents and instruments incidental thereto, and act in accordance with the terms thereof. For the avoidance of doubt, the Collateral Agent shall have no discretion under this Indenture, the Inter-creditor Agreement or the Security Documents and shall not be required to make or give any determina-tion, consent, approval, request or direction without the written direction of the Holders of a majority in aggregate principal amount of the then outstanding Notes or the Trustee, as applicable.

(u)        After the occurrence of an Event of Default, the Trustee may direct the Collateral Agent in connection with any action required or permitted by this Indenture, the Security Documents or the Intercreditor Agreement.

(v)        The Collateral Agent is authorized to receive any funds for the benefit of itself, the Trustee and the Holders distributed under the Security Documents or the Intercreditor Agreement and to the extent not prohibited under the Intercreditor Agreement, for turnover to the Trustee to make further distributions of such funds to itself, the Trustee and the Holders in accordance with the provisions of Sec-tion 6.10 hereof and the other provisions of this Indenture.

(w)        In each case that Collateral Agent may or is required hereunder or under any oth-er Security Document or the Intercreditor Agreement to take any action (an "*Action*"), including without limitation to make any determination, to give consents, to exercise rights, powers or remedies, to release or sell Collateral or otherwise to act hereunder or under the Security Documents or the Intercreditor Agreement, the Collateral Agent may seek direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes.  The Collateral Agent shall not be liable with respect to any Action taken or omitted to be taken by it in accordance with the direction from the Holders of a majority in ag-gregate principal amount of the then outstanding Notes.  If the Collateral Agent shall request direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes with respect to any Action, the Collateral Agent shall be entitled to refrain from such Action unless and until the Col-lateral Agent shall have received direction from the Holders of a majority in aggregate principal amount of the then outstanding Notes, and the Collateral Agent shall not incur liability to any Person by reason of so refraining.

(x)        Notwithstanding anything to the contrary in this Indenture, the Security Docu-ments or the Intercreditor Agreement, in no event shall the Collateral Agent be responsible for, or have any duty or obligation with respect to, the recording, filing, registering, perfection, protection or mainten-ance of the security interests or Liens intended to be created by this Indenture, the Security Documents or the Intercreditor Agreement (including without limitation the filing or continuation of any UCC financing or continuation statements or similar documents or instruments), nor shall the Collateral Agent be respon-sible for, and the Collateral Agent makes no representation regarding, the validity, effectiveness or priori-ty of any of the Security Documents or the security interests or Liens intended to be created thereby.

(y)        Before the Collateral Agent acts or refrains from acting in each case at the re-quest or direction of the Issuer or the Guarantors, it may require an Officers' Certificate and an Opinion of Counsel, which shall conform to the provisions of Section 13.05 hereof.  The Collateral Agent shall not be liable for any action it takes or omits to take in good faith in reliance on such certificate or opinion.

(z)        Notwithstanding anything to the contrary contained herein, the Collateral Agent shall act pursuant to the instructions of the secured parties solely with respect to the Security Documents and the Collateral.

-113-

Section 10.10    Designations.

Except as provided in the next sentence, for purposes of the provisions hereof and the Intercreditor Agreement requiring the Issuer to designate Indebtedness for the purposes of the terms "First Priority Obligations," "Revolving Credit Obligations," "First Lien Note Obligations", "Second Priority Obligations" or any other such designations hereunder or under the Intercreditor Agreement, any such designation shall be sufficient if the relevant designation is set forth in writing, signed on behalf of the Issuer by an Officer and delivered to the Trustee, the Collateral Agent, the First Lien Trustee, the collateral agent under the First Lien Notes and the collateral agent under the Credit Agreement.  For all purposes of the Intercreditor Agreement, the Issuer hereby designates the Obligations pursuant to the Credit Agreement and First Lien Notes as "First Priority Obligations."

ARTICLE 11

GUARANTEES

Section 11.01    Guarantee.

Subject to this Article 11, each of the Guarantors hereby, jointly and severally, fully and unconditionally guarantees to each Holder of a Note authenticated and delivered by the Trustee and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Issuer hereunder or thereunder, that:  (a) the principal of, interest, premium and Additional Interest, if any, on the Notes shall be promptly paid in full when due, whether, by acceleration, redemption or otherwise, and interest on the overdue principal of and interest on the Notes, if any, if lawful, and all other obligations of the Issuer to the Holders or the Trustee or the Collateral Agent hereunder or thereunder shall be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and (b) in case of any extension of time of payment or renewal of any Notes or any of such other obligations, that same shall be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by acceleration or otherwise.  Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors shall be jointly and severally obligated to pay the same immediately.  Each Guarantor agrees that this is a guarantee of payment and not a guarantee of collection.

The Guarantors hereby agree that their obligations hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder of the Notes with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor.  Each Guarantor hereby waives diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenants that this Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and this Indenture.

Each Guarantor also agrees to pay any and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee or any Holder in enforcing any rights under this Section 11.01.

If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid either to the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, shall be reinstated in full force and effect.

-114-

Each Guarantor agrees that it shall not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby until payment in full of all obligations guaranteed hereby.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 hereof for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6 hereof, such obligations (whether or not due and payable) shall forthwith become due and payable by the Guarantors for the purpose of this Guarantee.  The Guarantors shall have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantees.

Each Guarantee shall remain in full force and effect and continue to be effective should any petition be filed by or against the Issuer for liquidation, reorganization, should the Issuer become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of the Issuer's assets, and shall, to the fullest extent permitted by law, continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Notes are, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee on the Notes or Guarantees, whether as a "voidable preference," "fraudulent transfer" or otherwise, all as though such payment or performance had not been made.  In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Notes shall, to the fullest extent permitted by law, be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

In case any provision of any Guarantee shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

The Guarantee issued by any Guarantor shall be a general senior secured obligation of such Guarantor and shall be *pari passu* in right of payment with all existing and future senior Indebtedness of such Guarantor, if any.

Each payment to be made by a Guarantor in respect of its Guarantee shall be made without set-off, counterclaim, reduction or diminution of any kind or nature.

Notwithstanding anything to the contrary, any direct or indirect parent company of the Issuer may guarantee the Notes and become a Guarantor hereunder.

Section 11.02    <u>Limitation on Guarantor Liability</u>.

Each Guarantor, and by its acceptance of Notes, each Holder, hereby confirms that it is the intention of all such parties that the Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee.  To effectuate the foregoing intention, the Trustee, the Holders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor shall be limited to the maximum amount as will, after giving effect to such maximum amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under this Article 11, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent conveyance or fraudulent transfer under applicable law. Each Guarantor that makes a payment

-115-

under its Guarantee shall be entitled upon payment in full of all guaranteed obligations under this Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

Section 11.03    Execution and Delivery.

To evidence its Guarantee set forth in Section 11.01 hereof, each Guarantor hereby agrees that this Indenture or any supplemental indenture with respect hereto shall be executed on behalf of such Guarantor by its President, one of its Vice Presidents or one of its Assistant Vice Presidents.

Each Guarantor hereby agrees that its Guarantee set forth in Section 11.01 hereof shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

If an Officer whose signature is on this Indenture or any supplemental indenture with respect hereto no longer holds that office at the time the Trustee authenticates the Note, the Guarantee shall be valid nevertheless.

The delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

If required by Section 4.15 hereof, the Issuer shall cause any newly created or acquired Restricted Subsidiary to comply with the provisions of Section 4.15 hereof and this Article 11, to the extent applicable.

Section 11.04    Subrogation.

Each Guarantor shall be subrogated to all rights of Holders of Notes against the Issuer in respect of any amounts paid by any Guarantor pursuant to the provisions of Section 11.01 hereof; *provided* that, if an Event of Default has occurred and is continuing, no Guarantor shall be entitled to enforce or receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by the Issuer under this Indenture or the Notes shall have been paid in full.

Section 11.05    Benefits Acknowledged.

Each Guarantor acknowledges that it shall receive direct and indirect benefits from the financing arrangements contemplated by this Indenture and that the guarantee and waivers made by it pursuant to its Guarantee are knowingly made in contemplation of such benefits.

Section 11.06    Release of Guarantees.

A Guarantee by a Guarantor shall be automatically and unconditionally released and discharged upon:

(a)    any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or all or substantially all the assets of such Guarantor which sale, exchange or transfer is made in compliance with the applicable provisions of this Indenture;

-116-

(b)      the release or discharge of the guarantee by such Guarantor of all First Lien Obligations or such other guarantee that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c)      the proper designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in compliance with the applicable provisions of this Indenture; or

(d)      the Issuer exercising its Legal Defeasance option or Covenant Defeasance option in accordance with Article 8 hereof or the Issuer's obligations under this Indenture being discharged in accordance with Article 12 hereof.

## ARTICLE 12

## SATISFACTION AND DISCHARGE

Section 12.01    <u>Satisfaction and Discharge</u>.

This Indenture shall be discharged and shall cease to be of further effect as to all Notes, when either:

(1)      all Notes theretofore authenticated and delivered, except lost, stolen or destroyed Notes which have been replaced or paid and Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Trustee for cancellation; or

(2)      (A) all Notes not theretofore delivered to the Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, shall become due and payable within one year or are to be called for redemption and redeemed within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Issuer and the Issuer or any Guarantor shall irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders of the Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as shall be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation for principal amount, premium, if any, and (without duplication) accrued interest to the date of maturity or redemption, as the case may be;

(B)      no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to this Indenture or the Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit shall not result in a breach or violation of, or constitute a default under any First Lien Obligations or any other material agreement or instrument (other than this Indenture) to which the Issuer or any Guarantor is a party or by which the Issuer or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(C)      the Issuer has paid or caused to be paid all sums payable by it under this Indenture; and

-117-

100432088 v3

(D)    the Issuer has delivered irrevocable instructions to the Trustee to apply the deposited money toward the payment of the Notes or the Redemption Date, as the case may be.

In addition, the Issuer must deliver an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

Notwithstanding the satisfaction and discharge of this Indenture, if money shall have been deposited with the Trustee pursuant to subclause (A) of clause (2) of this Section 12.01, the provisions of Section 12.02 and Section 8.06 hereof shall survive.

Section 12.02    Application of Trust Money.

Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal (and premium and Additional Interest, if any) or interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and any Guarantor's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; *provided* that if the Issuer has made any payment of principal of, premium and Additional Interest, if any, or interest on any Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

ARTICLE 13

MISCELLANEOUS

Section 13.01    Trust Indenture Act Controls.

Except as expressly provided for herein prior to the qualification of this Indenture under the Trust Indenture Act, if any provision of this Indenture limits, qualifies or conflicts with the duties imposed by Trust Indenture Act Section 318(c), the imposed duties shall control.

Section 13.02    Notices.

Any notice or communication by the Issuer, any Guarantor or the Trustee to the others is duly given if in writing and delivered in person or mailed by first-class mail (registered or certified, return receipt requested), fax or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer and/or any Guarantor:

c/o American Media, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

If to the Trustee or Collateral Agent:

Wilmington Trust FSB, as Trustee and Collateral Agent:
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Fax No.: (612) 217-5651
Attention: Corporate Client Services

The Issuer, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications (other than those sent to Holders) shall be deemed to have been duly given: at the time delivered by hand, if personally delivered; five calendar days after being deposited in the mail, postage prepaid, if mailed by first-class mail; when receipt acknowledged, if faxed; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery; *provided* that any notice or communication delivered to the Trustee shall be deemed delivered upon actual receipt thereof.

Any notice or communication to a Holder shall be mailed by first-class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar.  Any notice or communication shall also be so mailed to any Person described in Trust Indenture Act Section 313(c), to the extent required by the Trust Indenture Act.  Failure to mail a notice or communication to a Holder or any defect in it shall not affect its sufficiency with respect to other Holders.

If a notice or communication is mailed in the manner provided above within  the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it shall mail a copy to the Trustee and each Paying Agent at the same time.

Section 13.03    Communication by Holders of Notes with Other Holders of Notes.

Holders may communicate pursuant to Trust Indenture Act Section 312(b) with other Holders with respect to their rights under this Indenture or the Notes.  The Issuer, the Trustee, the Registrar and anyone else shall have the protection of Trust Indenture Act Section 312(c).

Section 13.04    Certificate and Opinion as to Conditions Precedent.

Upon any request or application by the Issuer or any of the Guarantors to the Trustee to take any action under this Indenture or the Notes, the Issuer or such Guarantor, as the case may be, shall furnish to the Trustee:

        (a)       An Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture or the Notes, relating to the proposed action have been satisfied; and

        (b)       An Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which shall include the statements set forth in Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 13.05    <u>Statements Required in Certificate or Opinion</u>.

        Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture or the Notes (other than a certificate provided pursuant to Section 4.04 hereof or Trust Indenture Act Section 314(a)(4)) shall comply with the provisions of Trust Indenture Act Section 314(e) and shall include:

        (a)       a statement that the Person making such certificate or opinion has read such covenant or condition;

        (b)       a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

        (c)       a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with (and, in the case of an Opinion of Counsel, may be limited to reliance on an Officers' Certificate as to matters of fact); and

        (d)       a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with.

Section 13.06    <u>Rules by Trustee and Agents</u>.

        The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 13.07    <u>No Personal Liability of Directors, Officers, Employees and Stockholders</u>.

        No director, officer, employee, incorporator or stockholder, member or limited partner of the Issuer or any Guarantor or any of their parent companies shall have any liability for any obligations of the Issuer or the Guarantors under the Notes, the Guarantees, the Security Documents, the Intercreditor Agreement or this Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 13.08    <u>Governing Law</u>.

        THIS INDENTURE, THE NOTES AND ANY GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

100432088 v3

Section 13.09    Waiver of Jury Trial.

EACH OF THE ISSUER, THE GUARANTORS AND THE TRUSTEE HEREBY IR-REVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.10    Force Majeure.

In no event shall the Trustee be responsible or liable for any failure or delay in the per-formance of its obligations under this Indenture arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interrup-tions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

Section 13.11    No Adverse Interpretation of Other Agreements.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Issuer or its Restricted Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 13.12    Successors.

All agreements of the Issuer in this Indenture and the Notes shall bind its successors.  All agreements of the Trustee in this Indenture shall bind its successors.  All agreements of each Guarantor in this Indenture shall bind its successors, except as otherwise provided in Section 11.06 hereof.

Section 13.13    Severability.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenfor-ceable, the validity, legality and enforceability of the remaining provisions shall not in any way be af-fected or impaired thereby.

Section 13.14    Counterpart Originals.

The parties may sign any number of copies of this Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

Section 13.15    Table of Contents, Headings, etc.

The Table of Contents, Cross-Reference Table and headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and shall in no way modify or restrict any of the terms or provisions hereof.

Section 13.16    Qualification of Indenture.

The Issuer and the Guarantors shall qualify this Indenture under the Trust Indenture Act in accordance with the terms and conditions of the Registration Rights Agreement and shall pay all rea-sonable costs and expenses (including attorneys' fees and expenses for the Issuer, the Guarantors and the Trustee) incurred in connection therewith, including, but not limited to, costs and expenses of qualifica-

-121-

tion of this Indenture and the Notes and printing this Indenture and the Notes.  The Trustee shall be en-
titled to receive from the Issuer and the Guarantors any such Officers' Certificates, Opinions of Counsel
or other documentation as it may reasonably request in connection with any such qualification of this In-
denture under the Trust Indenture Act.

Section 13.17    <u>Direction by Holders to Enter into Security Documents and the
Intercreditor Agreement</u> .

By accepting a Note, each Holder is deemed to have authorized and directed the Trustee
and the Collateral Agent, as applicable, to enter into the Security Documents and the Intercreditor
Agreement.

[Signatures on following page]

-122-

100432088 v3

AMERICAN MEDIA, INC.

By: _____
      Name:
      Title:


AMERICAN MEDIA CONSUMER
ENTERTAINMENT, INC.
AMERICAN MEDIA CONSUMER MAGAZINE
GROUP, INC.
AMERICAN MEDIA DISTRIBUTION &
MARKETING GROUP, INC.
AMERICAN MEDIA MINI MAGS, INC.
AMERICAN MEDIA NEWSPAPER GROUP, INC.
AMERICAN MEDIA PROPERTY GROUP, INC.
AMI DIGITAL COMMERCE, INC.[1]
COUNTRY MUSIC MEDIA GROUP, INC.
DISTRIBUTION SERVICES, INC.
GLOBE COMMUNICATIONS CORP.
GLOBE EDITORIAL, INC.
MIRA! EDITORIAL, INC.
NATIONAL ENQUIRER, INC.
NATIONAL EXAMINER, INC.
STAR EDITORIAL, INC.
WEIDER PUBLICATIONS, LLC


By: _____
      Name:
      Title:

---

[1] Newly formed subsidiary.

S-1

WILMINGTON TRUST FSB,
as Trustee and Collateral Agent

By: _____
Name:
Title:

100432088 v3

EXHIBIT A

[Face of Note]

[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]

[Insert the Regulation S Temporary Global Note Legend, if applicable pursuant to the provisions of the Indenture]

A-1

CUSIP  [                ]<sup>1</sup>

ISIN  [                ]

[RULE 144A][REGULATION S] [IAI][GLOBAL] NOTE

13½% Second Lien Senior Secured Notes due 2018

No. ___                                                                    [$_____]

AMERICAN MEDIA, INC.

promises to pay to [Cede & Co.] or registered assigns, the principal sum [set forth on the Schedule of Exchanges of Interests in the Global Note or Increase/Decrease in the Principal Amount of the Global Note attached hereto] [of _____ United States Dollars] on June 15, 2018.

Interest Payment Dates:  June 15 and December 15

Record Dates:  June 1 and December 1

---

[1]    Rule 144A Note CUSIP: 02744L AC4
Rule 144A Note ISIN: US02744LAC46
Regulation S Note CUSIP: U02703 AA1
Regulation S Note ISIN: USU02703AA15
IAI Note CUSIP: 02744L AD2
IAI Note ISIN: US02744LAD29

A-2

IN WITNESS HEREOF, the Issuer has caused this instrument to be duly executed.

AMERICAN MEDIA, INC.

By: _____

     Name:

     Title:

This is one of the Notes referred to in the within-mentioned Indenture:

Dated:   [_____]

WILMINGTON TRUST FSB,
   as Trustee

By: _____

       Authorized Signatory

A-3

[Back of Note]

13½% Second Lien Senior Secured Notes due 2018

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.  References to "interest" shall also be deemed to be references to "Additional Interest," unless the context otherwise requires.

1.        INTEREST.  The references in this Note to the "*Issuer*" refers only to American Media, Inc., a Delaware corporation.  The Issuer promises to pay interest on the principal amount of this Note at the rate per annum shown above.  The Issuer will pay interest semiannually on June 15 and December 15 of each year, commencing on June 15, 2011, or if any such day is not a Business Day, on the next succeeding Business Day.  Interest on the Notes shall accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the issue date of the Notes.  Interest will be computed on the basis of a 360-day year comprised of twelve 30-day months.

2.        METHOD OF PAYMENT.  The Issuer shall pay interest on the Notes and Additional Interest, if any, to the Persons who are registered Holders of Notes at the close of business on the June 1 and December 1 (whether or not a Business Day), as the case may be, next preceding the Interest Payment Date, even if such Notes are canceled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest.  Payment of interest and Additional Interest, if any, may be made by check mailed to the Holders at their addresses set forth in the Register of the Holders, *provided* that [all payments of principal, premium, if any, and interest on this Notes will be made by wire transfer of immediately available funds to the accounts specified by the Holder or Holders thereof][2] [all payments of principal, premium, if any, and interest on, this Note will be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such Holder elects payment by wire transfer by giving written notice to the Trustee or the Paying Agent to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the Trustee may accept in its discretion)][3].  Such payment shall be in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts.

3.        PAYING AGENT AND REGISTRAR.  Initially, Wilmington Trust FSB, the Trustee under the Indenture, shall act as Paying Agent and Registrar.  The Issuer may change any Paying Agent or Registrar without notice to the Holders.  The Issuer or any of its Subsidiaries may act in any such capacity.

4.        INDENTURE.  The Issuer issued the Notes under an Indenture, dated as of December [ ], 2010 (as amended, modified or supplemented from time to time, the "*Indenture*"), among American Media, Inc., the Guarantors named therein, the Trustee and the Collateral Agent.  This Note is one of a duly authorized issue of notes of the Issuer designated as its 13½% Second Lien Senior Secured Notes due 2018.  The Issuer shall be entitled to issue Additional Notes pursuant to Section 2.01 and 4.09

---

[2]        Applicable if this Note is represented by a Global Note registered in the name of or held by DTC or its nominee on the relevant record date.

[3]        Applicable if this Note is represented by a Definitive Note.

A-4

of the Indenture.  The terms of the Notes include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939, as amended (the "*Trust Indenture Act*").  The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a statement of such terms.  To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

5.    OPTIONAL REDEMPTION.

(a)    At any time and from time to time prior to December 15, 2013, the Issuer may redeem up to 35% of the original principal amount of the Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 113.500% of the principal amount thereof plus accrued and unpaid interest and Additional Interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* that

(1)    at least 65% of the original principal amount of the Notes remains outstanding after each such redemption; and

(2)    the redemption occurs within 90 days after the closing of such Equity Offering.

(b)    At any time prior to December 15, 2013 the Issuer may redeem all or a part of the Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Notes, at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest and Additional Interest thereon, if any, to the Redemption Date, subject to the rights of Holders of Notes on the relevant record date to receive interest due on the relevant interest payment date.

(c)    On or after December 15, 2013, the Issuer may redeem the Notes, in whole or in part, upon notice as described in Section 3.03 of the Indenture, at the redemption prices (expressed as percentages of the principal amount of the Notes to be redeemed) set forth below plus accrued and unpaid interest, if any, to the Redemption Date, subject to the right of Holders of Notes of record on the relevant Record Date to receive interest due on the relevant Interest Payment Date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2013 | 110.125% |
| 2014 | 106.750% |
| 2015 | 103.375% |
| 2016 and thereafter | 100.000% |

Any redemption pursuant to this paragraph 5 shall be made pursuant to the provisions of Sections 3.01 through 3.06 of the Indenture.

6.    MANDATORY REDEMPTION.  The Issuer shall not be required to make mandatory redemption or sinking fund payments with respect to the Notes.  However, the Issuer may be required to offer to purchase the Notes pursuant to Sections 4.10 and 4.14 of the Indenture.  The Issuer may at any time and from time to time purchase Notes in the open market or otherwise.

7.    NOTICE OF REDEMPTION.  Subject to Section 3.03 of the Indenture, notice of redemption shall be mailed by first-class mail at least 30 days but not more than 60 days before the Redemption Date (except that redemption notices may be mailed more than 60 days prior to a Redemption

A-5

Date if the notice is issued in connection with Article 8 or Article 13 of the Indenture) to each Holder whose Notes are to be redeemed at its registered address. Notes shall be redeemed in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof; no Notes of $2,000 or less may be redeemed in part unless all of the Notes held by a Holder are to be redeemed. On and after the Redemption Date interest ceases to accrue on Notes or portions thereof called for redemption.

8.      OFFERS TO REPURCHASE.

(a)      Upon the occurrence of a Change of Control, the Issuer shall make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part of each Holder's Notes at a purchase price equal to 101% of the aggregate principal amount thereof plus accrued and unpaid interest and Additional Interest thereon, if any, to the date of purchase (the "*Change of Control Payment*"). The Change of Control Offer shall be made in accordance with Section 4.14 of the Indenture.

(b)      Upon the occurrence of Asset Sales, the Issuer may be obligated pursuant to Section 4.10 of the Indenture to make offers to purchase Notes and redeem other Permitted Second Lien Obligations of the Issuer with a portion of the Net Proceeds of such Asset Sales at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and Additional Interest, if any, to the date of purchase.

9.      DENOMINATIONS, TRANSFER, EXCHANGE. The Notes are issued initially in registered form without coupons in minimum denominations of $2,000 and integral multiples of $1,000 in excess thereof. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registrar and the Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuer may require a Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuer need not exchange or register the transfer of any Note or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issuer need not exchange or register the transfer of any Notes for a period of 15 days before a selection of Notes to be redeemed.

10.      PERSONS DEEMED OWNERS. The registered Holder of a Note may be treated as its owner for all purposes.

11.      AMENDMENT, SUPPLEMENT AND WAIVER. The Indenture, the Security Documents, the Intercreditor Agreement, the Guarantees or the Notes may be amended or supplemented as provided in the Indenture.

12.      DEFAULTS AND REMEDIES. The Events of Default relating to the Notes are defined in Section 6.01 of the Indenture. If any Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare the principal, premium, if any, interest and any other monetary obligations on all the then outstanding Notes to be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising from certain events of bankruptcy or insolvency, all outstanding Notes shall become due and payable immediately without further action or notice. Holders may not enforce the Indenture, the Notes or the Guarantees except as provided in the Indenture. Subject to certain limitations, Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold from Holders of the Notes notice of any continuing Default (except a Default relating to the payment of principal, premium, if any, Additional Interest, if any, or, without duplication, interest) if it determines that withholding notice is in their interest. The Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the Holders of all of the Notes waive any existing Default or and its consequences under the Indenture except

A-6

a continuing Default in payment of the principal of, premium, if any, Additional Interest, if any, or interest on, any of the Notes held by a non-consenting Holder.  The Issuer is required to deliver to the Trustee annually a statement regarding compliance with the Indenture, and the Issuer is required within five (5) Business Days after becoming aware of any Default, to deliver to the Trustee a statement specifying such Default and what action the Issuer is taking or proposes to take with respect thereto.

13.    AUTHENTICATION.  This Note shall not be entitled to any benefit under the Indenture or be valid or obligatory for any purpose until authenticated by the manual signature of the Trustee.

14.    ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.  In addition to the rights provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes shall have all the rights set forth in the Registration Rights Agreement, dated as of December [ ], 2010, among the Issuer, the Guarantors, the Backstop Parties and the other Holders named on the signature pages thereof (the "*Registration Rights Agreement*"), including the right to receive Additional Interest (as defined in the Registration Rights Agreement).

15.    GOVERNING LAW.  THE INDENTURE, THIS NOTE AND ANY GUARANTEE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

16.    CUSIP NUMBERS.  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Issuer has caused CUSIP numbers to be printed on the Notes and the Trustee may use CUSIP numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

The Issuer shall furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registration Rights Agreement.  Requests may be made to the Issuer at the following address:

American Media, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

A-7

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____
                 (Insert assignee's legal name)

_____
(Insert assignee's Soc. Sec. or tax I.D. no.)
_____
_____
_____
_____
(Print or type assignee's name, address and zip code)

and irrevocably appoint _____

to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature: _____
(Sign exactly as your name appears on
the face of this Note)

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other
signature guarantor acceptable to the Trustee).

A-8

## OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.10 or 4.14 of the Indenture, check the appropriate box below:

[  ] Section 4.10          [  ] Section 4.14

If you want to elect to have only part of this Note purchased by the Issuer pursuant to Section 4.10 or Section 4.14 of the Indenture, state the amount you elect to have purchased:

$_____

Date: _____

Your Signature: _____
                (Sign exactly as your name appears on
                the face of this Note)

Tax Identification No.: _____

Signature Guarantee*: _____

* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

A-9

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE OR
INCREASE/DECREASE IN THE PRINCIPAL AMOUNT OF THE GLOBAL NOTE*

The initial outstanding principal amount of this Global Note is $_____.  The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of a part of another Global or Definitive Note for an interest in this Global Note or increase/decrease in the principal amount of this Global Note, have been made:

| Date of Exchange or Increase/Decrease | Amount of decrease in Principal Amount | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease or increase | Signature of authorized officer of Trustee or Custodian |
| --- | --- | --- | --- | --- |
| | | | | |

_____
*This schedule should be included only if the Note is issued in global form.

A-10

100432088 v3

<u>EXHIBIT B</u>

FORM OF CERTIFICATE OF TRANSFER

American Media, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Fax No.:  (612) 217-5651
Attention: Corporate Client Services

Re:  13½% Second Lien Senior Secured Notes due 2018

Reference is hereby made to the Indenture, dated as of December [ ], 2010 (the "<u>Inden-ture</u>"), among American Media, Inc., the Guarantors named therein, the Collateral Agent and the Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "<u>Transferor</u>") owns and proposes to transfer the Note[s] or inter-est in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "<u>Transfer</u>"), to _____ (the "<u>Transferee</u>"), as further specified in Annex A hereto.  In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1.      [  ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE 144A GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO RULE 144A. The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Se-curities Act of 1933, as amended (the "<u>Securities Act</u>"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transac-tion meeting the requirements of Rule 144A and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States.

2.      [  ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN THE REGULATION S GLOBAL NOTE OR A DEFINITIVE NOTE PURSUANT TO REGULATION S.  The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasona-bly believed and believes that the Transferee was outside the United States or (y) the transaction was ex-

B-1

ecuted in, on or through the facilities of a designated offshore securities market and neither such Transfe-ror nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the Restricted Period, the transfer is not being made to a U.S. Person or for the account or benefit of a U.S. Person.  Upon consummation of the proposed transfer in accor-dance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall be sub-ject to the restrictions on Transfer enumerated in the Indenture and the Securities Act.

3.    [ ] CHECK AND COMPLETE IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE OR A RESTRICTED DEFINI-TIVE NOTE PURSUANT TO ANY PROVISION OF THE SECURITIES ACT OTHER THAN RULE 144A OR REGULATION S.  The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and pursuant to and in accordance with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that (check one):

(a)    [ ] such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b)    [ ] such Transfer is being effected to the Issuer or a subsidiary thereof;

or

(c)    [ ] such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance with the prospectus delivery requirements of the Se-curities Act;

or

(d)    [ ] such Transfer is being effect to an institutional "accredited investor" (as de-fined in Rule 501(a)(1),(2),(3) or (7) under the Securities Act of 1933) that has furnished to the Trustee a signed letter containing certain representations and agreements, in the form which is at-tached to the Indenture.

4.    [ ] CHECK IF TRANSFEREE WILL TAKE DELIVERY OF A BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE OR OF AN UNRESTRICTED DEFINITIVE NOTE.

(a)    [ ] CHECK IF TRANSFER IS PURSUANT TO RULE 144. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon con-summation of the proposed Transfer in accordance with the terms of the Indenture, the transferred benefi-cial interest or Definitive Note shall no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

B-2

(b)　　[ ] CHECK IF TRANSFER IS PURSUANT TO REGULATION S. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c)　　[ ] CHECK IF TRANSFER IS PURSUANT TO OTHER EXEMPTION.  (i) The Transfer is being effected pursuant to and in compliance with an exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act.  Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note shall not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Restricted Definitive Notes and in the Indenture.

B-3

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

[Insert Name of Transferor]

By: _____

Name:

Title:

Dated: _____

B-4

ANNEX A TO CERTIFICATE OF TRANSFER

1.    The Transferor owns and proposes to transfer the following:

[CHECK ONE OF (a) OR (b)]

(a)    [  ] a beneficial interest in the:

(i)    [  ] 144A Global Note (CUSIP [ ]), or

(ii)    [  ] Regulation S Global Note (CUSIP [ ]), or

(iii)    [  ] IAI Global Note (CUSIP [ ])), or

(b)    [  ] a Restricted Definitive Note.

2.    After the Transfer the Transferee shall hold:

[CHECK ONE]

(a)    [  ] a beneficial interest in the:

(i)    [  ] 144A Global Note (CUSIP [ ]), or

(ii)    [  ] Regulation S Global Note (CUSIP [ ]), or

(iii)    [  ] IAI Global Note (CUSIP [ ]), or

(iv)    [  ] Unrestricted Global Note; or

(b)    [  ] a Restricted Definitive Note; or

(c)    [  ] an Unrestricted Definitive Note,
in accordance with the terms of the Indenture.

B-5

<u>EXHIBIT C</u>

FORM OF CERTIFICATE OF EXCHANGE

American Media, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Fax No.: (612) 217-5651
Attention: Corporate Client Services

Re:  13½% Second Lien Senior Secured Notes due 2018

Reference is hereby made to the Indenture, dated as of December [ ], 2010 (the "<u>Inden-ture</u>"), among American Media, Inc., the Guarantors named therein, the Collateral Agent and the Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____ (the "<u>Owner</u>") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "<u>Exchange</u>").  In connection with the Exchange, the Owner hereby certifies that:

1)      EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL IN-TERESTS IN A RESTRICTED GLOBAL NOTE FOR UNRESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN AN UNRESTRICTED GLOBAL NOTE

a)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RE-STRICTED GLOBAL NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOB-AL NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own ac-count without transfer, (ii) such Exchange has been effected in compliance with the transfer re-strictions applicable to the Global Notes and pursuant to and in accordance with the United States Securities Act of 1933, as amended (the "<u>Securities Act</u>"), (iii) the restrictions on transfer con-tained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

b)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RE-STRICTED GLOBAL NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In connection with

C-1

the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

c)      [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN AN UNRESTRICTED GLOBAL NOTE.  In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

d)      [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO UNRESTRICTED DEFINITIVE NOTE.  In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2)      EXCHANGE OF RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES FOR RESTRICTED DEFINITIVE NOTES OR BENEFICIAL INTERESTS IN RESTRICTED GLOBAL NOTES

a)      [ ] CHECK IF EXCHANGE IS FROM BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE TO RESTRICTED DEFINITIVE NOTE.  In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued shall continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

b)      [ ] CHECK IF EXCHANGE IS FROM RESTRICTED DEFINITIVE NOTE TO BENEFICIAL INTEREST IN A RESTRICTED GLOBAL NOTE.  In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] [ ] 144A Global Note [ ] Regulation S Global Note [ ] IAI Global Note, with an equal prin-

C-2

cipal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Own-er's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accor-dance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States.  Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued shall be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note and in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer and are dated _____.

[Insert Name of Transferor]

By:    _____
       Name:
       Title:

Dated: _____

C-3

EXHIBIT D

[FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]

SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of [          ], among [GUARANTOR] (the "Guaranteeing Subsidiary"), AMERICAN MEDIA, INC., a Delaware corporation (the "Issuer") and WILMINGTON TRUST FSB, as trustee and collateral agent under the indenture referred to below (collectively in such capacities, the "Trustee").

W I T N E S S E T H:

WHEREAS, the Issuer has heretofore executed and delivered to the Trustee an indenture (the "Indenture"), dated as of December [ ], 2010, providing for the initial issuance of [up to $140,000,000] aggregate principal amount of 13½% Second Lien Senior Secured Notes due 2018 (the "Notes");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein and under the Indenture (the "Guarantee"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties mutually covenant and agree for the equal and ratable benefit of the Holders of the Notes as follows:

(1)    Capitalized Terms.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

(2)    Agreement to Guarantee.  The Guaranteeing Subsidiary hereby agrees as follows:

(a)    The Guaranteeing Subsidiary hereby becomes a party to the Indenture as a Guarantor and as such will have all of the rights and be subject to all of the obligations and agreements of a Guarantor under the Indenture.  The Guaranteeing Subsidiary agrees to be bound by all of the provisions of the Indenture applicable to a Guarantor and to perform all of the obligations and agreements of a Guarantor under the Indenture.

(b)    The Guaranteeing Subsidiary agrees, on a joint and several basis with all the existing Guarantors, to fully, unconditionally and irrevocably Guarantee to each Holder of the Notes and the Trustee the Obligations pursuant to Article 11 of the Indenture on a senior basis.

(3)    Execution and Delivery.  The Guaranteeing Subsidiary agrees that the Guarantee shall remain in full force and effect notwithstanding the absence of the endorsement of any notation of such Guarantee on the Notes.

D-1

100432088 v3

(4)    <u>Governing Law</u>.  THIS SUPPLEMENTAL INDENTURE SHALL BE GO-VERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK

(5)    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

(6)    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction hereof.

(7)    <u>The Trustee</u>.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing Subsidiary.

D-2

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed, all as of the date first above written.

[GUARANTEEING SUBSIDIARY]

By: _____
     Name:
     Title:

WILMINGTON TRUST FSB, as Trustee and Collateral
     Agent

By: _____
     Name:
     Title:

Acknowledged by:

AMERICAN MEDIA, INC.

By: _____
     Name:
     Title:

D-3

100432088 v3

<u>EXHIBIT E</u>

## FORM OF CERTIFICATE FROM
## ACQUIRING ACCREDITED INVESTOR

American Media, Inc.
1000 American Media Way
Boca Raton, FL  33464-1000
Fax No.:  (561) 989-1224
Attention:  General Counsel

Wilmington Trust FSB, as Trustee and Registrar
50 South Sixth Street, Suite 1290
Drop code 7100
Minneapolis, MN 55402-1544
Fax No.:  (612) 217-5651
Attention: Corporate Client Services

Re:  13½% Second Lien Senior Secured Notes due 2018

Reference is hereby made to the Indenture, dated as of December [ ], 2010 (the "Indenture"), among American Media, Inc., a Delaware corporation (the "Company"), the Guarantors named therein and Wilmington Trust FSB, as trustee and collateral agent.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase of $_____ aggregate principal amount of:

(i)    ☐  a beneficial interest in a Global Note, or

(ii)    ☐  a Definitive Note,

we confirm that:

1.    We understand that any subsequent transfer of the Notes or any interest therein is subject to certain restrictions and conditions set forth in the Indenture, and the undersigned agrees to be bound by, and not to resell, pledge or otherwise transfer the Notes or any interest therein except in compliance with, such restrictions and conditions and the United States Securities Act of 1933, as amended (the "Securities Act").

2.    We understand that the offer and sale of the Notes have not been registered under the Securities Act, and that the Notes and any interest therein may not be offered or sold except as permitted in the following sentence.  We agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, that if we should sell the Notes or any interest therein, we will do so only (a) to the Company (b) so long as the Notes are eligible for resale pursuant to Rule 144A under the Securities Act to a person whom we reasonably believe is a qualified institutional buyer within the meaning of Rule 144A purchasing for its own account or for the account of a qualified institutional buyer, in each

E-1

case, to whom notice is given that the offer, resale, pledge or other transfer is being made in reliance on Rule 144A, (c) to non-U.S. persons in offshore transactions in accordance with Rule 904 of Regulation S under the Securities Act, (d) pursuant to Rule 144 under the Securities Act, (e) pursuant to an effective registration statement under the Securities Act or (f) in any other transaction that does not require registration under the Securities Act, and we further agree to provide to any person purchasing the Definitive Note or beneficial interest in a Global Note from us in a transaction meeting the requirements of any of clauses (a) through (f) of this paragraph a notice advising such purchaser that resales thereof are restricted as stated herein.

3.      We understand that, on any proposed resale of the Notes or beneficial interest therein, we will be required to furnish to you and the Company such certifications, legal opinions and other information as you and the Company may reasonably require to confirm that the proposed sale complies with the foregoing restrictions.  We further understand that the Notes purchased by us will bear a legend to the foregoing effect.

4.      We are an institutional "accredited investor" (as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act) and have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or its investment.

5.      We are acquiring the Notes or beneficial interest therein purchased by us for our own account or for one or more accounts (each of which is an institutional "accredited investor") as to each of which we exercise sole investment discretion.

6.      We are acquiring a minimum principal amount of $250,000 of the Notes for investment purposes and not with a view to or for offer or sale in connection with any distribution in violation of the Securities Act.

You and the Company are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy to any interested party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____
[Insert Name of Transferor]

By:   _____
Name:
Title:

Dated: _____

E-2

## <u>EXHIBIT C</u>

**Purchase Agreement for New First Lien Notes**

AMO ESCROW CORPORATION
to be merged with and into
AMERICAN MEDIA OPERATIONS, INC.

$385,000,000 11-1/2% First Lien Senior Secured Notes due 2017

<u>Purchase Agreement</u>

November 16, 2010

J.P. Morgan Securities LLC
   As Representative of the
   several Initial Purchasers listed
   in Schedule I hereto
c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York  10179

Ladies and Gentlemen:

AMO Escrow Corporation, a Delaware corporation ("<u>Escrow Corporation</u>"), a newly formed wholly-owned, indirect, subsidiary of American Media Operations, Inc., a Delaware corporation (the "<u>Company</u>", which itself is a direct wholly-owned subsidiary of American Media, Inc., a Delaware corporation, "<u>AMI</u>"), proposes to issue and sell to the several initial purchasers listed on Schedule I hereto (the "<u>Initial Purchasers</u>") for whom you are acting as representative (the "<u>Representative</u>") $385,000,000 aggregate principal amount of 11-1/2% First Lien Senior Secured Notes due 2017 (the "<u>Notes</u>").  The Notes will be issued pursuant to an indenture to be dated as of December 1, 2010 (the "<u>Indenture</u>") between Escrow Corporation and Wilmington Trust Company, as trustee (the "<u>Trustee</u>"). On the Release Date (as defined below), the Company and the Guarantors (as defined below) will execute a joinder agreement in the form of Exhibit D hereto (the "<u>Joinder Agreement</u>") pursuant to which the Company and the Guarantors will become a party to this Agreement.

Escrow Corporation was created solely to issue the Notes and, upon execution and delivery of a supplemental indenture to the Indenture by the Company and the Guarantors (the "<u>Supplemental Indenture</u>"), to be dated as of the Release Date, will have its rights and obligations under the Notes and the Indenture assumed by the Company on the Release Date, as the successor obligor to the obligations under the Notes (the "<u>Escrow Assumption</u>") upon Escrow Corporation's merger with and into the Company.  Upon the satisfaction of the conditions set forth in the Escrow Agreement (as defined below) on the Release Date, the Notes and the Guarantees (as defined below) will be the senior secured obligations of the Company and the Guarantors, respectively.

Upon the satisfaction of the conditions set forth in the Escrow Agreement (as defined below), on the Release Date the Notes will be fully and unconditionally guaranteed (the "<u>Guarantees</u>") on a senior secured first priority basis, jointly and severally, by each of the Company's domestic subsidiaries listed on Schedule II hereto (the "<u>Subsidiary Guarantors</u>") and, subject to exceptions and limitations set forth in the Indenture, by any material domestic subsidiary of the Company formed or acquired after the Release Date that executes a supplemental indenture and an additional guarantee in accordance with the terms of the Indenture, and their respective successors and assigns (collectively with the Subsidiary Guarantors, the "<u>Guarantors</u>").

Holders of the Notes (including the Initial Purchasers and their direct and indirect transferees) will be entitled to the benefits of a registration rights agreement, the principal terms of which are described in the Time of Sale Information and the Offering Memorandum (the "<u>Registration Rights Agreement</u>"), between Escrow Corporation and the Representative, to be dated as of the Closing Date. Upon the Release Date, the Company and the Guarantors will become a party to the Registration Rights Agreement pursuant to a joinder agreement (the "<u>Registration Rights Agreement Joinder</u>"). The Registration Rights Agreement will provide that the Company and the Guarantors will agree to file one or more registration statements with the Securities and Exchange Commission (the "<u>Commission</u>") providing for the registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), of the Notes or the Exchange Securities (as defined in the Registration Rights Agreement).

Upon the satisfaction of the conditions set forth in the Escrow Agreement on the Release Date, the Notes and the Guarantees will be secured on a first priority basis, subject to Permitted Liens (as defined in the Indenture), by liens on the assets (the "<u>Collateral</u>") of the Company and the Guarantors that have been pledged on a first priority basis as collateral securing the Revolving Credit Facility (as defined below) and as more particularly described in the Time of Sale Information (as defined below) and documented by a pledge and security agreement dated the Release Date and other instruments evidencing or creating a security interest, collectively, the "<u>Security Documents</u>") in favor of Wilmington Trust Company, as collateral agent (in such capacity, the "<u>Notes Collateral Agent</u>"), for its benefit and the benefit of the Trustee and the holders of the Notes.

The Notes will be subject to the provisions of a first lien intercreditor agreement (as the same may be amended, supplemented or otherwise modified from time to time, the "<u>First Lien Intercreditor Agreement</u>"), dated as of the Release Date, by and among JPMorgan Chase Bank, N.A., as collateral agent under the Revolving Credit Facility (the "<u>Revolving Collateral Agent</u>") and the Notes Collateral Agent and acknowledged by the Company and the Guarantors.

In connection with the Company's plan of reorganization, (i) the Company and the Guarantors will enter into a senior secured revolving credit facility with JPMorgan Chase Bank, N.A., as administrative agent and revolving collateral agent, and the other agents and lenders party thereto (as amended, supplemented or otherwise modified from time to time, the "<u>Revolving Credit Facility</u>") and (ii) the Company will issue, and the Guarantors will guarantee, up to $140,000,000 in aggregate principal amount of Second Lien Senior Secured Notes due 2018, including any such Second Lien Secured Notes that will be issued by the Company on the Release Date in exchange for indebtedness of the Company existing as of the date hereof (the "<u>Second Lien Notes</u>") on the Release Date. The Notes and the Second Lien Notes will be subject to the provisions of a junior lien intercreditor agreement (as the same may be amended, supplemented or otherwise modified from time to time, the "<u>Junior Lien Intercreditor Agreement</u>" and together with the First Lien Intercreditor Agreement, the "<u>Intercreditor Agreements</u>"), dated as of the Release Date, by and among the Revolving Collateral Agent, the Notes Collateral Agent and the Collateral Agent for the holders of the Second Lien Notes and acknowledged by the Company and the Guarantors.

On the Closing Date, Escrow Corporation will enter into an escrow agreement (the "<u>Escrow Agreement</u>") with the Company, the Trustee and Wilmington Trust Company, as escrow agent (the "<u>Escrow Agent</u>"), pursuant to which Escrow Corporation will deposit, or cause to be deposited, with the Escrow Agent the cash proceeds received by Escrow Corporation from the sale of the Notes, and, on or prior to the Closing Date, the Company or Escrow Corporation shall deposit with the Escrow Agent an additional amount in cash or Escrow Investments (as defined in the Time of Sale Information and Offering Memorandum) (collectively, with any other property from time to time held by the Escrow Agent, the "<u>Escrow Property</u>") sufficient to redeem the Notes in cash at the redemption price applicable

-2-

to a Special Mandatory Redemption (as defined in the Time of Sale Information and the Offering Memorandum) (the "Escrow Redemption Amount").

The Escrow Property will be held by the Escrow Agent in an escrow account (the "Escrow Account") in accordance with the terms and provisions set forth in the Escrow Agreement, and released in accordance with the conditions set forth therein, including, but not limited to, consummation of the Plan (as defined in the Time of Sale Information), the effectiveness of the Revolving Credit Facility, the consummation of the Escrow Assumption, the execution and delivery of the Supplemental Indenture and the Registration Rights Agreement Joinder by the Company and the Guarantors and the execution and delivery of the Security Documents by the Company and the Guarantors, together with the satisfaction of the other conditions to the Release Date set forth in the Escrow Agreement (such date of release, the "Release Date").  Until the Escrow Property is so released, the Notes will be secured by a first-priority security interest in the Escrow Account and the Escrow Property pursuant to the Escrow Agreement.  If the Release Date does not occur by the earlier of (x) the date on which the Company determines in its sole discretion that the conditions to the Release Date cannot occur and (y) the 60th day after the issue date of the Notes, subject to extension for an additional 35 days on no more than one occasion in accordance with the terms of the Indenture (the "Outside Date"), Escrow Corporation will redeem (the "Redemption") the Notes at the Escrow Redemption Amount in accordance with the terms of the Indenture.  The Redemption will occur no later than 6 business days following the Outside Date (the "Redemption Date").

This Agreement, the Joinder Agreement, the Indenture, the Supplemental Indenture, the Notes, the Registration Rights Agreement, the Registration Rights Agreement Joinder, the Security Documents, the Intercreditor Agreement and the Escrow Agreement as entered into by Escrow Corporation, the Company, the Guarantors and others (to the extent a party thereto) are collectively hereinafter referred to herein as the "Transaction Documents."  The Joinder Agreement, the Supplemental Indenture, the Registration Rights Agreement Joinder, the Security Documents, the Guarantees and the Intercreditor Agreement as entered into by the Company, the Guarantors and others (to the extent a party thereto) on the Release Date, respectively, are hereinafter referred to collectively as the "Release Documents."

The Notes will be sold to the Initial Purchasers without being registered under the Securities Act, in reliance upon an exemption therefrom.  Escrow Corporation has prepared a preliminary offering memorandum dated November 10, 2010 (the "Preliminary Offering Memorandum") and will prepare an offering memorandum dated the date hereof (the "Offering Memorandum") setting forth information concerning Escrow Corporation, the Company and the Notes.  Copies of the Preliminary Offering Memorandum have been, and copies of the Offering Memorandum will be, delivered by the Company to the Initial Purchasers pursuant to the terms of this Agreement.  Escrow Corporation hereby confirms that it has authorized the use of the Preliminary Offering Memorandum, the other Time of Sale Information (as defined below) and the Offering Memorandum in connection with the offering and resale of the Notes by the Initial Purchasers in the manner contemplated by this Agreement.  Capitalized terms used but not defined herein shall have the meanings given to such terms in the Preliminary Offering Memorandum.

The Notes are being offered in contemplation of (a) the filing of the Company's Plan (as defined in the Time of Sale Information (as defined below)) with the U.S. Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (b) the Company and the Guarantors' ultimate restructuring and emergence from bankruptcy in accordance with the Plan as described in the Time of Sale Information (as defined below) and Offering Memorandum under the heading "Plan of reorganization."  The issuance and sale of the Notes and the various transactions contemplated and to be affected in accordance with the Plan are referred to herein as the "Transactions."

-3-

At or prior to the time when sales of the Notes were first made (the time when sales of the Notes were first made, the "Time of Sale"), the following information shall have been prepared (collectively, the "Time of Sale Information"):  the Preliminary Offering Memorandum, as supplemented and amended by the written communications listed on Schedule III hereto.

Escrow Corporation hereby confirms its agreement with the several Initial Purchasers concerning the purchase and resale of the Notes, as follows:

1.      Purchase and Resale of the Notes.

(a)      Escrow Corporation agrees to issue and sell the Notes to the several Initial Purchasers as provided in this Agreement and each Initial Purchaser, on the basis of the representations, warranties and agreements set forth herein and subject to the conditions set forth herein, agrees, severally and not jointly, to purchase from Escrow Corporation the respective principal amount of the Notes set forth opposite such Initial Purchaser's name in Schedule I hereto at a price equal to 98.5% of the principal amount thereof plus accrued interest, if any, from December 1, 2010 to the Closing Date.  On the date hereof, the Escrow Issuer shall pay to the Initial Purchasers, ratably in accordance with their respective amounts of Notes set forth on Schedule I hereto, an amount equal to $1,925,000 (such amount, the "Up Front Portion").  On the Closing Date, payment for the Notes shall be at the price set forth above plus a deferred discount of $3,850,000 (the "Deferred Discount").  Escrow Corporation will not be obligated to deliver any of the Notes except upon payment for all the Notes to be purchased as provided herein.

(b)      Escrow Corporation understands that the Initial Purchasers intend to offer the Notes for resale on the terms set forth in the Time of Sale Information.  Each Initial Purchaser, severally and not jointly, represents, warrants and agrees that:

(i)      it is a qualified institutional buyer within the meaning of Rule 144A under the Securities Act (a "QIB") and an accredited investor within the meaning of Rule 501(a) under the Securities Act;

(ii)      it has not solicited offers for, or offered or sold, and will not solicit offers for, or offer or sell, any of the Securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D under the Securities Act ("Regulation D") or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act; and

(iii)      it has not solicited offers for, or offered or sold, and will not solicit offers for, or offer or sell, any of the Securities as part of their initial offering except:

(A)      within the United States to persons whom it reasonably believes to be QIBs in transactions pursuant to Rule 144A under the Securities Act ("Rule 144A") and in connection with each such sale, it has taken or will take reasonable steps to ensure that the purchaser of the Securities is aware that such sale is being made in reliance on Rule 144A; or

(B)      in accordance with the restrictions set forth in Exhibit B hereto.

(c)      Each Initial Purchaser acknowledges and agrees that Escrow Corporation and, for purposes of the "no registration" opinions to be delivered to the Initial Purchasers pursuant to Sections 6(f) and 6(g), counsel for Escrow Corporation and counsel for the Initial Purchasers, respectively, may rely upon the accuracy of the representations and warranties of the Initial Purchasers, and compliance by

-4-

the Initial Purchasers with their agreements, contained in paragraph (b) above (including Exhibit B hereto), and each Initial Purchaser hereby consents to such reliance.

(d)       Escrow Corporation acknowledges and agrees that each Initial Purchaser may offer and sell Notes to or through any affiliate of an Initial Purchaser and that any such affiliate may offer and sell Notes purchased by it to or through any Initial Purchaser.

(e)       Escrow Corporation, and on the Release Date upon execution and delivery of the Joinder Agreement, the Company and the Guarantors, acknowledge and agree that each Initial Purchaser is acting solely in the capacity of an arm's length contractual counterparty to Escrow Corporation, the Company and each Guarantor with respect to the offering of the Notes contemplated hereby (including in connection with determining the terms of the offering) and not as a financial advisor or fiduciary to, or agent of, Escrow Corporation, the Company, any of the Guarantors or any other person.  Additionally, neither the Representative nor any other Initial Purchaser is advising Escrow Corporation, the Company, any of the Guarantors or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  Escrow Corporation, the Company and the Guarantors shall consult with their own advisors concerning such matters and shall be responsible for making their own independent investigation and appraisal of the transactions contemplated hereby, and neither the Representative nor any other Initial Purchaser shall have any responsibility or liability to Escrow Corporation, the Company or any of the Guarantors with respect thereto.  Any review by the Representative or any other Initial Purchaser of Escrow Corporation, the Company, the Guarantors and the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Representative or such Initial Purchaser, as the case may be, and shall not be on behalf of Escrow Corporation, the Company, any of the Guarantors or any other person.

2.       <u>Payment and Delivery</u>.

(a)       Payment of the Up Front Portion shall be made by Escrow Corporation on the date hereof.  Payment for and delivery of the Notes will be made at the offices of Cahill Gordon & Reindel LLP, New York, New York, at 10:00 A.M., New York City time, on December 1, 2010, or at such other time or place on the same or such other date, not later than the fifth business day thereafter, as the Representative and Escrow Corporation may agree upon in writing.  The time and date of such payment and delivery is referred to herein as the "<u>Closing Date</u>."

(b)       Payment for the Notes shall be made by wire transfer in immediately available funds of $383,075,000, which includes the Deferred Discount, to the Escrow Account against delivery to the nominee of The Depository Trust Company (the "<u>DTC</u>"), for the account of the Initial Purchasers, of one or more global notes, representing the Notes (the "<u>Global Notes</u>"), with any transfer taxes payable in connection with the sale of the Notes duly paid by Escrow Corporation.  Pursuant to the terms of the Escrow Agreement, the Deferred Discount shall be released to the Initial Purchasers on the Release Date or the Redemption Date.  The Global Notes and will be made available for inspection by the Representative not later than 1:00 P.M., New York City time, on the business day prior to the Closing Date.

-5-

3.      Representations and Warranties Concerning Escrow Corporation, the Company and the Guarantors.  Escrow Corporation represents and warrants to each Initial Purchaser (which representations and warranties, upon the execution and delivery of the Joinder Agreement, will be deemed to have been made by the Company and each Guarantor, jointly and severally, as if such representations and warranties were made by the Company and the Guarantors to the Initial Purchasers as of the date hereof) that:

(a)      *Preliminary Offering Memorandum, Time of Sale Information and Offering Memorandum.*  The Time of Sale Information, at the Time of Sale, did not, and at the Closing Date, will not, and the Offering Memorandum, in the form first used by the Initial Purchasers to confirm sales of the Notes and as of the Closing Date, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that Escrow Corporation makes no representation or warranty with respect to any statements or omissions made in reliance upon and in conformity with information relating to any Initial Purchaser furnished to Escrow Corporation in writing by such Initial Purchaser through the Representative expressly for use in the Time of Sale Information or the Offering Memorandum.

(b)      *Additional Written Communications.*  Escrow Corporation, the Company and the Guarantors (including their agents and representatives, other than the Initial Purchasers in their capacity as such) have not prepared, made, used, authorized, approved or referred to and will not prepare, make, use, authorize, approve or refer to any written communication that constitutes an offer to sell or solicitation of an offer to buy the Notes (each such communication by Escrow Corporation, the Company and the Guarantors or their agents and representatives (other than a communication referred to in clauses (i), (ii) and (iii) below) an "Issuer Written Communication") other than (i) the Preliminary Offering Memorandum, (ii) the Offering Memorandum, (iii) the documents listed on Schedule III hereto, including a term sheet substantially in the form of Exhibit A hereto, which constitute part of the Time of Sale Information, and (iv) any other written communications, in each case used in accordance with Section 4(c).  Each such Issuer Written Communication, when taken together with the Time of Sale Information, did not, and at the Closing Date will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that Escrow Corporation makes no representation and warranty with respect to any statements or omissions made in each such Issuer Written Communication in reliance upon and in conformity with information relating to any Initial Purchaser furnished to Escrow Corporation in writing by such Initial Purchaser through the Representative expressly for use in any Issuer Written Communication.

(c)      [*Reserved*].

(d)      *Financial Statements.*  The historical consolidated financial statements and the related notes thereto of the Company included in each of the Time of Sale Information and the Offering Memorandum present fairly the financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and the changes in their cash flows for the periods specified; such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby; and the other financial information included in each of the Time of Sale Information and the Offering Memorandum has been derived from the accounting records of the Company and its subsidiaries and presents fairly the information shown thereby.

-6-

(e)    *No Material Adverse Change.*  Since the date of the most recent historical consolidated financial statements of the Company included in each of the Time of Sale Information and the Offering Memorandum, except as otherwise stated in the Time of Sale Information or the Offering Memorandum, (i) there has been no material adverse change or any development involving a prospective material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or management of Escrow Corporation or the Company and its subsidiaries, considered as one entity, whether or not arising in the ordinary course of business, (ii) neither Escrow Corporation nor the Company and its subsidiaries, considered as one entity, has incurred any material liability or obligation, direct or contingent, other than in the ordinary course of business, (iii) neither Escrow Corporation nor the Company or any of its subsidiaries has entered into any material transaction other than in the ordinary course of business and (iv) there has not been any change in the capital stock or long-term debt of Escrow Corporation, the Company or any of its subsidiaries, or any dividend or distribution of any kind declared, paid or made by Escrow Corporation, the Company or any of its subsidiaries on any class of their respective capital stock.

(f)    *Organization and Good Standing.*  Escrow Corporation, the Company and each of the Company's subsidiaries have been duly organized and are validly existing and in good standing under the laws of their respective jurisdictions of organization, are duly qualified to do business and are in good standing in each jurisdiction in which their respective ownership or lease of property or the conduct of their respective businesses requires such qualification, and have all power and authority necessary to own or hold their respective properties and to conduct the businesses in which they are engaged, except where the failure to so qualify or have such power or authority would not, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), results of operations or business of Escrow Corporation, the Company and the Company's subsidiaries taken as a whole or on the performance of the Escrow Corporation, the Company and the Guarantors of their obligations under the Notes and the Guarantees (a "Material Adverse Effect").

(g)    *Capitalization.*  As of September 30, 2010, the Company had the authorized capitalization set forth in the "Historical" column under the caption "Capitalization" in the Time of Sale Information and the Offering Memorandum and, after giving effect to the transactions contemplated by the Time of Sale Information and the Offering Memorandum, would have had the authorized capitalization set forth in the "As Adjusted" column under the caption "Capitalization" in the Time of Sale Information and the Offering Memorandum; and all of the outstanding shares of capital stock of the Company have been duly and validly authorized and issued and are fully paid and non-assessable and are not subject to any preemptive or similar rights. All of the outstanding shares of capital stock of each subsidiary of the Company have been duly and validly authorized and issued, are fully paid and non-assessable and are owned directly or indirectly by the Company, free and clear of any lien, charge, encumbrance, security interest, restriction upon voting or transfer or any other claim of any third party, except as otherwise described in each of the Time of Sale Information and the Offering Memorandum.  All the capital stock of the Company is owned directly by AMI free and clear of any lien, charge, encumbrance, security interest, restriction upon voting or transfer or any other claim of any third party, except as otherwise described in each of the Time of Sale Information and the Offering Memorandum.

(h)    *Due Authorization.*  Escrow Corporation and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, the Company and each of the Guarantors, has full right, power and authority to execute and deliver the Transaction Documents to which they are or are to become a party and in each case to perform their respective obligations hereunder and

-7-

thereunder; all corporate action required to be taken for the due and proper authorization, execution and delivery of each of the Transaction Documents and the consummation of the transactions contemplated thereby by Escrow Corporation has been duly and validly taken; and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when executed and delivered by the Company and the Guarantors on the Release Date, all corporate action required to be taken for the due and proper authorization, execution and delivery of each of the Release Documents and the consummation of the transactions contemplated thereby by the Company and each of the Guarantors will be duly and validly taken.

(i)      *The Indenture*.  The Indenture has been duly authorized by Escrow Corporation and, when duly executed and delivered in accordance with its terms by each of the parties thereto on the Closing Date, the Indenture will constitute the valid and binding agreement of Escrow Corporation enforceable against Escrow Corporation in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability (collectively, the "Enforceability Exceptions"); and except as otherwise disclosed in the Time of Sale Information and the Offering Memorandum, on the Closing Date, the Indenture will conform in all material respects to the requirements of the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act"), and the rules and regulations of the Commission applicable to an indenture that is qualified thereunder.

(j)      *The Notes and the Guarantees*.  The Notes have been duly authorized by Escrow Corporation and, when duly executed, authenticated, issued and delivered as provided in the Indenture, and paid for as provided herein, will be duly and validly issued and outstanding and will constitute valid and binding obligations of Escrow Corporation, enforceable against Escrow Corporation in accordance with their terms, subject to the Enforceability Exceptions, and will be entitled to the benefits of the Indenture and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, upon execution and delivery of the Supplemental Indenture by the Company, will be the duly authorized and valid binding obligations of the Company, enforceable against the Company in accordance with their terms, subject to the Enforceability Exceptions; when executed and delivered by the Company, the Exchange Notes (as defined in the Registration Rights Agreement) will be duly and validly authorized by the Company and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when executed by the Company and authenticated by the Trustee in accordance with the provisions of the Indenture, the Registration Rights Agreement, the Registration Rights Agreement Joinder and the Exchange Offer, will constitute valid and binding obligations of the Company, and will be entitled to the benefits of the Indenture, and enforceable against the Company in accordance with their terms, subject to the Enforceability Exceptions; when executed and delivered by the Guarantors, the Guarantees and the guarantees of the Exchange Notes will be duly authorized by each of the Guarantors and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when the Notes have been duly executed, authenticated, issued and delivered as provided in the Indenture and paid for as provided herein, and upon the execution of the Supplemental Indenture by the Guarantors, the Guarantees will be valid and binding obligations of each of the Guarantors, enforceable against each of the Guarantors in accordance with their terms, subject to the Enforceability Exceptions, and will be entitled to the benefits of the Indenture; and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when the Exchange Notes have been authenticated by the Trustee in accordance with the provisions of the Indenture and executed and delivered in accordance with the Registration Rights Agreement, the Registration Rights Agreement Joinder, the Guarantees of the Exchange Notes will constitute valid and binding

-8-

obligations of each of the Guarantors, in each case, enforceable against the Guarantors in accordance with their terms, subject to the Enforceability Exceptions.

(k)    *The Supplemental Indenture.*  When executed and delivered by the Company and the Guarantors on the Release Date, the Supplemental Indenture will be duly authorized by all necessary corporate or other entity action on the part of the Company and Guarantors and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when duly executed and delivered by the Company and the Guarantors on the Release Date and, assuming due authorization, execution and delivery by the Trustee, the Indenture as supplemented by the Supplemental Indenture will constitute a valid and binding agreement of the Company and the Guarantors, enforceable against the Company and Guarantors in accordance with its terms, subject to the Enforceability Exceptions.

(l)    *The Security Documents.*  When executed and delivered by the Company and the Guarantors on the Release Date, each of the Security Documents to be delivered on the Release Date will be duly authorized by the Company and each of the Guarantors and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when duly executed and delivered by each of the parties thereto on the Release Date, will constitute a valid and binding agreement of the Company and each of the Guarantors, enforceable against the Company and each of the Guarantors in accordance with its terms, subject to the Enforceability Exceptions. Each Security Document, when executed and delivered by the Company and the Guarantors on the Release Date, will create in favor of the Notes Collateral Agent for the benefit of itself, the Trustee and the holders of the Notes, a valid security interest in the rights of the Company and each Guarantor in the Collateral and, upon the filing of appropriate Uniform Commercial Code ("UCC") financing statements with the applicable governmental authority and the taking of the other actions, in each case as further described in the Security Documents, such security interests in such Collateral will be perfected security interests, superior to and prior to the liens of all third persons other than Permitted Liens (as defined in the Indenture) and except as otherwise provided for in the Security Document, and subject to the terms of the Intercreditor Agreement.

(m)    *The Intercreditor Agreements.*  When executed and delivered by the Company and the Guarantors on the Release Date, each of the Intercreditor Agreements will be duly authorized by all necessary corporate or other entity action on the part of the Company and the Guarantors party thereto, and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when executed and delivered by the Company and the Guarantors party thereto on the Release Date, assuming due authorization, execution and delivery by the Notes Collateral Agent or other parties thereto, will constitute a valid and binding agreement of the Company and the Guarantors, enforceable against the Company and the Guarantors in accordance with their respective terms, subject to the Enforceability Exceptions.

(n)    *The Purchase Agreement.*  This Agreement has been duly authorized, executed and delivered by Escrow Corporation and, when duly executed and delivered in accordance with its terms by each of the parties thereto, will constitute a valid and binding agreement of Escrow Corporation enforceable against Escrow Corporation in accordance with its terms, subject to the Enforceability Exceptions; provided that no representation as to enforceability is made with respect to the Section entitled "Indemnification and Contribution" to the extent it may be limited by applicable law and public policy.

(o)    *The Joinder Agreement.* When executed and delivered by the Company and the Guarantors on the Release Date, the Joinder Agreement will be duly authorized by all necessary corporate or other entity action on the part of the Company and the Guarantors.

(p)    *The Registration Rights Agreement.* The Registration Rights Agreement has been duly authorized by Escrow Corporation and on the Closing Date will be duly executed and delivered by Escrow Corporation and, when duly executed and delivered in accordance with its terms by each of the parties thereto, will constitute a valid and binding agreement of Escrow Corporation enforceable against Escrow Corporation in accordance with its terms, subject to the Enforceability Exceptions; provided that no representation as to enforceability is made with respect to the Section entitled "Indemnification and Contribution" to the extent it may be limited by applicable law and public policy.

(q)    *The Registration Rights Agreement Joinder.* When executed and delivered by the Company and the Guarantors on the Release Date, the Registration Rights Agreement Joinder will be duly authorized by all necessary corporate or other entity action on the part of the Company and the Guarantors party thereto and, subject to the approval by the Bankruptcy Court and confirmation of the Plan, when executed and delivered by the Company and the Guarantors on the Release Date, assuming due authorization and execution by the Representative or other parties thereto, will constitute a valid and binding agreement of the Company and the Guarantors, enforceable against the Company and the Guarantors in accordance with its terms, subject to the Enforceability Exceptions.

(r)    *The Escrow Agreement.* The Escrow Agreement has been duly authorized by all necessary corporate or other entity action on the part of Escrow Corporation and, on the Closing Date, will have been duly executed and delivered by, and, assuming due authorization, execution and delivery by the Escrow Agent or other parties thereto, will constitute a valid and binding agreement of, Escrow Corporation, enforceable against Escrow Corporation in accordance with its terms, subject to the Enforceability Exceptions. Upon execution of the Escrow Agreement, the establishment of the Escrow Account to hold the Escrow Property and the issuance of the Notes, the first priority lien on and security interest in the Escrow Account and the Escrow Property granted in favor of the Notes Collateral Agent for the benefit of the Trustee and the holders of the respective series of Notes pursuant to the Escrow Agreement will constitute a perfected security interest and there are no other liens on or security interests in the Escrow Account of the Escrow Property.

(s)    *Descriptions of the Transaction Documents and the Release Documents.* Each Transaction Document and each Release Document conforms in all material respects to the description thereof contained in each of the Time of Sale Information and the Offering Memorandum.

(t)    *No Violation or Default.* None of Escrow Corporation, the Company or any of the Company's subsidiaries is (i) in violation of its limited liability company agreement, operating agreement, charter, by-laws or similar organizational documents, as applicable, (ii) in default, and no event has occurred which, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject or (iii) in violation of any law, ordinance, governmental rule, regulation or court decree to which it or its property or assets may be subject, except, in the case of clauses (ii) and (iii), for

-10-

any such violation or default that would not, individually or in the aggregate, have a Material Adverse Effect and except as disclosed in or specifically contemplated by the Time of Sale Information and the Offering Memorandum.

(u)    *No Conflicts*.  The execution, delivery and performance by Escrow Corporation, the Company and each of the Guarantors of each of the Transaction Documents to which each is a party, the issuance, authentication, sale and delivery of the Notes (including the related Guarantees) and compliance by Escrow Corporation, the Company and each of the Guarantors, as applicable, with the terms thereof and the consummation of the transactions contemplated by the Transaction Documents to which they are a party, will not conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than liens to be created pursuant to the Escrow Agreement and after the Release Date, the Security Documents) upon any property or assets of Escrow Corporation, and after the Escrow Assumption, the Company or any of the Company's subsidiaries pursuant to, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which Escrow Corporation, or, after the Escrow Assumption, the Company or any of the Company's subsidiaries is a party or by which Escrow Corporation, or, after the Escrow Assumption, the Company or any of the Company's subsidiaries is bound or to which any of the property or assets of Escrow Corporation, or, after the Escrow Assumption, the Company or any of the Company's subsidiaries is subject, except where such conflict, breach or violation would not, singularly or in the aggregate, have a Material Adverse Effect, nor will such actions result in any violation of the provisions of (x) the limited liability company agreement, operating agreement, charter, by-laws or similar organizational documents, as applicable, of Escrow Corporation, the Company or any of the Company's subsidiaries or (y) any statute or any judgment, order, decree, rule or regulation of any court or arbitrator or governmental agency or body having jurisdiction over Escrow Corporation, the Company or any of the Company's subsidiaries or any of their properties or assets, except where such violation of such judgment, order, decree, rule or regulation referenced in this subclause (y) would not, singularly or in the aggregate, have a Material Adverse Effect; and no consent, approval, authorization or order of, or filing or registration with, any such court or arbitrator or governmental agency or body under any such statute, judgment, order, decree, rule or regulation is required for the execution, delivery and performance by Escrow Corporation, the Company and each of the Guarantors of each of the Transaction Documents to which each is a party, the issuance, authentication, sale and delivery of the Notes (including the related Guarantees) and compliance by Escrow Corporation, the Company and each of the Guarantors with the terms thereof and the consummation of the transactions contemplated by the Transaction Documents, except for such consents, approvals, authorizations, filings, registrations or qualifications (i) which shall have been obtained or made on or prior to the Closing Date (in the case of Escrow Corporation) or the Release Date (in the case of the Company and the Guarantors), (ii) consisting of the Escrow Issuer Approval Order (as defined in Section 6(n)) or such other orders as are issued by the Bankruptcy Court in connection with the emergence of the Company and the Guarantors from bankruptcy in accordance with the Plan, (iii) under applicable state securities laws in connection with the purchase and resale of the Notes (including the related Guarantees), (iv) with respect to the Exchange Securities (including the related Guarantees) under the Securities Act, the Trust Indenture Act and the applicable state securities laws contemplated by the Registration Rights Agreement and the Registration Rights Agreement Joinder, (v) consisting of filings of financing statements under the UCC or the relevant personal property security legislation, each as from time to time in effect in the relevant jurisdictions, (vi) consisting of filings required by the United States Patent and Trademark Office or the United States Copyright Office or the applicable intellectual property legislation, rules or regulations in effect in the other

-11-

relevant jurisdictions and (vii) the failure to obtain which would not, singularly or in the aggregate, have a Material Adverse Effect.

(v)    *Legal Proceedings*.  Except as described in each of the Time of Sale Information and the Offering Memorandum, there are no legal or governmental proceedings pending to which AMI, Escrow Corporation, the Company or any of the Company's subsidiaries is a party or to which any property or assets of Escrow, Corporation, the Company or any of the Company's subsidiaries is the subject which (i) singularly or in the aggregate, if determined adversely to the Company or any of the Company's subsidiaries, could reasonably be expected to have a Material Adverse Effect or (ii) question the validity or enforceability of any of the Transaction Documents or the Release Documents or any action taken or to be taken pursuant thereto; and to the best knowledge of Escrow Corporation, no such proceedings are threatened or contemplated by governmental authorities or threatened by others.

(w)    *Independent Accountants*.  Deloitte & Touche LLP ("Deloitte & Touche"), who have certified certain financial statements of the Company and its subsidiaries, are independent public accountants with respect to the Company and its subsidiaries within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants and its interpretations and rulings thereunder.

(x)    *Title to Real and Personal Property*.  AMI, Escrow Corporation, the Company and each of the Company's subsidiaries have good and marketable title in fee simple to, or have valid rights to lease or otherwise use, all items of real and personal property which are material to the business of AMI, Escrow Corporation, the Company and the Company's subsidiaries, in each case free and clear of all liens, encumbrances, claims and defects and imperfections of title except those (i) described in the Time of Sale Information and the Offering Memorandum and, on the Closing Date, pursuant to the Revolving Credit Facility and the Security Documents or permitted thereunder, (ii) which do not materially interfere with the use made and proposed to be made of such property by AMI, Escrow Corporation, the Company and the Company's subsidiaries or (iii) could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(y)    *Title to Intellectual Property*.  AMI, Escrow Corporation, the Company and each of the Company's subsidiaries own or possess adequate rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) necessary for the conduct of their respective businesses; and the conduct of their respective businesses will not conflict in any material respect with any such rights of others, and AMI, Escrow Corporation, the Company and the Company's subsidiaries have not received any notice of any claim of infringement of or conflict with, any such rights of others, except for any such infringements or conflicts which could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(z)    *Ownership of Collateral*.  The Company and the Guarantors collectively own, have rights in or have the power to transfer rights in the Collateral, free and clear of any Liens (as defined under the caption "Description of first lien notes" and "Description of second lien notes" in the Time of Sale Information and the Offering Memorandum) other than (i) as described in the Time of Sale Information and the Offering Memorandum, including pursuant to the 2009 Credit Agreement (as defined in the Time of Sale Information), (ii) the security interests and Liens

-12-

granted pursuant to the Security Documents, (iii) Liens granted under the security documents relating to the Revolving Credit Facility and (iv) Liens expressly permitted to exist on the Collateral under the Indenture and under the Escrow Agreement.

(aa)    *No Undisclosed Relationships.*  No relationship, direct or indirect, exists between or among AMI, Escrow Corporation, the Company or any of the Company's subsidiaries, on the one hand, and the directors, officers, stockholders or other affiliates of Escrow Corporation, the Company or any of the Company's subsidiaries, on the other, that would be required by the Securities Act to be described in a registration statement to be filed with the Commission and that is not so described in each of the Time of Sale Information and the Offering Memorandum.

(bb)    *Investment Company Act.*  None of Escrow Corporation, the Company or any of the Company's subsidiaries is, and after giving effect to the application of the proceeds of the Notes on the Release Date as described in each of the Time of Sale Information and the Offering Memorandum none of them will be, an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder (collectively, the "Investment Company Act").

(cc)    *Taxes.*  AMI, Escrow Corporation, the Company and each of the Company's subsidiaries have filed all material federal, state, local and foreign income and franchise tax returns required to be filed through the date hereof and have paid all taxes shown to be due thereon, and no tax deficiency has been determined adversely to AMI, Escrow Corporation the Company or any of the Company's subsidiaries which has had (nor does AMI, Escrow Corporation, the Company or any of the Company's subsidiaries have any knowledge of any tax deficiency which, if determined adversely to AMI, Escrow Corporation, the Company or any of the Company's subsidiaries, would reasonably be expected to have) a Material Adverse Effect.

(dd)    *Licenses and Permits.*  AMI, the Company and each of the Company's subsidiaries possess all material licenses, certificates, authorizations and permits issued by, and have made all declarations and filings with, the appropriate federal, state or foreign regulatory agencies or bodies which are necessary for the ownership of their respective properties or the conduct of their respective businesses as described in the Time of Sale Information and the Offering Memorandum, except where the failure to possess or make the same would not, singularly or in the aggregate, have a Material Adverse Effect, and none of AMI, Escrow Corporation, the Company nor any of the Company's subsidiaries has received notification of any revocation or modification of any such license, certificate, authorization or permit or has any reason to believe that any such license, certificate, authorization or permit will not be renewed in the ordinary course, except where the revocation or modification of any such license, certificate, authorization or permit, or the failure to renew any such license, certificate, authorization or permit, would not, singularly or in the aggregate, have a Material Adverse Effect.

(ee)    *No Labor Disputes.*  No labor disturbance by or dispute with employees of AMI, the Company or any of the Company's subsidiaries exists or, to the best knowledge of AMI, Escrow Corporation, the Company and each of the Company's subsidiaries, is contemplated or threatened.

(ff)    *Compliance with Environmental Laws.*  There has been no storage, generation, transportation, handling, treatment, disposal, discharge, emission or other release of any kind of any toxic, infectious or hazardous substances or wastes by, due to or caused by AMI, Escrow

-13-

Corporation, the Company or any of the Company's subsidiaries (or, to the best knowledge of AMI, Escrow Corporation, the Company or any other entity (including any predecessor in interest) for whose acts or omissions AMI, Escrow Corporation, the Company or any of the Company's subsidiaries is or could reasonably be expected to be liable) upon any of the property now or previously owned or leased by AMI, Escrow Corporation, the Company or any of the Company's subsidiaries, or upon any other property, in violation of any statute or any ordinance, rule, regulation, order, judgment, decree or permit or which would, under any statute or any ordinance, rule (including rule of common law), regulation, order, judgment, decree or permit, give rise to any liability, except for any violation or liability that could not reasonably be expected to have, singularly or in the aggregate with all such violations and liabilities, a Material Adverse Effect; and there has been no disposal, discharge, emission or other release of any kind onto such property or into the environment surrounding such property of any toxic, infectious or hazardous substances or wastes with respect to which AMI, Escrow Corporation, the Company or any of the Company's subsidiaries has knowledge, except for any such disposal, discharge, emission or other release of any kind which could not reasonably be expected to have, singularly or in the aggregate with all such discharges and other releases, a Material Adverse Effect.

(gg)    *Compliance with ERISA.*  No "prohibited transaction" (as defined in Section 406 of the Employee Retirement Income Security Act of 1974, as amended, including the regulations and published interpretations thereunder ("ERISA"), or Section 4975 of the Internal Revenue Code of 1986, as amended from time to time (the "Code")) or "accumulated funding deficiency" (as defined in Section 302 of ERISA) or any of the events set forth in Section 4043(b) of ERISA (other than events with respect to which the 30-day notice requirement under Section 4043 of ERISA has been waived) has occurred with respect to any employee benefit plan of AMI, Escrow Corporation, the Company or any of the Company's subsidiaries which could reasonably be expected to have a Material Adverse Effect; each such employee benefit plan is in compliance in all material respects with applicable law, including ERISA and the Code; AMI, Escrow Corporation, the Company and each of the Company's subsidiaries have not incurred and do not expect to incur liability under Title IV of ERISA with respect to the termination of, or withdrawal from, any pension plan for which AMI, Escrow Corporation, the Company or any of the Company's subsidiaries would have any liability; and each such pension plan that is intended to be qualified under Section 401(a) of the Code is so qualified in all material respects and nothing has occurred, whether by action or by failure to act, which could reasonably be expected to cause the loss of such qualification.

(hh)    *Accounting Controls.*  The Company and its subsidiaries maintain systems of internal accounting controls sufficient to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles, including, but not limited to internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. There are no material weaknesses or significant deficiencies in the Company's internal accounting controls.

(ii)    *Insurance.*  AMI, Escrow Corporation, the Company and each of the Company's subsidiaries have insurance covering each of their respective properties, operations, personnel and

-14-

businesses, which insurance is in amounts and insures against such losses and risks as are adequate to protect AMI, Escrow Corporation, the Company and its subsidiaries and their respective businesses.

(jj)     *No Unlawful Payments.*  None of AMI, Escrow Corporation, the Company or any of the Company's subsidiaries nor, to the best knowledge of AMI, Escrow Corporation, the Company and each of the Guarantors, any director, officer, agent, employee or other person associated with or acting on behalf of AMI, Escrow Corporation, the Company or any of the Company's subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

(kk)     *Compliance with Money Laundering Laws.*  The operations of AMI, Escrow Corporation, the Company and the Company's subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "Money Laundering Laws") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving AMI, Escrow Corporation, the Company or any of the Company's subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(ll)     *Compliance with OFAC.*  None of AMI, Escrow Corporation, the Company, any of the Company's subsidiaries or, to the knowledge of AMI, Escrow Corporation, the Company, any director, officer, agent, employee or affiliate of AMI, Escrow Corporation, the Company or any of the Company's subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"); and none of AMI, Escrow Corporation or the Company will directly or indirectly use the proceeds of the offering of the Securities hereunder, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC.

(mm)     *Solvency.*  Immediately after giving effect to the Escrow Assumption, including the assumption of the Notes by the Company and to the other transactions related thereto and the issuance of the Second Lien Notes, as described in each of the Time of Sale Information and the Offering Memorandum, on the Release Date, (a) the fair value of the assets of the Company and each Guarantor, at a fair valuation, will exceed their respective debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Company and each Guarantor will be greater than the amount that will be required to pay the probable liability of their respective debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Company and each Guarantor will be able to pay their respective debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Company and each Guarantor will not have unreasonably small capital with which to conduct the business in which the Company or

-15-

such Guarantor is engaged as such business in now conducted and is proposed to be conducted following the Closing Date.

(nn) *No Restrictions on Subsidiaries.* No Subsidiary (as defined in the Time of Sale Information under the caption "Description of first lien notes" and "Description of second lien notes") of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such subsidiary's capital stock, from repaying to the Company any loans or advances to such subsidiary from the Company or from transferring any of such subsidiary's properties or assets to the Company or any other subsidiary of the Company, except as provided under the 2009 Credit Agreement and except as described in the Time of Sale Information and the Offering Memorandum, on the Release Date, pursuant to the Revolving Credit Facility and the Security Documents or permitted thereunder.

(oo) *No Broker's Fees.* Except for existing agreements with the Initial Purchasers, none of AMI, Escrow Corporation, the Company or any of the Company's subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against any of them or any Initial Purchaser for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Notes.

(pp) *Rule 144A Eligibility.* On the Closing Date, the Notes will not be, in each case, of the same class as securities listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in an automated inter-dealer quotation system; and each of the Preliminary Offering Memorandum and the Offering Memorandum, as of its respective date, contains or will contain all the information that, if requested by a prospective purchaser of the Notes, would be required to be provided to such prospective purchaser pursuant to Rule 144A(d)(4) under the Securities Act.

(qq) *No Integration.* None of AMI, Escrow Corporation, the Company or any of their respective affiliates (as defined in Rule 501(b) of Regulation D) has, directly or through any agent, sold, offered for sale, solicited offers to buy or otherwise negotiated in respect of any security (as defined in the Securities Act) that is or will be integrated with the sale of any of the Notes in a manner that would require registration of any of the Notes under the Securities Act.

(rr) *No General Solicitation or Directed Selling Efforts.* None of AMI, Escrow Corporation, the Company or any of their respective affiliates or any other person acting on its or their behalf (other than the Initial Purchasers, as to which no representation is made) has (i) solicited offers for, or offered or sold, the Notes by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act or (ii) engaged in any directed selling efforts within the meaning of Regulation S under the Securities Act ("Regulation S"), and all such persons have complied with the offering restrictions requirement of Regulation S.

(ss) *Securities Law Exemptions.* Assuming the accuracy of the representations and warranties of the Initial Purchasers contained in Section 1(b) (including Exhibit B hereto) and their compliance with their agreements set forth therein, it is not necessary, in connection with the issuance and sale of the Notes to the Initial Purchasers and the offer, resale and delivery of the Notes by the Initial Purchasers, in the manner contemplated by this Agreement, the Time of Sale

-16-

Information and the Offering Memorandum, to register any of the Notes under the Securities Act or to qualify either Indenture under the Trust Indenture Act.

(tt)     *No Stabilization*.  None of Escrow Corporation, the Company or any of the Guarantors has taken, directly or indirectly, any action designed to or that could reasonably be expected to cause or result in any stabilization or manipulation of the price of any of the Notes or the price of any security of the Issuers to facilitate the sale or resale of the Notes.

(uu)     *Margin Rules*.  Neither the issuance, sale and delivery of the Notes, nor the application of the proceeds by the Company following the Release Date as described in the Time of Sale Information and the Offering Memorandum will violate Regulation T, U or X of the Federal Reserve Board, as the same are in effect on the Closing Date.

(vv)     *Forward-Looking Statements*.  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in any of the Time of Sale Information or the Offering Memorandum has been made or reaffirmed without a reasonable basis or has been disclosed other than in good faith.

4.     <u>Covenants of Escrow Corporation, the Company and the Guarantors</u>.  Escrow Corporation and, on the Release Date upon execution of the Joinder Agreement, the Company and the Guarantors, jointly and severally, further covenant and agree with each Initial Purchaser that:

(a)     *Delivery of Copies*.  Escrow Corporation will deliver, without charge, to the Initial Purchasers as many copies of the Preliminary Offering Memorandum, any other Time of Sale Information, any Issuer Written Communication and the Offering Memorandum (including all amendments and supplements thereto) as the Representative may reasonably request.

(b)     *Offering Memorandum, Amendments or Supplements*.  Before finalizing the Offering Memorandum or making or distributing any amendment or supplement to any of the Time of Sale Information or the Offering Memorandum, Escrow Corporation will furnish to the Representative and counsel for the Initial Purchasers a copy of the proposed Offering Memorandum or such amendment or supplement for review, and will not distribute any such proposed Offering Memorandum, amendment or supplement to which the Representative reasonably objects.

(c)     *Additional Written Communications*.  Before making, preparing, using, authorizing, approving or referring to any Issuer Written Communication, Escrow Corporation will furnish to the Representative and counsel for the Initial Purchasers a copy of such written communication for review and will not make, prepare, use, authorize, approve or refer to any such written communication to which the Representative reasonably objects.

(d)     *Notice to the Representative*.  Escrow Corporation and the Company will advise the Representative promptly, and confirm such advice in writing, (i) of the issuance by any governmental or regulatory authority of any order preventing or suspending the use of any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum or the initiation or threatening of any proceeding for that purpose; (ii) of the occurrence of any event at any time prior to the completion of the initial offering of the Notes as a result of which any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum as then amended or supplemented would include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing when such Time of Sale Information, Issuer Written Communication or

-17-

the Offering Memorandum is delivered to a purchaser, not misleading; and (iii) of the receipt by Escrow Corporation or the Company of any notice with respect to any suspension of the qualification of the Notes for offer and sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and Escrow Corporation and the Company will use its reasonable best efforts to prevent the issuance of any such order preventing or suspending the use of any of the Time of Sale Information, any Issuer Written Communication or the Offering Memorandum or suspending any such qualification of the Notes and, if any such order is issued, will obtain as soon as possible the withdrawal thereof.

(e)     *Time of Sale Information*.  If at any time prior to the Closing Date (i) any event shall occur or condition shall exist as a result of which any of the Time of Sale Information as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (ii) it is necessary to amend or supplement any of the Time of Sale Information to comply with law, Escrow Corporation and the Company will immediately notify the Initial Purchasers thereof and forthwith prepare and, subject to paragraph (b) above, furnish to the Initial Purchasers such amendments or supplements to any of the Time of Sale Information as may be necessary so that the statements in any of the Time of Sale Information as so amended or supplemented will not, in light of the circumstances under which they were made, be misleading or so that any of the Time of Sale Information will comply with law.

(f)     *Ongoing Compliance of the Offering Memorandum*.  If at any time prior to the completion of the initial offering of the Notes (i) any event shall occur or condition shall exist as a result of which the Offering Memorandum as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Offering Memorandum is delivered to a purchaser, not misleading or (ii) it is necessary to amend or supplement the Offering Memorandum to comply with law, Escrow Corporation and the Company will immediately notify the Initial Purchasers thereof and forthwith prepare and, subject to paragraph (b) above, furnish to the Initial Purchasers such amendments or supplements to the Offering Memorandum as may be necessary so that the statements in the Offering Memorandum as so amended or supplemented will not, in the light of the circumstances existing when the Offering Memorandum is delivered to a purchaser, be misleading or so that the Offering Memorandum will comply with law.

(g)     *Blue Sky Compliance*.  Escrow Corporation will qualify the Notes for offer and sale under the securities or Blue Sky laws of such jurisdictions as the Representative shall reasonably request and will continue such qualifications in effect so long as required for the offering and resale of the Notes; <u>provided</u> that Escrow Corporation, the Company and the Guarantors shall not be required to (i) qualify as a foreign corporation or other entity or as a dealer in securities in any such jurisdiction where it would not otherwise be required to so qualify, (ii) file any general consent to service of process in any such jurisdiction or (iii) subject itself to taxation in any such jurisdiction if it is not otherwise so subject.

(h)     *Clear Market*.  During the period from the date hereof through and including the date that is 90 days after the Release Date, Escrow Corporation, the Company and each of the Guarantors will not, without the prior written consent of the Representative, offer, sell, contract to sell or otherwise dispose of any debt securities issued or guaranteed by Escrow Corporation, the

-18-

Company or any of the Guarantors and having a tenor of more than one year other than the Second Lien Notes.

(i)      *Use of Proceeds.*  Escrow Corporation will apply the proceeds from the sale of the Notes as set forth under "Use of proceeds" in the Time of Sale Information and the Offering Memorandum (including the deposit of the Escrow Property in the Escrow Account simultaneously with the issuance of the Notes) and, on and after the Release Date upon execution of the Joinder Agreement, the Company and the Guarantors will apply the proceeds from the sale of the Notes as set forth under "Use of proceeds" in the Time of Sale Information and the Offering Memorandum.

(j)      *Supplying Information.*  While the Notes remain outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Company and each of the Guarantors will, during any period in which the Company is not subject to and in compliance with Section 13 or 15(d) of the Exchange Act, furnish to holders of the Notes and prospective purchasers of the Notes designated by such holders, upon the request of such holders or such prospective purchasers, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(k)      *DTC.*  Escrow Corporation will assist the Initial Purchasers in arranging for the Notes to be eligible for clearance and settlement through DTC.

(l)      *Security Interest.*  (i) Prior to the Release Date, Escrow Corporation shall cause the Notes to be secured by the Escrow Property to the extent and in the manner provided in the Escrow Agreement and as described in the Time of Sale Information and the Offering Memorandum and (ii) on and after the Release Date, the Company and the Guarantors shall cause the Notes and the Guarantees to be secured by a lien on and security interest in the Collateral to the extent and in the manner provided for in the Indenture and the Security Documents, and as described in the Time of Sale Information and the Offering Memorandum.

(m)      *No Integration.* None of Escrow Corporation, the Company or any of its respective affiliates (as defined in Rule 501(b) of Regulation D) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of any of the Notes in a manner that would require registration of any of the Notes under the Securities Act.

(n)      *No General Solicitation or Directed Selling Efforts.*  None of Escrow Corporation, the Company or any of their respective affiliates or any other person acting on their respective behalf (other than the Initial Purchaser, as to which no covenant is given) will (i) solicit offers for, or offer or sell, the Notes by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D or in any manner involving a public offering within the meaning of Section 4(2) of the Securities Act or (ii) engage in any directed selling efforts within the meaning of Regulation S, and all such persons will comply with the offering restrictions requirement of Regulation S.

(o)      *No Stabilization.*  None of Escrow Corporation, the Company or any of the Guarantors will take, directly or indirectly, any action designed to or that could reasonably be expected to cause or result in any stabilization or manipulation of the price of any of the Notes.

(p)      *Opinions.*  Escrow Corporation and the Company shall cause (i) Akin Gump Strauss Hauer & Feld LLP, to deliver to the Initial Purchasers through the Representative on the

-19-

Release Date its opinion, dated the Release Date, to the effect set forth in Exhibit C-1 hereto and (ii) David Olson, Corporate Counsel of the Company, to deliver to the Initial Purchasers through the Representative on the Release Date his opinion, dated the Release Date, with respect to certain of the Guarantors to the effect set forth on Exhibit C-2 hereto.

(q)     *Release Date.*  On the Release Date, the Company and the Guarantors will cause to be delivered to the Representative (x) executed copies of the Release Documents and (y) such information and documents as they may reasonably require in connection with the execution of the Release Documents.

5.     <u>Certain Agreements of the Initial Purchaser</u>.  Each Initial Purchaser hereby represents and agrees that it has not and will not use, authorize use of, refer to, or participate in the planning for use of, any written communication that constitutes an offer to sell or the solicitation of an offer to buy the Notes other than (i) the Preliminary Offering Memorandum and the Offering Memorandum, (ii) a written communication that contains no "issuer information" (as defined in Rule 433(h)(2) under the Securities Act) that was not included (including through incorporation by reference) in the Preliminary Offering Memorandum or the Offering Memorandum, (iii) any written communication listed on Schedule III or prepared pursuant to Section 4(c) above, (iv) any written communication prepared by such Initial Purchaser and approved by the Company in advance in writing or (v) any written communication relating to or that contains the terms of the Notes and/or other information that was included (including through incorporation by reference) in the Preliminary Offering Memorandum or the Offering Memorandum.

6.     <u>Conditions of Initial Purchaser's Obligations</u>.  The obligation of each Initial Purchaser to purchase the Notes on the Closing Date as provided herein is subject to the performance by Escrow Corporation of its covenants and other obligations hereunder and to the following additional conditions:

(a)     *Representations and Warranties.*  The representations and warranties of Escrow Corporation contained herein shall be true and correct on the date hereof and on and as of the Closing Date (or if any representations or warranties are made as of a specified date, such representations or warranties shall be true and correct as of such date); and the statements of Escrow Corporation and its officers made in any certificates delivered pursuant to this Agreement shall be true and correct on and as of the Closing Date.

(b)     *Ratings.*  On or prior to the Closing Date, the Company shall have received a corporate credit rating from Moody's Investors Service, Inc.

(c)     *No Material Adverse Change.*  No event or condition of a type described in Section 3(e) hereof shall have occurred or shall exist, which event or condition is not described in each of the Time of Sale Information (excluding any amendment or supplement thereto) and the Offering Memorandum (excluding any amendment or supplement thereto) the effect of which in the judgment of the Representative makes it impracticable or inadvisable to proceed with the offering, sale or delivery of the Notes on the terms and in the manner contemplated by this Agreement, the Time of Sale Information and the Offering Memorandum.

(d)     *Officer's Certificate.*  The Representative shall have received on and as of the Closing Date a certificate of an executive officer of Escrow Corporation who has specific knowledge of Escrow Corporation's financial matters and is satisfactory to the Representative (i) confirming that such officer has carefully reviewed the Time of Sale Information and the Offering Memorandum and, to the best knowledge of such officer, the representations set forth in Sections 3(a) and 3(b) hereof are true and correct, (ii) confirming that the other representations and

-20-

warranties of Escrow Corporation in this Agreement are true and correct and that Escrow Corporation has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date and (iii) to the effect set forth in paragraph (c) above.

(e)     *Comfort Letters*.  On the date of this Agreement and on the Closing Date, Deloitte & Touche shall have furnished to the Representative, at the request of Escrow Corporation, letters, dated the respective dates of delivery thereof and addressed to the Initial Purchasers, in form and substance reasonably satisfactory to the Representative, containing statements and information of the type customarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in each of the Time of Sale Information and the Offering Memorandum; provided that the letter delivered on the Closing Date shall use a "cut-off" date no more than two business days prior to the Closing Date.

(f)     *Opinion and 10b-5 Statement of Counsel for Escrow Corporation*.  Akin Gump Strauss Hauer & Feld LLP, counsel for Escrow Corporation, shall have furnished to the Initial Purchasers through the Representative, at the request of Escrow Corporation, their written opinion and 10b-5 statement, dated the Closing Date and addressed to the Initial Purchasers, in form and substance reasonably satisfactory to the Representative, to the effect set forth in Exhibit C-3 hereto.

(g)     *Opinion and 10b-5 Statement of Counsel for the Initial Purchasers*.  The Initial Purchasers shall have received on and as of the Closing Date an opinion and 10b-5 statement of Cahill Gordon & Reindel LLP, counsel for the Initial Purchasers, with respect to such matters as the Representative may reasonably request, and such counsel shall have received such documents and information as they may reasonably request to enable them to pass upon such matters.

(h)     *No Legal Impediment to Issuance*.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority that would, as of the Closing Date, prevent the issuance or sale of the Notes (or the issuance of the Guarantees thereof); and no injunction or order of any federal, state or foreign court shall have been issued that would, as of the Closing Date, prevent the issuance or sale of the Notes (or the issuance of the Guarantees thereof).

(i)     *Good Standing*.  The Representative shall have received on and as of the Closing Date satisfactory evidence of the good standing of Escrow Corporation and the Company in their respective jurisdictions of organization and their good standing in such other jurisdictions as the Representative may reasonably request, in each case in writing or any standard form of telecommunication, from the appropriate governmental authorities of such jurisdictions.

(j)     *Indenture and Registration Rights Agreement*.  The Representative shall have received a counterpart of the Indenture and the Registration Rights Agreement that shall have been executed and delivered by a duly authorized officer of Escrow Corporation.

(k)     *Escrow Agreement*.  On the Closing Date, (i) Escrow Corporation, the Company, the Trustee and the Escrow Agent shall have executed the Escrow Agreement, and the Representative shall have received copies thereof, executed by Escrow Corporation, the Company, the Trustee and the Escrow Agent and such agreement shall be in full force and effect on and as of the Closing Date; (ii) Escrow Corporation shall have deposited the Escrow Property

-21-

equal to the Escrow Redemption Amount with the Escrow Agent solely in accordance with the Escrow Agreement; and (iii) the Notes Collateral Agent shall have a first-priority security interest in the Escrow Account and the Escrow Property pursuant to the Escrow Agreement.

(l)     *DTC*.  The Notes shall be eligible for clearance and settlement through DTC.

(m)     *Transactions*.  The Transactions shall be substantially concurrently consummated in all material respects on the terms set forth in the Time of Sale Information and the Offering Memorandum.

(n)     *Escrow Issuer Approval Order*.  On or prior to the Closing Date, the Bankruptcy Court shall have issued an order (the "Escrow Issuer Approval Order") approving the issuance of the Notes and finding that Escrow Corporation and its parent, a newly established non-Debtor Delaware company that is wholly-owned by the Company ("New Escrow Parent LLC"), are non-Debtor entities and that any proceeds or assets they have or will have, including the proceeds of the Notes, will not be deemed property of the Debtors' estates and will not be consolidated with the Debtors' assets or estates.  For purposes of this clause (n), the term "Debtor" shall refer to AMI, the Company and the Company's domestic subsidiaries (excluding Escrow Corporation and New Escrow Parent LLC).

(o)     *No Bankruptcy of Non-Debtors*.  Neither Escrow Corporation nor New Escrow Parent LLC, (i) shall have (v) commenced a voluntary case, (w) consented to entry of an order for relief against it in an involuntary case, (x) consented to the appointment of a custodian of it or for all or substantially all of its property, (y) made a general assignment for the benefit of its creditors or (z) begun generally not paying its debt as they become due, in each case, pursuant to or within the meaning of Title 11, U.S. Code or any similar Federal, state or foreign law for the relief of debtors or (ii) shall have been consolidated into the Plan or any other bankruptcy filing of the Debtors.

(p)     *Up Front Portion*.  On the date hereof, the Up Front Portion shall have been paid to the Initial Purchasers by or on behalf of Escrow Corporation.

(q)     *Additional Documents*.  On or prior to the Closing Date, Escrow Corporation shall have furnished to the Representative such further certificates and documents as the Representative may reasonably request.

All opinions, letters, certificates and evidence mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if they are in form and substance reasonably satisfactory to counsel for the Initial Purchasers.

7.     Indemnification and Contribution.

(a)     *Indemnification of the Initial Purchasers*.  Escrow Corporation and upon execution of the Joinder Agreement on the Release Date, the Company and each of the Guarantors, jointly and severally, agree to indemnify and hold harmless each Initial Purchaser, its affiliates, directors and officers and each person, if any, who controls each Initial Purchaser within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including, without limitation, invoiced, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, any untrue statement or alleged untrue statement of a material fact contained in the Preliminary Offering Memorandum, any of the other Time of Sale Information, any

-22-

Issuer Written Communication or the Offering Memorandum (or any amendment or supplement thereto) or any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Initial Purchaser furnished Escrow Corporation in writing by such Initial Purchaser through the Representative expressly for use therein.

(b)      *Indemnification of Escrow Corporation and the Company*.  Each Initial Purchaser agrees, severally and not jointly, to indemnify and hold harmless (x) Escrow Corporation and its directors and officers and each person, if any, who controls Escrow Corporation within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act and (y) upon execution of the Joinder Agreement on the Release Date, the Company, each Guarantor and each of their respective directors and officers and each person, if any, who controls the Company or any of the Guarantors within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, in each case, to the same extent as the indemnity set forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Initial Purchaser furnished to Escrow Corporation in writing by such Initial Purchaser through the Representative expressly for use in the Preliminary Offering Memorandum, any of the other Time of Sale Information, any Issuer Written Communication or the Offering Memorandum (or any amendment or supplement thereto), it being understood and agreed that the only such information consists of the following: the fourth and fifth sentences of the ninth paragraph and the eleventh paragraph under the caption "Plan of distribution."

(c)      *Notice and Procedures*.  If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any person in respect of which indemnification may be sought pursuant to either paragraph (a) or (b) above, such person (the "Indemnified Person") shall promptly notify the person against whom such indemnification may be sought (the "Indemnifying Person") in writing; provided that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under paragraph (a) or (b) above except to the extent that it has been materially prejudiced by such failure; and provided, further, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under paragraph (a) or (b) above.  If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 7 that the Indemnifying Person may designate in such proceeding and shall pay the invoiced, reasonable fees and expenses of such proceeding and shall promptly pay the invoiced, reasonable fees and expenses of such counsel related to such proceeding.  In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; or (iii) the Indemnified Person shall have reasonably concluded based on the advice of counsel that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person.  It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such invoiced, reasonable fees and expenses shall be promptly reimbursed.  Any such separate firm for any Initial Purchaser, its affiliates, directors and officers and any control persons of such Initial Purchaser shall be designated in writing by J.P. Morgan

-23-

Securities LLC and any such separate firm for Escrow Corporation, the Company, the Guarantors, their respective directors and officers and any control persons of Escrow Corporation, the Company and the Guarantors shall be designated in writing by Escrow Corporation prior to the Release Date and the Company following the Release Date.  The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (x) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)        *Contribution.*  If the indemnification provided for in paragraphs (a) and (b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by Escrow Corporation, the Company and the Guarantors on the one hand and the Initial Purchasers on the other from the offering of the Notes or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of Escrow Corporation, the Company and the Guarantors on the one hand and the Initial Purchasers on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative benefits received by Escrow Corporation, the Company and the Guarantors on the one hand and the Initial Purchasers on the other shall be deemed to be in the same respective proportions as the net proceeds (before deducting expenses) received by Escrow Corporation and the Company from the sale of the Notes and the total discounts and commissions (including the Up Front Portion) received by the Initial Purchasers in connection therewith, as provided in this Agreement, bear to the aggregate offering price of the Notes.  The relative fault of Escrow Corporation, the Company and the Guarantors on the one hand and the Initial Purchasers on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by Escrow Corporation, the Company or any Guarantor or by the Initial Purchasers and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.  Until the Company and the Guarantors and their respective directors, officers and control persons are entitled to indemnification from the Initial Purchasers, they are not entitled to contribution under this Section 7(d).

(e)        *Limitation on Liability.*  Escrow Corporation, and, on the Release Date upon execution of the Joinder Agreement, the Company and the Guarantors, and the Initial Purchasers agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by <u>pro rata</u> allocation (even if the Initial Purchasers were treated as one entity for such purposes) or by any other method of allocation that does not take account of the equitable considerations referred to in paragraph (d) above.  The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in paragraph (d) above shall be deemed to include, subject to the limitations set forth above, any legal or other expenses incurred by such Indemnified Person in connection with any such action or claim.  Notwithstanding the provisions of this Section 7, in no event shall an Initial Purchaser be

-24-

required to contribute any amount in excess of the amount by which the total discounts and commissions received by such Initial Purchaser with respect to the offering of the Notes exceeds the amount of any damages that such Initial Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Initial Purchasers' obligations to contribute pursuant to this Section 7 are several in proportion to their respective purchase obligations hereunder and not joint.

(f)    *Non-Exclusive Remedies.* The remedies provided for in this Section 7 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any Indemnified Person at law or in equity.

8.    <u>Termination</u>. This Agreement may be terminated in the absolute discretion of the Representative, by notice to Escrow Corporation, if after the execution and delivery of this Agreement and on or prior to the Closing Date (i) trading generally shall have been suspended or materially limited on the New York Stock Exchange or the over-the-counter market; (ii) trading of any securities issued or guaranteed by Escrow Corporation, the Company or any of the Guarantors shall have been suspended on any exchange or in any over-the-counter market; (iii) a general moratorium on commercial banking activities shall have been declared by federal or New York State authorities; or (iv) there shall have occurred any outbreak or escalation of hostilities or any change in financial markets or any calamity or crisis, either within or outside the United States, that, in the judgment of the Representative, is material and adverse and makes it impracticable or inadvisable to proceed with the offering, sale or delivery, of the Notes on the terms and in the manner contemplated by this Agreement, the Time of Sale Information and the Offering Memorandum.

9.    <u>Payment of Expenses</u>. Whether or not the transactions contemplated by this Agreement are consummated or this Agreement is terminated, Escrow Corporation agrees to pay or cause to be paid all costs and expenses incident to the performance of its obligations hereunder, including without limitation, (i) the costs incident to the authorization, issuance, sale, preparation and delivery of the Notes and any taxes payable in that connection; (ii) the costs incident to the preparation and printing of the Preliminary Offering Memorandum, any other Time of Sale Information, any Issuer Written Communication and the Offering Memorandum (including any amendment or supplement thereto) and the distribution thereof; (iii) the costs of reproducing and distributing each of the Transaction Documents; (iv) the fees and expenses of Escrow Corporation's, the Company's and the Guarantors' counsel and independent accountants; (v) the fees and expenses incurred in connection with the registration or qualification and determination of eligibility for investment of the Notes under the laws of such jurisdictions as the Representative may designate and the preparation, printing and distribution of a Blue Sky Memorandum (including the related fees and expenses of counsel for the Initial Purchasers); (vi) any fees charged by rating agencies for rating the Notes; (vii) the reasonable and documented fees and expenses of the Initial Purchasers, the Trustee, the Notes Collateral Agent, the Escrow Agent and any paying agent (including related fees and expenses of any counsel to such parties); (viii) all filing costs and expenses relating to the creation, documentation, perfection and maintenance of the security interests in the Collateral, as set forth in the Security Documents, including the reasonable fees and expenses of counsel to the Initial Purchasers in connection therewith; (ix) all expenses and application fees incurred in connection with the approval of the Notes for book-entry transfer by DTC; and (x) all expenses incurred by Escrow Corporation and the Company in connection with any "road show" presentation to potential investors (provided that the costs of any chartered aircraft shall be borne 50% by Escrow Corporation and 50% by the Initial Purchasers); <u>provided</u> that the aggregate amount of costs and expenses of the Initial Purchasers to be reimbursed hereunder pursuant to clauses (vii) and (viii) shall not exceed $500,000.

-25-

10.     <u>Persons Entitled to Benefit of Agreement</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and any controlling persons referred to herein, and the affiliates, officers and directors of each Initial Purchaser referred to in Section 7 hereof.  Nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein.  No purchaser of Notes from any Initial Purchaser shall be deemed to be a successor merely by reason of such purchase.

11.     <u>Survival</u>.  The respective indemnities, rights of contribution, representations, warranties and agreements of Escrow Corporation, the Company, the Guarantors and the Initial Purchasers contained in this Agreement or made by or on behalf of Escrow Corporation, the Company, the Guarantors or the Initial Purchasers pursuant to this Agreement or any certificate delivered pursuant hereto shall survive the delivery of and payment for the Notes and shall remain in full force and effect, regardless of any termination of this Agreement or any investigation made by or on behalf of Escrow Corporation, the Company, the Guarantors or the Initial Purchasers.

12.     <u>Certain Defined Terms</u>.  For purposes of this Agreement, (a) except where otherwise expressly provided, the term "affiliate" has the meaning set forth in Rule 405 under the Securities Act; (b) the term "business day" means any day other than a day on which banks are permitted or required to be closed in New York City; (c) the term "Exchange Act" means the Securities Exchange Act of 1934, as amended; (d) the term "subsidiary" has the meaning set forth in Rule 405 under the Securities Act; and (e) the term "written communication" has the meaning set forth in Rule 405 under the Securities Act.

13.     <u>Miscellaneous</u>.

(a)     *Authority of the Representative.*  Any action by the Initial Purchasers hereunder may be taken by J.P. Morgan Securities LLC on behalf of the Initial Purchasers, and any such action taken by J.P. Morgan Securities LLC shall be binding upon the Initial Purchasers.

(b)     *Notices.*  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted and confirmed by any standard form of telecommunication.  Notices to the Initial Purchaser shall be given to: J.P. Morgan Securities LLC, 383 Madison Avenue, New York, New York 10179; Attention:  Richard Gabriel (telecopier no.: (212) 270-1063).  Notices to Escrow Corporation, the Company and the Guarantors shall be delivered or sent by mail or telecopy transmission to the address of the Company set forth in the Offering Memorandum; Attention:  Christopher Polimeni, Chief Financial Officer (telecopier no.: (877) 569-5998).

(c)     *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

(d)     *Counterparts.*  This Agreement may be signed in counterparts (which may include counterparts delivered by any standard form of telecommunication), each of which shall be an original and all of which together shall constitute one and the same instrument.

(e)     *Amendments or Waivers.*  No amendment or waiver of any provision of this Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the parties hereto.

(f)     *Headings.*  The headings herein are included for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement.

-26-

If the foregoing is in accordance with your understanding, please indicate your acceptance of this Agreement by signing in the space provided below.

Very truly yours,

AMO ESCROW CORPORATION

By: _____
Name:  CHRISTOPHER V. POLIMENI
Title:  EVP-CFO & TREASURER

CONFIRMED AND ACCEPTED,
  as of the date first written above:

J.P. MORGAN SECURITIES LLC

  For itself and as Representative of the several Initial Purchasers

By: _____

  Name:
  Title:

**Earl Dowling**
**Executive Director**

[Signature Page to Purchase Agreement]

<u>SCHEDULE I</u>

| **Initial Purchaser** | **Principal Amount of Notes** |
| --- | :---: |
| J.P. Morgan Securities LLC............................................ | $192,500,000 |
| Deutsche Bank Securities Inc. ........................................ | $115,500,000 |
| Credit Suisse Securities (USA) LLC | <u>$77,000,000</u> |
| Total ................................................................................ | $385,000,000 |

<u>SCHEDULE II</u>

**<u>Guarantors</u>**

National Enquirer, Inc.
Globe Editorial, Inc.
Globe Communications, Corp.
Star Editorial, Inc.
National Examiner, Inc.
Mira! Editorial, Inc.
American Media Consumer Entertainment Inc.
American Media Consumer Magazine Group, Inc.
American Media Newspaper Group Inc.
Country Music Media Group, Inc.
American Media Mini Mags, Inc.
American Media Distribution & Marketing Group, Inc.
American Media Property Group, Inc.
Distribution Services, Inc.
Weider Publications, LLC

SCHEDULE III

**Additional Time of Sale Information**

Pricing Supplement, dated November 16, 2010, to the Preliminary Offering Memorandum, attached as Exhibit A hereto

EXHIBIT A

AMO ESCROW CORPORATION

Pricing Term Sheet

**PRICING SUPPLEMENT**                                                    **STRICTLY CONFIDENTIAL**

**AMO Escrow Corporation**
**To be merged with and into**
**American Media Operations, Inc.**

**11½% First Lien Senior Secured Notes due 2017**

**November 16, 2010**

This pricing supplement (the "Pricing Supplement") hereby amends, supplements, modifies and becomes part of, as of the date hereof, the preliminary offering memorandum dated November 10, 2010 (the "Preliminary Offering Memorandum"). The information in this Pricing Supplement supplements the Preliminary Offering Memorandum and supersedes the information in the Preliminary Offering Memorandum to the extent inconsistent with the information in the Preliminary Offering Memorandum. Terms that are defined in the Preliminary Offering Memorandum and used in this Pricing Supplement shall have the respective meanings given them in the Preliminary Offering Memorandum.

*The notes have not been registered under the Securities Act of 1933, as amended, or the securities laws of any other jurisdiction, and are being offered only to (1) "qualified institutional buyers" as defined in Rule 144A under the Securities Act and (2) outside the United States to non-U.S. persons in compliance with Regulation S under the Securities Act.*

**Terms Applicable to the 11½% First Lien Senior Secured Notes due 2017**

| | |
|---|---|
| **Issuer:** | AMO Escrow Corporation (to be merged with and into American Media Operations, Inc.) |
| **Title of Securities:** | 11½% First Lien Senior Secured Notes due 2017 |
| **Aggregate Principal Amount:** | $385,000,000 |
| **Final Maturity Date:** | December 15, 2017 |
| **Issue Price:** | 100%, plus accrued interest from December 1, 2010, if any |
| **Gross Proceeds (before initial purchasers' discount and expenses):** | $385,000,000 |
| **Coupon:** | 11.5% |
| **Yield to Maturity:** | 11.5% |
| **Spread to Treasury Security:** | +933 bps |
| **Benchmark:** | 4.25% UST due November 15, 2017 |
| **Record Dates:** | June 1 and December 1 |
| **Interest Payment Dates:** | June 15 and December 15 of each year |
| **First Interest Payment Date:** | June 15, 2011 |

| | |
|---|---|
| **Make Whole Redemption:** | Make-whole call at T+50 prior to December 15, 2013, plus accrued and unpaid interest. |
| **Optional Redemption:** | On or after December 15, 2013 the Company may redeem the First Lien Notes, in whole or in part, at the redemption prices (expressed as percentages of the principal amount) set forth below, plus accrued and unpaid interest thereon, if any, to the redemption date, if redeemed during the 12-month period commencing on December 15 of the years set forth below: |

| **Date** | **Price** |
|---|---|
| 2013 | 108.625% |
| 2014 | 105.750% |
| 2015 | 102.875% |
| 2016 and thereafter | 100.000% |

| | |
|---|---|
| | During any 12-month period prior to December 15, 2013, the Company will be entitled to redeem up to 10% of the aggregate principal amount of the First Lien Notes at a redemption price equal to 103.000% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, to the redemption date. |
| **Optional Redemption with Equity Proceeds:** | Prior to December 15, 2013, up to 35% of the original aggregate principal amount at 111.500%, plus accrued and unpaid interest. |
| **Change of Control:** | 101% |
| **Sole Book-Runner:** | J.P. Morgan Securities LLC |
| **Co-Managers:** | Deutsche Bank Securities Inc.<br>Credit Suisse Securities (USA) LLC |
| **Trade Date:** | November 16, 2010 |
| **Settlement Date:** | December 1, 2010  ("T+10") |
| **Distribution:** | Rule 144A and Regulation S with registration rights as set forth in the Preliminary Offering Memorandum |
| **CUSIP/ISIN Numbers:** | 144A CUSIP:  00175K AA2 |
| | 144A ISIN:  US00175KAA25 |
| | Regulation S CUSIP:  U03193 AA4 |
| | Regulation S ISIN:  USU03193AA44 |
| **Denominations:** | $2,000 and integral multiples of $1,000 in excess thereof |

-2-

**Additional Changes to the Preliminary Offering Memorandum**:

In addition to the pricing information set forth above, the Preliminary Offering Memorandum will be updated to reflect the following changes:

**Modifications to the First Lien Notes**

*The following revision is made under the caption "Escrow of Proceeds--Release Conditions" on page 130:*

Clause (6) is hereby replaced in its entirety with the following:

"(6) the Company and its Subsidiaries shall have no debt for borrowed money other than (a) the First Lien Notes and the Second Lien Notes (or any New PIK Notes issued in lieu of Second Lien Notes pursuant to the Plan), (b) the Credit Agreement and (c) up to $2 million of general debt for borrowed money;"

*Under the heading "Description of first lien notes—Certain covenants", the following language is added below the last full paragraph on page 168 of the Preliminary Offering Memorandum:*

**"Non-Impairment of security interest**

From and after the Release Date and subject to the rights of the holders of Permitted Liens that are existing on the Release Date or incurred after the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission could reasonably be expect to have the result of materially impairing the Lien with respect to the Collateral in favor of the holders of First Lien Obligations; provided that this covenant shall not prohibit the release of Guarantors as set forth herein under "—Guarantees," or the release of Collateral as set forth herein under "Certain covenants—Liens," "Security for the notes—Limitations on pledged equity interests," or "Security for the notes—Release of Collateral."

*The following revisions are made to the definitions found under the heading "Certain definitions" beginning on page 178:*

1. Clause (e) of the definition of "Asset Sales" set forth under the heading "Certain definitions" is hereby replaced in its entirety with the following:

"(e) any disposition of property or assets or issuance of securities (i) by a Guarantor to the Company or by the Company or a Guarantor to another Guarantor or (ii) by a Restricted Subsidiary that is not a Guarantor to the Company, a Guarantor or to another Restricted Subsidiary that is not a Guarantor;"

2. Clause (vi) of the definition of "Permitted Holders" set forth under the heading "Certain definitions" is hereby replaced in its entirety with the following: "(vi) [reserved],".

3. Clause (11) of the definition of "Permitted Investments" is hereby replaced in its entirety with the following:

"(11) any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "Certain covenants—Transactions with affiliates" (except transactions described in clauses (2), (5) and (16) of such paragraph);"

4. Clause 6(ii) of the definition of "Permitted Liens" is hereby amended by adding the following language at the end thereof: "covering only the property (real or personal) or equipment (other than software), whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, in each case, financed by or acquired with such Indebtedness".

5. The definition of "Permitted Parent" is hereby deleted.

-3-

**The Second Lien Notes**

In lieu of offering the second lien notes pursuant to the Preliminary Offering Memorandum, the Company expects to issue up to $140 million aggregate principal amount of second lien notes due 2018 (the "Plan second lien notes"), of which at least $25 million shall be issued to the Backstop Parties in accordance with the Plan as described in the Preliminary Offering Memorandum and the balance may be issued in accordance with the Plan or may be issued in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date. The terms of the Plan second lien notes are expected to be substantially consistent with the terms set forth in the Preliminary Offering Memorandum under the heading "Description of second lien notes," but with the same modifications as set forth above under "Modifications to the First Lien Notes".

The Plan second lien notes are expected to have a yield to maturity not to exceed 13.5% per annum. It is expected that prior to the third anniversary of their issue date, the Company will not be permitted to redeem the Plan second lien notes except (i) at a price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, plus a "T+50" make-whole premium or (ii) pursuant to an "equity clawback" of up to 35% of the aggregate principal amount of the Plan second lien notes issued with the proceeds of certain equity offerings at a price equal to 100% of the principal amount thereof, plus a premium equal to the stated coupon of the Plan second lien notes; *provided* that in the case of this clause (ii) at least 65% of the aggregate principal amount of the Plan second lien notes remain outstanding immediately thereafter. It is expected that on and after the third anniversary of their issue date, the Plan second lien notes may be redeemed by the Company in whole or in part at any time or from time to time at 100% of the principal amount thereof plus accrued and unpaid interest thereon, if any, plus a premium equal to one half of the stated coupon on such Plan second lien notes, which premium shall decline ratably on each subsequent anniversary of the issue date to zero on the date that is two years prior to the maturity of the Plan second lien notes.

**Related party transactions - Backstop Agreement**

As described under "Plan of reorganization," 2009 Term Facility Lenders will have the option to put any Plan second lien notes they receive pursuant to the Plan to the Backstop Parties. Specifically, the Backstop Parties have, severally and not jointly, committed to purchase at face amount their *pro rata* share (based upon their *pro rata* share of all Existing Subordinated Notes held collectively by the Backstop Parties) of any Plan second lien notes that would otherwise be distributed to the 2009 Term Facility Lenders pursuant to the Plan to the extent such 2009 Term Facility Lenders have so elected; *provided* that in no event shall more than $115 million of Plan second lien notes (other than on account of the Existing PIK Notes) be issued. The Backstop Parties shall receive from the Company a fee equal to 5% of the aggregate principal amount of Plan second lien notes issued or put to the Backstop Parties under the Plan (other than on account of the Existing PIK Notes), which fee shall be payable in cash.

**Plan of reorganization – Treatment of certain claims under the plan of reorganization**

Pursuant to the Plan, the holders of the Existing PIK Notes are expected to receive, subject to certain conditions, (i) Plan second lien notes, (ii) new unsecured pay-in-kind notes that are scheduled to mature after the maturity date of the first lien notes offered hereby ("New PIK Notes"), (iii) new preferred stock of AMI that will not be mandatorily redeemable by AMI prior to the maturity date of the first lien notes offered hereby ("New Preferred Stock") or (iv) a combination of the foregoing.

*This material is confidential and is for your information only and is not intended to be used by anyone other than you. This information does not purport to be a complete description of these securities or the offering. Please refer to the offering memorandum for a complete description.*

*This communication is being distributed in the United States solely to Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act of 1933, as amended, and outside the United States solely to non-U.S. persons as defined under Regulation S.*

*This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction.*

*Any disclaimers or notices that may appear on this communication below the text of this legend are not applicable to this communication and should be disregarded.  Such disclaimers may have been electronically generated as a result of this communication being sent via, or posted on, Bloomberg or another electronic mail system.*

<u>EXHIBIT B</u>

<u>Restrictions on Offers and Sales Outside the United States</u>

In connection with offers and sales of Notes outside the United States:

      (a)      Each Initial Purchaser acknowledges that the Notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except pursuant to an exemption from, or in transactions not subject to, the registration requirements of the Securities Act.

      (b)      Each Initial Purchaser, severally and not jointly, represents, warrants and agrees that:

      (i)      Such Initial Purchaser has offered and sold the Notes, and will offer and sell the Securities, (A) as part of their distribution at any time and (B) otherwise until 40 days after the later of the commencement of the offering of the Notes and the Closing Date, only in accordance with Regulation S under the Securities Act ("<u>Regulation S</u>") or Rule 144A or any other available exemption from registration under the Securities Act.

      (ii)      None of such Initial Purchaser or any of its affiliates or any other person acting on its or their behalf has engaged or will engage in any directed selling efforts with respect to the Notes, and all such persons have complied and will comply with the offering restrictions requirement of Regulation S.

      (iii)      At or prior to the confirmation of sale of any Notes sold in reliance on Regulation S, such Initial Purchaser will have sent to each distributor, dealer or other person receiving a selling concession, fee or other remuneration that purchases Notes from it during the distribution compliance period a confirmation or notice to substantially the following effect:

      "The Securities covered hereby have not been registered under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (i) as part of their distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the offering of the Securities and the date of original issuance of the Securities, except in accordance with Regulation S or Rule 144A or any other available exemption from registration under the Securities Act.  Terms used above have the meanings given to them by Regulation S."

      (iv)      Such Initial Purchaser has not and will not enter into any contractual arrangement with any distributor with respect to the distribution of the Notes, except with its affiliates or with the prior written consent of Escrow Corporation.

      Terms used in paragraph (a) and this paragraph (b) and not otherwise defined in this Agreement have the meanings given to them by Regulation S.

    (c)        Each Initial Purchaser, severally and not jointly, represents, warrants and agrees that:

       (i)       it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the United Kingdom Financial Services and Markets Act 2000 (the "<u>FSMA</u>")) received by it in connection with the issue or sale of any Securities in circumstances in which Section 21(1) of the FSMA does not apply to Escrow Corporation and the Company; and

       (ii)      it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Notes in, from or otherwise involving the United Kingdom.

    (d)        Each Initial Purchaser acknowledges that no action has been or will be taken by Escrow Corporation or the Company that would permit a public offering of the Notes, or possession or distribution of any of the Time of Sale Information, the Offering Memorandum, any Issuer Written Communication or any other offering or publicity material relating to the Notes, in any country or jurisdiction where action for that purpose is required.

<u>EXHIBIT C-1</u>

<u>Form of Opinion of Akin Gump Strauss Hauer & Feld LLP- Release Date</u>

1.  The Company is validly existing as a corporation in good standing under the laws of the State of Delaware.

2.  The Company has corporate power and authority to own its properties and to carry on its business as described in the Time of Sale Information and the Offering Memorandum.

3.  Each of the Guarantors incorporated or formed in the State of Delaware, as identified on a schedule to the opinion (the "<u>Delaware Guarantors</u>"), is validly existing as a corporation or limited liability company in good standing under the laws of the jurisdiction of its incorporation, has power and authority as a corporation or limited liability company to own its properties and to carry on its business as described in the Time of Sale Information and the Offering Memorandum.

4.  The execution, delivery and performance by the Company, Escrow Corporation and each Delaware Guarantor of the Release Documents to which the Company, Escrow Corporation and each Delaware Guarantor is a party (with respect to Escrow Corporation solely the Supplemental Indenture) have been duly authorized by all necessary corporate or limited liability company action, as applicable, on the part of the Company, Escrow Corporation and each Delaware Guarantor.  The Release Documents have been validly executed and delivered by the Company, Escrow Corporation and each Delaware Guarantor, as applicable.

5.  Each of the Release Documents (with respect to Escrow Corporation solely the Supplemental Indenture) constitutes valid and binding obligation of the Company, Escrow Corporation and of each Guarantor party thereto, enforceable against each in accordance with its terms.

6.  The execution and delivery by the Company, Escrow Corporation and the Delaware Guarantors of the Release Documents to which the Company, Escrow Corporation and each Delaware Guarantor is a party and the performance by the Company, Escrow Corporation and the Delaware Guarantors of their obligations thereunder, did not and will not: (a) result in a violation of the certificate of incorporation or by-laws (or comparable organizational documents) of the Company, Escrow Corporation or any Delaware Guarantor; or (b) result in a violation of any Included Laws (other than federal securities laws (including the Trust Indenture Act) and the rules and regulations of the Commission thereunder or the rules and regulations of FINRA, as to which such counsel need not express any opinion).

7.  The execution and delivery by the Company, Escrow Corporation and the Delaware Guarantors of the Release Documents to which the Company, Escrow Corporation and each Delaware Guarantor is a party and the performance by the Company, Escrow Corporation and the Delaware Guarantors of their obligations thereunder, did not and will not result in a violation of, or breach or default under, any of the agreements identified in Schedule I to the Officer's Certificates (each an "<u>Applicable Agreement</u>"); *provided, however,* that such counsel need not express any opinion as to the effect of the performance of the Company, Escrow Corporation or the Delaware Guarantors of their obligations under the Release Documents with respect to their compliance with financial covenants in any Applicable Agreement.  If any Applicable Agreement is governed by the laws of a jurisdiction other than

New York, such counsel may assume such Applicable Agreement is governed by the laws of the State of New York.

8.  Upon the Escrow Assumption, the Notes will have been duly authorized by the Company and will constitute the valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, and will be entitled to the benefits of the Indenture.

9.  Upon the Escrow Assumption, the Guarantees of the Notes by the Delaware Guarantors will have been duly authorized by the Delaware Guarantors and the Guarantees will constitute valid and binding agreements of the Guarantors, and will be entitled to the benefits of the Indenture.

10. Upon the Escrow Assumption, the issuance of the Exchange Securities will have been duly authorized by all necessary corporate action on the part of the Company and, upon delivery of the Exchange Securities in accordance with the Indenture, the Registration Rights Agreement and the Exchange Offer, when executed by the Company and upon the authentication of the certificate or certificates representing the Exchange Securities by a duly authorized signatory of the Trustee in accordance with the terms of the Indenture, the Exchange Securities will be the valid and binding obligations of the Company, enforceable against the Company in accordance with their terms, and entitled to the benefits of the Indenture.

11. Upon the Escrow Assumption, the Guarantees of the Exchange Securities by the Delaware Guarantors will have been duly authorized by all necessary corporate or limited liability company action on the party of the Delaware Guarantors and, upon delivery of the Exchange Securities in accordance with the Indenture, the Registration Rights Agreement and the Exchange Offer, when executed by the Guarantors and upon the authentication by a duly authorized signatory of the Trustee in accordance with the terms of the Indenture, the Guarantees will be the valid and binding obligations of the Guarantors, enforceable against the Guarantors in accordance with their terms.

12. No consent, approval, authorization or other order of or filing with, any governmental agency or body is required under any of the Included Laws  on the part of the Company, Escrow Corporation or the Delaware Guarantors for the execution and delivery of the Release Documents or the performance by the Company, Escrow Corporation or the Guarantors of their obligations thereunder, except (a) such as have been obtained on or prior to the Release Date, (b) such as may be required under the Act, the Exchange Act, the Trust Indenture Act and the various rules and regulations thereunder and (c) solely as to the performance of their obligations under each of the Release Documents, routine filings necessary in connection with the conduct of the businesses of the Company and the Delaware Guarantors.

13. The Security Agreement is effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a security interest (the "Security Interest") in that portion of the Collateral (as defined in the Security Agreement) of the Company and the Guarantors in which a security interest may be created under Article 9 of the Uniform Commercial Code as in effect on the date hereof in the State of New York (the "Code").

14. Upon the filing of the Financing Statements with the Secretary of State of the State of Delaware (the "Filing Office"), the Collateral Agent, for the benefit of the Secured Parties, will have a perfected Security Interest in the interest of the Company and the Delaware Guarantors in that portion of the Collateral (as defined in the Security Agreement) in which a

-2-

security interest may be perfected under Article 9 of the Uniform Commercial Code as currently in effect in the State of Delaware by the filing of a financing statement in the State of Delaware.

15. Upon delivery of the certificates representing the Certificated Securities (as defined below) identified on Schedule [●] to the Security Agreement to the Collateral Agent in the State of New York, effectively endorsed to the Collateral Agent or in blank, the Collateral Agent will acquire a perfected Security Interest for the benefit of the Secured Parties in such Certificated Securities, free of adverse claims.  For purposes of this paragraph, "<u>Certificated Securities</u>" means "certificated securities" as defined in Section 8-102 of the Code.

16. Neither the Company nor any of the Guarantors is, or after giving effect to the Escrow Assumption as described in the Time of Sale Information and the Offering Memorandum, will be, an investment company required to register under the Investment Company Act of 1940, as amended.

EXHIBIT C-2

Form of Opinion of David Olson, Corporate Counsel - Release Date

1.  National Enquirer, Inc. (the "Florida Guarantor") is validly existing as a corporation in good standing under the laws of the State of Florida, has power and authority as a corporation to own its properties and to carry on its business as described in the Time of Sale Information and the Offering Memorandum.

2.  The execution, delivery and performance by the Florida Guarantor of the Release Documents to which the Florida Guarantor is a party have been duly authorized by all necessary corporate action, as applicable, on the part of the Florida Guarantor.  The Release Documents have been validly executed and delivered by the Florida Guarantor.

3.  The execution and delivery by the Florida Guarantor of the Release Documents to which the Florida Guarantor is a party and the performance by the Florida Guarantor of its obligations thereunder, did not and will not: (a) result in a violation of the certificate of incorporation or by-laws of the Florida Guarantor; or (b) result in a violation of any Included Laws (other than federal securities laws (including the Trust Indenture Act) and the rules and regulations of the Commission thereunder or the rules and regulations of FINRA, as to which such counsel need not express any opinion).

4.  The execution and delivery by the Florida Guarantor of the Release Documents to which the Florida Guarantor is a party and the performance by the Florida Guarantor of its obligations thereunder, did not and will not result in a violation of, or breach or default under, any of the agreements identified in Schedule I to the Officer's Certificates (each an "Applicable Agreement"); *provided, however*, that such counsel need not express any opinion as to the effect of the performance of the Florida Guarantor of its obligations under the Release Documents with respect to its compliance with financial covenants in any Applicable Agreement.  If any Applicable Agreement is governed by the laws of a jurisdiction other than New York, such counsel may assume such Applicable Agreement is governed by the laws of the State of New York.

5.  Upon the Escrow Assumption, the Guarantees by the Florida Guarantor will have been duly authorized by the Florida Guarantor.

6.  Upon the Escrow Assumption, the Guarantees of the Exchange Securities by the Florida Guarantor will have been duly authorized by all necessary corporate action on the part of the Florida Guarantor.

7.  No consent, approval, authorization or other order of or filing with, any governmental agency or body is required under any of the Included Laws (as defined below) on the part of the Florida Guarantor for the execution and delivery of the Release Documents or the performance by the Florida Guarantor of its obligations thereunder, except (a) such as have been obtained on or prior to the Release Date, (b) such as may be required under the Act, the Exchange Act, the Trust Indenture Act and the various rules and regulations thereunder and (c) solely as to the performance of its obligations under each of the Release Documents, routine filings necessary in connection with the conduct of the businesses of the Florida Guarantor.

8.  Upon the filing of the Financing Statements with the Secretary of State of the State of Florida (the "<u>Filing Office</u>"), the Collateral Agent, for the benefit of the Secured Parties, will have a perfected Security Interest in the interest of the Florida Guarantor in that portion of the Collateral (as defined in the Security Agreement) in which a security interest may be perfected under Article 9 of the Uniform Commercial Code as currently in effect in the State of Florida by the filing of a financing statement in the State of Florida.

<u>EXHIBIT C-3</u>

<u>Form of Opinion of Akin Gump Strauss Hauer & Feld LLP- Closing Date</u>

1.       Escrow Corporation is validly existing as a corporation in good standing under the laws of the State of Delaware.

2.       Escrow Corporation has corporate power to own its properties and to carry on its business as described in the Time of Sale Information and the Offering Memorandum.

3.       The execution and delivery of the Purchase Agreement by Escrow Corporation has been duly authorized by all necessary corporate action on the part of Escrow Corporation.  The Purchase Agreement has been validly executed and delivered by Escrow Corporation.

4.       The Escrow Agreement has been duly authorized, executed and delivered by Escrow Corporation and constitutes a valid and binding obligation of Escrow Corporation, enforceable against the Escrow Corporation in accordance with its terms.

5.       The execution and delivery of the Registration Rights Agreement and the Indenture by Escrow Corporation and the performance by Escrow Corporation of its obligations thereunder have been duly authorized by all necessary corporate action on the part of Escrow Corporation.  The Registration Rights Agreement and the Indenture has been validly executed and delivered by Escrow Corporation.

6.       The Registration Rights Agreement and the Indenture constitutes the valid and binding obligation of Escrow Corporation, enforceable against Escrow Corporation in accordance with its terms.

7.       The issuance of the Notes has been duly authorized by all necessary corporate action on the part of Escrow Corporation, the Notes have been validly executed by Escrow Corporation and, upon payment for and delivery of the Notes in accordance with the Purchase Agreement and upon the authentication of the certificate or certificates representing the Notes by a duly authorized signatory of the Trustee in accordance with the terms of the Indenture, the Notes will be the valid and binding obligations of Escrow Corporation, enforceable against the Escrow Corporation in accordance with their terms, and entitled to the benefits of the Indenture.

8.       The Notes, the Indenture and the Registration Rights Agreement conform in all material respects to the descriptions thereof contained in the Time of Sale Information and the Offering Memorandum.

9.       Escrow Corporation is not, nor after giving effect to the offering and sale of the Notes and the application of the proceeds therefrom as described in the Time of Sale Information and the Offering Memorandum, will be, an investment company required to register under the Investment Company Act of 1940, as amended.

10.     No consent, approval, authorization or other order of or filing with, any governmental agency or body is required under any of the Included Laws (as defined in such counsel's opinion) on the part of Escrow Corporation for the execution and delivery of the Escrow Agreement, the Indenture or the Registration Rights Agreement or the performance by

Escrow Corporation of its obligations thereunder and the performance by Escrow Corporation of its obligations under the Purchase Agreement, including the issuance and sale of the Notes by the Escrow Corporation, except (a) such as have been obtained on or prior to the date hereof and (b) such as may be required under the Act, the Exchange Act, the Trust Indenture Act and the various rules and regulations thereunder.

11.    (a)    Assuming the "Escrow Account" referred to in the Escrow Agreement (the "Deposit Account") is maintained at the Escrow Agent and the Deposit Account is a "deposit account," the Escrow Agent is a "bank," the State of New York is the "bank's jurisdiction" with respect thereto, each within the meaning of the Uniform Commercial Code, as in effect on the date hereof in the State of New York (the "New York UCC"), the Escrow Agreement creates in favor of the Trustee for the benefit of the holders of the Notes a security interest in all of the right, title and interest of Escrow Corporation in the Deposit Account.  The execution and delivery of the Escrow Agreement by the parties to such Escrow Agreement is effective to perfect the security interest of the Trustee in the Escrow Account described therein.

(b)    Assuming the "Escrow Account" referred to in the Escrow Agreement (the "Securities Account") is maintained at the Escrow Agent and the Securities Account is a "securities account," the Escrow Agent is a "securities intermediary," the State of New York is the "securities intermediary's jurisdiction" with respect thereto, each within the meaning of the New York UCC, the Escrow Agreement creates in favor of the Trustee for the benefit of the holders of the Notes a security interest in all of the right, title and interest of Escrow Corporation in the Securities Account and in all security entitlements carried therein.  The execution and delivery of Escrow Agreement by the parties to such Escrow Agreement is effective to perfect the security interest of the Trustee in the Securities Account and in all security entitlements carried therein.

12.    The execution and delivery by Escrow Corporation of the Transaction Documents to which it is a party as of the Closing Date and Escrow Corporation's performance of its obligations thereunder, including the issuance and sale of the Notes by Escrow Corporation, did not and will not (a) result in a violation of Escrow Corporation's certificate of incorporation or by-laws or (b) result in a violation of any Included Laws (other than federal securities laws (including the Trust Indenture Act) and the rules and regulations of the Commission thereunder or the rules and regulations of FINRA, as to which we do not express any opinion).

13.    The execution and delivery by Escrow Corporation of the Transaction Documents to which it is a party as of the Closing Date and Escrow Corporation's performance of its obligations thereunder, including the issuance and sale of the Notes by Escrow Corporation, did not and will not result in a violation of, or breach or default under, any of the agreements identified in Schedule I to the Officer's Certificates (each an "Applicable Agreement"); *provided, however*, that such counsel need not express any opinion as to the effect of the performance of Escrow Corporation of its obligations under the Transaction Documents with respect to its compliance with financial covenants in any Applicable Agreement.  If any Applicable Agreement is governed by the laws of a jurisdiction other than New York, such counsel may assume such Applicable Agreement is governed by the laws of the State of New York.

14.    Assuming without independent investigation (a) that the Notes are sold to the Initial Purchasers, and initially resold by the Initial Purchasers, in accordance with the terms of, and in the manner contemplated by, the Purchase Agreement and the Time of Sale Information; (b) the accuracy of the representations and warranties of Escrow Corporation set forth in the Purchase Agreement and in those certain certificates delivered on the Closing Date; (c) the accuracy of the representations and warranties of the Initial Purchasers set forth in the Purchase Agreement and due performance by the Initial Purchasers of their covenants and agreements set forth in the Purchase Agreement; (d) the due performance of and compliance by Escrow Corporation with its covenants and agreements set forth in the Purchase Agreement; (e) the Initial Purchasers' compliance with the transfer procedures and restrictions described in the Preliminary Offering Memorandum and the Offering Memorandum; (f) the accuracy of the representations and warranties made in accordance with the Purchase Agreement and the "Transfer restrictions" section of the Preliminary Offering Memorandum and the Final Offering Memorandum by each purchaser to whom the Initial Purchasers initially resell the Notes; and (g) that reasonable steps have been taken to ensure that purchasers to whom the Initial Purchasers initially resell the Notes have been informed that the Initial Purchasers are relying on the exemption from the provisions of Section 5 of the Act provided by Rule 144A and Regulation S under the Act in connection with such sales, it is not necessary in connection with (i) the offer, sale and delivery of the Notes by the Escrow Corporation to the Initial Purchasers pursuant to the Purchase Agreement or (ii) the initial resale of the Notes by the Initial Purchasers in the manner contemplated by the Purchase Agreement, the Offering Memorandum and the Indenture, to register the Notes under the Act or to qualify the Indenture under the Trust Indenture Act (it being expressly understood that such counsel expresses no opinion as to any subsequent reoffer or resale of any of the Notes).

15.    The statements in the Preliminary Offering Memorandum, when read together with the Pricing Supplement, and in the Offering Memorandum under the captions "Description of notes" and "Exchange offer; registration rights" insofar as they summarize the Indenture, the Registration Rights Agreement and the terms of the Notes, the Guarantees, the Exchange Securities or the Exchange Securities Guarantees, are correct in all material respects.

16.    The statements in the Preliminary Offering Memorandum and the Offering Memorandum under the caption "Certain U.S. federal income tax considerations," insofar as such statements purport to summarize the United States federal tax laws referred to therein, are correct in all material respects.

EXHIBIT D

**Joinder Agreement**

WHEREAS, AMO Escrow Corporation and the Initial Purchasers named therein (the "Initial Purchasers") heretofore executed and delivered a Purchase Agreement ("Purchase Agreement"), dated November 16, 2010, providing for the issuance and sale of the Notes (as defined therein); and

WHEREAS, American Media Operations, Inc. (the "Company") and each of the Guarantors (as defined in the Purchase Agreement), which were originally not a party thereto, have agreed to join in the Purchase Agreement on the Release Date.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

NOW, THEREFORE, the Company and the Guarantors each hereby agree for the benefit of the Initial Purchasers, as follows:

1.      Joinder.  Each of the undersigned signatory parties hereby acknowledges that it has received and reviewed a copy of the Purchase Agreement and all other documents it deems fit to enter into this Joinder Agreement (the "Joinder Agreement"), and acknowledges and agrees to (i) join and become a party to the Purchase Agreement as indicated by its signature below; (ii) be bound by all covenants, agreements, representations, warranties, indemnities and acknowledgments attributable to Escrow Corporation and to such signatory party in the Purchase Agreement as if made by, and with respect to, such signatory party; and (iii) perform all obligations and duties required and be entitled to all the benefits of Escrow Corporation and of such signatory party pursuant to the Purchase Agreement.

2.      Representations and Warranties and Agreements of the Company and the Guarantors. Each of the undersigned hereby represents and warrants to and agrees with the Initial Purchasers that it has all the requisite corporate or limited liability company power and authority, as the case may be, to execute, deliver and perform its obligations under this Joinder Agreement and to consummate the transaction contemplated hereby.  This Joinder Agreement has been duly authorized, executed and delivered by each of the undersigned, and constitutes a valid and legally and binding agreement enforceable against each of the undersigned in accordance with its terms.

3.      Counterparts.  This Joinder Agreement may be signed in one or more counterparts (which may be delivered in original form or via facsimile), each of which shall constitute an original when so executed and all of which together shall constitute one and the same agreement.

4.      Amendments.  No amendment or waiver of any provision of this Joinder Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by all of the parties to the Purchase Agreement.

5.      Headings.  The section headings used herein are for convenience only and shall not affect the construction hereof.

6.      APPLICABLE LAW.  THIS JOINDER AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS JOINDER AGREEMENT SHALL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

-4-

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first written above.

AMERICAN MEDIA OPERATIONS, INC.

By: _____
      Name:
      Title:

[GUARANTORS]

By: _____
      Name:
      Title:

## **EXHIBIT D**

**Registration Rights Agreement for New First Lien Notes**

EXECUTION VERSION

REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT dated as of December 1, 2010 (this "Agreement") is entered into by and between AMO Escrow Corporation, a Delaware corporation (the "Escrow Corporation") and J.P. Morgan Securities LLC ("JPMorgan"), as representative of the several initial purchasers listed on Schedule I to the Purchase Agreement (as defined below) (collectively, the "Initial Purchasers"), each of whom has agreed to purchase a portion of the $385,000,000 aggregate principal amount of the Escrow Corporation's 11½% First Lien Senior Secured Notes due 2017 (the "Initial Notes") to be guaranteed by the Guarantors (the "Guarantees") pursuant to the Purchase Agreement. The Initial Notes and the Guarantees are herein collectively referred to as the "Securities." On the Release Date (as defined below), American Media Operations, Inc., a Delaware corporation (the "Company") and the Subsidiary Guarantors (as defined in the Purchase Agreement) will execute a registration rights agreement joinder in the form of Exhibit A hereto (the "Joinder Agreement") pursuant to which the Company and the Guarantors will become a party to this Agreement.

This Agreement is made pursuant to the Purchase Agreement dated November 16, 2010 (the "Purchase Agreement") by and between the Escrow Corporation and the Initial Purchasers (i) for the benefit of the Initial Purchasers and (ii) for the benefit of the Holders from time to time of the Securities, including the Initial Purchasers. In order to induce the Initial Purchasers to purchase the Securities, the Escrow Corporation has agreed to provide to the Initial Purchasers and their direct and indirect transferees the registration rights set forth in this Agreement. The execution and delivery of this Agreement is a condition to the obligations of the Initial Purchasers set forth in Section 5(j) of the Purchase Agreement.

For purposes of this Agreement only (x) prior to the Release Date, references to the "Company" shall be deemed references to AMO Escrow Corporation and (y) on and after the Release Date, references to the "Company" shall be deemed references to American Media Operations, Inc.

In consideration of the foregoing, the parties hereto agree as follows:

1.    Definitions. As used in this Agreement, the following terms shall have the following meanings:

"Additional Guarantor" shall mean any subsidiary of the Company that executes a Subsidiary Guarantee under the Indenture after the Release Date.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Company" shall have the meaning set forth in the preamble and shall also include the Company's successors.

"Escrow Corporation" shall have the meaning set forth in the preamble hereof and shall also include the Escrow Corporation's successors.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

"Exchange Dates" shall have the meaning set forth in Section 2(a)(ii) hereof.

"Exchange Offer" shall mean the exchange offer by the Company and the Guarantors of Exchange Securities for Registrable Securities pursuant to Section 2(a) hereof.

"Exchange Offer Registration" shall mean a registration under the Securities Act effected pursuant to Section 2(a) hereof.

"Exchange Offer Registration Statement" shall mean an exchange offer registration statement on Form S-4 (or, if applicable, on another appropriate form) and all amendments and supplements to such registration statement, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein.

"Exchange Securities" shall mean first lien senior secured notes issued by the Company and guaranteed by the Guarantors under the Indenture containing terms identical to the Securities (except that the Exchange Securities will not be subject to restrictions on transfer or to any increase in annual interest rate for failure to comply with this Agreement) and to be offered to Holders of Securities in exchange for Securities pursuant to the Exchange Offer.

"FINRA" shall mean the Financial Industry Regulatory Authority, Inc.

"Free Writing Prospectus" shall mean each free writing prospectus (as defined in Rule 405 under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the sale of the Securities or the Exchange Securities.

"Guarantors" shall mean, on the Release Date upon execution and delivery of the Joinder Agreement, the Subsidiary Guarantors, and shall thereafter include any Guarantor's successors and any Additional Guarantors.

"Holders" shall mean the Initial Purchasers, for so long as they own any Registrable Securities, and each of their successors, assigns and direct and indirect transferees who become owners of Registrable Securities under the Indenture; provided that for purposes of Sections 4 and 5 of this Agreement, the term "Holders" shall include Participating Broker-Dealers.

"Holders' Inspector" shall have the meaning set forth in Section 3(a)(xiv) hereof.

"Indemnified Person" shall have the meaning set forth in Section 5(c) hereof.

"Indemnifying Person" shall have the meaning set forth in Section 5(c) hereof.

"Indenture" shall mean the Indenture relating to the Securities dated as of December 1, 2010 by and between Escrow Corporation and Wilmington Trust FSB, as trustee and collateral agent, and as the same may be amended from time to time in accordance with the terms thereof.

"Information" shall have the meaning set forth in Section 3(a)(xiv) hereof.

"Initial Purchasers" shall have the meaning set forth in the preamble.

"Inspectors" shall have the meaning set forth in Section 3(a)(xiv) hereof.

"Issue Date" shall mean December 1, 2010.

"Issuer Information" shall have the meaning set forth in Section 5(a) hereof.

"JPMorgan" shall have the meaning set forth in the preamble.

-2-

"Majority Holders" shall mean the Holders of a majority of the aggregate principal amount of the outstanding Registrable Securities; provided that whenever the consent or approval of Holders of a specified percentage of Registrable Securities is required hereunder, any Registrable Securities owned directly or indirectly by the Company or any of its affiliates shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage or amount; and provided, further, that if the Company shall issue any additional Securities under the Indenture prior to consummation of the Exchange Offer or, if applicable, the effectiveness of any Shelf Registration Statement, such additional Securities and the Registrable Securities to which this Agreement relates shall be treated together as one class for purposes of determining whether the consent or approval of Holders of a specified percentage of Registrable Securities has been obtained.

"Participating Broker-Dealers" shall have the meaning set forth in Section 4(a) hereof.

"Person" shall mean an individual, partnership, limited liability company, corporation, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"Prospectus" shall mean the prospectus included in, or, pursuant to the rules and regulations of the Securities Act, deemed a part of, a Registration Statement, including any preliminary prospectus, and any such prospectus as amended or supplemented by any prospectus supplement, including a prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by a Shelf Registration Statement, and by all other amendments and supplements to such prospectus, and in each case including any document incorporated by reference therein.

"Purchase Agreement" shall have the meaning set forth in the preamble.

"Records" shall have the meaning set forth in Section 3(a)(xiv) hereof.

"Registrable Securities" shall mean the Securities; provided that the Securities shall cease to be Registrable Securities on the earliest of (i) when an Exchange Offer is completed (except with respect to Securities held by Persons that were not eligible to participate in the Exchange Offer), (ii) when a Registration Statement with respect to such Securities has become effective under the Securities Act and such Securities have been exchanged or disposed of pursuant to such Registration Statement (iii) the second anniversary of the Issue Date or (iv) when such Securities cease to be outstanding.

"Registration Actions" shall have the meaning set forth in Section 3(d)(i) hereof.

"Registration Default" shall have the meaning set forth in Section 2(d) hereof.

"Registration Expenses" shall mean any and all expenses incident to performance of or compliance by the Company and the Guarantors with this Agreement, including without limitation:  (i) all SEC, stock exchange or FINRA registration and filing fees, (ii) all fees and expenses incurred in connection with compliance with state securities or blue sky laws (including reasonable fees and disbursements of one counsel for any Underwriters or Holders (which counsel shall be selected by the Majority Holders and which counsel may also be counsel for the Initial Purchasers) in connection with blue sky qualification of any Exchange Securities or Registrable Securities), (iii) all expenses of the Company and the Guarantors in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any Free Writing Prospectus and any amendments or supplements thereto, any underwriting agree-

ments, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement, (iv) all rating agency fees, (v) all fees and disbursements relating to the qualification of the Indenture under applicable securities laws, (vi) the fees and disbursements of the Trustee and its counsel as may be agreed by the Company and the Trustee, (vii) the fees and disbursements of counsel for the Company and the Guarantors and, in the case of a Shelf Registration Statement, the reasonable fees and disbursements of one counsel for the Holders (which counsel shall be selected by the Majority Holders and which counsel may also be counsel for the Initial Purchasers) and (viii) the fees and disbursements of the independent public accounting firm of the Company and the Guarantors, including the expenses of any special audits or "comfort" letters required by or incident to the performance of and compliance with this Agreement, but excluding fees and expenses of counsel to the Underwriters (other than fees and expenses set forth in clause (ii) above) or the Holders and underwriting discounts and commissions, brokerage commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities by a Holder.

"Registration Statement" shall mean any registration statement filed under the Securities Act of the Company and the Guarantors that covers any of the Exchange Securities or Registrable Securities pursuant to the provisions of this Agreement and all amendments and supplements to any such registration statement, including post-effective amendments, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein.

"Release Date" shall have the meaning set forth in the Purchase Agreement.

"SEC" shall mean the United States Securities and Exchange Commission.

"Securities" shall have the meaning set forth in the preamble.

"Securities Act" shall mean the Securities Act of 1933, as amended from time to time.

"Shelf Effectiveness Period" shall have the meaning set forth in Section 2(b) hereof.

"Shelf Registration" shall mean a registration effected pursuant to Section 2(b) hereof.

"Shelf Registration Statement" shall mean a "shelf" registration statement of the Company and the Guarantors that covers all or a portion of the Registrable Securities (but no other securities unless approved by a majority of the Holders whose Registrable Securities are to be covered by such Shelf Registration Statement) on an appropriate form under Rule 415 under the Securities Act, or any similar rule that may be adopted by the SEC, and all amendments and supplements to such registration statement, including post-effective amendments, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein.

"Shelf Request" shall have the meaning set forth in Section 2(b) hereof.

"Staff" shall mean the staff of the SEC.

"Subsidiary Guarantees" shall mean the guarantees of the Securities and Exchange Securities by the Guarantors under the Indenture.

"Suspension Notice" shall have the meaning set forth in Section 3(d)(i) hereof.

-4-

"Suspension Period" shall have the meaning set forth in Section 3(d)(i) hereof.

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended from time to time.

"Trustee" shall mean the trustee with respect to the Securities under the Indenture.

"Underwriter" shall have the meaning set forth in Section 3(e) hereof.

"Underwriter Inspector" shall have the meaning set forth in Section 3(a)(xiv) hereof.

"Underwritten Offering" shall mean an offering in which Registrable Securities are sold to an Underwriter for reoffering to the public.

2.    Registration Under the Securities Act.

(a)    To the extent not prohibited by any applicable law or applicable interpretations of the Staff, the Company and the Guarantors shall use their commercially reasonable efforts to (i) cause to be filed an Exchange Offer Registration Statement covering an offer to the Holders to exchange all the Registrable Securities for Exchange Securities with the SEC, (ii) as soon as reasonably practicable following the filing of the Exchange Offer Registration Statement referred to in clause (i), cause such Exchange Offer Registration Statement to become effective under the Securities Act and (iii) have such Registration Statement remain effective until 180 days after the last Exchange Date for use by one or more Participating Broker Dealers.  The Company and the Guarantors shall commence the Exchange Offer promptly after the Exchange Offer Registration Statement is declared effective by the SEC and use their commercially reasonable efforts to complete the Exchange Offer not later than 450 days after the Issue Date.

The Company and the Guarantors shall commence the Exchange Offer by mailing the related Prospectus, appropriate letters of transmittal and other accompanying documents to each Holder stating, in addition to such other disclosures as are required by applicable law, substantially the following:

(i)    that the Exchange Offer is being made pursuant to this Agreement and that all Registrable Securities validly tendered and not properly withdrawn will be accepted for exchange.

(ii)    the dates of acceptance for exchange (which shall be a period of at least 20 Business Days from the date such notice is mailed) (the "Exchange Dates");

(iii)    that any Registrable Security not tendered will remain outstanding and continue to accrue interest but will not retain any rights under this Agreement, except as otherwise specified herein;

(iv)    that any Holder electing to have a Registrable Security exchanged pursuant to the Exchange Offer will be required to (A) surrender such Registrable Security, together with the appropriate letters of transmittal, to the institution and at the address (located in the Borough of Manhattan, The City of New York) and in the manner specified in the notice, or (B) effect such exchange otherwise in compliance with the applicable procedures of the depositary for such Registrable Security, in each case prior to the close of business on the last Exchange Date; and

(v)    that any Holder will be entitled to withdraw its election, not later than the close of business (New York City time) on the last Business Day of the Exchange Offer, by (A) sending to the institution and at the address (located in the Borough of Manhattan, The City of New York) specified in the notice, a telegram, telex, facsimile transmission or letter setting forth the name of such Holder, the principal amount of Registrable Securities delivered for exchange and a statement that such Holder is withdrawing its election to have such Registrable Securities exchanged or (B) effecting such withdrawal in compliance with the applicable procedures of the depositary for the Registrable Securities.

As a condition to participating in the Exchange Offer, a Holder will be required to represent to the Company and the Guarantors that (i) any Exchange Securities to be received by it will be acquired in the ordinary course of its business, (ii) at the time of the commencement of the Exchange Offer it has no arrangement or understanding with any Person to participate in the distribution (within the meaning of the Securities Act) of the Exchange Securities in violation of the provisions of the Securities Act, (iii) it is not an "affiliate" (within the meaning of Rule 405 under the Securities Act) of the Company or any Guarantor, (iv) if such Holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of Exchange Notes and (v) if such Holder is a broker-dealer that will receive Exchange Securities for its own account in exchange for Registrable Securities that were acquired as a result of market-making or other trading activities, then such Holder will provide such information as may be reasonably requested by the Company and deliver a Prospectus (or, to the extent permitted by law, make available a Prospectus to purchasers) in connection with any resale of such Exchange Securities.

As soon as practicable after the last Exchange Date, the Company and the Guarantors shall:

(i)    accept for exchange Registrable Securities or portions thereof validly tendered and not properly withdrawn pursuant to the Exchange Offer; and

(ii)    deliver, or cause to be delivered, to the Trustee for cancellation all Registrable Securities or portions thereof so accepted for exchange by the Company; and

(iii)    issue, and cause the Trustee to promptly authenticate and deliver to each Holder, Exchange Securities equal in principal amount to the principal amount of the Registrable Securities tendered by such Holder.

The Company and the Guarantors shall use their commercially reasonable efforts to complete the Exchange Offer as provided above and shall comply with the applicable requirements of the Securities Act, the Exchange Act and other applicable laws and regulations in connection with the Exchange Offer. The Exchange Offer shall not be subject to any conditions, other than that the Exchange Offer does not violate any applicable law or applicable interpretations of the Staff.

(b)    In the event that (i) the Company and the Guarantors determine that the Exchange Offer Registration provided for in Section 2(a) above is not available or may not be completed as soon as practicable after the last Exchange Date because it would violate any applicable law or applicable interpretations of the Staff, (ii) the Exchange Offer is not for any other reason completed on or before the 450th day after the Issue Date, (iii) upon receipt of a Holder's request with respect to any Holder of Registrable Securities that (A) is prohibited by applicable law or SEC policy from participating in the Exchange Offer or (B) may not resell the Exchange Securities acquired by it in the Exchange Offer to the public without delivering a prospectus and that the Prospectus contained in the Exchange Offer Registration Statement is not appropriate or available for such resales by such Holder or (iv) upon receipt of a written request (a "Shelf Request") from any Initial Purchaser representing that it holds Registrable Secu-

-6-

rities that are or were ineligible to be exchanged in the Exchange Offer, the Company and the Guarantors shall use their commercially reasonable efforts to cause to be filed after such determination date or Shelf Request, as the case may be, and in any event no later than 450 days after the Issue Date, a Shelf Registration Statement providing for the sale of all the Registrable Securities by the Holders thereof and thereafter to have such Shelf Registration Statement become effective.

In the event that the Company and the Guarantors are required to file a Shelf Registration Statement pursuant to clause (iv) of the preceding sentence, the Company and the Guarantors shall file and use their commercially reasonable efforts to have become effective both an Exchange Offer Registration Statement pursuant to Section 2(a) with respect to all Registrable Securities and a Shelf Registration Statement (which may be a combined Registration Statement with the Exchange Offer Registration Statement) with respect to offers and sales of Registrable Securities held by the Initial Purchasers described in clause (iv) after completion of the Exchange Offer.

The Company and the Guarantors agree to use their commercially reasonable efforts to keep the Shelf Registration Statement continuously effective until the earlier of (i) one year following the initial effectiveness of such Registration Statement or (ii) the date when all of the Registrable Securities covered by the Shelf Registration Statement have been sold or otherwise disposed of pursuant to the Shelf Registration Statement or cease to be Registrable Securities (the "Shelf Effectiveness Period"). The Company and the Guarantors further agree to supplement or amend the Shelf Registration Statement, the related Prospectus and any Free Writing Prospectus if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Shelf Registration Statement or by the Securities Act or by any other rules and regulations thereunder or if reasonably requested by a Holder of Registrable Securities with respect to information relating to such Holder, and to use their commercially reasonable efforts to cause any such amendment to become effective, if required, and such Shelf Registration Statement, Prospectus or Free Writing Prospectus, as the case may be, to become usable as soon as thereafter practicable. The Company and the Guarantors agree to furnish to the Holders of Registrable Securities copies of any such supplement or amendment promptly after its being used or filed with the SEC.

(c)    The Company and the Guarantors shall pay all Registration Expenses in connection with any registration pursuant to Section 2(a) or Section 2(b) hereof. Each Holder shall pay all underwriting discounts and commissions, brokerage commissions and transfer taxes, if any, relating to the sale or disposition of such Holder's Registrable Securities pursuant to the Shelf Registration Statement and any fees and disbursements of counsel or experts retained by such Holder in connection with any registration pursuant hereto (other than any such fees and disbursements included within the definition of Registration Expenses and paid for by the Company and the Guarantors in accordance with the terms of this Agreement).

(d)    An Exchange Offer Registration Statement pursuant to Section 2(a) hereof will not be deemed to have become effective unless it has been declared effective by the SEC. A Shelf Registration Statement pursuant to Section 2(b) hereof will not be deemed to have become effective unless it has been declared effective by the SEC or is automatically effective upon filing with the SEC as provided by Rule 462 under the Securities Act.

In the event that either (i) the Exchange Offer is not completed or the Shelf Registration Statement, if required pursuant to Section 2(b)(i) or 2(b)(ii) hereof, has not become effective on or prior to the date that is 450 days following the Issue Date, (ii) the Company receives a Shelf Request pursuant to Section 2(b)(iii) or 2(b)(iv), and the Shelf Registration Statement required to be filed thereby does not become effective within 450 days following the Issue Date, or (iii) the Exchange Offer Registration Statement or the Shelf Registration Statement, if required hereby, has become effective and thereafter either

-7-

ceases to be effective or the Prospectus contained therein ceases to be usable, in each case whether or not permitted by this Agreement, at any time during the Shelf Effectiveness Period or, in the case of the Exchange Offer Registration Statement, as required by this Agreement, and such failure to remain effective or usable exists for more than 60 days (whether or not consecutive) in any 12-month period (each such event referred to in clauses (i) through (iii), a "Registration Default"), the interest rate on the applicable Registrable Securities will be increased by (A) 0.25% per annum for the first 90-day period immediately following the occurrence of such Registration Default and (B) an additional 0.25% per annum with respect to each subsequent 90-day period until all Registration Defaults with respect to such Registrable Securities have been cured, up to a maximum increase of 1.00% per annum; *provided* that the Company and the Guarantors shall in no event be required to pay additional interest accrued for more than one Registration Default at any given time. Notwithstanding anything to the contrary set forth herein, (1) upon completion of the Exchange Offer in the case of clause (i) above, (2) upon the effectiveness of the Shelf Registration Statement in the case of clause (ii) above, or (3) upon the filing of a post-effective amendment to the Registration Statement or an additional Registration Statement that causes the Exchange Offer Registration Statement (and/or, if applicable, the Shelf Registration Statement) to again be declared effective or made usable in the case of clause (iii) above, additional interest with respect to the Registrable Securities as a result of such clause (i), (ii) or (iii), as applicable, shall cease to accrue. Notwithstanding anything to the contrary set forth in this Agreement, (x) the obligation of the Company and the Guarantors to pay or accrue additional interest as set forth in this paragraph shall be the sole and exclusive monetary remedy of the Initial Purchasers and the Holders in the event of a Registration Default, (y) a Holder of Registrable Securities that is not entitled to the benefits of the Shelf Registration Statement pursuant to the terms of this Agreement shall not be entitled to such additional interest with respect to a Registration Default that pertains to the Shelf Registration Statement and (z) such additional interest shall be paid or accrue only as to the Registrable Securities to which a Registration Default relates.

(e)    Without limiting the remedies available to the Initial Purchasers and the Holders, the Company and the Guarantors acknowledge that any failure by the Company or the Guarantors to comply with their obligations under Section 2(a) and Section 2(b) hereof may result in material irreparable injury to the Initial Purchasers or the Holders for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of any such failure, the Initial Purchasers or any Holder may obtain such relief as may be required to specifically enforce the Company's and the Guarantors' obligations under Section 2(a) and Section 2(b) hereof.

(f)    The Company and the Guarantors, represent, warrant and covenant that, in connection with the Exchange Offer, they (including their respective agents and representatives) will not prepare, make, use, authorize, approve or refer to any Free Writing Prospectus other than any written communication relating to or that contains solely the terms of the Exchange Offer and/or other information that was included in the Registration Statement.

3.    Registration Procedures.

(a)    In connection with their obligations pursuant to Section 2(a) and Section 2(b) hereof, the Company and the Guarantors shall as soon as reasonably practicable:

(i)    prepare and file with the SEC a Registration Statement on the appropriate form under the Securities Act, which form (x) shall be selected by the Company and the Guarantors, (y) shall, in the case of a Shelf Registration, be available for the sale of the Registrable Securities by the Holders thereof and (z) shall comply as to form in all material respects with the requirements of the applicable form and include all financial statements required by the SEC to be filed therewith; and use their commercially reasonable efforts to cause such Registration Statement to

-8-

become effective and remain effective for the applicable period in accordance with Section 2 hereof;

(ii)      subject to Section 3(d) hereof, prepare and file with the SEC such amendments and post-effective amendments to each Registration Statement and file with the SEC any other required document as may be necessary to keep such Registration Statement effective for the applicable period in accordance with Section 2 hereof and cause each Prospectus to be supplemented by any required prospectus supplement and, as so supplemented, to be filed pursuant to Rule 424 under the Securities Act; and keep each Prospectus current during the period described in Section 4(3) of and Rule 174 under the Securities Act that is applicable to transactions by brokers or dealers with respect to the Registrable Securities or Exchange Securities;

(iii)      to the extent any Free Writing Prospectus is used, file with the SEC any Free Writing Prospectus that is required to be filed by the Company or the Guarantors with the SEC in accordance with the Securities Act and to retain any Free Writing Prospectus not required to be filed;

(iv)      in the case of a Shelf Registration, furnish to each Holder of Registrable Securities, to counsel for the Initial Purchasers, to counsel for such Holders and to each Underwriter of an Underwritten Offering of Registrable Securities, if any, without charge, as many copies of each Prospectus, preliminary prospectus or Free Writing Prospectus, and any amendment or supplement thereto, as such Holder, counsel or Underwriter may reasonably request in order to facilitate the sale or other disposition of the Registrable Securities thereunder; and the Company and the Guarantors consent to the use of such Prospectus, preliminary prospectus or such Free Writing Prospectus and any amendment or supplement thereto in accordance with applicable law by each of the Holders of Registrable Securities and any such Underwriters in connection with the offering and sale of the Registrable Securities covered by and in the manner described in such Prospectus, preliminary prospectus or such Free Writing Prospectus or any amendment or supplement thereto in accordance with applicable law;

(v)      use their commercially reasonable efforts to register or qualify the Registrable Securities under all applicable state securities or blue sky laws of such jurisdictions as any Holder of Registrable Securities covered by a Registration Statement shall reasonably request in writing by the time the applicable Registration Statement becomes effective; cooperate with such Holders in connection with any filings required to be made with FINRA; and do any and all other acts and things that may be reasonably necessary or advisable to enable each Holder to complete the disposition in each such jurisdiction of the Registrable Securities owned by such Holder; provided that neither the Company nor any Guarantor shall be required to (1) qualify as a foreign corporation or other entity or as a dealer in securities in any such jurisdiction where it would not otherwise be required to so qualify, (2) file any general consent to service of process in any such jurisdiction or (3) subject itself to taxation in any such jurisdiction if it is not so subject;

(vi)      notify counsel for the Initial Purchasers and, in the case of a Shelf Registration notify each Holder of Registrable Securities and counsel for such Holders promptly and, if requested by any such Holder or counsel, confirm such advice in writing (1) when a Registration Statement has become effective, when any post-effective amendment thereto has been filed and becomes effective, when any Free Writing Prospectus has been filed or any amendment or supplement to the Prospectus or any Free Writing Prospectus has been filed, (2) of any request by the SEC or any state securities authority for amendments to the Prospectus or for additional information after the Registration Statement has become effective, (3) of the issuance by the SEC or any

-9-

state securities authority of any stop order suspending the effectiveness of a Registration State-
ment or the initiation of any proceedings for that purpose, including the receipt by the Company
of any notice of objection of the SEC to the use of a Shelf Registration Statement or any post-
effective amendment thereto pursuant to Rule 401(g)(2) under the Securities Act, (4) if, between
the applicable effective date of a Shelf Registration Statement and the closing of any sale of Reg-
istrable Securities covered thereby, the Company or any Guarantor receives any notification with
respect to the suspension of the qualification of the Registrable Securities for sale in any jurisdic-
tion or the initiation of any proceeding for such purpose, (5) of the happening of any event during
the period a Registration Statement is effective that makes any statement made in such Registra-
tion Statement or the related Prospectus or any Free Writing Prospectus untrue in any material re-
spect or that requires the making of any changes in such Registration Statement or Prospectus or
any Free Writing Prospectus in order to make the statements therein not misleading and (6) of any
determination by the Company or any Guarantor that a post-effective amendment to a Registra-
tion Statement or any amendment or supplement to the Prospectus or any Free Writing Prospectus
would be appropriate;

(vii)    use their reasonable best efforts to obtain the withdrawal of any order suspending
the effectiveness of a Registration Statement or, in the case of a Shelf Registration, the resolution
of any objection of the SEC pursuant to Rule 401(g)(2), including by filing an amendment to such
Shelf Registration Statement on the proper form, as soon as reasonably practicable and provide
prompt notice to each Holder of the withdrawal of any such order or such resolution;

(viii)    in the case of a Shelf Registration, furnish to each Holder of Registrable Securi-
ties, upon request and without charge, at least one conformed copy of each Registration Statement
and any post-effective amendment thereto (without any documents incorporated therein by refer-
ence or exhibits thereto, unless requested);

(ix)    in the case of a Shelf Registration, cooperate with the Holders of Registrable Se-
curities to facilitate the timely preparation and delivery of certificates (unless such Registrable
Securities are in book entry form only, in which case the Company and the Guarantors shall co-
operate to remove the restrictive legends from the existing global notes) representing Registrable
Securities to be sold and not bearing any restrictive legends and enable such Registrable Securi-
ties to be issued in such denominations and registered in such names (consistent with the provi-
sions of the Indenture) as such Holders may reasonably request at least one Business Day prior to
the closing of any sale of Registrable Securities;

(x)    subject to Section 3(d) hereof, in the case of a Shelf Registration, upon the occur-
rence of any event contemplated by Section 3(a)(vi)(5) hereof, use their reasonable best efforts to
prepare and file with the SEC a supplement or post-effective amendment to such Shelf Registra-
tion Statement or the related Prospectus or any Free Writing Prospectus or any document incorpo-
rated therein by reference or file any other required document so that, as thereafter delivered (or,
to the extent permitted by law, made available) to purchasers of the Registrable Securities, such
Prospectus or Free Writing Prospectus, as the case may be, will not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements therein, in the
light of the circumstances under which they were made, not misleading; and the Company and the
Guarantors shall notify the Holders of Registrable Securities to suspend use of the Prospectus or
any Free Writing Prospectus as promptly as practicable after the occurrence of such an event, and
such Holders hereby agree to suspend use of the Prospectus or any Free Writing Prospectus, as
the case may be, until the Company and the Guarantors have amended or supplemented the Pro-

spectus or the Free Writing Prospectus, as the case may be, to correct such misstatement or omission;

(xi)    a reasonable time prior to the filing of any Registration Statement, any Prospectus, any Free Writing Prospectus, any amendment to a Registration Statement or amendment or supplement to a Prospectus or a Free Writing Prospectus or of any document that is to be incorporated by reference into a Registration Statement, a Prospectus or a Free Writing Prospectus after initial filing of a Registration Statement, provide copies of such document to the Initial Purchasers and their counsel (and, in the case of a Shelf Registration Statement, to the Holders of Registrable Securities and their counsel) and make such of the representatives of the Company and the Guarantors as shall be reasonably requested by the Initial Purchasers or their counsel (and, in the case of a Shelf Registration Statement, the Holders of Registrable Securities or their counsel) available for discussion of such document; and the Company and the Guarantors shall not, at any time after initial filing of a Registration Statement, use or file any Prospectus, any Free Writing Prospectus, any amendment of or supplement to a Registration Statement or a Prospectus or a Free Writing Prospectus, or any document that is to be incorporated by reference into a Registration Statement, a Prospectus or a Free Writing Prospectus, of which the Initial Purchasers and their counsel (and, in the case of a Shelf Registration Statement, the Holders of Registrable Securities and their counsel) shall not have previously been advised and furnished a copy or to which the Initial Purchasers or their counsel (and, in the case of a Shelf Registration Statement, the Holders of Registrable Securities or their counsel) shall reasonably object;

(xii)    obtain a CUSIP number for all Exchange Securities or Registrable Securities, as the case may be, not later than the initial effective date of a Registration Statement;

(xiii)    cause the Indenture to be qualified under the Trust Indenture Act in connection with the registration of the Exchange Securities or Registrable Securities, as the case may be; cooperate with the Trustee and the Holders to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the Trust Indenture Act; and execute, and use their reasonable best efforts to cause the Trustee to execute, all documents as may be required to effect such changes and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner;

(xiv)    in the case of a Shelf Registration, make available for inspection by one representative designated by a majority of the Holders of Registrable Securities to be included in such Shelf Registration (such representative, the "Holders' Inspector") and the Underwriters participating in any disposition pursuant to such Shelf Registration Statement (or one counsel to such Underwriters) (such Underwriters or counsel, the "Underwriter Inspector" and, together with the Holders' Inspector, the "Inspectors"), each upon a written request, at the offices where normally kept, during reasonable business hours, all pertinent financial and other records, pertinent corporate documents and instruments of the Company and its subsidiaries (collectively, the "Records), as shall be reasonably necessary to enable the Inspectors to exercise any applicable due diligence responsibilities, and cause the officers, directors and employees of the Company and any of its subsidiaries to supply all information ("Information") reasonably requested by the Inspectors in connection with such due diligence responsibilities. The Inspectors shall agree in writing that they will keep the Records and Information confidential and that they will not disclose any of the Records or Information that the Company determines, in good faith, to be confidential and notifies the Inspectors in writing are confidential unless (i) the disclosure of such Records or Information is necessary to avoid or correct a material misstatement or omission in such Registration Statement or Prospectus, (ii) the release of such Records or Information is ordered pursuant to a

-11-

subpoena or other order from a court claiming jurisdiction or any request or order from a regulatory body, (iii) disclosure of such Records or Information is necessary or advisable, in the judgment of counsel for the Inspectors, in connection with any action, claim, suit or proceeding, directly or indirectly, involving or potentially involving the Inspectors and arising out of, based upon, relating to or involving this Agreement, the applicable Indenture or the Purchase Agreement or any transactions contemplated hereby or thereby or arising hereunder or thereunder, (iv) the information in such Records or Information has been made generally available to the public other than by the Inspectors or any "affiliate" (as defined in Rule 405 under the Securities Act) thereof, (v) such information becomes available to any such person from a source other than the Company and such source is not known by such person to be bound by a confidentiality obligation to the Company or (vi) such information is necessary to establish a due diligence defense; *provided*, *however*, that (if permitted) prior notice shall be provided as soon as practicable to the Company of the potential disclosure of any information by any Inspector pursuant to clauses (i), (ii) or (iii) of this sentence to permit the Company to obtain a protective order (or waive the provisions of this paragraph (xiv)) and that such Inspector shall take such actions as are reasonably necessary to protect the confidentiality of such information (if practicable) to the extent such action is otherwise not inconsistent with, an impairment of or in derogation of the rights and interests of such Holder or Inspector;

(xv)    in the case of a Shelf Registration, use their commercially reasonable efforts to cause all Registrable Securities to be listed on any securities exchange or any automated quotation system on which similar securities issued or guaranteed by the Company or any Guarantor are then listed if requested by the Majority Holders, to the extent such Registrable Securities satisfy applicable listing requirements;

(xvi)    if reasonably requested by any Holder of Registrable Securities covered by a Shelf Registration Statement, promptly include in a Prospectus supplement or post-effective amendment such information with respect to such Holder as such Holder reasonably requests to be included therein and make all required filings of such Prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received notification of the matters to be so included in such filing;

(xvii)    in the case of a Shelf Registration involving an Underwritten Offering, enter into such customary agreements and take all such other actions in connection therewith (including those requested by the Holders of a majority in principal amount of the Registrable Securities covered by the Shelf Registration Statement) in order to expedite or facilitate the disposition of such Registrable Securities and in such connection, (1) to the extent possible, make such representations and warranties to the Holders and any Underwriters of such Registrable Securities with respect to the business of the Company and its subsidiaries and the Registration Statement, Prospectus, any Free Writing Prospectus and documents incorporated by reference or deemed incorporated by reference, if any, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings of debt securities similar to the Securities and confirm the same if and when requested, (2) obtain opinions of counsel to the Company and the Guarantors (which opinions, in form, scope and substance, shall be reasonably satisfactory to such Underwriters and their counsel) addressed to each Underwriter of Registrable Securities, covering the matters customarily covered in opinions reasonably requested in underwritten offerings, (3) obtain "comfort" letters from the independent certified public accounting firm of the Company and the Guarantors (and, if necessary, any other certified public accountant of any subsidiary of the Company or any Guarantor, or of any business acquired by the Company or any Guarantor for which financial statements and financial data are or are required to be included in

-12-

the Registration Statement) addressed to each selling Holder (to the extent permitted by applicable professional standards) and Underwriter of Registrable Securities, such letters to be in customary form and covering matters of the type customarily covered in "comfort" letters in connection with underwritten offerings of debt securities similar to the Securities, including but not limited to financial information contained in any preliminary prospectus, Prospectus or Free Writing Prospectus and (4) deliver such other documents and certificates as may be reasonably requested by the Holders of a majority in principal amount of the Registrable Securities being sold or the Underwriters, and which are customarily delivered in underwritten offerings of debt securities similar to the Securities, to evidence the continued validity of the representations and warranties of the Company and the Guarantors made pursuant to clause (1) above and to evidence compliance with any customary conditions contained in an underwriting agreement; and

(xviii)    so long as any Registrable Securities remain outstanding, cause each Additional Guarantor upon the occurrence of the event resulting in such party becoming an Additional Guarantor, to execute a counterpart to this Agreement in the form attached hereto as Exhibit B and to deliver such counterpart to the Initial Purchasers no later than five Business Days following the execution thereof.

(b)    In the case of a Shelf Registration Statement, the Company may require each Holder of Registrable Securities to furnish to the Company such information regarding such Holder and the proposed disposition by such Holder of such Registrable Securities as the Company and the Guarantors may from time to time reasonably request in writing.  To the extent such information is necessary to include in such Shelf Registration Statement and any Holder fails or refuses to provide such information within a reasonable period of time from the Company's request (such time to be provided in the Company's written request) such Holder shall not be entitled to include its Registrable Securities in such Shelf Registration Statement until such information is provided to the Company and reflected in such Shelf Registration Statement.  Each Holder also agrees to notify the Company as promptly as reasonably practicable of any inaccuracy or change in information previously furnished by such Holder to the Company or of the occurrence of any event in either case as a result of which any Prospectus relating to the Shelf Registration Statement contains or would contain an untrue statement of a material fact regarding such Holder or such Holder's intended method of disposition of Registrable Securities or omits to state any material fact regarding such Holder or such Holder's intended method of disposition of such Registrable Securities required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing, and promptly to furnish to the Company any additional information required to correct and update any previously furnished information or required so that such Prospectus shall not contain, with respect to such Holder or the disposition of such Registrable Securities, an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(c)    In the case of a Shelf Registration Statement, each Holder of Registrable Securities covered in such Shelf Registration Statement agrees that, upon receipt of any notice from the Company and the Guarantors of the happening of any event of the kind described in Section 3(a)(vi)(3) or 3(a)(vi)(5) hereof, such Holder will forthwith discontinue disposition of Registrable Securities pursuant to the Shelf Registration Statement until such Holder's receipt of the copies of the supplemented or amended Prospectus and any Free Writing Prospectus contemplated by Section 3(a)(x) hereof and, if so directed by the Company and the Guarantors, such Holder will deliver to the Company and the Guarantors all copies in its possession, other than permanent file copies then in such Holder's possession, of the Prospectus and any Free Writing Prospectus covering such Registrable Securities that is current at the time of receipt of such notice.

-13-

(d)      (i) Subject to the limitation set forth in the next succeeding paragraph, the Company shall be entitled to delay the initial filing of any Registration Statement, suspend its obligation to file any amendment to any Registration Statement, furnish any supplement or amendment to a Prospectus included in any Registration Statement, make any other filing with the SEC that would be incorporated by reference into any Registration Statement, cause any Registration Statement to remain effective or take any similar action (collectively, "Registration Actions") (A) if the board of directors of the Company determines in good faith that taking any such Registration Actions (1) would reasonably be expected to materially impede, delay or interfere with, or require premature disclosure of, any material financing, offering, acquisition, merger, corporate reorganization or segment reclassification or discontinuance of operations, which is required to be reflected in pro forma or restated financial statements that amends a historical financial statement of the Company, or other significant transaction or any negotiations, discussions or pending proposals with respect thereto, involving the Company or any of its subsidiaries or (2) would require disclosure of non-public material information the disclosure of which would reasonably be expected to materially and adversely affect the Company, subject to the provisions of Section 3(d)(ii) or (B) upon any event described in Section 3(a)(vi)(5) (the period resulting from any such delay, suspension or other action, a "Suspension Period"). Upon the occurrence of any of the conditions described in the foregoing sentence, the Company shall give prompt notice (a "Suspension Notice") thereof to the Holders. Upon the termination of such condition, the Company shall give prompt notice thereof to the Holders and shall promptly proceed with all Registration Actions that were suspended pursuant to this paragraph.

(ii)      If the Company and the Guarantors shall give any Suspension Notice, the Company and the Guarantors shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement by the number of days during the period from and including the date of the giving of such notice to and including the date when the Holders of such Registrable Securities shall have received copies of the supplemented or amended Prospectus or any Free Writing Prospectus necessary to resume such dispositions. The Company and the Guarantors may give any such notice only twice during any 365-day period and any such suspensions shall not exceed 30 days for each suspension and there shall not be more than two suspensions in effect during any 365-day period.

(iii)      Each Holder agrees that upon receipt of any Suspension Notice from the Company pursuant to this Section 3(d), it will discontinue use of the Prospectus contained in such Registration Statement and any Free Writing Prospectus until receipt of copies of the supplemented or amended Prospectus or Free Writing Prospectus relating thereto or until advised in writing by the Company that the use of the Prospectus contained in such Registration Statement or Free Writing Prospectus may be resumed.

(e)      The Holders of Registrable Securities covered by a Shelf Registration Statement who desire to do so may sell such Registrable Securities in an Underwritten Offering. In any such Underwritten Offering, the investment bank or investment banks and manager or managers (each an "Underwriter") that will administer the offering will be selected by the Company, subject to the consent of the Holders of a majority in principal amount of the Registrable Securities included in such offering (which shall not be unreasonably withheld). No Holder may participate in any Underwritten Offering unless such Holder (i) agrees to sell such Holder's Securities on the basis provided in any underwriting arrangements approved by the persons entitled hereunder to approve such arrangements and (ii) timely completes and executes all reasonable questionnaires, powers of attorney, indemnities, underwriting agreements, lock-up letters and other documents, under customary terms, as customarily required under the terms of such underwriting arrangements.

4.      Participation of Broker-Dealers in Exchange Offer.

(a)        The Staff has taken the position that any broker-dealer that receives Exchange Securities for its own account in the Exchange Offer in exchange for Securities that were acquired by such broker-dealer as a result of market-making or other trading activities (a "Participating Broker-Dealer") may be deemed to be an "underwriter" within the meaning of the Securities Act and must deliver a prospectus meeting the requirements of the Securities Act in connection with any resale of such Exchange Securities.

The Company and the Guarantors understand that it is the Staff's position that if the Prospectus contained in the Exchange Offer Registration Statement includes a plan of distribution containing a statement to the above effect and the means by which Participating Broker-Dealers may resell the Exchange Securities, without naming the Participating Broker-Dealers or specifying the amount of Exchange Securities owned by them (except to the extent required by Staff positions), such Prospectus may be delivered by Participating Broker-Dealers (or, to the extent permitted by law, made available to purchasers) to satisfy their prospectus delivery obligation under the Securities Act in connection with resales of Exchange Securities for their own accounts, so long as the Prospectus otherwise meets the requirements of the Securities Act.

(b)        In light of the above, and notwithstanding the other provisions of this Agreement, the Company and the Guarantors agree to amend or supplement the Prospectus contained in the Exchange Offer Registration Statement for a period of up to 180 days after the last Exchange Date (as such period may be extended pursuant to Section 3(d) of this Agreement), in order to expedite or facilitate the disposition of any Exchange Securities by Participating Broker-Dealers consistent with the positions of the Staff recited in Section 4(a) above.  The Company and the Guarantors further agree that Participating Broker-Dealers shall be authorized to deliver such Prospectus (or, to the extent permitted by law, make available) during such period in connection with the resales contemplated by this Section 4.

(c)        The Initial Purchasers shall have no liability to the Company, any Guarantor or any Holder with respect to any request that they may make pursuant to Section 4(b) above.

5.        Indemnification and Contribution.

(a)        The Company and each Guarantor, jointly and severally, agree to indemnify and hold harmless each Initial Purchaser and each Holder, their respective affiliates, directors and officers and each Person, if any, who controls any Initial Purchaser or any Holder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including, without limitation, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, (1) any untrue statement or alleged untrue statement of a material fact contained in any Registration Statement or any omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein not misleading, or (2) any untrue statement or alleged untrue statement of a material fact contained in any Prospectus, any Free Writing Prospectus or any "issuer information" ("Issuer Information") filed or required to be filed pursuant to Rule 433(d) under the Securities Act, or any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Initial Purchaser or information relating to any Holder furnished to the Company in writing through JPMorgan or any selling Holder, respectively, expressly for use therein.  In connection with any Underwritten Offering permitted by Section 3, the Company and the Guarantors, jointly and severally,

-15-

will also indemnify the Underwriters, if any, selling brokers, dealers and similar securities industry professionals participating in the distribution, their respective affiliates and each Person who controls such Persons (within the meaning of the Securities Act and the Exchange Act) to the same extent as provided above with respect to the indemnification of the Holders, if requested in connection with any Registration Statement, any Prospectus, any Free Writing Prospectus or any Issuer Information.

(b)    Each Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, the Guarantors, the Initial Purchasers and the other selling Holders, the directors of the Company and the Guarantors, each officer of the Company and the Guarantors who signed the Registration Statement and each Person, if any, who controls the Company, the Guarantors, any Initial Purchaser and any other selling Holder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the indemnity set forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities (including, without limitation, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred) that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Holder furnished to the Company in writing by such Holder expressly for use in any Registration Statement, any Prospectus and any Free Writing Prospectus.

(c)    If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any Person in respect of which indemnification may be sought pursuant to either paragraph (a) or (b) above, such Person (the "Indemnified Person") shall promptly notify the Person against whom such indemnification may be sought (the "Indemnifying Person") in writing; provided that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under this Section 5 except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided, further, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under this Section 5. If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 5 that the Indemnifying Person may designate in such proceeding and shall pay the reasonable fees and expenses of such proceeding and shall pay the reasonable fees and expenses of such counsel related to such proceeding, as incurred. In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; (iii) the Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such reasonable fees and expenses shall be reimbursed as they are incurred. Any such separate firm (x) for any Initial Purchaser, its affiliates, directors and officers and any control Persons of such Initial Purchaser shall be designated in writing by JPMorgan, (y) for any Holder, its directors and officers and any control Persons of such Holder shall be designated in writing by the Majority Holders and (z) in all other cases shall be designated in writing by the Company. The Indemnifying Person shall not be liable for any settlement of any proceeding effected

-16-

without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (A) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (B) does not include any statement as to any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)        If the indemnification provided for in paragraphs (a) and (b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Guarantors from the offering of the Securities and the Exchange Securities, on the one hand, and by the Holders from receiving Securities or Exchange Securities registered under the Securities Act, on the other hand, or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and the Guarantors on the one hand and the Holders on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative fault of the Company and the Guarantors on the one hand and the Holders on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and the Guarantors or by the Holders and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(e)        The Company, the Guarantors and the Holders agree that it would not be just and equitable if contribution pursuant to this Section 5 were determined by *pro rata* allocation (even if the Holders were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in paragraph (d) above.  The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in paragraph (d) above shall be deemed to include, subject to the limitations set forth above, any reasonable legal or other expenses incurred by such Indemnified Person in connection with any such action or claim.  Notwithstanding the provisions of this Section 5, in no event shall a Holder be required to contribute any amount in excess of the amount by which the total price at which the Securities or Exchange Securities sold by such Holder exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The Holders' obligations to contribute pursuant to this Section 5 are several and not joint.

(f)        The remedies provided for in this Section 5 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any Indemnified Person at law or in equity.

(g)        The indemnity and contribution provisions contained in this Section 5 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of the Initial Purchasers or any Holder or any Person controlling any

-17-

Initial Purchaser or any Holder, or by or on behalf of the Company or the Guarantors or the officers or directors of or any Person controlling the Company or the Guarantors, (iii) acceptance of any of the Exchange Securities and (iv) any sale of Registrable Securities pursuant to a Shelf Registration Statement.

6.     General.

(a)     *Inconsistent Agreements.*  The Company and the Guarantors represent, warrant and agree that (i) the rights granted to the Holders hereunder do not in any way conflict with and are not inconsistent with the rights granted to the holders of any other outstanding securities issued or guaranteed by the Company or any Guarantor under any other agreement and (ii) neither the Company nor any Guarantor has entered into, or on or after the date of this Agreement will enter into, any agreement that is inconsistent with the rights granted to the Holders of Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof.  For clarification, nothing herein is intended to prohibit the Company and the Guarantors from (i) registering any Additional Notes (as defined in the Indenture) issued on the same registration statement as the Registrable Securities or (ii) complying with their obligations for the registration of any securities of pursuant to the terms of the Reorganization Plan (as defined in the Indenture) or any agreement entered into as contemplated by the Reorganization Plan (as defined in the Indenture).

(b)     *Amendments and Waivers.*  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given unless the Company and the Guarantors have obtained the written consent of Holders of at least a majority in aggregate principal amount of the outstanding Registrable Securities affected by such amendment, modification, supplement, waiver or consent; *provided*, that no amendment, modification, supplement, waiver or consent to any departure from the provisions of Section 5 hereof shall be effective as against any Holder of Registrable Securities unless consented to in writing by such Holder.  Any amendments, modifications, supplements, waivers or consents pursuant to this Section 6(b) shall be by a writing executed by each of the parties hereto.

(c)     *Notices.*  All notices and other communications provided for or permitted hereunder shall be made in writing by hand-delivery, registered first-class mail, telex, telecopier, or any courier guaranteeing overnight delivery (i) if to a Holder, at the most current address given by such Holder to the Company by means of a notice given in accordance with the provisions of this Section 6(c), which address initially is, with respect to the Initial Purchasers, the address set forth in the Purchase Agreement; (ii) if to the Company and the Guarantors, initially at the Company's address set forth in the Purchase Agreement and thereafter at such other address, notice of which is given in accordance with the provisions of this Section 6(c); and (iii) to such other persons at their respective addresses as provided in the Purchase Agreement and thereafter at such other address, notice of which is given in accordance with the provisions of this Section 6(c).  All such notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; when receipt is acknowledged, if telecopied; and on the next Business Day if timely delivered to an air courier guaranteeing overnight delivery.  Copies of all such notices, demands or other communications shall be concurrently delivered by the Person giving the same to the Trustee, at the address specified in the Indenture.

(d)     *Successors and Assigns.*  This Agreement shall inure to the benefit of and be binding upon the successors, assigns and transferees of each of the parties, including, without limitation and without the need for an express assignment, subsequent Holders; *provided* that nothing herein shall be deemed to permit any assignment, transfer or other disposition of Registrable Securities in violation of the terms of the Purchase Agreement or the Indenture.  If any transferee of any Holder shall acquire Reg-

-18-

istrable Securities in any manner, whether by operation of law or otherwise, such Registrable Securities shall be held subject to all the terms of this Agreement, and by taking and holding such Registrable Securities such Person shall be conclusively deemed to have agreed to be bound by and to perform all of the terms and provisions of this Agreement and such Person shall be entitled to receive the benefits hereof. The Initial Purchasers (in their capacity as Initial Purchasers) shall have no liability or obligation to the Company or the Guarantors with respect to any failure by a Holder (other than such Initial Purchaser) to comply with, or any breach by any Holder of, any of the obligations of such Holder (other than such Initial Purchaser) under this Agreement.

(e)    *Third Party Beneficiaries.*  Each Holder shall be a third party beneficiary to the agreements made hereunder between the Company and the Guarantors, on the one hand, and the Initial Purchasers, on the other hand, and shall have the right to enforce such agreements directly to the extent it deems such enforcement necessary or advisable to protect its rights or the rights of other Holders hereunder.

(f)    *Counterparts.*  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile, email or other electronic transmission (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

(g)    *Headings.*  The headings in this Agreement are for convenience of reference only, are not a part of this Agreement and shall not limit or otherwise affect the meaning hereof.

(h)    *Governing Law.*  This Agreement, and any claims, controversy or dispute arising under or related to this Agreement, shall be governed by and construed in accordance with the laws of the State of New York.

(i)    *Entire Agreement; Severability.*  This Agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.  The Company, the Guarantors and the Initial Purchasers shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

AMO ESCROW CORPORATION

By: _____
    Name:  Christopher Polimeni
    Title:   Executive Vice President, Chief
            Financial Officer and Treasurer

Confirmed and accepted as of the date first above written:

J.P. MORGAN SECURITIES LLC

For itself and on behalf of the
several Initial Purchasers

By: _____
                Authorized Signatory

EXECUTION VERSION

Exhibit A

Registration Rights Agreement Joinder

WHEREAS, AMO Escrow Corporation and J.P. Morgan Securities LLC, as representative of the Initial Purchasers named on Schedule I of the Purchase Agreement (collectively, the "Initial Purchasers"), heretofore executed and delivered a registration rights agreement ("Registration Rights Agreement"), dated December 1, 2010, providing for the registration and exchange of the Securities (as defined therein); and

WHEREAS, American Media Operations, Inc., a Delaware corporation (the "Company"), and each of the Guarantors, which was originally not a party thereto, has agreed to join in the Registration Rights Agreement on the Release Date.

Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Registration Rights Agreement.

NOW, THEREFORE, the Company and each Guarantor hereby agrees for the benefit of the Initial Purchasers, as follows:

1.        Joinder.  Each of the undersigned signatory parties hereby acknowledges that it has received and reviewed a copy of the Registration Rights Agreement and all other documents it deems fit to enter into this registration rights agreement joinder (the "Joinder Agreement"), and acknowledges and agrees to (i) join and become a party to the Registration Rights Agreement as indicated by its signature below; (ii) be bound by all covenants, agreements, representations, warranties, indemnities and acknowledgments attributable to the Guarantors and/or the Company, as applicable, to such signatory party in the Registration Rights Agreement as if made by, and with respect to, such signatory party; and (iii) perform all obligations and duties required and be entitled to all the benefits of the Guarantors or the Company, as applicable, and of such signatory party pursuant to the Registration Rights Agreement.

2.        Representations and Warranties and Agreements of the Company and the Guarantors.  Each of the undersigned hereby represents and warrants to and agrees with the Initial Purchasers that it has all the requisite corporate or limited liability company power and authority, as the case may be, to execute, deliver and perform its obligations under this Joinder Agreement and to consummate the transaction contemplated hereby.  This Joinder Agreement has been duly authorized, executed and delivered by each of the undersigned, and constitutes a valid and legally binding agreement enforceable against each of the undersigned in accordance with its terms.

3.        Counterparts.  This Joinder Agreement may be signed in one or more counterparts, each of which shall constitute an original when so executed and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile, email or other electronic transmission (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Joinder Agreement.

4.        Amendments.  No amendment or waiver of any provision of this Joinder Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by all of the parties to the Registration Rights Agreement.

5.        Headings.  The section headings used herein are for convenience only and shall not affect the construction hereof.

      6.      <u>Applicable Law</u>.  This Joinder Agreement, and any claims, controversy or dispute arising under or related to this Joinder Agreement, shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the undersigned has executed this agreement as of the date first written above.

AMERICAN MEDIA OPERATIONS, INC.

By: _____
   Name:
   Title:


[GUARANTORS]

By: _____
   Name:
   Title:

EXECUTION VERSION

<u>Exhibit B</u>

<u>Counterpart to Registration Rights Agreement</u>

The undersigned hereby absolutely, unconditionally and irrevocably agrees as a Guarantor (as defined in the Registration Rights Agreement, dated as of December 1, 2010 by and between AMO Escrow Corporation, a Delaware corporation, and J.P. Morgan Securities LLC, on behalf of itself and the other Initial Purchasers) to be bound by the terms and provisions of such Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this counterpart as of _____, 20[  ].

[ADDITIONAL GUARANTOR]

By: _____
        Name:
        Title:

## EXHIBIT E

**Registration Rights Agreement for New Second Lien Notes**

## REGISTRATION RIGHTS AGREEMENT

This REGISTRATION RIGHTS AGREEMENT dated as of December [   ], 2010 (this "Agreement") is entered into by and between American Media, Inc., a Delaware corporation (the "Company"), those certain Guarantors listed on the signature pages hereto and the parties identified as "Holders" (as defined below), each of whom beneficially owns a portion of the [$140,000,000] aggregate principal amount of the Company's 13.5% Second Lien Senior Secured Notes due 2018 (the "Notes") to be guaranteed by the Guarantors (the "Guarantees") pursuant to the Indenture (as defined below).  The Notes and the Guarantees are herein collectively referred to as the "Securities."

Pursuant to the Plan, the Company issued Notes to certain holders of the Term Facility Claims (as defined below), to the holders of the PIK Notes Claims (as defined below) and to the Backstop Parties (as defined below), and each of such holders has been deemed, pursuant to the Plan, to be a party to this Agreement as a result of the distribution it received under the Plan. This Agreement is made pursuant to the Plan and the Backstop Agreement (as defined below) for the benefit of the Holders from time to time of the Securities.  In order to induce the holders of the Term Facility Claims and the holders of the PIK Notes Claims to accept the Notes under the Plan and the Backstop Parties to purchase their allocable share of any Notes that would otherwise be distributed to the holders of the Term Facility Claims, the Company has agreed to provide to the Holders and their direct and indirect transferees the registration rights set forth in this Agreement.

In consideration of the foregoing, the parties hereto agree as follows:

1.      Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"Additional Guarantor" shall mean any subsidiary of the Company that executes a Subsidiary Guarantee under the Indenture after the Issue Date.

"AMO" shall mean American Media Operations, Inc., a Delaware corporation, prior to its merger with and into the Company on the date of this Agreement.

"Backstop Agreement" shall mean the agreement, dated as of October 30, 2010, by and among AMO, the Company, Avenue Capital Management II, L.P. and its affiliates and Angelo, Gordon & Co., L.P. and its affiliates.

"Backstop Parties" shall mean Avenue Capital Management II, L.P. and its affiliates and Angelo, Gordon & Co., L.P. and its affiliates.

"Bankruptcy Code" shall mean title 11 of the United States Code, as amended from time to time.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Claim" has the meaning set forth in Bankruptcy Code section 101(5).

"Company" shall have the meaning set forth in the preamble and shall also include the Company's successors.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended from time to time.

"FINRA" shall mean the Financial Industry Regulatory Authority, Inc.

"Free Writing Prospectus" shall mean each free writing prospectus (as defined in Rule 405 under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the resale of the Securities by the Holders pursuant to a Registration Statement.

"Guarantors" shall have the meaning set forth in the Indenture.

"Holders" shall mean (i) the parties identified as "Holders" on the signature pages hereto who beneficially own Registrable Securities, (ii) the other parties deemed to be parties to this Agreement pursuant to the Plan who beneficially own Registrable Securities, and (iii) each of their respective successors, assigns and direct and indirect transferees who become owners of Registrable Securities under the Indenture; provided that (x) in the case of a Holder defined in clause (i) or (iii), such Holder is identified as such on the signature pages hereto or executes and delivers to the Company a counterpart to this Agreement in the form attached hereto as Exhibit A, and (y) in the case of a Holder defined in clause (ii), such Holder provides its contact information to the Company.

"Holders' Inspector" shall have the meaning set forth in Section 4(a)(xiv) hereof.

"Indemnified Person" shall have the meaning set forth in Section 5(c) hereof.

"Indemnifying Person" shall have the meaning set forth in Section 5(c) hereof.

"Indenture" shall mean the Indenture relating to the Securities dated as of December [     ], 2010 by and among Company, the Guarantors and Wilmington Trust FSB, as trustee and collateral agent, and as the same may be amended from time to time in accordance with the terms thereof.

"Information" shall have the meaning set forth in Section 4(a)(xiv) hereof.

"Inspectors" shall have the meaning set forth in Section 4(a)(xiv) hereof.

"Issue Date" shall mean  December [     ], 2010.

"Issuer Information" shall have the meaning set forth in Section 5(a) hereof.

"Majority Holders" shall mean the Holders of a majority of the aggregate principal amount of the outstanding Registrable Securities; provided that whenever the con-

sent or approval of Holders of a specified percentage of Registrable Securities is required hereunder, any Registrable Securities owned directly or indirectly by the Company or any of its subsidiaries shall not be counted in determining whether such consent or approval was given by the Holders of such required percentage or amount; and provided, further, that if the Company shall issue any additional Securities to the Holders under the Indenture prior to the effectiveness of any Shelf Registration Statement, such additional Securities and the Registrable Securities to which this Agreement relates shall be treated together as one class for purposes of determining whether the consent or approval of Holders of a specified percentage of Registrable Securities has been obtained.

"Other Holders" shall have the meaning set forth in Section 4(c) hereof.

"Person" shall mean an individual, partnership, limited liability company, corporation, trust or unincorporated organization, or a government or agency or political subdivision thereof.

"PIK Notes Claims" shall mean any Claim arising under that certain Indenture dated as of January 20, 2009 among AMO, Wilmington Trust FSB and other parties thereto, as may have been further amended heretofore.

"Plan" shall mean AMO, Company and certain of its subsidiaries' Amended Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated October 30, 2010, as amended on December 15, 2010.

"Prospectus" shall mean the prospectus included in, or, pursuant to the rules and regulations of the Securities Act, deemed a part of, a Shelf Registration Statement, including any preliminary prospectus, and any such prospectus as amended or supplemented by any prospectus supplement, including a prospectus supplement with respect to the terms of the offering of any portion of the Registrable Securities covered by a Shelf Registration Statement, and by all other amendments and supplements to such prospectus, and in each case including any document incorporated by reference therein.

"Records" shall have the meaning set forth in Section 4(a)(xiv) hereof.

"Registrable Securities" shall mean the Securities; provided that the Securities shall cease to be Registrable Securities on the earliest of (i) when a Shelf Registration Statement with respect to all such Securities has become effective under the Securities Act and such Securities have been disposed of pursuant to such Shelf Registration Statement, (ii) when such Securities have been disposed of pursuant to a Piggyback Takedown or (iii) when such Securities cease to be outstanding.

"Registration Actions" shall have the meaning set forth in Section 4(d)(i) hereof.

"Registration Default" shall have the meaning set forth in Section 2(c) hereof.

"Registration Expenses" shall mean any and all expenses incident to performance of or compliance by the Company and the Guarantors with this Agreement, including

-3-

without limitation:  (i) all SEC, stock exchange or FINRA registration and filing fees, (ii) all fees and expenses incurred in connection with compliance with state securities or blue sky laws (including reasonable fees and disbursements of one counsel for any Underwriters or Holders (which counsel shall be selected by the Majority Holders and which counsel may also be counsel for the Backstop Parties) in connection with blue sky qualification of any Registrable Securities), (iii) all expenses of the Company and the Guarantors in preparing or assisting in preparing, word processing, printing and distributing any Shelf Registration Statement, any Prospectus, any Free Writing Prospectus and any amendments or supplements thereto, any underwriting agreements, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement, (iv) all rating agency fees, (v) all fees and disbursements relating to the qualification of the Indenture under applicable securities laws, (vi) the fees and disbursements of the Trustee and its counsel as may be agreed by the Company and the Trustee, (vii) the fees and disbursements of counsel for the Company and the Guarantors and the reasonable fees and disbursements of one counsel for the Holders (which counsel shall be selected by the Majority Holders and which counsel may also be counsel for the Backstop Parties) and (viii) the fees and disbursements of the independent public accounting firm of the Company and the Guarantors, including the expenses of any special audits or "comfort" letters required by or incident to the performance of and compliance with this Agreement, but excluding fees and expenses of counsel to the Underwriters (other than fees and expenses set forth in clause (ii) above) or the Holders and underwriting discounts and commissions, brokerage commissions and transfer taxes, if any, relating to the sale or disposition of Registrable Securities by a Holder.

"<u>Registration Statement</u>" shall mean any registration statement filed under the Securities Act of the Company and the Guarantors that covers any of the Registrable Securities pursuant to the provisions of this Agreement and all amendments and supplements to any such registration statement, including post-effective amendments, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein.

"<u>SEC</u>" shall mean the United States Securities and Exchange Commission.

"<u>Securities</u>" shall have the meaning set forth in the preamble.

"<u>Securities Act</u>" shall mean the Securities Act of 1933, as amended from time to time.

"<u>Shelf Effectiveness Period</u>" shall have the meaning set forth in Section 2(a) hereof.

"<u>Shelf Registration</u>" shall mean a registration effected pursuant to Section 2(a) hereof.

"<u>Shelf Registration Statement</u>" shall mean a "shelf" registration statement of the Company and the Guarantors that covers all or a portion of the Registrable Securities (but no other securities unless approved by a majority of the Holders whose Registrable Se-

curities are to be covered by such Shelf Registration Statement) on an appropriate form under Rule 415 under the Securities Act, or any similar rule that may be adopted by the SEC, and all amendments and supplements to such registration statement, including post-effective amendments, in each case including the Prospectus contained therein or deemed a part thereof, all exhibits thereto and any document incorporated by reference therein.

"Subsidiary Guarantees" shall mean the guarantees of the Securities by the Guarantors under the Indenture.

"Suspension Notice" shall have the meaning set forth in Section 4(d)(i) hereof.

"Suspension Period" shall have the meaning set forth in Section 4(d)(i) hereof.

"Term Facility Claims" shall mean any Claim arising under the Amended and Restated Credit Agreement dated as of January 30, 2006, as amended and restated as of December 31, 2008 and as may have been further amended heretofore, among AMO, the Company, and the other parties thereto.

"Trust Indenture Act" shall mean the Trust Indenture Act of 1939, as amended from time to time.

"Trustee" shall mean the trustee with respect to the Securities under the Indenture.

"Underwriter" shall have the meaning set forth in Section 4(e) hereof.

"Underwriter Inspector" shall have the meaning set forth in Section 4(a)(xiv) hereof.

"Underwritten Offering" shall mean an offering in which Registrable Securities are sold to an Underwriter for reoffering to the public.

2.      Registration Under the Securities Act.

(a)      The Company and the Guarantors  shall use their commercially reasonable efforts to (i) cause to be filed with the SEC a Shelf Registration Statement covering the sale of all the Registrable Securities and (ii) as soon as reasonably practicable following the filing of such Shelf Registration Statement, but in any case no later than 450 days after the Issue Date, cause such Shelf Registration Statement to become effective.  The Company and the Guarantors agree to use their commercially reasonable efforts to keep the Shelf Registration Statement continuously effective until the date when all of the Registrable Securities covered by the Shelf Registration Statement have been sold or otherwise disposed of pursuant to the Shelf Registration Statement or cease to be Registrable Securities (the "Shelf Effectiveness Period").  The Company and the Guarantors further agree to supplement or amend the Shelf Registration Statement, the related Prospectus and any Free Writing Prospectus if required by the rules, regulations or instructions applicable to the registration form used by the Company for such Shelf Registration Statement or by the Securities Act or by any other rules and regulations thereunder or if reasonably requested by a Holder of Registrable Securities with respect to information relating to such Holder, and to

-5-

use their commercially reasonable efforts to cause any such amendment to become effective, if required, and such Shelf Registration Statement, Prospectus or Free Writing Prospectus, as the case may be, to become usable as soon as thereafter practicable. The Company and the Guarantors agree to furnish to the Holders of Registrable Securities copies of any such supplement or amendment promptly after its being used or filed with the SEC.

(b)    The Company and the Guarantors shall pay all Registration Expenses in connection with any registration pursuant to Section 2(a) hereof. Each Holder shall pay all underwriting discounts and commissions, brokerage commissions and transfer taxes, if any, relating to the sale or disposition of such Holder's Registrable Securities pursuant to the Shelf Registration Statement and any fees and disbursements of counsel or experts retained by such Holder in connection with any registration pursuant hereto (other than any such fees and disbursements included within the definition of Registration Expenses and paid for by the Company and the Guarantors in accordance with the terms of this Agreement).

(c)    A Shelf Registration Statement pursuant to Section 2(a) hereof will not be deemed to have become effective unless it has been declared effective by the SEC or is automatically effective upon filing with the SEC as provided by Rule 462 under the Securities Act.

In the event that (i) the Shelf Registration Statement has not become effective on or prior to the date that is 450 days following the Issue Date, or (ii) the Shelf Registration Statement has become effective and thereafter either ceases to be effective or the Prospectus contained therein ceases to be usable, in each case whether or not permitted by this Agreement, at any time during the Shelf Effectiveness Period and such failure to remain effective or usable exists for more than 60 days (whether or not consecutive) in any 12-month period (each such event referred to in clauses (i) and (ii), a "Registration Default"), the interest rate on the applicable Registrable Securities will be increased by (A) 0.25% per annum for the first 90-day period immediately following the occurrence of such Registration Default and (B) an additional 0.25% per annum with respect to each subsequent 90-day period until all Registration Defaults with respect to such Registrable Securities have been cured, up to a maximum increase of 1.00% per annum; *provided* that the Company and the Guarantors shall in no event be required to pay additional interest accrued for more than one Registration Default at any given time. Notwithstanding anything to the contrary set forth herein, (1) upon the effectiveness of the Shelf Registration Statement in the case of clause (i) above, or (2) upon the filing of a post-effective amendment to the Shelf Registration Statement or an additional Registration Statement that causes the Shelf Registration Statement to again be declared effective or made usable in the case of clause (ii) above, additional interest with respect to the Registrable Securities as a result of such clause (i) and (ii), as applicable, shall cease to accrue. Notwithstanding anything to the contrary set forth in this Agreement, (x) the obligation of the Company and the Guarantors to pay or accrue additional interest as set forth in this paragraph shall be the sole and exclusive monetary remedy of the Holders in the event of a Registration Default, (y) a Holder of Registrable Securities that is not entitled to the benefits of the Shelf Registration Statement as a result of the failure of such Holder to comply with Section 4(b) or Section 4(e) shall not be entitled to such additional interest with respect to a Registration Default that pertains to the Shelf Registration Statement and (z) such additional interest shall be paid or accrue only as to the Registrable Securities to which a Registration Default relates.

-6-

(d)    Without limiting the remedies available to the Holders, the Company and the Guarantors acknowledge that any failure by the Company or the Guarantors to comply with their obligations under Section 2(a) hereof may result in material irreparable injury to the Holders for which there is no adequate remedy at law, that it will not be possible to measure damages for such injuries precisely and that, in the event of any such failure, any Holder may obtain such relief as may be required to specifically enforce the Company's and the Guarantors' obligations under Section 2(a) hereof.

3.    Piggyback Takedowns.

(a)    Right to Piggyback.  If the Company proposes to file a Registration Statement with respect to an offering of any of its securities for its own account (other than a Registration Statement on Form S-4 or S-8) or for the account of any securityholder of the Company, other than Holders pursuant to Section 2 hereof (a "Piggyback Takedown"), the Company shall give prompt written notice to all Holders of Registrable Securities of its intention to effect such Piggyback Takedown.  In the case of a Piggyback Takedown that is an offering under a Registration Statement that is a "shelf" registration statement (excluding a Shelf Registration), such notice shall be given not less than ten (10) Business Days prior to the expected date of commencement of marketing efforts for such Piggyback Takedown.  In the case of a Piggyback Takedown that is an offering under a Registration Statement that is not a shelf registration statement, such notice shall be given not less than ten (10) Business Days prior to the expected date of filing of such Registration Statement.  The Company shall, subject to the provisions of Sections 3(b) and (c) below, include in such Piggyback Takedown, as applicable, all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days (5) days after sending the Company's notice.  Notwithstanding anything to the contrary contained herein, the Company may determine not to proceed with any Piggyback Takedown upon written notice to the Holders of Registrable Securities requesting to include their Registrable Securities in such Piggyback Takedown.

(b)    Priority on Primary Piggyback Takedowns.  If a Piggyback Takedown is an underwritten primary registration on behalf of the Company, and the managing underwriters for a Piggyback Takedown advise the Company in writing that in their reasonable opinion the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range acceptable to the Company, the Company shall include in such Piggyback Takedown the number which can be so sold in the following order of priority: (i) first, the securities the Company proposes to sell, (ii) second, the Registrable Securities requested to be included in such Piggyback Takedown (pro rata among the Holders of such Registrable Securities on the basis of the number of Registrable Securities requested to be included therein by each such Holder), and (iii) third, other securities requested to be included in such Piggyback Takedown.

(c)    Priority on Secondary Piggyback Takedowns.  If a Piggyback Takedown is an underwritten secondary registration on behalf of holders of the Company's securities ("Other Holders"), and the managing underwriters advise the Company in writing that in their opinion the number of securities requested to be included in such Piggyback Takedown exceeds the number which can be sold in an orderly manner in such offering within a price range accept-

able to the Other Holders, the Company shall include in such registration the number which can be so sold in the following order of priority: (i) first, the securities requested to be included therein by the Other Holders requesting such registration and the Registrable Securities requested to be included in such registration, pro rata among the holders of any such securities and Registrable Securities on the basis of the number of securities and Registrable Securities so requested to be included therein by each such holder, and (ii) second, other securities requested to be included in such registration.

(d)    Selection of Underwriters.  If any Piggyback Takedown is an Underwritten Offering, the Company will have the sole right to select the investment banker(s) and manager(s) for the offering.

4.    Registration Procedures.

(a)    In connection with their obligations pursuant to Section 2(a) hereof, the Company and the Guarantors shall as soon as reasonably practicable:

(i)    prepare and file with the SEC a Registration Statement on the appropriate form under the Securities Act, which form (x) shall be selected by the Company and the Guarantors, (y) shall be available for the sale of the Registrable Securities by the Holders thereof and (z) shall comply as to form in all material respects with the requirements of the applicable form and include all financial statements required by the SEC to be filed therewith; and use their commercially reasonable efforts to cause such Registration Statement to become effective and remain effective for the applicable period in accordance with Section 2 hereof;

(ii)    subject to Section 4(d) hereof, prepare and file with the SEC such amendments and post-effective amendments to each Registration Statement and file with the SEC any other required document as may be necessary to keep such Registration Statement effective for the applicable period in accordance with Section 2 hereof and cause each Prospectus to be supplemented by any required prospectus supplement and, as so supplemented, to be filed pursuant to Rule 424 under the Securities Act; and keep each Prospectus current during the period described in Section 4(3) of and Rule 174 under the Securities Act that is applicable to transactions by brokers or dealers with respect to the Registrable Securities;

(iii)    to the extent any Free Writing Prospectus is used, file with the SEC any Free Writing Prospectus that is required to be filed by the Company or the Guarantors with the SEC in accordance with the Securities Act and to retain any Free Writing Prospectus not required to be filed;

(iv)    furnish to each Holder of Registrable Securities, to counsel for such Holders and to each Underwriter of an Underwritten Offering of Registrable Securities, if any, without charge, as many copies of each Prospectus, preliminary prospectus or Free Writing Prospectus, and any amendment or supplement thereto, as such Holder, counsel or Underwriter may reasonably request in order to facilitate the sale or other disposition of the Registrable Securities thereunder; and the Company and the Guarantors consent to the

use of such Prospectus, preliminary prospectus or such Free Writing Prospectus and any amendment or supplement thereto in accordance with applicable law by each of the Holders of Registrable Securities and any such Underwriters in connection with the offering and sale of the Registrable Securities covered by and in the manner described in such Prospectus, preliminary prospectus or such Free Writing Prospectus or any amendment or supplement thereto in accordance with applicable law;

(v)    use their commercially reasonable efforts to register or qualify the Registrable Securities under all applicable state securities or blue sky laws of such jurisdictions as any Holder of Registrable Securities covered by a Registration Statement shall reasonably request in writing by the time the applicable Registration Statement becomes effective; cooperate with such Holders in connection with any filings required to be made with FINRA; and do any and all other acts and things that may be reasonably necessary or advisable to enable each Holder to complete the disposition in each such jurisdiction of the Registrable Securities owned by such Holder; provided that neither the Company nor any Guarantor shall be required to (1) qualify as a foreign corporation or other entity or as a dealer in securities in any such jurisdiction where it would not otherwise be required to so qualify, (2) file any general consent to service of process in any such jurisdiction or (3) subject itself to taxation in any such jurisdiction if it is not so subject;

(vi)    notify each Holder of Registrable Securities and counsel for such Holders promptly and, if requested by any such Holder or counsel, confirm such advice in writing (1) when a Registration Statement has become effective, when any post-effective amendment thereto has been filed and becomes effective, when any Free Writing Prospectus has been filed or any amendment or supplement to the Prospectus or any Free Writing Prospectus has been filed, (2) of any request by the SEC or any state securities authority for amendments to the Prospectus or for additional information after the Registration Statement has become effective, (3) of the issuance by the SEC or any state securities authority of any stop order suspending the effectiveness of a Registration Statement or the initiation of any proceedings for that purpose, including the receipt by the Company of any notice of objection of the SEC to the use of a Shelf Registration Statement or any post-effective amendment thereto pursuant to Rule 401(g)(2) under the Securities Act, (4) if, between the applicable effective date of a Shelf Registration Statement and the closing of any sale of Registrable Securities covered thereby, the Company or any Guarantor receives any notification with respect to the suspension of the qualification of the Registrable Securities for sale in any jurisdiction or the initiation of any proceeding for such purpose, (5) of the happening of any event during the period a Registration Statement is effective that makes any statement made in such Registration Statement or the related Prospectus or any Free Writing Prospectus untrue in any material respect or that requires the making of any changes in such Registration Statement or Prospectus or any Free Writing Prospectus in order to make the statements therein not misleading and (6) of any determination by the Company or any Guarantor that a post-effective amendment to a Registration Statement or any amendment or supplement to the Prospectus or any Free Writing Prospectus would be appropriate;

(vii)    use their reasonable best efforts to obtain the withdrawal of any order sus-pending the effectiveness of a Registration Statement or the resolution of any objection of the SEC pursuant to Rule 401(g)(2), including by filing an amendment to the Shelf Registration Statement on the proper form, as soon as reasonably practicable and provide prompt notice to each Holder of the withdrawal of any such order or such resolution;

(viii)    furnish to each Holder of Registrable Securities, upon request and without charge, at least one conformed copy of each Registration Statement and any post-effective amendment thereto (without any documents incorporated therein by reference or exhibits thereto, unless requested);

(ix)    cooperate with the Holders of Registrable Securities to facilitate the timely preparation and delivery of certificates (unless such Registrable Securities are in book entry form only, in which case the Company and the Guarantors shall cooperate to remove the restrictive legends from the existing global notes) representing Registrable Securities to be sold and not bearing any restrictive legends and enable such Registrable Securities to be issued in such denominations and registered in such names (consistent with the provisions of the Indenture) as such Holders may reasonably request at least one Business Day prior to the closing of any sale of Registrable Securities;

(x)    subject to Section 4(d) hereof, upon the occurrence of any event contemplated by Section 4(a)(vi)(5) hereof, use their reasonable best efforts to prepare and file with the SEC a supplement or post-effective amendment to such Shelf Registration Statement or the related Prospectus or any Free Writing Prospectus or any document incorporated therein by reference or file any other required document so that, as thereafter delivered (or, to the extent permitted by law, made available) to purchasers of the Registrable Securities, such Prospectus or Free Writing Prospectus, as the case may be, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and the Company and the Guarantors shall notify the Holders of Registrable Securities to suspend use of the Prospectus or any Free Writing Prospectus as promptly as practicable after the occurrence of such an event, and such Holders hereby agree to suspend use of the Prospectus or any Free Writing Prospectus, as the case may be, until the Company and the Guarantors have amended or supplemented the Prospectus or the Free Writing Prospectus, as the case may be, to correct such misstatement or omission;

(xi)    a reasonable time prior to the filing of the Shelf Registration Statement, any Prospectus, any Free Writing Prospectus, any amendment to the Shelf Registration Statement or amendment or supplement to a Prospectus or a Free Writing Prospectus or of any document that is to be incorporated by reference into the Shelf Registration Statement, a Prospectus or a Free Writing Prospectus after initial filing of the Shelf Registration Statement, provide copies of such document to the Holders of Registrable Securities and their counsel and make such of the representatives of the Company and the Guarantors as shall be reasonably requested by the Holders of Registrable Securities or their counsel available for discussion of such document; and the Company and the Guarantors

-10-

shall not, at any time after initial filing of the Shelf Registration Statement, use or file any Prospectus, any Free Writing Prospectus, any amendment of or supplement to the Shelf Registration Statement or a Prospectus or a Free Writing Prospectus, or any document that is to be incorporated by reference into the Shelf Registration Statement, a Prospectus or a Free Writing Prospectus, of which the Holders of Registrable Securities and their counsel shall not have previously been advised and furnished a copy or to which the Holders of Registrable Securities or their counsel shall reasonably object;

(xii)     obtain a CUSIP number for all Registrable Securities that are resold by the Holders no later than the initial effective date of a Shelf Registration Statement;

(xiii)     cause the Indenture to be qualified under the Trust Indenture Act in connection with the registration of the resale of the Registrable Securities; cooperate with the Trustee and the Holders to effect such changes to the Indenture as may be required for the Indenture to be so qualified in accordance with the terms of the Trust Indenture Act; and execute, and use their reasonable best efforts to cause the Trustee to execute, all documents as may be required to effect such changes and all other forms and documents required to be filed with the SEC to enable the Indenture to be so qualified in a timely manner;

(xiv)     make available for inspection by one representative designated by a majority of the Holders of Registrable Securities to be included in such Shelf Registration (such representative, the "Holders' Inspector") and the Underwriters participating in any disposition pursuant to such Shelf Registration Statement (or one counsel to such Underwriters) (such Underwriters or counsel, the "Underwriter Inspector" and, together with the Holders' Inspector, the "Inspectors"), each upon a written request, at the offices where normally kept, during reasonable business hours, all pertinent financial and other records, pertinent corporate documents and instruments of the Company and its subsidiaries (collectively, the "Records), as shall be reasonably necessary to enable the Inspectors to exercise any applicable due diligence responsibilities, and cause the officers, directors and employees of the Company and any of its subsidiaries to supply all information ("Information") reasonably requested by the Inspectors in connection with such due diligence responsibilities.  The Inspectors shall agree in writing that they will keep the Records and Information confidential and that they will not disclose any of the Records or Information that the Company determines, in good faith, to be confidential and notifies the Inspectors in writing are confidential unless (i) the disclosure of such Records or Information is necessary to avoid or correct a material misstatement or omission in such Registration Statement or Prospectus, (ii) the release of such Records or Information is ordered pursuant to a subpoena or other order from a court claiming jurisdiction or any request or order from a regulatory body, (iii) disclosure of such Records or Information is necessary or advisable, in the judgment of counsel for the Inspectors, in connection with any action, claim, suit or proceeding, directly or indirectly, involving or potentially involving the Inspectors and arising out of, based upon, relating to or involving this Agreement, the Indenture or any transactions contemplated hereby or thereby or arising hereunder or thereunder, (iv) the information in such Records or Information has been made generally available to the public other than by the Inspectors or any "affiliate" (as defined in Rule

-11-

405 under the Securities Act) thereof, (v) such information becomes available to any such person from a source other than the Company and such source is not known by such person to be bound by a confidentiality obligation to the Company or (vi) such information is necessary to establish a due diligence defense; *provided*, *however*, that (if permitted) prior notice shall be provided as soon as practicable to the Company of the potential disclosure of any information by any Inspector pursuant to clauses (i), (ii) or (iii) of this sentence to permit the Company to obtain a protective order (or waive the provisions of this paragraph (xiv)) and that such Inspector shall take such actions as are reasonably necessary to protect the confidentiality of such information (if practicable) to the extent such action is otherwise not inconsistent with, an impairment of or in derogation of the rights and interests of such Holder or Inspector;

(xv)     use their commercially reasonable efforts to cause all Registrable Securities to be listed on any securities exchange or any automated quotation system on which similar securities issued or guaranteed by the Company or any Guarantor are then listed if requested by the Majority Holders, to the extent such Registrable Securities satisfy applicable listing requirements;

(xvi)     if reasonably requested by any Holder of Registrable Securities covered by a Shelf Registration Statement, promptly include in a Prospectus supplement or post-effective amendment such information with respect to such Holder as such Holder reasonably requests to be included therein and make all required filings of such Prospectus supplement or such post-effective amendment as soon as reasonably practicable after the Company has received notification of the matters to be so included in such filing;

(xvii)     in the case of a Shelf Registration involving an Underwritten Offering, enter into such customary agreements and take all such other actions in connection therewith (including those requested by the Holders of a majority in principal amount of the Registrable Securities covered by the Shelf Registration Statement) in order to expedite or facilitate the disposition of such Registrable Securities and in such connection, (1) to the extent possible, make such representations and warranties to the Holders and any Underwriters of such Registrable Securities with respect to the business of the Company and its subsidiaries and the Registration Statement, Prospectus, any Free Writing Prospectus and documents incorporated by reference or deemed incorporated by reference, if any, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings of debt securities similar to the Securities and confirm the same if and when requested, (2) obtain opinions of counsel to the Company and the Guarantors (which opinions, in form, scope and substance, shall be reasonably satisfactory to such Underwriters and their counsel) addressed to each Underwriter of Registrable Securities, covering the matters customarily covered in opinions reasonably requested in underwritten offerings, (3) obtain "comfort" letters from the independent certified public accounting firm of the Company and the Guarantors (and, if necessary, any other certified public accountant of any subsidiary of the Company or any Guarantor, or of any business acquired by the Company or any Guarantor for which financial statements and financial data are or are required to be included in the Registration Statement) addressed to each selling Holder (to the extent permitted by applicable professional standards) and

Underwriter of Registrable Securities, such letters to be in customary form and covering matters of the type customarily covered in "comfort" letters in connection with under-written offerings of debt securities similar to the Securities, including but not limited to financial information contained in any preliminary prospectus, Prospectus or Free Writ-ing Prospectus and (4) deliver such other documents and certificates as may be reasona-bly requested by the Holders of a majority in principal amount of the Registrable Securi-ties being sold or the Underwriters, and which are customarily delivered in underwritten offerings of debt securities similar to the Securities, to evidence the continued validity of the representations and warranties of the Company and the Guarantors made pursuant to clause (1) above and to evidence compliance with any customary conditions contained in an underwriting agreement; and

(xviii)    so long as any Registrable Securities remain outstanding, cause each Ad-ditional Guarantor upon the occurrence of the event resulting in such party becoming an Additional Guarantor, to execute a counterpart to this Agreement in the form attached he-reto as Exhibit B and to deliver such counterpart to the Backstop Parties no later than five Business Days following the execution thereof.

(b)    the Company may require each Holder of Registrable Securities to furnish to the Company such information regarding such Holder and the proposed disposition by such Holder of such Registrable Securities as the Company and the Guarantors may from time to time reasonably request in writing.  To the extent such information is necessary to include in such Shelf Registration Statement and any Holder fails or refuses to provide such information within a reasonable period of time from the Company's request (such time to be provided in the Compa-ny's written request) such Holder shall not be entitled to include its Registrable Securities in such Shelf Registration Statement until such information is provided to the Company and re-flected in such Shelf Registration Statement.  Each Holder also agrees to notify the Company as promptly as reasonably practicable of any inaccuracy or change in information previously fur-nished by such Holder to the Company or of the occurrence of any event in either case as a result of which any Prospectus relating to the Shelf Registration Statement contains or would contain an untrue statement of a material fact regarding such Holder or such Holder's intended method of disposition of Registrable Securities or omits to state any material fact regarding such Holder or such Holder's intended method of disposition of such Registrable Securities required to be stated therein or necessary to make the statements therein not misleading in light of the circums-tances then existing, and promptly to furnish to the Company any additional information required to correct and update any previously furnished information or required so that such Prospectus shall not contain, with respect to such Holder or the disposition of such Registrable Securities, an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing.

(c)    each Holder of Registrable Securities covered in such Shelf Registration Statement agrees that, upon receipt of any notice from the Company and the Guarantors of the happening of any event of the kind described in Section 4(a)(vi)(3) or 4(a)(vi)(5) hereof, such Holder will forthwith discontinue disposition of Registrable Securities pursuant to the Shelf Reg-istration Statement until such Holder's receipt of the copies of the supplemented or amended

-13-

Prospectus and any Free Writing Prospectus contemplated by Section 3(a)(x) hereof and, if so directed by the Company and the Guarantors, such Holder will deliver to the Company and the Guarantors all copies in its possession, other than permanent file copies then in such Holder's possession, of the Prospectus and any Free Writing Prospectus covering such Registrable Securities that is current at the time of receipt of such notice.

(d)    (i) Subject to the limitation set forth in the next succeeding paragraph, the Company shall be entitled to delay the initial filing of any Registration Statement, suspend its obligation to file any amendment to any Registration Statement, furnish any supplement or amendment to a Prospectus included in any Registration Statement, make any other filing with the SEC that would be incorporated by reference into any Registration Statement, cause any Registration Statement to remain effective or take any similar action (collectively, "Registration Actions") (A) if the board of directors of the Company determines in good faith that taking any such Registration Actions (1) would reasonably be expected to materially impede, delay or interfere with, or require premature disclosure of, any material financing, offering, acquisition, merger, corporate reorganization or segment reclassification or discontinuance of operations, which is required to be reflected in pro forma or restated financial statements that amends a historical financial statement of the Company, or other significant transaction or any negotiations, discussions or pending proposals with respect thereto, involving the Company or any of its subsidiaries or (2) would require disclosure of non-public material information the disclosure of which would reasonably be expected to materially and adversely affect the Company, subject to the provisions of Section 4(d)(ii) or (B) upon any event described in Section 4(a)(vi)(5) (the period resulting from any such delay, suspension or other action, a "Suspension Period"). Upon the occurrence of any of the conditions described in the foregoing sentence, the Company shall give prompt notice (a "Suspension Notice") thereof to the Holders. Upon the termination of such condition, the Company shall give prompt notice thereof to the Holders and shall promptly proceed with all Registration Actions that were suspended pursuant to this paragraph.

(ii)    If the Company and the Guarantors shall give any Suspension Notice, the Company and the Guarantors shall extend the period during which such Registration Statement shall be maintained effective pursuant to this Agreement by the number of days during the period from and including the date of the giving of such notice to and including the date when the Holders of such Registrable Securities shall have received copies of the supplemented or amended Prospectus or any Free Writing Prospectus necessary to resume such dispositions. The Company and the Guarantors may give any such notice only twice during any 365-day period and any such suspensions shall not exceed 30 days for each suspension and there shall not be more than two suspensions in effect during any 365-day period.

(iii)    Each Holder agrees that upon receipt of any Suspension Notice from the Company pursuant to this Section 4(d), it will discontinue use of the Prospectus contained in such Registration Statement and any Free Writing Prospectus until receipt of copies of the supplemented or amended Prospectus or Free Writing Prospectus relating thereto or until advised in writing by the Company that the use of the Prospectus contained in such Registration Statement or Free Writing Prospectus may be resumed.

-14-

(e)    If requested in writing by the Majority Holders, the Holders of Registrable Securities covered by a Shelf Registration Statement who desire to do so may sell such Registrable Securities in an Underwritten Offering.  In any such Underwritten Offering, the investment bank or investment banks and manager or managers (each an "Underwriter") that will administer the offering will be selected by the Company, subject to the consent of the Holders of a majority in principal amount of the Registrable Securities included in such offering (which shall not be unreasonably withheld). No Holder may participate in any Underwritten Offering unless such Holder (i) agrees to sell such Holder's Securities on the basis provided in any underwriting arrangements approved by the persons entitled hereunder to approve such arrangements and (ii) timely completes and executes all reasonable questionnaires, powers of attorney, indemnities, underwriting agreements, lock-up letters and other documents, under customary terms, as customarily required under the terms of such underwriting arrangements.

5.    Indemnification and Contribution.

(a)    The Company and each Guarantor, jointly and severally, agree to indemnify and hold harmless each Holder, their respective affiliates, directors and officers and each Person, if any, who controls any Holder within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including, without limitation, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, (1) any untrue statement or alleged untrue statement of a material fact contained in any Shelf Registration Statement or any omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein not misleading, or (2) any untrue statement or alleged untrue statement of a material fact contained in any Prospectus, any Free Writing Prospectus or any "issuer information" ("Issuer Information") filed or required to be filed pursuant to Rule 433(d) under the Securities Act, or any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, in each case except insofar as such losses, claims, damages or liabilities arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Holder furnished to the Company in writing by any selling Holder expressly for use therein. In connection with any Underwritten Offering permitted by Section 4, the Company and the Guarantors, jointly and severally, will also indemnify the Underwriters, if any, selling brokers, dealers and similar securities industry professionals participating in the distribution, their respective affiliates and each Person who controls such Persons (within the meaning of the Securities Act and the Exchange Act) to the same extent as provided above with respect to the indemnification of the Holders, if requested in connection with any Shelf Registration Statement, any Prospectus, any Free Writing Prospectus or any Issuer Information.

(b)    Each Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, the Guarantors and the other selling Holders, the directors of the Company and the Guarantors, each officer of the Company and the Guarantors who signed the Shelf Registration Statement and each Person, if any, who controls the Company, the Guarantors and any other selling Holder within the meaning of Section 15 of the Securities Act or Section 20 of

the Exchange Act to the same extent as the indemnity set forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities (including, without limitation, reasonable legal fees and other expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred) that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Holder furnished to the Company in writing by such Holder expressly for use in any Shelf Registration Statement, any Prospectus and any Free Writing Prospectus.

(c)    If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any Person in respect of which indemnification may be sought pursuant to either paragraph (a) or (b) above, such Person (the "Indemnified Person") shall promptly notify the Person against whom such indemnification may be sought (the "Indemnifying Person") in writing; provided that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under this Section 5 except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided, further, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under this Section 5.  If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section 5 that the Indemnifying Person may designate in such proceeding and shall pay the reasonable fees and expenses of such proceeding and shall pay the reasonable fees and expenses of such counsel related to such proceeding, as incurred.  In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; (iii) the Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the fees and expenses of more than one separate firm (in addition to any local counsel) for all Indemnified Persons, and that all such reasonable fees and expenses shall be reimbursed as they are incurred.  Any such separate firm (x) for any Holder, its directors and officers and any control Persons of such Holder shall be designated in writing by the Majority Holders and (y) in all other cases shall be designated in writing by the Company.  The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement or judgment.  No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could

-16-

have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (A) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (B) does not include any statement as to any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     If the indemnification provided for in paragraphs (a) and (b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company and the Guarantors from the offering of the Securities, on the one hand, and by the Holders from receiving Securities registered under the Securities Act, on the other hand, or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company and the Guarantors on the one hand and the Holders on the other in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative fault of the Company and the Guarantors on the one hand and the Holders on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company and the Guarantors or by the Holders and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(e)     The Company, the Guarantors and the Holders agree that it would not be just and equitable if contribution pursuant to this Section 5 were determined by *pro rata* allocation (even if the Holders were treated as one entity for such purpose) or by any other method of allocation that does not-take account of the equitable considerations referred to in paragraph (d) above.  The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in paragraph (d) above shall be deemed to include, subject to the limitations set forth above, any reasonable legal or other expenses incurred by such Indemnified Person in connection with any such action or claim.  Notwithstanding the provisions of this Section 5, in no event shall a Holder be required to contribute any amount in excess of the amount by which the total price at which the Securities sold by such Holder exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  The Holders' obligations to contribute pursuant to this Section 5 are several and not joint.

(f)     The remedies provided for in this Section 5 are not exclusive and shall not limit any rights or remedies that may otherwise be available to any Indemnified Person at law or in equity.

(g)    The indemnity and contribution provisions contained in this Section 5 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by or on behalf of any Holder or any Person controlling any Holder, or by or on behalf of the Company or the Guarantors or the officers or directors of or any Person controlling the Company or the Guarantors, (iii) any sale of Registrable Securities pursuant to a Shelf Registration Statement.

6.    <u>General</u>.

(a)    *Inconsistent Agreements.*  The Company and the Guarantors represent, warrant and agree that (i) the rights granted to the Holders hereunder do not in any way conflict with and are not inconsistent with the rights granted to the holders of any other outstanding securities issued or guaranteed by the Company or any Guarantor under any other agreement and (ii) neither the Company nor any Guarantor has entered into, or on or after the date of this Agreement will enter into, any agreement that is inconsistent with the rights granted to the Holders of Registrable Securities in this Agreement or otherwise conflicts with the provisions hereof. For clarification, nothing herein is intended to prohibit the Company and the Guarantors from (i) registering any Additional Notes (as defined in the Indenture) issued on the same registration statement as the Registrable Securities or (ii) complying with their obligations for the registration of any securities pursuant to the terms of the Plan or any agreement entered into as contemplated by the Plan.

(b)    *Amendments and Waivers.*  The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given unless the Company and the Guarantors have obtained the written consent of Holders of at least a majority in aggregate principal amount of the outstanding Registrable Securities affected by such amendment, modification, supplement, waiver or consent; *provided*, that no amendment, modification, supplement, waiver or consent to any departure from the provisions of Section 5 hereof shall be effective as against any Holder of Registrable Securities unless consented to in writing by such Holder.  Any amendments, modifications, supplements, waivers or consents pursuant to this Section 6(b) shall be by a writing executed by each of the parties hereto.

(c)    *Notices.*  All notices and other communications provided for or permitted hereunder shall be made in writing by hand-delivery, registered first-class mail, telex, telecopier, or any courier guaranteeing overnight delivery (i) if to a Holder, at the Holder's address set forth on the signature pages hereto, if any, or at such other address given by the Holder to the Company by means of a notice given in accordance with the provisions of this Section 6(c); (ii) if to the Company and the Guarantors, initially at the Company's address set forth on the signature pages hereto and thereafter at such other address, notice of which is given in accordance with the provisions of this Section 6(c); and (iii) if to other persons, at the most current address given by such person to the Company by means of a notice given in accordance with the provisions of this Section 6(c).  All such notices and communications shall be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when answered back, if telexed; when receipt is acknowledged, if telecopied; and on the next Business Day if timely delivered to an air courier guaranteeing

overnight delivery.  Copies of all such notices, demands or other communications shall be concurrently delivered by the Person giving the same to the Trustee, at the address specified in the Indenture.

(d)     *Successors and Assigns.*  This Agreement shall inure to the benefit of and be binding upon the successors, assigns and transferees of each of the parties, including, without limitation and without the need for an express assignment, subsequent Holders; provided that in order for a subsequent Holder to be included in a Registration Statement, such subsequent Holder must provide the Company with its contact information.

(e)     *Counterparts.*  This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile, email or other electronic transmission (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

(f)     *Headings.*  The headings in this Agreement are for convenience of reference only, are not a part of this Agreement and shall not limit or otherwise affect the meaning hereof.

(g)     *Governing Law.*  This Agreement, and any claims, controversy or dispute arising under or related to this Agreement, shall be governed by and construed in accordance with the laws of the State of New York.

(h)     *Entire Agreement; Severability.*  This Agreement contains the entire agreement between the parties relating to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.  The Company, the Guarantors and the Holders shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

AMERICAN MEDIA, INC.


By:_____
   Name:
   Title:


AMERICAN MEDIA CONSUMER
ENTERTAINMENT, INC.
AMERICAN MEDIA CONSUMER MAGAZINE
GROUP, INC.
AMERICAN MEDIA DISTRIBUTION &
MARKETING GROUP, INC.
AMERICAN MEDIA MINI MAGS, INC.
AMERICAN MEDIA NEWSPAPER GROUP,
INC.
AMERICAN MEDIA PROPERTY GROUP, INC.
[AMI DIGITAL COMMERCE, INC.]
COUNTRY MUSIC MEDIA GROUP, INC.
DISTRIBUTION SERVICES, INC.
GLOBE COMMUNICATIONS CORP.
GLOBE EDITORIAL, INC.
MIRA! EDITORIAL, INC.
NATIONAL ENQUIRER, INC.
NATIONAL EXAMINER, INC.
STAR EDITORIAL, INC.
WEIDER PUBLICATIONS, LLC


By:  _____
   Name:
   Title:


Address:  American Media Operations, Inc.
         1000 American Media Way
         Boca Raton, FL  33464-1000
         Fax No.:  (561) 989-1224
         Attention:  General Counsel

-20-

Confirmed and accepted as of the date first above written

ANGELO GORDON & CO., L.P., on behalf of
certain funds and managed accounts

By:_____
    Name:
    Title:

Address: Angelo, Gordon & Co., L.P.
        245 Park Avenue, 26th Floor
        New York, New York 10167
        Attention: Gavin Baiera

AVENUE CAPITAL MANAGEMENT II, L.P., on
behalf of :

AVENUE INVESTMENTS, L.P.

AVENUE INTERNATIONAL MASTER L.P.

AVENUE-CDP GLOBAL OPPORTUNITIES
FUND, L.P.

AVENUE SPECIAL SITUATIONS FUND IV, L.P.

AVENUE SPECIAL SITUATIONS FUND V, L.P.

By: AVENUE CAPITAL MANAGEMENT II.
GENPAR LLC, its general partner


[By: _____
Name:
Title:


Address:  ]

<u>Exhibit A</u>

<u>Holder Counterpart to Registration Rights Agreement</u>

The undersigned hereby absolutely, unconditionally and irrevocably agrees as a Holder (as defined in the Registration Rights Agreement, dated as of December [    ], 2010 by and between American Media, Inc., a Delaware corporation, the Guarantors and the other Holders) to be bound by the terms and provisions of such Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this counterpart as of _____, 20[  ].

[ADDITIONAL HOLDER]


By: _____
        Name:
        Title:


Address: [                            ]
        Attention: [                    ]

<u>Exhibit B</u>

<u>Guarantor Counterpart to Registration Rights Agreement</u>

The undersigned hereby absolutely, unconditionally and irrevocably agrees as a Guarantor (as defined in the Registration Rights Agreement, dated as of December [    ], 2010 by and between American Media, Inc., a Delaware corporation, the Guarantors and the Holders) to be bound by the terms and provisions of such Registration Rights Agreement.

IN WITNESS WHEREOF, the undersigned has executed this counterpart as of _____, 20[  ].

[ADDITIONAL GUARANTOR]

By: _____
      Name:
      Title:

## **EXHIBIT F**

**Escrow Agreement for New First Lien Notes**

EXECUTION VERSION

## ESCROW AGREEMENT

ESCROW AGREEMENT, dated as of December 1, 2010 (the "Agreement"), by and among AMO ESCROW CORPORATION, a Delaware corporation (the "Escrow Company"), AMERICAN MEDIA OPERATIONS INC., a Delaware corporation (the "Company"), WILMINGTON TRUST FSB, a federal savings bank, as trustee (together with its successors and assigns, in such capacity, the "Trustee") under the Indenture (as defined below), and WILMINGTON TRUST FSB, a federal savings bank, as escrow agent (together with its successors and assigns, in such capacity, the "Escrow Agent").

This Agreement is being entered into in connection with (i) the Purchase Agreement (the "Purchase Agreement"), dated November 16, 2010, between the Escrow Company and J.P. Morgan Securities LLC, as representative of the several initial purchasers named on Schedule I thereto (collectively, the "Initial Purchasers"), and (ii) the Indenture, dated as of the date hereof (as may be amended, supplemented or otherwise modified from time to time, the "Indenture"), between the Escrow Company and the Trustee, governing the Escrow Company's $385,000,000 in aggregate principal amount of 11½% First Lien Senior Secured Notes due 2017 (the "Notes").

For good and valuable consideration, the receipt and adequacy of which are hereby acknowledged by each of the parties hereto, the parties hereto, intending to be legally bound, do hereby agree as follows:

Section 1.    Definitions. Capitalized terms, used but not defined herein, shall have the respective meanings specified in the Indenture or the Purchase Agreement, as applicable.

Section 2.    Appointment and Jurisdiction of Escrow Agent.

(a)    The Escrow Company, the Company and the Trustee hereby appoint Wilmington Trust FSB as escrow agent in accordance with the terms and conditions set forth herein, and the Escrow Agent hereby accepts such appointment.

(b)    The Escrow Company, the Company, the Trustee and the Escrow Agent hereby agree that the "securities intermediary's jurisdiction" of the Escrow Agent is the State of New York for purposes of the New York UCC (as defined below), including Section 8-110 thereof.

(c)    The Escrow Company, the Company, the Trustee and the Escrow Agent hereby agree that the "bank's jurisdiction" of the Escrow Agent is the State of New York for purposes of the New York UCC, including Section 9-304 thereof.

Section 3.    The Escrow Property.

(a)    On the date hereof (the "Closing Date"), the Escrow Company shall cause the Initial Purchasers to deposit with the Escrow Agent:

(i)    $383,075,000, representing (A) the gross proceeds from the offering of the Notes of $385,000,000, less (B) $1,925,000, which is one-third of the discount payable to the Initial Purchasers with respect to the offering of the Notes which amount is payable on the Closing Date pursuant to the Purchase Agreement (the "Paid Discount Amount," and the difference of (A) and (B) referred to herein as the "Proceeds").

(b)    On the Closing Date, the Company shall deposit with the Escrow Agent:

(i)    the amount equal to the Paid Discount Amount;

(ii)    $3,850,000, representing two-thirds of the discount payable to the Initial Purchasers with respect to the offering of the Notes on either the Release Date or the Special Redemption Date pursuant to the Purchase Agreement (the "Unpaid Discount Amount"); and

(iii)    $7,256,181, representing the amount of interest that would accrue on the Notes from the Closing Date up to but not including January 30, 2011 (the "Initial Escrow End Date") (the foregoing interest amount being the "Interest Deposit" and together with the Proceeds, the Paid Discount Amount, the Unpaid Discount Amount and the Additional Interest Deposit (as defined below), plus all interest, dividends and other distributions and payments thereon, collectively referred to herein as the "Escrow Property").

(c)    If prior to the date of the Initial Escrow End Date, the Escrow Company elects to extend the Initial Escrow End Date to March 6, 2011 (such date, the "Escrow Extension Date"), no later than five (5) Business Days prior to the Initial Escrow End Date, the Company shall deposit with the Escrow Agent $4,427,500 (the "Additional Interest Deposit"), representing the amount equal to the additional interest that would accrue on the Notes from the Initial Escrow End Date up to, but not including, the Escrow Extension Date.

In no event shall the Company have any liability, obligation or responsibility for any of the amounts required to be deposited by the Escrow Company nor shall the Escrow Company have any liability, obligation or responsibility for any of the amounts required to be deposited by the Company. The Escrow Company and the Company agree that all amounts deposited pursuant to this Agreement shall be satisfactory for such purpose pursuant to the Indenture.

The Escrow Agent shall have no duty to solicit deposits of the Escrow Property. The Escrow Company and the Company, as applicable, certify that all amounts deposited pursuant to this Agreement shall be satisfactory for such purposes pursuant to the Indenture, and shall notify the Escrow Agent in writing at or prior to the time when any Escrow Property is sent to the Escrow Agent pursuant to this Agreement and certify at such time that all amounts deposited pursuant to this Agreement are satisfactory for such purposes pursuant to the Indenture. The Escrow Agent shall have no liability for Escrow Property, or interest thereon, sent to it that remains unclaimed and/or are returned if such written notification is not given.

(d)    (i) Subject to and in accordance with the provisions hereof, the Escrow Agent agrees to hold the Escrow Property in either a "securities account" (as defined in Section 8 501 of the Uniform Commercial Code in effect in the State of New York on the date hereof (the

"New York UCC") or in a "deposit account" (as defined in Section 9-102(a)(29) of the New York UCC), as applicable. Escrow Property will be held in the following account:

Wire Instructions:

| ABA # | 031100092 |
|---|---|
| Bank Name | Wilmington Trust |
| Account # | 098286-001 |
| Reference | AMO Escrow Corporation/AMO Escrow |
| Contact Person | Corporate Capital Markets - Jane Schweiger |

The above referenced account will be established with the Escrow Agent or an affiliate in the name of the Escrow Agent, as escrow agent on behalf of the Escrow Company, (together with any successor account or accounts the "Escrow Account") and the Escrow Agent shall administer the Escrow Account in accordance with the provisions of this Agreement, including, without limitation, holding in escrow, investing and reinvesting, and releasing or distributing the Escrow Property.

(ii)    As security for the due and punctual payment when due and punctual performance of all amounts that may be payable from time to time under the Indenture and the Notes, now or hereafter arising, the Escrow Company and the Company hereby pledge, assign and grant to the Trustee, for its benefit, the benefit of the Collateral Agent and the benefit of the holders of the Notes, a continuing security interest in, and a lien on, (i) the Escrow Account and the Escrow Property; (ii) all claims and rights of whatever nature which the Escrow Company may now have or hereafter acquire against any third party(ies) in respect of any of the Escrow Account or Escrow Property (including any claims or rights in respect of any Security Entitlements credited to an account of the Escrow Agent maintained at The Depository Trust Company or any other clearing corporation) or any other Securities Intermediary; (iii) all rights which the Escrow Company or the Company may now have or hereafter acquire against the Escrow Agent in respect of its holding and managing all or any part of the Escrow Account or Escrow Property; and (iv) all proceeds (as such term is defined in Section 9-102(a) of the UCC) of any of the foregoing. The Escrow Agent hereby acknowledges the Trustee's security interest as set forth in this Section 3(d)(ii). The security interest of the Trustee shall at all times be valid, perfected and enforceable as a first priority security interest by the Trustee against Escrow Company, the Company and all third parties in accordance with the terms of this Agreement. The Escrow Company shall cause the Unpaid Discount Amount to be paid from the Escrow Property to the Initial Purchasers pursuant to the Purchase Agreement at the same time Escrow Property is released from escrow pursuant to either Section 5(a) or 5(b) hereof).

(iii)    The Escrow Agent hereby agrees that each item of property (including, without limitation, all Escrow Investments (as defined in the Indenture) (collectively, the "Escrow Agreement Permitted Investments")), and any investment property, financial asset, security, instrument or cash or cash balances (irrespective of the currency in which such cash or cash balances are denominated) credited to a securities account

-3-

shall be treated as a "financial asset" within the meaning of Section 8-102(a)(9) of the New York UCC.

(iv)    If at any time the Escrow Agent receives from the Trustee (i) any entitlement order (as such term is defined in Section 8-102(a)(8) of the New York UCC) with respect to any financial asset credited to the Escrow Account or (ii) any instruction (within the meaning of Section 9-104(b) of the New York UCC) concerning the disposition of funds held in the Escrow Account, the Escrow Agent shall comply with such entitlement order or instruction, as applicable, without further consent of the Escrow Company or any other person. Notwithstanding the foregoing, the Trustee hereby agrees with the Escrow Company that it shall not give any entitlement orders or instructions, as applicable, unless the Notes become subject to a Special Mandatory Redemption pursuant to Section 3.10 of the Indenture or as otherwise permitted pursuant to Section 5 hereof.

(v)    Upon the release of any Escrow Property pursuant to Section 5 hereof, the security interest of the Trustee for the benefit of itself, the Collateral Agent and the holders of the Notes shall automatically terminate with respect to such Escrow Property without any further action and such Escrow Property shall be delivered to the recipient free and clear of any and all liens, claims or encumbrances of any person, including, without limitation, the Escrow Agent, the Trustee and the holders of the Notes.

(vi)    The Escrow Company agrees to take all steps reasonably necessary to maintain the security interest created by this Agreement as a perfected first-priority security interest and shall cause UCC financing statements describing the Escrow Property and Escrow Account to be promptly filed in the State of Delaware. Without limiting the foregoing, the Escrow Company agrees to take all steps reasonably requested by the Trustee in connection with the perfection of the Trustee's security interest in the Escrow Property and Escrow Account pursuant to this Agreement and, without limiting the generality of the foregoing, the Escrow Company hereby authorizes the Trustee and the Initial Purchasers on behalf of the Trustee to file one or more UCC financing statements that reasonably describe the collateral in such jurisdictions and filing offices and containing such description of collateral as the Trustee, or the Initial Purchasers on behalf of the Trustee, may determine is reasonably necessary in order to perfect the security interest granted herein.

(vii)    The Escrow Company represents and warrants that as of the date hereof it is duly formed and validly existing as a corporation under the laws of the state of Delaware and is not organized under the laws of any other jurisdiction, and the Escrow Company hereby agrees that, prior to the termination of this Agreement, it will not change its name or jurisdiction of organization without giving the Trustee and the Initial Purchasers not less than 10 days' prior written notice thereof.

Section 4.    Investment of the Escrow Property.    During the term of this Agreement, the Escrow Agent shall invest and reinvest the Escrow Property in the Escrow Agreement Permitted Investments at the written direction of one of the authorized representatives of the Escrow Company identified on Schedule I hereto (each such representative, an "Authorized Person").

-4-

The Escrow Agent shall have no obligation to invest or reinvest the Escrow Property if deposited with the Escrow Agent after 12:01 p.m. local time in the City of New York on such day of deposit until the next Business Day. Instructions received after 12:01 p.m. local time in the City of New York will be treated as if received on the following Business Day. The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Property. Any interest or other income received on such investment and reinvestment of the Escrow Property shall become part of the Escrow Property and any losses incurred on such investment and reinvestment of the Escrow Property shall be debited against the Escrow Property. In the absence of any other written instruction, the Escrow Property shall be invested in the Federated Government Obligations Fund Institutional Service Shares and Invesco Government & Agency Portfolio Private Class of the Wilmington family of mutual funds or such other mutual funds for which the Escrow Agent or any affiliate of the Escrow Agent may serve as investment advisor or other service provider. The parties acknowledge that shares in such mutual funds are not obligations of Wilmington Trust Company or Wilmington Trust Corporation, are not deposits and are not insured by the Federal Deposit Insurance Corporation. It is agreed and understood that the entity serving as Escrow Agent may earn fees associated with the investments outlined above in accordance with the terms of such investments. Notwithstanding the foregoing, the Escrow Agent shall have the power to sell or liquidate the foregoing investments whenever the Escrow Agent shall be required to release all or any portion of the Escrow Property pursuant to Section 5 hereof. In no event shall the Escrow Agent be deemed an investment manager or adviser in respect of any selection of investments hereunder. The Escrow Agent shall not be responsible for the investment performance of any investment selected pursuant to this Agreement. It is understood and agreed that the Escrow Agent or its affiliates are permitted to receive additional compensation that could be deemed to be in the Escrow Agent's economic self-interest for (1) serving as investment adviser, administrator, shareholder servicing agent, custodian or sub custodian with respect to certain of the investments, (2) using affiliates to effect transactions in certain investments and (3) effecting transactions in investments.

Section 5.    Distribution of Escrow Property. The Escrow Agent is directed to distribute the Escrow Property in the following manner:

(a)    if at any time prior to the Initial Escrow End Date, as may be extended to the Escrow Extension Date, the Escrow Agent receives an Officer's Certificate from the Company substantially in the form of Exhibit A, dated as of the date the Escrow Property is to be released pursuant to the Release Notice (as defined below), executed by an Authorized Person of the Company and certifying to the Escrow Agent as to the matters set forth therein (an "Officer's Certificate"), a written notice substantially in the form of Exhibit B, executed by an Authorized Person of the Escrow Company (a "Release Notice") and written instructions to liquidate any investments of the Escrow Property in accordance with Section 4 hereof (the "Liquidation Notice"), the Escrow Agent shall on the same Business Day that the Release Notice is received, provided that (x) the Release Notice is received by 12:01 p.m. local time in the City of New York on that same Business Day and (y) the Liquidation Notice is received by 12:01 p.m. local time in the City of New York at least one (1) Business Day prior to that same Business Day, release the Escrow Property as directed and in the manner set forth in the Release Notice from the Escrow Company; or

-5-

(b)    if at any time prior to the Escrow End Date, the Escrow Agent receives a written notice from the Escrow Company (or an entitlement order or instructions, as applicable, from the Trustee pursuant to Section 3(e)(iv) hereof) setting forth the date on which a Special Mandatory Redemption will occur in the form of Exhibit C hereto (a "Redemption Notice"), and a Release Notice, substantially in the form of Exhibit B, executed by an Authorized Person of the Escrow Company, the Escrow Agent shall liquidate the Escrow Property no later than one (1) Business Day prior to the date specified for the Special Mandatory Redemption, and shall release the Escrow Property as directed and in the manner set forth in the Release Notice from the Escrow Company.

Section 6.    Termination. This Agreement shall terminate upon the distribution of all Escrow Property from the account established hereunder. The provisions of Sections 7, 8, 9 and 10 shall survive the termination of this Agreement and the earlier resignation or removal of the Escrow Agent.

Section 7.    Compensation of Escrow Agent. The Escrow Agent shall be entitled to payment from either the Escrow Company or the Company (without duplication) for customary fees and expenses for all services rendered by it hereunder as separately agreed in writing between the Company, the Escrow Company and the Escrow Agent (as such fees may be adjusted from time to time). The Escrow Company and the Company, jointly and severally, shall reimburse the Escrow Agent on demand for all loss, liability, damage, disbursements, advances or reasonable and documented out-of-pocket expenses paid or incurred by it in the administration of its duties hereunder, including, but not limited to, all counsel, advisors' and agents' reasonable and documented out-of-pocket fees and disbursements and all taxes or other governmental charges, except, in each case, as was caused by the Escrow Agent's bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision. At all times, the Escrow Agent will have a right of set off and first lien on the funds in the Escrow Property for payment of customary fees and reasonable and documented out-of-pocket expenses and all such loss, liability, damage or expenses. Such compensation and expenses shall be paid from the Escrow Property to the extent not otherwise paid within ten (10) Business Days after an invoice has been rendered. Except as expressly provided in this Section 7, the Escrow Agent subordinates any lien or right of set off it may have with respect to the Escrow Property to the Trustee's and the Secured Parties' security interests granted hereunder other than in connection with fees pursuant to this Section 7 or the indemnification obligations in Section 9.

Section 8.    Resignation of Escrow Agent. The Escrow Agent may resign and be discharged from its duties hereunder at any time by giving thirty (30) calendar days' prior written notice of such resignation to the Escrow Company, the Company and the Trustee. Upon such notice, a successor escrow agent shall be appointed by the Escrow Company, the Company and the Trustee, who shall provide written notice of such to the resigning Escrow Agent. Such successor escrow agent shall become the escrow agent hereunder upon the resignation specified in such notice. If the Escrow Company, the Company and the Trustee are unable to agree upon a successor escrow agent within thirty (30) days after such notice, the Escrow Agent may, in its sole discretion, deliver the Escrow Property to the Trustee at the address provided herein or may apply to a court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief. The costs and reasonable and documented out-of-pocket expenses

-6-

(including its attorneys' fees and expenses) incurred by the Escrow Agent in connection with such proceeding shall be paid by the Escrow Company and the Company. Upon receipt of the identity of the successor escrow agent, the Escrow Agent shall either deliver the Escrow Property then held hereunder to the successor Escrow Agent, less the Escrow Agent's fees, costs and expenses or other obligations owed to the Escrow Agent to be paid from any interest earned in respect of the Escrow Property, or hold any interest earned in respect of the Escrow Property (or any portion thereof), pending distribution, until all such fees, costs and expenses or other obligations are paid. Upon its resignation and delivery of the Escrow Property as set forth in this Section 4, the Escrow Agent shall be discharged of and from any and all further obligations arising in connection with the Escrow Property or this Agreement.

Section 9.    Indemnification of Escrow Agent. The Escrow Company and the Company shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its officers, directors, employees and agents, from and against and reimburse the Escrow Agent for any and all claims, obligations, liabilities, losses, damages, injuries (to person, property, or natural resources), penalties, stamp or other similar taxes, actions, suits, judgments and reasonable and documented out-of-pocket costs and expenses (including reasonable and documented attorney's fees and expenses) demanded, asserted or claimed against the Escrow Agent directly or indirectly relating to, or arising from, claims against the Escrow Agent by reason of its participation in the transactions contemplated hereby, including without limitation all reasonable and documented out-of-pocket costs required to be associated with claims for damages to persons or property, and reasonable and documented out-of-pocket attorneys' and consultants' fees and reasonable and documented out-of-pocket expenses and court costs except to the extent caused by the Escrow Agent's bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision. The provisions of this Section 9 shall survive the termination of this Agreement or the earlier resignation or removal of the Escrow Agent.

Section 10.    The Escrow Agent. (a) The duties, responsibilities and obligations of Escrow Agent shall be limited to those expressly set forth herein and no duties, responsibilities or obligations shall be inferred or implied against the Escrow Agent. The Escrow Agent shall not be subject to, nor required to comply with, any other agreement to which the Escrow Company or the Trustee is a party, even though reference thereto may be made herein, or to comply with any direction or instruction (other than those contained herein or delivered in accordance with this Agreement) from the Escrow Company or the Trustee or an entity acting on its behalf. The Escrow Agent shall not be required to expend or risk any of its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder.

(b)    If at any time the Escrow Agent is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Escrow Property (including but not limited to orders of attachment or garnishment or other forms of levies or injunctions or stays relating to the transfer of the Escrow Property), the Escrow Agent is authorized to comply therewith in any manner it or legal counsel of its own choosing deems appropriate; and if the Escrow Agent complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, Escrow Agent shall not be liable to any of the parties hereto or to any other person or

-7-

entity even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(c)     The Escrow Agent shall not be liable for any action taken or omitted or for any loss or injury resulting from its actions or its performance or lack of performance of its duties hereunder in the absence of bad faith, gross negligence or willful misconduct on its part, as determined by a court of competent jurisdiction in a final and non-appealable decision.  In no event shall the Escrow Agent be liable (i) for acting in accordance with or conclusively relying upon any instruction, notice, demand, certificate or document from the Escrow Company or Trustee or any entity acting on behalf of the Escrow Company and the Trustee, (ii) for any indirect, consequential, punitive or special damages, regardless of the form of action and whether or not any such damages were foreseeable or contemplated, (iii) for the acts or omissions of its nominees, correspondents, designees, agents, subagents or subcustodians, (iv) for the investment or reinvestment of any cash held by it hereunder, in each case in good faith, and without gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision, in accordance with the terms hereof, including without limitation any liability for any delays (not resulting from its bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision) in the investment or reinvestment of the Escrow Property, or any loss of interest or income incident to any such delays, or (v) for an amount in excess of the value of the Escrow Property, valued as of the date of deposit, but only to the extent of direct money damages.

(d)     If any fees, reasonable out-of-pocket expenses or costs incurred by, or any obligations owed to, the Escrow Agent or its counsel hereunder are not paid within ten (10) Business Days after such expenses or costs are due, the Escrow Agent may reimburse itself therefor from the Escrow Property and may sell, liquidate, convey or otherwise dispose of any investment in respect of the Escrow Property for such purpose.  The Escrow Agent may in its sole discretion withhold from any distribution of any interest earned in respect of the Escrow Property an amount it believes would, upon sale or liquidation, produce proceeds equal to any unpaid amounts to which the Escrow Agent is entitled to hereunder.

(e)     The Escrow Agent may consult with legal counsel of its own choosing, at the expense of the Company, as to any matter relating to this Agreement, and the Escrow Agent shall not incur any liability in acting in good faith in accordance with any advice from such counsel.

(f)     The Escrow Agent shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of the Escrow Agent (including but not limited to any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

(g)     The Escrow Agent shall be entitled to conclusively rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity or the service thereof.  The Escrow Agent may act in conclusive

-8-

reliance upon any instrument or signature believed by it to be genuine and may assume that any person purporting to give receipt or advice to make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.

(h)　　The Escrow Agent shall not be responsible in any respect for the form, execution, validity, value or genuineness of documents or securities deposited hereunder, or for any description therein, or for the identity, authority or rights of persons executing or delivering or purporting to execute or deliver any such document, security or endorsement. The Escrow Agent shall not be called upon to advise any party as to the wisdom in selling or retaining or taking or refraining from any action with respect to any securities or other property deposited hereunder.

(i)　　The Escrow Agent shall not be under any duty to give the Escrow Property held by it hereunder any greater degree of care than it gives its own similar property and shall not be required to invest any funds held hereunder except as directed in this Agreement. Uninvested funds held hereunder shall not earn or accrue interest.

(j)　　When the Escrow Agent acts on any information, instructions, communications, (including, but not limited to, communications with respect to the delivery of securities or the wire transfer of funds) sent by telex, facsimile, email or other form of electronic or data transmission, the Escrow Agent, absent bad faith, gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision, shall not be responsible or liable in the event such communication is not an authorized or authentic communication of the Escrow Company or the Trustee or is not in the form the Escrow Company and the Trustee sent or intended to send (whether due to fraud, distortion or otherwise). The Escrow Company shall indemnify the Escrow Agent against any loss, liability, claim or reasonable and documented out-of-pocket expense (including reasonable out-of-pocket legal fees and expenses) it may incur with its acting in accordance with any such communication by the Escrow Company.

(k)　　In the event of any ambiguity or uncertainty hereunder or in any notice, instruction or other communication received by the Escrow Agent hereunder, the Escrow Agent may, in its sole discretion, refrain from taking any action other than to retain possession of the Escrow Property, unless the Escrow Agent receives written instructions, signed by the Escrow Company or the Trustee, which eliminates such ambiguity or uncertainty and upon which the Escrow Agent may conclusively rely.

(l)　　In the event of any dispute between or conflicting claims among the Escrow Company, the Company and the Trustee and any other person or entity with respect to any Escrow Property, the Escrow Agent shall be entitled, in its sole discretion, to refuse to comply with any and all claims, demands or instructions with respect to such Escrow Property so long as such dispute or conflict shall continue, and the Escrow Agent shall not be or become liable in any way to the Escrow Company, the Company or the Trustee for failure or refusal to comply with such conflicting claims, demands or instructions. The Escrow Agent shall be entitled to refuse to act until, in its sole discretion, either (i) such conflicting or adverse claims or demands shall have been determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or settled by agreement

-9-

between the conflicting parties as evidenced in a writing satisfactory to the Escrow Agent or (ii) the Escrow Agent shall have received security or an indemnity satisfactory to it sufficient to hold it harmless from and against any and all losses which it may incur by reason of so acting. Any court order, judgment or decree shall be accompanied by a legal opinion by counsel for the presenting party, satisfactory to the Escrow Agent, to the effect that said order, judgment or decree represents a final adjudication of the rights of the parties by a court of competent jurisdiction, and that the time for appeal from such order, judgment or decree has expired without an appeal having been filed with such court. The Escrow Agent shall act on such court order and legal opinions without further question. The Escrow Agent may, in addition, elect, in its sole discretion, to commence an interpleader action or seek other judicial relief or orders as it may deem, in its sole discretion, necessary. The reasonable and documented costs and out-of-pocket expenses (including attorneys' fees and expenses) incurred in connection with such proceeding shall be paid by, and shall be deemed a joint and several obligation of, the Escrow Company and the Company.

(m)    The Escrow Agent shall have no responsibility for the contents of any writing of the arbitrators or any third party contemplated herein as a means to resolve disputes and may conclusively rely without any liability upon the contents thereof.

(n)    Except as set forth in Section 7 hereof, the Escrow Agent does not have any interest in the Escrow Property deposited hereunder but is serving as escrow holder only and having only possession thereof. The Escrow Company and the Company shall pay or reimburse the Escrow Agent upon request for any transfer taxes or other taxes relating to the Escrow Property incurred in connection herewith and shall indemnify and hold harmless the Escrow Agent from any amounts that it is obligated to pay in the way of such taxes. The Escrow Company shall be treated as the owner of the Escrow Property for U.S. federal income tax purposes. Any payments of income from this Escrow Account shall be subject to withholding regulations then in force with respect to United States taxes. The Escrow Company will provide the Escrow Agent with appropriate W-9 forms for tax identification number certifications. It is understood that the Escrow Agent shall only be responsible for income reporting with respect to income earned on the Escrow Property and will not be responsible for any other reporting. This paragraph shall survive notwithstanding any termination of this Agreement or the resignation or removal of the Escrow Agent.

(o)    The Escrow Agent shall provide to the Escrow Company and the Company monthly electronic statements identifying transactions, transfers or holdings of Escrow Property and each such statement shall be deemed to be correct and final upon receipt thereof by the Escrow Company, the Company and the Trustee unless the Escrow Agent is notified in writing, by the Escrow Company, the Company and the Trustee, to the contrary within thirty (30) Business Days of the date of such statement. The Escrow Company and Company acknowledge that regulations of the Comptroller of the Currency grant the parties the right to receive brokerage confirmations of the security transactions as they occur. The Escrow Company and the Company specifically waive such notification to the extent permitted by law and will receive periodic cash transaction statements which will detail all investment transactions. Except as otherwise provided hereunder or agreed in writing among the parties hereto, Escrow Company shall retain the authority to institute, participate and join in any plan of reorganization, readjustment, merger or consolidation with respect to the issuer of any securities held hereunder,

and, in general, to exercise each and every other power or right with respect to each such asset or investment as individuals generally have and enjoy with respect to their own assets and investment, including power to vote upon any securities.

Section 11.    <u>Miscellaneous</u>.

(a)    This Agreement embodies the entire agreement and understanding among the parties relating to the subject matter hereof.

(b)    This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to the principles of conflict of laws (other than Section 5-1401 of the General Obligations Law).

(c)    Each of the parties hereto hereby irrevocably consents to the jurisdiction of the courts of the State of New York and of any Federal Court located in the Borough of Manhattan in such State in connection with any action, suit or other proceeding arising out of or relating to this Agreement or any action taken or omitted hereunder, and waives any claim of forum non conveniens and any objections as to laying of venue. Each party further waives personal service of any summons, complaint or other process and agrees that service thereof may be made by certified or registered mail directed to such person at such person's address for purposes of notices hereunder.

(d)    All notices and other communications under this Agreement shall be in writing in English and shall be deemed given when delivered personally, on the next Business Day after delivery to a recognized overnight courier on the fifth Business Day when mailed first class (postage prepaid) or on the same Business Day when sent by facsimile to the applicable parties before 5:00 p.m. Eastern time on the same Business Day (which facsimile copy shall be followed, in the case of notices or other communications sent to the Escrow Agent, by delivery of the original) at the following addresses (or to such other address as a party may have specified by notice given to the other parties pursuant to this provision):

If to the Escrow Company:

> AMO Escrow Corporation
> 1000 American Media Way
> Boca Raton, FL 33464-1000
> Facsimile: (877) 569-5998
> Attention: Christopher Polimeni

with a copy to (which copy shall not be deemed notice):

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Facsimile: (212) 872-1002
> Attention: Rosa A. Testani

-11-

If to the Company:

> American Media Operations, Inc.
> 1000 American Media Way
> Boca Raton, FL 33464-1000
> Facsimile: (877) 569-5998
> Attention: Christopher Polimeni

with a copy to (which copy shall not be deemed notice):

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036
> Facsimile: (212) 872-1002
> Attention: Rosa A. Testani

If to the Escrow Agent or the Trustee:

> Wilmington Trust FSB
> Corporate Client Services
> 50 South Sixth Street, Suite 1290
> Drop Code 7100
> Minneapolis, MN 55402-1544
> Tel: (612) 217-5632
> Fax: (612) 217-5651
> Attn: Jane Y. Schweiger

(e)    The headings of the Sections of this Agreement have been inserted for convenience and shall not modify, define, limit or expand the express provisions of this Agreement.

(f)    This Agreement and the rights and obligations hereunder of parties hereto may not be assigned except with the prior written consent of the other parties hereto. This Agreement shall be binding upon and inure to the benefit of each party's respective successors and permitted assigns. Except as expressly provided herein, no other person shall acquire or have any rights under or by virtue of this Agreement. This Agreement is intended to be for the sole benefit of the parties hereto, and (subject to the provisions of this Section 11(f)) their respective successors and assigns, and none of the provisions of this Agreement are intended to be, nor shall they be construed to be, for the benefit of any third person.

(g)    This Agreement may not be amended, supplemented or otherwise modified without the prior written consent of the parties hereto.

(h)    The Escrow Agent makes no representation as to the validity, value, genuineness or the collectability of any security or other document or instrument held by or delivered to it.

-12-

(i)    The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act the Escrow Agent, like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with Wilmington Trust FSB.  The parties to this Agreement agree that they will provide the Escrow Agent with such information as it may request in order for the Escrow Agent to satisfy the requirements of the USA Patriot Act.

(j)    This Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which together shall constitute one and the same instrument.

(k)    The rights and remedies conferred upon the parties hereto shall be cumulative, and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of any additional rights or remedies.  The waiver of any right or remedy hereunder shall not preclude the subsequent exercise of such right or remedy.

(l)    The Escrow Company, the Company, the Trustee and the Escrow Agent each hereby represents and warrants as to itself (i) that this Agreement has been duly authorized, executed and delivered on its behalf and constitutes its legal, valid and binding obligation and (ii) that the execution, delivery and performance of this Agreement by it does not and will not violate any applicable law or regulation.

(m)    The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision; and if any provision is held to be unenforceable as a matter of law, the other provisions shall not be affected thereby and shall remain in full force and effect.

(n)    For purposes of this Agreement, "Business Day" shall mean any day that is not a Saturday or Sunday or a day on which banks are required or permitted by law or executive order to be closed in the City of New York.

(o)    For purposes of sending and receiving instructions or directions hereunder, all such instructions or directions shall be, and the Escrow Agent may conclusively rely upon such instructions or directions, delivered, and executed by an Authorized Person of the Escrow Company or the Company designated on Schedule I attached hereto and made a part hereof, which such designation shall include specimen signatures of such representatives, as such Schedule I may be updated from time to time.

[SIGNATURE PAGE FOLLOWS]

-13-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

AMO ESCROW CORPORATION

By: _____

Name: Christopher Polimeni
Title:  Executive Vice President, Chief Financial
         Officer and Treasurer

AMERICAN MEDIA OPERATIONS, INC.

By: _____

Name: Christopher Polimeni
Title:  Executive Vice President, Chief Financial
         Officer and Treasurer

Signature Page to Escrow Agreement

WILMINGTON TRUST FSB, as
Escrow Agent

By: _____

Name: Jane Schweiger
Title: Vice President

WILMINGTON TRUST FSB, as
Trustee

By: _____
    Name: Jane Schweiger
    Title:  Vice President

**EXHIBIT A**

Officer's Certificate
of
AMERICAN MEDIA OPERATIONS, INC.

[_____], 20[ ]

This certificate is being delivered pursuant to Section 5 of the Escrow Agreement, dated as of December 1, 2010 (the "Escrow Agreement"), by and among AMO Escrow Corporation, a Delaware corporation (the "Escrow Company"), American Media Operations, Inc., a Delaware corporation (the "Company"), Wilmington Trust FSB, a federal savings bank, as trustee (together with its successors and assigns, in such capacity, the "Trustee"), and Wilmington Trust FSB, a federal savings bank, as escrow agent (together with its successors and assigns, in such capacity, the "Escrow Agent"). Capitalized terms used but not defined herein have the respective meanings specified in the Indenture, dated as of December 1, 2010 (the "Indenture"), or the Purchase Agreement, dated November 16, 2010 (the "Purchase Agreement"), in each case, between the Escrow Company and the Trustee.

The Company hereby certifies to the Escrow Agent through the undersigned officer as follows:

1.      The Bankruptcy Court has issued an order, that has not been stayed pending appeal, confirming the Reorganization Plan and, other than the release of the Escrow Proceeds (as defined in the Indenture) and other conditions to be satisfied substantially simultaneously with the release of the Escrow Proceeds, the satisfaction of all conditions precedent to the effectiveness of such Reorganization Plan has occurred.

2.      The Escrow Assumption has been consummated and the Company, as obligor in respect of the obligations under the Notes, has assumed all of the obligations of the Escrow Company under the Notes and the Indenture and the Guarantees of the Notes by the Guarantors are in full force and effect.

3.      No Default or Event of Default has occurred and is continuing under the Indenture.

4.      Prior to or substantially simultaneously with the release of Escrow Property (as defined in the Escrow Agreement), the Company and the Guarantors have executed and delivered documents relating to the Revolving Facility, including the Credit Agreement, and the conditions to effectiveness thereunder have been satisfied or waived by the parties thereto, and funds have been borrowed or received or are available to be borrowed pursuant to (as necessary to consummate the Reorganization Plan) the Credit Agreement, which provides for commitments in an aggregate principal amount of not less than $40.0 million; provided that no more than $10.0 million shall be borrowed thereunder on the date hereof.

5.      As demonstrated by Annex I hereto, the Company's pro forma ratio of Debt Covenant EBITDA (as defined in the Offering Memorandum dated as of November 16,

Exhibit A-1

2010 relating to the offering of the Notes) for the four quarters most recently ended for which financial statements have been delivered, to first lien Indebtedness (exclusive of certain revolver borrowings) is less than or equal to 3.5 to 1.0.

6.    The Company and its Subsidiaries have no debt for borrowed money other than (a) the Notes, (b) up to $140.0 million of second lien notes issued pursuant to the Reorganization Plan or otherwise (or any new unsecured pay-in-kind notes that are scheduled to mature after the maturity date of the Notes that are issued in lieu of such second lien notes), (c) the Credit Agreement and (d) up to $2 million of general debt for borrowed money.

7.    The Company and Escrow Company have caused (i) Akin, Gump, Strauss, Hauer & Feld LLP, to deliver to the Initial Purchasers on the Release Date their opinion, dated the Release Date, substantially to the effect set forth in Exhibit C-1 to the Purchase Agreement; and (ii) David Olson, Corporate Counsel of the Company, to deliver to the Initial Purchasers on the Release Date his opinion, dated the Release Date, substantially to the effect set forth in Exhibit C-2 to the Purchase Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Exhibit A-2

IN WITNESS WHEREOF, the Company, through the undersigned officer, has signed this officer's certificate as of the date first written above.

AMERICAN MEDIA OPERATIONS, INC.

By:_____
     Name:
     Title:

<u>ANNEX I</u>

[Set forth calculation of Debt Covenant EBITDA]

**EXHIBIT B**

**Release Notice**

[\_\_\_\_], 20[ ]

Reference is hereby made to the Escrow Agreement, dated as of December 1, 2010 (the "Escrow Agreement"), by and among AMO Escrow Corporation, a Delaware corporation (the "Escrow Company"), American Media Operations, Inc., a Delaware corporation (the "Company"), Wilmington Trust FSB, a federal savings bank, as trustee (together with its successors and assigns, in such capacity, the "Trustee"), and Wilmington Trust FSB, a federal savings bank, as escrow agent (together with its successors and assigns, in such capacity, the "Escrow Agent"). Capitalized terms used herein and not defined shall have the respective meanings ascribed to such terms in the Escrow Agreement.

Pursuant to the Escrow Agreement, the Escrow Company hereby authorizes the release by the Escrow Agent of the Escrow Property in the aggregate amount of:

**[Choose one of the following as applicable]**

**[[Choose if a release pursuant to Section 5(a)]**

(a)    $3,850,000 representing the Unpaid Discount Amount payable to the Initial Purchasers pursuant to the wire instructions on Schedule \_\_\_ attached hereto, which Unpaid Discount Amount is two-thirds of the fee payable pursuant to the Purchase Agreement; and

(b)    $[_____] representing the excess Escrow Property in the Escrow Account payable to the Company pursuant to the wire instructions on Schedule \_\_\_ attached hereto.]

**[[Choose if a Special Mandatory Redemption is triggered and Escrow Property is to be distributed pursuant to Section 5(b)]**

(a)    $3,850,000 representing the Unpaid Discount Amount payable to the Initial Purchasers pursuant to the wire instructions on Schedule [\_\_] attached hereto, which Unpaid Discount Amount is two-thirds of the fee payable pursuant to the Purchase Agreement;

(b)    $[_____] representing the gross proceeds of the Notes and the amount of Interest Deposit and any Additional Interest Deposit, if applicable, calculated based on the number of days from the Closing Date up to, but not including, the date of the Special Mandatory Redemption (the amounts collectively, the "Special Mandatory Redemption Price") to the Paying Agent (as defined in the Indenture) pursuant to the wire instructions on Schedule \_\_\_ attached hereto; and

Exhibit B-1

(c)    $[_____] representing the excess Escrow Property in the Escrow Account payable to the Escrow Company pursuant to the wire instructions on <u>Schedule</u> [____] attached hereto.]

IN WITNESS WHEREOF, the undersigned has caused this Release Notice to be duly executed and delivered as of the first date written above.

AMO ESCROW CORPORATION

By:_____
    Name:
    Title:

**EXHIBIT C**

REDEMPTION NOTICE

AMO ESCROW CORPORATION
11½ FIRST LIEN SENIOR SECURED NOTES DUE 2017
CUSIPS* : [00175KAA2 & U03193AA4]

NOTICE IS HEREBY GIVEN THAT, pursuant to Section 3.10 of the Indenture dated as of December 1, 2010 (the "Indenture"), by and between AMO Escrow Corporation, a Delaware corporation (the "Escrow Company"), and Wilmington Trust FSB, a federal savings bank, as trustee (together with its successors and assigns, in such capacity, the "Trustee"), all of the outstanding Notes are hereby called for redemption on [_____], 20[  ] (the "Special Mandatory Redemption Date") at a redemption price equal to 100% of the issue price of the Notes, together with accrued and unpaid interest on the Notes from the Issue Date up to but not including the Special Mandatory Redemption Date (the "Special Mandatory Redemption Price"). Capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Indenture.

If payment is requested to be made to any person other than the registered holder, a written instrument of transfer duly executed by the registered holder must accompany the Notes.

The Notes should be surrendered to the Paying Agent for payment of the Special Mandatory Redemption Price at the office of the Paying Agent as follows:

[By Mail]      [By Hand]      [By Courier]

The method chosen for the delivery of the Notes is at the option and risk of the holder. If delivery is by mail, use of registered or certified mail, properly insured is suggested. Notes held through The Depository Trust Company ("DTC") or Euroclear/Clearstream should be surrendered for redemption in accordance with DTC or Euroclear/Clearstream as applicable.

AMO ESCROW CORPORATION

By:_____
       Name:
       Title:

_____

*        No representation is made as to the accuracy of such CUSIP numbers either as provided on the Notes or as contained herein.

Exhibit C-1

**SCHEDULE I**

Authorized Representatives of AMO Escrow Corporation

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| David J. Pecker | President | *[signature]* |
| | | |
| Christopher Polimeni | Executive Vice President, Chief Financial Officer and Treasurer | *[signature]* |

Authorized Representatives of American Media Operations, Inc.

| Name | Title | Specimen Signature |
|------|-------|--------------------|
| David J. Pecker | Chairman, Chief Executive Officer and President | *[signature]* |
| | | |
| Christopher Polimeni | Executive Vice President, Chief Financial Officer and Treasurer | *[signature]* |

# **EXHIBIT G**

**Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for the New Revolver Facility Lenders, Trustee and Collateral Agent for New First Lien Note Holders, and Trustee and Collateral Agent for New Second Lien Note Holders**

1

2                          **INTERCREDITOR AGREEMENT**

Junior Lien Intercreditor Agreement (this "Agreement"), dated as of December 22, 2010 among JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, with its successors and assigns, the "Agent") and collateral agent (in such capacity, with its successors and assigns, the "Revolving Credit Collateral Agent") under the Revolving Facility (such term, and other capitalized terms used herein but not otherwise defined, having the meaning set forth in Section 1.1 below), Wilmington Trust FSB, as trustee (in such capacity, with its successors and assigns, and as more specifically defined below, the "First Lien Trustee") and collateral agent for the First Lien Note Secured Parties (in such capacity, with its successors and assigns, the "First Lien Collateral Agent"), Wilmington Trust FSB, as trustee (in such capacity, with its successors and assigns, the "Second Lien Trustee") and collateral agent for the Second Lien Note Secured Parties (in such capacity, with its successors and assigns, the "Second Lien Collateral Agent"), American Media, Inc. (f/k/a American Media Operations, Inc.), a Delaware corporation (the "Company") and each of the other Grantors (as defined below) party hereto from time to time.

WHEREAS, the Company, the Agent, the Revolving Credit Collateral Agent and certain financial institutions and other entities are parties to the Revolving Facility dated as of December 22, 2010 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Revolving Facility"), pursuant to which such financial institutions and other entities have agreed to make loans and extend other financial accommodations to the Company;

WHEREAS, the Company (as successor to AMO Escrow Corporation), the guarantors party thereto, the First Lien Collateral Agent and the First Lien Trustee are parties to the Indenture dated as of December 1, 2010 (the "First Lien Indenture"), pursuant to which the Company has issued $385.0 million 11-1/2% First Lien Senior Secured Notes due 2017 (the "First Lien Notes") guaranteed by the guarantors party thereto;

WHEREAS, the Company, the guarantors party thereto, the Second Lien Collateral Agent and the Second Lien Trustee are parties to the Indenture dated as of December [22], 2010 (the "Second Lien Indenture"), pursuant to which the Company has issued $[    ] million 13½ % Second Lien Senior Secured Notes due 2018 (the "Second Lien Notes") guaranteed by the guarantors party thereto;

WHEREAS, the Company and the other Grantors have granted to the First Priority Representative (as defined below) security interests in the Common Collateral (as defined below) as security for payment and performance of the First Priority Obligations (as defined below);

WHEREAS, the Company and the other Grantors propose to grant to the Second Priority Representative (as defined below) junior security interests in the Common Collateral as security for payment and performance of the Second Priority Obligations (as defined below); and

WHEREAS, it is a condition to the grant of such junior security interests that this Agreement be executed and delivered by the parties hereto to set forth the respective rights of the First Priority Secured Parties, on the one hand, and the Second Priority Secured Parties, on the other hand, and the application of any proceeds and certain other matters;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants herein contained and other good and valuable consideration, the existence and sufficiency of which is expressly recognized by all of the parties hereto, the parties agree as follows:

Section 1.    Definitions.

1.1.    Defined Terms.  The following terms, as used herein, have the following meanings:

44

45          "<u>Additional Collateral Agent</u>" has the meaning set forth in <u>Section 9.3</u>.

46          "<u>Additional First Priority Agreement</u>" means any agreement designated as such in writing (including by addendum to this Agreement substantially in the form set forth as Exhibit A hereto) by the Company; <u>provided</u> that the Company shall have delivered to each Secured Party (or the respective collateral agents on behalf of such Secured Parties) (i) true and complete copies of such agreement and security documents relating to such agreement, certified as being true and correct by an authorized officer of the Company and (ii) a certificate of an authorized officer describing the obligations incurred pursuant to such agreement to be designated as First Priority Obligations and the initial aggregate principal amount or face amount thereof, together with the aggregate commitments thereunder, and certifying that such obligations are permitted to be incurred and secured on a pari passu basis with the then extant First Priority Obligations by the terms of each then extant First Priority Agreement and Second Priority Agreement.

56          "<u>Additional Second Priority Agreement</u>" means any agreement designated as such in writing (including by addendum to this Agreement substantially in the form set forth as Exhibit A hereto) by the Company; <u>provided</u> that the Company shall have delivered to each Secured Party (or the respective collateral agents on behalf of such Secured Parties) (i) true and complete copies of such agreement and security documents relating to such agreement, certified as being true and correct by an authorized officer of the Company and (ii) a certificate of an authorized officer describing the obligations incurred pursuant to such agreement to be designated as Second-Priority Obligations and the initial aggregate principal amount or face amount thereof, together with the aggregate commitments thereunder, and certifying that such obligations are permitted to be incurred and secured on a pari passu basis with the then extant Second-Priority Obligations by the terms of each then extant First-Priority Agreement and Second Priority Agreement.

67          "<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For purposes of this definition, "<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

73          "<u>Agent</u>" has the meaning assigned to such term in the preamble hereto.

74          "<u>Agreement</u>" has the meaning assigned to such term in the preamble hereto.

75          "<u>Authorized Officer</u>" means, with respect to any Person, the chief executive officer, the chief financial officer, principal accounting officer, any vice president, treasurer, general counsel or another executive officer of such Person.

78          "<u>Bankruptcy Code</u>" means the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time.

80          "<u>Bankruptcy Law</u>" means each of the Bankruptcy Code and any similar federal, state or foreign bankruptcy, insolvency, reorganization, receivership or similar law.

82          "<u>Cash Management Bank</u>" means any Revolving Credit Creditor or an Affiliate of a Revolving Credit Creditor (together with its successors and assigns) providing Cash Management Services to the Company or any other Grantor.

"Cash Management Obligations" means all obligations owing by the Company or any other Grantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and Post-Petition Interest at the rate provided for in the respective documents governing the Cash Management Services), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Company or other Grantor with the terms, conditions and agreements of such Cash Management Services.

"Cash Management Services" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

"Collateral Agent Joinder Agreement" means a supplement to this Agreement substantially in the form of Exhibit A, appropriately completed.

"Collateral Agents" means the Revolving Credit Collateral Agent, the First Lien Collateral Agent, the Second Lien Collateral Agent and each Additional Collateral Agent.

"Common Collateral" means all assets that are both First Priority Collateral and Second Priority Collateral.

"Company" has the meaning assigned to such term in the preamble hereto.

"Comparable Second Priority Security Document" means, in relation to any Common Collateral subject to any First Priority Security Document, that Second Priority Security Document that creates a security interest in the same Common Collateral, granted by the same Grantor, as applicable.

"DIP Financing" has the meaning assigned to such term in Section 5.2.

"Enforcement Action" means, with respect to the First Priority Obligations or the Second Priority Obligations, any demand for acceleration or payment thereof, the exercise of any rights and remedies with respect to any Common Collateral securing such obligations or the commencement or prosecution of enforcement of any of the rights and remedies as a secured creditor under, as applicable, the First Priority Documents or the Second Priority Documents, or applicable law, including, without limitation, the exercise of any rights of set-off or recoupment and rights to credit bid debt, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code.

"First Lien Collateral Agent" has the meaning assigned to such term in the preamble.

"First Lien Indenture" has the meaning assigned to such term in the recitals.

"First Lien Note Documents" means the First Lien Indenture and each Note Security Document.

"First Lien Note Obligations" means all "Obligations" (as defined in the First Lien Indenture) under the First Lien Indenture and the First Lien Notes.

"First Lien Note Secured Party" means the First Lien Trustee, the First Lien Collateral Agent and each Holder (as defined in the First Lien Indenture).

"First Lien Note Security Documents" means the "Security Documents" as defined in the First Lien Indenture.

-3-

122    "First Lien Notes" has the meaning assigned to such term in the recitals.

123    "First Lien Trustee" has the meaning assigned to such term in the preamble.

124    "First Priority Agreement" means the collective reference to (a) the Revolving Facility, (b) the
125    First Lien Indenture, (c) any Additional First Priority Agreement and (d) any other credit agreement, loan
126    agreement, note agreement, promissory note, indenture or other similar agreement or instrument evidenc-
127    ing or governing the terms of any indebtedness or other financial accommodation that has been incurred
128    to extend, replace or refinance in whole or in part the indebtedness and other obligations outstanding un-
129    der the Revolving Facility, the First Lien Indenture, any Additional First Priority Agreement or any other
130    agreement or instrument referred to in this clause (d) unless such agreement or instrument expressly pro-
131    vides that it is not intended to be and is not a First Priority Agreement hereunder (a "Replacement First
132    Priority Agreement").  Except as otherwise expressly provided herein, any reference to the First Priority
133    Agreement hereunder shall be deemed a reference to any First Priority Agreement then extant.

134    "First Priority Collateral" means all assets, whether now owned or hereafter acquired by the
135    Company or any other Grantor, in which a Lien is granted or purported to be granted to any First Priority
136    Secured Party as security for any First Priority Obligation (including any Lien assigned to the First Priori-
137    ty Representative pursuant to Section 2.4).

138    "First Priority Documents" means the First Priority Intercreditor Agreement, the First Lien Inden-
139    ture, the Revolving Facility, each First Priority Security Document, each First Priority Guarantee, the Se-
140    cured Hedge Agreements, any and all documents governing the Cash Management Obligations and each
141    of the other agreements, documents, and instruments providing for or evidencing any other First Priority
142    Obligation and any other document or instrument executed or delivered at any time in connection with
143    any First Priority Obligation (including any intercreditor or joinder agreement among holders of First
144    Priority Obligations but excluding Secured Hedge Agreements and the documents governing the Cash
145    Management Obligations), to the extent such are effective at the relevant time, as each may be amended,
146    modified, restated, supplemented, replaced or refinanced from time to time.

147    "First Priority Guarantee" means any guarantee by any Grantor of any or all of the First Priority
148    Obligations.

149    "First Priority Intercreditor Agreement" has the meaning set forth in Section 9.1 hereof.

150    "First Priority Lien" means any Lien created by the First Priority Security Documents.

151    "First Priority Obligations" means (i) the Revolving Credit Obligations, (ii) all First Lien Note
152    Obligations, (iii) all Secured Hedging Obligations and (iv) all Cash Management Obligations; *provided*
153    that the aggregate principal amount of, without duplication, revolving credit loans, letters of credit, term
154    loans, other loans, notes or similar instruments (excluding, in any event, Cash Management Obligations
155    and Secured Hedging Obligations) provided for under the Revolving Facility or any other document relat-
156    ing to the Revolving Facility (or any refinancing thereof) in excess of the amount permitted under Section
157    4.09(b)(1) of the First Lien Indenture and any interest or fees relating to such excess amount, shall not
158    constitute First Priority Obligations for purposes of this Agreement. "First Priority Obligations" shall,
159    subject to the proviso in the immediately preceding sentence, include (a) all interest accrued or accruing,
160    or which would accrue, absent commencement of an Insolvency or Liquidation Proceeding (and the effect
161    of provisions such as Section 502(b)(2) of the Bankruptcy Code), on or after the commencement of an
162    Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Priority
163    Document, whether or not the claim for such interest is allowed or allowable as a claim in such Insolven-
164    cy or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial

-4-

consultants' fees and expenses) incurred by the First Priority Representative and the First Priority Secured Parties on or after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed or allowable under Section 502 or 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors as a claim in such Insolvency or Liquidation Proceeding, and (c) all obligations and liabilities of the Company and each other Grantor under each First Priority Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due and payable.

"First Priority Obligations Payment Date" means the first date on which (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective First Priority Document, whether or not such interest would be allowed in any such Insolvency or Liquidation Proceeding) and premium, if any that is due and payable, on all Indebtedness (as defined in the First Lien Indenture) under the First Priority Documents and termination of all commitments of the Lenders (as defined in the Revolving Facility) to lend or otherwise extend credit under the First Priority Documents, (b) payment in full in cash of all other First Priority Obligations (including letter of credit reimbursement obligations) that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest, and premium are paid (other than Cash Management Obligations and Secured Hedge Obligations so long as arrangements satisfactory to the applicable Cash Management Bank or Hedge Bank shall have been made), and (c) termination or cash collateralization (in an amount and manner, and on terms, reasonably satisfactory to the First Priority Representative) of all letters of credit issued under the First Priority Documents.

"First Priority Representative" means, as between collateral agents representing different series of First Priority Obligations and subject to any agreements between such collateral agents, the collateral agent representing the series of First Priority Obligations with the greatest outstanding principal amount.

"First Priority Secured Party" means the First Lien Note Secured Parties, the Revolving Credit Secured Parties and any other holder of First Priority Obligations.

"First Priority Security Documents" means the First Lien Note Security Documents, the Revolving Credit Security Documents, and any other documents that are designated under the First Priority Agreement as "First Priority Security Documents," "First Lien Note Security Documents" or "Revolving Credit Security Documents" for purposes of this Agreement; provided that unless entered into pursuant to the Revolving Facility or the First Lien Indenture, no document will constitute a First Priority Security Document unless the treatment of such document as a First Priority Security Document is permitted under each First Priority Agreement then extant, including, as of the date hereof and any other date if then extant, the Revolving Facility and the First Lien Indenture.

"Governmental Authority" means any federal, state, local or foreign court or governmental agency, authority, instrumentality or regulatory body.

"Grantor" means (a) the Company, (b) each direct or indirect subsidiary of the Company and (c) any other Person in which the Company or any of its subsidiaries holds an ownership interest, in each case (a) through (c), that is, at any time of determination, a party to any First Priority Security Document or Second Priority Security Document.  All references in this Agreement to any Grantor shall include such Grantor as a debtor-in-possession and any receiver or trustee for such Grantor in any Insolvency or Liquidation Proceeding.

-5-

207  "Hedge Bank" means any Person that is a Revolving Credit Creditor or an Affiliate of a Revolv-
208  ing Credit Creditor at the time it enters into a Swap Agreement, in its capacity as a party thereto, and such
209  Person's successors and assigns.

210  "Insolvency or Liquidation Proceeding" means (a) any voluntary or involuntary case or proceed-
211  ing under the Bankruptcy Code with respect to the Company or any Grantor, (b) any other voluntary or
212  involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation,
213  reorganization or other similar case or proceeding with respect to the Company or any Grantor or with
214  respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or
215  winding up of the Company or any Grantor, whether voluntary or involuntary and whether or not involv-
216  ing insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling
217  of assets and liabilities of the Company or any Grantor.

218  "Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or other-
219  wise), pledge, hypothecation, encumbrance, charge, preference, priority or security interest in, on or of
220  such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any con-
221  ditional sale or other title retention agreement, any lease in the nature thereof, any option or other agree-
222  ment to sell or give a security interest in and any filing of or agreement to give any financing statement
223  under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for
224  informational purposes) (b) the interest of a vendor or a lessor under any conditional sale agreement, capi-
225  tal lease or title retention agreement (or any financing lease having substantially the same economic effect
226  as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or
227  similar right of a third party with respect to such securities (other than arising from entry into an agree-
228  ment for the sale, transfer or disposition of Equity Interests (as defined in the Revolving Facility) as per-
229  mitted pursuant to the Revolving Facility).
230
231  "Person" means any natural person, corporation, business trust, joint venture, association, unin-
232  corporated organization, association, estate, company, partnership, individual or family trust, limited lia-
233  bility company or Governmental Authority or any agency or political subdivision thereof.

234  "Post-Petition Interest" means any interest or entitlement to fees or expenses or other charges due
235  under the First Priority Documents or Second Priority Documents, as applicable, that accrues after the
236  commencement of any Insolvency or Liquidation Proceeding, whether or not allowed or allowable as a
237  claim in any such Insolvency or Liquidation Proceeding.

238  "Recovery" has the meaning assigned to such term in Section 5.5.

239  "Reorganization Securities" has the meaning set forth in Section 5.12.

240  "Replacement First Priority Agreement" has the meaning set forth in the definition of "First
241  Priority Agreement".

242  "Replacement Second Priority Agreement" has the meaning set forth in the definition of "Second
243  Priority Agreement."

244  "Revolving Credit Collateral Agent" has the meaning set forth in the preamble.

245  "Revolving Credit Creditors" means the "Lenders" as defined in the Revolving Facility.

246  "Revolving Credit Documents" means the Revolving Facility and the other "Loan Documents"
247  (as defined in the Revolving Facility).

-6-

248    "<u>Revolving Credit Obligations</u>" means "Obligations" as defined in the Revolving Facility.

249    "<u>Revolving Credit Secured Party</u>" means (a) each Revolving Credit Creditor (and any Cash
250    Management Bank), (b) each "Issuing Bank" (as defined in the Revolving Facility), (c) the Revolving
251    Credit Collateral Agent, (d) each Hedge Bank, (e) the beneficiaries of each indemnification obligation
252    undertaken by any Grantor under any Revolving Credit Document and (f) the successors and assigns of
253    each of the foregoing.

254    "<u>Revolving Credit Security Documents</u>" means the "Security Documents" as defined in the Re-
255    volving Facility.

256    "<u>Revolving Facility</u>" has the meaning set forth in the recitals.

257    "<u>Second Lien Collateral Agent</u>" has the meaning ascribed to such term in the preamble.

258    "<u>Second Lien Indenture</u>" has the meaning assigned to such term in the recitals.

259    "<u>Second Lien Note Documents</u>" means the Second Lien Indenture and each Second Lien Note
260    Security Document.

261    "<u>Second Lien Note Obligations</u>" means all "Obligations" as defined in the Second Lien Indenture
262    under the Second Lien Indenture and the Second Lien Notes.

263    "<u>Second Lien Notes</u>" has the meaning assigned to such term in the recitals.

264    "<u>Second Lien Note Secured Party</u>" means the Second Lien Trustee, the Second Lien Collateral
265    Agent and each Holder (as defined in the Second Lien Indenture).

266    "<u>Second Lien Note Security Documents</u>" means the "Security Documents" as defined in the
267    Second Lien Indenture.

268    "<u>Second Lien Trustee</u>" has the meaning ascribed to such term in the preamble.

269    "<u>Second Priority Agreement</u>" means the collective reference to (a) the Second Lien Indenture, (b)
270    any Additional Second Priority Agreement and (c) any other credit agreement, loan agreement, note
271    agreement, promissory note, indenture, or other similar agreement or instrument evidencing or governing
272    the terms of any indebtedness or other financial accommodation that has been incurred to extend, replace
273    or refinance in whole or in part the indebtedness and other obligations outstanding under the Second Lien
274    Indenture, any Additional Second Priority Agreement or any other agreement or instrument referred to in
275    this clause (c) (a "<u>Replacement Second Priority Agreement</u>").  Except as otherwise expressly provided
276    herein, any reference to the Second Priority Agreement hereunder shall be deemed a reference to any
277    Second Priority Agreement then extant.

278    "<u>Second Priority Collateral</u>" means all assets, whether now owned or hereafter acquired by the
279    Company or any other Grantor, in which a Lien is granted or purported to be granted to any Second Prior-
280    ity Secured Party as security for any Second Priority Obligation.

281    "<u>Second Priority Documents</u>" means each Second Priority Agreement, each Second Priority Se-
282    curity Document and each Second Priority Guarantee and each of the other agreements, documents, and
283    instruments providing for or evidencing any other Second Priority Obligation (including any intercreditor
284    or joinder agreement among holders of Second Priority Obligations), to the extent such are effective at the

285 relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from
286 time to time.

287 "Second Priority Guarantee" means any guarantee by any Grantor of any or all of the Second
288 Priority Obligations.

289 "Second Priority Lien" means any Lien created by the Second Priority Security Documents.

290 "Second Priority Obligations" means the due and punctual payment of (a) all principal of and in-
291 terest (including any Post-Petition Interest) and premium (if any) on all indebtedness under the Second
292 Priority Agreement, and (b) all other monetary obligations, including fees, costs, expenses and indemni-
293 ties, whether primary, secondary, direct, contingent, fixed or otherwise (including Post-Petition Interest),
294 of the Company, the other Grantors or any of their Subsidiaries to the Second Priority Secured Parties
295 under the Second Priority Documents, and other amounts payable from time to time pursuant to the
296 Second Priority Documents, in each case whether or not allowed or allowable in an Insolvency or Liqui-
297 dation Proceeding.  To the extent any payment with respect to any Second Priority Obligation (whether
298 by or on behalf of any Grantor, as proceeds of security, enforcement of any right of setoff or otherwise) is
299 declared to be a fraudulent conveyance or a preference in whole or in part, or is otherwise set aside or re-
300 quired to be returned or paid to a debtor in possession, any First Priority Secured Party, any receiver or
301 any similar Person, then the obligation or part thereof originally intended to be satisfied shall, for the pur-
302 poses of this Agreement and the rights and obligations of the First Priority Secured Parties and the Second
303 Priority Secured Parties, be deemed to be reinstated and outstanding as if such payment had not occurred.

304 "Second Priority Representative" means, as between collateral agents representing different series
305 of Second Priority Obligations and subject to any agreements between such collateral agents, the collater-
306 al agent representing the series of Second Priority Obligations with the greatest outstanding principal
307 amount.

308 "Second Priority Secured Party" means the Second Lien Notes Secured Parties and any other
309 holders of the Second Priority Obligations.

310 "Second Priority Security Documents" means the "Security Documents" as defined in the Second
311 Lien Indenture and any documents that are designated under the Second Priority Agreement as "Second
312 Priority Security Documents" for purposes of this Agreement.

313 "Secured Credit Documents" means First Priority Documents and Second Priority Documents.

314 "Secured Hedge Agreements" means each Swap Agreement that governs Secured Hedging Obli-
315 gations.

316 "Secured Hedging Obligations" means (i) obligations (including obligations which, but for the
317 automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether
318 now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and
319 all Post-Petition Interest at the rate provided for in the respective Secured Hedge Agreement), of the
320 Company or any Grantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising
321 out of or in connection with, any Swap Agreement (including all such obligations and indebtedness under
322 any guarantee of any such Swap Agreement to which the Company or any other Grantor is a party) and
323 (ii) all performance and compliance obligations by the Company or any other Grantor under any Swap
324 Agreement.

325      "Secured Parties" means the First Priority Secured Parties and the Second Priority Secured Par-
326  ties.

327      "subsidiary" has the meaning specified in the Revolving Facility.

328      "Swap Agreement" means any agreement with respect to any swap, forward, future, derivative or
329  foreign exchange spot transaction or option or similar agreement involving, or settled by reference to, one
330  or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or
331  pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or
332  any combination of these transactions, in each case to the extent obligations under such agreement or in-
333  strument are permitted under the First Priority Documents and Second Priority Documents; provided that
334  no phantom stock or similar plan providing for payments only on account of services provided by current
335  or former directors, officers, employees or consultants of the Company or any of the Subsidiaries shall be
336  a Swap Agreement.

337      "Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to
338  time in the applicable jurisdiction.

339      1.2.    Amended Agreements.  All references in this Agreement to agreements or other
340  contractual obligations shall, unless otherwise specified, be deemed to refer to such agreements or
341  contractual obligations as amended, amended and restated, supplemented, restated or otherwise modified
342  from time to time in accordance with the terms of this Agreement, if applicable.

343      1.3.    Terms Generally.  The definitions in this Section shall apply equally to both the singular
344  and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the
345  corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including"
346  shall be deemed to be followed by the phrase "without limitation".  All references herein to Sections shall
347  be deemed references to Sections of this Agreement unless the context shall otherwise require.

348      Section 2.    Lien Priorities.

349      2.1.    Subordination of Liens.

350      (a)      Any and all Liens in or on the Common Collateral now existing or hereafter created or
351  arising in favor of any Second Priority Secured Party securing the Second Priority Obligations, regardless
352  of how acquired, whether by grant, statute, operation of law, judgment rendered in any judicial proceed-
353  ing, subrogation or otherwise, are expressly junior in priority, operation and effect to any and all Liens
354  now existing or hereafter created or arising in favor of the First Priority Secured Parties securing the First
355  Priority Obligations, notwithstanding (i) anything to the contrary contained in any agreement or filing to
356  which any Second Priority Secured Party may now or hereafter be a party, and regardless of the time, or-
357  der or method of grant, attachment, recording or perfection of any financing statements or other security
358  interests, assignments, pledges, deeds, mortgages and other Liens, charges or encumbrances or any defect
359  or deficiency or alleged defect or deficiency in any of the foregoing, (ii) any provision of the Uniform
360  Commercial Code or any other applicable law or any First Priority Document or Second Priority Docu-
361  ment or any other circumstance whatsoever and (iii) the fact that any such Liens in favor of any First
362  Priority Secured Party securing any of the First Priority Obligations are (x) subordinated to any Lien se-
363  curing any obligation of any Grantor other than the Second Priority Obligations or (y) otherwise subordi-
364  nated, voided, avoided, invalidated or lapsed.

365      (b)      No Second Priority Secured Party shall object to or contest, or support any other Person
366  in objecting to or contesting, in any proceeding (including, without limitation, any Insolvency or Liquida-

tion Proceeding), the validity, extent, perfection, priority or enforceability of any Lien on the First Priority Collateral granted to any First Priority Secured Party.  Notwithstanding any failure by any First Priority Secured Party to perfect its Lien on the First Priority Collateral granted to such First Priority Secured Party or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction of the Lien on the First Priority Collateral granted to the First Priority Secured Parties, the priority and rights as between the First Priority Secured Parties, on the one hand, and the Second Priority Secured Parties, on the other hand, with respect to the Common Collateral shall be as set forth herein.

2.2.    Nature of First Priority Obligations.  The Second Priority Representative on behalf of itself and the other Second Priority Secured Parties acknowledges that a portion of the First Priority Obligations represents debt that is revolving in nature and that the amount thereof that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed, and that the terms of the First Priority Obligations may be modified, extended or amended from time to time, and that the aggregate amount of the First Priority Obligations may be increased, replaced or refinanced, in each event, without notice to or consent by the Second Priority Secured Parties and without affecting the provisions hereof.  The lien priorities provided in Section 2.1 shall not be altered or otherwise affected by any such amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of the First Priority Obligations, or any portion thereof, or by any amendment, modification, supplement, extension, repayment, reborrowing, increase, replacement, renewal, restatement or refinancing of the Second Priority Obligations, or any portion thereof.

2.3.    Agreements Regarding Actions to Perfect Liens.

(a)    [Reserved].

(b)    The Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties that all Second Priority Security Documents entered into on or about the date hereof shall contain the following notation:  "The lien and security interest created by [this Agreement] on the property described herein is junior and subordinate, in accordance with the provisions of the Intercreditor Agreement dated as of December [22], 2010, among JPMorgan Chase Bank, N.A., in its capacity as Agent and Revolving Credit Collateral Agent, Wilmington Trust FSB, in its capacity as First Lien Collateral Agent and First Lien Trustee and Wilmington Trust FSB in its capacity as Second Lien Collateral Agent and Second Lien Trustee, American Media, Inc. (f/k/a American Media Operations, Inc.), and the other Grantors referred to therein, as amended from time to time, to the lien and security interest on such property created by any similar instrument now or hereafter granted to JPMorgan Chase Bank, N.A., as collateral agent under the Revolving Credit Documents and Wilmington Trust FSB as First Lien Collateral Agent and First Lien Trustee under the First Lien Note Documents, and each of their successors and assigns, in such property."  The Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties to use commercially reasonable efforts to ensure that all other Second Priority Security Documents shall bear substantially identical or, in the event that the Revolving Facility and the First Lien Indenture are no longer extant or JPMorgan Chase Bank, N.A. or Wilmington Trust FSB, in its capacity as First Lien Collateral Agent or First Lien Trustee, as applicable, shall cease to be the First Priority Representative, a substantially similar notation.

(c)    The First Priority Representative and each other First Priority Secured Party hereby agrees that, to the extent that it holds, or a third party holds on its behalf, physical possession of or "control" (as defined in the Uniform Commercial Code) (or any similar concept under foreign law) over Common Collateral pursuant to the First Priority Security Documents, such possession or control is also for the benefit of the Second Priority Representative and the other Second Priority Secured Parties solely to the extent required to perfect their security interest in such Common Collateral (such bailment being

-10-

413  intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2) and 9-
414  313(c) of the Uniform Commercial Code).  Nothing in the preceding sentence shall be construed to im-
415  pose any duty on the First Priority Representative or any other First Priority Secured Party (or any third
416  party acting on its behalf) with respect to such Common Collateral or provide the Second Priority Repre-
417  sentative or any other Second Priority Secured Party with any rights with respect to such Common Colla-
418  teral beyond those specified in this Agreement and the Second Priority Security Documents; provided that
419  subsequent to the occurrence of the First Priority Obligations Payment Date, the First Priority Representa-
420  tive or such other First Priority Secured Party shall (i) deliver to the Second Priority Representative, at the
421  Company's sole cost and expense, the Common Collateral in its possession or control together with any
422  necessary endorsements to the extent required by the Second Priority Documents, (ii) direct and deliver
423  such Common Collateral as a court of competent jurisdiction otherwise directs; and (iii) upon the reason-
424  able request of the Second Priority Representative, any other Second Priority Secured Party or the Com-
425  pany (and at the Company's sole expense), provide notice of the First Priority Obligations Payment Date
426  to such Persons as the Second Priority Representative shall request; provided, however, that the provi-
427  sions of this Agreement are intended solely to govern the respective Lien priorities as between the First
428  Priority Secured Parties and the Second Priority Secured Parties and shall not impose on the First Priority
429  Secured Parties any obligations in respect of the disposition of any Common Collateral (or any proceeds
430  thereof) that would conflict with prior perfected Liens.

431  2.4.  No New Liens.  So long as the First Priority Obligations Payment Date has not occurred,
432  the parties hereto agree that (a) there shall be no Lien, and no Grantor shall have any right to create any
433  Lien, on any assets of any Grantor securing any Second Priority Obligation if those same assets are not
434  subject to, and do not become subject to, a Lien securing the First Priority Obligations provided that the
435  foregoing shall not prohibit any Secured Party under any series of First Priority Obligations or Second
436  Priority Obligations from being secured by Equity Interests that do not secure any other series of First
437  Priority Obligations or Second Priority Obligations, as applicable, due to the Rule 3-16 Exception (as
438  defined in the First Lien Note Documents) and (b) if any Second Priority Secured Party shall acquire or
439  hold any Lien on any assets of any Grantor securing any Second Priority Obligation which assets are not
440  also subject to the first-priority Lien of the First Priority Representative under the First Priority
441  Documents, then the Second Priority Representative, shall be deemed to also hold and have held such
442  Lien for the benefit of the First Priority Secured Parties and shall promptly notify the First Priority
443  Representative of the existence of such Lien and, upon written request by the First Priority
444  Representative, will without the need for any further consent of any other Second Priority Secured Party,
445  notwithstanding anything to the contrary in any other Second Priority Document, either (i) release such
446  Lien or (ii) assign it to the First Priority Representative as security for the First Priority Obligations (in
447  which case the Second Priority Representative may retain a junior lien on such assets subject to the terms
448  hereof), in accordance with such written request of the First Priority Representative.  To the extent that
449  the foregoing provisions are not complied with for any reason, without limiting any other rights and
450  remedies available to the First Priority Secured Parties, the Second Priority Representative and the other
451  Second Priority Secured Parties agree that any amounts received by or distributed to any of them pursuant
452  to or as a result of Liens granted in contravention of this Section 2.4 shall be subject to Section 4.1.

453  2.5.  Further Assurances.  Each of the First Priority Representative, for itself and on behalf of
454  the other First Priority Secured Parties, and the Second Priority Representative, for itself and on behalf of
455  the other Second Priority Secured Parties, and each Grantor party hereto, for itself and on behalf of its
456  subsidiaries, agrees that it will execute, or will cause to be executed, any and all further documents,
457  agreements and instruments, and take all such further actions, as may be required under any applicable
458  law, or which the First Priority Representative or the Second Priority Representative may reasonably
459  request, to effectuate the terms of this Agreement, including the relative Lien priorities provided for
460  herein.

-11-

Section 3.   Enforcement Rights.

3.1.   Exclusive Enforcement.  Until the First Priority Obligations Payment Date has occurred, whether or not an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the First Priority Representative on behalf of the First Priority Secured Parties shall have the exclusive right to take and continue any Enforcement Action, including making determinations regarding the release, dispositions or restrictions with respect to the Common Collateral, without any consultation with or consent of any Second Priority Secured Party, but subject to the proviso set forth in Section 5.1.  In exercising rights and remedies with respect to the Common Collateral, the First Priority Representative may enforce the provisions of the First Priority Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by any of them to sell or otherwise dispose of the Common Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all rights and remedies of a secured creditor under the Uniform Commercial Code and of a secured creditor under the Bankruptcy Law of any applicable jurisdiction.

3.2.   Standstill and Waivers.  The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that, until the First Priority Obligations Payment Date has occurred, subject to the proviso set forth in Section 5.1:

(a)     they will not take or cause to be taken any Enforcement Action or any action, the purpose or effect of which is to make any Lien in respect of any Second Priority Obligation pari passu with or senior to, or to give any Second Priority Secured Party any preference or priority relative to, the Liens with respect to the First Priority Obligations or the First Priority Secured Parties with respect to any of the Common Collateral;

(b)     they will not contest, oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including the filing of an Insolvency or Liquidation Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Common Collateral or any other First Priority Collateral by any First Priority Secured Party or any other Enforcement Action taken (or any forbearance from taking any Enforcement Action) by or on behalf of any First Priority Secured Party;

(c)     they have no right to (i) direct either the First Priority Representative or any other First Priority Secured Party to exercise any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or (ii) consent or object to the exercise by the First Priority Representative or any other First Priority Secured Party of any right, remedy or power with respect to the Common Collateral or pursuant to the First Priority Security Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent they may have any such right described in this clause (c), as a junior lien creditor, they hereby irrevocably waive such right);

(d)     they will not institute any suit or other proceeding or assert in any suit, Insolvency or Liquidation Proceeding or other proceeding any claim against any First Priority Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and no First Priority Secured Party shall be liable for, any action taken or omitted to be taken by any First Priority Secured Party with respect to the Common Collateral or pursuant to the First Priority Documents;

(e)     they will not make any judicial or nonjudicial claim or demand or commence any judicial or non-judicial proceedings against any Grantor or any of its subsidiaries or affiliates un-

-12-

505 der or with respect to any Second Priority Security Document seeking payment or damages from
506 or other relief by way of specific performance, instructions or otherwise under or with respect to
507 any Second Priority Security Document or exercise any right, remedy or power under or with re-
508 spect to, or otherwise take any action to enforce, any Second Priority Security Document;

509 (f)    they will not commence judicial or nonjudicial foreclosure proceedings with re-
510 spect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, or at-
511 tempt any action to take possession of any Common Collateral, or exercise any right, remedy or
512 power with respect to, or otherwise take any action to enforce their interest in or realize upon, the
513 Common Collateral or pursuant to the Second Priority Security Documents;

514 (g)    they will not seek, and hereby waive any right, to have the Common Collateral or
515 any part thereof marshaled upon any foreclosure or other disposition of the Common Collateral
516 and hereby waive, to the fullest extent permitted by law, any right to demand, request, plead or
517 otherwise assert or claim the benefit of, any marshalling, appraisal, valuation or other similar
518 right that may otherwise be available under applicable law with respect to the Common Collateral
519 or any other similar rights a junior secured creditor may have under applicable law; and

520 (h)    they will not object to the forbearance by the First Priority Secured Parties from
521 bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or
522 remedies relating to the Common Collateral or any other First Priority Collateral.

523 3.3.    _Judgment Creditors_.  In the event that any Second Priority Secured Party becomes a
524 judgment lien creditor as a result of its enforcement of its rights as an unsecured creditor, such judgment
525 lien shall be subject to the terms of this Agreement for all purposes (including in relation to the First
526 Priority Liens and the First Priority Obligations) to the same extent as all other Liens securing the Second
527 Priority Obligations are subject to the terms of this Agreement.

528 3.4.    [Reserved].

529 3.5.    _No Additional Rights For the Grantors Hereunder_.  Except as provided in Section 3.6, if
530 any First Priority Secured Party or Second Priority Secured Party shall enforce its rights or remedies in
531 violation of the terms of this Agreement, no Grantor shall be entitled to use such violation as a defense to
532 any action by any First Priority Secured Party or Second Priority Secured Party, or to assert such violation
533 as a counterclaim or basis for set off or recoupment against any First Priority Secured Party or Second
534 Priority Secured Party.

535 3.6.    _Actions Upon Breach_.

536 (a)    If any Second Priority Secured Party, contrary to this Agreement, commences or partici-
537 pates in any Enforcement Action or other action or proceeding against the Common Collateral in contra-
538 vention of this Agreement, the related Grantor, with the prior written consent of the First Priority Repre-
539 sentative, may interpose as a defense or dilatory plea the making of this Agreement, and any First Priority
540 Secured Party may intervene and interpose such defense or plea in its or their name or in the name of such
541 Grantor.

542 (b)    Should any Second Priority Secured Party, contrary to this Agreement, in any way take,
543 attempt to take or threaten to take any Enforcement Action with respect to the Common Collateral (in-
544 cluding any attempt to realize upon or enforce any remedy with respect to this Agreement), or take any
545 other action in violation of this Agreement, or fail to take any action required by this Agreement, this
546 Agreement shall create an irrebuttable presumption and admission by such Second Priority Secured Party

-13-

547 that any First Priority Secured Party (in its own name or in the name of the relevant Grantor) or the rele-
548 vant Grantor may obtain relief against such Second Priority Secured Party by injunction, specific perfor-
549 mance and/or other appropriate equitable relief, it being understood and agreed by the Second Priority
550 Representative on behalf of each Second Priority Secured Party that (i) the First Priority Secured Parties'
551 damages from such actions of any Second Priority Secured Party may at that time be difficult to ascertain
552 and may be irreparable and the harm to the First Priority Secured Parties may not be adequately compen-
553 sated in damages and (ii) each Second Priority Secured Party waives any defense that the Company, the
554 other Grantors and/or the First Priority Secured Parties cannot demonstrate damage and/or be made whole
555 by the awarding of damages.

556        Section 4.   <u>Application Of Proceeds Of Common Collateral; Dispositions And Releases Of</u>
557 <u>Common Collateral; Inspection and Insurance</u>.

558        4.1.   <u>Application of Proceeds; Turnover Provisions</u>. All proceeds of Common Collateral
559 (including any interest earned thereon) resulting from the sale, collection or other disposition of Common
560 Collateral resulting from any Enforcement Action or that occurs after any Event of Default (as defined in
561 the First Priority Documents), whether or not pursuant to an Insolvency or Liquidation Proceeding, or
562 during the pendency of any Insolvency or Liquidation Proceeding shall be distributed as follows: <u>first</u> to
563 the First Priority Representative for application to the First Priority Obligations in accordance with the
564 terms of the First Priority Intercreditor Agreement, until the First Priority Obligations Payment Date has
565 occurred and <u>thereafter</u>, to the Second Priority Representative for application in accordance with the
566 terms of the Second Priority Documents and thereafter, after payment in full of all the First Priority
567 Obligations and Second Priority Obligations, to the Company and the other Grantors or their successors
568 and assigns, as their interest may appear, or as a court of competent jurisdiction may direct. Until the
569 occurrence of the First Priority Obligations Payment Date, any Common Collateral, including any
570 Common Collateral constituting proceeds, that may be received by any Second Priority Secured Party in
571 violation of this Agreement shall be segregated and held in trust and promptly paid over to the First
572 Priority Representative, for the benefit of the First Priority Secured Parties, in the same form as received,
573 with any necessary endorsements, and each Second Priority Secured Party hereby authorizes the First
574 Priority Representative to make any such endorsements as agent for the Second Priority Representative
575 (which authorization, being coupled with an interest, is irrevocable).

576        4.2.   <u>Releases of Second Priority Lien</u>.

577        (a)    Upon (i) any sale or other disposition of Common Collateral permitted pursuant to the
578 terms of the First Priority Documents that results in the release of the First Priority Lien on any Common
579 Collateral (including any sale or other disposition pursuant to any Enforcement Action) or (ii) any other
580 release of Common Collateral from the Lien under the First Priority Security Documents that is permitted
581 pursuant to the terms of the First Priority Documents, the Second Priority Lien on such Common Colla-
582 teral (excluding any portion of the proceeds of such Common Collateral remaining after the First Priority
583 Obligations Payment Date occurs) shall be automatically and unconditionally released with no further
584 consent or action of any Person, in each case, other than with respect to an Enforcement Action, so long
585 as such sale or other disposition or resulting release does not, or would not after the passage of time, con-
586 stitute an "Event of Default" under and as defined in the Second Lien Indenture.

587        (b)    The Second Priority Representative shall promptly execute and deliver such release doc-
588 uments and instruments and shall take such further actions as the First Priority Representative shall rea-
589 sonably request in writing to evidence any release of the Second Priority Lien described in paragraph (a)
590 of this Section 4.2. The Second Priority Representative hereby appoints the First Priority Representative
591 and any officer or duly authorized person of the First Priority Representative, with full power of substitu-
592 tion, as its true and lawful attorney-in-fact with full irrevocable power of attorney in the place and stead

-14-

593    of the Second Priority Representative and in the name of the Second Priority Representative or in the First
594    Priority Representative's own name, from time to time, in the First Priority Representative's sole discre-
595    tion, for the purposes of carrying out the terms of this Section 4.2, to take any and all appropriate action
596    and to execute and deliver any and all documents and instruments as may be necessary or desirable to
597    accomplish the purposes of this Section 4.2, including any financing statements, endorsements, assign-
598    ments, releases or other documents or instruments of transfer (which appointment, being coupled with an
599    interest, is irrevocable).

600       4.3.    Inspection Rights and Insurance.

601       (a)     Any First Priority Secured Party and its representatives and invitees may at any time in-
602    spect, repossess, remove and otherwise deal with the Common Collateral, and the First Priority Repre-
603    sentative may advertise and conduct public auctions or private sales of the Common Collateral, in each
604    case without notice to, the involvement of or interference by any Second Priority Secured Party or liabili-
605    ty to any Second Priority Secured Party.

606       (b)     Until the First Priority Obligations Payment Date has occurred, the First Priority Repre-
607    sentative will have the sole and exclusive right (i) to be named as additional insured and loss payee under
608    any insurance policies maintained from time to time by any Grantor (except that the Second Priority Rep-
609    resentative shall have the right to be named as additional insured and loss payee so long as its second lien
610    status is identified in a manner satisfactory to the First Priority Representative), (ii) to adjust or settle any
611    insurance policy or claim covering the Common Collateral in the event of any loss thereunder and (iii) to
612    approve any award granted in any condemnation or similar proceeding affecting the Common Collateral.

613       4.4.    Rights as Unsecured Creditors.   Notwithstanding anything to the contrary in this
614    Agreement, the Second Priority Representative and the other Second Priority Secured Parties may
615    exercise rights and remedies as unsecured creditors against the Company or any other Grantor that has
616    guaranteed the Second Priority Obligations in accordance with the terms of the Second Priority
617    Documents, including the acceleration of any Indebtedness or other obligations owing under the Second
618    Priority Documents or the demand for payment under the guarantee in respect thereof, in each case in
619    accordance with the terms of the applicable Second Priority Documents and applicable law and not
620    otherwise inconsistent with the terms of this Agreement.   Nothing in this Agreement shall prohibit the
621    receipt by any Second Priority Representative or any other Second Priority Secured Party of the required
622    payments of interest, principal and fees so long as such receipt is not the direct or indirect result of (a) the
623    exercise by any Second Priority Representative or any other Second Priority Secured Party of rights or
624    remedies as a secured creditor in respect of Common Collateral or (b) the enforcement in contravention of
625    this Agreement of any Second Priority Liens held by any of them.   Nothing in this Agreement impairs or
626    otherwise adversely affects any rights or remedies the First Priority Representative or the other First
627    Priority Secured Parties may have with respect to the First Priority Collateral.

628       Section 5.    Insolvency or Liquidation Proceedings.

629       5.1.    Filing of Motions.   Until the First Priority Obligations Payment Date has occurred, the
630    Second Priority Representative agrees on behalf of itself and the other Second Priority Secured Parties
631    that no Second Priority Secured Party shall, in or in connection with any Insolvency or Liquidation
632    Proceeding, file any pleading or motion, take any position at any hearing or proceeding of any nature, or
633    otherwise take any action whatsoever that is adverse to the First Priority Secured Parties, with respect to
634    the Common Collateral, including with respect to the determination of any Liens or claims (including the
635    validity and enforceability thereof) held by the First Priority Representative or any other First Priority
636    Secured Party or the value of any claims of such parties under Section 506(a) of the Bankruptcy Code or
637    otherwise; provided that (a) in any Insolvency or Liquidation Proceeding, the Second Priority

-15-

Representative may file a proof of claim or statement of interest with respect to the applicable Second Priority Liens and (b) the Second Priority Representative or any Second Priority Secured Party may (i) take any such action (not adverse to the First Priority Liens on the Common Collateral securing the First Priority Obligations, or the rights of either the First Priority Representative or the other First Priority Secured Parties to exercise remedies in respect thereof) to the extent required to create, create, perfect, preserve or protect (but not enforce) its rights in, and perfection and priority of its Liens on, the Common Collateral, (ii) otherwise file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance of its claims, in each case of (a) and (b) above, to the extent such action is not inconsistent with, and could not result in a resolution inconsistent with, the terms of this Agreement or (iii) exercise any rights or remedies permitted under Section 4.4 of this Agreement.

5.2.    <u>Financing Matters</u>.  If any Grantor becomes subject to any Insolvency or Liquidation Proceeding, and if the First Priority Representative (acting at the direction of the applicable requisite First Priority Secured Parties) desires to consent (or not object) to the use of cash collateral under the Bankruptcy Code or any other Bankruptcy Law or to provide financing to any Grantor under Section 363 or Section 364 of the Bankruptcy Code or any other similar provision in any Bankruptcy Law or to consent (or not object) to the provision of such financing (including financing that primes or takes priority over existing Liens) to any Grantor by any third party (any such financing, "<u>DIP Financing</u>"), then the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that each Second Priority Secured Party (a) will be deemed to have consented to, will raise no objection to, and will not support any other Person objecting to, the use of such cash collateral or to such DIP Financing, provided that such parties receive adequate protection in a manner otherwise consistent with this Agreement, (b) will not request adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in Section 5.4, (c) will subordinate (and will be deemed hereunder to have subordinated) the Second Priority Liens or claims (i) to any additional or replacement Liens, cash payments, or claims provided as adequate protection to the First Priority Secured Parties on the same terms as the Second Priority Liens, right to cash payments, or claims are subordinated to the First Priority Liens, right to cash payments, or claims under this Agreement and (ii)(x) to the Liens, right to cash payments, or claims securing such DIP Financing (and the Liens securing such Second Priority Obligations shall have the same priority with respect to Common Collateral relative to the Liens securing the First Priority Obligations as if such DIP Financing had not occurred) , (y) to any "carve-out" agreed to by the First Priority Representative or the other First Priority Secured Parties and (z) in the case of any Insolvency or Liquidation Proceeding outside the United States, to any administrative or other charges granted in such Insolvency or Liquidation Proceeding that are similar in nature to a "carve-out" and agreed to by the First Priority Representative or the other First Priority Secured Parties, in the case of each of clauses (ii) (x), (y) and (z), with such subordination to be on the same terms as the First Priority Liens, rights of cash payments, or claims are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), and (d) will be deemed to have consented to, and will raise no objection to, and will not support any other Person objecting to (i) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the First Priority Obligations made by the First Priority Representative or any First Priority Secured Party, (ii) any lawful exercise by the First Priority Representative or any other First Priority Secured Party of the right to credit bid any First Priority Obligations at any sale in foreclosure of First Priority Collateral or (iii) any other request for judicial relief made in any court by the First Priority Representative or any other First Priority Secured Party relating to the lawful enforcement of any First Priority Lien.

5.3.    <u>Relief From the Automatic Stay</u>.  Until the First Priority Obligations Payment Date, the Second Priority Representative agrees, on behalf of itself and the other Second Priority Secured Parties, that none of them will seek relief from the automatic stay or from any other stay in any Insolvency or

-16-

686  Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Common
687  Collateral, without the prior written consent of the First Priority Representative.

688      5.4.    Adequate Protection.  The Second Priority Representative, on behalf of itself and the
689  other Second Priority Secured Parties, agrees that none of them shall object to, contest, or support any
690  other Person objecting to or contesting (a) any request by the First Priority Representative or the other
691  First Priority Secured Parties for adequate protection or any adequate protection provided to the First
692  Priority Representative or the other First Priority Secured Parties or (b) any objection by the First Priority
693  Representative or any other First Priority Secured Parties to any motion, relief, action or proceeding based
694  on a claim of a lack of adequate protection or (c) the payment of interest, fees, expenses, costs, charges or
695  other amounts to the First Priority Representative or any other First Priority Secured Party under Section
696  506(b) or 506(c) of the Bankruptcy Code or otherwise.  Notwithstanding anything contained in this
697  Section and in Section 5.2(b) (but subject to all other provisions of this Agreement, including Sections
698  5.2(a) and 5.3), in any Insolvency or Liquidation Proceeding, (i) if the First Priority Secured Parties (or
699  any subset thereof) are granted adequate protection that includes additional or replacement collateral
700  (with replacement Liens on such additional or replacement collateral), cash payments, or claims in
701  connection with any DIP Financing or use of cash collateral, then in connection with any such DIP
702  Financing or use of cash collateral the Second Priority Representative, on behalf of itself and any of the
703  other Second Priority Secured Parties, may seek adequate protection consisting of an additional or a
704  replacement Lien on the same collateral, cash payment or claim (as applicable), subordinated to the Liens,
705  cash payments or claims (as applicable) securing (1) such DIP Financing on the same terms as the First
706  Priority Liens or claims are subordinated thereto (and such subordination will not alter in any manner the
707  terms of this Agreement), and (2) the First Priority Obligations on the same basis as the other Liens, cash
708  payments or claims (as applicable) securing the Second Priority Obligations are so subordinated to the
709  First Priority Obligations under this Agreement and (ii) in the event the Second Priority Representative,
710  on behalf of itself and the other Second Priority Secured Parties, seeks or accepts adequate protection in
711  accordance with clause (i) above in the form of additional or replacement collateral, cash payments or
712  claims, then the Second Priority Representative, on behalf of itself or any of the other Second Priority
713  Secured Parties, agrees that the First Priority Representative shall also be granted a senior Lien on such
714  collateral, right to cash payments, or claims (as applicable) as security for the First Priority Obligations
715  and any such DIP Financing and that any Lien, right to cash payment, or claim (as applicable) on such
716  collateral securing the Second Priority Obligations shall be subordinated to (A) the Liens on such
717  collateral securing the First Priority Obligations and any other Liens, right to cash payment, or claims
718  granted to the First Priority Secured Parties as adequate protection on the same terms that the Liens, right
719  to cash payment, or claims securing the Second Priority Obligations are subordinated to such First
720  Priority Obligations under this Agreement and (B) (x) the Liens or claims on such collateral securing such
721  DIP Financing (and all obligations relating thereto), (y) any "carve-out" agreed to by the First Priority
722  Representative or the other First Priority Secured Parties and (z) in the case of any Insolvency or
723  Liquidation Proceeding outside the United States, any administrative or other charges granted in any
724  Insolvency or Liquidation Proceeding that are similar in nature to a "carve-out" and agreed to by the First
725  Priority Representative or the other First Priority Secured Parties, in the case of each of clauses (B) (x),
726  (y) and (z), with such subordination to be on the same terms as the Liens or claims securing the First
727  Priority Obligations are subordinated thereto (and such subordination will not alter in any manner the
728  terms of this Agreement).  The Second Priority Representative, on behalf of itself and the other Second
729  Priority Secured Parties, agrees that except as expressly set forth in this Section 5.4, and except for
730  adequate protection in the form of access to information or other protection to the extent such access or
731  other protection is also made available to the First Priority Representative on behalf of itself and the other
732  First Priority Secured Parties, none of them shall seek additional adequate protection without the prior
733  written consent of the First Priority Representative.

-17-

5.5.    <u>Avoidance Issues</u>.  If any First Priority Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to disgorge, turn over or otherwise pay to the bankruptcy trustee or the estate of any Grantor, because such amount was avoided or ordered to be paid or disgorged for any reason, including because it was found to be a fraudulent or preferential transfer, any amount (a "<u>Recovery</u>"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then the First Priority Obligations shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the First Priority Obligations Payment Date, if it shall otherwise have occurred, shall be deemed not to have occurred.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  The Second Priority Secured Parties agree that none of them shall be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made on behalf of the First Priority Obligations in accordance with this Agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this Agreement.

5.6.    <u>Asset Dispositions in an Insolvency or Liquidation Proceeding</u>.  Neither the Second Priority Representative nor any other Second Priority Secured Party shall, in an Insolvency or Liquidation Proceeding or otherwise, oppose any sale or other disposition of any assets of any Grantor that is supported by the First Priority Secured Parties, and the Second Priority Representative and each other Second Priority Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any such sale or other disposition of assets supported by the First Priority Secured Parties and to have released their Liens on such assets; <u>provided</u>, to the extent such sale is to be free and clear of Liens, that the Liens securing the First Priority Obligations and the Second Priority Obligations will attach to the proceeds of the sale on the same basis of priority as the Liens released on the assets sold; <u>provided</u>, <u>further</u>, that they may assert any such objection that could be asserted by an unsecured creditor (without limiting the foregoing, neither the Second Priority Representative nor any other Second Priority Secured Party may raise any objections based on rights afforded by Sections 363(e) and (f) of the Bankruptcy Code to secured creditors (or any comparable provisions of any other Bankruptcy Law) with respect to the Liens granted to such person in respect of such assets).

5.7.    <u>Separate Grants of Security and Separate Classification</u>.  Each Second Priority Secured Party acknowledges and agrees that (a) the grants of Liens pursuant to the First Priority Security Documents and the Second Priority Security Documents constitute two separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Common Collateral, the Second Priority Obligations are fundamentally different from the First Priority Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the First Priority Secured Parties and Second Priority Secured Parties in respect of the Common Collateral constitute only one class of secured claims (rather than separate classes of senior and junior secured claims), then the Second Priority Secured Parties hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Grantors in respect of the Common Collateral (with the effect being that, to the extent that the aggregate value of the Common Collateral is sufficient (for this purpose ignoring all claims held by the Second Priority Secured Parties), the First Priority Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest, fees and expenses and any other claims, all amounts owing in respect of Post-Petition Interest before any distribution is made in respect of the Second Priority Obligations held by the Second Priority Secured Parties, with the Second Priority Secured Parties hereby acknowledging and agreeing to turn over to the First Priority Secured Parties amounts otherwise received or receivable by them to the extent necessary to effectuate the intent

-18-

783   of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second
784   Priority Secured Parties), and that, until turned over to the First Priority Secured Parties, such amounts
785   will be held in trust for the First Priority Secured Parties, in all cases subject to Section 5.12 hereof.

786       5.8.   No Waivers of Rights of First Priority Secured Parties.  Nothing contained herein shall
787   prohibit or in any way limit the First Priority Representative or any other First Priority Secured Party
788   from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by any
789   Second Priority Secured Party not expressly prohibited hereunder, including the seeking by any Second
790   Priority Secured Party of adequate protection (except as provided in Section 5.4) or the asserting by any
791   Second Priority Secured Party of any of its rights and remedies under the Second Priority Documents or
792   otherwise.

793       5.9.   [Reserved].

794       5.10.   [Reserved].

795       5.11.   Effectiveness in Insolvency or Liquidation Proceedings.  This Agreement, which the
796   parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the
797   Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency or
798   Liquidation Proceeding.  All references to any of the Company or any Grantor herein shall apply to any
799   trustee for such Person and such Person as debtor in possession.  The relative rights as to the Common
800   Collateral and other collateral and proceeds thereof shall continue after the filing thereof on the same
801   basis as prior to the date of the petition, subject to any court order approving the financing of, or use of
802   cash collateral by, any such Person.

803       5.12.   Reorganization Securities.  If, in any Insolvency or Liquidation Proceeding, debt
804   obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor
805   ("Reorganization Securities") are distributed, pursuant to a plan of reorganization or similar dispositive
806   restructuring plan, on account of the Second Priority Obligations, then the provisions of this Agreement
807   will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect
808   to the Liens securing such debt obligations.  In no event shall the Second Priority Secured Parties be
809   required to turn over to the First Priority Representative or any other First Priority Secured Party any
810   Reorganization Securities to the extent the same are subject to this Section 5.12.

811       5.13.   Post-Petition Claims.  None of the Second Priority Representative, the Trustee or any
812   Second Priority Secured Party shall oppose or seek to challenge any claim by the First Priority
813   Representative or any other First Priority Secured Party for allowance in any Insolvency or Liquidation
814   Proceeding of First Priority Obligations consisting of Post-Petition Interest or indemnities to the extent of
815   the value of the Liens in favor of the First Priority Representative and the other First Priority Secured
816   Parties, without regard to the existence of the Liens of the Second Priority Representative on behalf of the
817   Second Priority Secured Parties on the Common Collateral.

818       5.14.   Waivers.  Until the First Priority Obligations Payment Date, the Second Priority
819   Representative, on behalf of itself and each Second Priority Secured Party, agrees that (a) it will not assert
820   or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens
821   securing the First Priority Obligations for costs or expenses of preserving or disposing of any Common
822   Collateral or other collateral and (b) waives any claim it may now or hereafter have arising out of the
823   election by any First Priority Secured Party of the application of Section 1111(b)(2) of the Bankruptcy
824   Code.

-19-

Section 6.    <u>Second Priority Documents and First Priority Documents</u>.

(a)    Each Grantor and the Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the Second Priority Documents inconsistent with or in violation of this Agreement.

(b)    Each Grantor and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, agrees that it shall not at any time execute or deliver any amendment or other modification to any of the First Priority Documents inconsistent with or in violation of this Agreement.

(c)    In the event the First Priority Representative enters into any amendment, waiver or consent in respect of any of the First Priority Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Priority Security Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Comparable Second Priority Security Document without the consent of or action by any Second Priority Secured Party (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u> that (no such amendments, modifications or waivers shall provide for the security of any additional extensions of credit or add additional secured creditors in violation of the express provisions of the Second Priority Agreements), (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of any Second Priority Security Document, except to the extent that a release of such Lien is permitted by Section 4.2, (ii) any such amendment, waiver or consent that materially and adversely affects the rights of the Second Priority Secured Parties and does not affect the First Priority Secured Parties in a like or similar manner shall not apply to the Second Priority Security Documents without the consent of the Second Priority Representative and (iii) notice of such amendment, waiver or consent shall be given to the Second Priority Representative no later than 15 days after its effectiveness; provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

Section 7.    <u>Reliance; Waivers; etc</u>.

7.1.    <u>Reliance</u>.  The First Priority Documents are deemed to have been executed and delivered, and all extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The Second Priority Representative, on behalf of it itself and the other Second Priority Secured Parties, expressly waives all notice of the acceptance of and reliance on this Agreement by the First Priority Secured Parties.  The Second Priority Documents are deemed to have been executed and delivered and all issuances of debt and other extensions of credit thereunder are deemed to have been made or incurred, in reliance upon this Agreement.  The First Priority Representative expressly waives, on behalf of itself and all the other First Priority Secured Parties, all notices of the acceptance of and reliance by the Second Priority Representative and the other Second Priority Secured Parties.

7.2.    <u>No Warranties or Liability</u>.  The Second Priority Representative and the First Priority Representative acknowledge and agree that neither has made any representation or warranty with respect to the execution, validity, legality, completeness, collectibility or enforceability of any other First Priority Document or any Second Priority Document.  Except as otherwise provided in this Agreement, the Second Priority Representative and the First Priority Representative will be entitled to manage and supervise their respective extensions of credit to any Grantor in accordance with law and their usual practices, modified from time to time as they deem appropriate.

7.3.    <u>No Waivers</u>.  No right or benefit of any party hereunder shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of such party or any other party hereto or by

-20-

any noncompliance by any Grantor with the terms and conditions of any of the First Priority Documents or the Second Priority Documents.

Section 8.    Obligations Unconditional.

8.1.    First Priority Obligations Unconditional.  All rights and interests of the First Priority Secured Parties hereunder, and all agreements and obligations of the Second Priority Secured Parties (and, to the extent applicable, the Grantors) hereunder, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any First Priority Document;

(b)    any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Priority Document;

(c)    prior to the First Priority Obligations Payment Date, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Priority Obligations or any guarantee or guaranty thereof; or

(d)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the First Priority Obligations, or of any Second Priority Secured Party, or any Grantor, to the extent applicable, in respect of this Agreement.

8.2.    Second Priority Obligations Unconditional.  All rights and interests of the Second Priority Secured Parties hereunder, and all agreements and obligations of the First Priority Secured Parties (and, to the extent applicable, the Grantors) hereunder, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any Second Priority Document;

(b)    any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second Priority Obligations, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any Second Priority Document;

(c)    any exchange, release, voiding, avoidance or non-perfection of any security interest in any Common Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Priority Obligations or any guarantee or guaranty thereof; or

(d)    any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the Second  Priority Obligations, or of any First Priority Secured Party, or any Grantor, to the extent applicable, in respect of this Agreement.

Section 9.    Miscellaneous.

9.1.    Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of any First Priority Document or any Second Priority Document, the provisions of this

-21-

Agreement shall govern; provided that, in the event of any conflict between the provisions of this Agreement and the intercreditor agreement dated as of the date hereof (the "First Lien Intercreditor Agreement") among the Agent, the Revolving Credit Collateral Agent, the First Lien Collateral Agent, the First Lien Trustee, the Company and the other Grantors party thereto and each other First Priority Secured Party thereto from time to time in accordance with the terms thereof, the terms and conditions of the First Lien Intercreditor Agreement shall control as to the relative rights of the First Priority Secured Parties.

9.2.    Continuing Nature of Provisions.  This Agreement shall continue to be effective, and shall not be revocable by any party hereto, until the First Priority Obligations Payment Date shall have occurred, subject to Section 5.5.  This is a continuing agreement and the First Priority Secured Parties and the Second Priority Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide indebtedness to, or for the benefit of, any Company or any other Grantor on the faith hereof.

9.3.    Amendments; Waivers.  (a)  No amendment or modification of any of the provisions of this Agreement shall be effective unless the same shall be in writing and signed by the First Priority Representative and the Second Priority Representative provided that no such agreement shall by its terms amend, modify or otherwise affect the rights or obligations of any Grantor without the Company's or such Grantor's prior written consent; provided further that (i) without the consent of any party hereto, (A) this Agreement may be supplemented by a Collateral Agent Joinder Agreement, and an additional Collateral Agent (an "Additional Collateral Agent") on behalf of the Secured Parties under any Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, may become a party hereto, in accordance with Section 9.3(b) and (B) this Agreement may be supplemented by a Grantor Joinder Agreement, and a Subsidiary may become a party hereto, in accordance with Section 9.13, and (ii) in connection with the entering into of any Replacement First Priority Agreement or Replacement Second Priority Agreement, as applicable, each collateral agent party hereto shall enter (and are hereby authorized to enter without the consent of any other Secured Party), at the request of any Collateral Agent with respect to such Replacement First Priority Agreement or Replacement Second Priority Agreement, as applicable, or the Borrower, into such amendments or modifications of this Agreement as are reasonably necessary to reflect such Replacement First Priority Agreement or Replacement Second Priority Agreement, as applicable, and are reasonably satisfactory to each such collateral agent.

(b)    The Borrower may from time to time, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate documents governing additional indebtedness and re-lated obligations that are, or are to be, secured by Liens on any assets of the Borrower or any of the Gran-tors that would, if such Liens were granted, constitute Common Collateral as an Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, by delivering to each party hereto at such time a certificate of an Authorized Officer of the Borrower:

1.    describing the agreement governing the indebtedness and other obligations being designated as an Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

2.    setting forth the Additional First Priority Agreement or Additional Second Priori-ty Agreement, as applicable, as each Grantor has executed and delivered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of obligations under such Additional First Priority Agreement or Additional Second Priority Agreement, as ap-plicable, on the closing date of under such Additional First Priority Agreement or Additional

-22-

Second Priority Agreement, as applicable, certified as being true and complete by an Authorized Officer of the Borrower;

            3.    identifying the Person that serves as collateral agent on behalf of the Secured Parties under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable;

            4.    certifying that the incurrence of obligations and the creation of the Liens securing obligations under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, do not violate or result in a default under any provision of any Secured Credit Document in effect at such time;

            5.    identifying obligations under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, as First Priority Obligations or Second Priority Obligations, as applicable, and, certifying that the designation of such obligations as First Priority Obligations or Second Priority Obligations, as applicable, does not violate or result in a default under any provision of any Secured Credit Document in effect at such time;

            6.    certifying that the Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, (A) meet the requirements of Section 2.3(b) and (B) authorize the Person that serves as collateral agent on behalf of the Secured Parties under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, to become a Collateral Agent hereunder by executing and delivering a Collateral Agent Joinder Agreement and provide that, upon such execution and delivery, the holders of obligations under such the Person that serves as collateral agent on behalf of the Secured Parties under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable, shall become subject to and bound by the provisions of this Agreement; and

            7.    attaching a fully completed Collateral Agent Joinder Agreement executed and delivered by the Person that serves as collateral agent on behalf of the Secured Parties under such Additional First Priority Agreement or Additional Second Priority Agreement, as applicable.

Upon the delivery of such certificate and the related attachments as provided above and as so long as the statements made therein are true and correct as of the date of such certificate, the obligations designated in such notice shall become First Priority Obligations or Second Priority Obligations, as applicable, for all purposes of this Agreement.

            9.4.    <u>Information Concerning Financial Condition of the Company and the other Grantors</u>. Each of the Second Priority Representative, on behalf of the other Second Priority Secured Parties, and the First Priority Representative, on behalf of the First Priority Secured Parties, hereby agree that each Secured Party assumes responsibility for keeping itself informed of the financial condition of the Company and each of the other Grantors and all other circumstances bearing upon the risk of nonpayment of the First Priority Obligations or the Second Priority Obligations. The Second Priority Representative, on behalf of itself and the other Second Priority Secured Parties, and the First Priority Representative, on behalf of itself and the other First Priority Secured Parties, hereby agree that no party shall have any duty to advise any other Secured Party of information known to it regarding such condition or any such circumstances. In the event that any Secured Party, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, it shall be under no obligation (a) to provide any such information to such other party or any other party on any subsequent occasion, (b) to undertake any investigation, or (c) to disclose any other information.

995         9.5.    <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by
996 the law of the State of New York, except as otherwise required by mandatory provisions of law and
997 except to the extent that remedies provided by the laws of any jurisdiction other than the State of New
998 York are governed by the laws of such jurisdiction.

999         9.6.    <u>Submission to Jurisdiction</u>.

1000         (a)    Each First Priority Secured Party, each Second Priority Secured Party and each Grantor
1001 hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of
1002 the Supreme Court of the State of New York sitting in New York County and of the United States District
1003 Court of the Southern District of New York, and any appellate court from any thereof, in any action or
1004 proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment
1005 pursuant to any such action or proceeding, and each such party hereby irrevocably and unconditionally
1006 agrees that all claims, in respect of any such action or proceeding may be heard and determined in such
1007 New York State or, to the extent permitted by law, in such Federal court. Each such party agrees that a
1008 final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdic-
1009 tions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall
1010 affect any right that any First Priority Secured Party or Second Priority Secured Party may otherwise have
1011 to bring any action or proceeding against any Grantor or its properties in the courts of any jurisdiction.

1012         (b)    Each First Priority Secured Party, each Second Priority Secured Party and each Grantor
1013 hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so,
1014 (i) any objection it may now or hereafter have to the laying of venue of any suit, action or proceeding
1015 arising out of or relating to this Agreement in any court referred to in paragraph (a) of this Section and (ii)
1016 the defense of an inconvenient forum to the maintenance of such action or proceeding.

1017         (c)    Each party to this Agreement irrevocably consents to service of process in the manner
1018 provided for notices in Section 9.7. Nothing in this Agreement will affect the right of any party to this
1019 Agreement to serve process in any other manner permitted by law.

1020         9.7.    <u>Notices</u>. Unless otherwise specifically provided herein, any notice or other
1021 communication herein required or permitted to be given shall be in writing and may be personally served,
1022 telecopied, or sent by overnight express courier service or United States mail and shall be deemed to have
1023 been given when delivered in person or by courier service, upon receipt of a telecopy or five days after
1024 deposit in the United States mail (certified, with postage prepaid and properly addressed). For the
1025 purposes hereof, the address of (a) each of the Company, the Agent, Revolving Credit Collateral Agent,
1026 the First Lien Trustee, the First Lien Collateral Agent and the Second Priority Representative (until notice
1027 of a change thereof is delivered as provided in this Section) shall be as set forth in the First Priority
1028 Agreement or the Second Priority Agreement, as applicable, and (b) any other party shall be in care of the
1029 Company as so set forth in clause (a), or, as to each party, at such other address as may be designated by
1030 such party in a written notice to all of the other parties.

1031         9.8.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit
1032 of each of the parties hereto and each of the First Priority Secured Parties and Second Priority Secured
1033 Parties and their respective successors and permitted assigns, and nothing herein is intended, or shall be
1034 construed, to give any other Person any right, remedy or claim under, to or in respect of this Agreement or
1035 any Common Collateral.

1036         9.9.    <u>Headings</u>. Section headings used herein are for convenience of reference only, are not
1037 part of this Agreement and shall not affect the construction of, or be taken into consideration in
1038 interpreting, this Agreement.

-24-

1039    9.10.    <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or
1040  unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such
1041  invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the
1042  remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall
1043  not invalidate such provision in any other jurisdiction.

1044    9.11.    <u>Counterparts; Integration; Effectiveness</u>.  This Agreement may be executed in
1045  counterparts (and by different parties hereto on different counterparts), each of which shall constitute an
1046  original, but all of which when taken together shall constitute a single contract.  Delivery of an executed
1047  counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be
1048  effective as delivery of a manually executed counterpart of this Agreement.  This Agreement shall
1049  become effective when it shall have been executed by each party hereto.

1050    9.12.    <u>**WAIVER OF JURY TRIAL.**</u>  **EACH PARTY HERETO HEREBY**
1051  **IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL**
1052  **ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY**
1053  **COUNTERCLAIM THEREIN.**

1054    9.13.    <u>Additional Grantors</u>.  The Company shall cause each Person that becomes a Grantor after
1055  the date hereof (other than any such Grantor that does not grant any Liens to secure any of the First
1056  Priority Obligations or any of the Second Priority Obligations, until such time as such Grantor does grant
1057  any such Liens) to become a party to this Agreement by executing and delivering a supplement to this
1058  Agreement in substantially the form set forth in Exhibit B hereto (each a "Grantor Joinder Agreement")
1059  and otherwise reasonably satisfactory to the First Priority Representative and the Second Priority
1060  Representative.

1061    9.14.    <u>Representatives</u>.

1062    (a)    It is understood and agreed that the Revolving Credit Collateral Agent is entering into
1063  this Agreement in its capacity as administrative and collateral agent under the Revolving Facility and the
1064  provisions of Article VIII of the Revolving Facility applicable to the Revolving Credit Collateral Agent as
1065  administrative and collateral agent thereunder shall also apply to the Revolving Credit Collateral Agent if
1066  the Revolving Credit Collateral Agent serves as First Priority Representative hereunder.

1067    (b)    It is understood and agreed that the First Lien Trustee and First Lien Collateral Agent are
1068  entering into this Agreement in their capacities as trustee and collateral agent under the First Lien Inden-
1069  ture and the provisions of Articles 7 and 10 of the First Lien Indenture applicable to the First Lien Trustee
1070  and First lien Collateral Agent as trustee and collateral agent thereunder shall also apply to the First Lien
1071  Trustee and First Lien Collateral Agent if either of them serves as First Priority Representative hereunder.

1072    (c)    It is understood and agreed that the Second Lien Trustee and Second Lien Collateral
1073  Agent are entering into this Agreement in their capacities as trustee and collateral agent under the Second
1074  Lien Indenture and the provisions of Articles 7 and 10 of the Second Lien Indenture applicable to the
1075  Second Lien Trustee and Second lien Collateral Agent as trustee and collateral agent thereunder shall also
1076  apply to the Second Lien Trustee and Second Lien Collateral Agent if either of them serves as First
1077  Priority Representative hereunder.

1078    (d)    In connection with its execution of this Agreement and its actions hereunder, each of the
1079  First Priority Representative and the Second Priority Representative shall be entitled to all rights, privi-
1080  leges, benefits, protections, immunities and indemnities provided to it as administrative agent, trustee and

-25-

collateral agent under the First Priority Documents and as administrative agent, trustee and collateral agent under the Second Priority Documents, respectively.

9.15.    <u>Subrogation</u>.  The Second Priority Representative, for itself and on behalf of the other Second Priority Secured Parties, hereby waives any rights of subrogation it or they may acquire as a result of any payment hereunder until the First Priority Obligations Payment Date has occurred; <u>provided</u>, <u>however</u>, that, as between the Company and the other Grantors, on the one hand, and the Second Priority Secured Parties, on the other hand, any such payment that is paid over to the First Priority Representative pursuant to this Agreement shall be deemed not to reduce any of the Second Priority Obligations unless and until (and then only to the extent that) the First Priority Obligations Payment Date has occurred and the First Priority Representative delivers any such payment to the Second Priority Representative.

[Remainder of page intentionally left blank]

CG&R DRAFT:  12/15/10 6:02 PM                                                     #1121161 v8 (126S908_.DOC)

1095        IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first
1096    written above.

1097                                                      JPMORGAN CHASE BANK, N.A., as Agent and
1098                                                      Revolving Credit Collateral Agent for and on behalf
1099                                                      of the Revolving Credit Secured Parties
1100

1101                                                      By: _____
1102                                                          Name:
1103                                                          Title:

1104

1105                             WILMINGTON TRUST FSB, as First Lien Trustee
1106                             and First Lien Collateral Agent for and on behalf of
1107                             the First Lien Note Secured Parties

1108

1109                             By: _____
1110                                  Name:
1111                                  Title:

1112

1113
1114
1115
1116

1117
1118
1119
1120
1121

WILMINGTON TRUST FSB, as Second Lien Trus-
tee and Second Lien Collateral Agent for and on be-
half of the Second Lien Note Secured Parties

By: _____

    Name:

    Title:

1122                                         AMERICAN MEDIA, INC.

1123

1124                              By: _____
1125                                     Name:
1126                                     Title:
1127

1128                                   [OTHER GRANTORS]

1129

1130                              By: _____
1131                                     Name:
1132                                     Title:
1133
1134

1135                                                                                                                    EXHIBIT A

1136                    [FORM OF] COLLATERAL AGENT JOINDER AGREEMENT NO. [   ] dated as of
1137    [               ], 20[   ] (the "Joinder Agreement") to the JUNIOR LIEN INTERCREDITOR
1138    AGREEMENT dated as of [                ], 2010 (the "Intercreditor Agreement"), among AMERICAN
1139    MEDIA, INC. (F/K/A AMERICAN MEDIA OPERATIONS, INC.), a Delaware corporation (the "Bor-
1140    rower"), the GRANTORS party thereto, JPMORGAN CHASE BANK, N.A., as the Agent and Revolving
1141    Credit Collateral Agent, WILMINGTON TRUST FSB, as the First Lien Trustee and First Lien Collateral
1142    Agent, WILMINGTON TRUST FSB, as the Second Lien Trustee and Second Lien Collateral Agent, and
1143    each ADDITIONAL COLLATERAL AGENT from time to time party thereto.

1144                    A.        Capitalized terms used herein but not otherwise defined herein shall have the
1145    meanings assigned to such terms in the Intercreditor Agreement.

1146                    B.        The Borrower proposes to issue or incur additional [First][Second] Priority Obli-
1147    gations (the "Additional [First][Second] Priority Obligations") and the Person identified in the signature
1148    pages hereto as the "Additional Collateral Agent" (the "Additional Collateral Agent") will serve as the
1149    collateral agent, collateral trustee or a similar representative for the [First Priority][Second Priority] Se-
1150    cured Parties under such Additional [First][Second] Priority Obligations (the "Additional [First][Second]
1151    Priority Secured Parties"). The Additional [First][Second] Priority Obligations are being designated as
1152    [First][Second] Priority Obligations by the Borrower in accordance with Section 9.3(b) of the Intercredi-
1153    tor Agreement.

1154                    C.        The Additional Collateral Agent wishes to become a party to the Intercreditor
1155    Agreement and to acquire and undertake, for itself and on behalf of the Additional [First][Second] Priori-
1156    ty Secured Parties, the rights and obligations of a Collateral Agent thereunder. The Additional Collateral
1157    Agent is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor
1158    Agreement in order to become a Collateral Agent thereunder.

1159                    Accordingly, the Additional Collateral Agent and the Borrower agree as follows, for the
1160    benefit of the Additional Collateral Agent, the Borrower and each other Collateral Agent:

1161                    SECTION 1. Accession to the Intercreditor Agreement. The Additional Collateral Agent
1162    (a) hereby accedes and becomes a party to the First Lien Intercreditor Agreement as a collateral agent for
1163    the Additional [First][Second] Priority Secured Parties from time to time in respect of the Additional
1164    [First][Second] Priority Obligations, (b) agrees, for itself and on behalf of the Additional [First][Second]
1165    Priority Secured Parties from time to time in respect of the Additional [First][Second] Priority Obliga-
1166    tions, to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and
1167    obligations of a Collateral Agent under the Intercreditor Agreement.

1168                    SECTION 2. Representations, Warranties and Acknowledgement of the Additional Col-
1169    lateral Agent. The Additional Collateral Agent represents and warrants to the Collateral Agents and the
1170    Secured Parties, in each case party to the Intercreditor Agreement that (a) it has full power and authority
1171    to enter into this Joinder Agreement, in its capacity as the Additional Collateral Agent, (b) this Joinder
1172    Agreement has been duly authorized, executed and delivered by it and constitutes its legal, valid and
1173    binding obligation, enforceable against it in accordance with the terms of this Joinder Agreement and
1174    (c) the [Additional First Priority Agreement][Additional Second Priority Agreement] relating to such Ad-
1175    ditional [First][Second] Priority Obligations provide that, upon the Additional Collateral Agent's entry
1176    into this Joinder Agreement, the secured parties in respect of such Additional [First][Second] Priority Ob-
1177    ligations will be subject to and bound by the provisions of the Intercreditor Agreement as Secured Parties.

Ex. I-1

1178           SECTION 3.  <u>Counterparts</u>.  This Joinder Agreement may be executed in multiple coun-
1179 terparts, each of which shall constitute an original, but all of which when taken together shall constitute a
1180 single contract.  This Joinder Agreement shall become effective when each collateral agent shall have
1181 received a counterpart of this Joinder Agreement that bears the signature of the Additional Collateral
1182 Agent.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic
1183 transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

1184           SECTION 4.  <u>Benefit of Agreement</u>.  **The agreements set forth herein or undertaken**
1185 **pursuant hereto are for the benefit of, and may be enforced by, any party to the Intercreditor**
1186 **Agreement.**

1187           SECTION 5.  <u>Governing Law</u>.  **THIS JOINDER AGREEMENT SHALL BE**
1188 **GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE**
1189 **OF NEW YORK.**

1190           SECTION 6.  <u>Severability</u>.  In case any one or more of the provisions contained in this
1191 Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties he-
1192 reto shall be required to comply with such provision for so long as such provision is held to be invalid,
1193 illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained
1194 herein and in the Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto
1195 shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with
1196 valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or
1197 unenforceable provisions.

1198           SECTION 7.  <u>Notices</u>.  All communications and notices hereunder shall be in writing and
1199 given as provided in Section 9.7 of the Intercreditor Agreement.  All communications and notices he-
1200 reunder to the Additional Collateral Agent shall be given to it at the address set forth under its signature
1201 hereto, which information supplements Section 9.7 of the Intercreditor Agreement.

1202           SECTION 8.  <u>Expense Reimbursement</u>.  The Borrower agrees to reimburse each Colla-
1203 teral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, includ-
1204 ing the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

1205

Ex. I-2

IN WITNESS WHEREOF, the Additional Collateral Agent and the Borrower have duly executed this Joinder Agreement to the Intercreditor Agreement as of the day and year first above written.

[NAME OF ADDITIONAL COLLATERAL AGENT], as ADDITIONAL COLLATERAL AGENT for the ADDITIONAL [FIRST][SECOND] PRIORITY SECURED PARTIES

By: _____
     Name:
     Title:

Address for notices:

_____

_____

attention of: _____

Telecopy: _____

AMERICAN MEDIA, INC.

By: _____
     Name:
     Title:

Ex. I-3

1225    Acknowledged by:

1226    JPMORGAN CHASE BANK, N.A., as Agent and
1227    Revolving Credit Collateral Agent

1228    By: _____
1229        Name:
1230        Title:


1231    WILMINGTON TRUST FSB,
1232    as First Lien Trustee and First Lien Collateral Agent

1233    By: _____
1234        Name:
1235        Title:


1236    WILMINGTON TRUST FSB,
1237    as Second Lien Trustee and Second Lien Collateral Agent

1238    By: _____
1239        Name:
1240        Title:


1241    [EACH OTHER ADDITIONAL
1242    COLLATERAL AGENT], as Additional
1243    Collateral Agent

1244    By: _____
1245        Name:
1246        Title:


Ex. I-4

EXHIBIT B

[FORM OF] GRANTOR JOINDER AGREEMENT NO. [   ] dated as of [            ], 20[   ] (the "Joinder Agreement") to the JUNIOR LIEN INTERCREDITOR AGREEMENT dated as of [            ], 2010 (the "Intercreditor Agreement"), among AMERICAN MEDIA, INC. (F/K/A AMERICAN MEDIA OPERATIONS, INC.), a Delaware corporation (the "Borrower"), the GRANTORS party thereto, JPMORGAN CHASE BANK, N.A., as the Agent and Revolving Credit Collateral Agent, WILMINGTON TRUST FSB, as the First Lien Trustee and First Lien Collateral Agent, WILMINGTON TRUST FSB, as the Second Lien Trustee and Second Lien Collateral Agent, each ADDITIONAL COLLATERAL AGENT from time to time party thereto and [            ], a [            ], as an additional GRANTOR.

A.      Capitalized terms used herein but not otherwise defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

B.      [            ], a Subsidiary of the Borrower (the "Additional Grantor"), has granted a Lien on all or a portion of its assets to secure First Priority Obligations and Second Priority Obligations and such Additional Grantor is not a party to the Intercreditor Agreement.

C.      The Additional Grantor wishes to become a party to the Intercreditor Agreement and to acquire and undertake the rights and obligations of a Grantor thereunder.  The Additional Grantor is entering into this Joinder Agreement in accordance with the provisions of the Intercreditor Agreement in order to become a Grantor thereunder.

Accordingly, the Additional Grantor agrees as follows, for the benefit of the Borrower and each other party to the Intercreditor Agreement:

SECTION 1.  Accession to the Intercreditor Agreement.   In accordance with Section 9.13 of the Intercreditor Agreement, the Additional Grantor (a) hereby accedes and becomes a party to the Intercreditor Agreement as a Grantor with the same force and effect as if originally named therein as a Grantor, (b) agrees to all the terms and provisions of the Intercreditor Agreement and (c) shall have all the rights and obligations of a Grantor under the Intercreditor Agreement.

SECTION 2.  Representations, Warranties and Acknowledgement of the Additional Grantor.  The Additional Grantor represents and warrants to each Collateral Agent and each Secured Party that this Joinder Agreement has been duly authorized, executed and delivered by such Additional Grantor and constitutes the legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.  Counterparts.  This Joinder Agreement may be executed in multiple counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Joinder Agreement shall become effective when each collateral agent shall have received a counterpart of this Joinder Agreement that bears the signature of the Additional Grantor.  Delivery of an executed signature page to this Joinder Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Joinder Agreement.

Ex. I-1

SECTION 4.  <u>Benefit of Agreement</u>.  **The agreements set forth herein or undertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the Intercreditor Agreement.**

SECTION 5.  <u>Governing Law</u>.  **THIS JOINDER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

SECTION 6.  <u>Severability</u>.  In case any one or more of the provisions contained in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of the parties hereto shall be required to comply with such provision for so long as such provision is held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the remaining provisions contained herein and in the Intercreditor Agreement shall not in any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.  <u>Notices</u>.  All communications and notices hereunder shall be in writing and given as provided in Section 9.7 of the Intercreditor Agreement.

SECTION 8.  <u>Expense Reimbursement</u>.  The Additional Grantor agrees to reimburse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel for each Collateral Agent.

Ex. I-2

1307            IN WITNESS WHEREOF, the Additional Grantor has duly executed this Joinder
1308    Agreement to the Intercreditor Agreement as of the day and year first above written.

1309                              [NAME OF SUBSIDIARY]


1310                    By: _____
1311                         Name:
1312                         Title:


1313

Ex. I-3

1314    Acknowledged by:

1315    JPMORGAN CHASE BANK, N.A., as Agent and
1316    Revolving Credit Collateral Agent

1317    By: _____
1318        Name:
1319        Title:


1320    WILMINGTON TRUST FSB,
1321    as First Lien Trustee and First Lien Collateral Agent

1322    By: _____
1323        Name:
1324        Title


1325    WILMINGTON TRUST FSB,
1326    as Second Lien Trustee and Second Lien Collateral Agent

1327    By: _____
1328        Name:
1329        Title:


1330    [EACH OTHER ADDITIONAL
1331    COLLATERAL AGENT], as Additional
1332    Collateral Agent

1333    By: _____
1334        Name:
1335        Title:


1336

Ex. I-4

**<u>EXHIBIT H</u>**

**Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for New Revolver
Facility Lenders, and Trustee and Collateral Agent for New First Lien Note Holders**

FIRST LIEN INTERCREDITOR AGREEMENT

dated as of December 22, 2010,

among

AMERICAN MEDIA, INC.
(f/k/a American Media Operations, Inc.),

the other GRANTORS party hereto,

JPMORGAN CHASE BANK, N.A.,
as Agent,

JPMORGAN CHASE BANK, N.A.,
as Credit Agreement Collateral Agent,


WILMINGTON TRUST FSB,
as Senior Secured Notes Trustee,


WILMINGTON TRUST FSB,
as Senior Secured Notes Collateral Agent,

and

each ADDITIONAL COLLATERAL AGENT from time to time party hereto

FIRST LIEN INTERCREDITOR AGREEMENT dated as of December 22, 2010, 2010 (as amended, supplemented or otherwise modified from time to time, this "Agreement"), among AMERICAN MEDIA, INC. (f/k/a AMERICAN MEDIA OPERATIONS, INC.), a Delaware corporation (the "Borrower"), the other GRANTORS (as defined below) party hereto, JPMORGAN CHASE BANK, N.A., as administrative agent under the Credit Agreement (in such capacity, the "Agent") and as collateral agent for the Credit Agreement Secured Parties (as defined below) (in such capacity, the "Credit Agreement Collateral Agent"), WILMINGTON TRUST FSB, as Trustee under the Senior Secured Notes Indenture (as defined below) (together with its successors and assigns, in such capacity, the "Senior Secured Notes Trustee") and as collateral agent for the Senior Secured Notes Secured Parties (as defined below) (together with its successors and assigns, in such capacity, the "Senior Secured Notes Collateral Agent"), and each ADDITIONAL COLLATERAL AGENT from time to time party hereto as collateral agent for any First Lien Obligations (as defined below) of any other Class (as defined below).

The parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  Certain Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Additional Collateral Agent" has the meaning assigned to the term in Article VII.

"Additional First Lien Obligations" means all obligations of the Borrower and the other Grantors that shall have been designated as such pursuant to Article VII.

"Additional First Lien Obligations Documents" means the indentures or other agreements under which Additional First Lien Obligations of any Series are issued or incurred and all other instruments, agreements and other documents evidencing or governing Additional First Lien Obligations of such Series or providing any guarantee, Lien or other right in respect thereof.

"Additional Pari Passu Lien Indebtedness" means Indebtedness permitted to be incurred under the Senior Secured Notes Indenture and under the Credit Agreement which is by its terms intended to be secured on a *pari passu* basis with the Liens securing the Senior Secured Notes and the Credit Agreement Obligations; provided such Lien is permitted to be incurred under the Senior Secured Notes Indenture and the Credit Agreement and such Indebtedness has a stated maturity that is no earlier than the stated maturity of the Senior Secured Notes.

"Additional Secured Parties" means the holders of any Additional First Lien Obligations.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For purposes of this definition, "Control" means the

possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Agent" has the meaning assigned to such term in the preamble hereto.

"Agreement" has the meaning assigned to such term in the preamble hereto.

"Amend" means, in respect of any agreement, to amend, restate, supplement, waive or otherwise modify such agreement, in whole or in part.  The terms "Amended" and "Amendment" shall have correlative meanings.

"Authorized Officer" means, with respect to any Person, the chief executive officer, the chief financial officer, principal accounting officer, any vice president, treasurer, general counsel or another executive officer of such Person.

"Bailee Collateral Agent" has the meaning assigned to such term in Section 4.01(a).

"Bankruptcy Code" means Title 11 of the United States Code, as amended.

"Bankruptcy Law" means the Bankruptcy Code and any similar Federal, state or foreign law for the relief of debtors.

"Borrower" has the meaning assigned to such term in the preamble hereto.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Cash Management Bank" means any lender under the Credit Agreement or an Affiliate of a lender under the Credit Agreement (together with its successors and assigns) providing Cash Management Services to the Borrower or any other Grantor.

"Cash Management Obligations" means all obligations owing by the Borrower or any other Grantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documents governing the Cash Management Services, whether or not a claim for post-petition interest or fees is allowed or allowable in any such Insolvency or Liquidation Proceeding), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Borrower or any other Grantor with the terms, conditions and agreements of such Cash Management Services.

"Cash Management Services" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

-2-

98      "Class", when used in reference to (a) any First Lien Obligations, refers to wheth-
99  er such First Lien Obligations are the Credit Agreement Obligations, the Senior Secured Notes
100  Obligations or the Additional First Lien Obligations of any Series, (b) any Collateral Agent, re-
101  fers to whether such Collateral Agent is the Credit Agreement Collateral Agent, the Senior Se-
102  cured Notes Collateral Agent or the Additional Collateral Agent with respect to the Additional
103  First Lien Obligations of any Series, (c) any Bailee Collateral Agent, refers to whether such Bai-
104  lee Collateral Agent is the Credit Agreement Collateral Agent, the Senior Secured Notes Colla-
105  teral Agent or the Additional Collateral Agent with respect to the Additional First Lien Obliga-
106  tions of any Series, (d) any Secured Parties, refers to whether such Secured Parties are the Credit
107  Agreement Secured Parties, the Senior Secured Notes Secured Parties or the holders of the Addi-
108  tional First Lien Obligations of any Series, (e) any Secured Credit Documents, refers to whether
109  such Secured Credit Documents are the Credit Agreement Documents, the Senior Secured Notes
110  Documents or the Additional First Lien Obligations Documents with respect to Additional First
111  Lien Obligations of any Series, and (f) any Security Documents, refers to whether such Security
112  Documents are part of the Credit Agreement Documents, the Senior Secured Notes Documents
113  or the Additional First Lien Obligations Documents with respect to Additional First Lien Obliga-
114  tions of any Series.

115      "Collateral" means all assets of the Borrower or any of the Subsidiaries now or
116  hereafter subject to a Lien securing any First Lien Obligation.

117      "Collateral Agent Joinder Agreement" means a supplement to this Agreement
118  substantially in the form of Exhibit I, appropriately completed.

119      "Collateral Agents" means the Credit Agreement Collateral Agent, the Senior Se-
120  cured Notes Collateral Agent and each Additional Collateral Agent.

121      "Controlled Shared Collateral" has the meaning assigned to such term in Section
122  4.01(a).

123      "Credit Agreement" means the Revolving Credit Agreement dated as of Decem-
124  ber [  ], 2010 by and among the Borrower, the lenders party thereto in their capacities as lenders
125  thereunder and JPMorgan Chase Bank, N.A., as administrative agent, and one or more other fi-
126  nancing arrangements (including, without limitation, any guarantee agreements and security
127  documents), in each case as such agreements may be amended (including any amendment and
128  restatement thereof), supplemented or otherwise modified from time to time, including any
129  agreement extending the maturity of, refinancing, replacing, consolidating or otherwise restruc-
130  turing all or any portion of the Indebtedness under any such agreement or any successor or re-
131  placement agreement and whether by the same or any other agent, lender or group of lenders and
132  whether or not increasing the amount of Indebtedness that may be incurred thereunder; provided
133  that any such amendment, supplement, modification, refinancing, consolidating or restructuring
134  of Indebtedness under such agreement may only provide for the making of revolving loans
135  and/or issuance of letters of credit; provided further that the collateral agent for any such other
136  financing arrangement or agreement becomes a party hereto by executing and delivering a Colla-
137  teral Agent Joinder Agreement.

-3-

138     "Credit Agreement Collateral Agent" has the meaning assigned to such term in
139     the preamble hereto.

140     "Credit Agreement Collateral Agreement" has the meaning assigned to the term
141     "Guarantee and Collateral Agreement" in the Credit Agreement.

142     "Credit Agreement Documents" has the meaning assigned to the term "Loan
143     Documents" in the Credit Agreement.

144     "Credit Agreement Obligations" has the meaning assigned to the term "Obliga-
145     tions" in the Credit Agreement.

146     "Credit Agreement Secured Parties" has the meaning assigned to the term "Se-
147     cured Parties" in the Credit Agreement.

148     "Discharge" means, with respect to First Lien Obligations of any Class,
149     (a) payment in full in cash of the principal of and interest (including interest accruing on or after
150     the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the
151     Related Secured Credit Document, whether or not such interest would be allowed in any such
152     Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness under the Re-
153     lated Secured Credit Document and termination of all commitments of the lenders under the
154     Credit Agreement to lend or otherwise extend credit under the Related Secured Credit Docu-
155     ment, (b) payment in full in cash of all other First Lien Obligations (including letter of credit
156     reimbursement obligations) that are due and payable or otherwise accrued and owing at or prior
157     to the time such principal, interest, and premium are paid (other than Cash Management Obliga-
158     tions and Secured Hedge Obligations so long as arrangements satisfactory to the applicable Cash
159     Management Bank or Hedge Bank shall have been made), and (c) termination or cash collatera-
160     lization (in an amount and manner, and on terms, reasonably satisfactory to the Agent, the Credit
161     Agreement Collateral Agent, or, if the Discharge of Credit Agreement Obligations has occurred,
162     the Collateral Agent determined in accordance with Section 4.01(d)) of all letters of credit issued
163     under the Secured Credit Documents.

164     "Domestic Subsidiary" means each Subsidiary that is organized under the laws of
165     the United States of America or any State thereof or the District of Columbia.

166     "Event of Default" means an "Event of Default" (or similar event, however de-
167     nominated) as defined in any Secured Credit Document.

168     "First Lien Obligations" means (a) all the Credit Agreement Obligations, (b) all
169     the Senior Secured Notes Obligations and (c) all the Additional First Lien Obligations.

170     "Grantor Joinder Agreement" means a supplement to this Agreement substantially
171     in the form of Exhibit II, appropriately completed.

172     "Grantors" means, at any time, the Borrower and each Domestic Subsidiary that,
173     at such time, (a) pursuant to Security Documents of any Class have granted a Lien on any of its
174     assets to secure any First Lien Obligations of such Class and (b) pursuant to Security Documents

-4-

175  of any other Class has granted a Lien on any of its assets to secure any First Lien Obligations of
176  such other Class.

177           "Hedge Bank" means any Person that is a lender under the Credit Agreement or
178  an Affiliate of a lender under the Credit Agreement at the time it enters into a Secured Hedge
179  Agreement, in its capacity as a party thereto, and such Person's successors and assigns.

180           "Hedging Obligations" means, with respect to any Person, the obligations of such
181  Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar
182  agreement, commodity swap agreement, commodity cap agreement, commodity collar agree-
183  ment, foreign exchange contract, currency swap agreement or similar agreement providing for
184  the transfer or mitigation of interest rate or currency risks either generally or under specific con-
185  tingencies.

186           "Indebtedness" has the meaning assigned to such term in the Senior Secured
187  Notes Indenture or in the Credit Agreement.

188           "Impairment" has the meaning assigned to such term in Section 2.02.

189           "Insolvency or Liquidation Proceeding" means:

190           (a)     any voluntary or involuntary case or proceeding under the Bankruptcy
191  Code with respect to the Borrower or any other Grantor;

192           (b)     any other voluntary or involuntary insolvency, reorganization or bankrupt-
193  cy case or proceeding, or any receivership, liquidation, reorganization or other similar
194  case or proceeding with respect to the Borrower or any other Grantor or with respect to a
195  material portion of its respective assets;

196           (c)     any liquidation, dissolution, reorganization or winding up of the Borrower
197  or any other Grantor, whether voluntary or involuntary and whether or not involving in-
198  solvency or bankruptcy; or

199           (d)     any assignment for the benefit of creditors or any other marshalling of as-
200  sets and liabilities of the Borrower or any other Grantor.

201           "Intervening Creditor" has the meaning assigned to such term in Section 2.02.

202           "Intervening Lien" has the meaning assigned to such term in Section 2.02.

203           "Lien" means, with respect to any asset, (a) any mortgage, deed of trust,
204  lien(statutory or otherwise), pledge, hypothecation, encumbrance, charge, preference, priority or
205  security interest in, on or of such asset, whether or not filed, recorded or otherwise perfected un-
206  der applicable law, including any conditional sale or other title retention agreement, any lease in
207  the nature thereof, any option or other agreement to sell or give a security interest in and any fil-
208  ing of or agreement to give any financing statement under the Uniform Commercial Code (or
209  equivalent statutes) of any jurisdiction (other than a filing for informational purposes), (b) the
210  interest of a vendor or a lessor under any conditional sale agreement, capital lease or title reten-

-5-

tion agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities (other than arising from entry into an agreement for the sale, transfer or disposition of Equity Interests (as defined in the Credit Agreement) as permitted pursuant to the Credit Agreement.

"Pari Passu Lien Indebtedness" shall have the meaning assigned to such term in the Senior Secured Notes Indenture.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, governmental authority or other entity.

"Priority Payment Lien Obligations" shall have the meaning assigned to such term in the Senior Secured Notes Indenture (as the same is in effect on the date hereof).

"Proceeds" has the meaning assigned to such term in Section 2.01(b).

"Refinance" means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, redeem, purchase, defease, retire, restructure or replace, or to issue other Indebtedness in exchange or replacement for, such Indebtedness, in whole or in part.  "Refinanced" and "Refinancing" shall have correlative meanings.

"Related Secured Credit Documents" means, with respect to the Collateral Agent or Secured Parties of any Class, the Secured Credit Documents of such Class.

"Related Secured Parties" means, with respect to the Collateral Agent of any Class, the Secured Parties of such Class.

"Secured Credit Documents" means, collectively, (a) the Credit Agreement Documents, (b) the Senior Secured Notes Documents and (c) the Additional First Lien Obligations Documents.

"Secured Hedge Agreements" means each agreement that governs Hedging Obligations by and between the Borrower or any other Grantor, on the one hand, and any Hedge Bank from time to time, but only to the extent such agreement is permitted under the Credit Agreement and constitutes Credit Agreement Obligations; *provided*, *however*, that such Hedging Obligations shall not, solely by virtue of constituting a Credit Agreement Obligation, also constitute Indebtedness (as defined in the Senior Secured Notes Indenture) under the Credit Agreement.

"Secured Hedging Obligations" means (i) obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective Secured Hedge Agreement, whether or not a claim for post-petition interest or fees is allowed in any such Insolvency or Liquidation Proceeding), of the Borrower or any other Grantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising out of or in connection

-6-

249  with, any Secured Hedge Agreement (including all such obligations and indebtedness under any
250  guarantee of any such Secured Hedge Agreement to which the Borrower or any other Grantor is
251  a party) and (ii) all performance and compliance obligations by the Borrower or any other Gran-
252  tor under any Secured Hedge Agreement.

253       "Secured Parties" means (a) the Credit Agreement Secured Parties, (b) the Senior
254  Secured Notes Secured Parties and (c) the Additional Secured Parties.

255       "Security Documents" means (a) the Credit Agreement Collateral Agreement and
256  the other Security Documents (as defined in the Credit Agreement), (b) each of the Senior Se-
257  cured Notes Security Documents entered into in favor of the Senior Secured Notes Collateral
258  Agent for the purpose of securing the Senior Secured Notes Obligations and (c) any other
259  agreement entered into in favor of the Collateral Agent of any other Class for the purpose of se-
260  curing the First Lien Obligations of such Class.

261       "Senior Secured Notes" has the meaning assigned to such term in the definition
262  of "Senior Secured Notes Indenture."

263       "Senior Secured Notes Collateral Agent" has the meaning assigned to such term
264  in the preamble hereto.

265       "Senior Secured Notes Documents" means the Senior Secured Notes Indenture,
266  the Senior Secured Notes Security Documents and all other instruments, agreements and other
267  documents evidencing or governing the Senior Secured Notes Obligations or providing any
268  Guarantee (as defined in the Senior Secured Notes Indenture), Lien (including any mortgage) or
269  other right in respect thereof.

270       "Senior Secured Notes Indenture" means that certain Indenture, dated as of De-
271  cember 1, 2010, among the Borrower (as successor to AMO Escrow Corporation), the other
272  Grantors party thereto, as guarantors, the Senior Secured Notes Trustee and the Senior Secured
273  Notes Collateral Agent, governing the Borrower's 11.50% Senior Secured Notes due 2017 (the
274  "Senior Secured Notes").

275       "Senior Secured Notes Obligations" means all "Obligations" (as defined in the
276  Senior Secured Notes Indenture) under the Senior Secured Notes Indenture and the Senior Se-
277  cured Notes.

278       "Senior Secured Notes Secured Parties" means the Senior Secured Notes Trustee,
279  the Senior Secured Notes Collateral Agent and the holders of the Senior Secured Notes Obliga-
280  tions.

281       "Senior Secured Notes Security Documents" has the meaning assigned to the term
282  "Security Documents" in the Senior Secured Notes Indenture.

283       "Series", when used in reference to Additional First Lien Obligations, refers to
284  such Additional First Lien Obligations as shall have been issued or incurred pursuant to the same
285  indentures or other agreements and with respect to which the same Person acts as the Additional
286  Collateral Agent.

-7-

"Shared Collateral" means, at any time, Collateral on which Collateral Agents or Secured Parties of any two or more Classes have at such time a valid and perfected Lien (including as a result of the agreements set forth in Section 4.01). If First Lien Obligations of more than two Classes are outstanding at any time, then any Collateral shall constitute Shared Collateral with respect to First Lien Obligations of any Class only if the Collateral Agent or Secured Parties of such Class have at such time a valid and perfected Lien on such Collateral.

"Subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect from time to time in the applicable jurisdiction.

SECTION 1.02.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument, other document, statute or regulation herein shall be construed as referring to such agreement, instrument, other document, statute or regulation as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, but shall not be deemed to include the subsidiaries of such Person unless express reference is made to such subsidiaries, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections and Exhibits shall be construed to refer to Articles, and Sections of, and Exhibits to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.03.  Concerning the Credit Agreement Collateral Agent, the Senior Secured Notes Collateral Agent and Each Additional Collateral Agent.

(a)    Each acknowledgement, agreement, consent and waiver (whether express or implied) in this Agreement made by the Credit Agreement Collateral Agent, whether on behalf of itself or any of its Related Secured Parties, is made in reliance on the authority granted to the Credit Agreement Collateral Agent pursuant to the authorization thereof under the Credit Agreement.  It is understood and agreed that the Credit Agreement Collateral Agent shall not be responsible for or have any duty to ascertain or inquire into whether any of its Related Secured Parties is in compliance with the terms of this Agreement, and no party hereto or any other Se-

-8-

cured Party shall have any right of action whatsoever against the Credit Agreement Collateral Agent for any failure of any of its Related Secured Parties to comply with the terms hereof or for any of its Related Secured Parties taking any action contrary to the terms hereof.

(b)     Each acknowledgement, agreement, consent and waiver (whether express or implied) in this Agreement made by either the Senior Secured Notes Trustee or the Senior Secured Notes Collateral Agent, as applicable, whether on behalf of itself or any of its Related Secured Parties, is made in reliance on the authority granted to the Senior Secured Notes Trustee or the Senior Secured Notes Collateral Agent, as applicable, pursuant to the authorization thereof under the Senior Secured Notes Indenture.  It is understood and agreed that neither the Senior Secured Notes Trustee nor the Senior Secured Notes Collateral Agent shall be responsible for or have any duty to ascertain or inquire into whether any of its Related Secured Parties is in compliance with the terms of this Agreement, and no party hereto or any other Secured Party shall have any right of action whatsoever against the Senior Secured Notes Collateral Agent or the Senior Secured Notes Trustee for any failure of any of its Related Secured Parties to comply with the terms hereof or for any of its Related Secured Parties taking any action contrary to the terms hereof.

(c)     Each acknowledgement, agreement, consent and waiver (whether express or implied) in this Agreement made by any Additional Collateral Agent, whether on behalf of itself or any of its Related Secured Parties, is made in reliance on the authority granted to such Additional Collateral Agent pursuant to the authorization thereof under the Additional First Lien Obligations Documents relating to such Class of First Lien Obligations.  It is understood and agreed that no Additional Collateral Agent shall be responsible for or have any duty to ascertain or inquire into whether any of its Related Secured Parties is in compliance with the terms of this Agreement, and no party hereto or any other Secured Party shall have any right of action whatsoever against the Additional Collateral Agent for any failure of any of its Related Secured Parties to comply with the terms hereof or for any of its Related Secured Parties taking any action contrary to the terms hereof.

ARTICLE II

Lien Priorities; Proceeds

SECTION 2.01.  Relative Priorities.

(a)     Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any Lien on any Shared Collateral securing any First Lien Obligation, and notwithstanding any provision of the Uniform Commercial Code of any jurisdiction, any other applicable law or any Secured Credit Document, or any other circumstance whatsoever (but, in each case, subject to Section 2.01(b) and Section 2.02), the Agent, the Senior Secured Notes Trustee and each Collateral Agent, for itself and on behalf of its Related Secured Parties, agree that valid and perfected Liens on any Shared Collateral securing First Lien Obligations of any Class shall be of equal priority; provided that the Priority Payment Lien Obligations will have priority as set forth below to the Proceeds of or other payments or distributions on Shared Collateral upon a foreclosure or in an Insolvency or Liquidation Proceeding including without limitation all adequate protection payments made in any Insolvency or Liquidation Proceeding in re-

-9-

spect of the Shared Collateral and will be repaid in full prior to the repayment of the Senior Se-
cured Notes and any Additional Pari Passu Lien Indebtedness.

(b)    The Agent, the Senior Secured Notes Trustee and each Collateral Agent,
for itself and on behalf of its Related Secured Parties, agree that, notwithstanding (x) any provi-
sion of any Secured Credit Document to the contrary (but subject to Section 2.02) and (y) the
date, time, method, manner or order of grant, attachment or perfection of any Lien on any Shared
Collateral securing any First Lien Obligation, and notwithstanding any provision of the Uniform
Commercial Code of any jurisdiction, any other applicable law or any Secured Credit Document,
or any other circumstance whatsoever (but, in each case, subject to Section 2.02), if (i) an Event
of Default shall have occurred and is continuing and the Agent, the Senior Secured Notes Trustee
or such Collateral Agent or any of its Related Secured Parties is taking any action to enforce
rights or exercise remedies in respect of any Shared Collateral (including any such action re-
ferred to in Section 3.01(a)), (ii) any distribution, payment, compromise or settlement of any
kind (under a confirmed plan of reorganization or otherwise) is made in respect of any Shared
Collateral in any Insolvency or Liquidation Proceeding of the Borrower or any other Grantor or
(iii) the Agent, the Senior Secured Notes Trustee or such Collateral Agent or any of its Related
Secured Parties receives any payment with respect to any Shared Collateral pursuant to any in-
tercreditor agreement (other than this Agreement), then the cash and non-cash payments distribu-
tions or the proceeds of any sale, collection or other liquidation of any Shared Collateral obtained
by the Agent, the Senior Secured Notes Trustee or such Collateral Agent or any of its Related
Secured Parties on account of such enforcement of rights or exercise of remedies, and any such
cash or non-cash distributions or payments received by the Agent, the Senior Secured Notes
Trustee or such Collateral Agent or any of its Related Secured Parties (all such cash or non-cash
proceeds, distributions and payments being collectively referred to as "Proceeds"), shall be ap-
plied as follows:

(i)    FIRST, to (A) to the payment of all amounts owing to the Credit Agree-
ment Collateral Agent or the Agent for the Priority Payment Lien Obligations (in their re-
spective capacities as such) pursuant to the terms of any Credit Agreement Documents,

(B)    in the case of any such enforcement of rights or exercise of remedies, to
the payment of all costs and expenses incurred by the Credit Agreement Collateral Agent
or the Agent in connection therewith, and

(C)    in the case of any such payment pursuant to this Agreement, to the pay-
ment of all costs and expenses incurred by the Credit Agreement Collateral Agent or the
Agent for the Priority Payment Lien Obligations or any of its Related Secured Parties in
enforcing its rights hereunder to obtain such payment;

(ii)    SECOND, to the payment in full of any Priority Payment Lien Obligations
(including, for the avoidance of doubt, an amount equal to the post-petition interest, fees,
costs, and charges that would otherwise have accrued thereon under the terms of, and at
the rates specified in, the Credit Agreement either (i) had the Borrower not been the sub-
ject of an Insolvency or Liquidation Proceeding or (ii) had the claims under the Credit
Agreement been separately classified from those under the Senior Secured Notes Obliga-
tions in any Insolvency or Liquidation Proceeding (regardless of whether any such claims

-10-

413    may not be allowed in whole or in part as against the Borrower or the other Grantors or
414    the Shared Collateral in the respective Insolvency or Liquidation Proceeding pursuant to
415    Section 506(b) of the Bankruptcy Code or otherwise) and the termination of any com-
416    mitments under the Credit Agreement;

417    (iii)    THIRD (A) to the payment of all amounts owing to such Collateral Agent
418    (in its capacity as such) or any trustee for such First Lien Obligations pursuant to the
419    terms of any Related Secured Credit Document in respect of the Senior Secured Notes
420    Obligations or any Additional First Lien Obligations,

421    (B)    in the case of any such enforcement of rights or exercise of remedies, to
422    the payment of all costs and expenses incurred by such Collateral Agent, any trustee for
423    such First Lien Obligations or any of their Related Secured Parties in respect of the Se-
424    nior Secured Notes Obligations or any Additional First Lien Obligations in connection
425    therewith, and

426    (C)    in the case of any such payment pursuant to this Agreement, to the pay-
427    ment of all costs and expenses incurred by such Collateral Agent, any trustee for such
428    First Lien Obligations or any their Related Secured Parties in enforcing its rights the-
429    reunder to obtain such payment.

430    (iv)    FOURTH, to the payment in full of all other First Lien Obligations of each
431    Class secured by a valid and perfected Lien on such Shared Collateral at the time due and
432    payable (the amounts so applied to be distributed, as among such Classes of First Lien
433    Obligations, ratably in accordance with the amounts of the First Lien Obligations of each
434    such Class on the date of such application); provided that amounts applied under this
435    clause FOURTH during any period when the First Lien Obligations of any such Class
436    shall not be due and payable in full shall be allocated to the First Lien Obligations of such
437    Class as if such First Lien Obligations were at the time due and payable in full, and any
438    amounts allocated to the payment of the First Lien Obligations of such Class that are not
439    yet due and payable shall be transferred to, and held by, the Collateral Agent of such
440    Class solely as collateral for the First Lien Obligations of such Class (and shall not con-
441    stitute Shared Collateral for purposes hereof) until the date on which the First Lien Obli-
442    gations of such Class shall have become due and payable in full (at which time such
443    amounts shall be applied to the payment thereof); and

444    (v)    FIFTH, after payment in full of all the First Lien Obligations, to the hold-
445    ers of any junior Liens on the Shared Collateral and thereafter to the Borrower and the
446    other Grantors or their successors or assigns, as their interests may appear, or as a court
447    of competent jurisdiction may direct.

448    (c)    The parties to this Agreement (including the Borrower and the Grantors)
449    shall irrevocably agree that this Agreement (including the provisions described in Sec-
450    tion 2.01(b)) constitutes a "subordination agreement" within the meaning of both New York law
451    and Section 510(a) of the Bankruptcy Code, and that the terms hereof will survive, and will con-
452    tinue in full force and effect and be binding upon each of the parties hereto, in any Insolvency or
453    Liquidation Proceeding.

-11-

454    (d)    To further effectuate the intent, understanding, and agreement of the
455 Agent on the one hand, and the Senior Secured Notes Trustee and its Related Secured Parties, on
456 the other, if, as is contemplated, it is held (in the context of a confirmed plan of reorganization or
457 otherwise) that the claims against the Borrower or any Grantor under the Credit Agreement, the
458 Senior Secured Notes Obligation or any Additional Pari Passu Lien Indebtedness in respect of
459 the Shared Collateral constitute only one secured claim (rather than separate classes of senior and
460 junior claims), then the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent
461 and, by virtue of accepting the Senior Secured Notes, their Related Secured Parties, expressly
462 acknowledge and agree that all distributions, payments, compromises, or settlements of any kind
463 (under a confirmed plan of reorganization or otherwise) made in respect of any Shared Collateral
464 in any Insolvency or Liquidation Proceeding of the Borrower or otherwise shall be deemed for
465 all purposes with respect to this Agreement and such Insolvency or Liquidation Proceedings to
466 have been made as if there were separate classes of senior and junior secured claims against the
467 Borrower in respect of the Shared Collateral, with the effect being that (and the Senior Secured
468 Notes Trustee and its Related Secured Parties expressly acknowledge and agree) the Agent for
469 the Priority Payment Lien Obligations (on behalf of itself and holders of Priority Payment Lien
470 Obligations) shall be entitled to and shall receive from the Shared Collateral, in addition to
471 amounts distributed to them in respect of principal, pre-petition interest, and other claims, the
472 amount of interest, fees, costs, and charges that would otherwise have accrued post-petition un-
473 der the terms of, and at the rates specified in, the Credit Agreement as against the Borrower or
474 with respect to the Shared Collateral either (i) had the Borrower not been the subject of an Insol-
475 vency or Liquidation Proceeding or (ii) had the claims under the Credit Agreement been sepa-
476 rately classified from the Senior Secured Notes Obligations in any Insolvency or Liquidation
477 Proceeding (regardless of whether any such claims may or may not be allowed or allowable in
478 whole or in part as against the Borrower or the Shared Collateral in the respective Insolvency or
479 Liquidation Proceeding pursuant to Section 506(b) of the Bankruptcy Code or otherwise), before
480 any distribution is or may be made in respect of the claims relating to the Shared Collateral or the
481 Liens thereon securing the Senior Secured Notes held by the Senior Secured Notes Collateral
482 Agent, on behalf of its Related Secured Parties, with the Senior Secured Notes Trustee, the Se-
483 nior Secured Notes Collateral Agent and, by virtue of accepting the Senior Secured Notes, its
484 Related Secured Parties, further expressly acknowledging and agreeing to either turn over to, or
485 direct the Borrower and the Grantors to pay directly to, the holders of the Priority Payment Lien
486 Obligations all amounts otherwise received or receivable by them from the Shared Collateral or
487 in respect of the Liens thereon securing the Senior Secured Notes to the extent needed to effec-
488 tuate the intent of this provision to ensure that the Priority Payment Lien Obligations (including,
489 for the avoidance of doubt, those related to the post-petition interest, fees, costs, and charges that
490 would otherwise have accrued thereon under the terms of, and at the rates specified in, the Credit
491 Agreement either (i) had the Borrower not been the subject of an Insolvency or Liquidation Pro-
492 ceeding or (ii) had the claims under the Credit Agreement been separately classified from the
493 Senior Secured Notes Obligations in any Insolvency or Liquidation Proceeding (regardless of
494 whether such claims may or may not be allowed or allowable in whole or in part as against the
495 Borrower or the Shared Collateral in the respective Insolvency or Liquidation Proceeding pur-
496 suant to Section 506(b) of the Bankruptcy Code or otherwise) are paid in full, even if such turno-
497 ver of amounts has the effect of reducing the amount of the recovery and/or claims of the Senior
498 Secured Notes Secured Parties.

-12-

SECTION 2.02.  Impairments.  It is the intention of the parties hereto that the Secured Parties of any given Class of Pari Passu Lien Indebtedness (other than the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or any Collateral Agent with respect to Additional First Lien Obligations, in each case solely with respect to any amount owed to them in their respective capacity as such, and not the Secured Parties of any other Class of Pari Passu Lien Indebtedness) bear the risk of any determination by a court of competent jurisdiction that (i) any First Lien Obligations of such Class of Pari Passu Lien Indebtedness are unenforceable under applicable law or are subordinated to any other obligations (other than to any Pari Passu Lien Indebtedness), (ii) the Secured Parties of such Class of Pari Passu Lien Indebtedness do not have a valid and perfected Lien on any of the Collateral securing any First Lien Obligations of any other Class of Pari Passu Lien Indebtedness and/or (iii) any Person (other than any Collateral Agent or Secured Party) has a Lien on any Shared Collateral that is senior in priority to the Lien on such Shared Collateral securing First Lien Obligations of such Class of Pari Passu Lien Indebtedness, but junior to the Lien on such Shared Collateral securing any other class of Priority Payment Lien Obligations or Pari Passu Lien Indebtedness (any such Lien being referred to as an "Intervening Lien", and any such Person being referred to as an "Intervening Creditor") (any condition with respect to First Lien Obligations of such Class of Pari Passu Lien Indebtedness being referred to as an "Impairment" of such Class).  In the event an Impairment exists with respect to First Lien Obligations of any Class of Pari Passu Lien Indebtedness, the results of such Impairment shall be borne solely by the Secured Parties of such Class of Pari Passu Lien Indebtedness (other than the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or any Collateral Agent with respect to Additional First Lien Obligations, in each case solely with respect to any amount owed to them in their respective capacity as such, and not the Secured Parties of any other Class of Pari Passu Lien Indebtedness), and the rights of the Secured Parties of such Class of Pari Passu Lien Indebtedness (including the right to receive distributions in respect of First Lien Obligations of such Class of Pari Passu Lien Indebtedness pursuant to Section 2.01(b)) (except for the rights of the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or any Collateral Agent with respect to Additional First Lien Obligations, in each case solely with respect to any amount owed to them in their respective capacity as such, and not the Secured Parties of any other Class of Pari Passu Lien Indebtedness) set forth herein shall be modified to the extent necessary so that the results of such Impairment are borne solely by the Secured Parties of such Class (other than the Senior Secured Notes Trustee, the Senior Secured Notes Collateral Agent or any Collateral Agent with respect to Additional First Lien Obligations, in each case solely with respect to any amount owed to them in their respective capacity as such).  In furtherance of the foregoing, in the event First Lien Obligations of any Class of Pari Passu Lien Indebtedness shall be subject to an Impairment in the form of an Intervening Lien of any Intervening Creditor, the value of any Shared Collateral or Proceeds that are allocated to such Intervening Creditor shall be deducted solely from the Shared Collateral or Proceeds to be distributed in respect of First Lien Obligations of such Class.

SECTION 2.03.  Payment Over.  The Agent, the Senior Secured Notes Trustee and each Collateral Agent, on behalf of itself and its Related Secured Parties, agrees that if the Agent, the Senior Secured Notes Trustee or such Collateral Agent or any of its Related Secured Parties shall at any time obtain possession of any Shared Collateral or receive any Proceeds (other than as a result of any application of Proceeds pursuant to Section 2.01(b)), (i) the Agent, the Senior Secured Notes Trustee or such Collateral Agent or its Related Secured Party, as the case may be, shall promptly inform each other Collateral Agent thereof, (ii) the Agent, the Senior Se-

-13-

545 cured Notes Trustee or such Collateral Agent or its Related Secured Party shall hold such Shared
546 Collateral or Proceeds in trust for the benefit of the Secured Parties of any Class entitled thereto
547 pursuant to Section 2.01(b) and, with respect to any Shared Collateral constituting Controlled
548 Shared Collateral, such Collateral Agent shall comply with the provisions of Section 4.01 and
549 (iii) in the case of any such Proceeds, such Proceeds shall be applied in accordance with Section
550 2.01(b) as promptly as practicable.

551         SECTION 2.04.   Determinations with Respect to Amounts of Obligations and
552 Liens.  Whenever the Agent, the Senior Secured Notes Trustee or the Collateral Agent of any
553 Class shall be required, in connection with the exercise of its rights or the performance of its ob-
554 ligations hereunder, to determine the existence or amount of any First Lien Obligations of any
555 other Class, or the Shared Collateral subject to any Lien securing the First Lien Obligations of
556 any other Class (and whether such Lien constitutes a valid and perfected Lien), it may request
557 that such information be furnished to it in writing by the Agent, the Senior Secured Notes Trus-
558 tee or the Collateral Agent of such other Class and shall be entitled to make such determination
559 on the basis of the information so furnished; provided that if, notwithstanding the request of the
560 Collateral Agent of such Class, the Agent, the Senior Secured Notes Trustee or the Collateral
561 Agent of such other Class shall fail or refuse reasonably promptly to provide the requested in-
562 formation, the Collateral Agent of such Class shall be entitled to conclusively rely upon a certifi-
563 cate of an Authorized Officer of the Borrower.  The Agent, the Senior Secured Notes Trustee and
564 each Collateral Agent may rely conclusively, and shall be fully protected in so relying, on any
565 determination made by it in accordance with the provisions of the preceding sentence (or as oth-
566 erwise directed by a court of competent jurisdiction) and shall have no liability to any Grantor,
567 any Secured Party or any other Person as a result of such determination or any action taken or
568 not taken pursuant thereto.

569                     ARTICLE III
570
571         Rights and Remedies; Matters Relating to Shared Collateral

572         SECTION 3.01.   Exercise of Rights and Remedies.

573         (a)     Subject to paragraph (b) of this Section and Section 4.01(a), nothing in
574 this Agreement shall affect the ability of the Agent, the Senior Secured Notes Trustee and any
575 Collateral Agent or any of its Related Secured Parties (i) to enforce any rights and exercise any
576 remedies with respect to any Shared Collateral available under any Related Secured Credit Doc-
577 uments or applicable law, including any right of set-off and any determinations regarding the re-
578 lease of Liens on, or any sale, transfer or other disposition of, any Shared Collateral, or any other
579 rights or remedies available to a secured creditor under the Uniform Commercial Code of any
580 jurisdiction, the Bankruptcy Code or any other Bankruptcy Law, or (ii) to commence any action
581 or proceeding with respect to such rights or remedies (including any foreclosure action or pro-
582 ceeding or any Insolvency or Liquidation Proceeding).  Subject to paragraph (b) of this Section
583 and Section 4.01(a), any such exercise of rights and remedies by the Agent, the Senior Secured
584 Notes Trustee and any Collateral Agent or any of its Related Secured Parties may be made in
585 such order and in such manner as the Agent, the Senior Secured Notes Trustee and such Colla-
586 teral Agent or its Related Secured Parties may, subject to the provisions of their Related Secured
587 Credit Documents, determine in their sole discretion.

-14-

588           (b)       Notwithstanding paragraph (a) of this Section:

589           (i)       the Agent, the Senior Secured Notes Trustee and each Collateral Agent
590 and its Related Secured Parties shall remain subject to, and bound by, all covenants or
591 agreements made herein by or on behalf of the Agent, the Senior Secured Notes Trustee
592 or such Collateral Agent or its Related Secured Parties;

593           (ii)     the Agent, the Senior Secured Notes Trustee and each Collateral Agent
594 agrees, on behalf of itself and its Related Secured Parties, that, prior to the commence-
595 ment of any enforcement of rights or any exercise of remedies with respect to any Shared
596 Collateral by the Agent, the Senior Secured Notes Trustee or such Collateral Agent or
597 any of its Related Secured Parties, the Agent, the Senior Secured Notes Trustee and such
598 Collateral Agent or its Related Secured Party, as the case may be, shall provide prior
599 written notice thereof to each other Collateral Agent, such notice to be provided as far in
600 advance of such commencement as reasonably practicable, and shall consult with each
601 other Collateral Agent on a regular basis in connection with such enforcement or exer-
602 cise; and

603           (iii)    the Agent, the Senior Secured Notes Trustee and each Collateral Agent
604 agrees, on behalf of itself and its Related Secured Parties, that such Collateral Agent and
605 its Related Secured Parties shall cooperate in a commercially reasonable manner with
606 each other Collateral Agent and its Related Secured Parties in any enforcement of rights
607 or any exercise of remedies with respect to any Shared Collateral.

608         SECTION 3.02.   <u>Prohibition on Contesting Liens</u>.  Each of the Agent, the Senior
609 Secured Notes Trustee and each Collateral Agent agrees, on behalf of itself and its Related Se-
610 cured Parties, that neither such Collateral Agent nor any of its Related Secured Parties will, and
611 each hereby waives any right to, contest or support any other Person in contesting, in any pro-
612 ceeding (including any Insolvency or Liquidation Proceeding), the perfection, priority, validity,
613 attachment or enforceability of a Lien held by or on behalf of any other Collateral Agent or any
614 of its Related Secured Parties in all or any part of the Shared Collateral; <u>provided</u> that nothing in
615 this Agreement shall be construed to prevent or impair the rights of any Collateral Agent or any
616 of its Related Secured Parties to enforce this Agreement.

617         SECTION 3.03.   <u>Prohibition on Challenging this Agreement</u>.  Each of the Agent,
618 the Senior Secured Notes Trustee and each Collateral Agent agrees, on behalf of itself and its
619 Related Secured Parties, that neither such Collateral Agent nor any of its Related Secured Parties
620 will attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the
621 enforceability of any provision of this Agreement; <u>provided</u> that nothing in this Agreement shall
622 be construed to prevent or impair the rights of any Collateral Agent or any of its Related Secured
623 Parties to enforce this Agreement.

624         SECTION 3.04.   <u>Release of Liens</u>.  The parties hereto agree and acknowledge
625 that the release of Liens on any Shared Collateral securing First Lien Obligations of any Class,
626 whether in connection with a sale, transfer or other disposition of such Shared Collateral or oth-
627 erwise, shall be governed by and subject to the Secured Credit Documents of such Class, and that

-15-

628  nothing in this Agreement shall be deemed to amend or affect the terms of the Secured Credit
629  Documents of such Class with respect thereto.

630      SECTION 3.05.    Insurance and Condemnation Awards.  So long as the Discharge
631  of the Credit Agreement Obligations has not occurred, the Credit Agreement Collateral Agent
632  and its Related Secured Parties shall have the exclusive right, subject to the rights of the Grantors
633  under and solely to the extent provided in the Credit Agreement Documents, to settle and adjust
634  claims in respect of Shared Collateral under policies of insurance covering Shared Collateral and
635  to approve any award granted in any condemnation or similar proceeding, or any deed in lieu of
636  condemnation, in respect of the Shared Collateral; provided that any Proceeds arising therefrom
637  shall be subject to Article II.

638                      ARTICLE IV
639
640                      Collateral

641      SECTION 4.01.    Bailment for Perfection of Security Interests.

642      (a)    Each Collateral Agent agrees that if it shall at any time hold a Lien on any
643  Shared Collateral that can be perfected by the possession or control of such Shared Collateral or
644  of any deposit, securities or other account in which such Shared Collateral is held, and if such
645  Shared Collateral or any such account is in fact in the possession or under the control of such
646  Collateral Agent, or of agents or bailees of such Collateral Agent (such Shared Collateral being
647  referred to herein as the "Controlled Shared Collateral"), such Collateral Agent shall, solely for
648  the purpose of perfecting the Liens of any other Collateral Agent granted on such Shared Colla-
649  teral under its Related Secured Credit Documents and subject to the terms and conditions of this
650  Article, also hold such Controlled Shared Collateral as gratuitous bailee and sub-agent for each
651  such other Collateral Agent (any Collateral Agent that shall be holding any Controlled Shared
652  Collateral as gratuitous bailee and sub-agent being referred to herein as the "Bailee Collateral
653  Agent").  In furtherance of the foregoing, each Collateral Agent appoints each Bailee Collateral
654  Agent as such Collateral Agent's gratuitous bailee and sub-agent hereunder with respect to any
655  Controlled Shared Collateral that such Bailee Collateral Agent possesses or controls at any time
656  solely for the purpose of perfecting a Lien on such Controlled Shared Collateral.  Notwithstand-
657  ing anything herein to the contrary, it is understood and agreed that as of the date hereof and so
658  long as the Discharge of Credit Agreement Obligations has not occurred, the Credit Agreement
659  Collateral Agent shall have the sole right to give any instructions, directions and entitlement or-
660  ders (including any blockage or withdrawal instructions) with respect to any deposit, securities or
661  other accounts, or any funds contained therein and to exercise any other remedies under any
662  control agreement entered into with respect to a deposit account, a securities account or any other
663  account (whether or not the Senior Secured Notes Collateral Agent is also a party thereto); pro-
664  vided that, any amounts withdrawn therefrom shall be subject to Article II.  It is further unders-
665  tood and agreed that as of the date hereof and until such time as the Credit Agreement Obliga-
666  tions are Discharged, the Credit Agreement Collateral Agent shall be granted possession of all
667  possessory Controlled Shared Collateral and, thereafter, possession shall be determined by Sec-
668  tion 4.01(d).

-16-

669                (b)     In furtherance of the foregoing, each Grantor hereby grants a security in-
670  terest in the Controlled Shared Collateral to each Collateral Agent that possesses or controls
671  Controlled Shared Collateral as permitted in Section 4.01(a) for the benefit of the Secured Parties
672  under any other Class of First Lien Obligations which have been granted a Lien on the Con-
673  trolled Shared Collateral possessed or controlled by such Collateral Agent.

674                (c)     Subject to Section 4.01(a), for purposes of this Section, the Bailee Colla-
675  teral Agent shall be entitled to deal with the applicable Controlled Shared Collateral in accor-
676  dance with the terms of its Related Secured Credit Documents as if the Liens thereon of the Col-
677  lateral Agent or Secured Parties of any other Class (and the agreements set forth in paragraph (a)
678  of this Section) did not exist; <u>provided</u> that any Proceeds arising from any such Controlled
679  Shared Collateral shall be subject to Article II.  The obligations and responsibilities of any Bailee
680  Collateral Agent to any other Collateral Agent or any of its Related Secured Parties under this
681  Article shall be limited solely to holding or controlling the applicable Controlled Shared Colla-
682  teral as gratuitous bailee and sub-agent in accordance with this Article.  Without limiting the
683  foregoing, (i) no Bailee Collateral Agent shall have any obligation or responsibility to ensure that
684  any Controlled Shared Collateral is genuine or owned by any of the Grantors, (ii) no Bailee Col-
685  lateral Agent shall, by reason of this Agreement, any other Security Document or any other doc-
686  ument, have a fiduciary relationship or other implied duties in respect of any other Collateral
687  Agent or any other Secured Party and (iii) without affecting the agreement of any Bailee Colla-
688  teral Agent to act as a gratuitous bailee and sub-agent solely for the purpose set forth in para-
689  graph (a) of this Section or the right of any other Collateral Agent to enforce the rights and exer-
690  cise the remedies (in each case other than through such Bailee Collateral Agent) as set forth in
691  Section 3.01 and subject to the proviso in Section 4.01(a), each Collateral Agent agrees that such
692  Collateral Agent shall not issue any instructions to any Bailee Collateral Agent, in its capacity as
693  a gratuitous bailee and sub-agent of such Collateral Agent, with respect to the Controlled Shared
694  Collateral or otherwise seek to exercise control over any Bailee Collateral Agent.

695                (d)     The Bailee Collateral Agent of any Class shall, upon the Discharge of the
696  First Lien Obligations of such Class, transfer the possession and control of the applicable Con-
697  trolled Shared Collateral, together with any necessary endorsements but without recourse or war-
698  ranty, (i) if First Lien Obligations of any other Class are outstanding at such time, to the Colla-
699  teral Agent of such other Class (or, if First Lien Obligations of more than one other Class are
700  outstanding at such time, to the Collateral Agent of the same Class as the Class of the First Lien
701  Obligations the aggregate principal amount of which outstanding at such time exceeds the aggre-
702  gate principal amount of the First Lien Obligations of any other Class outstanding at such time)
703  and (ii) if no First Lien Obligations are outstanding at such time, to the applicable Grantor or as
704  directed by a court of competent jurisdiction, in each case so as to allow such Person to obtain
705  possession and control of such Controlled Shared Collateral.  In connection with any transfer un-
706  der clause (i) above by any Bailee Collateral Agent, such Bailee Collateral Agent agrees to take
707  all actions in its power as shall be reasonably requested by the transferee Collateral Agent to
708  permit the transferee Collateral Agent to obtain, for the benefit of its Related Secured Parties, a
709  first priority security interest in the applicable Controlled Shared Collateral.

710                SECTION 4.02.  <u>Delivery of Documents</u>.  Promptly after the execution and deli-
711  very to any Collateral Agent by any Grantor of any Security Document (other than (a) any Secu-
712  rity Document in effect on the date hereof and (b) any Additional First Lien Obligations Docu-

-17-

ment referred to in paragraph (b) of Article VII, but including any amendment, amendment and restatement, waiver or other modification of any such Security Document or Additional First Lien Obligations Document), the Borrower shall deliver to each Collateral Agent party hereto at such time a copy of such Security Document.

ARTICLE V

Other Agreements

SECTION 5.01.  <u>Concerning Secured Credit Documents and Collateral</u>.

(a)    The Secured Credit Documents of any Class may be Amended, in whole or in part, in accordance with their terms, in each case without notice to or the consent of the Collateral Agent or any Secured Parties of any other Class; <u>provided</u> that nothing in this paragraph shall affect any limitation on any such Amendment that is set forth in the Secured Credit Documents of any such other Class.

(b)    The Grantors agree that each Security Document (other than any Credit Agreement Document executed and delivered prior to the date hereof, without limitation of the applicability of this Agreement thereto) creating a Lien on any Shared Collateral securing any First Lien Obligations (i) shall contain a legend substantially in the form of Annex I, or, prior to the Discharge of Credit Agreement Obligations, similar provisions approved by the Credit Agreement Collateral Agent, which approval shall not be unreasonably withheld, and (ii) shall provide that all powers, rights and remedies under such Security Document with respect to Shared Collateral may be exercised solely by the Collateral Agent of the applicable Class on behalf of the Secured Parties of such Class in accordance with the terms thereof, and that no other Secured Party of the applicable Class shall have any right individually to realize upon any of the Liens on Shared Collateral granted thereunder to secure First Lien Obligations of such Class.

SECTION 5.02.  <u>Refinancings</u>.  The First Lien Obligations of any Class may be Refinanced, in whole or in part, in each case, without notice to, or the consent of the Collateral Agent or Secured Party of any other Class, all without affecting the priorities provided for herein (including, without limitation, the priority in right of payment of the Priority Payment Lien Obligations) or the other provisions hereof; <u>provided</u> that nothing in this paragraph shall affect any limitation on any such Refinancing that is set forth in the Secured Credit Documents of any such other Class; and <u>provided</u> <u>further</u> that, if any obligations of the Grantors in respect of such Refinancing indebtedness shall be secured by Liens on any Shared Collateral, such obligations and the holders thereof shall be subject to and bound by the provisions of this Agreement and, if not already, the collateral agent under such obligations shall become a party hereto by executing and delivering a Collateral Agent Joinder Agreement.

SECTION 5.03.  <u>Reinstatement</u>.  If, in any Insolvency or Liquidation Proceeding or otherwise, all or part of any payment with respect to the First Lien Obligations of any Class previously made shall be rescinded for any reason whatsoever (including an order or judgment for disgorgement of a preference under the Bankruptcy Code, or any similar law), then the terms and conditions of Article II shall be fully applicable thereto until all the First Lien Obligations of such Class shall again have been paid in full in cash.

-18-

754          SECTION 5.04.  <u>Reorganization Modifications</u>.  In the event the First Lien Obli-
755 gations of any Class are modified pursuant to applicable law, including Section 1129 of the
756 Bankruptcy Code, any reference to the First Lien Obligations of such Class or the Secured Credit
757 Documents of such Class shall refer to such obligations or such documents as so modified.

758          SECTION 5.05.  <u>Further Assurances</u>.  Each of the Collateral Agents and the
759 Grantors agrees that it will execute, or will cause to be executed, any and all further documents,
760 agreements and instruments, and take all such further actions, as may be required under any ap-
761 plicable law, or which any Collateral Agent may reasonably request in writing, to effectuate the
762 terms of this Agreement.

763                                ARTICLE VI
764
765                          <u>No Reliance; No Liability</u>

766          SECTION 6.01.  <u>No Reliance; Information</u>.  Each Collateral Agent, for itself and
767 on behalf of its Related Secured Parties, acknowledges that (a) such Collateral Agent and its Re-
768 lated Secured Parties have, independently and without reliance upon any other Collateral Agent
769 or any of its Related Secured Parties, and based on such documents and information as they have
770 deemed appropriate, made their own decision to enter into the Secured Credit Documents to
771 which they are party and (b) such Collateral Agent and its Related Secured Parties will, indepen-
772 dently and without reliance upon any other Collateral Agent or any of its Related Secured Par-
773 ties, and based on such documents and information as they shall from time to time deem appro-
774 priate, continue to make their own decision in taking or not taking any action under this Agree-
775 ment or any other Secured Credit Document to which they are party.  The Collateral Agent or
776 Secured Parties of any Class shall have no duty to disclose to any Collateral Agent or any Se-
777 cured Party of any other Class any information relating to the Borrower or any of the Subsidiar-
778 ies, or any other circumstance bearing upon the risk of nonpayment of any of the First Lien Obli-
779 gations, that is known or becomes known to any of them or any of their Affiliates.  If the Colla-
780 teral Agent or any Secured Party of any Class, in its sole discretion, undertakes at any time or
781 from time to time to provide any such information to, as the case may be, the Collateral Agent or
782 any Secured Party of any other Class, it shall be under no obligation (i) to make, and shall not be
783 deemed to have made, any express or implied representation or warranty, including with respect
784 to the accuracy, completeness, truthfulness or validity of the information so provided, (ii) to pro-
785 vide any additional information or to provide any such information on any subsequent occasion
786 or (iii) to undertake any investigation.

787          SECTION 6.02.  <u>No Warranties or Liability</u>.

788          (a)     Each Collateral Agent, for itself and on behalf of its Related Secured Par-
789 ties, acknowledges and agrees that no Collateral Agent or Secured Party of any other Class has
790 made any express or implied representation or warranty, including with respect to the execution,
791 validity, legality, completeness, collectability or enforceability of any of the Secured Credit
792 Documents, the ownership of any Shared Collateral or the perfection or priority of any Liens
793 thereon.  The Collateral Agent and the Secured Parties of any Class will be entitled to manage
794 and supervise their loans and other extensions of credit in the manner determined by them.  No
795 Collateral Agent shall, by reason of this Agreement, any other Security Document or any other

-19-

document, have a fiduciary relationship or other implied duties in respect of any other Collateral Agent or any other Secured Party.

(b)     No Collateral Agent or Secured Parties of any Class shall have any express or implied duty to the Collateral Agent or any Secured Party of any other Class to act or refrain from acting in a manner that allows, or results in, the occurrence or continuance of a default or an Event of Default under any Secured Credit Document (other than, in each case, this Agreement), regardless of any knowledge thereof that they may have or be charged with.

ARTICLE VII

Additional First Lien Obligations

The Borrower may from time to time, subject to any limitations contained in any Secured Credit Documents in effect at such time, designate additional indebtedness and related obligations that are, or are to be, secured by Liens on any assets of the Borrower or any of the Grantors that would, if such Liens were granted, constitute Shared Collateral as Additional First Lien Obligations by delivering to each Collateral Agent party hereto at such time a certificate of an Authorized Officer of the Borrower:

(a)     describing the indebtedness and other obligations being designated as Additional First Lien Obligations, and including a statement of the maximum aggregate outstanding principal amount of such indebtedness as of the date of such certificate;

(b)     setting forth the Additional First Lien Obligations Documents under which such Additional First Lien Obligations are issued or incurred or the Guarantees of or Liens securing such Additional First Lien Obligations are, or are to be, granted or created, and attaching copies of such Additional First Lien Obligations Documents as each Grantor has executed and delivered to the Person that serves as the collateral agent, collateral trustee or a similar representative for the holders of such Additional First Lien Obligations (such Person being referred to as the "Additional Collateral Agent") with respect to such Additional First Lien Obligations on the closing date of such Additional First Lien Obligations, certified as being true and complete by an Authorized Officer of the Borrower;

(c)     identifying the Person that serves as the Additional Collateral Agent;

(d)     certifying that the incurrence of such Additional First Lien Obligations, the creation of the Liens securing such Additional First Lien Obligations and the designation of such Additional First Lien Obligations as "Additional First Lien Obligations" hereunder do not violate or result in a default under any provision of any Secured Credit Document of any Class in effect at such time;

(e)     identifying such Additional First Lien Obligations as either Priority Payment Lien Obligations or Pari Passu Lien Indebtedness, and if identified as Priority Payment Lien Obligations, certifying that the designation of such Additional First Lien Obligations as Priority Payment Lien Obligations does not violate or result in a default under any provision of any Secured Credit Document of any Class in effect at such time;

-20-

(f)    certifying that the Additional First Lien Obligations Documents (A) meet the requirements of Section 5.01(b) and (B) authorize the Additional Collateral Agent to become a party hereto by executing and delivering a Collateral Agent Joinder Agreement and provide that, upon such execution and delivery, such Additional First Lien Obligations and the holders thereof shall become subject to and bound by the provisions of this Agreement; and

(g)    attaching a fully completed Collateral Agent Joinder Agreement executed and delivered by the Additional Collateral Agent.

Upon the delivery of such certificate and the related attachments as provided above and as so long as the statements made therein are true and correct as of the date of such certificate, the obligations designated in such notice shall become Additional First Lien Obligations for all purposes of this Agreement.

## ARTICLE VIII

## Miscellaneous

SECTION 8.01.   Notices.  All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(a)    if to any Grantor, to it (or, in the case of any Grantor other than the Borrower, to it in care of the Borrower) at American Media, Inc., 1000 American Media Way, Boca Raton, Florida 22464-1000, Attention of Chief Financial Officer and General Counsel (fax: (561) 989-1396) and [          ] (fax: (561) 998-7470);

(b)    if to the Credit Agreement Collateral Agent, to it at JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin Street, Houston, Texas 77002, Attention of Gloria Javier (Telecopy No. (713) 750-2878), with a copy to JPMorgan Chase Bank, N.A.,  270 Park Avenue, New York, New York 10017, Attention of Peter Thauer (Telecopy No. (212) 270-5127).

(c)    if to the Senior Secured Notes Collateral Agent, to it at Wilmington Trust FSB, 50 South Sixth Street, Suite 1290, Dropcode 7100, Minneapolis, MN 55402-1544, (fax: (612) 217-5651; Attention: Corporate Client Services; and

(d)    if to any Additional Collateral Agent, to it at the address set forth in the applicable Collateral Agent Joinder Agreement.

Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if a Business Day) and on the next Business Day thereafter (in all other cases) if delivered by hand or overnight courier service or sent by facsimile or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section or in ac-

-21-

875  cordance with the latest unrevoked direction from such party given in accordance with this Sec-
876  tion.  As agreed to in writing by any party hereto from time to time, notices and other communi-
877  cations to such party may also be delivered by e-mail to the e-mail address of a representative of
878  such party provided from time to time by such party.

879       SECTION 8.02.   Waivers; Amendment; Joinder Agreements.

880       (a)    No failure or delay on the part of any party hereto in exercising any right
881  or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of
882  any such right or power, or any abandonment or discontinuance of steps to enforce such a right
883  or power, preclude any other or further exercise thereof or the exercise of any other right or pow-
884  er.  The rights and remedies of the parties hereto are cumulative and are not exclusive of any
885  rights or remedies that they would otherwise have.  No waiver of any provision of this Agree-
886  ment or consent to any departure by any party therefrom shall in any event be effective unless
887  the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent
888  shall be effective only in the specific instance and for the purpose for which given.  No notice or
889  demand on any party hereto in any case shall entitle such party to any other or further notice or
890  demand in similar or other circumstances.

891       (b)    Neither this Agreement nor any provision hereof may be waived, amended
892  or otherwise modified except as contemplated by the Secured Credit Documents and then pur-
893  suant to an agreement or agreements in writing entered into by each Collateral Agent then party
894  hereto; provided that no such agreement shall by its terms amend, modify or otherwise affect the
895  rights or obligations of any Grantor without the Borrower's prior written consent; provided fur-
896  ther that (i) without the consent of any party hereto, (A) this Agreement may be supplemented by
897  a Collateral Agent Joinder Agreement, and an Additional Collateral Agent may become a party
898  hereto, in accordance with Article VII and (B) this Agreement may be supplemented by a Gran-
899  tor Joinder Agreement, and a Subsidiary may become a party hereto, in accordance with Section
900  8.12, and (ii) in connection with any Refinancing of First Lien Obligations of any Class, the Col-
901  lateral Agents then party hereto shall enter (and are hereby authorized to enter without the con-
902  sent of any other Secured Party), at the request of any Collateral Agent or the Borrower, into
903  such amendments or modifications of this Agreement as are reasonably necessary to reflect such
904  Refinancing and are reasonably satisfactory to each such Collateral Agent.

905       SECTION 8.03.   Parties in Interest.  This Agreement shall be binding upon and
906  inure to the benefit of the parties hereto and their respective successors and assigns, as well as
907  the other Secured Parties, all of whom are intended to be bound by, and to be third party benefi-
908  ciaries of, this Agreement.  No other Person shall have or be entitled to assert rights or benefits
909  hereunder.

910       SECTION 8.04.   Effectiveness; Survival.  This Agreement shall become effective
911  when executed and delivered by the parties hereto.  All covenants, agreements, representations
912  and warranties made by any party in this Agreement shall be considered to have been relied upon
913  by the other parties hereto and shall survive the execution and delivery of this Agreement.  This
914  Agreement shall continue in full force and effect notwithstanding the commencement of any In-
915  solvency or Liquidation Proceeding against the Borrower or any of the Subsidiaries.

-22-

916     SECTION 8.05.    Counterparts.  This Agreement may be executed in counter-
917 parts, each of which shall constitute an original but all of which when taken together shall consti-
918 tute a single contract.  Delivery of an executed signature page to this Agreement by facsimile or
919 other electronic transmission shall be as effective as delivery of a manually signed counterpart of
920 this Agreement.

921     SECTION 8.06.    Severability.  Any provision of this Agreement held to be
922 invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to
923 the extent of such invalidity, illegality or unenforceability without affecting the validity, legality
924 and enforceability of the remaining provisions hereof; and the invalidity of a particular provision
925 in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.  The par-
926 ties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable pro-
927 visions with valid provisions the economic effect of which comes as close as possible to that of
928 the invalid, illegal or unenforceable provisions.

929     SECTION 8.07.    Governing Law; Jurisdiction; Consent to Service of Process.

930     (a)     This Agreement shall be construed in accordance with and governed by
931 the law of the State of New York.

932     (b)     Each party hereto irrevocably and unconditionally submits, for itself and
933 its property, to the non-exclusive jurisdiction of the Supreme Court of the State of New York sit-
934 ting in the Borough of Manhattan, New York County and of the United States District Court of
935 the Southern District of New York sitting in the Borough of Manhattan, and any appellate court
936 from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for
937 recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably
938 and unconditionally agrees that all claims in respect of any such action or proceeding may be
939 heard and determined in such New York State or, to the extent permitted by law, in such Federal
940 court.  Each party hereto agrees that a final judgment in any such action or proceeding shall be
941 conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other
942 manner provided by law.  Nothing in this Agreement shall affect any right that any party hereto
943 or any Secured Party may otherwise have to bring any action or proceeding relating to this
944 Agreement against any party hereto or its properties in the courts of any jurisdiction.

945     (c)     Each party hereto irrevocably and unconditionally waives, to the fullest
946 extent it may legally and effectively do so, any objection which it may now or hereafter have to
947 the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement
948 in any court referred to in paragraph (b) of this Section.  Each party hereto irrevocably waives, to
949 the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of
950 such action or proceeding in any such court.

951     (d)     Each party hereto irrevocably consents to service of process in the manner
952 provided for notices in Section 8.01, such service to be effective upon receipt.  Nothing in this
953 Agreement will affect the right of any party hereto or any Secured Party to serve process in any
954 other manner permitted by law.

-23-

SECTION 8.08.  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN  ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.09.  <u>Headings</u>.  Article and Section headings used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 8.10.  <u>Conflicts</u>.  In the event of any conflict or inconsistency between the provisions of this Agreement and the provisions of any other Secured Credit Documents, the provisions of this Agreement shall control.

SECTION 8.11.  <u>Provisions Solely to Define Relative Rights</u>.  The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Secured Parties in relation to one another.  Except as expressly provided in this Agreement, none of the Borrower, any other Grantor, any other Subsidiary or any other creditor of any of the foregoing shall have any rights or obligations hereunder, and none of the Borrower, any other Grantor or any other Subsidiary may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of the Borrower or any other Grantor, which are absolute and unconditional, to pay the First Lien Obligations as and when the same shall become due and payable in accordance with their terms.  For the avoidance of doubt, nothing contained herein shall be construed to constitute a waiver or an amendment of any covenant of the Borrower or any other Grantor contained in any Secured Credit Document, which restricts the incurrence of any Indebtedness or the grant of any Lien.

SECTION 8.12.  <u>Additional Grantors</u>.  In the event any Subsidiary shall have granted a Lien on any of its assets to secure any First Lien Obligations, the Borrower shall cause such Subsidiary, if not already a party hereto, to become a party hereto as a "Grantor".  Upon the execution and delivery by any Subsidiary of a Grantor Joinder Agreement, any such Subsidiary shall become a party hereto and a Grantor hereunder with the same force and effect as if originally named as such herein.  The execution and delivery of any such instrument shall not require the consent of any other party hereto.  The rights and obligations of each party hereto shall remain in full force and effect notwithstanding the addition of any new Grantor as a party to this Agreement.

SECTION 8.13.  <u>Specific Performance</u>.  Each Collateral Agent, on behalf of itself and its Related Secured Parties, may demand specific performance of this Agreement.  Each Collateral Agent, on behalf of itself and its Related Secured Parties, hereby irrevocably waives

-24-

997  any defense based on the adequacy of a remedy at law and any other defense that might be as-
998  serted to bar the remedy of specific performance in any action which may be brought by the Se-
999  cured Parties.

1000          SECTION 8.14.  <u>Integration</u>.  This Agreement, together with the other Secured
1001  Credit Documents, represents the agreement of each of the Grantors and the Secured Parties with
1002  respect to the subject matter hereof and there are no promises, undertakings, representations or
1003  warranties by any Grantor, any Collateral Agent or any other Secured Party relative to the sub-
1004  ject matter hereof not expressly set forth or referred to herein or in the other Secured Credit Doc-
1005  uments.

1006

1007                          **[signature page follows]**

-25-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

JPMORGAN CHASE BANK, N.A., as
Credit Agreement Collateral Agent


By: _____

    Name:

    Title:


WILMINGTON TRUST FSB,
as Senior Secured Notes Trustee and Senior Secured Notes Collateral Agent


By: _____

    Name:

    Title:


AMERICAN MEDIA, INC.


By: _____

    Name:

    Title:

CG&R DRAFT:  12/15/10 4:00 PM

#1097705 v7 (11FV907_.DOC)

ANNEX I

## SECURITY DOCUMENTS LEGEND

**THIS [NAME OF SECURITY DOCUMENT] IS SUBJECT TO THE PROVISIONS OF THE FIRST LIEN INTERCREDITOR AGREEMENT DATED AS OF [          ], 2010 (AS AMENDED, SUPPLEMENTED OR OTHERWISE MODIFIED FROM TIME TO TIME), AMONG AMERICAN MEDIA, INC. (F/K/A AMERICAN MEDIA OPERATIONS, INC.), THE GRANTORS PARTY THERETO, J.P. MORGAN CHASE BANK, N.A., AS CREDIT AGREEMENT COLLATERAL AGENT, WILMINGTON TRUST FSB, AS SENIOR SECURED NOTES COLLATERAL AGENT AND SENIOR SECURED NOTES TRUSTEE, AND EACH ADDITIONAL COLLATERAL AGENT FROM TIME TO TIME PARTY THERETO.**

Annex I-1

1036                                                                                    EXHIBIT I

[FORM OF] COLLATERAL AGENT JOINDER AGREEMENT NO. [   ] dated
as of [            ], 20[   ] (the "Joinder Agreement") to the FIRST LIEN INTERCREDITOR
AGREEMENT dated as of [            ], 2010 (the "First Lien Intercreditor Agreement"),
among AMERICAN MEDIA, INC. (F/K/A AMERICAN MEDIA OPERATIONS, INC.), a De-
laware corporation (the "Borrower"), the GRANTORS party thereto, JPMORGAN CHASE
BANK, N.A., as the Credit Agreement Collateral Agent, WILMINGTON TRUST FSB, as the
Senior Secured Notes Trustee and Senior Secured Notes Collateral Agent, and each
ADDITIONAL COLLATERAL AGENT from time to time party thereto.

A.    Capitalized terms used herein but not otherwise defined herein shall have
the meanings assigned to such terms in the Intercreditor Agreement.

B.    The Borrower proposes to issue or incur Additional First Lien Obligations
and the Person identified in the signature pages hereto as the "Additional Collateral Agent" (the
"Additional Collateral Agent") will serve as the collateral agent, collateral trustee or a similar
representative for the Additional Secured Parties.  The Additional First Lien Obligations are be-
ing designated as such by the Borrower in accordance with Article VII of the First Lien Intercre-
ditor Agreement.

C.    The Additional Collateral Agent wishes to become a party to the First Lien
Intercreditor Agreement and to acquire and undertake, for itself and on behalf of the Additional
Secured Parties, the rights and obligations of an "Additional Collateral Agent" thereunder.  The
Additional Collateral Agent is entering into this Joinder Agreement in accordance with the pro-
visions of the First Lien Intercreditor Agreement in order to become an Additional Collateral
Agent thereunder.

Accordingly, the Additional Collateral Agent and the Borrower agree as follows,
for the benefit of the Additional Collateral Agent, the Borrower and each other party to the First
Lien Intercreditor Agreement:

SECTION 1.  Accession to the Intercreditor Agreement.  The Additional Colla-
teral Agent (a) hereby accedes and becomes a party to the First Lien Intercreditor Agreement as
an Additional Collateral Agent for the Additional Secured Parties from time to time in respect of
the Additional First Lien Obligations, (b) agrees, for itself and on behalf of the Additional Se-
cured Parties from time to time in respect of the Additional First Lien Obligations, to all the
terms and provisions of the First Lien Intercreditor Agreement and (c) shall have all the rights
and obligations of an Additional Collateral Agent under the First Lien Intercreditor Agreement.

SECTION 2.  Representations, Warranties and Acknowledgement of the Addi-
tional Collateral Agent.  The Additional Collateral Agent represents and warrants to the Collater-
al Agents and the Secured Parties that (a) it has full power and authority to enter into this Joinder
Agreement, in its capacity as the Additional Collateral Agent, (b) this Joinder Agreement has
been duly authorized, executed and delivered by it and constitutes its legal, valid and binding
obligation, enforceable against it in accordance with the terms of this Joinder Agreement and
(c) the Additional First Lien Obligations Documents relating to such Additional First Lien Obli-

Ex. I-1

1076 gations provide that, upon the Additional Collateral Agent's entry into this Joinder Agreement,
1077 the secured parties in respect of such Additional First Lien Obligations will be subject to and
1078 bound by the provisions of the First Lien Intercreditor Agreement as Additional Secured Parties.

1079     SECTION 3.  Counterparts.  This Joinder Agreement may be executed in multiple
1080 counterparts, each of which shall constitute an original, but all of which when taken together
1081 shall constitute a single contract.  This Joinder Agreement shall become effective when each
1082 Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signa-
1083 ture of the Additional Collateral Agent.  Delivery of an executed signature page to this Joinder
1084 Agreement by facsimile or other electronic transmission shall be effective as delivery of a ma-
1085 nually signed counterpart of this Joinder Agreement.

1086     SECTION 4.  Benefit of Agreement.  **The agreements set forth herein or un-**
1087 **dertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the**
1088 **First Lien Intercreditor Agreement.**

1089     SECTION 5.  Governing Law.  **THIS JOINDER AGREEMENT SHALL BE**
1090 **GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE**
1091 **STATE OF NEW YORK.**

1092     SECTION 6.  Severability.  In case any one or more of the provisions contained
1093 in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of
1094 the parties hereto shall be required to comply with such provision for so long as such provision is
1095 held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the re-
1096 maining provisions contained herein and in the First Lien Intercreditor Agreement shall not in
1097 any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to
1098 replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect
1099 of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

1100     SECTION 7.  Notices.  All communications and notices hereunder shall be in
1101 writing and given as provided in Section 8.01 of the First Lien Intercreditor Agreement.  All
1102 communications and notices hereunder to the Additional Collateral Agent shall be given to it at
1103 the address set forth under its signature hereto, which information supplements Section 8.01 of
1104 the First Lien Intercreditor Agreement.

1105     SECTION 8.  Expense Reimbursement.  The Borrower agrees to reimburse each
1106 Collateral Agent for its reasonable out-of-pocket expenses in connection with this Joinder
1107 Agreement, including the reasonable fees, other charges and disbursements of counsel for each
1108 Collateral Agent.

1109

Ex. I-2

1110    IN WITNESS WHEREOF, the Additional Collateral Agent and the Borrower
1111 have duly executed this Joinder Agreement to the First Lien Intercreditor Agreement as of the
1112 day and year first above written.

1113    [NAME OF ADDITIONAL COLLATERAL
1114    AGENT], as ADDITIONAL COLLATERAL
1115    AGENT for the ADDITIONAL SECURED
1116    PARTIES

1117    By: _____
1118       Name:
1119       Title:

1120    Address for notices:

1121    _____

1122    _____

1123    attention of: _____

1124    Telecopy: _____

1125    AMERICAN MEDIA, INC.

1126    By: _____
1127       Name:
1128       Title:

1129

Ex. I-3

1130    Acknowledged by:

1131    JPMORGAN CHASE BANK, N.A., as
1132    Credit Agreement Collateral Agent

1133    By: _____
1134         Name:
1135         Title:

1136    WILMINGTON TRUST FSB,
1137    as Senior Secured Notes Trustee and Senior Secured Notes Collateral Agent

1138    By: _____
1139         Name:
1140         Title:

1141    [EACH OTHER ADDITIONAL
1142    COLLATERAL AGENT], as Additional
1143    Collateral Agent

1144    By: _____
1145         Name:
1146         Title:

Ex. I-4

1147                                                                                    EXHIBIT II

1148            [FORM OF] GRANTOR JOINDER AGREEMENT NO. [   ] dated as of
1149    [        ], 20[   ] (the "Joinder Agreement") to the FIRST LIEN INTERCREDITOR
1150    AGREEMENT dated as of [              ], 2010 (the "First Lien Intercreditor Agreement"),
1151    among AMERICAN MEDIA, INC. (F/K/A AMERICAN MEDIA OPERATIONS, INC.), a De-
1152    laware corporation (the "Borrower"), the GRANTORS party thereto, JPMORGAN CHASE
1153    BANK, N.A., as Credit Agreement Collateral Agent, WILMINGTON TRUST FSB, as Senior
1154    Secured Notes Trustee and Senior Secured Notes Collateral Agent, each ADDITIONAL
1155    COLLATERAL AGENT from time to time party thereto and [              ], a [              ],
1156    as an additional GRANTOR.

1157            A.      Capitalized terms used herein but not otherwise defined herein shall have
1158    the meanings assigned to such terms in the First Lien Intercreditor Agreement.

1159            B.      [              ], a Subsidiary of the Borrower (the "Additional Grantor"),
1160    has granted a Lien on all or a portion of its assets to secure First Lien Obligations and such Addi-
1161    tional Grantor is not a party to the First Lien Intercreditor Agreement.

1162            C.      The Additional Grantor wishes to become a party to the First Lien Inter-
1163    creditor Agreement and to acquire and undertake the rights and obligations of a Grantor the-
1164    reunder.  The Additional Grantor is entering into this Joinder Agreement in accordance with the
1165    provisions of the First Lien Intercreditor Agreement in order to become a Grantor thereunder.

1166            Accordingly, the Additional Grantor agrees as follows, for the benefit of the Col-
1167    lateral Agents, the Borrower and each other party to the First Lien Intercreditor Agreement:

1168            SECTION 1.  Accession to the Intercreditor Agreement.  In accordance with Sec-
1169    tion 8.12 of the First Lien Intercreditor Agreement, the Additional Grantor (a) hereby accedes
1170    and becomes a party to the First Lien Intercreditor Agreement as a Grantor with the same force
1171    and effect as if originally named therein as a Grantor, (b) agrees to all the terms and provisions
1172    of the First Lien Intercreditor Agreement and (c) shall have all the rights and obligations of a
1173    Grantor under the First Lien Intercreditor Agreement.

1174            SECTION 2.  Representations, Warranties and Acknowledgement of the Addi-
1175    tional Grantor.  The Additional Grantor represents and warrants to each Collateral Agent and
1176    each Secured Party that this Joinder Agreement has been duly authorized, executed and delivered
1177    by such Additional Grantor and constitutes the legal, valid and binding obligation, enforceable
1178    against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganiza-
1179    tion, moratorium or other laws affecting creditors' rights generally and subject to general prin-
1180    ciples of equity, regardless of whether considered in a proceeding in equity or at law.

1181            SECTION 3.  Counterparts.  This Joinder Agreement may be executed in multiple
1182    counterparts, each of which shall constitute an original, but all of which when taken together
1183    shall constitute a single contract.  This Joinder Agreement shall become effective when each
1184    Collateral Agent shall have received a counterpart of this Joinder Agreement that bears the signa-
1185    ture of the Additional Grantor.  Delivery of an executed signature page to this Joinder Agreement

1186   by facsimile or other electronic transmission shall be effective as delivery of a manually signed
1187   counterpart of this Joinder Agreement.

1188            SECTION 4.   Benefit of Agreement.   **The agreements set forth herein or un-**
1189   **dertaken pursuant hereto are for the benefit of, and may be enforced by, any party to the**
1190   **First Lien Intercreditor Agreement.**

1191            SECTION 5.   Governing Law.   **THIS JOINDER AGREEMENT SHALL BE**
1192   **GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE**
1193   **STATE OF NEW YORK.**

1194            SECTION 6.   Severability.   In case any one or more of the provisions contained
1195   in this Joinder Agreement should be held invalid, illegal or unenforceable in any respect, none of
1196   the parties hereto shall be required to comply with such provision for so long as such provision is
1197   held to be invalid, illegal or unenforceable, but the validity, legality and enforceability of the re-
1198   maining provisions contained herein and in the First Lien Intercreditor Agreement shall not in
1199   any way be affected or impaired.  The parties hereto shall endeavor in good-faith negotiations to
1200   replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect
1201   of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

1202            SECTION 7.   Notices.   All communications and notices hereunder shall be in
1203   writing and given as provided in Section 8.01 of the First Lien Intercreditor Agreement.

1204            SECTION 8.   Expense Reimbursement.   The Additional Grantor agrees to reim-
1205   burse each Collateral Agent for its reasonable out-of-pocket expenses in connection with this
1206   Joinder Agreement, including the reasonable fees, other charges and disbursements of counsel
1207   for each Collateral Agent.

1208

Ex. II-2

1209          IN WITNESS WHEREOF, the Additional Grantor has duly executed this Joinder
1210   Agreement to the First Lien Intercreditor Agreement as of the day and year first above written.

1211                                   [NAME OF SUBSIDIARY]

1212                                   By: _____
1213                                        Name:
1214                                        Title:

1215

Ex. II-3

1216    Acknowledged by:

1217    JPMORGAN CHASE BANK, as
1218    Credit Agreement Collateral Agent

1219    By: _____
1220        Name:
1221        Title:

1222    WILMINGTON TRUST FSB,
1223    as Senior Secured Notes Trustee and Senior Secured Notes Collateral Agent

1224    By: _____
1225        Name:
1226        Title:

1227    [EACH OTHER ADDITIONAL
1228    COLLATERAL AGENT], as Additional
1229    Collateral Agent

1230    By: _____
1231        Name:
1232        Title:

1233

Ex. II-4

# EXHIBIT I

**Stockholders' Agreement**

**AMERICAN MEDIA, INC.**

**STOCKHOLDERS' AGREEMENT**

**DATED AS OF _____ ___, 2010**

# TABLE OF CONTENTS

**ARTICLE I** DEFINITIONS; RULES OF CONSTRUCTION ......................................................1

    1.1     Definitions...................................................................................................1

    1.2     Rules of Construction ...............................................................................11

**ARTICLE II** ISSUANCES AND TRANSFERS OF SECURITIES............................................12

    2.1     Issuances and Transfers of Securities .....................................................12

    2.2     Right of First Offer .................................................................................13

    2.3     [RESERVED.] ..........................................................................................14

    2.4     Co-Sale Rights .........................................................................................15

    2.5     Drag Along Right......................................................................................16

    2.6     Minority Transfer Restrictions.................................................................17

    2.7     Certain Affiliate Transactions. ................................................................18

**ARTICLE III** APPROVAL RIGHTS ........................................................................................19

    3.1     Rights Offering ........................................................................................19

    3.2     Mandatory Redemption of Common Stock. .............................................20

    3.3     Redemption Procedures. ...........................................................................20

    3.4     Reduction of Directors. ............................................................................21

    3.5     Rights Offering Voting.............................................................................22

**ARTICLE IV** BOARD OF DIRECTORS...................................................................................22

    4.1     Election of Directors; Voting ..................................................................22

**ARTICLE V** D&O INSURANCE...............................................................................................25

    5.1     D&O Insurance .........................................................................................25

**ARTICLE VI** REGISTRATION RIGHTS .................................................................................25

    6.1     Required Registration. .............................................................................25

    6.2     Piggyback Registration. ...........................................................................27

i

6.3    Registrations on Form S-3. ...................................................................................28

6.4    Holdback Agreement. ........................................................................................29

6.5    Preparation and Filing. ......................................................................................29

6.6    Expenses. ...........................................................................................................31

6.7    Indemnification. .................................................................................................32

6.8    Underwriting Agreement. ..................................................................................34

6.9    Information by Holder; Use of Prospectus. .......................................................35

6.10   Exchange Act Compliance. ................................................................................35

**ARTICLE VII** CONFIDENTIALITY; INFORMATION RIGHTS; ACCESS TO
       INFORMATION .................................................................................................35

7.1    Confidentiality. ..................................................................................................35

7.2    Information Rights. ............................................................................................36

**ARTICLE VIII** LEGENDS AND COMPLIANCE WITH SECURITIES LAWS .....................36

8.1    Restrictions on Transfer. ...................................................................................36

8.2    Restrictive Legends. ..........................................................................................37

8.3    Additional Legend. ............................................................................................39

8.4    Limit on Number of Stockholders. ....................................................................39

**ARTICLE IX** AMENDMENT AND WAIVER ......................................................................40

9.1    Amendment. .......................................................................................................40

9.2    Waiver. ...............................................................................................................41

**ARTICLE X** TERMINATION ...............................................................................................41

**ARTICLE XI** MISCELLANEOUS .........................................................................................41

11.1   Severability. .......................................................................................................41

11.2   Entire Agreement. ..............................................................................................42

11.3   Independence of Agreements and Covenants .....................................................42

11.4   Successors and Assigns. .....................................................................................42

11.5    Counterparts; Facsimile Signatures; Validity.........................................................42

11.6    Remedies.............................................................................................................42

11.7    Notices. ..............................................................................................................43

11.8    Governing Law; Jurisdiction...............................................................................44

11.9    Waiver of Jury Trial. ..........................................................................................44

11.10   Further Assurances..............................................................................................44

11.11   Third Party Reliance. ..........................................................................................45

11.12   Termination of Prior Stockholders Agreement. ..................................................45

**STOCKHOLDERS' AGREEMENT** dated as of _____ ___, 2010 (as amended, modified, supplemented or restated from time to time, this "Agreement"), among American Media, Inc., a Delaware corporation (the "Company") and the stockholders of the Company receiving Common Stock (as defined below) pursuant to the Plan (as defined below) and any other Persons that become a party to this Agreement in accordance with its terms.

**WHEREAS**, in connection with the financial restructuring of the Company and American Media Operations, Inc. ("AMOI"), AMOI has merged with and into the Company on the Effective Date (as defined below) and has issued common stock, par value $0.0001 per share (the "Common Stock"), to all of the holders of the Existing Notes and the Backstop Parties (each as defined below), pursuant to the Plan;

**WHEREAS**, the Company desires to enter into this Agreement to set forth the terms and conditions of ownership of its equity securities and the rights of certain holders thereof; and

**WHEREAS**, pursuant to the terms of the Plan, all of the Stockholders are bound by the transfer restrictions and other obligations set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as set forth herein.

## ARTICLE I

## DEFINITIONS; RULES OF CONSTRUCTION

**1.1**     **Definitions.**

As used in this Agreement, the following terms shall have the meanings set forth below.

"2011 Notes" means the 8 7/8% notes issued by AMOI pursuant to the 2011 Notes Indenture.

"2011 Notes Indenture" means that certain Indenture, dated as of January 23, 2003 among AMOI, HSBC Bank USA, National Association and other parties thereto, as well as any guarantees and other documents entered in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, or refinancings thereof.

"2013 Notes" means 14% Senior Subordinated Notes issued by AMOI pursuant to the 2013 Notes Indenture.

"2013 Notes Indenture" means the Indenture, dated as of January 30, 2009, among American Media Operations, Inc., the note guarantors listed on the signature pages thereto, and Wilmington Trust FSB, as trustee, providing for the issuance of the Company's 14% Senior Subordinated Notes due 2013, and any amendments, supplements, modifications, extensions, renewals, restatements, or refinancings thereof.

"Adjusted Percentage Ownership" means, with respect to any Stockholder, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by such Stockholder together with its Affiliates and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination held by all Stockholders (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all Equity Incentive Shares).

"Affiliate" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person and/or one or more Affiliates thereof.

"Agreement" has the meaning ascribed to it in the preamble.

"AMOI" has the meaning ascribed to it in the recitals.

"Alternative Majority Consent" means the consent of (i) any two (A) the Angelo Gordon Stockholders, (B) the Avenue Stockholders and (C) the Capital Research Stockholders and (ii) Holders of at least 67% of the Total Ownership Percentage; provided that if the Total Ownership Percentage of any of the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders is less than ten percent (10%), then Alternative Majority Consent shall mean the approval of Holders of at least 67% of the Total Ownership Percentage regardless of whether the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders are among the Holders that have consented; and provided further that if the Total Ownership Percentage of any of the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders is less than ten percent (10%), but the Total Ownership Percentage of the Credit Suisse Stockholders is more than ten percent (10%), then the Credit Suisse Stockholders shall be substituted in this definition in lieu of the first of the Angelo Gordon Stockholders, Avenue Stockholders or Capital Research Stockholders, to hold less than ten percent (10%) of the Total Ownership Percentage.

"Angelo Gordon Stockholders" means, collectively, AG CNG Fund, L.P., AG MM, L.P., PHS Bay Colony Fund, L.P., AGCR V Master Account LP, AG Capital Recovery Partners VI, L.P., AG Eleven Partners, L.P., GAM Arbitrage Investments Inc., AG Garden Partners, L.P., AG Super Fund International Partners, L.P., Nutmeg Partners, L.P., PHS Patriot Fund, L.P., AG Princess, L.P., AG Super Fund, L.P. and their respective Affiliates, in each case, only with respect to each such Person for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.

"Approved Sale" means a Transfer which would result in the Sale of the Company pursuant to which the Dragging Stockholders compel the other Stockholders to Transfer Stockholder Shares in accordance with Section 2.5.

"Approved Sale Notice" has the meaning ascribed to it in Section 2.5(b).

"Avenue Stockholders" means, collectively, Avenue Investments, L.P., Avenue – CDP Global Opportunities Fund, L.P., Avenue International Master, L.P., Avenue Special Situations Fund IV, L.P., Avenue Special Situations Fund V, L.P. and their respective Affiliates, in each case,

only with respect to each such Person for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.

"Backstop Parties" means Angelo Gordon Stockholders and Avenue Stockholders.

"Business Day" means any day except a Saturday, a Sunday or any other day on which commercial banks are not required by law to be open in New York, New York.

"By-laws" means the by-laws of the Company, as amended, modified, supplemented or restated and in effect from time to time.

"Capital Research Stockholders" means, collectively, American High-Income Trust, The Bond Fund of America, Inc., The Income Fund of America, Inc., American Funds Insurance Series – Asset Allocation, American Funds Insurance Series – Bond Fund, American Funds Insurance Series – Global Bond Fund, American Funds Insurance Series – High-Income Bond Fund, Capital World Bond Fund, Inc., Qualcom Incorporated, Capital Guardian US High Yield Fixed Income Master Fund, CIF Global High Income Opportunities, Capital Guardian Global High Income Opportunities Fund and their respective Affiliates, in each case, only with respect to each such Person for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.

"Certificate" means the amended and restated certificate of incorporation of the Company, as amended, modified, supplemented or restated and in effect from time to time, including any certificates of designation, correction or amendment filed with the Secretary of State of the State of Delaware pursuant to the terms thereof.

"Commission" means the Securities and Exchange Commission and any other Governmental Authority at the time administering the Securities Act.

"Committee Holder" means each of the Avenue Stockholders, the Angelo Gordon Stockholders, the Credit Suisse Stockholders, and the Capital Research Stockholders.

"Common Stock" has the meaning ascribed to it in the recitals.

"Company" has the meaning ascribed to it in the preamble.

"Company Board" means the board of directors of the Company.

"Control" means, (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or investment decisions of such Person, whether through the ownership of voting Securities, by contract or otherwise.

"Control Transaction" has the meaning ascribed to it in Section 2.6(a).

"Control Transaction Notice" has the meaning ascribed to it in Section 2.6(a).

"Counterparty" has the meaning ascribed to it in Section 2.2 (f).

"Counterparty Excluded Information" has the meaning ascribed to it in Section 2.2 (f).

"Co-Sale/Drag Sale Percentage" means, with respect to any Stockholder, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock proposed to be sold by Stockholders initiating a Transfer with respect to which co-sale rights under Section 2.4 or a requirement to sell under Section 2.5 apply and the denominator or which is the total number of shares of Common Stock held by such initiating Stockholders (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all Equity Incentive Shares).

"Co-Sale Notice" has the meaning ascribed to it in Section 2.4(a).

"Co-Sale Participant" means, as determined from time to time, (a) each Stockholder (other than a Transferring Stockholder) who is a Committee Holder as of the time of determination and (b) if such Transfer would result in a Sale of the Company, then all Stockholders.

"Credit Suisse Stockholders" means, collectively, Credit Suisse Securities (USA) LLC and its Affiliates, in each case, only with respect to each such Person for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.

"Cumulative Free Cash Flow" has the meaning ascribed to it in Section 3.2(a).

"Demand Registration Request" has the meaning ascribed to it in Section 6.1(a).

"Dragged Stockholder" has the meaning ascribed to it in Section 2.5(a).

"Dragging Stockholders" has the meaning ascribed to it in Section 2.5(a).

"EBITDA" has the meaning ascribed to it in Section 3.2(c)(ii).

"Effective Date" means [  ], 2010.

"Eligible Information Recipient" has the meaning ascribed to it in Section 7.2(a).

"Eligible Stockholder" means, as determined from time to time, a Stockholder who is an "accredited investor" as such term is defined in Rule 501 of the Securities Act and who is a Committee Holder.

"Equity Incentive Plan" means, collectively, any plan or agreement established, or entered into, by the Company for the purposes of issuing Securities to any employee, officer, consultant or director of the Company or its Subsidiaries as compensation.

"Equity Incentive Shares" means Stockholder Shares issued pursuant to, or acquired in connection with, the terms of any Equity Incentive Plan.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, or any successor Federal statute then in force, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"Excluded Securities" means the following Securities issued by the Company at any time:

      (a)     Securities issued pursuant to any Equity Incentive Plan;

      (b)     Securities issued in connection with a debt financing by the Company or its Subsidiaries;

      (c)     Securities issued as a stock dividend or distribution or upon any stock split, reclassification, recapitalization or other subdivision or combination of Securities;

      (d)     Securities issued upon the exercise, conversion or exchange of any options, warrants or any other derivative Securities of the Company issued in compliance with (or not otherwise in violation of) Section 3.1;

      (e)     Securities issued in connection with (i) the funding of an acquisition (whether by stock sale, merger, recapitalization, asset purchase or otherwise) of another Person (or portion thereof), or (ii) an Approved Sale; and

      (f)     Securities issued by the Company in an Initial Public Offering.

"Existing Notes" means each of the 2013 and 2011 Notes.

"Fair Market Value" means, with respect to the Stockholder Shares, the price that would be negotiated, in an arms length, free market transaction, for cash between a willing seller and a willing and able buyer, neither of whom is under undue pressure or compulsion to complete the transaction and without giving effect to any minority or liquidity discounts.  For the purposes of Section 2.6, "Fair Market Value" shall be determined by an independent investment bank mutually selected by the Company Board and a majority of those Stockholders not participating directly or indirectly in the Control Transaction.  The independent investment bank shall deliver its calculation of Fair Market Value to the Company and the participating Stockholders within 30 days of its appointment and its fees and expenses shall be paid by the Company.

"First Threshold Date" has the meaning ascribed to it in Section 4.1(c)(ii).

"Form S-1", "Form S-3" "Form S-4" or "Form S-8" means a Registration Statement on Form S-1, a Registration Statement on Form S-4, a Registration Statement on Form S-4 or a Registration Statement on Form S-8, as appropriate, under the Securities Act or any successor forms thereto.

"Free Cash Flow" has the meaning ascribed to it in Section 3.2(c)(i).

"Governmental Authority" means any domestic or foreign government or political subdivision thereof, whether on a Federal, state or local level and whether executive, legislative

or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

"Information" has the meaning ascribed to it in Section 6.5(i).

"Information Restrictions" has the meaning ascribed to it in Section 7.2(a).

"Initial Public Offering" means the first underwritten Public Offering.

"Inspectors" has the meaning ascribed to it in Section 6.5(i).

"Insurance Amount" has the meaning ascribed to it in Section 5.1.

"Joinder Agreement" has the meaning ascribed to it in Section 2.1(b).

"Majority Committee Holder Designated Director" has the meaning ascribed to it in Section 4.1(c).

"Majority Requisite Consent" means, at the time of determination, the approval of the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders; provided that if the Total Ownership Percentage of any of the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders is less than ten percent (10%), then Majority Requisite Consent shall mean the consent of the two remaining holders; provided further that if the Total Ownership Percentage of any two of (A) the Angelo Gordon Stockholders, (B) the Avenue Stockholders and (C) the Capital Research Stockholders is less than ten percent (10%), then Majority Requisite Consent shall mean the approval of holders of at least 67% of the Total Ownership Percentage regardless of whether the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders are among the Holders that have consented; provided, however, that if the Total Ownership Percentage of any of the Angelo Gordon Stockholders, the Avenue Stockholders and or the Capital Research Stockholders is less than ten percent (10%), but the Total Ownership Percentage of the Credit Suisse Stockholders is more than ten percent (10%), then the Credit Suisse Stockholders shall be substituted in this definition in lieu of the first of Angelo Gordon Stockholders, Avenue Stockholders or Capital Research Stockholders, to hold less than ten percent (10%) of the Total Ownership Percentage.

"Management Director" has the meaning ascribed to it in Section 4.1(b)(i).

"Management Stockholders" means each employee or officer of the Company or its Subsidiaries and any respective Permitted Family Transferee who owns or holds a beneficial interest in Stockholder Shares and is a signatory hereto from time to time (including any other employee or officer of the Company or its Subsidiaries who hereafter becomes a party to this Agreement pursuant to a Joinder Agreement entered into in accordance with Section 2.1(b)), whether acquired through the Equity Incentive Plan or otherwise, in each case, only for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.  Any Person who is a "Management Stockholder" shall continue to be a Management Stockholder following such

Person's termination of employment with the Company or its Subsidiaries if such Person continues to own Stockholder Shares following such termination of employment.

"New First Lien Indenture" means the Indenture, dated as of December 1, 2010, by and between AMO Escrow Corporation and Wilmington Trust FSB, as trustee and collateral agent, as well as any guarantees and other documents entered in connection therewith and any amendments, supplements, modifications, extensions, renewals, restatements, or refinancings thereof.

"Offer Final Notice" has the meaning ascribed to in Section 2.2(b).

"Offer Period" has the meaning ascribed to in Section 2.2(b).

"Offer to Purchase" has the meaning ascribed to it in Section 2.2(b).

"Offered Shares" has the meaning ascribed to it in Section 2.2(a).

"Other Shares" means, at any time, those shares of Common Stock which do not constitute Registrable Shares or Primary Shares.

"Participating Stockholder" has the meaning ascribed to it in Section 2.6(a).

"Permitted Family Transferee" means, with respect to a Stockholder who is a natural Person, (a) the spouse or any lineal descendant (including any descendant by adoption) of such Stockholder, (b) any trust solely for the benefit of such Stockholder or the spouse or any lineal descendant (including any descendant by adoption) of such Stockholder, or (c) a family trust or partnership established solely for the benefit of such Stockholder or such Stockholder's spouse or any lineal descendant (including any descendant by adoption) for estate planning purposes, provided such trust, family trust or partnership remains under the Control of such Stockholder prior to such Stockholder's death or disability, but, in each case, only to the extent that such Transferee agrees to execute a Joinder Agreement and be bound by this Agreement.

"Permitted Holders" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Management II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) any Permitted Parent, (vi) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any successor provision) of which any of the Permitted Holders specified in clauses (i)-(iv) are members, and (vii) the respective Affiliates of each of the foregoing; provided that in the case of any group specified in clause (vi) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(iv) and their respective Affiliates must collectively beneficially own a greater amount of the total voting power of the Voting Stock of AMI than the amount of the total voting power of the Voting Stock of AMI beneficially owned by any other member of such group.

"Permitted Parent" means any direct or indirect parent of the Company formed not in connection with, or in contemplation of, a transaction that, assuming such parent was not formed, after giving effect thereto would constitute a Sale of the Company.

"Permitted Transfer" means any Transfer of Stockholder Shares (a) to any Person (subject to the right of first offer set forth in Section 2.2 and the tag along rights set forth in Section 2.4), (b) pursuant to the exercise of tag along rights set forth in Section 2.4 or as required in connection with the exercise of drag-along rights as set forth in Section 2.5 or the exercise of put rights set forth in Section 2.6 or pursuant to a Transfer in connection with the exercise of registration rights set forth in Article VI, (c) if by a Stockholder who is not a natural Person, to an Affiliate of such Stockholder, or (d) if by a Stockholder who is a natural Person, to a Permitted Family Transferee of such Stockholder; provided that, in each case, such Transfer (taking into account any series of related transfers) (i) does not result in a violation of Article Fourth of the Certificate, (ii) does not result in a "Change of Control" as such term is defined in the Indenture and (iii) is otherwise completed in compliance with this Agreement.

"Person" shall be construed as broadly as possible and shall include an individual person, a partnership (including a limited liability partnership), a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and a Governmental Authority.

"Plan" means Company, AMOI and certain of its subsidiaries' Amended  Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated December 15, 2010.

"Potential Majority Owner" has the meaning ascribed to it in Section 2.6(a).

"Primary Shares" means, at any time, the authorized but unissued shares of Common Stock or shares of Common Stock held in the treasury of the Company.

"Prospective Seller" has the meaning ascribed to it in Section 2.6(a).

"Prospectus" means the prospectus included in any Registration Statement, including any amendment or prospectus subject to completion, and any such prospectus as amended or supplemented by any prospectus supplement with respect to the terms of the offering of any portion of the Registrable Shares and, in each case, by all other amendments and supplements to such prospectus, including post-effective amendments, and in each case including all material incorporated by reference therein.

"Public Offering" means the closing of a public offering of Common Stock pursuant to a Registration Statement declared effective under the Securities Act (excluding any offering pursuant to Form S-8 or Form S-4 under the Securities Act or other publicly registered offering pursuant to the Securities Act pertaining to the issuance of equity securities or equity linked securities exercisable therefor under any Equity Incentive Plan).

"Put Notice" has the meaning ascribed to it in Section 2.6(a).

"Records" has the meaning ascribed to it in Section 6.5(i).

"Redemption" has the meaning ascribed to it in Section 3.2(b).

"Registrable Shares" means at any time, and with respect to any Stockholder, the shares of Common Stock held by, or issuable to, such Stockholder.  As to any particular Registrable Shares, once issued, such Registrable Shares shall cease to be Registrable Shares (a) when an offering of such Registrable Shares has been registered under the Securities Act, the Registration Statement in connection therewith has been declared effective and such Registrable Shares have been disposed of pursuant to and in the manner described in such effective Registration Statement, (b) if eligible for sale without restriction under Rule 144 by the Holder of such Registrable Shares, (c) when such Registrable Shares shall be represented by certificates properly not bearing a legend restricting further Transfer under the Securities Act or (d) when such Registrable Shares have ceased to be outstanding.

"Registration Date" means the date upon which the Registration Statement filed by the Company to effect its Initial Public Offering shall have been declared effective by the Commission.

"Registration Expenses" has the meaning ascribed to it in Section 6.6.

"Registration Statement" means any registration statement of the Company that covers an offering of any of the Registrable Shares, and all amendments and supplements to any such Registration Statement, including post-effective amendments, in each case including the Prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

"Representative" means with respect to a particular Person, its Affiliates and its and their respective directors, officers, employees, agents, consultants, advisors or other representative of such Person, including legal counsel, accountants and financial advisors.

"Restricted Securities" has the meaning ascribed to such term under "restricted securities" as defined in Rule 144(a)(3) under the Securities Act (or any successor rule).

"ROFO Offeree" means, as determined from time to time, each Stockholder and its Affiliates (other than a Transferring Stockholder) who is a Committee Holder.

"Rule 144" means Rule 144 promulgated under the Securities Act or any successor rule thereto.

"Sale Offer" has the meaning ascribed to it in Section 2.2(a).

"Sale of the Company" means the occurrence of any of the following:

(a)    the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, other than to a Permitted Holder or to a Person with respect to which the Permitted Holders have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of such Person or any direct or indirect holding company of such Person;

(b) (i) the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), other than the Permitted Holders, has become the "beneficial owner" (as defined in Rules 13d-3 of the Exchange Act, or any successor provision), by way of merger, consolidation or other business combination or purchase, of 50% or more of the total voting power of the Voting Stock of the Company or any direct or indirect parent company holding directly or indirectly 100% of the total voting power of the Voting Stock of the Company and (ii) the Permitted Holders do not have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of the Company or such parent company; or

(c)      the adoption by the stockholders of the Company of a plan or proposal for the liquidation or dissolution of the Company.

"Sale Price" has the meaning ascribed to it in Section 2.2(a).

"Second Threshold Date" has the meaning ascribed to it in Section 4.1(c)(iii).

"Securities" means "securities" as defined in Section 2(a)(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock.

"Securities Act" means the Securities Act of 1933, as amended, or any successor Federal statute, and the rules and regulations of the Commission promulgated thereunder, all as the same shall be in effect from time to time.

"Significant Committee Holder" has the meaning ascribed to it in Section 4.1(d).

"Significant Committee Holder Designated Director" has the meaning ascribed to it in Section 4.1(d).

"Stockholders" means Persons (other than the Company), who are parties hereto, and shall include any other Person who hereafter becomes a party to this Agreement pursuant to a Joinder Agreement, in each case, only for so long as such Person owns or holds a beneficial interest in Stockholder Shares and has not received such Stockholder Shares in violation of the terms of this Agreement.

"Stockholders' Counsel" has the meaning ascribed to it in Section 6.5(b).

"Stockholder Shares" means (a) any equity Securities of the Company (including the Common Stock) purchased or otherwise acquired by any Stockholder prior to, on or after the Effective Date and (b) any equity Securities issued or issuable directly or indirectly with respect to the Securities referred to in clause (a) above by way of conversion, exercise or exchange, stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation or other reorganization.

"Subsidiary" means, at any time, with respect to any Person (the "Subject Person"), any other Person of which either (a) fifty percent (50.0%) or more of the Securities or other interests entitled to vote in the election of directors or comparable governance bodies performing similar functions or (b) fifty percent (50.0%) or more of an interest in the profits or capital of such Person, in each case, are at the time owned or Controlled directly or indirectly by the Subject Person or through one or more Subsidiaries of the Subject Person.

"Tag-Along Notice" has the meaning ascribed to it in Section 2.4(b).

"Third Party Sale" has the meaning ascribed to it in Section 2.2(d).

"Total Ownership Percentage" means, with respect to any Stockholder, or group of Stockholders, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock held by such Stockholder, or group of Stockholders, and the denominator of which is the total number of shares of Common Stock issued and outstanding at the time of determination (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities and all Equity Incentive Shares).

"Transfer" of Securities shall be construed broadly and shall include any direct or indirect issuance (other than an issuance of Securities by the Company), sale, assignment, transfer, participation, gift, bequest, distribution, or other disposition thereof, or any pledge or hypothecation thereof, placement of a lien thereon or grant of a security interest therein or other encumbrance thereon, in each case whether voluntary or involuntary or by operation of law or otherwise.  Notwithstanding anything to the contrary contained herein, Transfer shall not include the sale or transfer of Stockholder Shares by any Stockholder to the Company or pursuant to any employment, option, subscription or restricted stock purchase agreement between the Company and such Stockholder or any plan relating to the foregoing.

"Transferee" means a Person acquiring or intending to acquire Stockholder Shares through a Transfer.

"Transferor" means a Stockholder Transferring or intending to Transfer Stockholder Shares.

"Transferring Stockholder" has the meaning ascribed to it in Section 2.2(a).

"Trust" means in an irrevocable trust with a bank or trust company organized and in good standing under the laws of the United States of America or any State thereof, doing business in the Borough of Manhattan, The City of New York and having capital and surplus of not less than $50,000,000 according to its last published statement of condition for the pro rata benefit of the holders thereof.

## 1.2    **Rules of Construction**

The use in this Agreement of the term "including" means "including, without limitation." The words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole, including the schedules and exhibits, as the same may from time to time

be amended, modified, supplemented or restated, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement.  All references to sections, schedules and exhibits mean the sections of this Agreement and the schedules and exhibits attached to this Agreement, except where otherwise stated.  The title of and the section and paragraph headings in this Agreement are for convenience of reference only and shall not govern or affect the interpretation of any of the terms or provisions of this Agreement.  The use herein of the masculine, feminine or neuter forms shall also denote the other forms, as in each case the context may require.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.  In determining the number of Stockholder Shares held by any Stockholder as of the Effective Date, such Stockholder will be deemed to have then held the Stockholder Shares listed in stock register of the Company for such Stockholder as of the Effective Date.  In determining whether any percentage thresholds hereunder are satisfied by a Stockholder, the holdings of each of the individual members of the groups comprising each of the Avenue Stockholders, the Angelo Gordon Stockholders, the Credit Suisse Stockholders and the Capital Research Stockholders shall be aggregated with the other members of such group.

## ARTICLE II

## ISSUANCES AND TRANSFERS OF SECURITIES

### 2.1    Issuances and Transfers of Securities

(a)    The provisions in this Article II shall apply to all Stockholder Shares now owned by any Stockholder or hereafter acquired by any Person, including Stockholder Shares acquired by reason of original issuance, dividend, distribution, exchange, conversion and acquisition of outstanding Stockholder Shares from another Person, and such provisions shall apply to any Stockholder Shares obtained by a Stockholder upon the exercise, exchange or conversion of any option, warrant or other derivative Security (including Equity Incentive Shares).

(b)    The Company shall not issue to any Person, nor register or permit to be registered in the stock books of the Company any Transfer of Stockholder Shares unless, as a condition to the issuance or Transfer of such Stockholder Shares, such Person, if not already a Stockholder, agrees to be bound by the terms of this Agreement as if such Person had executed this Agreement, upon which time such Person will become a party to, and be bound by and obligated to comply with the terms and provisions of, this Agreement as a "Stockholder".  In furtherance of the foregoing, the Company may require any Person that is not already a Stockholder to execute and deliver a joinder agreement substantially in the form attached hereto as Exhibit A (a "Joinder Agreement").

(c)    No Stockholder shall Transfer any Stockholder Shares unless such Transfer is a Permitted Transfer.

(d)    Any attempt not in compliance with this Agreement to make any Transfer of all or any portion of Stockholder Shares shall be null and void and of no force and effect, the purported

Transferee shall have no rights or privileges in or with respect to the Company, and the Company shall not give any effect in the Company's records to such attempted Transfer.  In the case of a Transfer or attempted Transfer of any Stockholder Shares or other interest in the Company contrary to the provisions of the Agreement, the parties engaging or attempting to engage in such Transfer shall indemnify and hold harmless the Company and each of the Stockholders from all Losses that such indemnified Persons may incur (including legal fees and expenses) in enforcing the provisions of this Agreement.

## 2.2    **Right of First Offer**

(a)    No Stockholder shall Transfer any of its Stockholder Shares, unless such Stockholder proposing to Transfer such Stockholder Shares (the "Transferring Stockholder") shall first have delivered a written offer (a "Sale Offer") to the ROFO Offerees offering to Transfer to the ROFO Offerees the Transferring Stockholder's Stockholder Shares identified in the Sale Offer (the "Offered Shares") on the terms set forth therein.  The Sale Offer shall specify (i) that such Transferring Stockholder desires to Transfer all or a portion of its Stockholder Shares (and the amount of such portion), (ii) the proposed sale price of the Offered Shares (the "Sale Price") and (iii) any other material terms and conditions of the proposed Transfer.  Upon delivery of a Sale Offer, such Sale Offer shall be irrevocable unless and until the right of first offer provided for herein shall have been waived by the each ROFO Offeree or shall have expired in accordance with the terms hereof.

(b)    Within ten (10) Business Days following its receipt of a Sale Offer (the "Offer Period"), each ROFO Offeree shall have the right to deliver a written notice (the "Offer to Purchase") to the Transferring Stockholder agreeing (i) to purchase the number of Offered Shares up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not ROFO Offerees) of the total number or amount of Offered Shares and (ii) to offer to purchase up to its Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not ROFO Offerees) of the Offered Shares not subscribed for by ROFO Offerees (as further described below).  Any Offered Shares not purchased by a ROFO Offeree shall be deemed to be re-offered to and accepted by the ROFO Offerees exercising their options specified in clause (ii) of the immediately preceding sentence with respect to the lesser of (x) the amount specified in their respective Offer to Purchase and (y) an amount equal to their respective Adjusted Percentage Ownership (excluding for the purposes of this calculation Stockholder Shares held by Stockholders who are not ROFO Offerees and those held by ROFO Offerees who have not exercised their option specified in clause (ii) of the immediately preceding sentence) with respect to such deemed re-offer.  Such deemed re-offer and acceptance procedures described in the immediately preceding sentence shall be deemed to be repeated until either (i) all of the Offered Shares are accepted by the ROFO Offerees or (ii) no ROFO Offeree desires to subscribe for more of the Offered Shares.  The Transferring Stockholder shall notify (the "Offer Final Notice") each ROFO Offeree within five (5) Business Days following the expiration of the Offer Period of the number of Offered Shares which such ROFO Offeree has agreed to purchase pursuant to the foregoing.

(c)    Following receipt of an Offer to Purchase, the ROFO Offerees and the Transferring Stockholder shall consummate the transaction contemplated by the Sale Offer

within thirty (30) days after receipt of the Offer Final Notice.  At the closing of such Transfer, the ROFO Offerees and the Transferring Stockholder shall execute such documents as are otherwise necessary or appropriate to effectuate the Transfer.

(d)      If no Offer to Purchase has been timely delivered under Section 2.2(b) or the ROFO Offerees have agreed to purchase less than all of the Offered Shares, the Transferring Stockholder shall be permitted to Transfer all, but not less than all, of the Offered Shares not subject to an Offer to Purchase on the terms and conditions set forth in the Sale Offer (a "Third Party Sale"), subject to compliance with Section 2.1(c) hereof; provided, that such Third Party Sale is consummated within sixty (60) days after the earlier to occur of (x) the waiver by all of ROFO Offerees of their option to purchase Offered Shares and (y) the expiration of the ten (10) Business Day period permitted for delivery of the Offer to Purchase; provided further that such sixty (60) day period shall be extended to the extent required to allow compliance with the time periods set forth in Section 2.4.  If such Third Party Sale is not consummated within such sixty (60) day period (including any permitted extensions thereof) for any reason, then the restrictions provided for in this Section 2.2 shall again become effective, and no Transfer of Offered Shares may be made thereafter by the Transferring Stockholder without again offering the same to the ROFO Offerees in accordance with this Section 2.2.

(e)      The restrictions set forth in this Section 2.2 shall not apply to any Transfer of Stockholder Shares (i) by a Stockholder (A) that is a natural person, to a Permitted Family Transferee of such Stockholder, or (B) that is not a natural Person, to an Affiliate of such Stockholder, or (ii) pursuant to Sections 2.4(c), 2.5 and 2.6.

(f)      Each Stockholder acknowledges with respect to any purchase or sale of Offered Shares with any Committee Holder (or any of its Affiliates) that is entitled to designate one or more members of the Board of Directors (the "Counterparty") that (i) no Counterparty has made any representation or warranty, express or implied, regarding the Company; and (ii) a Counterparty may have, or may come into possession of, information with respect to the Offered Shares, the Company or the Company's Affiliates that may constitute material non-public information or information that is not known to such Stockholder and that may be material to a decision to the purchase or sale of Offered Shares (collectively, "Counterparty Excluded Information"), and that such Counterparty is not at liberty to disclose such information.  A Counterparty shall have no liability to any Stockholder with respect to the nondisclosure of Counterparty Excluded Information.  Such Stockholder irrevocably and unconditionally waives and releases the Counterparty and its Affiliates from all claims (whether for damages, rescission or any other relief), that it might have against the Counterparty whether under applicable securities laws or otherwise, with respect to the nondisclosure of Counterparty Excluded Information in connection with such purchase or sale transaction, and such Stockholder has agreed not to solicit or encourage, directly or indirectly, any other person to assert such a claim.  Such Stockholder further confirms that it understands the significance of the foregoing waiver.

**2.3      [RESERVED.]**

**2.4**     <u>**Co-Sale Rights**</u>

(a)     If at any time any Stockholder or group of Stockholders acting in concert propose to Transfer Stockholder Shares representing 5.0% or more of the then outstanding Common Stock in a transaction or series of related transactions to any Person (or group of Persons acting in concert) other than to their respective Affiliates or Permitted Family Transferees, as applicable, then at least ten (10) Business Days prior to the closing of such Transfer, the selling Stockholder(s) shall deliver a written notice (the "<u>Co-Sale Notice</u>") to each Co-Sale Participant offering such Co-Sale Participant the option to participate in such proposed Transfer by Transferring the Co-Sale/Drag Sale Percentage of Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) held by each such Co-Sale Participant. Such Co-Sale Notice shall specify in reasonable detail the identity of the prospective Transferee, the terms and conditions of the Transfer and the class and amount of Stockholder Shares proposed to be Transferred.

(b)     Any Co-Sale Participant shall, within five (5) Business Days of the receipt of a Co-Sale Notice, have the right to deliver written notice (each, a "<u>Tag-Along Notice</u>") to the selling Stockholder(s) stating that such Co-Sale Participant wishes to participate in such proposed Transfer by Transferring a number of Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) up to the Co-Sale/Drag Sale Percentage of Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) held by each such Co-Sale Participant. Such Co-Sale Participant shall propose to include only Stockholder Shares (excluding, other than in connection with the Sale of the Company, Equity Incentive Shares) of the same class of Stockholder Shares being transferred by the selling Stockholder(s).

(c)     If no Co-Sale Participant gives the selling Stockholder(s) a timely Tag-Along Notice with respect to the Transfer proposed in the Co-Sale Notice, the selling Stockholder(s) may thereafter Transfer the Stockholder Shares specified in the Co-Sale Notice on the terms and conditions set forth therein, subject to compliance with Section 2.1(c) hereof. If one or more Co-Sale Participants give the selling Stockholder(s) timely Tag-Along Notices, then the selling Stockholders shall use commercially reasonable efforts to cause the prospective Transferee(s) to agree to acquire all Stockholder Shares identified in all Tag-Along Notices that are given to the selling Stockholder(s) in accordance with the terms of this Section 2.4, upon the same terms and conditions as applicable to the selling Stockholder(s') Stockholder Shares, subject to compliance with Section 2.1(c) hereof. If the prospective Transferee(s) are unwilling or unable to acquire all Stockholder Shares proposed to be included in such sale upon such terms, then the selling Stockholders may elect either to cancel such proposed Transfer or to allocate the maximum number of Stockholder Shares that each prospective Transferee is willing to purchase among the selling Stockholder(s) and the Co-Sale Participants giving timely Tag-Along Notices in proportion to each such Stockholders' applicable Adjusted Percentage Ownership (excluding for the purposes of such calculation the Stockholder Shares held by Co-Sale Participants who have not timely delivered a valid Tag-Along Notice).

(d)     This Section 2.4 shall not apply to any sale of Stockholder Shares pursuant to a Public Offering, or pursuant to Sections 2.2(c), 2.5, and 2.6.

**2.5**    **Drag Along Right**

(a)    If Stockholders acting by Majority Requisite Consent propose to consummate a transaction or series of related transactions constituting a Sale of the Company (the "Dragging Stockholders") pursuant to an Approved Sale, such Dragging Stockholders shall have the right, at their option to require the other Stockholders (each a "Dragged Stockholder") to join in such Approved Sale by Transferring the Co-Sale/Drag Sale Percentage of Stockholder Shares proposed to be sold by the Dragging Stockholders, subject to the obligations in Section 2.5(c); provided that Alternative Majority Consent may be obtained if Majority Requisite Consent is not obtained. Each Stockholder shall consent to and raise no objections against (and, in any stockholder vote required with the respect to such Approved Sale, shall affirmatively vote all of its Stockholder Shares (if any) the Approved Sale, and if the Approved Sale is structured as a sale of the issued and outstanding equity Securities of the Company (whether by merger, recapitalization, consolidation or Transfer of Stockholder Shares or other Securities or otherwise), then each Dragged Stockholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such Approved Sale (if applicable), each Dragged Stockholder shall agree to sell his, her or its Stockholder Shares, subject to Section 2.5(c) below, on the terms and conditions as may be approved by the Dragging Stockholders. Each Dragged Stockholder and the Company (subject to applicable law and compliance by the Company Board with any fiduciary duties) shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including, but not limited to, the execution of such agreements and instruments and other actions necessary to provide the representations, warranties, indemnities, covenants, conditions, escrows and other provisions and agreements relating to such Approved Sale. Notwithstanding anything to the contrary contained herein, Sections 2.1, 2.2, 2.4, 2.6 and 2.7 and Articles III and VIII shall not apply in connection with an Approved Sale.

(b)    The Dragging Stockholders shall deliver written notice to each Dragged Stockholder setting forth in reasonable detail the material terms (including price, time and form of payment and the identity of the Dragging Stockholders) of any Approved Sale (the "Approved Sale Notice") at least ten (10) Business Days prior to the consummation of such Approved Sale. Within five (5) Business Days following receipt of the Approved Sale Notice, each Dragged Stockholder shall deliver to the Dragging Stockholders written notice (in form and substance reasonably satisfactory to the Dragging Stockholders) setting forth such Dragged Stockholder's agreement to consent to and raise no objections against, or impediments to, the Approved Sale (including, waiving all dissenter's and similar rights, if applicable) and if the Approved Sale is structured as a sale of stock, to sell its Stockholder Shares on the terms and conditions set forth in the Approved Sale Notice; provided, however, that the failure by any Dragged Stockholder to deliver such written notice and/or consent to the Dragging Stockholders shall not in any manner relieve or otherwise affect the obligations of each Dragged Stockholder pursuant to this Section 2.5.

(c)    The obligations of the Dragged Stockholders to participate in any Approved Sale pursuant to this Section 2.5 are subject to the satisfaction of the following conditions:

(i)    subject to clause (ii) below, upon the consummation of the Approved Sale, each Stockholder shall receive the same proportion of the aggregate consideration from

such Approved Sale that such holder would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in the Certificate as in effect immediately prior to such Approved Sale;

(ii)    if any Stockholder is given an option as to the form and amount of consideration to be received with respect to Securities in a class, all Stockholders of such class will be given the same option;

(iii)    no Stockholder shall be obligated to pay more than his, her or its pro-rata amount (based on the amount of aggregate consideration received) of all reasonable expenses incurred by the Company in connection with a consummated Approved Sale;

(iv)    any indemnification obligations for breaches of representations, warranties and covenants made by the Company and its Subsidiaries shall be pro-rata among the Stockholders based on the aggregate consideration received with respect to the Stockholder Shares and capped at such Stockholders' pro rata share of the aggregate consideration received; and

(v)    no Stockholder other than a Management Stockholder shall be required to sign on to any agreement restricting its ability to compete with the Company and its Subsidiaries.

(d)    To the extent the Approved Sale is structured as a sale of all or substantially all of the assets of the Company on a consolidated basis, each Dragged Stockholder shall consent to and raise no objections against (and, in any stockholder vote required with respect to such Approved Sale, shall affirmatively vote all of its Stockholder Shares in favor of) such transaction and shall waive any dissenters rights, appraisal rights or similar rights in connection with such transaction.

## 2.6    **Minority Transfer Restrictions**

(a)    If upon consummation of a proposed Transfer of Stockholder Shares the Transferee and its Affiliates (a "Potential Majority Owner") will Control 50.0% or more of the combined voting power of the outstanding voting Securities of the Company (a "Control Transaction"), the prospective Transferor(s) (the "Prospective Seller") and the Potential Majority Owner shall each immediately notify the Company and other Stockholders of such transaction upon becoming aware that such Transaction is a Control Transaction by delivering a written notice (a "Control Transaction Notice") specifying (i) that such Prospective Seller desires to Transfer all or a portion of its Stockholder Shares (and the amount of such portion) in a Control Transaction, (ii) the proposed sale price and (iii) any other material terms and conditions of the proposed Control Transaction.  Each of the other Stockholders (a "Participating Stockholder") shall then be entitled, upon written notice (a "Put Notice") delivered to the Prospective Seller and the Potential Majority Owner within ten (10) Business Days of receipt of the Control Transaction Notice, to require the Potential Majority Owner to purchase all, but not less than all, of their Stockholder Shares upon the terms and conditions set forth in this Section 2.6.  Such purchase

shall be completed within 30 days following receipt of the Put Notice delivered by such Participating Stockholders to the Prospective Seller and the Potential Majority Owner.

(b)      The purchase of Stockholder Shares pursuant to this Section 2.6 shall be at a price per Stockholder Share equal to the greater of (x) the price per Stockholder Share received by the Potential Seller in the Control Transaction and (y) the Fair Market Value of such Stockholder Shares.

(c)      The Prospective Seller shall not complete the proposed Transfer of its Stockholder Shares unless and until the Potential Majority Owner has purchased all the Stockholder Shares of the other Participating Stockholders specified in each such Participating Stockholder's Put Notice on terms set forth in Section 2.6(b).

(d)      Notwithstanding anything to the contrary contained herein, Sections 2.2 and 2.4 shall not apply in connection with a sale by the Participating Stockholders to the Potential Majority Owner pursuant to this Section 2.6.

**2.7**    **Certain Affiliate Transactions.**

(a)      No Stockholder shall intentionally avoid its obligation under this Agreement by making one or more Transfers of Stockholder Shares to its respective Affiliates and then Transferring all or any portion of such Stockholders' interest in any such Affiliate (or a direct or indirect parent thereof).

(b)      Any contract, commitment, arrangement or transaction between the Company or any of its Subsidiaries, on the one hand, and any Affiliate of the Company and any Affiliate thereof, on the other hand, shall be:

(i)      approved by at least a majority of the disinterested directors of the Company Board (it being understood and agreed that the Company Board shall determine whether or not a director is a disinterested director for the purposes of this Section 2.7(b)(i) and any such determination by the Company Board shall be conclusive); [and/or]

(ii)      approved by Majority Requisite Consent; provided that Alternative Majority Consent may be obtained if Majority Requisite Consent is not obtained; and provided, further however, for the purposes of this Section 2.7(b)(ii) only, to the extent a Committee Holder or an Affiliate of a Committee Holder is an interested party in such transaction, the shares of Common Stock held by such Committee Holder shall be disregarded in the calculation contemplated by clause (ii) of the definition of Alternative Majority Consent.

Notwithstanding the foregoing, the approvals set forth in this Section 2.7(b) shall not be required for:

1)    transactions between or among the Company and its Subsidiaries not involving any other Affiliate;

2) payment of dividends approved by the Company Board;

3) payment or prepayment of indebtedness, premiums, principal payments, fees, interest or similar payments when due for such indebtedness to the extent the incurrence of such indebtedness was not in violation of this Agreement;

4) any agreement or arrangement as in effect as of the Effective Date, or any amendment thereto (so long as any such amendment is not materially less favorable to the Company or any of its Subsidiaries when taken as a whole as compared to the applicable agreement or arrangement as in effect on the Effective Date);

5) the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Company or any of its Subsidiaries;

6) issuances or acquisitions of any Securities, or payments, pursuant to any Equity Incentive Plan;

7) the existence of, or the performance by the Company or any of its Subsidiaries of its obligations under the terms of this Agreement;

8) a rights offering approved pursuant to Section 3.1; and

9) transactions involving annual payments or annual consideration of less than $5,000,000; provided, however, this clause (9) shall not apply to any agreements with any Committee Holder or any investment fund affiliated with such Committee Holder that provides for the payment by the Company or any of its subsidiaries of management, advisory, monitoring or similar fees to such Committee Holder or any such investment fund.

## ARTICLE III

## APPROVAL RIGHTS

**3.1      Rights Offering**.  In the event that the Company proposes to issue any equity Securities to any existing equity holder (or its affiliates) of the Company, other than Excluded Securities, the Company must first obtain the consent of each of the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders, provided that (i) the consent of any of the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders shall not be required if such Stockholder does not have Total Ownership Percentage of at least ten percent (10.0%) and (ii) such consent shall not be required if the Board of Directors determines (as evidenced, subject to sections 3.4 and 3.5, by a resolution approved by not less than 8 out of 9 of the then current members of the Board of Directors) in the exercise of its business judgment, that the failure to make such issuance will have a material adverse effect on the Company; provided further, however, that the issuance of equity to fund an acquisition or investment shall not be considered a material adverse effect.

**3.2**    **Mandatory Redemption of Common Stock.** Within 45 days of the last day of each fiscal quarter (75 days after the year end quarter), the Company shall provide (through posting of such information on the Company's website) to each Stockholder a calculation of the Company's Free Cash Flow for (i) such fiscal quarter and (ii) all cumulative Free Cash Flow since September 30, 2010 (the "Cumulative Free Cash Flow").

(b)    If the calculation of Free Cash Flow for the then current fiscal quarter provided pursuant to Section 3.2(a)(i) above indicates that the Company had positive Free Cash Flow, and only if the Company determines not to issue a dividend of at least 75% of the Cumulative Free Cash Flow, then the Company shall, to the extent permitted by applicable law and not prohibited by the terms of indebtedness of the Company or any of its subsidiaries, redeem (the "Redemption"), on a pro rata basis, a portion of the then outstanding Common Stock utilizing at least 75% of the Cumulative Free Cash Flow, unless the Board of Directors determines (as evidenced, subject to section 3.4, by a resolution approved by not less than 66% of the then current members of the Board of Directors), in the exercise of its business judgment, that the making and/or consummation of the Redemption would have a material and adverse effect on the Company; provided that, if the Company is, as of the date of such calculation referred in to Section 3.2(a), prohibited pursuant to the terms of its then existing indebtedness from making such dividend or Redemption, then the Company may use such Free Cash Flow to repay the Company's then outstanding indebtedness; provided, further, that the Company will not be required to use amounts available to the Company pursuant  to Section 4.07 of the New First Lien Indenture or similar provisions of the successor financing to make such dividends or redemptions.

(c)    For purposes of this Section 3.2:

(i)    "Free Cash Flow" shall mean, with regard to any fiscal period, the Company's EBITDA for such period less working capital requirements, principal payments on indebtedness and capital leases, cash interest, cash taxes, and capital expenditures for such period, in each case calculated in accordance with generally acceptable accounting principles in the United States of America.

(ii)    "EBITDA" shall have the meaning assigned to such term under the company's outstanding debt documents at the time of calculation, and consistent with historical calculations.

**3.3**    **Redemption Procedures.** The Company shall give notice of any Redemption by mail, postage prepaid, not less than 30 days nor more than 60 days prior to the date fixed for such redemption, to each holder of record of the Common Stock to be redeemed appearing on the stock books of the Company as of the date of such notice at the address of said holder shown therein.  Such notice to any holder shall state the redemption date; the number of shares to be redeemed and the number (and the identification) of shares to be redeemed from such holder; the redemption price (which shall be determined by the Company Board and such determination shall be final), and the place where the shares to be redeemed shall be presented and surrendered for payment of the redemption price therefor.  Any notice which is mailed in the manner herein provided shall be conclusively presumed to have been duly given, whether or not the stockholder receives such notice, and failure duly to give such notice by mail, or any defect in such notice, to

any holder of shares of the Common Stock to be redeemed shall not affect the validity of the proceedings for the redemption of any other shares of the Common Stock.

(b)    If notice of redemption of shares of Common Stock to be redeemed on a redemption date shall have been duly given, and if the Company deposits in cash the aggregate redemption price of such shares in a Trust for the pro rata benefit of the holders of such shares prior to such redemption date, then from and after the time of such deposit, or, if no such deposit is made, then upon such redemption date (if on or before such redemption date all funds in cash necessary for redemption of such shares shall have been set aside by the Company, separate and apart from its other funds, in trust for the pro rata benefit of the holders of such shares, so as to be and continue to be available therefor), and notwithstanding that any certificate representing any such shares shall not have been surrendered for cancellation, (i) the holders of such shares shall cease to be stockholders with respect to such shares, (ii) such shares shall no longer be deemed to be outstanding and shall no longer be transferable on the books of the Company and (iii) such holders shall have no interest in or claim against the Company with respect to such shares except only the right to receive from the Company the amount payable on redemption thereof, without interest (or, in the case of such deposit, from such bank or trust company the funds so deposited, without interest), upon surrender of the certificates representing such shares on or after the redemption date (or, in the case of such deposit, at any time after such deposit). Any funds so deposited in a Trust and unclaimed at the end of two years from the date fixed for redemption shall, to the extent permitted by law, be repaid to the Company upon its request, after which the holders of such shares shall look only to the Company for payment thereof.

(c)    Any Redemption shall be effected only out of funds legally available for such purpose. If on any date the Company is required to redeem any shares of Common Stock pursuant to a Redemption and does not have sufficient funds legally available to redeem all such shares on such date, the Company shall use any funds which are legally available to redeem such portion of all such shares pro rata (as nearly as may be) on such redemption date as such funds are sufficient therefor and shall redeem the remaining shares of Common Stock on the earliest practicable date next following the day on which the Company shall first have funds legally available for the redemption of such shares.

(d)    The shares of Common Stock to be redeemed shall be determined pro rata among all holders of Common Stock, according to the respective number of shares of Common Stock held by such holders. In the event that less than all of the shares represented by any certificate evidencing shares of Common Stock are redeemed, the Company shall forthwith (or cause a transfer agent for the Common Stock to) issue a new certificate representing the unredeemed shares, in accordance with the provisions of this Article III, subject to the applicable escheat laws.

(e)    Upon any redemption of shares of Common Stock, the shares of Common Stock so redeemed shall be cancelled and shall revert to authorized but unissued Common Stock, and the number of shares of Common Stock which the Company shall have authority to issue shall not be decreased by such redemption.

**3.4    <u>Reduction of Directors</u>.**    For purposes of Sections 3.1 hereof, to the extent that (a) the Company has less than nine (9) current members of the Board of Directors, and (b) a Board of

Directors resolution is required, then the eight (8) out of nine (9) requirement will be adjusted to mean not less than 88% of the then current members of the Board of Directors.

**3.5**     **Rights Offering Voting.**

For purposes of Section 3.1 hereof, no member of the Board of Directors shall be precluded from voting on a resolution because the Stockholder that designated such member may purchase equity securities in connection with an issuance under Section 3.1.

## ARTICLE IV

## BOARD OF DIRECTORS

**4.1**     **Election of Directors; Voting**

(a)     The Stockholders and the Company acknowledge that the initial Company Board as of the Effective Date shall be composed of nine (9) directors who shall be the individuals set forth in Schedule I and for purpose of this Section 4.1, such directors (other than the Chief Executive Officer of the Company) shall be deemed to have been designated by the holder(s) set forth opposite such directors name on Schedule I.

(b)     Following the Effective Date and subject to Section 4.1(a), each Stockholder hereby covenants and agrees to use commercially reasonable efforts to take all action within their power, including voting (or delivering written consents with respect to) their Stockholder Shares, to cause the number of directors constituting the Company Board to be nine (9) and at each annual meeting of the holders of any class of Stockholder Shares, and at each special meeting of the holders of any class of Stockholder Shares called for the purpose of electing directors of the Company, and at any time at which holders of any class of Stockholder Shares shall have the right to vote for or consent in writing to the election of directors of the Company, then, and in each such event, each Stockholder shall vote all of the Stockholder Shares owned by them for, or consent in writing with respect to such Stockholder Shares in favor of, the election of the Company Board constituted as follows:

(i)     the individual holding the office of Chief Executive Officer of the Company from time to time (the "Management Director");

(ii)     four (4) individuals designated by the Avenue Stockholders; provided that one (1) such individual shall (x) not be affiliated with the Avenue Stockholders and (y) be acceptable to the Capital Research Stockholders and the Angelo Gordon Stockholders so long as each such Stockholder is a holder of at least ten percent (10%) of the Total Ownership Percentage;

(iii)     two (2) individuals designated by the Angelo Gordon Stockholders; and

(iv)     two (2) individuals designated by the Capital Research Stockholders;

provided, that (i) if the Avenue Stockholders have a Total Ownership Percentage of less then twenty percent (20%), but more than ten percent (10%), then the number of

designees to which the Avenue Stockholders are entitled pursuant to Section 4.1(b)(ii) shall be reduced to two (2); (ii) if the Total Ownership Percentage of any of the Avenue Stockholders, the Angelo Gordon Stockholders or the Capital Research Stockholders is less than ten percent (10%), but more than five percent (5%), then such Stockholder shall be entitled to designate one director; and (iii) if the Total Ownership Percentage of any of the Avenue Stockholders, the Angelo Gordon Stockholders or the Capital Research Stockholders is less than five percent (5%), then such Stockholder shall no longer be entitled to designate individuals pursuant to this Section 4.1(b).

(c)        If a Significant Committee Holder loses the right to designate one or more directors of the Company Board or the individual then holding the office of Chief Executive Officer of the Company ceases to hold such office, any director vacancy (if any) created by such event shall be filled by Significant Committee Holders acting by Majority Requisite Consent (such directors, the "Majority Committee Holder Designated Directors"); provided that if:

(i)        the Total Ownership Percentage of the Avenue Stockholders is less than twenty percent (20%), but more than ten percent (10%) (the first date on which such Total Ownership Percentage is reached is the "Avenue First Threshold Date") and a Significant Committee Holder (the "Avenue Acquiring Significant Committee Holder") has acquired from the Avenue Stockholders a number of shares of Common Stock equal to at least the product of (A) 50.1% and (B) the number of shares of Common Stock owned by the Avenue Stockholders on the Effective Date minus the of shares of Common Stock owned by the Avenue Stockholders on the Avenue First Threshold Date, then such Acquiring Significant Committee Holder shall be entitled to designate two (2) directors in addition to what it would otherwise be entitled to designate pursuant to Section 4.1(b);

(ii)        the Total Ownership Percentage of a Significant Committee Holder is less than ten percent (10%), but more than five percent (5%) (the first date on which such Total Ownership Percentage is reached is the "First Threshold Date") and a Significant Committee Holder (which may be the Avenue Acquiring Significant Committee Holder) (the "Acquiring Significant Committee Holder") has acquired from such Significant Committee Holder a number of shares of Common Stock equal to at least the product of (A) 50.1% and (B) the number of shares of Common Stock owned by (1) such Significant Committee Holder on the Effective Date if such Significant Committee Holder is the Angelo Gordon Stockholders or the Capital Research Stockholders or (2) such Significant Committee Holder on the Avenue First Threshold Date if such Significant Committee Holder is the Avenue Stockholders, in each case minus the of shares of Common Stock owned by such Significant Committee Holder on the First Threshold Date, then such Acquiring Significant Committee Holder shall be entitled to designate one (1) director in addition to what it would otherwise be entitled to designate pursuant to Section 4.1(b);

(iii)        the Total Ownership Percentage of a Significant Committee Holder is less than five percent (5%) (the first date on which such Total Ownership Percentage is reached is the "Second Threshold Date") and a Significant Committee Holder (which may be the Avenue Acquiring Significant Committee Holder) (the "Acquiring Significant Committee Holder") has acquired from such Significant Committee Holder a number of shares of Common Stock equal to at least the product of (A) 50.1% and (B) the number

of shares of Common Stock owned by (1) such Significant Committee Holder on the Effective Date if such Significant Committee Holder is the Angelo Gordon Stockholders or the Capital Research Stockholders or (2) such Significant Committee Holder on the Avenue First Threshold Date if such Significant Committee Holder is the Avenue Stockholders, in each minus the of shares of Common Stock owned by such Significant Committee Holder on the Second Threshold Date, then such Acquiring Significant Committee Holder case shall be entitled to designate one (1) director in addition to what it would otherwise be entitled to designate pursuant to Section 4.1(b);

(iv)    neither clause (i), (ii) or (iii) is applicable and the Credit Suisse Stockholders are a holder of at least ten percent (10%) of the Total Ownership Percentage, then the Credit Suisse Stockholders shall be considered a Significant Committee Holder and entitled to designate one director of the Company;

(v)    Majority Requisite Consent is required but cannot be obtained then such director vacancy shall be filled by the Significant Committee Holders acting by the Majority of the Total Ownership Percentage held by the Significant Committee Holders except that in such case the Majority Committee Holder Designated Director so nominated may not be affiliated with any Significant Committee Holder or the Company; and

(vi)    any of the Avenue Stockholders, Angelo Gordon Stockholders or Capital Research Stockholders reduce their Total Ownership Percentage in a single transfer to an Acquiring Significant Committee Holder and in an amount such that any of the Avenue First Threshold Date, First Threshold Date or Second Threshold Date is the same date, then the Acquiring Significant Committee Holder shall be entitled to designate the same number of directors as it would have been able to designate had it purchased the Common Stock in multiple transactions in which the Avenue First Threshold Date, First Threshold Date and/or Second Threshold Date had occurred on separate dates.

(d)    Each Significant Committee Holder (as defined below) shall have the exclusive right to cause the removal and appointment of their respective designees to the Company Board as well as the exclusive right to cause the filling of vacancies created by reason of death, disability, removal or resignation of their respective designees to the Company Board, subject to the limitation set forth in the proviso to Section 4.1(b) hereof.  In order to effect the rights granted by this Section 4.1(d), the directors (subject to their fiduciary duties) and the Company shall, or, in the case the directors fail to so act, the Stockholders shall use commercially reasonable efforts to take all action within their power, including voting (or delivering written consents with respect to) their Stockholder Shares, (i) to remove any Significant Committee Holder Designated Director (as defined below) or Majority Committee Holder Designated Director whose removal is requested by the applicable Significant Committee Holder who designated such Significant Committee Holder Designated Director or Committee Holders sufficient to constitute a Majority Requisite Consent, respectively, and (ii) to promptly fill any vacancy created by the death, disability, removal, or resignation of a director, in each case for the election of a new Significant Committee Holder Designated Director or Majority Committee Holder Designated Director designated by such Person or group of Persons who has the right to cause the filling of such vacancy. The Company (subject to the fiduciary duties of the directors)

and the Stockholders shall, if the Company Board fails to act, fill any vacancies of the Company Board, in accordance with this Section 4.1, as soon as practicable following the date such vacancy is created.  For the purposes of this Section 4.1(d), a "<u>Significant Committee Holder</u>" means each of the Avenue Stockholders, the Angelo Gordon Stockholders and the Capital Research Stockholders so long as it is a holder of at least five percent (5%) of the Total Ownership Percentage or if applicable pursuant to Section 4.1(b)(iv), the Credit Suisse Stockholders, and each director designated by each of the foregoing pursuant to Section 4.1(b) hereof is referred to herein as a "<u>Significant Committee Holder Designated Director</u>".

(e)     The Company shall pay all fees, charges and expenses (including travel and related expenses) reasonably incurred by each of the members of the Company Board in connection with (i) attending the meetings of the Company Board and (ii) conducting any other Company business requested by the Company.

## ARTICLE V

## D&O INSURANCE

### 5.1    <u>D&O Insurance</u>

Until the sixth anniversary of the Effective Date, the Company shall, and shall cause AMOI, to cause the individuals serving as directors of the Company, AMOI or any of their respective Subsidiaries to be covered following the Effective Time by the directors' and officers' liability insurance policies maintained by the Company immediately prior to the Effective Time (provided that the Company and/or AMOI may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous in any material respect than such policy); <u>provided</u> that in no event shall the Company or AMOI be required to expend annually in the aggregate an amount in excess of one hundred fifty percent (150%) of the annual premiums currently paid by Company for such insurance (the "<u>Insurance Amount</u>"), and <u>provided</u> <u>further</u> that if the Company is unable to maintain such policy (or such substitute policy) as a result of the preceding proviso, the Company shall obtain as much comparable insurance as is available for the Insurance Amount.

## ARTICLE VI

## REGISTRATION RIGHTS

### 6.1    <u>Required Registration.</u>

(a)     Except as limited by Section 6.1(b), if at any time and from time to time, the Company shall be requested in writing by Committee Holders constituting a Majority Requisite Consent (or, if Majority Requisite Consent is not obtained, by Alternative Majority Consent) to effect the registration under the Securities Act of an offering of Registrable Shares held by such Stockholders specifying the number of Registrable Shares to be so registered by each requesting Committee Holder and whether such offering shall be an underwritten offering  (a "<u>Demand Registration Request</u>"), then the Company shall promptly give written notice to all Stockholders of its intention to register the Registrable Shares subject to the Demand Registration Request

and, upon the written request of any Stockholder (given within ten (10) Business Days after delivery of any such notice to each Stockholder by the Company) to include in such registration any of its Registrable Shares (which request shall specify the number of Registrable Shares proposed to be included in such registration), and the Company shall, promptly use its commercially reasonable efforts to effect a registration under the Securities Act of an offering of all the Registrable Shares that the Company has been so requested to register for sale in accordance with this Section 6.1(a).

(b)    Anything contained in Section 6.1(a) to the contrary notwithstanding, the Company shall not be obligated to use its commercially reasonable efforts to file and cause to become effective (i) more than five (5) registration statements pursuant to a Demand Registration Request made on the Company pursuant to Section 6.1(a), (ii) any Registration Statement during any period in which any other registration statement (other than on Form S-4 or Form S-8) pursuant to which Primary Shares are to be or were offered and sold has been filed and not withdrawn or has been declared effective within the prior ninety (90) days (180 days in the case of the Initial Public Offering) and Section 6.2 is applicable.  Any registration initiated pursuant to a Demand Registration Request shall not count as a registration for purposes of this Section 6.1(b) unless and until such registration shall have become effective.

(c)    With respect to any registration pursuant to Section 6.1(a), the Company shall give notice of such registration to the holders of Registrable Shares hereunder who do not request registration hereunder and the Company may include in such registration any Primary Shares or Other Shares; provided, however, that if the managing underwriter advises the Company that the inclusion of all Registrable Shares, Primary Shares and Other Shares proposed to be included in such registration would materially adversely affect the offering and sale (including pricing) of all such Securities, then the number of Registrable Shares, Primary Shares and Other Shares proposed to be included in such registration shall be included in the following order:

(i)    first, Registrable Shares (excluding Equity Incentive Shares) owned by the Stockholders, pro rata based upon the number of Registrable Shares (excluding Equity Incentive Shares) owned by each such Stockholder at the time of such registration;

(ii)    second, the Primary Shares; and

(iii)    third, the Other Shares.

(d)    If any offering pursuant to a Demand Registration Request involves an underwritten offering, the Committee Holders acting by Majority Requisite Consent shall select the managing underwriter or underwriters to administer the offering, which managing underwriters shall be a firm of nationally recognized standing reasonably acceptable to the Company.

(e)    A registration undertaken by the Company pursuant to a Demand Registration Request will not count as a Demand Registration Request for purposes of Section 6.1(b)(i) if the Committee Holders constituting Majority Requisite Consent withdraw the Demand Registration

Request and promptly reimburses the Company for all fees, costs and expenses incurred by the Company in connection with such withdrawn Demand Registration Request.

(f)    Notwithstanding the foregoing, the Company may delay the filing or effectiveness of any registration of Registrable Shares on Form S-3 pursuant to Section 6.1(a) if at the time of such request (i) the Company is engaged, or has fixed plans to engage within 15 days following receipt of such request, in a firm commitment underwritten public offering of Primary Shares in which the holders of Registrable Shares have been or will be permitted to include all the Registrable Shares so requested to be registered pursuant to Section 6.2(a) or (ii) the Company Board reasonably determines that such registration and offering would interfere with any material transaction involving the Company; provided, however, that the Company may not exercise its rights in Sections 6.1(f) and 6.3(b), in the aggregate, more than once in any 12 month period.

**6.2**    **Piggyback Registration.**

(a)    If the Company at any time proposes for any reason to register Registrable Shares, Primary Shares or Other Shares under the Securities Act (other than on Form S-4 or Form S-8) other than pursuant to a registration initiated in accordance with Sections 6.1 or 6.3, it shall promptly give written notice to each Stockholder of its intention to register such Registrable Shares, the Primary Shares or Other Shares and, upon the written request of any Stockholder (given within ten (10) Business Days after delivery of any such notice to each Stockholder by the Company) to include in such registration Registrable Shares (which request shall specify the number of Registrable Shares proposed to be included in such registration), the Company shall use its best efforts to cause all such Registrable Shares requested to be included in such registration to be included on the same terms and conditions as the Securities otherwise being sold in such registration; provided, however, that if the managing underwriter advises the Company that the inclusion of all Registrable Shares, Primary Shares or Other Shares proposed to be included in such registration would interfere with the successful offering and sale (including pricing) of all such Securities, then the number of Primary Shares, Registrable Shares and Other Shares proposed to be included in such registration shall be included in the following order:

(i)    first, the Primary Shares;

(ii)    second, the Registrable Shares (excluding Equity Incentive Shares) owned by the Stockholders requesting that their Registrable Shares be included in such registration pursuant to the terms of this Section 6.2, pro rata based upon the number of Registrable Shares (excluding Equity Incentive Shares) owned by each such Stockholder at the time of such registration; and

(iii)    third, the Other Shares.

(b)    The Company shall have the right to terminate any registration initiated pursuant to this Section 6.2 by the Company.

(c)    Each Stockholder agrees to keep any information it receives from the Company pursuant to this Article VI, including any written notice pursuant to Section 6.1(a) or 6.2(a),

confidential until it is publicly disclosed.  Each Stockholder acknowledges that trading on material non-public information is a violation of the United States securities laws, and each Stockholder agrees not to do so in respect of its Registrable Shares.

**6.3     Registrations on Form S-3.**

(a)     At such time as the Company shall have qualified for the use of Form S-3 under the Securities Act or any successor form thereto, Stockholders collectively holding at least 1.0% of the outstanding Registrable Shares shall have the right to request an unlimited number of registrations of Registrable Shares on Form S-3 (which may, at such holders' request, be shelf registrations pursuant to Rule 415 promulgated under the Securities Act) or its successor form, which request or requests shall (i) specify the number of Registrable Shares intended to be Transferred and the holders thereof, (ii) state whether the intended method of Transfer of such Registrable Shares is an underwritten offering or a shelf registration and (iii) relate to Registrable Shares having an aggregate gross offering price (not taking into account underwriters discounts and commissions) of at least $10,000,000, and upon receipt of such request, the Company shall use its commercially reasonable efforts to promptly effect the registration under the Securities Act of the Registrable Shares so requested to be registered.  A requested registration on Form S-3 in compliance with this Section 6.3(a) shall not count as a registration statement initiated pursuant to Section 6.1(b)(i).

(b)     Notwithstanding the foregoing, the Company may delay the filing or effectiveness of any registration of Registrable Shares on Form S-3 pursuant to Section 6.3(a) if at the time of such request (i) the Company is engaged, or has fixed plans to engage within 15 days following receipt of such request, in a firm commitment underwritten public offering of Primary Shares in which the holders of Registrable Shares have been or will be permitted to include all the Registrable Shares so requested to be registered pursuant to Section 6.2(a) or (ii) the Company Board reasonably determines that such registration and offering would interfere with any material transaction involving the Company; provided, however, that the Company may not exercise its rights in Sections 6.1(f) and 6.3(b), in the aggregate, more than once in any 12 month period.

**6.4**    **Holdback Agreement.**

If the Company at any time shall register an offering and sale of shares of Common Stock under the Securities Act in an underwritten offering pursuant to an Initial Public Offering, no Stockholder who sells in such offering and no Management Stockholder shall sell, make any short sale of, grant any option for the purchase of, or otherwise Transfer any Securities of the Company (other than (i) those Registrable Shares included in such registration pursuant to Section 6.1 or 6.2, (ii) a Transfer to an Affiliate or (iii) subject to the consent of the underwriters, a Permitted Transfer) without the prior written consent of the Company for a period as shall be determined by the managing underwriters, which period cannot begin more than seven (7) days prior to the effectiveness of such Registration Statement and cannot last more than one-hundred eighty days after the effective date of such Registration Statement (subject to customary extensions if the Company issues an earnings release or material news or a material event occurs, in each case, during the last 17 days of the 180-day period).

**6.5**    **Preparation and Filing.**

If and whenever the Company is under an obligation pursuant to the provisions of this Agreement to effect the registration of an offering and sale of any Registrable Shares, the Company shall, as expeditiously as practicable:

(a)    use its commercially reasonable efforts to cause a Registration Statement that registers such offering of Registrable Shares to become and remain effective for a period of 180 days or until all of such Registrable Shares have been disposed of (if earlier);

(b)    furnish, at least five (5) Business Days before filing a Registration Statement that registers such Registrable Shares, a Prospectus relating thereto and any amendments or supplements relating to such Registration Statement or Prospectus, to one counsel (the "Stockholders' Counsel") selected by the majority in number of the Committee Holders, copies of all such documents proposed to be filed (it being understood that such five (5) Business Day period need not apply to successive drafts of the same document proposed to be filed so long as such successive drafts are supplied to such counsel in advance of the proposed filing by a period of time that is customary and reasonable under the circumstances), and shall use its reasonable best efforts to reflect in each such document, when so filed with the Commission, such comments as the Stockholders whose Registrable Shares are to be covered by such Registration Statement may reasonably propose;

(c)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period of at least 180 days or until all of such Registrable Shares have been disposed of (if earlier) and to comply with the provisions of the Securities Act with respect to the offering and sale or other disposition of such Registrable Shares;

(d)    notify the Stockholders' Counsel promptly in writing of (i) any comments by the Commission with respect to such Registration Statement or Prospectus, or any request by the Commission for the amending or supplementing thereof or for additional information with

respect thereto; (ii) the issuance by the Commission of any stop order suspending the effectiveness of such Registration Statement or Prospectus or any amendment or supplement thereto or the initiation of any proceedings for that purpose; and (iii) the receipt by the Company of any notification with respect to the suspension of the qualification of such Registrable Shares for sale in any jurisdiction or the initiation or threatening of any proceeding for such purposes;

(e)    use its commercially reasonable efforts to register or qualify such Registrable Shares under such other securities or "blue sky" laws of such jurisdictions as any seller of Registrable Shares reasonably requests and do any and all other acts and things that may reasonably be necessary or advisable to enable such seller of Registrable Shares to consummate the disposition in such jurisdictions of the Registrable Shares owned by such seller; provided, however, that the Company will not be required to qualify generally to do business, subject itself to general taxation or consent to general service of process in any jurisdiction where it would not otherwise be required to do so but for this Section 6.5(e);

(f)    furnish to each seller of such Registrable Shares such number of copies of a summary Prospectus or other Prospectus, including a preliminary Prospectus, in conformity with the requirements of the Securities Act, and such other documents as such seller of Registrable Shares may reasonably request in order to facilitate the public offering and sale or other disposition of such Registrable Shares;

(g)    use its commercially reasonable efforts to cause such offering and sale of Registrable Shares to be registered with or approved by such other Governmental Authority as may be necessary by virtue of the business and operations of the Company to enable the seller or sellers thereof to consummate the disposition of such Registrable Shares;

(h)    notify on a timely basis each seller of such Registrable Shares at any time when a Prospectus relating to such Registrable Shares is required to be delivered under the Securities Act within the appropriate period mentioned in Section 6.5(b) of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing and, at the request of such seller, prepare and furnish to such seller a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the offerees of such shares, such Prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing;

(i)    make available for inspection by any seller of such Registrable Shares, any underwriter participating in any disposition pursuant to such Registration Statement and any attorney, accountant or other agent retained by any such seller or underwriter (collectively, the "Inspectors"), all pertinent financial, business and other records, pertinent corporate documents and properties of the Company (collectively, the "Records"), as shall reasonably be necessary to enable them to exercise their due diligence responsibility, and cause the Company's officers, directors and employees to supply all information (together with the Records, the "Information") reasonably requested by any such Inspector in connection with such Registration Statement (and

any of the Information that the Company determines in good faith to be confidential, and of which determination the Inspectors are so notified, shall not be disclosed by the Inspectors unless (i) the disclosure of such Information is necessary to avoid or correct a misstatement or omission in the Registration Statement; (ii) the release of such Information is ordered pursuant to a subpoena or other order from a court of competent jurisdiction; (iii) such Information has been made generally available to the public; or (iv) the seller of Registrable Shares agrees that it will, upon learning that disclosure of such Information is sought in a court of competent jurisdiction, give notice to the Company and allow the Company, at the Company's expense, to undertake appropriate action to prevent disclosure of the Information deemed confidential);

(j)      use its best efforts to obtain from its independent certified public accountants a "cold comfort" letter in customary form and covering such matters of the type customarily covered by cold comfort letters;

(k)      use its best efforts to obtain, from its counsel, an opinion or opinions in customary form;

(l)      provide a transfer agent and registrar (which may be the same entity and which may be the Company) for such Registrable Shares;

(m)      issue to any underwriter to which any seller of Registrable Shares may sell shares in such offering certificates evidencing such Registrable Shares;

(n)      list such Registrable Shares on any national securities exchange on which any shares of the Common Stock are listed or, if the Common Stock is not listed on a national securities exchange, use its commercially reasonable efforts to qualify such Registrable Shares for quotation on such national securities exchange as the holders of a majority of such Registrable Shares included in such registration shall request;

(o)      otherwise use its commercially reasonable efforts to comply with all applicable rules and regulations of the Commission, and make available to its security holders, as soon as reasonably practicable but not later than eighteen (18) months after the effective date, earnings statements (which need not be audited) covering a period of twelve (12) months beginning within three (3) months after the effective date of the Registration Statement, which earnings statements shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder; and

(p)      use its commercially reasonable efforts to take all other steps necessary to effect the registration of such Registrable Shares contemplated hereby.

**6.6**    **Expenses.**

Except as set forth in Section 6.1(e), all expenses incident to the Company's performance of or compliance with Sections 6.1, 6.2, 6.3, 6.5 and 6.10, including without limitation (a) all registration and filing fees, and any other fees and expenses associated with filings required to be made with any stock exchange and the Commission; (b) all fees and expenses of compliance with state securities or "blue sky" laws (including fees and disbursements of counsel for the underwriters or Stockholders in connection with "blue sky" qualifications of the Registrable

Shares and determination of their eligibility for investment under the laws of such jurisdictions as the managing underwriters may designate); (c) all printing and related messenger and delivery expenses (including expenses of printing certificates for the Registrable Shares in a form eligible for deposit with The Depository Trust Company) and of printing prospectuses, (d) all fees and disbursements of counsel for the Company and of all independent certified public accountants of the issuer (including the expenses of any special audit and "cold comfort" letters required by or incident to such performance); (e) Securities Act liability insurance if the Company so desires; (f) all fees and expenses incurred in connection with the listing of the Registrable Shares on any securities exchange and all rating agency fees; (g) all reasonable fees and disbursements of the Stockholders' Counsel to represent such Persons in connection with such registration; (h) all fees and disbursements of underwriters customarily paid by the issuer or sellers of Securities, excluding underwriting discounts and commissions and transfer taxes, if any, and fees and disbursements of counsel to underwriters (other than such fees and disbursements incurred in connection with any registration or qualification of Registrable Shares under the securities or "blue sky" laws of any state); and (i) fees and expenses of other Persons retained by the Company (all such expenses being herein called "Registration Expenses"), will be borne by the Company, regardless of whether the Registration Statement becomes effective. In addition, the Company will, in any event, pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any audit and the fees and expenses of any Person, including special experts, retained by the Company.

**6.7    Indemnification.**

(a)    In connection with any registration of any offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, the Company shall indemnify and hold harmless the seller of such Registrable Shares, each underwriter, broker or any other Person acting on behalf of such seller, each other Person, if any, who controls any of the foregoing Persons within the meaning of the Securities Act and each Representative of any of the foregoing Persons, against any losses, claims, damages or liabilities, joint or several, to which any of the foregoing Persons may become subject, whether commenced or threatened, under the Securities Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Registration Statement under which such Registrable Shares were registered, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any offering and sale of any Registrable Shares, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or, with respect to any Prospectus, necessary to make the statements therein in light of the circumstances under which they were made not misleading, or any violation by the Company of the Securities Act or state securities or "blue sky" laws applicable to the Company and the Company shall promptly reimburse such seller, underwriter, broker, controlling Person or Representative for any legal or other expenses incurred by any of them in connection with investigating or defending any such loss, claim, damage, liability or action; provided, however, that the Company shall not be liable to any such Person to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in said Registration Statement,

preliminary Prospectus, amendment thereto, or any document incident to registration or qualification of any Registrable Shares in reliance upon and in conformity with written information furnished to the Company through an instrument duly executed by such Person, or a Person duly acting on their behalf, specifically for use in the preparation thereof.

(b)      In connection with any registration of an offering and sale of Registrable Shares under the Securities Act pursuant to this Agreement, each seller of Registrable Shares shall indemnify and hold harmless (in the same manner and to the same extent as set forth in Section 6.7(a)) the Company, each underwriter or broker involved in such offering, each other seller of Registrable Shares under such Registration Statement, each Person who controls any of the foregoing Persons within the meaning of the Securities Act and any Representative of the foregoing Persons with respect to any untrue statement or allegedly untrue statement in or omission or alleged omission from such Registration Statement, any preliminary Prospectus or final Prospectus contained therein, any amendment or supplement thereto or any document incident to registration or qualification of any such offering and sale of Registrable Shares, if such statement or omission was made in reliance upon and in conformity with written information furnished to the Company or such underwriter through an instrument duly executed by such seller or a Person duly acting on such Seller's behalf specifically for use in connection with the preparation of such Registration Statement, preliminary Prospectus, final Prospectus, amendment or supplement; provided, however, that the maximum amount of liability in respect of such indemnification shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Shares effected pursuant to such registration.

(c)      Promptly after receipt by an indemnified party of notice of the commencement of any action involving a claim referred to in the preceding paragraphs of this Section 6.7, such indemnified party will, if a claim in respect thereof is made against an indemnifying party, give written notice to the latter of the commencement of such action (provided, however, that an indemnified party's failure to give such notice in a timely manner shall only relieve the indemnification obligations of an indemnifying party to the extent such indemnifying party is materially prejudiced by such failure).  In case any such action is brought against an indemnified party, the indemnifying party will be entitled to participate in and to assume the defense thereof, jointly with any other indemnifying party similarly notified to the extent that it may wish, with counsel reasonably satisfactory to such indemnified party, and after notice from the indemnifying party to such indemnified party of its election to assume the defense thereof, the indemnifying party shall not be responsible for any legal or other expenses subsequently incurred by the indemnified party in connection with the defense thereof; provided, however, that if counsel to any indemnified party shall have reasonably concluded in writing that there may be one or more legal or equitable defenses available to such indemnified party which are in addition to or in conflict with those available to the indemnifying party, or that such claim or litigation involves or could have an effect upon matters beyond the scope of the indemnity agreement provided in this Section 6.7, the indemnifying party shall not have the right to assume the defense of such action on behalf of such indemnified party and such indemnifying party shall reimburse such indemnified party and any Person controlling such indemnified party for that portion of the fees and expenses of any one lead counsel (plus appropriate special and local counsel) retained by the indemnified party that are reasonably related to the matters covered by the indemnity agreement provided in this Section 6.7.  In the event any indemnified party is conducting the defense of any

action pursuant to this Section 6.7(c), no such action may be settled without the prior written consent of the indemnifying party (which shall not be unreasonably withheld). Furthermore, in the event that an indemnifying party assumes the defense of any action pursuant to this Section 6.7(c), no such action may be settled without the prior written consent of each indemnified party (which shall not be unreasonably withheld).

(d)      If the indemnification provided for in this Section 6.7 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, claim, damage or liability referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amounts paid or payable by such indemnified party as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other hand in connection with the statements or omissions that resulted in such loss, claim, damage or liability as well as any other relevant equitable considerations; provided, however, that the maximum amount of liability in respect of such contribution shall be limited, in the case of each seller of Registrable Shares, to an amount equal to the net proceeds actually received by such seller from the sale of Registrable Shares effected pursuant to such registration. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. Notwithstanding the foregoing, no Person guilty of fraudulent misrepresentation shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

(e)      The indemnification and contribution provided for under this Agreement will remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party and will survive the transfer of Registrable Shares.

**6.8      Underwriting Agreement.**

(a)      If any registration pursuant to Sections 6.1, 6.2, or 6.3 is requested to be an underwritten offering, the Company shall negotiate in good faith to enter into a reasonable and customary underwriting agreement with the underwriters thereof. The Company shall be entitled to receive indemnities from lead institutions, underwriters, selling brokers, dealer managers and similar securities industry professionals participating in the distribution, to the same extent as provided above with respect to information so furnished in writing by such Persons specifically for inclusion in any Prospectus or Registration Statement and to the extent customarily given their role in such distribution.

(b)      No Stockholder may participate in any registration hereunder that is underwritten unless such Stockholder agrees (i) to sell such Stockholder's Registrable Shares proposed to be included therein on the basis provided in any underwriting arrangements acceptable to the Company in the case of an offering of Primary Shares, or, in the case of a Demand Registration offering pursuant to Section 6.1 hereof, the Stockholders requesting Demand Registration pursuant to Section 6.1, (ii) as expeditiously as possible, to notify the Company of the occurrence of any event concerning such Stockholder as a result of which the Prospectus relating to such

registration contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading and (iii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents required under the terms of such underwriting arrangements.

**6.9**    **Information by Holder; Use of Prospectus.**

Each holder of Registrable Shares to be included in any registration shall furnish to the Company and the managing underwriter such written information regarding such holder and the distribution proposed by such holder as the Company or the managing underwriter may reasonably request in writing and as shall be reasonably required in connection with any registration, qualification or compliance referred to in this Agreement.  Each holder of Registrable Shares agrees that upon actual receipt of any notice from the Company of the happening of any event of the kind described in Section 6.6(h), such holder will forthwith discontinue disposition of such Registrable Shares covered by the applicable Registration Statement or Prospectus until such holder receives the copies of the supplemented or amended Prospectus contemplated by Section 6.6(h), or until it is advised in writing by the Company that the use of the applicable Prospectus may be resumed, and has received copies of any amendments or supplements thereto.

**6.10**    **Exchange Act Compliance.**

From and after the Registration Date or such earlier date as a registration statement filed by the Company pursuant to the Exchange Act relating to any class of the Company's Securities shall have become effective, the Company shall comply with all of the reporting requirements of the Exchange Act (whether or not it shall be required to do so) and shall comply with all other public information reporting requirements of the Commission but, in each case, only to the extent that such reporting requirements are conditions to the availability of Rule 144 for the sale of the Common Stock.  The Company shall cooperate with each Stockholder in supplying such information as may be necessary for such Stockholder to complete and file any information reporting forms presently or hereafter required by the Commission as a condition to the availability of Rule 144.

## ARTICLE VII

## CONFIDENTIALITY; INFORMATION RIGHTS; ACCESS TO INFORMATION

**7.1**    **Confidentiality.**

Except as otherwise required by law, each Stockholder shall, and shall use commercially reasonable efforts to cause its Representatives to, hold in confidence all confidential information of the Company provided or made available to such Stockholder and its Representatives until such time as such information has become publicly available other than as a consequence of any breach by such Stockholder or Representative of its confidentiality obligations hereunder; provided that the Company shall not provide any such confidential information to any

Stockholder who notifies the Company in writing that it desires not to receive any confidential information until such time as such notice is revoked in writing by such Stockholder.

## 7.2    Information Rights.

(a)    At the request of any Committee Holder so long as it holds 1.0% of the outstanding Common Stock or Stockholder Shares in an amount representing at least 50.0% of the Stockholder Shares held by such Committee Holder as of the Effective Date, (each an "Eligible Information Recipient"), the Company shall, and shall cause its Subsidiaries to, afford such Stockholder and its Representatives with reasonable access during normal business hours to books, properties and records of the Company and its Subsidiaries; provided that no Eligible Information Recipient shall be entitled, subject to any other rights such Stockholder may otherwise possess, to make such request more than four (4) times per year and the Company shall not be obligated to provide any Person with access or information to the extent that (i) any Law applicable to the Company or any Subsidiary requires such party to restrict or prohibit access to any such properties or information, (ii) such access would be in breach of any confidentiality obligation, commitment or provision by which the Company or any Subsidiary is bound or affected, which confidentiality obligation, commitment or provision shall be disclosed to the requesting Stockholder, provided that disclosure of such obligation, commitment or provision would not itself be the breach of an obligation or commitment to a third Person, (iii) such information is subject in the reasonable determination of the Company to an applicable attorney-client privilege or (iv) the Company reasonably determines, in good faith, that such Person is a competitor of the Company and promptly thereafter notifies such Stockholder of such determination (collectively, the "Information Restrictions").

(b)    Furthermore, the Company shall make available to the Eligible Information Recipients for so long as they hold Stockholder Shares, as soon as it is available the same financial information and access as the information and access required to be provided to noteholders under Section 4.03 of the Indenture, as such section is in effect as of the Effective Date and whether or not notes remain outstanding under such Indenture, or equivalent information, including regular quarterly and annual financial statements of the Company (or any successor entity, if applicable) prepared and made available in the ordinary course of business, if at a time when such financial information is not required to be provided to noteholders under the Indenture unless and to the extent that such information is covered by an Information Restriction.

## ARTICLE VIII

## LEGENDS AND COMPLIANCE WITH SECURITIES LAWS

## 8.1    Restrictions on Transfer.

In addition to any other restrictions on the Transfer of Stockholder Shares contained in this Agreement, the Stockholders shall not transfer any Restricted Securities except in compliance with this Article VIII.  Each Stockholder agrees that it shall not offer, sell or otherwise Transfer any of its Stockholder Shares other than (a) to the Company; (b) outside the United States in accordance with Rule 904 of Regulation S under the Securities Act; (c) within the United States in accordance with (i) Rule 144A under the Securities Act to a person who the

seller reasonably believes is a Qualified Institutional Buyer (as defined therein) that is purchasing for its own account or for the account of another Qualified Institutional Buyer to whom notice is given that the offer, sale, or transfer is being made in reliance on Rule 144A, if available, or (ii) the exemption from registration under the Securities Act provided by Rule 144 thereunder, if applicable; (d) in a transaction that does not require registration under the Securities Act or any applicable United States state laws and regulations governing the offer and sale of securities; or (e) pursuant to an effective registration statement under the U.S. Securities Act, _provided_ that with respect to sales or Transfers under (x) clauses (b) and (c)(i), only if the Stockholder has furnished to the Company a customary certificate confirming compliance with such exemptions, reasonably satisfactory to the Company, prior to such sale or Transfer to the extent requested by the Company, or (y) clauses (c)(ii) or (d), only if the Stockholder has furnished to the Company an opinion of counsel, reasonably satisfactory to the Company, prior to such sale or Transfer to the extent requested by the Company, and in each case in accordance with any applicable state securities laws in the United States and securities laws of any other applicable jurisdiction.  Each Stockholder consents to the Company making a notation on its records and giving instructions to any registrar and transfer agent not to record any Transfer of Stockholder Shares without first being notified by the Company that it is reasonably satisfied that such Transfer is exempt from, or not subject to, the registration requirements of the Securities Act and is a Permitted Transfer.  The Company shall promptly notify its registrar and transfer agent upon reasonably determining that a proposed Transfer is exempt from, or not subject to, the registration requirements of the Securities Act and is a Permitted Transfer.

**8.2**     **Restrictive Legends.**

(a)     All Stockholder Shares shall be issued and held in certificated form and each such certificate evidencing such Stockholders' ownership of Stockholder Shares shall be stamped or otherwise imprinted with legends in substantially the following form

(i) so long as Article FOURTH, Section 3 of the Charter is in effect:

"THE CORPORATION'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") INCLUDES, AMONG OTHER THINGS, TRANSFER RESTRICTIONS ON, AND OBLIGATIONS WITH RESPECT TO, THE COMMON STOCK AND THE PREFERRED STOCK OF THE CORPORATION.  SO LONG AS IT IS IN EFFECT, THE CHARTER RESTRICTS TRANSFERS THAT WOULD RESULT IN THE NUMBER OF RECORD HOLDERS OF ANY CLASS OF CAPITAL STOCK OF THE CORPORATION EXCEEDING 450 HOLDERS. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CHARTER, CONTAINING THE ABOVE-REFERENCED TRANSFER RESTRICTIONS AND OBLIGATIONS, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

(ii)

"THE CORPORATION'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") INCLUDES, AMONG OTHER THINGS, RESTRICTIONS ON TRANSFERS. A COPY OF THE CHARTER WILL BE FURNISHED WITHOUT CHARGE BY THE CORPORATION TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(iii)

"THE CORPORATION'S AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") INCLUDES, AMONG OTHER THINGS, TRANSFER RESTRICTIONS ON, AND OBLIGATIONS WITH RESPECT TO, THE COMMON STOCK AND THE PREFERRED STOCK OF THE CORPORATION. UNDER CERTAIN CIRCUMSTANCES, THE HOLDER OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE OBLIGATED TO TRANSFER SUCH HOLDER'S SHARES IN ACCORDANCE WITH THE CHARTER. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CHARTER, CONTAINING THE ABOVE-REFERENCED TRANSFER RESTRICTIONS AND OBLIGATIONS, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

and (iv):

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM PURSUANT TO APPLICABLE LAW. ANY OFFER, SALE, ASSIGNMENT, TRANSFER OR OTHER DISPOSITION OF THIS SECURITY IN A TRANSACTION THAT IS NOT REGISTERED UNDER THE SECURITIES ACT IS SUBJECT TO THE CORPORATION'S RIGHT TO REQUIRE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO THE CORPORATION."

(b) The Company shall, at the request of a Stockholder, remove from each certificate representing Stockholder Shares the legend described in Section 8.2(a)(iv), if at the request of the Company, the requesting holder provides, at its expense, an opinion of counsel satisfactory to the Company that the that such legend is no longer required under applicable requirements of the Securities Act or state securities laws. The Company shall, at the request of a Stockholder, remove from each certificate representing Stockholder Shares (i) the legend described in Section 8.2(a)(i) if the limitation on the number of holders Article IV, Section 3 of the Charter has been terminated in accordance with it terms and the legend and (ii) the legend described in Section 8.2(a)(ii) and (iii) upon the termination of this Agreement.

**8.3**   **Additional Legend.**

(a)    Each certificate evidencing Stockholder Shares and each certificate issued in exchange for or upon Transfer of any Stockholder Shares shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A STOCKHOLDERS' AGREEMENT DATED AS OF DECEMBER ___, 2010 (AS AMENDED, MODIFIED, SUPPLEMENTED OR RESTATED FROM TIME TO TIME, THE "AGREEMENT"), AMONG THE ISSUER OF SUCH SECURITIES (THE "COMPANY") AND THE COMPANY'S STOCKHOLDERS.   THE TERMS OF SUCH AGREEMENT INCLUDE, AMONG OTHER THINGS, RESTRICTIONS ON TRANSFERS.  A COPY OF THE AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

(b)    The legend set forth above shall be removed from certificates evidencing any Stockholder Shares which cease to be Stockholder Shares in accordance with the terms of this Agreement.

**8.4**   **Limit on Number of Stockholders.**

(a)    Notwithstanding anything set forth in this Agreement or in the Certificate, or the compliance with any of the terms hereof or thereof, no direct or indirect Transfer, however accomplished, of shares of Common Stock or any other class of capital stock of the Company shall be effective, and any such Transfer of Stockholder Shares shall be deemed null and void, if, as a result of any such Transfer, the record number of stockholders of the Company of the applicable class of capital stock  (as determined in accordance with Rule 12g5-1 under the Exchange Act or any successor rule or interpretation) would exceed four hundred fifty (450).

(b)    The restrictions contained in this Section 8.4 are for the purpose of ensuring that the Company is not required to become a registrant under the Exchange Act due to the number of stockholders of the Company.

(c)    Any Transfer attempted to be made in violation of this Section 8.4 will be null and void.  The proposed Transferee shall not be entitled to any rights of stockholders of the Company or as a Stockholder, including, but not limited to, the rights to vote or to receive dividends and liquidating distributions, with respect to the shares of Common Stock and/or any other class of capital stock of the Company that were the subject of such attempted Transfer.

(d)    In addition to any remedies available to the Company under applicable law or in equity, after learning of a Transfer not in compliance with this Section 8.4, the Company may demand the immediate surrender, or cause to be immediately surrendered, to the Company, all certificates representing the shares of Common Stock and/or any other class of capital stock of the Company that were the subject of such attempted Transfer, or any proceeds received upon a sale of such shares, and any dividends or other distributions made after such noncompliant Transfer with respect to such shares, if any.  Any such surrendered certificates may be destroyed. If any such certificates are not immediately surrendered, the Company shall cancel such

certificates, or cause such certificates to be cancelled, on the stock transfer records and other records of the Company.  Any shares of Common Stock and/or any other class of capital stock of the Company attempted to be Transferred pursuant to a destroyed or cancelled certificate shall continue to be registered in the name of the purported transferor.  Nothing in this subparagraph (d) shall be deemed inconsistent with the Transfer of such securities being deemed null and void pursuant to subparagraph (c) hereof.

(e)     The Company may require, as a condition precedent to the registration of the Transfer of any shares of Common Stock and/or any other class of capital stock of the Company or the payment of any distribution on any such shares, that the proposed Transferor and Transferee or payee furnish to the Company all information reasonably requested by the Company with respect to all the direct or indirect ownership interests in such shares.  The Company may make such arrangements or issue such instructions to its stock transfer agent as may be determined by the Chief Executive Officer under the direction of the Board of Directors to be necessary or advisable to implement this Section 8.4, including, without limitation, instructing the transfer agent not to register any Transfer of shares of Common Stock on the Company's stock transfer records if it has knowledge that such Transfer is prohibited by this Section 8.4, and/or authorizing such transfer agent to require an affidavit from a transferee or transferor regarding such Person's ownership of shares of Common Stock and other evidence that a Transfer will not be prohibited by this Section 8.4, as a condition to registering any Transfer.

(f)     Nothing contained in this Section 8.4 shall limit the authority of the Company, its executive officers or the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to ensure that the Company is not required to become a registrant under the Exchange Act due to the number of stockholders.

(g)     The provisions of this Section 8.4 shall terminate upon the earliest of (i) any firm commitment underwritten public offering of Common Stock pursuant to a registration statement filed with the Securities and Exchange Commission and declared effective under the Securities Act (ii), the filing by the Corporation of a registration statement pursuant to Section 12(g) of the Exchange Act, and (iii) such time as the Company Board determines that the provisions of Article FOURTH, Section 3 of the Certificate are no longer necessary for the preservation of the Corporation's status as a non-reporting company under the Exchange Act.

## ARTICLE IX

## AMENDMENT AND WAIVER

### 9.1    Amendment.

Except as otherwise set forth herein, the terms and provisions of this Agreement may not be amended, modified, restated, supplemented or waived except pursuant to a writing signed by Stockholders acting by Majority Requisite Consent (or if Majority Requisite Consent cannot be obtained, by Alternative Majority Consent); provided that the provisions of Article III, Section 9.1 and Article X may only be amended, modified, restated, supplemented or waived with Majority Requisite Consent; and provided, further that no such amendment, modification,

restatement, supplement or waiver shall materially and adversely affect any Stockholder disproportionately to the other Stockholders.

**9.2     Waiver.**

No course of dealing between the Company and the Stockholders (or any of them) or any delay in exercising any rights hereunder will operate as a waiver of any rights of any party to this Agreement.  The failure of any party to enforce any of the provisions of this Agreement will in no way be construed as a waiver of such provisions and will not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

## ARTICLE X

## TERMINATION

The provisions of this Agreement, except as otherwise expressly provided herein, shall terminate upon the first to occur of (a) the dissolution, liquidation or winding-up of the Company; (b) a Sale of the Company pursuant to an Approved Sale; (c) the consummation of an Initial Public Offering; or (d) the written approval of such termination by Stockholders constituting Majority Requisite Consent; provided, however, that (i) if the Agreement is terminated prior to the consummation of a Sale of the Company in which Stockholders exercise rights under Section 2.5 to compel an Approved Sale or an Initial Public Offering, the rights and obligations set forth in Article VII (other than Section 7.2(b)) shall continue without interruption until the earlier of the consummation of a Sale of the Company in which Stockholders exercise rights under Section 2.5 to compel an Approved Sale or an Initial Public Offering, and (ii) in the case of clause (c), all the provisions set forth in Article VI relating to registration rights (and all definitions and "Miscellaneous" provisions related thereto) shall continue without interruption until less than ten percent (10%) of the Stockholder Shares are Registrable Shares.  Anything contained herein to the contrary notwithstanding, as to any particular Stockholder, this Agreement shall no longer be binding or of further force or effect as to such Stockholder, except as otherwise expressly provided herein, as of the date such Stockholder has Transferred all of such Stockholder's Stockholder Shares in accordance with the terms hereof.

## ARTICLE XI

## MISCELLANEOUS

**11.1     Severability.**

It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  Notwithstanding the foregoing, if such provision could be more narrowly drawn so

as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

## 11.2    Entire Agreement.

This Agreement and the other agreements referred to herein and to be executed and delivered in connection herewith embody the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and thereof and supersede and preempt any and all prior and contemporaneous understandings, agreements, arrangements or representations by or among the parties, written or oral, which may relate to the subject matter hereof or thereof in any way.  The Company and the Committee Holders specifically agree that notwithstanding any contrary provision in the Certificate they will not exercise any right under Article Fourth, Section 4 of the Certificate (or any other section of the Certificate that relates to the same subject matter thereof) to compel Stockholders to participate in any drag-along sale in a manner inconsistent with the provisions of Section 2.5 of this Agreement; provided, however, that nothing herein shall limit the rights of the Company or the Committee Members in Article Fourth, Section 4 of the Certificate against any Person not a party to this Agreement.

## 11.3    Independence of Agreements and Covenants

All agreements and covenants hereunder shall be given independent effect so that if a certain action or condition constitutes a default under a certain agreement or covenant, the fact that such action or condition is permitted by another agreement or covenant shall not affect the occurrence of such default.

## 11.4    Successors and Assigns.

Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the Company and its successors and permitted assigns and the Stockholders and any subsequent holders of Stockholder Shares and the respective successors and permitted assigns of each of them, so long as they own Stockholder Shares.  No Stockholder may assign its rights hereunder in violation of this Agreement and any such attempted assignment shall be void ab initio.

## 11.5    Counterparts; Facsimile Signatures; Validity.

This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered (by facsimile or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature hereupon delivered by facsimile shall be deemed for all purposes as constituting good and valid execution and delivery of this Agreement by such party.

## 11.6    Remedies.

(a)      Each Stockholder shall have (i) all rights and remedies reserved for such Stockholder pursuant to this Agreement, (ii) all rights and remedies which such holder has been

granted at any time under any other agreement or contract and (iii) all of the rights which such holder has under any law or equity.  Any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law or equity.

(b)    It is acknowledged that it will be impossible to measure in money the damages that would be suffered by any party hereto if any other Person party hereto fails to comply with any of the obligations imposed on it upon them in this Agreement and that in the event of any such failure, the aggrieved party will be irreparably damaged and will not have an adequate remedy at law.  Any such aggrieved party shall, therefore, be entitled to equitable relief, including specific performance, to enforce such obligations, and if any action should be brought in equity to enforce any of the provisions of this Agreement, none of the parties hereto shall raise the defense that there is an adequate remedy at law.

**11.7    Notices.**

All notices, amendments, waivers or other communications pursuant to this Agreement shall be in writing and shall be deemed to have been duly given if personally delivered, telecopied, sent by nationally recognized overnight courier or mailed by registered or certified mail with postage prepaid, return receipt requested, to the parties hereto at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    if to the Company, to:

American, Media Inc.
1000 American Media Way
Boca Raton, FL 33464
Attention:  Chief Financial Officer
Telephone:  (561) 997-7733
Facsimile:  (561) 272-8127

with a copy to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY   10036
Attention:  Ira Dizengoff
Facsimile:  (212) 872-1002
Telephone:  (212) 872-1000

(b)    if to any Stockholder to the most current address given by such Stockholder to the Company, or if no such address is provided to the Company, such notice to be delivered to the address set forth in the stock register of the Company.

Any such notice or communication shall be deemed to have been given and received (a) when delivered, if personally delivered; (b) when sent, if sent by telecopy on a Business Day (or, if not sent on a Business Day, on the next Business Day after the date sent by

telecopy); (c) on the next Business Day after dispatch, if sent by nationally recognized overnight courier guaranteeing next Business Day delivery; and (d) on the fifth Business Day following the date on which the piece of mail containing such communication is posted, if sent by mail.

**11.8    Governing Law; Jurisdiction.**

EXCEPT AS SET FORTH BELOW, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE DOMESTIC LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO THE CONFLICTS OF LAWS OR PRINCIPLES THEREOF THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF DELAWARE.  WITH RESPECT TO ANY LAWSUIT OR PROCEEDING ARISING OUT OF OR BROUGHT WITH RESPECT TO THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY, EACH OF THE PARTIES HERETO IRREVOCABLY (a) SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES FEDERAL AND NEW YORK STATE COURTS LOCATED IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK; (b) WAIVES ANY OBJECTION IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT; (c) WAIVES ANY CLAIM THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM; AND (d) FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDINGS, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER SUCH PARTY.

**11.9    Waiver of Jury Trial.**

EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS BETWEEN THE PARTIES HERETO RELATING TO THE SUBJECT MATTER HEREOF.  EACH OF THE PARTIES HERETO ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND THAT MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF THE OTHER PARTY. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH OF THE PARTIES HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.  EACH OF THE PARTIES HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED OR HAD THE OPPORTUNITY TO REVIEW THIS WAIVER WITH ITS RESPECTIVE LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH SUCH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**11.10    Further Assurances.**

Each party hereto shall do and perform or cause to be done and performed all such further acts and things and shall execute and deliver all such other agreements, certificates, instruments, and documents as any other party hereto reasonably may request in order to carry out the provisions of this Agreement and the consummation of the transactions contemplated hereby.

**11.11** **Third Party Reliance.**

Anything contained herein to the contrary notwithstanding, the covenants of the Company contained in this Agreement (a) are being given by the Company as an inducement to the Stockholders to enter into this Agreement (and the Company acknowledges that the Stockholders have expressly relied thereon) and (b) are solely for the benefit of the Stockholders. Accordingly, no third party (including, without limitation, any holder of equity Securities who is not a Stockholder and any holder of any other Securities of the Company who is not a Stockholder) or anyone acting on behalf of any thereof other than the Stockholders, shall be a third party or other beneficiary of such covenants and no such third party shall have any rights of contribution against the Stockholders or the Company with respect to such covenants or any matter subject to or resulting in indemnification under this Agreement or otherwise. None of the provisions hereof shall create, or be construed or deemed to create, any right to employment in favor of any Person by the Company or any of its Subsidiaries.

**11.12** **Termination of Prior Stockholders Agreement.**

The Stockholders Agreement dated as of January 30, 2009 among the Company, the stockholders signatory thereto and the EMP Group Representative (the "Prior Agreement") is hereby terminated and is of no further force and effect, and other than as set expressly forth in the Prior Agreement, no party thereto shall have any surviving obligations, rights, or duties thereunder.

*******

**<u>Schedule I</u>**

**<u>Directors</u>**

| **<u>Name of Director</u>** | **<u>Means of Designation</u>** |
|---|---|
| David J. Pecker | Management Director |
| Philip L. Maslowe | Designated by the Angelo Gordon Stockholders |
| Gavin Baiera | Designated by the Angelo Gordon Stockholders |
| Susan Tolson | Designated by the Capital Research Stockholders |
| Cathryn C. Cranston | Designated by the Capital Research Stockholders |
| Michael Elkins | Designated by the Avenue Stockholders |
| Daniel Flores | Designated by the Avenue Stockholders |
| David Licht | Designated by the Avenue Stockholders |
| Lawrence S. Kramer | Designated by the Avenue Stockholders with consent of Angelo Gordon Stockholders and Capital Research Stockholders |

Doc#: US1:6626551v15

## **JOINDER AGREEMENT**

The undersigned is executing and delivering this Joinder Agreement pursuant to the Stockholders' Agreement dated as of _____, 2010 (as amended, modified, restated or supplemented from time to time, the "Stockholders' Agreement"), among American Media, Inc., a Delaware corporation (the "Company"), and its stockholders named therein.

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Stockholders' Agreement in the same manner as if the undersigned were an original signatory to such agreement.

The undersigned acknowledges and agrees that the undersigned shall be a "Stockholder", as such term is defined in the Stockholders' Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.

_____
*Signature of Stockholder*

_____
*Print Name of Stockholder*

_____

_____
*Address*

_____
*Facsimile*

_____
*Telephone*

Exhibit A -1

## EXHIBIT J

**Restated Bylaws**

AG Draft of 12/14/2010

SECOND AMENDED AND RESTATED BY-LAWS

OF

AMERICAN MEDIA, INC.

a Delaware corporation

(the "*Corporation*")

(Adopted as of December ___, 2010)

**SECOND AMENDED AND RESTATED BY-LAWS**

**OF**

**AMERICAN MEDIA, INC.**

## ARTICLE I.
### OFFICES

**Section 1.1.   Registered Office**.  The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

**Section 1.2.   Additional Offices**.  The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or as the business and affairs of the Corporation may require.

## ARTICLE II.
### STOCKHOLDERS MEETINGS

**Section 2.1.   Annual Meetings**.  Unless directors are elected by written consent in lieu of an annual meeting as permitted by applicable law or an annual meeting is otherwise not required by applicable law, an annual meeting of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).   At each annual meeting, the stockholders shall elect directors of the Corporation and may transact any other business as may properly be brought before the meeting. Stockholders may, unless the Corporation's Second Amended and Restated Certificate of Incorporation, as the same may be amended or restated from time to time (the "***Certificate of Incorporation***"), provides otherwise, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

**Section 2.2.   Special Meetings**.   Except as otherwise required by applicable law or provided in the Certificate of Incorporation, special meetings of stockholders, for any purpose or purposes, may be called only by the Chairman of the Board, Chief Executive Officer or the President, by the Board, or by the Secretary at the request in writing of stockholders holding shares representing at least ten percent (10%) of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called.   The Secretary shall call such a meeting upon receiving such a request.   Special meetings of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine

that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 9.5(a).

**Section 2.3.    Notices**.  Notice of each stockholders meeting stating the place, if any, date and time of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting if such date is different from the record date for determining stockholders entitled to notice of the meeting shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting.  Such notice shall be given by the Corporation not less than 10 nor more than 60 days before the date of the meeting.  If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto).

**Section 2.4.    Quorum**.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these Second Amended and Restated By-Laws, as the same may be amended or restated from time to time (the "***By-Laws***"), the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business.  If a quorum shall not be present at any meeting of the stockholders, the chairman of the meeting or the stockholders entitled to vote thereat so present, by a majority in voting power thereof, may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend.  The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

**Section 2.5.    Voting of Shares**.

(a)    Voting Lists.  The Secretary shall prepare, or shall cause the officer or agent who has charge of the stock ledger of the Corporation to prepare, at least 10 days before each meeting of stockholders, a complete list of the stockholders of record entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order for each class of stock and showing the address and the number of shares registered in the name of each stockholder. Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail

2

addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting: (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. If the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present. If a meeting of stockholders is to be held solely by means of remote communication as permitted by <u>Section 9.5(a)</u>, then such list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting. The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this <u>Section 2.5(a)</u> or to vote in person or by proxy at any meeting of stockholders.

(b)    <u>Manner of Voting</u>.    At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy. If authorized by the Board, the voting by stockholders or proxyholders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in <u>Section 9.3(c)</u>), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxyholder. The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)    <u>Proxies</u>.    Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. Proxies need not be filed with the Secretary until the meeting is called to order, but shall be filed with the Secretary before being voted. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority:

(i)    A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)    A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy, provided that any such

AG Draft of 12/14/2010

electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)    Required Vote.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("**Preferred Stock**"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon.  All other matters shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation or these By-Laws, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)    Inspectors of Election.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof.  The Board may appoint one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  No person who is a candidate for an office at an election may serve as an inspector at such election.  Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting.  If there is more than one inspector, the report of a majority shall be the report of the inspectors.

**Section 2.6.    Adjournments**.  Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting or by the stockholders present and entitled to vote thereat, by a majority in voting power thereof, from time to time, whether or not there is a quorum, to reconvene at the same or some other place.  Notice need not be given of any such adjourned meeting if the date, time, place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the

4

adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with <u>Section 2.3</u> and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

### Section 2.7.    Advance Notice for Business.

(a)    <u>Annual Meetings of Stockholders</u>.  No business may be transacted at an annual meeting of stockholders, other than business that is either (i) specified in the Corporation's notice of meeting (or any supplement thereto) given by or at the direction of the Board, (ii) otherwise properly brought before the annual meeting by or at the direction of the Board or (iii) otherwise properly brought before the annual meeting by any stockholder of the Corporation (x) who is a stockholder of record on the date of the giving of the notice provided for in this Section 2.7(a) and who is entitled to vote   at such annual meeting and (y) who complies with the notice procedures set forth in this Section 2.7(a).  This Section 2.7 shall not be applicable to nominations of person for election to the Board.

(i)    In addition to any other applicable requirements, for business (other than nominations) to be properly brought before an annual meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation and such business must otherwise be a proper matter for stockholder action.  Subject to Section 2.7(a)(iv), a stockholder's notice to the Secretary with respect to such business, to be timely, must comply with the provisions of this Section 2.7(a)(i).  A stockholder's notice must be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the 30th day nor earlier than the opening of business on the 60th day before the date of the annual meeting of stockholders; <u>provided</u>, <u>however</u>, that if the annual meeting is called for a date that is less than 40 days prior to the date of the annual meeting of stockholders, notice by the stockholder to be timely must be so received not later than the close of business on the 10th day following the day on which public announcement of the date of the annual meeting is first made by the Corporation.  The public announcement of an adjournment or postponement of an annual meeting shall not commence a new time period for the giving of a stockholder's notice as described in this Section 2.7(a).

(ii)    To be in proper written form, a stockholder's notice to the Secretary with respect to any business (other than nominations) must set forth (A) as to each such matter such stockholder proposes to bring before the annual meeting (1) a brief description of the business desired to be brought before the annual meeting and any material interest in such business of such stockholder and any Stockholder Associated Person (as defined below), individually or in the aggregate, (2) the text of the proposal or business (including the text of any resolutions proposed for consideration and if such business includes a proposal to amend these By-Laws, the text of the proposed

5

AG Draft of 12/14/2010

amendment) and (3) the reasons for conducting such business at the annual meeting, (B) the name and address of the stockholder proposing such business, as they appear on the Corporation's books, and the name and address of any Stockholder Associated Person, (C) the class or series and number of shares of capital stock of the Corporation that are owned of record or are directly or indirectly owned beneficially by such stockholder and by any Stockholder Associated Person, (D) any proxy, contract, arrangement, understanding or relationship pursuant to which such stockholder or any Stockholder Associated Person has a right to vote any shares of the Corporation, (E) a description of all agreements, arrangements or understandings (written or oral) between or among such stockholder, any Stockholder Associated Person or any other person or persons (including their names) in connection with the proposal of such business by such stockholder, (F) any other information relating to such stockholder and any Stockholder Associated Person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitation of proxies for election of directors (even if an election contest is not involved), (G) a representation that such stockholder intends to appear in person or by proxy at the annual meeting to bring such business before the meeting, and (H) a statement of whether such stockholder or any Stockholder Associated Person intends, or is part of a group that intends, to solicit proxies in connection with the proposal.

(iii)    No business shall be conducted at the annual meeting of stockholders except business brought before the annual meeting in accordance with the procedures set forth in this Section 2.7(a), provided, however, that once business has been properly brought before the annual meeting in accordance with such procedures, nothing in this Section 2.7(a) shall be deemed to preclude discussion by any stockholder of any such business.  If the Board or the chairman of the annual meeting determines that any stockholder proposal was not made in accordance with the provisions of this Section 2.7(a) or that the information provided in a stockholder's notice does not satisfy the information requirements of this Section 2.7(a), such proposal shall not be presented for action at the annual meeting.  Notwithstanding the foregoing provisions of this Section 2.7(a), if the stockholder (or a qualified representative of the stockholder) does not appear at the annual meeting of stockholders of the Corporation to present the proposed business, such proposed business shall not be transacted, notwithstanding that proxies in respect of such matter may have been received by the Corporation.

(b)    Special Meetings of Stockholders.  Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the Corporation's notice of meeting.

(c)    Definitions.  For purposes of these By-Laws, "**Stockholder Associated Person**" shall mean for any stockholder (i) any person controlling, directly or indirectly, or acting in concert with, such stockholder, (ii) any beneficial owner of shares of stock of the Corporation owned of record or beneficially by such stockholder, or (iii) any person controlling, controlled by or under common control with such person referred to in the preceding clauses (i) and (ii).

688913.0001 EAST 100432330 v1

AG Draft of 12/14/2010

**Section 2.8.    Conduct of Meetings**.  The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer, or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board, or in the absence of such appointment, a chairman chosen at the meeting.  The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the chairman of the meeting.  The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with these By-Laws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting.  Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**Section 2.9.    Consents in Lieu of Meeting**.  Unless otherwise provided by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation to its registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary.  Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the date the earliest dated consent is delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take such action are delivered to the Corporation by delivery to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  An electronic transmission consenting to the action to be taken and transmitted by a stockholder, proxyholder or a person or persons authorized to act for a stockholder or proxyholder shall be deemed to be written, signed and dated for purposes hereof if such electronic transmission sets forth or is delivered with information from which the Corporation can determine that such transmission was transmitted by a stockholder or proxyholder (or by a person authorized to act for a stockholder or proxyholder) and the date on which such stockholder, proxyholder or authorized person transmitted such transmission.  The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed.  No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced

7

in paper form and delivered to the Corporation by delivery either to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested.   Notwithstanding the limitations on delivery in the previous sentence, consents given by electronic transmission may be otherwise delivered to the Corporation's principal place of business or to the Secretary if, to the extent, and in the manner provided by resolution of the Board.   Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.   Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders were delivered to the Corporation as provided in this <u>Section 2.9</u>.

## ARTICLE III.
## DIRECTORS

**Section 3.1.    Powers**.  The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders. Directors need not be stockholders or residents of the State of Delaware.

**Section 3.2.    Number; Term**.  The number of directors of the Corporation initially shall be nine.   Thereafter, the number of directors, other than those who may be elected by the holders of one or more series of Preferred Stock voting separately by class or series, may be determined from time to time by the Board, but no decrease in such number shall have the effect of shortening the term of any incumbent director.  Except as otherwise provided in the Certificate of Incorporation, the directors shall be elected at the annual meeting of stockholders to hold office until the next succeeding annual meeting of stockholders.  Each director shall hold office for the term for which such director is elected and until his or her successor shall have been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 3.3.    Newly Created Directorships and Vacancies**.   Except as otherwise provided in the Certificate of Incorporation, vacancies resulting from death, resignation, retirement, disqualification, removal or other cause and newly created directorships resulting from an increase in the number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority vote of the directors then in office, even if less than a quorum, by a sole remaining director, or by the stockholders.   Except as otherwise provided in the Certificate of Incorporation, if the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled only by a majority of the directors elected by such class or classes or series thereof then in office, by a sole remaining director so elected, or by the stockholders of such class or classes or series

8

thereof.  Except as otherwise provided in the Certificate of Incorporation, any director elected or chosen in accordance with this <u>Section 3.3</u> shall hold office until the next annual election of directors and until his or her successor shall have been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 3.4.    Compensation**.    Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, the Board shall have the authority to fix the compensation of directors.  The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of committees of the Board may be allowed like compensation and reimbursement of expenses for attending committee meetings.

**ARTICLE IV.**
**BOARD MEETINGS**

**Section 4.1.    Annual Meetings**.  The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board.  No notice to the directors shall be necessary to legally convene this meeting, except as provided in this <u>Section 4.1</u>.

**Section 4.2.    Regular Meetings**.  Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places as shall from time to time be determined by the Board.

**Section 4.3.    Special Meetings**.  Special meetings of the Board (a) may be called by the Chairman of the Board or Chief Executive Officer and (b) shall be called by the Chairman of the Board, Chief Executive Officer or Secretary on the written request of a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request.  Notice of each special meeting of the Board shall be given, as provided in <u>Section 9.3</u>, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail.  If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting.  Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting.  Except as may be otherwise expressly provided by applicable law, the Certificate of Incorporation, or these By-Laws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.  A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with <u>Section 9.4</u>.

AG Draft of 12/14/2010

**Section 4.4.    Quorum; Required Vote**.  A majority of the Board, but in any event not less than one-third of the Whole Board (as defined below), shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these By-Laws.  If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.   "Whole Board" shall mean the total number of directors that the Corporation would have if there were no vacancies.

**Section 4.5.    Consent In Lieu of Meeting**.  Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

**Section 4.6.    Organization**.  The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present.  The Secretary shall act as secretary of all meetings of the Board.  In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

**ARTICLE V.**
**COMMITTEES OF DIRECTORS**

**Section 5.1.    Establishment**.  The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board when required.  The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

**Section 5.2.    Available Powers**.  Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

10

AG Draft of 12/14/2010

**Section 5.3.    Alternate Members**.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

**Section 5.4.    Procedures**.  Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee.  At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business.  The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these By-Laws or the Board.  If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  Unless the Board otherwise provides and except as provided in these By-Laws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article III and Article IV of these By-Laws.

## ARTICLE VI.
## OFFICERS

**Section 6.1.    Officers**.  The officers of the Corporation elected by the Board shall be a Chairman of the Board, a Chief Executive Officer, a President, a Treasurer, a Secretary and such other officers (including without limitation a Chief Financial Officer, Vice Presidents, Assistant Secretaries and Assistant Treasurers) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI.  Such officers shall also have such powers and duties as from time to time may be conferred by the Board.  The Chairman of the Board, Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation.  Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these By-Laws or as may be prescribed by the Board or, if such officer has been appointed by the Chairman of the Board, Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a)    Chairman of the Board.  The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board.  The Chairman of the Board shall advise and counsel the Chief Executive Officer and other officers and shall exercise such powers and perform such duties as shall be assigned to or required of the Chairman of the Board from time to time by the Board or these By-Laws.

(b)    Chief Executive Officer.  The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board.  In the absence (or

AG Draft of 12/14/2010

inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board.

(c)    President.    The President shall be the chief operating officer of the Corporation and shall, subject to the authority of the Chief Executive Officer and the Board, have general management and control of the day-to-day business operations of the Corporation and shall consult with and report to the Chief Executive Officer.  The President shall put into operation the business policies of the Corporation as determined by the Chief Executive Officer and the Board and as communicated to the President by the Chief Executive Officer and the Board.  The President shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer.  In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board.

(d)    Vice Presidents.    In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President.  Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(e)    Secretary.

(i)    The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President.  The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary.  The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii)    The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(f)    Assistant Secretaries.    The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(g)    <u>Treasurer</u>.  The Treasurer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation which from time to time may come into the Treasurer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize).

(h)    <u>Assistant Treasurers</u>.  The Assistant Treasurer or, if there shall be more than one, the Assistant Treasurers in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Treasurer, perform the duties and exercise the powers of the Treasurer.

**Section 6.2.    Term of Office; Removal; Vacancies**.  The elected officers of the Corporation shall be elected annually by the Board at its first meeting held after each annual meeting of stockholders.  All officers elected by the Board shall hold office until the next annual meeting of the Board and until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office.  Any officer may be removed, with or without cause, at any time by the Board.  Any officer appointed by the Chairman of the Board , Chief Executive Officer or President may also be removed, with or without cause, by the Chairman of the Board, Chief Executive Officer or President, as the case may be, unless the Board otherwise provides.  Any vacancy occurring in any elected office of the Corporation may be filled by the Board.  Any vacancy occurring in any office appointed by the Chairman of the Board, Chief Executive Officer or President may be filled by the Chairman of the Board, Chief Executive Officer or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3.    Other Officers**.  The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

**Section 6.4.    Multiple Officeholders; Stockholder and Director Officers**.  Any number of offices may be held by the same person unless the Certificate of Incorporation or these By-Laws otherwise provide.  Officers need not be stockholders or residents of the State of Delaware.

**ARTICLE VII.
SHARE CERTIFICATES**

**Section 7.1.    Entitlement to Certificates**.  The shares of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.  Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed in accordance with <u>Section 7.3</u> representing the number of shares registered in certificate form.  The Corporation shall not have power to issue a certificate representing shares in bearer form.

13

AG Draft of 12/14/2010

**Section 7.2.    Multiple Classes of Stock**.  If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; provided, however, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

**Section 7.3.    Signatures**.  Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by (a) the Chairman of the Board, the Chief Executive Officer, the President or a Vice President and (b) the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation.  Any or all the signatures on the certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

**Section 7.4.    Lost, Destroyed or Wrongfully Taken Certificates**.

(a)    If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b)    If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

**Section 7.5.    Transfer of Stock**.  If a certificate representing shares of the Corporation is presented to the Corporation with a stock power or other indorsement requesting the

14

registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(a)    in the case of certificated shares, the certificate representing such shares has been surrendered;

(b)    (A) with respect to certificated shares, the indorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the indorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(c)    the Corporation has received a guarantee of signature of the person signing such indorsement or instruction or such other reasonable assurance that the indorsement or instruction is genuine and authorized as the Corporation may request;

(d)    the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.7(a); and

(e)    such other conditions for such transfer as shall be provided for under applicable law and the Stockholders' Agreement of the Company dated as of December __, 2010, as such agreement may be amended, altered, restated, modified or supplemented from time to time, have been satisfied.

**Section 7.6.    Registered Stockholders**.   Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.7.    Effect of the Corporation's Restriction on Transfer**.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)    A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares.

Section 7.8.    **Regulations**. The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

## ARTICLE VIII.
## INDEMNIFICATION

Section 8.1.    **Right to Indemnification**.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "***proceeding***"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (hereinafter a "***Covered Person***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expenses, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by such Covered Person in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify a Covered Person in connection with a proceeding (or part thereof) initiated by such Covered Person only if such proceeding (or part thereof) was authorized by the Board.

Section 8.2.    **Right to Advancement of Expenses**.  In addition to the right to indemnification conferred in Section 8.1, a Covered Person shall also have the right to be paid by the Corporation the expenses (including, without limitation, attorneys' fees) incurred in defending, testifying, or otherwise participating in any such proceeding in advance of its final disposition (hereinafter an "***advancement of expenses***"); provided, however, that, if the Delaware General Corporation Law ("***DGCL***") requires, an advancement of expenses incurred by a Covered Person in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Covered Person, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the

16

AG Draft of 12/14/2010

Corporation of an undertaking (hereinafter an "***undertaking***"), by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "***final adjudication***") that such Covered Person is not entitled to be indemnified for such expenses under this Article VIII or otherwise.

Section 8.3.    **Right of Indemnitee to Bring Suit**.    If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Covered Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.    If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Covered Person shall also be entitled to be paid the expense of prosecuting or defending such suit.    In any suit brought by (a) the Covered Person to enforce a right to indemnification hereunder (but not in a suit brought by a Covered Person to enforce a right to an advancement of expenses) it shall be a defense that, and (b) the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the Covered Person has not met any applicable standard for indemnification set forth in the DGCL.    Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders)   to have made a determination prior to the commencement of such suit that indemnification of the Covered Person is proper in the circumstances because the Covered Person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Covered Person has not met such applicable standard of conduct, shall create a presumption that the Covered Person has not met the applicable standard of conduct or, in the case of such a suit brought by the Covered Person, shall be a defense to such suit.    In any suit brought by the Covered Person to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Covered Person is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise shall be on the Corporation.

Section 8.4.    **Non-Exclusivity of Rights**.    The rights provided to Covered Persons pursuant to this Article VIII shall not be exclusive of any other right that any Covered Person may have or hereafter acquire under applicable law, the Certificate of Incorporation, these By-Laws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

Section 8.5.    **Insurance**.    The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

17

AG Draft of 12/14/2010

**Section 8.6.    Indemnification of Other Persons**.  This <u>Article VIII</u> shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Covered Persons.  Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this <u>Article VIII</u> with respect to the indemnification and advancement of expenses of Covered Persons under this <u>Article VIII</u>.

**Section 8.7.    Amendments**.  Any repeal or amendment of this <u>Article VIII</u> by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these By-Laws inconsistent with this <u>Article VIII</u>, shall, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Covered Persons on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

**Section 8.8.    Certain Definitions**.  For purposes of this <u>Article VIII</u>, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9.    Contract Rights**.  The rights provided to Covered Persons pursuant to this <u>Article VIII</u> (a) shall be contract rights based upon good and valuable consideration, pursuant to which a Covered Person may bring suit as if the provisions of this <u>Article VIII</u> were set forth in a separate written contract between the Covered Person and the Corporation, (b) shall fully vest at the time the Covered Person first assumes his or her position as a director or officer of the Corporation, (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this <u>Article VIII</u>, (d) shall continue as to a Covered Person who has ceased to be a director or officer of the Corporation, and (e) shall inure to the benefit of the Covered Person's heirs, executors and administrators.

**Section 8.10.    Severability**.  If any provision or provisions of this <u>Article VIII</u> shall be held to be invalid, illegal or unenforceable for any reason whatsoever:  (a) the validity, legality and enforceability of the remaining provisions of this <u>Article VIII</u> shall not in any way be affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this <u>Article VIII</u> (including, without limitation, each such portion of this <u>Article VIII</u> containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

AG Draft of 12/14/2010

# ARTICLE IX.
## MISCELLANEOUS

**Section 9.1.    Place of Meetings**.  If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these By-Laws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

**Section 9.2.    Fixing Record Dates**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board so fixes a record date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 9.21(a) at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board.  If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is otherwise required, shall be the

19

AG Draft of 12/14/2010

first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board and prior action by the Board is otherwise required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

**Section 9.3.    Means of Giving Notice**.

(a)    Notice to Directors. Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone. A notice to a director will be deemed given as follows: (i) if given by hand delivery, orally, or by telephone, when actually received by the director, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)    Notice to Stockholders. Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in, Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows:   (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, and (iv) if given by a form of electronic transmission consented to by the stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (C) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later

20

of (1) such posting and (2) the giving of such separate notice, and (D) if by any other form of electronic transmission, when directed to the stockholder.  A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation.  Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(c)     Electronic Transmission.  "*Electronic transmission*" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail, telegram and cablegram.

(d)     Notice to Stockholders Sharing Same Address.  Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these By-Laws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given.  A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation.  Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e)     Exceptions to Notice Requirements.  Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these By-Laws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person.  Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.  If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these By-Laws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of

21

such notice to such stockholder shall not be required.  Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated.  If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL.  The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

**Section 9.4.    Waiver of Notice**.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these By-Laws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, shall be deemed equivalent to such required notice.  All such waivers shall be kept with the books of the Corporation.  Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.5.    Meeting Attendance via Remote Communication Equipment**.

(a)    <u>Stockholder Meetings</u>.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

(b)    <u>Board Meetings</u>.  Unless otherwise restricted by applicable law, the Certificate of Incorporation, or these By-Laws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.  Such participation in a meeting shall constitute presence in person

at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

**Section 9.6.    Dividends**.    The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

**Section 9.7.    Reserves**.  The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

**Section 9.8.    Contracts and Negotiable Instruments**.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-Laws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize.  Such authority may be general or confined to specific instances as the Board may determine.  The Chairman of the Board, the Chief Executive Officer, the President or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation.  Subject to any restrictions imposed by the Board, the Chairman of the Board, Chief Executive Officer, President or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

**Section 9.9.    Fiscal Year**.  The fiscal year of the Corporation shall be fixed by the Board.

**Section 9.10.  Seal**.  The Board may adopt a corporate seal which shall be in such form as the Board determines.  The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

**Section 9.11.  Books and Records**.  The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

**Section 9.12.  Resignation**.  Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary.  The resignation shall take effect at the time specified therein, or at the time of receipt of such notice if no time is specified or the specified time is earlier than the time of such receipt.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

**Section 9.13.  Surety Bonds**.  Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, Chief Executive Officer, President or the Board may direct,

23

AG Draft of 12/14/2010

from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, Chief Executive Officer, President or the Board may determine.  The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

**Section 9.14.  Securities of Other Corporations**.  Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, Chief Executive Officer, President or any Vice President.  Any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.  The Board may from time to time confer like powers upon any other person or persons.

**Section 9.15.  Forum for Adjudication of Disputes**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.15.

**Section 9.16.  Amendments**.  The Board shall have the power to adopt, amend, alter or repeal the By-Laws.  The By-Laws also may be adopted, amended, altered or repealed by the stockholders.

AMENDED AND RESTATED BY-LAWS


OF


_____


a Delaware corporation


(the "**_Corporation_**")


(Adopted as of December ___, 2010)

# BY-LAWS

## OF

_____

## ARTICLE I.
## OFFICES

**Section 1.1.   Registered Office**.  The registered office of the Corporation within the State of Delaware shall be located at either (a) the principal place of business of the Corporation in the State of Delaware or (b) the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

**Section 1.2.   Additional Offices**.  The Corporation may, in addition to its registered office in the State of Delaware, have such other offices and places of business, both within and outside the State of Delaware, as the Board of Directors of the Corporation (the "***Board***") may from time to time determine or as the business and affairs of the Corporation may require.

## ARTICLE II.
## STOCKHOLDERS MEETINGS

**Section 2.1.   Annual Meetings**.  Unless directors are elected by written consent in lieu of an annual meeting as permitted by applicable law or an annual meeting is otherwise not required by applicable law, an annual meeting of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to  Section 9.5(a).     At each annual meeting, the stockholders shall elect directors of the Corporation and may transact any other business as may properly be brought before the meeting. Stockholders may, unless the Corporation's Certificate of Incorporation, as the same may be amended or restated from time to time (the "***Certificate of Incorporation***"), provides otherwise, act by written consent to elect directors; provided, however, that if such consent is less than unanimous, such action by written consent may be in lieu of holding an annual meeting only if all of the directorships to which directors could be elected at an annual meeting held at the effective time of such action are vacant and are filled by such action.

**Section 2.2.   Special Meetings**.   Except as otherwise required by applicable law or provided in the Certificate of Incorporation, special meetings of stockholders, for any purpose or purposes, may be called only by the Chairman of the Board, Chief Executive Officer or the President, by the Board, or by the Secretary at the request in writing of stockholders holding shares representing at least ten percent (10%) of the voting power of the outstanding shares entitled to vote on the matter for which such meeting is to be called.   The Secretary shall call such a meeting upon receiving such a request.   Special meetings of stockholders shall be held at such place and time and on such date as shall be determined by the Board and stated in the Corporation's notice of the meeting, provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to  Section 9.5(a).

Section 2.3.    **Notices**.  Notice of each stockholders meeting stating the place, if any, date and time of the meeting, the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, and the record date for determining the stockholders entitled to vote at the meeting if such date is different from the record date for determining stockholders entitled to notice of the meeting shall be given in the manner permitted by Section 9.3 to each stockholder entitled to vote thereat as of the record date for determining the stockholders entitled to notice of the meeting.  Such notice shall be given by the Corporation not less than 10 nor more than 60 days before the date of the meeting.  If said notice is for a stockholders meeting other than an annual meeting, it shall in addition state the purpose or purposes for which the meeting is called, and the business transacted at such meeting shall be limited to the matters so stated in the Corporation's notice of meeting (or any supplement thereto).

Section 2.4.    **Quorum**.  Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-Laws, the presence, in person or by proxy, at a stockholders meeting of the holders of shares of outstanding capital stock of the Corporation representing a majority of the voting power of all outstanding shares of capital stock of the Corporation entitled to vote at such meeting shall constitute a quorum for the transaction of business at such meeting, except that when specified business is to be voted on by a class or series of stock voting as a class, the holders of shares representing a majority of the voting power of the outstanding shares of such class or series shall constitute a quorum of such class or series for the transaction of such business.  If a quorum shall not be present at any meeting of the stockholders, the chairman of the meeting or the stockholders entitled to vote thereat so present, by a majority in voting power thereof, may adjourn the meeting from time to time in the manner provided in Section 2.6 until a quorum shall attend.  The stockholders present at a duly convened meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.  Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the voting power of the shares entitled to vote in the election of directors of such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation or any such other corporation to vote shares held by it in a fiduciary capacity.

Section 2.5.    **Voting of Shares**.

(a)    Voting Lists.  The Secretary shall prepare, or shall cause the officer or agent who has charge of the stock ledger of the Corporation to prepare, at least 10 days before each meeting of stockholders, a complete list of the stockholders of record entitled to vote at the meeting (provided, however, if the record date for determining the stockholders entitled to vote is less than 10 days before the meeting date, the list shall reflect the stockholders entitled to vote as of the tenth day before the meeting date), arranged in alphabetical order for each class of stock and showing the address and the number of shares registered in the name of each stockholder.  Nothing contained in this Section 2.5(a) shall require the Corporation to include electronic mail addresses or other electronic contact information on such list.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours for a period of at least 10 days prior to the meeting:  (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided

2

with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation.  If the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof, and may be examined by any stockholder who is present.  If a meeting of stockholders is to be held solely by means of remote communication as permitted by Section 9.5(a), then such list shall be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of meeting.  The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the list required by this Section 2.5(a) or to vote in person or by proxy at any meeting of stockholders.

(b)    Manner of Voting.    At any stockholders meeting, every stockholder entitled to vote may vote in person or by proxy.  If authorized by the Board, the voting by stockholders or proxyholders at any meeting conducted by remote communication may be effected by a ballot submitted by electronic transmission (as defined in Section 9.3(c)), provided that any such electronic transmission must either set forth or be submitted with information from which the Corporation can determine that the electronic transmission was authorized by the stockholder or proxyholder.  The Board, in its discretion, or the chairman of the meeting of stockholders, in such person's discretion, may require that any votes cast at such meeting shall be cast by written ballot.

(c)    Proxies.  Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  Proxies need not be filed with the Secretary until the meeting is called to order, but shall be filed with the Secretary before being voted.  Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, either of the following shall constitute a valid means by which a stockholder may grant such authority:

(i)    A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy.  Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

(ii)    A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.

Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be

substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

(d)    <u>Required Vote</u>.  Subject to the rights of the holders of one or more series of preferred stock of the Corporation ("***Preferred Stock***"), voting separately by class or series, to elect directors pursuant to the terms of one or more series of Preferred Stock, the election of directors shall be determined by a plurality of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon.  All other matters shall be determined by the vote of a majority of the votes cast by the stockholders present in person or represented by proxy at the meeting and entitled to vote thereon, unless the matter is one upon which, by applicable law, the Certificate of Incorporation or these By-Laws, a different vote is required, in which case such provision shall govern and control the decision of such matter.

(e)    <u>Inspectors of Election</u>.  The Board may, and shall if required by law, in advance of any meeting of stockholders, appoint one or more persons as inspectors of election, who may be employees of the Corporation or otherwise serve the Corporation in other capacities, to act at such meeting of stockholders or any adjournment thereof and to make a written report thereof.  The Board may appoint one or more persons as alternate inspectors to replace any inspector who fails to act.  If no inspectors of election or alternates are appointed by the Board, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall ascertain and report the number of outstanding shares and the voting power of each; determine the number of shares present in person or represented by proxy at the meeting and the validity of proxies and ballots; count all votes and ballots and report the results; determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors; and certify their determination of the number of shares represented at the meeting and their count of all votes and ballots.  No person who is a candidate for an office at an election may serve as an inspector at such election.  Each report of an inspector shall be in writing and signed by the inspector or by a majority of them if there is more than one inspector acting at such meeting.  If there is more than one inspector, the report of a majority shall be the report of the inspectors.

**Section 2.6.    Adjournments**.  Any meeting of stockholders, annual or special, may be adjourned by the chairman of the meeting or by the stockholders present and entitled to vote thereat, by a majority in voting power thereof, from time to time, whether or not there is a quorum, to reconvene at the same or some other place.  Notice need not be given of any such adjourned meeting if the date, time, place, if any, thereof, and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting are announced at the meeting at which the adjournment is taken.  At the adjourned meeting the stockholders, or the holders of any class or series of stock entitled to vote separately as a class, as the case may be, may transact any business that might have been transacted at the original meeting.  If the adjournment is for more than 30 days, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for stockholders

4

entitled to vote is fixed for the adjourned meeting, the Board shall fix a new record date for notice of such adjourned meeting in accordance with Section 2.3 and shall give notice of the adjourned meeting to each stockholder of record entitled to vote at such adjourned meeting as of the record date fixed for notice of such adjourned meeting.

Section 2.7.    **Conduct of Meetings**.  The chairman of each annual and special meeting of stockholders shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer, or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the President or if the President is not a director, such other person as shall be appointed by the Board, or in the absence of such appointment, a chairman chosen at the meeting.  The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting by the chairman of the meeting.  The Board may adopt such rules and regulations for the conduct of the meeting of stockholders as it shall deem appropriate.  Except to the extent inconsistent with these By-Laws or such rules and regulations as adopted by the Board, the chairman of any meeting of stockholders shall have the right and authority to convene and to adjourn the meeting, to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Unless and to the extent determined by the Board or the chairman of the meeting, meetings of stockholders shall not be required to be held in accordance with the rules of parliamentary procedure.  The secretary of each annual and special meeting of stockholders shall be the Secretary or, in the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary so appointed to act by the chairman of the meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.8.    **Consents in Lieu of Meeting**.  Unless otherwise provided by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum voting power that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation to its registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary.  Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within 60 days of the date the earliest dated consent is delivered to the Corporation, a written consent or consents signed by a sufficient number of holders to take such action are delivered to the Corporation by delivery to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  An electronic transmission consenting to the action to be taken and transmitted by a stockholder, proxyholder or a person or persons authorized to act for a stockholder or proxyholder shall be deemed to be written, signed and dated for purposes hereof if such electronic transmission sets forth or is delivered with information from which the Corporation can determine that such transmission was

5

transmitted by a stockholder or proxyholder (or by a person authorized to act for a stockholder or proxyholder) and the date on which such stockholder, proxyholder or authorized person transmitted such transmission. The date on which such electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and delivered to the Corporation by delivery either to the Corporation's registered office in the State of Delaware, the Corporation's principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be made by hand or by certified or registered mail, return receipt requested. Notwithstanding the limitations on delivery in the previous sentence, consents given by electronic transmission may be otherwise delivered to the Corporation's principal place of business or to the Secretary if, to the extent, and in the manner provided by resolution of the Board. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used; provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for notice of such meeting had been the date that written consents signed by a sufficient number of holders were delivered to the Corporation as provided in this <u>Section 2.8</u>.

## ARTICLE III.
## DIRECTORS

**Section 3.1.    Powers**. The business and affairs of the Corporation shall be managed by or under the direction of the Board, which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders. Directors need not be stockholders or residents of the State of Delaware.

**Section 3.2.    Number; Term**. The number of directors of the Corporation initially shall be nine. Thereafter, the number of directors, other than those who may be elected by the holders of one or more series of Preferred Stock voting separately by class or series, may be determined from time to time by the Board, but no decrease in such number shall have the effect of shortening the term of any incumbent director. Except as otherwise provided in the Certificate of Incorporation, the directors shall be elected at the annual meeting of stockholders to hold office until the next succeeding annual meeting of stockholders. Each director shall hold office for the term for which such director is elected and until his or her successor shall have been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 3.3.    Newly Created Directorships and Vacancies**. Except as otherwise provided in the Certificate of Incorporation, vacancies resulting from death, resignation, retirement, disqualification, removal or other cause and newly created directorships resulting from an increase in the number of directors elected by all of the stockholders having the right to vote as a single class may be filled by a majority vote of the directors then in office, even if less than a quorum, by a sole remaining director, or by the stockholders. Except as otherwise

6

provided in the Certificate of Incorporation, if the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled only by a majority of the directors elected by such class or classes or series thereof then in office, by a sole remaining director so elected, or by the stockholders of such class or classes or series thereof.  Except as otherwise provided in the Certificate of Incorporation, any director elected or chosen in accordance with this <u>Section 3.3</u> shall hold office until the next annual election of directors and until his or her successor shall have been elected and qualified, subject to such director's earlier death, resignation, retirement, disqualification or removal.

**Section 3.4.    Compensation**.    Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, the Board shall have the authority to fix the compensation of directors.  The directors may be reimbursed their expenses, if any, of attendance at each meeting of the Board and may be paid either a fixed sum for attendance at each meeting of the Board or other compensation as director.  No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.  Members of committees of the Board may be allowed like compensation and reimbursement of expenses for attending committee meetings.

**ARTICLE IV.**
**BOARD MEETINGS**

**Section 4.1.    Annual Meetings**.  The Board shall meet as soon as practicable after the adjournment of each annual stockholders meeting at the place of the annual stockholders meeting unless the Board shall fix another time and place and give notice thereof in the manner required herein for special meetings of the Board.  No notice to the directors shall be necessary to legally convene this meeting, except as provided in this <u>Section 4.1</u>.

**Section 4.2.    Regular Meetings**.  Regularly scheduled, periodic meetings of the Board may be held without notice at such times, dates and places as shall from time to time be determined by the Board.

**Section 4.3.    Special Meetings**.  Special meetings of the Board (a) may be called by the Chairman of the Board or Chief Executive Officer and (b) shall be called by the Chairman of the Board, Chief Executive Officer or Secretary on the written request of a majority of directors then in office, or the sole director, as the case may be, and shall be held at such time, date and place as may be determined by the person calling the meeting or, if called upon the request of directors or the sole director, as specified in such written request.  Notice of each special meeting of the Board shall be given, as provided in <u>Section 9.3</u>, to each director (i) at least 24 hours before the meeting if such notice is oral notice given personally or by telephone or written notice given by hand delivery or by means of a form of electronic transmission and delivery; (ii) at least two days before the meeting if such notice is sent by a nationally recognized overnight delivery service; and (iii) at least five days before the meeting if such notice is sent through the United States mail.  If the Secretary shall fail or refuse to give such notice, then the notice may be given by the officer who called the meeting or the directors who requested the meeting.  Any and all business that may be transacted at a regular meeting of the Board may be transacted at a special meeting.  Except as may be otherwise expressly provided by applicable law, the Certificate of

7

Incorporation, or these By-Laws, neither the business to be transacted at, nor the purpose of, any special meeting need be specified in the notice or waiver of notice of such meeting.  A special meeting may be held at any time without notice if all the directors are present or if those not present waive notice of the meeting in accordance with Section 9.4.

Section 4.4.    **Quorum; Required Vote**.  A majority of the Board, but in any event not less than one-third of the Whole Board (as defined below), shall constitute a quorum for the transaction of business at any meeting of the Board, and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board, except as may be otherwise specifically provided by applicable law, the Certificate of Incorporation or these By-Laws.  If a quorum shall not be present at any meeting, a majority of the directors present may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.  "Whole Board" shall mean the total number of directors that the Corporation would have if there were no vacancies.

Section 4.5.    **Consent In Lieu of Meeting**.  Unless otherwise restricted by the Certificate of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board or any committee thereof may be taken without a meeting if all members of the Board or committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions (or paper reproductions thereof) are filed with the minutes of proceedings of the Board or committee.  Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 4.6.    **Organization**.  The chairman of each meeting of the Board shall be the Chairman of the Board or, in the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) or, in the absence (or inability or refusal to act) of the Chief Executive Officer or if the Chief Executive Officer is not a director, the President (if he or she shall be a director) or in the absence (or inability or refusal to act) of the President or if the President is not a director, a chairman elected from the directors present.  The Secretary shall act as secretary of all meetings of the Board.  In the absence (or inability or refusal to act) of the Secretary, an Assistant Secretary shall perform the duties of the Secretary at such meeting.  In the absence (or inability or refusal to act) of the Secretary and all Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.

### ARTICLE V.
### COMMITTEES OF DIRECTORS

Section 5.1.    **Establishment**.  The Board may designate one or more committees, each committee to consist of one or more of the directors of the Corporation.  Each committee shall keep regular minutes of its meetings and report the same to the Board when required.  The Board shall have the power at any time to fill vacancies in, to change the membership of, or to dissolve any such committee.

Section 5.2.    **Available Powers**.  Any committee established pursuant to Section 5.1 hereof, to the extent permitted by applicable law and by resolution of the Board, shall have and

688913.0001 EAST 100432330 v1

may exercise all of the powers and authority of the Board in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers that may require it.

**Section 5.3.    Alternate Members**.  The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of such committee.

**Section 5.4.    Procedures**.  Unless the Board otherwise provides, the time, date, place, if any, and notice of meetings of a committee shall be determined by such committee.  At meetings of a committee, a majority of the number of members of the committee (but not including any alternate member, unless such alternate member has replaced any absent or disqualified member at the time of, or in connection with, such meeting) shall constitute a quorum for the transaction of business.  The act of a majority of the members present at any meeting at which a quorum is present shall be the act of the committee, except as otherwise specifically provided by applicable law, the Certificate of Incorporation, these By-Laws or the Board.  If a quorum is not present at a meeting of a committee, the members present may adjourn the meeting from time to time, without notice other than an announcement at the meeting, until a quorum is present.  Unless the Board otherwise provides and except as provided in these By-Laws, each committee designated by the Board may make, alter, amend and repeal rules for the conduct of its business.  In the absence of such rules each committee shall conduct its business in the same manner as the Board is authorized to conduct its business pursuant to Article III and Article IV of these By-Laws.

## ARTICLE VI.
## OFFICERS

**Section 6.1.    Officers**.  The officers of the Corporation elected by the Board shall be a Chairman of the Board, a Chief Executive Officer, a President, a Treasurer, a Secretary and such other officers (including without limitation a Chief Financial Officer, Vice Presidents, Assistant Secretaries and Assistant Treasurers) as the Board from time to time may determine. Officers elected by the Board shall each have such powers and duties as generally pertain to their respective offices, subject to the specific provisions of this Article VI.  Such officers shall also have such powers and duties as from time to time may be conferred by the Board.  The Chairman of the Board, Chief Executive Officer or President may also appoint such other officers (including without limitation one or more Vice Presidents and Controllers) as may be necessary or desirable for the conduct of the business of the Corporation.  Such other officers shall have such powers and duties and shall hold their offices for such terms as may be provided in these By-Laws or as may be prescribed by the Board or, if such officer has been appointed by the Chairman of the Board, Chief Executive Officer or President, as may be prescribed by the appointing officer.

(a)    Chairman of the Board.  The Chairman of the Board shall preside when present at all meetings of the stockholders and the Board.  The Chairman of the Board shall advise and counsel the Chief Executive Officer and other officers and shall exercise such powers and perform such duties as shall be assigned to or required of the Chairman of the Board from time to time by the Board or these By-Laws.

688913.0001 EAST 100432330 v1

(b)    <u>Chief Executive Officer</u>.  The Chief Executive Officer shall be the chief executive officer of the Corporation, shall have general supervision of the affairs of the Corporation and general control of all of its business subject to the ultimate authority of the Board, and shall be responsible for the execution of the policies of the Board.  In the absence (or inability or refusal to act) of the Chairman of the Board, the Chief Executive Officer (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board.

(c)    <u>President</u>.  The President shall be the chief operating officer of the Corporation and shall, subject to the authority of the Chief Executive Officer and the Board, have general management and control of the day-to-day business operations of the Corporation and shall consult with and report to the Chief Executive Officer.  The President shall put into operation the business policies of the Corporation as determined by the Chief Executive Officer and the Board and as communicated to the President by the Chief Executive Officer and the Board.  The President shall make recommendations to the Chief Executive Officer on all operational matters that would normally be reserved for the final executive responsibility of the Chief Executive Officer.  In the absence (or inability or refusal to act) of the Chairman of the Board and Chief Executive Officer, the President (if he or she shall be a director) shall preside when present at all meetings of the stockholders and the Board.

(d)    <u>Vice Presidents</u>.  In the absence (or inability or refusal to act) of the President, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board) shall perform the duties and have the powers of the President.  Any one or more of the Vice Presidents may be given an additional designation of rank or function.

(e)    <u>Secretary</u>.

(i)    The Secretary shall attend all meetings of the stockholders, the Board and (as required) committees of the Board and shall record the proceedings of such meetings in books to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board and shall perform such other duties as may be prescribed by the Board, the Chairman of the Board, Chief Executive Officer or President.  The Secretary shall have custody of the corporate seal of the Corporation and the Secretary, or any Assistant Secretary, shall have authority to affix the same to any instrument requiring it, and when so affixed, it may be attested by his or her signature or by the signature of such Assistant Secretary.  The Board may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing thereof by his or her signature.

(ii)    The Secretary shall keep, or cause to be kept, at the principal executive office of the Corporation or at the office of the Corporation's transfer agent or registrar, if one has been appointed, a stock ledger, or duplicate stock ledger, showing the names of the stockholders and their addresses, the number and classes of shares held by each and, with respect to certificated shares, the number and date of certificates issued for the same and the number and date of certificates cancelled.

(f)     <u>Assistant Secretaries</u>.  The Assistant Secretary or, if there be more than one, the Assistant Secretaries in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Secretary, perform the duties and have the powers of the Secretary.

(g)     <u>Treasurer</u>.  The Treasurer shall perform all duties commonly incident to that office (including, without limitation, the care and custody of the funds and securities of the Corporation which from time to time may come into the Treasurer's hands and the deposit of the funds of the Corporation in such banks or trust companies as the Board, the Chief Executive Officer or the President may authorize).

(h)     <u>Assistant Treasurers</u>.  The Assistant Treasurer or, if there shall be more than one, the Assistant Treasurers in the order determined by the Board shall, in the absence (or inability or refusal to act) of the Treasurer, perform the duties and exercise the powers of the Treasurer.

**Section 6.2.    Term of Office; Removal; Vacancies**.  The elected officers of the Corporation shall be elected annually by the Board at its first meeting held after each annual meeting of stockholders.  All officers elected by the Board shall hold office until the next annual meeting of the Board and until their successors are duly elected and qualified or until their earlier death, resignation, retirement, disqualification, or removal from office.  Any officer may be removed, with or without cause, at any time by the Board.  Any officer appointed by the Chairman of the Board , Chief Executive Officer or President may also be removed, with or without cause, by the Chairman of the Board, Chief Executive Officer or President, as the case may be, unless the Board otherwise provides.  Any vacancy occurring in any elected office of the Corporation may be filled by the Board.  Any vacancy occurring in any office appointed by the Chairman of the Board, Chief Executive Officer or President may be filled by the Chairman of the Board, Chief Executive Officer or President, as the case may be, unless the Board then determines that such office shall thereupon be elected by the Board, in which case the Board shall elect such officer.

**Section 6.3.    Other Officers**.  The Board may delegate the power to appoint such other officers and agents, and may also remove such officers and agents or delegate the power to remove same, as it shall from time to time deem necessary or desirable.

**Section 6.4.    Multiple Officeholders; Stockholder and Director Officers**.  Any number of offices may be held by the same person unless the Certificate of Incorporation or these By-Laws otherwise provide.  Officers need not be stockholders or residents of the State of Delaware.

## ARTICLE VII.
## SHARE CERTIFICATES

**Section 7.1.    Entitlement to Certificates**.  The shares of the Corporation shall be represented by certificates, provided that the Board may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares.  Any such resolution shall not apply to shares represented by a certificate until such certificate is

11

surrendered to the Corporation. Notwithstanding the adoption of such a resolution by the Board, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed in accordance with <u>Section 7.3</u> representing the number of shares registered in certificate form. The Corporation shall not have power to issue a certificate representing shares in bearer form.

Section 7.2.    **Multiple Classes of Stock**. If the Corporation shall be authorized to issue more than one class of stock or more than one series of any class, the Corporation shall (a) cause the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights to be set forth in full or summarized on the face or back of any certificate that the Corporation issues to represent shares of such class or series of stock or (b) in the case of uncertificated shares, within a reasonable time after the issuance or transfer of such shares, send to the registered owner thereof a written notice containing the information required to be set forth on certificates as specified in clause (a) above; <u>provided</u>, <u>however</u>, that, except as otherwise provided by applicable law, in lieu of the foregoing requirements, there may be set forth on the face or back of such certificate or, in the case of uncertificated shares, on such written notice a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences or rights.

Section 7.3.    **Signatures**. Each certificate representing capital stock of the Corporation shall be signed by or in the name of the Corporation by (a) the Chairman of the Board, the Chief Executive Officer, the President or a Vice President and (b) the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of the Corporation. Any or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, such certificate may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar on the date of issue.

Section 7.4.    **Lost, Destroyed or Wrongfully Taken Certificates**.

(a)    If an owner of a certificate representing shares claims that such certificate has been lost, destroyed or wrongfully taken, the Corporation shall issue a new certificate representing such shares or such shares in uncertificated form if the owner: (i) requests such a new certificate before the Corporation has notice that the certificate representing such shares has been acquired by a protected purchaser; (ii) if requested by the Corporation, delivers to the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the alleged loss, wrongful taking or destruction of such certificate or the issuance of such new certificate or uncertificated shares; and (iii) satisfies other reasonable requirements imposed by the Corporation.

(b)    If a certificate representing shares has been lost, apparently destroyed or wrongfully taken, and the owner fails to notify the Corporation of that fact within a reasonable time after the owner has notice of such loss, apparent destruction or wrongful taking and the

12

Corporation registers a transfer of such shares before receiving notification, the owner shall be precluded from asserting against the Corporation any claim for registering such transfer or a claim to a new certificate representing such shares or such shares in uncertificated form.

**Section 7.5.    Transfer of Stock**.  If a certificate representing shares of the Corporation is presented to the Corporation with a stock power or other indorsement requesting the registration of transfer of such shares or an instruction is presented to the Corporation requesting the registration of transfer of uncertificated shares, the Corporation shall register the transfer as requested if:

(a)    in the case of certificated shares, the certificate representing such shares has been surrendered;

(b)    (A) with respect to certificated shares, the indorsement is made by the person specified by the certificate as entitled to such shares; (B) with respect to uncertificated shares, an instruction is made by the registered owner of such uncertificated shares; or (C) with respect to certificated shares or uncertificated shares, the indorsement or instruction is made by any other appropriate person or by an agent who has actual authority to act on behalf of the appropriate person;

(c)    the Corporation has received a guarantee of signature of the person signing such indorsement or instruction or such other reasonable assurance that the indorsement or instruction is genuine and authorized as the Corporation may request;

(d)    the transfer does not violate any restriction on transfer imposed by the Corporation that is enforceable in accordance with Section 7.7(a); and

(e)    such other conditions for such transfer as shall be provided for under applicable law as such agreement may be amended, altered, restated, modified or supplemented from time to time, have been satisfied.

**Section 7.6.    Registered Stockholders**.  Before due presentment for registration of transfer of a certificate representing shares of the Corporation or of an instruction requesting registration of transfer of uncertificated shares, the Corporation may treat the registered owner as the person exclusively entitled to inspect for any proper purpose the stock ledger and the other books and records of the Corporation, vote such shares, receive dividends or notifications with respect to such shares and otherwise exercise all the rights and powers of the owner of such shares, except that a person who is the beneficial owner of such shares (if held in a voting trust or by a nominee on behalf of such person) may, upon providing documentary evidence of beneficial ownership of such shares and satisfying such other conditions as are provided under applicable law, may also so inspect the books and records of the Corporation.

**Section 7.7.    Effect of the Corporation's Restriction on Transfer**.

(a)    A written restriction on the transfer or registration of transfer of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, if permitted by the DGCL and noted conspicuously on the certificate representing such shares or, in the case of uncertificated shares, contained in a notice sent by the

13

Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares, may be enforced against the holder of such shares or any successor or transferee of the holder including an executor, administrator, trustee, guardian or other fiduciary entrusted with like responsibility for the person or estate of the holder.

(b)     A restriction imposed by the Corporation on the transfer or the registration of shares of the Corporation or on the amount of shares of the Corporation that may be owned by any person or group of persons, even if otherwise lawful, is ineffective against a person without actual knowledge of such restriction unless: (i) the shares are certificated and such restriction is noted conspicuously on the certificate; or (ii) the shares are uncertificated and such restriction was contained in a notice sent by the Corporation to the registered owner of such shares within a reasonable time after the issuance or transfer of such shares.

**Section 7.8.    Regulations**. The Board shall have power and authority to make such additional rules and regulations, subject to any applicable requirement of law, as the Board may deem necessary and appropriate with respect to the issue, transfer or registration of transfer of shares of stock or certificates representing shares.  The Board may appoint one or more transfer agents or registrars and may require for the validity thereof that certificates representing shares bear the signature of any transfer agent or registrar so appointed.

# ARTICLE VIII.
## INDEMNIFICATION

**Section 8.1.    Right to Indemnification**.  Each person who was or is made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (hereinafter a "***proceeding***"), by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (hereinafter a "***Covered Person***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, shall be indemnified and held harmless by the Corporation to the fullest extent authorized or permitted by applicable law, as the same exists or may hereafter be amended, against all expenses, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by such Covered Person in connection with such proceeding; provided, however, that, except as provided in Section 8.3 with respect to proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify a Covered Person in connection with a proceeding (or part thereof) initiated by such Covered Person only if such proceeding (or part thereof) was authorized by the Board.

**Section 8.2.    Right to Advancement of Expenses**.  In addition to the right to indemnification conferred in Section 8.1, a Covered Person shall also have the right to be paid by the Corporation the expenses (including, without limitation, attorneys' fees) incurred in defending, testifying, or otherwise participating in any such proceeding in advance of its final

14

disposition (hereinafter an "***advancement of expenses***"); provided, however, that, if the Delaware General Corporation Law ("***DGCL***") requires, an advancement of expenses incurred by a Covered Person in his or her capacity as a director or officer of the Corporation (and not in any other capacity in which service was or is rendered by such Covered Person, including, without limitation, service to an employee benefit plan) shall be made only upon delivery to the Corporation of an undertaking (hereinafter an "***undertaking***"), by or on behalf of such Covered Person, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (hereinafter a "***final adjudication***") that such Covered Person is not entitled to be indemnified for such expenses under this Article VIII or otherwise.

**Section 8.3.    Right of Indemnitee to Bring Suit**.  If a claim under Section 8.1 or Section 8.2 is not paid in full by the Corporation within 60 days after a written claim therefor has been received by the Corporation, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be 20 days, the Covered Person may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim.  If successful in whole or in part in any such suit, or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Covered Person shall also be entitled to be paid the expense of prosecuting or defending such suit.  In any suit brought by (a) the Covered Person to enforce a right to indemnification hereunder (but not in a suit brought by a Covered Person to enforce a right to an advancement of expenses) it shall be a defense that, and (b) the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that, the Covered Person has not met any applicable standard for indemnification set forth in the DGCL.  Neither the failure of the Corporation (including its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders)  to have made a determination prior to the commencement of such suit that indemnification of the Covered Person is proper in the circumstances because the Covered Person has met the applicable standard of conduct set forth in the DGCL, nor an actual determination by the Corporation (including a determination by its directors who are not parties to such action, a committee of such directors, independent legal counsel, or its stockholders) that the Covered Person has not met such applicable standard of conduct, shall create a presumption that the Covered Person has not met the applicable standard of conduct or, in the case of such a suit brought by the Covered Person, shall be a defense to such suit.  In any suit brought by the Covered Person to enforce a right to indemnification or to an advancement of expenses hereunder, or by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Covered Person is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise shall be on the Corporation.

**Section 8.4.    Non-Exclusivity of Rights**.  The rights provided to Covered Persons pursuant to this Article VIII shall not be exclusive of any other right that any Covered Person may have or hereafter acquire under applicable law, the Certificate of Incorporation, these By-Laws, an agreement, a vote of stockholders or disinterested directors, or otherwise.

**Section 8.5.    Insurance**.  The Corporation may maintain insurance, at its expense, to protect itself and/or any director, officer, employee or agent of the Corporation or another

corporation, partnership, joint venture, trust or other enterprise against any expense, liability or loss, whether or not the Corporation would have the power to indemnify such person against such expense, liability or loss under the DGCL.

**Section 8.6.    Indemnification of Other Persons**.  This <u>Article VIII</u> shall not limit the right of the Corporation to the extent and in the manner authorized or permitted by law to indemnify and to advance expenses to persons other than Covered Persons.  Without limiting the foregoing, the Corporation may, to the extent authorized from time to time by the Board, grant rights to indemnification and to the advancement of expenses to any employee or agent of the Corporation and to any other person who is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust or other enterprise, including service with respect to an employee benefit plan, to the fullest extent of the provisions of this <u>Article VIII</u> with respect to the indemnification and advancement of expenses of Covered Persons under this <u>Article VIII</u>.

**Section 8.7.    Amendments**.  Any repeal or amendment of this <u>Article VIII</u> by the Board or the stockholders of the Corporation or by changes in applicable law, or the adoption of any other provision of these By-Laws inconsistent with this <u>Article VIII</u>, shall, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide broader indemnification rights to Covered Persons on a retroactive basis than permitted prior thereto), and will not in any way diminish or adversely affect any right or protection existing hereunder in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

**Section 8.8.    Certain Definitions**.  For purposes of this <u>Article VIII</u>, (a) references to "other enterprise" shall include any employee benefit plan; (b) references to "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan; (c) references to "serving at the request of the Corporation" shall include any service that imposes duties on, or involves services by, a person with respect to any employee benefit plan, its participants, or beneficiaries; and (d) a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interest of the Corporation" for purposes of Section 145 of the DGCL.

**Section 8.9.    Contract Rights**.  The rights provided to Covered Persons pursuant to this <u>Article VIII</u> (a) shall be contract rights based upon good and valuable consideration, pursuant to which a Covered Person may bring suit as if the provisions of this <u>Article VIII</u> were set forth in a separate written contract between the Covered Person and the Corporation, (b) shall fully vest at the time the Covered Person first assumes his or her position as a director or officer of the Corporation, (c) are intended to be retroactive and shall be available with respect to any act or omission occurring prior to the adoption of this <u>Article VIII</u>, (d) shall continue as to a Covered Person who has ceased to be a director or officer of the Corporation, and (e) shall inure to the benefit of the Covered Person's heirs, executors and administrators.

**Section 8.10.  Severability**.  If any provision or provisions of this <u>Article VIII</u> shall be held to be invalid, illegal or unenforceable for any reason whatsoever:  (a) the validity, legality and enforceability of the remaining provisions of this <u>Article VIII</u> shall not in any way be

16

affected or impaired thereby; and (b) to the fullest extent possible, the provisions of this Article VIII (including, without limitation, each such portion of this Article VIII containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## ARTICLE IX.
## MISCELLANEOUS

Section 9.1.    **Place of Meetings**.  If the place of any meeting of stockholders, the Board or committee of the Board for which notice is required under these By-Laws is not designated in the notice of such meeting, such meeting shall be held at the principal business office of the Corporation; provided, however, if the Board has, in its sole discretion, determined that a meeting shall not be held at any place, but instead shall be held by means of remote communication pursuant to Section 9.5 hereof, then such meeting shall not be held at any place.

Section 9.2.    **Fixing Record Dates**.

(a)    In order that the Corporation may determine the stockholders entitled to notice of any meeting of stockholders or any adjournment thereof, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which record date shall not be more than 60 nor less than 10 days before the date of such meeting.  If the Board so fixes a record date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders entitled to vote in accordance with the foregoing provisions of this Section 9.21(a) at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action.  If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board adopts the resolution relating thereto.

(c)    In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board may fix a record date, which

17

record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board, and which date shall not be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board. If no record date has been fixed by the Board, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board is otherwise required, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or the Secretary. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board and prior action by the Board is otherwise required, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board adopts the resolution taking such prior action.

**Section 9.3.    Means of Giving Notice**.

(a)    <u>Notice to Directors</u>. Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any director, such notice shall be given either (i) in writing and sent by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, (ii) by means of facsimile telecommunication or other form of electronic transmission, or (iii) by oral notice given personally or by telephone. A notice to a director will be deemed given as follows: (i) if given by hand delivery, orally, or by telephone, when actually received by the director, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the director at the director's address appearing on the records of the Corporation, (iv) if sent by facsimile telecommunication, when sent to the facsimile transmission number for such director appearing on the records of the Corporation, (v) if sent by electronic mail, when sent to the electronic mail address for such director appearing on the records of the Corporation, or (vi) if sent by any other form of electronic transmission, when sent to the address, location or number (as applicable) for such director appearing on the records of the Corporation.

(b)    <u>Notice to Stockholders</u>. Whenever under applicable law, the Certificate of Incorporation or these By-Laws notice is required to be given to any stockholder, such notice may be given (i) in writing and sent either by hand delivery, through the United States mail, or by a nationally recognized overnight delivery service for next day delivery, or (ii) by means of a form of electronic transmission consented to by the stockholder, to the extent permitted by, and subject to the conditions set forth in, Section 232 of the DGCL. A notice to a stockholder shall be deemed given as follows: (i) if given by hand delivery, when actually received by the stockholder, (ii) if sent through the United States mail, when deposited in the United States mail, with postage and fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, (iii) if sent for next day delivery by a nationally recognized overnight delivery service, when deposited with such service, with fees thereon prepaid, addressed to the stockholder at the stockholder's address appearing on the stock ledger of the Corporation, and (iv) if given by a form of electronic transmission consented to by the

stockholder to whom the notice is given and otherwise meeting the requirements set forth above, (A) if by facsimile transmission, when directed to a number at which the stockholder has consented to receive notice, (B) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice, (C) if by a posting on an electronic network together with separate notice to the stockholder of such specified posting, upon the later of (1) such posting and (2) the giving of such separate notice, and (D) if by any other form of electronic transmission, when directed to the stockholder. A stockholder may revoke such stockholder's consent to receiving notice by means of electronic communication by giving written notice of such revocation to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary or to the Corporation's transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

(c)     Electronic Transmission. "*Electronic transmission*" means any form of communication, not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process, including but not limited to transmission by telex, facsimile telecommunication, electronic mail, telegram and cablegram.

(d)     Notice to Stockholders Sharing Same Address. Without limiting the manner by which notice otherwise may be given effectively by the Corporation to stockholders, any notice to stockholders given by the Corporation under any provision of the DGCL, the Certificate of Incorporation or these By-Laws shall be effective if given by a single written notice to stockholders who share an address if consented to by the stockholders at that address to whom such notice is given. A stockholder may revoke such stockholder's consent by delivering written notice of such revocation to the Corporation. Any stockholder who fails to object in writing to the Corporation within 60 days of having been given written notice by the Corporation of its intention to send such a single written notice shall be deemed to have consented to receiving such single written notice.

(e)     Exceptions to Notice Requirements. Whenever notice is required to be given, under the DGCL, the Certificate of Incorporation or these By-Laws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting that shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given. If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate shall state, if such is the fact and if notice is required, that notice was given to all persons entitled to receive notice except such persons with whom communication is unlawful.

Whenever notice is required to be given by the Corporation, under any provision of the DGCL, the Certificate of Incorporation or these By-Laws, to any stockholder to whom (1) notice of two consecutive annual meetings of stockholders and all notices of stockholder

19

meetings or of the taking of action by written consent of stockholders without a meeting to such stockholder during the period between such two consecutive annual meetings, or (2) all, and at least two payments (if sent by first-class mail) of dividends or interest on securities during a 12-month period, have been mailed addressed to such stockholder at such stockholder's address as shown on the records of the Corporation and have been returned undeliverable, the giving of such notice to such stockholder shall not be required.  Any action or meeting that shall be taken or held without notice to such stockholder shall have the same force and effect as if such notice had been duly given.  If any such stockholder shall deliver to the Corporation a written notice setting forth such stockholder's then current address, the requirement that notice be given to such stockholder shall be reinstated.  If the action taken by the Corporation is such as to require the filing of a certificate with the Secretary of State of Delaware, the certificate need not state that notice was not given to persons to whom notice was not required to be given pursuant to Section 230(b) of the DGCL.  The exception in subsection (1) of the first sentence of this paragraph to the requirement that notice be given shall not be applicable to any notice returned as undeliverable if the notice was given by electronic transmission.

Section 9.4.    **Waiver of Notice**.  Whenever any notice is required to be given under applicable law, the Certificate of Incorporation, or these By-Laws, a written waiver of such notice, signed before or after the date of such meeting by the person or persons entitled to said notice, or a waiver by electronic transmission by the person entitled to said notice, shall be deemed equivalent to such required notice.  All such waivers shall be kept with the books of the Corporation.  Attendance at a meeting shall constitute a waiver of notice of such meeting, except where a person attends for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.5.    **Meeting Attendance via Remote Communication Equipment**.

(a)    <u>Stockholder Meetings</u>.  If authorized by the Board in its sole discretion, and subject to such guidelines and procedures as the Board may adopt, stockholders and proxyholders not physically present at a meeting of stockholders may, by means of remote communication:

(i)    participate in a meeting of stockholders; and

(ii)    be deemed present in person and vote at a meeting of stockholders, whether such meeting is to be held at a designated place or solely by means of remote communication, provided that (A) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder, (B) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings, and (C) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such votes or other action shall be maintained by the Corporation.

20

(b)    Board Meetings.    Unless otherwise restricted by applicable law, the Certificate of Incorporation, or these By-Laws, members of the Board or any committee thereof may participate in a meeting of the Board or any committee thereof by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other.   Such participation in a meeting shall constitute presence in person at the meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting was not lawfully called or convened.

Section 9.6.    Dividends.    The Board may from time to time declare, and the Corporation may pay, dividends (payable in cash, property or shares of the Corporation's capital stock) on the Corporation's outstanding shares of capital stock, subject to applicable law and the Certificate of Incorporation.

Section 9.7.    Reserves.    The Board may set apart out of the funds of the Corporation available for dividends a reserve or reserves for any proper purpose and may abolish any such reserve.

Section 9.8.    Contracts and Negotiable Instruments.    Except as otherwise provided by applicable law, the Certificate of Incorporation or these By-Laws, any contract, bond, deed, lease, mortgage or other instrument may be executed and delivered in the name and on behalf of the Corporation by such officer or officers or other employee or employees of the Corporation as the Board may from time to time authorize.   Such authority may be general or confined to specific instances as the Board may determine.   The Chairman of the Board, the Chief Executive Officer, the President or any Vice President may execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation.   Subject to any restrictions imposed by the Board, the Chairman of the Board, Chief Executive Officer, President or any Vice President may delegate powers to execute and deliver any contract, bond, deed, lease, mortgage or other instrument in the name and on behalf of the Corporation to other officers or employees of the Corporation under such person's supervision and authority, it being understood, however, that any such delegation of power shall not relieve such officer of responsibility with respect to the exercise of such delegated power.

Section 9.9.    Fiscal Year.    The fiscal year of the Corporation shall be fixed by the Board.

Section 9.10.    Seal.    The Board may adopt a corporate seal which shall be in such form as the Board determines.   The seal may be used by causing it or a facsimile thereof to be impressed, affixed or otherwise reproduced.

Section 9.11.    Books and Records.    The books and records of the Corporation may be kept within or outside the State of Delaware at such place or places as may from time to time be designated by the Board.

Section 9.12.    Resignation.    Any director, committee member or officer may resign by giving notice thereof in writing or by electronic transmission to the Chairman of the Board, the Chief Executive Officer, the President or the Secretary.   The resignation shall take effect at the

21

time specified therein, or at the time of receipt of such notice if no time is specified or the specified time is earlier than the time of such receipt.  Unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

Section 9.13.  **Surety Bonds**.  Such officers, employees and agents of the Corporation (if any) as the Chairman of the Board, Chief Executive Officer, President or the Board may direct, from time to time, shall be bonded for the faithful performance of their duties and for the restoration to the Corporation, in case of their death, resignation, retirement, disqualification or removal from office, of all books, papers, vouchers, money and other property of whatever kind in their possession or under their control belonging to the Corporation, in such amounts and by such surety companies as the Chairman of the Board, Chief Executive Officer, President or the Board may determine.  The premiums on such bonds shall be paid by the Corporation and the bonds so furnished shall be in the custody of the Secretary.

Section 9.14.  **Securities of Other Corporations**.  Powers of attorney, proxies, waivers of notice of meeting, consents in writing and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chairman of the Board, Chief Executive Officer, President or any Vice President.  Any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities, or to consent in writing, in the name of the Corporation as such holder, to any action by such corporation, and at any such meeting or with respect to any such consent shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed.  The Board may from time to time confer like powers upon any other person or persons.

Section 9.15.  **Forum for Adjudication of Disputes**.  Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine.  Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.15.

Section 9.16.  **Amendments**.  The Board shall have the power to adopt, amend, alter or repeal the By-Laws.  The By-Laws also may be adopted, amended, altered or repealed by the stockholders.

688913.0001 EAST 100432330 v1

# EXHIBIT K

**Restated Certificates of Incorporation**

**SECOND AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**AMERICAN MEDIA, INC.**

American Media, Inc. (the "<u>Corporation</u>"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, as from time to time amended, (the "<u>DGCL</u>"), hereby certifies as follows:

1.    The Corporation filed an amended joint pre-packaged plan of reorganization under chapter 11 of title 11 of the United States Code on December 15, 2010 (the "<u>Plan</u>").

2.    The date of filing of the original Certificate of Incorporation with the Secretary of State was June 19, 1990, under the name GP Group Holdings, Inc.  The Corporation subsequently changed its name to American Media, Inc.  Pursuant to the Plan, American Media Operations, Inc., a wholly-owned subsidiary of the Corporation, merged with and into the Corporation.  The Corporation was the surviving corporation in the merger.

3.    This Second Amended and Restated Certificate of Incorporation ("<u>Certificate</u>") has been deemed approved without the need for Board of Directors ("<u>Board</u>") or stockholder approval pursuant to Section 303 of the DGCL because it is adopted pursuant to the Plan, as confirmed on December 20, 2010 by the United States Bankruptcy Court for the Southern District of New York.

4.    Pursuant to the provisions of Sections 242(a) and 303 of the DGCL, the undersigned Corporation does hereby certify that the text of the Certificate is hereby amended and restated to read as follows:

**FIRST**
**NAME**

The name of the Corporation is "American Media, Inc."

**SECOND**
**REGISTERED AGENT**

The registered office of the Corporation within the State of Delaware is Corporation Trust Center, 1209 Orange Street, City of Wilmington 19808, County of New Castle.  The registered agent of the Corporation within the State of Delaware is The Corporation Trust Company, the business office of which is identical to the registered office of the Corporation.

688913.0001 EAST 100429940 v1

**THIRD**
**PURPOSE**

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the DGCL.

**FOURTH**
**CAPITALIZATION**

The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is _____ shares of capital stock, consisting of (i) [_____] shares of common stock, par value $0.0001 per share ("Common Stock"), and (ii) 1,000,000 shares of preferred stock, par value $0.0001 per share ("Preferred Stock").  To the extent prohibited by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Corporation will not issue non-voting equity securities; provided, however, the foregoing restriction will (a) have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

The number of authorized shares of either of the Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority in voting power of the stock of the Corporation entitled to vote thereon irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), and no vote of the holders of either of the Common Stock or Preferred Stock voting separately as a class shall be required therefor.

The statement of the powers, preferences and rights and the qualifications, limitations or restrictions of the shares of each class is as follows:

1.    Terms of the Common Stock.

(a)    *Equal Rights*.  Each share of Common Stock of the Corporation shall have the same powers, rights, and preferences and shall be subject to the same limitations, qualifications and restrictions as every other share of Common Stock of the Corporation.

(b)    *Voting*.  At each annual or special meeting of stockholders, each holder of Common Stock shall be entitled to one (1) vote in person or by proxy for each share of Common Stock held of record standing in such holder's name on the stock transfer records of the Corporation in connection with the election of directors and all other actions submitted to a vote of holders of Common Stock.  Notwithstanding the foregoing, except as otherwise required by law or this Second Amended and Restated Certificate of Incorporation (including a Preferred Stock Designation), holders of Common Stock shall not be entitled to vote on any amendment to this Second Amended and Restated Certificate of Incorporation (including any amendment to any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this

2

Second Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) or pursuant to the DGCL.

(c)    *Dividends and Other Distributions*.  Subject to the rights of the holders of the Preferred Stock, if any, the record holders of Common Stock shall be entitled to receive such dividends and other distributions in cash, stock, evidences of indebtedness or property of the Corporation as may be declared thereon by the Corporation's Board of Directors (the "Board of Directors") out of assets and funds legally available therefor and shall share equally on a per share basis in such dividends and other distributions.

(d)    *Liquidation*.  In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, after payment or provision for payment of the debts and other liabilities of the Corporation, and subject to the rights of the holders of the Preferred Stock, if any, the record holders of Common Stock shall be entitled to participate pro rata in all distributions to holders of Common Stock in any liquidation, dissolution or winding up of the Corporation.

2.    Terms of the Preferred Stock.  The Preferred Stock may be issued from time to time in one or more series.  The Board of Directors is hereby expressly authorized, by resolution or resolutions thereof, to provide for the issuance of shares of Preferred Stock in one or more series and to establish from time to time the number of shares to be included in each such series and to fix the number of shares constituting such series and the designation of such series, the voting powers (if any) of the shares of such series, and the powers, preferences and relative, participating, optional or other special rights, if any, and any qualifications, limitations or restrictions thereof, of the shares of such series and to cause to be filed with the Secretary of State of the State of Delaware a certificate of designation (the "Preferred Stock Designation") with respect thereto. The powers, preferences and relative, participating, optional and other special rights of each series of Preferred Stock, and the qualifications, limitations or restrictions thereof, if any, may differ from those of any and all other series at any time outstanding.

3.    Limitation on Number of Record Holders.

(a)    Notwithstanding anything set forth in this Second Amended and Restated Certificate of Incorporation, or the compliance with any of the terms hereof, no direct or indirect Transfer, however accomplished, of shares of Common Stock or Preferred Stock shall be effective, and any such Transfer of shares of Common Stock or Preferred Stock shall be deemed null and void, if, as a result of any such Transfer, the record number of stockholders of the Corporation of the applicable class of capital stock (as determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934, as amended from time to time (the "Exchange Act"), or any successor rule or interpretation) would exceed 450.

(b)    The restrictions contained in this Article FOURTH, Section 3 are for the purpose of ensuring that the Corporation is not required to become a registrant under the Exchange Act due to the number of stockholders of the Corporation.

(c)    Any Transfer attempted to be made in violation of this Article FOURTH, Section 3 will be null and void.  The proposed transferee shall not be entitled to any rights of

3

stockholders of the Corporation, including, but not limited to, the rights to vote or to receive dividends and liquidating distributions, with respect to the shares of Common Stock and/or Preferred Stock that were the subject of such attempted Transfer.

(d)    In addition to any remedies available to the Corporation under applicable law or in equity, after learning of a Transfer not in compliance with this Article FOURTH, Section 3, the Corporation may demand the immediate surrender, or cause to be immediately surrendered, to the Corporation, all certificates representing the shares of Common Stock and/or Preferred Stock that were the subject of such attempted Transfer, or any proceeds received upon a sale of such shares, and any dividends or other distributions made after such noncompliant Transfer with respect to such shares, if any.  Any such surrendered certificates may be destroyed. If any such certificates are not immediately surrendered, the Corporation shall cancel such certificates, or cause such certificates to be cancelled, on the stock transfer records and other records of the Corporation.  Any shares of Common Stock and/or Preferred Stock attempted to be Transferred pursuant to a destroyed or cancelled certificate, or attempted to be Transferred in violation of this Article FOURTH, shall continue to be registered in the name of the purported transferor.  Nothing in this subparagraph (d) shall be deemed inconsistent with the Transfer of such securities being deemed null and void pursuant to subparagraph (c) hereof.

(e)    The Corporation may require, as a condition precedent to the registration of the Transfer of any shares of Common Stock and/or Preferred Stock or the payment of any distribution on any such shares, that the proposed transferor and transferee or payee furnish to the Corporation all information reasonably requested by the Corporation with respect to all the direct or indirect ownership interests in such shares.  The Corporation may make such arrangements or issue such instructions to its stock transfer agent as may be determined by the Chief Executive Officer under the direction of the Board of Directors to be necessary or advisable to implement this Article FOURTH, Section 3, including, without limitation, instructing the transfer agent not to register any Transfer of shares of Common Stock and/or Preferred Stock on the Corporation's stock transfer records if it has knowledge that such Transfer is prohibited by this Article FOURTH, Section 3, and/or authorizing such transfer agent to require an affidavit from a transferee or transferor regarding such Person's ownership of shares of Common Stock and/or Preferred Stock and other evidence that a Transfer will not be prohibited by this Article FOURTH, Section 3, as a condition to registering any Transfer.

(f)    Nothing contained in this Article FOURTH, Section 3 shall limit the authority of the Corporation, its executive officers or the Board of Directors to take such other action to the extent permitted by law as it deems necessary or advisable to ensure that the Corporation is not required to become a registrant under the Exchange Act due to the number of stockholders of the Corporation.

(g)    So long as this Article FOURTH, Section 3 is in effect, each certificate evidencing Common Stock and/or Preferred Stock and each certificate issued in exchange for, or upon Transfer of, any Common Stock and/or Preferred Stock shall be stamped or otherwise imprinted with a legend in substantially the following form:

"THE CORPORATION'S SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER")

4

INCLUDES, AMONG OTHER THINGS, TRANSFER RESTRICTIONS ON, AND OBLIGATIONS WITH RESPECT TO, THE COMMON STOCK AND THE PREFERRED STOCK OF THE CORPORATION. SO LONG AS IT IS IN EFFECT, THE CHARTER RESTRICTS TRANSFERS THAT WOULD RESULT IN THE NUMBER OF RECORD HOLDERS OF ANY CLASS OF CAPITAL STOCK OF THE CORPORATION EXCEEDING 450 HOLDERS. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CHARTER, CONTAINING THE ABOVE-REFERENCED TRANSFER RESTRICTIONS AND OBLIGATIONS, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS.";

provided that such legend may be combined with the legend set forth in Article Fourth, Section 4(f).

(h)    The provisions of this Article FOURTH, Section 3 shall terminate upon the earliest of (i) any firm commitment underwritten public offering of Common Stock pursuant to a registration statement filed with the Securities and Exchange Commission and declared effective under the Securities Act, (ii) the filing by the Corporation of a registration statement pursuant to Section 12(g) of the Exchange Act, and (iii) such time as the Board of Directors determines that the provisions of this Article FOURTH, Section 3 are no longer necessary for the preservation of the Corporation's status as a non-reporting company under the Exchange Act. Any determination by the Board of Directors pursuant to clause (iii) above shall be publicly announced and a record of such determination shall be kept at the offices of the Corporation.

4.    Drag Along Rights.

(a)    If stockholders that are a party to the Stockholders Agreement, acting by Majority Requisite Consent, propose to consummate a transaction or series of related transactions constituting a Sale of the Company (the "Dragging Stockholders") pursuant to an Approved Sale, such Dragging Stockholders shall have the right, at their option to require the other holders of Stockholder Shares (each a "Dragged Stockholder") to join in such Approved Sale by Transferring the Co-Sale/Drag Sale Percentage of Stockholder Shares proposed to be sold by the Dragging Stockholders, subject to the obligations in Article FOURTH, Section 4(c); provided that Alternative Majority Consent may be obtained if Majority Requisite Consent is not obtained.    Each stockholder shall consent to and raise no objections against (and, in any stockholder vote required with the respect to such Approved Sale, shall affirmatively vote all of its Stockholder Shares (if any) the Approved Sale, and if the Approved Sale is structured as a sale of the issued and outstanding equity Securities of the Corporation (whether by merger, recapitalization, consolidation or Transfer of Stockholder Shares or other Securities or otherwise), then each Dragged Stockholder shall waive any dissenters rights, appraisal rights or similar rights in connection with such Approved Sale (if applicable), each Dragged Stockholder shall agree to sell his, her or its Stockholder Shares, subject to Article FOURTH, Section 4(c) below, on the terms and conditions as may be approved by the Dragging Stockholders.    Each Dragged Stockholder and the Corporation (subject to applicable law and compliance by the

5

Corporation with any fiduciary duties) shall take all necessary and desirable actions in connection with the consummation of the Approved Sale, including, but not limited to, the execution of such agreements and instruments and other actions necessary to provide the representations, warranties, indemnities, covenants, conditions, escrows and other provisions and agreements relating to such Approved Sale.

(b)    The Dragging Stockholders shall deliver written notice to each Dragged Stockholder setting forth in reasonable detail the material terms (including price, time and form of payment and the identity of the Dragging Stockholders) of any Approved Sale (the "Approved Sale Notice") at least ten (10) Business Days prior to the consummation of such Approved Sale. Within five (5) Business Days following receipt of the Approved Sale Notice, each Dragged Stockholder shall deliver to the Dragging Stockholders written notice (in form and substance reasonably satisfactory to the Dragging Stockholders) setting forth such Dragged Stockholder's agreement to consent to and raise no objections against, or impediments to, the Approved Sale (including, waiving all dissenter's and similar rights, if applicable) and if the Approved Sale is structured as a sale of stock, to sell its Stockholder Shares on the terms and conditions set forth in the Approved Sale Notice; provided, however, that the failure by any Dragged Stockholder to deliver such written notice and/or consent to the Dragging Stockholders shall not in any manner relieve or otherwise affect the obligations of each Dragged Stockholder pursuant to this Article FOURTH, Section 4.

(c)    The obligations of the Dragged Stockholders to participate in any Approved Sale pursuant to this Article FOURTH, Section 4 are subject to the satisfaction of the following conditions:

(i)    subject to clause (ii) below, upon the consummation of the Approved Sale, each stockholder shall receive the same proportion of the aggregate consideration from such Approved Sale that such holder would have received if such aggregate consideration had been distributed by the Corporation in complete liquidation pursuant to the rights and preferences set forth in this Second Amended and Restated Certificate of Incorporation as in effect immediately prior to such Approved Sale;

(ii)    if any stockholder is given an option as to the form and amount of consideration to be received with respect to Securities in a class, all stockholders of such class will be given the same option;

(iii)    no stockholder shall be obligated to pay more than his, her or its pro-rata amount (based on the amount of aggregate consideration received) of all reasonable expenses incurred by the Corporation in connection with a consummated Approved Sale;

(iv)    any indemnification obligations for breaches of representations, warranties and covenants made by the Corporation and its Subsidiaries shall be pro-rata among the stockholders based on the aggregate consideration received with respect to the Stockholder Shares and capped at such stockholders' pro rata share of the aggregate consideration received; and

688913.0001 EAST 100429940 v1

(v)      no stockholder who is not an employee of the Corporation shall be required to sign on to any agreement restricting its ability to compete with the Corporation and its Subsidiaries.

(d)      To the extent the Approved Sale is structured as a sale of all or substantially all of the assets of the Corporation on a consolidated basis, each Dragged Stockholder shall consent to and raise no objections against (and, in any stockholder vote required with respect to such Approved Sale, shall affirmatively vote all of its Stockholder Shares in favor of) such transaction and shall waive any dissenters rights, appraisal rights or similar rights in connection with such transaction.

(e)      The provisions of this Article FOURTH, Section 4 shall terminate upon the termination of the Stockholders' Agreement in accordance with its terms.  The termination of the Stockholders' Agreement shall be publicly announced and a record thereof kept at the offices of the Corporation.

(f)      So long as this Article FOURTH, Section 4 is in effect, each certificate evidencing Common Stock and each certificate issued in exchange for or upon Transfer of any Common Stock and Preferred Stock shall be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE CORPORATION'S SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION (THE "CHARTER") INCLUDES, AMONG OTHER THINGS, TRANSFER RESTRICTIONS ON, AND OBLIGATIONS WITH RESPECT TO, THE COMMON STOCK AND THE PREFERRED STOCK OF THE CORPORATION. UNDER CERTAIN CIRCUMSTANCES, THE HOLDER OF THE SHARES REPRESENTED BY THIS CERTIFICATE MAY BE OBLIGATED TO TRANSFER SUCH HOLDER'S SHARES IN ACCORDANCE WITH THE CHARTER.  THE CORPORATION WILL FURNISH WITHOUT CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE A COPY OF THE CHARTER, CONTAINING THE ABOVE-REFERENCED TRANSFER RESTRICTIONS AND OBLIGATIONS, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS."

provided that such legend may be combined with the legend set forth in Article Fourth, Section 3(g).

## FIFTH
### DIRECTORS

1.      General.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.   Unless and except to the extent that the Corporation's By-Laws, as the same may be amended or restated from time to time (the "By-Laws"), shall so require, the election of directors need not be by written ballot.

7

2.      Election of Directors; Voting.

(a)      The number of directors constituting the Board of Directors shall initially be nine (9).  Thereafter, the number of directors constituting the Board of Directors may be determined from time to time by resolution of the Board of Directors.

(b)      A director shall hold office until the next annual meeting and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal from office.  A director may resign at any time upon notice to the Corporation.

3.      Exculpation.  To the fullest extent that the DGCL or any other law of the State of Delaware as the same exists or is hereafter amended permits the limitation or elimination of the liability of directors, no person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director.

## SIXTH
## AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right at any time, and from time to time amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate of Incorporation, and other provisions authorized by the laws of the State of Delaware at the time in force may be added or inserted, in the manner now or hereafter prescribed by law; and all rights, preferences and privileges of any nature conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate of Incorporation in its present form or as hereafter amended are granted subject to the rights reserved in this Article SIXTH.

## SEVENTH
## CORPORATE OPPORTUNITIES

1.      In recognition and anticipation that (i) stockholders (other than stockholders who are employees of the Corporation or any of its Subsidiaries), their Affiliates and their respective directors, principals, officers, employees and/or other representatives may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, and (ii) members of the Board of Directors who are not employees of the Corporation ("Non-Employee Directors") and their respective Affiliates may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this Article SEVENTH are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve the stockholders, the Non-Employee Directors or their respective Affiliates and the powers, rights,

8

duties and liabilities of the Corporation and its directors, officers and stockholders in connection therewith.  Solely for the purposes of this Article SEVENTH, "Affiliate" shall mean (A) in respect of any specified person (other than the Corporation), any other person that, directly or indirectly, is controlled by, controls or us under common control with such specified person and shall include any principal, member, director, partner, stockholder, officer, employee or other representative of any of the foregoing, (B) in respect of a Non-Employee Director, such Non-Employee Director's employer and its Affiliates and any person that, directly or indirectly, is controlled by such Non-Employee Director (other than the Corporation and any entity that is controlled by the Corporation) and (C) in respect of the Corporation, any person that, directly or indirectly, is controlled by the Corporation.

2.    Except as specifically provided in Section 4 to this Article SEVENTH none of (i) the stockholders (other than stockholders who are employees of the Corporation or any of its Subsidiaries) or any of their Affiliates or (ii) any Non-Employee Director or any of his or her Affiliates (the persons identified in (i) and (ii) above being referred to, collectively, as "Identified Person" and, individually, as an "Identified Person") shall have any duty to refrain, directly or indirectly, from (A) engaging in a corporate opportunity in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (B) otherwise competing with the Corporation, and, to the fullest extent permitted by the DGCL, no Identified Person shall be liable to the Corporation or its stockholders for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities.  The Corporation hereby renounces any interest or expectancy in, or in being offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for both an Identified Person and the Corporation or any of its Affiliates, expect as specifically provided in Section 4 to this Article SEVENTH.

3.    Except as specifically provided in Section 4 to this Article SEVENTH, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity both for itself or himself and the Corporation or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by the DGCL, shall not be liable to the Corporation or its stockholders for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself or himself, or offers or directors such corporate opportunity to another person.

4.    The Corporation does not renounce its interest in any corporate opportunity offered to any Non-Employee Director if such opportunity is expressly offered to such person solely in his or her capacity as a director of the Corporation and the provisions of Sections 1, 2 and 3 of this Article SEVENTH shall not apply to any such opportunity.

**EIGHTH**
**SECTION 203**

The Corporation elects not to be governed by Section 203 of the DGCL.

## NINTH
## SEVERABILITY

If any provision or provisions of this Second Amended and Restated Certificate of Incorporation shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (i) the validity, legality and enforceability of the remaining provisions of this Second Amended and Restated Certificate of Incorporation (including, without limitation, each portion of any paragraph of this Second Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable, that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby; and (ii) to the fullest extent possible, the provisions of this Second Amended and Restated Certificate of Incorporation (including, without limitation, each such portion of any paragraph of this Second Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

## TENTH
## BY-LAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power to adopt, amend, alter or repeal the By-Laws of the Corporation. The By-Laws also may be adopted, amended, altered or repealed by the stockholders.

## ELEVENTH
## DEFINITIONS

As used herein, the following terms shall have the meanings set forth below:

1.      "<u>Affiliate</u>" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, such Person and/or one or more Affiliates thereof.

2.      "<u>Alternative Majority Consent</u>" shall have the meaning ascribed to it in the Stockholders' Agreement.

3.      "<u>Approved Sale</u>" means a Transfer which would result in the Sale of the Company pursuant to which the Dragging Stockholders compel the other stockholders to Transfer Stockholder Shares in accordance with Article FOURTH, Section 4.

4.      "<u>Business Day</u>" means any day except a Saturday, a Sunday or any other day on which commercial banks are not required by law to be open in New York, New York.

5.      "<u>Committee Holders</u>" shall have the meaning ascribed to it in the Stockholders' Agreement.

6.      "<u>Control</u>" means, (including, with correlative meaning, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or

10

investment decisions of such Person, whether through the ownership of voting Securities, by contract or otherwise.

7.      "Co-Sale/Drag Sale Percentage" means, with respect to any stockholder, the fraction, expressed as a percentage, the numerator of which is the total number of shares of Common Stock proposed to be sold by stockholders initiating a Transfer and the denominator or which is the total number of shares of Common Stock held by such initiating stockholders (excluding, from each of the numerator and the denominator above, any options, warrants, convertible debt obligations or similar Securities, and all equity Securities issues pursuant to, or acquired in connection with, the terms of any plan or agreement established or entered into by the Corporation for the purpose of issuing Securities to any employee, officer, consultant or director of the Corporation or its Subsidiaries as compensation).

8.      "Majority Requisite Consent" shall have the meaning ascribed to it in the Stockholders' Agreement.

9.      "Person" shall be construed as broadly as possible and shall include an individual person, a partnership (including a limited liability partnership), a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture, an unincorporated organization and any domestic or foreign government or political subdivision thereof, whether on a Federal, state or local level and whether executive, legislative or judicial in nature, including any agency, authority, board, bureau, commission, court, department or other instrumentality thereof.

10.     "Sale of the Company" means (a) any sale or other Transfer, in one or a series of related transactions, of Stockholder Shares (including any such Transfer effected by merger, reorganization, recapitalization, consolidation or similar transaction) following which either (x) any Person (or group of Persons acting in concert), individually or together with its Affiliates, beneficially owns, directly or indirectly, fifty percent (50%) or more of the combined voting power or economic interest (in capital or profits) of the outstanding equity Securities of the Corporation or (y) those Persons that are a party to the Stockholders' Agreement as of December ___, 2010 and their respective Affiliates, beneficially own, directly or indirectly, less than fifty percent (50%) of the combined voting power or economic interests (in capital and profits) represented by the outstanding equity Securities of the Corporation, (b) any sale or other Transfer (other than a pledge or hypothecation of, or any placement of a lien thereon or grant of a security interest in or other encumbrance on, property or assets), in one or a series of related transactions, of all or substantially all of the property and assets of the Corporation and its Subsidiaries on a consolidated basis, or (c) any merger, reorganization, recapitalization or consolidation to which the Corporation is a party and following which those Persons that are a party to the Stockholders' Agreement as of December ___, 2010 and their respective Affiliates, beneficially own, directly or indirectly, less than fifty percent (50%) of the combined voting power or economic interests (in capital and profits) represented by the outstanding equity Securities of the surviving entity immediately following such transaction.

11.     "Securities" means "securities" as defined in Section 2(1) of the Securities Act and includes, with respect to any Person, such Person's capital stock or other equity interests or

11

any options, warrants or other securities that are directly or indirectly convertible into, or exercisable or exchangeable for, such Person's capital stock.

12.    "Securities Act" means the Securities Act of 1933, as amended, or any successor Federal statute, and the rules and regulations of the Securities and Exchange Commission promulgated thereunder, all as the same shall be in effect from time to time.

13.    "Stockholders' Agreement" means the Stockholders' Agreement dated as of December ___, 2010, among the Corporation and the stockholders signatory thereto from time to time, as amended, modified, supplemented or restated from time to time.

14.    "Stockholder Shares" means (a) any equity Securities of the Corporation (including the Common Stock) purchased or otherwise acquired by any stockholder prior to, on or after the date hereof and (b) any equity Securities issued or issuable directly or indirectly with respect to the Securities referred to in clause (a) above by way of conversion, exercise or exchange, stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, consolidation or other reorganization.

15.    "Subsidiaries" means, at any time, with respect to any Person (the "Subject Person"), any other Person of which either (a) fifty percent (50.0%) or more of the Securities or other interests entitled to vote in the election of directors or comparable governance bodies performing similar functions or (b) fifty percent (50.0%) or more of an interest in the profits or capital of such Person, in each case, are at the time owned or Controlled directly or indirectly by the Subject Person or through one or more Subsidiaries of the Subject Person.

16.    "Transfer" of Securities shall be construed broadly and shall include any direct or indirect issuance (other than issuance of Securities by the Corporation), sale, assignment, transfer, participation, gift, bequest, distribution, or other disposition thereof, or any pledge or hypothecation thereof, placement of a lien thereon or grant of a security interest therein or other encumbrance thereon, in each case whether voluntary or involuntary or by operation of law or otherwise.

688913.0001 EAST 100429940 v1

IN WITNESS WHEREOF, American Media, Inc. has caused this Second Amended and Restated Certificate of Incorporation to be signed by a duly authorized officer, on the __ day of December, 2010.

AMERICAN MEDIA, INC.

By: _____

Name:

Title:

# CERTIFICATE OF INCORPORATION

## OF

_____

_____ (the "***Corporation***"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, as from time to time amended, (the "***DGCL***"), hereby certifies as follows:

1.      The Corporation filed an amended joint pre-packaged plan of reorganization under chapter 11 of title 11 of the United States Code on December \_\_\_, 2010 (the "***Plan***").

2.      The date of filing of the original Certificate of Incorporation with the Secretary of State was _____, under the name _____.

3.      This Amended and Restated Certificate of Incorporation ("***Certificate***") has been deemed approved without the need for Board of Directors ("***Board***") or stockholder approval pursuant to Section 303 of the DGCL because it is adopted pursuant to the Plan, as confirmed on December \_\_\_, 2010 by the United States Bankruptcy Court for the Southern District of New York.

4.      Pursuant to the provisions of Sections 242(a) and 303 of the DGCL, the undersigned Corporation does hereby certify that the text of the Certificate is hereby amended and restated to read as follows:

## ARTICLE I
## NAME

The name of the corporation is _____ (the "***Corporation***").

## ARTICLE II
## PURPOSE

The purpose for which the Corporation is organized is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE III
## REGISTERED AGENT

The street address of the initial registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, and the name of the Corporation's initial registered agent at such address is The Corporation Trust Company.

## ARTICLE IV
## CAPITALIZATION

The total number of shares of capital stock that the Corporation is authorized to issue is 1,000 shares of common stock, par value $0.0001 per share (the "***Common Stock***"). To the extent prohibited by Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***"), the Corporation will not issue non-voting equity securities; provided, however, the foregoing restriction will (a) have no further force and effect beyond that required under Section 1123 of the Bankruptcy Code, (b) only have such force and effect for so long as Section 1123 of the Bankruptcy Code is in effect and applicable to the Corporation and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time may be in effect.

## ARTICLE V
## DIRECTORS

Section 5.1    General.  The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  Unless and except to the extent that the By-Laws shall so require, the election of directors need not be by written ballot.

Section 5.2    Election of Directors; Voting.

(a)    The number of directors constituting the Board of Directors shall be determined from time to time by resolution of the Board of Directors.

(b)    A director shall hold office until the next annual meeting and until his or her successor has been elected and qualified, subject, however, to such director's earlier death, resignation, retirement, disqualification or removal from office.  A director may resign at any time upon notice to the Corporation.

Section 5.3    Vacancies.  Newly created directorships resulting from any increase in the authorized number of directors or any vacancies in the Board of Directors resulting from death, resignation, retirement, disqualification, removal from office or other cause may be filled by the affirmative vote of a majority of the remaining directors then in office (even though less than a quorum of the Board of Directors) or by the stockholders.  Any director so chosen shall hold office until the next annual meeting of stockholders and until his successor shall be elected and qualified.

## ARTICLE VI
## LIMITATION OF DIRECTOR LIABILITY;
## INDEMNIFICATION AND ADVANCEMENT OF EXPENSES

Section 6.1    Limitation of Director Liability.  To the fullest extent that the DGCL or any other law of the State of Delaware as the same exists or is hereafter amended permits the limitation or elimination of the liability of directors, no person who is or was a director of the Corporation shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director.  Any repeal or amendment of this Section 6.1 by the stockholders of the Corporation or by changes in law, or the adoption of any other

2

provision of this Certificate inconsistent with this Section 6.1 will, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to further limit or eliminate the liability of directors) and shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to acts or omissions occurring prior to such repeal or amendment or adoption of such inconsistent provision.

Section 6.2    Indemnification and Advancement of Expenses.

(a)    To the fullest extent permitted by applicable law, as the same exists or may hereafter be amended, the Corporation shall indemnify and hold harmless each person who is or was made a party or is threatened to be made a party to or is otherwise involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "***Proceeding***") by reason of the fact that he or she is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, other enterprise or nonprofit entity, including service with respect to an employee benefit plan (an "***Indemnitee***"), whether the basis of such Proceeding is alleged action in an official capacity as a director, officer, employee or agent, or in any other capacity while serving as a director, officer, employee or agent, against all expenses, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by such Indemnitee in connection with such Proceeding.  The right to indemnification conferred by this Section 7.2 shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any such Proceeding in advance of its final disposition; provided, however, that, if the DGCL requires, an advancement of expenses shall be made only upon delivery to the Corporation of an undertaking, by or on behalf of the Indemnitee, to repay all amounts so advanced if it shall ultimately be determined by final judicial decision from which there is no further right to appeal that the Indemnitee is not entitled to be indemnified for the expenses under this Section 6.2 or otherwise.  The rights to indemnification and advancement of expenses conferred by this Section 6.2 shall be contract rights and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee or agent and shall inure to the benefit of his or her heirs, executors and administrators.   Notwithstanding the foregoing provisions of this Section 6.2, except for Proceedings to enforce rights to indemnification and advancement of expenses, the Corporation shall indemnify and advance expenses to an Indemnitee in connection with a Proceeding (or part thereof) initiated by such Indemnitee only if such Proceeding (or part thereof) was authorized by the Board.

(b)    The rights to indemnification and advancement of expenses conferred on any Indemnitee by this Section 6.2 shall not be exclusive of any other rights that any Indemnitee may have or hereafter acquire under law, this Certificate, the By-Laws, an agreement, vote of stockholders or disinterested directors, or otherwise.

(c)    Any repeal or amendment of this Section 6.2 by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Certificate inconsistent with this Section 6.2, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide

3

broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

(d)    This Section 6.2 shall not limit the right of the Corporation, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other than Indemnitees.

ARTICLE VII
CORPORATE OPPORTUNITIES

Section 7.1    In recognition and anticipation that (i) stockholders (other than stockholders who are employees of the Corporation or any of its Subsidiaries), their Affiliates and their respective directors, principals, officers, employees and/or other representatives may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, and (ii) members of the Board of Directors who are not employees of the Corporation ("***Non-Employee Directors***") and their respective Affiliates may now engage, may continue to engage, or may, in the future, decide to engage, in the same or similar activities or related lines of business as those in which the Corporation, directly or indirectly, may engage and/or other business activities that overlap with or compete with those in which the Corporation, directly or indirectly, may engage, the provisions of this ARTICLE VII are set forth to regulate and define the conduct of certain affairs of the Corporation with respect to certain classes or categories of business opportunities as they may involve the stockholders, the Non-Employee Directors or their respective Affiliates and the powers, rights, duties and liabilities of the Corporation and its directors, officers and stockholders in connection therewith.    Solely for purposes of this ARTICLE VII, "***Affiliate***" shall mean (A) in respect of any specified person (other than the Corporation), any other person that, directly or indirectly, is controlled by, controls or us under common control with such specified person and shall include any principal, member, director, partner, stockholder, officer, employee or other representative of any of the foregoing, (B) in respect of a Non-Employee Director, such Non-Employee Director's employer and its Affiliates and any person that, directly or indirectly, is controlled by such Non-Employee Director (other than the Corporation and any entity that is controlled by the Corporation) and (C) in respect of the Corporation, any person that, directly or indirectly, is controlled by the Corporation.

Section 7.2    Except as specifically provided in Section 7.4 to this ARTICLE VII none of (i) the stockholders (other than stockholders who are employees of the Corporation or any of its Subsidiaries) or any of their Affiliates or (ii) any Non-Employee Director or any of his or her Affiliates (the persons identified in (i) and (ii) above being referred to, collectively, as "***Identified Person***" and, individually, as an "***Identified Person***") shall have any duty to refrain, directly or indirectly, from (A) engaging in a corporate opportunity in the same or similar business activities or lines of business in which the Corporation or any of its Affiliates now engages or proposes to engage or (B) otherwise competing with the Corporation, and, to the fullest extent permitted by the DGCL, no Identified Person shall be liable to the Corporation or

4

its stockholders for breach of any fiduciary duty solely by reason of the fact that such Identified Person engages in any such activities.  The Corporation hereby renounces any interest or expectancy in, or in being offered an opportunity to participate in, any business opportunity which may be a corporate opportunity for both an Identified Person and the Corporation or any of its Affiliates, expect as specifically provided in <u>Section 7.4</u> to this <u>ARTICLE VII</u>.

Section 7.3    Except as specifically provided in <u>Section 7.4</u> to this <u>ARTICLE VII</u>, in the event that any Identified Person acquires knowledge of a potential transaction or other business opportunity which may be a corporate opportunity both for itself or himself and the Corporation or any of its Affiliates, such Identified Person shall have no duty to communicate or offer such transaction or other business opportunity to the Corporation or any of its Affiliates and, to the fullest extent permitted by the DGCL, shall not be liable to the Corporation or its stockholders for breach of any fiduciary duty as a stockholder, director or officer of the Corporation solely by reason of the fact that such Identified Person pursues or acquires such corporate opportunity for itself or himself, or offers or directors such corporate opportunity to another person.

Section 7.4    The Corporation does not renounce its interest in any corporate opportunity offered to any Non-Employee Director if such opportunity is expressly offered to such person solely in his or her capacity as a director of the Corporation and the provisions of <u>Sections 7.1</u>, <u>7.2</u> and <u>7.3</u> of this <u>ARTICLE VII</u> shall not apply to any such opportunity.

ARTICLE VIII
BY-LAWS

In furtherance and not in limitation of the powers conferred upon it by law, the Board shall have the power to adopt, amend, alter or repeal the By-Laws of the Corporation.  The By-Laws also may be adopted, amended, altered or repealed by the stockholders.

ARTICLE IX
AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate, in the manner now or hereafter prescribed by this Certificate and the DGCL; and except as set forth in <u>ARTICLE VI</u>, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article.

IN WITNESS WHEREOF, the incorporator of the Corporation hereto has caused this Certificate of Incorporation to be duly executed as of December ____, 2010.

_____

_____, _____

## EXHIBIT L

**Equity Incentive Plan**

## AMERICAN MEDIA, INC.
## EQUITY INCENTIVE PLAN

1.    *Purpose*.  The purpose of the American Media, Inc. Equity Incentive Plan is to provide a means through which the Company and its Affiliates may attract and retain key personnel and to provide a means whereby directors, officers, employees, consultants and advisors (and prospective directors, officers, employees, consultants and advisors) of the Company and its Affiliates can acquire and maintain an equity interest in the Company, or be paid incentive compensation, which may (but need not) be measured by reference to the value of Common Shares, thereby strengthening their commitment to the welfare of the Company and its Affiliates and aligning their interests with those of the Company's shareholders.

2.    *Definitions*.  The following definitions shall be applicable throughout the Plan:

(a)    *"Affiliate"* means (i) any Person that directly or indirectly controls, is controlled by or is under common control with the Company and/or (ii) to the extent provided by the Committee, any Person in which the Company has a significant interest. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting or other securities, by contract or otherwise.

(b)    *"Angelo Gordon Stockholders"* means, collectively, AG CNG Fund, L.P., AG MM, L.P., PHS Bay Colony Fund, L.P., AGCR V Master Account LP, AG Capital Recovery Partners VI, L.P., AG Eleven Partners, L.P., GAM Arbitrage Investments Inc., AG Garden Partners, L.P., AG Super Fund International Partners, L.P., Nutmeg Partners, L.P., PHS Patriot Fund, L.P., AG Princess, L.P., AG Super Fund, L.P. and their respective Affiliates.

(c)    *"Avenue Stockholders"* means, collectively, Avenue Investments, L.P., Avenue – CDP Global Opportunities Fund, L.P., Avenue International Master, L.P., Avenue Special Situations Fund IV, L.P., Avenue Special Situations Fund V, L.P. and their respective Affiliates.

(d)    *"Award"* means, individually or collectively, any Incentive Stock Option, Nonqualified Stock Option, Stock Appreciation Right, Restricted Stock, Restricted Stock Unit, Stock Bonus Award, and Performance Compensation Award granted under the Plan.

(e)    *"Board"* means the Board of Directors of the Company.

(f)    *"Capital Research Stockholders"* means, collectively, American High-Income Trust, The Bond Fund of America, Inc., The Income Fund of America, Inc., American Funds Insurance Series – Asset Allocation, American Funds Insurance Series – Bond Fund, American Funds Insurance Series – Global Bond Fund, American Funds Insurance Series – High-Income Bond Fund, Capital World Bond Fund, Inc., Qualcom Incorporated, Capital Guardian US High Yield Fixed Income Master Fund, CIF Global High Income Opportunities, Capital Guardian Global High Income Opportunities Fund and their respective Affiliates.

(g)     "*Change in Control*" shall mean a "Sale of the Company," as defined in the Stockholders' Agreement.  Notwithstanding the foregoing, a "Change in Control" (A) with respect to any Award which constitutes deferred compensation subject to Section 409A of the Code, shall be deemed to have occurred only if a change in the ownership or effective control of the Company or a change in the ownership of a substantial portion of the assets of the Company shall also be deemed to have occurred under Section 409A of the Code and (B) shall not be deemed to occur as a result of an increase in ownership of Common Shares by any of the Angelo Gordon Stockholders, the Avenue Stockholders, the Capital Research Stockholders, or the Credit Suisse Stockholders.

(h)     "*Code*" means the Internal Revenue Code of 1986, as amended, and any successor thereto.  Reference in the Plan to any section of the Code shall be deemed to include any regulations or other interpretative guidance under such section, and any amendments or successor provisions to such section, regulations or guidance.

(i)     "*Committee*" means a the Compensation Committee of the Board or another committee of at least two people as the Board may appoint to administer the Plan or, if no such committee has been appointed by the Board, the Board.

(j)     "*Common Shares*" means the common shares, par value $0.0001 per share, of the Company (and any stock or other securities into which such common shares may be converted or into which they may be exchanged).

(k)     "*Company*" means American Media, Inc., a Delaware corporation.

(l)     "*Confidential Information*" means any and all confidential and/or proprietary trade secrets, knowledge, data, or information of the Company including, without limitation, any: (A) drawings, inventions, methodologies, mask works, ideas, processes, formulas, source and object codes, data, programs, software source documents, works of authorship, know-how, improvements, discoveries, developments, designs and techniques, and all other work product of the Company, whether or not patentable or registrable under trademark, copyright, patent or similar laws; (B) information regarding plans for research, development, new service offerings and/or products, marketing, advertising and selling, distribution, business plans and strategies, business forecasts, budgets and unpublished financial statements, licenses, prices and costs, suppliers, customers, customer history, customer preferences, or distribution arrangements; (C) any information regarding the skills or compensation of employees, suppliers, agents, and/or independent contractors of the Company; (D) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of the Company; (E) information about the Company's investment program, trading methodology, or portfolio holdings; or (F) any other information, data or the like that is labeled confidential or described as confidential.

(m)     "*Credit Suisse Stockholders*" means, collectively, Credit Suisse Securities (USA) LLC and its Affiliates.

(n)     "*Date of Grant*" means the date on which the granting of an Award is authorized, or such other date as may be specified in such authorization.

(o)    *"Effective Date"* means December ___, 2010.

(p)    *"Eligible Director"* means a person who is (i) a "non-employee director" within the meaning of Rule 16b-3 under the Exchange Act, and (ii) an "outside director" within the meaning of Section 162(m) of the Code.

(q)    *"Eligible Person"* means any (i) individual employed by the Company or an Affiliate; provided, however, that no such employee covered by a collective bargaining agreement shall be an Eligible Person unless and to the extent that such eligibility is set forth in such collective bargaining agreement or in an agreement or instrument relating thereto; (ii) consultant or advisor to the Company or an Affiliate, provided that if the Securities Act applies such persons must be eligible to be offered securities registrable on Form S-8 under the Securities Act; (iii) prospective employees, officers, consultants or advisors who have accepted offers of employment or consultancy from the Company or its Affiliates (and would satisfy the provisions of clause (i) or (ii) above once he or she begins employment with or begins providing services to the Company or its Affiliates); or (iv) any director of the Company.

(r)    *"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and any reference in the Plan to any section of (or rule promulgated under) the Exchange Act shall be deemed to include any rules, regulations or other interpretive guidance under such section or rule, and any amendments or successor provisions to such section, rules, regulations or guidance.

(s)    *"Exercise Price"* has the meaning given such term in Section 7(b) of the Plan.

(t)    *"Fair Market Value"* means, as of any date, the value of Common Shares determined as follows:

(i)    If the Common Shares are listed on any established stock exchange or a national market system, including without limitation the Nasdaq Global Select Market, the Nasdaq Global Market or the Nasdaq Capital Market of The Nasdaq Stock Market, the Fair Market Value will be the closing sales price for such shares (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in *The Wall Street Journal* or such other source as the Committee deems reliable;

(ii)    If the Common Shares are regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Common Share will be the mean between the high bid and low asked prices for the Common Shares on the day of determination, as reported in *The Wall Street Journal* or such other source as the Committee deems reliable; or

(iii)    In the absence of an established market for the Common Shares, the Fair Market Value will be determined in good faith by the Committee.

(u)    *"Immediate Family Members"* shall have the meaning set forth in Section 16(b).

(v)      *"Incentive Stock Option"* means an Option that is designated by the Committee as an incentive stock option as described in Section 422 of the Code and otherwise meets the requirements set forth in the Plan.

(w)      *"Indemnifiable Person,"* shall have the meaning set forth in Section 4(e) of the Plan.

(x)      *"Initial Public Offering"* means the first underwritten public offering and sale of Common Shares after the date of this Agreement pursuant to an effective registration statement under the Securities Act (other than on Form S-4, Form S-8 or a comparable form) resulting in net proceeds to the Company (after deduction of underwriting discount, commission and expenses of sale) of at least $75,000,000.

(y)      *"Intellectual Property-Products"* shall have the meaning set forth in Section 15(c) of the Plan.

(z)      *"Liquidity Event"* means the earlier to occur of a Change in Control and an Initial Public Offering.

(aa)     *"Mature Shares"* means Common Shares owned by a Participant that are not subject to any pledge or security interest and that have been either previously acquired by the Participant on the open market or meet such other requirements, if any, as the Committee may determine are necessary in order to avoid an accounting earnings charge on account of the use of such shares to pay the Exercise Price or satisfy a withholding obligation of the Participant.

(bb)     *"Negative Discretion"* shall mean the discretion authorized by the Plan to be applied by the Committee to eliminate or reduce the size of a Performance Compensation Award consistent with Section 162(m) of the Code.

(cc)     *"Nonqualified Stock Option"* means an Option that is not designated by the Committee as an Incentive Stock Option.

(dd)     *"Option"* means an Award granted under Section 7 of the Plan.

(ee)     *"Option Period"* has the meaning given such term in Section 7(c) of the Plan.

(ff)      *"Participant"* means an Eligible Person who has been selected by the Committee to participate in the Plan and to receive an Award pursuant to Section 6 of the Plan.

(gg)     *"Performance Compensation Award"* shall mean any Award designated by the Committee as a Performance Compensation Award pursuant to Section 11 of the Plan.

(hh)     *"Performance Criteria"* shall mean the criterion or criteria that the Committee shall select for purposes of establishing the Performance Goal(s) for a Performance Period with respect to any Performance Compensation Award under the Plan.

4

(ii)     "*Performance Formula*" shall mean, for a Performance Period, the one or more objective formulae applied against the relevant Performance Goal to determine, with regard to the Performance Compensation Award of a particular Participant, whether all, some portion but less than all, or none of the Performance Compensation Award has been earned for the Performance Period.

(jj)     "*Performance Goals*" shall mean, for a Performance Period, the one or more goals established by the Committee for the Performance Period based upon the Performance Criteria.

(kk)     "*Performance Period*" shall mean the one or more periods of time, as the Committee may select, over which the attainment of one or more Performance Goals will be measured for the purpose of determining a Participant's right to, and the payment of, a Performance Compensation Award.

(ll)     "*Permitted Transferee*" shall have the meaning set forth in Section 16(b) of the Plan.

(mm)     "*Person*" means an individual person, a partnership (including a limited liability partnership), a corporation, an association, a joint stock company, a limited liability company, a trust, a joint venture and an unincorporated organization.

(nn)     "*Plan*" means this American Media, Inc. Equity Incentive Plan.

(oo)     "*Restricted Period*" means the period of time determined by the Committee during which an Award is subject to restrictions or, as applicable, the period of time within which performance is measured for purposes of determining whether an Award has been earned.

(pp)     "*Restricted Stock*" means Common Shares, subject to certain specified restrictions (including, without limitation, a requirement that the Participant remain continuously employed or provide continuous services for a specified period of time), granted under Section 9 of the Plan.

(qq)     "*Restricted Stock Unit*" means an unfunded and unsecured promise to deliver Common Shares, cash, other securities or other property, subject to certain restrictions (including, without limitation, a requirement that the Participant remain continuously employed or provide continuous services for a specified period of time), granted under Section 9 of the Plan.

(rr)     "*SAR Period*" has the meaning given such term in Section 8(b) of the Plan.

(ss)     "*Securities Act*" means the Securities Act of 1933, as amended, and any successor thereto.  Reference in the Plan to any section of the Securities Act shall be deemed to include any rules, regulations or other interpretative guidance under such section, and any amendments or successor provisions to such section, rules, regulations or guidance.

(tt)    *"Stock Appreciation Right"* or *"SAR"* means an Award granted under Section 8 of the Plan.

(uu)    *"Stock Bonus Award"* means an Award granted under Section 10 of the Plan.

(vv)    *"Stockholders' Agreement"* means the Stockholders' Agreement, dated as of December ___, 2010, among the Company and its stockholders signatory thereto, as amended, modified, supplemented or restated from time to time.

(ww)    *"Strike Price"* means, except as otherwise provided by the Committee in the case of Substitute Awards, (i) in the case of a SAR granted in tandem with an Option, the Exercise Price of the related Option, or (ii) in the case of a SAR granted independent of an Option, the Fair Market Value on the Date of Grant.

(xx)    *"Subsidiary"* means, with respect to any specified Person:

(1)    any corporation, association or other business entity of which more than 50% of the total voting power of shares of Outstanding Company Voting Securities (without regard to the occurrence of any contingency and after giving effect to any voting agreement or shareholders' agreement that effectively transfers voting power) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)    any partnership (or any comparable foreign entity) (a) the sole general partner (or functional equivalent thereof) or the managing general partner of which is such Person or Subsidiary of such Person or (b) the only general partners (or functional equivalents thereof) of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

(yy)    *"Substitute Award"* has the meaning given such term in Section 5(e).

3.    *Effective Date; Duration.*  The Plan shall be effective as of the Effective Date. The expiration date of the Plan, on and after which date no Awards may be granted hereunder, shall be the tenth anniversary of the Effective Date; provided, however, that such expiration shall not affect Awards then outstanding, and the terms and conditions of the Plan shall continue to apply to such Awards.

4.    *Administration.*  (a) The Committee shall administer the Plan.  To the extent required to comply with the provisions of Rule 16b-3 promulgated under the Exchange Act (if the Board is not acting as the Committee under the Plan) or necessary to obtain the exception for performance-based compensation under Section 162(m) of the Code, as applicable, it is intended that each member of the Committee shall, at the time he takes any action with respect to an Award under the Plan, be an Eligible Director.  However, the fact that a Committee member shall fail to qualify as an Eligible Director shall not invalidate any Award granted by the Committee that is otherwise validly granted under the Plan.  The acts of a majority of the members present at any meeting at which a quorum is present or acts approved in writing by a

majority of the Committee shall be deemed the acts of the Committee.  A majority of the members of the Committee shall constitute a quorum for this purpose.

(b)     Subject to the provisions of the Plan and applicable law, the Committee shall have the sole and plenary authority, in addition to other express powers and authorizations conferred on the Committee by the Plan, to: (i) designate Participants; (ii) determine the type or types of Awards to be granted to a Participant; (iii) determine the number of Common Shares to be covered by, or with respect to which payments, rights, or other matters are to be calculated in connection with, Awards; (iv) determine the terms and conditions of any Award; (v) determine whether, to what extent, and under what circumstances Awards may be settled or exercised in cash, Common Shares, other securities, other Awards or other property, or canceled, forfeited, or suspended and the method or methods by which Awards may be settled, exercised, canceled, forfeited, or suspended; (vi) determine whether, to what extent, and under what circumstances the delivery of cash, Common Shares, other securities, other Awards or other property and other amounts payable with respect to an Award shall be deferred either automatically or at the election of the Participant or of the Committee; (vii) interpret, administer, reconcile any inconsistency in, correct any defect in and/or supply any omission in the Plan and any instrument or agreement relating to, or Award granted under, the Plan; (viii) establish, amend, suspend, or waive any rules and regulations and appoint such agents as the Committee shall deem appropriate for the proper administration of the Plan; (ix) accelerate the vesting or exercisability of, payment for or lapse of restrictions on, Awards; and (x) make any other determination and take any other action that the Committee deems necessary or desirable for the administration of the Plan.

(c)     The Committee may delegate to one or more officers of the Company or any Affiliate the authority to act on behalf of the Committee with respect to any matter, right, obligation, or election that is the responsibility of or that is allocated to the Committee herein, and that may be so delegated as a matter of law, except for grants of Awards to persons (i) subject to Section 16 of the Exchange Act or (ii) who are, or who are reasonably expected to be, "covered employees" for purposes of Section 162(m) of the Code.

(d)     Unless otherwise expressly provided in the Plan, all designations, determinations, interpretations, and other decisions under or with respect to the Plan or any Award or any documents evidencing Awards granted pursuant to the Plan shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive and binding upon all persons or entities, including, without limitation, the Company, any Affiliate, any Participant, any holder or beneficiary of any Award, and any shareholder of the Company.

(e)     No member of the Board, the Committee, delegate of the Committee or any employee or agent of the Company (each such person, an "**Indemnifiable Person**") shall be liable for any action taken or omitted to be taken or any determination made in good faith with respect to the Plan or any Award hereunder.  Each Indemnifiable Person shall be indemnified and held harmless by the Company against and from any loss, cost, liability, or expense (including attorneys' fees) that may be imposed upon or incurred by such Indemnifiable Person in connection with or resulting from any action, suit or proceeding to which such Indemnifiable Person may be a party or in which such Indemnifiable Person may be involved by reason of any action taken or omitted to be taken under the Plan or any Award agreement and against and from

7

any and all amounts paid by such Indemnifiable Person with the Company's approval, in settlement thereof, or paid by such Indemnifiable Person in satisfaction of any judgment in any such action, suit or proceeding against such Indemnifiable Person, provided, that the Company shall have the right, at its own expense, to assume and defend any such action, suit or proceeding and once the Company gives notice of its intent to assume the defense, the Company shall have sole control over such defense with counsel of the Company's choice.  The foregoing right of indemnification shall not be available to an Indemnifiable Person to the extent that a final judgment or other final adjudication (in either case not subject to further appeal) binding upon such Indemnifiable Person determines that the acts or omissions of such Indemnifiable Person giving rise to the indemnification claim resulted from such Indemnifiable Person's bad faith, fraud or willful criminal act or omission or that such right of indemnification is otherwise prohibited by law or by the Company's Certificate of Incorporation or By-Laws.  The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such Indemnifiable Persons may be entitled under the Company's Certificate of Incorporation or By-Laws, as a matter of law, or otherwise, or any other power that the Company may have to indemnify such Indemnifiable Persons or hold them harmless.

(f)      Notwithstanding anything to the contrary contained in the Plan, the Board may, in its sole discretion, at any time and from time to time, grant Awards and administer the Plan with respect to such Awards.  In any such case, the Board shall have all the authority granted to the Committee under the Plan.

5.      *Grant of Awards; Shares Subject to the Plan; Limitations*.  (a) The Committee may, from time to time, grant Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units, Stock Bonus Awards and/or Performance Compensation Awards to one or more Eligible Persons.

(b)      Subject to Section 12 of the Plan, the Committee is authorized to deliver under the Plan [  ][1] Common Shares.

(c)      Use of Common Shares to pay the required Exercise Price or tax obligations, or shares not issued in connection with settlement of an Option or SAR or that are used or withheld to satisfy tax obligations of the Participant shall, notwithstanding anything herein to the contrary, not be available again for other Awards under the Plan.  Shares underlying Awards under this Plan that are forfeited, cancelled, expire unexercised, or are settled in cash are available again for Awards under the Plan.

(d)      Common Shares delivered by the Company in settlement of Awards may be authorized and unissued shares, shares held in the treasury of the Company, shares purchased on the open market or by private purchase, or a combination of the foregoing.

(e)      Awards may, in the sole discretion of the Committee, be granted under the Plan in assumption of, or in substitution for, outstanding awards previously granted by an entity acquired by the Company or with which the Company combines (**"Substitute Awards"**).  The

---

[1] NTD: 10% of the number of Common Shares outstanding upon the Effective Date.

number of Common Shares underlying any Substitute Awards shall be counted against the aggregate number of Common Shares available for Awards under the Plan.

6.    *Eligibility*.  Participation shall be limited to Eligible Persons who have entered into an Award agreement or who have received written notification from the Committee, or from a person designated by the Committee, that they have been selected to participate in the Plan.  As a condition to receipt of any Award, a Participant, if not already a party to the Stockholders' Agreement, shall execute and deliver to the Company a joinder agreement substantially in the form attached hereto as <u>Attachment 1</u>, pursuant to which the Participant shall agree to become a party to, to be bound by and to comply with the provisions of the Stockholders' Agreement in the same manner as if the Participant were an original signatory to such agreement.

7.    *Options*.  (a) <u>Generally</u>.  Each Option granted under the Plan shall be evidenced by an Award agreement (whether in paper or electronic medium (including email or the posting on a web site maintained by the Company or a third party under contract with the Company)).  Each Option so granted shall be subject to the conditions set forth in this Section 7, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award agreement.  All Options granted under the Plan shall be Nonqualified Stock Options unless the applicable Award agreement expressly states that the Option is intended to be an Incentive Stock Option.  Incentive Stock Options shall be granted only to Eligible Persons who are employees of the Company and its Affiliates, and no Incentive Stock Option shall be granted to any Eligible Person who is ineligible to receive an Incentive Stock Option under the Code.  No Option shall be treated as an Incentive Stock Option unless the Plan has been approved by the shareholders of the Company in a manner intended to comply with the stockholder approval requirements of Section 422(b)(1) of the Code, <u>provided</u> that any Option intended to be an Incentive Stock Option shall not fail to be effective solely on account of a failure to obtain such approval, but rather such Option shall be treated as a Nonqualified Stock Option unless and until such approval is obtained.  In the case of an Incentive Stock Option, the terms and conditions of such grant shall be subject to and comply with such rules as may be prescribed by Section 422 of the Code.  If for any reason an Option intended to be an Incentive Stock Option (or any portion thereof) shall not qualify as an Incentive Stock Option, then, to the extent of such nonqualification, such Option or portion thereof shall be regarded as a Nonqualified Stock Option appropriately granted under the Plan.

(b)    <u>Exercise Price</u>.  The exercise price (**"Exercise Price"**) per Common Share for each Option shall not be less than 100% of the Fair Market Value of such share determined as of the Date of Grant; <u>provided</u>, <u>however</u>, that in the case of an Incentive Stock Option granted to an employee who, at the time of the grant of such Option, owns shares representing more than 10% of the voting power of all classes of shares of the Company or any Affiliate, the Exercise Price per share shall not be less than 110% of the Fair Market Value per share on the Date of Grant and <u>provided, further</u> that, notwithstanding any provision herein to the contrary, the Exercise Price shall not be less than the par value per Common Share.

(c)    <u>Vesting and Expiration</u>.  Options shall vest and become exercisable in such manner and on such date or dates determined by the Committee and set forth in the applicable Award agreement, and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the **"Option Period"**); <u>provided</u>, <u>however</u>, that the Option

Period shall not exceed five years from the Date of Grant in the case of an Incentive Stock Option granted to a Participant who on the Date of Grant owns shares representing more than 10% of the voting power of all classes of shares of the Company or any Affiliate; provided, further, that notwithstanding any vesting dates set by the Committee, the Committee may, in its sole discretion, accelerate the exercisability of any Option, which acceleration shall not affect the terms and conditions of such Option other than with respect to exercisability.

(d)     *Method of Exercise and Form of Payment*.  No Common Shares shall be delivered pursuant to any exercise of an Option until payment in full of the Exercise Price therefor is received by the Company and the Participant has paid to the Company an amount equal to any federal, state, local and non-U.S. income and employment taxes required to be withheld.  Options that have become exercisable may be exercised by delivery of written or electronic notice of exercise to the Company in accordance with the terms of the Option accompanied by payment of the Exercise Price.  The Exercise Price shall be payable (i) in cash, check, cash equivalent and/or Common Shares valued at the Fair Market Value at the time the Option is exercised (including, pursuant to procedures approved by the Committee, by means of attestation of ownership of a sufficient number of Common Shares in lieu of actual delivery of such shares to the Company); provided, that such Common Shares are not subject to any pledge or other security interest and are Mature Shares; and (ii) by such other method as the Committee may permit in accordance with applicable law, in its sole discretion, including without limitation: (A) in other property having a Fair Market Value on the date of exercise equal to the Exercise Price or (B) if there is a public market for the Common Shares at such time, by means of a broker-assisted "cashless exercise" pursuant to which the Company is delivered a copy of irrevocable instructions to a stockbroker to sell the Common Shares otherwise deliverable upon the exercise of the Option and to deliver promptly to the Company an amount equal to the Exercise Price or (C) by a "net exercise" method whereby the Company withholds from the delivery of the Common Shares for which the Option was exercised that number of Common Shares having a Fair Market Value equal to the aggregate Exercise Price for the Common Shares for which the Option was exercised.  Any fractional Common Shares shall be settled in cash.

(e)     *Notification upon Disqualifying Disposition of an Incentive Stock Option*. Each Participant awarded an Incentive Stock Option under the Plan shall notify the Company in writing immediately after the date he makes a disqualifying disposition of any Common Shares acquired pursuant to the exercise of such Incentive Stock Option.  A disqualifying disposition is any disposition (including, without limitation, any sale) of such Common Shares before the later of (A) two years after the Date of Grant of the Incentive Stock Option or (B) one year after the date of exercise of the Incentive Stock Option, The Company may, if determined by the Committee and in accordance with procedures established by the Committee, retain possession of any Common Shares acquired pursuant to the exercise of an Incentive Stock Option as agent for the applicable Participant until the end of the period described in the preceding sentence.

(f)     *Compliance With Laws, etc*.  Notwithstanding the foregoing, in no event shall a Participant be permitted to exercise an Option in a manner that the Committee determines would violate the Sarbanes-Oxley Act of 2002, if applicable, or any other applicable law or the applicable rules and regulations of the Securities and Exchange Commission or the applicable rules and regulations of any securities exchange or inter-dealer quotation system on which the securities of the Company are listed or traded.

10

8.    *Stock Appreciation Rights*.  (a) <u>*Generally*</u>.  Each SAR granted under the Plan shall be evidenced by an Award agreement (whether in paper or electronic medium (including email or the posting on a web site maintained by the Company or a third party under contract with the Company)).  Each SAR so granted shall be subject to the conditions set forth in this Section 8, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award agreement.  Any Option granted under the Plan may include tandem SARs.  The Committee also may award SARs to Eligible Persons independent of any Option.

(b)    <u>*Exercise Price*</u>.  The Exercise Price per Common Share for each Option shall not be less than 100% of the Fair Market Value of such share determined as of the Date of Grant.

(c)    <u>*Vesting and Expiration*</u>.  A SAR granted in connection with an Option shall become exercisable and shall expire according to the same vesting schedule and expiration provisions as the corresponding Option.  A SAR granted independent of an Option shall vest and become exercisable and shall expire in such manner and on such date or dates determined by the Committee and set forth in the applicable Award agreement, and shall expire after such period, not to exceed ten years, as may be determined by the Committee (the **"SAR Period"**); <u>provided</u>, <u>however</u>, that notwithstanding any vesting dates set by the Committee, the Committee may, in its sole discretion, accelerate the exercisability of any SAR, which acceleration shall not affect the terms and conditions of such SAR other than with respect to exercisability.

(d)    <u>*Method of Exercise*</u>.  SARs that have become exercisable may be exercised by delivery of written or electronic notice of exercise to the Company in accordance with the terms of the Award, specifying the number of SARs to be exercised and the date on which such SARs were awarded.  Notwithstanding the foregoing, if on the last day of the Option Period (or in the case of a SAR independent of an option, the SAR Period), the Fair Market Value exceeds the Strike Price, the Participant has not exercised the SAR or the corresponding Option (if applicable), and neither the SAR nor the corresponding Option (if applicable) has expired, such SAR shall be deemed to have been exercised by the Participant on such last day and the Company shall make the appropriate payment therefor.

(e)    <u>*Payment*</u>.  Upon the exercise of a SAR, the Company shall pay to the Participant an amount equal to the number of shares subject to the SAR that are being exercised multiplied by the excess, if any, of the Fair Market Value of one Common Share on the exercise date over the Strike Price, less an amount equal to any federal, state, local and non-U.S. income and employment taxes required to be withheld.  The Company shall pay such amount in cash, in Common Shares valued at Fair Market Value, or any combination thereof, as determined by the Committee.  Any fractional Common Share shall be settled in cash.

9.    *Restricted Stock and Restricted Stock Units*.  (a) <u>*Generally*</u>.  Each grant of Restricted Stock and Restricted Stock Units shall be evidenced by an Award agreement (whether in paper or electronic medium (including email or the posting on a web site maintained by the Company or a third party under contract with the Company)).  Each such grant shall be subject to the conditions set forth in this Section 9, and to such other conditions not inconsistent with the Plan as may be reflected in the applicable Award agreement.

(b)    _Restricted Accounts; Escrow or Similar Arrangement_.  Upon the grant of Restricted Stock, a book entry in a restricted account shall be established in the Participant's name at the Company's transfer agent and, if the Committee determines that the Restricted Stock shall be held by the Company or in escrow rather than held in such restricted account pending the release of the applicable restrictions, the Committee may require the Participant to additionally execute and deliver to the Company (i) an escrow agreement satisfactory to the Committee, if applicable, and (ii) the appropriate share power (endorsed in blank) with respect to the Restricted Stock covered by such agreement.  If a Participant shall fail to execute an agreement evidencing an Award of Restricted Stock and, if applicable, an escrow agreement and blank share power within the amount of time specified by the Committee, the Award shall be null and void.  Subject to the restrictions set forth in this Section 9 and the applicable Award agreement, the Participant generally shall have the rights and privileges of a shareholder as to such Restricted Stock, including without limitation the right to vote such Restricted Stock and the right to receive dividends, if applicable.  To the extent shares of Restricted Stock are forfeited, any share certificates issued to the Participant evidencing such shares shall be returned to the Company, and all rights of the Participant to such shares and as a shareholder with respect thereto shall terminate without further obligation on the part of the Company.

(c)    _Lapse of Restrictions_.  The Restricted Period applicable to awards of Restricted Stock and Restricted Stock Units shall lapse on such date or dates determined by the Committee and set forth in the applicable Award agreement.

(d)    _Delivery of Restricted Stock and Settlement of Restricted Stock Units_. (i) Upon the expiration of the Restricted Period with respect to any shares of Restricted Stock, the restrictions set forth in the applicable Award agreement shall be of no further force or effect with respect to such shares, except as set forth in the applicable Award agreement.  If an escrow arrangement is used, upon such expiration, the Company shall deliver to the Participant, or his beneficiary, without charge, the share certificate evidencing the shares of Restricted Stock that have not then been forfeited and with respect to which the Restricted Period has expired (rounded down to the nearest full share).  Dividends, if any, that may have been withheld by the Committee and attributable to any particular share of Restricted Stock shall be distributed to the Participant in cash or, at the sole discretion of the Committee, in shares of Common Stock having a Fair Market Value equal to the amount of such dividends, upon the release of restrictions on such share and, if such share is forfeited, the Participant shall have no right to such dividends (except as otherwise set forth by the Committee in the applicable Award agreement).

(ii)    Unless otherwise provided by the Committee in an Award agreement, upon the expiration of the Restricted Period with respect to any outstanding Restricted Stock Units, the Company shall deliver to the Participant, or his beneficiary, without charge, one Common Share for each such outstanding Restricted Stock Unit; provided, however, that the Committee may, in its sole discretion, elect to (i) pay cash or part cash and part Common Share in lieu of delivering only Common Shares in respect of such Restricted Stock Units or (ii) defer the delivery of Common Shares (or cash or part Common Shares and part cash, as the case may be) beyond the expiration of the Restricted Period if such delivery would result in a violation of applicable law until such time as is no longer the case, if a cash payment is made in lieu of delivering Common Shares, the amount of such payment shall be equal to the Fair Market

12

Value of the Common Shares as of the date on which the Restricted Period lapsed with respect to such Restricted Stock Units, less an amount equal to any federal, state, local and non-U.S. income and employment taxes required to be withheld.

10.    *Stock Bonus Awards*.  The Committee may issue unrestricted Common Shares, or other Awards denominated in Common Shares, under the Plan to Eligible Persons, either alone or in tandem with other awards, in such amounts as the Committee shall from time to time in its sole discretion determine.  Each Stock Bonus Award granted under the Plan shall be evidenced by an Award agreement (whether in paper or electronic medium (including email or the posting on a web site maintained by the Company or a third party under contract with the Company)).  Each Stock Bonus Award so granted shall be subject to such conditions not inconsistent with the Plan as may be reflected in the applicable Award agreement.

11.    *Performance Compensation Awards*.  (a) <u>Generally</u>.  The Committee shall have the authority, at the time of grant of any Award described in Sections 7 through 10 of the Plan, to designate such Award as a Performance Compensation Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code.  The Committee shall have the authority to make an award of a cash bonus to any Participant and designate such Award as a Performance Compensation Award intended to qualify as "performance-based compensation" under Section 162(m) of the Code.

(b)    <u>Discretion of Committee with Respect to Performance Compensation Awards</u>.  With regard to a particular Performance Period, the Committee shall have sole discretion to select the length of such Performance Period, the type(s) of Performance Compensation Awards to be issued, the Performance Criteria that will be used to establish the Performance Goal(s), the kind(s) and/or level(s) of the Performance Goals(s) that is (are) to apply and the Performance Formula.  Within the first 90 days of a Performance Period (or, if longer or shorter, within the maximum period allowed under Section 162(m) of the Code, if applicable), the Committee shall, with regard to the Performance Compensation Awards to be issued for such Performance Period, exercise its discretion with respect to each of the matters enumerated in the immediately preceding sentence and record the same in writing.

(c)    <u>Performance Criteria</u>.  The Performance Criteria that will be used to establish the Performance Goal(s) shall be based on the attainment of specific levels of performance of the Company (and/or one or more Affiliates, divisions or operational units, or any combination of the foregoing) and shall include the following: (i) net earnings or net income (before or after taxes); (ii) basic or diluted earnings per share (before or after taxes); (iii) net revenue or revenue growth; (iv) gross profit or gross profit growth; (v) operating profit (before or after taxes); (vi) return measures (including, but not limited to, return on assets, capital, invested capital, equity, or sales); (vii) cash flow (including, but not limited to, operating cash flow, free cash flow, and cash flow return on capital); (viii) earnings before or after taxes, interest, depreciation and/or amortization; (ix) gross or operating margins; (x) productivity ratios; (xi) share price (including, but not limited to, growth measures and total shareholder return); (xii) expense targets; (xiii) margins; (xiv) operating efficiency; (xv) objective measures of customer satisfaction; (xvi) working capital targets; (xvii) measures of economic value added; (xviii) inventory control; (xix) enterprise value; (xx) sales; (xxi) debt levels and net debt; (xxii) combined ratio; (xxiii) timely launch of new facilities; (xxiv) client retention; (xxv) employee

retention; (xxvi) timely completion of new product rollouts; and (xxvii) objective measures of personal targets, goals or completion of projects, Any one or more of the Performance Criteria may be used on an absolute or relative basis to measure the performance of the Company and/or one or more Affiliates as a whole or any business unit(s) of the Company and/or one or more Affiliates or any combination thereof, as the Committee may deem appropriate, or any of the above Performance Criteria may be compared to the performance of a selected group of comparison companies, or a published or special index that the Committee, in its sole discretion, deems appropriate, or as compared to various stock market indices.  The Committee also has the authority to provide for accelerated vesting of any Award based on the achievement of Performance Goals pursuant to the Performance Criteria specified in this paragraph.  To the extent required under Section 162(m) of the Code, the Committee shall, within the first 90 days of a Performance Period (or, if longer or shorter, within the maximum period allowed under Section 162(m) of the Code), define in an objective fashion the manner of calculating the Performance Criteria it selects to use for such Performance Period and thereafter promptly communicate such Performance Criteria to the Participant.

(d)      *Modification of Performance Goal(s)*.  In the event that applicable tax and/or securities laws change to permit Committee discretion to alter the governing Performance Criteria without obtaining shareholder approval of such alterations, the Committee shall have sole discretion to make such alterations without obtaining shareholder approval.  The Committee is authorized at any time during the first 90 days of a Performance Period (or, if longer or shorter, within the maximum period allowed under Section 162(m) of the Code, if applicable), or at any time thereafter to the extent the exercise of such authority at such time would not cause the Performance Compensation Awards granted to any Participant for such Performance Period to fail to qualify as "performance-based compensation" under Section 162(m) of the Code, in its sole discretion, to adjust or modify the calculation of a Performance Goal for such Performance Period, based on and in order to appropriately reflect the following events: (i) asset write-downs; (ii) litigation or claim judgments or settlements; (iii) the effect of changes in tax laws, accounting principles, or other laws or regulatory rules affecting reported results; (iv) any reorganization and restructuring programs; (v) extraordinary nonrecurring items as described in Accounting Principles Board Opinion No. 30 (or any successor pronouncement thereto) and/or in management's discussion and analysis of financial condition and results of operations appearing in the Company's annual report to shareholders for the applicable year; (vi) acquisitions or divestitures; (vii) any other specific unusual or nonrecurring events, or objectively determinable category thereof; (viii) foreign exchange gains and losses; and (ix) a change in the Company's fiscal year.

(e)      *Payment of Performance Compensation Awards*.  (i) *Condition to Receipt of Payment*.  Unless otherwise provided in the applicable Award agreement, a Participant must be employed by the Company on the last day of a Performance Period to be eligible for payment in respect of a Performance Compensation Award for such Performance Period.

(ii)      *Limitation*.  A Participant shall be eligible to receive payment in respect of a Performance Compensation Award only to the extent that: (A) the Performance Goals for such period are achieved; and (B) all or some of the portion of such Participant's Performance Compensation Award has been earned for the Performance Period based on the application of the Performance Formula to such achieved Performance Goals.

14

(iii)     _Certification_.  Following the completion of a Performance Period, the Committee shall review and certify in writing whether, and to what extent, the Performance Goals for the Performance Period have been achieved and, if so, calculate and certify in writing that amount of the Performance Compensation Awards earned for the period based upon the Performance Formula.  The Committee shall then determine the amount of each Participant's Performance Compensation Award actually payable for the Performance Period and, in so doing, may apply Negative Discretion.

(iv)     _Use of Negative Discretion_.  In determining the actual amount of an individual Participant's Performance Compensation Award for a Performance Period, the Committee may reduce or eliminate the amount of the Performance Compensation Award earned under the Performance Formula in the Performance Period through the use of Negative Discretion if, in its sole judgment, such reduction or elimination is appropriate.  The Committee shall not have the discretion, except as is otherwise provided in the Plan, to grant or provide payment in respect of Performance Compensation Awards for a Performance Period if the Performance Goals for such Performance Period have not been attained.

(f)     _Timing of Award Payments_.  Performance Compensation Awards granted for a Performance Period shall be paid to Participants as soon as administratively practicable following completion of the certifications required by this Section 11, but in no event later than two-and-one-half months following the end of the fiscal year during which the Performance Period is completed.

12.     _Changes in Capital Structure and Similar Events_.  In the event of (a) any dividend or other distribution (whether in the form of cash, Common Shares, other securities or other property), recapitalization, stock split, reverse stock split, reorganization, merger, amalgamation, consolidation, split-up, split-off, combination, repurchase or exchange of Common Shares or other securities of the Company, issuance of warrants or other rights to acquire Common Shares or other securities of the Company, or other similar corporate transaction or event (including, without limitation, a Change in Control) that affects the Common Shares, or (b) unusual or nonrecurring events (including, without limitation, a Change in Control) affecting the Company, any Affiliate, or the financial statements of the Company or any Affiliate, or changes in applicable rules, rulings, regulations or other requirements of any governmental body or securities exchange or inter-dealer quotation system, accounting principles or law, such that in either case an adjustment is determined by the Committee in its sole discretion to be necessary or appropriate, then the Committee shall make any such adjustments in such manner as it may deem equitable, including without limitation any or all of the following:

(i)     adjusting any or all of (A) the number of Common Shares or other securities of the Company (or number and kind of other securities or other property) that may be delivered in respect of Awards or with respect to which Awards may be granted under the Plan (including, without limitation, the limitation under Section 5 of the Plan) and (B) the terms of any outstanding Award, including, without limitation, (1) the number of Common Shares or other securities of the Company (or number and kind of other securities or other property) subject to outstanding Awards or to which outstanding Awards relate, (2) the Exercise Price or Strike Price with respect to any Award or (3) any applicable performance measures (including, without limitation, Performance Criteria and Performance Goals);

(ii)    providing for a substitution or assumption of Awards, accelerating the exercisability of, lapse of restrictions on, or termination of, Awards or providing for a period of time for exercise prior to the occurrence of such event; and

(iii)    canceling any one or more outstanding Awards and causing to be paid to the holders thereof, in cash, Common Shares, other securities or other property, or any combination thereof, the value of such Awards, if any, as determined by the Committee (which if applicable may be based upon the price per Common Share received or to be received by other shareholders of the Company in such event), including without limitation, in the case of an outstanding Option or SAR, a cash payment in an amount equal to the excess, if any, of the Fair Market Value (as of a date specified by the Committee) of the Common Shares subject to such Option or SAR over the aggregate Exercise Price or Strike Price of such Option or SAR, respectively (it being understood that, in such event, any Option or SAR having a per share Exercise Price or Strike Price equal to, or in excess of, the Fair Market Value of a Common Share subject thereto may be canceled and terminated without any payment or consideration therefor);

provided, however, that in the case of any "equity restructuring" (within the meaning of the Financial Accounting Standards Board Statement of Financial Accounting Standards No. 123 (revised 2004)), the Committee shall make an equitable or proportionate adjustment to outstanding Awards to reflect such equity restructuring.  Any adjustment in Incentive Stock Options under this Section 12 (other than any cancellation of Incentive Stock Options) shall be made only to the extent not constituting a "modification" within the meaning of Section 424(h)(3) of the Code, and any adjustments under this Section 12 shall be made in a manner that does not adversely affect the exemption provided pursuant to Rule 16b-3 under the Exchange Act.  The Company shall give each Participant notice of an adjustment hereunder and, upon notice, such adjustment shall be conclusive and binding for all purposes.

13.    *Effect of Change in Control or Initial Public Offering*.  The treatment of an outstanding Award upon the occurrence of a Change in Control or Initial Public Offering shall be determined by the Committee and set forth in the applicable Award agreement issued in respect of such Award.

14.    *Amendments and Termination*.  (a) *Amendment and Termination of the Plan*.  The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuation or termination shall be made without shareholder approval if such approval is necessary to comply with any tax or regulatory requirement applicable to the Plan (including, without limitation, as necessary to comply with any rules or requirements of any securities exchange or inter-dealer quotation system on which the Common Shares may be listed or quoted or to prevent the Company from being denied a tax deduction under Section 162(m) of the Code); provided, further, that any such amendment, alteration, suspension, discontinuance or termination that would materially and adversely affect the rights of any Participant or any holder or beneficiary of any Award theretofore granted shall not to that extent be effective without the consent of the affected Participant, holder or beneficiary.

16

(b)      *Amendment of Award Agreements*.  The Committee may, to the extent consistent with the terms of any applicable Award agreement, waive any conditions or rights under, amend any terms of, or alter, suspend, discontinue, cancel or terminate, any Award theretofore granted or the associated Award agreement, prospectively or retroactively; provided that any such waiver, amendment, alteration, suspension, discontinuance, cancellation or termination that would materially and adversely affect the rights of any Participant with respect to any Award theretofore granted, including the taxation thereof, shall not to that extent be effective without the consent of the affected Participant; provided, further, that without shareholder approval, except as otherwise permitted under Section 12 of the Plan, (i) no amendment or modification may reduce the Exercise Price of any Option or the Strike Price of any SAR, (ii) the Committee may not cancel any outstanding Option or SAR and replace it with a new Option or SAR, another Award or cash and (iii) the Committee may not take any other action that is considered a "repricing" for purposes of the shareholder approval rules of the applicable securities exchange or inter-dealer quotation system on which the Common Shares are listed or quoted.

15.      *Restrictive Covenants*.  (a) *Confidentiality*.  By accepting an Award under the Plan, and as a condition thereof, each Participant agrees not to, at any time, either during their employment or thereafter, divulge, use, publish or in any other manner reveal, directly or indirectly, to any person, firm, corporation or any other form of business organization or arrangement, and to keep in the strictest confidence any Confidential Information, except (i) as may be necessary to the performance of the Participant's duties to the Company, (ii) with the Company's express written consent, (iii) to the extent that any such information is in or becomes in the public domain other than as a result of the Participant's breach of any of his or her obligations under this Section 15(a), or (iv) where required to be disclosed by court order, subpoena or other government process and in such event, the Participant shall cooperate with the Company in attempting to keep such information confidential to the maximum extent possible. Upon the request of the Company or an Affiliate, the Participant agrees to promptly deliver to the Company the originals and all copies, in whatever medium, of all such Confidential Information.

(b)      *Non-Disparagement*.  By accepting an Award under the Plan, and as a condition thereof, the Participant acknowledges and agrees that he or she will not defame or publicly criticize the services, business, integrity, veracity or personal or professional reputation of the Company, including its officers, directors, partners, executives or agents, in either a professional or personal manner at any time during or following his or her employment.

(c)      *Post-Employment Property*.  By accepting an Award under the Plan, and as a condition thereof, the Participant agrees that any work of authorship, invention, design, discovery, development, technique, improvement, source code, hardware, device, data, apparatus, practice, process, method or other work product whatever (whether patentable or subject to copyright, or not, and hereinafter collectively called "discovery") related to the business of the Company that the Participant, either solely or in collaboration with others, has made or may make, discover, invent, develop, perfect, or reduce to practice during his or her employment, whether or not during regular business hours and created, conceived or prepared on the Company's premises or otherwise shall be the sole and complete property of the Company. More particularly, and without limiting the foregoing, the Participant agrees that all of the

17

foregoing and any (i) inventions (whether patentable or not, and without regard to whether any patent therefor is ever sought), (ii) marks, names, or logos (whether or not registrable as trade or service marks, and without regard to whether registration therefor is ever sought), (iii) works of authorship (without regard to whether any claim of copyright therein is ever registered), and (iv) trade secrets, ideas, and concepts ((i) — (iv) collectively, "**Intellectual Property Products**") created, conceived, or prepared on the Company's premises or otherwise, whether or not during normal business hours, shall perpetually and throughout the world be the exclusive property of the Company, as shall all tangible media (including, but not limited to, papers, computer media of all types, and models) in which such Intellectual Property Products shall be recorded or otherwise fixed. The Participant further agrees promptly to disclose in writing and deliver to the Company all Intellectual Property Products created during his or her engagement by the Company, whether or not during normal business hours. The Participant agrees that all works of authorship created by the Participant during his or her engagement by the Company shall be works made for hire of which the Company is the author and owner of copyright. To the extent that any competent decision-making authority should ever determine that any work of authorship created by the Participant during his or her engagement by the Company is not a work made for hire, by accepting an Award, the Participant assigns all right, title and interest in the copyright therein, in perpetuity and throughout the world, to the Company. To the extent that this Plan does not otherwise serve to grant or otherwise vest in the Company all rights in any Intellectual Property Product created by the Participant during his or her engagement by the Company, by accepting an Award, the Participant assigns all right, title and interest therein, in perpetuity and throughout the world, to the Company. The Participant agrees to execute, immediately upon the Company's reasonable request and without charge, any further assignments, applications, conveyances or other instruments, at any time, whether or not the Participant is engaged by the Company at the time such request is made, in order to permit the Company and/or its respective assigns to protect, perfect, register, record, maintain, or enhance their rights in any Intellectual Property Product; provided, that, the Company shall bear the cost of any such assignments, applications or consequences. Upon termination of the Participant's employment by the Company for any reason whatsoever, and at any earlier time the Company so requests, the Participant will immediately deliver to the custody of the person designated by the Company all originals and copies of any documents and other property of the Company in the Participant's possession, under the Participant's control or to which he or she may have access.

For purposes of this Section 15, the term "Company" shall include the Company and its Affiliates.

16. *General*. (a) *Award Agreements*. Each Award under the Plan shall be evidenced by an Award agreement, which shall be delivered to the Participant (whether in paper or electronic medium (including email or the posting on a web site maintained by the Company or a third party under contract with the Company)) and shall specify the terms and conditions of the Award and any rules applicable thereto, including without limitation, the effect on such Award of the death, disability or termination of employment or service of a Participant, or of such other events as may be determined by the Committee.

(b) *Nontransferability*. (i) Each Award shall be exercisable only by a Participant during the Participant's lifetime, or, if permissible under applicable law, by the Participant's legal guardian or representative. No Award (other than a Stock Bonus Award or a

18

Restricted Stock Award, to the extent any applicable restrictions on such Award have lapsed and subject to the Stockholders' Agreement) may be assigned, alienated, pledged, attached, sold or otherwise transferred or encumbered by a Participant other than by will or by the laws of descent and distribution and any such purported assignment, alienation, pledge, attachment, sale, transfer or encumbrance shall be void and unenforceable against the Company or an Affiliate; <u>provided</u> that the designation of a beneficiary shall not constitute an assignment, alienation, pledge, attachment, sale, transfer or encumbrance.

(ii)    Notwithstanding the foregoing, the Committee may, in its sole discretion, permit Awards (other than Incentive Stock Options) to be transferred by a Participant, without consideration, subject to such rules as the Committee may adopt consistent with any applicable Award agreement to preserve the purposes of the Plan, to: (A) any person who is a "family member" of the Participant, as such term is used in the instructions to Form S-8 under the Securities Act (collectively, the "**Immediate Family Members**"); (B) a trust solely for the benefit of the Participant and his or her Immediate Family Members; or (C) a partnership or limited liability company whose only partners or stockholders are the Participant and his or her Immediate Family Members; or (D) any other transferee as may be approved either (I) by the Board or the Committee in its sole discretion, or (II) as provided in the applicable Award agreement (each transferee described in clauses (A), (B) (C) and (D) above is hereinafter referred to as a "**Permitted Transferee**"); <u>provided</u>, that the Participant gives the Committee advance written notice describing the terms and conditions of the proposed transfer and the Committee notifies the Participant in writing that such a transfer would comply with the requirements of the Plan.

(iii)    The terms of any Award transferred in accordance with the immediately preceding sentence shall apply to the Permitted Transferee and any reference in the Plan, or in any applicable Award agreement, to a Participant shall be deemed to refer to the Permitted Transferee, except that (A) Permitted Transferees shall not be entitled to transfer any Award, other than by will or the laws of descent and distribution; (B) Permitted Transferees shall not be entitled to exercise any transferred Option unless there shall be in effect a registration statement on an appropriate form covering the Common Shares to be acquired pursuant to the exercise of such Option if the Committee determines, consistent with any applicable Award agreement, that such a registration statement is necessary or appropriate; (C) the Committee or the Company shall not be required to provide any notice to a Permitted Transferee, whether or not such notice is or would otherwise have been required to be given to the Participant under the Plan or otherwise; and (D) the consequences of the termination of the Participant's employment by, or services to, the Company or an Affiliate under the terms of the Plan and the applicable Award agreement shall continue to be applied with respect to the Participant, including, without limitation, that an Option shall be exercisable by the Permitted Transferee only to the extent, and for the periods, specified in the Plan and the applicable Award agreement.

(c)    *Tax Withholding*.  (i) A Participant shall be required to pay to the Company or any Affiliate, and the Company or any Affiliate shall have the right and is hereby authorized to withhold, from any cash, Common Shares, other securities or other property deliverable under any Award or from any compensation or other amounts owing to a Participant, the amount (in cash, Common Shares, other securities or other property) of any required withholding taxes in respect of an Award, its exercise, or any payment or transfer under an

19

Award or under the Plan and to take such other action as may be necessary in the opinion of the Committee or the Company to satisfy all obligations for the payment of such withholding and taxes.

        (ii)      Without limiting the generality of clause (i) above, the Committee may, in its sole discretion, permit a Participant to satisfy, in whole or in part, the foregoing withholding liability by (A) the delivery of Common Shares (which are not subject to any pledge or other security interest and are Mature Shares) owned by the Participant having a Fair Market Value equal to such withholding liability or (B) having the Company withhold from the number of Common Shares otherwise issuable or deliverable pursuant to the exercise or settlement of the Award a number of shares with a Fair Market Value equal to such withholding liability (but no more than the minimum required statutory withholding liability).

        (d)      *No Claim to Awards; No Rights to Continued Employment; Waiver*.  No employee of the Company or an Affiliate, or other person, shall have any claim or right to be granted an Award under the Plan or, having been selected for the grant of an Award, to be selected for a grant of any other Award.  There is no obligation for uniformity of treatment of Participants or holders or beneficiaries of Awards.  The terms and conditions of Awards and the Committee's determinations and interpretations with respect thereto need not be the same with respect to each Participant and may be made selectively among Participants, whether or not such Participants are similarly situated.  Neither the Plan nor any action taken hereunder shall be construed as giving any Participant any right to be retained in the employ or service of the Company or an Affiliate.  The Company or any of its Affiliates may at any time dismiss a Participant from employment or discontinue any consulting relationship, free from any liability or any claim under the Plan, unless otherwise expressly provided in the Plan or any Award agreement.  By accepting an Award under the Plan, a Participant shall thereby be deemed to have waived any claim to continued exercise or vesting of an Award or to damages or severance entitlement related to non-continuation of the Award beyond the period provided under the Plan or any Award agreement, notwithstanding any provision to the contrary in any written employment contract or other agreement between the Company and its Affiliates and the Participant, whether any such agreement is executed before, on or after the Date of Grant.

        (e)      *International Participants*.  With respect to Participants who reside or work outside of the United States of America and who are not (and who are not expected to be) "covered employees" within the meaning of Section 162(m) of the Code, the Committee may in its sole discretion amend the terms of the Plan or outstanding Awards with respect to such Participants in order to conform such terms with the requirements of local law or to obtain more favorable tax or other treatment for a Participant, the Company or its Affiliates.

        (f)      *Designation and Change of Beneficiary*.  Each Participant may file with the Committee a written designation of one or more persons as the beneficiary(ies) who shall be entitled to receive the amounts payable with respect to an Award, if any, due under the Plan upon his death.  A Participant may, from time to time, revoke or change his beneficiary designation without the consent of any prior beneficiary by filing a new designation with the Committee.  The last such designation received by the Committee shall be controlling; provided, however, that no designation, or change or revocation thereof, shall be effective unless received by the Committee prior to the Participant's death, and in no event shall it be effective as of a date prior

to such receipt.  If no beneficiary designation is filed by a Participant, the beneficiary shall be deemed to be his or her spouse or, if the Participant is unmarried at the time of death, his or her estate.

(g)     *Termination of Employment/Service*.  Unless determined otherwise by the Committee at any point following such event: (i) neither a temporary absence from employment or service due to illness, vacation or leave of absence nor a transfer from employment or service with the Company to employment or service with an Affiliate (or vice-versa) shall be considered a termination of employment or service with the Company or an Affiliate; and (ii) if a Participant's employment with the Company and its Affiliates terminates, but such Participant continues to provide services to the Company and its Affiliates in a non-employee capacity (or vice-versa), such change in status shall not be considered a termination of employment with the Company or an Affiliate.

(h)     *No Rights as a Stockholder*.  Except as otherwise specifically provided in the Plan or any Award agreement, no person shall be entitled to the privileges of ownership in respect of Common Shares that are subject to Awards hereunder until such shares have been issued or delivered to that person.

(i)     *Government and Other Regulations*.  (i) The obligation of the Company to settle Awards in Common Shares or other consideration shall be subject to all applicable laws, rules, and regulations, and to such approvals by governmental agencies as may be required. Notwithstanding any terms or conditions of any Award to the contrary, the Company shall be under no obligation to offer to sell or to sell, and shall be prohibited from offering to sell or selling, any Common Shares pursuant to an Award unless such shares have been properly registered for sale pursuant to the Securities Act with the Securities and Exchange Commission or unless the Committee has determined that such shares may be offered or sold without such registration pursuant to an available exemption therefrom and the terms and conditions of such exemption have been fully complied with.  The Company shall be under no obligation to register for sale under the Securities Act any of the Common Shares to be offered or sold under the Plan. The Committee shall have the authority to provide that all certificates for Common Shares or other securities of the Company or any Affiliate delivered under the Plan shall be subject to such stop transfer orders and other restrictions as the Committee may deem advisable under the Plan, the applicable Award agreement, the federal securities laws, or the rules, regulations and other requirements of the Securities and Exchange Commission, any securities exchange or inter-dealer quotation system upon which such shares or other securities are then listed or quoted and any other applicable federal, state, local or non-U.S. laws, and, without limiting the generality of Section 9 of the Plan, the Committee may cause a legend or legends to be put on any such certificates to make appropriate reference to such restrictions.  Notwithstanding any provision in the Plan to the contrary, the Committee reserves the right to add any additional terms or provisions to any Award granted under the Plan that it in its sole discretion deems necessary or advisable in order that such Award complies with the legal requirements of any governmental entity to whose jurisdiction the Award is subject.

(ii)     The Committee may cancel an Award or any portion thereof if it determines, in its sole discretion, that legal or contractual restrictions and/or blockage and/or other market considerations would make the Company's acquisition of Common Shares from the

public markets, the Company's issuance of Common Shares to the Participant, the Participant's acquisition of Common Shares from the Company and/or the Participant's sale of Common Shares to the public markets, illegal, impracticable or inadvisable.  If the Committee determines to cancel all or any portion of an Award in accordance with the foregoing, the Company shall pay to the Participant an amount equal to the excess of (A) the aggregate Fair Market Value of the Common Shares subject to such Award or portion thereof canceled (determined as of the applicable exercise date, or the date that the shares would have been vested or delivered, as applicable), over (B) the aggregate Exercise Price or Strike Price (in the case of an Option or SAR, respectively) or any amount payable as a condition of delivery of Common Shares (in the case of any other Award).  Such amount shall be delivered to the Participant as soon as practicable following the cancellation of such Award or portion thereof.

(j)      _Payments to Persons Other Than Participants_.  If the Committee shall find that any person to whom any amount is payable under the Plan is unable to care for his affairs because of illness or accident, or is a minor, or has died, then any payment due to such person or his estate (unless a prior claim therefor has been made by a duly appointed legal representative) may, if the Committee so directs the Company, be paid to his spouse, child, relative, an institution maintaining or having custody of such person, or any other person deemed by the Committee to be a proper recipient on behalf of such person otherwise entitled to payment.  Any such payment shall be a complete discharge of the liability of the Committee and the Company therefor.

(k)      _Nonexclusivity of the Plan_.  Neither the adoption of this Plan by the Board nor the submission of this Plan to the shareholders of the Company for approval shall be construed as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options or other equity-based awards otherwise than under this Plan, and such arrangements may be either applicable generally or only in specific cases.

(l)      _No Trust or Fund Created_.  Neither the Plan nor any Award shall create or be construed to create a trust or separate fund of any kind or a fiduciary relationship between the Company or any Affiliate, on the one hand, and a Participant or other person or entity, on the other hand.  No provision of the Plan or any Award shall require the Company, for the purpose of satisfying any obligations under the Plan, to purchase assets or place any assets in a trust or other entity to which contributions are made or otherwise to segregate any assets, nor shall the Company maintain separate bank accounts, books, records or other evidence of the existence of a segregated or separately maintained or administered fund for such purposes.  Participants shall have no rights under the Plan other than as unsecured general creditors of the Company, except that insofar as they may have become entitled to payment of additional compensation by performance of services, they shall have the same rights as other employees under general law.

(m)      _Reliance on Reports_.  Each member of the Committee and each member of the Board shall be fully justified in acting or failing to act, as the case may be, and shall not be liable for having so acted or failed to act in good faith, in reliance upon any report made by the independent public accountant of the Company and its Affiliates and/or any other information furnished in connection with the Plan by any agent of the Company or the Committee or the Board, other than himself.

(n)    _Relationship to Other Benefits_.  No payment under the Plan shall be taken into account in determining any benefits under any pension, retirement, profit sharing, group insurance or other benefit plan of the Company except as otherwise specifically provided in such other plan.

(o)    _Governing Law_.  The Plan shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and performed wholly within the State of New York, including, without limitation, Section 5-1401 of the New York General Obligations Law.

(p)    _Severability_.  If any provision of the Plan or any Award or Award agreement is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity or Award, or would disqualify the Plan or any Award under any law deemed applicable by the Committee, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Committee, materially altering the intent of the Plan or the Award, such provision shall be construed or deemed stricken as to such jurisdiction, person or entity or Award and the remainder of the Plan and any such Award shall remain in full force and effect.

(q)    _Obligations Binding on Successors_.  The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, amalgamation, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to substantially all of the assets and business of the Company.

(r)    _Code Section 162(m) Approval_.  If so determined by the Committee, the provisions of the Plan regarding Performance Compensation Awards shall be disclosed and reapproved by shareholders no later than the first shareholder meeting that occurs in the fifth year following the year in which shareholders previously approved such provisions, in each case in order for certain Awards granted after such time to be exempt from the deduction limitations of Section 162(m) of the Code.  Nothing in this clause, however, shall affect the validity of Awards granted after such time if such shareholder approval has not been obtained.

(s)    _Expenses; Gender; Titles and Headings_.  The expenses of administering the Plan shall be borne by the Company and its Affiliates. Masculine pronouns and other words of masculine gender shall refer to both men and women.  The titles and headings of the sections in the Plan are for convenience of reference only, and in the event of any conflict, the text of the Plan, rather than such titles or headings shall control.

(t)    _Other Agreements_.  Notwithstanding the above, the Committee may require, as a condition to the grant of and/or the receipt of Common Shares under an Award, that the Participant execute lock-up, shareholder or other agreements, as it may determine in its sole and absolute discretion.

(u)    _Payments_.  Participants shall be required to pay, to the extent required by applicable law, any amounts required to receive Common Shares under any Award made under the Plan.

23

(v)     _Section 409A_.  The intent of the Company is that payments and benefits under the Plan comply with Section 409A of the Code to the extent subject thereto, and, accordingly, to the maximum extent permitted, the Plan shall be interpreted and be administered to be in compliance therewith.  Notwithstanding anything contained herein to the contrary, a Participant shall not be considered to have terminated employment with the Company and its Affiliates for purposes of any payments hereunder which are subject to Section 409A of the Code until the Participant has incurred a "separation from service" from the Company and its Affiliates within the meaning of Section 409A of the Code.  Any payments described in the Plan that are due within the "short-term deferral period" as defined in Section 409A of the Code shall not be treated as deferred compensation unless applicable law requires otherwise. Notwithstanding anything to the contrary in the Plan, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A of the Code, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to the Plan during the six (6) month period immediately following the Participant's termination of employment shall instead be paid on the first business day after the date that is six (6) months following the Participant's separation from service (or upon the Participant's death, if earlier).  In addition, for purposes of the Plan, each amount to be paid or benefit to be provided to the Participant pursuant to the Plan, which constitute deferred compensation subject to Section 409A of the Code, shall be construed as a separate identified payment for purposes of Section 409A of the Code.

*     *     *

As adopted by the Board of Directors of American Media, Inc. on [  ], 2010.

As adopted by the Stockholders of American Media, Inc. on [    ], 2010.

Attachment 1

## JOINDER AGREEMENT

The undersigned is executing and delivering this Joinder Agreement pursuant to the Stockholders' Agreement, dated as of December ___, 2010, among American Media, Inc., a Delaware corporation (the "Company") and its stockholders signatory thereto, as amended (the "Stockholders' Agreement").

By executing and delivering this Joinder Agreement to the Company, the undersigned hereby agrees to become a party to, to be bound by, and to comply with the provisions of the Stockholders' Agreement in the same manner as if the undersigned were an original signatory to such agreement.

The undersigned acknowledges and agrees that the undersigned shall be a "Management Stockholder", as such term is defined in the Stockholders' Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of _____.

_____
*Signature of Stockholder*

_____
*Print Name of Stockholder*

_____

_____

_____
*Address*

_____
*Facsimile*

_____
Telephone

# EXHIBIT M

**Director Severance Plan**

## AMERICAN MEDIA, INC.
## NON-EMPLOYEE DIRECTOR SEPARATION PAY PLAN

1.      *Purpose*.  The purpose of the American Media, Inc. Non-Employee Director Separation Pay Plan (the "**Plan**") is to provide severance benefits to Eligible Directors (as defined below) of American Media, Inc. (the "**Company**") upon certain terminations of their service as members of the Company's board of directors (the "**Board**").  Any capitalized term that is used but not otherwise defined herein shall have the meaning assigned to such term in the American Media, Inc. Equity Incentive Plan.

2.      *Eligibility*.  Each member of the Board who is not an employee of the Company and who is selected by the Board to participate in the Plan shall become a participant in the Plan on the date of such selection, or such later date specified by the Board (each person, an "**Eligible Director**").

3.      *Severance Benefits*.

        (a)      Upon the termination of an Eligible Director's service as a member of the Board prior to the occurrence of a Liquidity Event for any reason, the Eligible Director shall be entitled to receive a lump sum cash payment in an amount equal to $35,000 for each year and partial year during which the Eligible Director served on the Board, payable within thirty (30) days following the date of termination.

4.      *Duration of the Plan*.  The Plan shall continue in effect until the earlier to occur of (i) a Liquidity Event and (ii) the date on which the Plan is terminated pursuant to Section 5 hereof.

5.      *Amendment and Termination*.  The Board may amend, alter, suspend, discontinue, or terminate the Plan or any portion thereof at any time; provided, that no such amendment, alteration, suspension, discontinuance or termination may, without the Eligible Directors' consent, materially and adversely affect the rights of any Eligible Director who became entitled to participate in the Plan prior to the later of (i) the date of adoption of such amendment, alteration, suspension, discontinuance or termination or (ii) the effective date of such amendment, alteration, suspension, discontinuance or termination.

6.      *Confidentiality*.  By becoming a participant in the Plan, and as a condition hereof, each Eligible Director agrees not to, at any time, either during his or her period of service on the Board or thereafter, divulge, use, publish or in any other manner reveal, directly or indirectly, to any person, firm, corporation or any other form of business organization or arrangement, and to keep in the strictest confidence any Confidential Information, except (i) as may be necessary to the performance of the Eligible Director's duties to the Company, (ii) with the Company's express written consent, (iii) to the extent that any such information is in or becomes in the public domain other than as a result of the breach of any of the Eligible Director's obligations under this Section 6, or (iv) where required to be disclosed by court order, subpoena or other government process, and in such event, the Eligible Director agrees to cooperate with the Company in attempting to keep such information confidential to the maximum extent possible. Upon the request of the Company or an Affiliate, the Eligible Director agrees to promptly deliver

1

to the Company the originals and all copies, in whatever medium, of all such Confidential Information of the Company.

7. *Non-Disparagement*.  By becoming a participant in the Plan, and as a condition hereof, each Eligible Director acknowledges and agrees that he or she will not defame or publicly criticize the services, business, integrity, veracity or personal or professional reputation of the Company, including its officers, other directors, partners, executives or agents, in either a professional or personal manner at any time during or following the Eligible Director's service on the Board.

8. *Withholding of Taxes*.  No withholding or deduction from any amounts payable under the Plan shall be made by the Company, and each Eligible Director shall be solely responsible for the payment of any federal, state, local or other income, payroll and/or other taxes that result from any amounts payable under the Plan.

9. *Non-exclusivity of the Plan*.  The adoption of this Plan shall not be construed as creating any limitations on the power of the Board to adopt such other arrangements as it may deem desirable.

10. *Notice.*  Any notice required or permitted under the Plan will be given in writing and will be deemed to be effectively given upon the earliest of personal delivery, receipt or the third full day following deposit in the United States Post Office with postage and fees prepaid, addressed to the other party hereto at the address last known or at such other address as such party may designate by ten (10) days' advance written notice to the other party hereto.

11. *Section 409A*.  The intent of the Company is that payments under the Plan comply with Section 409A of the Code to the extent subject thereto, and, accordingly, to the maximum extent permitted, the Plan shall be interpreted and be administered to be in compliance therewith. Notwithstanding anything contained herein to the contrary, an Eligible Director shall not be considered to have terminated service on the Board with the Company for purposes of any payments hereunder which are subject to Section 409A of the Code until the Eligible Director has incurred a "separation from service" from the Company and its Affiliates within the meaning of Section 409A of the Code.  Any payments described in the Plan that are due within the "short-term deferral period" as defined in Section 409A of the Code shall not be treated as deferred compensation unless applicable law requires otherwise.  Notwithstanding anything to the contrary in the Plan, to the extent required in order to avoid accelerated taxation and/or tax penalties under Section 409A of the Code, amounts that would otherwise be payable and benefits that would otherwise be provided pursuant to the Plan during the six (6) month period immediately following the Eligible Director's termination of service on the Board shall instead be paid on the first business day after the date that is six (6) months following the Eligible Director's separation from service (or upon the Eligible Director's death, if earlier).

12. *Governing Law*.  The Plan shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and performed wholly within the State of New York, including, without limitation, Section 5-1401 of the New York General Obligations Law.

13.     *Severability*.  If any provision of the Plan is or becomes or is deemed to be invalid, illegal, or unenforceable in any jurisdiction or as to any person or entity, or would disqualify the Plan under any law deemed applicable by the Board, such provision shall be construed or deemed amended to conform to the applicable laws, or if it cannot be construed or deemed amended without, in the determination of the Board, materially altering the intent of the Plan, such provision shall be construed or deemed stricken as to such jurisdiction, person or entity and the remainder of the Plan shall remain in full force and effect.

14.     *General*.  This Plan is intended to be an unfunded "top-hat" plan for purposes of the Employee Retirement Income Security Act of 1974, as amended.  Eligible Directors shall not have any interest in any particular property or assets of the Company and payments under the Plan shall be made from the general funds of the Company.

15.     *Obligations Binding on Successors*.  The obligations of the Company under the Plan shall be binding upon any successor corporation or organization resulting from the merger, amalgamation, consolidation or other reorganization of the Company, or upon any successor corporation or organization succeeding to substantially all of the assets and business of the Company.

As adopted by the Board of Directors of American Media, Inc. on [  ], 2010.

## EXHIBIT N

**Emergence Incentive Plan**

## American Media, Inc. Emergence Bonus Plan

**Purpose**:  The American Media Inc. Emergence Bonus Plan is intended to motivate certain key employees of the Company who have been critical to the restructuring efforts of the Company to continue with their diligent efforts to maximize the value of the Company's assets and business operation for the benefit of the Company and its stakeholders.

**Eligibility and Bonus Payment Date**:  Upon the occurrence of a Reorganization Event, certain employees, who are either still employed by the Company or whose employment with the Company was terminated by the Company (i) without Cause (as determined by the Board of Directors or its designee) or (ii) due to the participant's death or disability (as determined by the Board of Directors or its designee) following the approval of the plan of reorganization, shall be entitled to receive a bonus payment.  Payment of the bonus will be made as soon as practicable following the occurrence of the Reorganization Event, but in any event no later than March 15, 2011.  "*Reorganization Event*" means the business day on or after entry of a final order of the Court confirming a plan of reorganization (the "*Confirmation Order*") specified by the Company on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to effectiveness of the plan of reorganization have been satisfied or waived.

**Maximum Payments under the Bonus Plan**:  The maximum aggregate bonus payments to all plan participants shall not exceed $2,255,000 and will be allocable by the Chief Executive Officer of the Company post-emergence from chapter 11.  The bonus allocations for the Chief Executive Officer and the Chief Financial Officer have been determined by the Committee.

**Administration of Plan**:  The plan shall be administered by the Chief Executive Officer or his designee and the administrator is given full authority and discretion within the limits of this Plan to establish such administrative measures as may be necessary to administer and attain the objectives of this Plan.  The Administrator shall have full power and authority to construe and interpret this Plan and any interpretation by the Administrator shall be accorded the maximum deference permitted by law.

# EXHIBIT O

**Identity of Members of the New Boards and
the Initial Officers of the Reorganized Debtors**

## New Board and Officers of Reorganized American Media, Inc.

Set forth below are the directors and executive officers of American Media, Inc. effective upon the Effective Date of the Plan.[1]  All officers serve at the pleasure of the New Board.

*David J. Pecker* became Chairman, Chief Executive Officer, President and a Director on May 7, 1999.  Mr. Pecker also serves Chief Executive Officer, President and a Director of the Debtor Subsidiaries.  Prior to serving in these roles, Mr. Pecker had been the Chief Executive Officer since 1992, and President since 1991, of Hachette.  Prior to 1991, he was Executive Vice President/Publishing and Chief Operating and Chief Financial Officer of Hachette.  Mr. Pecker has 29 years of publishing industry experience having worked as the Director of Financial Reporting at CBS, Inc. Magazine Group and as the Vice President and Controller of Diamandis Communications Inc.  Mr. Pecker currently serves as a director of the Magazine Publishers' Association of America, as a director of the Madison Square Boys and Girls Club of New York, and was appointed to the Board of Trustees of Pace University in February 2009.  Mr. Pecker holds a B.B.A. from Pace University, received an honorary doctorate degree in Commercial Science from Pace University in 1998, and is Founder, past President and a current director of the Federal Drug Enforcement Foundation.

*Philip L. Maslowe* became a Director in January 2009.  Mr. Maslowe has served on the board of directors for NextMedia Group, Inc., an out-of-home media company that owns and operates radio and outdoor advertising properties throughout the United States since May 2010. Mr. Maslowe has served on the board of directors and as chairman of the audit committee for United Site Services, Inc., a leading national provider of portable restrooms, temporary fence, storage, erosion control and power sweeping, since January 2010.  Mr. Maslowe has served on the board of directors and as the chairman of the audit committee for Delek US Holdings, Inc., a diversified energy business, since May 2006, and has served on the board of directors and audit committee, as well as chairman of the human resources committee, of NorthWestern Corporation, a publicly traded provider of electricity and natural gas, since December 2004.  From 2008 to 2009, Mr. Maslowe served as a member of the board of directors and audit committee, as well as a member of the special committee to oversee the company, of Hilex Poly, Co., LLC, a leading manufacturer of plastic bag and film products.  From March 2006 to February 2007, Mr. Maslowe served on the board of managers of Gate Gourmet Group Holding, LLC, a private company providing catering services to airlines.  From 2002 to 2004, Mr. Maslowe served as a member of the board of directors and audit committee, as well as chairman of the corporate governance committee, of Mariner Health Care, Inc., a publicly-traded provider of post-acute health care services, and as chairman of the board of directors, chairman of the audit committee, and chairman or member of the compensation committee of AMF Bowling Worldwide, Inc., a company that operates bowling centers and holds an interest in a business that manufactures and sells bowling equipment.  From 2000 to 2001, Mr. Maslowe, served as a member of the board of directors and audit committee of Bruno's Supermarkets, Inc., a supermarket chain in Alabama, Georgia, Florida and Mississippi.  From 1997 to 2002, Mr. Maslowe served as executive vice president and chief financial officer of The Wackenhut Corporation, a provider of diversified

---

[1] Pursuant to Section 5.2 of the Plan, the Debtors will be assuming the prepetition employment agreements with existing members of management.

outsourcing services for security, staffing and privatized prisons. Mr. Maslowe holds a B.B.A. from Loyola University of Chicago and received a Master of Management degree from Northwestern University and is a CPA.

*Susan Tolson* is a director nominee of Reorganized AMI. From 1990 to 2010, Ms. Tolson worked as an Analyst and Portfolio Manager at Capital Research Company, a division of The Capital Group, one of the world's largest investment management organizations. At Capital Research, she served as a Senior Vice President, specializing in High Yield Bonds. Prior to joining Capital Research, Ms. Tolson spent two years with Aetna Investment Management Company making private investments in media and entertainment companies. Ms. Tolson serves as Board member and Audit Committee member of the American Cinémathèque, Board member and member of the Business Affairs Committee of The American University of Paris, and Board member of the Fulbright Foundation. Ms. Tolson also serves on the Investment Committee of the American School of Paris. Presently, she resides in Paris with her husband, the U.S. Ambassador to France. Ms. Tolson holds a BA *cum laude* in economics from Smith College and an MBA from Harvard University Graduate School of Business Administration.

*Michael Elkins* is a director nominee of Reorganized AMI. Mr. Elkins joined Avenue Capital Group in 2004 and is currently a Portfolio Manager of the Avenue U.S. Funds. In such capacity, Mr. Elkins is responsible for assisting with the direction of the investment activities of the Avenue U.S. strategy. Prior to joining Avenue, Mr. Elkins was a Portfolio Manager and Trader with ABP Investments US, Inc. While at ABP, he was responsible for actively managing the firm's US high yield and distressed investment strategy. Prior to ABP, Mr. Elkins served as a Portfolio Manager and Trader for UBK Asset Management, after joining the company as a High Yield Credit Analyst. Previously, Mr. Elkins was a Credit Analyst for both Oppenheimer & Co., Inc. and Smith Barney, Inc. Mr. Elkins has served on the board of directors of Vertis Communication since October 2008, Milacron LLC since April 2009, and Magnachip Semiconductor LLC since November 2009. Mr. Elkins serves on the board of directors of each of these private companies in connection with a reorganization or refinancing involving affiliates of Avenue and serves as a result of his position with Avenue.

*David Licht* is a director nominee of Reorganized AMI. Mr. Licht joined Avenue CapitalGroup in 2007 and is currently a Senior Vice President of the Avenue U.S. Funds. In such capacity, Mr. Licht focuses on distressed debt and undervalued securities of U.S. companies. Prior to joining Avenue, Mr. Licht was a Senior Portfolio Manager at ABP Investments US, Inc. While at ABP, he was responsible for managing and overseeing the firms high yield, distressed debt and bank debt portfolios. Prior to ABP, Mr. Licht was an Associate at Donaldson, Lufkin & Jenrette Securities Corporation in its Leveraged Finance Division. Previously, Mr. Licht worked for Arthur Andersen LLP where he received his CPA. Mr. Licht holds a B.B.A. from the University of Michigan Business School. Mr. Licht currently serves on the board of directors of Trump Entertainment Resorts, Inc. and was appointed to this board pursuant to Trump Entertainment Resorts, Inc.'s July 16, 2010 plan of reorganization.

*Daniel Flores* is a director nominee of Reorganized AMI. Mr. Flores joined Avenue in 2008 and is currently a Senior Vice President. In such capacity, Mr. Flores focuses on distressed debt opportunities and restructuring transactions for Avenue's U.S. Strategy. Prior to joining Avenue, Mr. Flores was a Vice President in the Restructuring and Finance Group at Lehman

2

Brothers.  Prior to joining Lehman Brothers in 2002, he was a Co-Founder and Director of MENU Pte Ltd, and an Analyst in Merrill Lynch's Global Power Group in New York and Singapore.  Mr. Flores has served on the board of directors of Vertis, Inc. since December 2009 and Milacron LLC since August 2009.  Mr. Flores serves on the board of directors of each of these private companies in connection with a reorganization or refinancing involving affiliates of Avenue.

*Gavin Baiera* is a director nominee of Reorganized AMI.  Mr. Baiera joined Angelo Gordon in 2008 and is a Managing Director at Angelo Gordon.  In such capacity, Mr. Baiera is responsible for investing in distressed securities.  Prior to joining Angelo Gordon, Mr. Baiera was the Co-head of the Strategic Finance Group at Morgan Stanley where he was responsible for all origination, underwriting, and distribution of restructuring transactions.  Prior to joining Morgan Stanley in 2005, Mr. Baiera was at General Electric Capital Corporation concentrating underwriting and investing in restructuring transactions.  Mr. Baiera began his career at General Electric Capital Corporation as a part of their financial management program, and holds a B.A. degree from Fairfield University and an M.B.A. degree from the University of Southern California.

*Cathryn C. Cranston* became a Director in March 2009.  Ms. Cranston is the publisher of the Columbia Journalism Review.  She began her career in publishing at The New York Times. She also served as publisher of the Harvard Business Review, and subsequently as executive vice president of Mansueto Ventures, the owner of the Inc. and Fast Company media brands. Ms. Cranston has also consulted for leading scientific, legal, and business publishers.  Ms. Cranston is the immediate past chair of the Governing Board of the Chicago-based Bulletin of the Atomic Scientists and serves on the Visiting Committee of the Division of Physical Sciences at the University of Chicago.  Ms. Cranston is a member of the Economic Club of New York and the New York Women's Forum. She graduated from Harvard College (Fine Arts).

*Lawrence S. Kramer* became a Director in March 2009.  Mr. Kramer is a media consultant and an adjunct professor of Media Management at Syracuse University.  He was Senior Adviser at Polaris Venture Partners, a national venture capital firm, from January 2008 until January 2010.  From March 2005 to November 2006, he was President of CBS Digital Media and continued to act as an adviser to CBS until April 2008.  From 1997 until its sale to Dow Jones in January 2005, he was Chairman, Chief Executive Officer and Founder of MarketWatch, Inc.  He currently sits on the Board of Directors of Discovery Communications, Answers.com, BlackArrow, Inc. and Harvard Business School Publishing, and serves on the Advisory Boards to the Newhouse School of Communications at Syracuse University, Minyanville, Crossboarders.tv, Newser.com and Jib Jab Media Inc.  Previously, he served as a member of the Board of Directors of Xinhua Finance Media.  He was a founding Board member and former Chairman of The Online Publishers Association.  Mr. Kramer received his B.S. from Syracuse University and his M.B.A. from Harvard University.

*Christopher Polimeni* is Executive Vice President for Finance and Planning, Chief Financial Officer and Treasurer of Reorganized AMI and its Debtor Subsidiaries and also serves as a Director on the boards of the Debtor Subsidiaries.  Prior to being appointed Chief Financial Officer in March 2010, Mr. Polimeni served as Executive Vice President, Chief Accounting Officer and Treasurer from July 2009 and Senior Vice President of Finance and Treasurer from

September 2008 and as Senior Vice President of Process Improvement from February 2007 until September 2008.  Prior to joining AMO, he formed his own consulting firm in 2003 and provided services in areas such as SEC reporting, mergers and acquisitions, internal control evaluations, chapter 11 reorganizations, and technology strategic planning and implementation. From 1994 to 2003 Mr. Polimeni served as Vice President of Finance and Corporate Controller of GE Supply Logistics, LLC (formerly Questron Technology, Inc.), the leading provider of inventory logistics management services.  He practiced as a certified public accountant between 1987 and 1994.  Mr. Polimeni has a B.B.A. in Accounting and Business Computer Information Systems from Hofstra University.

*Kevin Hyson* is Executive Vice President and Chief Marketing Officer of Reorganized AMI and its Debtor Subsidiaries.  Mr. Hyson joined AMO as a Senior Vice President and was promoted to Executive Vice President in 2001.  Prior to joining AMO, Mr. Hyson was President of Hylen Sharp Inc., a Greenwich, Connecticut based marketing firm whose clients included Hachette, JVC and Sony.

*David Leckey* became Executive Vice President, Consumer Marketing of Reorganized AMI in February 2006. From 2001 to 2006, Mr. Leckey was Senior Vice President, Consumer Marketing at Hachette, where he spent 28 years.  Prior to that, he was at Hearst Publications.  Mr. Leckey was elected to the Board of MPA in 2010.  Mr. Leckey has served on the Board of Directors of the Audit Bureau of Circulations since 1988, where he is Chairman of the Magazine Committee, which addresses issues confronting the media industry, especially those concerning circulation reporting and measurement standards.  He was the 2002 recipient of the Lee C. Williams Lifetime Achievement Award by the Fulfillment Management Association.

*John Swider* is the President and Chief Executive Officer of Distribution Services, Inc. ("***DSI***").  Prior to being appointed President and Chief Executive Officer of DSI, Mr. Swider served as Executive Vice President, Operations of AMO from November 1999 to October 2010. Prior to joining AMO in November 1999, Mr. Swider was an Executive Vice President for *Globe* Communications Corp.  His current responsibilities include production, manufacturing, newsstand circulation, corporate library/archives, customer service and the Mini Mag division. Mr. Swider holds a B.A. in Education from Wake Forest University.

*Jeffrey Laymon* is Senior Vice President, Controller and Chief Accounting Officer of Reorganized AMI and its Debtor Subsidiaries.  Prior to being appointed Chief Accounting Officer in March 2010, Mr. Laymon served as Vice President, Internal Audit from May 2007, when he joined AMO, to January 2009 and was Vice President, Controller from January 2009. Prior to joining AMO, Mr. Laymon served as Vice President – Accounting at First Data Corporation, a provider of electronic payment processing solutions, from 1995 to 2006, and from 1984 to 1993, Mr. Laymon was Director of International Finance at Gulf + Western Corporation, a conglomerate corporation with a diversified business. Mr. Laymon has a B.A. in Accounting from Wake Forest University.

*David Olson* is Corporate Counsel and Secretary of Reorganized AMI and its Debtor Subsidiaries and also serves as a Director of the Debtor Subsidiaries.  Mr. Olson joined AMI in January 2003, and he became Secretary of AMI in September 2008.  Prior to that, Mr. Olson was an associate at the law firm of Hughes Hubbard & Reed LLP from 1999 to 2002.  Mr. Olson

holds a B.A. in Spanish and Portuguese Literature from the University of California at Berkeley, an M.A. in Latin American Studies from the University of California at Los Angeles and a J.D. from the University of Texas School of Law.

# **EXHIBIT P**

**New Revolver Credit Facility Credit Agreement**

REVOLVING CREDIT AGREEMENT

dated as of

December 22, 2010

among

AMERICAN MEDIA, INC.,

The Lenders Party Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent

and

DEUTSCHE BANK SECURITIES INC.,
as Syndication Agent
_____

J.P. MORGAN SECURITIES LLC.
as Co-Lead Arranger and Sole Bookrunner

and

DEUTSCHE BANK SECURITIES INC., and
CREDIT SUISSE SECURITIES (USA) LLC,
as Co-Lead Arrangers

and
CREDIT SUISSE SECURITIES (USA) LLC,
as Documentation Agent

41                                    TABLE OF CONTENTS

42                                                                                      Page

43                                        ARTICLE I
44
45                                       DEFINITIONS

46    SECTION 1.01.    Defined Terms ................................................................................. 1
47    SECTION 1.02.    Classification of Loans and Borrowings.................................... 22
48    SECTION 1.03.    Terms Generally ............................................................................ 22
49    SECTION 1.04.    Accounting Terms; GAAP; Treatment of Unrestricted Subsidiaries;
50                            Reclassification of Capital Leases ......................................... 22

51                                        ARTICLE II
52
53                                       THE CREDITS

54    SECTION 2.01.    Revolving Commitments ............................................................ 23
55    SECTION 2.02.    Loans and Borrowings................................................................ 23
56    SECTION 2.03.    Requests for Borrowings ........................................................... 23
57    SECTION 2.04.    Swingline Loans .......................................................................... 24
58    SECTION 2.05.    Letters of Credit........................................................................... 26
59    SECTION 2.06.    Funding of Borrowings .............................................................. 30
60    SECTION 2.07.    Interest Elections ......................................................................... 30
61    SECTION 2.08.    Termination and Reduction of Revolving Commitments ......... 31
62    SECTION 2.09.    Repayment of Loans; Evidence of Debt ................................... 32
63    SECTION 2.10.    [Reserved]..................................................................................... 32
64    SECTION 2.11.    Prepayment of Loans .................................................................. 32
65    SECTION 2.12.    Fees................................................................................................ 33
66    SECTION 2.13.    Interest.......................................................................................... 35
67    SECTION 2.14.    Alternate Rate of Interest ........................................................... 35
68    SECTION 2.15.    Increased Costs ........................................................................... 36
69    SECTION 2.16.    Break Funding Payments ........................................................... 37
70    SECTION 2.17.    Taxes............................................................................................. 37
71    SECTION 2.18.    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.... 39
72    SECTION 2.19.    Mitigation Obligations; Replacement of Lenders..................... 40
73    SECTION 2.20.    [Reserved]..................................................................................... 41
74    SECTION 2.21.    Defaulting Lenders ..................................................................... 41

75                                       ARTICLE III
76
77                        REPRESENTATIONS AND WARRANTIES

78    SECTION 3.01.    Organization; Powers ................................................................. 42
79    SECTION 3.02.    Authorization; Enforceability .................................................... 42
80    SECTION 3.03.    Governmental Approvals; No Conflicts ................................... 42
81    SECTION 3.04.    Financial Condition; No Material Adverse Change ................. 42
82    SECTION 3.05.    Properties..................................................................................... 43
83    SECTION 3.06.    Litigation and Environmental Matters...................................... 43
84    SECTION 3.07.    Compliance with Laws and Agreements ................................. 44

Page

| 85 | SECTION 3.08. | Investment Company Status | 44 |
| 86 | SECTION 3.09. | Taxes | 44 |
| 87 | SECTION 3.10. | ERISA | 44 |
| 88 | SECTION 3.11. | Disclosure | 44 |
| 89 | SECTION 3.12. | Subsidiaries | 44 |
| 90 | SECTION 3.13. | Insurance | 44 |
| 91 | SECTION 3.14. | Labor Matters | 45 |
| 92 | SECTION 3.15. | Solvency | 45 |
| 93 | SECTION 3.16. | Senior Indebtedness | 45 |
| 94 | SECTION 3.17. | Security Documents | 45 |
| 95 | SECTION 3.18. | Margin Stock | 46 |
| 96 | SECTION 3.19. | Anti-Terrorism Laws | 46 |

97                                ARTICLE IV
98
99                                CONDITIONS

| 100 | SECTION 4.01. | Effective Date | 47 |
| 101 | SECTION 4.02. | Each Credit Event | 50 |

102                                ARTICLE V
103
104                         AFFIRMATIVE COVENANTS

| 105 | SECTION 5.01. | Financial Statements and Other Information | 50 |
| 106 | SECTION 5.02. | Notices of Material Events | 51 |
| 107 | SECTION 5.03. | Information Regarding Collateral | 52 |
| 108 | SECTION 5.04. | Existence; Conduct of Business | 52 |
| 109 | SECTION 5.05. | Payment of Obligations | 52 |
| 110 | SECTION 5.06. | Maintenance of Properties | 53 |
| 111 | SECTION 5.07. | Insurance | 53 |
| 112 | SECTION 5.08. | Casualty and Condemnation | 53 |
| 113 | SECTION 5.09. | Books and Records; Inspection and Audit Rights | 53 |
| 114 | SECTION 5.10. | Compliance with Laws | 53 |
| 115 | SECTION 5.11. | Use of Proceeds and Letters of Credit | 53 |
| 116 | SECTION 5.12. | Additional Subsidiaries | 53 |
| 117 | SECTION 5.13. | Further Assurances | 54 |
| 118 | SECTION 5.14. | Perfection of Certain Liens | 54 |

119                                ARTICLE VI
120
121                         NEGATIVE COVENANTS

| 122 | SECTION 6.01. | Indebtedness; Certain Equity Securities | 55 |
| 123 | SECTION 6.02. | Liens | 57 |
| 124 | SECTION 6.03. | Fundamental Changes | 59 |
| 125 | SECTION 6.04. | Investments, Loans, Advances, Guarantees and Acquisitions | 60 |
| 126 | SECTION 6.05. | Asset Sales | 62 |
| 127 | SECTION 6.06. | Sale and Leaseback Transactions | 62 |
| 128 | SECTION 6.07. | [Reserved] | 62 |
| 129 | SECTION 6.08. | Restricted Payments; Certain Payments of Indebtedness | 62 |

Page

130    SECTION 6.09.    Transactions with Affiliates ................................................................... 64
131    SECTION 6.10.    Restrictive Agreements ...................................................................... 65
132    SECTION 6.11.    Amendment of Material Documents .................................................. 65
133    SECTION 6.12.    First Lien Leverage Ratio ................................................................... 65
134    SECTION 6.13.    Fiscal Year ......................................................................................... 66

135                                    ARTICLE VII
136
137                                    EVENTS OF DEFAULT

138    SECTION 7.01.    Events of Default ................................................................................ 66
139    SECTION 7.02.    Specified Equity Contribution ........................................................... 68

140                                    ARTICLE VIII
141
142                                    THE AGENT

143                                    ARTICLE IX
144
145                                    MISCELLANEOUS

146    SECTION 9.01.    Notices ................................................................................................. 71
147    SECTION 9.02.    Waivers; Amendments ....................................................................... 72
148    SECTION 9.03.    Expenses; Indemnity; Damage Waiver .............................................. 73
149    SECTION 9.04.    Successors and Assigns ...................................................................... 74
150    SECTION 9.05.    Survival ............................................................................................... 77
151    SECTION 9.06.    Counterparts; Integration; Effectiveness ........................................... 77
152    SECTION 9.07.    Severability ......................................................................................... 78
153    SECTION 9.08.    Right of Setoff .................................................................................... 78
154    SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process ............ 78
155    SECTION 9.10.    WAIVER OF JURY TRIAL ............................................................... 79
156    SECTION 9.11.    Headings .............................................................................................. 79
157    SECTION 9.12.    Confidentiality .................................................................................... 79
158    SECTION 9.13.    Interest Rate Limitation ...................................................................... 79
159    SECTION 9.14.    USA Patriot Act .................................................................................. 80
160    SECTION 9.15.    Determination of Fiscal Periods ......................................................... 80
161
162    SCHEDULES:

163    Schedule 2.01        -- Revolving Commitments
164    Schedule 3.05(b)     -- Intellectual Property
165    Schedule 3.05(c)     -- Real Property
166    Schedule 3.05(d)     -- Real Property Purchase Rights
167    Schedule 3.06        -- Disclosed Matters
168    Schedule 3.12        -- Subsidiaries
169    Schedule 3.13        -- Insurance
170    Schedule 6.01        -- Existing Indebtedness
171    Schedule 6.02        -- Existing Liens
172    Schedule 6.04        -- Existing Investments
173    Schedule 6.10        -- Existing Restrictions

174    <u>EXHIBITS</u>:

175    Exhibit A   — Form of Assignment and Acceptance
176    Exhibit B   — Form of Guarantee and Collateral Agreement
177    Exhibit C   — Form of Solvency Certificate

                        REVOLVING CREDIT AGREEMENT dated as of December 22, 2010
                among AMERICAN MEDIA, INC., the LENDERS party hereto, and JPMOR-
                GAN CHASE BANK, N.A., as Administrative Agent.

                                    R E C I T A L S:

                A.      On November 17, 2010, American Media, Inc. and the then-existing Loan Parties
filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (11
U.S.C. §§ 101-1532, as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the
Southern District of New York (the "Bankruptcy Court"), jointly administered as Case No. 10-16140 and
continued in the possession of their property and in the management of their businesses pursuant to Sec-
tions 1107 and 1108 of the Bankruptcy Code (the "Bankruptcy Cases").

                B.      On December [15], 2010, the then-existing Loan Parties filed their Amended
Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Reorganization
Plan").

                C.      The Reorganization Plan proposes, among other things and the Borrower has du-
ly authorized, the issuance of $[140.0] million aggregate principal amount of the Borrower's second lien
senior secured notes due 2018 (the "Second Lien Notes").

                D.      On November 17, 2010, American Media, Inc. and the backstop purchasers party
thereto (the "Backstop Parties") entered into an agreement pursuant to which, among other things, the
Backstop Parties, in order to facilitate the Reorganization Plan, agreed to purchase certain amounts of
Second Lien Notes.

                E.      On December [20], 2010, the Bankruptcy Court entered the order confirming the
Reorganization Plan (the "Confirmation Order") pursuant to which, among other things, the Bankruptcy
Court approved the Emergence Transactions.

                F.      On the date hereof, concurrently with the effectiveness of this Agreement, the
Reorganization Plan shall become effective in accordance with its terms.

                G.      In connection with the Emergence Transactions contemplated by the Confirma-
tion Order and the Reorganization Plan, the Borrower has requested that Lenders provide a revolving cre-
dit facility to the Borrower, and Lenders are willing to provide such credit facility on the terms and condi-
tions set forth in this Agreement.

                **NOW, THEREFORE,** for the valuable consideration hereby acknowledged, the parties
agree as follows:

                                        ARTICLE I

                                        Definitions

                SECTION 1.01.    Defined Terms.  As used in this Agreement, the following terms have
the meanings specified below:

                "ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan,
or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Al-
ternate Base Rate.

217    "Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest
218    Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to the
219    greater of (a) the LIBO Rate for such Interest Period multiplied by the Statutory Reserve Rate or
220    (b) 2.00%.

221    "Administrative Agent" means JPMorgan Chase Bank, N.A., in its capacity as adminis-
222    trative agent for the Lenders hereunder, and any successor in such capacity.

223    "Administrative Questionnaire" means an Administrative Questionnaire in a form sup-
224    plied by the Administrative Agent.

225    "Affiliate" means, with respect to a specified Person, another Person that directly, or indi-
226    rectly through one or more intermediaries, Controls or is Controlled by or is under common Control with
227    the Person specified.

228    "Aggregate Revolving Commitments" means the Revolving Commitments of all the
229    Lenders.

230    "Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of
231    (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½
232    of 1% and (c) the Adjusted LIBO Rate (giving effect to clause (b) of the definition thereof, if applicable)
233    for a one month Interest Period on such day (or if such day is not a Business Day, the immediately pre-
234    ceding Business Day) plus 1%, provided that, for the avoidance of doubt, the LIBO Rate for any day shall
235    be based on the rate appearing on the Reuters Screen LIBOR 01 Page (or on any successor or substitute
236    page of such page) at approximately 11:00 a.m. London time on such day.  Any change in the Alternate
237    Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or such LIBO Rate shall
238    be effective from and including the effective date of such change in the Prime Rate, the Federal Funds
239    Effective Rate or such LIBO Rate, respectively.

240    "Anti-Terrorism Laws" means any Applicable Law related to terrorism financing or
241    money laundering, including the USA Patriot Act, the Currency and Foreign Transaction Reporting Act
242    (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and
243    1951-1959), the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) and Executive Order
244    13224 (effective September 24, 2001).

245    "Applicable Law" means all applicable provisions of constitutions, laws, statutes, ordin-
246    ances, rules, treaties, regulations, permits, licenses, approvals, interpretations and order of courts or Go-
247    vernmental Authorities and all orders and decrees of all courts and arbitrators.

248    "Applicable Percentage" means, with respect to any Revolving Lender, the percentage of
249    the total Revolving Commitments represented by such Lender's Revolving Commitment.  If the Revolv-
250    ing Commitments have terminated or expired, the Applicable Percentages shall be determined based upon
251    the Revolving Commitments most recently in effect, giving effect to any assignments.

252    "Applicable Period" has the meaning ascribed to such term in the definition of Applica-
253    ble Rate.

254    "Applicable Rate" means with respect to any ABR Loan or Eurodollar Loan that is a Re-
255    volving Loan or any ABR Loan that is a Swingline Loan, or with respect to the commitment fees payable
256    hereunder, as the case may be, (A) until the first Business Day following the delivery of financial state-
257    ments pursuant to Section 5.01(a) for the fiscal quarter ended [March 31], 2011, the rate per annum set

258  forth below by reference to Category 1, and (B) thereafter, the rate per annum set forth below under the
259  caption "ABR Spread" or "Eurodollar Spread" or "Revolving Commitment Fee Rate", as the case may
260  be, based upon the First Lien Leverage Ratio as of the most recent determination date:

| First Lien Leverage Ratio: | ABR Spread | Eurodollar Spread | Revolving Commitment Fee Rate |
|---|---|---|---|
| Category 1 Greater than or equal to 2.50 to 1.00 | 5.00% | 6.00% | 0.75% |
| Category 2 Less than 2.50 to 1.00 but greater than or equal to 1.50 to 1.00 | 4.75% | 5.75% | 0.625% |
| Category 3 Less than 1.50 to 1.00 | 4.50% | 5.50% | 0.50% |

261
262  Any increase or decrease in the Applicable Rate resulting from a change in the First Lien Leverage Ratio
263  shall become effective as of the first Business Day immediately following the date a certificate of a Fi-
264  nancial Officer of the Borrower is delivered pursuant to Section 5.01(c); provided that, at the option of the
265  Administrative Agent or the Required Lenders, the higher pricing level shall apply (x) as of the first Busi-
266  ness Day after the date on which a certificate of a Financial Officer of the Borrower was required to have
267  been delivered but was not delivered, and shall continue to so apply to and including the date on which
268  such certificate of a Financial Officer of the Borrower is so delivered (and thereafter the pricing level oth-
269  erwise determined in accordance with this definition shall apply) and (y) as of the first Business Day after
270  an Event of Default under Section 7.01 shall have occurred and be continuing, and shall continue to so
271  apply to but excluding the date on which such Event of Default is cured or waived (and thereafter the
272  pricing level otherwise determined in accordance with this definition shall apply).

273              In the event that any financial statements under Section 5.01 or a certificate of a Financial
274  Officer of the Borrower delivered pursuant to Section 5.01(c) is shown to be inaccurate at any time that
275  this Agreement is in effect and any Loans or Revolving Commitments are outstanding hereunder when
276  such inaccuracy is discovered or within 91 days after the date on which all Loans have been repaid and all
277  Revolving Commitments have been terminated, and such inaccuracy, if corrected, would have led to a
278  higher Applicable Rate for any period (an "Applicable Period") than the Applicable Rate applied for such
279  Applicable Period, then (i) the Borrower shall promptly (and in no event later than five (5) Business Days
280  thereafter) deliver to the Administrative Agent a correct certificate of a Financial Officer of the Borrower
281  for such Applicable Period, (ii) the Applicable Rate shall be determined by reference to the corrected cer-
282  tificate of a Financial Officer of the Borrower (but in no event shall the Lenders owe any amounts to the
283  Borrower), and (iii) the Borrower shall pay to the Administrative Agent promptly upon demand (and in no
284  event later than five (5) Business Days after demand) any additional interest owing as a result of such
285  increased Applicable Rate for such Applicable Period, which payment shall be promptly applied by the
286  Administrative Agent in accordance with the terms hereof.  Notwithstanding anything to the contrary in
287  this Agreement, any additional interest hereunder shall not be due and payable until demand is made for
288  such payment pursuant to clause (iii) above and accordingly, any nonpayment of such interest as result of
289  any such inaccuracy shall not constitute a Default (whether retroactively or otherwise), and no such
290  amounts shall be deemed overdue (and no amounts shall accrue interest at the Default Rate), at any time
291  prior to the date that is five (5) Business Days following such demand.

292              "Approved Fund" has the meaning set forth in Section 9.04.

293              "Arrangers" means J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Cre-
294  dit Suisse Securities (USA) LLC.

-3-

295       "Assignment and Acceptance" means an assignment and acceptance entered into by a
296 Lender and an assignee (with the consent of any party whose consent is required by Section 9.04), and
297 accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Ad-
298 ministrative Agent.

299       "Bankruptcy Cases" has the meaning set forth in Recital A hereto.

300       "Bankruptcy Code" has the meaning set forth in Recital A hereto.

301       "Bankruptcy Court" has the meaning set forth in Recital A hereto

302       "Board" means the Board of Governors of the Federal Reserve System of the United
303 States of America.

304       "Borrower" means American Media Operations, Inc., a Delaware corporation.

305       "Borrowing" means (a) Revolving Loans of the same Type, made, converted or contin-
306 ued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect,
307 or (b) a Swingline Loan.

308       "Borrowing Request" means a request by the Borrower for a Borrowing in accordance
309 with Section 2.03.

310       "Business Day" means any day that is not a Saturday, Sunday or other day on which
311 commercial banks in New York City are authorized or required by law to remain closed; provided that,
312 when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on
313 which banks are not open for dealings in dollar deposits in the London interbank market.

314       "Capital Lease Obligations" of any Person means the obligations of such Person to pay
315 rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal
316 property, or a combination thereof, which obligations are required to be classified and accounted for as
317 capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be
318 the capitalized amount thereof determined in accordance with GAAP.

319       "Cash Collateral" has the meaning set forth in Section 2.05(j).

320       "Change in Control" means:

321       (a)     at any time prior to the consummation of a Qualified IPO, any combination of
322 Permitted Holders shall fail to own beneficially (within the meaning of Rules 13d-3 and 13d-5
323 under the Exchange Act), directly or indirectly, in the aggregate Equity Interests representing at
324 least a majority of the aggregate ordinary voting power represented by the issued and outstanding
325 Equity Interests of the Borrower;

326       (b)     at any time after the consummation of a Qualified IPO, (i) (A) any "person" (as
327 such term is used in Sections 13(d) and 14(d) of the Exchange Act), other than one or more Per-
328 mitted Holders, being or becoming the "beneficial owner" (as defined in Rules 13d-3 and 13d-5
329 under the Exchange Act except that for purposes of this paragraph (c)(i)(A) a person shall be
330 deemed to have "beneficial ownership" of all shares that such person has the right to acquire,
331 whether such right is exercisable immediately or only after the passage of time), directly or indi-
332 rectly, of more than 35% of the total voting power of the voting Equity Interests of the Borrower

      

333 and (B) the Permitted Holders "beneficially own" (as defined in clause (A) above), directly or in-
334 directly, in the aggregate a lesser percentage of the total voting power of the voting Equity Inter-
335 ests of the Borrower than such other person or, (ii) during any period of two consecutive years,
336 individuals who at the beginning of such period constituted the board of directors of the Borrower
337 (together with any new directors whose election by such board of directors of the Borrower or
338 whose nomination for election by the stockholders of the Borrower was approved by a vote of at
339 least 66-2/3% of the directors of the Borrower then still in office who were either directors at the
340 beginning of such period or whose nomination for election was previously so approved) ceasing
341 for any reason to constitute a majority of the board of directors of the Borrower, or

342         (c)     the occurrence of a "Change in Control" (or any similar event as defined therein),
343 as defined in the Senior Secured Note Indenture, the Second Lien Indenture and any Permitted
344 Refinancing Indebtedness with respect thereto.

345         "Change in Law" means (a) the adoption of any law, rule or regulation after the Effective
346 Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any
347 Governmental Authority after the Effective Date or (c) compliance by any Lender or the Issuing Bank (or,
348 for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's or the Issuing
349 Bank's holding company, if any) with any request, guideline or directive (whether or not having the force
350 of law) of any Governmental Authority made or issued after the Effective Date.

351         "Charges" has the meaning set forth in Section 9.13.

352         "Class", when used in reference to any Loan or Borrowing, refers to whether such Loan,
353 or the Loans comprising such Borrowing, are Revolving Loans or Swingline Loans.

354         "Closing Date Material Adverse Effect" means any fact, event, change, effect, develop-
355 ment, condition or occurrence that has had or would reasonably be expected to have a material adverse
356 effect on or with respect to the business, assets, liabilities, financial conditions or results of operations of
357 the Borrower, taken as whole; provided that none of the following (or the effects or results thereof) in and
358 of itself shall constitute or shall be considered in determining whether there shall have occurred a Closing
359 Date Material Adverse Effect: (i) the commencement of the Bankruptcy Cases, (ii) any change in law or
360 accounting standards or interpretations thereof applicable to the Borrower; (iii) general changes in eco-
361 nomic, business or political conditions; (iv) general changes in the securities, credit or financial markets
362 or in the banking industry; (v) general changes in the business in which the Borrower operates and (vi)
363 any acts of god, natural disasters or acts or war, terrorism, insurrection or civil disobedience.

364         "Code" means the Internal Revenue Code of 1986, as amended.

365         "Collateral" means any and all "Collateral", as defined in any applicable Security Docu-
366 ment.

367         "Consolidated EBITDA" means, for any period, Consolidated Net Income for such pe-
368 riod (adjusted to exclude any extraordinary losses, charges or gains and to exclude any gain or loss recog-
369 nized in connection with the sale of any assets outside the ordinary course of business), plus, without dup-
370 lication and to the extent deducted in determining Consolidated Net Income, the sum of (a) the aggregate
371 amount of interest expense for such period, (b) the aggregate amount of income tax expense for such pe-
372 riod, (c) all amounts attributable to depreciation, amortization (including such amortization associated
373 with capitalized or short term display rack costs) and other noncash charges (excluding any such charge
374 that (i) consists of or requires an accrual of, or cash reserve for, any anticipated cash charges for any prior
375 or in any future period or (ii) consists of a writedown or writeoff of any current assets) for such period,

376  including the amortization of debt discounts and deferred financing charges, (d) restructuring charges,
377  reserves or expenses (which, for the avoidance of doubt, shall include, without limitation, the effect of
378  inventory optimization programs, facility consolidations, retention, headcount reductions, systems estab-
379  lishment costs, contract termination costs, future lease commitments, excess pension charges and ex-
380  penses and charges relating to severance, relocation and the discontinuation of titles), in each case, not
381  exceeding (i) $10,000,000 in the aggregate under this clause (d) for any four consecutive fiscal quarter
382  period for which Consolidated EBITDA is calculated ending on or prior to March 31, 2012 and (ii)
383  $5,000,000 in the aggregate under this clause (d) for any four consecutive fiscal quarter period for which
384  Consolidated EBITDA is calculated ending after March 31, 2012, (e) cash expenses in connection with
385  the Emergence Transactions, and (f) any charges or credits relating to the adoption of fresh start account
386  principles.  For purposes of calculating Consolidated EBITDA for any period (each, a "Reference Pe-
387  riod") in connection with a determination of the First Lien Leverage Ratio for such period, if during such
388  Reference Period (or, in the case of pro forma calculations, during the period from the last day of such
389  Reference Period to and including the date as of which such calculation is made) the Borrower or any Re-
390  stricted Subsidiary shall have made a Permitted Acquisition, an investment permitted under Section 6.04
391  or a disposition of assets (collectively, "Subject Transactions"), Consolidated EBITDA for such Refer-
392  ence Period shall be calculated after giving pro forma effect thereto as if such Subject Transaction oc-
393  curred on the first day of such Reference Period (with the Reference Period for the purposes of pro forma
394  calculations being the most recent period of four consecutive fiscal quarters for which the relevant finan-
395  cial information is available); provided that such pro forma calculations shall give effect to operating ex-
396  pense reductions and other cost savings only to the extent that such reductions and savings are either in
397  accordance with Article 11 of Regulation S-X or, in the good faith determination of a Financial Officer of
398  the Borrower, are expected to be realized within 12 months of the Subject Transaction and otherwise
399  would be in accordance with Article 11 of Regulation S-X.

400  Notwithstanding the foregoing, for purposes of determining Consolidated EBITDA for
401  any period that includes any fiscal quarter ended on a date set forth below (including, without limitation,
402  for the purposes of Section 6.12), Consolidated EBITDA for such fiscal quarter shall mean the amount set
403  forth below corresponding to such fiscal quarter:

| Fiscal Quarter End | Consolidated EBITDA |
| --- | --- |
| December 31, 2009 | $23,400,000 |
| March 31, 2010 | $34,300,000 |
| June 30, 2010 | $27,200,000 |
| September 30, 2010 | $29,200,000 |

404

405  "Consolidated Leverage Ratio" means, on any date, the ratio of (a) Total Debt as of such
406  date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters ended on such date
407  (or, if such date is not the last day of a fiscal quarter, then for the period of four consecutive fiscal quar-
408  ters most recently ended prior to that date for which internal financial statements are available), all deter-
409  mined on a consolidated basis in accordance with GAAP.

410  "Consolidated Net Income" means, for any period, net income or loss of the Borrower
411  and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with
412  GAAP; provided that there shall be excluded (a) the income of any Person in which any other Person
413  (other than the Borrower or any of the Restricted Subsidiaries or any director holding qualifying shares in
414  compliance with applicable law) has an ownership interest, except to the extent of the amount of divi-
415  dends or other distributions actually paid to the Borrower or any of the Restricted Subsidiaries by such
416  Person during such period, (b) except as otherwise provided in the definition of Consolidated EBITDA,
417  the income (or loss) of any Person accrued prior to the date it becomes a Restricted Subsidiary or is

CG&R DRAFT:  12/15/10 11:13 PM                                                    #1052964 v14 (1049414_.DOC)

merged into or consolidated with the Borrower or any of the Restricted Subsidiaries or the date that Person's assets are acquired by the Borrower or any of the Restricted Subsidiaries, (c) the cumulative effect of a change in accounting principles, (d) any net after-tax income (loss) from the early extinguishment of Indebtedness, Hedging Agreements or other derivative instruments, and (e) any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, disposition, recapitalization, investment, asset sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means, subject to Section 2.21(c), any Lender, as determined by the Administrative Agent, that has (a) failed to fund any portion of its Loans or participations in Letters of Credit or Swingline Loans within three Business Days of the date required to be funded by it hereunder, (b) notified the Borrower, the Administrative Agent, the Issuing Bank, the Swingline Lender or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements in which it commits to extend credit, (c) failed, within three Business Days after request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit and Swingline Loans, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within three Business Days of the date when due, unless the subject of a good faith dispute, or (e)(i) become or is insolvent or has a parent company that has become or is insolvent or (ii) become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means, with respect to any Person, any Equity Interest which by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event:

(a)    matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

(b)    is convertible or exchangeable for Indebtedness or Disqualified Stock (excluding Equity Interests convertible or exchangeable solely at the option of the Borrower or a Restricted Subsidiary; provided that any such conversion or exchange shall be deemed an issuance of Disqualified Stock, as applicable); or

-7-

(c)    is redeemable, or subject to mandatory purchase by the Borrower or any Subsidi-ary, at the option of the holder thereof, in whole or in part;

in each case, on or prior to the date that is 91 days after the Maturity Date.

"dollars" or "$" refers to lawful money of the United States of America.

"Effective Date" means the date on which the conditions specified in Section 4.01 are sa-tisfied (or waived in accordance with Section 9.02).

"Embargoed Person" means any party that (i) is publicly identified on the most current list of "Specially Designated Nationals and Blocked Persons" published by the U.S. Treasury Depart-ment's Office of Foreign Control ("OFAC") or resides, is organized or chartered, or has a place of busi-ness in a country or territory subject to OFAC sanctions or embargo programs or (ii) is publicly identified as prohibited from doing business with the United States under the International Emergency Economic Powers Act, the Trading With the Enemy Act, or any other Applicable Law.

"Emergence Transactions" means, collectively, (a) the consummation of the Reorganiza-tion Plan and the other transactions contemplated by the Confirmation Order to be consummated on the Effective Date, (b) the entering into by the Loan Parties of the documents related to the Exit Financing to which they are or are intended to be a party, and the borrowings hereunder and thereunder on the Effec-tive Date and application of the proceeds as contemplated hereby and thereby, (c) the repayment or satis-faction in full and termination of all Indebtedness required by the Reorganization Plan to be repaid or sa-tisfied and canceled on the Effective Date and (d) the payment of the fees and expenses incurred in con-nection with the consummation of the foregoing that are required to be paid on the Effective Date.

"Environmental Laws" means all laws, rules, regulations, codes, ordinances, orders, de-crees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources or the management, release or threatened release of any Hazardous Material.

"Environmental Liability" means any liability, loss, cost or damage, contingent or other-wise (including any liability, loss, cost or damage for environmental remediation, fines, penalties or in-demnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treat-ment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or within or upon any building, struc-ture, facility or fixture or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership inter-ests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, to-gether with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, sole-ly for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer un-der Section 414 of the Code.

#1052964 v14 (1049414_.DOC)

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the minimum funding standard under Section 430 of the Code or Section 303 of ERISA or a failure to make a required contribution to a Multiemployer Plan whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower, any Subsidiary or any of their ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower, any Subsidiary or any of their ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower, any Subsidiary or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower, any Subsidiary or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a withdrawal by Borrower, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (i) the occurrence of a nonexempt prohibited transaction with respect to an employee benefit plan maintained or contributed to by a Borrower, any Subsidiary or any ERISA Affiliate (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could result in material liability to Borrower, any Subsidiary or any ERISA Affiliate; or (j) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction described in clause (a) above and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.19(b)), any U.S. federal withholding tax that (i) is in effect and would apply to amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to any withholding tax pursuant to Section 2.17(a), or (ii) is attributable to such Foreign Lender's failure to comply with Section 2.17(e).

"Exit Financing" means that certain financing to finance the Reorganization Plan comprised of this Agreement, the Senior Secured Notes and the Second Lien Notes.

-9-

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of the Borrower.

"First Lien Intercreditor Agreement" means the First Lien Intercreditor Agreement dated on or about the Effective Date among the Administrative Agent, the Senior Secured Notes Collateral Agent, the Borrower and each other Guarantor named therein, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"First Lien Leverage Ratio" means, on any date, the ratio of (a) Total First Lien Debt as of such date to (b) Consolidated EBITDA for the period of four consecutive fiscal quarters ended on such date (or, if such date is not the last day of a fiscal quarter, then for the period of four consecutive fiscal quarters most recently ended prior to that date), all determined on a consolidated basis in accordance with GAAP.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is organized under the laws of a jurisdiction other than the United States of America or any State thereof or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States which are in effect on the Effective Date.  At any time after the Effective Date, the Borrower may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in this Agreement); provided that any such election, once made, shall be irrevocable; provided, further, any calculation or determination in this Agreement that requires the application of GAAP for periods that include fiscal quarters ended prior to the Borrower's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP.  The Borrower shall give written notice of any such election made in accordance with this definition to the Administrative Agent.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or

-10-

lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" means the Guarantee and Collateral Agreement, substantially in the form of Exhibit B, among the Loan Parties and the Administrative Agent for the benefit of the Secured Parties, as such agreement may be amended, modified, restated or supplemented from time to time in accordance with its terms.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, anthrax and anthrax-causing agents, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed (it being understood that, unless such Person shall have assumed such Indebtedness, the amount of such Indebtedness shall be the lesser of (x) the fair market value of the property securing such Indebtedness and (y) the outstanding principal of such Indebtedness), (f) all Guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (i) all obligations under Hedging Agreements, and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning set forth in Section 9.03.

"Intercreditor Agreements" means the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, unless the context otherwise requires.

"Interest Election Request" means a request by the Borrower to convert or continue a Revolving Borrowing in accordance with Section 2.07.

634         "<u>Interest Payment Date</u>" means (a) with respect to any ABR Loan (other than a Swingline
635 Loan), the last day of each March, June, September and December and the Maturity Date, (b) with respect
636 to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such
637 Loan is a part and the Maturity Date, and, in the case of a Eurodollar Borrowing with an Interest Period of
638 more than three months' duration, each day prior to the last day of such Interest Period that occurs at in-
639 tervals of three months' duration after the first day of such Interest Period, and (c) with respect to any
640 Swingline Loan, the day that such Loan is required to be repaid.

641         "<u>Interest Period</u>" means, with respect to any Eurodollar Borrowing, the period commenc-
642 ing on the date of such Borrowing and ending on the numerically corresponding day in the calendar
643 month that is one, two, three or six months thereafter (or nine or twelve months thereafter if, at the time of
644 the relevant Borrowing, all Lenders participating therein agree to make interest periods of such duration
645 available), as the Borrower may elect; <u>provided</u> that (a) if any Interest Period would end on a day other
646 than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless
647 such next succeeding Business Day would fall in the next calendar month, in which case such Interest
648 Period shall end on the next preceding Business Day, (b) any Interest Period that commences on the last
649 Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the
650 last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month
651 of such Interest Period and (c) no Interest Period shall extend beyond the Maturity Date. For purposes
652 hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter
653 shall be the effective date of the most recent conversion or continuation of such Borrowing.

654         "<u>Issuing Bank</u>" means JPMorgan Chase Bank, N.A., in its capacity as the issuer of Let-
655 ters of Credit hereunder, and its successors in such capacity as provided in Section 2.05(i). The Issuing
656 Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of the Is-
657 suing Bank, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters
658 of Credit issued by such Affiliate.

659         "<u>Joint Venture</u>" means a joint venture, partnership, or other similar arrangement, whether
660 in corporate, partnership, or other legal form; <u>provided</u> in no event shall any Subsidiary of any Person be
661 considered to be a Joint Venture to which such Person is a party.

662         "<u>LC Disbursement</u>" means a payment made by the Issuing Bank pursuant to a Letter of
663 Credit.

664         "<u>LC Exposure</u>" means, at any time, the sum of (a) the aggregate undrawn amount of all
665 outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that
666 have not yet been reimbursed by or on behalf of the Borrower at such time. The LC Exposure of any Re-
667 volving Lender at any time shall be its Applicable Percentage of the total LC Exposure at such time.

668         "<u>Lenders</u>" means the Persons listed on Schedule 2.01 and any other Person that shall
669 have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that
670 ceases to be a party hereto pursuant to an Assignment and Acceptance. Unless the context otherwise re-
671 quires, the term "Lenders" includes the Swingline Lender.

672         "<u>Letter of Credit</u>" means any letter of credit issued pursuant to this Agreement.

673         "<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period,
674 the rate appearing on Reuters Screen LIBOR 01 Page (or on any successor or substitute page of such ser-
675 vice, or any successor to or substitute for such service, providing rate quotations comparable to those cur-
676 rently provided on such page of such service, as determined by the Administrative Agent from time to

time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" with respect to such Eurodollar Borrowing for such Interest Period shall be the rate at which dollar deposits of $5,000,000 and for a maturity comparable to such Interest Period are offered by the principal London office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, charge, preference, priority or security interest in, on or of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for informational purposes), (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities (other than arising from entry into an agreement for the sale, transfer or disposition of Equity Interests as permitted pursuant to Section 6.05(d)).

"Loan Documents" means this Agreement, the Guarantee and Collateral Agreement, the First Lien Intercreditor Agreement, the Second Lien Intercreditor Agreement and the other Security Documents.

"Loan Parties" means the Borrower and the Subsidiary Loan Parties.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement..

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations or condition, financial or otherwise, of the Borrower and the Restricted Subsidiaries taken as a whole, (b) the ability of the Loan Parties to perform any of their obligations under the Loan Documents, or (c) the rights of or benefits available to the Lenders under the Loan Documents; provided that, no Material Adverse Effect shall be deemed to occur as a result of the Bankruptcy Cases and any effects that may occur as a result thereof.

"Material Indebtedness" means Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower and its Restricted Subsidiaries in an aggregate principal amount exceeding $35,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower or any Restricted Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower or such Restricted Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"Maturity Date" means December 22, 2015.

"Maximum Rate" has the meaning set forth in Section 9.14.

719        "Moody's" means Moody's Investors Service, Inc.

720        "Mortgage" means a mortgage, deed of trust, assignment of leases and rents, leasehold
721  mortgage or other security document granting a Lien on any Mortgaged Property to secure the Obliga-
722  tions.  Each Mortgage shall be satisfactory in form and substance to the Administrative Agent.

723        "Mortgaged Property" means each parcel of real property and improvements thereto with
724  respect to which a Mortgage is granted pursuant to Section 5.12 or 5.13.

725        "Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of
726  ERISA.

727        "Net Proceeds" means, with respect to any event (a) the cash proceeds received in respect
728  of such event including (i) any cash received in respect of any non-cash proceeds, but only as and when
729  received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or simi-
730  lar event, condemnation awards and similar payments, net of (b) the sum of (i) all reasonable fees and
731  out-of-pocket expenses paid by the Borrower and the Restricted Subsidiaries to third parties (other than
732  Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset
733  (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar pro-
734  ceeding), the amount of all payments required to be made by the Borrower and the Restricted Subsidiaries
735  as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise sub-
736  ject to mandatory prepayment as a result of such event, and (iii) the amount of all taxes paid (or reasona-
737  bly estimated to be payable) by the Borrower and the Restricted Subsidiaries, and the amount of any re-
738  serves established by the Borrower and the Restricted Subsidiaries to fund contingent liabilities reasona-
739  bly estimated to be payable, in each case during the year that such event occurred or the next succeeding
740  year and that are directly attributable to such event (as determined reasonably and in good faith by the
741  Financial Officer of the Borrower).

742        "Obligations" has the meaning assigned to such term in the Guarantee and Collateral
743  Agreement.

744        "Offering Memorandum" means the offering memorandum, dated November 16, 2010,
745  relating to the sale of the Senior Secured Notes.

746        "Other Taxes" means any and all present or future recording, stamp, documentary,
747  excise, transfer, sales, property or similar taxes, charges or levies arising from any payment made under
748  any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any
749  Loan Document.

750        "Participant" has the meaning set forth in Section 9.04.

751        "PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in
752  ERISA and any successor entity performing similar functions.

753        "Perfection Certificate" means a certificate in the form of Exhibit II to the Guarantee and
754  Collateral Agreement or any other form approved by the Administrative Agent.

755        "Permitted Acquisition" means any acquisition by the Borrower or any Restricted Sub-
756  sidiary of all or substantially all the assets of, or all or substantially all of the outstanding Equity Interests
757  in, a Person or division or line of business of a Person if, (a) immediately prior to, and after giving effect
758  thereto, no Default has occurred and is continuing or would result therefrom, (b) after giving effect there-

-14-

to, the principal business of such Person shall be reasonably related, ancillary or complementary, to a business in which the Borrower and its Restricted Subsidiaries were engaged on the Effective Date, (c) immediately after giving effect thereto, each Subsidiary formed for the purpose of or resulting from such acquisition shall be a Restricted Subsidiary and all of the Equity Interests of each such Subsidiary shall be owned directly by the Borrower or a Restricted Subsidiary of the Borrower and all actions required to be taken with respect to such acquired or newly formed Subsidiary and its assets under Sections 5.12 and 5.13 have been taken concurrently with such acquisition (notwithstanding any additional time periods permitted by Sections 5.12 and 5.13), other than with regard to the granting of any Mortgages required thereunder, which shall be granted within 45 days after such acquisition (or such longer period as may be agreed to by the Administrative Agent), (d) immediately after giving effect thereto, the Borrower and its Restricted Subsidiaries are in compliance, on a pro forma basis after giving effect to such acquisition, with the First Lien Leverage Ratio recomputed as at the last day of the most recently ended fiscal quarter of the Borrower for which financial statements are available, as if such acquisition had occurred on the first day of each relevant period for testing such compliance, (e) the Borrower shall have delivered to the Administrative Agent an officer's certificate certifying as to satisfaction of the requirements set forth in clauses (a), (b), (c), (d) and (e), including reasonably detailed calculations demonstrating satisfaction of the requirement set forth in clause (d) above, together with all relevant financial information for the Person or assets to be acquired and (e) the acquisition shall have been approved by the board of directors or other governing body or controlling Person of the Person being acquired.

"Permitted Encumbrances" means:

(a)     pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(b)     Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(c)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(d)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(e)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate mate-

804 rially adversely affect the value of said properties or materially impair their use in the operation
805 of the business of such Person; and

806 (f) judgment liens in respect of judgments that do not constitute an Event of Default
807 under Section 7.01(k);

808 provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

809 "Permitted Holder" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Manage-
810 ment II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and
811 Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) Regiment Capital Management,
812 LLC, (vi) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any suc-
813 cessor provision) of which any of the Permitted Holders specified in clauses (i)-(v) are members, and (vii)
814 the respective Affiliates of each of the foregoing; provided that in the case of any group specified in
815 clause (vi) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(v) and
816 their respective Affiliates must collectively beneficially own a greater amount of the total voting power of
817 the voting stock of the Borrower than the amount of the total voting power of the voting stock of the Bor-
818 rower beneficially owned by any other member of such group.

819 "Permitted Investments" means:

820 (1) United States dollars;

821 (2) (a) euro, or any national currency of any particular member of the EMU; or (b) in
822 the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by
823 them from time to time in the ordinary course of business;

824 (3) securities issued or directly and fully and unconditionally guaranteed or insured
825 by the U.S. government or issued by any agency or instrumentality thereof the securities of which
826 are unconditionally guaranteed as a full faith and credit obligation of such government with ma-
827 turities of 24 months or less from the date of acquisition;

828 (4) certificates of deposit, time deposits and eurodollar time deposits with maturities
829 of one year or less from the date of acquisition, bankers' acceptances with maturities not exceed-
830 ing one year and overnight bank deposits, in each case with any commercial bank having capital
831 and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the
832 U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

833 (5) repurchase obligations for underlying securities of the types described in clauses
834 (3) and (4) entered into with any financial institution meeting the qualifications specified in
835 clause (4) above;

836 (6) commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in
837 each case maturing within 24 months after the date of creation thereof;

838 (7) marketable short-term money market and similar securities having a rating of at
839 least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor
840 S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in
841 each case maturing within 24 months after the date of creation thereof;

-16-

(8)    investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an investment grade rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)    Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

"Permitted Refinancing Indebtedness" means Indebtedness incurred to refinance any Indebtedness as permitted in Section 6.01; provided that (a) such Indebtedness is issued by the Borrower and is not Guaranteed by any Person that is not a Subsidiary Loan Party, (b) the aggregate principal amount thereof does not exceed the sum of the aggregate principal amount (or accreted value if applicable) of Indebtedness being refinanced thereby, accrued interest thereon at the time and the amount of reasonable expenses, fees and premiums incurred in connection with such refinancing (in each case, other than any original issue discount) and (c) such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (d) at the time thereof, no Event of Default shall have occurred and be continuing, (e) to the extent such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended; provided that a certificate of a Responsible Officer delivered to the Administrative Agent stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement and (f) such modification, refinancing, refunding, renewal, replacement or extension is incurred by the Person who is the obligor or guarantor of the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower, any Subsidiary or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Prime Rate" means the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

-17-

886    "Pro Rata Share" means, with respect to each Lender at any time a fraction (expressed as
887    a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Revolv-
888    ing Commitments of such Lender under the Revolving Loans at such time and the denominator of which
889    is the amount of the Aggregate Revolving Commitments under the Revolving Loans at such time; pro-
890    vided that if such Revolving Commitments have been terminated, then the Pro Rata Share of each Lender
891    shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination
892    and after giving effect to any subsequent assignments made pursuant to the terms hereof.

893    "Qualified IPO" means the issuance by the Borrower of its common Equity Interests in
894    an underwritten primary public offering (other than a public offering pursuant to a registration statement
895    on Form S-8) (i) pursuant to an effective registration statement filed with the SEC in accordance with the
896    Securities Act (whether alone or in connection with a secondary public offering).

897    "Register" has the meaning set forth in Section 9.04.

898    "Regulation S-X" means Regulation S-X promulgated under the Securities Act.

899    "Related Parties" means, with respect to any specified Person, such Person's Affiliates
900    and the respective directors, officers, employees, trustees, agents and advisors of such Person and such
901    Person's Affiliates.

902    "Reorganization Plan" has the meaning provided in Recital B hereto.

903    "Required Lenders" means, at any time, Lenders having Revolving Exposures and un-
904    used Revolving Commitments representing more than 50% of the sum of the total Revolving Exposures
905    and unused Revolving Commitments at such time.

906    "Responsible Officer" means the chief executive officer, president, vice president, chief
907    financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party.

908    "Restricted Payment" means any dividend or other distribution (whether in cash, securi-
909    ties or other property) with respect to any Equity Interests in the Borrower or any Restricted Subsidiary,
910    or any payment (whether in cash, securities or other property), including any sinking fund or similar de-
911    posit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any
912    Equity Interests in the Borrower or any Restricted Subsidiary or any option, warrant or other right to ac-
913    quire any such Equity Interests in the Borrower or any Restricted Subsidiary.

914    "Restricted Subsidiary" means any Subsidiary that is not an Unrestricted Subsidiary.

915    "Revolving Availability Period" means the period from and including the Effective Date
916    to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commit-
917    ments.

918    "Revolving Commitment" means, with respect to each Lender, the commitment, if any,
919    of such Lender to make Revolving Loans and to acquire participations in Letters of Credit and Swingline
920    Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's
921    Revolving Exposure hereunder, as such commitment may be (a) reduced from time to time pursuant to
922    Section 2.08 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender
923    pursuant to Section 9.04.  The initial amount of each Lender's Revolving Commitment is set forth on
924    Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender shall have assumed

-18-

925    its Revolving Commitment, as applicable.  The initial aggregate amount of the Lenders' Revolving
926    Commitments is $40,000,000.

927              "<u>Revolving Exposure</u>" means, with respect to any Lender at any time, the sum of the out-
928    standing principal amount of such Lender's Revolving Loans and its LC Exposure and Swingline Expo-
929    sure at such time.

930              "<u>Revolving Lender</u>" means a Lender with a Revolving Commitment or, if the Revolving
931    Commitments have terminated or expired, a Lender with Revolving Exposure.

932              "<u>Revolving Loan</u>" means a Loan made pursuant to Section 2.01.

933              "<u>S&P</u>" means Standard & Poor's Ratings Services.

934              "<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority
935    succeeding to any of its principal functions.

936              "<u>Second Lien Collateral Agent</u>" means Wilmington Trust FSB, as collateral agent under
937    the Second Lien Indenture.

938              "<u>Second Lien Indenture</u>" means the indenture in respect of the Second Lien Notes dated
939    as of a date on or before the Effective Date among the Issuer and the Second Lien Trustee, as amended or
940    supplemented from time to time.

941              "<u>Second Lien Intercreditor Agreement</u>" means an intercreditor agreement dated as of the
942    Effective Date among the Administrative Agent, the Senior Secured Notes Collateral Agent, the Borrower
943    and each other Guarantor and the Second Lien Collateral Agent.

944              "<u>Second Lien Notes</u>" has the meaning provided in <u>Recital C</u> hereto.

945              "<u>Second Lien Trustee</u>" means Wilmington Trust FSB, as trustee for the holders of
946    Second Lien Notes.

947              "<u>Secured Indebtedness</u>" means any Indebtedness secured by a Lien.

948              "<u>Secured Parties</u>" has the meaning assigned to such term in the Guarantee and Collateral
949    Agreement.

950              "<u>Securities Act</u>" means the Securities Act of 1933, as amended, and the rules and regula-
951    tions of the SEC promulgated thereunder.

952              "<u>Security Documents</u>" means the Guarantee and Collateral Agreement, the First Lien In-
953    tercreditor Agreement, the Second Lien Intercreditor Agreement, the Mortgages and each other security
954    agreement or other instrument or document executed and delivered pursuant to Section 5.12, 5.13 or the
955    definition of "Permitted Acquisition" to secure any of the Obligations.

956              "<u>Senior Secured Notes</u>" means the 11-1/2% Senior Secured Notes due 2017 issued under
957    the Senior Secured Notes Indenture, as in effect on the Effective Date and as the same may be amended,
958    amended and restated, modified, supplemented and/or extended from time to time in accordance with the
959    terms hereof and thereof.

CG&R DRAFT:  12/15/10 11:13 PM          #1052964 v14 (1049414_.DOC)

960                "<u>Senior Secured Notes Collateral Agent</u>" means Wilmington Trust FSB, as collateral
961   agent under the Senior Secured Notes Indenture.

962                "<u>Senior Secured Notes Indenture</u>" means the indenture dated as of December 1, 2010, re-
963   lated to the Senior Secured Notes, among AMO Escrow Corporation and the Senior Secured Notes Trus-
964   tee, as in effect on the Effective Date and as thereafter amended, amended and restated, modified, sup-
965   plemented and/or extended from time to time in accordance with the terms hereof and thereof.

966                "<u>Senior Secured Notes Trustee</u>" means Wilmington Trust FSB, as trustee for the holders
967   of Senior Secured Notes.

968                "<u>Specified Equity Contribution</u>" has the meaning set forth in Section 7.02.

969                "<u>Statutory Reserve Rate</u>" means a fraction (expressed as a decimal), the numerator of
970   which is the number one and the denominator of which is the number one minus the aggregate of the
971   maximum reserve percentages (including any marginal, special, emergency or supplemental reserves)
972   expressed as a decimal established by the Board to which the Administrative Agent is subject for eurocur-
973   rency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such
974   reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall
975   be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without ben-
976   efit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender
977   under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted au-
978   tomatically on and as of the effective date of any change in any reserve percentage.

979                "<u>Subject Transactions</u>" has the meaning set forth in the definition of "Consolidated
980   EBITDA".

981                "<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corpora-
982   tion, limited liability company, partnership, association or other entity of which securities or other owner-
983   ship interests representing more than 50% of the equity or more than 50% of the ordinary voting power
984   or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date,
985   owned, controlled or held by the parent or one or more subsidiaries of the parent or by the parent and one
986   or more subsidiaries of the parent.

987                "<u>Subsidiary</u>" means any subsidiary of the Borrower.

988                "<u>Subsidiary Loan Party</u>" means any Restricted Subsidiary that is not a Foreign Subsidi-
989   ary.

990                "<u>Swingline Exposure</u>" means, at any time, the aggregate principal amount of all Swin-
991   gline Loans outstanding at such time.  The Swingline Exposure of any Lender at any time shall be its Ap-
992   plicable Percentage of the total Swingline Exposure at such time.

993                "<u>Swingline Lender</u>" means JPMorgan Chase Bank, N.A., in its capacity as lender of
994   Swingline Loans hereunder.

995                "<u>Swingline Loan</u>" means a Loan made pursuant to Section 2.04.

996                "<u>Taxes</u>" means any and all present or future taxes, levies, imposts, duties, deductions,
997   charges or withholdings imposed by any Governmental Authority including any interest, additions to tax
998   or penalties applicable thereto.

                        

999     "Total Assets" means the total consolidated assets of the Borrower and its Restricted
1000   Subsidiaries, as shown on the most recent balance sheet of the Borrower.

1001     "Total Debt" means, as of any date of determination, the aggregate principal amount of
1002   Indebtedness (excluding Indebtedness consisting of contingent liabilities in respect of undrawn letters of
1003   credit, Hedging Agreements and Indebtedness issued in payment of interest obligations) of the Borrower
1004   and the Restricted Subsidiaries outstanding as of such date, determined on a consolidated basis in accor-
1005   dance with GAAP.

1006     "Total First Lien Debt" means, as of any date of determination, Total Debt as of such
1007   date that is secured by a first-priority lien on Collateral, including, without limitation, all Obligations and
1008   the Senior Secured Notes.

1009     "Type", when used in reference to any Loan or Borrowing, refers to whether the rate of
1010   interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Ad-
1011   justed LIBO Rate or the Alternate Base Rate.

1012     "Unrestricted Subsidiary" means (a) any Subsidiary of the Borrower that shall have been
1013   designated an Unrestricted Subsidiary by the Borrower in the manner provided below and (b) any Subsid-
1014   iary of an Unrestricted Subsidiary.  The Borrower may designate any Subsidiary (including any newly
1015   acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary if (i) neither such Subsidiary nor
1016   any of its Subsidiaries owns any Equity Interests or Indebtedness of, or holds any Lien on any property
1017   of, the Borrower or any other Restricted Subsidiary, or owns or holds any asset that is Collateral, (ii) after
1018   giving effect to such designation, the Borrower shall be in compliance with clause (c) of Section 6.04 (it
1019   being understood that, for purposes of determining such compliance, all investments made by Loan Par-
1020   ties in, loans or advances made by Loan Parties to and Guarantees made by Loan Parties of Indebtedness
1021   of any Subsidiary so designated, shall be deemed to be investments, loans, advances and Guarantees in, to
1022   or on behalf of an Unrestricted Subsidiary), (iii) after giving effect to such designation, the Borrower and
1023   the Restricted Subsidiaries shall be in compliance on a pro forma basis with the covenant contained in
1024   Section 6.12 recomputed as at the last day of the most recently completed fiscal quarter of the Borrower
1025   for which financial statements are available, as if such designation had occurred on the first day of each
1026   relevant period for testing such compliance and (iv) no Default shall have occurred and be continuing or
1027   would result therefrom.  The Borrower may designate any Unrestricted Subsidiary to be a Restricted Sub-
1028   sidiary if (i) no Default shall have occurred and be continuing or would result therefrom and (ii) after giv-
1029   ing effect to such designation, the Borrower and the Restricted Subsidiaries are in compliance on a pro
1030   forma basis with the covenant contained in Section 6.12 recomputed as at the last day of the most recently
1031   completed fiscal quarter of the Borrower for which financial statements are available, as if such designa-
1032   tion had occurred on the first day of each relevant period for testing such compliance.  The Borrower shall
1033   promptly notify the Administrative Agent in writing of any such designation (and the Administrative
1034   Agent shall notify the Lenders) and shall deliver to the Administrative Agent a certificate signed by a Fi-
1035   nancial Officer of the Borrower certifying that such designation complied with the foregoing provisions
1036   together with reasonably detailed calculations demonstrating satisfaction of the requirement set forth in
1037   clause (iii) of the second sentence of this definition or in clause (ii) of the third sentence of this definition,
1038   as applicable.  For the avoidance of doubt, the designation of any Unrestricted Subsidiary as a Restricted
1039   Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such
1040   Subsidiary existing at such time.

1041     "Unsecured Debt" means Indebtedness that is not Secured Indebtedness.

1042     "Weighted Average Life to Maturity" means, when applied to any Indebtedness at any
1043   date, the number of years obtained by dividing:  (i) the sum of the products obtained by multiplying (a)

      

1044  the amount of each then remaining installment, sinking fund, serial maturity or other required payments
1045  of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated
1046  to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the
1047  then outstanding principal amount of such Indebtedness.

1048      "Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete
1049  or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of
1050  Title IV of ERISA.

1051      SECTION 1.02.    Classification of Loans and Borrowings.  For purposes of this Agree-
1052  ment, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a
1053  "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan").  Borrowings also may be
1054  classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Bor-
1055  rowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

1056      SECTION 1.03.    Terms Generally.  The definitions of terms herein shall apply equally
1057  to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun
1058  shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes"
1059  and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall
1060  be construed to have the same meaning and effect as the word "shall".  Unless the context requires other-
1061  wise (a) any definition of or reference to any agreement, instrument or other document herein shall be
1062  construed as referring to such agreement, instrument or other document as from time to time amended,
1063  supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or
1064  modifications set forth herein), (b) any reference herein to any Person shall be construed to include such
1065  Person's successors and assigns, (c)  the words "herein", "hereof" and "hereunder", and words of similar
1066  import, shall be construed to refer to this Agreement in its entirety and not to any particular provision he-
1067  reof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to
1068  Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and
1069  "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and
1070  intangible assets and properties, including cash, securities, accounts and contract rights.

1071      SECTION 1.04.    Accounting Terms; GAAP; Treatment of Unrestricted Subsidiaries.

1072      (a)      Except as otherwise expressly provided herein or the context otherwise requires,
1073  all terms of an accounting or financial nature shall be construed in accordance with GAAP.

1074      (b)      Except as otherwise expressly provided herein, all accounting and financial cal-
1075  culations and determinations hereunder shall be made without consolidating the accounts of Unrestricted
1076  Subsidiaries with those of the Borrower or any Restricted Subsidiary, notwithstanding that such treatment
1077  is inconsistent with GAAP.

1078      (c)      Notwithstanding anything to the contrary, for purposes of determining com-
1079  pliance with any covenant (including the computation of any financial covenant) contained herein, the
1080  effects of FASB ASC 825 (Financial Instruments) and ASC 470-20 (Debt with Conversion and Other
1081  Options) on financial liabilities shall be disregarded.

-22-

ARTICLE II

The Credits

SECTION 2.01.  Revolving Commitments.  Subject to the terms and conditions set forth herein, each Lender agrees to make Revolving Loans to the Borrower from time to time during the Revolving Availability Period in an aggregate principal amount that will not result in such Lender's Revolving Exposure exceeding such Lender's Revolving Commitment.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.

SECTION 2.02.  Loans and Borrowings.

(a)    Each Revolving Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Revolving Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Revolving Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)    Subject to Section 2.14, each Revolving Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request in accordance herewith; provided that all Borrowings made on the Effective Date must be made as ABR Borrowings.  Each Swingline Loan shall be an ABR Loan.  Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan so long as no increased costs are incurred as contemplated by Section 2.15; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000.  At the time that each ABR Revolving Borrowing is made, such Borrowing shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000; provided that an ABR Revolving Borrowing may be in an aggregate amount that is equal to the entire unused balance of the total Revolving Commitments or that is required to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(e).  Each Swingline Loan shall be in an amount that is not less than $100,000.  Borrowings of more than one Type and Class may be outstanding at the same time; provided that there shall not at any time be more than a total of [ten] Eurodollar Borrowings of any Class outstanding.

(d)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

SECTION 2.03.  Requests for Borrowings.  To request a Borrowing, the Borrower shall notify the Administrative Agent of such request by telephone (a) in the case of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of the proposed Borrowing or (b) in the case of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of the proposed Borrowing; provided that any such notice of an ABR Revolving Borrowing to finance the reimbursement of an LC Disbursement as contemplated by Section 2.05(e) may be given not later than 10:00 a.m., New York City time, on the date of the proposed Borrowing.  Each such telephonic Borrowing Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Borrowing Request in a form approved by the

-23-

Administrative Agent and signed by the Borrower.  Each such telephonic and written Borrowing Request shall specify the following information in compliance with Section 2.02:

> (i)    the Class and aggregate amount of such Borrowing;

> (ii)    the date of such Borrowing, which shall be a Business Day;

> (iii)    whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

> (iv)    in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

> (v)    the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.06.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Swingline Loans.

(a)    Subject to the terms and conditions set forth herein, the Swingline Lender agrees to make Swingline Loans to the Borrower from time to time during the Revolving Availability Period, in an aggregate principal amount at any time outstanding that will not result in (i) the aggregate principal amount of outstanding Swingline Loans exceeding $5,000,000 or (ii) the sum of the total Revolving Exposures exceeding the total Revolving Commitments; provided that the Swingline Lender shall not be required to make a Swingline Loan to refinance an outstanding Swingline Loan.  Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Swingline Loans.

Notwithstanding the foregoing, if at any time any Revolving Lender is a Defaulting Lender, such Defaulting Lender's Pro Rata Share of the Swingline Loans will be reallocated among all Revolving Lenders that are not Defaulting Lenders (pro rata in accordance with their respective Pro Rata Shares) but only to the extent (x) that no non-Defaulting Lender's share of the Revolving Exposure shall exceed such non-Defaulting Lender's Revolving Commitment and (y) the conditions set forth in Section 4.02 are satisfied at such time (in which case the Revolving Commitments of all Defaulting Lenders shall be deemed to be zero (except to the extent Cash Collateral has been posted by such Defaulting Lender in respect of any portion of such Defaulting Lender's participations in Swingline Loans or LC Exposures) for purposes of any determination of the Revolving Lenders' respective Pro Rata Shares of the Swingline Loans (including for purposes of all fee calculations hereunder)); provided that if such reallocation cannot be made, the Borrower and such Defaulting Lender, on a joint and several basis, hereby agree, within two Business Days following notice by the Administrative Agent, to cause to be deposited with the Administrative Agent for the benefit of the Swingline Lender Cash Collateral or similar security reasonably satisfactory to such Swingline Lender (in its sole discretion) in the full amount of such Defaulting Lender's Pro Rata Share of outstanding Swingline Loans.  The Borrower and/or such Defaulting Lender hereby grants to the Administrative Agent, for the benefit of the Swingline Lender, a security interest in all such Cash Collateral and all proceeds of the foregoing.  Such Cash Collateral shall be maintained as provided in Section 2.05(j).  If at any time the Administrative Agent determines that any funds held as Cash Colla-

1168    teral under this paragraph are subject to any right or claim of any Person other than the Administrative
1169    Agent for the benefit of the Swingline Lender or that the total amount of such funds is less than the ag-
1170    gregate risk participation of such Defaulting Lender in the applicable Swingline Loan, the Borrower
1171    and/or such Defaulting Lender will, promptly upon demand by the Administrative Agent, pay to the Ad-
1172    ministrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess
1173    of (x) such aggregate risk participation over (y) the total amount of funds, if any, then held as Cash Colla-
1174    teral under this paragraph that the Administrative Agent determines to be free and clear of any such right
1175    and claim.  If the Revolving Lender that triggers the Cash Collateral requirement under this paragraph
1176    ceases to be a Defaulting Lender (as determined by the Swingline Lender in good faith), or if the Swin-
1177    gline Exposures have been permanently reduced to zero, the funds held as Cash Collateral shall thereafter
1178    be returned to the Borrower or the Defaulting Lender, whichever provided the funds for the Cash Colla-
1179    teral.

1180            (b)      To request a Swingline Loan, the Borrower shall notify the Administrative Agent
1181    of such request by telephone (confirmed by telecopy), not later than 12:00 noon, New York City time, on
1182    the day of a proposed Swingline Loan.  Each such notice shall be irrevocable and shall specify the re-
1183    quested date (which shall be a Business Day) and amount of the requested Swingline Loan.  The Admin-
1184    istrative Agent will promptly advise the Swingline Lender of any such notice received from the Borrower.
1185    The Swingline Lender shall make each Swingline Loan available to the Borrower by means of a credit to
1186    the general deposit account of the Borrower with the Swingline Lender (or, in the case of a Swingline
1187    Loan made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(e), by remit-
1188    tance to the Issuing Bank) by 3:00 p.m., New York City time, on the requested date of such Swingline
1189    Loan.

1190            (c)      The Swingline Lender may by written notice given to the Administrative Agent
1191    not later than 12:00 noon, New York City time, on any Business Day require the Revolving Lenders to
1192    acquire participations on such Business Day in all or a portion of the Swingline Loans outstanding.  Such
1193    notice shall specify the aggregate amount of Swingline Loans in which Revolving Lenders will partici-
1194    pate.  Promptly upon receipt of such notice, the Administrative Agent will give notice thereof to each Re-
1195    volving Lender, specifying in such notice such Lender's Applicable Percentage of such Swingline Loan
1196    or Loans.  Each Revolving Lender hereby absolutely and unconditionally agrees, upon receipt of notice as
1197    provided above, to pay to the Administrative Agent, for the account of the Swingline Lender, such Lend-
1198    er's Applicable Percentage of such Swingline Loan or Loans.  Each Revolving Lender acknowledges and
1199    agrees that its obligation to acquire participations in Swingline Loans pursuant to this paragraph is abso-
1200    lute and unconditional and shall not be affected by any circumstance whatsoever, including the occur-
1201    rence and continuance of a Default or reduction or termination of the Revolving Commitments, and that
1202    each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.
1203    Each Revolving Lender shall comply with its obligation under this paragraph by wire transfer of imme-
1204    diately available funds, in the same manner as provided in Section 2.06 with respect to Loans made by
1205    such Lender (and Section 2.06 shall apply, _mutatis mutandis_, to the payment obligations of the Revolving
1206    Lenders), and the Administrative Agent shall promptly pay to the Swingline Lender the amounts so re-
1207    ceived by it from the Revolving Lenders.  The Administrative Agent shall notify the Borrower of any par-
1208    ticipations in any Swingline Loan acquired pursuant to this paragraph, and thereafter payments in respect
1209    of such Swingline Loan shall be made to the Administrative Agent and not to the Swingline Lender.  Any
1210    amounts received by the Swingline Lender from the Borrower (or other party on behalf of the Borrower)
1211    in respect of a Swingline Loan after receipt by the Swingline Lender of the proceeds of a sale of participa-
1212    tions therein shall be promptly remitted to the Administrative Agent; any such amounts received by the
1213    Administrative Agent shall be promptly remitted by the Administrative Agent to the Revolving Lenders
1214    that shall have made their payments pursuant to this paragraph and to the Swingline Lender, as their inter-
1215    ests may appear.  The purchase of participations in a Swingline Loan pursuant to this paragraph shall not
1216    relieve the Borrower of any default in the payment thereof.  Notwithstanding the foregoing, a Revolving

                                                          

Lender shall not have any obligation to acquire a participation in a Swingline Loan pursuant to this para-graph if an Event of Default shall have occurred and be continuing at the time such Swingline Loan was made and such Lender shall have notified the Swingline Lender in writing, at least one Business Day prior to the time such Swingline Loan was made, that such Event of Default has occurred and that such Lender will not acquire participations in Swingline Loans made while such Event of Default is continu-ing.

SECTION 2.05.    Letters of Credit.

(a)    General.  Subject to the terms and conditions set forth herein, the Borrower may request the issuance of Letters of Credit for its own account, in a form reasonably acceptable to the Ad-ministrative Agent and the Issuing Bank, at any time and from time to time during the Revolving Availa-bility Period.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control.

In the case where any Revolving Lender is at any time a Defaulting Lender, the Default-ing Lender's Pro Rata Share of the LC Exposures will be reallocated among all Revolving Lenders that are not Defaulting Lenders (pro rata in accordance with their respective Pro Rata Shares) but only to the extent (x) that no non-Defaulting Lender's share of the Revolving Exposure shall exceed such non-Defaulting Lender's Revolving Commitment and (y) the conditions set forth in Section 4.02 are satisfied at such time (in which case the Revolving Commitments of all Defaulting Lenders shall be deemed to be zero (except to the extent Cash Collateral has been posted by such Defaulting Lender in respect of any portion of such Defaulting Lender's LC Exposures or participations in Swingline Loans) for purposes of any determination of the Revolving Lenders' respective Pro Rata Shares of LC Exposures (including for purposes of all fee calculations hereunder)); provided, that if such reallocation cannot be made as pro-vided above, the Borrower and such Defaulting Lender, on a joint and several basis, hereby agree, within two Business Days following written notice by the Administrative Agent, to cause to be deposited with the Administrative Agent for the benefit of the Issuing Bank, Cash Collateral in the full amount of such Defaulting Lender's Pro Rata Share of the outstanding LC Exposures.  The Borrower and/or such De-faulting Lender hereby grant to the Administrative Agent, for the benefit of such Issuing Bank, a security interest in any Cash Collateral and all proceeds of the foregoing with respect to such Defaulting Lender's participations in Letters of Credit deposited hereunder.  Such Cash Collateral shall be maintained as pro-vided in Section 2.05(j).  If at any time the Administrative Agent determines that any funds held as Cash Collateral under this paragraph are subject to any right or claim of any Person other than the Administra-tive Agent for the benefit of such Issuing Bank or that the total amount of such funds is less than such Defaulting Lender's Pro Rata Share of all LC Exposures that has not been reallocated as provided above, the Borrower and/or such Defaulting Lender will, promptly upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (I) such Defaulting Lender's Pro Rata Share of all LC Exposures that have not been so reallocated over (II) the total amount of funds, if any, then held as Cash Collateral in respect thereof under this paragraph that the Administrative Agent determines to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Laws, to reimburse such Issuing Bank.  If the Lender that triggers the Cash Collateral requirement under this paragraph ceases to be a Defaulting Lend-er (as determined by such Issuing Bank in good faith), or if there are no LC Exposures outstanding, any funds held as Cash Collateral pursuant to the foregoing provisions shall thereafter be returned to the Bor-rower or the Defaulting Lender, whichever provided the funds for the Cash Collateral, and the Pro Rata Share of the LC Exposures of each Revolving Lender shall thereafter take into account such Revolving Lender's Revolving Commitment.

-26-

(b)    <u>Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions</u>.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Issuing Bank) to the Issuing Bank and the Administrative Agent (reasonably in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) of this Section), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the Issuing Bank, the Borrower also shall submit a letter of credit application on the Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure shall not exceed $10,000,000 and (ii) the total Revolving Exposures shall not exceed the total Revolving Commitments.

(c)    <u>Expiration Date</u>.  Each Letter of Credit shall expire at or prior to the close of business on the earlier of (i) (A) in the case of any Letter of Credit that is a standby Letter of Credit, the date one year after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, one year after such renewal or extension) and (B) in the case of any Letter of Credit that is a commercial Letter of Credit, 180 days after the date of the issuance of such Letter of Credit and (ii) the date that is five Business Days prior to the Maturity Date; <u>provided</u>, <u>however</u>, that any Letter of Credit that is a standby Letter of Credit with term of one year may provide for renewal thereof for additional periods of up to one year (which in no event shall extend beyond the date referred to in clause (ii)).

(d)    <u>Participations</u>.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Revolving Lender, and each Revolving Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Applicable Percentage of each LC Disbursement made by the Issuing Bank and not reimbursed by the Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment required to be refunded to the Borrower for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or reduction or termination of the Revolving Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    <u>Reimbursement</u>.  If the Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse such LC Disbursement by paying to the Administrative Agent an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the Business Day immediately following the date the Borrower has received notice of such LC Disbursement; <u>provided</u> that the Borrower may, subject to the conditions to borrowing set forth herein, request in accordance with Section 2.03 or 2.04 that such payment be financed with an ABR Revolving Borrowing or Swingline Loan in an equivalent amount and, to the extent so financed, the Borrower's obligation to make such payment shall be discharged and replaced by the resulting ABR Revolving Borrowing or Swingline Loan.  If the Borrower fails to make such payment when due, the Administrative Agent shall

-27-

notify each Revolving Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the Borrower, in the same manner as provided in Section 2.06 with respect to Loans made by such Lender (and Section 2.06 shall apply, *mutatis mutandis*, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Revolving Lenders.  Promptly following receipt by the Administrative Agent of any payment from the Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that Revolving Lenders have made payments pursuant to this paragraph to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.  Any payment made by a Revolving Lender pursuant to this paragraph to reimburse the Issuing Bank for any LC Disbursement (other than the funding of ABR Revolving Loans or a Swingline Loan as contemplated above) shall not constitute a Loan and shall not relieve the Borrower of its obligation to reimburse such LC Disbursement.

(f)    <u>Obligations Absolute</u>.  The Borrower's obligation to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit, or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  Neither the Administrative Agent, the Lenders nor the Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank; <u>provided</u> that the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)    <u>Disbursement Procedures</u>.  The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Issuing Bank shall promptly notify the Administrative Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Issuing Bank has made or will make an

-28-

1362    LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not
1363    relieve the Borrower of its obligation to reimburse the Issuing Bank and the Revolving Lenders with re-
1364    spect to any such LC Disbursement.

1365           (h)    Interim Interest.  If the Issuing Bank shall make any LC Disbursement, then, un-
1366    less the Borrower shall reimburse such LC Disbursement in full on the date such LC Disbursement is
1367    made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC
1368    Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, at
1369    the rate per annum then applicable to ABR Revolving Loans; provided that, if the Borrower fails to reim-
1370    burse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.13(c)
1371    shall apply.  Interest accrued pursuant to this paragraph shall be for the account of the Issuing Bank, ex-
1372    cept that interest accrued on and after the date of payment by any Revolving Lender pursuant to para-
1373    graph (e) of this Section to reimburse the Issuing Bank shall be for the account of such Lender to the ex-
1374    tent of such payment.

1375           (i)    Replacement of the Issuing Bank.  The Issuing Bank may be replaced at any time
1376    by written agreement among the Borrower, the Administrative Agent, the replaced Issuing Bank and the
1377    successor Issuing Bank.  The Administrative Agent shall notify the Lenders of any such replacement of
1378    the Issuing Bank.  At the time any such replacement shall become effective, the Borrower shall pay all
1379    unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12(b).  From and
1380    after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights
1381    and obligations of the Issuing Bank under this Agreement with respect to Letters of Credit to be issued
1382    thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor
1383    or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall
1384    require.  After the replacement of an Issuing Bank hereunder, the replaced Issuing Bank shall remain a
1385    party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this
1386    Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be re-
1387    quired to issue additional Letters of Credit.

1388           (j)    Cash Collateralization.  If any Event of Default shall occur and be continuing, on
1389    the Business Day that the Borrower receives notice from the Administrative Agent or the Required Lend-
1390    ers (or, if the maturity of the Loans has been accelerated, Revolving Lenders with LC Exposure
1391    representing greater than 50% of the total LC Exposure) demanding the deposit of cash collateral pur-
1392    suant to this paragraph, the Borrower shall deposit in an account with the Administrative Agent, in the
1393    name of the Administrative Agent and for the benefit of the Lenders, an amount in cash equal to the LC
1394    Exposure as of such date plus any accrued and unpaid interest thereon ("Cash Collateral"); provided that
1395    the obligation to deposit such cash collateral shall become effective immediately, and such deposit shall
1396    become immediately due and payable, without demand or other notice of any kind, upon the occurrence
1397    of any Event of Default with respect to the Borrower described in Section 7.01(h) or (i).  Each such depo-
1398    sit shall be held by the Administrative Agent as collateral for the payment and performance of the obliga-
1399    tions of the Borrower under this Agreement.  The Administrative Agent shall have exclusive dominion
1400    and control, including the exclusive right of withdrawal, over such account.  Other than any interest
1401    earned on the investment of such deposits, which investments shall be made at the option and sole discre-
1402    tion of the Administrative Agent and at the Borrower's risk and expense, such deposits shall not bear in-
1403    terest.  Interest or profits, if any, on such investments shall accumulate in such account.  Moneys in such
1404    account shall be applied by the Administrative Agent to reimburse the Issuing Bank for LC Disburse-
1405    ments for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfac-
1406    tion of the reimbursement obligations of the Borrower for the LC Exposure at such time or, if the maturity
1407    of the Loans has been accelerated (but subject to the consent of Revolving Lenders with LC Exposure
1408    representing greater than 50% of the total LC Exposure), be applied to satisfy other obligations of the
1409    Borrower under this Agreement.  If the Borrower is required to provide an amount of cash collateral he-

1410 reunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as afo-
1411 resaid) shall be returned to the Borrower within three Business Days after all Events of Default have been
1412 cured or waived.

1413            SECTION 2.06.    Funding of Borrowings.

1414            (a)    Each Lender shall make each Loan to be made by it hereunder on the proposed
1415 date thereof by wire transfer of immediately available funds by 1:00 p.m., New York City time, to the
1416 account of the Administrative Agent most recently designated by it for such purpose by notice to the
1417 Lenders; provided that Swingline Loans shall be made as provided in Section 2.04.  The Administrative
1418 Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in
1419 like funds, to an account of the Borrower maintained with the Administrative Agent in New York City
1420 and designated by the Borrower in the applicable Borrowing Request; provided that ABR Revolving
1421 Loans made to finance the reimbursement of an LC Disbursement as provided in Section 2.05(e) shall be
1422 remitted by the Administrative Agent to the Issuing Bank.

1423            (b)    Unless the Administrative Agent shall have received notice from a Lender prior
1424 to the proposed date of any Borrowing that such Lender will not make available to the Administrative
1425 Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender
1426 has made such share available on such date in accordance with paragraph (a) of this Section and may, in
1427 reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if
1428 a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent,
1429 then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith
1430 on demand such corresponding amount with interest thereon, for each day from and including the date
1431 such amount is made available to the Borrower to but excluding the date of payment to the Administrative
1432 Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate deter-
1433 mined by the Administrative Agent in accordance with banking industry rules on interbank compensation
1434 or (ii) in the case of the Borrower, the interest rate applicable to ABR Loans.  If such Lender pays such
1435 amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in
1436 such Borrowing.

1437            SECTION 2.07.    Interest Elections.

1438            (a)    Each Revolving Borrowing initially shall be of the Type specified in the Borrow-
1439 ing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in
1440 such Borrowing Request.  Subject to Section 2.13, thereafter, the Borrower may elect to convert such
1441 Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing,
1442 may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different op-
1443 tions with respect to different portions of the affected Borrowing, in which case each such portion shall be
1444 allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans com-
1445 prising each such portion shall be considered a separate Borrowing.  This Section shall not apply to
1446 Swingline Borrowings, which may not be converted or continued.

1447            (b)    To make an election pursuant to this Section, the Borrower shall notify the Ad-
1448 ministrative Agent of such election by telephone by the time that a Borrowing Request would be required
1449 under Section 2.03 if the Borrower were requesting a Revolving Borrowing of the Type resulting from
1450 such election to be made on the effective date of such election.  Each such telephonic Interest Election
1451 Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Admin-
1452 istrative Agent of a written Interest Election Request in a form approved by the Administrative Agent and
1453 signed by the Borrower.

-30-

(c)    Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)    Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)    If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall automatically be converted to an ABR Borrowing (and the Borrower shall pay any costs associated therewith).

SECTION 2.08.    Termination and Reduction of Revolving Commitments.

(a)    Unless previously terminated, the Revolving Commitments shall terminate on the Maturity Date.

(b)    The Borrower may at any time terminate, or from time to time reduce, the Revolving Commitments; provided that (i) each reduction of the Revolving Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $5,000,000 and (ii) the Borrower shall not terminate or reduce the Revolving Commitments if, after giving effect to any concurrent prepayment of the Revolving Loans in accordance with Section 2.11, the sum of the Revolving Exposures would exceed the total Revolving Commitments.

(c)    The Borrower shall notify the Administrative Agent of any election to terminate or reduce the Revolving Commitments under paragraph (b) of this Section at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable;

1494    provided that a notice of termination of the Revolving Commitments delivered by the Borrower may state
1495    that such notice is conditioned upon the effectiveness of other credit facilities or other financing, in which
1496    case such notice may be revoked by the Borrower (by notice to the Administrative Agent on or prior to
1497    the specified effective date) if such condition is not satisfied.  Any termination or reduction of the Revolv-
1498    ing Commitments shall be permanent.  Each reduction of the Revolving Commitments shall be made rat-
1499    ably among the Lenders in accordance with their respective Revolving Commitments.

1500        SECTION 2.09.    Repayment of Loans; Evidence of Debt.

1501        (a)      The Borrower hereby unconditionally promises to pay (i) to the Administrative
1502    Agent for the account of each Lender the then unpaid principal amount of each Revolving Loan of such
1503    Lender on the Maturity Date and (ii) to the Swingline Lender the then unpaid principal amount of each
1504    Swingline Loan on the Maturity Date; provided that on each date that a Revolving Borrowing is made, the
1505    Borrower shall repay all Swingline Loans that were outstanding on the date such Borrowing was re-
1506    quested.

1507        (b)      Each Lender shall maintain in accordance with its usual practice an account or
1508    accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by
1509    such Lender, including the amounts of principal and interest payable and paid to such Lender from time to
1510    time hereunder.

1511        (c)      The Administrative Agent shall maintain accounts in which it shall record (i) the
1512    amount of each Loan made hereunder, the Class and Type thereof and the Interest Period applicable the-
1513    reto, (ii) the amount of any principal or interest due and payable or to become due and payable from the
1514    Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent
1515    hereunder for the account of the Lenders and each Lender's share thereof.

1516        (d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of
1517    this Section shall be prima facie evidence of the existence and amounts of the obligations recorded there-
1518    in; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any
1519    error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accor-
1520    dance with the terms of this Agreement.

1521        (e)      Any Lender may request that Loans of any Class made by it be evidenced by a
1522    promissory note.  In such event, the Borrower shall prepare, execute and deliver to such Lender a promis-
1523    sory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its reg-
1524    istered assigns) and in a form approved by the Administrative Agent.  Thereafter, the Loans evidenced by
1525    such promissory note and interest thereon shall at all times (including after assignment pursuant to Sec-
1526    tion 9.04) be represented by one or more promissory notes in such form payable to the order of the payee
1527    named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

1528        SECTION 2.10.    [Reserved].

1529        SECTION 2.11.    Prepayment of Loans.

1530        (a)      The Borrower shall have the right at any time and from time to time to prepay
1531    any Borrowing in whole or in part, subject to the requirements of this Section.

1532        (b)      In the event and on such occasion that the sum of the Revolving Exposures ex-
1533    ceeds the total Revolving Commitments, the Borrower shall prepay Revolving Borrowings or Swingline

        

1534     Borrowings (or, if no such Borrowings are outstanding, deposit cash collateral in an account with the
1535     Administrative Agent pursuant to Section 2.05(j)) in an aggregate amount equal to such excess.

1536             (c)     [Reserved].

1537             (d)     [Reserved].

1538             (e)     Prior to any prepayment of Borrowings hereunder, the Borrower shall select the
1539     Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment
1540     pursuant to paragraph (f) of this Section.

1541             (f)     The Borrower shall notify the Administrative Agent (and, in the case of prepay-
1542     ment of a Swingline Loan, the Swingline Lender) by telephone (confirmed by telecopy) of any prepay-
1543     ment hereunder (i) in the case of prepayment of any Borrowing (other than a Swingline Loan or an op-
1544     tional prepayment of an ABR Borrowing), not later than 11:00 a.m., New York City time, three Business
1545     Days before the date of prepayment, (ii) in the case of an optional prepayment of an ABR Borrowing, not
1546     later than 11:00 a.m., New York City time, one Business Day before the date of prepayment or (iii) in the
1547     case of prepayment of a Swingline Loan, not later than 12:00 noon, New York City time, on the date of
1548     prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal
1549     amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a
1550     reasonably detailed calculation of the amount of such prepayment; provided that, if a notice of optional
1551     prepayment is given in connection with a conditional notice of termination of the Revolving Commit-
1552     ments as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of
1553     termination is revoked in accordance with Section 2.08.  Promptly following receipt of any such notice
1554     (other than a notice relating solely to Swingline Loans), the Administrative Agent shall advise the Lend-
1555     ers of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would
1556     be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, ex-
1557     cept as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a
1558     Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be
1559     accompanied by accrued interest to the extent required by Section 2.13.

1560             (g)     All prepayments of Eurodollar Borrowings (other than on the last day of the rele-
1561     vant interest period) shall be accompanied by any amounts payable under Section 2.15 or 2.16.

1562             SECTION 2.12.   Fees.

1563             (a)     The Borrower agrees to pay to the Administrative Agent for the account of each
1564     Revolving Lender a commitment fee, which shall accrue at a rate per annum on the average daily unused
1565     amount of the Revolving Commitment of such Lender equal to the Applicable Rate in effect from time to
1566     time as set forth under the caption "Revolving Commitment Fee Rate" in the definition thereof during the
1567     period from and including the Effective Date to but excluding the date on which such Revolving Com-
1568     mitment terminates.  Accrued commitment fees shall be payable in arrears on the last day of March, June,
1569     September and December of each year and on the date on which the Revolving Commitments terminate,
1570     commencing on the first such date to occur after the Effective Date, provided that (x) any commitment fee
1571     accrued with respect to Revolving Commitments of a Defaulting Lender during the period prior to the
1572     time such Revolving Lender became a Defaulting Lender and unpaid at such time shall not be payable by
1573     the Borrower to such Defaulting Lender so long as such Revolving Lender shall be a Defaulting Lender
1574     except to the extent that such commitment fee shall otherwise have been due and payable by the Borrower
1575     prior to such time and (y) no commitment fee shall accrue on any of the Revolving Commitments of a
1576     Defaulting Lender so long as such Revolving Lender shall be a Defaulting Lender.  All commitment fees
1577     shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days

1578  elapsed (including the first day but excluding the last day). For purposes of computing commitment fees
1579  with respect to Revolving Commitments, a Revolving Commitment of a Lender shall be deemed to be
1580  used to the extent of the outstanding Revolving Loans and LC Exposure of such Lender (and the Swin-
1581  gline Exposure of such Lender shall be disregarded for such purpose).

1582         (b)    The Borrower agrees to pay (i) to the Administrative Agent for the account of
1583  each Revolving Lender a participation fee with respect to its participations in Letters of Credit (including,
1584  for the avoidance of doubt, any participations reallocated to such Revolving Lender from a Defaulting
1585  Lender pursuant to Section 2.5), which shall accrue at the same Applicable Rate as interest on Eurodollar
1586  Revolving Loans on the average daily amount of such Lender's LC Exposure (excluding any portion the-
1587  reof attributable to unreimbursed LC Disbursements) during the period from and including the Effective
1588  Date to but excluding the later of the date on which such Lender's Revolving Commitment terminates and
1589  the date on which such Lender ceases to have any LC Exposure; provided that (x) any participation fee
1590  paid to the Administrative Agent for the account of a Defaulting Lender during the period prior to the
1591  time such Revolving Lender became a Defaulting Lender and unpaid at such time shall not be payable by
1592  the Borrower so long as such Revolving Lender shall be a Defaulting Lender except to the extent that
1593  such participating fee shall otherwise have been due and payable by the Borrower prior to such time and
1594  (y) no participation fee shall accrue on any of the participations in Letters of Credit of a Defaulting Lend-
1595  er so long as such Revolving Lender shall be a Defaulting Lender, and (ii) to the Issuing Bank a fronting
1596  fee, which shall accrue at the rate per annum of 0.25% on the average daily amount of the LC Exposure
1597  (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from
1598  and including the Effective Date to but excluding the later of the date of termination of the Revolving
1599  Commitments and the date on which there ceases to be any LC Exposure, as well as the Issuing Bank's
1600  standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or
1601  processing of drawings thereunder. Participation fees and fronting fees accrued through and including the
1602  last day of March, June, September and December of each year shall be payable on the third Business
1603  Day following such last day, commencing on the first such date to occur after the Effective Date; pro-
1604  vided that all such fees shall be payable on the date on which the Revolving Commitments terminate and
1605  any such fees accruing after the date on which the Revolving Commitments terminate shall be payable on
1606  demand. Any other fees payable to the Issuing Bank pursuant to this paragraph shall be payable within
1607  10 days after demand. All participation fees and fronting fees shall be computed on the basis of a year of
1608  360 days and shall be payable for the actual number of days elapsed (including the first day but excluding
1609  the last day).

1610         (c)    The Borrower agrees to pay to the Administrative Agent, for its own account,
1611  fees payable in the amounts and at the times separately agreed upon between the Borrower and the Ad-
1612  ministrative Agent.

1613         (d)    All fees payable hereunder shall be paid on the dates due, in immediately availa-
1614  ble funds, to the Administrative Agent (or to the Issuing Bank, in the case of fees payable to it) for distri-
1615  bution, in the case of commitment fees and participation fees, to the Lenders entitled thereto. Fees paid
1616  shall not be refundable under any circumstances.

1617         (e)    The Borrower agrees to pay on the Effective Date to each Revolving Lender par-
1618  ty to this Agreement on the Effective Date, as fee compensation for the making of such Revolving Lend-
1619  er's Revolving Commitment, a closing fee (the "Closing Fee") in an amount equal to 2.00% of the stated
1620  principal amount of such Revolving Lender's Revolving Commitment on the Effective Date. Such Clos-
1621  ing Fee will be in all respects fully earned, due and payable on the Effective Date and non-refundable and
1622  non-creditable thereafter.

SECTION 2.13.    Interest.

(a)    The Loans comprising each ABR Borrowing (including each Swingline Loan) shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)    The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)    Notwithstanding the foregoing, upon the occurrence and continuance of any Event of Default under Section 7.01(a), (b), (h), (i) or (j) (or any other Event of Default under Section 7.01 if requested by the Required Lenders), (x) any principal of or interest on any Loan or any fee or other amount payable by the Borrower hereunder shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of principal of any Loan, 2.00% plus the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount, 2.00% plus the rate applicable to ABR Revolving Loans as provided in paragraph (a) of this Section; and (y) all Loans comprising Eurodollar Borrowings shall automatically convert to ABR Borrowings (and the Borrower shall pay any costs associated therewith), and the Lenders shall no longer have an obligation to fund Eurodollar Borrowings until such Event of Default is cured or waived in accordance herewith.

(d)    Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan and, in the case of Revolving Loans, upon termination of the Revolving Commitments; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Revolving Loan prior to the end of the Revolving Availability Period), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)    All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.14.    Alternate Rate of Interest.  If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)    the Administrative Agent is advised by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan) included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any  Borrowing as, a Euro-

-35-

1665   dollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing,
1666   such Borrowing shall be made as an ABR Borrowing.

1667          SECTION 2.15.   Increased Costs.

1668          (a)     If any Change in Law shall:

1669                 (i)     impose, modify or deem applicable any reserve, special deposit or similar re-
1670   quirement against assets of, deposits with or for the account of, or credit extended by, any Lender
1671   (except any such reserve requirement reflected in the Adjusted LIBO Rate) or the Issuing Bank;
1672   or

1673                 (ii)     impose on any Lender or the Issuing Bank or the London interbank market any
1674   other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter
1675   of Credit or participation therein;

1676   and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintain-
1677   ing any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost
1678   to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to
1679   reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder
1680   (whether of principal, interest or otherwise), then the Borrower will pay to such Lender or the Issuing
1681   Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Is-
1682   suing Bank, as the case may be, for such additional costs incurred or reduction suffered.

1683          (b)     If any Lender or the Issuing Bank determines that any Change in Law regarding
1684   capital requirements has or would have the effect of reducing the rate of return on such Lender's or the
1685   Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any,
1686   as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by,
1687   such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender
1688   or the Issuing Bank or such Lender's or the Issuing Bank's holding company could have achieved but for
1689   such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the poli-
1690   cies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from
1691   time to time the Borrower will pay to such Lender or the Issuing Bank, as the case may be, such addition-
1692   al amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing
1693   Bank's holding company for any such reduction suffered.

1694          (c)     A certificate of a Lender or the Issuing Bank setting forth the amount or amounts
1695   necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as
1696   specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive
1697   absent manifest error.  The Borrower shall pay such Lender or the Issuing Bank, as the case may be, the
1698   amount shown as due on any such certificate within 10 days after receipt thereof.

1699          (d)     Failure or delay on the part of any Lender or the Issuing Bank to demand com-
1700   pensation pursuant to this Section shall not constitute a waiver of such Lender's or the Issuing Bank's
1701   right to demand such compensation; provided that the Borrower shall not be required to compensate a
1702   Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more
1703   than 180 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Bor-
1704   rower of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the
1705   Issuing Bank's intention to claim compensation therefor; provided further that, if the Change in Law giv-
1706   ing rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall
1707   be extended to include the period of retroactive effect thereof.

CG&R DRAFT:  12/15/10 11:13 PM                                                    #1052964 v14 (1049414_.DOC)

SECTION 2.16.    Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Revolving Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.11(f) and is revoked in accordance therewith), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.19, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the eurodollar market.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.17.    Taxes.

(a)    Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent, Lender or Issuing Bank (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    The Borrower shall indemnify the Administrative Agent, each Lender and the Issuing Bank, within 30 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent, such Lender or the Issuing Bank, as the case may be, on or with respect to any payment by or on account of any obligation of the Borrower hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender or the Issuing Bank, or by the Administrative Agent on its own behalf or on behalf of a Lender or the Issuing Bank, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the

#1052964 v14 (1049414_.DOC)

1754 original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment,
1755 a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to
1756 the Administrative Agent.

1757    (e)  Any Foreign Lender that is entitled to an exemption from or reduction of with-
1758 holding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such
1759 jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with
1760 a copy to the Administrative Agent), at the time or times prescribed by applicable law and at such other
1761 times as may be necessary in the determination of Borrower or Administrative Agent (each in the reason-
1762 able exercise of its discretion), (a) two original copies of Internal Revenue Service Form W‑‑‑8BEN, W‑
1763 ‑‑8IMY, or W‑‑‑8ECI (or any successor forms), properly completed and duly executed by such Foreign
1764 Lender, and such other documentation required under the Code and reasonably requested by Borrower to
1765 establish that such Foreign Lender is not subject to deduction or withholding of United States federal in-
1766 come Tax with respect to any payments to such Foreign Lender of principal, interest, fees, or other
1767 amounts payable under this Agreement or any of the Loan Documents or is subject to deduction or with-
1768 holding at a reduced rate, or (b) if such Foreign Lender is not a "bank" or other Person described in Sec-
1769 tion 881(c)(3) of the Code and is claiming exemption from United States federal withholding tax under
1770 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a Certificate Regarding
1771 Non-Bank Status together with two original copies of Internal Revenue Service Form W-8BEN (or any
1772 successor form), properly completed and duly executed by such Foreign Lender, and such other documen-
1773 tation required under the Code and reasonably requested by Borrower to establish that such Foreign
1774 Lender is not subject to deduction or withholding of United States federal income Tax with respect to any
1775 payments to such Foreign Lender of interest payable under this Agreement or any of the Loan Docu-
1776 ments.  Each Foreign Lender required to deliver any forms, certificates, or other evidence with respect to
1777 United States federal income Tax-withholding matters pursuant to this Section 2.17(e) hereby agrees,
1778 from time to time after the initial delivery by such Foreign Lender of such forms, certificates, or other
1779 evidence, whenever a lapse in time or change in circumstances renders such forms, certificates, or other
1780 evidence obsolete or inaccurate in any material respect, that such Foreign Lender shall promptly deliver to
1781 Administrative Agent for transmission to Borrower two new original copies of Internal Revenue Service
1782 Form W-8BEN, W-8IMY, or W-8ECI, or a Certificate Regarding Non-Bank Status and two original cop-
1783 ies of Internal Revenue Service Form W-8BEN (or any successor form), as the case may be, properly
1784 completed and duly executed by such Foreign Lender, and such other documentation required under the
1785 Code and reasonably requested by Borrower to confirm or establish that such Foreign Lender is not sub-
1786 ject to deduction or withholding of United States federal income Tax with respect to payments to such
1787 Foreign Lender under this Agreement or the Loan Documents or is subject to deduction or withholding at
1788 a reduced rate, or notify Administrative Agent and Borrower of its inability to deliver any such forms,
1789 certificates, or other evidence.  Nothing in this Section 2.17 shall be construed to require a Lender, Ad-
1790 ministrative Agent, or Issuing Bank to provide any forms or documentation that it is not legally entitled to
1791 provide.

1792    (f)  Each Lender that is a United States Person (as such term is defined in Section
1793 7701(a)(30) of the Code) for United States federal income Tax purposes (a "United States Lender") shall
1794 deliver to Administrative Agent for transmission to the Borrower, on or prior to the Effective Date (in the
1795 case of each Lender listed on the signature pages hereof on the Effective Date, and at such other times as
1796 may be necessary in the determination of the Borrower or Administrative Agent (each in the reasonable
1797 exercise of its discretion), two original copies of Internal Revenue Service Form W-9 (or any successor
1798 forms), properly completed and duly executed by such Lender, and such other documentation required
1799 under the Code and reasonably requested by the Borrower to establish that such Lender is not subject to
1800 backup withholding under Section 3406 of the Code with respect to any payments to such Lender of prin-
1801 cipal, interest, fees, or other amounts payable under this Agreement or any of the Loan Documents.

1802         (g)    If the Administrative Agent or a Lender determines, in its sole discretion, that it
1803 has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or
1804 with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay
1805 over such refund to the Borrower (but only to the extent of indemnity payments made, or additional
1806 amounts paid, by the Borrower under this Section 2.17 with respect to the Taxes or Other Taxes giving
1807 rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and
1808 without interest (other than any interest paid by the relevant Governmental Authority with respect to such
1809 refund); underline{provided}, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees
1810 to repay the amount refunded to the Borrower (plus any penalties, interest or other charges imposed by
1811 the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Ad-
1812 ministrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This
1813 Section shall not be construed to require the Administrative Agent or any Lender (i) to make available its
1814 Tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or
1815 any other Person or (ii) to determine whether it is entitled to apply for a refund of any Taxes or Other
1816 Taxes.

1817         SECTION 2.18.   Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

1818         (a)    The Borrower shall make each payment required to be made by it hereunder or
1819 under any other Loan Document (whether of principal, interest, fees or reimbursement of LC Disburse-
1820 ments, or of amounts payable under Sections 2.15, 2.16 or 2.17, or otherwise) prior to the time expressly
1821 required hereunder or under such other Loan Document for such payment (or, if no such time is expressly
1822 required, prior to 12:00 noon, New York City time), on the date when due, in immediately available
1823 funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the dis-
1824 cretion of the Administrative Agent, be deemed to have been received on the next succeeding Business
1825 Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative
1826 Agent at its offices at 270 Park Avenue, New York, New York, except payments to be made directly to
1827 the Issuing Bank or Swingline Lender as expressly provided herein and except that payments pursuant to
1828 Sections 2.15, 2.16, 2.17 and 9.03 shall be made directly to the Persons entitled thereto and payments pur-
1829 suant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent
1830 shall distribute any such payments received by it for the account of any other Person to the appropriate
1831 recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a
1832 day that is not a Business Day, the date for payment shall be extended to the next succeeding Business
1833 Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of
1834 such extension.  All payments under each Loan Document shall be made in dollars.

1835         (b)    If at any time insufficient funds are received by and available to the Administra-
1836 tive Agent to pay fully all amounts of principal, unreimbursed LC Disbursements, interest and fees then
1837 due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due he-
1838 reunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees
1839 then due to such parties, and (ii) second, towards payment of principal and unreimbursed LC Disburse-
1840 ments then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of
1841 principal and unreimbursed LC Disbursements then due to such parties.

1842         (c)    If any Lender shall, by exercising any right of setoff or counterclaim or other-
1843 wise, obtain payment in respect of any principal of or interest on any of its Revolving Loans or participa-
1844 tions in LC Disbursements or Swingline Loans resulting in such Lender receiving payment of a greater
1845 proportion of the aggregate amount of its Revolving Loans and participations in LC Disbursements and
1846 Swingline Loans and accrued interest thereon than the proportion received by any other Lender, then the
1847 Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Re-
1848 volving Loans and participations in LC Disbursements and Swingline Loans of other Lenders to the ex-

1849   tent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accor-
1850   dance with the aggregate amount of principal of and accrued interest on their respective Revolving Loans
1851   and participations in LC Disbursements and Swingline Loans; provided that (i) if any such participations
1852   are purchased and all or any portion of the payment giving rise thereto is recovered, such participations
1853   shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and
1854   (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower
1855   pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a
1856   Lender as consideration for the assignment of or sale of a participation in any of its Loans or participa-
1857   tions in LC Disbursements to any assignee or participant, other than to the Borrower or any Subsidiary or
1858   Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the
1859   foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquir-
1860   ing a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of
1861   set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor
1862   of the Borrower in the amount of such participation.

1863          (d)     Unless the Administrative Agent shall have received notice from the Borrower
1864   prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders
1865   or the Issuing Bank hereunder that the Borrower will not make such payment, the Administrative Agent
1866   may assume that the Borrower has made such payment on such date in accordance herewith and may, in
1867   reliance upon such assumption, distribute to the Lenders or the Issuing Bank, as the case may be, the
1868   amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders
1869   or the Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith
1870   on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day
1871   from and including the date such amount is distributed to it to but excluding the date of payment to the
1872   Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the
1873   Administrative Agent in accordance with banking industry rules on interbank compensation.

1874          (e)     Prior to an Event of Default, if any Lender shall fail to make any payment re-
1875   quired to be made by it pursuant to Sections 2.04(c), 2.05(d) or (e), 2.06(b), 2.18(d) or 9.03(c), then the
1876   Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any
1877   amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such
1878   Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

1879          SECTION 2.19.   Mitigation Obligations; Replacement of Lenders.

1880          (a)     If any Lender requests compensation under Section 2.15, or if the Borrower is
1881   required to pay any additional amount to any Lender or any Governmental Authority for the account of
1882   any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different
1883   lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder
1884   to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or as-
1885   signment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as the case may
1886   be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would
1887   not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable
1888   costs and expenses incurred by any Lender in connection with any such designation or assignment.

1889          (b)     If any Lender requests compensation under Section 2.15, or if the Borrower is
1890   required to pay any additional amount to any Lender or any Governmental Authority for the account of
1891   any Lender pursuant to Section 2.17, or if any Lender becomes a Defaulting Lender, then the Borrower
1892   may, at its sole expense (including any processing and recordation fee) and effort, upon notice to such
1893   Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in
1894   accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obli-

-40-

gations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that (i) the Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Commitment is being assigned, the Issuing Bank and Swingline Lender), which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans and participations in LC Disbursements and Swingline Loans, accrued interest thereon, accrued fees (including any applicable prepayment fee) and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.15 or payments required to be made pursuant to Section 2.17, such assignment will result in a material reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.20.    [Reserved].

SECTION 2.21.    <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Revolving Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    if any Swingline Exposure or LC Exposure exists at the time a Revolving Lender is a Defaulting Lender, the Borrower shall (i) within five Business Days following notice by the Administrative Agent prepay such Swingline Exposure or, if agreed by the Swingline Lender, within one Business Day following notice by the Administrative Agent, cash collateralize the Swingline Exposure of the Defaulting Lender on terms satisfactory to the Swingline Lender and (ii) within one Business Day following notice by the Administrative Agent, cash collateralize such Defaulting Lender's LC Exposure in accordance with the procedures set forth in Section 2.05(j) for so long as such LC Exposure is outstanding; and

(b)    the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Bank shall not be required to issue, amend or increase any Letter of Credit unless it is satisfied that cash collateral will be provided by the Borrower or the applicable Lender in accordance with Section 2.04 and 2.05, as applicable; and

(c)    If the Borrower, the Administrative Agent, Swingline Lender and the Issuing Bank agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to Cash Collateral) that Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may reasonably determine to be necessary to cause the Revolving Commitments and funded and unfunded Letters of Credit and Swingline Loans to be held on a pro rata basis by the Lenders in accordance with their Pro Rata Shares, whereupon that Lender will cease to be a Defaulting Lender; <u>provided</u> that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and <u>provided</u>, <u>further</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

#1052964 v14 (1049414_.DOC)

ARTICLE III

Representations and Warranties

The Borrower represents and warrants to the Lenders that:

SECTION 3.01.    Organization; Powers.  Each of the Borrower and its Subsidiaries is duly organized and validly existing and, except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.    Authorization; Enforceability.  The Emergence Transactions entered into and to be entered into by each Loan Party are within such Loan Party's corporate powers and have been duly authorized by all necessary corporate and, if required, stockholder action.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of the Borrower or such Loan Party (as the case may be), enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03.    Governmental Approvals; No Conflicts.  The Emergence Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of the Borrower or any of its Subsidiaries or any order of any Governmental Authority, (c) will not violate or result in a default under any material indenture, agreement or other instrument binding upon the Borrower or any of its Restricted Subsidiaries or its assets, or give rise to a right thereunder to require any payment to be made by the Borrower or any of its Restricted Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of the Borrower or any of its Restricted Subsidiaries, except Liens created under the Loan Documents, the Security Documents (as defined in the Senior Secured Notes Indenture) and the Security Documents (as defined in the Second Lien Indenture).

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrower has heretofore furnished to the Lenders its consolidated balance sheet and statements of income, stockholders' equity and cash flows (i) as of and for the fiscal year ended March 31, 2010, reported on by Deloitte & Touche LLP, independent public accountants, and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended September 30, 2010, certified by its chief financial officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Except as disclosed in the financial statements referred to above or the notes thereto and except for the Disclosed Matters, none of the Borrower or any of its Subsidiaries has, as of the Effective Date, any material contingent liabilities, unusual long-term commitments or unrealized losses.

-42-

(c)    Since March 31, 2010, there has been no material adverse change in the business, assets, operations or condition, financial or otherwise, of the Borrower and its Subsidiaries, taken as a whole (other than as a result of the Bankruptcy Cases and any effects that may occur as a result thereof).

SECTION 3.05.    Properties.

(a)    Each of the Borrower and its Restricted Subsidiaries has good title to, or valid leasehold interests in, all its real and personal property material to their business (including its Mortgaged Properties), taken as a whole, except for minor defects in title that do not interfere with its ability to con-duct its business as currently conducted or to utilize such properties for their intended purposes.

(b)    Each of the Borrower and its Restricted Subsidiaries owns, or is licensed to use, all trademarks, trade names, copyrights, patents and other intellectual property material to their business, taken as a whole, and the use thereof by the Borrower and its Restricted Subsidiaries does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggre-gate, could not reasonably be expected to result in a Material Adverse Effect.  Schedule 3.05(b) sets forth a complete list of all trademarks, trade names, copyrights, patents and other intellectual property owned by the Borrower and its Restricted Subsidiaries as of the Effective Date that has been duly registered in, filed in or issued by the United States Patent and Trademark Office or the United States Copyright Office or any other appropriate office.

(c)    Schedule 3.05(c) sets forth the address of each real property that is owned or leased by the Borrower or any of its Subsidiaries as of the Effective Date.

(d)    As of the Effective Date, neither the Borrower nor any of its Subsidiaries has re-ceived notice of, or has knowledge of, any pending or contemplated condemnation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation.  Except as set forth on Schedule 3.05(d), none of the Mortgaged Properties or any interest therein is subject to any right of first refusal, option or other contractual right to purchase any such Mortgaged Property or interest therein.

SECTION 3.06.    Litigation and Environmental Matters.

(a)    There are no actions, suits or proceedings by or before any arbitrator or Govern-mental Authority pending against or, to the knowledge of the Borrower, threatened against or affecting the Borrower or any of its Subsidiaries (i) that could reasonably be expected, individually or in the aggre-gate, to result in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any of the Loan Documents or the Emergence Transactions.

(b)    Except for the Disclosed Matters and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, neither the Borrower nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Envi-ronmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim asserting that the Borrower or any of its Subsidiaries is obligated to redress any Environmental Lia-bility or (iv) knows of any basis for any Environmental Liability that the Borrower or any of its Subsidiar-ies is reasonably likely to become obligated to redress.

(c)    Since the Effective Date, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

-43-

SECTION 3.07.    Compliance with Laws and Agreements.  Each of the Borrower and its Subsidiaries is in compliance with all laws, regulations and orders of any Governmental Authority applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.08.    Investment Company Status.  Neither the Borrower nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.09.    Taxes.  Each of the Borrower and its Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) any Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions to fund such Plan) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of such Plan by an amount which, if required to be paid, could reasonably be expected to have a Material Adverse Effect, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions to fund such Plan) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the assets of all such underfunded Plans by an amount which, if required to be paid, could reasonably be expected to have a Material Adverse Effect.

SECTION 3.11.    Disclosure.  The Borrower has disclosed to the Lenders all agreements, instruments and corporate or other restrictions to which the Borrower or any of its Subsidiaries is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of this Agreement, any other Loan Document, or delivered hereunder or thereunder (as modified or supplemented by other information so furnished, taken as a whole) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 3.12.    Subsidiaries.  Schedule 3.12 sets forth the name of, and the ownership interest of the Borrower in, each Subsidiary of the Borrower and identifies each Subsidiary that is a Subsidiary Loan Party, in each case as of the Effective Date.  As of the Effective Date, all Subsidiaries are Restricted Subsidiaries.

SECTION 3.13.    Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Borrower and its Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums in respect of such insurance have been paid in accordance with the applicable policy.  The Borrower believes that the insurance maintained by or on behalf of the Borrower and its Subsidiaries is adequate.

SECTION 3.14.    Labor Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns against the Borrower or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  The hours worked by and payments made to employees of the Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters, except for such violations that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  All payments due from the Borrower or any Restricted Subsidiary, or for which any claim may be made against the Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Borrower or such Restricted Subsidiary, except for such payments which, if not paid or accrued, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The consummation of the Emergence Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Borrower or any Subsidiary is bound, except for such rights of termination or renegotiation, which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.15.    Solvency.  Immediately following the making of any Loan made on the Effective Date and after giving effect to the application of the proceeds of such Loans, (a) the fair value of the assets of the Borrower and its Subsidiaries, taken as a whole, at a fair valuation, will exceed their debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Borrower and its Subsidiaries, taken as a whole, will be greater than the amount that will be required to pay the probable liability of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower and its Subsidiaries, taken as a whole, will be able to pay their respective debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Borrower and its Subsidiaries, taken as a whole, will not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the Effective Date.

SECTION 3.16.    Senior Indebtedness.  The Obligations constitute "Senior Indebtedness" under and as defined in any indenture under which any subordinated Indebtedness was or is issued.

SECTION 3.17.    Security Documents.

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in the Guarantee and Collateral Agreement).

(b)    When the portion of the Collateral constituting certificated securities (as defined in the Uniform Commercial Code) is delivered to the Administrative Agent, the Guarantee and Collateral Agreement shall constitute a fully perfected first priority Lien on, and security interest in, all right, title and interest of the pledgor thereunder in such Collateral, in each case prior and superior in right to any other Person other than with respect to the Liens on Collateral securing the Senior Secured Notes.  When financing statements in appropriate form are filed in the offices specified on Schedule 6 to the Perfection Certificate, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in such Collateral (other than the Intellectual Property (as defined in the Guarantee and Collateral Agreement)), to the extent such security interests can be perfected by the filing of financing statements, in each case prior and superior in right to any other Person, other than with respect to Liens expressly permitted by this Agreement or the Guarantee and Collateral Agreement.  When control agreements are entered into with the financial institutions specified on Schedule 13 to the Perfection Certificate, the Guarantee and Collateral Agreement shall constitute

-45-

a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in all deposit accounts, securities accounts, and Collateral contained in such accounts, and any other Collateral as set forth in such control agreement, to the extent such security interests can be perfected by the entering into of such control agreements, in each case prior and superior in right to any other Person, other than with respect to Liens expressly permitted by this Agreement or the Guarantee and Collateral Agreement.

(c)    When the Guarantee and Collateral Agreement, a supplement thereto or other appropriate notice is filed in the United States Patent and Trademark Office and the United States Copyright Office, the security interest created thereunder shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the domestic Intellectual Property (as defined in the Guarantee and Collateral Agreement) in which a security interest may be perfected by filing, recording or registering a security agreement, financing statement or analogous document in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, in each case prior and superior in right to any other Person, other than with respect to the rights of Persons pursuant to Liens expressly permitted by the Guarantee and Collateral Agreement (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks, trademark applications and copyrights acquired by the Loan Parties after the Effective Date.

(d)    Each of the Intercreditor Agreements is effective and has established the relationship (including with respect to priorities) of the Liens created by the Senior Secured Notes, the Liens created by the Second Lien Notes and the Liens securing the Obligations.

SECTION 3.18.    Margin Stock.  No Loan Party nor any Subsidiary thereof is engaged principally or as one of its activities in the business of extending credit for the purpose of "purchasing" or "carrying" any "margin stock" (as each such term is defined or used, directly or indirectly, in Regulation U of the Board).  No part of the proceeds of any of the Loans or Letters of Credit will be used for purchasing or carrying margin stock or for any purpose which violates, or which would be inconsistent with, the provisions of Regulation T, U or X of the Board.  If requested by any Lender (through the Administrative Agent) or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

SECTION 3.19.    Anti-Terrorism Laws.

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or Affiliate (i) has violated or is in violation of Anti-Terrorism Laws or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in the "Forty Recommendations" and "Nine Special Recommendations" published by the Organisation for Economic Co-operation and Development's Financial Action Task Force on Money Laundering.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Party, such Subsidiary or such Affiliate that is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person.

(c)    No Loan Party, none of its Subsidiaries and, to the knowledge of each Loan Party, none of its Affiliates and none of the respective officers, directors, brokers or agents of such Loan Par-

ty, such Subsidiary or such Affiliate acting or benefiting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person, (ii) deals in, or otherwise engages in any transaction related to, any property or interests in property blocked pursuant to any Anti-Terrorism Law or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

ARTICLE IV

<u>Conditions</u>

SECTION 4.01.   <u>Effective Date</u>.  The obligations of the Lenders to make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of each of (i) Akin, Gump, Strauss, Hauer & Feld LLP, counsel for the Borrower and (ii) David Olson, Esq., Corporate Counsel for the Borrower, in the case of each such opinion required by this paragraph, covering such matters relating to the Loan Parties, the Loan Documents and the Emergence Transactions as the Administrative Agent or the Required Lenders shall reasonably request and reasonably satisfactory in form and substance to the Administrative Agent.  The Borrower hereby requests such counsel to deliver such opinions.

(c)     The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of each Loan Party, the authorization of the Emergence Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Emergence Transactions, all in form and substance reasonably satisfactory to the Administrative Agent and its counsel.

(d)     The Administrative Agent shall have received (i) a certificate, dated the Effective Date and signed by the President or a Vice President of the Borrower or a Financial Officer, confirming compliance with the conditions set forth in paragraphs (a) and (b) of Section 4.02 and (ii) a solvency certificate in the form of Exhibit C hereto dated the Effective Date and signed by the chief financial officer of the Borrower.

(e)     The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel) required to be reimbursed or paid by any Loan Party hereunder or under any other Loan Document.

(f)     The Administrative Agent shall have received executed counterparts of each of the Intercreditor Agreement duly executed by each party thereto.

-47-

(g)    The Administrative Agent shall have received from each Loan Party a counter-part of the Guarantee and Collateral Agreement duly executed and delivered on behalf of such Loan Party, together with the following:

(i)    certificates representing all the outstanding Equity Interests of the Borrower and each Subsidiary owned by or on behalf of any Loan Party as of the Effective Date (except that certificates representing shares of voting stock of a Foreign Subsidiary may be limited to 65% of the outstanding shares of voting stock of such Foreign Subsidiary), promissory notes evidencing all intercompany Indebtedness owed to any Loan Party by the Borrower or any Subsidiary as of the Effective Date and stock powers and instruments of transfer, endorsed in blank, with respect to such stock certificates and promissory notes;

(ii)    all documents and instruments, including Uniform Commercial Code financing statements and filings with the United States Patent and Trademark Office and United States Copyright Office, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to create or perfect the Liens intended to be created under the Guarantee and Collateral Agreement;

(iii)    certified copies of UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate or that the Administrative Agent deems necessary or appropriate, none of which encumber the Lien intended to be created under the Guarantee and Collateral Agreement;

(iv)    all other certificates, agreements, including Control Agreements, or instruments necessary to perfect the Liens intended to be created under the Guarantee and Collateral Agreement in all Chattel Paper, all Instruments, all Deposit Accounts and all Investment Property of each Loan Party (as each such term is defined in and to the extent required by the Guarantee and Collateral Agreement); and

(v)    a completed Perfection Certificate dated the Effective Date and signed by an executive officer or Financial Officer of the Borrower, together with all attachments contemplated thereby, including the results of a search of the Uniform Commercial Code (or equivalent) filings made with respect to the Loan Parties in the jurisdictions contemplated by the Perfection Certificate and copies of the financing statements (or similar documents) disclosed by such search and evidence reasonably satisfactory to the Administrative Agent that the Liens indicated by such financing statements (or similar documents) are permitted by this Agreement and the Guarantee and Collateral Agreement or have been released.

(h)    The Administrative Agent shall have received copies of insurance certificates evidencing the insurance required by Section 5.07 and the Security Documents is in effect, each of which will be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Administrative Agent, on behalf of the Lenders, as additional insured, in form and substance reasonably satisfactory to the Administrative Agent, provided that if such endorsement or amendment cannot be delivered

-48-

by the Effective Date, the Administrative Agent may consent to such endorsement or amendment being delivered at such later date as it reasonably deems appropriate in the circumstances.

(i)    The Bankruptcy Court shall have entered the Confirmation Order, which shall be (i) in form and substance reasonably satisfactory to the Arrangers and (ii) in full force and effect and shall not have been reversed or modified and shall not be stayed.

(j)    The Borrower and its Subsidiaries have no outstanding indebtedness or preferred stock other than (a) Loans under this Agreement in an aggregate principal amount not to exceed $10,000,000, (b) the Senior Secured Notes, (c) up to $140,000,000 of Second Lien Notes issued pursuant to the Reorganization Plan or otherwise (or any new unsecured pay-in-kind notes that are scheduled to mature after the maturity date of the Senior Secured Notes that are issued in lieu of such Second Lien Notes) and (d) up to $2 million of general debt for borrowed money.  Accordingly, the Administrative Agent shall have received releases, satisfactions and payoff letters terminating all other Liens on the Collateral (including all such releases, satisfactions and payoff letters relating to the Indebtedness to be repaid in accordance with the Reorganization Plan), other than Permitted Liens.

(k)    Since March 31, 2010, there has been no Closing Date Material Adverse Effect and no event, circumstance or condition exists which has had or would reasonably be expected to have, individually or in the aggregate, a Closing Date Material Adverse Effect.

(l)    Each Lender shall have received all documentation and other information requested by it to satisfy the requirements of the bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act.

(m)    The Arrangers shall be satisfied that the pro forma ratio of first lien indebtedness (calculated on a gross basis and exclusive of Revolving Loans on the Effective Date to finance upfront fees or original issue discount) to Debt Covenant EBITDA (as defined in the Offering Memorandum) of the Borrower and its Subsidiaries for the four quarters ended September 30, 2010 of the Borrower and its Subsidiaries on a consolidated basis is less than or equal to 3.5 to 1.0.

(n)    Prior to or concurrently with the Effective Date, AMO Escrow Corporation shall have completed the issuance and sale of the Senior Secured Notes and shall have received the Escrow Proceeds (as defined in the Senior Secured Notes Indenture) in an amount not less than $385,000,000 and the Borrower shall have issued the Second Lien Notes in an aggregate principal amount not more than $140,000,000.

(o)    All actions by or on behalf of the Loan Parties, which are necessary or appropriate to implement the Reorganization Plan and all other transactions contemplated to be taken on or prior to the Effective Date by the Reorganization Plan and the Confirmation Order (other than the closing of the credit facility provided hereby) shall have been effected in accordance in all respects with the terms thereof.  All conditions precedent to the confirmation, consummation and effectiveness of the Reorganization Plan (other than the closing of the credit facility provided hereby) shall have been satisfied in the reasonable judgment of the Administrative Agent.  Concurrently with the closing of the credit facility provided hereby, the Reorganization Plan shall have become effective in accordance with the terms of the Reorganization Plan and the Confirmation Order.

-49-

The Administrative Agent shall notify the Borrower and the Lenders of the Effective Date, and such no-
tice shall be conclusive and binding.  Notwithstanding the foregoing, the obligations of the Lenders to
make Loans and of the Issuing Bank to issue Letters of Credit hereunder shall not become effective unless
each of the foregoing conditions is satisfied (or waived pursuant to Section 9.02) at or prior to 5:00 p.m.,
New York City time, on [        ], 2010, and in the event such conditions are not so satisfied or waived,
the Revolving Commitments shall terminate at such time.

SECTION 4.02.    Each Credit Event.  The obligation of each Lender to make a Loan on
the occasion of any Borrowing, and of the Issuing Bank to issue, amend, renew or extend any Letter of
Credit, is subject to receipt of the request therefor in accordance herewith and to the satisfaction of the
following conditions:

(a)        The representations and warranties of each Loan Party set forth in the Loan Doc-
uments shall be true and correct (or, in the case of such representations and warranties that are not
qualified as to materiality, true and correct in all material respects) on and as of the date of such
Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as
applicable, except for representations and warranties that expressly relate to a specific earlier
date, in which case such representations and warranties were true and correct (or in the case of
such representations and warranties that are not qualified as to materiality, true and correct in all
material respects) as of such earlier date.

(b)        At the time of and immediately after giving effect to such Borrowing or the is-
suance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default shall
have occurred and be continuing.

Each Borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be
deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters
specified in paragraphs (a) and (b) of this Section.

ARTICLE V

Affirmative Covenants

Until the Revolving Commitments have expired or been terminated and the principal of
and interest on each Loan and all fees payable hereunder shall have been paid in full and all Letters of
Credit shall have expired or terminated and all LC Disbursements shall have been reimbursed, the Bor-
rower covenants and agrees with the Lenders that:

SECTION 5.01.    Financial Statements and Other Information.  The Borrower will fur-
nish to the Administrative Agent (which shall furnish a copy thereof to each Lender):

(a)        within 90 days after the end of each fiscal year of the Borrower, the audited con-
solidated balance sheet and related statements of operations, stockholders' equity and cash flows
of the Borrower and its Restricted Subsidiaries as of the end of and for such year, setting forth in
each case in comparative form the figures for the previous fiscal year, all reported on by De-
loitte & Touche LLP or other independent public accountants of recognized national standing
(without a "going concern" or like qualification or exception and without any qualification or ex-
ception as to the scope of such audit) to the effect that such consolidated financial statements
present fairly in all material respects the financial condition and results of operations of the Bor-
rower and its Restricted Subsidiaries on a consolidated basis in accordance with GAAP consis-
tently applied, together with a customary management discussion and analysis;

(b)    within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows of the Borrower and its Restricted Subsidiaries, in each case as of the end of and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by one of its Financial Officers as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its Restricted Subsidiaries, in each case on a consolidated basis in accordance with GAAP consistently applied, subject to normal year end audit adjustments and the absence of footnotes, together with a customary management discussion and analysis;

(c)    concurrently with any delivery of financial statements under clause (a) or (b) above, a certificate of a Financial Officer of the Borrower (i) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations demonstrating compliance with Sections 6.01, 6.04, 6.05, 6.08 and 6.12, (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the Borrower's audited financial statements referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate and (iv) listing all Unrestricted Subsidiaries (if any);

(d)    [reserved];

(e)    prior to the commencement of each fiscal year of the Borrower, a detailed consolidated quarterly budget for such fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flow as of the end of and for such fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(f)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower or any Subsidiary with the SEC, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed by the Borrower to its shareholders generally, as the case may be; provided that any such materials posted on the website of the Borrower or the SEC shall be deemed furnished when so posted; and

(g)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of the Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

SECTION 5.02.    Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender prompt written notice of the following:

(a)    the occurrence of any Default;

(b)    the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting the Borrower or any Affiliate thereof that, if adversely determined, could reasonably be expected to result in a Material Adverse Effect;

-51-

(c)    the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000; and

(d)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Information Regarding Collateral.

(a)    The Borrower will furnish to the Administrative Agent prompt written notice of any change (i) in any Loan Party's name, (ii) in the jurisdiction of incorporation or organization of any Loan Party, (iii) in the location of the chief executive office of any Loan Party, (iv) in any Loan Party's identity or type of organization or corporate structure or (v) in any Loan Party's Organizational Identification Number.  The Borrower agrees to promptly provide the Administrative Agent with certified organizational documents reflecting any of the changes described in the first sentence of this paragraph.  The Borrower agrees not to effect or permit any change referred to in the first sentence of this paragraph unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Administrative Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.  The Borrower also agrees promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)    Each year, at the time of delivery of annual financial statements with respect to the preceding fiscal year pursuant to clause (a) of Section 5.01, the Borrower shall deliver to the Administrative Agent a certificate of a Financial Officer and the chief legal officer of the Borrower setting forth the information required pursuant to Section 2 of the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section.  Each certificate delivered pursuant to this Section 5.03(b) shall identify in the format of Schedule  III of the Guarantee and Collateral Agreement all Intellectual Property (as defined in the Guarantee and Collateral Agreement) of any Loan Party in existence on the date thereof and not then listed on such Schedules as previously so identified to the Administrative Agent.

SECTION 5.04.    Existence; Conduct of Business.  The Borrower will, and will cause each of the Subsidiary Loan Parties to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect, its rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under 6.03.

SECTION 5.05.    Payment of Obligations.  The Borrower will, and will cause each of the Restricted Subsidiaries to, pay its Indebtedness and other obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Restricted Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (d) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

-52-

SECTION 5.06.    <u>Maintenance of Properties</u>.  The Borrower will, and will cause each of the Restricted Subsidiaries to, keep and maintain all property material to the conduct of their business, taken as a whole, in good working order and condition, ordinary wear and tear excepted.

SECTION 5.07.    <u>Insurance</u>.  The Borrower will, and will cause each of its Restricted Subsidiaries to, maintain, with financially sound and reputable insurance companies (a) insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations, including insurance against libel actions, and (b) all insurance required to be maintained pursuant to the Security Documents.  The Borrower will furnish to the Lenders, upon request of the Administrative Agent, information in reasonable detail as to the insurance so maintained.

SECTION 5.08.    <u>Casualty and Condemnation</u>.  The Borrower will furnish to the Administrative Agent and the Lenders prompt written notice of any casualty or other insured damage to any material portion of any Collateral or the commencement of any action or proceeding for the taking of any Collateral or any part thereof or interest therein under power of eminent domain or by condemnation or similar proceeding.

SECTION 5.09.    <u>Books and Records; Inspection and Audit Rights</u>.  The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made in accordance with GAAP, consistently applied, of all dealings and transactions in relation to its business and activities.  The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender (coordinated through the Administrative Agent), upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

SECTION 5.10.    <u>Compliance with Laws</u>.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.11.    <u>Use of Proceeds and Letters of Credit</u>.  The proceeds of the Revolving Loans on the Effective Date will be used to pay upfront fees and original issue discount incurred in connection with the Emergence Transactions in an amount not to exceed $10.0 million.  After the Effective Date, the proceeds of the Revolving Loans and Swingline Loans will be used only for general corporate purposes (including, without limitation, for Permitted Acquisitions).  No part of the proceeds of any Loan will be used, whether directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X.  Letters of Credit will be issued only for general corporate purposes.

SECTION 5.12.    <u>Additional Subsidiaries</u>.  If any additional Subsidiary is formed or acquired after the Effective Date or if any Unrestricted Subsidiary is designated as a Restricted Subsidiary, the Borrower will notify the Administrative Agent and the Lenders thereof and (a) if such Subsidiary is a Subsidiary Loan Party, the Borrower will cause such Subsidiary to become a party to the Guarantee and Collateral Agreement within five Business Days after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations as the Administrative Agent or the Required Lenders shall reasonably request and (b) if any Equity Interest in or Indebtedness of such Subsidiary is owned by or on behalf of any Loan Party, the Borrower will cause such Equity Interests and promissory notes evidencing such Indebtedness to be pledged pursuant to the Guarantee and Collateral Agreement within five Business Days after such Subsidiary is formed or ac-

#1052964 v14 (1049414_.DOC)

2461  quired (except that, if such Subsidiary is a Foreign Subsidiary, shares of voting stock of such Subsidiary
2462  to be pledged pursuant to the Guarantee and Collateral Agreement shall be limited to 65% of the out-
2463  standing shares of voting stock of such Subsidiary).

2464            SECTION 5.13.    Further Assurances.

2465            (a)      The Borrower will, and will cause each Subsidiary Loan Party to, execute any
2466  and all further documents, financing statements, agreements, account control agreements, and instru-
2467  ments, and take all such further actions (including the filing and recording of financing statements, fixture
2468  filings, mortgages, deeds of trust and other documents), which may be required under any applicable law,
2469  or which the Administrative Agent or the Required Lenders may reasonably request, to effectuate the
2470  transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens
2471  created or intended to be created by the Security Documents or the validity or priority of any such Lien,
2472  all at the expense of the Loan Parties.  The Borrower also agree to provide to the Administrative Agent,
2473  from time to time upon request, evidence reasonably satisfactory to the Administrative Agent as to (x) the
2474  perfection and priority of the Liens created or intended to be created by the Security Documents, and (y)
2475  the compliance of any Unrestricted Subsidiaries with the definition thereof.

2476            (b)      If any material assets (including any owned real property or improvements there-
2477  to or any interest therein, but excluding any leasehold interests in real property) are acquired by the Bor-
2478  rower or any Subsidiary Loan Party after the Effective Date (other than assets constituting Collateral un-
2479  der the Guarantee and Collateral Agreement that become subject to the Lien of the Guarantee and Colla-
2480  teral Agreement upon acquisition thereof), the Borrower will promptly (and in no event later than ten (10)
2481  Business Days after such acquisition) notify the Administrative Agent and the Lenders thereof, and, if
2482  requested by the Administrative Agent or the Required Lenders, the Borrower will promptly (and in no
2483  event later than (x) ten (10) Business Days after the later of (i) such acquisition or (ii) such request in re-
2484  spect of an acquisition of assets other than owned real property, and (y) 45 days after the later of (x) such
2485  acquisition or (y) such request in respect of an acquisition of any owned real property, which period in the
2486  case of this clause (y), may be extended by the Administrative Agent in its discretion) cause such assets to
2487  be subjected to a Lien securing the Obligations and will take, and cause the Subsidiary Loan Parties to
2488  take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and
2489  perfect such Liens, including actions described in paragraph (a) of this Section, all at the expense of the
2490  Loan Parties.

2491            SECTION 5.14.    Perfection of Certain Liens.  Within thirty (30) Business Days after the
2492  Effective Date (subject to extension by the Administrative Agent in its discretion), the Loan Parties shall
2493  comply with the requirements of the Guarantee and Collateral Agreement relating to the perfection of se-
2494  curity interests in Collateral consisting of Deposit Accounts and Investment Property (as such terms are
2495  defined in the Guarantee and Collateral Agreement).

2496                                    ARTICLE VI
2497
2498                                    Negative Covenants

2499            Until the Revolving Commitments have expired or terminated and the principal of and in-
2500  terest on each Loan and all fees payable hereunder have been paid in full and all Letters of Credit have
2501  expired or terminated and all LC Disbursements shall have been reimbursed, the Borrower covenants and
2502  agrees with the Lenders that:

-54-

2503            SECTION 6.01.    <u>Indebtedness; Certain Equity Securities</u>.

2504            (a)        The Borrower will not, and will not permit any Restricted Subsidiary to, create,
2505    incur, assume or permit to exist any Indebtedness, except:

2506            (i)        Indebtedness created under the Loan Documents;

2507            (ii)        Indebtedness existing on the Effective Date permitted to be outstanding under the
2508    Reorganization Plan and set forth in Schedule 6.01 and extensions, renewals and replacements of
2509    any such Indebtedness that do not increase the outstanding principal amount thereof or result in
2510    an earlier maturity date or decreased weighted average life thereof;

2511            (iii)        subject to Section 6.04, Indebtedness of the Borrower to any Restricted Subsidi-
2512    ary and of any Restricted Subsidiary to the Borrower or any other Restricted Subsidiary;

2513            (iv)        Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Re-
2514    stricted Subsidiary of Indebtedness of the Borrower or any other Subsidiary; <u>provided</u> that
2515    (A) Guarantees by the Borrower or any Restricted Subsidiary of Indebtedness of any Subsidiary
2516    that is not a Loan Party shall be subject to Section 6.04 and (B) a Restricted Subsidiary that is not
2517    a Loan Party shall not Guarantee any Indebtedness of any Loan Party;

2518            (v)        Indebtedness of the Borrower or any Restricted Subsidiary incurred to finance
2519    the acquisition, construction or improvement of any fixed or capital assets, including Capital
2520    Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such
2521    assets or secured by a Lien on any such assets in each case, prior to or within 180 days after the
2522    acquisition, construction or improvement of such assets, and extensions, renewals and replace-
2523    ments of any such Indebtedness that do not increase the outstanding principal amount thereof;
2524    <u>provided</u> that the aggregate principal amount of Indebtedness permitted by this clause (v) at any
2525    time outstanding shall not exceed $15,000,000;

2526            (vi)        Indebtedness of any Person that becomes a Restricted Subsidiary after the Effec-
2527    tive Date and extensions, renewals and replacements of any such Indebtedness that do not in-
2528    crease the outstanding principal amount thereof; <u>provided</u> that such Indebtedness exists at the
2529    time such Person becomes a Restricted Subsidiary and is not created in contemplation of or in
2530    connection with such Person becoming a Restricted Subsidiary;

2531            (vii)        the Senior Secured Notes and the Second Lien Notes and any Permitted Refi-
2532    nancing Indebtedness incurred to refinance any Indebtedness permitted under this clause (vii);

2533            (viii)        obligations in respect of performance, bid, appeal and surety bonds and comple-
2534    tion guarantees provided by the Borrower or any of its Restricted Subsidiaries in the ordinary
2535    course of business;

2536            (ix)        Indebtedness in respect of earn-outs relating to Permitted Acquisitions that are
2537    based on the income of the assets acquired in such Permitted Acquisition after the consummation
2538    thereof;

2539            (x)        Indebtedness to the seller in respect of any Permitted Acquisition; <u>provided</u> such
2540    Indebtedness is subordinated to the Obligations on terms satisfactory to the Administrative Agent;

(xi)     Indebtedness under Hedging Agreements, other than those entered into for spe-
culative purposes;

(xii)     other Indebtedness in an aggregate principal amount not exceeding $25,000,000
at any time outstanding;

(xiii)     Indebtedness incurred by the Borrower or any of its Restricted Subsidiaries con-
stituting reimbursement obligations with respect to letters of credit issued in the ordinary course
of business, including letters of credit in respect of workers' compensation claims, or other Indeb-
tedness with respect to reimbursement type obligations regarding workers' compensation claims;
provided, however, that such letters of credit are not drawn;

(xiv)     Indebtedness arising from agreements of the Borrower or its Restricted Subsidi-
aries providing for indemnification, adjustment of purchase price or similar obligations, in each
case, incurred or assumed in connection with the disposition of any business, assets or a Subsidi-
ary , other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of
such business, assets, or a Subsidiary for the purpose of financing such acquisition; provided,
however, that the maximum assumable liability in respect of all such Indebtedness shall at no
time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-
cash proceeds being measured at the time received and without giving effect to any subsequent
changes in value) actually received by the Borrower and its Restricted Subsidiaries in connection
with such disposition;

(xv)     Indebtedness arising from the honoring by a bank or other financial institution of
a check, draft or similar instrument drawn against insufficient funds in the ordinary course of
business; provided that such Indebtedness is extinguished within two Business Days of its incur-
rence;

(xvi)     Indebtedness of the Borrower or any of its Restricted Subsidiaries consisting of
(x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply ar-
rangements, in each case incurred in the ordinary course of business;

(xvii)     Indebtedness consisting of Indebtedness issued by the Borrower or any of the Re-
stricted Subsidiaries to current or former officers, directors and employees thereof, their respec-
tive estates, spouses or former spouses, in each case to finance the purchase or redemption of Eq-
uity Interests of the Borrower or a Restricted Subsidiary;

(xviii)     customer deposits and advance payments received in the ordinary course of busi-
ness from customers for goods purchased in the ordinary course of business;

(xix)     Indebtedness owed on a short term basis of no longer than 30 days to banks and
other financial institutions incurred in the ordinary course of business of the Borrower and the
Restricted Subsidiaries with such banks or financial institutions that arises in connection with or-
dinary banking arrangements to manage cash balances of the Borrower and the Restricted Subsid-
iaries;

(xx)     all premiums (if any), interest (including post-petition interest), fees, expenses,
charges and additional or contingent interest on obligations described in clauses (i) through (xix)
above; and

-56-

(xxi)    additional unsecured Indebtedness of the Borrower or any Restricted Subsidiary, if the Consolidated Leverage Ratio on a consolidated basis for the Borrower and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred would have been less than 4.50 to 1.00; provided that, (x) the amount of Indebtedness that may be incurred by Restricted Subsidiaries that are not Subsidiary Loan Parties under this clause (xxi) shall not exceed $10,000,000 at any one time outstanding and (y) such Indebtedness (i) has a final maturity date 91 days after the Maturity Date and (ii) has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Loans.

(b)    The Borrower will not, nor will it permit any Restricted Subsidiary to, issue any preferred stock or other preferred Equity Interests (other than preferred stock that is issued by any Restricted Subsidiary to the Borrower or a Subsidiary Loan Party that is not Disqualified Stock).

SECTION 6.02.    Liens.

(a)    The Borrower will not, and will not permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except:

(i)    Liens created under the Loan Documents;

(ii)    Permitted Encumbrances;

(iii)    any Lien on any property or asset of the Borrower or any Restricted Subsidiary existing on the Effective Date permitted to be outstanding on the Effective Date by the Reorganization Plan and set forth in Schedule 6.02; provided that (A) such Lien shall not apply to any other property or asset of the Borrower or any Restricted Subsidiary beyond such property subject to a Lien on the Effective Date and (B) such Lien shall secure only those obligations which it secures on the Effective Date and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(iv)    any Lien existing on any property or asset prior to the acquisition thereof by the Borrower or any Subsidiary after the Effective Date or existing on any property or asset of any Person that becomes a Restricted Subsidiary after the Effective Date prior to the time such Person becomes a Restricted Subsidiary; provided that (A) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Restricted Subsidiary, as the case may be, (B) such Lien shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary and (C) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(v)    Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Restricted Subsidiary; provided that (A) such security interests secure Indebtedness permitted by clause (v) of Section 6.01(a), (B) such security interests and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (C) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such fixed or capital assets and (D) such secu-

-57-

rity interests shall not apply to any other property or assets of the Borrower or any Restricted Subsidiary;

(vi)    Liens arising by operation of law that secure obligations in an aggregate amount not to exceed $5,000,000 at any time outstanding, including Liens imposed pursuant to Environmental Laws securing obligations not reasonably expected to exceed such amount;

(vii)    any sale or assignment of accounts receivable permitted by clause (c) of Section 6.05;

(viii)    other Liens on assets that do not constitute Collateral; provided, that the aggregate amount of all obligations secured by such Liens does not exceed $15,000,000 in the aggregate at any time outstanding;

(ix)    Liens on Collateral securing the Senior Secured Notes, the Second Lien Notes or Permitted Refinancing Indebtedness in respect thereof incurred pursuant to this Agreement so long as such Liens are subject to the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, as applicable;

(x)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(xi)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries and do not secure any Indebtedness;

(xii)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Borrower and its Restricted Subsidiaries in the ordinary course of business;

(xiii)    Liens in favor of the Borrower or any Subsidiary Loan Party;

(xiv)    Liens on equipment of the Borrower or any of its Restricted Subsidiaries granted in the ordinary course of business to the Borrower's clients not related to Indebtedness;

(xv)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(xvi)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(xvii)    Liens (x) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or any comparable or successor provision) on items in the course of collection, (y) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (z) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

-58-

2661      (xviii)    Liens encumbering reasonable customary initial deposits and margin deposits
2662 and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred
2663 in the ordinary course of business and not for speculative purposes;

2664      (xix)    Liens that are contractual rights of set-off (x) relating to the establishment of de-
2665 pository relations with banks not given in connection with the issuance of Indebtedness, (y) relat-
2666 ing to pooled deposit or sweep accounts of the Borrower or any of its Restricted Subsidiaries to
2667 permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business
2668 of the Borrower and its Restricted Subsidiaries or (z) relating to purchase orders and other agree-
2669 ments entered into with customers of the Borrower or any of its Restricted Subsidiaries in the or-
2670 dinary course of business;

2671      (xx)    any encumbrance or restriction (including put and call arrangements) with re-
2672 spect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or
2673 similar agreement;

2674      (xxi)    Liens arising out of conditional sale, title retention, consignment or similar ar-
2675 rangements for the sale or purchase of goods entered into by the Borrower or any of its Restricted
2676 Subsidiaries in the ordinary course of business; and

2677      (xxii)    Liens on the Equity Interests of Unrestricted Subsidiaries.

2678      (xxiii)    Liens securing obligations under the Hedging Agreements, other than those en-
2679 tered into for speculative purposes;

2680      (xxiv)    Liens deemed to exist in connection with investments in repurchase agreements
2681 permitted under Section 6.01; provided that such Liens do not extend to any assets other than
2682 those that are the subject of such repurchase agreements; and

2683      (xxv)    Liens arising from the deposit of funds or securities in trust for the purpose of
2684 decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such de-
2685 creasing or defeasing of Indebtedness are permitted under Section 6.08.

2686      In addition, Borrower agrees that it shall not, and shall not permit any Restricted Subsidiary to,
2687 grant or permit or suffer to exist any Liens on any asset or property to secure the Senior Secured Notes
2688 unless has granted a Lien on such asset or property to secure the Obligations.

2689      SECTION 6.03.    Fundamental Changes.

2690      (a)    The Borrower will not, nor will it permit any Restricted Subsidiary to, merge into
2691 or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or
2692 liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no De-
2693 fault shall have occurred and be continuing (i) any Person may merge into the Borrower in a transaction
2694 in which the Borrower is the surviving corporation, (ii) any Person may merge into any Restricted Subsid-
2695 iary in a transaction in which the surviving entity is a Restricted Subsidiary and (if any party to such mer-
2696 ger is a Subsidiary Loan Party) is a Subsidiary Loan Party, (iii) any Restricted Subsidiary may liquidate
2697 or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best in-
2698 terests of the Borrower and is not materially disadvantageous to the Lenders and (iv) any Restricted Sub-
2699 sidiary that is part of an asset sale permitted under this Agreement may merge with another entity in order
2700 to effect a sale of such Subsidiary; provided that such merger is treated as a sale of assets and otherwise
2701 complies with, and is permitted by, this Agreement; provided that any such merger involving a Person

     

2702 that is not a wholly owned Restricted Subsidiary immediately prior to such merger shall not be permitted
2703 unless also permitted by Section 6.04.

2704         (b)      The Borrower will not, and will not permit any of its Restricted Subsidiaries to,
2705 engage to any material extent in any business other than businesses of the type conducted by the Borrow-
2706 er and its Restricted Subsidiaries on the Effective Date and businesses reasonably related thereto.

2707         SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  The
2708 Borrower will not, and will not permit any of its Restricted Subsidiaries to, purchase, hold or acquire (in-
2709 cluding pursuant to any merger with any Person that was not a wholly owned Restricted Subsidiary prior
2710 to such merger) any Equity Interests in or evidences of indebtedness or other securities (including any
2711 option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or ad-
2712 vances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest
2713 in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any
2714 assets of any other Person constituting a business unit, except:

2715         (a)      Permitted Investments;

2716         (b)      investments existing on the Effective Date and set forth on Schedule 6.04;

2717         (c)      investments by the Borrower and its Restricted Subsidiaries in Equity Interests in
2718 their respective Restricted Subsidiaries; provided that (i) any such Equity Interests in a Subsidiary
2719 held by a Loan Party shall be pledged pursuant to the Guarantee and Collateral Agreement (sub-
2720 ject to the limitations applicable to the pledge of Equity Interests in Foreign Subsidiaries set forth
2721 in Section 5.12), and (ii) the aggregate amount of investments by Loan Parties in, and loans and
2722 advances by Loan Parties to, and Guarantees by Loan Parties of Indebtedness of, Restricted Sub-
2723 sidiaries that are Foreign Subsidiaries (including all such investments, loans, advances and Guar-
2724 antees existing on the Effective Date) shall not exceed the greater of (x) $10,000,000 and (y)
2725 1.0% of Total Assets, at any time outstanding, when combined with any Investments in Foreign
2726 Subsidiaries under clauses (g) and (i) of this Section 6.04 (it being understood that, for purposes
2727 of determining outstanding investments in Restricted Subsidiaries that are Foreign Subsidiaries,
2728 the sale or disposition by a Loan Party of an investment in a Restricted Subsidiary that is a For-
2729 eign Subsidiary shall be deemed to reduce investments in Restricted Subsidiaries that are Foreign
2730 Subsidiaries by an amount equal to the Net Proceeds of such sale or disposition);

2731         (d)      loans or advances made by the Borrower to any Subsidiary and made by any Re-
2732 stricted Subsidiary to the Borrower or any other Subsidiary; provided that the amount of such
2733 loans and advances made by Loan Parties to Unrestricted Subsidiaries, or to Restricted Subsidiar-
2734 ies that are Foreign Subsidiaries, shall be subject to the limitations set forth in clauses (c) and (i)
2735 of this Section 6.04;

2736         (e)      Guarantees constituting Indebtedness permitted by Section 6.01; provided that
2737 (i) a Restricted Subsidiary shall not Guarantee any Indebtedness of the Borrower or any Subsid-
2738 iary Loan Party unless (A) such Restricted Subsidiary also has Guaranteed the Obligations pur-
2739 suant to the Guarantee and Collateral Agreement, (B) in the case of any Guarantee of Subordi-
2740 nated Debt, such Guarantee is subordinated to such Guarantee of the Obligations on terms no less
2741 favorable to the Lenders than the subordination provisions of the applicable Subordinated Debt
2742 and (C) such Guarantee provides for the release and termination thereof, without action by any
2743 party, upon the sale or transfer of the Equity Interests of such Restricted Subsidiary as a result of
2744 a foreclosure of the Lien on such Equity Interests that secures the Obligations, where (1) after
2745 such sale or transfer, such Restricted Subsidiary is no longer a Subsidiary and (2) the Net

Proceeds resulting from such sale or transfer are applied in accordance with the terms of the applicable Guaranteed Indebtedness that would apply to a sale of such Equity Interests by the Borrower, and (ii) the aggregate principal amount of Indebtedness of Unrestricted Subsidiaries, or of Restricted Subsidiaries that are Foreign Subsidiaries, that is Guaranteed by any Loan Party shall be subject to the limitations set forth in clauses (c), (d), and (i) of this Section 6.04;

(f)    loans and advances to, or guarantees of Indebtedness of, officers, directors and employees in an amount not to exceed $5.0 million at any time outstanding;

(g)    investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)    Permitted Acquisitions; provided that the amount of such Investments in respect of Permitted Acquisitions of Restricted Subsidiaries that are Foreign Subsidiaries shall be subject to the limitations set forth in clause (c) of this Section 6.04;

(i)    any investments in or loans to any other Person received as noncash consideration for sales, transfers, leases and other dispositions permitted by Section 6.05;

(j)    any other investments in, advances or loans to or Guarantees of Indebtedness of, any Person in an aggregate amount not to exceed, when combined with any amounts permitted to be invested, loaned, guaranteed, or advanced under Section 6.04(c)(ii), the greater of (x) $50,000,000 and (y) 5.0% of Total Assets, at any time outstanding; provided, however, that (x) no more than an amount equal to the greater of (x) $10,000,000 and (y) 1.0% of Total Assets, may be used for the purposes permitted under Section 6.04(c)(ii); (y) to the extent any investments, advances, loans, or Guarantees of Indebtedness permitted under this Section 6.04(i) are used for Joint Ventures, the Equity Interests (or similar interests) held by the Borrower or any Restricted Subsidiary in such Joint Venture shall be pledged pursuant to the Guarantee and Collateral Agreement (subject to the limitations applicable to the pledge of Equity Interests in Foreign Subsidiaries set forth in Section 5.12); and (z) the aggregate amount of investments in, advances or loans to or Guarantees of Indebtedness of, Unrestricted Subsidiaries shall not exceed (x) $10,000,000 and (y) 1.0% of Total Assets, at any time outstanding (it being understood that, for purposes of determining under this Agreement the amount of outstanding investments in Unrestricted Subsidiaries, the sale or disposition by a Loan Party of an investment in an Unrestricted Subsidiary shall be deemed to reduce investments in Unrestricted Subsidiaries by an amount equal to the Net Proceeds of such sale or disposition;

(k)    Guarantees by the Borrower of obligations (other than Indebtedness) of a Subsidiary Loan Party;

(l)    Investments in Hedge Agreements permitted under Section 6.01;

(m)    Loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business; and

(n)    prepaid expenses, deposits, advances, loans or extensions of trade credit in the ordinary course of business by the Borrower or any Restricted Subsidiary.

-61-

SECTION 6.05.   Asset Sales.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any of its Restricted Subsidiaries to issue any additional Equity Interest in such Restricted Subsidiary, except:

(a)     sales or dispositions of cash, inventory, used or surplus equipment and Permitted Investments in the ordinary course of business;

(b)     (i) sales, transfers and dispositions to the Borrower or a Restricted Subsidiary and (ii) the making of an investment permitted by Section 6.04;

(c)     sales of accounts receivable (i) that are delinquent or the amount of which is in dispute, in each case in connection with the compromise or collection thereof in the ordinary course of business, or (ii) of any account debtor in connection with the termination, wind-down or restructuring of the relationship with such account debtor in the ordinary course of business;

(d)     sales, transfers and other dispositions of assets (other than the sale of less than all of the Equity Interests in a Subsidiary owned by the Borrower and its Subsidiaries) that are not permitted by any other clause of this Section; provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this clause (d) shall not exceed $100,000,000 in the aggregate prior to the Maturity Date and no more than $25,000,000 in any four quarter period;

(e)     the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(f)     the granting of Liens not prohibited hereby; and

(g)     the licensing or sublicensing of intellectual property or other general intangibles in the ordinary course of business;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (b) above) shall be made for fair value and for at least 80% cash consideration and provided further, that the aggregate noncash consideration received for all sales, transfers, leases and other dispositions permitted hereby shall not exceed $20,000,000.

SECTION 6.06.   Sale and Leaseback Transactions.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereinafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, except for any such sale of any fixed or capital assets that is made for cash consideration in an amount not less than the cost of such fixed or capital asset and is consummated within 180 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset.

SECTION 6.07.   [Reserved].

SECTION 6.08.   Restricted Payments; Certain Payments of Indebtedness.

(a)     Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent

or otherwise) to do so, except (i) Borrower may declare and pay dividends with respect to its capital stock payable solely in additional shares of its common stock, (ii) Subsidiaries may declare and pay dividends ratably with respect to their capital stock, (iii) Borrower may make Restricted Payments not exceeding $4,000,000 during any fiscal year, pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the Borrower and its Subsidiaries, (iv) the Borrower may pay dividends to a direct or indirect parent company at such times and in such amounts, not exceeding $2,000,000 during any fiscal year, as shall be necessary to permit such direct or indirect parent company to pay reasonable administrative expenses incurred in the ordinary course of its business, (v) Borrower may make Restricted Payments not exceeding $5,000,000 in any fiscal year or $20,000,000 in the aggregate from the Effective Date, to repurchase Equity Interests in the Borrower owned by employees or former employees of the Borrower or the Subsidiaries pursuant to the terms of agreements (including employment agreements) with such employees, (vi) any Restricted Subsidiary may make Restricted Payments to any Restricted Subsidiary or the Borrower, to pay any Tax with respect to income attributable to the party making such Restricted Payments as the result of such party being a member of a consolidated, affiliated or unitary group (for tax purposes) that includes the Borrower as its parent, (vii) the Borrower may pay, prepay, redeem or acquire the Second Lien Notes or Permitted Refinancing Indebtedness thereof incurred pursuant to Section 6.01(a)(vii) with the Net Proceeds of (or, in the case of Permitted Refinancing Indebtedness, in exchange for) Permitted Refinancing Indebtedness, (provided, in the case of each payment, prepayment, redemption or acquisition permitted by this clause (vii), that any Indebtedness so paid, prepaid, redeemed or acquired is cancelled and retired), (viii) payments made by the Borrower or any Restricted Subsidiary in respect of withholding or similar Taxes payable by any employee, director, manager or consultant and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options not exceeding $1,000,000 in any fiscal year of the Borrower, and (ix) other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (ix) and any prepayments of Indebtedness made pursuant to Section 6.08(b)(vii) not to exceed $[2,500,000]; provided that any Restricted Payment otherwise permitted by clause (iii) and clauses (v) through (ix) above shall not be permitted if at the time thereof and after giving effect thereto a Default shall have occurred and be continuing.

(b)    The Borrower will not, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest or premium on any Indebtedness (other than Indebtedness secured on a first lien basis), or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except:

(i)    payment of Indebtedness created under the Loan Documents;

(ii)    payment of regularly scheduled interest and principal payments and any mandatory prepayments and mandatory offers to purchase (including any premiums required under the documents governing such Indebtedness), in each case as and when due (or thereafter) in respect of any Indebtedness (including, without limitation, any regularly scheduled interest payments which the Borrower or such Restricted Subsidiary may elect to pay in cash or by the issuance of additional Indebtedness), other than (x) payments in respect of the Subordinated Debt prohibited by the subordination provisions thereof;

(iii)    refinancings of Indebtedness to the extent that the Indebtedness incurred to refinance such other Indebtedness is permitted under Section 6.01;

(iv)    refinancings of Indebtedness with the Net Proceeds of any issuance of Equity Interests by the Borrower to any Person other than the Borrower or any Restricted Subsidiary;

(v)    payment of Secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(vi)    payments made to pay, prepay, redeem or acquire Indebtedness pursuant to and in compliance with clause (vii) of paragraph (a) of this Section; provided that any Indebtedness so prepaid, redeemed or acquired is cancelled and retired; and

(vii)    other payments in an aggregate amount taken together with all other payments made pursuant to this clause (vii) and any Restricted Payments made pursuant to Section 6.08(a)(ix) not to exceed $2,500,000.

SECTION 6.09.    Transactions with Affiliates.  The Borrower will not, nor will not they permit any Restricted Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates (which, for purposes of this Section 6.09, shall include each Permitted Holder (individually, without giving effect to the stockholders' agreement entered into by certain of the Permitted Holders) (x) that has designated or Controls a majority of the members of the Board of Directors of the Borrower, (y) whose representatives or Affiliates comprise a majority of the members of the Board of Directors of the Borrower, or (z) that holds, directly or indirectly, at least 20% of the total voting power of the voting Equity Interests of the Borrower), except (a) transactions that do not involve the Borrower and are at prices and on terms and conditions not less favorable to the Borrower or such Restricted Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and the Subsidiary Loan Parties not involving any other Affiliate, (c) any payment permitted by the exceptions to Section 6.08, (d) the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Borrower, any of its direct or indirect parent companies or any of its Restricted Subsidiaries, (e) any agreement or arrangement as in effect as of the Effective Date, or any amendment thereto (so long as any such amendment is not materially disadvantageous to the Lenders when taken as a whole as compared to the applicable agreements or arrangement as in effect on the Effective Date), (f) the existence of, or the performance by the Borrower or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which the Borrower or any such Restricted Subsidiary is a party as of the Effective Date and any similar agreements which it may enter into thereafter; provided, however, that the existence of or the performance by the Borrower or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Effective Date shall only be permitted by this clause (f) to the extent that the terms of any such amendment or new agreement are not otherwise materially disadvantageous to the Lenders when taken as a whole, (g) transactions with customers, clients, suppliers or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of this Agreement that are fair to the Borrower and its Restricted Subsidiaries, in the reasonable determination of the board of directors of the Borrower or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party, (h) the issuance of Equity Interests (other than Disqualified Stock) of the Borrower to any Person and any contribution to the capital of the Borrower, (i) payments to the Borrower or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures, which payments are approved by a majority of the board of directors of the Borrower in good faith, (j) the Emergence Transactions, including the payment of fees and expenses in connection therewith, (k) payments or loans (or cancellation of loans) to employees or consultants of the Borrower, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are ap-

#1052964 v14 (1049414_.DOC)

proved by the Borrower in good faith, (l) transactions between the Borrower or any of its Restricted Sub-
sidiaries and any Person a director of which is also a director of the Borrower or any direct or indirect
parent of the Borrower; provided, however, that such director abstains from voting as a director of the
Borrower or such direct or indirect parent, as the case may be, on any matter involving such other Person,
(m) transactions permitted by, and complying with, Section 6.03 hereof, (n) the pledge of Equity Interests
of an Unrestricted Subsidiary to lenders of such Unrestricted Subsidiary to support the Indebtedness of
such Unrestricted Subsidiary owed to such lenders and (o) any transaction with (or for the benefit of) a
Person that would constitute an Affiliate Transaction solely because the Borrower or a Restricted Subsidi-
ary owns an equity interest in or otherwise controls such Person.

SECTION 6.10.    Restrictive Agreements.  The Borrower will not, nor will not they
permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agree-
ment or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the
Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its property
or assets, or (b) the ability of any Restricted Subsidiary to pay dividends or other distributions with re-
spect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other
Restricted Subsidiary or to Guarantee Indebtedness of the Borrower or any other Restricted Subsidiary;
provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or applicable
rule, regulation or order by any Loan Document, the Senior Secured Notes Indenture or the Second
Lien Indenture, (ii) the foregoing shall not apply to restrictions and conditions existing on the Effective
Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope
of any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and con-
ditions contained in agreements relating to the sale of a Subsidiary or asset pending such sale, provided
such restrictions and conditions apply only to the Subsidiary or asset that is to be sold and such sale is
permitted hereunder, (iv) clause (a) of the foregoing shall not apply to restrictions or conditions imposed
by any agreement relating to Indebtedness permitted by this Agreement if and to the extent that such
agreement relating to such Indebtedness shall permit any and all Liens, whether entered into, incurred or
permitted to exist prior to, on or after the date of such agreement, securing any Obligations, whether such
Obligations arise prior to, on or after the date of such agreement, and any Indebtedness incurred to refin-
ance any such Obligations, (v) clause (a) of the foregoing shall not apply to restrictions or conditions im-
posed by any agreement relating to Indebtedness of a Foreign Subsidiary permitted by this Agreement if
such restrictions or conditions apply only to the property or assets of such Foreign Subsidiary,
(vi) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment
thereof, (vii) the foregoing will not apply to restrictions on cash or other deposits or net worth imposed by
customers under contracts entered into in the ordinary course of business, (viii) the foregoing will not ap-
ply to customary provisions in joint venture agreements and other similar agreements or arrangements
relating solely to such joint venture and (ix) the foregoing will not apply to customary provisions con-
tained in leases or licenses of intellectual property and other agreements, in each case, entered into in the
ordinary course of business.

SECTION 6.11.    Amendment of Material Documents.  The Borrower will, nor will they
permit any Subsidiary to, amend, modify or waive any of its rights under (a) the Second Lien Indenture,
(b) its certificate of incorporation, by-laws or other organizational documents, (c) the Confirmation Order
or (d) the Reorganization Plan, in each case in any manner that is adverse in any material respect to the
interests of the Lenders or the Loan Parties (determined as though any Indebtedness that is the subject of
any such amendment, modification or waiver is not in default).

SECTION 6.12.    First Lien Leverage Ratio.  The Borrower will not permit the First
Lien Leverage Ratio as of the last day of any fiscal quarter ending on any date during any period set forth
below to exceed the ratio set forth below opposite such period:

| Period | Ratio |
|---|---|
| Effective Date to and including June 30, 2013 | 4.75 to 1.00 |
| July 1, 2013 and thereafter | 4.50 to 1.00 |

SECTION 6.13.   <u>Fiscal Year</u>.  The Borrower shall not change its fiscal year-end to a date other than March 31.

ARTICLE VII

<u>Events of Default</u>

SECTION 7.01.   <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan or any reimbursement obligation in respect of any LC Disbursement, when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of one day;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than as referred to in clause (a) of this Section 7.01) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)    any representation or warranty made or deemed made by or on behalf of the Borrower or any Subsidiary in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any certificate furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect (or, in the case of any such representation or warranty that is not qualified as to materiality, incorrect in any material respect) when made or deemed made;

(d)    the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02, 5.04 (with respect to the existence of the Borrower) or 5.11, or in Article VI;

(e)    (x) the Borrower shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.12, 5.13, or 5.14 and such failure shall continue unremedied for a period of 5 Business Days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) or (y) any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in clause (a), (b), (d), or (e)(x) of this Section), and such failure shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender);

(f)    the Borrower or any Restricted Subsidiary shall fail to make any payment of principal or interest (regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable (after giving effect to any applicable period of grace, in the case of interest);

-66-

(g)    any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(h)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Restricted Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(i)    the Borrower or any Restricted Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Restricted Subsidiary or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(j)    the Borrower or any Restricted Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(k)    one or more judgments for the payment of money in an aggregate amount in excess of $35,000,000 shall be rendered against the Borrower, any Restricted Subsidiary or any combination thereof and the same shall remain undischarged for a period of 60 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)    an ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect;

(m)    (i) any Security Document or any Guarantee of the Loan Document Obligations (as defined in the Guarantee and Collateral Agreement) shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party party thereto or (ii) any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material portion of the Collateral, with the priority required by the applicable Security Document, except (x) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents or (y) as a result of the Administrative Agent's failure to maintain possession of any

-67-

3048    stock certificates, promissory notes or other instruments delivered to it under the Guarantee and
3049    Collateral Agreement;

3050    (n)    a Change in Control shall occur; or

3051    (o)    each of the Intercreditor Agreements or any of the respective provisions thereof
3052    shall cease to be in full force and effect other than in accordance with its respective terms;

3053    then, and in every such event (other than an event with respect to the Borrower described in clause (h) or
3054    (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative
3055    Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or
3056    both of the following actions, at the same or different times:  (i) terminate the Revolving Commitments,
3057    and thereupon the Revolving Commitments shall terminate immediately, and (ii) declare the Loans then
3058    outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be
3059    due and payable may thereafter be declared to be due and payable), and thereupon the principal of the
3060    Loans so declared to be due and payable, together with accrued interest thereon and all fees and other ob-
3061    ligations of the Borrower accrued hereunder, shall become due and payable immediately, without pre-
3062    sentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;
3063    and in case of any event with respect to the Borrower described in clause (h) or (i) of this Article, the Re-
3064    volving Commitments shall automatically terminate and the principal of the Loans then outstanding, to-
3065    gether with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder,
3066    shall automatically become due and payable, without presentment, demand, protest or other notice of any
3067    kind, all of which are hereby waived by the Borrower.

3068    SECTION 7.02.    Specified Equity Contribution.  Notwithstanding anything to the con-
3069    trary contained in Section 7.01, in the event that the Borrower fails to comply with the requirements of the
3070    covenant set forth in Section 6.12, then (A) from the first Business Day after the period for which the re-
3071    levant financial statement are required to be delivered pursuant to Sections 5.01(a) and (b) until the expi-
3072    ration of the 10th Business Day subsequent to the date the relevant financial statements are required to be
3073    delivered pursuant to Sections 5.01(a) and (b), the Borrower shall have the right to issue common equity
3074    for cash or receive a contribution to its common equity, and upon the receipt by the Borrower of such
3075    cash (each, a "Specified Equity Contribution") pursuant to the exercise by the Borrower of such right, the
3076    calculation of Consolidated EBITDA as used in the covenant set forth in Section 6.12 shall be recalcu-
3077    lated giving effect to the following pro forma adjustments:

3078    (i)    Consolidated EBITDA shall be increased, solely for the purpose of measuring the
3079    covenant set forth in Section 6.12 and not for any other purpose under this Agreement (including
3080    but not limited to determining the availability or amount of any covenant baskets or carve-outs or
3081    determining the Applicable Rate), by an amount equal to the Specified Equity Contribution; pro-
3082    vided that no Specified Equity Contribution shall reduce Indebtedness on a pro forma basis for
3083    the applicable period for purposes of calculating the covenant set forth in Section 6.12; and

3084    (ii)    if, after giving effect to the foregoing recalculations, the Borrower shall then be
3085    in compliance with the requirements of the covenant set forth in Section 6.12, the Borrower shall
3086    be deemed to have satisfied the requirements of the covenant set forth in Section 6.12 as of the re-
3087    levant date of determination with the same effect as though there had been no failure to comply
3088    therewith at such date, and the applicable breach or default of the covenants set forth in Sec-
3089    tions 6.12 that had occurred shall be deemed cured for the purposes of this Agreement.

3090    Notwithstanding anything herein to the contrary, (i) in each four consecutive fiscal-quarter period
3091    there shall be at least two fiscal quarters in respect of which the right to cure set forth in this Section 7.02

-68-

is not exercised, (ii) there can be no more than four fiscal quarters in respect of which such right is exercised during the term of this Agreement, and (iii) for purposes of this Section 7.02, the Specified Equity Contribution utilized shall be no greater than the amount required for purposes of complying with the covenant set forth in Section 6.12.

ARTICLE VIII

The Agent

Each of the Lenders and the Issuing Bank hereby irrevocably appoints JPMorgan Chase Bank, N.A. as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other

-69-

3138 experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the
3139 advice of any such counsel, accountants or experts.

3140         The Administrative Agent may perform any and all its duties and exercise its rights and
3141 powers by or through any one or more sub-agents appointed by the Administrative Agent. The Adminis-
3142 trative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers
3143 through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall
3144 apply to any such sub-agent and to the Related Parties of each Administrative Agent and any such sub-
3145 agent, and shall apply to their respective activities in connection with the syndication of the credit facili-
3146 ties provided for herein as well as activities as Administrative Agent.

3147         Subject to the appointment and acceptance of a successor Administrative Agent as pro-
3148 vided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders, the
3149 Issuing Bank and the Borrower. Upon any such resignation, the Required Lenders shall have the right, in
3150 consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by
3151 the Required Lenders and shall have accepted such appointment within 30 days after the retiring Admin-
3152 istrative Agent gives notice of its resignation, then the retiring Administrative Agent may, on behalf of the
3153 Lenders and the Issuing Bank, appoint a successor Administrative Agent which shall be a bank with an
3154 office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment
3155 as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested
3156 with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring
3157 Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by
3158 the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor
3159 unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's res-
3160 ignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit
3161 of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any
3162 actions taken or omitted to be taken by any of them while it was acting as Administrative Agent.

3163         Each Lender acknowledges that it has, independently and without reliance upon the Ad-
3164 ministrative Agent or any other Lender and based on such documents and information as it has deemed
3165 appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also
3166 acknowledges that it will, independently and without reliance upon the Administrative Agent or any other
3167 Lender and based on such documents and information as it shall from time to time deem appropriate, con-
3168 tinue to make its own decisions in taking or not taking action under or based upon this Agreement, any
3169 other Loan Document or related agreement or any document furnished hereunder or thereunder.

3170         Notwithstanding anything herein to the contrary, each Lender acknowledges that the Lien
3171 and security interest granted to the Administrative Agent pursuant to the Security Documents and the ex-
3172 ercise of any right or remedy by the Administrative Agent thereunder are subject to the provisions of the
3173 Intercreditor Agreements.

3174         To the extent required by any applicable law, the Administrative Agent shall withhold
3175 from any payment to any Lender an amount equal to any applicable withholding Tax. If the IRS or any
3176 Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax
3177 from any amount paid to or for the account of any Lender for any reason (including because the appropri-
3178 ate form was not delivered or was not properly executed, or because such Lender failed to notify the Ad-
3179 ministrative Agent of a change in circumstances that rendered the exemption from, or reduction of, with-
3180 holding Tax ineffective), such Lender shall indemnify and hold harmless the Administrative Agent (to the
3181 extent that the Administrative Agent has not already been reimbursed by the Company and without limit-
3182 ing or expanding the obligation of the Company to do so) for all amounts paid, directly or indirectly, by
3183 the Administrative Agent as tax or otherwise, including any penalties, additions to Tax or interest thereon,

                                                       

together with all expenses incurred, including legal expenses and any out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Government Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Article VIII.  The agreements in this Article VIII shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Loans and the repayment, satisfaction or discharge of all obligations under this Agreement.  Unless required by applicable laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender any refund of Taxes withheld or deducted from funds paid for the account of such Lender.

ARTICLE IX

<u>Miscellaneous</u>

     SECTION 9.01.    <u>Notices</u>.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

     (a)    if to the Borrower, to it at American Media Operations, Inc., 1000 American Media Way, Boca Raton, Florida 22464-1000, Attention of Chief Financial Officer and General Counsel (Telecopy No. (561) 989-1396) and [          ] (Telecopy No. (561) 998-7470), with a copy to Akin, Gump, Strauss, Hauer & Feld LLP, Attention of [          ] (Telecopy No. [          ]), [          ], [          ], [          ];

     (b)    [if to the Administrative Agent, to JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin Street, Houston, Texas 77002, Attention of Gloria Javier (Telecopy No. (713) 750-2878), with a copy to JPMorgan Chase Bank, N.A., 270 Park Avenue, New York, New York 10017, Attention of Peter Thauer (Telecopy No. (212) 270-5127);][1]

     (c)    [if to the Issuing Bank, to it at JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin Street, Houston, Texas 77002, Attention of Gloria Javier (Telecopy No. (713) 750-2878);][2]

     (d)    [if to the Swingline Lender, to it at JPMorgan Chase Bank, N.A., Loan and Agency Services Group, 1111 Fannin Street, Houston, Texas 77002, Attention of Gloria Javier (Telecopy No. (713) 750-2878);][3] and

---

[1]    To be confirmed.

[2]    To be confirmed.

[3]    To be confirmed.

3218           (e)     if to any other Lender, to it at its address (or telecopy number) set forth in its
3219    Administrative Questionnaire.

3220    Any party hereto may change its address or telecopy number for notices and other communications he-
3221    reunder by notice to the other parties hereto.  Notices and other communications to the Lenders and the
3222    Issuing Bank hereunder may also be delivered or furnished by electronic communication (including e-
3223    mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent;
3224    provided that the foregoing shall not apply to notices to any Lender or the Issuing Bank pursuant to Ar-
3225    ticle II if such Lender or the Issuing Bank, as applicable, has notified the Administrative Agent that it is
3226    incapable of receiving notices under such Article by electronic communication.  The Administrative
3227    Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it he-
3228    reunder by electronic communications pursuant to procedures approved by it; provided that approval of
3229    such procedures may be limited to particular notices or communications.  All notices and other communi-
3230    cations given to any party hereto in accordance with the provisions of this Agreement shall be deemed to
3231    have been given on the date of receipt.

3232           SECTION 9.02.   Waivers; Amendments.

3233           (a)     No failure or delay by the Administrative Agent, the Issuing Bank or any Lender
3234    in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver
3235    thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discon-
3236    tinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the
3237    exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Issuing
3238    Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclu-
3239    sive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan
3240    Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless
3241    the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be ef-
3242    fective only in the specific instance and for the purpose for which given.  Without limiting the generality
3243    of the foregoing, the making of a Loan or issuance of a Letter of Credit shall not be construed as a waiver
3244    of any Default, regardless of whether the Administrative Agent, any Lender or the Issuing Bank may have
3245    had notice or knowledge of such Default at the time.

3246           (b)     Neither this Agreement nor any other Loan Document nor any provision hereof
3247    or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an
3248    agreement or agreements in writing entered into by the Borrower and the Required Lenders or, in the case
3249    of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Ad-
3250    ministrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the con-
3251    sent of the Required Lenders; provided that no such agreement shall (i) increase the Revolving Commit-
3252    ment of any Lender without the written consent of such Lender, (ii) reduce or forgive the principal
3253    amount of any Loan or LC Disbursement or reduce the rate of interest thereon, or reduce any fees payable
3254    hereunder, without the written consent of each Lender affected thereby, (iii) postpone the maturity of any
3255    Loan or the required date of reimbursement of any LC Disbursement, or any date for the payment of any
3256    interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or post-
3257    pone the scheduled date of expiration of any Revolving Commitment, without the written consent of each
3258    Lender affected thereby, (iv) change Section 2.18(b) or (c) in a manner that would alter the ratable provi-
3259    sions or pro rata sharing of payments required thereby, without the written consent of each Lender,
3260    (v) change any of the provisions of this Section or the percentage set forth in the definition of "Required
3261    Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders
3262    required to waive, amend or modify any rights thereunder or make any determination or grant any consent
3263    thereunder, without the written consent of each Lender, (vi) release all or substantially all of the Guaran-
3264    tees made by the Borrower and the Subsidiary Loan Parties under the Guarantee and Collateral Agree-

3265 ment (except as expressly provided in the Guarantee and Collateral Agreement), or limit their liability in
3266 respect of all or substantially all of such Guarantees, without the written consent of each Lender or
3267 (vii) release all or substantially all of the Collateral from the Liens of the Security Documents, without the
3268 written consent of each Lender; provided further that no such agreement shall amend, modify or other-
3269 wise affect the rights or duties of the Administrative Agent, the Issuing Bank or the Swingline Lender
3270 without the prior written consent of the Administrative Agent, the Issuing Bank or the Swingline Lender,
3271 as the case may be. Notwithstanding the foregoing, any provision of this Agreement may be amended by
3272 an agreement in writing entered into by the Borrower, the Required Lenders and the Administrative Agent
3273 (and, if their rights or obligations are affected thereby, the Issuing Bank and the Swingline Lender) if
3274 (i) by the terms of such agreement the Revolving Commitment of each Lender not consenting to the
3275 amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the
3276 time such amendment becomes effective, each Lender not consenting thereto receives payment in full of
3277 the principal of and interest accrued on each Loan made by it and all other amounts owing to it or accrued
3278 for its account under this Agreement.

3279        (c)        Each of the Intercreditor Agreements may be amended, modified or waived by
3280 the Administrative Agent at the direction of the Required Lenders, and the consent of the Borrower or any
3281 other Loan Party shall be required only to the extent required in such Intercreditor Agreement.

3282        (d)        Anything herein to the contrary notwithstanding, during such period as a Lender
3283 is a Defaulting Lender, to the fullest extent permitted by applicable law, such Lender will not be entitled
3284 to vote in respect of amendments, waivers and consents hereunder and the Revolving Commitment and
3285 the outstanding Loans or other extensions of credit of such Lender hereunder will not be taken into ac-
3286 count in determining whether the Required Lenders or all of the Lenders, as required, have approved any
3287 such amendment, waiver or consent (and the definition of "Required Lenders" will automatically be
3288 deemed modified accordingly for the duration of such period); provided that any such amendment or
3289 waiver that would increase or extend the term of the Revolving Commitment of such Defaulting Lender,
3290 extend the date fixed for the payment of principal or interest owing to such Defaulting Lender hereunder,
3291 reduce the principal amount of any obligation owing to such Defaulting Lender, reduce the amount of or
3292 the rate or amount of interest on any amount owing to such Defaulting Lender or of any fee payable to
3293 such Defaulting Lender hereunder, or alter the terms of this proviso, will require the consent of such De-
3294 faulting Lender.

3295        SECTION 9.03.    Expenses; Indemnity; Damage Waiver.

3296        (a)        The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the
3297 Administrative Agent, the Arrangers and their respective Affiliates, including the reasonable fees, charges
3298 and disbursements of counsel for the Administrative Agent, in connection with the preparation and ad-
3299 ministration of the Loan Documents or any amendments, modifications or waivers of the provisions the-
3300 reof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all rea-
3301 sonable out-of-pocket expenses incurred by the Issuing Bank in connection with the issuance, amend-
3302 ment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all out-
3303 of-pocket expenses incurred by the Administrative Agent, the Issuing Bank or any Lender, including the
3304 fees, charges and disbursements of any counsel for the Administrative Agent (and, if requested by the
3305 Required Lenders, one counsel (and if appropriate, one local counsel) and one financial advisor for such
3306 Lenders), the Issuing Bank or any Lender, in connection with the enforcement or protection of its rights in
3307 connection with the Loan Documents, including its rights under this Section, or in connection with the
3308 Loans made or Letters of Credit issued hereunder, including all such out-of-pocket expenses incurred dur-
3309 ing any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.

-73-

(b)     The Borrower shall indemnify the Administrative Agent, the Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Emergence Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any Mortgaged Property or any other property currently or formerly owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent, the Issuing Bank or the Swingline Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent, the Issuing Bank or the Swingline Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Issuing Bank or the Swingline Lender in its capacity as such; provided further that any indemnification of the Issuing Bank or Swingline Lender shall be limited to Revolving Lenders only. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total Revolving Exposures and unused Revolving Commitments at the time.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Emergence Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 9.04.    Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby

-74-

3356 (including any Affiliate of the Issuing Bank that issues any Letter of Credit), Participants (to the extent
3357 provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related
3358 Parties of each of the Administrative Agent, the Issuing Bank and the Lenders) any legal or equitable
3359 right, remedy or claim under or by reason of this Agreement.

3360         (b)     (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may
3361 assign to one or more assignees all or a portion of its rights and obligations under this Agreement (includ-
3362 ing all or a portion of its Revolving Commitment and the Loans at the time owing to it) with the prior
3363 written consent (such consent not to be unreasonably withheld or delayed) of:

3364         (A)     the Borrower; provided that no consent of the Borrower shall be required for an
3365 assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has
3366 occurred and is continuing, any other assignee;

3367         (B)     the Administrative Agent; provided that no consent of the Administrative Agent
3368 shall be required for an assignment of all or any portion of a Revolving Loan or a Revolving
3369 Commitment to an assignee that is a Revolving Lender immediately prior to giving effect to such
3370 assignment; and

3371         (C)     the Issuing Bank.

3372         (ii)     Assignments shall be subject to the following additional conditions:

3373         (A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or
3374 Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Re-
3375 volving Commitment or Loans, the amount of the Revolving Commitment or Loans of the assign-
3376 ing Lender subject to each such assignment (determined as of the effective date specified in the
3377 Assignment and Acceptance with respect to such assignment or, if no effective date is so speci-
3378 fied, as of the date the Assignment and Acceptance with respect to such assignment is delivered
3379 to the Administrative Agent) shall not be less than $2,500,000, unless each of the Borrower and
3380 the Administrative Agent otherwise consent (such consent not to be unreasonably withheld or de-
3381 layed); provided that no such consent of the Borrower shall be required if an Event of Default has
3382 occurred and is continuing;

3383         (B)     each partial assignment shall be made as an assignment of a proportionate part of
3384 all the assigning Lender's rights and obligations under this Agreement;

3385         (C)     the parties to each assignment shall execute and deliver to the Administrative
3386 Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500;
3387 and

3388         (D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent
3389 an Administrative Questionnaire.

3390         Notwithstanding anything else to the contrary in this Section 9.04 to the contrary, if the
3391 Borrower's consent is required by this paragraph with respect to any assignment and the Borrower has not
3392 given the Administrative Agent written notice of its objection to such assignment within five (5) Business
3393 Days after written notice to the Borrower, the Borrower shall be deemed to have consented to such as-
3394 signment.

3395               For the purposes of this Section 9.04(b), the term "Approved Fund" has the following
3396  meaning:

3397               "Approved Fund" means any Person (other than a natural person) that is engaged in mak-
3398      ing, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary
3399      course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an
3400      entity or an Affiliate of an entity that administers or manages a Lender.

3401           (iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this
3402  Section, from and after the effective date specified in each Assignment and Acceptance the assignee the-
3403  reunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Accep-
3404  tance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender the-
3405  reunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from
3406  its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of
3407  the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party
3408  hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03). Any assign-
3409  ment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this
3410  Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in
3411  such rights and obligations in accordance with paragraph (c) of this Section.

3412           (iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower,
3413  shall maintain at one of its offices a copy of each Assignment and Acceptance delivered to it and a regis-
3414  ter for the recordation of the names and addresses of the Lenders, and the Revolving Commitment of, and
3415  principal amount of the Loans (and related interest) and LC Disbursements owing to, each Lender pur-
3416  suant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclu-
3417  sive, and the Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall treat each Per-
3418  son whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all
3419  purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for
3420  inspection by the Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to
3421  time upon reasonable prior notice.

3422           (v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an
3423  assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the as-
3424  signee shall already be a Lender hereunder), the processing and recordation fee referred to in para-
3425  graph (b)(ii)(C) of this Section and any written consent to such assignment required by paragraph (b) of
3426  this Section, the Administrative Agent shall accept such Assignment and Acceptance and record the in-
3427  formation contained therein in the Register. No assignment shall be effective for purposes of this Agree-
3428  ment unless it has been recorded in the Register as provided in this paragraph.

3429           (c)     (i)     Any Lender may, without the consent of the Borrower, the Administrative
3430  Agent, the Issuing Bank or the Swingline Lender, sell participations to one or more banks or other entities
3431  (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (includ-
3432  ing all or a portion of its Revolving Commitment and the Loans owing to it); provided that (A) such
3433  Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely
3434  responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the
3435  Administrative Agent, the Issuing Bank and the other Lenders shall continue to deal solely and directly
3436  with such Lender in connection with such Lender's rights and obligations under this Agreement. Any
3437  agreement or instrument pursuant to which a Lender sells such a participation shall provide that such
3438  Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification
3439  or waiver of any provision of the Loan Documents; provided that such agreement or instrument may pro-
3440  vide that such Lender will not, without the consent of the Participant, agree to any amendment, modifica-

-76-

3441 tion or waiver described in the first proviso to Section 9.02(b) that affects such Participant. Subject to
3442 paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits
3443 of Sections 2.15, 2.16 and 2.17 (subject to the requirement and limitations in those Sections, including the
3444 Documentation requirements in Section 2.17(e)) to the same extent as if it were a Lender and had ac-
3445 quired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by
3446 law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, pro-
3447 vided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.

3448          Each Lender that sells a participation shall, acting solely for this purpose as a non-
3449 fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Par-
3450 ticipant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other
3451 obligations under this Agreement (the "Participant Register"). The entries in the Participant Register
3452 shall be conclusive and such Lender shall treat each Person whose name is recorded in the Participant
3453 Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice
3454 to the contrary.

3455          (ii)     A Participant shall not be entitled to receive any greater payment under Sec-
3456 tion 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the partic-
3457 ipation sold to such Participant, unless the sale of the participation to such Participant is made with the
3458 Borrower's prior written consent or the entitlement to a greater payment results from a Change in Law
3459 occurring after the Participant became a Participant.

3460          (d)     Any Lender may at any time pledge or assign a security interest in all or any por-
3461 tion of its rights under this Agreement to secure obligations of such Lender, including any pledge or as-
3462 signment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such
3463 pledge or assignment of a security interest; provided that no such pledge or assignment of a security inter-
3464 est shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee
3465 for such Lender as a party hereto.

3466          SECTION 9.05.    Survival. All covenants, agreements, representations and warranties
3467 made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in
3468 connection with or pursuant to this Agreement or any other Loan Document shall be considered to have
3469 been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Doc-
3470 uments and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation
3471 made by any such other party or on its behalf and notwithstanding that the Administrative Agent, the Is-
3472 suing Bank or any Lender may have had notice or knowledge of any Default or incorrect representation or
3473 warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as
3474 the principal of or any accrued interest on any Loan or any fee or any other amount payable under this
3475 Agreement is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Revolving
3476 Commitments have not expired or terminated. The provisions of Sections 2.15, 2.16, 2.17 and 9.03 and
3477 Article VIII shall survive and remain in full force and effect regardless of the consummation of the trans-
3478 actions contemplated hereby, the repayment of the Loans, the expiration or termination of the Letters of
3479 Credit and the Revolving Commitments or the termination of this Agreement or any provision hereof.

3480          SECTION 9.06.    Counterparts; Integration; Effectiveness. This Agreement may be ex-
3481 ecuted in counterparts (and by different parties hereto on different counterparts), each of which shall con-
3482 stitute an original, but all of which when taken together shall constitute a single contract. This Agree-
3483 ment, the other Loan Documents and any separate letter agreements with respect to fees payable to the
3484 Administrative Agent and the Issuing Bank constitute the entire contract among the parties relating to the
3485 subject matter hereof and supersede any and all previous agreements and understandings, oral or written,
3486 relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become

-77-

effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy (or any other means of electronic transmission) shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07.   Severability.  Any provision of this Agreement held to be invalid, il-legal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.   Right of Setoff.  If an Event of Default shall have occurred and be con-tinuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  The rights of each Lender under this Section are in addition to other rights and remedies (in-cluding other rights of setoff) which such Lender may have.

SECTION 9.09.   Governing Law; Jurisdiction; Consent to Service of Process.

(a)      This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)      The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appel-late court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and de-termined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Noth-ing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any juris-diction.

(c)      The Borrower hereby irrevocably and unconditionally waives, to the fullest ex-tent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irre-vocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the main-tenance of such action or proceeding in any such court.

-78-

3529        (d)        Each party to this Agreement irrevocably consents to service of process in the
3530    manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document
3531    will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

3532        SECTION 9.10.    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY
3533    WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT
3534    MAY HAVE TO A TRIAL BY JURY IN  ANY LEGAL PROCEEDING DIRECTLY OR INDIRECT-
3535    LY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT
3536    OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT,
3537    TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRE-
3538    SENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EX-
3539    PRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LIT-
3540    IGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT
3541    IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS
3542    AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS
3543    IN THIS SECTION.

3544        SECTION 9.11.    Headings.  Article and Section headings and the Table of Contents
3545    used herein are for convenience of reference only, are not part of this Agreement and shall not affect the
3546    construction of, or be taken into consideration in interpreting, this Agreement.

3547        SECTION 9.12.    Confidentiality.  Each of the  Administrative Agent, the Issuing Bank
3548    and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that
3549    Information may be disclosed (a) to its and its Affiliates' and its Approved Funds' directors, officers, em-
3550    ployees and agents, including accountants, legal counsel and other advisors (it being understood that the
3551    Persons to whom such disclosure is made will be informed of the confidential nature of such Information
3552    and instructed to keep such Information confidential), or to any direct or indirect contractual counterparty
3553    in swap agreements or such contractual counterparty's professional advisor (so long as such contractual
3554    counterparty or professional advisor agrees to be bound by the provisions of this Section 9.12), (b) to the
3555    extent requested by any regulatory authority, (c) to the extent required by applicable laws or regulations
3556    or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection
3557    with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement
3558    or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an
3559    agreement containing provisions substantially the same as those of this Section, to any assignee of or Par-
3560    ticipant in, or any prospective assignee of or Participant in, any of its rights or obligations under this
3561    Agreement, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes public-
3562    ly available other than as a result of a breach of this Section or (ii) becomes available to the Administra-
3563    tive Agent, the Issuing Bank or any Lender on a nonconfidential basis from a source other than the Bor-
3564    rower.  For the purposes of this Section, "Information" means all information received from the Borrower
3565    relating to the Borrower or its business, other than any such information that is available to the Adminis-
3566    trative Agent, the Issuing Bank or any Lender on a nonconfidential basis prior to disclosure by the Bor-
3567    rower.  Any Person required to maintain the confidentiality of Information as provided in this Section
3568    shall be considered to have complied with its obligation to do so if such Person has exercised the same
3569    degree of care to maintain the confidentiality of such Information as such Person would accord to its own
3570    confidential information.

3571        SECTION 9.13.    Interest Rate Limitation.  Notwithstanding anything herein to the con-
3572    trary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other
3573    amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"),
3574    shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, tak-
3575    en, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of

interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.14.    USA Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 9.15.    Determination of Fiscal Periods.  Any references in this Agreement to any fiscal period ending March 31, June 30, September 30 or December 31 of any year shall be deemed to refer to the fiscal period ending on or about such date.  Any references in this Agreement to any fiscal period commencing April 1, July 1, October 1 or January 1 of any year shall be deemed to refer to the first day of the fiscal period immediately following the fiscal period ending on or about March 31, June 30, September 30 or December 31 of any such year.

[SIGNATURES ON FOLLOWING PAGE]

-80-

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed by their respective authorized officers as of the date first above written.

AMERICAN MEDIA, INC.,

By: _____

Name:

Title:

S-1

3602
3603
3604

3605
3606
3607

3608

JPMORGAN CHASE BANK, N.A., in its
capacity as Lender and as Administrative
Agent,

By: _____
    Name:
    Title:

S-2

3609
3610
3611
3612
3613

3614
3615
3616

3617
3618
3619
3620

SIGNATURE PAGE TO CREDIT AGREEMENT
DATED AS OF _____, 2010,
AMONG AMERICAN MEDIA, INC., THE LENDERS
PARTY HERETO, AND JPMORGAN CHASE BANK,
N.A., AS ADMINISTRATIVE AGENT

Lender Name:

_____

By:    _____
        Name:
        Title:

S-3