AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) | Case No. 10-16140 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' MEMORANDUM OF LAW IN
SUPPORT OF ENTRY OF AN ORDER (I) APPROVING
(A) THE DEBTORS' DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §§
1125 AND 1126(b), (B) THE SOLICITATION OF VOTES AND SOLICITATION AND
ELECTION PROCEDURES, (C) FORMS OF BALLOTS AND (D) THE ELECTION
FORM, AND (II) CONFIRMING THE DEBTORS' AMENDED JOINT PREPACKAGED
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................1

II.    BACKGROUND AND PLAN OVERVIEW ...........................................3

    A.    Prepetition Negotiations...........................................................3

    B.    The Proposed Joint Prepackaged Plan of Reorganization ......................3

        1.    Overview and Summary of the Plan ...............................3

        2.    The Solicitation of Votes to Accept or Reject the Plan ..............................5

        3.    The Election by Holders of Term Facility Claims .......................6

III.    THE DISCLOSURE STATEMENT SHOULD BE APPROVED ......................6

IV.    THE DEBTORS' SOLICITATION PROCEDURES SHOULD BE APPROVED ...........8

    A.    The Debtors Established an Appropriate Voting Record Date................8

    B.    The Debtors Have Complied with Applicable Notice Requirements with Respect to the Solicitation Package ........................9

    C.    The Holders of Claims in the Voting Classes Were Provided a Reasonable Time to Accept or Reject the Plan .......................10

    D.    The Debtors' Vote Tabulation Procedures Should Be Approved ..........10

    E.    The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable Under Nonbankruptcy Law .......................11

V.    THE ELECTION PROCEDURES SHOULD BE APPROVED ......................12

VI.    THE PLAN SHOULD BE CONFIRMED ......................13

    A.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1) ......................14

        1.    The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122......................14

        2.    The Plan Complies with the Requirements of 11 U.S.C. § 1123(a) ..........16

        3.    The Plan Complies with the Requirements of 11 U.S.C. § 1123(b) ..........24

    B.    The Debtors, as Plan Proponents, Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)...............26

    C.    The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3) ......................27

    D.    The Plan Provides for Court Approval of Payment of Services and Expenses – 11 U.S.C. § 1129(a)(4)......................28

i

E.       All Necessary Information Regarding the Directors and Officers of the Debtors Under the Plan Has Been Disclosed – 11 U.S.C. § 1129(a)(5) ...............29

F.       The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6) ...............31

G.       The Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)...............................................................................................31

H.       Acceptance by All Impaired Classes – 11 U.S.C. § 1129(a)(8) ............................33

I.       The Plan Provides for Payment of Priority Claims – 11 U.S.C. § 1129(a)(9)...............................................................................................................34

J.       The Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote – 11 U.S.C. § 1129(a)(10) .............................................................35

K.       The Plan is Not Likely to be Followed by Liquidation or the Need for Further Financial Reorganization – 11 U.S.C. § 1129(a)(11) ...............................36

L.       The Plan Provides for Full Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12)...............................................................................................................38

M.       The Plan Provides for an Appropriate Treatment of Retiree Benefits – 11 U.S.C. § 1129(a)(13).............................................................................................39

N.       The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b)........39

       1.       The Plan Does Not Discriminate Unfairly With Respect to the Rejecting Classes ..............................................................................40

       2.       The Plan is Fair and Equitable with Respect to the Rejecting Classes.............................................................................................41

VII.    The Limited Release, Exculpation, and Injunction Provisions of the Plan Should be Approved.....................................................................................................................42

A.       The Debtor Release Should Be Approved ............................................................43

B.       The Third Party Release Should Be Approved .....................................................46

C.       The Exculpation Should Be Approved .................................................................49

D.       The Injunction Should Be Approved ....................................................................51

VIII.   THE MODIFICATIONS TO THE PLAN ARE NOT MATERIAL ................................51

IX.    PROPOSED ORDER .....................................................................................................54

X.     IMMEDIATE EFFECTIVENESS .................................................................................54

XI.    CONCLUSION................................................................................................................55

# TABLE OF AUTHORITIES

<span style="font-variant: small-caps;">Cases</span>

*Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs)*,
  156 B.R. 414 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1994) ...........................................45

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)...................................................................................................31

*Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*,
  57 B.R. 354 (D. Utah 1985).......................................................................................53

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983).......................................................................................45

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005).......................................................................................46

*Enron Power Corp. v. New Power Co. (In re New Power Co.)*,
  438 F.3d 1113 (11th Cir. 2008) .................................................................................53

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) ...................................................................................13

*In re 11,111, Inc.*,
  117 B.R. 471 (Bankr. D. Minn. 1990) ........................................................................40

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007).......................................................................46

*In re Adelphia Commc'ns Corp.*,
  Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007) ......................................20

*In re Am. Solar King Corp.*,
  90 B.R. 808 (Bankr. W.D. Tex. 1988)........................................................................53

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  Case No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)...............13, 27, 45

*In re Bally Total Fitness of Greater New York, Inc.*,
  Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Aug. 19, 2009)....................................20

*In re Buttonwood Partners, Ltd.*,
    111 B.R. 57 (Bankr. S.D.N.Y. 1990) ................................................................40

*In re Cellular Info. Sys., Inc.*,
    171 B.R. 926 (Bankr. S.D.N.Y. 1994) ..............................................................28

*In re Chapel Gate Apartments, Ltd.*,
    64 B.R. 569 (Bankr. N.D. Tex. 1986) ...............................................................29

*In re Chateaugay Corp.,*
    89 F.3d 942 (2d Cir. 1996) ................................................................................15

*In re Copy Crafters Quickprint, Inc.*,
    92 B.R. 973 (Bankr. N.D.N.Y. 1988) ..................................................................7

*In re Dana Corp.*,
    Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Dec. 6, 2007) .............................20

*In re Delta Air Lines, Inc.*,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007) ..............................................................19

*In re Delta Air Lines, Inc.*,
    Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Apr. 25, 2007) ...........................20

*In re Dreier LLP*,
    429 B.R. 112 (Bankr. S.D.N.Y. 2010) ..............................................................47

*In re Drexel Burnham Lambert Grp., Inc.*,
    138 B.R. 723 (Bankr. S.D.N.Y. 1992) .............................................14, 26, 37, 51

*In re Eagle-Picher Indus.*,
    203 B.R. 256 (Bankr. S.D. Ohio 1996), *aff'd*, 172 F.3d 48 (6th Cir. 1998) ..........28

*In re Enron Corp.*,
    Case No. 02 Civ. 8489, 2003 WL 230838 (S.D.N.Y. Jan. 31, 2003) ................45

*In re Footstar, Inc.*,
    Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Sept. 30, 2005) ..........................19

*In re Holywell Corp.*,
    913 F.2d 873 (11th Cir. 1990) ..........................................................................16

*In re Johns-Manville Corp.*,
    68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part, on other grounds*, 78
    B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) ................26, 29, 40

*In re Kaiser Aluminum Corp.*,
    Case No. 02-10429 (JFK), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) ..........20

iv

*In re Kent Terminal Corp.*,
166 B.R. 555 (Bankr. S.D.N.Y. 1994) ...................................................................37

*In re Leslie Fay Cos.*,
207 B.R. 764 (Bankr. S.D.N.Y. 1997) ............................................................27, 37

*In re Metcalfe & Mansfield Alternative Investments*,
421 B.R. 685 (Bankr. S.D.N.Y. 2010) ...................................................................47

*In re Mid-State Raceway, Inc.*,
Case No. 04-65746, 2006 WL 4050809 (Bankr. N.D.N.Y. Feb. 10, 2006) ...........27

*In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I*,
79 B.R. 305 (Bankr. S.D. Ohio 1987)....................................................................53

*In re One Times Square Assocs. Ltd. P'ship*,
159 B.R. 695 (Bankr. S.D.N.Y. 1993) ...................................................................36

*In re Oneida Ltd.*,
351 B.R. 79 (Bankr. S.D.N.Y. 2006) ...............................................................49, 50

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)...................................................................................19

*In re Prudential Energy Co.*,
58 B.R. 857 (Bankr. S.D.N.Y. 1986) .....................................................................37

*In re Purofied Down Prods. Corp.*,
150 B.R. 519 (S.D.N.Y. 1993)................................................................................45

*In re Rivera Echevarria*,
129 B.R. 11 (Bankr. D.P.R. 1991) .........................................................................40

*In re Sherwood Square Assocs.*,
107 B.R. 872 (Bankr. D. Md. 1989) .......................................................................30

*In re Spiegel, Inc.*,
Case No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005)...........17, 20, 28, 45

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) ...............................................................30, 37

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) .....................................................................28

*In re Trans World Airlines, Inc.*,
185 B.R. 302 (Bankr. E.D. Mo. 1995) ...................................................................30

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) .....................36

*In re W.E. Parks Lumber Co.*,
    19 B.R. 285 (Bankr. W.D. La. 1982) ...................................................................30

*In re WorldCom, Inc.*,
    Case No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .........19, 26, 27, 36

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ......................................................................27

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    843 F.2d 649 (2d Cir. 1988) ...........................................................................27, 36

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*,
    68 F.3d 26 (2d Cir. 1995) ....................................................................................44

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
    960 F.2d 285 (2d Cir. 1992)................................................................................50

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
    844 F.2d 1142 (5th Cir. 1988) ..............................................................................7

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*,
    860 F.2d 515 (2d Cir. 1988)............................................................................19, 21

*United States v. Energy Res. Co., Inc.*,
    495 U.S. 545 (1990)............................................................................................36

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
    518 U.S. 213 (1996)............................................................................................31

*Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers, Inc.)*,
    419 F.3d 83 (2d Cir. 2005)...................................................................................25

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
    326 B.R. 497 (Bankr. S.D.N.Y. 2005) .................................................................49

**STATUTES**

11 U.S.C. § 1122..........................................................................................14, 15, 16

11 U.S.C. § 1123(a) ...............................................................................................16

11 U.S.C. § 1123(a)(1).............................................................................................16

11 U.S.C. § 1123(a)(2).............................................................................................16

11 U.S.C. § 1123(a)(3)................................................................................17

11 U.S.C. § 1123(a)(4)................................................................................17

11 U.S.C. § 1123(a)(5)............................................................................17, 22

11 U.S.C. § 1123(a)(5)(C)...........................................................................19

11 U.S.C. § 1123(a)(6)................................................................................22

11 U.S.C. § 1123(a)(7)............................................................................23, 24

11 U.S.C. § 1123(b)....................................................................................24

11 U.S.C. § 1123(b)(1)................................................................................24

11 U.S.C. § 1123(b)(2)................................................................................24

11 U.S.C. § 1123(b)(3)................................................................................25

11 U.S.C. § 1123(b)(3)(A)......................................................................44, 46

11 U.S.C. § 1123(b)(6)........................................................................24, 25, 26

11 U.S.C. § 1125(a)(1)..................................................................................7

11 U.S.C. § 1126(b) ................................................................................11, 12

11 U.S.C. § 1126(b)(1)..............................................................................6, 12

11 U.S.C. § 1126(b)(2)..................................................................................7

11 U.S.C. § 1126(c)................................................................................10, 11

11 U.S.C. §§ 1127(a)..................................................................................52

11 U.S.C. §§ 1127(d)..................................................................................52

11 U.S.C. § 1129(a)(1)............................................................................14, 26

11 U.S.C. § 1129(a)(2)............................................................................26, 27

11 U.S.C. § 1129(a)(3)................................................................................27

11 U.S.C. § 1129(a)(4)............................................................................28, 29

11 U.S.C. § 1129(a)(5)....................................................................23, 29, 30, 31

11 U.S.C. § 1129(a)(5)(A)(ii).........................................................................30

11 U.S.C. § 1129(a)(5)(B) ...................................................................30

11 U.S.C. § 1129(a)(6) .......................................................................31

11 U.S.C. § 1129(a)(7) ...................................................................31, 32

11 U.S.C. § 1129(a)(8) ...................................................................33, 39

11 U.S.C. § 1129(a)(9) ...................................................................34, 35

11 U.S.C. § 1129(a)(10) .................................................................35, 36

11 U.S.C. § 1129(a)(11) .................................................................36, 38

11 U.S.C. § 1129(a)(12) .................................................................38, 39

11 U.S.C. § 1129(a)(13) .......................................................................39

11 U.S.C. § 1129(b) ...........................................................34, 39, 40, 41

11 U.S.C. § 1129(b)(1) .......................................................................40

11 U.S.C. § 1129(b)(2) .......................................................................41

15 U.S.C. §§ 77a-77aa .......................................................................12

## RULES

Fed. R. Bankr. P. 3017 ..........................................................................8

Fed. R. Bankr. P. 3017(d) ......................................................................9

Fed. R. Bankr. P. 3018 ..........................................................................8

Fed. R. Bankr. P. 3018(a) ....................................................................11

Fed. R. Bankr. P. 3018(b) .................................................................8, 10

Fed. R. Bankr. P. 3019 ........................................................................51

## OTHER AUTHORITIES

7 *Collier on Bankruptcy* ¶ 1123.01[7] (Henry J. Sommer
    & Alan Resnick eds. 16th ed. 2010) .................................................23

7 *Collier on Bankruptcy* ¶ 1129.03[2], at 1129-26 (Henry J. Sommer &
    Alan Resnick eds. 15th ed. Rev. 2006) ...........................................26

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .........14

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ................................................14

The above-captioned debtors and debtors in possession (each, a "*Debtor*" and, collectively, the "*Debtors*") submit this Memorandum of Law (the "*Memorandum*") in Support of Entry of an Order (I) Approving (A) the Debtors' Disclosure Statement Pursuant to 11 U.S.C. §§ 1125 and 1126(b), (B) the Solicitation of Votes and Solicitation and Election Procedures, (C) Forms of Ballots, and (D) the Election Form and (II) Confirming the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "*Plan*"), pursuant to section 1129 of title 11 of the United States Code (the "*Bankruptcy Code*"). In support of this Memorandum, the Debtors respectfully represent as follows:

## I.    PRELIMINARY STATEMENT[2]

The Debtors seek confirmation of a Plan that will enable them to realize their goals of restructuring their balance sheet to improve their financial position, and emerging from chapter 11 on an expedited basis in order to preserve the value of their estates for the benefit of all parties in interest. The Plan represents the culmination of extensive prepetition negotiations between the Debtors and certain of their major creditors, particularly the Committee (as defined below) and the Administrative Agent (as defined below). These negotiations resulted in a Plan that enjoys the overwhelming support of the Debtors' creditors, with all but one of the Debtors' creditors that were entitled to vote on the Plan voting to accept the Plan, and that will enable the Debtors to emerge from bankruptcy less than two months after the commencement of these chapter 11 cases.

As discussed more fully below, the prepetition solicitation conducted by the Debtors and the Voting Agent (as defined below) complies with all applicable nonbankruptcy law requirements governing the solicitation of a chapter 11 plan prior to the commencement of

---

[2]      Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

chapter 11 cases, as well as all applicable requirements of the Bankruptcy Code, the Federal

Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), the Local Bankruptcy Rules of the

Southern District of New York (the "***Local Rules***"), and the Amended Procedural Guidelines for

Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern District of

New York, Administrative Order 387, amending General Order 203 (the "***Prepack Guidelines***").

       In addition, as already noted, the Plan is supported by the overwhelming majority of the

Debtors' creditors.  As set forth below, Classes 2, 5 and 6 have voted to accept the Plan, and

while Class 7 has voted to reject the Plan, such rejection is based on the vote of a single creditor

holding only $3,106,782 in Claims against the Debtors.[3]  Moreover, notwithstanding the

rejection of the Plan by Class 7 and the extensive noticing of the hearing on confirmation of the

Plan, no objections to confirmation have been received.

       Based on, among other things, the extensive prepetition negotiations over the terms of the

Plan and the overwhelming support for the Plan among the Debtors' creditors, the Plan is in the

best interests of the Debtors' estates and all parties in interest.  In addition, as set forth herein, the

Debtors submit that all of the requirements for confirmation of the Plan under Bankruptcy Code

section 1129 have been satisfied and, thus, the Plan should be confirmed.

---

[3]      Holders of Claims holding a total of $722,423,345.38 in Claims voted to accept the Plan.

## II. BACKGROUND AND PLAN OVERVIEW[4]

### A. Prepetition Negotiations

1. In September 2010, the Debtors (along with their legal and financial advisors) began discussions with an ad hoc committee comprised of certain holders of Subordinated Notes and PIK Notes (the "*Committee*"), the Administrative Agent, the lenders under the Term Facility (the "*Term Facility Lenders*"), the lenders under the Revolving Facility (the "*Revolver Lenders*"), and potential new financing lenders. The Debtors actively negotiated with all groups to create a consensus on the appropriate restructuring (and/or repayment) of the Debtors' outstanding debt. Ultimately, as further discussed below, the Debtors were able to reach a consensual resolution with the members of the Committee and certain of the Term Facility Lenders and Revolver Lenders on the terms of a comprehensive balance sheet restructuring as reflected in the Plan and entered into a restructuring support agreement (the "*RSA*") with such parties to document the parties' support of the proposed restructuring.

### B. The Proposed Joint Prepackaged Plan of Reorganization

#### 1. Overview and Summary of the Plan

2. On the November 17, 2010 (the "*Petition Date*"), the Debtors filed with the Court, among other things, (i) the Plan and (ii) the accompanying disclosure statement (the "*Disclosure Statement*").[5] As noted above, the Debtors and certain of their major creditors negotiated the terms of the Debtors' restructuring and entered into the RSA prior to the Petition

---

[4] The factual background concerning the Debtors' business operations, capital structure and prepetition indebtedness, and the events leading up to the commencement of these chapter 11 cases, is set forth in detail in the Declaration of Christopher Polimeni, Executive Vice President, Chief Financial Officer and Treasurer of American Media, Inc., in Support of the Debtors' Chapter 11 Petitions and Request for First Day Relief (the "*First Day Declaration*") and the Disclosure Statement (as defined below). The factual background contained in the First Day Declaration and the Disclosure Statement is hereby expressly incorporated by reference as if set forth fully and at length herein.

Date.  Pursuant to the RSA, the Debtors and their major creditors agreed that the Debtors would implement a comprehensive balance sheet restructuring by soliciting votes to accept or reject the Plan through a "prepackaged" bankruptcy and the commencement of these chapter 11 cases. The Plan sets forth the Debtors' post-Effective Date capital structure and provides for the treatment of Classes of Claims against and Interests in the Debtors.  Specifically, upon the Effective Date, among other things:[6]

(i)     Holders of Term Facility Claims will receive their *pro rata* share of the following in an aggregate amount equal to the Allowed amount of all Term Facility Claims: (i) cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims; and (ii) New Second Lien Notes; *provided however*, that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; *provided further, however,* that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in full, in cash to the Administrative Agent.  In addition, and pursuant to the Plan, each Holder of a Term Facility Claim shall have the right to require the Backstop Parties to purchase from such Holder, on the Effective Date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to the Plan for the face amount of such Holder's New Second Lien Notes, which face amount such Holder shall receive in cash;

(ii)    the Holders of Allowed Revolver Claims shall receive payment in full, in cash;

(iii)   the Holders of Allowed Subordinated Notes Claims will receive 98% of the New Common Stock, subject to dilution for the Equity Incentive Plan (holders of Allowed Subordinated Notes Claims other than the Backstop Parties will also be diluted by the Backstop Shares);

(iv)    the Holders of Allowed PIK Notes Claims will receive New Second Lien Notes;

(v)     the Holders of Allowed 2011 Notes Claims will receive approximately 2% of the New Common Stock, subject to dilution for the Equity Incentive Plan (Holders of

---

[5]     On December 15, 2010, the Debtors filed an amended version of the Plan reflecting certain non-material Modifications (as defined below) to the version of the Plan that was filed on the Petition Date.  *See* Docket No. 115.

[6]     The summary of Plan provisions contained herein is subject in its entirety to the terms and provisions in the Plan or other documents referenced therein.

Allowed 2011 Notes Claims other than the Backstop Parties will also be diluted by the Backstop Shares);

(vi)     the Holders of Allowed General Unsecured Claims will be unimpaired; and

(vii)    Interests in AMI, including warrants, will be cancelled.

### 2.    *The Solicitation of Votes to Accept or Reject the Plan*

3.      Prior to the Petition Date, on October 30, 2010, the Debtors commenced the solicitation of votes to accept or reject the Plan from Holders of Claims in Classes 2, 5, 6 and 7 (the "***Voting Classes***").  In connection therewith, the Debtors' voting agent, Kurtzman Carson Consultants LLC (the "***Voting Agent***" or "***KCC***"), distributed to Holders of Claims in the Voting Classes a solicitation package (the "***Solicitation Package***"), containing, among other things, (i) the Plan, (ii) the Disclosure Statement, and (iii) appropriate forms of ballots (the "***Ballots***") for each of the Holders of Claims in the Voting Classes to vote to accept or reject the Plan.  The Debtors established November 15, 2010 at 5:00 p.m. (ET) (the "***Voting Deadline***") as the deadline for returning Ballots to accept or reject the Plan.

4.      After the Voting Deadline, the Voting Agent tabulated the votes to accept or reject the Plan reflected in the Ballots received on or prior to the Voting Deadline.  The Voting Agent filed a declaration certifying the results and methodology for the tabulation of Ballots accepting or rejecting the Plan on the Petition Date (the "***KCC Declaration***") (Docket No. 24). As set forth in the KCC Declaration, Classes 2, 5 and 6 unanimously voted to accept the Plan. Class 7 voted to reject the Plan.[7]

---

[7]      According to the KCC Declaration, two creditors in Class 7 (holding approximately 0.018% of the Claims in Class 7) voted to accept the Plan, and one creditor (holding approximately 41.4% of the Claims in Class 7) voted to reject the Plan.

### 3. *The Election by Holders of Term Facility Claims*

5.      In addition to the foregoing, on November 24, 2010, the Debtors distributed an election form (the "***Election Form***") to all Holders of Term Facility Claims other than the Backstop Parties.  By completing the Election Form and timely returning it to the Voting Agent, Holders of Term Facility Claims indicated whether they were electing to require that the Backstop Parties purchase in cash from such Holders, on the Effective Date, their *pro rata* share of the New Second Lien Notes which they receive pursuant to the Plan for the face amount of such Holder's New Second Lien Notes.  Holders of Term Facility Claims that received the Election Form were instructed to return the Election Form by 5:00 p.m. (ET) on December 10, 2010, unless such deadline was extended by the Debtors.[8]  As set forth in the Affidavit of Service and Declaration of David Hartie Regarding the Service and Transmittal of Class 2 Election Form and the Tabulation of Elections (Docket No. 118), approximately 94% of the Holders of Term Facility Claims (excluding the Backstop Parties) elected to put their New Second Lien Notes to the Backstop Parties.

### III.      THE DISCLOSURE STATEMENT SHOULD BE APPROVED

6.      Under Bankruptcy Code section 1126(b), prepetition disclosure statements are subject to requirements distinct from postpetition disclosure statements.  First, the solicitation must be "in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation."  11 U.S.C. § 1126(b)(1).  Second, "if there is not any such law, rule, or regulation . . . acceptance or rejection [of the plan must

---

[8]      Upon the request of counsel to the Administrative Agent, on December 7, 2010, the Election Form was transmitted to counsel to the Administrative Agent to be distributed to certain entities who alleged an entitlement to receive a distribution as a Class 2 claimant.  The Debtors allowed such claimants to submit an Election Form on a provisional basis and agreed to extend the election deadline for such parties to December 14, 2010 at 5:00 p.m. (ET). The Administrative Agent will determine to what extent, if any, these claimants are entitled to any recovery.

have been] solicited after disclosure to such holder of adequate information, as defined in [Bankruptcy Code section 1125(a)]." 11 U.S.C. § 1126(b)(2).

Bankruptcy Code section 1125(a) defines "adequate information" in the following terms:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1). The adequacy of a disclosure statement "is to be determined on a case-specific basis under a flexible standard that can promote the policy of Chapter 11 towards fair settlement through a negotiation process between informed interested parties." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 979 (Bankr. N.D.N.Y. 1988). As such, in examining the adequacy of the information contained in a disclosure statement, the bankruptcy court enjoys broad discretion. *See Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988).

7.       The Debtors submit that the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125. The Disclosure Statement is extensive and comprehensive and contains descriptions and summaries of, among other things, (i) the Plan (Disclosure Statement pages 14-41), (ii) certain events preceding the commencement of these chapter 11 cases (Disclosure Statement pages 5-12), (iii) claims asserted against the Debtors' estates (Disclosure Statement pages 14-17), (iv) funding under the Plan (Disclosure Statement pages 9-12, (v) risk factors affecting the Plan (Disclosure Statement pages 43-56), (vi) a liquidation analysis setting forth the estimated return that Holders of Claims and Interests would receive in a hypothetical chapter 7 case (Disclosure Statement page 63; Exhibit I to the Disclosure Statement), (vii) financial forecasts that would be relevant to creditors'

determinations of whether to accept or reject the Plan (Disclosure Statement pages 41-42; Exhibit G to the Disclosure Statement), and (viii) certain federal tax law consequences of the Plan (Disclosure Statement pages 64-81). In addition, the Disclosure Statement was subject to the review and comment of the Administrative Agent and the Committee.

8. Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125 and should be approved as such by the Court.

## IV. THE DEBTORS' SOLICITATION PROCEDURES SHOULD BE APPROVED

9. The Bankruptcy Rules require, among other things, that a debtor distribute its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities, and that creditors and equity security holders be permitted a reasonable period of time in which to accept or reject the proposed plan. *See* Fed. R. Bankr. P. 3017, 3018. The Debtors respectfully submit that, as evidenced by the KCC Declaration, they have satisfied all such requirements, and that no party in interest has objected with respect to these matters.

### A. The Debtors Established an Appropriate Voting Record Date

10. Bankruptcy Rule 3018(b) provides that, with respect to a prepetition solicitation, the holders of record of the applicable claims against and interests in a debtor entitled to vote to accept or reject a plan are determined on "the date specified in the solicitation." Fed R. Bankr. P. 3018(b). The Solicitation Package clearly identified October 29, 2010 as the record date (the "***Voting Record Date***") for determining which Holders of Claims were entitled to vote on the Plan. Accordingly, the Debtors' designation of the Voting Record Date conforms to Bankruptcy Rule 3018(b).

**B.    The Debtors Have Complied with Applicable Notice Requirements with Respect to the Solicitation Package**

11.    Bankruptcy Rule 3017(d) provides that, unless the Court orders otherwise,[9] all creditors and equity security holders should be mailed (i) the plan or a summary of the plan, (ii) the disclosure statement, (iii) a notice of the time within which acceptances and rejections of the plan may be filed and (iv) any other information as the Court may direct.  Fed. R. Bankr. P. 3017(d).  Bankruptcy Rule 3017(d) also requires that holders of claims or equity interests entitled to vote on the plan be sent ballots that conform to Official Form 14.  *Id.*

12.    On October 30, 2010, the Debtors caused the Solicitation Package to be transmitted to Holders of Claims in the Voting Classes.  The Ballots conform with Official Form 14, except to the extent that they have been tailored to address the particular circumstances of these chapter 11 cases and to include certain additional information that the Debtors believe to be relevant and appropriate for creditors entitled to vote to accept or reject the Plan.

13.    The Solicitation Packages were transmitted by the Debtors to the Voting Agent which, in turn, forwarded the Solicitation Packages, by overnight mail, to the Holders of Claims in the Voting Classes as of the Voting Record Date.  Such Holders were instructed to return their Ballots to the address specified on the pre-addressed, postage-paid envelope included in the Solicitation Package.  All other Classes of Claims and Interests were not provided with a Solicitation Package, but Holders of Interests in AMI were given a separate letter indicating how they could receive a copy of the Plan and the Disclosure Statement.  Such Holders hold Claims or Interests in Classes that are either (i) unimpaired and conclusively presumed to accept the Plan

---

[9]    On November 19, 2010, the Court entered an order relieving the Debtors of the obligation to mail copies of the Plan and the Disclosure Statement to holders of Claims and Interests in Classes that are presumed to accept or deemed to reject the Plan, unless a specific written request is made to counsel to the Debtors or the Voting Agent. *See* Docket No. 47.

pursuant to Bankruptcy Code section 1126(f) or (ii) impaired, entitled to receive no distribution on account of such Claims or Interests, and therefore deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).

**C.     The Holders of Claims in the Voting Classes Were Provided a Reasonable Time to Accept or Reject the Plan**

14.     Bankruptcy Rule 3018(b) provides that prepetition acceptances or rejections of a plan are valid only if the plan was transmitted to substantially all the holders of claims or equity interests in each solicited class and the time for voting was not unreasonably short.  Fed. R. Bankr. P. 3018(b).  The Prepack Guidelines provide that the Court will approve as reasonable a "fourteen (14) day voting period, measured from the date of commencement of mailing" for debt for borrowed money and securities which are not Publicly Traded Securities (as defined in the Prepack Guidelines).  The Debtors have no Publicly Traded Securities.

15.     The Debtors commenced the solicitation of votes for approval of the Plan on or about October 30, 2010.  As previously noted, the Debtors established 5:00 p.m. (Prevailing Eastern Time) on November 15, 2010 as the Voting Deadline, which is a period of sixteen (16) days (the "***Voting Period***") – two more days than required.  In addition, the Ballots clearly indicated that all Ballots were required to be properly executed, completed and delivered to the Voting Agent, so that they were actually received by the Voting Agent prior to the Voting Deadline.

**D.     The Debtors' Vote Tabulation Procedures Should Be Approved**

16.     Bankruptcy Code section 1126(c) provides:

A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).  Further, Bankruptcy Rule 3018(a) provides that the "court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."  Fed. R. Bankr. P. 3018(a).

17.     The Debtors request that the Court approve their vote tabulation methodology.  In determining whether the Plan had been accepted or rejected, the Voting Agent did not count or consider the following Ballots: (i) any Ballot that was received after the Voting Deadline; (ii) any Ballot that was illegible, mutilated or incomplete; (iii) any Ballot that did not indicate an acceptance or rejection or that indicated both an acceptance and a rejection; (iv) any Ballot cast or submitted by a person or entity that did not hold a claim in one of the Voting Classes; (v) any form of Ballot other than the official form sent by the Voting Agent or a copy of such official form; (vi) any copy of a Ballot, facsimile Ballot, or Ballot transmitted by electronic means; and (vii) any Ballot that was superseded by a properly executed duplicate Ballot voting the same claim prior to the Voting Deadline.

18.     The Voting Agent tabulated Ballots based on information regarding the holdings of each of the Holders of Claims in the Voting Classes that was received from the Administrative Agent and the Depository Trust & Clearing Corporation.

**E.     The Debtors' Prepetition Solicitation Was Exempt from Registration and Disclosure Requirements Otherwise Applicable Under Nonbankruptcy Law**

19.     Bankruptcy Code section 1126(b) provides, in relevant part, as follows:

[A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if — (1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

11 U.S.C. § 1126(b).  Thus, prepetition solicitation must comply with either generally applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, the solicited holders must receive "adequate information" under Bankruptcy Code section 1125.

20.     The Debtors respectfully submit that their prepetition solicitation is exempt from registration pursuant to section 4(2) of the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa (as amended from time to time, the "*Securities Act*") and under state "Blue Sky" laws, or any similar rules, regulations, or statutes.  Specifically, section 4(2) of the Securities Act creates an exemption from the registration requirements under the Securities Act for transactions not involving a "public offering."  By virtue of Section 18 of the Securities Act, section 4(2) also provides that any state "Blue Sky" law requirements shall not apply to such offer or sale.  The Debtors believe that their prepetition solicitation did not constitute a public offering because the manner in which the Debtors conducted the solicitation does not constitute a general solicitation, and none of the securities issued pursuant to the Plan will be registered under the Securities Act or other "Blue Sky" requirements.  Therefore, the requirements of Bankruptcy Code section 1126(b)(1) are inapplicable to the Debtors' prepetition solicitation.

## V.     THE ELECTION PROCEDURES SHOULD BE APPROVED

21.     Pursuant to the Plan, each Holder of a Term Facility Claim other than a Backstop Party had the right to elect to require that the Backstop Parties purchase in cash from such Holder, on the Effective Date of the Plan, its *pro rata* share of the New Second Lien Notes which it receives pursuant to the Plan for the face amount of such Holder's New Second Lien Notes.  In order to enable applicable Holders of Term Facility Claims to make the foregoing election, the Debtors (i) distributed an Election Form to such Holders on November 24, 2010 and (ii) required that applicable Holders of Term Facility Claims return the Election Form to the Voting Agent by

December 10, 2010 at 5:00 p.m. (ET), unless such deadline was extended by the Debtors (the "*Election Procedures*" and, together with the Solicitation Procedures, the "*Solicitation and Election Procedures*").[10]  The Debtors submit that the form of the Election Form is appropriately tailored to the requirements of the election contemplated by the Plan, and that the timeline for the distribution and return of the Election Forms was reasonable and appropriate.

## VI.    THE PLAN SHOULD BE CONFIRMED[11]

22.     To confirm the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of Bankruptcy Code section 1129 by a preponderance of the evidence.  *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown") (footnote omitted).  As set forth below and in the Declaration of Christopher Polimeni in Support of Confirmation of the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Docket No. 119) (the "*Polimeni Declaration*") and the Declaration of Zul Jamal in Support of

---

[10]     As previously noted, upon the request of counsel to the Administrative Agent, on December 7, 2010, the Election Form was transmitted to counsel to the Administrative Agent to be distributed to certain entities who alleged an entitlement to receive a distribution as a Class 2 claimant.  The Debtors allowed such claimants to submit an Election Form on a provisional basis and agreed to extend the election deadline for such parties to December 14, 2010 at 5:00 p.m. (ET).  The Administrative Agent will determine to what extent, if any, these claimants are entitled to any recovery.

Confirmation of the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (Docket No. 120) (the "***Jamal Declaration***"), the Debtors, and the Plan presented by the Debtors, satisfy each of the requirements of Bankruptcy Code section 1129. Accordingly, the Plan should be confirmed.

**A. The Plan Complies with the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(1)**

23. Bankruptcy Code section 1129(a)(1) requires that "[t]he plan compl[y] with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). Bankruptcy Code section 1129(a)(1) has been interpreted by courts as requiring that a plan comply with section 1122 (governing classification of claims) and 1123 (governing the contents of a plan). *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 ("***Drexel I***") (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 (stating that "[p]aragraph (1) [of 1129(a)] requires that the plan comply with the applicable provisions of chapter 11, such as §§ 1122 and 1123, governing classification and contents of [a] plan"); H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 (same). As set forth below, the Plan complies fully with the requirements of both Bankruptcy Code sections 1122 and 1123.

**1. *The Plan Satisfies the Classification Requirements of 11 U.S.C. § 1122***

24. Bankruptcy Code section 1122 governs the classification of claims or interests under a plan and provides, in pertinent part, as follows:

---

[11] Bankruptcy Code sections 1129(a)(14)-(16) are inapplicable to the Plan and therefore are not discussed herein.

(a)     Except as provided in subsection (b) of this section, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)     A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.  Under this section, the relevant inquiries are (i) whether all claims and interests in a class have substantially similar rights with respect to the debtor's assets, and (ii) whether there are sufficient business or legal justifications to justify separate classes of similar claims or interests.  *See In re Chateaugay Corp.,* 89 F.3d 942, 949 (2d Cir. 1996).

25.     Section 3 of the Plan provides for the classification of Claims and Interests in ten individual Classes, each based upon the legal nature and/or priority of such Claims and Interests. Administrative Claims and Priority Tax Claims are not classified and are separately treated in Section 2 of the Plan.  The Classes of Claims and Interests are as follows:

| | |
|---|---|
| **Class 1** | Priority Non-Tax Claims |
| **Class 2** | Term Facility Claims |
| **Class 3** | Revolver Claims |
| **Class 4** | Other Secured Claims |
| **Class 5** | PIK Notes Claims |
| **Class 6** | Subordinated Notes Claims |
| **Class 7** | 2011 Notes Claims |
| **Class 8** | General Unsecured Claims |
| **Class 9** | Intercompany Claims |
| **Class 10** | Interests in AMI |

26.     Each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class.  In addition, the Plan's classification scheme properly

follows the Debtors' capital structure. Specifically, (i) secured debt is classified separately from unsecured debt and (ii) the various tranches of unsecured bond debt are classified separately. This gives effect to priority and subordination issues. Accordingly, the Debtors' classification of Claims and Interests does not prejudice the rights of Holders of such Claims and Interests. *See In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990) (plan proponent allowed considerable discretion to classify claims and interests according to facts and circumstances of case so long as classification scheme does not violate basic priority rights or manipulate voting). The classification of Claims and Interests in the Plan complies with Bankruptcy Code section 1122.

### 2. The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)

27. Bankruptcy Code section 1123(a) sets forth seven (7) requirements for the contents of a plan of reorganization with which every chapter 11 plan must comply. *See* 11 U.S.C § 1123(a). As demonstrated below, the Plan fully complies with each of those requirements.

### a. The Plan Designates Classes of Claims and Interests – 11 U.S.C. § 1123(a)(1)

28. Bankruptcy Code section 1123(a)(1) requires that a plan designate classes of claims, other than claims of a kind specified in Bankruptcy Code sections 507(a)(1) (administrative expense claims), 507(a)(2) (claims arising during the "gap" period in an involuntary case), or 507(a)(8) (priority tax claims). *See* 11 U.S.C. § 1123(a)(1). As set forth above, Section 3 of the Plan designates ten (10) Classes of Claims and Interests and therefore complies with Bankruptcy Code section 1123(a)(1).

### b. The Plan Specifies Unimpaired Classes – 11 U.S.C. § 1123(a)(2)

29. Bankruptcy Code section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan." *See* 11 U.S.C. § 1123(a)(2). Section 3 of

the Plan specifies the Classes of Claims and Interests that are unimpaired under the Plan and, thus, the Plan complies with Bankruptcy Code section 1123(a)(2).

### c. *The Plan Adequately Specifies the Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)*

30.     Bankruptcy Code section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan." *See* 11 U.S.C. § 1123(a)(3). Section 4 of the Plan specifies the treatment of those Classes of Claims and Interests that are impaired under the Plan and thus the Plan complies with Bankruptcy Code section 1123(a)(3).

### d. *The Plan Provides for the Same Treatment for Claims or Interests Within the Same Class – 11 U.S.C. § 1123(a)(4)*

31.     Bankruptcy Code section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This provision provides creditors of the same class with a right to equality of treatment. Section 4 of the Plan provides for equality of treatment for each Claim or Interest within a particular Class and thus the Plan complies with Bankruptcy Code section 1123(a)(4).

### e. *The Plan Provides Adequate Means for its Implementation – 11 U.S.C. § 1123(a)(5)*

32.     Bankruptcy Code section 1123(a)(5) requires a plan of reorganization to "provide adequate means for the plan's implementation" and sets forth several examples of such means, including retention by the debtor of property of the estate, sales of the debtor's property, satisfaction or modification of any lien, and issuance of securities of the debtor in exchange for claims or interests. 11 U.S.C. § 1123(a)(5); *see generally In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25, 2005).

33. Section 5 of the Plan provides for, among other things: (i) the distribution of New Second Lien Financing; (ii) the offer to purchase New Second Lien Notes; (iii) the issuance of New Common Stock; (iv) the cancellation of existing securities and agreements; (v) the entry into a Stockholders Agreement by the Reorganized Debtors and the parties that receive New Common Stock under the Plan; (vi) the cancellation of liens; and (vii) the limited substantive consolidation of the Debtors' estates. In addition, Section 5 of the Plan provides for the establishment of an Equity Incentive Plan and a Director Severance Plan, and Section 5.2(a) of the Plan authorizes the Debtors to implement an Emergence Incentive Plan. Moreover, the Debtors have also filed with the Court many of the salient documents that will govern the operations of the Reorganized Debtors in connection with the Plan Supplement. *See* Docket No. 116.

### 1. The Limited Substantive Consolidation of the Debtors' Estates Is Appropriate

34. In addition to the foregoing, Section 5.1 of the Plan provides for the limited substantive consolidation of the Debtors' estates for purposes of the Plan only. Accordingly, on the Effective Date, all of the Debtors and their estates will, for Plan purposes only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (d) any Claim filed in the chapter 11 cases shall be deemed filed against the consolidated Debtors and a single obligation of the Debtors on and after the Effective Date. The proposed substantive consolidation of the Debtors' estates is limited in that it shall not (other than for voting,

treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the Debtor Subsidiaries), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor.

35. The text of the Bankruptcy Code contemplates that a consolidation may appropriately be used to effectuate a plan of reorganization. *See* 11 U.S.C. § 1123(a)(5)(C) (stating that "[n]othwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plans implementation, such as . . . consolidation of the debtor with one or more persons . . . ."); *see also In re WorldCom, Inc.*, Case No. 02-13533, 2003 WL 23861928, at *35 (Bankr. S.D.N.Y. Oct. 31, 2003) (nothing that consolidation is contemplated by Bankruptcy Code section 1123(a)(5)); *In re Footstar, Inc.*, Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Sept. 30, 2005) (same). Indeed, it is well established that courts have the general equitable power to order such consolidations in circumstances where consolidation is not employed by a plan proponent "offensively to achieve advantage over one group in the plan negotiation process." *See, e.g.*, *In re Owens Corning*, 419 F.3d 195, 215 (3d Cir. 2005); *Union Sav. Bank. v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518-19 (2d Cir. 1988) (observing that, as an equitable remedy, consolidation is also used to afford creditors equitable treatment and thus may be ordered when the benefits to creditors therefrom exceed any harm suffered).

36. Pursuant to Section 5.1 of the Plan, the Debtors propose the substantive consolidation of their estates solely to facilitate implementation of the Plan. The Debtors do not seek to improperly enhance or impair the recoveries of any creditors by way of the substantive consolidation. Indeed, the Debtors are not aware of any creditor actually affected by the substantive consolidation of their estates contemplated by the Plan.

37.     It is well-settled that substantive consolidation is appropriate where creditors consent to it.  *See, e.g.*, *In re Owens Corning*, 419 F.3d at 211 (describing standards for consolidation as "what must be proven (absent consent) . . . ."); *In re Delta Air Lines, Inc.*, 370 B.R. 537, 539 (Bankr. S.D.N.Y. 2007) (consolidation of debtors for plan purposes approved where no objection lodged); *In re Kaiser Aluminum Corp.*, Case No. 02-10429 (JFK), 2006 WL 616243, at *22 (Bankr. D. Del. Feb. 6, 2006) (approving "deemed substantive consolidation" where (i) deemed consolidation "will promote efficiency and decrease costs in the implementation of the Plan," and (ii) no creditor objected to the proposed deemed consolidation and stating that "[i]n the absence of any creditor objection to the deemed substantive consolidation, and in light of the overwhelming creditor support for the Plan, the deemed substantive consolidation of the Substantively Consolidated Debtors . . . is consensual.").  In fact, consensual consolidations have routinely been approved in this judicial district.  *See, e.g.*, *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 08-14818 (BRL) (Bankr. S.D.N.Y. Aug. 19, 2009); *In re Dana Corp.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. Dec. 26, 2007); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Apr. 25, 2007); *In re Adelphia Commc'ns Corp.*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Jan. 5, 2007);  *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094 (each approving consolidation of the debtors for plan implementation purposes).

38.     In these chapter 11 cases, the Debtors' creditors have voted overwhelmingly in support of the Plan.  Classes 2, 5 and 6 voted unanimously to accept the Plan, and the rejection of the Plan by Class 7 was based on the vote of only a single creditor holding $3,106,782 in Claims against the Debtors.  Moreover, no creditor has objected to the substantive consolidation of the

Debtors' estates contemplated by the Plan.  Accordingly, the proposed substantive consolidation of the Debtors' estates is consensual and should be approved.

39.     Moreover, even if the substantive consolidation of the Debtors' estates was not consensual, there is a sufficient basis upon which to authorize substantive consolidation.  In determining whether substantive consolidation is warranted, courts in this district apply the following two prong disjunctive test: (i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit; or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors.  *See In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d at 518.

40.     As set forth in the Polimeni Declaration, the limited substantive consolidation of the Debtors' estates is warranted on the facts of these cases.  Specifically, the Debtors' creditors generally dealt with the Debtors as a single business unit.  Indeed, the Debtors believe that many of their creditors, including their wholesalers and advertisers, are unaware of the legal distinctions between the various Debtor entities.  As a result, the Debtors' creditors believed they were dealing with AMI and were largely unaware of the existence of separate Debtor subsidiaries.  Even the Debtors' lenders dealt with the Debtors' enterprise as a whole.  Therefore, from the perspective of the Debtors' creditors, the Debtors operate as a single business enterprise.

41.     Finally, in the event that the Court does not approve the substantive consolidation of the Debtors' estates for Plan purposes only, the Debtors have reserved the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by-entity basis.  As such, the Debtors request that (i) the Plan be treated as a separate plan of reorganization for each of the Debtors, (ii) the Debtors not be required to re-solicit votes with respect to the Plan, and (iii) the

Court confirm the Plan. As set forth in the Jamal Declaration, while the Debtors believe the substantive consolidation of the estates will, among other things, facilitate timely distributions, the Debtors do not believe that the de-consolidation of their estates would have any impact on creditor recoveries. All Allowed General Unsecured Creditors are contemplated to be paid in full, whereas the Debtors' funded debt Claim Holders (i.e. those Holders of Claims in Classes 2, 5, 6 and 7) would be entitled to assert the full amount of their respective claims at AMO and each Debtor subsidiary entity because each of the foregoing is either a borrower/issuer or guarantor under the 2009 Credit Agreement and the Indentures.

42. Based on the foregoing, Debtors submit that the Plan complies with Bankruptcy Code section 1123(a)(5).

### f. *Prohibition of the Issuance of Nonvoting Equity Securities – 11 U.S.C. § 1123(a)(6)*

43. Bankruptcy Code section 1123(a)(6) requires a plan of reorganization to provide for the inclusion in a debtor's corporate charter of provisions prohibiting the issuance of non-voting equity securities and arranging "an appropriate distribution" of power among the classes of securities possessing voting power. *See* 11 U.S.C. § 1123(a)(6). Section 5.2(b) of the Plan specifically provides that:

> In addition, on or before the Effective Date, pursuant to and only to the extent required by Bankruptcy Code section 1123(a)(6), the Restated Certificate of Incorporation, the New Preferred Stock Certification of Designation (if applicable), the certificates of incorporation of the Debtors that are corporations, and the organization documents for the Debtors that are limited liability companies shall also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision increasing the number of authorized shares of Reorganized AMI, (ii) a provision prohibiting the issuance of non-voting equity securities and (iii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

*See* Plan, Section 5.2(b).  The Plan therefore complies with Bankruptcy Code section 1123(a)(6).

### g. The Plan Contains Appropriate Provisions with Respect to the Selection of Post-Confirmation Directors and Officers – 11 U.S.C. § 1123(a)(7)

44.     Bankruptcy Code section 1123(a)(7) provides that a plan may "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  This provision is supplemented by Bankruptcy Code section 1129(a)(5), which directs the scrutiny of the Court to the methods by which the management of the reorganized corporation is to be chosen to provide adequate representation of those whose investments are involved in the reorganization, such as creditors and equity holders.  *See* 7 *Collier on Bankruptcy* ¶ 1123.01[7] (16th ed. 2010).

45.     Sections 5.2(c) and (d) of the Plan comply with Bankruptcy Code section 1123(a)(7) by properly and adequately disclosing or otherwise identifying the procedures for determining the identity and affiliations of all individuals or entities proposed to serve as officers or members of the boards of directors, as applicable, of the Reorganized Debtors.  Specifically, Section 5.2(c) provides that the initial boards of directors of Reorganized AMI will be composed of nine members, eight of whom shall be selected by members of the Committee consistent with the terms outlined in the Stockholders Agreement, and one of whom shall be the post-Effective Date chief executive officer of AMI.  In addition, Section 5.2(d) of the Plan provides that, after the Effective Date, the selection of officers of the Reorganized Debtors will be as provided in the organizational documents for the applicable Reorganized Debtors.  Moreover, the Debtors disclosed the identity of the members of the initial boards of directors and the initial officers of

the Reorganized Debtors in connection with the filing of the Plan Supplement. *See* Docket No. 116. The selection process for the initial members of the boards of directors and the officers of the Reorganized Debtors provides adequate representation of the interests of the Holders of Claims and Interests and is consistent with public policy. The Plan therefore complies with Bankruptcy Code section 1123(a)(7).

### 3. *The Plan Complies with the Requirements of 11 U.S.C. § 1123(b)*

46. Bankruptcy Code section 1123(b) sets forth the permissive provisions that may be incorporated into a chapter 11 plan, including any "provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." *See* 11 U.S.C. § 1123(b)(6). The permissive provisions contained in the Plan are discussed below.

#### a. *The Plan Impairs Certain Classes and Leaves Others Unimpaired – 11 U.S.C. § 1123(b)(1)*

47. Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). Pursuant to Sections 3 and 4 of the Plan, (a) Classes 2, 5, 6, 7, 9, and 10 are impaired, and (b) Classes 1, 3, 4, and 8 are unimpaired. The Plan complies with Bankruptcy Code section 1123(b)(1).

#### b. *Treatment of Executory Contracts and Unexpired Leases – 11 U.S.C. § 1123(b)(2)*

48. Section 1123(b)(2) allows a Plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to Bankruptcy Code section 365. Section 8.1 of the Plan provides that, except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors will be deemed to have assumed each executory contract and unexpired lease to which they are a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or

terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors

on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or

unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement. The

Debtors have determined not to reject any of their executory contracts or unexpired leases and,

accordingly, the Plan Supplement filed by the Debtors on December 15, 2010 does not include a

schedule of any executory contracts or unexpired leases to be rejected by the Debtors.

### c. *Settlement or Retention of Claims or Interests – 11 U.S.C. § 1123(b)(3)*

49. Bankruptcy Code section 1123(b)(3) provides that a plan may provide for the

settlement or retention of any claim or interest belonging to the debtor. Section 10.9 of the Plan

provides that all claims or causes of actions accruing to the Debtors, other than those claims and

causes of action that are released or enjoined pursuant to the Debtor Release, the Third Party

Release, the Exculpation or the Injunction (each as defined below), shall become assets of the

Debtors on the Effective Date.

### d. *Other Appropriate Measures – 11 U.S.C. § 1123(b)(6)*

50. Bankruptcy Code section 1123(b)(6) is a catch-all provision that permits inclusion

of any appropriate provision so long as it is consistent with the applicable provisions of the

Bankruptcy Code. Section 11 of the Plan provides that, among other things, the Court shall

retain jurisdiction over all matters arising in, arising under, and related to the Debtors' chapter 11

cases and the Plan. This provision is appropriate because the Court otherwise has jurisdiction

over all of these matters during the pendency of these chapter 11 cases, and case law establishes

that a bankruptcy court may retain jurisdiction over the debtor or the property of the estate

following confirmation. *See Universal Oil Ltd. v. Allfirst Bank (In re Millenium Seacarriers,*

*Inc.)*, 419 F.3d 83, 96 (2d Cir. 2005) ("a bankruptcy court retains post-confirmation jurisdiction

to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of

reorganization.") (quoting *In re Petrie Retail*, 304 F.3d 223, 230 (2d Cir. 2002)). Accordingly, the continuing jurisdiction of the Court is consistent with applicable law and is therefore permissible under Bankruptcy Code section 1123(b)(6).

51. Based upon the foregoing, the Plan fully complies with the requirements of Bankruptcy Code sections 1122 and 1123, as well as with all other provisions of the Bankruptcy Code, and thus satisfies the requirement of Bankruptcy Code section 1129(a)(1).

**B. The Debtors, as Plan Proponents, Have Complied With the Applicable Provisions of the Bankruptcy Code – 11 U.S.C. § 1129(a)(2)**

52. Bankruptcy Code section 1129(a)(2) requires the proponent of a plan to comply "with the applicable provisions of this title." See 11 U.S.C. § 1129(a)(2). Whereas Bankruptcy Code section 1129(a)(1) focuses on the form and content of a plan itself, section 1129(a)(2) is concerned with the applicable activities of a plan proponent under the Bankruptcy Code. *See* 7 *Collier on Bankruptcy* ¶ 1129.03[2], at 1129-26 (15th ed. Rev. 2006). In determining whether a plan proponent has complied with this section, courts focus on whether the disclosure and solicitation requirements adhere to Bankruptcy Code sections 1125 and 1126. *See, e.g., In re WorldCom, Inc.*, 2003 WL 23861928, at *49 ("The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code."); *Drexel I*, 138 B.R. at 759 (noting that the legislative history of section 1129(a)(2) explains that this provision embodies the disclosure and solicitation requirements under section 1125 and 1126); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part, on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd*, 843 F.2d 636 (2d Cir. 1988) (stating that "[o]bjections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code"). As discussed above, the Debtors have complied with all

applicable disclosure and solicitation requirements of Bankruptcy Code sections 1125 and 1126. Thus, the requirements of Bankruptcy Code section 1129(a)(2) have been satisfied.

**C.     The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law – 11 U.S.C. § 1129(a)(3)**

53.     Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The United States Court of Appeals for the Second Circuit (the "***Second Circuit***") has defined the good faith standard as requiring a showing that "the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988) (citing *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984) (internal quotations omitted)). In the context of a chapter 11 plan, courts have held that "a plan is proposed in good faith if there is a likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *In re WorldCom, Inc.*, 2003 WL 23861928, at *51; *see also In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999). Moreover, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied." *In re Mid-State Raceway, Inc.*, Case No. 04-65746, 2006 WL 4050809, at *16 (Bankr. N.D.N.Y. Feb. 10, 2006) (quoting *Brite v. Sun Country Dev., Inc.* (*In re Sun Country Dev., Inc.*), 764 F.2d 406, 408 (5th Cir. 1985)); *see also In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *5 (Bankr. S.D.N.Y. Sept. 17, 2007) (holding that the good faith requirement was satisfied where the plan was proposed with the legitimate and honest purpose of reorganizing the debtors, maximizing the value of the debtors' assets, and expeditiously making distributions to creditors and other interest holders); *In re*

*Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *6 (Bankr. S.D.N.Y. May 25, 2005) (same); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) (same). The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *See In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 945 (Bankr. S.D.N.Y. 1994).

54. The Debtors have proposed the Plan in good faith, with the legitimate and honest purpose of reorganizing the Debtors' ongoing businesses and improving the Debtors' financial position while providing significant recoveries to their creditors. The Plan is the product of extensive negotiations among the Debtors and certain of their major creditors, including the Committee and the Administrative Agent. These negotiations resulted in a Plan that was supported by almost every single one of the Debtors' creditors that voted. The support of the Committee, the Administrative Agent and the overwhelming acceptance of the Plan by Holders of Claims entitled to vote on the Plan reflect the overall fairness of the Plan and the acknowledgement by the Debtors' creditors that the Plan has been proposed in good faith and for proper purposes. *See In re Eagle-Picher Indus.*, 203 B.R. 256, 274 (Bankr. S.D. Ohio 1996), aff'd, 172 F.3d 48 (6th Cir. 1998) (finding that a plan of reorganization was proposed in good faith when, among other things, it was based on extensive negotiations among the plan proponents and other parties in interest).

**D.     The Plan Provides for Court Approval of Payment of Services and Expenses – 11 U.S.C. § 1129(a)(4)**

55. Bankruptcy Code section 1129(a)(4) provides that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

*See* 11 U.S.C. § 1129(a)(4).  In essence, this subsection requires that any and all postpetition fees

in the bankruptcy case be disclosed and subject to the court's review.  *See In re Johns-Manville*

*Corp.*, 68 B.R. at 632 (Bankr. S.D.N.Y. 1986) (implying that the court must be permitted to

review and approve the reasonableness of professional fees paid from estate assets).  *In re*

*Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a

plan may be confirmed, "there must be a provision for review by the Court of any professional

compensation.").

56.     Pursuant to Section 2.2 of the Plan, the payment of compensation for services

rendered or reimbursement for expenses incurred by professionals in connection with the

Debtors' chapter 11 cases under Bankruptcy Code sections 330, 331, 503(b)(2), 503(b)(3),

503(b)(4) or 503(b)(5) are subject to review by the Court.  Section 2.2 of the Plan further

provides that the Debtors will pay all reasonable fees, costs and expenses of the Committee's

counsel incurred through and including the date on which the Plan is confirmed.  In addition,

Section 11(h) of the Plan provides that the Court will retain jurisdiction after the Effective Date

to hear and determine all applications of retained professionals under Bankruptcy Code sections

330, 331 and 503(b) for awards of compensation for services rendered or expenses incurred prior

to the Effective Date.

57.     Based on the foregoing, the Plan fully complies with the requirements of

Bankruptcy Code section 1129(a)(4).

**E.      All Necessary Information Regarding the Directors and Officers of the Debtors**
**Under the Plan Has Been Disclosed – 11 U.S.C. § 1129(a)(5)**

58.     Bankruptcy Code section 1129(a)(5) provides that a plan of reorganization may

be confirmed if the proponent discloses the identity of those individuals who will serve as

management of the reorganized debtor, the identity of any insider to be employed or retained by

the reorganized debtor and the compensation to be paid to such insider.  11 U.S.C. § 1129(a)(5)(B).  In addition, under Bankruptcy Code section 1129(a)(5)(A)(ii), the appointment of, or continuation in office of, existing management must be consistent with the interests of creditors, equity security holders and public policy.  11 U.S.C. § 1129(a)(5)(A)(ii).

59.     In determining whether the post-effective date management of a debtor is consistent with the interests of creditors, equity security holders, and public policy, a court must consider proposed management's competence, discretion, experience, and affiliation with entities having interests adverse to the debtor.  *See In re Sherwood Square Assocs.*, 107 B.R. 872, 878 (Bankr. D. Md. 1989); *see also In re W.E. Parks Lumber Co.*, 19 B.R. 285, 292 (Bankr. W.D. La. 1982) (a court should consider whether "the initial management and board of directors of the reorganized corporation will be sufficiently independent and free from conflicts and the potential of post-reorganization litigation so as to serve all creditors and interested parties on an even and loyal basis").  In general, however, "[t]he [d]ebtor should have first choice of its management, unless compelling cause to the contrary exists."  *In re Sherwood Square Assocs.*, 107 B.R. at 878.  The case law is also clear that a plan may contemplate the retention of the debtor's existing directors and officers.  *See, e.g.*, *In re Texaco Inc.*, 84 B.R. 893, 906 (Bankr. S.D.N.Y. 1988) (determining that section 1129(a)(5) was satisfied where plan disclosed debtor's existing directors and officers who would continue to serve in office after plan confirmation); *see also In re Trans World Airlines, Inc.*, 185 B.R. 302, 314 (Bankr. E.D. Mo. 1995).

60.     In accordance with Sections 5.2(c) and (d) of the Plan, the Debtors filed a list of the initial members of the boards of directors of the Reorganized Debtors and the initial officers of the Reorganized Debtors with the Court as part of the Plan Supplement on December 15, 2010 (Docket No. 116).  Based on the standard set forth above, the Debtors submit that the

appointment of each of the proposed initial directors and officers of the Reorganized Debtors is consistent with the interests of the Debtors' creditors, equity security holders and public policy. In addition, the Debtors have disclosed the nature of compensation to be paid to any insiders, to the extent known. Specifically, as set forth in the Plan Supplement and Section 5.2 of the Plan, the Debtors will be assuming the prepetition employment agreements with the existing members of their management. Further, the Debtors filed the Director Severance Plan, the Emergence Incentive Plan and the Equity Incentive Plan as part of the Plan Supplement. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(5).

**F.** **The Plan Does Not Contain Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission – 11 U.S.C. § 1129(a)(6)**

61.     Bankruptcy Code section 1129(a)(6) requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its business approve any rate change provided for in a plan of reorganization. *See* 11 U.S.C. § 1129(a)(6). Bankruptcy Code section 1129(a)(6) is inapplicable because the Plan does not provide for a change in any rates that are subject to regulatory approval.

**G.** **The Plan is in the Best Interests of Creditors and Interest Holders – 11 U.S.C. § 1129(a)(7)**

62.     Bankruptcy Code section 1129(a)(7) requires that a plan be in the best interests of creditors and stockholders. The best interests test focuses on individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999). Under the best interests test, the court must find that each non-accepting creditor will receive or retain value that is not less than the amount it would receive if the debtor were liquidated in a hypothetical proceeding under chapter 7 of the Bankruptcy Code. *See 203 N. LaSalle*, 526 U.S. at 441; *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 228 (1996). By its express terms, Bankruptcy Code section 1129(a)(7)

applies only to non-accepting impaired claims or equity interests. *See* 11 U.S.C. § 1129(a)(7). If a class of claims or equity interests unanimously accepts the plan, the best interests test automatically is deemed satisfied for all members of that class.

63. Bankruptcy Code section 1129(a)(7) is inapplicable to Holders of Claims in Classes 1, 3, 4, and 8 because those Classes are unimpaired and deemed to accept, and to Holders of Claims in Class 9, which is impaired and deemed to accept. Bankruptcy Code section 1129(a)(7) is also inapplicable to Holders of Claims in Classes 2, 5 and 6, which unanimously voted to accept the Plan.

64. Bankruptcy Code section 1129(a)(7) is applicable with respect to Holders of Claims in Class 7 that voted to reject the Plan. In addition, Bankruptcy Code section 1129(a)(7) is applicable to Holders of Interests in Class 10 that were deemed to reject the Plan.

65. To determine the value that Holders of Claims in Class 7 or Interests in Class 10 would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Court must first determine the aggregate dollar amount that likely would be generated by the hypothetical liquidation of the Debtors in a case under chapter 7. The value generated in such a scenario would consist of the net proceeds of the disposition of each of the Debtors' assets and any cash held by the Debtors.

66. In addition, the liquidation of the Debtors' estates would also result in certain priority claims, such as severance pay, and would likely accelerate the payment of other priority claims and priority tax claims that otherwise would be payable in the ordinary course of business. These priority claims and tax claims would be paid in full out of the net proceeds of the liquidation of the Debtors' estates, after the payment of secured claims to the extent of the value of the underlying collateral, before the balance would be made available to pay general

unsecured claims or to make any distribution in respect of Interests. The Debtors further believe that the liquidation of their estates would result in an increase of the number and amount of general unsecured claims, including rejection damage claims, tax claims and other governmental claims.

67.     Exhibit I to the Disclosure Statement sets forth the liquidation analysis (the "***Liquidation Analysis***") prepared by the Debtors to determine whether the Plan satisfies the best interests test and to assist creditors in voting on the Plan. As set forth in the Liquidation Analysis and as further described in the Jamal Declaration, the distributions to be received by Holders of Claims in Class 7 or Interests in Class 10 in a hypothetical liquidation under chapter 7 of the Bankruptcy Code are less than or equal to the expected recoveries to such Holders under the Plan. Under the Plan, Holders of Claims in Class 7 will receive a distribution that is equal to approximately 53.5% of their Claims, but in a chapter 7 liquidation, there would likely be no distribution to Holders of Class 7 Claims. In addition, while Holders of Interests in Class 10 will not receive a distribution under the Plan, such Holders would similarly receive no distribution in a liquidation of the Debtors' estates under chapter 7 of the Bankruptcy Code.

68.     Based on the foregoing, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(7).

**H.      Acceptance by All Impaired Classes – 11 U.S.C. § 1129(a)(8)**

69.     Bankruptcy Code section 1129(a)(8) requires that each class of impaired claims or interests accept the plan: "With respect to each class of claims or interests - (A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). Class 7 voted to reject the Plan. In addition, Class 10 is impaired and deemed to reject the Plan under Bankruptcy Code section 1126(f) because Holders of Interests in Class 10 will not receive a recovery under the Plan. Accordingly, section 1129(a)(8) is not satisfied. As a result, the

Debtors must satisfy the "cram down" requirements of section 1129(b) (as discussed below) to confirm the Plan.

## I.  The Plan Provides for Payment of Priority Claims – 11 U.S.C. § 1129(a)(9)

70.     Bankruptcy Code section 1129(a)(9) requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under a plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) requires a plan to provide as follows:

(A)     with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)     with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive -

(i)     if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii)     if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)     with respect to a claim of a kind specified in section 507(a)(8) of [the Bankruptcy Code], the holder of such claim will receive on account of such claim regular installment payments in cash -

(i)     of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)     over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii)     in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b));

(D)     with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

11 U.S.C. § 1129(a)(9).

71.     In accordance with sections 1129(a)(9)(A) and (B), Section 2.1 of the Plan provides that Allowed Administrative Expense Claims shall be paid in full, in cash, on the latest of: (a) on or as soon as reasonably practicable after the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable.  Section 2.1 of the Plan further provides that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such transactions.  Thus, the Plan satisfies the requirements of Bankruptcy Code sections 1129(a)(9)(A) and (B).

72.     The Plan also satisfies the requirements of Bankruptcy Code section 1129(a)(9)(C) with respect to the treatment of Priority Tax Claims.  Section 2.3 of the Plan provides that each Allowed Priority Tax Claim shall (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in cash, on the Effective Date, or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable nonbankruptcy law, or in the ordinary course of business.  Based on the foregoing, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9).

**J.      The Plan Has Been Accepted by at Least One Impaired Class that is Entitled to Vote – 11 U.S.C. § 1129(a)(10)**

73.     Bankruptcy Code section 1129(a)(10) requires that, if a class of claims is impaired under a plan, at least one class of impaired claims must have voted to accept the plan.

*See* 11 U.S.C. § 1129(a)(10).  The Plan satisfies that requirement.  Classes 2, 5 and 6 are

impaired under the Plan and have voted to accept the Plan.  These Classes, therefore, qualify as

impaired accepting classes and satisfy the requirement of section 1129(a)(10).

**K.     The Plan is Not Likely to be Followed by Liquidation or the Need for Further
        Financial Reorganization – 11 U.S.C. § 1129(a)(11)**

74.     Bankruptcy Code section 1129(a)(11) requires that, as a condition precedent to

confirmation, the Court determine that the Plan is feasible.  Specifically, the Court must

determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the
> need for further financial reorganization, of the debtor or any successor to the
> debtor under the plan, unless such liquidation or reorganization is proposed in the
> plan.

11 U.S.C. § 1129(a)(11).  As discussed in Section X.F. of the Disclosure Statement and the Jamal

Declaration, the Plan is feasible within the meaning of this provision.

75.     The feasibility test set forth in Bankruptcy Code section 1129(a)(11) requires the

Court to determine whether the Plan is workable and has a reasonable likelihood of success.  *See*

*United States v. Energy Res. Co., Inc.*, 495 U.S. 545, 549 (1990); *Kane v. Johns-Manville Corp.*,

843 F.2d 649.

76.     The Second Circuit has stated that "the feasibility standard is whether the plan

offers a reasonable assurance of success.  Success need not be guaranteed."  *Id.; see also In re*

*U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require

the certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In*

*re WorldCom, Inc.*, 2003 WL 23861928, at *57 ("The feasibility test set forth in section

1129(a)(11) requires the [c]ourt to determine whether the [p]lan is workable and has a reasonable

likelihood of success."); *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr.

S.D.N.Y. 1993) ("It is not necessary that the success be guaranteed, but only that the plan

presents a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.") (quoting 5 *Collier on Bankruptcy* ¶ 1129.02[11], at 1129-54 (15th ed. 1992)); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("Guaranteed success in the stiff winds of commerce without the protection of the [Bankruptcy] Code is not the standard under § 1129(a)(11).").

77.     The key element of feasibility is whether there exists a reasonable probability that the provisions of the plan can be performed.  The purpose of the feasibility test is to protect against visionary or speculative plans.  *See In re Kent Terminal Corp.*, 166 B.R. 555, 560 (Bankr. S.D.N.Y. 1994).  "Just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds."  *In re Drexel I*, 138 B.R. at 762.

78.     Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

      (1)     the adequacy of the capital structure;

      (2)     the earning power of the business;

      (3)     economic conditions;

      (4)     the ability of management;

      (5)     the probability of the continuation of the same management; and

      (6)     any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See In re Leslie Fay Cos., Inc.*, 207 B.R. at 789 (citing 7 *Collier on Bankruptcy* ¶ 1129.LH[2], at 1129-82 (15th ed. rev. 1996)); *see also In re Texaco*, 84 B.R. at 910; *Prudential Energy*, 58 B.R. at 862-63.  The foregoing list is neither exhaustive nor exclusive.  *Drexel I*, 138 B.R. at 763.  The Plan satisfies these standards of feasibility.

79.     For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.  As part of this analysis, the Debtors have prepared a financial forecast (the "***Forecast***") for the Reorganized Debtors that is attached to the Disclosure Statement as Exhibit G, and that is discussed in detail in Section X.F. of the Disclosure Statement and the Jamal Declaration.  Based upon the information contained in the Disclosure Statement, the Jamal Declaration and the Forecast, the Debtors believe that their cash on hand upon emergence, together with the proceeds of the New Financing, will provide sufficient liquidity to make all payments required pursuant to the Plan and satisfy all ongoing capital requirements.  In addition, no party has challenged the Forecast or the feasibility of the Plan.

80.     The Debtors further believe that their new management team is qualified to manage the implementation of the Plan and achieve success following the Debtors' emergence from chapter 11, and that they have or will be able to satisfy all of the conditions precedent to the Effective Date contained in Section 9.1 of the Plan.

81.     Based upon the foregoing, the Plan is feasible because there is a reasonable likelihood that the Reorganized Debtors will meet their financial obligations under the Plan in the ordinary course of business and because confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Reorganized Debtors.  The Plan therefore satisfies the feasibility standard of Bankruptcy Code section 1129(a)(11).

**L.     The Plan Provides for Full Payment of All Statutory Fees – 11 U.S.C. § 1129(a)(12)**

82.     Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 [title 28, the United States Code], as determined by the court at the hearing on confirmation of the plan...."  11 U.S.C. § 1129(a)(12).  Bankruptcy Code section 507 provides that "any fees

and charges assessed against the estate under [section 1930] chapter 123 of title 28" are afforded priority as administrative expenses. *Id*. at § 507(a)(2). In accordance with Bankruptcy Code sections 507 and 1129(a)(12), Section 12.1 of the Plan provides that all such fees and charges will be paid on the Effective Date and thereafter as may be required. Thus, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(12).

**M.      The Plan Provides for an Appropriate Treatment of Retiree Benefits – 11 U.S.C. § 1129(a)(13)**

83.      Bankruptcy Code section 1129(a)(13) requires that a plan of reorganization provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to Bankruptcy Code section 1114 at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. Section 8.5 of the Plan provides that all employee compensation and benefit plans entered into before or after the Petition Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan. Section 8.5 of the Plan further provides that the Debtors' obligations under such plans and programs shall survive confirmation of the Plan. Thus, the requirements of Bankruptcy Code section 1129(a)(13) have been satisfied.

**N.      The Plan Satisfies the "Cram Down" Requirements of 11 U.S.C. § 1129(b)**

84.      As described above, Holders of Claims in Class 7 voted to reject the Plan, and Class 10 is deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g). As a result, Bankruptcy Code section 1129(a)(8) has not been satisfied and, accordingly, the Debtors are seeking confirmation of the Plan pursuant to Bankruptcy Code section 1129(b).

85.      Bankruptcy Code section 1129(b) provides a mechanism for confirmation of a plan in circumstances where the plan is not accepted by all impaired classes of claims and equity

interests. This mechanism is commonly referred to as "cram down." Section 1129(b) provides in pertinent part:

> Notwithstanding section 510(a) of [the Bankruptcy Code], if all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph *if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.*

11 U.S.C. § 1129(b)(1) (emphasis supplied). Thus, under Bankruptcy Code section 1129(b), the Court may "cram down" a plan that has not been accepted by all impaired classes if the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.

### 1. *The Plan Does Not Discriminate Unfairly With Respect to the Rejecting Classes*

86.     Bankruptcy Code section 1129(b)(1) does not prohibit discrimination between classes; it prohibits only discrimination that is *unfair*. *See In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990). The weight of judicial authority holds that a plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) only if similar classes are treated differently without a reasonable basis for the disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990); *Johns-Manville*, 68 B.R. 618. Accordingly, as between two classes of claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are comprised of dissimilar claims or interests, *see, e.g., Johns-Manville*, 68 B.R. at 636, or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable basis for such disparate treatment, *see, e.g., Buttonwood Partners*, 111 B.R. at 63; *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991).

87.     The Plan does not "discriminate unfairly" with respect to the rejecting Classes of Claims and Interests. Class 7 (2011 Notes Claims) and Class 10 (Interests in AMI) consist of

Claims that are dissimilar to other Classes of Claims treated under the Plan and Interests.

Accordingly, the separate classification of the Claims in Class 7 and the Interests in Class 10 is

appropriate. Moreover, Holders of Claims in Class 7 are receiving the same treatment as

Holders of Claims in Class 6. Specifically, Holders of Claims in Class 7 are receiving 2% of the

New Common Stock, which represents the *pro rata* portion that Class 7 represents of the

aggregate amount of Allowed Claims in Class 6 and Class 7 (subject to dilution on account of

the Backstop Shares and the Equity Incentive Plan). Based on the foregoing, the Debtors submit

that the Plan does not discriminate unfairly with respect to either Class 7 or Class 10.

Accordingly, the first prong of the cram down analysis is satisfied.

### 2. The Plan is Fair and Equitable with Respect to the Rejecting Classes

88. Bankruptcy Code section 1129(b) defines the phrase "fair and equitable" as

follows:

(a) As to secured creditors: Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds is provided in clause (i) or (ii) of this subparagraph.

(b) As to unsecured creditors: Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) As to equity interest holders: Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

11 U.S.C. § 1129(b)(2). In the instant case, the "fair and equitable" rule is satisfied with respect

to Class 7 because, as evidenced by the valuations and estimates contained in the Disclosure

Statement, no Class of Claims senior to Class 7 is receiving more than payment in full on account of such Claims, and no Class of Claims or Interests that is junior to Class 7 will receive any distribution under the Plan. In addition, the Plan is fair and equitable with respect to Class 10 because such Holders are not entitled to any recovery under the Plan, and no Holders of Interests junior to Class 10 will receive or retain any property under the Plan.

## VII. THE LIMITED RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS OF THE PLAN SHOULD BE APPROVED

89. The Plan provides for (i) the release of certain causes of action of the Debtors and their estates, (ii) the release of certain causes of action by certain Holders of Claims and Interests, (iii) the exculpation of claims for certain parties, and (iv) a permanent injunction enjoining the prosecution of certain claims. The release, exculpation and injunction provisions contained in the Plan are proper because, among other things, such provisions are the product of arm's-length negotiations and have been critical to the formulation of the Plan.

**A.     The Debtor Release Should Be Approved**

90.     Section 10.7 of the Plan (the "***Debtor Release***") contains a release of the Released Parties[12] from all claims and causes of action that the Debtors, the Reorganized Debtors and the estates and their Affiliates would have been entitled to assert based on or relating to, among other things, (i) the Debtors, (ii) the chapter 11 cases, (iii) the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, (iv) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, (v) the business or contractual arrangements between any Debtor and any Released Party, (vi) the restructuring of Claims and Interests before or during the chapter 11 cases, (vii) the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments or other documents, or (viii) other acts, omissions, transactions, agreements or events taking place on or before the Effective Date.  The Debtor Release does not

absolve any Released Party from liability with respect to (a) any act or omission that constitutes gross negligence, willful misconduct, criminal acts or fraud or (b) Claims that arise in the ordinary course of the Debtors' businesses and contractual obligations that are not otherwise being satisfied or discharged under the Plan (the "***Release Carve Out***").

91.     Pursuant to Bankruptcy Code section 1123(b)(3)(A), a plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  11 U.S.C. § 1123(b)(3)(A).  The rules governing the approval of a settlement under Bankruptcy Rule 9019 are useful in evaluating plan releases.  In reviewing such releases, courts frequently use the benchmark for approval of a settlement under Bankruptcy Rule 9019.  *See, e.g.*, *Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 33 (2d Cir. 1995) (the release and injunction provisions of the plan were deemed submitted for approval of the

---

12      The Released Parties include each of:  (i) the Debtors and Reorganized Debtors; (ii) any direct or indirect shareholder of the Debtors, and such shareholder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors; (iii) the current and former (in each case, as of the Effective Date) directors, officers, and employees, professional advisors, sub-advisors, managers, affiliated management companies, and managing and executive directors of the Debtors; (iv) the members of the Committee and their respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, and managing and executive directors; (v) the Indenture Trustees and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (vi) the Term Facility Lenders, the Revolver Lenders, the Administrative Agent, the collateral agent and other agents under the 2009 Credit Agreement and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (vii) the New First Lien Notes Holders and the indenture trustee, the escrow agent and the collateral agent under the New First Lien Indenture, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (viii) the New Second Lien Notes Holders and the indenture trustee, the escrow agent, and the collateral agent under the New Second Lien Indenture, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (ix) the New Revolver Facility Lenders and the New Revolver Facility administrative agent and their respective directors, officers, partners, members, representatives, employees and professional advisors; (x) the Backstop Parties, and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (xi) the indenture trustee under the New PIK Notes Indenture and the holders of the New PIK Notes, if any, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (xii) Holders of New Common Stock and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors; and (xiii) Holders of the New Preferred Stock, if any, and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors.

court pursuant to Bankruptcy Code section 1123(b)(3)(A) and Bankruptcy Rule 9019(a)); *In re Bally Total Fitness, Inc.*, No. 07-12395, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) ("To the extent that a release or other provision in the [p]lan constitutes a compromise of a controversy, this [c]onfirmation [o]rder shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 24, 2005) (approving releases pursuant to Bankruptcy Code section 1123(b)(3) and Bankruptcy Rule 9019). Under Bankruptcy Rule 9019, courts may approve a settlement so long as it does not "fall below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1973); *In re Enron Corp.*, No. 02 Civ. 8489, 2003 WL 230838, at *2 (S.D.N.Y. Jan. 31, 2003) ("[A]pproval of the settlement lies within the sound discretion of the bankruptcy court . . . .") (citations omitted); *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993) ("[T]he court need not conduct a 'mini-trial' to determine the merits of the underlying [dispute]"); *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs)*, 156 B.R. 414, 426-27 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1994).

92.     Based on the foregoing, the Debtors believe that the Debtor Release satisfies the standard applied by courts in evaluating such provisions. The Debtors do not believe that they possess any valuable claims or causes of action against any of the Released Parties. Moreover, even if the Debtors could potentially assert any claims or causes of action against the Released Parties, the Debtors believe that the cost and expense associated with pursuing such claims or causes of action would ultimately exceed the value of any such claims or causes of action. The Debtors further submit that the Debtor Release is an important component of the Plan, and the

Debtor Release was negotiated as part of the comprehensive restructuring embodied in the Plan.

Accordingly, the Debtors submit that the Debtor Release is consistent with applicable law,

represents a valid settlement of whatever claims and causes of action that the Debtors may have

against the Released Parties pursuant to Bankruptcy Code section 1123(b)(3)(A) and, thus,

should be approved.

**B.      The Third Party Release Should Be Approved**

93.      Section 10.8 of the Plan contains a release (the "***Third Party Release***") by

Holders of Claims and Interests of claims and causes of action that could be asserted by such

Holders against the Released Parties, including certain non-Debtor Released Parties.  The scope

of the Third Party Release is substantially similar to the Debtor Release.  In addition, the Third

Party Release is also subject to the Release Carve Out.

94.      The Second Circuit has determined that releases of non-Debtors may be approved

as part of a chapter 11 plan of reorganization if there are "unusual circumstances" that render the

release terms important to the success of the plan.  *Deutsche Bank AG, London Branch v.*

*Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d

Cir. 2005).  Courts have approved releases of non-debtors when: (i) the estate received

substantial consideration; (ii) the enjoined claims were channeled to a settlement fund rather than

extinguished; (iii) the enjoined claims would indirectly impact the reorganization by way of

indemnity or contribution; (iv) the plan otherwise provided for the full payment of the enjoined

claims; and (v) the affected creditors consent to the release.  *Id.* at 142; *see also In re Adelphia*

*Commc'ns Corp.*, 368 B.R. 140, 266 (Bankr. S.D.N.Y. 2007).

95.      Before a determination can be made as to whether third party releases are

warranted by "unusual circumstances," the Second Circuit has concluded that there is a threshold

jurisdictional inquiry as to whether the Bankruptcy Court has subject matter jurisdiction to grant

such releases.  *See In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) (finding no

jurisdiction to approve releases of claims that did not affect the estate); *In re Metcalfe &*

*Mansfield Alternative Investments*, 421 B.R. 685, 695-96 (Bankr. S.D.N.Y. 2010) (discussing

and approving releases in a case under chapter 15 of the Bankruptcy Code).  Courts in this

district have determined that jurisdiction over a third party cause of action or claim exists if it

will "directly and adversely impact the reorganization."  *In re Dreier LLP*, 429 B.R. at 132.

Conversely, the court may lack jurisdiction if the released claim is one that would "not affect

property of the estate or the administration of the estate."  *Id.* at 133.  Here, all of the released

Claims could "directly and adversely impact the reorganization" of the Debtors' estates.  Each of

the non-Debtor Released Parties could have a potential Claim for indemnification and

contribution against the Debtors for any liabilities incurred on such Claims, as well as any

expenses incurred to defend such Claims.[13]  In addition, because all Allowed General Unsecured

Claims are being satisfied in full under the Plan, the Debtors would have to satisfy these

indemnification and contribution Claims in full.  The ultimate effect of doing so would reduce

the Debtors' distributable value and would likely reduce recoveries for the Debtors' creditors

under the Plan.  The Debtors' estates therefore would be directly and adversely impacted if the

released Claims were pursued.

      96.     In addition, the circumstances of these chapter 11 cases are unique and satisfy the

*Metromedia* requirements.  Among other things, the non-Debtor Released Parties have provided

substantial consideration to the Debtors' estates by, among other things, their support for the

reorganization process (evidenced by, among other things, their overwhelming votes in favor of

---

[13]     A chart setting forth examples of indemnification provisions included in the 2009 Credit Agreement, the
2011 Notes Indenture, the Subordinated Notes Indenture, the New First Lien Indenture, and the New Second Lien

the Plan and the fact that not a single objection to confirmation was filed). Moreover, the Committee, the Administrative Agent and many of the other non-Debtor Released Parties were instrumental in the formulation of the Plan and the Debtors' overall restructuring process, which required the involved parties to expend significant efforts over a period of months. Without the significant cooperation and material compromises afforded by the non-Debtor Released Parties (as evidenced by, among other things, their overwhelming support for the Plan), it would not have been possible for the Debtors to complete their restructuring on such an expedited basis and in such a successful manner. Indeed, without the participation of the Backstop Parties, it is unlikely that the Debtors could have obtained sufficient financing to ensure the success of the Plan.

97.     Several other considerations also warrant approval of the Third Party Release contained in the Plan. First, the Plan pays all Allowed General Unsecured Claims in full and provides substantial recoveries to Holders of Claims related to the Debtors' funded debt obligations. Second, the Debtors are not aware of any claims or causes of action that have been or could be asserted against any of the non-Debtor Released Parties. Third, even if there were potential claims or causes of action against any of the non-Debtor Released Parties, the Debtors believe that the non-Debtor Released Parties would have potential Claims for indemnification against the Debtors, which, as already noted, could adversely affect recoveries under the Plan and the Debtors' efforts to reorganize. Fourth, approximately 72% of the creditors that were eligible to vote, voted to accept the Plan with the Third Party Release incorporated in the Plan, and the Ballots sent to Holders of Claims entitled to vote on the Plan included conspicuous language discussing the Third Party Release in order to ensure that all parties voting on the Plan

---

Indenture is attached hereto as <u>Exhibit B</u>. The chart provides a non-exclusive selection of indemnification

were adequately informed of the Third Party Release.  Thus, the Holders of Claims that voted on the Plan were therefore aware of and had a reasonable opportunity to consider the Third Party Release when voting to accept or reject the Plan.  Finally, no party has objected to the Third Party Release or the Plan.

98.    Based on the foregoing, the Debtors believe that the Third Party Release is appropriate under the *Metromedia* decision and other applicable case law and should therefore be approved.

**C.    The Exculpation Should Be Approved**

99.    Section 10.4 of the Plan includes a customary exculpatory provision (the "***Exculpation***") which, with certain limited exceptions, protects the Released Parties from liability for claims and causes of action related to any act or omission taken in connection with, or arising out of, (i) the chapter 11 cases, (ii) the formulation, dissemination, consummation or administration of the Plan, (iii) property to be distributed under the Plan, or (iv) any other act or omission in connection with the chapter 11 cases, the Plan or any contract, instrument, indenture or other agreement or document related thereto or delivered thereunder.  The Exculpation is subject to a carve-out for acts or omissions constituting gross negligence, willful misconduct, criminal acts and fraud.

100.    Courts in this jurisdiction consistently approve exculpation provisions that protect key parties in a debtor's restructuring from liability for conduct related to the debtor's restructuring so long as such parties are not shielded from liability for conduct constituting gross negligence, willful misconduct or fraud.  *See, e.g., Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501 (Bankr. S.D.N.Y. 2005) (discussing bankruptcy court's ruling

---

provisions from applicable agreements and has been included for illustrative purposes only.

on exculpation provision contained in debtor's plan); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (finding that an exculpation provision that carves out gross negligence and willful misconduct and fraud was appropriate).  Indeed, courts in this jurisdiction have recognized that negotiating and implementing a plan would not be possible if participating parties were not afforded protection from liability for their involvement in a debtor's restructuring.  *See SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) (upholding an injunction in a settlement agreement resulting from complex negotiations involving numerous parties).  Moreover, courts have approved exculpation provisions that extend to both prepetition and postpetition conduct.  *See In re Oneida Ltd.*, 351 B.R. at 94 n.22 (noting that exculpation provision covered both prepetition and postpetition conduct related to the debtor's restructuring).

101.    Based on the foregoing, the Debtors submit that the Exculpation is appropriate and should be approved.  The Exculpation is integral to the Plan and the success of the Debtors' restructuring.  The Debtors were able to formulate and propose the Plan only after engaging in extensive, arm's-length negotiations with numerous parties during the period leading up to the Petition Date.  In the absence of the protection from liability provided by the Exculpation to the parties that participated in the foregoing negotiations, the Debtors would not have been able to propose the Plan and successfully consummate their restructuring.  Moreover, the Exculpation (i) specifically provides that the Released Parties will not be protected from liability for acts or omissions that constitute gross negligence, willful misconduct, criminal acts or fraud and (ii) applies solely to acts or omissions directly related to the Debtors' chapter 11 cases and the formulation, confirmation and implementation of the Plan.  Accordingly, the Exculpation is enforceable under applicable law and should be approved.

**D.      The Injunction Should Be Approved**

102.      Section 10.5 of the Plan contains an injunction (the "*Injunction*") that, among other things, permanently enjoins Holders of Claims or Interests from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against any Reorganized Debtor, (ii) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim or Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Interest, and (v) pursuing any Claim released pursuant to the Debtor Release or the Third Party Release.  The Injunction does not enjoin any claims that have been alleged or that could have been alleged in the Anderson Litigation.

103.      The Injunction is necessary to preserve and enforce the Debtor Release, the Third Party Release and the Exculpation and is narrowly tailored to achieve that purpose.  In addition, the Injunction is a key component of the Debtors' ultimate reorganization. *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).  Thus, the Injunction is appropriate and should be approved.

**VIII.   THE MODIFICATIONS TO THE PLAN ARE NOT MATERIAL**

104.      As previously represented to the Court, since the Petition Date, the Debtors have received comments on the Plan from the Office of the United States for the Southern District of New York, counsel to the Committee, counsel to the Administrative Agent, counsel to certain of the indenture trustees for the Debtors' prepetition note issuances and counterparties to certain

prepetition litigation. To address these comments and concerns, the Debtors made certain modifications (the "**_Modifications_**") to the Plan and filed the Plan, as modified, with the Court on December 15, 2010. *See* Docket No. 115. The Modifications do not materially or adversely affect the way any Claim or Interest is treated under the version of the Plan distributed to Holders of Claims in the Voting Classes in connection with the prepetition solicitation of votes on the Plan.

105.　Bankruptcy Code section 1127 provides, in relevant part:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of section 1122 and 1123 of the [Bankruptcy Code]. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan . . . .

> Any holder of a claim or interest that has accepted or rejected a plan is deemed to have accepted or rejected, as the case may be, such plan as modified, unless, within the time fixed by the court, such holder changes such holder's previous acceptance or rejection.

11 U.S.C. §§ 1127(a), (d).

106.　Bankruptcy Rule 3019, designed to implement Bankruptcy Code section 1127, in turn, provides, in relevant part:

> In a . . . chapter 11 case, after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan. If the court finds after hearing on notice of the trustee, any committee appointed under the [Bankruptcy Code], and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019.

107.　Here, the requirements of Bankruptcy Code section 1127(d) have been met because all Holders of Claims and Interests in these chapter 11 cases have received notice of the hearing on confirmation of the Plan and will have an opportunity to object to the Modifications

at that time. *See* Docket No. 115; *see also Citicorp Acceptance Co., Inc. v. Ruti-Sweetwater (In re Sweetwater)*, 57 B.R. 354, 358 (D. Utah 1985) (creditors who had knowledge of pending confirmation hearing had sufficient opportunity to raise objections to modifications of the plan). Moreover, the Debtors submit that several of their major creditors or their representatives reviewed the Modifications and have not objected to any such Modifications.

108.     Bankruptcy Code section 1127 provides a plan proponent with the right to modify a plan "at any time" before confirmation. This right would be meaningless if the promulgation of all plan modifications, ministerial or substantive, adverse to certain claimants or not, necessitated the resolicitation of votes. Accordingly, in keeping with traditional bankruptcy practice, courts have typically allowed a plan proponent to make non-material changes to a plan without any special procedure or resolicitation. *See, e.g.*, *In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) (stating that "if a modification does not 'materially' impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (citation omitted); *see also Enron Power Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2008) ("[T]he bankruptcy court may deem a claim or interest holder's vote for or against a plan as a corresponding vote in relation to a modified plan unless the modification materially and adversely changes the way that claim or interest holder is treated."); *In re Mt. Vernon Plaza Cmty. Urban Redevelopment Corp. I*, 79 B.R. 305, 306 (Bankr. S.D. Ohio 1987) (all creditors were deemed to have accepted plan as modified because "[n]one of the changes negatively affects the repayment of creditors, the length of the [p]lan, or the protected property interests of parties in interest.").

109.     Accordingly, because the Modifications are non-material and do not materially adversely affect the treatment of any creditor that has previously accepted the Plan, and the Plan

continues to comply with the requirements of Bankruptcy Code section 1122 and 1123, the

Debtors believe that resolicitation is not required.

## IX. PROPOSED ORDER

110.    Attached hereto as <u>Exhibit A</u> are proposed findings of fact, conclusions of law

and an order confirming the Plan (the "***Confirmation Order***").  The findings of fact and

conclusions of law in the Confirmation Order are supported by the declarations in support of

confirmation of the Plan filed concurrently herewith.

## X. IMMEDIATE EFFECTIVENESS

111.    The Debtors respectfully request that the Court direct that the order confirming

the Plan become effective immediately upon its entry notwithstanding the 14-day stay imposed

by Bankruptcy Rule 3020(e).  Under the unique circumstances of these chapter 11 cases and

given the overwhelming support of the Plan by affected creditors and the fact that no objections

to confirmation of the Plan have been filed, the Debtors believe the request for waiver of the stay

is reasonable.  Specifically, the waiver of the stay is necessary to ensure the Debtors maintain

their relationships with their advertisers.  As previously expressed to the Court, in December, the

Debtors' advertisers establish their budgets for the next calendar year and make non-binding

commitments to advertise in the Debtors' publications.  The Debtors believe that while the

Debtors' advertisers have continued to do business with the Debtors and have continued to make

commitments to advertise in the Debtors' publications, a large part of their decision to do so has

been based on their belief that these chapter 11 cases will not have a material impact on the

Debtors' ongoing business operations.  Indeed, AMI's competitors have attempted to dissuade

customers from advertising in AMI's magazines by arguing that there can be no assurance any

particular AMI publication will be on a newsstand in the near future since the company has filed

for bankruptcy.  AMI has thus had to repeatedly assure its customers and vendors that its pre-

packaged chapter 11 cases will have only a minimal, if any, impact on its operations. In the event that the Debtors are unable to emerge by year-end, the Debtors believe that some of the Debtors' advertisers may cancel their non-binding commitments to advertise in the Debtors' publications and choose to place advertisements with the Debtors' competitors. The Debtors further believe that such a loss would materially affect the Debtors' businesses and it may take years for the Debtors to regain that loss.

112. Moreover, the Debtors believe that their expedited emergence before year-end is critical to avoiding any disruptions to their businesses and relationships with their trade creditors. The Debtors have repeatedly informed their business counterparties and their employees that the Debtors' restructuring is a balance sheet restructuring that will not have a negative impact on the Debtors' business operations and will permit the Debtors to enjoy a fresh start in the new calendar year. Finally, the Debtors note that, in connection with the filing of the Plan Supplement, they provided notice of their intent to request that the Court direct that the order confirming the Plan become effective immediately upon its entry notwithstanding the 14-day stay period contemplated by Bankruptcy Rule 3020(e). *See* Docket No. 117. The Debtors therefore seek a waiver of the stay to preserve their credibility with their employees and counterparties and minimize the possibility of disruption to their businesses post-emergence.

## XI.    CONCLUSION

113. The Plan complies with and satisfies all applicable requirements of Bankruptcy Code section 1129. Accordingly, the Debtors request that the Court (i) approve (a) the Disclosure Statement, (b) the solicitation of votes and the Solicitation and Election Procedures, (c) the forms of ballots, and (d) the Election Form, (ii) confirm the Plan, (iii) overrule any objections to confirmation of the Plan, if necessary, and (iv) grant the Debtors such other and further relief as is just and proper.

New York, New York
Dated: December 17, 2010

/s/ *Ira S. Dizengoff*
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*