**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) | Case No. 10-16140 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER (I) APPROVING (A) THE DEBTORS'
DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. §§ 1125
AND 1126(b), (B) SOLICITATION OF VOTES AND SOLICITATION AND ELECTION
PROCEDURES, (C) FORMS OF BALLOTS, AND (D) THE ELECTION FORM
AND (II) CONFIRMING THE DEBTORS' AMENDED JOINT PREPACKAGED
PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

This order (this "***Confirmation Order***") is entered to effectuate confirmation of the

*Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the*

*Bankruptcy Code* dated December 15, 2010 (Docket No. 115) (the "***Plan***") and attached hereto

as <u>Exhibit A</u> and approve the adequacy of (i) the *Disclosure Statement Relating to the Debtors'*

*Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket

No. 19) (the "***Disclosure Statement***"), (ii) the solicitation of votes and solicitation and election

procedures, (iii) the forms of ballots and (iv) the election form.  The Debtors having:

      a.     commenced, on November 17, 2010 (the "***Petition Date***"), these chapter 11 cases
(collectively, the "***Chapter 11 Cases***") by filing voluntary petitions for relief
under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***");

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).

b.   continued to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code section 1107(a) and 1108;

c.   filed, on November 17, 2010, the *Motion Pursuant to Bankruptcy Code Sections 363(b), 365 and 503(b)(1) and Bankruptcy Rules 2002 and 6004 for an Order Authorizing the Debtors to (I) Assume or Enter into Certain Agreements in Connection with the New Financing and Backstop Commitment, (II) Incur and Pay Related Fees and Expenses as Administrative Expenses, (III) Transfer Certain Funds into Escrow and (IV) Establish Special Purpose Entities as Non-Debtor Entities* (Docket No. 17) (the "**Escrow Motion**");

d.   filed, on November 24, 2010, the *Declaration of Zul Jamal in Support of Motion Pursuant to Bankruptcy Code Sections 363(b), 365 and 503(b)(1) and Bankruptcy Rules 2002 and 6004 for an Order Authorizing the Debtors to (I) Assume or Enter into Certain Agreements in Connection with the New Financing and Backstop Commitment, (II) Incur and Pay Related Fees and Expenses as Administrative Expenses, (III) Transfer Certain Funds into Escrow, and (IV) Establish Special Purpose Entities as Non-Debtor Entities* (Docket No. 63);

e.   filed, on November 17, 2010, *Affidavit of Service and Declaration of David Hartie Regarding the Service and Transmittal of Solicitation Packages and the Certification and Tabulation of Ballots Accepting or Rejecting the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 24) (the "**Voting Certification**") detailing the results of the Plan voting process;

f.   filed, on November 17, 2010, the *Debtors' Motion for an Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Solicitation and Election Procedures and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement, the Solicitation and Election Procedures and the Plan, and (C) Approving the Form and Manner of the Notice of the Combined Hearing* (Docket No. 21) (the "**Scheduling Motion**");

g.   distributed, on November 22, 2010, notice (the "**Combined Notice**") of the combined hearing (the "**Combined Hearing**") to consider the adequacy of the Disclosure Statement and solicitation and election procedures (the "**Solicitation and Election Procedures**") and confirmation of the Plan; consistent with the *Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Solicitation and Election Procedures and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement, the Solicitation and Election Procedures and the Plan, and (C) Approving the Form and Manner of the Notice of Combined Hearing* (Docket No. 47) (the "**Scheduling Order**"); as evidenced by the *Affidavit of Service of Ricardo Tejeda Romero re: Summary of Plan of Reorganization, Notice of Commencement of Chapter 11 Bankruptcy Cases, and Notice of Combined Hearing on Disclosure Statement and Plan Confirmation* (Docket No. 68);

2

h.      filed, on December 1, 2010 an amended notice of the Combined Hearing (Docket No. 78), as evidenced by the *Affidavit of Service of Ricardo Tejeda Romero re: Amended Summary of Plan of Reorganization, Notice of Commencement of Chapter 11 Bankruptcy Cases, and Notice of Combined Hearing on Disclosure Statement and Plan Confirmation Dated December 1, 2010* (Docket No. 79); *See Affidavit of Service of Isidro N. Panizales re: Amended Summary of Plan of Reorganization, Notice of Commencement of Chapter 11 Bankruptcy Cases, and Notice of Combined Hearing on Disclosure Statement and Plan Confirmation Dated December 1, 2010* (Docket No. 80);

i.      published, on November 29, 2010, notice of the Combined Hearing in The New York Times (National Edition), USA Today (National Edition) and the Miami Herald consistent with the Scheduling Order, as evidenced by *Affidavit of Publication of Summary of Plan of Reorganization and Amended Notice of Hearing to Consider (A) Adequacy of the Disclosure Statement and Solicitation and Election Procedures and (B) Confirmation of Plan of Reorganization and Related Matters in the Miami Herald* (Docket No. 90); *Affidavit of Publication of Summary of Plan of Reorganization and Amended Notice of Hearing to Consider (A) Adequacy of the Disclosure Statement and Solicitation and Election Procedures and (B) Confirmation of Plan of Reorganization and Related Matters in the New York Times* (Docket No. 91); *Affidavit of Publication of Summary of Plan of Reorganization and Amended Notice of Hearing to Consider (A) Adequacy of the Disclosure Statement and Solicitation and Election Procedures and (B) Confirmation of Plan of Reorganization and Related Matters in USA Today* (Docket No. 92);

j.      filed, on November 17, 2010, the *Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 20), which was subsequently amended as provided herein, and the *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 19);

k.      filed, on December 15, 2010, the *Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 115) to reflect certain non-substantive changes to the Plan;

l.      filed, on November 24, 2010, the *Plan Financing Supplement to the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 65); and *Notice of Filing Plan Financing Supplement to the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 66);

m.      filed, on December 15, 2010, the *Plan Supplement to the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 116); and *Notice of Filing of Plan Supplement to Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (Docket No. 117);

n.  filed, on December 17, 2010, the *Affidavit of Service and Declaration of David Hartie Regarding the Service and Transmittal of Class 2 Election Form and the Tabulation of Elections* (Docket No. 118) (the "**Election Certification**")*;* and

o.  filed, on December 17, 2010, the *Debtors' Memorandum of Law in Support of Entry of an Order (I) Approving (A) the Debtors' Disclosure Statement Pursuant to 11 U.S.C. §§ 1125 and 1126(b), (B) Solicitation of Votes and Solicitation and Election Procedures, (C) Forms of Ballots, and (D) Form of Ballot, and (II) Confirming the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Confirmation Brief**") (Docket No. 121); the *Declaration of Christopher Polimeni in Support of Confirmation of the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Polimeni Declaration**") (Docket No. 119); and the *Declaration of Zul Jamal in support of the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "**Jamal Declaration**") (Docket No. 120), each in support of confirmation of the Plan.

This Court having:

a.  entered, on November 19, 2010, the Scheduling Order (Docket No. 47);

b.  entered on November 29, 2010, the *Order Authorizing the Debtors to (I) Assume or Enter into Certain Agreements in Connection with the New Financing and Backstop Commitment, (II) Incur and Pay Related Fees and Expenses as Administrative Expenses, (III) Transfer Certain Funds into Escrow and (IV) Establish Special Purpose Entities as Non-Debtor Entities* (Docket No. 72);

c.  set December 20, 2010, at 10:00 a.m. (Prevailing Eastern Time), as the date and time for the commencement of the Combined Hearing;

d.  reviewed the Plan, the Disclosure Statement, the Confirmation Brief, the Polimeni Declaration, the Jamal Declaration and all pleadings, exhibits, statements, responses and comments regarding confirmation;

e.  heard the statements, arguments and objections made by counsel in respect of confirmation;

f.  considered all oral representations, testimony, documents, filings and other evidence regarding confirmation; and

g.  taken judicial notice of all papers and pleadings filed in the Chapter 11 Cases.

NOW, THEREFORE, it appearing to the Court that notice of the Combined Hearing, the

Plan and all modifications thereto have been adequate and appropriate as to all parties affected or

to be affected by the Plan and the transactions contemplated thereby and that any party in interest

so affected has had the opportunity to object to confirmation of the Plan and the adequacy of the

Disclosure Statement; and, after due deliberation and based upon the record described above, it

appearing to the Court that the legal and factual bases set forth in the documents filed in support

of confirmation of the Plan and the adequacy of the Disclosure Statement and presented at the

Combined Hearing establish just cause for the relief granted herein; the Court hereby makes and

issues the following Findings of Fact, Conclusions of Law and Order:

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED AND ORDERED THAT:**

    **A.**       **Findings of Fact and Conclusions of Law**

    1.       The findings of fact and conclusions of law stated in this Confirmation Order

shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made

applicable to this proceeding by Bankruptcy Rule 9014.  To the extent any finding of fact shall

be determined to be a conclusion of law, it shall be so deemed, and to the extent a conclusion of

law shall be determined to be a finding of fact, it shall be so deemed.

    **B.**       **Jurisdiction and Venue**

    2.       This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§

157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  Confirmation of the

Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has jurisdiction to

determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and

should be confirmed.

    **C.**       **Commencement and Joint Administration of the Chapter 11 Cases**

    3.       On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing

voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court.  By prior

order of the Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 (Docket No. 38). The Debtors have operated their businesses and managed their properties as debtors in possession since the Petition Date pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Chapter 11 Cases.

### D.      Filing of the Plan

4.      On November 17, 2010, the Debtors filed the Plan (Docket No. 20) and the Disclosure Statement (Docket No. 19). On November 24, 2010, the Debtors filed the Plan Financing Supplement[2] with the indicative terms of the New First Lien Notes and the New Second Lien Notes (Docket No. 65). On December 15, 2010, the Debtors filed non-substantive amendments to the Plan (Docket No. 114). On December 15, 2010, the Debtors filed the Plan Supplement, which included the following documents: (a) the New First Lien Indenture; (b) the New Second Lien Indenture; (c) the Purchase Agreement for New First Lien Notes; (d) the Registration Rights Agreement for New First Lien Notes; (e) the Registration Rights Agreement for New Second Lien Notes; (f) the Escrow Agreement for New First Lien Notes; (g) the Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for the New Revolver Facility Lenders, Trustee and Collateral Agent for New First Lien Note Holders, and Trustee and Collateral Agent for New Second Lien Note Holders; (h) the Intercreditor Agreement Among Reorganized Debtors, Collateral Agent for New Revolver Facility Lenders, and Trustee and Collateral Agent for New First Lien Note Holders; (i) the Stockholders Agreement; (j) the Restated Bylaws; (k) the Restated Certificates of Incorporation; (l) the Equity Incentive Plan;

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or Disclosure Statement.

(m) the Director Severance Plan; (n) the Emergence Incentive Plan; (o) the identity of members of the New Boards and the initial officers of the Reorganized Debtors; and (p) the New Revolver Credit Facility Credit Agreement (Docket No. 116).  The documents contained in the Plan Financing Supplement and the Plan Supplement were filed in draft form and remain subject to modification and amendment, in either case, on terms consistent with the Plan and this Confirmation Order.

### E.      Judicial Notice

5.      The Court takes judicial notice of (and deems admitted into evidence for confirmation of the Plan and approval of the Disclosure Statement) the docket of the Chapter 11 Cases and all related adversary proceedings, appeals and District Court proceedings, maintained by the clerk of the applicable court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts and all evidence and arguments made, proffered or adduced at the hearings held before the applicable court during the pendency of the Chapter 11 Cases.  Any resolutions of objections to confirmation of the Plan or approval of the Disclosure Statement explained at the Combined Hearing are hereby incorporated by reference.  All unresolved objections, statements and reservations of rights are hereby overruled on the merits.

### F.      Transmittal of Solicitation Package

6.      As set forth in the Voting Certification, on October 30, 2010, the Debtors, through their solicitation agent, Kurtzman Carson Consultants LLC ("***KCC***"), caused the applicable forms of ballots, in the forms attached to the Scheduling Motion as Exhibit B (the "***Ballots***"), and copies of the Disclosure Statement and Plan (collectively with the Ballots, the "***Solicitation Package***") to be served and distributed as required by the Bankruptcy Code, Bankruptcy Rules

3017 and 3018, the Disclosure Statement, the Local Bankruptcy Rules for the United States

Bankruptcy Court for the Southern District of New York (the "***Local Rules***"), all other applicable

provisions of the Bankruptcy Code, the Scheduling Order, and all other rules, laws, and

regulations applicable to such solicitation.  The Plan and the Disclosure Statement were

transmitted to all creditors entitled to vote on the Plan and sufficient time was prescribed for

creditors to vote to accept or reject the Plan.  The Solicitation Package was transmitted and

served in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy

Rules, including Bankruptcy Rule 3017(d), the Local Rules, the Amended Procedural Guidelines

for Prepackaged Chapter 11 Cases in the United States Bankruptcy Court for the Southern

District of New York, General Order M-387, dated November 24, 2009 (the "***Prepack***

***Guidelines***"), the Scheduling Order and all other applicable rules, laws, and regulations.  Such

transmittal and service was adequate and sufficient under the circumstances and no other or

further notice is or shall be required.

> **G.**    **Mailing and Publication of Combined Notice**

7.        On November 22, 2010, the Debtors caused the Combined Notice to be mailed to

all of the Debtors' known creditors and Interest Holders of record.  On December 1, 2010, the

Debtors caused the Amended Summary of Plan of Reorganization, Notice of Commencement of

Chapter 11 Bankruptcy Cases, and Notice of Combined Hearing on Disclosure Statement and

Plan Confirmation, attached to the Scheduling Order, to be mailed to all of the Debtors' known

creditors and Interest Holders of record.  Additionally, the Debtors published the Combined

Notice in The New York Times (National Edition), USA Today (National Edition) and the Miami

Herald on November 29, 2010.  Publication of the Combined Notice was in substantial

compliance with the Scheduling Order and Bankruptcy Rule 2002(l).  The Debtors have given

proper, adequate and sufficient notice of the hearing to approve the Disclosure Statement as required by Bankruptcy Rule 3017(a).  The Debtors have given proper, adequate and sufficient notice of the Confirmation Hearing as required by Bankruptcy Rule 3017(d).  Due, adequate, and sufficient notice of the Combined Hearing, along with deadlines for filing objections to the Plan and the Disclosure Statement, has been given to all known Holders of Claims and Interests substantially in accordance with the procedures set forth in the Scheduling Order.  No other or further notice is or shall be required.

### H.    Objections

8.    All objections and all reservations of rights that have not been withdrawn, waived or settled pertaining to confirmation of the Plan and adequacy of the Disclosure Statement are overruled on the merits.

### I.    Adequacy of Disclosure Statement

9.    The adequacy of the Disclosure Statement is governed by Bankruptcy Code section 1125(a).  The Disclosure Statement contains adequate information as that term is defined in Bankruptcy Code section 1125(a) and complies with any additional requirements of the Bankruptcy Code and the Bankruptcy Rules.  Specifically, but without limitation, the Disclosure Statement complies with the requirements of Bankruptcy Rule 3016(c) by sufficiently describing in specific and conspicuous bold language the provisions of the Plan that provide for releases and injunctions against conduct not otherwise enjoined under the Bankruptcy Code and sufficiently identifies the persons and entities that are subject to the releases and injunctions.

### J.    Solicitation

10.    Bankruptcy Code sections 1125(g) and 1126(b) apply to the solicitation of acceptances and rejections of the Plan prior to the commencement of these Chapter 11 Cases.

The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 (as amended, and including the rules and regulations promulgated thereunder, the "***Securities Act***") and applicable state and local securities laws, and no other non-bankruptcy law applies to the solicitation.  Votes for acceptance or rejection of the Plan were solicited in good faith and in compliance with Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, and all other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Prepack Guidelines, and all other rules, laws, and regulations.  In particular, the solicitation of votes to accept or reject the Plan satisfies Bankruptcy Rule 3018.  The Plan and the Disclosure Statement were transmitted to all creditors entitled to vote on the Plan and sufficient time was prescribed for such creditors to accept or reject the Plan.  The solicitation materials and solicitation procedures comply with Bankruptcy Code section 1126, thereby satisfying the requirements of Bankruptcy Rule 3018.  The Debtors' procedures for transmitting the Disclosure Statement, the Plan, the Ballots, and the voting instructions are adequate and comply with the requirements of Bankruptcy Rule 3017(d) and (e), all other applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Prepack Guidelines, the Scheduling Order, and all other applicable rules, laws, and regulations.

11.     The form of the Ballots was adequate and appropriate and complied with Bankruptcy Rule 3018(c).  The form of the Ballots was sufficiently consistent with Official Form No. 14 and the form of ballot annexed to the Prepack Guidelines and adequately addressed the particular needs of these Chapter 11 Cases and was appropriate for each Class entitled to vote to accept or reject the Plan.

### K.    Good Faith Solicitation

12.    All persons who solicited votes on the Plan, including any such persons released pursuant to Section 10 of the Plan, solicited such votes in good faith and in compliance with the applicable provisions of the Bankruptcy Code and are entitled to the protections afforded by Bankruptcy Code section 1125(e) as well as the exculpation and limitation of liability provisions set forth in Section 10 of the Plan.

### L.    Voting Certification

13.    On November 17, 2010, KCC filed the Voting Certification, certifying the method and results of the ballot tabulation for each of the Classes entitled to vote under the Plan (the "**Voting Classes**").  Under the Plan, Holders of Claims in Classes 2, 5, 6 and 7 are impaired and, therefore, were entitled to vote on the Plan.  As evidenced by the Voting Certification, Holders of Claims in Classes 2, 5 and 6 voted to accept the Plan.  As further evidenced by the Voting Certification, Holders of Claims in Class 7 voted to reject the Plan.  All procedures used to tabulate the Ballots were fair and reasonable and conducted in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Prepack Guidelines, the Scheduling Order and all other applicable rules, laws, and regulations.

### M.    Election Certification

14.    On December 17, 2010, KCC filed the Election Certification, certifying the method and results of the Class 2 election for Holders of Term Facility Claims (other than the Backstop Parties) to put the New Second Lien Notes they would otherwise receive pursuant to the Plan to the Backstop Parties.  As further evidenced by the Election Certification, the procedures used to tabulate the election forms relating to such election were fair and reasonable.

### N.    Modifications to the Plan

15.    Subsequent to solicitation of the Plan, the Debtors made certain non-material modifications to the Plan in response to various comments received from parties in interest, including the U.S. Trustee.  None of the modifications made since the solicitation adversely affects the treatment of any Holder of a Claim or Interest under the Plan.  Accordingly, pursuant to Bankruptcy Code section 1127(a), none of the modifications require additional disclosure under Bankruptcy Code section 1125 or resolicitation of votes under Bankruptcy Code section 1126.

### O.    Bankruptcy Rule 3016

16.    The Plan is dated and identifies the entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the clerk of the Court simultaneously with the Plan satisfies Bankruptcy Rule 3016(b).

### P.    Burden of Proof

17.    As more fully set forth herein, the Debtors, as proponents of the Plan, have met their burden of proving each of the elements of Bankruptcy Code sections 1129(a) and 1129(b) by a preponderance of the evidence, which is the applicable evidentiary standard for confirmation of the Plan.

### Q.    Compliance with the Requirements of Bankruptcy Code Section 1129

18.    The Plan complies with all applicable provisions of Bankruptcy Code section 1129 as follows:

**(i)    Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code**

19.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by Bankruptcy Code section 1129(a)(1), including, without limitation, sections 1122 and 1123.

**(a)    Sections 1122 and 1123(a)(1) – Proper Classification**

20.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to Bankruptcy Code sections 1122(a) and 1123(a)(1), Section 3 of the Plan provides for the separate classification of Claims and Interests into ten Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Claims and Priority Tax Claims, which are addressed in Section 2 of the Plan and which are not required to be designated as separate Classes pursuant to Bankruptcy Code section 1123(a)(1)).  Valid business, factual and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

21.    As required by Bankruptcy Code section 1122(a), each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of Bankruptcy Code sections 1122(a), 1122(b) and 1123(a)(1) have been satisfied.

**(b)    Section 1123(a)(2)—Specification of Unimpaired Classes**

22.    Section 3 of the Plan specifies that Classes 1, 3, 4, and 8 are unimpaired under the Plan.  Additionally, Section 2 of the Plan specifies that Administrative Claims and Priority Tax

Claims are unimpaired, although these Claims are not classified under the Plan. Accordingly, the

requirements of Bankruptcy Code section 1123(a)(2) have been satisfied.

(c)  Section 1123(a)(3)—Specification of Treatment of Impaired Classes

23.  The Plan specifies in Section 3 that Classes 2, 5, 6, 7, 9 and 10 are impaired under

the Plan and sets forth the treatment of the impaired Classes in Section 4 of the Plan, thereby

satisfying Bankruptcy Code section 1123(a)(3).

(d)  Section 1123(a)(4)—No Discrimination

24.  Section 4 of the Plan provides for the same treatment for each Claim or Interest in

each respective Class unless the Holder of a particular Claim or Interest has agreed to a less

favorable treatment of such Claim or Interest. Accordingly, the Plan satisfies Bankruptcy Code

section 1123(a)(4).

(e)  Section 1123(a)(5)—Adequate Means for Plan Implementation

25.  Section 5 of the Plan and various other provisions of the Plan specifically provide

in detail adequate and proper means for implementation of the Plan including, but not limited to:

(i) the distribution of New Second Lien Financing; (ii) the offer by the Backstop Parties to

purchase New Second Lien Notes; (iii) the issuance of New Common Stock; (iv) the cancellation

of existing securities and agreements; (v) the entry into a Stockholders Agreement by the

Reorganized Debtors and the parties that receive New Common Stock under the Plan; (vi) the

cancellation of liens; and (vii) the substantive consolidation of the Debtors' estates. In addition,

Section 5 of the Plan provides for the establishment of an Equity Incentive Plan, a Director

Severance Plan and an Emergence Incentive Plan. Moreover, the Reorganized Debtors will

have, immediately upon the Effective Date, sufficient Cash to make all payments required to be

made on the Effective Date pursuant to the terms of the Plan.  Accordingly, the requirements of

Bankruptcy Code section 1123(a)(5) have been satisfied.

      (f)     <u>Section 1123(a)(6)—Voting Power of Equity Securities</u>

26.    Section 5.2 of the Plan provides that the organizational documents of each

Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the

Bankruptcy Code, including section 1123(a)(6).  The Restated Certificates of Incorporation

provide that the Reorganized Debtors shall not issue any non-voting equity securities to the

extent required by Bankruptcy Code section 1123(a)(6).  Accordingly, the Plan satisfies

Bankruptcy Code section 1123(a)(6).

      (g)     <u>Section 1123(a)(7)—Selection of Officers and Directors</u>

27.    The identity and affiliations of the members of the New Boards as of the Effective

Date are listed in <u>Exhibit O</u> to the Plan Supplement as filed on December 15, 2010.  The

Restated Certificates of Incorporation of Reorganized AMI and each of the Reorganized Debtors

describe the manner of the selection of additional members of the New Boards following the

Effective Date.  Section 5 of the Plan describes the manner of selection of officers and directors

for the Reorganized Debtors.  The selection of the initial directors and officers of the

Reorganized Debtors was, is and will be consistent with the interests of Holders of Claims and

Interests and public policy.  Accordingly, the requirements of Bankruptcy Code section

1123(a)(7) have been satisfied.

      (h)     <u>Section 1123(b)—Discretionary Contents of the Plan</u>

28.    The Plan contains various provisions that may be construed as discretionary but

are not required for confirmation under the Bankruptcy Code.  As set forth below, such

discretionary provisions comply with Bankruptcy Code section 1123(b) and are not inconsistent

with the applicable provisions of the Bankruptcy Code. Thus, Bankruptcy Code section 1123(b)
is satisfied.

<em>i.</em>    <em>Section 1123(b)(1)-(2) – Claims and Executory Contracts</em>

29.    Pursuant to Bankruptcy Code sections 1123(b)(1) and 1123(b)(2), Section 3 of the

Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and

Section 8 of the Plan provides for the assumption, assumption and assignment, or rejection of the

executory contracts and unexpired leases of the Debtors not previously assumed, assumed and

assigned, or rejected pursuant to Bankruptcy Code section 365 and appropriate authorizing

orders of the Court.

<em>ii.</em>    <em>Section 1123(b)(3)— Releases, Exculpation, Injunction, and<br>Preservation of Claims and Causes of Action</em>

30.    **Release by the Debtors**. The releases and discharges of Claims and Causes of

Action described in Section 10.7 of the Plan (the "***Debtor Release***") releases certain parties

defined in the Plan as the "***Released Parties***." The Released Parties include (i) the Debtors and

Reorganized Debtors; (ii) any direct or indirect shareholder of the Debtors, and such

shareholder's respective directors, officers, partners, members, representatives, employees,

professional advisors, sub-advisors, managers, affiliated management companies and managing

and executive directors; (iii) the current and former (in each case, as of the Effective Date)

directors, officers, employees, professional advisors, sub-advisors, managers, affiliated

management companies, and managing and executive directors of the Debtors; (iv) the members

of the Committee and their respective directors, officers, partners, members, representatives,

employees, professional advisors, sub-advisors, managers, and managing and executive

directors; (v) the Indenture Trustees and their respective directors, officers, partners, members,

representatives, employees, and professional advisors; (vi) the Term Facility Lenders, the

16

Revolver Lenders, the Administrative Agent, the collateral agent and other agents under the 2009 Credit Agreement and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (vii) the New First Lien Notes Holders and the indenture trustee, collateral agent and escrow agent under the New First Lien Indenture and their respective directors, officers, partners, members, representatives, employees and professional advisors; (viii) the New Second Lien Notes Holders and the indenture trustee, collateral agent and escrow agent under the New Second Lien Indenture and their respective directors, officers, partners, members, representatives, employees and professional advisors; (ix) the New Revolver Facility Lenders and the New Revolver Facility administrative agent and their respective directors, officers, partners, members, representatives, employees and professional advisors; (x) the Backstop Parties, and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (xi) the indenture trustee under the New PIK Notes Indenture and the Holders of the New PIK Notes, if any, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (xii) Holders of New Common Stock and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors; and (xiii) Holders of the New Preferred Stock, if any, and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors.

31.    **Third Party Releases**.  The releases of Claims and Causes of Action by Holders of Claims and Interests described in Section 10.8 of the Plan (collectively, the "***Third Party Releases***") release the Released Parties.

32.    **Injunction**.  The injunction provisions described in Sections 10.5 and 10.6 of the

Plan (the "***Plan Injunction***") permanently enjoin all Persons who have held, hold or may hold

Claims against or Interests in any Debtor, from and after the Effective Date, from (i)

commencing or continuing in any manner any action or other proceeding of any kind on any

such Claim or Interest against any Reorganized Debtor, (ii) the enforcement, attachment,

collection or recovery by any manner or means of any judgment, award, decree or order against

any Reorganized Debtor with respect to any such Claim or Interest, (iii) creating, perfecting or

enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property

or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim

or Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any

obligation due from any Reorganized Debtor, or against the property or interests in property of

any Reorganized Debtor with respect to any such Claim or Interest, and (v) pursuing any Claim

released pursuant to Sections 10.7 and 10.8 of the Plan.  Section 10.5(a) of the Plan does not

enjoin any Claims that have been alleged or could have been alleged in that certain litigation in

the United States District Court for the Southern District of New York captioned *Anderson News,*

*LLC, et al. v. American Media, Inc., et al*., Case No. 09-Civ.-2227 (PAC) and the appeal of the

August 2, 2010 order dismissing such action, currently pending in the United States Court of

Appeals for the Second Circuit (collectively, the "***Anderson Litigation***").

33.    In addition, upon entry of the Confirmation Order, all Holders of Claims and

Interests and other parties in interest, along with their respective present or former employees,

agents, officers, directors or principals, are enjoined from taking any actions to interfere with the

implementation or Consummation of the Plan.

34.    **Exculpation**.  The exculpation provisions described in Section 10.4 of the Plan
(the "***Exculpation***") exculpate the Released Parties from certain liability arising from the
Chapter 11 Cases, to the extent permitted by applicable law, subject to a limited carve-out solely
for gross negligence, willful misconduct, criminal acts and fraud.  Nothing in Section 10.4 of the
Plan (1) exculpates any Person or Entity from any liability resulting from any act or omission
constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse
of confidential information that causes damages or ultra vires act as determined by a Final Order
or (2) limits the liability of the professionals of the Released Parties to their respective clients
pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

35.    Each of the Debtor Releases, the Third Party Releases, the Plan Injunction and the
Exculpation: (i) is within the jurisdiction of the Court under 28 U.S.C. §§ 1334(a), (b), and (d);
(ii) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the
Bankruptcy Code; (iii) is an integral element of the transactions incorporated into the Plan; (iv)
confers a material benefit on, and is in the best interests of, the Debtors, their Estates and their
creditors; (v) is important to the overall objectives of the Plan to finally resolve all Claims among
or against the parties in interest in the Chapter 11 Cases with respect to the Debtors, their
organization, capitalization, operation and reorganization; and (vi) is consistent with Bankruptcy
Code sections 105, 1123, 1129, and other applicable provisions.

36.    **Preservation of Claims and Causes of Action**.  Section 10.9 of the Plan
appropriately provides for the preservation by the Debtors of any action, cause of action,
liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand
whatsoever, whether known or unknown, in law, equity or otherwise (the "***Causes of Action***"), in
accordance with Bankruptcy Code section 1123(b)(3)(B).  The provisions regarding the retained

Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, the

Estates and all Holders of Claims and Interests.

(i)    Section 1123(d)—Cure of Defaults

37.    Section 8.2 of the Plan provides for the satisfactions of any monetary defaults

under each executory contract and unexpired lease to be assumed pursuant to the Plan.

Accordingly, the requirements of Bankruptcy Code section 1123(d) are satisfied.

**(ii)    Section 1129(a)(2)—Compliance of the Debtors and Others With the
Applicable Provisions of the Bankruptcy Code**

38.    The Debtors have complied with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, the Scheduling Order, and other orders of this Court, thereby

satisfying Bankruptcy Code section 1129(a)(2).  In particular, the Debtors are properly debtors

under Bankruptcy Code section 109.  The Debtors are proper proponents of the Plan pursuant to

Bankruptcy Code section 1121(a).  The Debtors, as proponents of the Plan, complied with the

applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the

Prepack Guidelines and the Scheduling Order in transmitting the Plan, the Disclosure Statement,

the Ballots and notices, and in soliciting and tabulating votes on the Plan.

**(iii)    Section 1129(a)(3)—Proposal of Plan in Good Faith**

39.    The Debtors have proposed the Plan in good faith, for proper purposes and not by

any means forbidden by law, thereby satisfying Bankruptcy Code section 1129(a)(3).  In

determining that the Plan has been proposed in good faith, the Court has examined the totality of

the circumstances surrounding the filing of the Chapter 11 Cases, the formulation of the Plan and

all modifications thereto.  The Chapter 11 Cases were filed, and the Plan and all modifications

thereto were proposed, with the legitimate and honest purpose of reorganizing and maximizing

the value of the Debtors and the recovery to claimholders.  Therefore, the Debtors have proposed

the Plan in good faith and not by any means forbidden by law, and Bankruptcy Code section

1129(a)(3) is satisfied with respect to the Plan.

### (iv) Section 1129(a)(4)—Court Approval of Certain Payments as Reasonable

40.    All fees and expenses of professionals retained in the Chapter 11 Cases remain

subject to final review for reasonableness by the Court.  Pursuant to Section 2.2, professionals

are required to file their final fee applications with the Court no later than forty-five (45) days

after the Effective Date.  These applications remain subject to Court approval under the standards

established by the Bankruptcy Code, including the requirements of Bankruptcy Code sections

327, 328, 330, 331, 503(b) and 1103, as applicable.  Finally, Section 11(h) of the Plan provides

that the Court will retain jurisdiction after the Effective Date to hear and determine all

applications for allowance of compensation or reimbursement of expenses authorized pursuant to

the Bankruptcy Code or the Plan, including requests by professionals.  Accordingly, the Plan

fully complies with the requirements of Bankruptcy Code section 1129(a)(4).

### (v) Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

41.    The Plan complies with the requirements of Bankruptcy Code section 1129(a)(5)

because, in the Disclosure Statement, the Plan and/or the Plan Supplement, the Debtors have

disclosed the following:  (a) the identity and affiliations of each proposed director, each proposed

officer and the manner in which additional officers and directors of the Reorganized Debtors will

be chosen following confirmation; and (b) the identity and nature of any compensation for any

insider who will be employed or retained by the Reorganized Debtors.  The method of

appointment of directors and officers of the Reorganized Debtors was, is and will be consistent

with the interests of Holders of Claims and Interests and public policy.  Accordingly, the

requirements of Bankruptcy Code section 1129(a)(5) are satisfied.  The compensation for the

proposed officers of the Reorganized Debtors is disclosed on pages 107-109 of the *Offering Memorandum for the $385,000,000 11 ½% First Lien Senior Secured Notes Due 2017*, attached hereto as <u>Exhibit C</u>.

### (vi)    Section 1129(a)(6)—Approval of Rate Changes

42.    The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval.  Therefore, Bankruptcy Code section 1129(a)(6) is inapplicable to the Chapter 11 Cases.

### (vii)    Section 1129(a)(7)—Best Interests of Holders of Claims and Interests

43.    The liquidation analysis attached as <u>Exhibit I</u> to the Disclosure Statement (the "***Liquidation Analysis***"), the Polimeni Declaration, the Jamal Declaration and other evidence proffered or adduced at the Confirmation Hearing (i) are reasonable, persuasive and credible, (ii) are based upon reasonable and sound assumptions, (iii) have not been controverted by other evidence, (iv) provide a reasonable estimate of the liquidation values of the Debtors in the event the Debtors were liquidated under chapter 7 of the Bankruptcy Code, and (v) establish that each Holder of a Claim or Interest in an impaired Class that has not accepted the Plan will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  Therefore, the Plan satisfies Bankruptcy Code section 1129(a)(7).

44.    Specifically, the Liquidation Analysis properly estimated that the net liquidation value of the Debtors would be comprised of, among other things, the Debtors' cash on hand, trade receivables and property value after reductions for certain liquidation fees and costs likely to be incurred in a chapter 7 case, including estimated expenses of the trustee and its

22

professionals as well as wind-down expenses. The Liquidation Analysis assumes that, in the hypothetical chapter 7 cases, the bankruptcy trustee would wind down the Debtors' operations in an orderly manner and liquidate substantially all of the Debtors' assets over a six-month period. Accordingly, the requirements of Bankruptcy Code section 1129(a)(7) are satisfied.

> **(viii)    Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class**

45.    Classes 1, 3, 4 and 8 are unimpaired by the Plan and therefore, under Bankruptcy Code section 1126(f), such Classes are conclusively presumed to have accepted the Plan. Class 9, Intercompany Claims, is impaired but deemed to have accepted the Plan because the Debtors, at their discretion, may adjust, continue or discharge Intercompany Claims pursuant to the Plan. Classes 2, 5, 6 and 7 were entitled to vote on the Plan and Classes 2, 5 and 6 voted to accept the Plan. Accordingly, Bankruptcy Code section 1129(a)(8) has been satisfied with respect to Classes 1-6, 8 and 9.

46.    Class 7 rejected the Plan and Class 10 is deemed to reject the Plan pursuant to Bankruptcy Code section 1126(g), but, as found in section (xiv) below, the Plan is confirmable under Bankruptcy Code section 1129(b) notwithstanding the rejections by such Classes. Therefore, Bankruptcy Code section 1129(a)(8) has not been satisfied with respect to these Classes.

> **(ix)    Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Bankruptcy Code Section 507(a)**

47.    The treatment of Administrative Claims and Priority Non-Tax Claims under the Plan satisfies the requirements of Bankruptcy Code sections 1129(a)(9)(A) and (B), and the treatment of Priority Tax Claims under the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(9)(C).

### (x)    Section 1129(a)(10)—Acceptance by at Least One Impaired Class

48.    As set forth in the Voting Certification, at least one impaired Class of Claims

voted to accept the Plan.  Specifically, Holders of Claims in Classes 2, 5 and 6 voted to accept

the Plan.  As such, there is at least one Class of Claims that is impaired under the Plan that has

accepted the Plan, determined without including any acceptance of the Plan by any insider (as

defined by the Bankruptcy Code).  Accordingly, the requirements of Bankruptcy Code section

1129(a)(10) have been satisfied.

### (xi)    Section 1129(a)(11)—Feasibility of the Plan

49.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The Plan does not

provide for the liquidation of all or substantially all of the property of the Debtors.  The financial

projections in Exhibit G to the Disclosure Statement, the Polimeni Declaration, the Jamal

Declaration and the evidence proffered or adduced at the Confirmation Hearing:  (a) are

reasonable, persuasive, credible and accurate as of the dates such analysis or evidence was

prepared, presented or proffered; (b) utilize reasonable and appropriate methodologies and

assumptions; (c) have not been controverted by other evidence; (d) establish that the Plan is

feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need

for further financial reorganization, of the Reorganized Debtors or any successor to the

Reorganized Debtors under the Plan except as provided in the Plan; and (e) establish that the

Reorganized Debtors will have sufficient funds available to meet their obligations under the

Plan.  Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been

satisfied.

### (xii)    Section 1129(a)(12)—Payment of Bankruptcy Fees

50.    The Debtors have paid or will pay by the Effective Date fees payable under 28

U.S.C. § 1930.  On and after the Effective Date, the Reorganized Debtors shall pay the

applicable U.S. Trustee fees for each of the Reorganized Debtors when due in the ordinary

course until such time as the Court enters a final decree in such Reorganized Debtor's Chapter 11

Case.  Accordingly, the requirements of Bankruptcy Code section 1129(a)(12) have been

satisfied.

### (xiii)    Section 1129(a)(13)—Retiree Benefits

51.    Bankruptcy Code section 1129(a)(13) requires a plan to provide for "retiree

benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to

section 1114 of the Bankruptcy Code.  Section 8.5 of the Plan provides that all employee

compensation and benefit plans entered into before or after the Petition Date and not since

terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be

assumed pursuant to the Plan.  The Debtors' obligations under such plans and programs shall

survive confirmation of the Plan.  Accordingly, the requirements of Bankruptcy Code section

1129(a)(13) have been satisfied.

### (xiv)    Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Class

52.    Notwithstanding the fact that Class 7 has voted not to accept the Plan and Class

10 is deemed to reject the Plan (collectively, the "***Rejecting Classes***"), the Plan may be

confirmed pursuant to Bankruptcy Code section 1129(b)(1) because:  (a) Classes 2, 5 and 6 are

impaired and have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is

fair and equitable with respect to the Rejecting Classes.  Thus, the Plan may be confirmed

notwithstanding the Debtors' failure to satisfy Bankruptcy Code section 1129(a)(8).  After entry

of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be

binding upon the members of the Rejecting Classes.

53.    The Plan does not unfairly discriminate because members within each Class are treated similarly.  Accordingly, the Plan does not discriminate unfairly with respect to the Rejecting Classes or any other Class of Claims or Interests.

54.    To determine whether a plan is "fair and equitable" with respect to a class of unsecured claims, Bankruptcy Code section 1129(b)(2)(B) provides that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property . . . ."  There are no Classes junior to Class 7 that will receive any distribution under the Plan.

55.    To determine whether a plan is "fair and equitable" with respect to a class of interests, Bankruptcy Code section 1129(b)(2)(C)(ii) provides that "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."  There are no Classes junior to the Class 10 that will receive any distribution under the Plan.  Therefore, the Plan is fair and equitable and satisfies the requirements of Bankruptcy Code section 1129(b).

56.    Additionally, with respect to Intercompany Claims, Class 9 is impaired and deemed to accept the Plan.  The preservation of Intercompany Claims is a means to preserve the Reorganized Debtors' corporate structure that does not have any economic substance and that does not enable any Claim Holder or Interest Holder junior to the Rejecting Classes to retain or recover any value under the Plan.  Accordingly, the impaired status of Class 9 is consistent with the requirement that no Holders of Claims or Interests junior to the Holders of Claims or Interests in the Rejecting Classes receive or retain any property under the Plan on account of such Claims or Interests.  Accordingly, the Plan is fair and equitable and does not discriminate

unfairly, as required by Bankruptcy Code section 1129(b), and may be confirmed under

Bankruptcy Code section 1129(b) notwithstanding the Rejecting Classes' rejection of the Plan.

### (xv)    Section 1129(c)—Only One Plan

57.    Other than the Plan (including previous versions thereof), no other plan has been

filed in the Chapter 11 Cases.  Accordingly, the requirements of Bankruptcy Code section

1129(c) have been satisfied.

### (xvi)    Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes

58.    No governmental unit has requested that the Court refuse to confirm the Plan on

the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of

the application of section 5 of the Securities Act.  As evidenced by its terms, the principal

purpose of the Plan is not such avoidance.  Accordingly, the requirements of Bankruptcy Code

section 1129(d) have been satisfied.

### R.    Satisfaction of Confirmation Requirements

59.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set

forth in Bankruptcy Code section 1129.

### S.    Executory Contracts

60.    The Debtors have exercised reasonable business judgment in determining whether

to assume or reject their executory contracts and unexpired leases pursuant to Section 8 of the

Plan.  Each assumption of an executory contract or unexpired lease pursuant to Section 8 of the

Plan shall be legal, valid and binding upon the applicable Debtor or Reorganized Debtor and

their assignees or successors and all non-Debtor parties (and their assignees or successors) to

such executory contract or unexpired lease, all to the same extent as if such assumption had been

effectuated pursuant to an order of the Court entered before the date of the entry of this

Confirmation Order under Bankruptcy Code section 365.

### T.    Issuance of New Common Stock

61.    Issuance of the New Common Stock is an essential element of the Plan and is in the best interests of the Debtors, their Estates, and their creditors.  The Debtors are authorized, without further approval of this Court or any other party, to issue the New Common Stock in accordance with the Plan, execute the Stockholders Agreement and to execute and deliver all agreements, documents, instruments, and certificates relating thereto.

### U.    Distributions of New Common Stock and New Second Lien Notes Are Exempt From the Securities Act

62.    The distribution of the New Common Stock pursuant to the Plan in exchange for the Subordinated Notes and the 2011 Notes is exempt from the requirements of section 5 of the Securities Act, as amended, and any state or local laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealing in, a security pursuant to Bankruptcy Code section 1145(a).

63.    The distribution of the New Second Lien Notes pursuant to the Plan is exempt from the requirements of section 5 of the Securities Act, as amended, and any state or local laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealing in, a security pursuant to Bankruptcy Code section 1145(a), section 3(a)(9) of the Securities Act and section 4(2) of the Securities Act.

### V.    New Financing

64.    On the Effective Date, (i) AMO will merge into the Reorganized AMI and (ii) the Escrow Issuer and New LLC will merge into Reorganized AMI, which will assume the Escrow Issuer's obligations under the New First Lien Notes, the New First Lien Indenture and the related registration rights agreement, (iii) the Reorganized Debtor Subsidiaries will guarantee Reorganized AMI's obligations under the New First Lien Notes and the New First Lien Indenture

28

and (iv) the proceeds of the New First Lien Notes Offering (and any other amounts held in escrow) will be released from escrow.  In addition, on the Effective Date, (i) Reorganized AMI will enter into the New Second Lien Indenture and the New Revolver Credit Facility Agreement and (ii) the Reorganized Debtor Subsidiaries will guarantee Reorganized AMI's obligations under the New Second Lien Indenture and the New Revolver Credit Facility Agreement.

65.    The Reorganized Debtors' assumption or execution of the New First Lien Indenture, the New Second Lien Indenture and the New Revolver Facility Credit Agreement, and all documents related to the foregoing, including the granting of the guarantees, liens and security interests relating thereto (together, the "***New Financing***"), is an exercise of reasonable business judgment, proposed in good faith, critical to the success and feasibility of the Plan and in the best interests of the Debtors, the Reorganized Debtors, their Estates and creditors.  The financial accommodations extended to the Debtors and/or the Reorganized Debtors pursuant to the New Financing are, were and continue to be extended and implemented in good faith and for legitimate business purposes.  The liens, claims, liabilities and obligations of the Debtors and/or the Reorganized Debtors created under the New Financing are valid, binding and enforceable, properly perfected and not subject to avoidance.  All documentation relating to the New Financing will continue to be valid, binding and enforceable agreements.

**W.    Corporate Action**

66.    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including the (a) assumption of the Management Agreements, (b) selection of the directors and officers of the Reorganized Debtors, (c) issuance of the New Common Stock by Reorganized AMI, (d) issuance of the New Second Lien Notes, (e) release of the proceeds of the New First Lien Notes Offering from escrow, (f) assumption of

the obligations under the New First Lien Notes and the New First Lien Indenture and execution

of the New Second Lien Indenture, the New Revolver Facility Credit Agreement and the

registration rights agreement relating to the New Second Lien Notes, (g) the issuance of

guarantees of the New First Lien Notes, the New Second Lien Notes and the New Revolver

Facility Credit Agreement by the Reorganized Debtor Subsidiaries, (h) adoption of the Equity

Incentive Plan and the issuance of awards pursuant to the Plan, (i) adoption of the Director

Severance Plan, (j) implementation of the Emergence Incentive Plan, (k) the execution of the

Stockholders Agreement and (l) all other actions contemplated by the Plan (whether to occur

before, on or after the Effective Date).  All matters provided for in the Plan involving the

corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required

by the Debtors or the Reorganized Debtors in connection with the implementation of the Plan,

shall be deemed to have occurred and shall be in effect upon the Effective Date, without any

requirement of further action by the directors or officers of the Debtors or the Reorganized

Debtors.

## X.    Implementation

67.    All documents and agreements necessary to implement the Plan, including those

contained in the Plan Supplement, and all other relevant and necessary documents (including the

Restated Certificates of Incorporation and the Restated Bylaws of the Reorganized Debtors, the

New First Lien Indenture, the New Second Lien Indenture, the New Revolver Facility Credit

Agreement and the Stockholders Agreement) have been negotiated in good faith, at arm's length,

and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon

completion of documentation and execution be valid, binding, and enforceable documents and

agreements not in conflict with any federal or state law.

**Y.      Plan Conditions to Consummation**

68.      Each of the conditions to the Effective Date, as set forth in Section 9 of the Plan,

is reasonably likely to be satisfied or waived in accordance with the terms of the Plan.

**Z.      Retention of Jurisdiction**

69.      The Court properly may retain jurisdiction over the matters set forth in Section 11

and other applicable provisions of the Plan.

## ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF
LAW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

**(i)      Confirmation of Plan and Related Matters**

1.      <u>Approval of Disclosure Statement</u>.  Pursuant to Bankruptcy Rule 3017(b),

the Disclosure Statement is approved under Bankruptcy Code sections 1125(a) and 1125(g).

2.      <u>Solicitation</u>.  The Solicitation and Election Procedures, including the

procedures for transmittal of Solicitation Packages, the forms of Ballots, and the Voting

Deadline, are approved under Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017

and 3018, the Disclosure Statement, the Scheduling Order, the Prepack Guidelines, the Local

Rules, all other applicable provisions of the Bankruptcy Code, and all other rules, laws, and

regulations applicable to such solicitation.  The solicitation materials are approved under

Bankruptcy Code sections 1125 and 1126, Bankruptcy Rules 3017 and 3018, the Disclosure

Statement, the Scheduling Order, the Prepack Guidelines, the Local Rules, all other applicable

provisions of the Bankruptcy Code, and all other applicable rules, laws, and regulations.

3.      <u>Confirmation</u>.  The Plan, in the form attached hereto as <u>Exhibit A</u>,

including all provisions thereof, all Exhibits attached thereto, the Plan Financing Supplement and

the Plan Supplement (each as may be amended by the Confirmation Order or in accordance with

the Plan), is approved and confirmed under Bankruptcy Code section 1129.  The terms of the

Plan, the Plan Financing Supplement, the Plan Supplement and exhibits thereto are incorporated

by reference into and are an integral part of this Confirmation Order.  All acceptances and

rejections previously cast for or against the Plan are hereby deemed to constitute acceptances or

rejections of the Plan in the form attached to this Confirmation Order.  The documents contained

in the Plan Financing Supplement and Plan Supplement, and any amendments, modifications,

and supplements thereto, and all documents and agreements related thereto (including all

exhibits and attachments thereto and documents referred to in such papers), and the execution,

delivery and performance thereof by the Debtors and the Reorganized Debtors, are authorized

and approved as finalized, executed and delivered.  Without further order or authorizations of the

Court, the Debtors, the Reorganized Debtors and their successors are authorized and empowered

to make all modifications to all documents included as part of the Plan Financing Supplement

and/or Plan Supplement that are consistent with the Plan.

    4.  <u>Confirmation Order Binding on All Parties</u>.  Subject to the provisions of

the Plan and Bankruptcy Rule 3020(e), in accordance with Bankruptcy Code section 1141(a) and

notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the

terms of the Plan and this Confirmation Order shall be binding upon, and inure to the benefit of:

(a) the Debtors; (b) the Reorganized Debtors; (c) any and all Holders of Claims or Interests

(irrespective of whether such Claims or Interests are impaired under the Plan or whether the

Holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected

the Plan); (d) any other person giving, acquiring or receiving property under the Plan; (e) any

and all non-Debtor parties to executory contracts or unexpired leases with any of the Debtors;

and (f) the respective heirs, executors, administrators, trustees, affiliates, officers, directors,

32

agents, representatives, attorneys, beneficiaries, guardians, successors or assigns, if any, of any of the foregoing.  On the Effective Date, all settlements, compromises, releases, waivers, discharges, exculpations and injunctions set forth in the Plan shall be effective and binding on all Persons who may have had standing to assert any settled, released, discharged, exculpated or enjoined causes of action, and no other Person or entity shall possess such standing to assert such causes of action after the Effective Date.

5. <u>Notice</u>.  Notice of the Combined Hearing was proper and adequate.

6. <u>Objections</u>.  All objections and all reservations of rights that have not been withdrawn, waived or settled, pertaining to the confirmation of the Plan are overruled on the merits.

7. <u>Effectiveness of All Actions</u>.  All actions contemplated by the Plan are hereby authorized and approved in all respects (subject to the provisions of the Plan).  The approvals and authorizations specifically set forth in this Confirmation Order are nonexclusive and are not intended to limit the authority of any Debtor or Reorganized Debtor or any officer or director thereof to take any and all actions necessary or appropriate to implement, effectuate and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order.  Pursuant to this Confirmation Order, Delaware General Corporate Law section 303, and other applicable law, the Debtors and the Reorganized Debtors are authorized and empowered, without action of their respective stockholders or members or boards of directors or managers (but subject to consent rights, if any, set forth in the Plan) to take any and all such actions as any of their executive officers may determine are necessary or appropriate to implement, effectuate and consummate any and all documents or transactions contemplated by the Plan or this Confirmation Order.

33

8.      <u>Vesting of Assets and Operation as of the Effective Date</u>.  Except as

otherwise explicitly provided in the Plan, on the Effective Date, all property comprising the

Estates shall vest in each of the Debtors and, ultimately, in the Reorganized Debtors, free and

clear of all Claims, liens and interests (except for the liens and security interests granted to

secure the New Financing).  As of the Effective Date, each of the Reorganized Debtors may

operate its business and use, acquire, and dispose of property and settle and compromise Claims

without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and this

Confirmation Order.

9.      <u>Mergers</u>.  On the Effective Date, (i) AMO will merge into Reorganized

AMI and (ii) the Escrow Issuer and New LLC will merge into Reorganized AMI.

10.      <u>Organizational Documents</u>.  On or immediately prior to the Effective

Date, the Reorganized Debtors shall, and are hereby authorized to, (i) file their respective

Restated Certificates of Incorporation, forms of which are attached to the Plan Supplement as

Exhibit K, with the Delaware Secretary of State, (ii) adopt their respective Restated Bylaws,

forms of which are attached to the Plan Supplement as Exhibit J and (iii) adopt the Stockholders

Agreement, which is attached to the Plan Supplement as Exhibit I.

11.      <u>Reorganized Debtors' Boards of Directors and Officers</u>.  The boards of

directors and officers of each of the Reorganized Debtors have been identified in the Plan

Supplement, and the Reorganized Debtors shall be authorized to employ such officers without

further order of the Court or other further action by any other person or entity.

12.      <u>Cancellation of Interests</u>.  On the Effective Date, all notes, instruments,

certificates, and other documents evidencing Interests shall be cancelled, terminated and

extinguished and the obligations of the Debtors thereunder or in any way related thereto shall be discharged including, but not limited to, (a) the Interests in AMI and (b) any options or warrants to purchase Interests of AMI, or obligating such Debtors to issue, transfer or sell Interests or any other capital stock of such Debtors.

13.    <u>Cancellation of the Notes, the Indentures, and the 2009 Credit Agreement</u>. On the Effective Date, except as otherwise specifically provided for in the Plan, all of the agreements and other documents evidencing the Claims or rights of any Holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims.  Notwithstanding the foregoing and anything contained in the Plan, the 2009 Credit Agreement and the Indentures shall continue in effect to the extent necessary to (i) allow the Reorganized Debtors, the Administrative Agent and the Indenture Trustees to make distributions pursuant to the Plan on account of the Claims under the 2009 Credit Agreement and Indentures, as applicable, (ii) permit the applicable Indenture Trustee to assert its charging lien, (iii) permit the applicable Indenture Trustee to perform such other functions with respect thereto, (iv) permit the applicable Indenture Trustee or Administrative Agent to maintain and enforce any right to indemnification, contribution or other Claim it may have under the Indentures or 2009 Credit Agreement, as applicable, (v) permit the applicable Indenture Trustee and Administrative Agent to exercise its rights and obligations relating to the interests of the applicable noteholders or lenders and their relationship with the noteholders or lenders, and (vi) appear in these Chapter 11 Cases, *provided, however*, that the Indenture Trustees and the Administrative Agent will not be reimbursed by the Debtors for fees and expenses for post-Effective Date services in connection with (v) and (vi) above.

14.  Surrender of Existing Securities.  As a condition precedent to receiving

any distribution on account of any Notes Claims, each record Holder of any Notes Claims shall

be deemed to have surrendered such notes or other documentation underlying such notes and all

such surrendered notes and other documentation shall be deemed to be cancelled in accordance

with Section 5.7 of the Plan.  If the record Holder of a Subordinated Note, PIK Note or 2011

Note is The Depository Trust Company ("**DTC**") or its nominee or such other securities

depository or custodian thereof or is held in book entry or electronic form pursuant to a global

security held by DTC, then the beneficial Holder of such a Note Claim shall be deemed to have

surrendered such Holder's security, note, debenture or other evidence of indebtedness upon

surrender of such global security by DTC or such other securities depository or custodian

thereof.

15.  Issuance of New Common Stock.  Issuance of the New Common Stock in

accordance with the Plan is approved.  Each of the Debtors and the Reorganized Debtors are

authorized and empowered, without further approval of this Court or any other party, to take

such actions and to perform such acts as may be necessary, desirable or appropriate to implement

the issuance of the New Common Stock in accordance with the Plan and to execute and deliver

all agreements, documents, securities, instruments, and certificates relating thereto.  The New

Common Stock to be issued is hereby deemed issued as of the Effective Date regardless of the

date on which it is actually distributed.  All New Common Stock issued by the Reorganized

Debtors pursuant to the provisions of the Plan is hereby deemed to be duly authorized and

issued, fully paid and nonassessable.

16.  Exemption from Registration.  The (i) offer by the Debtors and/or the

Reorganized Debtors of the New Common Stock issued under the Plan in exchange for the

Subordinated Notes Claims and the 2011 Notes Claims is exempt from the registration

requirements of the Securities Act and similar state statutes pursuant to applicable securities law

and (ii) issuance by the Reorganized Debtors of the New Common Stock pursuant to the Plan in

exchange for the Subordinated Notes Claims and the 2011 Notes Claims is exempt from the

registration requirements of the Securities Act and similar state statutes pursuant to Bankruptcy

Code section 1145.  In addition, pursuant to section 3(a)(9) of the Securities Act, section 4(2) of

the Securities Act, and Bankruptcy Code section 1145, the distribution of the New Second Lien

Notes pursuant to the Plan is exempt from registration requirements of the Securities Act and

similar state statutes including any state or local laws requiring registration for offer or sale of a

security and is exempt from any other requirements of federal, state or local securities laws.

> 17.    New Financing.  On the Effective Date, (i) the Escrow Issuer and New

LLC are authorized to merge into Reorganized AMI immediately following the merger of AMO

into Reorganized AMI, which will assume the Escrow Issuer's obligations under the New First

Lien Notes, the New First Lien Indenture and the related registration rights agreement, (ii) the

proceeds of the New First Lien Notes Offering (and any other amounts held in escrow) will be

released from escrow, and (iii) the Reorganized Debtors, as applicable, are authorized to (a) enter

into or assume, as applicable, and deliver the documents and agreements related to the New

Financing, including all guarantees and security documents relating thereto, and the registration

rights agreement relating to the New Second Lien Notes, (b) execute and deliver such security

documents, control agreements, certificates, financing statements and other documentation as

required under the terms of the New Financing or as the applicable agents under the New

Financing reasonably request, and (c) deliver insurance and customary opinions (collectively, the

documents in (a)-(c), the "***New Financing Documents***"), and such documents and all other

documents, instruments and agreements to be entered into, delivered or contemplated thereunder shall become effective in accordance with their terms on the Effective Date.  Without limiting the foregoing, the Reorganized Debtors are authorized to enter into, perform and take all other actions to consummate any and all transactions contemplated by the New Financing Documents, including to pay, and shall pay, as and when due, all fees, indemnities, expenses and other amounts provided under the New Financing Documents.  The Reorganized Debtors, as applicable, may enter into such amendments and modifications as may be agreed to by and between the Reorganized Debtors, as applicable, and the applicable or requisite indenture trustees, noteholders, lenders and agents under the New Financing Documents on and after the Effective Date without further order of the Court to effectuate the transactions contemplated by the Plan and this Confirmation Order, notwithstanding anything to the contrary in the Plan.  The New Financing Documents shall constitute the legal, valid, binding and authorized obligations of the applicable Reorganized Debtors, enforceable in accordance with their terms.  On the Effective Date, all of the liens and security interests granted in accordance with the New Financing Documents are hereby deemed approved and shall be legal, valid, binding, enforceable and non-avoidable liens on and security interests in the collateral granted thereunder in accordance with the terms of the New Financing Documents and shall be deemed properly perfected as of the Effective Date.  The Debtors or the Reorganized Debtors, as applicable, are hereby authorized to make any and all filings with any state or local recording officer or otherwise, including this Confirmation Order, to evidence the release of any liens existing on the property of the Estates immediately prior to the Effective Date.  All obligations of the Reorganized Debtors arising pursuant to the New Financing Documents are in exchange for fair and reasonably equivalent value and do not constitute a preferential transfer or fraudulent

transfer or fraudulent conveyance under applicable federal or state laws and will not subject the

indenture trustees, noteholders, lenders or agents party to the New Financing Documents to any

liability by reason of the incurrence of such obligation or grant of such liens or security interests

under applicable federal or state laws, including but not limited to successor or transferee

liability.

18.    <u>Election to Put New Second Lien Notes to Backstop Parties</u>.  The election

form provided to Holders of Term Facility Claims and the election procedures, as described in

the Scheduling Motion, were reasonable and appropriate.  To the extent that a Holder of a Term

Facility Claim has made an election to have the Backstop Parties purchase (or elect to receive) its

New Second Lien Notes pursuant to the Plan (a "***Backstop Election***"), the Backstop Parties will

purchase (or elect to receive) such New Second Lien Notes on the Effective Date, and such

Holder shall receive the face amount of such New Second Lien Notes in Cash on the Effective

Date.  The failure of a Holder to make a Backstop Election reflects an agreement that such

Holder (a "***Non-Electing Holder***") will retain its New Second Lien Notes received pursuant to

the Plan; *provided, however*, the Debtors shall have the right, for purposes of making the

distributions under the Plan on the Effective Date, to deem any Non-Electing Holder to have

made a Backstop Election solely with respect to that portion of its Term Facility Claim

attributable to the Deferred Fees (as defined in the 2009 Credit Agreement and including, for the

avoidance of doubt, accrued and unpaid interest thereon), so long as the aggregate face amount

of New Second Lien Notes that all such Non-Electing Holders so deemed to have made a

Backstop Election would have otherwise received pursuant to the Plan does not exceed $60,000.

19.    <u>Executory Contracts and Unexpired Leases</u>.  On the Effective Date, all

executory contracts or unexpired leases of the Debtors, other than any executory contract or

unexpired lease that (a) was previously assumed or rejected or (b) is subject to a pending motion

to assume or reject as of the Confirmation Date, shall be deemed assumed as of the Confirmation

Date (but subject to the occurrence of the Effective Date) in accordance with, and subject to, the

provisions and requirements of Bankruptcy Code sections 365 and 1123.

20.    All executory contracts or unexpired leases assumed by the Debtors

pursuant to the foregoing (the "***Assumed Agreements***") shall remain in full force and effect for

the benefit of the Reorganized Debtors, as applicable, and be enforceable by the Reorganized

Debtors, as applicable, in accordance with their terms notwithstanding any provision in such

Assumed Agreements that purports to prohibit, restrict or condition such assumption.  The

assumption of the Assumed Agreements shall be free and clear of all liens, encumbrances,

pledges, mortgages, deeds of trust, security interests, claims, charges, options, rights of first

refusal, easements, servitudes, proxies, voting trusts or agreements, and/or transfer restrictions

under any shareholder or similar agreement or encumbrance (except for the liens and security

interests granted to secure the New Financing).  Any provision in the Assumed Agreements that

purports to declare a breach or default based in whole or in part on the above-captioned cases is

hereby deemed unenforceable, and the Assumed Agreements shall remain in full force and

effect.

21.    <u>Employee Benefits</u>.  All employee, retirement and other agreements or

arrangements in place as of the Effective Date with the Debtors' officers, directors, or

employees, who will continue in such capacities or similar capacities after the Effective Date, or

retirement plans and welfare benefit plans for such persons, shall remain in place after the

Effective Date, and the Reorganized Debtors will continue to honor such agreements,

arrangements, programs and plans; *provided, however*, that the foregoing shall not apply to any

stock-based compensation or incentive plan existing as of the Petition Date. Notwithstanding the

foregoing, pursuant to Bankruptcy Code section 1129(a)(13), on and after the Effective Date, all

retiree benefits (as that term is defined in Bankruptcy Code section 1114), if any, shall continue

to be paid in accordance with applicable law.

22.    <u>Vesting of Assets in the Reorganized Debtors</u>.  Except as otherwise

provided in the Plan or any agreement, instrument or other document incorporated therein, on the

Effective Date, all property in each Estate, and all Causes of Action (except those released

pursuant to the Debtor Releases) shall vest in each of the respective Reorganized Debtors, free

and clear of all liens, Claims, charges or other encumbrances (except for the liens and security

interests granted to secure the New Financing).  On and after the Effective Date, except as

otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use,

acquire or dispose of property and compromise or settle any Claims, Interests or Causes of

Action without supervision or approval by the Court and free of any restrictions of the

Bankruptcy Code or Bankruptcy Rules.

23.    <u>Incentive and Severance Plans</u>.  The terms of the Equity Incentive Plan,

the Director Severance Plan and the Emergence Incentive Plan, as set forth in the Plan

Supplement, are hereby approved, and the Debtors and Reorganized Debtors are authorized,

without further approval of this Court or any other party, to execute and deliver all agreements,

documents, instruments and certificates relating to the Equity Incentive Plan, the Director

Severance Plan and the Emergence Incentive Plan, and to perform their obligations thereunder.

24.    <u>Effectuating Documents; Further Transactions</u>.  On and after the Effective

Date, the Reorganized Debtors and the managers, officers and members of the boards of

directors thereof are authorized to issue, execute, deliver, file or record such contracts, securities,

instruments, releases and other agreements or documents and take such actions as may be

necessary or appropriate to effectuate, implement and further evidence the terms and conditions

of the Plan (including the New Financing) and the securities issued pursuant to the Plan in the

name of and on behalf of the Reorganized Debtors, without the need for any approvals,

authorization or consents except for those expressly required pursuant to the Plan.

25.     D&O Insurance Policy.  Notwithstanding anything in the Plan or in this

Confirmation Order to the contrary, as of the Effective Date, the Debtors shall assume (and

assign to the Reorganized Debtors if necessary to continue the D&O Insurance Policy in full

force) the D&O Insurance Policy pursuant to Bankruptcy Code section 365(a).  Entry of this

Confirmation Order shall constitute the Court's approval of the Debtors' foregoing assumption

of the D&O Insurance Policy.  Until the sixth anniversary of the Effective Date, Reorganized

AMI shall cause the individuals serving as directors of the Reorganized Debtors to be covered by

the D&O Insurance Policy (provided that Reorganized AMI may substitute therefor policies of at

least the same coverage and amounts containing terms and conditions that are not less

advantageous in any material respect than the D&O Insurance Policy); provided that in no event

shall Reorganized AMI be required to expend annually in the aggregate an amount in excess of

150.0% of the annual premiums currently paid by AMI for such insurance (the "***Insurance***

***Amount***"), and provided further that if Reorganized AMI is unable to maintain the D&O

Insurance Policy (or such substitute policy) as a result of the preceding proviso, Reorganized

AMI shall obtain as much comparable insurance as is available for the Insurance Amount.

26.     Preservation of Rights of Action.  In accordance with Bankruptcy Code

section 1123(b), and except where such Causes of Action have been expressly released

(including, for the avoidance of doubt, pursuant to the Debtor Releases provided by Section 10.7

of the Plan), the Reorganized Debtors shall retain and may enforce all rights to commence and

pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition

Date, and the Reorganized Debtors' rights to commence, prosecute or settle such Causes of

Action shall be preserved notwithstanding the occurrence of the Effective Date.  The

Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the

best interests of the Reorganized Debtors.  No Entity may rely on the absence of a specific

reference in the Plan or the Disclosure Statement to any Cause of Action against them as any

indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all

available Causes of Action against them.  Except with respect to Causes of Action as to which

the Debtors or Reorganized Debtors have released any Person or Entity on or before the

Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or

Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes

of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any

Causes of Action against an Entity are expressly waived, relinquished, exculpated, released,

compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors

expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion

doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of

Action upon, after or as a consequence of the confirmation or Consummation.

       27.   <u>Exemption from Certain Transfer Taxes</u>.  The issuance, transfer or

exchange of debt and equity under the Plan, the creation of any mortgage, deed of trust, or other

security interest, the making or assignment of any contract, lease or sublease, or the making or

delivery of any deed or other instrument of transfer under, in furtherance of, or in connection

with the Plan shall be exempt from all taxes (including, without limitation, stamp tax or similar

taxes) to the fullest extent permitted by Bankruptcy Code section 1146, and the appropriate state

or local governmental officials or agents shall not collect any such tax or governmental

assessment and shall accept for filing and recordation any of the foregoing instruments or other

documents without the payment of any such tax or governmental assessment.

28.    Provisions Governing Distributions.  The distribution provisions of

Section 6 of the Plan are hereby approved and authorized in their entirety.  Except as otherwise

set forth in the Plan, the Reorganized Debtors shall make all distributions under the Plan.

Notwithstanding anything contained in the Plan, the Plan Financing Supplement, the Plan

Supplement or this Confirmation Order, each of the Indenture Trustees will serve as

Disbursement Agent to facilitate distributions to its respective Class of Notes Claims and the

Administrative Agent will serve as the Disbursement Agent to facilitate distributions to Holders

of Term Facility Claims and Revolver Claims.

**(ii)    Discharge of Debtors, Releases and Injunctions**

29.    Discharge of Debtors.  Pursuant to Bankruptcy Code section 1141(d), and

except as otherwise specifically provided in the Plan or in this Confirmation Order, except to the

extent otherwise provided in the Plan, the treatment of all Claims against or Interests in the

Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and

release of all Claims against or Interests in the Debtors of any nature whatsoever, known or

unknown, including any interest accrued or expenses incurred thereon from and after the Petition

Date, or against their Estates or properties or interests in property.  Except as otherwise provided

in the Plan, upon the Effective Date, all Claims against and Interests in the Debtors shall be

satisfied, discharged and released in full exchange for the consideration provided under the Plan.

Except as otherwise provided in the Plan, all Persons shall be precluded from asserting against

44

the Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date. For the avoidance of doubt, Section 10.3 of the Plan shall not discharge any Claims that have been alleged or could be alleged in the Anderson Litigation.

30.    <u>Releases, Limitations of Liability and Indemnification</u>.  The releases set forth in Section 10.7 and 10.8 of the Plan, and the exculpation and limitation of liability provisions set forth in Section 10.4 of the Plan are incorporated in this Confirmation Order as if set forth in full herein and are hereby approved and authorized in their entirety and shall be, and hereby are, effective and binding, subject to the respective terms thereof, on all persons and entities who may have had standing to assert released Claims or causes of action, and no person or entity shall possess such standing to assert such Claims or causes of action after the Effective Date.

31.    <u>Injunctions</u>.  Except to the extent otherwise provided in the Plan, all Persons who have held, hold or may hold Claims against or Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against any Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim or Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor

with respect to any such Claim or Interest, and (v) pursuing any Claim released pursuant to

Sections 10.7 or 10.8 of the Plan.  For the avoidance of doubt, Section 10.5(a) of the Plan shall

not enjoin any Claims that have been alleged or could have been alleged in the Anderson

Litigation.  Unless otherwise provided, all injunctions or stays arising under or entered during the

Chapter 11 Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on

the Confirmation Date, shall remain in full force and effect until the later of the Effective Date

and the date indicated in the order providing for such injunction or stay.

32.    <u>Exculpations</u>.  Except as otherwise specifically provided in the Plan or

Plan Supplement, no Released Party shall have or incur any liability for any claim, cause of

action, or other assertion of liability for any act taken or omitted to be taken in connection with,

or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation,

Consummation, or administration of the Plan, or property to be distributed under the Plan, or any

other act or omission in connection with the Chapter 11 Cases, the Plan, or any contract,

instrument, indenture, or other agreement or document related thereto or delivered thereunder,

*provided, however,* that the foregoing shall be subject to a limited carve-out solely for gross

negligence, willful misconduct criminal acts and fraud.  Notwithstanding anything herein to the

contrary, nothing in the Plan shall (1) exculpate any Person or Entity from any liability resulting

from any act or omission constituting fraud, willful misconduct, gross negligence, criminal

conduct, malpractice, misuse of confidential information that causes damages or ultra vires act as

determined by a Final Order or (2) limit the liability of the professionals of the Released Parties

to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule

1.8(h)(1) (2009).

### (iii)   Plan Modifications

33.     <u>Plan Modifications</u>.  The modifications to the Plan were made in a manner consistent with Section 12.6 of the Plan and did not materially or adversely modify the treatment of any Claims or Interests.  The Plan, as modified, satisfies the requirements of Bankruptcy Code sections 1122 and 1123.  Accordingly, pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under Bankruptcy Code section 1125 or resolicitation of votes under Bankruptcy Code section 1126, nor do they require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan.  Such modifications are approved pursuant to section 1127(a).

### (iv)   Notice and Other Provisions

34.     <u>Notice of Confirmation Order</u>.  On or before the fifth (5th) day following the occurrence of the Effective Date, the Debtors shall serve notice of entry of this Confirmation Order pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and 3020(c), on: (a) the U.S. Trustee; (b) the United States Attorney for the Southern District of New York; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the parties listed in the consolidated list of fifty (50) largest unsecured creditors filed by the Debtors in these bankruptcy cases; (f) counsel to the Administrative Agent; (g) counsel to the Committee; and (h) other parties in interest, by causing a notice of this Confirmation Order in substantially the form of the notice annexed hereto as <u>Exhibit B</u> (the "***Notice of Confirmation***"), which form is hereby approved, to be delivered to such parties by first class mail, postage prepaid.  The Notice of Confirmation shall also be published in The New York Times (National Edition), USA Today (National Edition) and the Miami Herald and any other publications the Debtors deem necessary in their sole discretion.

35.     Notice need not be given or served under the Bankruptcy Code, the
Bankruptcy Rules, or this Confirmation Order to any Person to whom the Debtors mailed a
notice of the Combined Hearing, but received such notice returned marked "undeliverable as
addressed," "moved - left no forwarding address," "forwarding order expired," or similar reason,
unless the Debtors have been informed in writing on or before the Effective Date by such Person
of that Person's new address.

36.     Mailing and publication of the Notice of Confirmation in the time and
manner set forth in the preceding paragraphs shall be good and sufficient notice under the
particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and
3020(c), and no other or further notice is necessary.  The Notice of Confirmation shall have the
effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the
Confirmation Order to any filing and recording officers, and shall be a recordable instrument
notwithstanding any contrary provision of applicable non-bankruptcy law.

37.     <u>Professional Compensation</u>.  Except as otherwise expressly permitted in
the Plan or other orders of the Court, all final requests for professional compensation and
reimbursement Claims shall be filed no later than 45 days after the Effective Date.  After notice
and a hearing in accordance with the procedures established by the Bankruptcy Code and prior
Court orders, the Allowed amounts of such professional compensation and reimbursement
Claims shall be determined by the Court.  Except as otherwise specifically provided in the Plan,
from and after the Effective Date, each Reorganized Debtor shall, in the ordinary course of
business and without any further notice to or action, order or approval of the Court, pay in Cash
the reasonable legal, professional or other fees and expenses incurred by that Reorganized
Debtor after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement

48

that Professionals comply with Bankruptcy Code sections 327 through 331 and 1103 in seeking

retention or compensation for services rendered after such date shall terminate, and each

Reorganized Debtor may employ and pay any professional in the ordinary course of business

without any further notice to or action, order or approval of the Court.

           38.      The Debtors or Reorganized Debtors shall promptly pay in full, in Cash

reasonable, documented and necessary fees for services rendered and out-of-pocket expenses

incurred by the Administrative Agent, and the Indenture Trustees (and their agents, attorneys and

professionals) without the need of such parties to file fee applications with the Court; provided

that each party and/or its counsel provide the Debtors (or the Reorganized Debtors, as

applicable) with the invoices (or such other documentation as the Debtors (or the Reorganized

Debtors, as applicable) may reasonably request) for which it seeks payment.  If the Debtors (or

the Reorganized Debtors, as applicable) have no objection to such fees, such fees shall be paid

within ten business days of the request for payment.  To the extent that the Debtors (or the

Reorganized Debtors, as applicable) object to such fees, the Debtors (or the Reorganized

Debtors, as applicable) shall not be required to pay any disputed portion of such fees until a

resolution of such objection is agreed to by the Debtors (or the Reorganized Debtors, as

applicable) and such party and/or their counsel or a further order of the Court upon a motion by

such party brought in accordance with the terms of the Plan and this Confirmation Order;

*provided, however*, nothing in this Paragraph 38 shall modify, alter or amend the provisions of

the Plan relating to the payment by the Debtors (or the Reorganized Debtors, as applicable) of

any fees and expenses requested by the Indenture Trustees in accordance with Section 12.2 of the

Plan.

39.     The Debtors or Reorganized Debtors shall promptly pay in full, in Cash

reasonable, documented and necessary fees for services rendered and out-of-pocket expenses

incurred by the Committee (and their agents, attorneys and professionals) without the need of

such parties to file fee applications with the Court.  Each party and/or its counsel shall provide

the Debtors (or the Reorganized Debtors, as applicable) with the invoices (or such other

documentation as the Debtors (or the Reorganized Debtors, as applicable) may reasonably

request) for which it seeks payment.  In addition, the Committee shall file a fee statement for the

Court's approval, which approval shall be subject to the Court's determination that the fee

statement is reasonable.

40.     Release of Liens.  Except as otherwise provided in the Plan or in any

contract, instrument, release or other agreement or document created pursuant to the Plan, on the

Effective Date and concurrently with the applicable distributions made pursuant to the Plan and,

in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is

Allowed as of the Effective Date, all mortgages, deeds of trust, liens, pledges or other security

interests against any property of the Estates shall be fully released and discharged, and all of the

right, title and interest of any Holder of such mortgages, deeds of trust, liens, pledges or other

security interests shall revert to the Reorganized Debtors and their successors and assigns.

41.     Failure to Consummate Plan and Substantial Consummation.  If the

Effective Date does not occur, then the Plan, any settlement or compromise embodied in the Plan

(including the fixing or limiting to an amount certain any Claim or Class of Claims), the

assumption or rejection of executory contracts or unexpired leases effected by the Plan, and any

document or agreement executed pursuant to the Plan, shall be null and void.  In such event,

nothing contained in the Plan or this Confirmation Order, and no acts taken in preparation for

consummation of the Plan, shall, or shall be deemed to, (a) constitute a waiver or release of any

Claims by or against or Interests in the Debtors or any other Person, (b) prejudice in any manner

the rights of the Debtors or any Person in any further proceedings involving the Debtors,

(c) constitute an admission of any sort by the Debtors or any other Person, or (d) be construed as

a finding of fact or conclusion of law with respect thereto.

42.     <u>References to Plan Provisions</u>.  The failure to include or specifically

reference any particular provision of the Plan in this Confirmation Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Plan be

confirmed in its entirety.

43.     <u>Exhibits</u>.  Each reference to a document, agreement or summary

description that is in the form attached as an exhibit to the Plan in this Confirmation Order, or in

the Plan, the Plan Financing Supplement, or the Plan Supplement shall be deemed to be a

reference to such document, agreement or summary description in substantially the form of the

latest version of such document, agreement or summary description filed with the Court (whether

filed as an attachment to the Plan, Plan Financing Supplement, Plan Supplement or filed

separately).

44.     <u>Plan Provisions Mutually Dependent</u>.  The provisions of the Plan are

hereby deemed nonseverable and mutually dependent.

45.     <u>Confirmation Order Provisions Mutually Dependent</u>.  The provisions of

this Confirmation Order are hereby deemed nonseverable and mutually dependent.

46.     <u>Confirmation Order Supersedes</u>.  It is hereby ordered that this

Confirmation Order shall supersede any orders of this Court issued prior to the Confirmation

Date that may be inconsistent with this Confirmation Order.

47.    <u>Conflicts Between Confirmation Order and Plan</u>.  The provisions of the

Plan and of this Confirmation Order shall be construed in a manner consistent with each other so

as to effect the purposes of each; *provided, however*, that if there is determined to be any

inconsistency between any Plan provision and any provision of this Confirmation Order that

cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of this

Confirmation Order shall govern and any such provision of this Confirmation Order shall be

deemed a modification of the Plan and shall control and take precedence.

48.    <u>Retention of Jurisdiction</u>.  Pursuant to Bankruptcy Code sections 105(a)

and 1142, and notwithstanding the entry of this Confirmation Order or the occurrence of the

Effective Date, this Court, except as otherwise provided in the Plan or herein, shall retain

exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the

Plan to the fullest extent permitted by law, including, but not limited to, the matters set forth in

Section 11 of the Plan.

49.    <u>Final Order</u>.  This Confirmation Order is a Final Order and the period in

which an appeal must be filed shall commence upon the entry hereof.

50.    <u>Immediate Effectiveness</u>.  Notwithstanding Bankruptcy Rules 3020(e),

6004(h), 7062, 8001, 8002 or otherwise, immediately upon the entry of this Confirmation Order,

this Confirmation Order and, immediately upon the occurrence of the Effective Date, the terms

of the Plan, the Plan Financing Supplement, and the Plan Supplement, shall be, and hereby are,

immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized

Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or

Interests are impaired under the Plan or whether the Holders of such Claims or Interests

accepted, were deemed to have accepted, rejected or were deemed to have rejected the Plan), any

trustees or examiners appointed in the Chapter 11 Cases, all persons and entities that are party to

or subject to the settlements, compromises, releases, discharges, injunctions, stays and

exculpations described in the Plan or herein, each person or entity acquiring property under the

Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the

Debtors and the respective heirs, executors, administrators, successors or assigns, affiliates,

officers, directors, agents, representatives, attorneys, beneficiaries, or guardians, if any, of any of

the foregoing.  The Debtors are authorized to consummate the Plan at any time after the entry of

the Confirmation Order subject to satisfaction or waiver of the conditions precedent to

consummation set forth in Section 9 of the Plan.

Dated: New York, New York
           December 20, 2010

                                    **/s/Martin Glenn**
                                    MARTIN GLENN
                            United States Bankruptcy Judge

**EXHIBIT A**

**Debtors' Amended Joint Prepackaged Plan of
Reorganization Under Chapter 11 of the Bankruptcy Code**

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) Case No. 10-16140 (MG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**DEBTORS' AMENDED JOINT PREPACKAGED PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: December 15, 2010

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).  The address for all Debtors is 1000 American Media Way, Boca Raton, FL, 33464.

# TABLE OF CONTENTS

SECTION 1.        DEFINITIONS AND INTERPRETATION ........................................................ 1
   **1.1**    Definitions........................................................................................................... 1
   **1.2**    Rules of Interpretation ..................................................................................... 11
   **1.3**    Computation of Time ....................................................................................... 12
   **1.4**    Governing Law ................................................................................................ 12
   **1.5**    References to Monetary Figures ....................................................................... 12
   **1.6**    Reference to Debtors or Reorganized Debtors ................................................. 12

SECTION 2.        ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS ....................... 12
   **2.1**    Administrative Expense Claims........................................................................ 12
   **2.2**    Professional Compensation and Reimbursement Claims ................................... 13
   **2.3**    Priority Tax Claims .......................................................................................... 13

SECTION 3.        CLASSIFICATION OF CLAIMS AND INTERESTS ................................... 13

SECTION 4.        TREATMENT OF CLAIMS AND INTERESTS ......................................... 14
   **4.1**    Priority Non-Tax Claims (Class 1) ................................................................... 14
   **4.2**    Term Facility Claims (Class 2) ........................................................................ 14
   **4.3**    Revolver Claims (Class 3) ............................................................................... 15
   **4.4**    Other Secured Claims (Class 4)........................................................................ 16
   **4.5**    PIK Notes Claims (Class 5) ............................................................................. 16
   **4.6**    Subordinated Notes Claims (Class 6) ............................................................... 16
   **4.7**    2011 Notes Claims (Class 7)............................................................................ 17
   **4.8**    General Unsecured Claims (Class 8) ................................................................ 17
   **4.9**    Intercompany Claims (Class 9)........................................................................ 17
   **4.10**   Interests in AMI (Class 10).............................................................................. 18

SECTION 5.        MEANS FOR IMPLEMENTATION............................................................ 18
   **5.1**    Substantive Consolidation of Debtors for Plan Purposes Only ......................... 18
   **5.2**    Corporate Action............................................................................................. 18
   **5.3**    Distribution of New Second Lien Financing ..................................................... 21
   **5.4**    Offer to Purchase New Second Lien Notes ....................................................... 21
   **5.5**    Issuance of New Common Stock and New Preferred Stock, if Applicable.................. 22
   **5.6**    Merger/Dissolution/Consolidation.................................................................... 22
   **5.7**    Cancellation of Existing Securities and Agreements ......................................... 23
   **5.8**    Surrender of Existing Securities ....................................................................... 23
   **5.9**    Equity Incentive Plan ...................................................................................... 23
   **5.10**   Director Severance Plan................................................................................... 23
   **5.11**   24
   Cancellation of Liens. ................................................................................................ 24
   **5.12**   Compromise of Controversies .......................................................................... 24
   **5.13**   Stockholders Agreement .................................................................................. 24
   **5.14**   Listing of New Common Stock and Transfer Restrictions. ............................... 24
   **5.15**   Exemption from Securities Laws...................................................................... 24
   **5.16**   Exemption from Transfer Taxes....................................................................... 25

**5.17**   D&O Insurance Policy ................................................................................... 26

SECTION 6.       DISTRIBUTIONS ....................................................................... 26
**6.1**   Voting of Claims ......................................................................................... 26
**6.2**   Cramdown and No Unfair Discrimination..................................................... 26
**6.3**   Distribution Record Date ............................................................................. 26
**6.4**   Date of Distributions .................................................................................. 27
**6.5**   Sources of Cash for Distributions ............................................................... 27
**6.6**   Disbursement Agent .................................................................................... 27
**6.7**   Rights and Powers of the Disbursement Agent.............................................. 27
**6.8**   Expenses of the Disbursement Agent ........................................................... 27
**6.9**   Delivery of Distributions ............................................................................ 27
**6.10**  Manner of Payment Under Plan................................................................... 29
**6.11**  No Fractional Shares of New Common Stock or New Preferred Stock, if Any ........... 30
**6.12**  Setoffs and Recoupment ............................................................................. 30
**6.13**  Distributions After Effective Date .............................................................. 30
**6.14**  Cash Distributions...................................................................................... 30
**6.15**  Allocation of Distributions Between Principal and Interest ........................... 30
**6.16**  No Postpetition Interest on Claims .............................................................. 30

SECTION 7.       PROCEDURES FOR DISPUTED CLAIMS ...................................... 31
**7.1**   Disputed Claims/Process ............................................................................. 31
**7.2**   Objections to Claims ................................................................................... 31
**7.3**   Estimation of Claims................................................................................... 31
**7.4**   No Distributions Pending Allowance............................................................ 31
**7.5**   Distributions After Allowance ..................................................................... 32
**7.6**   Preservation of Claims and Rights to Settle Claims ...................................... 32

SECTION 8.       EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................. 32
**8.1**   Assumption and Rejection of Contracts and Leases....................................... 32
**8.2**   Cure of Defaults ......................................................................................... 33
**8.3**   Rejection Claims......................................................................................... 33
**8.4**   Survival of the Debtors' Indemnification Obligations.................................... 33
**8.5**   Survival of Management Agreements and Other Employment Arrangements............. 34
**8.6**   Insurance Policies ....................................................................................... 34

SECTION 9.       CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.................. 34
**9.1**   Conditions Precedent to the Effective Date .................................................. 34
**9.2**   Waiver of Conditions Precedent .................................................................. 35
**9.3**   Effect of Failure of Conditions ................................................................... 35

SECTION 10.      EFFECT OF CONFIRMATION.................................................... 35
**10.1**  Vesting of Assets........................................................................................ 35
**10.2**  Binding Effect ........................................................................................... 36
**10.3**  Discharge of the Debtors ............................................................................ 36
**10.4**  Exculpation ............................................................................................... 36
**10.5**  Term of Injunctions or Stays....................................................................... 37

ii

**10.6**   Injunction Against Interference with Plan ................................................................. 37
**10.7**   Releases by the Debtors ............................................................................................ 37
**10.8**   Releases by the Holders of Claims and Interests ...................................................... 38
**10.9**   Preservation of Claims .............................................................................................. 40
**10.10**  Reservation of Rights ................................................................................................ 40
**10.11**  Plan Supplement ....................................................................................................... 40
**10.12**  Plan Financing Supplement ...................................................................................... 40

SECTION 11.    RETENTION OF JURISDICTION ................................................................. 41

SECTION 12.    MISCELLANEOUS PROVISIONS .................................................................. 42
**12.1**   Payment of Statutory Fees ........................................................................................ 42
**12.2**   Payment of Indenture Trustee Fee Claims ................................................................ 42
**12.3**   Dissolution of Statutory Committees and Cessation of Fee and Expense Payment ..... 43
**12.4**   Substantial Consummation ........................................................................................ 43
**12.5**   Determination of Tax Filings and Taxes ................................................................... 43
**12.6**   Amendments .............................................................................................................. 43
**12.7**   Effectuating Documents and Further Transactions .................................................... 44
**12.8**   Revocation or Withdrawal of the Plan ...................................................................... 44
**12.9**   Severability ............................................................................................................... 44
**12.10**  Schedules and Exhibits Incorporated ........................................................................ 44
**12.11**  Solicitation of the Plan .............................................................................................. 44
**12.12**  Governing Law .......................................................................................................... 45
**12.13**  Compliance with Tax Requirements .......................................................................... 45
**12.14**  Conflict between Plan, Disclosure Statement and Plan Supplement Documents ......... 45
**12.15**  Notices ...................................................................................................................... 46

iii

American Media, Inc., American Media Operations, Inc. and the Debtor Subsidiaries[2] in the above-captioned Chapter 11 Cases propose this amended joint prepackaged plan of reorganization (the "***Plan***") pursuant to section 1121(a) of title 11 of the Bankruptcy Code.

Holders of Claims against and Interests in the Debtors may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information and forecasts of future operations, as well as a summary of the Plan.

## SECTION 1.  DEFINITIONS AND INTERPRETATION

### 1.1    *Definitions*.

The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

1.      ***2009 Credit Agreement*** means that certain Amended and Restated Credit Agreement dated as of January 30, 2006, as amended and restated as of December 31, 2008 and as may be further amended from time to time, among AMI, AMO, the Administrative Agent and the other parties thereto.

2.      ***2011 Notes*** means the 8 7/8% notes issued by AMO pursuant to the 2011 Notes Indenture.

3.      ***2011 Notes Claims*** means any Claim arising under the 2011 Notes Indenture, which Claims include, but are not limited to, principal and interest as of the Petition Date and, if applicable, postpetition interest.

4.      ***2011 Notes Indenture*** means that certain Indenture dated as of January 23, 2003 among AMO, the 2011 Notes Indenture Trustee and other parties thereto, as well as any guarantees and other documents entered in connection therewith, as may be amended from time to time.

5.      ***2011 Notes Indenture Trustee*** means HSBC Bank USA, National Association and/or its duly appointed successor, in its capacity as indenture trustee under the 2011 Notes Indenture.

6.      ***Additional Shares*** has the meaning ascribed to it in Section 5.4.

7.      ***Administrative Agent*** means JPMorgan Chase Bank, N.A.

8.      ***Administrative Expense Claim*** means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases Allowed under and in accordance with, as applicable, Bankruptcy Code sections 330, 503(b), 507(a)(2) and 507(b), including, without limitation, (a) any actual and necessary costs and expenses of preserving the Debtors' Estates or

---

[2] Capitalized terms used herein shall have the meanings ascribed to them in Section 1.1.

operating the Debtors' businesses, (b) any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, and (c) any compensation for professional services rendered and reimbursement of expenses incurred by a professional retained by order of the Bankruptcy Court or otherwise allowed pursuant to Bankruptcy Code section 503(b).

9.    ***Affiliate*** has the meaning set forth in Bankruptcy Code section 101(2).

10.    ***Allowed*** means, with reference to any Claim, (a) any Claim arising on or before the Effective Date (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, (b) any Claim as to which the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court or (c) any Claim expressly Allowed hereunder.

11.    ***AMI*** means American Media, Inc., a Delaware corporation.

12.    ***AMO*** means American Media Operations, Inc., a Delaware corporation.

13.    ***Angelo Gordon*** means Angelo Gordon & Co., L.P., along with its affiliates and subsidiaries.

14.    ***Avenue*** means Avenue Capital Group, along with its affiliates and subsidiaries.

15.    ***Backstop Agreement*** means that certain agreement dated as of October 30, 2010 among the Backstop Parties, AMI and AMO.

16.    ***Backstop Commitment*** has the meaning ascribed to it in Section 5.4.

17.    ***Backstop Parties*** means Avenue and Angelo Gordon.

18.    ***Backstop Percentage Interest*** has the meaning ascribed to it in Section 5.4.

19.    ***Backstop Shares*** has the meaning ascribed to it in Section 5.4.

20.    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time.

21.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the order of the United States District Court for the Southern District of New York, the United States District Court for the Southern District of New York.

22.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code, as well as the general, local and chambers rules of the Bankruptcy Court.

23.     ***Business Day*** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

24.     ***Cash*** means legal tender of the United States of America.

25.     ***Chapter 11 Cases*** means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court under Case No. 10- [ ].

26.     ***Claim*** has the meaning set forth in Bankruptcy Code section 101(5).

27.     ***Class*** means any group of substantially similar Claims or Interests classified by the Plan pursuant to Bankruptcy Code sections 1122 and 1123(a)(1).

28.     ***Class 6 Distribution Pool*** means the pool of New Common Stock representing 98% of all New Common Stock outstanding on the Effective Date (which represents the *pro rata* portion that Class 6 represents of the aggregate amount of Allowed Claims in Class 6 and Class 7), subject to dilution for the Equity Incentive Plan and the Backstop Shares (provided, however, that no Backstop Party's share of the Class 6 Distribution Pool shall be diluted by the Backstop Shares), from which distributions shall be made to the Holders of Allowed Subordinated Notes Claims.

29.     ***Class 7 Distribution Pool*** means the pool of New Common Stock representing 2% of all New Common Stock outstanding on the Effective Date (which represents the *pro rata* portion that Class 7 represents of the aggregate amount of Allowed Claims in Class 6 and Class 7), subject to dilution for the Equity Incentive Plan and the Backstop Shares (provided, however, that no Backstop Party's share of the Class 7 Distribution Pool shall be diluted by the Backstop Shares), from which distributions shall be made to the Holders of Allowed 2011 Notes Claims.

30.     ***Collateral*** means any property or interest in property of the Estate of any Debtor subject to a lien, charge or other encumbrance to secure the payment or performance of a Claim, which lien, charge or other encumbrance is neither subject to avoidance nor otherwise invalid under the Bankruptcy Code or applicable state law.

31.     ***Committee*** means that certain ad hoc committee comprised of certain Holders of Subordinated Notes and PIK Notes.

32.     ***Confirmation Date*** means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

33.     ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

34.     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

3

35.     ***Consummation*** means the occurrence of the Effective Date.

36.     ***D&O Insurance Policy*** shall be as described in Section 5.17.

37.     ***Debtors*** means AMI, AMO and their Debtor Subsidiaries.

38.     ***Debtor Subsidiaries*** means any of American Media Consumer Entertainment, Inc.; American Media Consumer Magazine Group, Inc.; American Media Distribution & Marketing Group, Inc.; American Media Mini Mags, Inc.; American Media Newspaper Group, Inc.; American Media Property Group, Inc.; Country Music Media Group, Inc.; Distribution Services, Inc.; Globe Communications Corp.; Globe Editorial, Inc.; Mira! Editorial, Inc.; National Enquirer, Inc.; National Examiner, Inc.; Star Editorial, Inc.; and Weider Publications, LLC.

39.     ***Director Severance Plan*** shall be as described in Section 5.10.

40.     ***Disbursement Agent*** means any Entity (including any applicable Debtor if it acts in such capacity) in its capacity as a Disbursement Agent under Sections 6.6, 6.7, and 6.9 hereof.

41.     ***Disclosure Statement*** means that certain *Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, dated October 30, 2010, including, without limitation, all exhibits and schedules thereto and references therein, as the same may be amended, supplemented or otherwise modified from time to time.

42.     ***Disputed*** means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.  A Claim or Administrative Expense Claim that is Disputed as to its amount shall not be Allowed in any amount for purposes of distribution until it is no longer a Disputed Claim.

43.     ***Distribution Record Date*** means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

44.     ***Effective Date*** means the Business Day on or after the Confirmation Date specified by the Debtors on which (a) no stay of the Confirmation Order is in effect and (b) the conditions to the effectiveness of the Plan specified in Section 9 hereof have been satisfied or waived.

45.     ***Emergence Incentive Plan*** means that incentive plan which will provide for the payment of Cash bonuses to certain of the Debtors' key employees, the material terms of which shall be filed in connection with the Plan Supplement.

46.     ***Entity*** means an entity as such term is defined in Bankruptcy Code section 101(15).

47.     ***Equity Incentive Plan*** has the meaning ascribed to it in Section 5.9.

4

48.    ***Escrow Issuer*** means AMO Escrow Corporation, a new non-Debtor Delaware company.

49.    ***Escrow Motion*** has the meaning ascribed to it in Section 5.2(e).

50.    ***Estate*** means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to Bankruptcy Code section 541.

51.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a stay, new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari or move for a stay, new trial, reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion pursuant to Bankruptcy Code section 502(j) or 1144 or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not cause such order to not be a "Final Order."

52.    ***General Unsecured Claims*** means any Claim against any of the Debtors that (a) is not an Administrative Expense Claim, Priority Tax Claim, Priority Non-Tax Claim, Term Facility Claim, Revolver Claim, Other Secured Claim, PIK Notes Claim, Subordinated Notes Claim, 2011 Notes Claim, or Intercompany Claim or (b) is otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

53.    ***Holder*** means any Person or Entity holding a Claim or an Interest.

54.    ***Indenture Trustees*** means, collectively, the PIK Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, and the 2011 Notes Indenture Trustee, and their respective directors, officers, partners, members, representatives, employees and professional advisors.

55.    ***Indentures*** means, collectively, the PIK Notes Indenture, the Subordinated Notes Indenture and the 2011 Notes Indenture.

56.    ***Initial Percentage Ownership*** means, with respect to any Backstop Party, the fraction, expressed as a percentage, the numerator of which is the total number of shares of New Common Stock held by such Backstop Party and the denominator of which is the total number of shares of New Common Stock issued and outstanding held by all stockholders of Reorganized AMI, in each case, immediately after the Effective Date but excluding the issuance of any Initial Shares or Additional Shares.

57.    ***Initial Shares*** has the meaning ascribed to it in Section 5.4.

58.     ***Insurance Amount*** has the meaning ascribed to it in Section 5.17.

59.     ***Intercompany Claims*** means any Claim held by (i) a Debtor against another Debtor or (ii) a non-Debtor subsidiary against a Debtor.

60.     ***Intercreditor Agreements*** means the following agreements: (i) that certain agreement to be entered into between the Reorganized Debtors, the New First Lien Holders, and the New Second Lien Holders (or their respective agents); and (ii) that certain agreement to be entered into between the Reorganized Debtors, the New Revolver Facility Lenders and the New First Lien Holders (or their respective agents), each to be dated as of the Effective Date.

61.     ***Interests*** means any equity security in a Debtor as defined in Bankruptcy Code section 101(16), including all issued, unissued, authorized or outstanding shares of capital stock of the Debtors together with any warrants, options or contractual rights to purchase or acquire such equity securities at any time and all rights arising with respect thereto, including, without limitation, rights to purchase restricted stock or interests.

*62.*     ***Management Agreements*** means the employment agreements with existing members of management.

63.     ***New Boards*** means each board of directors appointed pursuant to Section 5.2(c) of the Plan.

64.     ***New Common Stock*** means that number of common shares in the capital of Reorganized AMI authorized for issuance in accordance with the terms hereof on the Effective Date.

65.     ***New First Lien Financing*** means the new first lien secured financing evidenced by the New First Lien Notes.

66.     ***New First Lien Holders*** means the holders of the New First Lien Notes.

67.     ***New First Lien Indenture*** means that certain Indenture, pursuant to which the New First Lien Notes are to be originally issued by Escrow Issuer prior to the Effective Date, the material terms of which will be filed in the Plan Financing Supplement, and a draft of which, in substantially final form, will be included in the Plan Supplement.

68.     ***New First Lien Notes*** means those certain notes, in an aggregate principal amount of up to approximately $385 million, to be issued pursuant to the New First Lien Indenture.

69.     ***New First Lien Notes Offering*** means that certain notes offering to raise the New First Lien Financing.

70.     ***New LLC*** means that newly established non-Debtor Delaware company.

71.     ***New PIK Notes*** means, if any, the notes issued pursuant to the New PIK Notes Indenture.

72.    ***New PIK Notes Indenture*** means that certain Indenture, to be dated as of the Effective Date, pursuant to which the New PIK Notes (if any) are to be issued, the material terms of which will be filed in the Plan Financing Supplement, and a draft of which, in substantially final form, will be filed as part of the Plan Supplement, in either case only if the Debtors elect to issue New PIK Notes to Holders of PIK Notes Claims.

73.    ***New Preferred Stock*** means, if any, that number of preferred shares in the capital of Reorganized AMI authorized for issuance in accordance with the terms hereof on the Effective Date, with the terms and conditions to be set forth in the New Preferred Stock Certificate of Designation.

74.    ***New Preferred Stock Certificate of Designation*** means that certain certificate of designation setting forth the terms and conditions of the New Preferred Stock, if any, a draft of which, in substantially final form, will be included in the Plan Supplement, if the Debtors elect to issue New Preferred Stock to Holders of PIK Notes Claims.

75.    ***New Revolver Facility*** means the revolver facility of approximately $40 million of aggregate commitments entered into pursuant to that certain New Revolver Facility Credit Agreement.

76.    ***New Revolver Facility Credit Agreement*** means the first lien revolving credit facility agreement, to be dated as of the Effective Date, a draft of which, in substantially final form, will be filed as part of the Plan Supplement.

77.    ***New Revolver Facility Lenders*** means the lenders party to the New Revolver Facility Credit Agreement.

78.    ***New Second Lien Financing*** means the new second lien secured financing evidenced by the New Second Lien Notes.

79.    ***New Second Lien Holders*** means the holders of the New Second Lien Notes.

80.    ***New Second Lien Indenture*** means that certain Indenture, pursuant to which the New Second Lien Notes are to be issued, the material terms of which will be filed in the Plan Financing Supplement, and a draft of which, in substantially final form, will be included in the Plan Supplement.

81.    ***New Second Lien Notes*** means those certain notes, in an aggregate principal amount of up to approximately $140 million, to be issued pursuant to the New Second Lien Indenture.

82.    ***New Second Lien Notes Offering*** means that certain notes offering, if any, to raise New Second Lien Financing.

83.    ***Notes Claims*** means, collectively, the 2011 Notes Claims, the Subordinated Notes Claims and the PIK Notes Claims.

84.    ***Other Secured Claims*** means a Secured Claim other than a Term Facility Claim or a Revolver Claim.

85.    ***Person*** has the meaning set forth in Bankruptcy Code section 101(41).

86.    ***Petition Date*** means that date on which each of the respective Debtors commenced its Chapter 11 Case.

87.    ***PIK Notes*** means the unsecured 9% senior PIK notes due 2013, issued pursuant to the PIK Notes Indenture.

88.    ***PIK Notes Claims*** means any Claim arising under the PIK Notes Indenture, which Claims include, but are not limited to, principal and interest as of the Petition Date and, if applicable, postpetition interest.

89.    ***PIK Notes Indenture*** means that certain Indenture dated as of January 20, 2009 among AMO, the PIK Notes Indenture Trustee and other parties thereto, as may be amended from time to time.

90.    ***PIK Notes Indenture Trustee*** means Wilmington Trust FSB and/or its duly appointed successor, in its capacity as indenture trustee under the PIK Notes Indenture.

91.    ***Plan*** means this joint prepackaged plan of reorganization, including the exhibits and schedules hereto and contained in the Plan Supplement and Plan Financing Supplement, as the same may be amended or modified from time to time in accordance with the provisions of the Bankruptcy Code.

92.    ***Plan Financing Supplement*** means a supplemental appendix to the Plan, to be filed with the Bankruptcy Court on the Petition Date, or as soon thereafter as is practicable, that will contain the material terms of the New First Lien Indenture, the New Second Lien Indenture, and the New PIK Notes Indenture, if any.

93.    ***Plan Supplement*** means a supplemental appendix to the Plan, to be filed with the Bankruptcy Court prior to the Confirmation Hearing, that will contain the draft forms of the Plan Supplement Documents to be entered into as of the Effective Date.

94.    ***Plan Supplement Documents*** means the documents to be executed, delivered, assumed and/or performed in conjunction with the consummation of the Plan on the Effective Date including, but not limited to, the Restated Bylaws, the Restated Certificate of Incorporation, the Equity Incentive Plan, the Emergence Incentive Plan, the Director Severance Plan, the Intercreditor Agreements, the New Revolver Facility Credit Agreement, the New First Lien Indenture, the New Second Lien Indenture, any documents to be executed by the Escrow Issuer in connection with the New First Lien Notes Offering and New Second Lien Notes Offering, the Stockholders Agreement, and, to the extent applicable, the New PIK Notes Indenture and the New Preferred Stock Certificate of Designation.  Except as otherwise provided herein, the Plan Supplement Documents must be reasonably acceptable to the Committee.  Each of the Plan Supplement Documents to be entered into as of the Effective Date will be filed in draft form in the Plan Supplement.

95.    ***Priority Non-Tax Claims*** means any Claim against any of the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in Bankruptcy Code sections 507(a)(3), (4), (5), (6), (7) or (9).

96.    ***Priority Tax Claims*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in Bankruptcy Code sections 502(i) and 507(a)(8).

97.    ***pro rata*** means the proportion that (a) an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or (b) Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

98.    ***Released Parties*** means (i) the Debtors and Reorganized Debtors; (ii) any direct or indirect shareholder of the Debtors, and such shareholder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors; (iii) the current and former (in each case, as of the Effective Date) directors, officers, and employees, professional advisors, sub-advisors, managers, affiliated management companies, and managing and executive directors of the Debtors; (iv) the members of the Committee and their respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, and managing and executive directors; (v) the Indenture Trustees and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (vi) the Term Facility Lenders, the Revolver Lenders, the Administrative Agent, the collateral agent and other agents under the 2009 Credit Agreement and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (vii) the New First Lien Notes Holders and the indenture trustee, the escrow agent and the collateral agent under the New First Lien Indenture, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (viii) the New Second Lien Notes Holders and the indenture trustee, the escrow agent, and the collateral agent under the New Second Lien Indenture, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (ix) the New Revolver Facility Lenders and the New Revolver Facility administrative agent and their respective directors, officers, partners, members, representatives, employees and professional advisors; (x) the Backstop Parties, and their respective directors, officers, partners, members, representatives, employees, and professional advisors; (xi) the indenture trustee under the New PIK Notes Indenture and the holders of the New PIK Notes, if any, and their respective directors, officers, partners, members, representatives, employees and professional advisors; (xii) Holders of New Common Stock and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors; and (xiii) Holders of the New Preferred Stock, if any, and such Holder's respective directors, officers, partners, members, representatives, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors.

99.    ***Reorganized*** means, with respect to the Debtor Subsidiaries, any Debtor Subsidiaries or any successor(s) thereto, by merger, consolidation or otherwise, on or after the Effective Date.

100.    ***Reorganized AMI*** means AMI and, after giving effect to the merger with AMO, AMO, or any successor(s) thereto, by merger, consolidation or otherwise, on or after the Effective Date.

101.    ***Restated Bylaws*** means the amended and restated bylaws to be adopted by Reorganized AMI upon the Effective Date, substantially in the form to be included in the Plan Supplement.

102.    ***Restated Certificate of Incorporation*** means the amended and restated certificate of incorporation to be adopted by Reorganized AMI and filed with the Secretary of State of Delaware prior to or on the Effective Date, substantially in the form to be included in the Plan Supplement.

103.    ***Revolver Claims*** means any Claim arising under the revolving facility pursuant to the 2009 Credit Agreement.

104.    ***Revolver Lenders*** means the lenders under the revolving facility pursuant to the 2009 Credit Agreement.

105.    ***Secured Claims*** means a Claim to the extent (a) secured by a lien on Collateral, to the extent of the value of such Collateral (i) as set forth in the Plan, or (ii) as determined by a Final Order in accordance with Bankruptcy Code section 506(a), or (b) secured by the amount of any rights of setoff of the Holder thereof under Bankruptcy Code section 553.

106.    ***Securities Act*** means the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.

107.    ***Stockholders Agreement*** means the agreement between creditors who receive New Common Stock pursuant to the Plan, substantially in the form to be included in the Plan Supplement.

108.    ***Subordinated Notes*** means the unsecured 14% senior subordinated notes due 2013 issued by AMO pursuant to the Subordinated Notes Indenture.

109.    ***Subordinated Notes Claims*** means any Claim arising from the Subordinated Notes Indenture which Claims include, but are not limited to, principal and interest as of the Petition Date and, if applicable, postpetition interest.

110.    ***Subordinated Notes Indenture*** means that certain Indenture dated as of January 30, 2009 among AMO, the Subordinated Notes Indenture Trustee and other parties thereto, as well as any guarantees and other documents entered in connection therewith, as may be amended from time to time.

111.    ***Subordinated Notes Indenture Trustee*** means U.S. Bank National Association, as successor to Wilmington Trust FSB.

112.    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury regulations promulgated thereunder.

113.    ***Term Facility*** means the amount outstanding of the term loan commitment under the 2009 Credit Agreement.

114.    ***Term Facility Claims*** means any Claim arising under the Term Facility, which shall include, without limitation, any and all obligations of the Debtors under the Term Facility due and owing on the Effective Date.

115.    ***Term Facility Lenders*** means the lenders under the Term Facility.

116.    ***U.S. Trustee*** means the United States Trustee for the Southern District of New York.

### 1.2    Rules of Interpretation.

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule or exhibit, whether or not filed, having been filed or to be filed shall mean that document, schedule or exhibit, as it may thereafter be amended, modified or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement or the Plan Financing Supplement; (7) unless otherwise specified, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (11) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order; and (14) any reference to a document or any action to be approved or performed by the Committee shall, except as otherwise provided herein, mean the approval of the members of the Committee holding two-thirds in principal amount of the Subordinated Notes Claims held by the Committee.

### 1.3    Computation of Time.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### 1.4    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however,* that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

### 1.5    References to Monetary Figures.

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

### 1.6    Reference to Debtors or Reorganized Debtors.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

## SECTION 2.  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS

### 2.1    Administrative Expense Claims.

Except with respect to Administrative Expense Claims that are for professional compensation and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment with respect to such Claim, each Holder of an Allowed Administrative Expense Claim shall, in full satisfaction, release, and discharge of such Allowed Administrative Expense Claim, be paid in full, in Cash, on the latest of: (a) on or as soon as reasonably practicable after the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; *provided, however*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to, such transactions.

## 2.2    Professional Compensation and Reimbursement Claims.

Except as provided in Section 2.1 hereof, all entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Bankruptcy Code sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) shall (a) file, on or before the date that is forty-five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred, and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.  The Reorganized Debtors shall pay all reasonable fees, costs and expenses of the Committee's counsel incurred through and including the Confirmation Date without the need for approval by the Bankruptcy Court.

## 2.3    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to different treatment, each Holder of an Allowed Priority Tax Claim shall, in full satisfaction, release and discharge of such Allowed Priority Tax Claim, (a) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date, or (b) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtors and such Holder, or as may be due and owing under applicable nonbankruptcy law, or in the ordinary course of business.

## SECTION 3.  CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to Bankruptcy Code section 1122, set forth below is a designation of Classes of Claims against and Interests in the Debtors.  All Claims and Interests, except for Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth in this Section 3.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released or otherwise satisfied before the Effective Date.

As discussed in greater detail in Section 5.1, the Plan is premised upon the substantive consolidation of AMI, AMO and the Debtor Subsidiaries for purposes of the Plan only.  Accordingly, for purposes of the Plan, the assets and liabilities of AMI, AMO and the Debtor Subsidiaries are deemed assets and liabilities of a single, consolidated Entity.

The following chart summarizes the classification of Claims against, and Interests in, the Debtors:

13

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Term Facility Claims | Impaired | Yes |
| 3 | Revolver Claims | Unimpaired | No (deemed to accept) |
| 4 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 5 | PIK Notes Claims | Impaired | Yes |
| 6 | Subordinated Notes Claims | Impaired | Yes |
| 7 | 2011 Notes Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| 9 | Intercompany Claims | Impaired | No (deemed to accept) |
| 10 | Interests in AMI | Impaired | No (deemed to reject) |

### SECTION 4.  TREATMENT OF CLAIMS AND INTERESTS

#### 4.1    Priority Non-Tax Claims (Class 1).

(a)    <u>Impairment and Voting</u>.  Class 1 is unimpaired by the Plan.  No Holder of an Allowed Priority Non-Tax Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against any of the Debtors agrees to a different treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 1 Claim, each such Holder shall receive, in full satisfaction of such Claim, Cash in an amount equal to such Claim, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Claim becomes Allowed, and (iii) the date for payment provided by any agreement or understanding between the applicable Debtor and the Holder of such Claim.

#### 4.2    Term Facility Claims (Class 2).

(a)    <u>Impairment and Voting</u>.  Class 2 is impaired by the Plan.  The Term Facility Claims shall be Allowed in the aggregate amount of (i) $445,675,713.80 (for the avoidance of doubt, such amount includes the principal amount outstanding, any prepayment penalties due and owing, and that portion of the deferred consent fee allocable to the Term Facility Claims), plus (ii) (a) all accrued and unpaid interest thereon (including all accrued and unpaid interest on any prepayment penalties due and owing and the deferred consent fee) at the non-default contract rate under the 2009 Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied and (b) all unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date, which fees and expenses

14

shall be paid in full, in Cash.  Each Holder of an Allowed Term Facility Claim is entitled to vote to accept or reject the Plan.

(b)     Distributions.  On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 2 Claim, each Holder of an Allowed Term Facility Claim shall receive its pro rata share, on a dollar for dollar basis of the following in an aggregate amount equal to the Allowed amount of all Term Facility Claims: (i) Cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of all Allowed Term Facility Claims; and (ii) New Second Lien Notes; *provided however,* that the aggregate amount of New Second Lien Notes distributed to Term Facility Lenders shall not be greater than the Backstop Commitment; *provided further however*, that notwithstanding the foregoing, and for the avoidance of doubt, the unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date shall be paid in full, in Cash to the Administrative Agent.  In addition, and pursuant to the provisions of Section 5.4, each Holder of a Term Facility Claim (other than a Backstop Party) shall have the right to require that the Backstop Parties purchase from such Holder, on the Effective Date, its *pro rata* share of the New Second Lien Notes which it receives pursuant to this Section 4.2(b) for the face amount of such Holder's New Second Lien Notes, which face amount such Holder will receive in Cash.  For the avoidance of doubt, the Allowed Term Facility Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

### 4.3     Revolver Claims (Class 3).

(a)     Impairment and Voting.  Class 3 is unimpaired by the Plan.  The Revolver Claims shall be allowed in the aggregate amount of (i) $60,822,634.69 (for the avoidance of doubt, such amount includes the principal amount outstanding and that portion of the deferred consent fee allocable to the Revolver Claims), plus (ii) all accrued and unpaid interest thereon (including all accrued and unpaid interest on the deferred consent fee) at the non-default contract rate under the 2009 Credit Agreement as of the Effective Date, except to the extent such interest is otherwise provided herein to be paid or satisfied and (b) all unpaid reasonable and documented out-of-pocket fees and expenses (including legal fees and expenses) of the Administrative Agent through and including the Effective Date.  No Holder of an Allowed Revolver Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)     Distributions.  On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 3 Claim, each Holder of an Allowed Revolver Claim shall receive payment in full, in Cash.  For the avoidance of doubt, the Allowed Revolver Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

### 4.4    Other Secured Claims (Class 4).

(a)    <u>Impairment and Voting</u>.  Class 4 is unimpaired by the Plan.  No Holder of an Allowed Other Secured Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    <u>Distributions</u>.  On the Effective Date or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 4 Claim, each Holder of an Allowed Other Secured Claim shall, at the Debtors' option, (i) receive payment in full, in Cash, (ii) be reinstated pursuant to Bankruptcy Code section 1124, or (iii) receive such other recovery to be determined by the Debtors in their sole discretion.

### 4.5    PIK Notes Claims (Class 5).

(a)    <u>Impairment and Voting</u>.  Class 5 is impaired by the Plan.  The PIK Notes Claims shall be Allowed in the aggregate amount of $24,790,102, plus accrued and unpaid interest thereon as of the Petition Date.  Each Holder of an Allowed PIK Notes Claim is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 5 Claim, each Holder of an Allowed PIK Notes Claim shall receive, at the Debtors' option, but with the Committee's consent, as described in the succeeding sentence, its *pro rata* share of $24,790,102, plus accrued and unpaid interest thereon as of the Petition Date, in the form of either (i) New Second Lien Notes, (ii) New PIK Notes, (iii) New Preferred Stock, or (iv) a combination of the foregoing.  The Debtors shall require the consent of the Committee (which consent shall not be unreasonably withheld or delayed) in determining the form of consideration to be distributed pursuant to this Section 4.5(b); *provided, however*, that (i) the Committee may not require the Debtors to issue a security or debt instrument to the extent that the terms thereof violate the terms of any Plan Supplement Document and (ii) the consent of the members of the Committee holding two-thirds in principal amount of the Allowed PIK Notes Claims held by the Committee at the time the determination is made as to the form of the PIK Notes Claims distribution shall be required in connection with this Section 4.5(b).  For the avoidance of doubt, the Allowed PIK Notes Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

### 4.6    Subordinated Notes Claims (Class 6).

(a)    <u>Impairment and Voting</u>.  Class 6 is impaired by the Plan.  The Subordinated Notes Claims shall be Allowed in the aggregate amount of $355,756,041, plus accrued and unpaid interest thereon as of the Petition Date.  Each Holder of an Allowed Subordinated Notes Claim is entitled to vote to accept or reject the Plan.

16

(b)    _Distributions_.  On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 6 Claim, each Holder of a Subordinated Notes Claim shall receive its _pro rata_ share of the Class 6 Distribution Pool.  For the avoidance of doubt, the Allowed Subordinated Notes Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

### 4.7    2011 Notes Claims (Class 7).

(a)    _Impairment and Voting_.  Class 7 is impaired by the Plan.  The 2011 Notes Claims shall be Allowed in the aggregate amount of $7,501,679, plus accrued and unpaid interest thereon as of the Petition Date.  Each Holder of an Allowed 2011 Notes Claim is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.  On the Effective Date, or as soon thereafter as is reasonably practicable, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 7 Claim, each Holder of an Allowed 2011 Notes Claim shall receive its _pro rata_ share of the Class 7 Distribution Pool.  For the avoidance of doubt, the Allowed 2011 Notes Claims shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

### 4.8    General Unsecured Claims (Class 8).

(a)    _Impairment and Voting_.  Class 8 is unimpaired by the Plan.  No Holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(b)    _Distributions_.  In full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 8 Claim, each Holder of an Allowed General Unsecured Claim shall (a) retain unaltered the legal, equitable, and contractual rights to which such Claim entitles the Holder of such Claim and (b) receive payment in full, in Cash of the unpaid portion of its Allowed General Unsecured Claim on the latest of (i) the Effective Date (or as soon thereafter as is reasonably practicable), (ii) the date on which such Claim becomes Allowed or would otherwise be paid in the ordinary course of the Debtors' business, or (iii) as otherwise agreed by the Debtors and the Holder of such Claim; _provided, however_, that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business.  The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

### 4.9    Intercompany Claims (Class 9).

(a)    _Impairment and Voting_.  Class 9 is impaired by the Plan.  No Holder of an Allowed Intercompany Claim is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

17

(b)    Distributions.  On or as soon as practicable after the Effective Date, in full and final satisfaction, settlement, release and discharge of and in exchange for each and every Allowed Class 9 Claim, all Allowed Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the stockholders of the Reorganized Debtors.

**4.10    Interests in AMI (Class 10)**.

(a)    Impairment and Voting.  Class 10 is impaired by the Plan.  No Holder of an Allowed Interest in AMI is entitled to vote to accept or reject the Plan and shall be conclusively deemed to have rejected the Plan.

(b)    Distributions.  On the Effective Date, all Interests in AMI shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Holders of Interests in AMI shall neither receive distributions nor retain any property under the Plan on account of such Interests in AMI.

## SECTION 5.  MEANS FOR IMPLEMENTATION

**5.1    Substantive Consolidation of Debtors for Plan Purposes Only**.

The Plan is premised upon the substantive consolidation of the Debtors for purposes of the Plan only.  The Debtors propose procedural substantive consolidation to avoid the inefficiency of proposing, voting on, and making distributions in respect of Entity-specific claims.  Accordingly, on the Effective Date, all of the Debtors and their Estates shall, for purposes of the Plan only, be deemed merged and (a) all assets and liabilities of the Debtors shall be treated for purposes of the Plan only as though they were merged, (b) all guarantees of the Debtors of payment, performance, or collection of obligations of any other Debtor shall be eliminated and cancelled, (c) all joint obligations of two (2) or more Debtors, and all multiple Claims against such entities on account of such joint obligations, shall be considered a single Claim against the Debtors, and (d) any Claim filed in the Chapter 11 Cases shall be deemed filed against the consolidated Debtors and a single obligation of the Debtors on and after the Effective Date.  Unless otherwise set forth herein, such substantive consolidation shall not (other than for voting, treatment, and distribution purposes under the Plan) affect (i) the legal and corporate structures of the Debtors (including the corporate ownership of the Debtor Subsidiaries), (ii) any Intercompany Claims, or (iii) the substantive rights of any creditor.  If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an Entity-by-Entity basis.

**5.2    Corporate Action**.

(a)    General.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) assumption of the Management Agreements, (ii) selection of the directors and officers for the Reorganized Debtors, (iii) issuance

of the New Common Stock by Reorganized AMI, (iv) incurrence of the New First Lien Notes and the New Second Lien Notes, (v) release of the proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering from escrow, (vi) execution of the New Revolver Facility Credit Agreement, (vii) issuance of the New Preferred Stock, if applicable, (viii) issuance of the New PIK Notes, if applicable, (ix) adoption of the Equity Incentive Plan, (x) adoption of the Director Severance Plan, (xi) implementation of the Emergence Incentive Plan and (xii) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall occur in accordance with the Plan and any governing agreements or transfer documents shall be in effect, without any requirement of further action by the security Holders, directors or officers of the Debtors or the Reorganized Debtors. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (i) the New PIK Notes Indenture, if applicable, (ii) the New First Lien Indenture, (iii) the New Second Lien Indenture, (iv) the New Revolver Facility Credit Agreement, (v) the Stockholders Agreement, (vi) the Intercreditor Agreements, (vii) the registration rights agreements relating to the New First Lien Notes and the New Second Lien Notes, and (viii) any and all other agreements, documents, securities and instruments relating to the foregoing (including, without limitation, security documents). The authorizations and approvals contemplated by this Section 5.2(a) shall be effective notwithstanding any requirements under non-bankruptcy law.

(b)     Restated Certificate of Incorporation, New Preferred Stock Certificate of Designation (if Applicable) and Restated Bylaws of Reorganized AMI and the Other Reorganized Debtors.

On the Effective Date, Reorganized AMI shall adopt the Restated Certificate of Incorporation, the New Preferred Stock Certification of Designation (if applicable) and the Restated Bylaws, and shall file the Restated Certificate of Incorporation and the New Preferred Stock Certification of Designation (if applicable) with the Secretary of State of the State of Delaware. In addition, on or before the Effective Date, pursuant to and only to the extent required by Bankruptcy Code section 1123(a)(6), the Restated Certificate of Incorporation, the New Preferred Stock Certification of Designation (if applicable), the certificates of incorporation of the Debtors that are corporations, and the organization documents for the Debtors that are limited liability companies shall also be amended (and as to the corporate Debtors, filed with the Secretary of State of their respective states of incorporation) as necessary to satisfy the provisions of the Bankruptcy Code and shall include, among other things, (i) a provision increasing the number of authorized shares of Reorganized AMI, (ii) a provision prohibiting the issuance of non-voting equity securities and (iii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power. On the Effective Date, the New Boards of each corporate Reorganized Debtor shall be deemed to have adopted the restated certificate of incorporation and restated bylaws for such Reorganized Debtor.

      (c)     <u>Boards of Directors of Reorganized AMI and the Other Reorganized Debtors</u>.

On the Effective Date, the operation of Reorganized AMI shall become the general responsibility of their respective boards of directors, subject to, and in accordance with, the Restated Certificate of Incorporation and Restated Bylaws.  On the Effective Date, the operation of each of the other Reorganized Debtors shall become the general responsibility of its respective board of directors or board of managers, as applicable, subject to and in accordance with its respective restated certificates of incorporation and restated bylaws or other organizational documents.  The initial boards of directors of Reorganized AMI and the other Reorganized Debtors shall be disclosed in the Plan Supplement (or as soon thereafter as is reasonably practicable).  The initial boards of directors of Reorganized AMI shall be composed of nine members, eight of whom shall be selected by members of the Committee consistent with the terms outlined in the Stockholders Agreement, and one of whom shall be the post-Effective Date chief executive officer of AMI and AMO.

      (d)     <u>Officers of Reorganized AMI and the Other Reorganized Debtors</u>.

The initial officers of Reorganized AMI and the other Reorganized Debtors shall be disclosed in the Plan Supplement (or as soon thereafter as is reasonably practicable).  The selection of officers of Reorganized AMI and the other Reorganized Debtors after the Effective Date shall be as provided in the respective restated certificates of incorporation and restated bylaws or other organizational documents of Reorganized AMI or the applicable Reorganized Debtor.

      (e)     <u>Escrow Issuer for New First Lien Financing and the New Second Lien Financing, if Applicable</u>.

On the Petition Date, or as soon as practicable thereafter, the Debtors will file a motion (the "***Escrow Motion***") requesting an order from the Bankruptcy Court finding that New LLC and the Escrow Issuer are non-Debtor entities and that any proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering or other assets held by New LLC and Escrow Issuer will not be deemed property of the Debtors' Estates and will not be consolidated with the Debtors' assets or Estates.  In addition, the Debtors will request Bankruptcy Court approval for authority to transfer approximately $15 million into escrow or to the Escrow Issuer to pay fees, including fees payable to the indenture trustees, the collateral agents and the escrow agents with respect to the New First Lien Notes and the New Second Lien Notes, interest and other amounts associated with (y) the New First Lien Financing and (z) the New Second Lien Financing.  Upon Bankruptcy Court approval of the Escrow Motion, the Escrow Issuer will (i) enter into related escrow agreements, pursuant to which the proceeds of the New First Lien Notes Offering, that portion of the New Second Lien Financing provided by third-party investors (if any) and other amounts relating to other payment obligations in respect of the New First Lien Financing and New Second Lien Financing will be held pending consummation of the Plan; (ii) grant a lien for the benefit of the New First Lien Holders on the proceeds from the New First Lien Notes Offering and all other assets in the applicable escrow account; and (iii) grant a lien for the benefit of the New Second Lien Holders on the proceeds from the New Second Lien Notes Offering (if any) who purchased their New Second Lien Notes for Cash and all other

assets in the applicable escrow account.  On the Effective Date, (a) the Escrow Issuer will merge into Reorganized AMI, which will assume the ongoing liability for the New First Lien Notes and New Second Lien Notes under the New First Lien Indenture and the New Second Lien Indenture, respectively, and the related registration rights agreements; (b) Reorganized AMI shall be authorized to distribute the New Second Lien Notes; (c) Reorganized AMI and the Reorganized Debtors shall be authorized to execute, deliver and enter into, *inter alia*, the Intercreditor Agreements and collateral documents without the need for any further corporate action and without further action by the Holders of Claims or Interests; and (d) the proceeds of the New First Lien Notes Offering and the New Second Lien Notes Offering (and any other amounts held in escrow) will be released from escrow.

### 5.3    Distribution of New Second Lien Financing.

On the Effective Date, the New Second Lien Notes that were not issued for Cash in the New Second Lien Notes Offering shall be distributed on behalf of Reorganized AMI to (a) Holders of Allowed Term Facility Claims to the extent provided in Section 4.2 hereof, (b) at the election of the Debtors, Holders of Allowed PIK Notes Claims to the extent provided in Section 4.5 hereof, and (c) the Backstop Parties as set forth in Sections 4.2(b) and 4.5(b) above and Section 5.4 below.  On the Effective Date, Holders who receive New Second Lien Notes pursuant to the Plan will be deemed to become parties to the registration rights agreement relating to the New Second Lien Notes as a result of the distribution they receive under the Plan.

### 5.4    Offer to Purchase New Second Lien Notes.

Pursuant to and in accordance with the terms of the Backstop Agreement, the Backstop Parties have, severally and not jointly, committed to purchase their allocable share of any New Second Lien Notes that would otherwise be distributed to the Holders of the Allowed Term Facility Claims (excluding any Backstop Party) pursuant to Section 4.2(b) hereof (the "***Backstop Commitment***") to the extent such Holders have made the election described in the next sentence.  Holders of Allowed Term Facility Claims may elect to have the Backstop Parties purchase their *pro rata* share of the New Second Lien Notes for the face amount of such New Second Lien Notes pursuant to an election form that, subject to Bankruptcy Court approval, will be distributed to such Holders no later than 10 days after the Petition Date.  Any Holder of an Allowed Term Facility Claim electing to have the Backstop Parties purchase their share of the New Second Lien Notes must do so by noting its election on such Holder's supplemental election form and returning same to the Debtors by no later than 10 Business Days after the date the election form is distributed (or such later date that has been agreed to by the Debtors).  The mechanism by which electing Holders of Allowed Term Facility Claims will exercise their put option to ensure that such Holders will obtain Cash in exchange for their allocation of New Second Lien Notes will be set forth in the supplemental election form.  Consummation of the purchase of such New Second Lien Notes shall occur on the Effective Date.  If one or more Term Facility Lenders exercises its option to put its *pro rata* allocation of New Second Lien Notes to the Backstop Parties, the Backstop Parties shall receive from the Debtors a fee equal to 5% of the aggregate principal amount of New Second Lien Notes issued or put to the Backstop Parties by the Term Facility Lenders, which fee shall be payable in Cash.

In addition, pursuant to and in accordance with the terms of the Backstop Agreement, in consideration for undertaking their commitments under the Backstop Agreement, the Backstop Parties shall be entitled to a fully earned and nonrefundable fee payable in fully-paid and non-assessable New Common Stock, representing 5% (the "***Backstop Percentage Interest***") of the New Common Stock to be issued and outstanding on the Effective Date, which 5% shall be calculated after giving effect to the issuance of New Common Stock to the Backstop Parties on account of any Subordinated Notes they hold and without dilution in respect of the Additional Shares (as defined below) (collectively, the "***Initial Shares***"); provided that, if the Backstop Parties are not required to purchase (or elect to receive) a portion of the New Second Lien Notes pursuant to the terms of the Backstop Agreement, then the Backstop Percentage Interest shall be reduced to 3.5%.  In addition, on the Effective Date, each Backstop Party shall be entitled to such additional fully-paid and non-assessable shares of New Common Stock (collectively, the "***Additional Shares***" and, together with the Initial Shares, the "***Backstop Shares***") as are required so that its Initial Percentage Ownership shall not be diluted by the issuance of the Initial Shares.  The issuance of Backstop Shares to the Backstop Parties shall be subject to dilution by the Equity Incentive Plan.  The Backstop Agreement provides for the execution of a registration rights agreement, on commercially reasonable terms to be mutually agreed upon, to be entered into between the Reorganized Debtors and the Backstop Parties.

**5.5    Issuance of New Common Stock and New Preferred Stock, if Applicable**.

The issuance of New Common Stock and the New Preferred Stock (if applicable) by Reorganized AMI shall be authorized without the need for any further corporate action.  On the Effective Date, Reorganized AMI shall issue the New Common Stock and the New Preferred Stock (if applicable).  Reorganized AMI shall:

(a)    issue the shares of New Common Stock to the Holders of Allowed 2011 Notes and Subordinated Notes as set forth herein;

(b)    issue the New Preferred Stock to the Holders of Allowed PIK Notes, if applicable;

(c)    pursuant to the Equity Incentive Plan described in Section 5.9 below, issue up to 6.5% of the shares of New Common Stock to certain employees, directors and consultants of the Reorganized Debtors and such employees, directors and consultants will be deemed parties to the Stockholders Agreement; and

(d)    issue the Backstop Shares to the Backstop Parties pursuant to the Backstop Agreement.

**5.6    Merger/Dissolution/Consolidation**.

On or as of the Effective Date or as soon as practicable thereafter and without the need for any further action, the Reorganized Debtors may (i) cause any or all of the Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, or (iii) engage in any

other transaction in furtherance of the Plan.  In addition, as of the Effective Date, (a) the Escrow Issuer and New LLC will merge into Reorganized AMI and (b) AMO will merge into Reorganized AMI.

### 5.7    Cancellation of Existing Securities and Agreements.

Except as otherwise provided hereunder, including Section 8.4 hereof, on the Effective Date, all of the agreements and other documents evidencing (a) the Claims or rights of any Holder of a Claim against the Debtors, including all credit agreements, indentures and notes evidencing such Claims, (b) the Interests in AMI, and (c) any options or warrants to purchase Interests of AMI, or obligating such Debtors to issue, transfer or sell Interests or any other capital stock of such Debtors, shall be cancelled.  Notwithstanding the foregoing and anything contained in the Plan, the Indentures shall continue in effect to the extent necessary to (i) allow the Reorganized Debtors and the Indenture Trustees to make distributions pursuant to the Plan on account of the Claims under the respective Indentures, (ii) permit the Indenture Trustees to assert their charging liens, (iii) permit the applicable Indenture Trustee to perform such other functions with respect thereto, (iv) permit the Indenture Trustees to maintain and enforce any right to indemnification, contribution or other Claim it may have under the Indentures, (v) permit an Indenture Trustee to exercise its rights and obligations relating to the interests of the applicable noteholders and their relationship with the noteholders, and (vi) appear in these Chapter 11 Cases, so long as for purposes of such clauses (v) and (vi) above, the Indenture Trustees are not reimbursed by the Debtors for fees and expenses for post-Effective Date services in connection therewith.

### 5.8    Surrender of Existing Securities.

As a condition precedent to receiving any distribution on account of Allowed Notes Claims, each record Holder of any such securities shall be deemed to have surrendered such securities or other underlying documentation and all such surrendered securities and other documentation shall be deemed to be cancelled in accordance with Section 5.7 of the Plan.

### 5.9    Equity Incentive Plan.

As of the Effective Date, Reorganized AMI shall establish the Equity Incentive Plan, which will provide for up to 10% of the New Common Stock on a fully diluted basis, of which no more than 6.5% shall be issued as soon as practicable to the officers and key employees of the Reorganized Debtors and their affiliates as determined by the New Board of Reorganized AMI after the Effective Date.

### 5.10    Director Severance Plan.

As of the Effective Date, the Reorganized Debtors shall establish the Director Severance Plan.  Pursuant to the Director Severance Plan, the Debtors provide severance benefits to certain directors of AMI upon certain terminations of their service as members of the board.  Upon the termination of the service of certain non-employee directors as a member of the board, such directors shall be entitled to receive a lump sum cash payment in an amount equal to

$35,000 for each year and partial year during which such director served on the board, payable within thirty (30) days following the date of termination.

**5.11    Cancellation of Liens.**Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, any lien securing any Secured Claim shall be deemed released, and the Holder of such Secured Claim shall be authorized and directed to release any Collateral or other property of any Debtor (including any Cash Collateral) held by such Holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such lien, including the execution, delivery and filing or recording of such releases.

**5.12    Compromise of Controversies**.

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

**5.13    Stockholders Agreement**.

On the Effective Date, creditors, directors, officers and consultants who receive New Common Stock pursuant to the Plan will be deemed to become parties to the Stockholders Agreement as a result of the distribution they receive under the Plan.  The Stockholders Agreement shall contain certain customary rights and obligations, including director designation rights, right of first offer, registration rights, drag rights, tag rights, minority transfer rights and rights to receive certain information concerning the Debtor's at a party's option and limits on the number of record holders.  Each creditor (including the beneficial Holder of any Note Claim held of record by the Depository Trust Company ("***DTC***") or its nominee or such other securities depository or custodian thereof or is held in book entry or electronic form pursuant to a global security held by DTC), director, officer and consultant who receives New Common Stock pursuant to the Plan may be requested to execute the Stockholders Agreement as a result of the distribution they receive under the Plan.

**5.14    Listing of New Common Stock and Transfer Restrictions.**

Other than as provided in the Stockholders Agreement, the Reorganized Debtors shall not be obligated, and do not intend, to list the New Common Stock on a national securities exchange.  In order to ensure that Reorganized AMI will not become subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Certificate of Incorporation and the Stockholders Agreement will impose certain trading restrictions to limit the number of record holders thereof. The New Common Stock will be subject to certain transfer and other restrictions pursuant to the Stockholders Agreement and the New Certificate of Incorporation.

**5.15    Exemption from Securities Laws**.

Section 3(a)(9) of the Securities Act provides that, except for securities exchanged in a case under chapter 11 of the Bankruptcy Code, the registration requirements of section 5 of

the Securities Act shall not apply to securities exchanged by an issuer with its existing security Holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. By virtue of section 18 of the Securities Act, section 3(a)(9) also provides that any state "blue sky" law requirements shall not apply to such exchange.

Section 4(2) of the Securities Act provides that the registration requirements of section 5 of the Securities Act shall not apply to the offer and sale of a security in connection with transactions not involving any public offering. By virtue of section 18 of the Securities Act, section 4(2) also provides that any state "blue sky" law requirements shall not apply to such offer or sale.

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any state Blue Sky Law requirements) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

In reliance upon these exemptions, the distribution of the New Common Stock, New Preferred Stock, if applicable, New PIK Notes, if applicable, and New Second Lien Notes pursuant to the Plan will not be registered under the Securities Act or any state "blue sky" law requirements.

**5.16    Exemption from Transfer Taxes**.

Pursuant to Bankruptcy Code section 1146(a), any issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any instrument of transfer from a Debtor to a Reorganized Debtor or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment. Without limiting the foregoing, any issuance, transfer or exchange of a security or any making or delivery of an instrument of transfer pursuant to the Plan shall be exempt from the imposition and payment of any and all transfer taxes (including, without limitation, any and all stamp taxes or similar taxes and any interest, penalties and addition to the tax that may be required to be paid in connection with the Consummation of the Plan and the Plan Supplement Documents) pursuant to Bankruptcy Code sections 1146(a), 505(a), 106 and 1141.

### 5.17    D&O Insurance Policy.

As of the Effective Date, the Reorganized Debtors will assume the D&O Insurance Policy pursuant to Bankruptcy Code section 365(a).  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of the D&O Insurance Policy.  Until the sixth anniversary of the Effective Date, Reorganized AMI shall cause the individuals serving as directors of the Reorganized Debtors to be covered by the D&O Insurance Policy (provided that Reorganized AMI may substitute therefor policies of at least the same coverage and amounts containing terms and conditions that are not less advantageous in any material respect than the D&O Insurance Policy); provided that in no event shall Reorganized AMI be required to expend annually in the aggregate an amount in excess of 150.0% of the annual premiums currently paid by AMI for such insurance (the "***Insurance Amount***"), and provided further that if Reorganized AMI is unable to maintain the D&O Insurance Policy (or such substitute policy) as a result of the preceding proviso, Reorganized AMI shall obtain as much comparable insurance as is available for the Insurance Amount.

## SECTION 6.  DISTRIBUTIONS

### 6.1    Voting of Claims.

Each Holder of an Allowed Claim in an impaired class of Claims that is entitled to vote on the Plan pursuant to Sections 3 and 4 of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court approving procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order of the Bankruptcy Court.

### 6.2    Cramdown and No Unfair Discrimination.

In the event that any impaired Class of Claims or Interests rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to (a) request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b) with respect to such non-accepting Class, in which case the Plan shall constitute a motion for such relief, and/or (b) amend the Plan in accordance with Section 12.6 hereof.

### 6.3    Distribution Record Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims.  The Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of Claims occurring on or after the Distribution Record Date. The Debtors, the Reorganized Debtors or any party responsible for making distributions pursuant to this Section 6 shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

### 6.4    Date of Distributions.

Except as otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is reasonably practicable. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. For the avoidance of doubt and as set forth below, only the Reorganized Debtors, the Administrative Agent or the Indenture Trustees may act as Disbursement Agent.

### 6.5    Sources of Cash for Distributions.

Except as otherwise provided herein or in the Confirmation Order, all Cash required for the payments to be made hereunder shall be obtained from the Debtors' and the Reorganized Debtors' operations, Cash on hand, the New Revolver Facility, New First Lien Financing, and that portion, if any, of the New Second Lien Financing that is issued for Cash.

### 6.6    Disbursement Agent.

Unless otherwise specified herein, all distributions under the Plan shall be made by AMO as Disbursement Agent or such other Entity designated by AMO as a Disbursement Agent on the Effective Date. No Disbursement Agent hereunder, including, without limitation, the Administrative Agent and the Indenture Trustees, shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 6.7    Rights and Powers of the Disbursement Agent.

Each Disbursement Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby, (c) employ professionals to represent it with respect to its responsibilities, and (d) exercise such other powers as may be vested in the Disbursement Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by such Disbursement Agent to be necessary and proper to implement the provisions hereof.

### 6.8    Expenses of the Disbursement Agent.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by each Disbursement Agent acting in such capacity (including taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.9    Delivery of Distributions.

(a)    <u>Last Known Address</u>. Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim shall be made to the address of such Holder as set forth in the books and records of the Debtors, unless the applicable Reorganized Debtor has been notified in writing of a change of address. In the event that any distribution to any Holder is returned as

undeliverable, the Disbursement Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursement Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided, however*, that such distributions shall be deemed unclaimed property under Bankruptcy Code section 347(b) at the expiration of one (1) year from the Effective Date. After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.

(b)     Distributions by Administrative Agent. The Administrative Agent shall be the Disbursement Agent for the Term Facility Claims and the Revolver Claims. Distributions under the Plan to Holders of such Allowed Term Facility Claims and Allowed Revolver Claims shall be made by the Reorganized Debtors to the Administrative Agent, which, in turn, shall make the distributions to the Holders of such Allowed Claims, and upon completion thereof, shall be discharged from all of its obligations associated with the Term Facility Claims and the Revolver Claims. The Administrative Agent shall not be required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions. Upon delivery by the Reorganized Debtors of the distributions to the Administrative Agent in conformity with Sections 4.2(b) and 4.3(b), the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions.

The Administrative Agent acting as Disbursement Agent shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (A) liability (other than gross negligence and willful misconduct) for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

Notwithstanding any provision contained in the Plan to the contrary, unless otherwise agreed to by the Administrative Agent and the Debtors, all reasonable, actual and documented fees and expenses incurred on or after the Effective Date by the Administrative Agent in connection with distributions made pursuant to this Plan, shall be paid in Cash by the Reorganized Debtors within 10 days of the presentation of invoices by the Administrative Agent and without the need for application to, or approval by, any Court.

(c)     Distributions by the Indenture Trustees. The Indenture Trustees shall be the Disbursement Agent for the Allowed Notes Claims. Distributions under the Plan to Holders of Allowed Notes Claims shall be made by Reorganized Debtors to, or at the direction of, the Indenture Trustees, which, in turn, shall make or direct the distributions to the Holders of such Allowed Notes Claims and, upon completion thereof, shall be discharged from all of their obligations associated with the 2011 Notes, Subordinated Notes and PIK Notes. Such distributions shall be made in accordance with the terms of the Plan and the respective Indentures. Upon delivery of the distribution set forth in Sections 4.5(b), 4.6(b) and 4.7(b) to, or at the direction of, the Indenture Trustees, the Reorganized Debtors shall be released of all liability with respect to the delivery of such distributions. The Indenture Trustees shall not be

28

required to give any bond, surety or other security for the performance of its duties with respect to its administration of distributions.

The applicable Indenture Trustee acting as Disbursement Agent shall only be required to act and make distributions in accordance with the terms of the Plan and shall have no (A) liability (other than gross negligence and willful misconduct) for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (B) obligation or liability for distributions under the Plan to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or who does not otherwise comply with the terms of the Plan.

If the record holder of a Subordinated Note, PIK Note or 2011 Note is DTC or its nominee or such other securities depository or custodian thereof or is held in book entry or electronic form pursuant to a global security held by DTC, then the beneficial holder of such a Note Claim shall be deemed to have surrendered such holder's security, note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

Notwithstanding any provision contained in the Plan to the contrary, unless otherwise agreed to by the Indenture Trustees and the Debtors, all reasonable, actual and documented fees and expenses incurred by the applicable Indenture Trustee in connection with distributions made pursuant to this Plan, shall be paid in Cash by the Reorganized Debtors within 10 days of the presentation of invoices by each Indenture Trustee and without the need for application to, or approval by, any Court.

### 6.10    Manner of Payment Under Plan.

(a)    All distributions of New Second Lien Notes to the Holders of Claims under the Plan shall be made by, or at the direction of, the applicable Disbursement Agent on behalf of Reorganized AMI.

(b)    All distributions of New Common Stock to the Holders of Claims and the Backstop Parties under the Plan shall be made by the Disbursement Agent on behalf of Reorganized AMI.

(c)    All distributions of New Common Stock to employees, directors and consultants made on account of the Equity Incentive Plan shall be made by Reorganized AMI.

(d)    All distributions of New Preferred Stock, if any, to Holders of Claims under the Plan shall be made by the Disbursement Agent on behalf of Reorganized AMI.

(e)    All distributions of Cash under the Plan shall be made by the applicable Disbursement Agent on behalf of the applicable Debtor.

(f)    At the option of the applicable Disbursement Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

**6.11    No Fractional Shares of New Common Stock or New Preferred Stock, if Any**.

No fractional shares of New Common Stock or New Preferred Stock, if any, shall be issued or distributed under the Plan, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Stock or New Preferred Stock, if any, that is not a whole number, the actual distribution of shares of New Common Stock or New Preferred Stock, if any, shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefor.  The total number of authorized shares of New Common Stock or New Preferred Stock, if any, to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

**6.12    Setoffs and Recoupment**.

The Debtors and the Reorganized Debtors may, but shall not be required to, setoff against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made) any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claim the Debtors or the Reorganized Debtors may have against the Holder of such Claim.

**6.13    Distributions After Effective Date**.

Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

**6.14    Cash Distributions**.

No payment of Cash of less than $100 shall be made to any holder of an Allowed Claim unless a request therefor is made in writing to the appropriate Disbursement Agent.

**6.15    Allocation of Distributions Between Principal and Interest**.

In the case of distributions with respect to any Notes Claim pursuant to this Plan, the fair market value of any distribution received by the Holder of such Notes Claim will be allocable first to the principal amount of such Notes Claim (as determined for federal income tax purposes) and then, to the extent of any excess, the remainder of the Notes Claim.

**6.16    No Postpetition Interest on Claims**.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or as required by applicable bankruptcy law, postpetition interest shall not accrue on or after the Petition Date on account of any Claim.

## SECTION 7.  PROCEDURES FOR DISPUTED CLAIMS

### 7.1    Disputed Claims/Process.

On and after the Effective Date, except as otherwise provided herein, all Claims will be paid in the ordinary course of business of the Reorganized Debtors.  Except insofar as a Claim is Allowed pursuant to the Plan, the Debtors may dispute Claims, and if the Debtors dispute any Claim, such dispute shall be determined, resolved or adjudicated, as the case may be, in a manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Notwithstanding Bankruptcy Code section 502(a), and considering the unimpaired treatment of all holders of General Unsecured Claims under this Plan, all proofs of claim filed in these Chapter 11 Cases shall be considered objected to and disputed without further action by the Debtors.  Upon the Effective Date, all proofs of claim filed against the Debtors, regardless of the time of filing, and including claims filed after the Effective Date, shall be deemed withdrawn.  The deemed withdrawal of all proofs of claim is without prejudice to each claimant's rights under this Section 7.1 to assert their claims in any forum as though the Chapter 11 Cases had not been commenced.

### 7.2    Objections to Claims.

Except insofar as a Claim is Allowed under the Plan and notwithstanding Section 7.1 above, the Debtors, the Reorganized Debtors or any other party in interest shall be entitled to object to Claims, if necessary.

### 7.3    Estimation of Claims.

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.4    No Distributions Pending Allowance.

Notwithstanding any provision otherwise in the Plan: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b)

any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claim has been Allowed.

### 7.5    Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursement Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

### 7.6    Preservation of Claims and Rights to Settle Claims.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with Bankruptcy Code section 1123(b), the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court, subject to the terms of Section 7.2 hereof, the Confirmation Order, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

### SECTION 8.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    Assumption and Rejection of Contracts and Leases.

Except as otherwise provided herein, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each executory contract and unexpired lease to which they are a party, unless such contract or lease (a) was previously assumed or rejected by the Debtors, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date or (d) is set forth in a schedule, as an executory contract or unexpired lease to be rejected, if any, filed by the Debtors as part of the Plan Supplement.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Bankruptcy Code sections 365 and 1123(b) approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any

agreement, instrument or other document that in any manner affects such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements, vaults, tunnel or bridge agreements or franchises and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an order of the Bankruptcy Court.

### 8.2    Cure of Defaults.

Any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under Bankruptcy Code section 365(b)(1), by the Debtors upon assumption thereof or as soon as practicable thereafter.  If there is a dispute regarding (a) the nature or amount of any cure, (b) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the contract or lease to be assumed or (c) any other matter pertaining to assumption, any cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 8.3    Rejection Claims.

All Claims arising out of the rejection of executory contracts and unexpired leases must be served upon the Debtors and their counsel within thirty (30) days after the date of entry of an order of the Bankruptcy Court approving such rejection.  Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, and their property.

### 8.4    Survival of the Debtors' Indemnification Obligations.

Any obligations of the Debtors pursuant to their certificates of incorporation and bylaws or organizational documents, as applicable, or any other agreements entered into by any Debtors at any time prior to the Effective Date, to indemnify current and former directors, officers, agents, and/or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents, and/or employees, based upon any act or omission for or on behalf of the Debtors, irrespective of whether such indemnification is owed in connection with an event occurring before or after the Petition Date, shall not be discharged or impaired by confirmation of the Plan.  For the avoidance of doubt, the indemnification obligations referred to in this Section 8.4 include the obligations provided for in Section 9.03 of the 2009 Credit Agreement, Section 7.07 of the PIK Notes Indenture, Section 7.07 of the Subordinated Notes Indenture, and Section 7.07 of the 2011 Notes Indenture.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors hereunder and shall continue as obligations of the Reorganized Debtors.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of Bankruptcy Code section 502(e)(1)(B).

8.5     **Survival of Management Agreements and Other Employment Arrangements**.

Except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date,  all Management Agreements entered into before or after the Petition Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan.  In addition, except and to the extent previously assumed by an order of the Bankruptcy Court, on or before the Confirmation Date, all employee compensation and benefit plans (other than the existing incentive plans to be replaced by the Equity Incentive Plan) entered into before or after the Petition Date and not since terminated shall be deemed to be, and shall be treated as if they were, executory contracts to be assumed pursuant to the Plan.  The Debtors' obligations under such plans and programs shall survive confirmation of the Plan, except for (a) executory contracts or employee benefit plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate Bankruptcy Code sections 1114 and 1129(a)(13)) and (b) such executory contracts or employee benefit plans as have previously been rejected, are the subject of a motion to reject as of the Confirmation Date, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

8.6     **Insurance Policies**.

Except as set forth herein, all insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect.  All other insurance policies shall re-vest in the Reorganized Debtors.

**SECTION 9.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**

9.1     **Conditions Precedent to the Effective Date**.

The occurrence of the Effective Date of the Plan is subject to satisfaction of the following conditions precedent:

(a)     <u>Confirmation Order</u>.  The Confirmation Order shall have been entered in form and substance reasonably acceptable to the Debtors and the Committee (which consent shall not be unreasonably withheld or delayed) and shall be in full force and effect and there shall not be a stay or injunction (or similar prohibition) in effect with respect thereto.

(b)     <u>Execution and Delivery of Other Documents</u>.  All other actions and all agreements, instruments or other documents necessary to implement the Plan, including the New First Lien Indenture, the New Second Lien Indenture, the New Revolver Facility Credit Agreement and all other documents comprising the Plan Supplement and Plan Financing Supplement, all of which shall be in form and substance reasonably acceptable to the Debtors and the Committee (which consent shall not be unreasonably withheld or delayed), shall have been (i) effected or (ii) duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

(c)    <u>Regulatory Approvals</u>.  The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents necessary to implement the Plan and that are required by law, regulation, or order.

(d)    <u>Consents</u>.  All authorizations, consents and approvals determined by the Debtors to be necessary to implement the Plan shall have been obtained.

(e)    <u>Corporate Formalities</u>.  The Restated Certificate of Incorporation shall be filed with the Secretary of State of the State of Delaware contemporaneously with the Effective Date.

(f)    <u>Other Acts</u>.  Any other actions the Debtors determine are necessary to implement the terms of the Plan shall have been taken.

### 9.2    Waiver of Conditions Precedent.

Each of the conditions precedent in Section 9.1 hereof may be waived, in whole or in part, by the Debtors without notice or order of the Bankruptcy Court, with the consent of the Committee (which consent shall not be unreasonably withheld or delayed).

### 9.3    Effect of Failure of Conditions.

If the conditions specified in Section 9.1 hereof have not been satisfied or waived in the manner provided in Section 9.2 hereof by the date that is sixty (60) days after the Confirmation Date, then:  (a) the Confirmation Order shall be of no further force or effect; (b) no distributions under the Plan shall be made; (c) the Debtors and all Holders of Claims and Interests in the Debtors shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; (d) all of the Debtors' obligations with respect to the Claims and Interests shall remain unaffected by the Plan and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors; and (e) the Plan shall be deemed withdrawn.

## SECTION 10.   EFFECT OF CONFIRMATION

### 10.1    Vesting of Assets.

On the Effective Date, except as otherwise provided in the Plan, pursuant to Bankruptcy Code sections 1141(b) and (c), all property of the Debtors' Estates shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges, and other interests.  Except as otherwise provided in the Plan, each of the Debtors, as Reorganized Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all of the powers available to such legal Entity under applicable law, without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) in accordance with such applicable law.  On and after the Effective Date, the Reorganized Debtors shall be authorized to operate their respective businesses, and to use, acquire or dispose of assets, without supervision or

approval by the Bankruptcy Court and free from any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

### 10.2    Binding Effect.

Except as otherwise provided in Bankruptcy Code section 1141(d)(3) and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any Holder of a Claim against, or Interest in, the Debtors, and such Holder's respective successors and assigns, whether or not the Claim or Interest of such Holder is impaired under the Plan and whether or not such Holder has accepted the Plan.

### 10.3    Discharge of the Debtors.

Except to the extent otherwise provided in the Plan, the treatment of all Claims against or Interests in the Debtors under the Plan shall be in exchange for and in complete satisfaction, discharge and release of all Claims against or Interests in the Debtors of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, or against their Estate or properties or interests in property. Except as otherwise provided in the Plan, upon the Effective Date, all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full exchange for the consideration provided under the Plan.  Except as otherwise provided in the Plan, all Persons shall be precluded from asserting against the Debtors, or their respective properties or interests in property, any other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  For the avoidance of doubt, Section 10.3 of the Plan shall not discharge any Claims that have been alleged or could be alleged in that certain litigation in the United States District Court for the Southern District of New York captioned Anderson News, LLC, et al. v. American Media, Inc., et al., Case No. 09-Civ.-2227 (PAC) and the appeal of the August 2, 2010 order dismissing such action, currently pending in the United States Court of Appeals for the Second Circuit (collectively, the "***Anderson Litigation***").

### 10.4    Exculpation.

Notwithstanding anything provided herein, as of the Effective Date, none of the Released Parties shall have or incur any liability for any claim, cause of action, or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the Chapter 11 Cases, the formulation, dissemination, confirmation, Consummation, or administration of the Plan, or property to be distributed under the Plan, or any other act or omission in connection with the Chapter 11 Cases, the Plan, or any contract, instrument, indenture, or other agreement or document related thereto or delivered thereunder; *provided, however*, that the foregoing shall be subject to a limited carve-out solely for gross negligence, willful misconduct, criminal acts and fraud.

Notwithstanding anything herein to the contrary, nothing in the foregoing "Exculpation" shall (1) exculpate any Person or Entity from any liability resulting from any act or omission constituting fraud, willful misconduct, gross negligence, criminal conduct, malpractice, misuse of confidential information that causes damages or ultra vires act as

determined by a Final Order or (2) limit the liability of the professionals of the Released Parties to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

### 10.5    Term of Injunctions or Stays.

(a)    Except as otherwise expressly provided herein, all Persons who have held, hold or may hold Claims against or Interests in any Debtor are permanently enjoined, from and after the Effective Date, from (i) commencing or continuing in any manner any action or other proceeding of any kind on any such Claim or Interest against any Reorganized Debtor, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any Reorganized Debtor with respect to any such Claim or Interest, (iii) creating, perfecting or enforcing any encumbrance of any kind against any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor, as applicable with respect to any such Claim or Interest, (iv) asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any Reorganized Debtor, or against the property or interests in property of any Reorganized Debtor with respect to any such Claim or Interest, and (v) pursuing any Claim released pursuant to Sections 10.7 and 10.8. For the avoidance of doubt, Section 10.5(a) of the Plan shall not enjoin any Claims that have been alleged or could have been alleged in the Anderson Litigation.

(b)    Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.6    Injunction Against Interference with Plan.

Upon the entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

### 10.7    Releases by the Debtors.

**Pursuant to Bankruptcy Code section 1123(b) and to the extent permitted by applicable law, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors and the Estates and their Affiliates from any and all Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising**

37

from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan and the Disclosure Statement, or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, however, such releases shall not apply to (i) any act or omission that constitutes gross negligence, willful misconduct, breach of fiduciary duty, criminal acts or fraud, (ii) Claims that arise in the ordinary course of the Debtors' businesses, (iii) any Claims that have been alleged or could be alleged in connection with the Anderson Litigation and (iv) contractual obligations that are not otherwise being satisfied or discharged under the Plan (the "*Release Carve-Out*").  For the avoidance of doubt, none of the foregoing releases shall include releases of any claims, demands, causes of action and the like, in each case, solely to the extent these arise from or relate to acts or omissions occurring after the Effective Date.

       **10.8**    **Releases by the Holders of Claims and Interests.**

       To the extent permitted by applicable law, as of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates and their Affiliates and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Disclosure Statement, the Plan Supplement, the Plan Financing Supplement or related agreements, instruments or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, provided, however, such releases shall be subject to the Release Carve-Out.  Nothing in this Section 10.8 shall limit the liability of the professionals of the Released Parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility, N.Y. Comp. Codes R. & Regs. tit. 22 section 1120.8 Rule 1.8(h)(l) (2009), and any other statutes, rules or regulations dealing with professional conduct to which such professionals are subject.  For the avoidance of doubt, none of the foregoing releases shall include releases of any claims, demands, causes of action and the like, in each case, solely to the extent these arise from or relate to acts or omissions occurring after the Effective Date.

Section 10.8 of the Plan provides for releases of certain Claims against non-Debtors in consideration of services provides to the estates and investments made by the non-Debtor Released Parties. The non-Debtor Released Parties are: (i) any direct or indirect shareholders of the Debtors, (ii) the current and former directors, officers, employees, professional advisors, sub-advisors, managers, affiliated management companies and managing and executive directors of the Debtors, (iii) members of the Committee, (iv) the Indenture Trustees, (v) the Term Facility Lenders, the Revolver Lenders, the Administrative Agent, the collateral agent and other agents under the 2009 Credit Agreement (vi) the New First Lien Notes Holders, the indenture trustee, the escrow agent and the collateral agent under the New First Lien Indenture, (vii) the New Second Lien Notes Holders, the indenture trustee, the escrow agent and the collateral agent under the New Second Lien Indenture, (viii) the New Revolver Facility Lenders and the New Revolver Facility administrative agent, (ix) the Backstop Parties, (x) the Holders of the New PIK Notes and the indenture trustee under the New PIK Notes, if any, (xi) the Holders of New Common Stock, and (xii) the Holders of the New Preferred Stock, if any, and (xiii) each of the respective directors, officers, partners, members, representatives, employees and professional advisors of those Persons in clauses (i) through (xii) (but in each case solely in their capacities as such). To the extent permitted by applicable law, the releases are given by the Debtors and all Holders of Claims and Interests against the Debtors. The released Claims are any and all Claims or causes of action, including without limitation those in connection with, related to, or arising out of the Chapter 11 Cases.

The United States Court of Appeals for the Second Circuit has determined that releases of non-Debtors may be approved as part of a chapter 11 plan of reorganization if there are "unusual circumstances" that render the release terms important to the success of the plan. *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005). Courts have approved releases of non-debtors when: (i) the estate received substantial consideration; (ii) the enjoined claims were channeled to a settlement fund rather than extinguished; (iii) the enjoined claims would indirectly impact the reorganization by way of indemnity or contribution; (iv) the plan otherwise provided for the full payment of the enjoined claims; and (v) the affected creditors consent to the release. *Id.* at 142.

Before a determination can be made as to whether releases are appropriate as warranted by "unusual circumstances," the United States Court of Appeals for the Second Circuit has concluded that there is threshold jurisdictional inquiry as to whether the Bankruptcy Court has subject matter jurisdiction to grant such releases. *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008); *see also In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) (finding no jurisdiction to approve releases of claims that did not affect the estate); *In re Metcalf & Mansfield Alternative Investments*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) (discussing and approving releases in a case under chapter 15 of the Bankruptcy Code). Courts have jurisdiction over a third party cause of action or claims if it will "directly and adversely impact the reorganization." *Dreier*, 429 B.R. at 132. Conversely, the court may lack jurisdiction if the released claim is one that would "not affect the property of the estate or the administration of the estate." *Id.* at 133. Here, all of the released Claims would "directly and adversely impact the reorganization" of the Debtors' Estates. Each of the non-Debtor Released Parties would have a potential Claim for indemnification and contribution against the Debtors for any liabilities incurred on such Claims, as well as any expenses incurred to defend such claims. Because all Allowed General Unsecured Claims are being satisfied in full under the Plan, the Debtors would

39

have to satisfy indemnification and contribution claims in full. The ultimate effect of doing so would reduce the Debtors' distributable value and may reduce recoveries for the Debtors' creditors under the Plan. The Estates therefore would be directly and adversely impacted if the released Claims were pursued and the Bankruptcy Court has jurisdiction to approve them as part of the Plan.

The circumstances of the Chapter 11 Cases are unique and satisfy the *Metromedia* requirements. The Plan pays all Allowed General Unsecured Claims in full and provides substantial recoveries to the Debtors' funded debt obligations. The non-Debtor Released Parties have provided substantial consideration to the Estates and are instrumental to the Debtors' successful reorganization. The recipients of the releases would have potential Claims for indemnification against the Debtors and the Debtors believe that the releases are appropriate under the *Metromedia* decision and other case law.

### 10.9    Preservation of Claims.

Except as otherwise provided in the Plan, including Sections 10.6, 10.7 and 10.8, as of the Effective Date, pursuant to Bankruptcy Code section 1123(b)(3)(B), any action, cause of action, liability, obligation, right, suit, debt, sum of money, damage, judgment, claim and demand whatsoever, whether known or unknown, in law, equity or otherwise, accruing to the Debtors shall become assets of the Reorganized Debtors, and the Reorganized Debtors shall have the authority to commence and prosecute such causes of action for the benefit of the Estates of the Debtors. After the Effective Date, the Reorganized Debtors shall have the authority to compromise and settle, otherwise resolve, discontinue, abandon or dismiss all such causes of action without approval of the Bankruptcy Court.

### 10.10    Reservation of Rights.

The Plan shall have no force or effect unless and until the Effective Date. Prior to the Effective Date, none of the filing of the Plan, any statement or provision contained in the Plan, or action taken by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of any Debtor or any other party with respect to any Claims or Interests or any other matter.

### 10.11    Plan Supplement.

A draft form of the Plan Supplement Documents to be entered into as of the Effective Date and any other appropriate documents shall be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court five days prior to the Confirmation Hearing. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

### 10.12    Plan Financing Supplement

The Plan Financing Supplement will be filed with the Clerk of the Bankruptcy Court on the Petition Date, or as soon thereafter as is practicable. Upon its filing with the Bankruptcy Court, the Plan Financing Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.

## SECTION 11.    RETENTION OF JURISDICTION

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan for, among other things, the following purposes:

(a)    To hear and determine applications, if any, for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom.

(b)    To determine any and all motions, adversary proceedings, applications, contested matters, or other litigated matters pending on the Effective Date.

(c)    To ensure that distributions to Holders of Allowed Claims are accomplished as provided herein.

(d)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated.

(e)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court.

(f)    To hear and determine any timely objections to Administrative Expense Claims or to proofs of claim or interests, including any objections to the classification of any Claim or Interest, and to allow or disallow any Disputed Claim, in whole or in part.

(g)    To consider any amendments to or modifications of the Plan, or remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof.

(h)    To hear and determine all applications of retained professionals under Bankruptcy Code sections 330, 331, and 503(b) for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date.

(i)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the documents comprising the Plan Supplement, the documents comprising the Plan Financing Supplement, any transactions or payments contemplated hereby or any agreement, instrument, or other document governing or relating to any of the foregoing, other than any agreements entered into solely by non-Debtor Entities.

(j)    To issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation.

(k)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order.

(l)    To hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146 (including any requests for expedited determinations under Bankruptcy Code section 505(b)).

(m)    To hear and determine all disputes involving the existence, scope and nature of the discharges granted under Section 10.3.

(n)    To hear and determine all disputes involving or in any manner implicating the exculpation provisions granted under Section 10.4.

(o)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code.

(p)    To enter a final decree closing the Chapter 11 Cases.

(q)    To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

## SECTION 12.    MISCELLANEOUS PROVISIONS

### 12.1    Payment of Statutory Fees.

On the Effective Date, and thereafter as may be required, the Debtors shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code. Notwithstanding Section 5.1 above, the Debtors shall pay all of the foregoing fees on a per-Debtor basis.

### 12.2    Payment of Indenture Trustee Fees.

Notwithstanding any provision contained in the Plan to the contrary, the Reorganized Debtors shall pay all reasonable fees, costs and expenses incurred by the Indenture Trustees (and their agents, attorneys and professionals) whether or not incurred prior to, on or after the Effective Date, including but not limited to fees, costs and expenses incurred in connection with the distributions required pursuant to the Plan and the implementation of any provision of the Plan, in Cash, within 10 days of the presentation of invoices by an Indenture Trustee, without the need for application to, or approval by, the Bankruptcy Court.  Nothing contained in this Plan or the Confirmation Order shall be deemed to impair, waive, extinguish or negatively impact any lien, charging lien or other priority in payment to which the Indenture Trustees are entitled under the applicable Indentures.  In addition, for the avoidance of doubt, payments pursuant to this Section 12.2 shall be made by the Debtors or the Reorganized Debtors, as applicable, and shall not be deducted from distributions to be made pursuant to the Plan to Holders of Allowed Claims receiving distributions from the Indenture Trustees as Disbursement Agents.

In the event that the Reorganized Debtors are unable to resolve a dispute with respect to the payment of reasonable fees, costs and expenses incurred by the Indenture Trustees, any such disputed amount shall be subject to the jurisdiction of the Bankruptcy Court only with respect to the reasonableness standard as provided under the applicable Indenture and not subject to the requirements of Bankruptcy Code sections 503(b)(3) or (4). In the event that the Reorganized Debtors and the applicable Indenture Trustee are unable to resolve a dispute with respect to an Indenture Trustee fee Claim, the applicable Indenture Trustee may, in its sole discretion, elect to (i) submit any such dispute to the Bankruptcy Court for resolution or (ii) assert any other remedies it is entitled to assert under the applicable Indenture or applicable law, including, without limitation, asserting its charging lien and holding back disputed amounts from distribution, to obtain payment of such disputed Indenture Trustee fee Claim.

**12.3    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment**.

Any statutory committees appointed in the Chapter 11 Cases shall dissolve on the Effective Date. Provided that all such fees and expenses payable as of the Effective Date have been paid in full, the Reorganized Debtors shall not be responsible for paying any fees and expenses incurred after the Effective Date by the Committee's professionals, and the professionals retained by any statutory committees.

**12.4    Substantial Consummation**.

On the Effective Date, the Plan shall be deemed to be substantially consummated under Bankruptcy Code sections 1101 and 1127(b).

**12.5    Determination of Tax Filings and Taxes**.

The Reorganized Debtors shall have the right to request an expedited determination of their tax liability, if any, under Bankruptcy Code section 505(b) with respect to any tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

**12.6    Amendments**.

Subject to Bankruptcy Code section 1127 and, to the extent applicable, Bankruptcy Code sections 1122, 1123 and 1125, alterations, amendments or modifications of the Plan may be proposed in writing by the Debtors (with the prior written consent of the Committee, which consent shall not be unreasonably withheld or delayed) at any time prior to or after the Confirmation Date, but prior to the Effective Date. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification complies with the requirements of this Section 12.6 and does not materially and adversely change the treatment of the Claim of such Holder; *provided, however*, that any Holders of Claims who were deemed to accept the Plan because such Claims were unimpaired shall continue to be deemed to accept the Plan only if, after giving effect to such amendment or modification, such Claims continue to be unimpaired.

### 12.7    Effectuating Documents and Further Transactions.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 12.8    Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in further proceedings involving the Debtors.

### 12.9    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the prior written consent of Committee, which consent shall not be unreasonably withheld or delayed), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 12.10    Schedules and Exhibits Incorporated.

All exhibits and schedules to the Plan, including the Plan Supplement and Plan Financing Supplement, are incorporated into and are a part of the Plan as if fully set forth herein.

### 12.11    Solicitation of the Plan.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code including, without limitation, Bankruptcy Code sections 1125(a) and (e), and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors, the members of the Committee, the Administrative Agent, the Indenture Trustees, and each of their respective directors, officers, employees, Affiliates, agents, members, managers, partners, financial advisors, investment bankers, professionals, accountants and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the

Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation shall not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 12.12   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or Plan Financing Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 12.13   Compliance with Tax Requirements.

In connection with the Plan and all instruments issued in connection herewith and distributed hereunder, any Person issuing any instruments or making any distribution under the Plan, including any Person described in Sections 5.3 and 5.5 hereof, shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any withholding or reporting requirements.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any Person issuing any instruments or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such Holder has made arrangements satisfactory to such issuing or distributing Person for payment of any such tax obligations and, if any Person issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such Holder's distribution, and is later held liable for the amount of such withholding, the Holder shall reimburse such Person.  The Debtors may require, as a condition to the receipt of a distribution, that the Holder complete the appropriate Form W-8 or Form W-9, as applicable to each Holder.

### 12.14   Conflict between Plan, Disclosure Statement and Plan Supplement Documents .

(a)      In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Disclosure Statement, the terms and provisions of the Plan shall control and govern.

(b)      In the event of any conflict between the terms and provisions in the Plan and the terms and provisions in the Plan Supplement Documents, the terms and provisions of the relevant Plan Supplement Document shall control and govern.

45

### 12.15  Notices.

After the Effective Date, any pleading, notice or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to the Debtors |
|---|---|
| American Media Operations, Inc.<br>1000 American Media Way<br>Boca Raton, Florida  33464<br>Attention:  Chief Financial Officer | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, New York 10036<br>Attention:  Ira S. Dizengoff, Esq.<br>            Arik Preis, Esq.<br>            Meredith A. Lahaie, Esq.<br>Telephone:  (212) 872-1000<br>Facsimile: (212) 872-1002<br>Emails:       idizengoff@akingump.com<br>              apreis@akingump.com<br>              mlahaie@akingump.com |
| **United States Trustee** | **Counsel to the Committee** |
| Office of the United States Trustee<br>33 Whitehall Street<br>New York, New York 10004 | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York  10019<br>Attention:  Andrew Rosenberg, Esq.<br>            Diane Meyers, Esq.<br>            Arina Popova, Esq.<br>Telephone:  (212) 373-3000<br>Facsimile: (212) 757-3990<br>Emails:       arosenberg@paulweiss.com<br>              dmeyers@paulweiss.com<br>              apopova@paulweiss.com |
| **Administrative Agent** | **Counsel to the Administrative Agent** |
| JPMorgan Chase Bank, N.A.<br>Loan and Agency Services Group<br>1111 Fannin Street<br>Houston, Texas 77002<br>Attention: Gloria Javier<br>Facsimile: (713) 750-2878<br><br>JPMorgan Chase Bank, N.A.<br>270 Park Avenue<br>New York, New York 10017<br>Attention: Peter Thauer<br>Facsimile: (212) 270-5127 | Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, New York 10019<br>Attention:  Richard G. Mason, Esq.<br>            Jennifer S. Nam, Esq.<br>Telephone: (212) 403-1000<br>Facsimile:  (212) 403-2000<br>Email:        rgmason@wlrk.com<br>              jsnam@wlrk.com |

Dated: December 15th, 2010

Respectfully submitted,

American Media, Inc.
American Media Operations, Inc.
American Media Consumer Entertainment,
   Inc.
American Media Consumer Magazine Group,
   Inc.
American Media Distribution & Marketing
   Group, Inc.
American Media Mini Mags, Inc.
American Media Newspaper Group, Inc.
American Media Property Group, Inc.
Country Music Media Group, Inc.
Distribution Services, Inc.
Globe Communications Corp.
Globe Editorial, Inc.
Mira! Editorial, Inc.
National Enquirer, Inc.
National Examiner, Inc.
Star Editorial, Inc.
Weider Publications, LLC

By: _____
Christopher Polimeni
Executive Vice President, Chief Financial
   Officer and Treasurer

# EXHIBIT B

## Notice of Entry of Confirmation Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN MEDIA, INC., *et al.*,[1] | ) Case No. 10-16140 (MG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

### NOTICE OF ENTRY OF ORDER CONFIRMING DEBTORS' AMENDED JOINT PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

   **PLEASE TAKE NOTICE THAT,** on [_____], 2010, the United States Bankruptcy Court for the Southern District of New York (the "*Court*") entered the *Findings of Fact, Conclusions of Law and Order (I) Approving (A) the Debtors' Disclosure Statement Pursuant to 11 U.S.C. §§ 1125 and 1126(b), (B) Solicitation of Votes and Solicitation and Election Procedures, and (C) Forms of Ballots, and (II) Confirming the Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. [XX]] (the "*Confirmation Order*").  Among other things, the Confirmation Order confirmed the *Debtors' Amended Joint Prepackaged Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 115] (the "*Plan*"),[2] thereby authorizing American Media, Inc., and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "*Debtors*") to implement the Plan in accordance with its terms.

   **PLEASE TAKE FURTHER NOTICE THAT** in conjunction with the Confirmation Order, the Court granted the Debtors a waiver under rule 3020(e) of the Federal Rules of Bankruptcy Procedure of the 14-day stay period between the date of entry of the Confirmation Order and the Effective Date of the Plan.

   **PLEASE TAKE FURTHER NOTICE THAT** the Plan and its provisions are binding on the Debtors, the Reorganized Debtors, any holder of a Claim or Interest and such holder's respective successors and assigns, whether or not the Claim or Interest of such holder is impaired under the Plan and whether or not such holder or assign voted to accept the Plan.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  American Media, Inc. (3383); American Media Operations, Inc. (4424); American Media Consumer Entertainment, Inc. (3852); American Media Consumer Magazine Group, Inc. (3863); American Media Distribution & Marketing Group, Inc. (3860); American Media Mini Mags, Inc. (3854); American Media Newspaper Group, Inc. (3864); American Media Property Group, Inc. (4153); Country Music Media Group, Inc. (2019); Distribution Services, Inc. (1185); Globe Communications Corp. (2593); Globe Editorial, Inc. (3859); Mira! Editorial, Inc. (3841); National Enquirer, Inc. (4097); National Examiner, Inc. (3855); Star Editorial, Inc. (9233); and Weider Publications, LLC (1848).

[2]      Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Plan or related documents you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in these chapter 11 cases (the "***Notice and Claims Agent***"), by (a) calling the Debtors' restructuring hotline at (877) 660-6698, (b) visiting the Debtors' restructuring website at:  www.kccllc.net/AMI, and/or (c) writing the Debtors at American Media c/o Kurtzman Carson Consultants LLC, 599 Lexington Avenue, 39th Floor, New York, New York, 10022.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at https://ecf.nysb.uscourts.gov.

New York, New York
Dated: December [20], 2010

*/s/ DRAFT*
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York 10036
Telephone:  (212) 872-1000
Facsimile:  (212) 872-1002
Ira S. Dizengoff
Arik Preis
Meredith A. Lahaie

*Counsel to the Debtors and Debtors in Possession*

## EXHIBIT C

### Offering Memorandum

**Offering memorandum**                                                                 **Strictly Confidential**



## AMO Escrow Corporation
**To be Merged with and Into**
## American Media Operations, Inc.

### *$385,000,000*
### *11 1/2% First Lien Senior Secured Notes due 2017*
*Interest payable June 15 and December 15.*
**Issue Price: 100%**

AMO Escrow Corporation (the "*Escrow Issuer*"), a newly-formed Delaware corporation that is an indirect, wholly-owned subsidiary of American Media Operations, Inc. ("*AMO*"), is offering $385,000,000 aggregate principal amount of 11 1/2% First Lien Senior Secured Notes due 2017 (the "*first lien notes*" or the "*notes*"). The Escrow Issuer was created solely to issue the notes and any senior secured second lien notes that may be issued in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date (as defined below). This offering is occurring in connection with American Media, Inc., AMO and certain of its subsidiaries' prepackaged plan of reorganization substantially on the terms described herein (the "*Plan*"). If the escrow release conditions are satisfied, AMO will become the issuer of the notes upon the merger of the Escrow Issuer with and into AMO and upon AMO's execution of a supplemental indenture assuming the rights and obligations of the Escrow Issuer under the notes. See "Description of first lien notes—Escrow of proceeds— Release conditions." Upon satisfaction of the escrow release conditions, AMO will use the net proceeds of this offering, along with cash on hand, and borrowings under our new revolving credit facility, if necessary, to make certain payments, including fees and expenses, related to the foregoing and its emergence from chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") pursuant to the Plan that AMO and certain of its subsidiaries expect to file with the Bankruptcy Court (as defined herein) after the date of this offering memorandum. The issuance of the notes is expected to occur after AMO and certain of its subsidiaries file for bankruptcy. However, the Escrow Issuer and its direct parent will not file for bankruptcy and the issuance of notes is conditioned upon, among other things, (i) the required votes in favor of the Plan are obtained prior to filing for bankruptcy and (ii) the Bankruptcy Court issuing an order confirming that the Escrow Issuer's and its direct parent's assets and properties are not and will not become part of AMO and its other subsidiaries' bankruptcy estate and permitting AMO to deposit into escrow the additional amounts referred to below necessary to fund (together with the proceeds to the Escrow Issuer from the notes) the special mandatory redemption (as described below).

Upon the issuance of the order of the Bankruptcy Court described above, the Escrow Issuer will deposit the proceeds of this offering, and AMO will deposit additional amounts that together will be sufficient to redeem the first lien notes at 100% of the issue price plus accrued and unpaid interest, into an escrow account until the earlier of (i) the date that the escrow release conditions are satisfied or (ii) a special mandatory redemption of the notes is required to be funded. The proceeds to the Escrow Issuer of the first lien notes offered hereby, together with the additional amounts to be contributed by AMO, will be pledged for the benefit of the first lien noteholders. If the Plan is not confirmed by the Bankruptcy Court, or any of the other escrow release conditions described herein

*(continued on next page)*

*Sole book-running manager*

## J.P. Morgan

---

*Co-Managers*

## Deutsche Bank Securities                                                   ## Credit Suisse

November 16, 2010

*(continued from prior page)*

are not satisfied, or we determine they cannot be satisfied, on or prior to the 60th day following the issue date (subject to one 35-day extension), the notes will be subject to a special mandatory redemption. The special mandatory redemption price for each series of notes is equal to 100% of the issue price of such notes plus accrued and unpaid interest thereon from the issue date up to but not including the date of special mandatory redemption.

The first lien notes will mature on December 15, 2017. Interest will accrue on the notes from December 1, 2010, and the first interest payment date will be June 15, 2011. We may redeem some or all of the first lien notes at any time after December 15, 2013 at the redemption prices set forth in this offering memorandum. We may also redeem up to 35% of the aggregate principal amount of the first lien notes using the proceeds of certain equity offerings completed before December 15, 2013. In addition, we may redeem some or all of the first lien notes at any time prior to December 15, 2013 at a price equal to 100% of the principal amount thereof plus a make-whole premium. We may also redeem up to 10% of the aggregate principal amount of the first lien notes in any twelve-month period at any time and from time to time prior to December 15, 2013, at a price equal to 103% of the principal amount of first lien notes redeemed. If we sell certain of our assets or experience specific kinds of changes of control, we must offer to purchase the notes.

Upon our emergence from bankruptcy, the first lien notes will be guaranteed on a first lien senior secured basis by each of our domestic subsidiaries that guarantees our new revolving credit facility. Upon our emergence from bankruptcy, the first lien notes and the guarantees of the first lien notes will be secured by a first-priority lien on substantially all of our assets (subject to permitted liens and exceptions described elsewhere in this offering memorandum), pari passu with the liens granted under our new revolving credit facility; provided that in the event of a foreclosure on the collateral or of insolvency proceedings, obligations under our new revolving credit facility will be repaid in full with proceeds from the collateral prior to the obligations under the first lien notes.

Upon our emergence from bankruptcy, the notes and the guarantees thereof will be our and the guarantors' senior secured obligations, will rank senior in right of payment to all of our and the guarantors' future indebtedness that is expressly subordinated in right of payment to the first lien notes and will rank equally in right of payment with all of our and the guarantors' existing and future liabilities that are not so subordinated, including our new revolving credit facility. Upon our emergence from bankruptcy, the notes and the guarantees will be structurally subordinated to the liabilities of any of our subsidiaries that do not guarantee the notes.

**See "Risk factors" beginning on page 17 for a discussion of certain risks that you should consider in connection with an investment in the notes.**

The notes have not been registered under the Securities Act of 1933, as amended, or the securities laws of any other jurisdiction. The Escrow Issuer is offering the securities only to "*qualified institutional buyers*" under Rule 144A of the Securities Act and to non-U.S. persons outside the United States under Regulation S. See "Transfer restrictions" for additional information about eligible offerees and transfer restrictions.

The notes will not be listed on any securities exchange. Currently, there is no market for the notes. We have agreed to file a registration statement with the Securities and Exchange Commission ("*SEC*") relating to an exchange offer for the notes, or, under certain circumstances, to file a shelf registration statement for the notes.

We expect delivery of the notes to be made to investors in book-entry form through The Depository Trust Company on or about December 1, 2010.

In making your investment decision, you should rely only on the information included in this offering memorandum. We and the initial purchasers have not authorized anyone to provide you with any other information. If you receive any other information, you should not rely on it.

We and the initial purchasers are offering to sell the notes only in places where offers and sales are permitted.

You should not assume that the information contained in this offering memorandum is accurate as of any date other than the date on the front cover of this offering memorandum. Our business, financial condition, results of operations and prospects may have changed since that date.

# Table of Contents

| | |
|---|---|
| Summary | 1 |
| Risk factors | 17 |
| Plan of reorganization | 43 |
| Use of proceeds | 47 |
| Capitalization | 48 |
| Selected historical consolidated financial statements | 49 |
| Management's discussion and analysis of financial condition and results of operations | 52 |
| Business | 88 |
| Management | 103 |
| Related party transactions | 113 |
| Security ownership of certain beneficial owners and management | 118 |
| Description of other indebtedness | 120 |
| Description of first lien notes | 122 |
| Description of second lien notes | 204 |
| Registration rights; exchange offer | 282 |
| Book-entry settlement and clearance of notes | 284 |
| Transfer restrictions | 289 |
| Certain U.S. federal income tax considerations | 292 |
| Plan of distribution | 297 |
| Legal matters | 300 |
| Independent auditors | 300 |
| Index to consolidated financial statements | F-1 |

_____

This offering memorandum is a confidential document that we are providing only to prospective purchasers of the notes. You should read this offering memorandum before making a decision whether to purchase any notes. You must not:

- **use this offering memorandum or the information it contains for any other purpose;**

- **make copies of any part of this offering memorandum or give a copy of it to any other person; or**

- **disclose any information in this offering memorandum to any other person.**

We have prepared this offering memorandum and are solely responsible for its contents. You are responsible for making your own examination of us and your own assessment of the merits and risks of investing in any of the notes. You may contact us if you need any additional information. By purchasing any notes, you will be deemed to have acknowledged that:

- **you have reviewed this offering memorandum;**

- you have had an opportunity to request any additional information that you need from us; and

- the initial purchasers are not responsible for, and are not making any representation to you concerning, our future performance or the accuracy or completeness of this offering memorandum.

We are not providing you with any legal, business, tax or other advice in this offering memorandum. You should consult with your own advisors as needed to assist you in making your investment decision and to advise you whether you are legally permitted to purchase the notes.

You must comply with all laws that apply to you in any place in which you buy, offer or sell any notes or possess this offering memorandum. You must also obtain any consents or approvals that you need in order to purchase any notes. We and the initial purchasers are not responsible for your compliance with these legal requirements.

We are offering the notes in reliance on exemptions from the registration requirements of the Securities Act of 1933, as amended (the "*Securities Act*"). These exemptions apply to offers and sales of notes that do not involve a public offering. The notes have not been recommended by any federal, state or foreign securities authorities and no such authority has determined that this offering memorandum is accurate or complete. Any representation to the contrary is a criminal offense.

The notes are subject to restrictions on resale and transfer as described under "Transfer restrictions." By purchasing notes, you will be deemed to have represented, acknowledged and agreed to all the provisions contained in that section of this offering memorandum. You may be required to bear the financial risks of investing in the notes for an indefinite period of time.

# Notice to New Hampshire residents

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES ANNOTATED, 1955, AS AMENDED ("RSA 421-B"), WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

# Non-GAAP financial measures

We have provided Adjusted EBITDA (as defined below) and operating income (loss) attributable to AMO and its Subsidiaries before the provision for impairment of intangible assets and goodwill in this offering memorandum because we believe they provide investors with additional information regarding our operating performance. Adjusted EBITDA and operating income (loss) before the provision for impairment of intangible assets and goodwill are not recognized terms

under generally accepted accounting principles ("*GAAP*") and do not purport to be alternatives to income from continuing operations or to net income (loss) as measures of operating performance or to cash flows from operating activities as a measure of liquidity. Additionally, Adjusted EBITDA is not intended to be a measure of free cash flow available for management's discretionary use as it does not consider certain cash requirements such as interest payments, tax payments and debt service requirements. The presentation of Adjusted EBITDA and operating income (loss) before the provision for impairment of intangible assets and goodwill has limitations as analytical tools, and you should not consider it in isolation, or as a substitute for analysis of AMO's results as reported under GAAP.

"*Adjusted EBITDA*" is defined as net income (loss) plus interest expense, provision (benefit) for income taxes, depreciation of property and equipment, amortization of intangible assets, deferred debt costs and deferred rack costs, senior subordinated notes issued and provision for impairment of intangible assets and goodwill. We believe Adjusted EBITDA is helpful in highlighting trends because Adjusted EBITDA excludes the impact of certain items that can differ significantly from company to company depending on long-term strategic decisions regarding capital structure, the tax jurisdictions in which companies operate and capital investments. We believe operating income (loss) before the provision for impairment of intangible assets and goodwill provides a consistent and comparable measure of our operating income (loss) for the periods indicated below due to the significant fluctuations in the impairment provision between such periods.

Management compensates for limitations of using non-GAAP financial measures by using them to supplement GAAP results to provide a more complete understanding of the factors and trends affecting our business than GAAP results alone. Because not all companies use identical calculations, our presentation of Adjusted EBITDA and operating income (loss) before the provision for impairment of intangible assets and goodwill may not be comparable to other similarly titled measures of other companies. See the footnotes to "Selected historical consolidated financial data."

# SEC review; financial information

In the course of review by the SEC of any registration statement that we may file with the SEC, including any exchange offer registration statement or any shelf registration statement relating to the notes sold in this offering, we may be required to provide additional information or change, modify, reformulate or eliminate disclosure and other data that we present in this offering memorandum, including, without limitation, the description of our business, Management's Discussion and Analysis of Financial Condition and Results of Operations and other information and financial data included in this offering memorandum. Any such change, modification, reformulation or elimination may be significant. In particular, we note that the SEC has adopted rules regarding the use of financial measures that do not comply with GAAP, which will be applicable to any such registration statement. We may be required to change the way we report our non-GAAP financial measures in such registration statement. If required, these changes will result in differences between some, or all, of the non-GAAP financial measures included in this offering memorandum and those included in the registration statement, and these changes could be significant.

# Basis of presentation

In this offering memorandum, we present the consolidated financial statements and other financial information of AMO, including "Management's Discussion and Analysis of Financial Condition and Results of Operations." Because holders of our voting stock immediately prior to our filing for bankruptcy in their capacity as holders of our indebtedness will receive more than 50% of our voting stock upon emergence in accordance with the Plan, we do not expect that "fresh start" accounting will be applicable to us.

No separate financial information has been provided in this offering memorandum for the Escrow Issuer because: (1) the Escrow Issuer does not conduct operations; (2) prior to this offering, the Escrow Issuer had no material assets; and (3) AMO will assume all of the Escrow Issuer's obligations under the agreements and subject to the conditions described herein upon the release of funds from escrow. The indenture governing the notes offered hereby will restrict the activities of the Escrow Issuer prior to AMO's assumption of the notes obligations. See "Description of first lien notes—Certain covenants—Activities of Escrow Issuer prior to the Release Date and Assumption."

# Where you can find additional information

We historically filed annual, quarterly and current reports, proxy statements and other information with the SEC; however, commencing in May 2009, we ceased filing such reports and information with the SEC. Our parent company, American Media, Inc. ("*AMI*"), also does not file or furnish reports or other information with the SEC. As a result, there is limited information regarding us and AMI. Please note that our reports and other information previously filed with the SEC, and the information contained on AMI's website, are not incorporated by reference into this offering memorandum and should not be considered to be part of this offering memorandum.

Under the terms of the indenture governing the notes, we will agree after the Release Date (as defined below) that, whether or not we are required to do so by the rules and regulations of the SEC, after the exchange offer is completed and for so long as any of the notes remain outstanding, we will furnish to the trustees and the holders of the notes, by filing with the SEC (unless the SEC will not accept such a filing) (1) all quarterly and annual reports that would be required to be filed with the SEC on Forms 10-Q and 10-K if we were required to file such reports, and, with respect to the annual report on Form 10-K only, a report thereon by our independent registered public accountants and (2) all current reports that would be required to be filed with the SEC on Form 8-K if we were required to file such reports, in each case, within the time period specified in the rules and regulations of the SEC for non-accelerated filers. In addition, for so long as any of the notes remain outstanding, at any time when we are not required to file reports with the SEC, we have agreed to make available to any holder of the notes, securities analysts and prospective investors, at their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

You should rely only upon the information provided in this offering memorandum. We have not authorized anyone to provide you with different information. You should not assume that the information in this offering memorandum is accurate as of any date other than the date of this offering memorandum.

This offering memorandum contains summaries of certain agreements and documents that we have entered into or will enter into in connection with the Transactions (as defined below), such as the indenture governing the first lien notes offered hereby, the registration rights agreement relating to the first lien notes, our new revolving credit facility, the indenture governing the Plan second lien notes (as defined below) and certain agreements described under "Management" and "Related party transactions." The descriptions contained in this offering memorandum of these agreements and documents do not purport to be complete and are subject to, or qualified in their entirety by reference to, the definitive agreements and documents. Copies of the definitive agreements and documents will be made available without charge to you in response to a written or oral request to us by contacting us at the following address: American Media Operations, Inc., 1000 American Media Way, Boca Raton, Florida 33464, Attention: Chief Financial Officer, Telephone (561) 997-7733.

# Industry data and circulation information

Information contained in this offering memorandum concerning publishing industry data, circulation information, rankings, readership information (e.g., multiple readers per copy) and other industry and market information, including our general expectations concerning the publishing industry, are based on estimates prepared by us based on certain assumptions and our knowledge of the publishing industry as well as data from various third party sources. These sources include, but are not limited to, reports of the Audit Bureau of Circulation (the "*ABC*"), BPA Circulation Statements, Statement of Ownership figures filed with the U.S. Postal Service and Mediamark Research Inc. ("*MRI*") syndicated research data. While we are not aware of any misstatements regarding any industry data presented in this offering memorandum, we have not independently verified any of the data from any of these sources and, as a result, this data may be imprecise. Our estimates, in particular as they relate to our general expectations concerning the publishing industry, involve risks and uncertainties and are subject to change based on various factors. See "Risk factors" beginning on page 17 of this offering memorandum.

Unless otherwise indicated, all average circulation information for our publications is an average of actual single copy circulation and subscription copies for fiscal year 2010. All references to "*circulation*" are to single copy newsstand sales and paid subscription circulation, unless otherwise specified. References to "*verified non-paid subscriptions*" are to non-paid subscription copies designated by publishers for readership in public places or intended for individual use by recipients who are likely to have a strong affinity for the content of the publication.

# Forward-looking statements

We make statements in this offering memorandum that are considered "*forward-looking statements*," which are usually identified by the use of words such as "*will*," "*anticipates*," "*believes*," "*estimates*," "*expects*," "*projects*," "*plans*," "*intends*," "*should*" or similar expressions. Examples of forward-looking statements include, but are not limited to (i) projections of revenues, income or loss, capital expenditures, capital structure and other financial items, (ii) statements regarding our plans and objectives, including planned introductions of new publications or other products, or estimates or predictions of actions by customers, advertisers, suppliers, competitors or regulatory authorities, (iii) statements of future economic performance, (iv) outcomes of contingencies such as legal or any regulatory

proceedings and (v) statements of assumptions underlying other statements and statements about our business. These forward-looking statements reflect our current views about our plans, strategies and prospects, which are based on the information currently available to us and on assumptions we have made. Although we believe that our plans, intentions and expectations as reflected in or suggested by those forward-looking statements are reasonable, we can give no assurance that the plans, intentions or expectations will be achieved.

This offering memorandum identifies important factors which could cause our actual results to differ materially from those indicated by the forward-looking statements, particularly those set forth in the sections "Summary" and "Risk factors." The factors that could affect our actual results include the following:

- our ability to refinance our debt, including through the consummation of this offering and the Plan;

- the negative impact of filing bankruptcy, including the possibility of a costly and lengthy bankruptcy process;

- the ability to file, confirm and consummate the Plan or any other chapter 11 plans of reorganization on the terms described herein or otherwise;

- variations of our actual financial results to the projections filed with the Bankruptcy Court;

- potential limitations on our ability to offset future U.S. taxable income and losses and credits incurred prior to our emergence from chapter 11 bankruptcy proceedings;

- whether we will be subject to claims not discharged in the Chapter 11 Cases (as defined below);

- our high degree of leverage and significant debt service obligations;

- changes in discretionary consumer spending patterns;

- changes in general economic and business conditions, both nationally and internationally, which can influence the readership level of our publications as well as advertising and circulation revenue;

- our ability to realize expected benefits from cost savings and revenue enhancement initiatives;

- any downgrade in the rating of our securities;

- increased competition, including price competition and competition from other publications and forms of media, such as television and radio programs and Internet sites concentrating on celebrity news and health and fitness;

- our ability to implement our business strategy;

- changes in demand for our services and products by our customers and advertisers, including as a result of the current economic downturn;

- changes in the price of fuel, paper or postage costs;

- our ability to renew our wholesaler service agreements with respect to the distribution of our publications;

- any loss of one or more of our key vendors;

- our ability to attract and retain experienced and qualified personnel;

- adverse results in litigation matters or any regulatory proceedings; and

- our ability to maintain an effective system of internal controls over financial reporting.

The risk factors included in this offering memorandum are not necessarily all of the important factors that could cause actual results to differ materially from those expressed in any of our forward-looking statements. Other unknown or unpredictable factors could also harm our future results. Given these uncertainties, readers are cautioned not to place undue reliance on such forward-looking statements. The outcome of the Chapter 11 Cases is uncertain and subject to substantial risk. There can be no assurance that we will be successful in achieving our financial restructuring. There also may be other factors that may cause our actual results to differ materially from the forward-looking statements. All forward-looking statements attributable to us or persons acting on our behalf apply only as of the date of this offering memorandum and are expressly qualified in their entirety by the cautionary statements included herein and therein. We undertake no obligations to update or revise forward-looking statements to reflect events or circumstances that arise after the date made or to reflect the occurrence of unanticipated events. In evaluating forward-looking statements, you should consider these risks and uncertainties.

# Summary

*This summary highlights information contained elsewhere in this offering memorandum. This summary is not complete and may not contain all of the information that you should consider before investing in the notes. You should read this entire offering memorandum carefully. This offering memorandum contains forward-looking statements, which involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including those set forth in "Risk Factors" and elsewhere in this offering memorandum. Unless otherwise indicated or the context otherwise requires, we refer to American Media Operations, Inc., a Delaware corporation, as the "Company" or "AMO." The Company is a direct, wholly owned subsidiary of American Media, Inc., a Delaware corporation, which we refer to in this offering memorandum as "AMI." The terms "we," "us" and "our" refer to AMO and all of its subsidiaries (excluding the Escrow Issuer and the Escrow Issuer's direct parent), unless otherwise indicated or the context otherwise requires. Concurrently with the consummation of the Transactions, AMI may be merged with and into AMO, with AMO being the surviving corporation. If such merger were to occur, then all references in this offering memorandum to "AMI," would mean AMO (as the surviving corporation in the merger with AMI) and its consolidated subsidiaries (excluding the Escrow Issuer and its direct parent), except as otherwise indicated or unless the context otherwise requires. References to "fiscal year" mean the 12-month period ended March 31 of the applicable year.*

## Overview

AMO was incorporated under the laws of Delaware in 1981 and is a wholly-owned subsidiary of AMI. AMO conducts all of AMI's operations and represents substantially all of AMI's assets. Our headquarters and principal executive offices are located at 1000 American Media Way, Boca Raton, Florida 33464 and our telephone number is (561) 997-7733.

We are a leading publisher in the field of celebrity journalism and health and fitness magazines. Our publications include *National Enquirer, Star, Globe, National Examiner, Country Weekly, Mira!, Sun, Shape, Muscle & Fitness, Flex, Men's Fitness, Muscle & Fitness Hers, Fit Pregnancy, Natural Health, UFC Magazine,* and other publications.

We also provide publishing services, which may include, without limitation, advertising sales and marketing, circulation and production management services, to other publishers, including Playboy Enterprises, Inc. ("*Playboy*") and World Wrestling Entertainment, Inc. ("*WWE*"). We will seek to capitalize on opportunities to expand our publishing services business, including pursuing opportunities with our affiliates or companies controlled by our affiliates. Additionally, our wholly-owned subsidiary, Distribution Services, Inc. ("*DSI*"), arranges for the placement of our publications and third-party publications with retailers. DSI monitors through its regional managers and merchandising staff that these publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great Atlantic & Pacific Tea Company and Winn Dixie. DSI coordinates (also known as acting as a "category manager/front-end advisor") the racking of magazine fixtures for selected retailers. In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients. Some of DSI's third-party publishing clients include Hachette Filipacchi Media U.S. ("*Hachette*"), which publishes *Woman's Day* and

*Elle*; *Newsweek*, Inc., which publishes *Newsweek*; Bauer Publishing, which publishes *First for Women*, *Woman's World*, *Life & Style* and *In Touch*; *Rodale, Inc.*, which publishes *Prevention, Men's Health and Woman's Health*; General Mills, which publishes *Pillsbury* and *Betty Crocker*; Typhoon Media Corporation, which publishes various dictionary and reference books, medical and health encyclopedias, classical fiction, cookbooks and homeopathic health titles; and New York Media LLC, which publishes *New York Magazine* and specials. Some of DSI's third-party non-publishing clients include Kroger, Safeway, Random House, Blackhawk Network and Frontline Marketing, Inc.

As of September 30, 2010, our magazines comprised approximately 21% of total U.S. and Canadian newsstand circulation for ABC audited weekly publications. Total average newsstand and subscription circulation per issue for all of our publications that are currently published and have a publishing frequency of six or more times per year was approximately 6.0 million copies for the six months ended September 30, 2010, as compared to 6.4 million copies for the six months ended September 30, 2009, and 6.1 million copies for fiscal year 2010 as compared to 7.0 million copies for fiscal year 2009.

For the six months ended September 30, 2010 and 2009, we derived approximately 57% and 60%, respectively, of our total operating revenues from circulation. Single copy sales accounted for approximately 81% and 82% of such circulation revenues in the six months ended September 30, 2010 and 2009, respectively, and the remainder was from subscription sales. Our advertising revenues are generated by national advertisers, including packaged goods, sports nutrition products, automotive, entertainment, pharmaceutical, sports apparel, beauty and cosmetics, fashion and direct response. For the six months ended September 30, 2010 and 2009, approximately 33% and 32%, respectively, of our total operating revenues were from advertising. In fiscal year 2010, we derived approximately 60% of our total operating revenues from circulation, with the remainder from advertising and other sources, as compared to 55% for fiscal year 2009.

As of September 30, 2010, our publications were distributed to newsstands primarily by three wholesalers, which we estimate represent approximately 81% of the newsstand distribution market, as compared to 80% as of September 30, 2009, as well as several smaller wholesalers who represent the remaining approximately 19%, as compared to 20% as of September 30, 2009. For both fiscal years 2010 and 2009, wholesalers distribute the copies to approximately 110,000 retail outlets in the United States and Canada, representing, in the opinion of management, substantially complete coverage of periodical outlets in North America. The wholesalers also process returns of our publications, bill and collect from the retailers, and make payments to our national distributors. We distribute our publications to the wholesalers with a full right of return, who in turn sell them to retailers with a full right of return. Our national distributors' primary function is to bill and collect funds from wholesalers and remit these funds to us.

In addition to our relationships with our national distributors and wholesalers, we also have relationships with retailers, to which we pay one or more of the following:

• Rack Costs—We pay a fee to retailers to sell our publications in the display racks in the checkout section of supermarkets and other large retailers, typically for three year periods.

- Display Continuity Allowances ("*DCA*")—DCA is a payment that we make directly to the retailer and is similar to slotting fees paid by other industries to supermarkets.

- Retail Display Allowance ("*RDA*")—We make this payment directly to the retailers based upon quarterly claim forms that they submit to us. On average, RDA payments are equal to approximately 10% of the cover price for each magazine sold.

- Retail Display Pockets ("*RDP*")—We pay this fixed per pocket fee directly to retailers. This fee is similar to RDA, except that the amount is fixed per pocket. We pay either RDA or RDP to a particular retailer, but not both.

Subscription revenues are derived from copies mailed to our subscribers. We outsource our subscription fulfillment services to a third-party. Advertising revenues are derived primarily from customer advertisements placed in our publications.

## 2008/2009 Restructuring

On January 30, 2009, AMO successfully completed its cash tender offers and received the requisite consents in the related consent solicitations in respect of AMO's then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 10 $1/4$% Series B Subordinated Notes due 2009 (the "*2009 Notes*") and (2) $155.5 million aggregate principal amount of 8 $7/8$% Subordinated Notes due 2011 (the "*2011 Notes*" and, together with the 2009 Notes, the "*Prior Notes*"). $400.5 million in aggregate principal amount of the 2009 Notes and $148.0 million in aggregate principal amount of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

On December 31, 2008, AMO amended and restated its Credit Agreement dated as of January 30, 2006 (the "*2006 Credit Agreement*"), among AMO, AMI, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and Deutsche Bank Securities Inc., as Syndication Agent (the "*2009 Credit Agreement*"). On January 30, 2009, concurrently with the consummation of AMO's cash tender offers, the 2009 Credit Agreement became effective. The 2009 Credit Agreement provided for a $60.0 million revolving credit facility (the "*2009 Revolving Facility*") and a $450.0 million term loan facility (the "*2009 Term Facility*").

On January 29, 2009, AMO amended and restated its certificate of incorporation to increase the number of shares authorized to be issued from 10,000 to 7,500,000 and changed the par value of such common stock from $0.20 to $0.0001. In addition, AMO exchanged 5,994,411 shares of common stock for 7,508 shares of common stock previously owned by AMI.

On January 30, 2009, AMO issued approximately $300 million aggregate principal amount of 14% Senior Subordinated Notes due 2013 (the "*Existing Subordinated Notes*") and approximately $21.2 million aggregate principal amount of 9% Senior PIK Notes due 2013 (the "*Existing PIK Notes*"). Concurrently with the notes offering, AMI sold 5,688,891 shares of AMI common stock (valued at approximately $1.0 million) (the "*AMI Common Stock*", and together with the Existing PIK Notes and the Existing Subordinated Notes, the "*Prior Restructuring Securities*") for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement, dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering of the Prior Restructuring Securities, together with AMO's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to

pay approximately $35.0 million of fees and expenses related to such offering and the tender offers and consent solicitations. (For U.S. federal income tax purposes, AMO treated the tender offers for the Prior Notes and the issuance of the Prior Restructuring Securities as an exchange of the Prior Notes for the Prior Restructuring Securities.) In addition, on January 30, 2009, AMI issued an aggregate of 305,520 shares of AMI Common Stock to AMI's equityholders prior to the financial restructuring (the "*Prior Equityholders*") in exchange for the AMI Common Stock they owned prior to the restructuring.

As a result of the restructuring of AMO's capital structure and the issuance of AMI Common Stock to the bondholders who participated in the cash tender offers completed on January 30, 2009 and receipt of requisite consents in the related consent solicitations (the "*Prior Tendering Bondholders*"), the Prior Tendering Bondholders acquired approximately 94.9% of AMI's Common Stock. The Prior Equityholders retained approximately 5.1% of AMI's Common Stock.

These transactions are referred to collectively as the "*Prior Restructuring*" in this offering memorandum.

## 2010 Restructuring efforts

On or about July 14, 2010, AMO launched an exchange offer for the Subordinated Notes (the "*Exchange Offer*"), and a cash tender offer for the PIK Notes (the "*Tender Offer*"). In the Exchange Offer, holders of Subordinated Notes were offered $269.52 in cash and 335.62 shares of AMI Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, AMI offered to purchase each $1,000 principal amount of outstanding PIK Notes for $1,020 in cash. Concurrently with the Exchange Offer and the Tender Offer, AMI solicited consents to amend the indenture governing the Existing Subordinated Notes (the "*Existing Subordinated Note Indenture*") and the indenture governing the Existing PIK Notes (the "*Existing PIK Note Indenture*") to remove substantially all of the restrictive covenants and certain events of default from each indenture. The Exchange Offer and the Tender Offer were unsuccessful and were terminated on November 1, 2010. All tendered Existing PIK Notes and Existing Subordinated Notes were returned to holders and the amendments to the Existing PIK Note Indenture and the Existing Subordinated Note Indenture contemplated under the Exchange Offer and the Tender Offer did not become operative.

On October 12, 2010, AMO commenced a separate consent solicitation (the "*Interest Deferral Consent Solicitation*") to solicit consents from eligible holders of Existing Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Existing Subordinated Notes to January 3, 2011 (such deferred payment of interest, the "*Deferred Interest Payment*"). At least 75% of eligible holders of outstanding principal amount of Existing Subordinated Notes were required to deliver consents to the Deferred Interest Payment, and such consents were received. On October 28, 2010, AMO executed a supplemental indenture to the Existing Subordinated Note Indenture (the "*Deferred Interest Supplemental Indenture*"), and the Deferred Interest Supplemental Indenture became operative immediately upon execution. The Deferred Interest Payment and the Deferred Interest Supplemental Indenture are applicable to all holders of the outstanding Existing Subordinated Notes, whether or not the holder consented to the Interest Deferral Consent Solicitation.

## Purposes of the transactions

In September 2010, we (along with our legal and financial advisors) began discussions with an ad hoc committee of holders of Existing Subordinated Notes and holders of Existing PIK Notes (the "*RSA Committee*"), the administrative agent under the 2009 Credit Agreement, the lenders under the 2009 Term Facility (the "*2009 Term Facility Lenders*"), the lenders under the 2009 Revolving Facility (the "*2009 Revolver Lenders*") and potential new financing lenders. We actively negotiated with all groups to create a consensus on the appropriate restructuring (and/or repayment) of our outstanding debt. Ultimately, as further discussed below under "—Prepackaged plan of reorganization," we were able to reach a consensual resolution with the members of the RSA Committee and certain other 2009 Term Facility Lenders and certain 2009 Revolver Lenders on the terms of a comprehensive balance sheet restructuring and entered into a restructuring support agreement with such parties to document the parties' support of such restructuring.

As used in this offering memorandum, the term "*Transactions*" refers, collectively, to (1) the offering and the sale of the notes offered hereby by Escrow Issuer, (2) the voluntarily filing by AMI, AMO and AMO's domestic subsidiaries (excluding the Escrow Issuer and the Escrow Issuer's direct parent) for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") after the date of this offering memorandum and confirmation and consummation of the Plan on substantially the terms described herein, (3) the merger of the Escrow Issuer with and into AMO, with AMO assuming the obligations for the notes offered hereby, and the release of the escrowed funds upon consummation of the Plan, (4) the entry into our new $40.0 million senior secured revolving credit facility of which $10.0 million will be available through a letter of credit subfacility (the "*new revolving credit facility*") upon consummation of the Plan, together with the initial borrowings thereunder, if any, upon consummation of the Plan, (5) the issuance of up to $140 million aggregate principal amount of second lien senior secured notes due 2018 (the "*Plan second lien notes*" or "*second lien notes*") to be issued in accordance with the Plan or that may be issued in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date, of which at least $25 million shall be issued to the 2009 Term Facility Lenders (including the Backstop Parties (as defined below)) in accordance with the Plan and (6) the payment of fees and expenses related to the foregoing.

The purpose of the Transactions is to reduce our leverage and to enhance our long-term growth and competitive position. Specifically, the Transactions are designed to accomplish the following:

- reduce our outstanding indebtedness and interest expense;

- improve our capital structure;

- better position us to enter into value enhancing and other strategic transactions;

- improve our ability to restructure and/or refinance other outstanding indebtedness to reduce leverage, interest expense and ease covenant requirements;

- provide suppliers, customers and employees with more confidence in us and enable us to capitalize on available opportunities to expand its publishing services business as a result of an improved capital structure;

- enhance our enterprise value in excess of the principal amount of our existing debt; and

- mitigate our refinancing risks, given the significant amount of our existing debt that is scheduled to mature in 2013.

The consummation of the Transactions will significantly de-lever our capital structure. On September 30, 2010, on an as adjusted basis after giving effect to the Transactions, we would have had approximately $525 million of total consolidated debt, consisting of the first lien notes, and the Plan second lien notes, and we would have $40.0 million available for borrowing under our new revolving credit facility.

## Prepackaged plan of reorganization

On October 30, 2010, an ad hoc committee, the members of which collectively hold, through one or more of their affiliates and consolidated funds, approximately 78% in principal amount of our Existing Subordinated Notes, approximately 89% in principal amount of the Existing PIK Notes and approximately 35% in principal amount of the 2009 Term Facility, executed a Restructuring Support Agreement (the "*Restructuring Support Agreement*"). Pursuant to the Restructuring Support Agreement, members of the RSA Committee agreed to support the comprehensive financial restructuring and to vote in favor of the Plan in accordance with applicable law.

On October 30, 2010, AMI, AMO and AMO's domestic subsidiaries (excluding the Escrow Issuer and the Escrow Issuers direct parent), who we collectively refer to as the "*Debtors*" (and "*Reorganized Debtors*" means any Debtors or any successor(s) thereto, by merger, consolidation or otherwise, on or after the Plan Effective Date), began soliciting votes to approve the Plan, in advance of our filing voluntary cases for relief under chapter 11 of the Bankruptcy Code. The Plan sets forth the Company's post-effective date capital structure and the distribution that each class of the Company's creditors is to receive under the Plan. The voting deadline with respect to the Plan is November 15, 2010 at 5:00 p.m. Eastern time, unless extended.

If the required votes to approve the Plan are received and if certain other prefiling conditions are met, the Debtors intend to file voluntary cases under chapter 11 of the Bankruptcy Code to implement the Plan (the "*Chapter 11 Cases*"). If the Debtors file the Chapter 11 Cases, the Company will promptly seek orders of the Bankruptcy Court to, among other things, approve (i) the contribution of amounts by AMO to the Escrow Issuer in an amount such that, taken together with the proceeds to the Escrow Issuer from the notes, the Escrow Issuer has funds sufficient to satisfy the special mandatory redemption and (ii) the issuance of the notes offered hereby and find that the Escrow Issuer and its parent, a newly established non-Debtor Delaware company that is wholly owned by AMO (the "*New Escrow Parent LLC*"), are non-Debtor entities and that any proceeds or assets they have or will have will not be deemed property of the Debtors' estates and will not be consolidated with the Debtors' assets or estates (the "*Escrow Issuer Approval Order*"). The closing of this offering of the notes is conditioned upon receipt of the Escrow Issuer Approval Order, receipt of the required votes to approve the Plan, filing of the Chapter 11 Cases, the receipt of corporate family ratings for AMO from Moody's Investors Services, Inc. (the "*Rating Condition*") and the satisfaction of certain other conditions, prior to the scheduled date of issuance of the notes.

On the date of consummation of the Plan (the "*Plan Effective Date*"), the terms of the Plan approved by the requisite creditors and confirmed by the Bankruptcy Court will be deemed

binding upon the Debtors and all other parties affected by the Plan. Parties will have a period of time following the confirmation of the Plan to file a notice of appeal with respect to any confirmation order. Even if a notice of appeal is timely filed, the Debtors expect to proceed to consummate the Plan confirmed by the Bankruptcy Court in accordance with its terms, unless the party seeking the appeal also obtains a stay of implementation of the Plan pending appeal of the confirmation order and certain other requirements are met.

The Plan includes the following key elements, among others:

- the 2009 Term Facility Lenders will receive (i) cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of their allowed claims and (ii) Plan second lien notes, which Plan second lien notes will not be greater than the Backstop Commitment (as defined below) entered into by the Backstop Parties; the 2009 Term Facility Lenders will have the right to require that the Backstop Parties purchase from them such Plan second lien notes at face amount (as further described below);

- the 2009 Revolver Lenders' claims will be paid in full in cash;

- the holders of the Existing Subordinated Notes will receive 98% of the New AMI Common Stock (as defined below), subject to dilution for (i) the Equity Incentive Plan (as defined below) and (ii) holders who are not Backstop Parties, for the Backstop Shares (as defined below);

- the holders of the Existing PIK Notes are expected to receive, subject to certain conditions, (i) Plan second lien notes, (ii) new unsecured pay-in-kind notes that are scheduled to mature after the maturity date of the first lien notes offered hereby ("*New PIK Notes*"), (iii) new preferred stock of AMI that will not be mandatorily redeemable by AMI prior to the maturity date of the first lien notes offered hereby ("*New Preferred Stock*") or (iv) a combination of the foregoing;

- the holders of the 2011 Notes will receive approximately 2% of the New AMI Common Stock, subject to dilution for (i) the Equity Incentive Plan and (ii) holders who are not Backstop Parties, for the Backstop Shares;

- all pre-existing equity interests in AMI, including warrants, will be cancelled;

- AMO and the guarantor subsidiaries will enter into the new $40.0 million revolving credit facility; and

- the proceeds from this offering of notes will be released from escrow and used to consummate the Plan.

As stated above, under the Plan, certain holders of 2009 Term Facility debt will have the option to put any Plan second lien notes they receive pursuant to the Plan (such right, the "*Put Right*") to Avenue Capital Group ("*Avenue*") and Angelo, Gordon & Co., L.P. ("*Angelo Gordon*", and together with Avenue, the "*Backstop Parties*"). Pursuant to a Backstop Commitment Letter, dated as of October 30, 2010 (the "*Backstop Agreement*"), by and among, AMI, AMO and the Backstop Parties, the Backstop Parties have, severally and not jointly, committed to purchase at face amount their share of any Plan second lien notes that would otherwise be distributed to the 2009 Term Facility Lenders pursuant to the Plan (the "*Backstop Commitment*"). Holders of the 2009 Term Facility claims may elect to have the Backstop Parties purchase their share of the Plan

second lien notes; provided that in no event shall more than $115 million of Plan second lien notes (other than on account of the Existing PIK Notes) be issued. The Backstop Parties will consummate the purchase of the Plan second lien notes on the Plan Effective Date.

Pursuant to and in accordance with the terms of the Backstop Agreement, in consideration for undertaking their commitments under the Backstop Agreement, on the Plan Effective Date, the Backstop Parties shall receive the Backstop Shares and shall be reimbursed in cash for their related fees, costs and expenses, including reasonable attorneys' fees. The Backstop Parties shall be entitled to a fully earned and nonrefundable fee payable in fully-paid and non-assessable new common stock of AMI to be issued pursuant to the Plan (the "*New AMI Common Stock*") representing 5% (the "*Backstop Percentage Interest*") of the New AMI Common Stock to be issued and outstanding on the Plan Effective Date, which 5% shall be calculated after giving effect to the issuance of New AMI Common Stock under the Plan and without dilution in respect of the Additional Shares (as defined below) (collectively, the "*Initial Shares*"); provided that, if the Backstop Parties are not required to purchase (or elect to receive) a portion of the Plan second lien notes pursuant to the terms of the Backstop Agreement, then the Backstop Percentage Interest shall be reduced to 3.5%, which 3.5% shall be calculated after giving effect to the issuance of New AMI Common Stock under the Plan and without dilution in respect of the Additional Shares. In addition, on the Plan Effective Date, each Backstop Party shall be entitled to such additional fully-paid and non-assessable shares of New AMI Common Stock (collectively, the "*Additional Shares*" and, together with the Initial Shares, the "*Backstop Shares*") as are required so that its initial percentage ownership shall not be diluted by the issuance of the Initial Shares. In addition, the Backstop Parties will receive from the Company a cash fee equal to 5% of the aggregate principal amount of Plan second lien notes issued or put to the Backstop Parties under the Plan (other than on account of the Existing PIK Notes). The Backstop Agreement also provides for the execution of a registration rights agreement, on commercially reasonable terms to be mutually agreed upon, to be entered into between the Company and the Backstop Parties. See "Related party transactions—Backstop Agreement."

As a result of the Transactions, including the issuance of the Backstop Shares pursuant to the Plan, the Backstop Parties are expected to beneficially own at least 59.3% of the equity interests of AMI, subject to dilution for the Equity Incentive Plan.

# The offering

*The following is a brief summary of some of the terms of this offering. For a more complete description of the terms of the notes, please refer to the section of this offering memorandum entitled "Description of first lien notes."*

**Issuer** ........................................ Prior to the Release Date (as defined below), the obligor of the notes will be the Escrow Issuer, and after the Release Date, the primary obligor on the notes will be American Media Operations, Inc.

**Notes offered** ........................... $385,000,000 aggregate principal amount of 11 $^{1}/_{2}$% first lien senior secured notes due 2017.

**Maturity** .................................... The first lien notes will mature on December 15, 2017.

**Interest payment dates** ........... June 15 and December 15, commencing on June 15, 2011. Interest will accrue from December 1, 2010.

**Optional redemption** ............... Prior to December 15, 2013, we may redeem the first lien notes, in whole or in part, at a price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, plus the make-whole premium described under "Description of first lien notes— Optional redemption."

We may also redeem any of the first lien notes at any time on or after December 15, 2013, in whole or in part, at the redemption prices described under "Description of first lien notes—Optional redemption," plus accrued and unpaid interest, if any, to the date of redemption.

In addition, prior to December 15, 2013, we may redeem up to 35% of the aggregate principal amount of the first lien notes issued under the first lien indenture with the net proceeds of certain equity offerings, provided that at least 65% of the aggregate principal amount of the first lien notes remains outstanding immediately after such redemption. See "Description of first lien notes—Optional redemption."

We may also redeem up to 10% of the aggregate principal amount of the first lien notes in any twelve-month period at any time and from time to time prior to December 15, 2013, at a price equal to 103% of the principal amount of the notes redeemed. See "Description of first lien notes—Optional redemption."

**Escrow of Proceeds; Special Mandatory Redemption** .......... The Escrow Issuer will deposit the cash proceeds it receives from this offering (the "*Escrow Issuer Proceeds*") and the Escrow Issuer will deposit additional amounts sufficient to redeem the notes at the issue

price in connection with a special mandatory redemption, into an escrow account until the date that the escrow release conditions are satisfied or a special mandatory redemption is required.

Escrow funds will be released to effect a special mandatory redemption if (i) the Bankruptcy Court does not approve the Plan within 60 days of the issue date, subject to extension for an additional 35 days on no more than one occasion, if certain conditions described under "Description of first lien notes—Certain definitions—Escrow end date" are satisfied or (ii) prior to the date specified in clause (i) if the Escrow Issuer has determined, in its reasonable discretion that the following escrow release conditions among others, cannot be satisfied by such date:

- issuance by the Bankruptcy Court of an order that has not been stayed pending appeal confirming the Plan and, other than release of escrow proceeds and other conditions to be satisfied substantially simultaneously with release of escrow proceeds, satisfaction or waiver of all conditions precedent to effectiveness of such Plan;

- the new revolving credit facility shall have been entered into and become effective;

- we and our subsidiaries shall have no other debt for borrowed money other than (a) the first lien notes offered hereby and the Plan second lien notes, and (b) up to $2 million of general debt for borrowed money; and

- AMO delivering to the Escrow Agent a certificate showing in reasonable detail that, as of the Release Date, AMO's pro forma ratio of Debt Covenant EBITDA (as defined on page 80 of this offering memorandum) for the four fiscal quarters most recently then ended for which financial statements have been delivered to first lien indebtedness (exclusive of certain revolver borrowings) is less than or equal to 3.5 to 1.0, such certificate being conclusive absent manifest error.

The special mandatory redemption price for the first lien notes is equal to 100% of the issue price of such notes set forth on the cover page of this offering memorandum plus accrued and unpaid interest on such notes from the issue date up to but not including the date of the special mandatory redemption. See "Description of first lien notes—Escrow of proceeds—Release conditions."

**Guarantees** ............................... Upon our emergence from bankruptcy and the release of the funds from escrow, the first lien notes will be guaranteed on a first lien senior secured basis by each of our domestic subsidiaries that guarantees obligations under the new revolving credit facility. As of

September 30, 2010, the non-guarantor subsidiaries had (i) approximately $8.3 million of total liabilities and (ii) approximately $9.5 million of total assets. For the six months ended September 30, 2010, the non-guarantor subsidiaries had operating income of $1.3 million.

**Collateral** ................................. Upon our emergence from bankruptcy and the release of the funds from escrow, the first lien notes and the guarantees of the first lien notes will be secured by a first-priority lien on the assets that from time to time secure our and the guarantors' obligations under the new revolving credit facility, subject to permitted liens and certain exceptions (including that pledges of capital stock or other securities of our subsidiaries will be limited to the extent Rule 3-16 of Regulation S-X would require the filing of separate financial statements with the SEC for that subsidiary (such limitation is referred to herein as the "*3-16 Exemption*")). With respect to the collateral, the indebtedness and obligations under the first lien notes and the new revolving credit facility will have first-priority liens. Under the terms of the Intercreditor Agreement (as defined below), however, in the event of a foreclosure on the collateral or insolvency proceedings, the holders of the first lien notes will receive proceeds from the collateral only after obligations under the new revolving credit facility have been paid in full. See "Description of first lien notes— Security for the notes."

**Ranking** .................................... Upon our emergence from bankruptcy and the release of the funds from escrow, the first lien notes and the guarantees of the first lien notes will be our and the guarantors' first lien senior secured obligations. The indebtedness evidenced by the first lien notes and the guarantees of the first lien notes will:

- rank senior in right of payment to our and the guarantors' future subordinated indebtedness;

- rank equally in right of payment to all of our and the guarantors' existing and future senior indebtedness, including obligations under the new revolving credit facility and the Plan second lien notes;

- rank equally in lien priority with our and the guarantors' obligations under the new revolving credit facility and any other pari passu lien obligations incurred after the Release Date to the extent of the value of the collateral; provided that in the event of a foreclosure on the collateral or insolvency proceedings, the holders of the first lien notes and any other pari passu lien indebtedness will receive proceeds from the collateral only after obligations under the new revolving credit facility have been paid in full;

- be effectively senior to all of our and the guarantors' future junior lien and unsecured indebtedness, including the Plan second lien notes, to the extent of value of the collateral; and

- be structurally junior to all existing and future indebtedness and other liabilities of each of our subsidiaries that is not a guarantor of the notes.

**Intercreditor agreements** ........ Upon our emergence from bankruptcy and the release of the funds from escrow, the trustee and the collateral agent under the indenture governing the first lien notes (the "*collateral trustee*") and the administrative agent and collateral agent under the revolving credit agreement (the "*revolver agent*") will enter into an intercreditor agreement (the "*Intercreditor Agreement*") as to the relative priorities of their respective security interests in the assets securing the first lien notes and obligations under our new revolving credit facility and certain other matters relating to the administration of security interests, exercise of remedies, certain bankruptcy-related provisions and other intercreditor matters. The Intercreditor Agreement will also provide that in the event of a foreclosure on the collateral or insolvency proceedings, the holders of first lien notes will receive proceeds from the collateral only after obligations under the new revolving credit facility have been paid in full.

Upon our emergence from bankruptcy and the release of the funds from escrow, the trustee and collateral agent under the indenture governing the second lien notes, the revolver agent and the first lien collateral trustee will enter into an intercreditor agreement as to the relative priorities of their respective security interests in the assets securing the second lien notes and obligations under our new revolving credit facility and certain other matters relating to the administration of security interests, exercise of remedies, amendments to second lien documentation, if any, certain bankruptcy-related provisions and other intercreditor matters.

See "Description of first lien notes—Security for first lien notes—Security documents and intercreditor agreements and "Description of second lien notes—Security for second lien notes—Security documents and intercreditor agreements."

**Change of control, asset sales** ........................................ Upon certain types of changes in control, we will be required to make an offer to purchase each holder's notes at a purchase price of 101% of the principal amount thereof, plus accrued and unpaid interest, to date of purchase. See "Description of first lien notes—Repurchase at the option of holders—Change of control."

If we sell assets under certain circumstances, we will be required to make an offer to purchase the notes at 100% of their face amount, plus accrued and unpaid interest to the date of purchase. See "Description of first lien notes—Repurchase at the option of holders—Asset sales."

**Certain covenants** ....................The indenture governing the first lien notes will contain covenants that will, among other things, limit our ability and the ability of our restricted subsidiaries to:

- incur or guarantee additional indebtedness or issue certain preferred equity;

- pay dividends and make certain distributions in respect of capital stock or make other restricted payments;

- make certain investments;

- create or incur certain liens;

- sell or otherwise dispose of certain assets;

- enter into certain transactions with affiliates;

- limit the ability of our restricted subsidiaries to make payments to us;

- merge, consolidate, sell or otherwise dispose of all or substantially all of our assets; and

- designate our subsidiaries as unrestricted subsidiaries.

These covenants are subject to a number of important exceptions and qualifications. See "Description of first lien notes—Certain covenants."

**Activities of the Escrow Issuer** ........................................The indenture governing the notes will require the Escrow Issuer's activities to be restricted to issuing the notes and the Plan second lien notes, performing its obligations with respect to the notes and the Plan second lien notes under the indentures and the escrow agreement for the notes and, if applicable, the Plan second lien notes and consummating the merger of the Escrow Issuer with and into AMO or redeeming the notes pursuant to a special mandatory redemption, as applicable. The Escrow Issuer may not own, hold or otherwise have any interest in any assets other than the escrow account and cash or certain cash equivalents.

**Registration rights; exchange offer** ...........................................Pursuant to the registration rights agreement to be executed as part of this offering, the Escrow Issuer will agree and, upon our emergence from bankruptcy and the release of funds from escrow, AMO and the guarantors will agree, to use commercially reasonable efforts (a) to register with the SEC exchange notes having substantially identical

terms as the notes offered hereby, (b) to have an exchange offer completed no later than 450 calendar days after the issue date and (c) under certain circumstances, file a shelf registration statement with respect to the notes. If we fail to meet the conditions set forth in the registration rights agreement, the annual interest on the notes will increase by 0.25% per annum. The annual interest rate on the notes will increase by an additional 0.25% per annum for each subsequent 90-day period up to a maximum additional interest rate of 1.00% per annum. See "Registration rights; exchange offer."

**Transfer restrictions** .............. The notes and the guarantees have not been registered under the Securities Act and may not be offered or sold except in accordance with the limitations described under "Transfer restrictions."

**No prior market** ...................... The notes will be a new class of securities for which there is currently no established trading market. Although the initial purchasers have advised us that they intend to make a market in the notes, they are not obligated to do so and may discontinue market-making activities at any time without notice. Accordingly, a liquid market for the notes may not develop or be maintained.

**Use of proceeds** ..................... Upon satisfaction of the escrow release conditions, we will use the net proceeds of this offering, along with cash on hand and borrowings under the new revolving credit facility, if necessary, to finance our emergence from bankruptcy and pay related fees and expenses. See "Use of proceeds."

**Tax** ........................................... Prospective investors are strongly urged to consult their tax advisors with respect to the federal, state, local and foreign tax consequences of purchasing, owning and disposing of the notes. See "Certain U.S. federal income tax considerations."

**Risk factors** .............................See "Risk factors" immediately following this summary for a discussion of certain risks relating to an investment in the notes.

**Conditions to consummating the offering** .............................. The consummation of the offering will be subject to the Bankruptcy Court issuing the Escrow Issuer Approval Order, receipt of the required votes to approve the Plan, filing of the Chapter 11 Cases, satisfaction of the Rating Condition and the satisfaction of certain other conditions, prior to the scheduled date of issuance of the notes.

# Summary historical consolidated financial data

The summary historical financial data presented below as of and for the six months ended September 30, 2010 and 2009 is derived from AMO's unaudited consolidated financial statements. The summary financial data presented below as of and for fiscal years 2008 through 2010 is derived from AMO's audited financial statements. AMO's unaudited financial statements as of September 30, 2010 and for the six months ended September 30, 2010 and audited financial statements as of March 31, 2009 and 2010 and for the fiscal years ended March 31, 2008, 2009 and 2010 are included elsewhere in this offering memorandum.

The following summary financial data should be read in conjunction with "Management's discussion and analysis of financial condition and results of operations" and the audited and unaudited consolidated financial statements of AMO, as well as the related notes, included elsewhere in this offering memorandum.

| (dollars in thousands) | Six months ended September 30, | | Fiscal year ended March 31, | | |
| --- | --- | --- | --- | --- | --- |
| | 2010 | 2009 | 2010 | 2009 | 2008 |
| **Statement of Income (Loss) Data:** | | | | | |
| Operating revenues | $ 202,870 | $ 211,730 | $ 412,430 | $ 461,649 | $ 490,774 |
| Operating expenses(1) | 154,688 | 180,576 | 331,453 | 588,680 | 423,720 |
| Operating income (loss) | 48,182 | 31,154 | 80,977 | (127,031) | 67,054 |
| Interest expense(2) | (25,402) | (25,463) | (50,601) | (85,251) | (99,042) |
| Senior subordinated notes issued | — | — | — | — | (17,109) |
| Amortization of deferred debt costs | (1,953) | (2,040) | (3,893) | (9,849) | (10,926) |
| Other income, net(3) | — | — | — | 537 | 2,522 |
| Gain on extinguishment of debt | — | — | — | 4,858 | — |
| Income (loss) before provision (benefit) for income taxes, and income (loss) from discontinued operations(4) | 20,827 | 3,651 | 26,483 | (216,736) | (57,501) |
| Provision (benefit) for income taxes | 2,880 | 678 | 22,756 | (33,339) | 3,284 |
| Income (loss) from continuing operations | 17,947 | 2,973 | 3,727 | (183,397) | (60,785) |
| Income (loss) from discontinued operations, net of income taxes | — | — | — | 500 | (685) |
| Net income (loss) | 17,947 | 2,973 | 3,727 | (182,897) | (61,470) |
| Less: net income attributable to the noncontrolling interest | (520) | (449) | (509) | (426) | (424) |
| Net income (loss) attributable to American Media Operations, Inc. and subsidiaries | $ 17,427 | $ 2,524 | $ 3,218 | $ (183,323) | $ (61,894) |
| **Other Data:** | | | | | |
| Depreciation of property and equipment(5) | $ 1,789 | $ 1,570 | $ 3,283 | $ 2,973 | $ 4,233 |
| Amortization of deferred rack costs(5) | $ 3,443 | $ 3,112 | $ 5,892 | $ 11,232 | $ 10,810 |
| Adjusted EBITDA(6) | $ 56,408 | $ 56,927 | $ 114,597 | $ 115,274 | $ 126,439 |
| **Balance Sheet Data** | | | | | |
| Total assets | $ 655,428 | $ 644,934 | $ 620,459 | $ 666,843 | $ 941,159 |
| Property and equipment, net | $ 7,014 | $ 6,489 | $ 6,494 | $ 6,262 | $ 5,097 |
| Deferred rack costs, net | $ 10,298 | $ 7,742 | $ 8,461 | $ 6,686 | $ 7,749 |
| Goodwill and other identified intangibles, net | $ 501,209 | $ 503,934 | $ 502,520 | $ 523,465 | $ 747,415 |
| Total debt, net of premium and discount(2) | $1,027,786 | $ 1,035,722 | $ 1,014,480 | $ 1,061,991 | $ 1,077,681 |
| Total stockholder's (deficit) equity | $ (560,986) | $ (579,090) | $ (578,434) | $ (581,703) | $ (399,082) |

(1) AMO recorded a non-cash provision for impairment of intangible assets and goodwill of $17.6 million, $217.4 million and $31.1 million in fiscal years 2010, 2009 and 2008, respectively.

(2) We recorded the principal amount of the Existing PIK Notes and the Existing Subordinated Notes and all future interest payments associated with the Existing PIK Notes and the Existing Subordinated Notes in the accompanying audited consolidated balance sheet included elsewhere in this offering memorandum. As a result, we do not recognize interest expense on the Existing PIK Notes and the Existing Subordinated Notes.

(3) Other income in fiscal years 2009 and 2008 was primarily related to interest income.

(4) In fiscal year 2008, we discontinued the publication of Weekly World News. As a result, the balance associated with this title has been reclassified to income (loss) from discontinued operations, net of income taxes for all years presented.

(5) Includes balances associated with continuing and discontinued operations.

(6) Adjusted EBITDA, a measure used by AMO to measure operating performance, is defined as net income (loss) attributable to AMO and its subsidiaries plus interest expense, provision (benefit) for income taxes, depreciation of property and equipment, amortization of intangible assets, deferred debt costs and deferred rack costs, senior subordinated notes issued and provision for impairment of intangible assets and goodwill. Adjusted EBITDA is not a recognized term under GAAP and does not purport to be an alternative to income from continuing operations as a measure of operating performance or to cash flows from operating activities as a measure of liquidity. Additionally, Adjusted EBITDA is not intended to be a measure of free cash flow available for management's discretionary use as it does not consider certain cash requirements such as interest payments, tax payments and debt service requirements. The presentation of Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation, or as a substitute for analysis of AMO's results as reported under GAAP. AMO believes Adjusted EBITDA is helpful in highlighting trends because Adjusted EBITDA excludes the impact of certain items that can differ significantly from company to company depending on long-term strategic decisions regarding capital structure, the tax jurisdictions in which companies operate and capital investments. Management compensates for limitations of using non-GAAP financial measures by using them to supplement GAAP results to provide a more complete understanding of the factors and trends affecting our business than GAAP results alone. Because not all companies use identical calculations, our presentation of Adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

Historical Adjusted EBITDA is calculated as follows:

| (dollars in thousands) | Six months ended September 30, | | Fiscal year ended March 31, | | |
|---|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 | 2008 |
| Net income (loss) attributable to AMO and its subsidiaries | $ 17,427 | $ 2,524 | $ 3,218 | $ (183,323) | $ (61,894) |
| Interest expense(a) | 25,402 | 25,463 | 50,601 | 85,251 | 99,065 |
| Provision (benefit) for income taxes | 2,880 | 678 | 22,756 | (33,339) | 3,284 |
| Depreciation and amortization | 3,099 | 3,506 | 6,633 | 9,573 | 12,588 |
| Amortization of deferred debt costs | 1,953 | 2,040 | 3,893 | 9,849 | 10,926 |
| Provision for impairment of intangible assets and goodwill | — | 17,595 | 17,595 | 217,350 | 31,097 |
| Senior subordinated notes issued | — | — | — | — | 17,109 |
| Amortization and write-off of deferred rack costs and short-term rack programs | 5,647 | 5,121 | 9,901 | 14,771 | 14,264 |
| Gain on extinguishment of debt | — | — | — | (4,858) | — |
| Adjusted EBITDA | $ 56,408 | $ 56,927 | $ 114,597 | $ 115,274 | $ 126,439 |

(a) Includes $23.0 thousand of interest expense attributable to discontinued operations in fiscal 2008.

# Risk factors

*Investing in the notes involves risks. You should carefully consider the following information about these risks before investing in the notes. The risks and uncertainties described below are not the only risks and uncertainties we face. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. If any of these risks actually occur, our business, financial condition or results of operations would likely suffer. In such case, the trading price of the notes could fall, and you may lose all or part of the money you paid to buy the notes.*

## Risks related to our business

**Our substantial debt could impair our ability to operate and expose us to certain risks.**

Our future performance could be affected by our substantial amount of debt. As of September 30, 2010, on an as adjusted basis after giving effect to the Transactions, our total principal amount of outstanding debt would have been approximately $525.0 million, consisting of approximately $385.0 million principal amount of first lien notes offered hereby and up to $140.0 million principal amount of second lien notes. In addition, we would have borrowing availability under our new revolving credit facility of $40.0 million, which will include a $10.0 million subfacility for letters of credit. In addition, subject to certain exceptions, the covenants in the indentures governing the notes and the second lien notes and our new revolving credit facility are expected to restrict us from paying dividends in cash, securities or other property, incurring additional debt, entering into certain mergers or consolidations, making acquisitions, investments or capital expenditures and selling or otherwise disposing of assets. See "Description of other indebtedness—New revolving credit facility."

Although the consummation of the Transactions will reduce our debt level and is intended to improve our capital structure and operating flexibility, our remaining level of debt could have important consequences for our business and operations, including the following:

- our debt level requires that a substantial portion of our cash flow from operations be used for the payment of interest on debt, reducing our ability to use our cash flow to fund working capital, capital expenditures and general corporate requirements;

- our debt under the new revolving credit facility is expected to have, a variable rate of interest, which will expose us to the risk of increased interest rates;

- we may have a much higher level of debt than certain of our competitors, which may put us at a competitive disadvantage;

- our debt level makes us more vulnerable to economic downturns and adverse developments in our business;

- our debt level reduces our flexibility in responding to changing business and economic conditions, including increased competition in the publishing industry; and

- our debt level limits our ability to pursue other business opportunities, borrow more money for operations or capital in the future and implement our business strategy.

Under our new revolving credit facility, we will have to comply with a maximum first lien leverage ratio test. Our ability to satisfy such ratio test is dependent on our business performing in accordance with our projections. If the performance of our business deviates from our projections, we may not be able to satisfy such ratio test. If we do not comply with this or other covenants and restrictions, we would be in default under our new revolving credit facility unless we obtained a waiver from the required lenders thereunder. Our outstanding debt under our new revolving credit facility, together with accrued interest, could then be declared immediately due and payable and commitments thereunder could be terminated. Our ability to comply with such provisions may be affected by events beyond our control. Moreover, the instruments governing almost all of our other debt contain cross-acceleration provisions so that an acceleration under any of our debt may result in a default under our other debt instruments. If a cross-acceleration occurs, the maturity of almost all of our debt could be accelerated and become immediately due and payable. If that happens, we would not be able to satisfy our debt obligations, which would have a substantial adverse effect on our ability to continue as a going concern.

Obligations under our new revolving credit facility will be secured by substantially all of our assets and the assets of all of our domestic subsidiaries. In addition, our obligations under our new revolving credit facility will be secured by, a pledge of all of the issued and outstanding shares of, or other equity interests in, substantially all of our existing or subsequently acquired or organized domestic subsidiaries and a percentage of the capital stock of, or other equity interests in, certain of our subsequently acquired or organized foreign subsidiaries. Following the consummation of the Transactions, if we or one of our restricted subsidiaries are declared bankrupt or insolvent or if we otherwise default under our new revolving credit facility, the lenders could declare all of the funds borrowed thereunder, together with accrued interest, immediately due and payable and commitments thereunder could be terminated. If we were unable to repay such debt, the lenders could foreclose on the pledged stock of our subsidiaries and on the assets in which they have been granted a security interest.

***Future acquisitions, partnerships, publishing services agreements and joint ventures may require significant resources and/or result in significant unanticipated losses, costs or liabilities.***

In the future, we may seek to grow our business by making acquisitions or entering into partnerships, publishing services agreements or joint ventures, including pursuing opportunities with our affiliates or companies controlled by our affiliates. Any future acquisition, partnership, publishing service agreement or joint venture may require that we make a significant cash investment, issue stock or incur substantial debt. In addition, acquisitions, partnerships, publishing services agreements or joint ventures may require significant managerial attention, which may be diverted from our other operations. These capital, equity and managerial commitments may impair the operation of our businesses. Furthermore, any future acquisitions of businesses or facilities could entail a number of additional risks, including:

- problems with effective integration of operations;

- the inability to maintain key pre-acquisition business relationships;

- increased operating costs;

- exposure to unanticipated liabilities; and

- difficulties in realizing projected efficiencies, synergies and cost savings.

We have incurred indebtedness to finance past acquisitions. We may finance future acquisitions with additional indebtedness, subject to limits in our debt agreements. As a result, we could face the financial risks associated with incurring additional indebtedness such as reducing our liquidity and access to financing markets and increasing the amount of cash flow required to service such indebtedness.

***Our performance could be adversely affected if we lose our key personnel.***

We believe that our success is largely dependent on the abilities and experience of our senior management team. The loss of the services of one or more of these senior executives could adversely affect our ability to effectively manage our overall operations or successfully execute current or future business strategies. We do not maintain key man life insurance on the lives of our senior management. We have entered into employment contracts with our senior management team, all of which contain non-compete provisions. While we believe that we could find replacements for these key personnel, the loss of their services could have a significant adverse effect on our operations.

***If we fail to implement our business strategy, our business will be adversely affected.***

Our future financial performance and success are dependent in large part upon our ability to successfully implement our business strategy. We cannot assure you that we will be able to successfully implement our business strategy or be able to improve our operating results. In particular, we cannot assure you that we will be able to increase circulation of our publications, obtain new sources of advertising revenues, generate additional revenues by building on the brand names of our publications, attract new clients for DSI, grow our publishing services business or raise the cover prices of our publications without causing a decline in circulation. Furthermore, any growth through acquisitions and investments will be dependent upon identifying suitable acquisition or investment candidates and successfully consummating such transactions and integrating the acquired operations at reasonable costs. We may not successfully integrate any acquired businesses or publishing services clients and may not be able to achieve anticipated revenue and cost benefits.

Such acquisitions and investments may require additional funding which may be provided in the form of additional debt, equity financing or a combination thereof. We cannot assure you that any such additional financing will be available to us on acceptable terms or at all or that we will be permitted under the terms of the new revolving credit facility (or any replacement thereof) or under the terms of our indentures to obtain such financing for such purpose.

Any failure to successfully implement our business strategy may adversely affect our ability to service our indebtedness, including our ability to make principal and interest payments on the debt. We may, in addition, decide to alter or discontinue certain aspects of our business strategy at any time.

***The global financial crisis and economic downturn could continue to negatively impact our liquidity, results of operations and financial condition, as well as our ability to accurately forecast our results, and it may cause a number of the risks that we currently face to increase in likelihood, magnitude and duration.***

The current financial crisis and economic downturn has adversely affected economic activity globally. Our operations and performance depend significantly on worldwide economic

conditions. Customers across all our businesses have been delaying and reducing their expenditures in response to deteriorating macroeconomic and industry conditions and uncertainty, which has had a significant negative impact on the demand for our products and therefore the cash flows of our businesses, and could continue to have a negative impact on our liquidity and capital resources. In addition, our revenues from advertising have decreased significantly as advertising budgets have been scaled back. During fiscal 2011, management expects to continue facing challenges resulting from the downturn in economic conditions, both domestically and internationally.

Additionally, we may face new risks as yet unidentified, and a number of risks that we ordinarily face may increase in likelihood, magnitude and duration. These risks include but are not limited to deferrals or reductions of customer orders, potential deterioration of our customers' ability to pay, losses or impairment charges, reduced revenue, further deterioration in our cash balances, an inability to access the capital markets, a further reduction in the amount of money that advertisers have available to spend for advertising in our products increases in gas prices, which affect our freight costs, increases in postage rates, unfavorable regulations and our continued ability to achieve cost savings. We expect to continue facing challenges resulting from the downturn in economic conditions, both domestically and internationally.

***Our business is affected by factors that impact consumer spending habits or patterns.***

Most of our products involve discretionary spending on the part of consumers. Consumer spending is influenced by general economic conditions and the availability of discretionary income. This makes our products sensitive to general economic conditions and economic cycles and trends in advertising placements and we have experienced reduced demand for, and decreased advertising in, our products in the current recessionary environment. Certain economic conditions such as regional or international economic downturns, including periods of increased inflation, unemployment levels, tax rates, interest rates, gasoline and other energy prices or declining consumer confidence negatively impact consumer spending. Reduced consumer spending or a shift in consumer spending patterns will likely result in reduced demand for our products and may also require increased selling and promotional expenses. A reduction or shift in domestic or international consumer spending habits or patterns could negatively impact our business, results of operations and financial condition.

***General economic trends, as well as trends in advertising spending and competition, along with declines in single copy circulation, may reduce our advertising and circulation revenues which represent the vast majority of our revenues.***

Our advertising and circulation revenues, which accounted for 90% of our total operating revenues for the six months ended September 30, 2010 and 93% of our total operating revenues in fiscal year 2010, are subject to the risks arising from adverse changes in domestic and global market conditions (i.e., recessionary environments or increases in gas prices and interest rates) and possible shifting of advertising spending from print to Internet or other media or decreases in advertising budgets. Extraordinary weather conditions, such as hurricanes (i.e., Hurricane Katrina in fiscal year 2006), can impact newsstand sales, advertising revenues and other revenues like distribution. Any adverse impact of economic conditions on our business may result in reductions in advertising and circulation revenue.

Our circulation revenues are subject to the risks arising from our ability to institute price increases for our print products and are affected by competition from other publications and other forms of media available in our various markets, changing consumer lifestyles resulting in decreasing amounts of free time, declining frequency of regular magazine buying among young people, and increasing costs of circulation acquisition.

We believe that the principal factors contributing to the declines in our single copy circulation include: (1) the current economic slowdown; (2) increased competition from other publications and forms of media, such as certain newspapers, television and radio programs and Internet sites concentrating on celebrity news; (3) a general industry-wide decline in single copy circulation of individual publications due to an increasing number of publications in the industry; and (4) diminished service levels from wholesalers who distribute our magazines to retailers and fill the pockets at checkout counters as a result of consolidation among wholesalers and their related efforts to cut expenses.

Historically, we have been able to offset some of the declines in single copy circulation, in part, through increases in cover prices and cost reductions. We cannot assure you that we will be able to increase cover prices without decreasing circulation, or be able to take other measures, such as increasing advertising revenue rates or pages, and decrease promotion expenses of our titles to offset such circulation declines, or that the single copy circulation declines described above will be reversed. Continued declines in circulation could have a material adverse effect on our business and financial performance and condition.

### *We operate in a very competitive business environment.*

*Star*, *National Enquirer*, *Globe*, *National Examiner*, *Sun*, *Mira!* and *Country Weekly* compete in varying degrees with other publications sold at retailers' checkout counters, as well as forms of media concentrating on celebrity news, such as certain tabloids, magazines and television and radio programs. We believe that historical declines in single copy circulation of *National Enquirer*, *Globe* and *National Examiner* have resulted in part from increased competition from these publications and forms of media. Competition for circulation is largely based upon the content of the publication, its placement in retail outlets and its price. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price, and advertising results. Certain of our competitors have substantially larger operating staffs, greater capital resources and greater revenues from their publications. In this respect, we may be at a competitive disadvantage with such entities. We believe that currently our most significant direct competitors in the print media are Time Warner Inc. (which publishes *People*, *People's Country*, *In Style* and *Entertainment Weekly*), Wenner Media, Inc. (which publishes *US Weekly* and *Men's Journal*), Rodale Inc. (which publishes *Men's Health* and *Woman's Health*), Bauer Publishing (which publishes *In Touch* and *Life & Style*), Condé Nast Publications, Inc. (which publishes *Self*) and Northern & Shell North America Ltd. (which publishes *OK!*). As use of the Internet and new on-line ventures focusing on celebrity news has increased, we have faced additional competition.

In addition, we compete with many other companies providing marketing and distribution services, such as full-service national distributors, wholesalers and publishers with their own marketing organizations. Certain of our competitors have substantially larger operating staffs and greater capital resources. In this respect, we may be at a competitive disadvantage with such entities.

Increased competition may result in less demand for our products and services which may have a material adverse effect on our business, results of operations and financial condition.

***Our business and results of operations may be adversely affected by increases in fuel costs and increases in the price of paper or postage.***

Many aspects of our business have been directly affected by increases in the cost of fuel. Increased fuel costs have translated into increased costs for the products and services we receive from our third party suppliers including, but not limited to, increased production and distribution costs for our products. In particular, paper and postage represent significant components of our total cost to produce and distribute our printed products. Paper is a commodity and its price has been subject to significant volatility. Furthermore, because the United States Postal Service and Canada Post Corporation distribute substantially all of our subscription publications and many of our marketing materials, increases in the cost of postage to mail our subscription publications may have an adverse effect on our business. We cannot predict with certainty the magnitude of future price changes in paper and postage or how increases in fuel costs will affect our third party suppliers and the rates they charge us. If fuel, paper or postage prices increase, and we cannot pass these costs on to our customers, such increases may have a material adverse effect on our business, results of operations and financial condition.

***Our business may be adversely affected if we lose one or more of our vendors.***

A loss of one or more of our vendors related to production or circulation or a disruption in one of those vendors' businesses or a failure by one of them to meet our production or circulation needs on a timely basis could cause temporary shortages in needed materials or services which could have a negative effect on our business and results of operations.

***Terrorist attacks and other acts of violence or war may affect the financial markets and our business, results of operations and financial condition.***

Terrorist attacks may negatively affect our operations and financial condition. In 2001, we were subject to "anthrax letter" terrorist attacks. There can be no assurance that there will not be further terrorist attacks against the United States or U.S. businesses or us. These attacks or armed conflicts may directly impact our physical facilities or those of our retailers and customers. These events could cause consumer confidence and spending to decrease or result in increased volatility in the U.S. and world financial markets and economy. They could result in an economic recession in the United States or abroad. Any of these occurrences could have a material adverse impact on our business, results of operations and financial condition.

***Pending and future litigation or regulatory proceedings could materially affect our operations.***

Because the focus of some of our publications often involves celebrities or controversial subjects and because of our news gathering techniques, the risk of defamation or invasion of privacy litigation or the filing of criminal charges exists. While we have not historically experienced any difficulty obtaining insurance coverage, we cannot assure you that we will be able to do so in the future at rates acceptable to us or at all. There are currently no such claims pending that we believe would have a material adverse effect on our operations. We cannot assure you that any pending or future litigation, if adversely determined, would not have a material adverse effect on our business, results of operations and financial condition.

In addition, on March 10, 2009, Anderson News, L.L.C. and Anderson Services, L.L.C., magazine wholesalers, (collectively, "*Anderson*") filed a lawsuit against AMI, DSI and various magazine

publishers, wholesalers and distributors in the Federal District Court for the Southern District of New York (the "*Anderson Action*"). The complaint alleges that the defendants violated Section 1 of the Sherman Anti-Trust Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Plaintiffs also purport to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint does not specify the amount of damages sought. On August 2, 2010, the District Court dismissed the complaint in its entirety with prejudice and without leave to replead and, on October 25, 2010, denied Anderson's motion for reconsideration of the dismissal decision. Anderson has until November 24, 2010 to file an appeal, and it has publicly stated that it intends to do so. While it is not possible to predict with certainty the final outcome of an appeal, if any, of the Anderson Action or to estimate the impact of a final judgment against us (if that were to occur), we will continue to vigorously defend the case. An adverse determination in this action could have an adverse effect on our business.

***If our goodwill or other identifiable intangible assets become impaired, we may be required to record a significant charge to earnings.***

As of September 30, 2010, the net book value of our goodwill and other intangible assets was approximately $501.2 million. Accounting rules require us to record a charge against our earnings to the extent that any of these assets are impaired. Accordingly, impairment of our goodwill, tradenames, covenants not to compete, subscriber lists, advertising relationships, non-subscriber customer relationships or the impairment of other intangible assets due to litigation, obsolescence, competitive factors, or other reasons could result in a material charge against our earnings and have a material adverse effect on our results of operations.

***We may be unable to continue as a going concern.***

Our audited and unaudited consolidated financial statements and related notes included elsewhere in this offering memorandum have been prepared assuming that we will continue as a going concern although the Plan and the voluntary chapter 11 cases that we expect to file upon receipt of the required votes raise substantial doubt about our ability to continue as a going concern. Our ability to continue as a going concern is dependent on restructuring our obligations pursuant to the Plan and receipt of an order approving the confirmation of the Plan by the Bankruptcy Court. The consolidated financial statements and related notes included elsewhere in this offering memorandum do not include any adjustments related to the recoverability and classification of recorded assets or to the amounts and classification of liabilities or any other adjustments that might be necessary should we be unable to continue as a going concern. See Note 19 to the audited consolidated financial statements and Note 1 to the unaudited consolidated financial statements included elsewhere in this offering memorandum.

As a result of the substantial doubt regarding our ability to continue as a going concern and the launch of the solicitation of the Plan, management concluded that we were not in compliance with certain covenants of the 2009 Credit Agreement, which includes the 2009 Revolving Facility and the 2009 Term Facility, for the year ended March 31, 2010. On November 5, 2010, we entered into the Waiver to Amended and Restated Credit Agreement with respect to certain provisions of the 2009 Credit Agreement (the "*Waiver*"). The Waiver provided, among other things, temporary relief from certain events of default under the 2009 Credit Agreement as a result of the Plan, including the going concern qualification and launch of the solicitation of the Plan.

The outstanding debt under the 2009 Credit Agreement could be declared immediately due and payable after the Waiver period expires. As the Waiver expires after 35 days, for accounting

purposes, the Company has accelerated the obligations under the 2009 Credit Agreement and classified the entire principal amount associated with the 2009 Credit Agreement as current as of September 30, 2010. The Company has also classified as current the deferred fees associated with the 2009 Credit Agreement. Additionally, the Existing Subordinated Notes and the Existing PIK Notes contain cross-acceleration provisions with respect to the 2009 Credit Agreement. Accordingly, the Company has also classified the Existing Subordinated Notes and the Existing PIK Notes as current as of September 30, 2010.

***Some provisions of Delaware law and AMI's amended and restated certificate of incorporation may deter third parties from acquiring AMI.***

Provisions contained in AMI's amended and restated certificate of incorporation and the laws of Delaware, the state in which AMI is incorporated, could make it more difficult for a third party to acquire us, even if doing so might be beneficial to our stockholders. Provisions of AMI's amended and restated certificate of incorporation impose various procedural and other requirements, which could make it more difficult for stockholders to effect certain corporate actions. These anti-takeover defenses could discourage, delay or prevent a transaction involving a change in control. These provisions could also discourage proxy contests and make it more difficult for stockholders to elect directors of their choosing and cause AMI to take other corporate actions that AMI's stockholders desire.

***We may not be able to maintain an effective system of internal control over financial reporting and disclosure controls.***

Effective internal control over financial reporting and disclosure controls are necessary for us to provide reliable financial reports, effectively prevent fraud and operate successfully. If we cannot provide reliable financial reports or prevent fraud, our operating results and reputation would be harmed. As part of our ongoing monitoring, we may discover material weaknesses or significant deficiencies in our internal control over financial reporting that require remediation.

We cannot assure you that internal control over financial reporting or disclosure control deficiencies might not be identified in the future. Any failure to maintain effective controls or timely effect any necessary improvement of our internal control over financial reporting and disclosure controls could, among other things, result in losses from fraud or error, cause us to not satisfy our reporting obligations, cause investors to lose confidence in our reported financial information or harm our reputation, all of which could have a material adverse effect on our results of operations and financial condition.

***We may suffer credit losses that could adversely affect our results of operation.***

We extend unsecured credit to most of our customers. We recognize that extending credit and setting appropriate reserves for receivables is largely a subjective decision based on knowledge of the customer and the industry. Credit exposure also includes the amount of estimated unbilled sales. The level of credit is influenced by the customer's credit history with us and other available information, including industry-specific data.

We share partially in the credit risk for sales to our wholesalers under our agreement with our largest national distributor.

We maintain a reserve account for estimated losses resulting from the inability of our customers to make required payments. If the financial condition of our customers were to deteriorate, resulting in an impairment of their ability to pay, additional allowances might be required.

***Our single copy revenues consist of copies sold primarily to three wholesalers.***

As of September 30, 2010, single copy revenues consisted of copies distributed to newsstands primarily by three wholesalers, which we estimate represented approximately 81% of the newsstand distribution market, as well as several smaller wholesalers who represented the remaining approximately 19%. In the six months ended September 30, 2010 and in fiscal year 2010, two wholesalers each accounted for greater than 10% of our total operating revenue and accounted for approximately 47% and 45% of our total operating revenue, respectively. We have service agreements with these wholesalers, which provide incentives to maintain certain levels of service. When these agreements expire, we cannot assure you that our wholesalers will renew these agreements on favorable terms, extend the terms of these agreements or extend their relationship with us at all. Our operating results could be materially affected by disruption of the distribution of our magazines through the wholesalers.

***Employee benefit costs are increasing significantly.***

Health insurance costs have increased significantly faster than inflation on an annual basis during the past few years. We also anticipate that in coming years, the cost of health care will continue to escalate, causing an increase to our expenses and employee contributions.

***Consummation of this offer and the Transactions related thereto may affect our liability for U.S. federal income taxes currently or in the future.***

We currently estimate that we have U.S. federal income tax net operating loss carryforwards of approximately $40.0 million, and we project additional net operating loss carryforwards of approximately $35 million in the current fiscal year. Subject to certain limitations, net operating loss carryforwards may be used to offset future taxable income and thereby reduce U.S. federal income taxes otherwise payable. For U.S. federal income tax purposes, a corporation that undergoes an "*ownership change*" is limited in its ability to utilize its net operating loss carryforwards in existence at the time of such change to offset taxable income arising after such ownership change. Generally, an ownership change occurs if there is an increase of more than 50 percentage points in the ownership of a corporation's issued and outstanding stock (based on value) by one or more "*5-percent shareholders*" during the applicable testing period which is usually the three-year period ending on the date on which a transaction is tested for an ownership change. Following an ownership change, the loss limitation for any post-change year is an amount equal to the value of the loss corporation immediately prior to the change multiplied by the long-term tax-exempt rate in effect at the time of such change. Currently, none of our net operating loss carryforwards is limited by these rules. We may experience an ownership change as a result of the Transactions. Whether or not the Transactions result in an ownership change, it is possible that we will undergo an ownership change in the future. As a result, our ability to use that portion of our net operating losses and other tax attributes attributable to periods prior to any such ownership change to offset taxable income in taxable periods after such an ownership change may be limited as described above. In addition, any net operating losses and other tax attributes that are currently limited may be limited further.

We believe that, based on the expected terms of the Transactions, we will not recognize any substantial amounts of income from the transactions contemplated herein, in the Plan and in the new revolving credit facility. However, we are likely to utilize some or all of our net operating losses and may also be required to reduce other tax attributes, such as our tax basis in certain assets, as a result of this offer or the Plan. This view is based on an analysis of the history of the

Existing Subordinated Notes, the Existing PIK Notes and the 2011 Notes (including the Prior Restructuring); there can be no assurance that the U.S. Internal Revenue Service (the "*IRS*") will not challenge this result or, if challenged, that a court will uphold such result.

## Risks relating to our bankruptcy cases and emergence

***Our actual financial results may vary significantly from the projections to be filed with the Bankruptcy Court.***

In connection with our soliciting votes to approve the Plan, we prepared the Disclosure Statement Relating to the Debtors' Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "*Disclosure Statement*"), which we expect will be filed with the Bankruptcy Court after the date of this offering memorandum and prior to the closing of this offering of the notes. The Disclosure Statement was distributed to our creditors on October 30, 2010 and contains our projected financial information to demonstrate to the Bankruptcy Court the feasibility of the Plan and our ability to continue operations upon our emergence from chapter 11. This projected financial information was not audited or reviewed by our independent public accountants. These projections were prepared solely for the purpose of the Chapter 11 Cases and not for the purpose of an offering of the notes and have not been, and will not be, updated on an ongoing basis. These projections are not included in this offering memorandum and have not been incorporated by reference into this offering memorandum and should not be relied upon in connection with the offering or sale of the notes. At the time they were prepared, the projections reflected numerous assumptions concerning our anticipated future performance and with respect to prevailing and anticipated market and economic conditions that were and remain beyond our control and that may not materialize. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic and competitive risks and the assumptions underlying the projections and/or valuation estimates may prove to be wrong in material respects. Actual results may vary significantly from those contemplated by the projections that were prepared in connection with the Disclosure Statement and the hearing to consider confirmation of the Plan. As a result, you should not consider or rely on such projections in deciding whether to invest in the notes offered hereby.

***Our emergence from Chapter 11 may trigger consent rights or termination rights in certain material contracts.***

We and our affiliates are parties to certain material contracts that contain various consent rights or potential termination rights that may or may not be triggered in connection with our emergence from bankruptcy. In the event that such rights are triggered, we or our affiliates may not be able to obtain the relevant consents or waivers on commercially reasonable terms, or at all. Accordingly, the counterparties to such contracts could have a right to terminate such contracts, and such termination could have a material adverse effect on our financial performance or affect our ability to carry out our business plan.

***The bankruptcy may affect our relationship with key employees, suppliers, customers and others.***

The Chapter 11 Cases may significantly harm relationships we have with key customers, joint venture partners, suppliers, employees, and others, which in turn could materially and adversely affect our businesses and financial condition following our emergence from bankruptcy. Our ability to attract, motivate and retain key employees and managers may be affected by

bankruptcy, which may limit our ability to take some measures intended to motivate key employees and managers to remain with us until our emergence from bankruptcy and following such emergence.

***If we are unable to consummate a plan of reorganization on a timely basis or the escrow release conditions are not timely met, we will be required to redeem the notes. If this occurs, you may realize a lower return on your investment than if the notes had been held through maturity.***

Until the satisfaction of the escrow release conditions, the escrow agent will hold the Escrow Issuer Proceeds from the offering of the notes together with additional amounts sufficient to redeem the notes in an escrow account for the benefit of the holders of the first lien notes. The release of the escrowed funds to finance our emergence will be conditioned upon, among other things, consummation of the Plan. In order for the Plan to be consummated, it must first be approved by a certain percentage of affected creditors and then confirmed by the Bankruptcy Court. There can be no assurance that the Plan or an alternative plan of reorganization, will be successfully confirmed and that the other conditions to release of funds from escrow will be satisfied.

If the Bankruptcy Court (i) does not approve the Plan within 60 days of the issue date, subject to extension for an additional 35 days on no more than one occasion, subject to certain conditions as described under "Description of first lien notes—Certain definitions—Escrow End Date" or (ii) prior to the date specified in clause (i) if the Escrow Issuer has determined, in its reasonable discretion, that the escrow conditions cannot be satisfied by such date, then the escrow funds will be released to effect a special mandatory redemption of the notes. The special mandatory redemption price for the notes is equal to the sum of the issue price of the notes set forth on the cover page of this offering memorandum plus accrued and unpaid interest on the notes from the issue date up to but not including the date of the special mandatory redemption. Upon such redemption, you may not be able to reinvest the proceeds from the redemption in an investment that yields comparable returns. Additionally, you may suffer a loss on your investment if you purchase the notes at a price greater than the issue price of the notes.

***It is possible that the plan of reorganization that is confirmed and effected is materially different from the one that we have presently proposed and that funds will nonetheless be released from escrow to fund our emergence from bankruptcy.***

It is possible that a plan of reorganization that materially differs from our proposed Plan may be approved and that the other conditions to release of funds from escrow to fund our emergence will be satisfied. All of the as adjusted financial information that reflects our emergence from bankruptcy is based upon the proposed Plan. Based upon the Restructuring Support Agreement, we believe that there will not be any material changes to the Plan from the perspective of investors in the notes and that the Plan will be timely approved. However, investors are subject to the risk that this will not be the case. In the event the escrow release conditions cannot timely be satisfied, we may seek a waiver of the conditions or the requirements to effect a special mandatory redemption from holders of not less than 75% of the aggregate principal amount of the first lien notes under the indenture governing the notes. Non-consenting noteholders would be bound by that waiver and would be required to participate in the special mandatory redemption.

***We may be subject to claims that were not discharged in the Chapter 11 Cases, which could have a material adverse effect on our results of operations and profitability.***

We expect that substantially all of the claims against us that arose prior to the date of our bankruptcy filing will be resolved during the Chapter 11 Cases. Subject to certain exceptions (such as certain employee and customer claims) and as set forth in the Plan, all claims against and interests in the Debtors that arose prior to the initiation of the Chapter 11 Cases (1) are subject to compromise and/or treatment under the Plan and (2) may be discharged, in accordance with and subject to the Bankruptcy Code and the terms of the Plan. Pursuant to the terms of the Plan, the provisions of the Plan constitute a good faith compromise or settlement of all such claims and the entry of the order confirming the Plan will constitute the Bankruptcy Court's approval of the compromise or settlement arrived at with respect to all such claims. Circumstances in which claims and other obligations that arose prior to our bankruptcy filing may not have been discharged include instances where a claimant had inadequate notice of the bankruptcy filing or a valid argument as to when its claim arose as a matter of law or otherwise.

***Concerns about the economy and our Chapter 11 Cases may cause a decrease in the ability or willingness of our current and future vendors to supply products and services to us on favorable terms, which may have a negative impact on our business.***

We have developed, and rely on, relationships with contractors and vendors who provide us with products and/or services. Our most important vendor relationships include paper suppliers, printing distribution contractors and payment processors. Many factors outside our control may harm these relationships and the ability or willingness of current and future contractors and vendors to sell these products or to provide these services to us, on acceptable terms. A contractor or vendor may seek to modify the terms of the relationship that it has with us, due to general economic concerns or concerns relating to their relationship with us, at any time. Our results of operations and cash flows have been negatively impacted by the tightening of the global economy. Should these negative trends continue, certain vendors may raise concerns about entering into new agreements with us without some assurance that we will operate profitably. Furthermore, certain vendors may refuse to continue to do business with us unless we commit to certain guarantees, including the posting of collateral, making advance payments for products or services, or changing our payment terms. This concern is exacerbated in the current economic environment. Disruptions in goods supplied or services provided from and by our contractors and vendors or changes in the terms of our relationships, including those that could arise because of concerns about our profitability, viability, or our compliance with the covenants contained in our credit facilities and indenture, could have a material adverse effect on our business, financial condition, results of operations and cash flows.

***Following our emergence from bankruptcy, our historical consolidated financial information included in this offering memorandum may not be comparable to financial information for future periods.***

During the course of the Chapter 11 Cases, our financial results may be volatile as asset impairments, asset dispositions, bankruptcy professional fees, contract terminations and rejections and claims assessments, among other things, could significantly impact our consolidated financial statements. Upon emergence from bankruptcy, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements.

***We cannot be certain that the Chapter 11 Cases will not adversely affect our operations going forward.***

Although we intend to emerge from bankruptcy upon consummation of a plan of reorganization, we cannot assure you that having been subject to bankruptcy protection will not adversely affect our operations going forward, including our ability to negotiate favorable terms from suppliers, hedging counterparties and others and to attract and retain customers. The failure to obtain such favorable terms and retain customers could adversely affect our financial performance.

***Holders of notes may not be able to determine when a change of control giving rise to their right to have the notes repurchased has occurred following a sale of "substantially all" of our assets.***

The definition of change of control in the indenture governing the notes includes a phrase relating to the sale of "all or substantially all" of our assets. There is no precise established definition of the phrase "substantially all" under applicable law. Accordingly, the ability of a holder of notes to require us to repurchase its notes as a result of a sale of less than all our assets to another person may be uncertain.

***Many of the covenants in the indenture will not apply while the notes are rated investment grade by both Moody's and Standard & Poor's.***

Many of the covenants in the indenture governing the notes will not apply to us if the notes are rated investment grade by both Moody's Investors Services, Inc. ("*Moody's*") and Standard & Poor's Ratings Services ("*S&P*"), provided at such time no default or event of default has occurred and is continuing. There can be no assurance that the notes will ever be rated investment grade, or that if they are rated investment grade, that the notes will maintain these ratings. However, suspension of these covenants would allow us to engage in certain transactions that would not be permitted while these covenants were in effect. To the extent the covenants are subsequently reinstated, any such actions taken while the covenants were suspended would not result in an event of default under the indenture governing the notes. See "Description of first lien notes—Certain covenants."

***Ratings of the notes may cause their trading price to fall and affect the marketability of the notes.***

We currently expect that the notes will be rated by Moody's and S&P. A rating agency's rating of the notes is not a recommendation to purchase, sell or hold any particular security, including the notes. Such ratings are limited in scope, and do not comment as to material risks relating to an investment in the notes. An explanation of the significance of such ratings may be obtained from such rating agencies. There is no assurance that such credit ratings will be issued or remain in effect for any given period of time. Rating agencies also may lower, suspend or withdraw ratings on the notes or our other debt in the future. Holders of the notes will have no recourse against us or any other parties in the event of a change in or suspension or withdrawal of such ratings. Any lowering, suspension or withdrawal of such ratings may have an adverse effect on the market prices or marketability of the notes.

## Risks related to this offering

***Our substantial indebtedness could adversely affect our businesses, financial condition and financial results and prevent AMO from fulfilling its obligations, including those under the notes.***

Following consummation of the Transactions, we will continue to have a significant amount of indebtedness. At September 30, 2010, on an as adjusted basis after giving effect to the Transactions, we would have had approximately $525.0 million of total indebtedness outstanding. In addition, we would have borrowing availability under our new revolving credit facility of $40.0 million, which will include a $10.0 million subfacility for letters of credit.

Our substantial indebtedness and our use of cash flow from operations to make principal and interest payments on our indebtedness may, among other things:

- limit the cash flow available to fund our working capital, capital expenditures, acquisitions or other general corporate requirements;

- limit our ability to obtain additional financing to fund future working capital, capital expenditures, acquisitions or other general corporate requirements;

- place us at a competitive disadvantage relative to those of our competitors that have greater financial resources;

- make it more difficult for us to comply with the financial covenants in our new revolving credit facility which could result in a default and an acceleration of all amounts outstanding thereunder;

- limit our ability to incur additional indebtedness;

- force us to seek and obtain alternate or additional sources of funding, which may be unavailable, or may be on less favorable terms, or may require the consent of lenders under our new revolving credit facility or the holders of our other indebtedness;

- limit our flexibility in planning for, or reacting to, changes in our business and industry;

- increase our vulnerability to general adverse economic and industry conditions; and

- expose us to increased interest expense because our new revolving credit facility is variable rate indebtedness.

Any of the foregoing matters could adversely affect our business, financial condition and financial results and, consequently, our ability to fulfill our debt service obligations.

***Despite our high indebtedness level, we and our subsidiaries still may incur significant additional amounts of debt, which could further exacerbate the risks associated with our substantial indebtedness.***

We and our subsidiaries may be able to incur substantial additional indebtedness in the future. Although our new revolving credit facility and the indentures governing the notes and the Plan second lien notes will contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of significant qualifications and exceptions, and under certain circumstances, the amount of indebtedness that could be incurred in compliance with these restrictions could be substantial.

If new debt is added to our and our subsidiaries' existing debt levels, the related risks that we will face would increase. In addition, the indenture governing the notes will not prevent us or our subsidiaries from incurring obligations that do not constitute indebtedness under the indenture governing the notes.

***To service our indebtedness, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

Our ability to generate cash flow from operations to make principal and interest payments on our indebtedness, including the notes, will depend on our future performance, which will be affected by a range of economic, competitive and business factors. We cannot control many of these factors, including general economic conditions, our allocation of advertising expenditures among available media and the amount spent on advertising in general. In particular, we cannot estimate the impact the ongoing economic crisis will have on our business going forward. If our operations do not generate sufficient cash flow from operations to satisfy our debt service obligations, we may need to borrow additional funds to make these payments or undertake alternative financing plans, such as refinancing or restructuring our indebtedness, disposing of assets or reducing or delaying capital investments and acquisitions. We cannot guarantee that such additional funds or alternative financing will be available on favorable terms, if at all. Our inability to generate sufficient cash flow from operations or obtain additional funds or alternative financing on acceptable terms could have a material adverse effect on our business, financial condition and results of operations.

We cannot assure you that our business will generate sufficient cash flows from operations, that anticipated cost savings and operating improvements will be realized or that we can obtain alternative financing proceeds in an amount sufficient to enable us to service our indebtedness, including the notes, or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness, including the notes, on or before maturity. We cannot assure you that we will be able to refinance any of our indebtedness on commercially reasonable terms or at all.

***We may be unable to repay or repurchase the notes at maturity.***

At the maturity date, the entire principal amount of the first lien notes, together with accrued and unpaid interest, will become due and payable. We may not have the ability to repay or refinance these obligations. If the maturity date occurs at a time when other arrangements prohibit us from repaying the first lien notes, we would try to obtain waivers of such prohibitions from the lenders and holders under those arrangements, or we could attempt to refinance the borrowings that contain the restrictions. If we could not obtain the waivers or refinance these borrowings, we would be unable to repay the notes.

***Our new revolving credit facility and the indentures governing the notes and the Plan second lien notes will contain restrictions that will limit our flexibility in operating our business.***

Our new revolving credit facility and the indentures governing the notes and the Plan second lien notes will contain a number of covenants that limit the discretion of our management with respect to certain business matters and may impair our ability to respond to changing business and economic conditions. Among other things, our new revolving credit facility and the indentures governing the notes and the Plan second lien notes will restrict our ability to:

- incur or guarantee additional indebtedness or issue certain preferred equity;

- pay dividends and make certain distributions, in respect of capital stock or make other restricted payments;

- make certain investments;

- create or incur certain liens;

- sell or otherwise dispose of assets;

- enter into certain transactions with affiliates;

- merge, consolidate, sell or otherwise dispose of all or substantially all of our assets;

- designate our subsidiaries as unrestricted subsidiaries;

- receive payments from our restricted subsidiaries; and

- pay cash interest in excess of specified rates.

In addition, our new revolving credit facility will contain a maximum first lien leverage ratio.

***Prior to the satisfaction of the escrow release conditions and the assumption of the notes by AMO and the guarantors, the Escrow Issuer will be the obligor on the notes. The Escrow Issuer does not have any significant operations.***

Prior to the satisfaction of the escrow release conditions, you will only be able to look to the Escrow Issuer to pay obligations on the notes. The Escrow Issuer is a limited purpose subsidiary with only nominal assets, other than the proceeds of the notes held in an escrow account, and no significant independent operations. Until the assumption of the notes by AMO and the guarantors, no other entity will have any obligation to make payment on the notes. If the satisfaction of the escrow release conditions does not occur by the 60th day after the issue date (subject to one 35-day extension), the Escrow Issuer will be obligated to make a special mandatory redemption of the notes as described elsewhere in this offering memorandum using the proceeds of the notes held in the escrow account.

***The notes will be secured only to the extent of the value of the assets that have been granted as security for the notes and in the event that the security is enforced against the collateral, the holders of the notes will receive proceeds from the collateral only after obligations under our new revolving credit facility have been paid in full.***

If we default on the notes, the holders of the notes will be secured only to the extent of the value of the assets underlying their security interest. Furthermore, upon enforcement against any collateral or insolvency, under the terms of the Intercreditor Agreement, proceeds of such enforcement will first be used to pay obligations outstanding under our new revolving credit facility in full (including post-petition interest, whether or not allowable in any bankruptcy case) prior to paying the notes. See "—The rights of holders of first lien notes in the collateral may be adversely affected by the Intercreditor Agreement."

***The value of the noteholders' security interest in the collateral may not be sufficient to satisfy all our obligations under the notes.***

The first lien notes and the guarantees of the first lien notes will be secured on a first-priority basis by a lien on the assets that secure our obligations under our new revolving credit facility, including

accounts, chattel paper, instruments, letter of credit rights, documents, equipment, general intangibles, inventory, cash and deposit accounts, investment property, certain owned real property and proceeds of the foregoing, in each case, subject to certain permitted liens and certain excluded assets. See "Description of first lien notes—Security for the notes."

If we default on the notes, the holders of the notes will be secured only to the extent of the value of the assets underlying their security interest. Furthermore, upon enforcement against any collateral or insolvency, under the terms of the Intercreditor Agreement, proceeds of such enforcement will be used first to pay obligations outstanding under our new revolving credit facility in full (including post-petition interest, whether or not allowable in any bankruptcy case) and second to pay the first lien notes. To prevent foreclosure, we may be motivated to commence voluntary bankruptcy proceedings, or the holders of the notes and/or various other interested persons may be motivated to institute bankruptcy proceedings against us. The commencement of such bankruptcy proceedings would expose the holders of the notes to additional risks, including additional restrictions on exercising rights against collateral. See "—In the event of a future bankruptcy, the ability of the holders of the notes to realize upon the collateral will be subject to certain bankruptcy law limitations."

The new revolving credit facility and the indentures governing the notes and the Plan second lien notes will allow us to incur additional obligations secured by liens in amounts that may be significant. Any additional indebtedness or obligations secured by a lien on the collateral securing the notes could adversely affect the relative position of the holders of the notes with respect to the collateral securing the notes.

The collateral may be subject to exceptions, defects, encumbrances, liens and other imperfections. Further, the value of the collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the collateral. By its nature, some or all of the collateral may be illiquid and may have no readily ascertainable market value. The value of the assets pledged as collateral for the notes could be impaired in the future as a result of changing economic conditions, our failure to implement our business strategy, competition or other future trends. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, no assurance can be given that the proceeds from any sale or liquidation of the collateral securing our obligations under our new revolving credit facility will be sufficient to pay our obligations under the notes, in full or at all, after first satisfying our obligations in full under our new revolving credit facility. There also can be no assurance that the collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.

In addition, we may not have liens perfected on all of the collateral securing the notes prior to the closing of this offering or, in some cases, such liens may not be perfected at all. To the extent certain security interests cannot be granted, filed and/or perfected on the closing date, a covenant in the indenture governing the notes will require us to do or cause to be done all things that may be required under applicable law, or that the collateral trustees from time to time may reasonably request, to grant, preserve, protect and perfect the validity and priority of the security interest in the collateral. We cannot assure you that we will be able to perfect the security interests on a timely basis, and our failure to do so may result in a default under the indentures, the new revolving credit facility and the security documents. To the extent the certain security interests are perfected following the Release Date, that security interest would remain at risk of having been granted within 90 days (or other applicable period) of a bankruptcy filing after the Release Date (in

which case it might be avoided as a preferential transfer by a trustee in bankruptcy) even after the security interests perfected on the Release Date were no longer subject to such risk.

Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the notes. Any claim for the difference between the amount, if any, realized by holders of the notes from the sale of the collateral securing the notes and the obligations under the notes will rank equally in right of payment with all of our other unsecured unsubordinated indebtedness and other obligations, including trade payables.

With respect to some of the collateral, the collateral trustee's security interest and ability to foreclose will also be limited by the need to meet certain requirements, such as obtaining third-party consents and making additional filings. If we are unable to obtain these consents or make these filings, the security interests may be invalid and the holders will not be entitled to the collateral or any recovery with respect thereto. We cannot assure you that any such required consents can be obtained on a timely basis or at all. These requirements may limit the number of potential bidders for certain collateral in any foreclosure and may delay any sale, either of which events may have an adverse effect on the sale price of the collateral. Therefore, the practical value of realizing on the collateral may, without the appropriate consents and filings, be limited.

*Certain assets will be excluded from the collateral.*

Certain assets are excluded from the collateral securing the notes, as described under "Description of first lien notes— Security for the notes," including the following:

- any capital stock of any foreign subsidiaries of the guarantors in excess of 65% of the capital stock such foreign subsidiaries;

- items as to which a security interest cannot be granted without violating contract rights or applicable law;

- assets securing purchase money debt or capitalized lease obligations permitted to be incurred under the indenture to the extent the documentation relating to such purchase money debt or capitalized lease obligations prohibits such assets from being collateral;

- any leasehold interest in any real property of AMO or any guarantor; and

- certain other exceptions described in the First Lien Security Documents.

If an event of default occurs and the notes are accelerated, the notes will rank equally with the holders of all of our other unsubordinated and unsecured indebtedness and other liabilities with respect to such excluded assets. As a result, if the value of the security interest for the notes and the guarantees is less than the value of the claims of the holders of the notes, no assurance can be provided that the holders of the notes would receive any substantial recovery from the excluded assets.

*The pledge of the capital stock or other securities of our subsidiaries that secure the notes will automatically be released from the lien on it and will no longer constitute collateral for so long as the pledge of such capital stock or such other securities would require the filing of separate financial statements with the SEC for such subsidiary.*

Upon our emergence from bankruptcy and the release of funds from escrow, the notes and the guarantees will be secured by a pledge of the stock of some of our subsidiaries. Under the SEC

regulations in effect as of the issue date of the notes, if the par value, book value as carried by us or market value (whichever is greatest) of the capital stock or other securities of a subsidiary pledged as part of the collateral for any class of securities registered or to be registered is greater than or equal to 20% of the aggregate principal amount of the notes then outstanding, such a subsidiary would be required to provide separate financial statements in filings with the SEC. Therefore, the indenture and the collateral documents will provide that any capital stock and other securities of any of our subsidiaries will be excluded from the collateral for the notes (but will remain collateral for the new revolving credit facility) for so long as the pledge of such capital stock or other securities to secure the notes would cause such subsidiary to be required to file separate financial statements with the SEC pursuant to Rule 3-16 of Regulation S-X (as in effect from time to time).

As a result, holders of the notes could lose a portion or all of their security interest in the capital stock or other securities of those subsidiaries during such period. It may be more difficult, costly and time-consuming for holders of the notes to foreclose on the assets of a subsidiary than to foreclose on its capital stock or other securities, so the proceeds realized upon any such foreclosure could be significantly less than those that would have been received upon any sale of the capital stock or other securities of such subsidiary. See "Description of the first lien notes—Security for the notes."

***Rights of holders of notes in the collateral may be adversely affected by the failure to perfect liens on certain collateral acquired and other issues generally associated with the realization of security interests in the collateral in the future.***

Applicable law requires that a security interest in certain tangible and intangible assets can only be perfected and its priority retained through certain actions undertaken by the secured party. The liens on the collateral securing obligations under the notes from time to time owned by us or the guarantors may not be perfected if we or the collateral trustee have not taken the actions necessary to perfect any of those liens upon or prior to the issuance of the notes, including in respect of collateral of a type that perfection of a lien may only be obtained by possession or control by the revolving agent. The inability or failure of us or the collateral trustee to promptly take all actions necessary to create properly perfected security interests in the collateral may result in the loss of the priority, or a defect in the perfection, of the security interest for the benefit of the holders of the notes to which they would have been otherwise entitled.

In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified. We and the guarantors will have limited obligations to perfect the security interests of the holders of the notes in specified collateral. There can be no assurance that the trustee or the collateral trustee will monitor, or that we or the guarantors will inform the trustee or the collateral trustee of, the future acquisition of property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the lien on such after-acquired collateral. The collateral trustee for the notes has no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interests therein. Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes.

The security interests of the collateral trustee will be subject to practical challenges generally associated with the realization of security interests in the collateral. For example, the collateral

trustee may need to obtain the consent of a third party to obtain or enforce a security interest in an asset. We cannot assure you that the collateral trustee will be able to obtain any such consent or that the consents of any third parties will be given when required to facilitate a foreclosure on such assets. As a result, the collateral trustee may not have the ability to foreclose upon those assets and the value of the collateral may therefore significantly decrease.

***The collateral is subject to casualty risks.***

The security documents will require us and our restricted subsidiaries to maintain adequate insurance or otherwise insure against risks to the extent customary with companies in the same or similar businesses operating in the same or similar locations as us. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. As a result, we cannot assure you that the insurance proceeds will compensate us fully for our losses. If there is a total or partial loss of any of the collateral securing the notes we cannot assure you that any insurance proceeds received by us will be sufficient to satisfy our obligations, including the notes.

***The collateral securing the notes may be diluted under certain circumstances.***

The indentures governing the notes and the Plan second lien notes and the new revolving credit facility will permit us, under certain circumstances, to issue additional senior secured indebtedness, including additional notes.

In addition, the indentures and our other security documents will permit us and certain of our subsidiaries to incur additional pari passu obligations, secured by the same security interests that will secure the notes, up to a maximum threshold amount. These additional pari passu obligations may be incurred by issuing additional notes under the indentures governing the notes and the Plan second lien notes or issuing additional debt securities under one or more new indentures. Any additional pari passu obligations secured by the collateral that will secure the notes would dilute the value of the note holders' rights to the collateral.

***The rights of holders of first lien notes in the collateral may be adversely affected by the Intercreditor Agreement.***

Under the terms of the Intercreditor Agreement, the liens securing the obligations under our new revolving credit facility on assets of ours or the guarantors will generally rank equally with the liens on such assets securing ours and the guarantors' obligations under the first lien notes and the guarantees. However, the Intercreditor Agreement provides that the obligations under our new revolving credit facility (including post-petition interest, whether or not allowable in any bankruptcy case) will be paid prior to the obligations under the first lien notes and guarantees in the event of any foreclosure or bankruptcy event.

Additionally, the Intercreditor Agreement will generally permit each of the collateral trustee, the collateral agent for the lenders under our new revolving credit facility and the collateral agent for any other holders of pari passu lien indebtedness to independently enforce their liens on the collateral (provided that distributions received on enforcement are applied as provided in the Intercreditor Agreement). It is possible that disputes may occur between the holders of the first lien notes and lenders under our new revolving credit facility or other secured parties as to the appropriate manner of pursuing enforcement remedies with respect to the collateral which may delay enforcement of the collateral, result in litigation and/or result in enforcement actions

against the collateral that are not approved by the holders of the notes. See "Description of first lien notes—Security for the notes."

***Federal and state fraudulent transfer laws may permit a court to void all or a portion of the obligations represented by the notes or the guarantees, subordinate claims in respect of the notes or the guarantees and require holders to return payments received and, if that occurs, you may not receive any payments on the notes.***

Federal and state fraudulent transfer and conveyance statutes may apply to all or a portion of the obligations represented by the notes or the incurrence of any guarantees of the notes, including the guarantee by the guarantors entered into upon issuance of the guarantees (if any) that may be entered into thereafter under the terms of the indenture governing the notes. Under federal bankruptcy law and comparable provisions of state fraudulent transfer or conveyance laws, which may vary from state to state, all of or a portion of the obligations represented by the notes or the guarantees could be voided as a fraudulent transfer or conveyance if (1) AMO incurred the notes or any of the guarantors incurred the guarantees with the intent of hindering, delaying or defrauding creditors or (2) AMO or any of the guarantors received less than reasonably equivalent value or fair consideration in return for incurring the notes or the guarantees, as applicable, and, in the case of (2) only, one of the following is also true at the time thereof:

- they were insolvent or rendered insolvent by reason of the incurrence of such indebtedness;

- the incurrence of the notes or the guarantees left AMO or any of the guarantors, as applicable, with an unreasonably small amount of capital to carry on the business;

- they intended to, or believed that they would, incur debts beyond their ability to pay such debts as they mature; or

- they were a defendant in an action for money damages, or had a judgment for money damages docketed against them if, in either case, after final judgment, the judgment is unsatisfied.

A court would likely find that AMO or a guarantor did not receive reasonably equivalent value or fair consideration for the notes or a guarantee, as applicable, if the applicable entity did not substantially benefit directly or indirectly from the issuance of the notes or the applicable guarantee. As a general matter, value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied.

We cannot be certain as to the standards a court would use to determine whether or not AMO or the guarantors were solvent at the relevant time or, regardless of the standard that a court uses, that the issuance of the notes or the guarantees would not be subordinated to any of the Company's or the guarantors' other debt. Generally, however, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all its assets; or

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or

- it could not pay its debts as they become due.

If a court were to find that the issuance of the notes or the incurrence of the guarantee was a fraudulent transfer or conveyance, the court could void the payment obligations under the notes or such guarantee, as applicable, or further subordinate the notes or such guarantee, as applicable, to presently existing and future indebtedness of the Company or of the related guarantor, or require the holders of the notes to repay any amounts received with respect to the notes or such guarantee, as applicable. In the event of a finding that a fraudulent transfer or conveyance occurred, you may not receive any repayment on the notes. Further, the voidance of the notes could result in an event of default with respect to the Company's and its guarantor subsidiaries' other debt that could result in acceleration of such debt.

Although each guarantee entered into by a subsidiary will contain a provision intended to limit that guarantor's liability to the maximum amount that it could incur without causing the incurrence of obligations under its guarantee to be a fraudulent transfer, this provision may not be effective to protect those guarantees from being voided under fraudulent transfer law, or may reduce that guarantor's obligation to an amount that effectively makes its guarantee worthless. In a recent Florida bankruptcy case, this kind of provision was found to be ineffective to protect the guarantees.

***The value of the collateral securing the notes may not be sufficient to entitle holders to payment of post-petition interest.***

In the event of a future bankruptcy, liquidation, dissolution, reorganization or similar proceeding against us following the Plan Effective Date, holders of the notes will only be entitled to post-petition interest under the Bankruptcy Code to the extent that the value of their security interest in the collateral is greater than their pre-bankruptcy claim. Holders of the notes that have a security interest in collateral with a value equal to or less than their pre-bankruptcy claim will not be entitled to post-petition interest under the Bankruptcy Code. The bankruptcy trustee, the debtor-in-possession or competing creditors could possibly assert that the fair market value of the collateral with respect to the notes on the date of the bankruptcy filing was less than the then-current principal amount of the notes and other obligations secured by that collateral. Upon a finding by a bankruptcy court that the notes and other obligations are under-collateralized, the claims in the bankruptcy proceeding with respect to the notes and other obligations would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the collateral. Other consequences of a finding of under collateralization would be, among other things, a lack of entitlement on the part of holders of notes to receive post-petition interest and a lack of entitlement on the part of the unsecured portion of the notes to receive other "adequate protection" under U.S. federal bankruptcy laws. In addition, if any payments of post-petition interest were made at the time of such a finding of under collateralization, such payments could be re-characterized by the bankruptcy court as a reduction of the principal amount of the secured claim with respect to the notes. We cannot assure you that the value of the noteholders' interest in the collateral securing the notes equals or exceeds the principal amount of the notes.

***There are circumstances other than repayment or discharge of the notes under which the collateral securing the notes and the related guarantees will be released automatically, without your consent or the consent of the notes trustee.***

Under various circumstances, all or a portion of the collateral may be released, including:

- to enable the sale, transfer or other disposal of such collateral in a transaction not prohibited under the indentures governing the notes and the Plan second lien notes or our new revolving credit facility, including the sale of any entity in its entirety that owns or holds such collateral; and

- with respect to collateral held by a guarantor, upon the release of such guarantor from its guarantee.

In addition, the guarantee of a subsidiary guarantor will be released in connection with a sale of such subsidiary guarantor in a transaction not prohibited by the notes indenture.

The indenture governing the notes will also permit us to designate one or more of our restricted subsidiaries that is a guarantor of the notes as an unrestricted subsidiary. If we designate a subsidiary guarantor as an unrestricted subsidiary, all of the liens on any collateral owned by such subsidiary or any of its subsidiaries and any guarantees of the notes by such subsidiary or any of its subsidiaries will be released under the indenture governing the notes but not under our new revolving credit facility. Designation of an unrestricted subsidiary will reduce the aggregate value of the collateral securing the notes to the extent that liens on the assets of the unrestricted subsidiary and its subsidiaries are released. In addition, the creditors of the unrestricted subsidiary and its subsidiaries will have a senior claim on the assets of such unrestricted subsidiary and its subsidiaries. See "Description of first lien notes—Security for the notes—Release of collateral."

***Any future grant of a lien on the collateral might be avoidable in bankruptcy.***

Any future grant of a lien on the collateral in favor of the trustee and the collateral trustee for the notes, including pursuant to security documents delivered after the date of the indenture governing the notes, might be avoidable by the person granting such lien (as debtor-in-possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including if the person granting such lien is insolvent at the time the lien is granted, the lien permits the holders of the notes to receive a greater recovery than if the lien had not been given and a bankruptcy proceeding in respect of the person granting such lien is commenced within 90 days following the date the lien was granted, or, in certain circumstances, a longer period.

***In the event of a future bankruptcy, the ability of the holders of the notes to realize upon the collateral will be subject to certain bankruptcy law limitations.***

The ability of holders of the notes to realize upon the collateral will be subject to certain bankruptcy law limitations in the event of a bankruptcy following the Plan Effective Date. Under applicable U.S. federal bankruptcy laws, secured creditors are prohibited from, among other things, repossessing their security from a debtor in a bankruptcy case without bankruptcy court approval and may be prohibited from retaining security repossessed by such creditor without bankruptcy court approval. Moreover, applicable federal bankruptcy laws generally permit the debtor to continue to retain collateral, including cash collateral, even though the debtor is in

default under the applicable debt instruments, provided that the secured creditor is given "adequate protection."

The secured creditor is entitled to "adequate protection" to protect the value of the secured creditor's interest in the collateral as of the commencement of the bankruptcy case but the adequate protection actually provided to a secured creditor may vary according to the circumstances. Adequate protection may include cash payments or the granting of additional security if and at such times as the court, in its discretion and at the request of such creditor, determines after notice and a hearing that the collateral has diminished in value as a result of the imposition of the automatic stay of repossession of such collateral or the debtor's use, sale or lease of such collateral during the pendency of the bankruptcy case. In view of the lack of a precise definition of the term "adequate protection" and the broad discretionary powers of a U.S. bankruptcy court, we cannot predict whether or when the trustee and collateral trustees under the indenture governing the notes could foreclose upon or sell the collateral or whether or to what extent holders of notes would be compensated for any delay in payment or loss of value of the collateral through the requirement of "adequate protection."

Moreover, the trustee and collateral trustee under the indenture governing the notes may need to evaluate the impact of the potential liabilities before determining to foreclose on collateral consisting of real property, if any, because secured creditors that hold a security interest in real property may be held liable under environmental laws for the costs of remediating or preventing the release or threatened releases of hazardous substances at such real property. Consequently, the collateral trustee for the notes may decline to foreclose on such collateral or exercise remedies available in respect thereof if it does not receive indemnification to its satisfaction from the holders of the notes.

***We may not be able to purchase the notes upon a change of control.***

Upon the occurrence of certain specific kinds of change of control events, AMO will be required to offer to repurchase all outstanding notes at a purchase price of 101% of their principal amount plus accrued and unpaid interest, if any, to the date of repurchase. However, it is possible that we will not have sufficient funds at the time of the change of control to make the required repurchase of notes or that restrictions in the new revolving credit facility will not allow such repurchase. Accordingly, we may not be able to satisfy our obligations to purchase the notes unless we are able to refinance or obtain waivers under the new revolving credit facility. AMO's failure to repurchase the notes upon a change of control would cause a default under the indenture governing the notes and a cross-default under the new revolving credit facility and the indenture governing the Plan second lien notes. The new revolving credit facility will also provide that a change of control will be a default that permits lenders to accelerate the maturity of borrowings thereunder. The lenders under the new revolving credit facility will have the right to require repayment in full of all outstanding borrowings under the new revolving credit facility prior to any repurchase of the notes. We will not, therefore, be able to effect a repurchase of the notes upon a change of control event unless we repay all of the outstanding borrowings under the new revolving credit facility or obtain the consent of the lenders thereunder. Any of the Company's future debt agreements may contain similar provisions.

***There are restrictions on your ability to transfer the notes.***

We will be relying on exemptions from registration under the Securities Act and state securities laws in offering the notes. The notes may be transferred or resold only in transactions registered,

or exempt from registration, under the Securities Act. We cannot assure you that any such exemption, including any exemption under Rule 144 promulgated under the Securities Act, will be available to holders of the notes and, if any such exemption is not available, holders of the notes will not be able to transfer or resell their notes unless the notes have been registered. See "Transfer restrictions."

***There currently exists no market for the notes. If an active trading market does not develop for the notes you may not be able to resell them.***

The notes have not been registered under the Securities Act. Accordingly, the notes may only be offered or sold pursuant to an exemption from the registration requirements of the Securities Act or pursuant to an effective registration statement. The notes are new securities for which there is no established trading market. We cannot assure you that an active trading market will develop for the notes. If no active trading market develops, you may not be able to resell your notes at their fair market value or at all. Future trading prices of the notes will depend on many factors, including, among other things, prevailing interest rates, our operating results and the market for similar securities. We have been informed by the initial purchasers that they intend to make a market in the notes after this offering is completed. However, the initial purchasers are not obligated to do so and may discontinue any market-making activities with respect to the notes at any time. The liquidity of any market for notes will depend upon various factors, including:

- the number of holders of the notes;

- the interest of securities dealers in making a market for the notes;

- the overall market for similar classes of securities;

- our financial performance or prospects; and

- the performance and prospects for companies in our industry generally.

Accordingly, we cannot assure you that a market or liquidity will develop for the notes. Historically, the markets for non-investment grade indebtedness have been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. We cannot assure you that the market for the notes, if any, will not be subject to similar disruptions. Any such disruptions may adversely affect you as a holder of the notes. We do not intend to apply to list the notes on any securities exchange.

***The interests of our significant stockholders may conflict with the interests of our noteholders.***

AMI is currently controlled by, and after consummation of the Transactions will continue to be controlled by, certain stockholders who are members of the RSA Committee, each of whom, collectively with its affiliates, will beneficially own at least 5% of the common stock of AMI following the consummation of the Plan. The members of the RSA Committee currently own approximately 70% of AMI Common Stock and following the Transactions are expected to own in excess of 78.6% of New AMI Common Stock. In particular, following the Transactions, the Backstop Parties are expected to own in excess of 59.3% of New AMI Common Stock. As a result, the members of the RSA Committee, particularly the Backstop Parties, will continue to be able to influence or control matters requiring approval by our stockholders, including the election of directors and the approval of mergers or other material corporate transactions. The members of the RSA Committee may also have interests that differ from those of the holders of notes, and may vote their equity interests in a manner which may be adverse to your interests as a holder of

notes. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the members of the RSA Committee might conflict with your interests as a holder of the notes. The members of the RSA Committee may also have an interest in pursuing acquisitions, divestitures, financings or other transactions that, in their judgment, could enhance their equity investments, even though such transactions might involve risks to you as a holder of the notes.

# Plan of reorganization

*This section provides a description of the Plan and our emergence from bankruptcy reflecting the expected approval by the requisite creditors and confirmation of the Plan by the Bankruptcy Court. The description in this section is qualified in its entirety by reference to the Plan, a copy of which may be obtained from the Company as discussed under "Where you can find additional information." The terms of the Plan are more detailed than the description provided in this section.*

## Prepackaged plan of reorganization

On October 30, 2010, the members of the RSA Committee, which collectively hold through one or more of their affiliates and consolidated funds, approximately 78% in principal amount of the Existing Subordinated Notes, approximately 89% in principal amount of the Existing PIK Notes and approximately 35% in principal amount of the 2009 Term Facility executed the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, members of the RSA Committee agreed to support the comprehensive financial restructuring and to vote in favor of the Plan in accordance with Bankruptcy Code Section 1125.

On October 30, 2010, AMI, AMO and AMO's domestic subsidiaries (excluding the Escrow Issuer and the Escrow Issuer's direct parent), who we collectively refer to as the "*Debtors*" (and "*Reorganized Debtors*" means any Debtors or any successor(s) thereto, by merger, consolidation or otherwise, on or after the Plan Effective Date), began soliciting votes to approve the Plan, in advance of our filing voluntary cases for relief under chapter 11 of the Bankruptcy Code. The Plan sets forth the Company's post-effective date capital structure and the distribution that each class of the Company's creditors is to receive under the Plan. The voting deadline with respect to the Plan is November 15, 2010 at 5:00 p.m. Eastern time, unless extended.

If the required votes to approve the Plan are received and if certain other prefiling conditions are met, the Debtors intend to file the Chapter 11 Cases. If the Debtors file the Chapter 11 Cases, the Company will promptly seek orders of the Bankruptcy Court, including the Escrow Issuer Approval Order approving the issuance of the notes offered hereby and stating that the Escrow Issuer and the New Escrow Parent LLC are non-Debtor entities and that any proceeds or assets they have or will have will not be deemed property of the Debtors' estates and will not be consolidated with the Debtors' assets or estates. The closing of this offering of the notes is conditioned upon receipt of the Escrow Issuer Approval Order, receipt of the required votes to approve the Plan, the filing of the Chapter 11 Cases, the satisfaction of the Rating Condition, and the satisfaction of certain other conditions, prior to the scheduled date of the issuance of the notes.

## Treatment of certain claims under the plan of reorganization

The Plan provides for the treatment of administrative expense claims, prepetition claims and equity interests against and in the Debtors, including any distributions to be made to holders of "allowed" claims or equity interests. The treatment provided under the Plan for these claims and equity interests is in full and complete satisfaction, settlement and release of any such administrative expense, claim or equity interest. Once confirmed, the Plan is binding on all creditors and equity interest holders of the Debtors, whether or not their claims or equity interests have been "allowed" and whether or they have voted for or against confirmation of the Plan.

The following is a summary of the proposed treatment under the Plan of certain prepetition and post-petition secured claims against the Debtors. Pursuant to the Plan, the liens and security interests of these creditors will be released, thereby enabling the new liens and security interests of the notes being offered hereby to be put into place.

The Plan includes the following key elements, among others:

- the 2009 Term Facility Lenders will receive (i) cash, in an amount to be determined by the Debtors but in any event no less than 70% of the amount of their allowed claims and (ii) Plan second lien notes, which Plan second lien notes will not be greater than the Backstop Commitment entered into by the Backstop Parties (as such terms are defined below); the 2009 Term Facility Lenders will have the right to require that the Backstop Parties purchase from them such Plan second lien notes at face amount (as further described below);

- the 2009 Revolver Lenders' claims will be paid in full in cash;

- the holders of the Existing Subordinated Notes will receive 98% of the New AMI Common Stock, subject to dilution for (i) the Equity Incentive Plan (as defined below) and (ii) holders who are not Backstop Parties, for the Backstop Shares;

- the holders of the Existing PIK Notes are expected to receive, subject to certain conditions, (i) Plan second lien notes, (ii) New PIK Notes, (iii) New Preferred Stock or (iv) a combination of the foregoing; which, to the extent issued, may be subject to a registration rights agreement to be agreed upon by the Company and the Backstop Parties;

- the holders of the 2011 Notes will receive approximately 2% of the New AMI Common Stock, subject to dilution for (i) the Equity Incentive Plan and (ii) holders who are not Backstop Parties, for the Backstop Shares;

- all pre-existing equity interests in AMI, including warrants, will be cancelled;

- AMO and the guarantor subsidiaries will enter into the new $40.0 million revolving credit facility; and

- the proceeds from this offering of notes will be released from escrow and used to consummate the Plan.

As stated above, under the Plan, certain holders of 2009 Term Facility debt will have a Put Right for any Plan second lien notes they receive to the Backstop Parties. Pursuant to the Backstop Agreement, the Backstop Parties have, severally and not jointly, committed to purchase at face amount their pro rata share (based upon their pro rata share of all Existing Subordinated Notes collectively held by the Backstop Parties) of any Plan second lien notes that would otherwise be distributed to the 2009 Term Facility Lenders pursuant to the Plan. Holders of the 2009 Term Facility claims may elect to have the Backstop Parties purchase their share of the Plan second lien notes; provided that in no event shall more than $115 million of Plan second lien notes (other than on account of the Existing PIK Notes) be issued. The Backstop Parties will consummate the purchase of the Plan second lien notes on the Plan Effective Date. See "Related party transactions—Backstop Agreement."

## Effect of plan of reorganization

As of the Plan Effective Date, all assets of the Debtors will vest in the Reorganized Debtors free and clear of all claims, liens, encumbrances, charges, and other interests, except as provided in the Plan or the confirmation order. Except as otherwise expressly provided in the Plan or in the confirmation order, upon the Plan Effective Date, each holder of a claim or equity interest will be deemed to have forever waived, released, and discharged the Debtors, the Reorganized Debtors and other Released Parties (as defined in the Plan) to the fullest extent permitted by law, of and from any and all claims, equity interests, rights, and liabilities that arose prior to the confirmation date. Upon the Plan Effective Date, all such persons will be forever precluded and enjoined, from prosecuting or asserting against the Debtors or Reorganized Debtors or their respective properties or interests in property, any such discharged claim against or equity interest in any Debtor or Reorganized Debtor.

## Tax impact of reorganization

The Debtors will realize substantial cancellation of debt, or "*COD*," income for federal tax purposes as a result of the implementation of the Plan. Because the Debtors will be debtors in a bankruptcy case at the time they realize the COD income, they will not be required to include that COD income in their taxable income for federal income tax purposes. Instead, following the close of their 2010 tax year, the Debtors will be required to reduce or eliminate certain of their federal income tax attributes, including net operating losses, tax credits and tax basis in certain assets. As a result, we expect that the Debtors' tax basis in their assets will be significantly reduced and we do not expect the Debtors to retain any NOL carryforwards to their tax year beginning April 1, 2011.

It is possible, albeit not likely, that the implementation of our Plan will cause an "ownership change" with respect to the stock of the Debtors for federal tax purposes. In the event of such an ownership change, certain of the Debtors' pre-Plan Effective Date tax attributes that are not eliminated by attribute reduction would be subject to certain limitations as to their future use under Sections 382 and 383 of the Code.

As a result of these reductions and limitations of our federal tax attributes, we expect our cash tax liabilities for our tax years following the fiscal year ending March 31, 2011 to be significantly higher than our cash tax liabilities for the fiscal years ending March 31, 2010 and 2011.

## Conditions precedent to reorganization

Certain important conditions precedent to the Plan going effective include:

- the confirmation order having been entered and the Plan having been approved by the Bankruptcy Court, in each case, in form and substance reasonably satisfactory to certain constituents in the Chapter 11 Cases, and the confirmation order not being subject to any stay;

- the receipt of all governmental and other regulatory approvals or rulings that may be necessary for consummation of the Plan or that are required by law, regulation or order;

- the receipt of the Escrow Issuer Proceeds from the sale of the notes offered hereby; and

- entry into our new revolving credit facility and the satisfaction or waiver of all conditions precedent thereunder.

**Impact of confirmation of plan of reorganization**

On the Plan Effective Date, the terms of the Plan confirmed by the Bankruptcy Court and approved by the requisite creditors will be deemed binding upon the Debtors and all other parties affected by the Plan. Parties will have a period of time following confirmation of the Plan to file a notice of appeal with respect to any confirmation order. Even if a notice of appeal is timely filed, the Debtors expect to proceed to consummate the Plan in accordance with its terms, unless the party seeking the appeal also obtains a stay of implementation of the Plan pending appeal of the confirmation order, in which event the Debtors will not be able to implement the terms of the Plan unless and until the stay is lifted. An appeal of the confirmation order may proceed even if there is no stay pending appeal of the confirmation order and, in such circumstance, the appeal may be dismissed as moot if the Debtors have implemented the Plan to the point of "substantial consummation." In determining whether a plan has been "substantially consummated," courts considering bankruptcy appeals under such circumstances have typically sought to determine whether implementation of the reorganization plan has progressed to a point at which fundamental changes in the plan as a result of any appeals being upheld would jeopardize its success.

# Use of proceeds

We estimate that the Escrow Issuer Proceeds will be approximately $379.2 million from this offering. Upon consummation of the offering, the Escrow Issuer will deposit the Escrow Issuer Proceeds and such additional funds as would be necessary to fund a special mandatory redemption into an escrow account. The escrowed funds will be temporarily invested in U.S. treasury securities or other permitted investments. Upon satisfaction of the escrow release conditions described under "Description of first lien notes—Escrow of proceeds—Release conditions," the escrowed funds will be released to AMO to fund our emergence from bankruptcy. If the escrow conditions are not timely satisfied or waived, the escrow funds must be used to effect the special mandatory redemption of the notes described herein. The closing of this offering of the notes is conditioned upon the Bankruptcy Court issuing the Escrow Issuer Approval Order, receipt of the required votes to approve the Plan, filing of the Chapter 11 Cases, the satisfaction of the Rating Condition, and the satisfaction of certain other conditions.

Upon our emergence from bankruptcy, the net proceeds from this offering will be used, together with cash on hand and borrowings under our new revolving credit facility, if necessary, to finance our emergence from bankruptcy and to pay related fees and expenses. For a summary description of the terms of the existing indebtedness that will be refinanced, see Notes 6 and 7 to the audited consolidated financial statements included elsewhere in this offering memorandum.

# Capitalization

The following table sets forth AMO's and its consolidated subsidiaries' cash and capitalization as of September 30, 2010:

- on an actual basis, and

- on an as adjusted basis to give effect to the Transactions.

The information presented below should be read in conjunction with "Management's discussion and analysis of financial condition and results of operations" and with AMO's consolidated financial statements, as well as the related notes, included elsewhere in this offering memorandum.

| (dollars in thousands) | As of September 30, 2010 | |
| --- | --- | --- |
| | Historical | As adjusted |
| | (unaudited) | |
| **Cash and cash equivalents** | $ 42,842 | $ 28,446 |
| **Debt (including current portion):** | | |
| 2009 Credit Agreement | | |
| Revolving credit facility | 35,000 | — |
| Term loan facility | 430,621 | — |
| Total 2009 Credit Agreement | 465,621 | — |
| New revolving credit facility(1) | — | — |
| 2011 Notes | 7,502 | — |
| Existing PIK Notes(2) | 23,723 | — |
| Existing Subordinated Notes(2) | 355,756 | — |
| First lien notes | — | 385,000 |
| Second lien notes(3) | — | 140,000 |
| Total debt | $ 852,602 | $ 525,000 |
| **Stockholder's deficit:** | | |
| Common stock, par value $0.0001 per share, 7,500,000 shares authorized and 6,284,360 shares outstanding historical; 20,000,000 shares authorized and 10,000,000 shares outstanding, as adjusted | $ 1 | $ 1 |
| Additional paid in capital(4) | 282,747 | 646,004 |
| Accumulated deficit(5) | (843,575) | (685,982) |
| Accumulated other comprehensive income | (159) | (159) |
| Total stockholder's deficit | $(560,986) | $ (40,136) |
| **Total capitalization** | $ 291,617 | $ 484,864 |

(1) None of the $40.0 million available for borrowing under our new revolving credit facility is expected to be drawn on the Plan Effective Date. For a discussion of the terms of our new revolving credit facility, see "Description of other indebtedness—New revolving credit facility."

(2) Amounts do not include future interest in the carrying amount of our Existing Subordinated Notes or our Existing PIK Notes.

(3) Amount assumes $140.0 million of second lien notes to be issued in accordance with the Plan or in one or more private placement offerings.

(4) The change in additional paid in capital of $363.3 million reflects the exchange of the Existing Subordinated Notes and 2011 Notes for equity.

(5) The change in accumulated deficit represents the income statement impact of accrued interest, deferred debt costs and the credit agreement early payment premium associated with the 2009 Credit Agreement, Existing PIK Notes and Existing Subordinated Notes.

# Selected historical consolidated financial data

The selected historical financial data presented below as of and for the six months ended September 30, 2010 and 2009 is derived from AMO's unaudited consolidated financial statements. The selected financial data presented below as of and for fiscal years 2006 through 2010 is derived from the Company's audited financial statements.

AMO's unaudited financial statements as of September 30, 2010 and for the six months ended September 30, 2010 and audited financial statements as of March 31, 2009 and 2010 and for the fiscal years ended March 31, 2008, 2009 and 2010 are included elsewhere in this offering memorandum. The selected historical financial data as of September 30, 2010 and September 30, 2009 and for the six months ended September 30, 2010 and September 30, 2009 have been derived from the Company's unaudited historical condensed consolidated financial statements, which have been prepared on a basis consistent with the Company's audited historical consolidated financial statements. In the opinion of management, such unaudited financial data reflect all adjustments, consisting only of normal and recurring adjustments, necessary for a fair statement of the results for those periods. The results of operations for the interim periods are not necessarily indicative of the results to be expected for the full year or any future period.

The following selected financial data should be read in conjunction with "Management's discussion and analysis of financial condition and results of operations" and the audited and unaudited consolidated financial statements of AMO, as well as the related notes, included elsewhere in this offering memorandum.

| (dollars in thousands) | Six months ended September 30, | | Fiscal year ended March 31, | | | | |
|---|---|---|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 | 2008 | 2007 | 2006 |
| **Statement of Income (Loss) Data:** | | | | | | | |
| Operating revenues | $202,870 | $211,730 | $412,430 | $461,649 | $490,774 | $470,860 | $478,978 |
| Operating expenses(1) | 154,688 | 180,576 | 331,453 | 588,680 | 423,720 | 724,555 | 559,802 |
| Operating income (loss) | 48,182 | 31,154 | 80,977 | (127,031) | 67,054 | (253,695) | (80,824) |
| Interest expense(2) | (25,402) | (25,463) | (50,601) | (85,251) | (99,042) | (97,435) | (86,026) |
| Senior subordinated notes issued | — | — | — | — | (17,109) | — | — |
| Amortization of deferred debt costs | (1,953) | (2,040) | (3,893) | (9,849) | (10,926) | (7,987) | (10,727) |
| Other income, net(3) | — | — | — | 537 | 2,522 | 2,907 | 2,075 |
| Gain on extinguishment of debt | — | — | — | 4,858 | — | — | — |
| Income (loss) before provision (benefit) for income taxes, and income (loss) from discontinued operations | 20,827 | 3,651 | 26,483 | (216,736) | (57,501) | (356,210) | (175,502) |
| Provision (benefit) for income taxes | 2,880 | 678 | 22,756 | (33,339) | 3,284 | (22,936) | (42,873) |
| Income (loss) from continuing operations | 17,947 | 2,973 | 3,727 | (183,397) | (60,785) | (333,274) | (132,629) |
| Income (loss) from discontinued operations, net of income taxes(4) | — | — | — | 500 | (685) | (10,129) | (27,893) |
| Net income (loss) | 17,947 | 2,973 | 3,727 | (182,897) | (61,470) | (343,403) | (160,522) |
| Less: net income attributable to the noncontrolling interest | (520) | (449) | (509) | (426) | (424) | (395) | (363) |
| Net income (loss) attributable to American Media Operations, Inc and subsidiaries | $ 17,427 | $ 2,524 | $ 3,218 | $ (183,323) | $ (61,894) | $ (343,798) | $ (160,885) |

| | Six months ended September 30, | | Fiscal year ended March 31, | | | | |
| (dollars in thousands) | 2010 | 2009 | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|---|---|
| **Other Data:** | | | | | | | |
| Depreciation of property and equipment(5) | $ 1,789 | $ 1,570 | $ 3,283 | $ 2,973 | $ 4,233 | $ 6,218 | $ 11,531 |
| Amortization of deferred rack costs(5) | $ 3,443 | $ 3,112 | $ 5,892 | $ 11,232 | $ 10,810 | $ 17,204 | $ 18,632 |
| Adjusted EBITDA(6) | $ 56,408 | $ 56,927 | $ 114,597 | $ 115,274 | $ 126,439 | $ 84,981 | $ 83,194 |
| **Balance Sheet Data** | | | | | | | |
| Total assets | $ 655,428 | $ 644,934 | $ 620,459 | $ 666,843 | $ 941,159 | $ 979,283 | $ 1,289,314 |
| Property and equipment, net | $ 7,014 | $ 6,489 | $ 6,494 | $ 6,262 | $ 5,097 | $ 6,906 | $ 10,590 |
| Deferred rack costs, net | $ 10,298 | $ 7,742 | $ 8,461 | $ 6,686 | $ 7,749 | $ 11,838 | $ 20,943 |
| Goodwill and other identified intangibles, net | $ 501,209 | $ 503,934 | $ 502,520 | $ 523,465 | $ 747,415 | $ 786,867 | $ 1,108,330 |
| Total debt, net of premium and discount(2) | $ 1,027,786 | $ 1,035,722 | $ 1,014,480 | $ 1,061,991 | $ 1,077,681 | $ 1,060,217 | $ 1,000,321 |
| Total stockholder's (deficit) equity | $ (560,986) | $ (579,090) | $ (578,434) | $ (581,703) | $ (399,082) | $ (334,417) | $ 9,324 |

(1) AMO recorded a non-cash provision for impairment of intangible assets and goodwill of $17.6 million, $217.4 million, $31.1 million, $305.4 million and $131.7 million in fiscal years 2010, 2009, 2008, 2007 and 2006, respectively.

(2) We recorded the principal amount of the Existing PIK Notes and the Existing Subordinated Notes and all future interest payments associated with the Existing PIK Notes and the Existing Subordinated Notes in the accompanying audited consolidated balance sheet included elsewhere in this offering memorandum. As a result, we do not recognize interest expense on the Existing PIK Notes and the Existing Subordinated Notes.

(3) Other income in fiscal years 2009 and 2008 was primarily related to interest income. Other income in fiscal year 2007 was primarily related to $1.2 million of cash received related to the recognition of the deferred gain on the sale of Frontline Marketing Inc. and $1.3 million related to interest income. Other income for fiscal year 2006 includes cash received of $1.6 million related to the sale of stock. We had provided advertising to a third party during fiscal year 2001, resulting in a receivable due from such third party, which we previously deemed to be worthless. In fiscal year 2003, we exchanged the receivable associated with that advertising for stock in the third party, which we sold in fiscal year 2006.

(4) In fiscal year 2007, AMO discontinued the publication of Celebrity Living Weekly, MPH, Shape En Espanol and Looking Good Now and during fiscal year 2008, we discontinued the publication of Weekly World News. As a result, the balances associated with these titles have been reclassified to income (loss) from discontinued operations, net of income taxes for all years presented.

(5) Includes balances associated with continuing and discontinued operations.

(6) Adjusted EBITDA, a measure used by AMO to measure operating performance, is defined as net income (loss) attributable to AMO and its subsidiaries plus interest expense, provision (benefit) for income taxes, depreciation of property and equipment, amortization of intangible assets, deferred debt costs and deferred rack costs, senior subordinated notes issued and provision for impairment of intangible assets and goodwill. Adjusted EBITDA is not a recognized term under GAAP and does not purport to be an alternative to income from continuing operations as a measure of operating performance or to cash flows from operating activities as a measure of liquidity. Additionally, Adjusted EBITDA is not intended to be a measure of free cash flow available for management's discretionary use as it does not consider certain cash requirements such as interest payments, tax payments and debt service requirements. The presentation of Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation, or as a substitute for analysis of AMO's results as reported under GAAP. AMO believes Adjusted EBITDA is helpful in highlighting trends because Adjusted EBITDA excludes the impact of certain items that can differ significantly from company to company depending on long-term strategic decisions regarding capital structure, the tax jurisdictions in which companies operate and capital investments. Management compensates for limitations of using non-GAAP financial measures by using them to supplement GAAP results to provide a more complete understanding of the factors and trends affecting our business than GAAP results alone. Because not all companies use identical calculations, our presentation of Adjusted EBITDA may not be comparable to other similarly titled measures of other companies.

Historical Adjusted EBITDA is calculated as follows:

| (dollars in thousands) | Six months ended September 30, | | Fiscal year ended March 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | 2009 | 2010 | 2009 | 2008 | 2007 | 2006 |
| Net income (loss) attributable to AMO and its subsidiaries | $ 17,427 | $ 2,524 | $ 3,218 | $ (183,323) | $ (61,894) | $ (343,798) | $ (160,885) |
| Interest expense(a) | 25,402 | 25,463 | 50,601 | 85,251 | 99,065 | 97,435 | 86,026 |
| Provision (benefit) for income taxes | 2,880 | 678 | 22,756 | (33,339) | 3,284 | (22,936) | (42,873) |
| Depreciation and amortization | 3,099 | 3,506 | 6,633 | 9,573 | 12,588 | 15,113 | 24,115 |
| Amortization of deferred debt costs | 1,953 | 2,040 | 3,893 | 9,849 | 10,926 | 7,987 | 10,727 |
| Provision for impairment of intangible assets and goodwill | — | 17,595 | 17,595 | 217,350 | 31,097 | 312,568 | 147,452 |
| Senior subordinated notes issued | — | — | — | — | 17,109 | — | — |
| Amortization and write-off of deferred rack costs and short-term rack programs | 5,647 | 5,121 | 9,901 | 14,771 | 14,264 | 18,612 | 18,632 |
| Gain on extinguishment of debt | — | — | — | (4,858) | — | — | — |
| Adjusted EBITDA | $ 56,408 | $ 56,927 | $ 114,597 | $ 115,274 | $ 126,439 | $ 84,981 | $ 83,194 |

(a)   Includes $23.0 thousand of interest expense attributable to discontinued operations in fiscal year 2008.

# Management's discussion and analysis of financial condition and results of operations

*You should read the following discussion and analysis of AMO's financial condition and results of operations together with AMO's consolidated audited financial statements and the related notes and other financial information included elsewhere in this offering memorandum. Some of the information contained in this discussion and analysis or set forth elsewhere in this offering memorandum, including information with respect to our plans and strategy for our business, includes forward-looking statements that involve risks and uncertainties. You should review "Risk Factors" and "Forward-Looking Statements" in this offering memorandum for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis. AMO conducts all of AMI's operations and represents substantially all of AMI's assets. AMO represented 100% of AMI's consolidated revenue and 100% of AMI's net income (loss) for the periods presented in the following discussion and analysis. References to "the Company," "we," "our" and "us" and similar terms in this discussion and analysis mean AMO and its consolidated subsidiaries (excluding Escrow Issuer and its direct parent). Concurrently with the consummation of the Transactions, AMI may be merged with and into AMO, with AMO being the surviving corporation. If such merger were to occur, then all references in this offering memorandum to "AMI," would mean AMO (as the surviving corporation in the merger with AMI) and its consolidated subsidiaries (excluding the Escrow Issuer and the Escrow Issuer's direct parent), except as otherwise indicated or unless the context otherwise requires.*

## Introduction

The following is a discussion of our financial condition and results of operations for the three fiscal years ended March 31, 2010 and for the six month period ended September 30, 2010. This discussion should be read in conjunction with our audited consolidated financial statements and our unaudited consolidated financial statements, and the notes thereto, respectively. The accompanying Management's discussion and analysis of financial condition and results of operations exclude the results of our discontinued operations for the fiscal years ended March 31, 2009 and 2008, respectively. See Note 3, "Discontinued operations," in the notes to audited consolidated financial statements herein for a discussion regarding discontinued operations.

## Executive summary

We are a leading publisher in the field of celebrity journalism and health and fitness magazines. Our publications include *National Enquirer, Star, Globe, National Examiner, Country Weekly, Mira!, Sun, Shape, Muscle & Fitness, Flex, Men's Fitness, Muscle & Fitness Hers, Fit Pregnancy, Natural Health, UFC Magazine,* and other publications. Our magazines comprise approximately 21% of total U.S. and Canadian newsstand circulation for audited (by ABC) weekly publications as of September 30, 2010. The total average newsstand and subscription circulation per issue for all of our publications that are currently published and have a frequency of six or more times per year was approximately 6.0 million copies and 6.1 million copies for the six months ended September 30, 2010 and fiscal year 2010, respectively.

We also provide publishing services, which may include, without limitation, advertising sales and marketing, circulation and production management services, to other publishers, including *Playboy and WWE.* We will seek to capitalize on opportunities to expand our publishing services business, including pursuing opportunities with our affiliates or companies controlled by our affiliates.

Our circulation revenue represented approximately 58% of our total operating revenue in the six months ended September 30, 2010 and approximately 60% of our total operating revenue in the six months ended September 30, 2009. Our circulation revenue represented approximately 60% of our total operating revenues in fiscal year 2010 and approximately 55% of our total operating revenue in fiscal years 2009 and 2008. Single copy sales accounted for approximately 81% of such circulation revenue for the six months ended September 30, 2010 and approximately 82% of such circulation revenue in the six months ended September 30, 2009. Single copy sales accounted for approximately 81% of such circulation revenue in fiscal year 2010 and approximately 82% of such circulation revenue in fiscal years 2009 and 2008, respectively. The remainder of circulation revenues was from subscription sales.

Our advertising revenues are generated by national advertisers, including packaged goods, sports nutrition products, automotive, entertainment, pharmaceutical, sports apparel, beauty and cosmetics, fashion and direct response. Advertising revenues accounted for approximately 33% of our total operating revenue in the six months ended September 30, 2010 and approximately 32% of our total operating revenue in the six months ended September 30, 2009. Advertising revenues accounted for approximately 33% of our total operating revenues in fiscal year 2010 and approximately 37% of our total operating revenue in fiscal years 2009 and 2008.

Our primary operating costs and expenses are comprised of production, distribution, circulation, editorial and selling, general and administrative expenses. The largest components of our costs are related to production, which includes printing, paper and circulation expenses. Circulation costs primarily include subscription fulfillment, postage and newsstand transportation. Editorial costs include salaries and costs associated with freelancers, manuscripts and photographs.

We did not record a provision for the impairment of intangible assets and goodwill in the six months ended September 30, 2010. During the three months ended June 30, 2009, we recorded a provision for impairment of intangible assets and goodwill of $17.6 million. Operating expenses totaled $180.6 million for the six months ended September 30, 2009 including this non-cash impairment charge. During fiscal years 2010, 2009 and 2008, we recorded non-cash provisions for the impairment of intangible assets and goodwill of $17.6 million, $217.4 million and $31.1 million, respectively. For a detailed description of these impairment charges, see Note 2, "Goodwill and other identified intangible assets" in the notes to audited consolidated financial statements included herein and Note 4, "Goodwill and other identified intangible assets" in the notes to unaudited consolidated financial statements.

During the second quarter of fiscal year 2008, we discontinued the publication of *Weekly World News* and subsequently sold it in fiscal year 2009. The income (loss) from discontinued operations, including the gain on the sale of *Weekly World News*, was $0.5 million and $(0.7) million, net of taxes, for fiscal years 2009 and 2008, respectively. Operating results of this publication have been classified as discontinued operations for all periods presented. See Note 3, "Discontinued operations," in the notes to audited consolidated financial statements included herein for further discussion.

We implemented initiatives relating to cost savings and revenue enhancements opportunities (the "*2009 Management Action Plan*") during the first fiscal quarter of fiscal year 2009, which resulted in approximately $25.7 million of cost savings and approximately $7.5 million of revenue enhancements during fiscal year 2009 as compared to our fiscal year 2009 budget. Cost savings primarily included cost reductions related to employee-related expenses and selling, general and

administrative expenses, as well as production and subscription expenses. Revenue enhancements included certain cover price increases and the publishing of an additional issue of seven of our publications, as well as the publication of four special interest publications during fiscal year 2009.

We also implemented an additional management action plan (the "*Supplemental Management Action Plan*") during the fourth fiscal quarter of fiscal year 2009, which resulted in approximately $21.0 million and $2.6 million of cost savings in fiscal years 2010 and 2009, respectively. In connection with the Supplemental Management Action Plan, the Company terminated approximately 113 employees, which resulted in a charge of approximately $2.1 million for termination benefits. Cost savings primarily included cost reductions related to employee-related expenses, production and subscription expenses.

During the fiscal year ended March 31, 2010, we implemented an additional management action plan (the "*2010 Management Action Plan*" and, together with the Supplemental Management Action Plan, the "*Management Action Plans*"), that resulted in additional cost savings of $11.5 million and revenue enhancements of $5.7 million as compared to our fiscal year 2010 budget. Cost savings included reductions in production, editorial, distribution and personnel-related costs. Revenue enhancements included cover price increases and the publishing of four special issues.

During the six months ended September 30, 2010, we implemented an additional management action plan that we expect to result in $10.4 million of cost savings in fiscal year 2011. The cost reductions were in the manufacturing area primarily related to print order reductions and reduced book sizes to be comparable to our competitive set, as well as paper rate savings based on our purchasing strategy.

On January 30, 2009, we successfully completed our cash tender offers and receipt of requisite consents in the related consent solicitations in respect of our then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 2009 Notes and (2) $155.5 million aggregate principal amount of 2011 Notes. $400.5 million aggregate principal amount of the 2009 Notes and $148.0 million aggregate principal amount of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

On December 31, 2008, we entered into the 2009 Credit Agreement, which replaced our then existing 2006 Credit Agreement. On January 30, 2009, concurrently with the consummation of our cash tender offers, the 2009 Credit Agreement became effective.

On January 30, 2009, we issued (i) $21.2 million aggregate principal amount of the Existing PIK Notes and (ii) $299.7 million aggregate principal amount of the Existing Subordinated Notes. Also on January 30, 2009, AMI sold 5,688,891 shares of AMI Common Stock (valued at approximately $1.0 million) for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering, together with our cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to the offering and the tender offers and consent solicitations. In addition, on January 30, 2009, AMI issued 305,520 shares of AMI Common Stock to the Prior Equityholders in exchange for AMI Common Stock they owned prior to the Prior Restructuring.

As a result of the Prior Restructuring and the issuance of AMI Common Stock to the Prior Tendering Bondholders, the Prior Tendering Bondholders acquired 94.9% of AMI Common Stock on January 30, 2009. AMI's Prior Equityholders retained 5.1% of AMI Common Stock.

As a result of the restructuring of our capital structure and the completion of our cash tender offers, we recognized cancellation of indebtedness income and utilized a significant portion of our previously valued net operating loss carry-forwards. In addition, we reduced the tax basis of depreciable and amortizable assets. As a result of the Prior Tendering Bondholders acquiring 94.9% of AMI's Common Stock, we underwent an ownership change under the Internal Revenue Code of 1986, as amended (the "*Code*") Section 382 ("*Section 382*"). Since the majority of our pre-acquisition net operating losses were reduced as a result of attribute reduction, only $19.4 million of net operating losses remain subject to the consolidated net operating loss Section 382 limitation.

On or about July 14, 2010, we launched the Exchange Offer and the Tender Offer. In the Exchange Offer, holders of Existing Subordinated Notes were offered $269.52 in cash and 335.62 shares of AMI Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, we offered to purchase each $1,000 principal amount of outstanding Existing PIK Notes for $1,020.

On October 12, 2010, we commenced the Interest Deferral Consent Solicitation to solicit consents from eligible holders of Existing Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Existing Subordinated Notes to January 3, 2011. Holders of more than 75% of the aggregate outstanding principal amount of Existing Subordinated Notes delivered their consents to the Deferred Interest Payment in the Interest Deferral Consent Solicitation. On October 28, 2010, we executed the Deferred Interest Supplemental Indenture, which became operative immediately upon execution.

The Exchange Offer and the Tender Offer were initially scheduled to expire on August 11, 2010, and were subsequently extended to November 1, 2010. Neither the Exchange Offer nor the Tender Offer was successfully consummated. The Company's Board of Directors has approved a financial restructuring through solicitation of the Plan. Management has informed its investors that if the Company receives the requisite number of votes from its creditors in favor of the Plan by November 15, 2010 (unless extended), it will initiate a prepackaged chapter 11 filing in order to confirm and consummate the Plan. The Company's reorganization is premised around a debt-for-equity exchange with holders of the $299.7 million aggregate principal amount of Existing Subordinated Notes, approximately 78% of which have agreed to support the restructuring by executing a Restructuring Support Agreement with the Company. The Company will be offering a total aggregate principal of approximately $525.0 million of new first lien notes and second lien notes in connection with the Plan. The proceeds from the offering will primarily be used to refinance the 2009 Credit Agreement. The new first lien notes and second lien notes will be issued after the Company files for chapter 11 and the Company will only proceed with the Plan if the offering is successful. As a result of the anticipated chapter 11 filing and the launch of the solicitation of the Plan, there is substantial doubt regarding the Company's ability to continue as a going concern.

Management plans to address the issue of substantial doubt by the consummation of the Plan. However, there can be no assurance that the Company will receive the requisite consents to consummate the Plan and emerge from chapter 11.

As a result of the substantial doubt regarding the Company's ability to continue as a going concern and the launch of the solicitation of the Plan, management concluded that the Company was not in compliance with certain covenants of the 2009 Credit Agreement, which includes the 2009 Revolving Facility and the 2009 Term Facility, for the year ended March 31, 2010. On November 5, 2010, the Company entered into the Waiver to Amended and Restated Credit Agreement (the "*Waiver*") with respect to certain provisions of the 2009 Credit Agreement. The Waiver provided, among other things, temporary relief from certain events of default under the 2009 Credit Agreement as a result of the Plan, including the going concern qualification and launch of the solicitation of the Plan.

The outstanding debt under the 2009 Credit Agreement could be declared immediately due and payable after the Waiver period expires. As the Waiver expires after 35 days, for accounting purposes, the Company has accelerated the obligations under the 2009 Credit Agreement and classified the entire principal amount associated with the 2009 Credit Agreement as current as of September 30, 2010. The Company has also classified as current the deferred fees associated with the 2009 Credit Agreement. Additionally, the Existing Subordinated Notes and the Existing PIK Notes contain cross-acceleration provisions with respect to the 2009 Credit Agreement. Accordingly, the Company has also classified the Existing Subordinated Notes and the Existing PIK Notes as current as of September 30, 2010.

We believe that the following factors have contributed to the leading market position of our publications:

### Strong well-established brand names

Each of our publications has leading positions in their respective categories. Our most popular magazine titles consist of *Star, Shape, Men's Fitness* and *Muscle & Fitness. Star* is a weekly celebrity news-based glossy magazine dedicated to covering the stars of movies, television and music. *Star's* editorial content also incorporates fashion, beauty and accessories. *Shape* is the leader in circulation and advertising revenues in the women's active lifestyle and health and fitness category. *Shape's* mission is to help women lead a healthier lifestyle by providing information on exercise techniques, nutrition, psychology and other inspirational topics, while also offering extensive beauty and fashion coverage. *Men's Fitness* is a leading monthly magazine for men 18-34 years old with active lifestyles. The magazine promotes a multi-training approach towards exercise and nutrition, while also offering information and advice in the areas of career, relationships, fashion and sports. *Muscle & Fitness* is the preeminent monthly fitness training magazine, appealing to exercise enthusiasts and athletes of all ages, especially those focused on resistance training, body fat control and sports nutrition.

Other popular magazines include *Flex*, *Fit Pregnancy, Natural Health, Muscle & Fitness Hers* and *Country Weekly. Flex*, which was spun off from *Muscle & Fitness* in 1983, is a monthly magazine devoted to professional bodybuilding. The magazine delivers nutrition and performance science information for bodybuilding enthusiasts. *Fit Pregnancy* was spun off from *Shape* in 1995. *Fit Pregnancy's* editorial focus makes it a premier lifestyle magazine for *Shape* women during pregnancy as well as the first six months after childbirth and the two-year postpartum period. *Fit Pregnancy* delivers authoritative information on health, fashion, food and fitness. *Natural Health* is a leading wellness magazine published ten times during fiscal year 2010 and eight times beginning in fiscal year 2011, offering readers practical information to benefit from the latest scientific knowledge and advancements in the field of natural health, including advice to improve beauty and fitness. *Muscle & Fitness Hers* is designed for the active woman who

demands more out of fitness and delivers a competitive edge for expert training, nutrition, health, beauty and fashion tips for today's woman. *Country Weekly* is an entertainment magazine presenting all aspects of country music celebrities and their lifestyles, events and personalities. *Country Weekly* was changed from a bi-weekly to a weekly publication effective with the March 30, 2009 issue, and subscriptions for *Country Weekly* were discontinued effective with the March 9, 2009 issue as we transitioned this publication from an advertising/rate-based publication to a newsstand-based publication.

Our tabloid-type publications consist of *National Enquirer, Globe, National Examiner, Sun* and *Mira!*. Our largest tabloid circulations, *National Enquirer* and *Globe*, which commenced publication in the early 1950's, have been two of the leading general interest tabloids for over 50 years. *National Enquirer* is a weekly general interest publication with an editorial content devoted to celebrities, investigative reporting, human interest stories and articles covering lifestyle topics such as crime, health, fashion and beauty. *Globe* is a weekly tabloid with features that are less time-sensitive and focuses on political scandals and investigative crime stories that are less mainstream and more hard-hitting than *National Enquirer*.

*National Examiner's* editorial content consists of celebrity and human-interest stories, differentiating it from the other titles through its upbeat positioning as the "gossip, contests, women's service and good news" tabloid. *Sun's* editorial content is skewed to an older target audience and focuses on religion, health, holistic remedies, predictions and prophecies. *Sun* also includes entertaining and unusual articles from around the world. *Mira!* is a Spanish language tabloid that features exclusive news and gossip about the hottest stars in the Latino market in movies, television and music, along with interviews and in-depth stories spotlighting them at work and at play. Effective with the January 19, 2009 issue, subscriptions for *Mira!* were discontinued as we transitioned this publication from an advertising/rate-based publication to a newsstand-based publication.

We believe that our brand names are among the most familiar magazine and tabloid-type titles to consumers and are synonymous with the celebrity and fitness genre. In our opinion, the long history and strong brand identity of our publications has allowed us to establish a large and loyal readership base.

***Broad distribution base***

Our publications are sold in all 50 states in the United States, as well as in Canada and, to a lesser extent, the United Kingdom, continental Europe, Latin America and Australia. Our distribution in the United States includes virtually all of the leading supermarkets, mass merchandisers, drug store chains and major convenience store chains as well as a broad base of regional and local newsstand outlets. In addition, DSI, our wholly-owned subsidiary that works with retailers to design their front-end racks and position magazines for increased sales, provides a value-added service to the retailers and helps to further strengthen our retailer relationships and distribution. Our distribution base also allows us to efficiently launch new titles and expand the distribution of acquired titles.

## Critical accounting policies and estimates

Our discussion and analysis of financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with generally accepted accounting principles. The preparation of these financial statements requires us to

make estimates and judgments that affect the reported amounts in our consolidated financial statements. We evaluate our estimates on an on-going basis, including those related to revenue, trade receivables and allowance for doubtful accounts, goodwill and other intangible assets, deferred rack costs, income taxes and contingent liabilities. We base our estimates on historical experience and on various other assumptions that we believe reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities. Actual results may differ from these estimates or our estimates may be affected by different assumptions or conditions. Critical accounting policies are those that are both most important to the portrayal of a company's financial position and results of operations, and require management's most difficult, subjective or complex judgments. The following accounting policies and estimates are those that management deems most critical. For a complete listing of our significant accounting policies, see Note 1, "Description of Business, Basis of presentation and summary of significant accounting policies," in the notes to audited consolidated financial statements herein.

### Revenue recognition

Our revenues are primarily comprised of single copy, subscription and advertising. Single copy, subscription and advertising revenue and related expenses for our publications are recognized on the on-sale date.

Revenues from single copy sales are recognized net of expected sales returns, after considering such factors as sales history and available market information. All of our publications are sold with full return privileges. Our major U.S. and Canadian distributor provides us with weekly reporting on the actual returns by publication and by issue of each publication. We also receive sales data from certain retailers that sell our publications. We utilize these data sources as well as our long-term history of sales data by publication to estimate the actual anticipated sale of our publications and our experience has demonstrated that the actual sale of each issue of each magazine can be reasonably estimated based on this information. Our in-house circulation department has developed financial models which we utilize when projecting the anticipated sale of magazines. Revenues are presented net of amortization on the deferred rack costs, terminal and other short-term rack promotions and product placement costs ("*retail display allowances and pockets*") paid to the retailers and sales taxes.

Other revenues, primarily from marketing services performed for third parties by DSI, are recognized when the service is performed.

### Trade receivables and allowance for doubtful accounts

Substantially all of our trade receivables are from single copy distributors, subscriptions and advertising customers. We maintain allowances for doubtful accounts for estimated losses resulting from our customers not making required payments. We make estimates of the collectability of trade receivables. We critically review trade receivables and analyze historical bad debts, past-due accounts, customer credit-worthiness and current economic trends when evaluating the adequacy of the allowance for doubtful accounts.

### Goodwill and intangible assets

Our reporting units and related indefinite-lived intangibles are tested annually during the fourth quarter of each fiscal year to determine whether their carrying value exceeds their fair value. Goodwill and other indefinite-lived intangible assets are also tested for impairment on an

interim basis if an event occurs or circumstances change between annual tests that would indicate that impairment exists. Impairment losses, if any, are reflected in operating income or loss in the consolidated statements of income (loss). Our reporting units consist of each of our publications and other consolidated subsidiaries.

We review finite-lived intangible assets for impairment whenever an event occurs or circumstances change which indicates that the carrying amount of such assets may not be fully recoverable. Determination of recoverability is based on an estimate of undiscounted future cash flows resulting from the use of the asset and its eventual disposition. Measurement of an impairment loss is based on the fair value of the asset compared to its carrying value. Impairment losses, if any, are reflected in operating income or loss in the consolidated statements of income (loss).

In assessing goodwill and intangible assets for impairment, we make estimates of fair value which are based on our projection of revenues, operating costs, and cash flows of each reporting unit considering historical and anticipated future results, general economic and market conditions, as well as the impact of planned business or operational strategies. The valuations employ a combination of present value techniques to measure fair value and consider market factors. Changes in our judgments and projections could result in a significantly different estimate of the fair value of the reporting units and could result in an impairment of goodwill or other intangible assets.

During fiscal years 2010, 2009 and 2008, we recorded certain non-cash provisions for impairment of intangible assets and goodwill. See Note 2, "Goodwill and other identified intangible assets," in the notes to audited consolidated financial statements included herein for further discussion relating to these charges and the assumptions utilized.

### Deferred rack costs

Rack costs are capitalized and amortized as a reduction in circulation revenue in accordance with the terms of the relevant agreements (typically 36 months). We perform periodic and timely reviews to determine if impairment charges are required due to market conditions including store closings or store bankruptcies.

### Income taxes

Income taxes are accounted for using the asset and liability method. Deferred tax assets and liabilities are recognized for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The asset and liability method of accounting for deferred income taxes requires a valuation against deferred tax assets, if based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. The effect on any changes in deferred tax assets and liabilities as a result of a change in tax rates is recognized in income. All tax positions taken by AMO in its income tax returns that are recognized in the financial statements must satisfy a more-likely-than-not threshold.

### Contingent liabilities

We have certain contingent liabilities that arise in the ordinary course of our business activities. We accrue for contingent liabilities when it is probable that future expenditures will be made

and such expenditures can be reasonably estimated. Reserves for contingent liabilities are reflected in our consolidated financial statements based on management's assessment, along with legal counsel, of the expected outcome of the contingencies. If the final outcome of our contingencies differs from that currently expected, it would result in a change to earnings in the period determined. See Note 8, "Litigation" in the notes to unaudited audited consolidated financial statements included herein for a description of litigation.

### Results of operations

The following table presents our results of operations by segment for the periods indicated and the change from the corresponding period in the prior year (in thousands).

Operating income (loss) is calculated before the provision for impairment of intangible assets and goodwill. The following table summarizes our results of operations by segment based on this calculation. Operating income (loss) before the provision for impairment of intangible assets and goodwill is not a measure of financial performance calculated in accordance with GAAP. You should not consider it as an alternative to net income (loss) as a measure of operating performance. Our calculation of operating income (loss) before the provision for impairment of intangible assets and goodwill herein may be different from the calculation used by other companies and therefore comparability may be limited. We present operating income (loss) before the provision for impairment of intangible assets and goodwill to provide a consistent and comparable measure of our operating income (loss) for the periods indicated below due to the significant fluctuations in the impairment provision between such periods.

| | For the six months ended | | Six months ended September 30, 2010 vs. September 30, 2009 | |
| --- | --- | --- | --- | --- |
| | September 30, 2010 | September 30, 2009 | | |
| | (unaudited) | | | |
| **Operating Revenue** | | | | |
| Celebrity Publications ........................................... | $ 49,936 | $ 54,050 | $ (4,114) | -7.6% |
| Tabloid Publications............................................. | 64,152 | 66,535 | (2,383) | -3.6% |
| Women's Health and Fitness Publications ....................... | 33,712 | 31,602 | 2,110 | 6.7% |
| Distribution Services ............................................ | 14,542 | 14,652 | (110) | -0.8% |
| Corporate/Other.................................................. | 44,494 | 49,138 | (4,644) | -9.5% |
| Intersegment Eliminations ................................... | (3,966) | (4,247) | 281 | -6.6% |
| **Total Operating Revenue**............................................ | $ 202,870 | $ 211,730 | $ (8,860) | -4.2% |
| **Operating Income (Loss) before Provision for Impairment of Intangible Assets and Goodwill**(1) | | | | |
| Celebrity Publications ........................................... | $ 15,111 | $ 14,322 | $ 789 | 5.5% |
| Tabloid Publications............................................. | 31,846 | 31,063 | 783 | 2.5% |
| Women's Health and Fitness Publications ....................... | 7,984 | 7,758 | 226 | 2.9% |
| Distribution Services ............................................ | 2,656 | 2,650 | 6 | 0.2% |
| Corporate/Other.................................................. | (9,415) | (7,044) | (2,371) | 33.7% |
| Total Operating Income before Provision for Impairment of Intangible Assets and Goodwill.......... | $ 48,182 | $ 48,749 | $ (567) | -1.2% |
| Provision for Impairment of Intangibles Assets and Goodwill(1)............................................ | $ — | $ (17,595) | $ 17,595 | 100.0% |
| **Operating Income**.................................................. | $ 48,182 | $ 31,154 | $ 17,028 | 54.7% |

(1)    Operating income before provision for impairment of intangible assets and goodwill for the fiscal quarter ended June 30, 2009 excludes impairment losses for tradenames and goodwill of $17.6 million for the Women's Health and Fitness Publications segment. See Note 4, "Goodwill and other identified intangible assets," in the notes to unaudited consolidated financial statements contained herein for further discussion.

**Comparison of six months ended September 30, 2010 vs. six months ended September 30, 2009**

## Operating revenue

Total operating revenue was $202.9 million and $211.7 million for the six months ended September 30, 2010 and 2009, respectively, representing a decrease in revenue of $8.9 million, or 4.2%. This revenue reduction of 4.2% was caused by the continuing softness in the U.S. economy which impacted newsstand sales in the Celebrity Publications, Corporate/Other and Tabloid Publications segments. In addition, our nutritional sport supplement advertising continued to be negatively impacted due to regulatory issues on two diet products that have been resolved and advertising for these products should resume in our third quarter. These items were partially offset by higher revenues for publishing services in our Corporate/Other segment, higher advertising revenue in our Women's Health and Fitness Publications segment and an increase in subscription revenue in our Tabloid Publications segment.

As of September 30, 2010, single copy revenue consisted of newsstand units distributed by three primary wholesalers, which we estimate represented 81% of the newsstand magazine fulfillment market, as well as several smaller wholesalers who represent the remaining 19%. Operating revenue generated by these wholesalers is included in the Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications and Corporate/Other segments. In the six months ended September 30, 2010 two wholesalers accounted for greater than 10% of our total operating revenue and in the aggregate accounted for approximately 43% of our total operating revenue. In the six months ended September 30, 2009 two wholesalers accounted for greater than 10% of our total operating revenue and in the aggregate accounted for approximately 36% of our total operating revenue. We have service agreements with these wholesalers, which provide incentives to maintain certain levels of service. Our operating results could be materially affected by disruption of the distribution of our magazines through the wholesalers.

## Operating expense

Total operating expense, before the non-cash provision for impairment of intangible assets and goodwill, was $154.7 million and $163.0 million for the six months ended September 30, 2010 and 2009, respectively, representing a decrease of $8.3 million, or 5.1%. This reduction is primarily due to a decrease in production expenses due to implementation of our Management Action Plans.

In addition, we recorded a provision for impairment of intangible assets and goodwill of $17.6 million for the three months ended June 30, 2009. Operating expenses totaled $180.6 million for the six months ended September 30, 2009, including this non-cash impairment charge. There was no provision for impairment charges for the six months ended September 30, 2010.

## Income taxes

We recorded a $2.9 million income tax provision for the six months ended September 30, 2010. This expense is primarily due to a domestic tax provision of $2.5 million and a foreign tax provision of $0.4 million. The income tax expense for the six months ended September 30, 2010 is

primarily related to tax amortization of indefinite-lived intangible assets. We recorded a $0.7 million income tax expense for the six months ended September 30, 2009. This expense is primarily due to a domestic expense of $0.2 million and foreign tax expense of $0.5 million.

**The operating income (loss) discussions below for each of our segments reflect amounts before provision for impairment of intangible assets and goodwill that was recorded in the six months ended September 30, 2009.**

### *Celebrity Publications segment*

## Operating revenue

Total operating revenue in the Celebrity Publications segment was $49.9 million for the six months ended September 30, 2010, representing a decrease of $4.1 million, or 7.6%, from the prior year. This reduction in revenue was primarily attributable to reduced *Star* newsstand sales of $5.2 million caused by reduced consumer spending and reduced subscriptions of $0.9 million caused by the rate base reduction. This was partially offset by increased advertising volume in Star ($0.7 million) and subscription revenue in Country Weekly ($0.5 million) due to our strategy to reintroduce subscriptions in April 2010.

## Operating income

Operating income in the Celebrity Publications segment increased for the six months ended September 30, 2010 from prior year by $0.8 million, or 5.5%, to $15.1 million. This was primarily attributable to reductions in manufacturing costs of $4.5 million as a result of a reduction in *Star's* book size and rate base. This was partially offset by the 7.6% revenue decline.

### *Tabloid Publications segment*

## Operating revenue

Total operating revenue in the Tabloid Publications segment was $64.2 million for the six months ended September 30, 2010, representing a decrease of $2.4 million, or 3.6%, from prior year. This revenue decline was attributable to lower newsstand sales for *Globe* ($1.3 million) and *National Enquirer* ($1.2 million) due to reduced consumer spending as well as a decrease in *National Enquirer* advertising revenue of $0.7 million. These items were partially offset by a cover price increase for *National Enquirer* and *Globe* of 8% and higher subscription revenue for *National Enquirer* of $0.7 million.

## Operating income

Operating income in the Tabloid Publications segment increased in the six months ended September 30, 2010 from prior year by $0.8 million, or 2.5%, to $31.8 million. This increase was primarily attributable to lower manufacturing costs due to *National Enquirer's* rate base reduction of 17%. This was partially offset by the 3.6% operating revenue decline.

### *Women's Health and Fitness Publications segment*

## Operating revenue

Total operating revenue in the Women's Health and Fitness Publications segment was $33.7 million for the six months ended September 30, 2010, representing an increase of $2.1 million, or

6.7%, from prior year. This was primarily attributable to a $2.4 million increase in *Shape's* advertising revenue, partially offset by a $0.4 million decrease in *Shape's* newsstand revenue.

## Operating income

Operating income in the Women's Health and Fitness Publications segment increased in the six months ended September 30, 2010 from prior year by $0.2 million, or 2.9%, to $8.0 million. This was primarily attributable to the revenue increase of 6.7%.

### *Distribution Services segment*

## Operating revenue

Total operating revenue in the Distribution Services segment was $10.6 million, net of eliminations, for the six months ended September 30, 2010, representing a decrease of $0.2 million, or 1.6% from prior year.

## Operating income

Operating income in the Distribution Services segment was $2.7 million in the six months ended September 30, 2010 representing an increase of 0.2% from prior year.

### *Corporate/Other segment*

## Operating revenue

Total operating revenue in the Corporate/Other segment was $44.5 million for the six months ended September 30, 2010, representing a decrease of $4.6 million, or 9.5%, from prior year. This reduction was attributable to the following:

- a decrease in advertising revenue for *Muscle & Fitness* of $1.6 million and *Men's Fitness* of $1.3 million;

- a combined decrease in newsstand revenue for our digest and minimag titles of $0.8 million due to discontinuation of these titles;

- two less issues of *Natural Health* ($0.9 million less revenue) and one less issue of *Fit Pregnancy Mom & Baby* ($0.4 million less revenue) published during the six months ended September 30, 2010 as compared to prior year; and

- the *Michael Jackson* special issue that was published during the three months ended June 30, 2009 ($1.4 million less revenue compared to prior year).

These items were partially offset by higher publishing services revenues of $2.0 million and two more issues of *UFC* ($0.7 million increase in revenue) published during the six months ended September 30, 2010 as compared to prior year.

## Operating loss

Operating loss increased by $2.4 million in the six months ended September 30, 2010, from the prior year period, or 33.7%, to $9.4 million. This increase is primarily due to the reduced

operating revenues mentioned above. The operating loss was partially offset by a decrease in manufacturing costs due to reduced book sizes in *Muscle & Fitness* and the increase in publishing services revenue.

### Results of operations for fiscal years ended march 31, 2010, 2009 and 2008

The following table presents our results of operations by segment for the periods indicated (in thousands):

Operating income (loss) is calculated before the provision for impairment of intangible assets and goodwill. The following table summarizes our results of operations by segment based on this calculation. Operating income (loss) before the provision for impairment of intangible assets and goodwill is not a measure of financial performance calculated in accordance with GAAP. You should not consider it as an alternative to net income (loss) as a measure of operating performance. Our calculation of operating income (loss) herein may be different from the calculation used by other companies and therefore comparability may be limited. We present operating income (loss) before the provision for impairment of intangible assets and goodwill to provide a consistent and comparable measure of our operating income (loss) for the periods indicated below due to the significant fluctuations in the impairment provision between such periods.

| | Fiscal year ended | | |
| --- | ---: | ---: | ---: |
| | March 31, 2010 | March 31, 2009 | March 31, 2008 |
| **Operating Revenue** | | | |
| Celebrity Publications | $102,172 | $ 113,731 | $127,667 |
| Tabloid Publications | 131,715 | 134,064 | 140,667 |
| Women's Health and Fitness Publications | 63,753 | 78,337 | 85,533 |
| Distribution Services | 29,215 | 32,931 | 32,956 |
| Corporate/Other | 93,762 | 111,129 | 112,649 |
| Intersegment Eliminations | (8,187) | (8,543) | (8,698) |
| **Total Operating Revenue** | $412,430 | $ 461,649 | $490,774 |
| **Operating Income (Loss) before Provision for Impairment of Intangible Assets and Goodwill(1)** | | | |
| Celebrity Publications | $ 26,843 | $ 21,034 | $ 32,217 |
| Tabloid Publications | 63,323 | 58,647 | 64,832 |
| Women's Health and Fitness Publications | 16,961 | 21,312 | 29,248 |
| Distribution Services | 5,949 | 6,831 | 8,666 |
| Corporate/Other | (14,504) | (17,505) | (36,812) |
| **Total Operating Income before Provision for Impairment of Intangible Assets and Goodwill** | $ 98,572 | $ 90,319 | $ 98,151 |
| Provision for impairment of intangible assets and goodwill | $ (17,595) | $ (217,350) | $ (31,097) |
| **Operating Income (Loss)** | $ 80,977 | $ (127,031) | $ 67,054 |

(1)  Operating income (loss) before provision for impairment of intangible assets and goodwill for fiscal year 2010 excludes impairment losses for tradenames, goodwill and other identified intangibles of $17.6 million for Women's Health and Fitness Publications. Operating income (loss) before provision for impairment of intangible assets and goodwill for fiscal year 2009 excludes impairment losses for tradenames, goodwill and other identified intangibles of $63.1 million for Celebrity Publications, $83.2 million for Tabloid Publications, $62.0 million for Women's Health and Fitness Publications and $9.0

million for Corporate/Other. Operating income (loss) before provision for impairment of intangible assets and goodwill for fiscal year 2008 excludes impairment losses for tradenames, goodwill and other identified intangibles of $11.5 million for Celebrity Publications and $19.6 million for Corporate/Other. See Note 2, "Goodwill and other identified intangible assets," in the notes to audited consolidated financial statements included elsewhere herein.

***Comparison of fiscal year ended March 31, 2010 to fiscal year ended March 31, 2009***

## Operating revenue

Total operating revenue was $412.4 million and $461.6 million for the fiscal years ended March 31, 2010 and 2009, respectively, representing a decrease in revenue of $49.2 million, or 10.7%. This decrease was primarily due to reduced overall U.S. advertising spending, which caused reductions in advertising revenue in our Celebrity and Women's Health & Fitness Publications and Corporate/Other segments. Further, newsstand sales were also impacted by the current economic slowdown resulting in lower circulation revenues in our Tabloid and Celebrity Publications and Corporate/Other segments. Advertising and newsstand revenues in the Women's Health and Fitness Publications and Corporate/Other segments were also impacted by one less issue of *Shape*, *Muscle & Fitness* and *Flex* published during the fiscal year ended March 31, 2010 when compared to the prior year.

As of March 31, 2010, single copy revenue consisted of newsstand units distributed by three primary wholesalers, which we estimate represented approximately 81% of the newsstand magazine market, as well as several smaller wholesalers who represented the remaining approximately 19%. Operating revenue generated by these wholesalers is included in the Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications and Corporate/Other segments. In fiscal years 2010 and 2009, two and three wholesalers each accounted for greater than 10% of our total operating revenue and in the aggregate accounted for approximately 45% and 36%, respectively, of our total operating revenue. Our operating results could be materially affected by disruption of the distribution of our magazines through the wholesaler distribution channel.

## Operating expense

Total operating expense, before the non-cash provision for impairment of intangible assets and goodwill, was $313.9 million and $371.3 million for the fiscal years ended March 31, 2010 and 2009, respectively, representing a decrease of $57.4 million, or 15.5%. This decrease is primarily due to the implementation of our Management Action Plans, coupled with one less issue of *Shape*, *Muscle & Fitness* and *Flex* which was not published in our fiscal year ended March 31, 2010. These initiatives resulted in reduced production, distribution, editorial, advertising sales expenses and personnel-related costs. This was coupled with a reduction in amortization expense as a result of an impairment of certain finite-lived intangible assets in the third quarter of fiscal year 2009.

In addition, we recorded provisions for impairment of intangible assets and goodwill of $17.6 million and $217.4 million for the fiscal years ended March 31, 2010 and 2009, respectively. These non-cash impairment charges resulted in operating expenses totaling $331.5 million and $588.7 million for the fiscal years ended March 31, 2010 and 2009, respectively.

## Interest expense

Interest expense was $50.6 million and $85.3 million for the fiscal years ended March 31, 2010 and 2009, respectively, representing a decrease of $34.7 million, or 40.7%. This decrease in

interest expense is primarily attributable to our accounting for issuance of the Existing PIK Notes and the Existing Subordinated Notes. We recorded the principal amount of the Existing PIK Notes and the Existing Subordinated Notes and all future interest payments associated with the Existing PIK Notes and the Existing Subordinated Notes in the accompanying audited consolidated balance sheet included herein. As a result, we do not recognize interest expense on the Existing PIK Notes and the Existing Subordinated Notes.

This decrease in interest expense was also due to lower average outstanding balances under the 2009 Credit Agreement. The lower average outstanding balances were due to principal payments on the 2009 Term Facility and the 2009 Revolving Facility (defined below).

These items were partially offset by a higher effective weighted-average interest rate on the 2009 Credit Agreement for the fiscal year ended March 31, 2010 of 10.0% as compared to an effective weighted-average interest rate of 7.1% on the 2009 Credit Agreement and the 2006 Credit Agreement for the prior year period. See "Management's discussion and analysis of financial condition and results of operations—Existing credit agreement and subordinated indebtedness" herein for further discussion.

## Amortization of deferred debt costs

Total amortization of deferred debt costs was $3.9 million and $9.8 million for the fiscal years ended March 31, 2010 and 2009, respectively. This decrease was due to lower costs being amortized during the fiscal year ended March 31, 2010 as a result of the write-off of the costs associated with the tendered portion of our Prior Notes as a result of the Prior Restructuring.

## Income taxes

We recorded a $22.8 million income tax expense for the fiscal year ended March 31, 2010, compared to a $33.3 million income tax benefit for the fiscal year ended March 31, 2009. The primary components of the income tax provision (benefit) for the fiscal years ended March 31, 2010 and 2009 were:

| (dollars in millions) | 2010 | 2009 |
|---|---|---|
| Primarily related to book income (loss) | $ 22.1 | $(59.4) |
| Related to indefinite-lived intangible assets | 23.0 | (33.2) |
| Increase (decrease) in valuation allowance | (22.3) | 59.3 |
| Income tax expense (benefit) | $ 22.8 | $(33.3) |

As of December 31, 2009, we recorded a change in estimated income taxes due to the filing of our federal income tax return for the fiscal year ended March 31, 2009 wherein we elected, under Section 108(b)(5) of the Code, to apply a portion of the debt discharge amount to first reduce the basis of depreciable and amortizable assets. The election resulted in additional tax expense of $24.8 million due to the reduction of basis on our indefinite lived intangible assets, which are deferred tax liabilities and could not be used as a future source of income to support the realization of our previously valued deferred tax assets.

The effective tax rate for the fiscal year ended March 31, 2010 was 85.9%, resulting in a provision for income taxes for the year. The effective tax rate for the fiscal year ended March 31, 2009 was 15.4%, resulting in a benefit for income taxes for the year. See Note 5, "Income Taxes," in the notes to audited consolidated financial statements herein for further discussion.

**The operating income (loss) discussions below for each of our segments reflect amounts before provision for impairment of intangible assets and goodwill.**

*Celebrity Publications segment*

## Operating revenue

Total operating revenue in the Celebrity Publications segment was $102.2 million for the fiscal year ended March 31, 2010, representing a decrease of $11.6 million, or 10.2%, from the prior year comparable period. This reduction in revenue was primarily attributable to the following:

- a reduction in *Star* newsstand revenues due to lower consumer spending. Advertising revenues were down due to a 12% rate base reduction; and

- *Country Weekly's* elimination of its subscription base and reduced rate base.

## Operating income (loss)

Operating income in the Celebrity Publications segment increased in the fiscal year ended March 31, 2010 from the prior year by $5.8 million, or 27.6%, to $26.8 million. The increase in operating income was primarily attributable the following:

- a $9.9 million combined reduction in *Star* production, distribution and editorial costs, primarily as a result of the 12% rate base reduction which reduced print orders and book size;

- a $4.6 million combined reduction in production, distribution and editorial costs for *Country Weekly* due to reduced print orders caused by our strategy to eliminate *Country Weekly's* subscription base;

- a $1.3 million decrease in rack amortization expense; and

- the implementation of our Management Action Plans, which resulted in lower personnel-related and production costs.

*Tabloid Publications segment*

## Operating revenue

Total operating revenue in the Tabloid Publications segment was $131.7 million for the fiscal year ended March 31, 2010, representing a decrease of $2.3 million, or 1.8%, from the prior year. This reduction in revenue was primarily attributable to the following:

- a $6.2 million decrease in *National Enquirer* newsstand revenue due to lower consumer spending, offset in part by U.S. cover price increases from $3.49 to $3.59 in May 2009, then to $3.69 in October 2009, coupled with favorable currency exchange rates; and

- a $1.0 million decrease in *National Enquirer* advertising revenues caused by a 16% rate base reduction and reduced overall U.S. advertising spending.

These decreases in revenue were partially offset by higher *National Examiner* newsstand revenues caused primarily by cover price increases from $3.29 to $3.39 in May 2009, then to $3.49 in September 2009; a $2.0 million combined decrease in *National Examiner*, *National Enquirer* and *Globe* rack amortization expense, and a $1.7 million increase in *National Enquirer* subscription revenues driven by higher renewal prices.

## Operating income (loss)

Operating income in the Tabloid Publications segment increased in the fiscal year ended March 31, 2010 from the prior year by $4.7 million, or 8.0%, to $63.3 million. This increase in operating income is primarily attributable to the implementation of our Management Action Plans, which resulted in reduced production, transportation and editorial expenses and personnel-related costs.

### *Women's Health and Fitness Publications segment*

## Operating revenue

Total operating revenue in the Women's Health and Fitness Publications segment was $63.8 million for the fiscal year ended March 31, 2010, representing a decrease of $14.6 million, or 18.6%, from the prior year. This revenue reduction was primarily caused by the aforementioned weakness in overall U.S. advertising spending, which impacted *Shape* and *Fit Pregnancy* ($13.7 million). This was coupled with one less issue of *Shape* published during the fiscal year ended March 31, 2010 when compared to the prior year.

## Operating income (loss)

Operating income in the Women's Health and Fitness Publications segment decreased in the fiscal year ended March 31, 2010 from the prior year by $4.4 million, or 20.4%, to $17.0 million. This reduction in operating income was primarily attributable to the operating revenue decline mentioned above, which was partially offset by lower editorial, production, distribution, advertising sale expenses and personnel-related costs. These cost reductions were a result of one less issue of *Shape* published during the fiscal year as compared to the prior year, as well as the implementation of our Management Action Plans.

### *Distribution Services segment*

### *Operating revenue*

Total operating revenue in the Distribution Services segment was $21.5 million, net of eliminations, for the fiscal year ended March 31, 2010, representing a decrease of $3.4 million, or 13.8%, from the prior year. This reduction in revenue was primarily attributable to lower newsstand sales for all DSI publishing clients.

## Operating income

Operating income in the Distribution Services segment decreased in the fiscal year ended March 31, 2010 from the prior year by $0.9 million, or 12.9%, to $5.9 million caused by the reason discussed above.

### *Corporate/Other segment*

## Operating revenue

Total operating revenue in the Corporate/Other segment was $93.3 million for the fiscal year ended March 31, 2010, representing a decrease of $17.4 million, or 15.6%, from the prior year. This reduction in revenue was primarily attributable to the following:

- a combined $17.1 million advertising revenues decrease for *Muscle & Fitness*, *Flex*, *Men's Fitness*, *Natural Health, Fit Pregnancy, Mom & Baby* and *Mira!* caused primarily by: (i) the

aforementioned market weakness in advertising spending, (ii) the impact of one less issue of *Muscle & Fitness* and *Flex* published during the fiscal year ended March 31, 2010 when compared to the prior year, and (iii) a change in strategy to discontinue subscriptions for *Mira!* at the end of fiscal year 2009 and reduce its rate base, which impacted its advertising revenue; and

- a decrease in newsstand revenues for *Muscle & Fitness*, *Flex* and *MiniMags* primarily due to the aforementioned softness in newsstand sales, coupled with one less issue of *Muscle & Fitness* and *Flex* published during the fiscal year ended March 31, 2010 when compared to the prior year.

These decreases in revenues were partially offset by newsstand and advertising revenues generated by two additional special publications in fiscal year 2010.

## Operating loss

Operating loss in the fiscal year ended March 31, 2010 decreased from the prior year period by $3.0 million, or 17.1%, to $14.5 million. This decrease in operating loss is primarily due to cost savings as a result of the implementation of our Management Action Plans. These items resulted in reduced production, transportation, editorial, advertising sales expenses and personnel-related costs. These decreases in operating loss were partially offset by the two additional special publications.

*Comparison of fiscal year ended March 31, 2009 to fiscal year ended March 31, 2008*

## Operating revenue

Total operating revenue was $461.6 million and $490.8 million for the fiscal years ended March 31, 2009 and 2008, respectively, representing a decrease in revenue of $29.1 million, or 5.9%. This decrease was primarily due to softness in newsstand sales caused by the current economic slowdown, which resulted in lower circulation revenues as a result of a reduced number of single copies sold in our Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications and Corporate/Other segments as well as rate base reductions for some of our publications. Newsstand sales were also impacted by temporary disruptions in the distribution of certain of our publications in the end of fiscal year 2009 and unfavorable currency exchange rates. Furthermore, the overall market weakness in advertising spending due to the current economic slowdown triggered decreases in advertising revenue in our Celebrity Publications, Tabloid Publications and Women's Health and Fitness Publications segments. These decreases were partially offset by an increase in advertising revenue in our Corporate/Other segment primarily as a result of the impact to operating revenue of having one additional issue of *Muscle & Fitness* and *Flex* during the fiscal year ended March 31, 2009 when compared to the prior fiscal year, coupled with an increase in advertising pages and an increase in subscription revenue in our Tabloid Publications segment.

As of March 31, 2009, single copy revenue consisted of copies distributed to newsstands primarily by three wholesalers, which we estimate represented approximately 82% of the newsstand distribution market, as well as several smaller wholesalers who represented the remaining approximately 18%. Operating revenue generated by these wholesalers is included in the Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications and Corporate/Other segments. In the fiscal years ended March 31, 2009 and 2008, three wholesalers each accounted for greater than 10% of our total operating revenue and in the aggregate

accounted for 36% and 37%, respectively, of our total operating revenue. We have service agreements with these wholesalers, which provide incentives to maintain certain levels of service. Our operating results could be materially affected by disruption of the distribution of our magazines through the wholesalers.

## Operating expense

Total operating expense, before the non-cash provision for impairment of intangible assets and goodwill, was $371.3 million and $392.6 million for the fiscal years ended March 31, 2009 and 2008, respectively, representing a decrease of $21.3 million, or 5.4%. This decrease in operating expense is primarily due to the implementation of our Management Action Plans, which resulted in decreases in editorial, production, distribution and selling, general and administrative expenses. The decrease in operating expenses was also due to a reduction in depreciation and amortization expense, primarily due to certain assets becoming fully depreciated and as a result of impairments of certain finite-lived intangibles assets. These decreases to operating expenses were partially offset by higher production costs due to increased paper costs coupled with additional issues of *Shape*, *Flex* and *Muscle & Fitness* during the fiscal year ended March 31, 2009.

In addition, we recorded provisions for impairment of intangible assets and goodwill of $217.4 million and $31.1 million for the fiscal years ended March 31, 2009 and 2008, respectively. These non-cash impairment charges resulted in operating expenses totaling $588.7 million and $423.7 million for the fiscal years ended March 31, 2009 and 2008, respectively.

## Interest expense

Interest expense was $85.3 million and $99.0 million for the fiscal years ended March 31, 2009 and 2008, respectively, representing a decrease of $13.8 million, or 13.9%. This decrease in interest expense was primarily attributable to our accounting for the Existing PIK Notes and the Existing Subordinated Notes. We recorded the principal amount of the Existing PIK Notes and the Existing Subordinated Notes plus all future interest payments associated with the Existing PIK Notes and the Existing Subordinated Notes in the accompanying audited consolidated balance sheet. Accordingly, we will not recognize interest expense on the Existing PIK Notes and the Existing Subordinated Notes. This decrease in interest expense was also due to a lower weighted average interest rate on the 2009 Term Facility and on the 2009 Revolving Facility of 7.1% for fiscal year 2009 as compared to 8.5% for fiscal year 2008 under our term facility and our revolving facility under the 2006 Credit Agreement, coupled with lower average outstanding balances on both our 2009 Term Facility and 2009 Revolving Facility during the fiscal year ended March 31, 2009 when compared to the prior year comparable period under our term facility and our revolving facility under the 2006 Credit Agreement as a result of principal payments on our 2009 Term Facility and 2009 Revolving Facility made during the fiscal year ended March 31, 2009. See Note 6, "Credit agreement," and Note 7, "Senior subordinated indebtedness," in the notes to audited consolidated financial statements herein for details.

## Amortization of deferred debt costs

Total amortization of deferred debt costs was $9.8 million and $10.9 million, respectively, for fiscal years 2009 and 2008, representing a decrease of $1.1 million, or 9.9%. This decrease in amortization of deferred debt costs was primarily related to lower costs being amortized during the end of fiscal year 2009 as a result of the write-off of the costs associated with the tendered portion of our Prior Notes.

## Other income, net

Other income, net was $0.5 million and $2.5 million for the fiscal years ended March 31, 2009 and 2008, respectively, representing a decrease of $2.0 million, or 77.3%. Other income, net in fiscal years 2009 and 2008 was primarily related to interest income. The decrease in other income, net was mainly due to lower interest income, driven by lower interest rates.

## Gain on extinguishment of debt

As part of the Prior Restructuring, we recorded a gain on extinguishment of debt of $4.9 million in the fiscal year ended March 31, 2009. This gain is comprised of $548.5 million of tendered Prior Notes and $38.1 million of forfeited interest on our Prior Notes, less: (i) $320.9 million principal amount of the Existing PIK Notes and the Existing Subordinated Notes, (ii) $232.2 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our Exiting Subordinated Notes in the accompanying audited consolidated balance sheet, (iii) consent fees of $12.0 million, (iv) issuance costs of $10.1 million, (v) write-off of deferred costs related to the Prior Notes of $4.6 million, (vi) issuance of $1.0 million of AMI Common Stock, and (vii) a write-off of discount associated with the Prior Notes of $0.9 million.

## Discontinued operations

In order to improve our profitability and future net cash flows, during the second quarter of fiscal year 2008, we discontinued the publication of *Weekly World News* and subsequently sold it in fiscal year 2009. The total income (loss) from discontinued operations, including the gain on the sale of *Weekly World News*, was $0.5 million and ($0.7) million for the fiscal years ended March 31, 2009 and 2008, respectively. Operating results of this publication have been classified as discontinued operations for all periods presented. This publication was previously included in the Corporate/Other segment. See Note 3, "Discontinued operations," in the Notes to audited consolidated financial statements included herein for further discussion.

## Income taxes

The income tax benefit was $33.3 million for the fiscal year ended March 31, 2009 when compared to an income tax expense of $3.3 million for the fiscal year ended March 31, 2008. The income tax benefit for the fiscal year ended March 31, 2009 is comprised of a $59.4 million income tax benefit primarily related to our book loss plus $33.2 million income tax benefit related to indefinite-lived intangible assets, partially offset by the increase in valuation allowance of $59.3 million during the fiscal year ended March 31, 2009. The income tax expense for the fiscal year ended March 31, 2008 is comprised of a $19.6 million income tax benefit primarily related to our book loss and tax amortization of indefinite-lived intangible assets, less the increase in valuation allowance of $22.9 million during the fiscal year ended March 31, 2008. The effective tax rate for the fiscal year ended March 31, 2009 was 15.4%, resulting in a benefit for income taxes for the year. The effective tax rate for the fiscal year ended March 31, 2008 was 5.7% resulting in a provision for income taxes for the year.

*Celebrity Publications segment*

## Operating revenue

Total operating revenue in the Celebrity Publications segment was $113.7 million for the fiscal year ended March 31, 2009, representing a decrease of $13.9 million, or 10.9%, from the prior

year comparable period. This decrease in revenue was primarily attributable to decreases in *Star* and *Country Weekly* advertising revenue as a result of the aforementioned market weakness in advertising spending. This decrease was also due to lower *Star* and *Country Weekly* newsstand revenue attributable to the aforementioned softness in newsstand sales, a *Star* rate base reduction in January 2009 and unfavorable currency exchange rates, partially offset by a *Star* cover price increase from $3.49 to $3.99 at the end of fiscal year 2008.

## Operating income (loss)

Operating income before the non-cash provision for impairment of intangible assets and goodwill in the Celebrity Publications segment decreased in the fiscal year ended March 31, 2009 from the prior year comparable period by $11.2 million, or 34.7%, to $21.0 million. The operating income decrease was attributable primarily to the above-mentioned operating revenue decrease, coupled with higher paper costs, partially offset by reduced advertising-related costs and the implementation of our Management Action Plans.

In addition, we recorded a provision for impairment of intangible assets and goodwill in the Celebrity Publications segment of $63.1 million and $11.5 million during the fiscal years ended March 31, 2009 and 2008, respectively. These non-cash impairment charges resulted in an operating loss in the Celebrity Publications segment of $42.0 million in fiscal year 2009 and operating income in the Celebrity Publications segment of $20.7 million in the fiscal year ended March 31, 2008.

### *Tabloid Publications segment*

## Operating revenue

Total operating revenue in the Tabloid Publications segment was $134.1 million for the fiscal year ended March 31, 2009, representing a decrease of $6.6 million, or 4.7%, from the prior year comparable period. This decrease in revenue was primarily attributable to the following:

- a $3.9 million decrease in *National Enquirer* newsstand revenues due to lower single copies sold and unfavorable currency exchange rates, partially offset by a U.S. cover price increase from $3.29 to $3.49 at the end of fiscal year 2008 and an additional issue of *National Enquirer* during fiscal year 2009 when compared to the prior fiscal year;

- a $1.5 million decrease in *Globe* newsstand revenues primarily due to lower single copies sold, partially offset by a U.S. cover price increase from $3.29 to $3.49 at the end of fiscal year 2008; and

- a $2.1 million decrease in *National Enquirer* advertising revenue due to a planned rate base reduction in January 2008, coupled with the aforementioned market weakness in advertising spending.

These decreases in revenue were partially offset by a $0.7 million increase in *National Examiner* newsstand revenues caused by a U.S. cover price increase from $2.49 to $2.99 in August 2008, and then to $3.29 in October 2008, and a $0.5 million increase in *National Enquirer* subscription revenue due to an increase in subscription pricing.

## Operating income (loss)

Operating income before the non-cash provision for impairment of intangible assets and goodwill in the Tabloid Publications segment decreased in the fiscal year ended March 31, 2009

from the prior year comparable period by $6.2 million, or 9.5%, to $58.6 million. This decrease in operating income is primarily attributable to the above-mentioned operating revenue decline, partially offset by the implementation of our Management Action Plans.

In addition, we recorded a provision for impairment of intangible assets and goodwill in the Tabloid Publications segment of $83.2 million during the fiscal year ended March 31, 2009. This non-cash impairment charge resulted in an operating loss in the Tabloid Publications segment of $24.6 million in the fiscal year ended March 31, 2009.

### Women's Health and Fitness Publications segment

## Operating revenue

Total operating revenue in the Women's Health and Fitness Publications segment was $78.3 million for the fiscal year ended March 31, 2009, representing a decrease of $7.2 million, or 8.4%, from the prior year comparable period. This decrease in revenue was primarily attributable to a $6.9 million decrease in *Shape* advertising revenue as a result of the aforementioned weakness in advertising spending.

## Operating income (loss)

Operating income before the non-cash provision for impairment of intangible assets and goodwill in the Women's Health and Fitness Publications segment decreased in the fiscal year ended March 31, 2009 from the prior year comparable period by $7.9 million, or 27.1%, to $21.3 million. This decrease was primarily attributable to the above-mentioned operating revenue decrease.

In addition, we recorded a provision for impairment of intangible assets and goodwill in the Women's Health and Fitness Publications segment of $62.0 million during the fiscal year ended March 31, 2009. This non-cash impairment charge resulted in an operating loss in the Women's Health and Fitness Publications segment of $40.7 million in the fiscal year ended March 31, 2009.

### Distribution Services segment

## Operating revenue

Total operating revenue in the Distribution Services segment was $24.4 million, net of eliminations, for the fiscal year ended March 31, 2009, which was essentially flat to the prior year comparable period.

## Operating income

Operating income in the Distribution Services segment decreased in the fiscal year ended March 31, 2009 from the prior year comparable period by $1.8 million, or 21.2%, to $6.8 million. This decrease in operating income is primarily attributable to additional costs incurred with respect to the aforementioned temporary wholesaler disruption during the fourth quarter of fiscal year 2009.

*Corporate/Other segment*

## Operating revenue

Total operating revenue in the Corporate/Other segment was $111.1 million for the fiscal year ended March 31, 2009, representing a decrease of $1.5 million, or 1.3%, from the prior year comparable period. This decrease is primarily attributable to the following:

- a $2.7 million charge to revenues representing our share of the bad debt related to the shutdown of the Anderson wholesaler business in January 2009;

- a combined $2.0 million decrease in *Muscle & Fitness* and *Flex* newsstand revenues primarily as a result of the aforementioned softness in newsstand sales coupled with unfavorable currency exchange rates impacting international sales;

- a $1.0 million and $0.6 million decrease in *Men's Fitness* and *Natural Health* advertising revenues, respectively, due to the aforementioned market weakness in advertising spending; and

- a $0.9 million and $0.4 million decrease in *Mira!* and *Sun* newsstand revenues, respectively, as a result of lower single copies sold as a result of the aforementioned softness in newsstand sales.

These decreases in revenues were partially offset by a combined $6.3 million increase in *Muscle & Fitness* and *Flex* advertising revenues due to an increase in advertising pages, including the publication of one additional issue of *Flex* and *Muscle & Fitness* during the fiscal year ended March 31, 2009 when compared to the prior fiscal year. These publications have been less impacted by the current economic downturn due to the nutritional supplement segment being less affected by the current economic environment.

## Operating loss

Operating loss before the non-cash provision for impairment of intangible assets and goodwill in the Corporate/Other segment decreased from the prior year comparable period by $19.3 million, or 52.4%, to $17.5 million. This decrease in operating loss is primarily due to across-the-board cost savings as a result of the implementation of our Management Action Plans.

In addition, we recorded a provision for impairment of intangible assets and goodwill in the Corporate/Other segment of $9.0 million and $19.6 million during the fiscal years ended March 31, 2009 and 2008, respectively. These non-cash impairment charges resulted in operating losses in the Corporate/Other segment of $26.5 million and $56.4 million in the fiscal years ended March 31, 2009 and 2008, respectively.

## Liquidity and capital resources

### Pre-Transactions

Our primary sources of liquidity are cash generated from operations, cash on hand and amounts available to be borrowed under the 2009 Credit Agreement. For a description of the terms of the 2009 Credit Agreement, see Note 6, "Credit agreement," in the notes to audited consolidated financial statements included herein.

As of September 30, 2010, we had cash and cash equivalents of $42.8 million and $35.0 million outstanding under our 2009 Revolving Facility. Prior to the impact of the reclassification of the

entire principal amount associated with the 2009 Credit Agreement, the Existing Subordinated Notes, the Existing PIK Notes and the deferred debt fees from long-term to current liabilities and the related tax implications we had a working capital deficit of $13.4 million. The decrease in working capital deficit of $34.4 million from $47.8 million at March 31, 2010 primarily resulted from: (i) a $36.2 million increase in cash and cash equivalents, (ii) a $3.1 million increase in inventory, and (iii) a $2.2 million decrease in deferred revenue. These items were partially offset by a $3.2 million increase in accrued expenses and other current liabilities. For a description of the balance sheet reclassification of 2009 Credit Agreement, the Existing Subordinated Notes, and the Existing PIK Notes, see Note 1, "Basis of presentation," in the notes to unaudited consolidated financial statements included herein.

As of March 31, 2010, we had cash and cash equivalents of $6.6 million, $21.0 million outstanding on the Revolving Facility under the 2009 Credit Agreement, and a working capital deficit of $47.8 million. The increase in working capital deficit from $41.7 million at March 31, 2009 to $47.8 million at March 31, 2010, primarily resulted from: (i) a $12.4 million decrease in cash and cash equivalents, (ii) a $9.9 million increase in the current portion of long-term debt due to $7.5 million of 2011 Notes reclassified to current and $32.0 million of future interest payments reclassified to current, offset in part by a $14.0 million payment on the 2009 Notes and a $15.5 million decrease in future interest payments on the Existing PIK Notes, (iii) a $4.8 million decrease in inventories, and (iv) a $12.8 million decrease in net receivables primarily due to lower advertising revenues and timing of on-sale dates for certain publications. These items were partially offset by: (i) a $3.6 million decrease in accrued interest as a result of only the non-tendered portion of the Prior Notes being outstanding as of March 31, 2010 and AMO not accruing interest on the Existing PIK Notes and the Existing Subordinated Notes, (ii) a $11.7 million decrease in accounts payable due to timing of payments and reduction of the purchase of paper, (iii) a $13.2 million decrease in accrued expenses and other liabilities due to lower personnel-related costs, tax-related accruals, and retail display allowance, (iv) a $0.8 million decrease in deferred revenues, and (v) a $4.4 million increase in prepaid expenses and other current assets.

Assuming the Plan, the offering of new first lien notes and any offering of second lien notes are successful, we currently believe that available funds and cash flows generated by operations will be sufficient to fund our working capital and capital expenditure requirements for at least the next 12 months. We believe that available cash at September 30, 2010 and amounts available under our 2009 Revolving Facility will mitigate future possible cash flow requirements. To the extent we make future acquisitions, we may require new sources of funding, including additional debt, equity financing or some combination thereof. There can be no assurances that we will be able to secure additional sources of funding or that such additional sources of funding will be available to us on acceptable terms.

At September 30, 2010, our outstanding indebtedness totaled $852.6 million, of which $465.6 million represented borrowings under the 2009 Credit Agreement, $7.5 million represented the remaining principal amount of the 2011 Notes, $23.7 million represented the principal amount of the Existing PIK Notes and $355.8 million represented the principal amount of the Existing Subordinated Notes. The accompanying unaudited condensed consolidated balance sheet includes $175.2 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our senior subordinated indebtedness.

At March 31, 2010, our outstanding indebtedness totaled $816.2 million, of which $453.9 million represented borrowings under the 2009 Credit Agreement, $7.5 million represented the

remaining principal amount of Prior Notes, $22.7 million represented the principal amount of the Existing PIK Notes and $332.1 million represented the principal amount of the Existing Subordinated Notes. The accompanying audited consolidated balance sheet includes $198.4 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our senior subordinated indebtedness.

### Post-Transactions

Following the consummation of the Transactions, we will have a substantially different capital structure than before the Transactions. Our capital structure as of September 30, 2010, on an as adjusted basis after giving effect to the Transactions, is described in the as adjusted column under "Capitalization" in this offering memorandum. Following the Transactions, we will fund ongoing liquidity requirements through a combination of cash flows from operations, borrowings under our new revolving credit facility and other financing arrangements.

Following the consummation of the Transactions, as of September 30, 2010, on an as adjusted basis we would have had cash and cash equivalents of $28.4 million, $385.0 million principal amount of first lien notes offered hereby, $140.0 million principal amount of Plan second lien notes (assuming $140.0 million aggregate principal amount of second lien are issued in accordance with the Plan or in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date), and a working capital surplus of $34.9 million. In addition, we would have had $40.0 million available for borrowing under our new revolving credit facility.

### Cash flow

*Comparison of two fiscal quarters ended September 30, 2010 to two fiscal quarters ended September 30, 2009*

Net cash provided by operating activities was $27.4 million for the six months ended September 30, 2010, as compared to net cash provided by operating activities of $34.2 million for the six months ended September 30, 2009. During the six months ended September 30, 2010, net cash provided by operating activities was primarily attributable to: (i) $17.9 million in net income, (ii) $10.7 million of non-cash expenses (excluding amortization of deferred rack costs) primarily due to a $3.2 million deferred income tax provision, $2.0 million amortization of deferred debt costs and $3.1 million depreciation and amortization, (iii) a $3.2 million decrease in trade receivables, (iv) a $3.4 million increase in accrued expenses and other current liabilities, and (v) a $1.3 million increase in accrued interest. These items were partially offset by: (i) a $1.8 million net increase in deferred rack costs, (ii) a $3.1 million increase in inventory, and (iii) a $2.2 million decrease in deferred revenue.

During the six months ended September 30, 2009, net cash provided by operating activities was primarily attributable to: (i) $23.3 million of non-cash expenses (excluding amortization of deferred rack costs) primarily due to a $17.6 million provision for impairment of intangible assets and goodwill, (ii) a $9.5 million decrease in trade receivables primarily due to lower advertising revenues and timing of on-sale dates for certain publications, (iii) a $7.8 million increase in accrued interest primarily due to timing of interest payments related to the 2009 Term Facility, (iv) $2.5 million of net income, and (v) a $2.3 million increase in other non-current liabilities. These items were partially offset by: (i) a $5.0 million decrease in accounts payable due to timing of payments, (ii) a $3.5 million increase in prepaid expenses and other current assets, and (iii) a $2.4 million decrease in accrued expenses.

Net cash used in investing activities was $2.6 million for the six months ended September 30, 2010 as compared to $2.5 million for the six months ended September 30, 2009. Net cash used in investing activities for the six months ended September 30, 2010 was primarily attributable to $2.4 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC. Net cash used in investing activities for the six months ended September 30, 2009 was primarily attributable to $2.8 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC, partially offset by $0.6 million related to proceeds from the sale of assets.

Net cash provided by financing activities was $11.8 million for the six months ended September 30, 2010, as compared to net cash used in financing activities of $27.2 million for the six months ended September 30, 2009.

Net cash provided by financing activities for the six months ended September 30, 2010 primarily consisted of a repayment of $63.0 million and borrowings of $77.0 million on the 2009 Revolving Facility, as well as a required quarterly principal payment on the 2009 Term Facility of $2.3 million. Net cash used in financing activities for the six months ended September 30, 2009 primarily consisted of a $14.0 million payment to retire the aggregate principal amount of outstanding 2009 Notes, a repayment on the 2009 Revolving Facility of $10.0 million, required quarterly principal payments on the 2009 Term Facility of $2.3 million and a $0.9 million payment relating to debt costs.

*Comparison of fiscal year ended March 31, 2010 to fiscal year ended March 31, 2009*

Net cash provided by operating activities was $40.3 million for the fiscal year ended March 31, 2010, as compared to net cash provided by operating activities of $9.8 million for the fiscal year ended March 31, 2009. During the fiscal year ended March 31, 2010, net cash provided by operating activities was primarily attributable to: (i) $50.9 million of non-cash expenses (excluding amortization and write-off of deferred rack costs) primarily as a result of a $17.6 million provision for impairment of intangible assets and goodwill, $22.3 million increase in deferred income taxes, $3.9 million in amortization of deferred costs and $6.6 million in depreciation and amortization expenses, (ii) a $11.2 million decrease in trade receivables due to lower advertising revenues and timing of on-sale dates for certain publications, and (iii) a $4.8 million decrease in inventories. These items were partially offset by: (i) $11.7 million decrease in accounts payable due to timing of payments and reduction of the purchase of paper, (ii) $9.1 million decrease in accrued expenses and other current liabilities due to lower personnel-related costs, tax-related accruals, and retail display allowance, and (iii) $3.6 million net decrease in accrued interest due to timing of payments, the fact that we are no longer accruing interest on the tendered portion of the Prior Notes and the interest related to the Existing PIK Notes and the Existing Subordinated Notes being reflected in the carrying amount of our Existing Subordinated notes in our audited consolidated balance sheet included herein.

Net cash used in investing activities was $4.2 million for the fiscal year ended March 31, 2010, as compared to $2.7 million for the fiscal year ended March 31, 2009. Net cash used in investing activities for fiscal year 2010 was primarily attributable to $4.6 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC, partially offset by $0.6 million related to proceeds from the sale of assets. Net cash used in investing activities for the fiscal year ended March 31, 2009 was primarily attributable to $3.0 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC, partially offset by $0.5 million related to proceeds from the sale of discontinued operations.

Net cash used in financing activities was $49.2 million for the fiscal year ended March 31, 2010, as compared to $52.2 million for the fiscal year ended March 31, 2009. Net cash used in financing activities for the fiscal year ended March 31, 2010 primarily consisted of: (i) a $35.0 million payment towards the 2009 Revolving Facility, (ii) required quarterly principal payments on the 2009 Term Facility totaling $4.5 million, (iii) a $14.0 million payment on the 2009 Notes and (iv) $6.0 million borrowed on our 2009 Revolving Facility. Net cash used in financing activities for the fiscal year ended March 31, 2009 primarily consisted of: (i) $22.5 million related to costs associated with the offering of the Prior Restructuring Securities, the tender offers and consent solicitations and the 2009 Credit Agreement, (ii) a $10.0 million payment towards the 2009 Revolving Facility, (iii) a fiscal year 2008 Excess Cash Flow payment of $8.1 million, (iv) $6.6 million in payment of consent fees, (v) required quarterly principal payments on the term facility under the 2006 Credit Agreement totaling $4.5 million, and (vi) net payments of $0.4 million associated with the offering of the Prior Restructuring Securities.

*Comparison of fiscal year ended March 31, 2009 to fiscal year ended March 31, 2008*

Net cash provided by operating activities was $9.8 million for the fiscal year ended March 31, 2009, as compared to net cash provided by operating activities of $6.8 million for the fiscal year ended March 31, 2008. During the fiscal year ended March 31, 2009, net cash provided by operating activities was primarily attributable to: (i) $199.3 million of non-cash expenses (excluding amortization and write-off of deferred rack costs) primarily as a result of a $217.4 million provision for impairment of intangible assets and goodwill, $9.8 million in amortization of deferred costs and $9.6 million in depreciation and amortization expenses, offset in part by a $31.2 million decrease in deferred income taxes, a $4.9 million gain on extinguishment of debt and a $4.0 million decrease in management fee payable as a result of the Management Agreement being terminated (discussed below in the "Contractual Obligations" section), (ii) a $18.9 million net decrease in accrued interest due to timing of payments, the fact that we are no longer accruing interest on the tendered portion of the Prior Notes and the interest related to the Existing PIK Notes and the Existing Subordinated Notes being reflected in the carrying amount of our Existing Subordinated Notes in our audited consolidated balance sheet included herein, and (iii) a $10.3 million decrease in inventories as we purchased less paper. These items were partially offset by: (i) a $183.3 million net loss, (ii) a $15.1 million decrease in accounts payable due to timing of payments and reduction of purchase of paper, (iii) a decrease in accrued expenses and other liabilities of $10.7 million, (iv) an increase in trade receivables of $6.5 million, and (v) $3.9 million decrease in deferred revenues.

During the fiscal year ended March 31, 2008, net cash provided by operating activities was primarily attributable to: (i) $76.8 million of non-cash expenses (excluding amortization and write-off of deferred rack costs) primarily as a result of the $31.1 million provision for impairment of intangible assets and goodwill and the $17.1 million charge related to the issuance of senior subordinated notes, (ii) a net decrease in deferred rack costs of $4.1 million (resulting from our efforts to more effectively manage our deferred rack expenditures), and (iii) increases in accounts payable, management fee payable, and accrued expenses and other liabilities of $9.3 million, $2.0 million and $1.1 million, respectively. The increase in accounts payable was a result of our efforts to more effectively manage our liquidity. These items were partially offset by: (i) a $61.9 million net loss, (ii) an $11.5 million increase in trade receivables primarily as a result of the increase in advertising revenues in the fourth quarter of fiscal year 2008, (iii) a $5.1 million increase in inventories (resulting from our efforts to purchase paper at

advantageous pricing levels), and (iv) a decrease in accrued interest of $7.5 million, which occurred because of the timing of interest payments related to the 2006 Credit Agreement.

Net cash used in investing activities was $2.7 million for the fiscal year ended March 31, 2009, as compared to $2.2 million for the fiscal year ended March 31, 2008. Net cash used in investing activities for the fiscal year ended March 31, 2009 was primarily attributable to $3.0 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC, partially offset by $0.5 million related to proceeds from the sale of discontinued operations. Net cash used in investing activities for the fiscal year ended March 31, 2008 was primarily attributable to $2.4 million for purchases of property and equipment and $0.3 million related to the investment in Mr. Olympia, LLC, partially offset by $0.4 million related to proceeds from the sale of fixed assets.

Net cash used in financing activities was $52.2 million for the fiscal year ended March 31, 2009, as compared to $0.9 million for the fiscal year ended March 31, 2008. Net cash used in financing activities for the fiscal year ended March 31, 2009 primarily consisted of: (i) $22.5 million related to costs associated with the offering of the Prior Restructuring Securities, the tender offers and consent solicitations and the 2009 Credit Agreement, (ii) a $10.0 million payment towards the Revolving Facility, (iii) a fiscal year 2008 Excess Cash Flow payment of $8.1 million, (iv) $6.6 million in payment of consent fees, (v) required quarterly principal payments on the term facility under the 2006 Credit Agreement totaling $4.5 million, and (vi) net payments of $0.4 million associated with the offering of the Prior Restructuring Securities. Net cash used in financing activities for the fiscal year ended March 31, 2008 consisted of payments of $0.9 million related to deferred debt costs.

## Existing credit agreement and subordinated indebtedness

On January 30, 2006, we entered into the 2006 Credit Agreement, which replaced our then existing credit agreement dated as of January 23, 2003. On December 31, 2008, we entered into the 2009 Credit Agreement, which replaced the 2006 Credit Agreement. The 2009 Credit Agreement became effective on January 30, 2009 (the "*2009 Credit Agreement Effective Date*"), concurrently with the consummation of our cash tender offers. The 2009 Credit Agreement includes the $60.0 million 2009 Revolving Facility and the $450.0 million 2009 Term Facility. As part of the Transactions, we will terminate the 2009 Credit Agreement and we will enter into our new revolving credit facility on the Plan Effective Date. See "Description of other indebtedness."

The 2009 Credit Agreement includes certain representations and warranties, conditions precedent, affirmative covenants, negative covenants and events of default customary for agreements of this type. The negative covenants include financial maintenance covenants comprised of a leverage ratio, a senior secured leverage ratio, a consolidated interest expense coverage ratio, and capital expenditure limits. The 2009 Credit Agreement also contains certain covenants that, subject to certain exceptions, restrict paying dividends, incurring additional indebtedness, creating liens, making acquisitions or other investments, entering into certain mergers or consolidations and selling or otherwise disposing of assets. The 2009 Credit Agreement includes a broadening from the 2006 Credit Agreement of the circumstances that would give rise to prepayment of the loans and the introduction of more restrictive covenants, particularly relating to indebtedness, investments, restricted payments and capital expenditures. As of September 30, 2010, we were in compliance with all financial covenants under the 2009 Credit Agreement; however, as disclosed in Note 1, "Basis of presentation," in the notes to unaudited condensed consolidated financial statements included herein, management concluded

that the Company was not in compliance with certain covenants of the 2009 Credit Agreement. Accordingly, the Company has classified the entire principal amount associated with the 2009 Credit Agreement as current as of September 30, 2010.

The indebtedness under the 2009 Credit Agreement is guaranteed by AMI and AMO's domestic subsidiaries and is secured by liens on substantially all of the assets of AMI, AMO and its domestic subsidiaries. In addition, our obligations are secured by a pledge of all of the issued and outstanding shares of, or other equity interests in, AMO and all of its existing or subsequently acquired or organized domestic subsidiaries and a percentage of the capital stock of, or other equity interests in, certain of its existing or subsequently acquired or organized foreign subsidiaries.

Calculations of the leverage ratio, senior secured leverage ratio and consolidated interest expense coverage ratio in the 2009 Credit Agreement utilize Debt Covenant EBITDA. The following table summarizes Debt Covenant EBITDA for the three months ended September 30, 2010 and September 30, 2009 and twelve months ended March 31, 2010 and March 31, 2009.

"*Debt Covenant EBITDA*" means Consolidated EBITDA as defined in the 2009 Credit Agreement, which generally represents Adjusted EBITDA further adjusted for gains or costs related to closures or re-launches of publications, restructuring costs and severance, professional fees, management fees and other one-time costs. Debt Covenant EBITDA is used in calculating covenant compliance under the 2009 Credit Agreement and was used in calculating covenant compliance under the 2006 Credit Agreement and is expected to be included in our new revolving credit facility. We expect that the calculation of Debt Covenant EBITDA will be generally consistent with our calculation of EBITDA as defined the indenture governing the notes offered hereby. Adjusted EBITDA and Debt Covenant EBITDA are not measures of financial performance in accordance with GAAP. You should not consider them as alternatives to net income (loss) as a measure of operating performance. Our calculations of Adjusted EBITDA and Debt Covenant EBITDA may be different from the calculations used by other companies and therefore comparability may be limited. We present Adjusted EBITDA to provide additional information regarding our performance and because it is a measure by which we gauge our profitability. In addition, information concerning Debt Covenant EBITDA is being presented because it reflects important components included in the financial covenants of the 2009 Credit Agreement and 2006 Credit Agreement and expected to be included in our new revolving credit facility, the indenture governing the notes offered hereby and the indenture governing the Plan second lien notes.

| | For the six months ended September 30, | | For the twelve months ended March 31, | |
|---|---|---|---|---|
| | **2010** | **2009** | **2010** | **2009** |
| | | (unaudited) | | |
| Net Income (Loss) attributable to American Media Operations, Inc. and subsidiaries | $ 17,427 | $ 2,524 | $ 3,218 | $(183,323) |
| Add (deduct): | | | | |
| Interest expense | 25,402 | 25,463 | 50,601 | 85,251 |
| Provision (benefit) for income taxes | 2,880 | 678 | 22,756 | (33,339) |
| Depreciation and amortization | 3,099 | 3,506 | 6,633 | 9,573 |
| Amortization of deferred debt costs | 1,953 | 2,040 | 3,893 | 9,849 |
| Amortization of deferred rack costs | 3,443 | 3,112 | 5,892 | 11,232 |
| Amortization of short-term racks | 2,205 | 2,009 | 4,009 | 3,539 |
| Provision for impairment of intangible assets and goodwill | — | 17,595 | 17,595 | 217,350 |
| Gain on extinguishment of debt | — | — | — | (4,858) |
| **Adjusted EBITDA** | $ 56,409 | $ 56,927 | $114,597 | $ 115,274 |
| Add (deduct): | | | | |
| Costs (gains) related to closures and re-launch of publications | — | — | — | (433) |
| Restructuring costs and severance | — | — | — | 3,581 |
| Professional fees | — | — | — | 450 |
| Management fees | — | — | — | 1,000 |
| Other | — | (610) | (610) | 1,875 |
| **Debt Covenant EBITDA** | $ 56,409 | $ 56,317 | $113,987 | $ 121,747 |

Our fixed rate debt consists primarily of the Existing PIK Notes and the Existing Subordinated Notes.

On May 7, 1999, we issued $250.0 million in aggregate principal amount of the 2009 Notes. On February 14, 2002, we issued $150.0 million in aggregate principal amount of the 2009 Notes. On January 23, 2003, we issued $150.0 million aggregate principal amount of the 2011 Notes.

The Prior Notes were unconditionally guaranteed, on a senior subordinated basis, by all of our domestic subsidiaries. Prior Note guarantees were joint and several, full and unconditional and general unsecured obligations of the Prior Note guarantors. The Prior Note guarantees were subordinated in right of payment to all existing and future senior debt of the Prior Note guarantors, including the 2006 Credit Agreement, and were also effectively subordinated to all secured obligations of Prior Note guarantors to the extent of the assets securing such obligations, including the 2006 Credit Agreement. Furthermore, the indentures governing the Prior Notes permitted the Prior Note guarantors to incur additional indebtedness, including senior debt, subject to certain limitations. See Note 18, "Supplemental condensed consolidating financial information" in the notes to audited consolidated financial statements included herein.

Under the indenture governing the 2011 Notes, as of January 15, 2010, the 2011 Notes became redeemable at par, plus accrued and unpaid interest.

The indentures governing the Prior Notes contained a number of covenants that, among other things, limited our ability and that of our restricted subsidiaries, subject to important exceptions

and qualifications, to: borrow money; guarantee other indebtedness; use assets as security in other transactions; pay dividends on stock, redeem stock or redeem subordinated debt; make investments; enter into agreements that restrict the payment of dividends by subsidiaries; sell assets; enter into affiliate transactions; sell capital stock of subsidiaries; enter into new lines of business; and merge or consolidate. In addition, these indentures imposed certain requirements as to future subsidiary guarantors and contained certain customary events of default.

On January 30, 2009, we issued: (i) $21.2 million aggregate principal amount of the Existing PIK Notes and (ii) $299.7 million aggregate principal amount of the Existing Subordinated Notes. Also on January 30, 2009, AMI sold 5,688,891 shares of AMI Common Stock (valued at approximately $1.0 million) for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. In addition, on January 30, 2009, AMI issued 305,520 shares of AMI Common Stock to the Prior Equityholders in exchange for the AMI Common Stock they owned prior to the restructuring.

On January 30, 2009, $400.5 million of the 2009 Notes and $148.0 million of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes. The cash proceeds received from the offering of the equity securities included in the Prior Restructuring Securities, together with our cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to the offering of the Prior Restructuring Securities and the tender offers and consent solicitations.

The Existing PIK Notes are unsecured senior obligations of AMO and are effectively subordinated to all of our existing and future secured debt, including obligations under the 2009 Credit Agreement. The Existing PIK Notes will mature on May 1, 2013. Interest on the Existing PIK Notes will accrue at the rate of 9% per annum based upon the outstanding principal amount. The 2009 Credit Agreement prohibits the payment of cash interest on the Existing PIK Notes.

The Existing Subordinated Notes are unsecured senior subordinated obligations of AMO and are subordinated in right of payment to our existing and future senior debt, including obligations under the 2009 Credit Agreement and the Existing PIK Notes. The Existing Subordinated Notes will mature on November 1, 2013. Interest on the Existing Subordinated Notes will accrue at the rate of 14% per annum based upon the outstanding principal amount of the Existing Subordinated Notes (with (i) 10% per annum payable in cash, (ii) 2% per annum payable, at our option, either in cash or by the issuance of additional Existing Subordinated Notes, and (iii) 2% per annum payable (x) in cash when our Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is greater than $27.5 million and (y) at our option, either in cash or by the issuance of additional Existing Subordinated Notes when our Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is less than or equal to $27.5 million).

The Existing PIK Notes and the Existing Subordinated Notes are unconditionally guaranteed, on a senior subordinated basis, by all of our domestic subsidiaries. The Existing PIK Notes and the Existing Subordinated Notes guarantees are joint and several, full and unconditional and general unsecured obligations of the Existing PIK Notes and the Existing Subordinated Notes guarantors. The Existing PIK Notes and the Existing Subordinated Notes guarantees are subordinated in right of payment to all existing and future senior debt of the Existing PIK Notes and the Existing Subordinated Notes guarantors, including the 2009 Credit Agreement, and are also effectively

subordinated to all secured obligations of Existing PIK Notes and the Existing Subordinated Notes guarantors to the extent of the assets securing such obligations, including the 2009 Credit Agreement. Furthermore, the Existing PIK Note Indenture and the Existing Subordinated Note Indenture permit the Existing PIK Notes and the Existing Subordinated Notes guarantors to incur additional indebtedness, including senior debt, subject to certain limitations. See Note 18, "Supplemental condensed consolidating financial information" in the notes to audited consolidated financial statements included herein.

As of the date hereof, the 2009 Credit Agreement does not permit the payment of cash interest on the Existing Subordinated Notes (i) at a rate in excess of 10% per annum when our Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is less than or equal to $27.5 million and (ii) at a rate in excess of 12% per annum when our Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is greater than $27.5 million.

We pay interest on the Existing PIK Notes and the Existing Subordinated Notes semi-annually in arrears on May 1 and November 1 of each year, commencing on May 1, 2009. To date, interest with respect to the (i) Existing PIK Notes has been paid entirely by the issuance of additional Existing PIK Notes and (ii) the Existing Subordinated Notes has been paid at the rate of 14% per annum in the form of additional Existing Subordinated Notes of $10.6 million on May 1, 2009 and $21.7 million on November 1, 2009.

Pursuant to the Existing PIK Note Indenture and the Existing Subordinated Note Indenture, beneficial owners of the Existing PIK Notes and the Existing Subordinated Notes, who together beneficially owned more than 75% in aggregate principal amount of the outstanding Existing PIK Notes and Existing Subordinated Notes, respectively, consented on behalf of all holders of the Existing PIK Notes and Existing Subordinated Notes that the $23.7 million interest payment, including the $16.6 million of cash interest due May 1, 2010 be deferred until June 21, 2010.

Although interest with respect to the Existing Subordinated Notes is payable at a rate of 10% per annum in cash and 4% per annum in the form of additional Existing Subordinated Notes, in accordance with the terms of the Existing Subordinated Note Indenture and at the request of the requisite holders of Existing Subordinated Notes, the full amount of the May 1, 2010 interest payment was paid entirely in the form of additional Existing Subordinated Notes on June 21, 2010.

Pursuant to the Existing Subordinated Note Indenture, beneficial owners of the Existing Subordinated Notes, who together beneficially owned more than 75% in aggregate principal amount of the outstanding Existing Subordinated Notes consented on behalf of all holders of the Existing Subordinated Notes that the interest payment due November 1, 2010 be deferred until January 3, 2011.

Under the Existing PIK Note Indenture and the Existing Subordinated Note Indenture, we are permitted to redeem some or all of the Existing PIK Notes and the Existing Subordinated Notes, at our option, at redemption prices set forth below.

| Year | Percentage |
|---|---|
| November 1, 2009 to October 31, 2010 | 102.00% |
| November 1, 2010 to October 31, 2011 | 101.00% |
| November 1, 2011 and thereafter | 100.00% |

The Existing PIK Note Indenture and the Existing Subordinated Note Indenture contain a number of covenants that, among other things, limit our ability and that of our restricted subsidiaries,

subject to important exceptions and qualifications, to: borrow money; guarantee other indebtedness; use assets as security in other transactions; pay dividends on stock, redeem stock or redeem subordinated debt; make investments; enter into agreements that restrict the payment of dividends by subsidiaries; sell assets; enter into affiliate transactions; sell capital stock of subsidiaries; enter into new lines of business; and merge or consolidate. In addition, the Existing Subordinated Note Indenture and the Existing PIK Note Indenture impose certain requirements as to future subsidiary guarantors and contain certain customary events of default.

As of September 30, 2010, our total principal amount of senior subordinated debt was approximately $387.0 million, consisting of $7.5 million principal amount of 2011 Notes, $23.7 million principal amount of Existing PIK Notes and $355.8 million principal amount of Existing Subordinated Notes. The accompanying unaudited condensed consolidated balance sheet includes $175.2 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our Company's Existing Subordinated Notes.

As of March 31, 2010, our total principal amount of senior subordinated debt was approximately $362.3 million, consisting of approximately $7.5 million principal amount of 2011 Notes, approximately $22.7 million principal amount of Existing PIK Notes and approximately $332.1 million principal amount of Existing Subordinated Notes. The accompanying audited consolidated balance sheet includes $198.4 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our Existing Subordinated Notes. Therefore, the Company does not recognize interest expense on the Existing PIK Notes and the Existing Subordinated Notes.

On May 1, 2009, we retired $14.0 million aggregate principal amount of the 2009 Notes then outstanding with cash on hand.

As part of the Prior Restructuring, we recorded a gain on extinguishment of debt of $4.9 million in fiscal year 2009. This gain is comprised of $548.5 million of tendered Prior Notes and $38.1 million of forfeited interest on our Prior Notes, less $320.9 million principal amount of the Existing PIK Notes and the Existing Subordinated Notes, $232.2 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our Existing Subordinated Notes in the accompanying audited consolidated balance sheet, consent fees of $12.0 million, issuance costs of $10.1 million, write-off of deferred costs related to the Prior Notes of $4.6 million, issuance of $1.0 million of AMI Common Stock and a write-off of discount associated with the Prior Notes of $0.9 million.

## Contractual obligations

The impact that our aggregate contractual obligations as of March 31, 2010 are expected to have on our liquidity and cash flow in future periods is as follows (in thousands):

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | Total | Less than 1 year | 1-3 Years | 4-5 Years | More than 5 years |
| Long-term debt obligations, principal(1) | $1,014,494 | $ 43,972 | $ 517,238 | $ 453,284 | $ — |
| Long-term debt obligations, interest(2) | $ 134,824 | $ 48,877 | $ 84,651 | $ 1,296 | $ — |
| Operating lease obligations | $ 8,397 | $ 4,948 | $ 3,067 | $ 164 | $ 218 |
| Printing agreement obligations(3) | $ 377,023 | $ 57,642 | $ 106,024 | $ 91,804 | $ 121,553 |
| Pre-press obligations(4) | $ 26,074 | $ 4,911 | $ 8,137 | $ 5,275 | $ 7,751 |
| Trademark license agreement(5) | $ 1,400 | $ 200 | $ 400 | $ 400 | $ 400 |
| Mr. Olympia, LLC agreement(6) | $ 4,200 | $ 300 | $ 600 | $ 600 | $ 2,700 |
| Transportation Agreement(7) | $ 55,799 | $ 6,548 | $ 13,648 | $ 14,418 | $ 21,185 |
| Other agreements(8) | $ 7,843 | $ 4,010 | $ 3,833 | $ — | $ — |
| Subscription agreement(9) | $ 34,635 | $ 7,615 | $ 14,711 | $ 12,309 | $ — |
| Total contractual obligations(10) | $1,664,689 | $ 179,023 | $ 752,309 | $ 579,550 | $ 153,807 |

(1) Includes principal payments on both fixed and variable rate obligations and $198.4 million in future interest payments on the Existing PIK Notes and the Existing Subordinated Notes reflected in the carrying amount of our Existing Subordinated Notes. Amount does not include the premium or discount on the Prior Notes.

(2) Includes interest payments on both fixed and variable rate obligations and a commitment fee of 1% on the unused portion of our 2009 Revolving Facility. The interest payments associated with our variable rate obligations (for amounts borrowed under the 2009 Credit Agreement) are based upon interest rates forecasted for fiscal year 2010. The interest to be paid on variable rate obligations is affected by changes in our capital applicable borrowing rate subject to a 10% floor, which materially affect the contractual obligation amounts to be paid. See Note 6, "Credit agreement," and Note 7, "Senior subordinated indebtedness" in the notes to audited consolidated financial statements included herein.

(3) We have a printing agreement expiring in our fiscal year 2018 with an unrelated printer to print *National Enquirer, Globe, Shape, Men's Fitness, Fit Pregnancy, Muscle & Fitness, Muscle & Fitness Hers, Flex, Natural Health, National Examiner, Sun, Mira!* and *Country Weekly*. We have printing agreements to print *Star* with unrelated printers expiring in our fiscal year 2012 and 2015, respectively. We also have a printing agreement with an unrelated printer to print certain of our European publications expiring in fiscal year 2011. These contracts, with the exception of the contract with the printer for certain of our European publications, require pricing adjustments based on the Consumer Price Index. Based on current pricing and production levels, these contracts are estimated to cost approximately $377.0 million over their remaining life.

(4) We have a pre-press agreement expiring in our fiscal year 2018 with an unrelated company to perform pre-press services for *Shape, Men's Fitness, Fit Pregnancy, Muscle & Fitness, Muscle & Fitness Hers, Flex* and *Natural Health*. All other titles are under a pre-press agreement with a related company expiring in our fiscal year 2013. Based on current pricing and production levels, these contracts, one of which requires pricing adjustments based on changes in the Consumer Price Index, are estimated to cost approximately $26.1 million over their remaining life. See Note 9, "Related party transactions," in the notes to audited consolidated financial statements included herein for a discussion of our pre-press relationship with Vertis.

(5) As part of the acquisition of Weider Publications LLC in January 2003, we entered into a trademark license agreement with Weider Health and Fitness which grants us the exclusive right to use the Weider trademarks on the cover and in the editorial content of existing Weider titles of the acquired business and in any future healthy living or fitness-related publications in any media. We were also given the non-exclusive right to use the trade name Joe Weider on products and services other than publications. We pay Weider Health and Fitness $0.2 million per year pursuant to the trademark license agreement and we have assumed that such payments will continue through 2017. We also have the right to use the Weider, Team Weider and Joe Weider trademarks in most other countries in the world.

(6) In April 2005, we entered into a limited liability company agreement (the "*Olympia Agreement*") to form a joint venture ("*Mr. Olympia, LLC*") to manage and promote the Mr. Olympia fitness events. At any time prior to the tenth anniversary of the execution date of the Olympia Agreement the other limited liability company member may require us to purchase all of the limited liability company units ("*Put Option*") for a cash purchase price of $3.0 million. In the event that the other limited liability company member does not exercise the Put Option, for a period of 120 days following the tenth anniversary of the date of execution of the Olympia Agreement, we may require the other limited liability company member to sell all of its limited liability company units ("*Call Option*") for a sale price of $3.0 million. In April 2005, the other limited liability company member licensed certain trademarks related to the Mr. Olympia fitness events (collectively, the "*Olympia*

*Trademarks*") to Mr. Olympia, LLC in exchange for us paying $3.0 million over a ten year period. In the event that the Put Option or Call Option is exercised, the Olympia Trademarks will be transferred and owned by Mr. Olympia, LLC. Any remaining balance of the $3.0 million license fee will become due and payable upon such exercise. In the event that the Put Option or Call Option is not exercised, Mr. Olympia, LLC retains the right to the Olympia Trademarks in perpetuity once the $3.0 million license fee is paid. We have assumed that such Call Option will be exercised in 2015. See Note 10, "Investment in joint ventures—Mr. Olympia, LLC," in the notes to audited consolidated financial statements included herein of the Olympia Agreement.

(7)  We have a transportation agreement expiring in fiscal 2018 with an unrelated company to deliver some of our publications to wholesalers within the continental United States and Canada.

(8)  We have a consulting agreement expiring in fiscal year 2012 with an unrelated company to assist us with the marketing of our brands. We also have a consumer marketing agreement expiring in fiscal year 2011 with an unrelated company for the printing of consumer marketing materials.

(9)  We have a subscription agreement expiring in fiscal year 2015 with an unrelated company for subscription fulfillment services.

(10)  The timing of future cash flows related to tax liabilities of $1.2 million cannot be reasonably estimated. See Note 5, "Income taxes," in the notes to audited consolidated financial statements included herein.

The above table shows contractual obligations as of March 31, 2010 and accordingly does not reflect (i) changes to our contractual obligations that are expected to occur as a result of the Transactions or (ii) that our long-term debt is reclassified as current as of September 30, 2010, as described in Note 1 to the unaudited consolidated financial statements included elsewhere in this offering memorandum.

## New accounting pronouncements

In October 2009, the Financial Accounting Standards Board ("*FASB*") issued Accounting Standards Update ("*ASU*") No. 2009–13, "*Multiple–Deliverable Revenue Arrangements*" ("*ASU 2009–13*"). ASU 2009–13 amends existing revenue recognition accounting pronouncements that are currently within the scope of FASB ASC Subtopic 605-25. The Emerging Issues Task Force Issue No. 08–1, "*Revenue Arrangements with Multiple Deliverables*", provides accounting principles and application guidance on whether multiple deliverables exist, how the arrangement should be separated, and the consideration allocated. This guidance eliminates the requirement to establish the fair value of undelivered products and services and also eliminates the residual method of allocating arrangement consideration. The new guidance provides for separate revenue recognition based upon management's estimate of the selling price for an undelivered item when there is no other means to determine the selling price of that undelivered item. Under the previous guidance, if the fair value of all of the elements in the arrangement was not determinable, then revenue was deferred until all of the items were delivered or fair value was determined. This new approach is effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. We are currently assessing the impact of the adoption of this new guidance on our results of operations, financial position, cash flows and disclosures.

In January 2010, the FASB issued ASU No. 2010-06, "*Improving Disclosures about Fair Value Measurements"* ("*ASU 2010-06*"). ASU 2010-06 amends the Fair Value Measurements and Disclosures Topic to require additional disclosures regarding fair value measurements. The amended guidance requires entities to disclose additional information regarding assets and liabilities that are transferred between levels of the fair value hierarchy. Entities are also required to disclose information in the Level 3 roll-forward about purchases, sales, issuances and settlements on a gross basis. In addition to these new disclosure requirements, ASU 2010-06 clarifies existing guidance pertaining to the level of disaggregation at which fair value disclosures should be made and the requirements to disclose information about the valuation techniques and inputs used in estimating Level 2 and Level 3 fair value measurements. The guidance in ASU

2010-06 is effective for interim and annual reporting periods beginning after December 15, 2009, except for the requirement to separately disclose purchases, sales, issuances and settlements in the Level 3 roll-forward, which becomes effective for fiscal years (and for interim periods within those fiscal years) beginning after December 15, 2010. Our adoption of ASU 2010-06, effective January 1, 2010, did not have a material impact on our results of operations, financial position, cash flows and disclosures. We do not expect the deferred portion of the adoption of ASU 2010-06 to have a material impact on our results of operations, financial position, cash flows and disclosures.

In September 2010, the FASB published Concepts Statement (CON) No. 8 ("*CON No. 8*"), Conceptual Framework for Financial Reporting: Chapter 1, *The Objective of General Purpose Financial Reporting*, and Chapter 3, *Qualitative Characteristics of Useful Financial Information*. FASB CON No. 8 replaces CON No. 1, *Objectives of Financial Reporting by Business Enterprises*, and CON No. 2, *Qualitative Characteristics of Accounting Information*. Our adoption of CON No. 8 did not have a material impact on our results of operations, financial position, cash flows and disclosures.

## Quantitative and qualitative disclosures about market risk

We are exposed to certain market risks that are inherent in our financial statements. We are subject to interest rate risk on our credit facilities and any future financing requirements. Our fixed rate debt consists primarily of the Existing PIK Notes and the Existing Subordinated Notes.

Our primary market risk exposures relate to (1) the interest rate risk on long-term borrowings, (2) the impact of interest rate movements on our ability to meet interest expense requirements and comply with financial covenants, (3) the impact of interest rate movements on our ability to obtain adequate financing to fund acquisitions, (4) the impact of paper or postage cost increases and (5) the impact of changes in distribution and placement costs. We manage the interest rate risk on our outstanding long-term debt through our use of fixed and variable rate debt.

Interest rate changes affect our income before taxes and cash provided from operating activities. A 1% change in our weighted average interest rate on our variable debt would have resulted in a change of $4.5 million in our interest expense for the fiscal year ended March 31, 2010.

## Exchange rate sensitivity

We face exposures to adverse movements in foreign currency exchange rates, as a portion of our revenues, expenses, assets and liabilities are denominated in currencies other than the U.S. dollar, primarily the Canadian dollar, the British pound, and the Euro. These exposures may change over time as business practices evolve. Currently, we do not hold any derivatives contracts that hedge our foreign currency risk, but we may adopt such strategies in the future.

# Business

## Overview

AMO was incorporated under the laws of Delaware in 1981 and is a wholly-owned subsidiary of AMI. AMO conducts all of AMI's operations and represents substantially all of AMI's assets. Our headquarters and principal executive offices are located at 1000 American Media Way, Boca Raton, Florida 33464 and our telephone number is (561) 997-7733.

We are a leading publisher in the field of celebrity journalism and health and fitness magazines. Our publications include *National Enquirer, Star, Globe, National Examiner, Country Weekly, Mira!, Sun, Shape, Muscle & Fitness, Flex, Men's Fitness, Muscle & Fitness Hers, Fit Pregnancy, Natural Health, UFC Magazine,* and other publications.

We also provide publishing services, which may include, without limitation, advertising sales and marketing, circulation and production management services, to other publishers, including Playboy and WWE. We will seek to capitalize on opportunities to expand our publishing services business, including pursuing opportunities with our affiliates or companies controlled by our affiliates. Additionally, our wholly-owned subsidiary, DSI, arranges for the placement of our publications and third-party publications with retailers. DSI monitors through its regional managers and merchandising staff that these publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great A&P Tea Company and Winn Dixie. DSI coordinates (also known as acting as a "category manager/front-end advisor") the racking of magazine fixtures for selected retailers. In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients. Some of DSI's third-party publishing clients include Hachette, which publishes *Woman's Day* and *Elle;* Newsweek, Inc., which publishes *Newsweek;* Bauer Publishing, which publishes *First for Women, Woman's World, Life & Style* and *In Touch;* Rodale, Inc., which publishes *Prevention, Men's Health* and *Woman's Health;* General Mills, which publishes *Pillsbury* and *Betty Crocker;* Typhoon Media Corporation, which publishes various dictionary and reference books, medical and health encyclopedias, classical fiction, cookbooks and homeopathic health titles; and New York Media LLC, which publishes *New York Magazine* and specials. Some of DSI's third-party non-publishing clients include Kroger, Safeway, Random House, Blackhawk Network and Frontline Marketing, Inc.

As of September 30, 2010, our magazines comprise approximately 21% of total U.S. and Canadian newsstand circulation for ABC audited weekly publications. Total average newsstand and subscription circulation per issue for all of our publications that are currently published and have a publishing frequency of six or more times per year was approximately 6.0 million copies for the six months ended September 30, 2010 and approximately 6.1 million copies for fiscal year 2010, as compared to 7.0 million copies for fiscal year 2009.

For the six months ended September 30, 2010 and 2009, we derived approximately 57% and 60%, respectively, of our total operating revenues from circulation. Single copy sales accounted for approximately 81% and 82% of such circulation revenues in the six months ended September 30, 2010 and 2009, respectively, and the remainder was from subscription sales. Our advertising revenues are generated by national advertisers, including packaged goods, sports nutrition products, automotive, entertainment, pharmaceutical, sports apparel, beauty and

cosmetics, fashion and direct response. For the six months ended September 30, 2010 and 2009, approximately 33% and 32%, respectively, of our total operating revenues were from advertising. In fiscal year 2010, we derived approximately 60% of our total operating revenues from circulation, with the remainder from advertising and other sources, as compared to 55% for fiscal year 2009.

As of September 30, 2010, our publications were distributed to newsstands primarily by three wholesalers, which we estimate represent approximately 81% of the newsstand distribution market, as compared to 80% as of September 30, 2009, as well as several smaller wholesalers who represent the remaining approximately 19%, as compared to 20% as of September 30, 2009. For both fiscal years 2010 and 2009, wholesalers distribute the copies to approximately 110,000 retail outlets in the United States and Canada, representing, in the opinion of management, substantially complete coverage of periodical outlets in North America. The wholesalers also process returns of our publications, bill and collect from the retailers, and make payments to our national distributors. We distribute our publications to the wholesalers with a full right of return, who in turn sell them to retailers with a full right of return. Our national distributors' primary function is to bill and collect funds from wholesalers and remit these funds to us.

In addition to our relationships with our national distributors and wholesalers, we also have relationships with retailers, to which we pay one or more of the following:

- Rack Costs—We pay a fee to retailers to sell our publications in the display racks in the checkout section of supermarkets and other large retailers, typically for three year periods.

- Display Continuity Allowances—DCA is a payment that we make directly to the retailer and is similar to slotting fees paid by other industries to supermarkets.

- Retail Display Allowance—We make this payment directly to the retailers based upon quarterly claim forms that they submit to us. On average, RDA payments are equal to approximately 10% of the cover price for each magazine sold.

- Retail Display Pockets—We pay this fixed per pocket fee directly to retailers. This fee is similar to RDA, except that the amount is fixed per pocket. We pay either RDA or RDP to a particular retailer, but not both.

Subscription revenues are derived from copies mailed to our subscribers. We outsource our subscription fulfillment services to a third party. Advertising revenues are derived primarily from customer advertisements placed in our publications.

## 2008/2009 Restructuring

On January 30, 2009, AMO successfully completed its cash tender offers and received the requisite consents in the related consent solicitations in respect of AMO's then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 2009 Notes and (2) $155.5 million aggregate principal amount of 2011 Notes. $400.5 million aggregate principal amount of the 2009 Notes and $148.0 million aggregate principal amount of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

On December 31, 2008, AMO amended and restated its 2006 Credit Agreement. On January 30, 2009, concurrently with the consummation of AMO's cash tender offers, the 2009 Credit Agreement became effective.

On January 29, 2009, AMO amended and restated its certificate of incorporation to increase the number of shares authorized to be issued from 10,000 to 7,500,000 and changed the par value of such common stock from $0.20 to $0.0001. In addition, AMO exchanged 5,994,411 shares of common stock for 7,508 shares common stock previously owned by AMI.

On January 30, 2009, AMO issued the Existing PIK Notes and the Existing Subordinated Notes. Concurrently with the notes offering, AMI sold 5,688,891 shares of AMI Common Stock (valued at approximately $1.0 million) for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement dated January 29, 2009, among AMI, AMO, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering of the Prior Restructuring Securities, together with AMO's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to such offering and the tender offers and consent solicitations. In addition, on January 30, 2009, AMI issued an aggregate of 305,520 shares of AMI Common Stock to the Prior Equityholders in exchange for the AMI Common Stock they owned prior to the restructuring.

As a result of the restructuring of AMO's capital structure and the issuance of AMI Common Stock to the Prior Tendering Bondholders, the Prior Tendering Bondholders acquired approximately 94.9% of AMI Common Stock. The Prior Equityholders retained approximately 5.1% of AMI Common Stock.

## Segment information

We have aggregated our business into five reporting segments: Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications, Distribution Services and Corporate/Other. The aggregation of our business is based upon our publications having the following similarities: economic characteristics, types of products and services, types of production processes, type or class of customers, and method of distribution.

### Celebrity Publications segment

Our Celebrity Publications segment aggregates the following titles, which have leading market positions in the categories they serve.

- *Star* is a weekly celebrity news-based glossy magazine dedicated to covering the stars of movies, television and music. *Star's* editorial content also incorporates fashion, beauty and accessories. For fiscal year 2010, *Star* sold on average 570,000 single copies per week and had a total average weekly circulation of approximately 1.0 million copies, including subscriptions, and an estimated total weekly readership of 9.1 million.

- *Country Weekly* is an entertainment magazine presenting all aspects of country music celebrities and their lifestyles, events and personalities, and has the highest weekly circulation of any such magazine in its category. Effective with the March 9, 2009 issue, subscriptions for *Country Weekly* were discontinued. *Country Weekly* was changed from a bi-weekly to a weekly publication effective with the March 30, 2009 issue and for fiscal year 2010, had an average single copy circulation of 73,000 copies and an estimated total readership of 0.8 million per issue.

*Circulation*

The following table sets forth average circulation (per issue) and U.S. cover prices for our Celebrity Publications segment for fiscal years 2008, 2009 and 2010.

| | For fiscal year ended | | |
|---|---|---|---|
| (Circulation data in thousands) | March 31, 2010 | March 31, 2009 | March 31, 2008 |
| **Celebrity Publications Segment** | | | |
| *Star* | | | |
| Total Circulation ................................................ | 1,025 | 1,235 | 1,367 |
| Subscription Circulation ................................................ | 455 | 610 | 651 |
| Single Copy Circulation ................................................ | 570 | 625(4) | 716(6) |
| Cover Price ................................................ | $ 3.99 | $3.99 | $ 3.99(5) |
| *Country Weekly* | | | |
| Total Circulation ................................................ | 73 | 370 | 426 |
| Subscription Circulation ................................................ | —(2) | 285(2) | 323 |
| Single Copy Circulation ................................................ | 73(3) | 85(3) | 103 |
| Cover Price ................................................ | $ 2.99(1) | $2.49(1) | $ 3.49 |

(1)   We decreased the U.S. cover price of *Country Weekly* from $3.49 to $2.49 effective with the April 6, 2009 issue. Effective with the February 8, 2010 issue, we increased the U.S. cover price of *Country Weekly* from $2.49 to $2.99.

(2)   Effective with the March 9, 2009 issue, subscriptions for *Country Weekly* were discontinued.

(3)   Amount includes two reduced issues for *Country Weekly* that included 64 pages versus a regular issue of 72 pages and were each priced at $3.49. Effective with the March 30, 2009 issue, we changed *Country Weekly* from a bi-weekly to a weekly publication. Effective with the April 6, 2009 issue, we reduced the number of pages of *Country Weekly* from 72 to 64 pages.

(4)   Amount includes one expanded issue for *Star* that included 108 pages versus a regular issue of 96 pages and was priced at $4.49. Amount also includes two special issues for *Star* priced at $3.99 and $4.99, respectively.

(5)   We increased the U.S. cover price of *Star* from $3.49 to $3.99 effective with the March 31, 2008 issue.

(6)   Amount includes seven reduced issues for *Star* that included 84 pages versus a regular issue of 96 pages and was priced at $3.49.

*Subscription sales*

Our overall strategy with respect to subscriptions is to obtain the most cost-efficient subscriptions in meeting our circulation rate base. To accomplish this strategy, we focus on magazine specific sales of our titles through inserts, direct mailings, in-house advertisements and third party agents. Effective with the March 9, 2009 issue, subscriptions for *Country Weekly* were discontinued as we transitioned this publication from an advertising/rate-based publication to a newsstand-based publication.

*Advertising revenue*

Our advertising revenue is generated by national advertisers, including sports nutrition products, automotive, entertainment, packaged goods, pharmaceutical, sports apparel, beauty and cosmetics, fashion, and direct response.

*Competition*

Each of our Celebrity Publications faces competition in its subject area from a variety of publishers and competes for readers on the basis of the quality of its targeted editorial content, display rack placements and editorial staffing. Competition for advertising revenues is largely

based upon circulation levels, readership, demographics, price, and advertising results. We believe that our most significant direct competitors in the celebrity print media are Time Warner Inc. (which publishes *People, In Style* and *Entertainment Weekly*), Wenner Media, Inc. (which publishes *US Weekly*), Bauer Publishing (which publishes *In-Touch* and *Life & Style*), and Northern & Shell North America Ltd. (which publishes *OK!*). Competition for *Country Weekly* is primarily from Time Warner Inc. (which publishes *People's Country*) and two national cable networks, CMT (Country Music Television) and Great American Country, along with their respective web sites. As use of the Internet and new on-line ventures focusing on celebrity news has increased, we have faced additional competition.

### Tabloid Publications segment

Our Tabloid Publications segment aggregates the following titles, which have leading market positions in the categories they serve.

- *National Enquirer* is a weekly general interest publication with an editorial content devoted to celebrities, investigative reporting, human interest stories and articles covering lifestyle topics such as crime, health, fashion and beauty. For fiscal year 2010, we sold approximately 560,000 single copies of *National Enquirer* per week primarily in the United States and Canada. For fiscal year 2010, *National Enquirer* had a total average weekly circulation of approximately 784,000 copies, including subscriptions, and an estimated total weekly readership of 9.2 million.

- *Globe* is a weekly tabloid with features that are less time-sensitive and focuses on political scandals and investigative crime stories that are less mainstream and more hard-hitting than *National Enquirer*. For fiscal year 2010, *Globe* had an average weekly single copy circulation of 304,000 copies, with a total average weekly circulation of approximately 352,000 copies, including subscriptions, and an estimated total weekly readership of 1.0 million.

- *National Examiner's* editorial content consists of celebrity and human-interest stories, differentiating it from the other titles through its upbeat positioning as the "gossip, contests, women's service and good news" tabloid. For fiscal year 2010, *National Examiner* had an average weekly single copy circulation of 110,000 copies, with a total average weekly circulation of approximately 125,000 copies, including subscriptions, and an estimated total weekly readership of 1.0 million.

*Circulation*

The following table sets forth average circulation (per issue) and U.S. cover prices for our Tabloid Publications segment for fiscal years 2008, 2009 and 2010.

| | For fiscal year ended | | |
| --- | --- | --- | --- |
| (Circulation data in thousands) | March 31, 2010 | March 31, 2009 | March 31, 2008 |
| **Tabloid Publications Segment** | | | |
| *National Enquirer* | | | |
| Total Circulation ............................................................... | 784 | 899 | 1,001 |
| Subscription Circulation ................................................. | 224 | 274 | 314 |
| Single Copy Circulation ................................................. | 560 | 625(3) | 687(1) |
| Cover Price ...................................................................... | $3.69(1) | $3.49(1) | $3.49(1) |
| *Globe* | | | |
| Total Circulation ............................................................... | 352 | 379 | 412 |
| Subscription Circulation ................................................. | 48 | 58 | 67 |
| Single Copy Circulation ................................................. | 304 | 321 | 345(2) |
| Cover Price ...................................................................... | $3.69(1) | $3.49(1) | $3.49(1) |
| *National Examiner* | | | |
| Total Circulation ............................................................... | 125 | 137 | 153 |
| Subscription Circulation ................................................. | 15 | 18 | 23 |
| Single Copy Circulation ................................................. | 110 | 119(4) | 130 |
| Cover Price ...................................................................... | $3.49(1) | $3.29(1) | $2.49(1) |

(1)  Effective with the March 31, 2008 issue, we increased the U.S. cover price of *National Enquirer* from $3.29 to $3.49. Effective with the May 4, 2009 issue, we increased the U.S. cover price of *National Enquirer* from $3.49 to $3.59. We then increased the U.S. cover price of *National Enquirer* from $3.59 to $3.69 effective with the October 5, 2009 issue. Effective with the March 31, 2008 issue, we increased the U.S. cover price of *Globe* from $3.29 to $3.49, and then to $3.59 effective with the May 4, 2009 issue. We then increased the U.S. cover price of *Globe* from $3.59 to $3.69 effective with the October 5, 2009 issue. We increased the U.S. cover price of *National Examiner* from $2.49 to $2.99 effective with the August 11, 2008 issue, then to $3.29 effective with the October 13, 2008 issue, and to $3.39 effective with the May 4, 2009 issue. We then increased the U.S. cover price of *National Examiner* from $3.39 to $3.49 effective with the October 5, 2009 issue.

(2)  Effective with the October 22, 2007 issue, we increased the number of pages of *Globe* from 56 to 60 pages.

(3)  Amount includes one special issue of *National Enquirer* that included 96 pages and was priced at $5.99.

(4)  Effective with the August 11, 2008 issue, we increased the number of pages of *National Examiner* from 48 to 56 pages.

*Competition*

*National Enquirer, Globe, and National Examiner compete in varying degrees with other publications sold at* retailers' checkout counters, as well as forms of media concentrating on celebrity news, such as internet sites, certain newspapers, magazines and television and radio programs. We believe that historical declines in single copy circulation of *National Enquirer, Globe,* and *National Examiner* have resulted in part from increased competition from these publications and other forms of media. Competition for circulation is largely based upon the content of the publication, its placement in retail outlets and its price. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price and advertising results. As use of the internet and new on-line ventures focusing on celebrity news has increased, we have faced additional competition.

*Women's Health and Fitness Publications segment*

Our Women's Health and Fitness Publications segment aggregates the following titles, which have leading market positions in the categories they serve.

- *Shape* is the leader in circulation and advertising revenues in the women's active lifestyle and health and fitness category. *Shape's* mission is to help women lead a healthier lifestyle by providing information on exercise techniques, nutrition, psychology and other inspirational topics, while also offering extensive beauty and fashion coverage. For fiscal year 2010, *Shape* had a total average monthly circulation of approximately 1.7 million copies, including monthly subscriptions of 1.4 million, and an estimated total monthly readership of 6.0 million.

- *Fit Pregnancy* was spun off from *Shape* in 1995. *Fit Pregnancy's* editorial focus makes it a premier lifestyle magazine for *Shape* women during pregnancy, as well as the first six months after childbirth and the two-year postpartum period. *Fit Pregnancy* delivers authoritative information on health, fashion, food and fitness. For fiscal year 2010, *Fit Pregnancy* had a total average bi-monthly circulation of approximately 495,000 copies, including a combined bi-monthly paid and verified non-paid subscriptions of 446,000, and an estimated total bi-monthly readership of 2.5 million.

*Circulation*

The following table sets forth average circulation (per issue) and U.S. cover prices for our Women's Health and Fitness Publications segment for fiscal years 2008, 2009 and 2010.

| | For fiscal year ended | | |
| --- | --- | --- | --- |
| **(Circulation data in thousands)** | **March 31, 2010** | **March 31, 2009** | **March 31, 2008** |
| **Women's Health and Fitness Publications Segment** | | | |
| *Shape* | | | |
| Total Circulation | 1,657 | 1,685 | 1,728 |
| Subscription Circulation | 1,369 | 1,387 | 1,363 |
| Single Copy Circulation | 288(1) | 298(1) | 365 |
| Cover Price | $ 4.99 | $ 4.99(2) | $ 3.99 |
| *Fit Pregnancy* | | | |
| Total Circulation | 495 | 510 | 508 |
| Subscription Circulation | 446 | 445 | 439 |
| Single Copy Circulation | 49 | 65 | 69 |
| Cover Price | $ 5.95 | $ 5.95(2) | $ 4.95 |

(1)    Amounts include one special issue for *Shape* in December 2008 priced at $4.99 and one special issue for *Shape* in February 2010 priced at $5.99.

(2)    Effective with the January 2009 issue, we increased the U.S. cover price of *Shape* from $3.99 to $4.99. Effective with the September 2008 issue, we increased the U.S. cover price of *Fit Pregnancy* from $4.95 to $5.95.

*Subscription sales*

Our overall strategy with respect to subscriptions is to obtain the most cost-efficient subscriptions in meeting our circulation rate base. To accomplish this strategy, we focus on magazine specific sales of our titles through inserts, direct mailings, in-house advertisements and third party agents.

*Advertising revenue*

Our advertising revenue is generated by national advertisers, including beauty and cosmetics, packaged goods, automotive, entertainment, pharmaceutical, sports apparel, sports nutrition products, fashion and direct response. Advertising revenue is typically lowest in the third quarter of our fiscal year due to seasonality.

*Competition*

Each of our Women's Health and Fitness Publications faces competition in its subject area from a variety of publishers and competes for readers on the basis of the quality of its targeted editorial content, display rack placements and editorial staffing. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price, and advertising results. We believe that our Women's Health and Fitness Publications' most significant direct competitors include Condé Nast Publications, Inc. (which publishes *Self*), Meredith Corporation (which publishes *Fitness, Parents* and *American Baby*), and Rodale Inc. (which publishes *Women's Health*).

### Distribution Services segment

DSI arranges for the placement of our publications and third-party publications with retailers, and monitors, through its regional managers and merchandising staff, that our publications and third-party publications are properly displayed in stores. DSI does not physically distribute our publications. All deliveries of our publications are made through third-party wholesalers. DSI's merchandising services relate to various services performed by DSI to ensure that our third-party wholesalers properly deliver our publications and third-party publications to the correct rack locations at each retailer. DSI's sales and marketing services relate to various point of purchase services performed by DSI to increase our publications' and third-party publications' newsstand sales at retail locations.

In addition to the services DSI provides for our publications, DSI acts as a "category manager/front-end advisor" for approximately 39% (based on our estimates for fiscal year 2010) of all new front-end racking programs, as compared to approximately 40% (based on our estimates for fiscal year 2009). This represents approximately 47% for both fiscal years 2010 and 2009 (based on our estimates for fiscal year 2010 and fiscal year 2009) of all the racks placed annually in the United States and Canada by supermarkets, drugstores, mass market chains and other high volume retailers for our category. DSI continues to leverage its network of field representatives, which are regularly in retail outlets performing its services, by expanding its services to provide merchandising, advertisement placements, resetting of rack programs and point of purchase information gathering services to consumer product companies outside the publishing industry. We continue to expand the distribution of our publications into specialty and niche retail accounts utilizing DSI's extensive retail relationships.

Approximately every three years, supermarkets and other retailers typically redesign their front-end racks, generally as part of store renovations or new store openings. As a "category manager/front-end advisor" DSI is selected by retailers to assist in coordinating the selection and positioning of magazines and overall front-end space on the retailers' racks. Publishers, including AMI, which are allocated space on a rack, enter into agreements directly with the retailer for the payment of fees (rack costs) or other charges with respect to that space. DSI uses its role as

"category manager/front-end advisor" of new front-end rack programs initiated by retailers in the United States to achieve better placement of our publications and of the publications of DSI's third-party publishing clients.

*Competition*

DSI primarily competes with Time Warner Retail Services, Inc. and Comag Marketing Group, LLC (a joint venture between The Hearst Corporation and Condé Nast Publications, Inc.) in providing marketing and distribution services to magazine publishers.

### Corporate/Other segment

Our Corporate/Other segment aggregates *Muscle & Fitness* and several other publications, publishing services, ancillary sales and corporate overhead.

While most of the publications aggregated in the Corporate/Other segment have certain similar products and services, production processes, type or class of customers, and method of distribution as some of the other publications which are aggregated in the other reporting segments (Celebrity Publications, Tabloid Publications and Women's Health and Fitness Publications), their economic characteristics are dissimilar with such other publications. Accordingly, we aggregated those publications in the Corporate/Other reporting segment.

Our publications in the Corporate/Other segment include the following titles, which have leading market positions in the categories they serve.

- *Muscle & Fitness* is the preeminent monthly fitness training magazine, appealing to exercise enthusiasts and athletes of all ages, especially those focused on resistance training, body fat control and sports nutrition. *Muscle & Fitness* has 70 years of brand equity and has served as a successful brand extension foundation for new titles. For fiscal year 2010, *Muscle & Fitness* had a total average monthly circulation of approximately 402,000 copies, including monthly subscriptions of 291,000, and an estimated total monthly readership of 6.5 million.

- *Men's Fitness* is a leading magazine published ten times a year, for men 18-34 years old with active lifestyles. The magazine promotes a multi-training approach towards exercise and nutrition, while also offering information and advice in the areas of career, relationships, fashion and sports. For fiscal year 2010, *Men's Fitness* had a total average circulation per issue of approximately 614,000 copies, including subscriptions per issue of 528,000, and an estimated total readership per issue of 6.9 million.

- *Muscle & Fitness Hers* is a bi-monthly magazine designed for the active woman who demands more out of fitness. *Muscle & Fitness Hers* delivers a competitive edge for expert training, nutrition, health, beauty and fashion tips for today's woman. *Muscle & Fitness Hers* readers are typically college educated, professional, fitness enthusiasts. For fiscal year 2010, *Muscle & Fitness Hers* had a total average bi-monthly circulation of approximately 96,000 copies, including subscriptions, and an estimated total bi-monthly readership of 479,000.

- *Flex*, which was spun off from *Muscle & Fitness* in 1983, is a monthly magazine devoted to professional bodybuilding. The magazine delivers nutrition and performance science information for bodybuilding enthusiasts. As *Flex* is a premier title in the bodybuilding segment, it receives a significant share of advertising devoted to the sports nutritional and

vitamin business. For fiscal year 2010, *Flex* had a total average monthly circulation of approximately 105,000 copies, including monthly subscriptions of 63,000, and an estimated total monthly readership of 1.8 million.

- *Natural Health,* published for more than 30 years, is a leading wellness magazine published ten times during fiscal year 2010 and eight times beginning in fiscal year 2011, offering readers practical information to benefit from the latest scientific knowledge and advancements in the field of natural health, including advice to improve beauty and fitness. For fiscal year 2010, *Natural Health* had a total average circulation per issue of approximately 312,000 copies, including subscriptions of 271,000, and an estimated total readership of 1.6 million.

- *Sun* is a tabloid whose editorial content is skewed to an older target audience and focuses on religion, health, holistic remedies, predictions and prophecies. *Sun* also includes entertaining and unusual articles from around the world. For fiscal year 2010, *Sun* had a total average weekly circulation of approximately 49,000 copies, including subscriptions, and an estimated total weekly readership of 392,000.

- *Mira!* is a Spanish language tabloid that features exclusive news and gossip about the hottest stars in the Latino market in movies, television and music, along with interviews and in-depth stories spotlighting them at work and at play. It is distributed at checkout counters in mass merchandisers, supermarkets and bodegas in the top Hispanic markets in the United States. The tabloid was launched in June 2000 and was changed from a bi-weekly to a weekly publication effective with the February 9, 2009 issue. Effective with the January 19, 2009 issue, subscriptions for *Mira!* were discontinued. For fiscal year 2010, *Mira!* had an average single copy circulation of approximately 31,000 copies per issue and an estimated total readership of 231,000 per issue. For fiscal year 2010, it was the largest weekly Spanish language celebrity tabloid in the United States.

*Circulation*

The following table sets forth average circulation (per issue) and U.S. cover prices for our Corporate/Other segment publications for fiscal years 2008, 2009 and 2010.

| | | For fiscal year ended | |
|---|---|---|---|
| **(Circulation data in thousands)** | **March 31, 2010** | **March 31, 2009** | **March 31, 2008** |
| **Corporate/Other Segment** | | | |
| *Muscle & Fitness* | | | |
| Total Circulation ........................................................... | 402 | 415 | 440 |
| Subscription Circulation ............................................... | 291 | 291 | 289 |
| Single Copy Circulation ................................................ | 111(4) | 124(4) | 151 |
| Cover Price ................................................................... | $ 6.99 | $ 6.99 | $ 6.99(2) |
| *Men's Fitness* | | | |
| Total Circulation ........................................................... | 614 | 716 | 738 |
| Subscription Circulation ............................................... | 528 | 602 | 614 |
| Single Copy Circulation ................................................ | 86(4) | 114(4) | 124 |
| Cover Price ................................................................... | $ 4.99(2) | $ 4.50(2) | $ 3.99 |
| *Muscle & Fitness Hers* | | | |
| Total Circulation ........................................................... | 96 | 102 | 107 |
| Subscription Circulation ............................................... | 27 | 20 | 15 |
| Single Copy Circulation ................................................ | 69 | 82 | 92 |
| Cover Price ................................................................... | $ 4.99 | $ 4.99 | $ 4.99 |
| *Flex* | | | |
| Total Circulation ........................................................... | 105 | 107 | 101 |
| Subscription Circulation ............................................... | 63 | 63 | 51 |
| Single Copy Circulation ................................................ | 42 | 44 | 50 |
| Cover Price ................................................................... | $ 6.99 | $ 6.99 | $ 6.99(2) |
| *Natural Health* | | | |
| Total Circulation ........................................................... | 312 | 359 | 365 |
| Subscription Circulation ............................................... | 271 | 313 | 315 |
| Single Copy Circulation ................................................ | 41 | 46 | 50 |
| Cover Price ................................................................... | $ 4.99(3) | $ 4.50(3) | $ 4.50(3) |
| *Sun* | | | |
| Single Copy Circulation ................................................ | 49 | 48 | 52 |
| Cover Price ................................................................... | $ 3.39(1) | $ 3.29(1) | $ 2.99 |
| *Mira!* | | | |
| Single Copy Circulation ................................................ | 31 | 48(5) | 72 |
| Cover Price ................................................................... | $ 2.69(1) | $ 2.29(1) | $ 2.49 |

(1) We increased the U.S. cover price of *Mira!* from $2.49 to $2.69 effective with the May 12, 2008 issue, and then reduced the U.S. cover price of *Mira!* to $2.29 effective with the February 9, 2009 issue. We then increased the U.S. cover price of *Mira!* from $2.29 to $2.69 effective with the July 13, 2009 issue. We increased the U.S. cover price of *Sun* from $2.99 to $3.29 effective with the August 11, 2008 issue. We then increased the U.S. cover price of *Sun* from $3.29 to $3.39 effective with the October 5, 2009 issue.

(2) We increased the U.S. cover price of *Muscle & Fitness* from $5.99 to $6.99 effective with the May 2007 issue. We increased the U.S. cover price of *Men's Fitness* from $3.99 to $4.50 effective with the May 2008 issue. We then increased the U.S. cover price of *Men's Fitness* from $4.50 to $4.99 effective with the August 2009 issue. We increased the U.S. cover price of *Flex* from $5.99 to $6.99 effective with the May 2007 issue.

(3) We increased the U.S. cover price of *Natural Health* from $3.95 to $4.50 effective with the May 2007 issue. We then increased the U.S. cover price of *Natural Health* from $4.50 to $4.99 effective with the May 2009 issue.

(4)   Amounts include one special issue for *Muscle & Fitness* priced at $4.99 in February 2009 and February 2010, respectively, and one special issue for *Men's Fitness* priced at $5.99 in December 2008/January 2009 and December 2009/January 2010, respectively.

(5)   Effective with the February 9, 2009 issue, we changed *Mira!* from a bi-weekly to a weekly publication and reduced the number of pages of *Mira!* from 60 to 48 pages.

*Subscription sales*

Our overall strategy with respect to subscriptions is to obtain the most cost-efficient subscriptions in meeting our circulation rate base. To accomplish this strategy, we focus on magazine specific sales of our titles through inserts, direct mailings, in-house advertisements and third party agents. Effective with the January 19, 2009 issue, subscriptions for *Mira!* were discontinued as we transitioned this publication from an advertising/rate-based publication to a newsstand-based publication.

*Advertising revenue*

Our advertising revenue is generated by national advertisers, including sports nutrition products, automotive, entertainment, packaged goods, pharmaceutical, sports apparel, beauty and cosmetics, fashion, tobacco and direct response. Advertising revenue is typically lowest in the third quarter of our fiscal year due to seasonality.

*Competition*

Each of our Corporate/Other segment publications faces competition in its subject area from a variety of publishers and competes for readers on the basis of the quality of its targeted editorial content, display rack placements and editorial staffing. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price and advertising results. We believe that our Corporate/Other segment publications' most significant direct competitors include Meredith Corporation (which publishes *Fitness*), Rodale Inc. (which publishes *Men's Health*), Wenner Media, Inc. (which publishes *Men's Journal*) and Advanced Research Press (which publishes *Muscular Development*).

*Mira!* and *Sun* compete in varying degrees with other publications sold at retailers' checkout counters, as well as forms of media concentrating on celebrity news, such as certain newspapers, magazines and television and radio programs. We believe that historical declines in single copy circulation of *Mira!* and *Sun* have resulted in part from increased competition from these publications and other forms of media. Competition for circulation is largely based upon the content of the publication, its placement in retail outlets and its price. Competition for advertising revenues is largely based upon circulation levels, readership, demographics, price and advertising results.

*Ancillary sales and corporate overhead*

We have ancillary sales (primarily licensing, syndication and new media). New media consists of web sites for *Muscle & Fitness* (muscleandfitness.com), *Flex* (flexonline.com), *Men's Fitness* (mensfitness.com), *Shape* (Shape.com), *Muscle & Fitness Hers* (muscleandfitnesshers.com), *Natural Health* (naturalhealthmag.com), *Country Weekly* (countryweekly.com), *Fit Pregnancy* (fitpregnancy.com) and for the Mr. Olympia events (MrOlympia.com). Additionally, we maintain an online fitness portal (FitnessOnline.com) and have two websites focused on the sale of fitness

merchandising (ShapeBoutique.com and MuscleStuff.com). Content producers at each publication's website coordinate with the editorial staff of the respective publication. Our print and digital advertising sales and marketing efforts are completely integrated within each publication. Our business development group handles content syndication, online licensing and new media growth areas such as wireless.

In October 2008, we entered into a limited liability company agreement (the "*Radar Online Agreement*") to form a joint venture ("*Radar Online, LLC*") to manage the RadarOnline.com website. Radar Online, LLC operates a celebrity news website (RadarOnline.com). Radar Online, LLC also operates websites for *Star* (starmagazine.com), *National Enquirer* (nationalenquirer.com) and *Globe* (globemagazine.com). We own 50% of Radar Online, LLC and account for this joint venture using the equity method, and therefore do not consolidate Radar Online, LLC in our consolidated financial statements. Radar Online, LLC management fees receivable totaled $716,000 and $216,000 as of March 31, 2010 and 2009, respectively. The management fees are included in the unaudited consolidated balance sheet included elsewhere herein within the line item for other long-term assets.

Corporate overhead includes executive staff, production and circulation department costs, as well as support departments such as information technology, accounting, legal, human resources and administration.

*Weider UK*

We publish international versions of *Muscle & Fitness* and *Flex,* both of which are excluded from the table above, from our offices in Harrogate, England. These publications are tailored to the local markets in the United Kingdom, France, Italy, Germany, Holland and Australia. Additionally, they are distributed throughout other countries in Western Europe, Canada and New Zealand. In the six target markets, they are the industry leader in their categories for circulation and advertising revenues.

*License agreement—UFC Magazine*

In August 2009, we entered into a magazine publishing and license agreement with Zuffa, LLC ("*UFC*"). Under this agreement, we licensed from UFC the right to publish, produce, market and distribute a publication titled *UFC Magazine.* The first issue of *UFC Magazine* under this agreement went on sale in November 2009. In consideration for the licensing rights, we will make quarterly payments to UFC based on the net profit generated by *UFC Magazine.*

*Publishing services—Playboy*

In November 2009, we entered into a publishing services agreement with Playboy. Under this agreement, we assumed responsibility for *Playboy* magazine's advertising sales and marketing, circulation and production management, newsstand distribution and back office financial services as of January 2010. In consideration for these services, Playboy makes payments to us for certain service fees, certain cost savings and subscription revenue incentives. In addition, we provide advertising services to Playboy.com and management for certain Playboy events.

*Publishing services—World Wrestling Entertainment*

In November 2009, we entered into a publishing services agreement with WWE to provide advertising sales and other related support services for both *WWE* magazine and *WWE Kids* magazine as of February 2010. In consideration for these services, WWE pays us certain service fees.

## Production, transportation, and distribution

Outside vendors perform the pre-press operations for substantially all of our publications and are responsible for transmitting files electronically to our third party printing plants. We also outsource the printing, transportation, and distribution of all our publications.

We have a printing agreement expiring in our fiscal year 2018 with R.R. Donnelley & Sons Company ("*RR Donnelly*") to print *National Enquirer*, *Globe*, *Shape*, *Men's Fitness*, *Fit Pregnancy*, *Muscle & Fitness*, *Muscle & Fitness Hers*, *Flex*, *Natural Health*, *National Examiner*, *Sun*, *Mira!* and *Country Weekly.* Additionally, we have printing agreements with Quad/Graphics, Inc. to print *Star* expiring in our fiscal year 2015, and Trend Offset Printing, Inc. to print *Star* expiring in our fiscal year 2012.

We have a pre-press agreement expiring in our fiscal year 2018 with RR Donnelley for *Shape, Men's Fitness, Muscle & Fitness Hers, Fit Pregnancy, Muscle & Fitness, Flex and Natural Health.* All other titles are under a pre-press contract with Vertis, Inc. ("*Vertis*") expiring in our fiscal year 2013.

We have a transportation agreement expiring in fiscal year 2018 with RR Donnelley to transport *Star, National Enquirer, Globe, National Examiner, Sun, Country Weekly and Mira!* to wholesalers within the continental United States and Canada.

We have a subscription agreement with CDS Global, Inc. expiring in the Company's fiscal year 2015 for subscription fulfillment services *for National Enquirer, Globe, Shape, Men's Fitness, Fit Pregnancy, Muscle & Fitness, Muscle & Fitness Hers, Flex, Natural Health, National Examiner and Sun.*

We believe our relationships with our pre-press and printing companies are adequate and that there are printing and pre-press facilities available elsewhere, should the need arise.

Once printed, the newsstand copies are transported by unrelated third parties and distributed to newsstands primarily by three wholesalers. We estimated that these three wholesalers represented approximately 81% of the newsstand distribution market as of September 30, 2010, while the remaining approximately 19% is represented by several smaller wholesalers. In fiscal year 2010, two wholesalers each accounted for operating revenue greater than 10% of our total operating revenue and in the aggregate accounted for approximately 45% of our total operating revenue. We have service agreements with our wholesalers, which provide incentives to maintain certain levels of service. Wholesalers deliver the copies to approximately 110,000 retail sales locations. Subscription copies are distributed primarily by the United States Postal Service.

Paper is the principal raw material utilized by our publications. We purchase the paper directly from several suppliers based upon pricing and, to a lesser extent, availability, then deliver the paper to our third party printing companies. Paper is a commodity product with pricing affected by demand, capacity and economic conditions. We believe that adequate sources of supply are available to fulfill our current as well as future requirements. Our operating income could be significantly affected by changes in the price of paper used in our publications.

## Employees

At March 31, 2010, we employed approximately 654 persons equivalent to full-time employees (each, an "*FTE*"), excluding Distribution Services part-time employees. There are 74 FTEs in our Celebrity Publications segment, 70 FTEs are in our Tabloid Publications segment, 87 FTEs are in our Women's Health and Fitness Publications segment, 139 FTEs are in our Distribution Services segment and 284 FTEs are in our Corporate/Other segment. In addition, at March 31, 2010, we employed approximately 1,350 part-time merchandising employees in our Distribution Services segment. None of our employees are represented by any union or other labor organization. We have had no strikes or work stoppages during the last five years. We believe that our relations with our employees are good.

## Legal proceedings

On March 10, 2009, Anderson News, L.L.C. and Anderson Services, L.L.C., magazine wholesalers, filed a lawsuit against AMI, DSI, and various magazine publishers, wholesalers and distributors in the Federal District Court for the Southern District of New York. Anderson's complaint alleged that the defendants violated Section 1 of the Sherman Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Plaintiffs also purported to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint did not specify the amount of damages sought. On August 2, 2010, the District Court dismissed the complaint in its entirety with prejudice and without leave to replead and, on October 25, 2010, denied Anderson's motion for reconsideration of the dismissal decision. Anderson has until November 24, 2010 to file an appeal, and it has publicly stated that it intends to do so. While it is not possible to predict with certainty the final outcome of an appeal, if any, of the Anderson Action or to estimate the impact of a final judgment against us (if that were to occur), we will continue to vigorously defend the case.

Because the focus of some of our publications often involves celebrities and controversial subjects, the risk of defamation or invasion of privacy litigation exists. Our experience indicates that the claims for damages made in such lawsuits are usually inflated and the lawsuits are usually defensible and, in any event, any reasonably foreseeable material liability or settlement would likely be covered by insurance.

We periodically evaluate and assess the risks and uncertainties associated with litigation disregarding the existence of insurance that would cover liability for such litigation. At present, in the opinion of management, after consultation with outside legal counsel, the liability resulting from such litigation, even if insurance was not available, is not expected to have a material effect on AMO's financial statements.

# Management

## Directors and executive officers

The following table sets forth the directors and executive officers of AMI and AMO effective upon consummation of the Plan. All officers serve at the pleasure of the applicable Board of Directors.

| Name | Age | Position(s) | Director or officer since |
|------|-----|-------------|---------------------------|
| David J. Pecker | 59 | Chairman, Chief Executive Officer, President and Director | May 1999 |
| Philip L. Maslowe | 63 | Director | January 2009 |
| Susan Tolson | 48 | Director | (**) |
| Michael Elkins | 42 | Director | (**) |
| David Licht | 36 | Director | (**) |
| Daniel Flores | 40 | Director | (**) |
| Gavin Baiera | 34 | Director | (**) |
| Cathryn C. Cranston | 55 | Director | March 2009 |
| Lawrence S. Kramer | 60 | Director | March 2009 |
| Christopher Polimeni | 44 | Executive Vice President, Chief Financial Officer and Treasurer | January 2009 |
| Kevin Hyson | 61 | Executive Vice President and Chief Marketing Officer* | May 1999 |
| David Leckey | 57 | Executive Vice President, Consumer Marketing* | February 2006 |
| John Swider | 50 | President and Chief Executive Officer of DSI and Executive Vice President, Operations of AMI | May 2006 |
| Jeffrey Laymon | 52 | Senior Vice President, Controller and Chief Accounting Officer | March 2010 |

\*    These persons are executive officers of AMO only.

\*\*    These persons are expected to become a director on the Plan Effective Date.

David J. Pecker became Chairman, Chief Executive Officer, President and a Director on May 7, 1999. Prior to that, Mr. Pecker had been the Chief Executive Officer since 1992, and President since 1991, of Hachette. Prior to 1991, he was Executive Vice President/Publishing and Chief Operating and Chief Financial Officer of Hachette. Mr. Pecker has 29 years of publishing industry experience having worked as the Director of Financial Reporting at CBS, Inc. Magazine Group and as the Vice President and Controller of Diamandis Communications Inc. Mr. Pecker currently serves as a director of the Magazine Publishers' Association of America, as a director of the Madison Square Boys and Girls Club of New York, and was appointed to the Board of Trustees of Pace University in February 2009. Mr. Pecker holds a B.B.A. from Pace University, received an honorary doctorate degree in Commercial Science from Pace University in 1998, and is Founder, past President and a current director of the Federal Drug Enforcement Foundation.

Philip L. Maslowe became a Director in January 2009. Mr. Maslowe has served on the board of directors for NextMedia Group, Inc., an out-of-home media company that owns and operates

radio and outdoor advertising properties throughout the United States since May 2010. Mr. Maslowe has served on the board of directors and chairman of the audit committee for United Site Services, Inc., a leading national provider of portable restrooms, temporary fence, storage, erosion control and power sweeping, since January 2010. Mr. Maslowe has served on the board of directors and as the chairman of the audit committee for Delek US Holdings, Inc., a diversified energy business, since May 2006, and has served on the board of directors and audit committee, as well as chairman of the human resources committee, of NorthWestern Corporation, a publicly traded provider of electricity and natural gas, since December 2004. From 2008 to 2009, Mr. Maslowe served as a member of the board of directors and audit committee, as well as a member of the special committee to oversee the company, of Hilex Poly, Co., LLC, a leading manufacturer of plastic bag and film products. From March 2006 to February 2007, Mr. Maslowe served on the board of managers of Gate Gourmet Group Holding, LLC, a private company providing catering services to airlines. From 2002 to 2004, Mr. Maslowe served as a member of the board of directors and audit committee, as well as chairman of the corporate governance committee, of Mariner Health Care, Inc., a publicly-traded provider of post-acute health care services, and as chairman of the board of directors, chairman of the audit committee, and chairman or member of the compensation committee of AMF Bowling Worldwide, Inc., a company that operates bowling centers and holds an interest in a business that manufactures and sells bowling equipment. From 2000 to 2001, Mr. Maslowe, served as a member of the board of directors and audit committee of Bruno's Supermarkets, Inc., a supermarket chain in Alabama, Georgia, Florida and Mississippi. From 1997 to 2002, Mr. Maslowe served as executive vice president and chief financial officer of The Wackenhut Corporation, a provider of diversified outsourcing services for security, staffing and privatized prisons. Mr. Maslowe holds a B.B.A. from Loyola University of Chicago and received a Master of Management degree from Northwestern University and is a CPA.

Susan Tolson is a director nominee of AMI and AMO. From 1990 to June 2010, Ms. Tolson worked as an Analyst and Portfolio Manager at Capital Research Company, a subsidiary of The Capital Group Companies, Inc., one of the world's largest investment management organizations. At Capital Research, she served as a Senior Vice President, specializing in the high yield bond market. Prior to joining Capital Research, Ms. Tolson spent two years with Aetna Investment Management Company making private investments in media and entertainment companies. Ms. Tolson serves as board member and audit committee member of the American Cinémathèque, board member and member of the Business Affairs Committee of The American University of Paris, and, board member of the Fulbright Foundation. Ms. Tolson also serves on the investment committee of the American School of Paris. Presently, she resides in Paris with her husband, the U.S. Ambassador to France. Ms. Tolson holds a B.A., *cum laude*, in economics from Smith College and an MBA from Harvard University Graduate School of Business Administration.

Michael Elkins is a director nominee of AMI and AMO. Mr. Elkins joined Avenue in 2004 and is currently a Portfolio Manager of the Avenue U.S. Funds. In such capacity, Mr. Elkins is responsible for assisting with the direction of the investment activities of the Avenue U.S. Strategy. Prior to joining Avenue, Mr. Elkins was a Portfolio Manager and Trader with ABP Investments US, Inc. ("*ABP*"). While at ABP, he was responsible for actively managing the firm's U.S. high-yield and distressed investment strategy. Prior to ABP, Mr. Elkins served as a Portfolio Manager and Trader for UBK Asset Management, after joining the company as a High Yield Credit Analyst. Previously, Mr. Elkins was a Credit Analyst for both Oppenheimer & Co., Inc. and Smith Barney, Inc. Mr. Elkins has served on the board of directors of Vertis Communication since October 2008,

Milacron LLC since April 2009, and Magnachip Semiconductor LLC since November 2009. Mr. Elkins serves on the board of directors of each of these private companies in connection with a reorganization or refinancing involving affiliates of Avenue.

David Licht is a director nominee of AMI and AMO. Mr. Licht joined Avenue in 2007 and is currently a Senior Vice President of the Avenue U.S. Funds. In such capacity, Mr. Licht focuses on distressed debt and undervalued securities of U.S. companies. Prior to joining Avenue, Mr. Licht was a Senior Portfolio Manager at ABP. While at ABP, he was responsible for managing and overseeing the firms high yield, distressed debt and bank debt portfolios. Prior to ABP, Mr. Licht was an Associate at Donaldson, Lufkin & Jenrette Securities Corporation in its Leveraged Finance Division. Previously, Mr. Licht worked for Arthur Andersen LLP where he received his CPA. Mr. Licht holds a B.B.A. from the University of Michigan Business School. Mr. Licht currently serves on the board of directors of Trump Entertainment Resorts, Inc. where he was appointed pursuant to its July 16, 2010 plan of reorganization.

Daniel Flores is a director nominee of AMI and AMO. Mr. Flores joined Avenue in 2008 and is currently a Senior Vice President. In such capacity, Mr. Flores focuses on distressed debt opportunities and restructuring transactions for Avenue's U.S. Strategy. Prior to joining Avenue, Mr. Flores was a Vice President in the Restructuring and Finance Group at Lehman Brothers. Prior to joining Lehman Brothers in 2002, he was a Co-Founder and Director of MENU Pte Ltd, and an Analyst in Merrill Lynch's Global Power Group in New York and Singapore. Mr. Flores has served on the board of directors of Vertis, Inc. since December 2009 and Milacron LLC since August 2009. Mr. Flores serves on the board of directors of each of these private companies in connection with a reorganization or refinancing involving affiliates of Avenue.

Gavin Baiera is a director nominee of AMI and AMO. Mr. Baiera joined Angelo Gordon in 2008 and is a Managing Director at Angelo Gordon. In such capacity, Mr. Baiera is responsible for investing in distressed securities. Prior to joining Angelo Gordon, Mr. Baiera was the Co-head of the Strategic Finance Group at Morgan Stanley where he was responsible for all origination, underwriting, and distribution of restructuring transactions. Prior to joining Morgan Stanley in 2005, Mr. Baiera was at General Electric Capital Corporation concentrating underwriting and investing in restructuring transactions. Mr. Baiera began his career at General Electric Capital Corporation as a part of their financial management program, and holds a B.A. degree from Fairfield University and an M.B.A. degree from the University of Southern California.

Cathryn C. Cranston became a Director in March 2009. Ms. Cranston is the publisher of the Columbia Journalism Review. She began her career in publishing at The New York Times. She also served as publisher of the Harvard Business Review, and subsequently as executive vice president of Mansueto Ventures, the owner of the Inc. and Fast Company media brands. Ms. Cranston has also consulted for leading scientific, legal, and business publishers. Ms. Cranston is the immediate past chair of the Governing Board of the Chicago-based Bulletin of the Atomic Scientists and serves on the Visiting Committee of the Division of Physical Sciences at the University of Chicago. Ms. Cranston is a member of the Economic Club of New York and the New York Women's Forum. She graduated from Harvard College (Fine Arts).

Lawrence S. Kramer became a Director in March 2009. Mr. Kramer is a media consultant and an adjunct professor of Media Management at Syracuse University. He was Senior Adviser at Polaris Venture Partners, a national venture capital firm, from January 2008 until January 2010. From March 2005 to November 2006, he was President of CBS Digital Media and continued to act as an adviser to CBS until April 2008. From 1997 until its sale to Dow Jones in January 2005, he was Chairman, Chief Executive Officer and Founder of MarketWatch, Inc. He currently sits on the

Board of Directors of Discovery Communications, Answers.com, BlackArrow, Inc. and Harvard Business School Publishing, and serves on the Advisory Boards to the Newhouse School of Communications at Syracuse University, Minyanville, Crossboarders.tv, Newser.com and Jib Jab Media Inc. Previously, he served as a member of the Board of Directors of Xinhua Finance Media. He was a founding Board member and former Chairman of The Online Publishers Association. Mr. Kramer received his B.S. from Syracuse University and his M.B.A. from Harvard University.

Christopher Polimeni is Executive Vice President for Finance and Planning, Chief Financial Officer and Treasurer. Prior to being appointed Chief Financial Officer of AMO in March 2010, Mr. Polimeni served as Executive Vice President, Chief Accounting Officer and Treasurer from July 2009 and Senior Vice President of Finance and Treasurer of AMO from September 2008 and as Senior Vice President of Process Improvement from the time he joined AMO in February 2007 until September 2008. Prior to joining AMO, he formed his own consulting firm in 2003 and provided services in areas such as SEC reporting, mergers and acquisitions, internal control evaluations, chapter 11 reorganizations, and technology strategic planning and implementation. From 1994 to 2003 Mr. Polimeni served as Vice President of Finance and Corporate Controller of GE Supply Logistics, LLC (formerly Questron Technology, Inc.), the leading provider of inventory logistics management services. He practiced as a certified public accountant between 1987 and 1994. Mr. Polimeni has a B.B.A. in Accounting and Business Computer Information Systems from Hofstra University.

Kevin Hyson is Executive Vice President and Chief Marketing Officer. Mr. Hyson joined AMO as a Senior Vice President and was promoted to Executive Vice President in 2001. Prior to joining AMO, Mr. Hyson was President of Hylen Sharp Inc., a Greenwich, Connecticut based marketing firm whose clients included Hachette, JVC and Sony.

David Leckey became Executive Vice President, Consumer Marketing in February 2006. From 2001 to 2006, Mr. Leckey was Senior Vice President, Consumer Marketing at Hachette, where he spent 28 years. Prior to that, he was at Hearst Publications. Mr. Leckey was elected to the Board of MPA in 2010. Mr. Leckey has served on the Board of Directors of the Audit Bureau of Circulations since 1988, where he is Chairman of the Magazine Committee, which addresses issues confronting the media industry, especially those concerning circulation reporting and measurement standards. He was the 2002 recipient of the Lee C. Williams Lifetime Achievement Award by the Fulfillment Management Association.

John Swider is the President and Chief Executive Officer of DSI. Prior to being appointed President and Chief Executive Officer of DSI, Mr. Swider served as Executive Vice President, Operations of AMO from November 1999 to October 2010. Prior to joining AMO in November 1999, Mr. Swider was an Executive Vice President for *Globe* Communications Corp. His current responsibilities include production, manufacturing, newsstand circulation, corporate library/archives, customer service and the Mini Mag division. Mr. Swider holds a B.A. in Education from Wake Forest University.

Jeffrey Laymon is Senior Vice President, Controller and Chief Accounting Officer. Prior to being appointed Chief Accounting Officer in March 2010, Mr. Laymon served as Vice President, Internal Audit from May 2007, when he joined AMO, to January 2009 and was Vice President, Controller from January 2009. Prior to joining AMO, Mr. Laymon served as Vice President—Accounting at First Data Corporation, a provider of electronic payment processing solutions, from 1995 to 2006, and from 1984 to 1993, Mr. Laymon was Director of International Finance at Gulf + Western Corporation, a conglomerate corporation with a diversified business. Mr. Laymon has a B.A. in Accounting from Wake Forest University.

## Employment Agreements

The following are summaries of employment agreements with executive officers of AMI. Under the Plan, all employment agreements that are not terminated are to be assumed by the Reorganized Debtors.

*David J. Pecker.*    Mr. Pecker entered into an employment agreement with AMO on March 2, 2009, which was subsequently amended on July 9, 2010, pursuant to which he serves as Chairman, Chief Executive Officer, President and Director. The term of Mr. Pecker's employment agreement is scheduled to expire on March 31, 2013, but the agreement is subject to automatic renewal for additional one-year terms unless either party provides at least 60 days' advance notice of non-renewal.

Pursuant to his employment agreement, Mr. Pecker receives an annual base salary of $1,500,000 until January 31, 2011 and $1,750,000 thereafter, subject to an automatic increase to $2,000,000 from April 1, 2012 if certain targets communicated in writing (including Board-approved EBITDA budget) are met with respect to the 2012 fiscal year. Mr. Pecker is also eligible to receive an annual performance bonus (generally of up to 50% of his base salary but with an opportunity to earn more than that amount with respect to the 2011 fiscal year) based on achievement of specified performance targets. Mr. Pecker is also entitled to receive reimbursement for certain expenses, including (i) first-class business travel, (ii) the cost of cellular and home business telecommunication lines, (iii) country club dues of up to $7,000 per year, (iv) up to 17 round trip flights per year for his spouse between New York and Florida, (v) a leased luxury car and driver, (vi) tax and investment management services of up to $30,000 per year, and (vii) reasonable gifts presented to clients and employees. Mr. Pecker is also entitled to a gross-up payment for income tax incurred with respect to the reimbursement of these expenses.

Upon the termination of Mr. Pecker's employment (1) by AMO without "cause" (as defined in the employment agreement), (2) by Mr. Pecker with "good reason" (as defined in the employment agreement, and generally including certain reductions in compensation or duties, certain relocations of Mr. Pecker's place of employment and a material breach of the employment agreement by AMO) or (3) by AMO upon its election not to renew the employment agreement, in each case subject to Mr. Pecker's execution of a release of claims and continued compliance with the restrictive covenants described below, Mr. Pecker will be entitled to receive (i) continued base salary for one year (two years if such termination occurs within one year following a change in control); (ii) continued welfare benefits for one year; (iii) outplacement services for one year; (iv) any earned but unpaid bonus relating to the prior year and pro-rated bonus for the year of termination; (v) if applicable following a change in control, an excise tax gross-up payment of up to $4,800,000 for any so-called "golden parachute" payments; and (vi) immediate vesting of all nonvested plan benefits, including full vesting of all equity awards.

Mr. Pecker's employment agreement provides that, during his employment and for one year following the termination of his employment for any reason, Mr. Pecker will not compete with, or solicit the customers, suppliers or employees of, AMI, AMO or their respective subsidiaries.

*Christopher Polimeni.*    Mr. Polimeni entered into an employment agreement with AMO on March 8, 2010, pursuant to which he serves as Executive Vice President for Finance and Planning, Chief Financial Officer and Treasurer. The term of Mr. Polimeni's employment agreement is scheduled to expire on March 31, 2011.

Pursuant to his employment agreement, Mr. Polimeni receives an annual base salary of $335,000, and is eligible to receive an annual discretionary bonus of up to $175,000. Mr. Polimeni is also eligible to participate in employee benefit plans.

Upon a termination of Mr. Polimeni's employment by AMI without "cause" (as defined in the employment agreement), Mr. Polimeni will be entitled to receive, subject to his execution of a release of claims, nine months of base salary, payable over 18 months.

Mr. Polimeni's employment agreement provides that, during his employment and for nine months following the termination of his employment for any reason, Mr. Polimeni will not compete with, or solicit the customers or employees of, AMI, AMO or their respective affiliates.

*Kevin Hyson.*    Mr. Hyson entered into an employment agreement with AMO on November 1, 2004, which was most recently amended on October 18, 2009, pursuant to which he serves as Executive Vice President and Chief Marketing Officer. The current term of the agreement is scheduled to expire on March 31, 2011. Pursuant to his employment agreement, Mr. Hyson receives an annual base salary of $325,000, and is eligible to receive an annual discretionary bonus of up to $175,000. Mr. Hyson is also eligible to participate in employee benefit plans and to receive a monthly living allowance of $1,000.

Upon a termination of Mr. Hyson's employment by AMO without "cause" (as defined in the employment agreement), Mr. Hyson will be entitled to receive, subject to his execution of a release of claims, continued base salary for up to six months. Mr. Hyson is also entitled to receive a pro-rated bonus for the year of termination.

Mr. Hyson's employment agreement provides that, during his employment and for six months following the termination of his employment for any reason, Mr. Hyson will not compete with, or solicit the customers or employees of, AMI, AMO or their respective affiliates.

*David Leckey.*    Mr. Leckey entered into an employment agreement with AMO on March 22, 2009, which was amended on October 18, 2009, pursuant to which he serves as Executive Vice President, Consumer Marketing. The current term of the agreement is scheduled to expire on March 31, 2011. Pursuant to his employment agreement, Mr. Leckey receives an annual base salary of $350,000 and is eligible to receive an annual discretionary bonus. Mr. Leckey is also eligible to participate in employee benefit plans.

Upon a termination of Mr. Leckey's employment by AMO without "cause" (as defined in the employment agreement), Mr. Leckey will be entitled to receive, subject to his execution of a release of claims, continued base salary for four months. Mr. Leckey is also entitled to receive a pro-rated bonus for the year of termination.

Mr. Leckey's employment agreement provides that, during his employment and for four months following the termination of his employment for any reason, Mr. Leckey will not compete with, or solicit the customers or employees of, AMI, AMO or their respective affiliates.

*John Swider.*    Mr. Swider entered into an employment agreement with AMO on October 22, 2004, which was most recently amended on September 13, 2010, pursuant to which he serves as Executive Vice President, Operations of AMI and President/CEO of DSI. The term of Mr. Swider's employment agreement is scheduled to expire on March 31, 2013.

Pursuant to his employment agreement, Mr. Swider receives an annual base salary of $325,000 until March 31, 2011, $400,000 from April 1, 2011 to March 31, 2012, and $425,000 from April 1, 2012 to March 31, 2013. Mr. Swider is eligible to receive an annual performance bonus

(discretionary in fiscal year 2011, and up to $150,000 and $175,000 in fiscal years 2012 and 2013, respectively) based on achievement of specified DSI performance targets, and up to $75,000 in fiscal years 2012 and 2013 based on achievement of specified cost savings targets. Mr. Swider is also eligible to participate in employee benefit plans and receives a monthly auto allowance in the amount of $400.

Upon the termination of Mr. Swider's employment (1) by AMO without "cause" (as defined in the employment agreement), Mr. Swider will be entitled to receive, subject to his execution of a release of claims, $375,000, payable over 12 months, plus an additional severance payment in the amount of $117,000 payable in a single sum within 5 days of Mr. Swider's termination.

Mr. Swider employment agreement provides that, during his employment and for six months following the termination of his employment for any reason, Mr. Swider will not compete with, or solicit the customers, suppliers or employees of, AMI, AMO or their respective subsidiaries.

*Jeffrey Laymon.*   Mr. Laymon entered into an employment agreement with AMO on March 16, 2010, pursuant to which he serves as Senior Vice President/Chief Accounting Officer and Controller. The term of Mr. Laymon's employment agreement is scheduled to expire on March 31, 2011.

Pursuant to his employment agreement, Mr. Laymon receives an annual base salary of $275,000, and is eligible to receive an annual discretionary bonus of up to $125,000. Mr. Laymon is also eligible to participate in employee benefit plans.

Upon a termination of Mr. Laymon's employment by AMO without "cause" (as defined in the employment agreement), Mr. Laymon will be entitled to receive, subject to his execution of a release of claims, nine months of base salary, payable in bimonthly payments over nine months.

Mr. Laymon's employment agreement provides that, during his employment and for six months following the termination of his employment for any reason, Mr. Laymon will not solicit the customers or employees of, AMI, AMO or their respective affiliates. Mr. Laymon's employment agreement further provides that, during his employment and for nine months following the termination of his employment for any reason, Mr. Laymon will not compete with AMO.

## Stockholders Agreement

A previous stockholders agreement, dated January 30, 2009, is expected to be terminated and a new stockholders agreement is expected to be entered into in connection with the Plan (the "*Stockholders Agreement*"). Under the Stockholders Agreement, the boards of directors of AMO and AMI will be composed of nine members, one of whom is the chief executive officer of AMO and AMI and the remaining eight directors are designated by certain stockholders, each of whom, collectively with its affiliates, beneficially owns at least 5% of the common stock of AMI following the consummation of the Plan pursuant to the following designation rights: (A) several investment funds managed by Avenue (collectively, the "*Avenue Stockholders*") will have the right to designate four directors; provided that one such individual shall be acceptable to American High-Income Trust and certain related funds and other entities managed by Capital Research, Capital Guardian Trust Company and Capital International, Inc. (collectively, the "*Capital Research Stockholders*") and several investment funds and separately managed accounts managed by Angelo Gordon (collectively, the "*Angelo Gordon Stockholders*") so long as each such stockholder has a Total Ownership Percentage of at least 10%, (B) the Angelo Gordon Stockholders will have the right to designate two directors, and (C) the Capital Research

Stockholders will have the right, but not the obligation, to designate two directors; provided, however, (i) if the Avenue Stockholders have a Total Ownership Percentage of less than 20%, then the number of directors to which the Avenue Stockholders are entitled to designate shall be reduced to two, (ii) if the Total Ownership Percentage of the Avenue Stockholders, the Angelo Gordon Stockholders or the Capital Research Stockholders is less than 10% but more than 5%, then such stockholders shall be entitled to designate one director and (iii) if the Total Ownership Percentage of the Avenue Stockholders, the Angelo Gordon Stockholders or the Capital Research Stockholders is less than 5%, then such stockholder shall no longer be entitled to designate directors. Pursuant to the Stockholders Agreement, we anticipate that: (1) the Angelo Gordon Stockholders will designate Philip L. Maslowe and Gavin Baiera as directors, (2) the Avenue Stockholders will designate Michael Elkins, David Licht, Daniel Flores and Lawrence Kramer as directors and (3) the Capital Research Stockholders designations will be filled by Susan Tolson and Cathryn Cranston. See "Related party transactions—Stockholders Agreement" for a description of additional provisions and terms.

## Equity Incentive Plan

*General.*    As part of the Plan, AMI will adopt the Equity Incentive Plan, and all awards made under the Equity Incentive Plan will be contingent upon the consummation of the Plan. The Equity Incentive Plan will permit AMI to make grants of incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock awards, restricted stock units, stock bonus awards and performance compensation awards to current and proposed employees, directors and consultants of AMI and its affiliates. Each award made under the Equity Incentive Plan will be evidenced by a written award agreement.

*Shares Subject to Issuance.*    A number of shares of AMI Common Stock equal to up to 10% of the total number of shares of AMI Common Stock outstanding immediately following the consummation of the Plan on a fully diluted basis will be reserved for issuance under the Equity Incentive Plan. The number of shares of AMI Common Stock reserved under the Equity Incentive Plan and the number of shares (or other property) subject to outstanding awards or the terms of outstanding awards shall be adjusted, if the adjustment is determined by the AMI board of directors to be necessary or appropriate, in the event of a dividend or other distribution, upon certain corporate transactions affecting the shares of AMI Common Stock, or in the case of changes in applicable law, governmental rules or accounting principles or certain unusual or nonrecurring events affecting AMI, its affiliates or their respective financial statements.

*Administration.*    The Equity Incentive Plan will be administered by the AMI board of directors, or by a committee designated by the AMI board of directors. The administrator has authority to, among other things, designate participants; determine the types of awards to be granted to participants; determine the number of shares of AMI Common Stock to be covered by an award; determine the terms and conditions of awards; interpret the terms and provisions of the Equity Incentive Plan; establish, amend, suspend or waive any rules or regulations it deems necessary for administration of the Equity Incentive Plan; accelerate the vesting, exercisability or payment of awards; and make any other determination and take any other action it deems necessary or desirable for administration of the Equity Incentive Plan.

*Stock Options.*    The Equity Incentive Plan will permit the grant of incentive stock options and non-qualified stock options. The incentive stock options granted under the Equity Incentive Plan are intended to qualify as "*incentive stock options,*" as defined in Section 422 of the Code. The administrator will determine the terms and conditions applicable to the option, which will be set

forth in the award agreement, including at what time or times each option may be exercised (provided that in no event may it exceed ten (10) years from the date of grant) and the method by which the optionee may exercise the option and pay the exercise price of the option. In no event may the exercise price of a stock option be less than 100% of the fair market value of a share of AMI Common Stock on the date of grant.

*Stock Appreciation Rights.*    The Equity Incentive Plan will permit the grant of stock appreciation rights. Stock appreciation rights allow the recipient to receive the appreciation in the fair market value of AMI Common Stock between the exercise date and the date of grant, in the form of shares of AMI Common Stock, cash or a combination thereof. The administrator will determine the terms and conditions applicable to stock appreciation rights, which will be set forth in the award agreement, including at what time or times each stock appreciation right may be exercised (provided that in no event may it exceed 10 years from the date of grant) and the method by which the optionee may exercise the stock appreciation right. In no event may the exercise price of a stock appreciation right be less than 100% of the fair market value of a share of AMI Common Stock on the date of grant.

*Restricted Stock and Restricted Stock Units.*    The Equity Incentive Plan will permit the grant of restricted stock awards and restricted stock units. Restricted stock awards are shares of AMI Common Stock that vest in accordance with terms and conditions established by the administrator, as set forth in an award agreement, including the date or dates on which the restricted award will vest and the conditions under which such awards will be subject to forfeiture. Recipients of restricted stock awards will generally have the rights of holders of AMI Common Stock, including the right to vote and the right to receive dividends. A restricted stock unit is an award that entitles the recipient to receive a share of AMI Common Stock, or an amount of cash equal to the value of a share of AMI Common Stock, following a specified vesting period determined by the administrator. The administrator will determine the terms and conditions applicable to restricted stock units, which will be set forth in an award agreement, including the time or times on which the restricted stock units will vest, the date or dates on which the underlying shares or cash will be delivered and the conditions under which such awards will be subject to forfeiture.

*Stock Bonus Awards.*    The Equity Incentive Plan will permit the grant of stock bonus awards. Stock bonus awards may consist of unrestricted shares of AMI Common Stock or other awards denominated in shares of AMI Common Stock. The terms and conditions applicable to stock bonus awards will be determined by the administrator and set forth in an award agreement.

*Performance Compensation Awards.*    The Equity Incentive Plan will permit the grant of performance compensation awards. The administrator may, in its discretion, designate any award granted under the Equity Incentive Plan as a performance compensation award or to grant cash awards that are subject to the achievement of specified performance criteria. The administrator has the sole discretion to determine the length of the performance period, the type of performance compensation awards to be granted and the specific performance criteria. Performance compensation awards will generally be paid as soon as practicable following certification of the performance goals, provided that the recipient is employed by AMI on the last day of the applicable performance period.

*Effect of a Change in Control or Initial Public Offering.*    The treatment of an award upon the occurrence of a change in control (generally defined as a "*Sale of the Company*" in the

111

Stockholders Agreement, but not including increases in stock ownership among certain existing stockholders) or initial public offering (as defined in the Stockholders Agreement) shall be determined by the administrator and set forth in an award agreement.

*Grant of Awards in Connection with the Plan.*    Contingent upon, and effective as of, the consummation of the Plan, AMI will grant an aggregate of 6.5% of the shares of AMI Common Stock outstanding immediately following the Plan to certain key employees (including Messrs. Pecker and Polimeni) and non-employee directors, in the form of restricted stock awards. These restricted stock awards will become vested solely upon the earlier to occur of a change in control and an initial public offering, provided that the recipient is still employed by, or serving as a director to, AMI on the date of such change in control or initial public offering. Pursuant to his employment agreement, Mr. Pecker's restricted stock awards will vest upon his termination of employment by AMI without "*cause*" or his resignation for "*good reason*" (each as defined in Mr. Pecker's employment agreement) prior to a change in control or initial public offering.

*Restrictive Covenants.*    By accepting an award under the Equity Incentive Plan, the recipient of the award will be required to agree to certain provisions regarding confidentiality, non-disparagement and intellectual property rights.

*Transfer of Awards.*    Awards granted under the Equity Incentive Plan generally may not be transferred (other than stock bonus and restricted stock awards, to the extent applicable restrictions have lapsed), and only the recipient of the award may exercise an award during his or her lifetime. However, the Equity Incentive Plan will permit certain awards to be transferred by recipients to family members and other entities with relationships to the recipient.

*Amendment and Termination.*    The AMI board of directors may amend, suspend or terminate the Equity Incentive Plan, or any portion thereof, at any time. However, no such action may be made without the participant's consent if it would materially and adversely affect the rights of the participant, and no such action may be made without stockholder approval, if such approval is necessary to comply with applicable regulatory or tax requirements.

## Non-Employee Director Separation Pay Plan

In connection with the Plan, AMI will adopt the American Media, Inc. Non-Employee Director Separation Pay Plan, or director severance plan, which will become effective upon the consummation of the Plan. The director severance plan will provide each non-employee member of the AMI board of directors who is selected to participate in the director severance plan with a lump sum cash severance payment upon any termination of the director's service on the board. The amount of the cash severance payment is equal to $35,000 for each year and partial year during which the director served on the AMI board of directors, payable within 30 days following the date of termination.

The director severance plan will terminate on the earlier to occur of a change in control and an initial public offering (each as defined in the Equity Incentive Plan). The AMI board of directors may amend, alter, suspend, discontinue, or terminate the director severance plan or any portion thereof at any time, but no such action may adversely affect the rights of the participants. Participants in the director severance plan are subject to certain provisions regarding confidentiality and non-disparagement.

# Related party transactions

## Restructuring Support Agreement

On October 30, 2010, the RSA Committee, the members of which collectively hold through one or more of their affiliates and consolidated funds, approximately 78% in principal amount of the Existing Subordinated Notes, approximately 89% in principal amount of the Existing PIK Notes and approximately 35% in principal amount of the 2009 Term Facility, executed the Restructuring Support Agreement. Pursuant to the Restructuring Support Agreement, members of the RSA Committee agreed to support the comprehensive financial restructuring and to vote in favor of the Plan.

## Backstop Agreement

On October 30, 2010, AMI, AMO and the Backstop Parties, which consist of affiliates of Avenue and Angelo Gordon, entered into the Backstop Agreement. Under the Plan, certain holders of 2009 Term Facility debt will have a Put Right with respect to any Plan second lien notes they receive pursuant to the Plan. Pursuant to the Backstop Agreement, the Backstop Parties have, severally and not jointly, committed to purchase at face amount their share of any Plan second lien notes that would otherwise be distributed to the 2009 Term Facility Lenders pursuant to the Plan. Holders of the 2009 Term Facility debt may elect to have the Backstop Parties purchase their share of the Plan second lien notes; provided that in no event shall more than $115 million of Plan second lien notes (other than on account of the Existing PIK Notes) be issued. The Backstop Parties will consummate the purchase of the Plan second lien notes on the Plan Effective Date.

Pursuant to and in accordance with the terms of the Backstop Agreement, in consideration for undertaking their commitments under the Backstop Agreement, on the Plan Effective Date, the Backstop Parties shall receive the Backstop Shares and shall be reimbursed in cash for their related fees, costs and expenses, including reasonable attorneys' fees. The Backstop Parties shall be entitled to a fully earned and nonrefundable fee payable in fully-paid and non-assessable New AMI Common Stock to be issued pursuant to the Plan representing 5% (the "*Backstop Percentage Interest*") of the New AMI Common Stock to be issued and outstanding on the Plan Effective Date, which 5% shall be calculated after giving effect to the issuance of New AMI Common Stock under the Plan and without dilution in respect of the Additional Shares (collectively, the "*Initial Shares*"); provided that, if the Backstop Parties are not required to purchase (or elect to receive) a portion of the Plan second lien notes pursuant to the terms of the Backstop Agreement, then the Backstop Percentage Interest shall be reduced to 3.5%, which 3.5% shall be calculated after giving effect to the issuance of New AMI Common Stock under the Plan and without dilution in respect of the Additional Shares. In addition, on the Plan Effective Date, each Backstop Party shall be entitled to such fully-paid and non-assessable shares of New AMI Common Stock (collectively, the "*Additional Shares*" and, together with the Initial Shares, the "*Backstop Shares*") as are required so that its Initial Percentage Ownership (as defined below) shall not be diluted by the issuance of the Initial Shares. The "*Initial Percentage Ownership*" means, with respect to any Backstop Party, the fraction, expressed as a percentage, the numerator of which is the total number of shares of New AMI Common Stock held by such Backstop Party and the denominator of which is the total number of shares of New AMI Common

Stock issued and outstanding held by all stockholders of the reorganized Company, in each case, immediately after the Plan Effective Date but excluding the issuance of any Initial Shares or Additional Shares. The issuance of Backstop Shares to the Backstop Parties shall be subject to dilution by the Equity Incentive Plan.

In addition, the Backstop Parties will receive from the Company a cash fee equal to 5% of the aggregate principal amount of Plan second lien notes issued or put to the Backstop Parties under the Plan (other than on account of the Existing PIK Notes). The Backstop Agreement also provides for the execution of a registration rights agreement, on commercially reasonable terms to be mutually agreed upon, to be entered into between the Company and the Backstop Parties.

As a result of the Transactions, including the issuance of the Backstop Shares pursuant to the Plan, the Backstop Parties are expected to beneficially own at least 59.3% of the equity interests of AMI, subject to dilution for the Equity Incentive Plan.

## Stockholders Agreement

*General*.    Upon the Plan Effective Date, AMI will enter into the Stockholders Agreement, containing certain customary rights and obligations, including director designation rights, right of first offer, registration rights, drag rights, tag rights, minority transfer rights and rights to receive certain information concerning AMI and its subsidiaries at a party's option.

All stockholders of the Company (including the Committee Holders) will be parties to the Stockholders Agreement. The "*Committee Holders*" means: (a) the Avenue Stockholders, (b) the Angelo Gordon Stockholders, (c) the Capital Research Stockholders and (d) the Credit Suisse Stockholders (defined in the Stockholders Agreement as Credit Suisse Securities (USA) LLC and its affiliates, in each case, only with respect to each such person for so long as such person owns stockholder shares and has not received such stockholder shares in violation of the terms of the Stockholders Agreement).

*Drag Right*.    The Stockholders Agreement provides that if the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders (or in the alternative, the consent of (i) any two of the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders and (ii) holders of at least 67% of the Total Ownership Percentage) propose to consummate a transaction constituting a Sale of the Company (as defined in the Stockholders Agreement), all other parties to the Stockholders Agreement shall be subject to certain customary drag provisions.

*Tag Right*.    The Stockholders Agreement provides that the Committee Holders have the right to participate in any sale transaction involving more than 5% of the outstanding equity interests in AMI by any other party to the Stockholders Agreement (other than a sale to an affiliate of the transferor who agrees to become party to the Stockholders Agreement and to be bound thereby to the same extent as the transferor) on a pro rata basis, on the same price and the same terms as the transferor proposed to accept.

*Right of First Offer*.    The Stockholders Agreement provides that the Committee Holders have a pro rata right of first offer on any sale of equity interests by any other party to the Stockholders Agreement to an unaffiliated third-party.

*Minority Transfer Rights.*    The Stockholders Agreement provides that in the event that any person (collectively with its affiliates) upon a proposed transfer of equity interests from a stockholder of the Company would control 50% or more of the combined voting power of the outstanding equity interests of AMI (such party, a "*Majority Owner*") each of the other parties to the Stockholders Agreement has the option to require the Majority Owner to purchase all of their equity interests of AMI at a price equal to the greater of (x) the price paid by the Majority Owner in connection with the Majority Owner's purchase of equity interests of AMI sufficient to give such Majority Owner control of 50% or more of the combined voting power of the outstanding equity interests of AMI and (y) the fair market value of such equity interests at such time. The proposed transfer to the Majority Owner cannot be consummated unless the Majority Owner purchases all of the shares of the stockholders of the Company.

*Consent Rights.*    The Stockholders Agreement prohibits AMI from issuing any additional equity securities to an existing stockholder, subject to certain exceptions, without first obtaining the consent of each of the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders, provided that (i) the consent of any of the Angelo Gordon Stockholders, the Avenue Stockholders or the Capital Research Stockholders shall not be required if such Stockholder does not own at least 10.0% of the Total Ownership Percentage and (ii) such consent shall not be required if a supermajority of the Board of Directors determines, in the exercise of its business judgment, that the failure to make such issuance will have a material adverse effect on the Company; provided further, however, that the issuance of equity to fund an acquisition or investment shall not be considered a material adverse effect.

*Redemption Rights.*    The Stockholders Agreement requires AMI, if AMI determines not to issue a dividend of 75% of its free cash flow, to use at least 75% of its free cash flow to redeem, to the extent permitted by applicable law and not prohibited by the terms of indebtedness of AMI or its subsidiaries, on a *pro rata* basis, a portion of the then outstanding shares of AMI Common Stock utilizing at least 75% of its free cash flow, unless a supermajority of AMI's board of directors determines (as evidenced, subject to adjustment, by a resolution approved by not less than 66% of the then current members of the board of directors), in the exercise of its business judgment, such redemption would reasonably be likely to have a material and adverse effect on AMI.

*Affiliate Transactions.*    The Stockholders Agreement provides that transactions involving (a) AMI or any of its subsidiaries and (b) any stockholder, Committee Holder, director or any member of management or any of their respective affiliates, will require the approval of a majority of the disinterested directors of the AMI board and Committee Holders constituting a Majority Requisite Consent (or if not obtained, an Alternative Majority Consent), subject to certain exceptions.

*Information Rights.*    The Stockholders Agreement provides that the Committee Holders have the right up to four times per year to inspect the properties, books and other records of AMI and its subsidiaries at reasonable times and upon reasonable notice and subject to certain limitations. In addition, each of the aforementioned parties to the Stockholders Agreement, subject to certain limitations, is entitled to have access to the same financial information as the holders of the second lien notes. All such information shall be subject to a customary confidentiality obligation.

*Appointment of Directors.*    The Stockholders Agreement provides that boards of directors of AMO and AMI shall be composed of nine members. The Stockholders Agreement provides that eight of such directors shall be designated by the Committee Holders and the other shall be the chief executive officer of AMO and AMI. Under the terms of the Stockholders Agreement, the

Committee Holders have the following designation rights: (a) the Avenue Stockholders will have the right to designate four directors; provided that one such individual shall be acceptable to the Capital Research Stockholders and the Angelo Gordon Stockholders and so long as each stockholder has a Total Ownership Percentage of at least 10%, (b) the Angelo Gordon Stockholders will have the right to designate two directors, and (c) the Capital Research Stockholders will have the right, but not the obligation, to designate two directors; provided, however, (i) if the Avenue Stockholders have a Total Ownership Percentage of less than 20%, then the number of directors to which the Avenue Stockholders are entitled to designate shall be reduced to two and (ii) if the Total Ownership Percentage of the Avenue Stockholders, the Angelo Gordon Stockholders or the Capital Research Stockholders is less than 10%, but more than 5%, then such stockholder shall be entitled to designate one director, and (iii) if the Total Ownership Percentage of the Avenue Stockholders, the Angelo Gordon Stockholders, and the Capital Reserve Stockholders is less than 5%, then such stockholder shall no longer be entitled to designate directors. If any Committee Holder loses the right to designate a director, such vacancy shall be filled by Committee Holders constituting a Majority Requisite Consent, subject to certain exceptions. The parties to the Stockholders Agreement are obligated to vote for the directors designated in accordance with the foregoing terms.

*Registration Rights.*   The Stockholders Agreement provides for certain customary registration rights, including but not limited to, the Angelo Gordon Stockholders, the Avenue Stockholders and the Capital Research Stockholders, having up to 5 demand rights to require AMI to use commercially reasonable efforts to register their common stock on Form S-1 with the SEC for resale, subject to certain exceptions. Thereafter, any stockholder holding at least 1% of the outstanding shares of AMI registrable pursuant to the Stockholders Agreement has unlimited demand rights to require AMI to use commercially reasonable efforts to register its common stock on Form S-3 with the SEC for resale, subject to certain exceptions and all stockholders party to the Stockholders Agreement have piggyback registration rights.

Furthermore, shares of common stock subject to the Stockholders Agreement shall also be restricted by the terms and conditions of the Stockholders Agreement which, among other transfer restrictions, prohibit any transfer or series of related transfers that results in a "change of control" (as such term is defined under the indenture governing the first lien notes).

## Warrant Agreement

On January 30, 2009, AMI, American Stock Transfer & Trust Company, LLC, as Warrant Agent, Prior Equityholders, and a representative designated by and on behalf of the Prior Equityholders entered into a Warrant Agreement (the "*Warrant Agreement*"). Under the Warrant Agreement, each of the following related persons received a warrant representing his *pro rata* percentage as follows: (a) certain affiliates of T.H. Lee received their combined *pro rata* percentage of 58.982%; (b) certain affiliates of Evercore received their combined *pro rata* percentage of 21.815%; and (c) David Pecker, Chairman, Chief Executive Officer and Director of AMI and AMO, received his *pro rata* percentage of 4.950%. Pursuant to the Plan, the existing warrants will be cancelled and shall be of no further force and effect after the Plan Effective Date.

## Other relationships

Vertis, Inc. performs significant portions of AMO's Tabloid Publications pre-press operations. Prior to the Prior Restructuring, certain affiliates of T.H. Lee owned 59.0% of the Class A units of the

LLC, and certain affiliates of Evercore owned 21.8% of the Class A units of the LLC. Evercore and T.H. Lee and their affiliates beneficially owned approximately 10% and 62%, respectively, of Vertis until Vertis emerged from a pre-packaged bankruptcy, at which point Vertis ceased to be a related party.

As a result of the Prior Restructuring, Vertis again became a related party effective January 30, 2009 due to the new stockholders of AMI holding significant equity interest in Vertis following its emergence from bankruptcy.

Payments to Vertis for these services totaled $2.6 million, $3.1 million, and $3.0 million for fiscal years 2010, 2009 and 2008, respectively. At March 31, 2010 and 2009, AMO had payables due to Vertis of $285,000 and $301,000, respectively.

The Charter of the Audit Committee requires the Audit Committee to review and approve all proposed transactions or dealings with related persons, and to discuss such transactions and their appropriate disclosure in our financial statements with management and AMO's independent auditors.

# Security ownership of certain beneficial owners and management

The following table presents, as of November 1, 2010, information relating to the beneficial ownership of AMI, held by the following persons:

- persons who are known to AMI to be the beneficial owners of more than 5% thereof;

- each director upon consummation of the Plan and certain executive officers of AMI; and

- all of the executive officers and directors upon consummation of the Plan of AMI as a group.

The table below does not give effect to the additional shares of AMI Common Stock that will be issued pursuant to the Plan, including the Backstop Shares, or the awards to be granted under the Equity Incentive Plan. AMI is currently controlled by, and after consummation of the Transactions will continue to be controlled by, certain stockholders who are members of the RSA Committee, each of whom, collectively with its affiliates, will beneficially own at least 5% of the common stock of AMI following the consummation of the Plan. The members of the RSA Committee currently own approximately 70% of AMI Common Stock and following the Transactions are expected to own in excess of 78.6% of New AMI Common Stock. In particular, following the Transactions, the Backstop Parties are expected to own in excess of 59.3% of New AMI Common Stock.

Under the rules of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), a person is deemed to be a beneficial owner of a security if that person has or shares voting power, which includes the power to vote or to direct the voting of such security, or investment power, which includes the power to dispose of or to direct the disposition of such security. A person is also deemed to be the beneficial owner of any securities of which that person has the right to acquire beneficial ownership within 60 days. Under these rules, more than one person may be deemed to be a beneficial owner of the same securities, and a person may be deemed to be a beneficial owner of securities as to which that person has no beneficial interest.

| Name and address of beneficial owner | Amount and nature of beneficial ownership | Percent |
|---|---|---|
| American High-Income Trust(l) | 1,707,468 | 27.2% |
| Angelo, Gordon & Co., L.P.(2) | 1,087,365 | 17.3% |
| Avenue Capital Management II, L.P.(3) | 1,124,665 | 17.9% |
| Credit Suisse Securities (USA) LLC(4) | 491,154 | 7.8% |
| Regiment Capital Ltd.(5) | 397,423 | 6.3% |
| Philip L. Maslowe(6) | 8,000 | * |
| Susan Tolson | — | * |
| Michael Elkins(7) | — | * |
| David Licht(8) | — | * |
| Daniel Flores(9) | — | * |
| Gavin Baiera(10) | — | * |
| Cathryn C. Cranston(6) | 8,000 | * |
| Lawrence S. Kramer(6) | 8,000 | * |
| David J. Pecker | 173,019 | 2.8% |
| Christopher Polimeni | 3,723 | * |
| Kevin Hyson | 5,366 | * |
| David Leckey | 5,011 | * |
| John Swider | 4,736 | * |
| Jeffrey Laymon | 3,150 | * |

\*    Does not exceed one percent.

(1) Reflects the 1,707,467.710 shares of AMI Common Stock held of record by American High-Income Trust. Capital Research and Management Company serves as the investment adviser for American High-Income Trust. In its capacity as investment adviser, Capital Research and Management Company has voting and investment power with respect to the shares held of record by
American High-Income Trust. For purposes of the reporting requirements of the Exchange Act, Capital Research and Management Company may be deemed to be the beneficial owner of all of the shares held by the fund or affiliated funds. Capital Research and Management Company, however, expressly disclaims that it is, in fact, the beneficial owner of such shares. Does not reflect shares of AMI's Common Stock held by other funds for which Capital Research and Management Company also serves as the investment advisor and has voting and/or investment power. Capital Research and Management Company is an investment adviser registered under the Investment Advisers Act of 1940. The address of American High-Income Trust is 333 South Hope Street, Los Angeles, CA 90071. The information relating to such person is based on information provided to us by such person.

(2) Reflects the 1,087,364.940 shares of AMI Common Stock held of record by several investment funds and separately managed accounts managed by Angelo Gordon. In such capacity, Angelo Gordon may be deemed to have sole voting and sole dispositive power over the shares owned by the investment funds and separately managed accounts. John M. Angelo and Michael L. Gordon are the principal executive officers of Angelo Gordon, and in such capacity may also be deemed to have shared voting and shared dispositive power over these shares. Each of Angelo Gordon and Messrs. Angelo and Gordon expressly disclaims beneficial ownership of the shares held by the investment funds and separately managed accounts. The address of Angelo Gordon is 245 Park Avenue, New York, NY 10167. The information relating to such person is based on information provided to us by such person.

(3) Reflects the 1,124,665.170 shares of AMI Common Stock held of record by several investment funds managed by Avenue Capital Management II, LP. Marc Lasry is the managing member of Avenue Capital Management II GenPar, L.L.C., the general partner of Avenue Capital Management II, L.P. Each of Avenue Capital Management II, L.P. and Mr. Lasry expressly disclaims beneficial ownership of the shares held by the investment funds. The address of Avenue Capital Management II, L.P. is 535 Madison Avenue, 14th Floor, New York, NY 10022. The information relating to such person is based on information provided to us by such person.

(4) Reflects the 491,153.890 shares of AMI Common Stock held of record by Credit Suisse Securities (USA) LLC for its own account. Credit Suisse Securities (USA) LLC has sole voting and sole dispositive power over the shares it owns. The address of Credit Suisse Securities (USA) LLC is 11 Madison Avenue, New York, New York 11010. The information relating to such person is based on information provided to us by such person.

(5) Reflects the 397,422.510 shares of AMI Common Stock held of record by several investment funds and separately managed accounts, including Regiment Capital Ltd., managed by Regiment Capital Management, LLC. Regiment Capital Management, LLC is a wholly-owned subsidiary of Regiment Capital Advisors, LP, and has sole voting and sole dispositive power over the shares owned by Regiment Capital Ltd. The general partner of Regiment Capital Advisors, LP is Regiment Capital Advisors, LLC. For purposes of the reporting requirements of the Exchange Act, Regiment Capital Management, LLC may be deemed to be the beneficial owner of all of the shares held by the fund, affiliated funds or separately managed accounts. Regiment Capital Management, LLC, however, expressly disclaims that it is, in fact, the beneficial owner of all of such shares. The address of Regiment Capital Management, LLC is 222 Berkeley Street, 12th Floor, Boston, MA 02116. The information relating to such person is based on information provided to us by such person.

(6) 8,000 shares of AMI Common Stock were granted to each non-employee director of AMI on April 17, 2009 under the American Media, Inc. Fiscal Year 2010 Non-Employee Director Stock Plan (the "*Director Stock Plan*") and the Stock Bonus and Restricted Stock Agreement with the director (the "*Award Agreement*"). Pursuant to the terms of the Director Stock Plan and the Award Agreement, the shares granted to each director were subject to the following vesting schedule: 2,000 shares were fully vested as of the date of grant; 2,000 shares became fully vested on March 31, 2010; 2,000 shares will become fully vested on March 31, 2011; and 2,000 shares will become fully vested on March 31, 2012. Any unvested shares will become immediately vested upon a director's death or "*disability*" or a "*change in control*," as those terms are defined in the Director Stock Plan. If the director's service on the Board of Directors ends for any other reason, the director will forfeit any shares that are unvested as of the date of his or her termination of service.

(7) Michael Elkins is associated with Avenue Capital Management II, LP. Mr. Elkins disclaims beneficial ownership of shares of common stock owned by Avenue Capital Management II, LP and any other stockholder, except to the extent of any pecuniary interest therein.

(8) David Licht is associated with Avenue Capital Management II, LP. Mr. Licht disclaims beneficial ownership of shares of common stock owned by Avenue Capital Management II, LP and any other stockholder, except to the extent of any pecuniary interest therein.

(9) Daniel Flores is associated with Avenue Capital Management II, LP. Mr. Flores disclaims beneficial ownership of shares of common stock owned by Avenue Capital Management II, LP and any other stockholder, except to the extent of any pecuniary interest therein.

(10) Gavin Baiera is associated with Angelo Gordon. Mr. Baiera disclaims beneficial ownership of shares of common stock owned by Angelo Gordon and any other stockholder, except to the extent of any pecuniary interest therein.

# Description of other indebtedness

## New revolving credit facility

Upon our emergence from bankruptcy, we will enter into a new senior secured first lien revolving credit facility in an aggregate principal amount of up to $40.0 million. Borrowing under the new revolving credit facility may be used for general corporate purposes, and will include a subfacility for the issuance of letters of credit. The stated maturity date of the new revolving credit facility is expected to be before the maturity date of the notes. The following is a summary of certain expected terms of the new revolving credit facility, although documentation for such facility may contain terms that vary from the following summary.

Borrowings under the new revolving credit facility will bear interest based on variable rate interest options plus an applicable margin. We also are expected to be required to pay a commitment fee on the unused portion of the new revolving credit facility. The indebtedness under the new revolving credit facility, including certain hedging obligations and cash management obligations owing to lenders or the agent and their respective affiliates, will be guaranteed by AMI and the domestic subsidiaries of AMO and will be secured by substantially all of the assets of AMI, AMO and all of its domestic subsidiaries, subject to exceptions to be agreed. In the event of a foreclosure on the collateral or of insolvency proceedings, obligations under our new revolving credit facility will be repaid in full with the proceeds from the collateral prior to the obligations under the notes offered hereby.

The new revolving credit facility is expected to include covenants, representations and warranties and events of default customary for agreements of this type. Such covenants are expected to include:

- limitations on the incurrence of additional indebtedness and certain equity securities,
- limitations on liens;
- limitations on fundamental changes;
- limitations on investments, loans, advances, guarantees, mergers and acquisitions;
- limitations on asset sales;
- limitations on sale and leaseback transactions;
- limitations on dividends and stock repurchases and optional redemptions of certain debt;
- limitations on restricted payments and certain payments of junior indebtedness;
- limitations on transactions with affiliates;
- limitations on restrictive agreements; and
- limitations on amendments of certain material documents, in each case subject to certain exceptions.

The covenants are also expected to include a financial maintenance covenant based on first lien leverage.

Our new revolving credit facility will not require any scheduled principal payments prior to the stated maturity date.

Under certain conditions, amounts outstanding under the new revolving credit facility may be accelerated. Certain bankruptcy events with respect to AMO will result in an automatic acceleration of the indebtedness under the new revolving credit facility. Subject to notice and cure periods in certain cases, other events of default under the new revolving credit facility will result in acceleration of indebtedness under the new revolving credit facility at the option of the agent or the requisite lenders. Such other events of default are expected to include failure to pay any principal, interest or other amounts when due, failure to comply with covenants, breach of representations or warranties in any material respect, default or acceleration of other material debt, entry of material judgments or a change of control.

J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Credit Suisse Securities (USA) LLC are expected to act as co-lead arrangers for our new revolving credit facility. JPMorgan Chase Bank, N.A., an affiliate of J.P. Morgan Securities LLC, is expected to serve as administrative agent and a lender under our new revolving credit facility and affiliates of each of the other initial purchasers are expected to be lenders under our new revolving credit facility.

## The Plan second lien notes

The Company expects to issue up to $140 million aggregate principal amount of Plan second lien notes, of which at least $25 million shall be issued to 2009 Term Facility Lenders (including the Backstop Parties) in accordance with the Plan as described in "Plan of reorganization—Treatment of certain claims under the plan of reorganization," and the balance may be issued in accordance with the Plan or may be issued in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date. The terms of the Plan second lien notes are expected to be substantially consistent with the terms set forth in "Description of second lien notes" herein.

The Plan second lien notes are expected to have a yield to maturity not to exceed 13.5% per annum. It is expected that prior to the third anniversary of their issue date, the Company will not be permitted to redeem the Plan second lien notes except (i) at a price equal to 100% of the principal amount thereof, plus accrued and unpaid interest, if any, plus a "T+50" make-whole premium or (ii) pursuant to an "equity clawback" of up to 35% of the aggregate principal amount of the Plan second lien notes issued with the proceeds of certain equity offerings at a price equal to 100% of the principal amount thereof, plus a premium equal to the stated coupon of the Plan second lien notes; provided that in the case of this clause (ii) at least 65% of the aggregate principal amount of the Plan second lien notes remain outstanding immediately thereafter. It is expected that on and after the third anniversary of their issue date, the Plan second lien notes may be redeemed by the Company in whole or in part at any time or from time to time at 100% of the principal amount thereof plus accrued and unpaid interest thereon, if any, plus a premium equal to one half of the stated coupon on such Plan second lien notes, which premium shall decline ratably on each subsequent anniversary of the issue date to zero on the date that is two years prior to the maturity of the Plan second lien notes.

# Description of first lien notes

## General

On the Issue Date, AMO Escrow Corporation (the "*Escrow Issuer*") will issue $385.0 million aggregate principal amount of 11 $^{1}$/2% first lien senior secured notes due 2017 (the "*First Lien Notes*") under an indenture to be dated as of the Issue Date (as such may be amended from time to time, the "*Indenture*") between the Escrow Issuer and Wilmington Trust FSB as trustee (the "*First Lien Trustee*") and as collateral agent (the "*Collateral Agent*").

Definitions of certain capitalized terms used in this "Description of first lien notes" may be found under the heading "—Certain definitions." For purposes of this section, prior to the consummation of the Assumption, references to the Company in this description refer only to the Escrow Issuer. After the consummation of the Assumption, the terms "Company," "we," "us" and "our" refer only to American Media Operations, Inc. and not any of its Subsidiaries. Each of the Subsidiaries of the Company that guarantees the First Lien Notes is referred to in this section as a "Guarantor." Each such guarantee is termed a "Guarantee."

The Indenture contains provisions which define your rights under the First Lien Notes. In addition, the Indenture governs the obligations of the Company and of each Guarantor under the First Lien Notes. The terms of the First Lien Notes will include those stated in the Indenture. Pursuant to the Registration Rights Agreement, after the Release Date the Company will use commercially reasonable efforts to commence an offer to exchange the First Lien Notes for equivalent notes registered under U.S. securities laws or, in certain circumstances, register the reoffer and resale of the First Lien Notes under U.S. securities laws. See "Registration rights; exchange offer." The terms of the First Lien Notes will include those stated in the Indenture and, if and when the First Lien Notes have been registered and the Indenture has been qualified under the TIA, those terms expressly made part of the Indenture by reference to the TIA. Prior to registration and qualification under the TIA, the Indenture will contain certain provisions, such as permitting affiliates of the Company that hold First Lien Notes to consent to amendments and waivers that will not be available if and when the Indenture is so qualified.

The following description is meant to be only a summary of certain provisions of the Indenture, the Escrow Agreement, the Security Documents, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement. It does not restate the terms of each of the Indenture, the Security Documents, the Escrow Agreement, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement in their entirety. We urge that you carefully read the Indenture, the Escrow Agreement, the Security Documents, the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement as they, and not this description, govern your rights as Holders.

## Brief description of notes

After the Release Date and the Assumption, the First Lien Notes:

- will be general senior obligations of the Company;

- will be secured, subject to Permitted Liens, on a first-priority basis, equally and ratably with all obligations of the Company and the Guarantors under any Additional Pari Passu Lien Indebtedness and Priority Payment Lien Obligations (although the Holders will receive proceeds of Collateral in accordance with the terms of the First Lien Intercreditor Agreement after the

payment in full of the Priority Payment Lien Obligations in the event of a foreclosure or in any bankruptcy, insolvency or similar event) to the extent set forth below under "—Security for the notes—Security documents and intercreditor agreement";

- will rank *pari passu* in right of payment with all existing and future Indebtedness of the Company that is not subordinated in right of payment to the First Lien Notes;

- will be senior in right of payment to all existing and future Indebtedness of the Company that is, by its terms, expressly subordinated in right of payment to the First Lien Notes;

- will be effectively senior to all Permitted Second Lien Obligations and Unsecured Indebtedness of the Company, in each case, to the extent of the value of the Collateral;

- will be unconditionally guaranteed by the Guarantors; and

- will be structurally subordinated to the Indebtedness and other obligations of Subsidiaries of the Company that do not guarantee the First Lien Notes.

## Guarantees

Upon release of the Escrow Proceeds from escrow on the Release Date as described under "—Release Conditions", the Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally, fully and unconditionally guarantee, on a senior secured basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Company under the Indenture and the First Lien Notes, whether for payment of principal of, premium, if any, or interest on the First Lien Notes, expenses, indemnification or otherwise, on the terms set forth in the Indenture by executing the Indenture or a supplement thereto.

Each of the Restricted Subsidiaries (other than as detailed below) will initially guarantee the Indebtedness and Obligations under the First Lien Notes. Each of the Guarantees:

- will be a senior obligation of such Guarantor;

- will be secured, subject to Permitted Liens, on a first-priority basis, equally and ratably with all obligations of the Company and the Guarantors under any Additional Pari Passu Lien Indebtedness and Priority Payment Lien Obligations (although the Holders will receive proceeds of Collateral after the payment in full of the Priority Payment Lien Obligations in the event of a foreclosure or in any bankruptcy, insolvency or similar event) to the extent set forth below under "—Security for the notes—Security documents and intercreditor agreement";

- will rank *pari passu* in right of payment with all existing and future Indebtedness of such Guarantor that is not subordinated in right of payment to such Guarantee;

- will be senior in right of payment to all existing and future Indebtedness of such Guarantor that is, by its terms, expressly subordinated in right of payment to the Guarantees;

- will be effectively senior to all Permitted Second Lien Obligations and Unsecured Indebtedness of such Guarantor to the extent of the value of the Collateral; and

- will be structurally subordinated to the Indebtedness and other obligations of Subsidiaries of the Company, in each case, that do not guarantee the First Lien Notes.

Not all of the Company's Subsidiaries will guarantee the First Lien Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt, their trade creditors and the holders of their Preferred Stock, if any, before they will be able to distribute any of their assets to the Company. The First Lien Notes will not be guaranteed by our current or future Foreign Subsidiaries. As of September 30, 2010, these non-guarantor Subsidiaries (including Foreign Subsidiaries) had (i) approximately $8.3 million of total liabilities (including Trade Payables), (ii) revenues of approximately $5.7 million for the six months ended September 30, 2010 and (iii) approximately $9.5 million of total assets. For the six months ended September 30, 2010, the non-guarantor subsidiaries had Adjusted EBITDA of $1.4 million.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk factors—Risks related to this offering."

A Guarantee by a Guarantor will provide by its terms that it shall be automatically and unconditionally released and discharged upon:

(a)    any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or all or substantially all the assets of such Guarantor which sale, exchange or transfer is made in compliance with the applicable provisions of the Indenture;

(b)    the release or discharge of the guarantee by such Guarantor of all Pari Passu Lien Indebtedness or such other guarantee that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c)    the proper designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary; or

(d)    the Company exercising its legal or covenant defeasance options as described under "—Defeasance" or the Company's obligations under the Indenture being discharged in accordance with the terms of the Indenture.

## Ranking

The Indebtedness evidenced by the First Lien Notes will be senior Indebtedness of the Company, will be equal in right of payment to all existing and future senior Indebtedness of the Company (including Priority Payment Lien Obligations and any Additional Pari Passu Lien Indebtedness), will have the benefit of the first-priority security interest in the Collateral described below under

"—Security for the notes" and will be senior in right of payment to all existing and future Indebtedness of the Company that is, by its terms, expressly subordinated in right of payment to the First Lien Notes.

The Indebtedness evidenced by the Guarantees will be senior Indebtedness of the applicable Guarantor, will be equal in right of payment to all existing and future senior Indebtedness of such Guarantor (including its guarantee of Priority Payment Lien Obligations and any Additional Pari Passu Lien Indebtedness), will have the benefit of the first-priority security interest in the Collateral described below under "—Security for the notes" and will be senior in right of payment to all existing and future Indebtedness of such Guarantor that is, by its terms, expressly subordinated in right of payment to the Guarantees.

The Indebtedness incurred under the Priority Payment Lien Obligations will also be secured by first-priority security interests in the Collateral but will have a prior right to receive proceeds of collateral in the event of a foreclosure or in any bankruptcy, insolvency or similar event. Accordingly, while the First Lien Notes and the Guarantees rank equally in right of payment with the Priority Payment Lien Obligations, the First Lien Notes and the Guarantees will be effectively subordinated to the Priority Payment Lien Obligations to the extent of the proceeds of the Collateral.

Although the Indenture will limit the incurrence of Indebtedness by and the issuance of Preferred Stock of our Restricted Subsidiaries, such limitation is subject to a number of significant qualifications.

We currently conduct a significant portion of our operations through our Subsidiaries. To the extent such Subsidiaries are not Guarantors, creditors of such Subsidiaries, including trade creditors, and preferred stockholders, if any, of such Subsidiaries generally will have priority with respect to the assets and earnings of such Subsidiaries over the claims of creditors of the Company, including Holders. The First Lien Notes, therefore, will be structurally subordinated to the claims of creditors, including trade creditors, and preferred stockholders, if any, of Subsidiaries of the Company that are not Guarantors. For example, the Company's Foreign Subsidiaries will not guarantee the First Lien Notes.

On an adjusted basis, assuming that we had completed the Emergence Transaction, as of September 30, 2010, there would have been outstanding:

- $385.0 million in aggregate principal amount of first lien Secured Indebtedness of the Company, consisting of the First Lien Notes;

- up to $140.0 million in aggregate principal amount of second lien Secured Indebtedness of the Company, consisting of the Second Lien Notes;

- no senior Indebtedness of the Guarantors (excluding their guarantees of our Indebtedness under our Credit Agreement, the First Lien Notes and the Second Lien Notes);

- no subordinated Indebtedness of the Guarantors; and

- $8.3 million of liabilities, and no Preferred Stock, of our Subsidiaries that are not Guarantors.

Although the amount of additional Indebtedness the Company and its Restricted Subsidiaries can incur is limited, the Company and its Restricted Subsidiaries may be able to incur substantial

amounts of additional Indebtedness in certain circumstances. Such Indebtedness may be senior Indebtedness. See "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" below.

## Escrow of proceeds

The cash proceeds to the Escrow Issuer of the offering of the First Lien Notes (the "*Escrow Issuer Proceeds*") will be placed in escrow until the Release Date or a Special Mandatory Redemption (as defined below). The terms of the escrow will be set forth in the Escrow Agreement, pursuant to which the Escrow Issuer will deposit with the Escrow Agent on the Issue Date, the Escrow Issuer Proceeds, and AMO or the Escrow Issuer will deposit on the Issue Date sufficient cash or Escrow Investments, in an amount sufficient to redeem, for cash, the First Lien Notes at a redemption price equal to the sum of 100% of their issue price together with accrued and unpaid interest on the First Lien Notes from the Issue Date up to but not including the date of the Special Mandatory Redemption described below (collectively, the "*Escrow Proceeds*"). The Escrow Issuer will grant the Collateral Agent, for its benefit and for the benefit of the First Lien Trustee and the Holders, a first priority security interest in the escrow account (the "*Escrow Account*") and all deposits therein to secure the Special Mandatory Redemption.

Prior to release of Escrow Proceeds (either on the Release Date or in connection with the Special Mandatory Redemption), the First Lien Notes will be secured only by a pledge of the Escrow Proceeds.

### Release conditions

The Company will only be entitled to direct the Escrow Agent to release to it the Escrow Proceeds (the "*Escrow Release*") upon satisfaction of the following conditions, which shall be certified in writing by the Company in an Officers' Certificate contemporaneously with the release of the Escrow Proceeds on or prior to the Escrow End Date (such date, the "*Release Date*"):

(1)    issuance by the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*") of an order that has not been stayed pending appeal confirming the Reorganization Plan and, other than release of Escrow Proceeds and other conditions to be satisfied substantially simultaneously with release of Escrow Proceeds, satisfaction of all conditions precedent to effectiveness of such Reorganization Plan;

(2)    the execution and delivery of all documents necessary to effect the Assumption;

(3)    no Default or Event of Default shall have occurred and be continuing under the Indenture;

(4)    substantially simultaneously with the release of Escrow Proceeds, the respective parties shall have executed and delivered documents relating to the Revolving Facility, including the Credit Agreement, and the conditions to effectiveness thereunder shall have been satisfied or waived by the parties thereto, and funds shall have been borrowed or received or available to be borrowed pursuant to the terms contained therein; provided, that no more than $10 million shall be borrowed thereunder on the Release Date;

(5)    AMO delivering to the Escrow Agent a certificate showing in reasonable detail that, as of the Release Date, AMO's pro forma ratio of Debt Covenant EBITDA (as defined in the Offering Memorandum) for the four quarters most recently then ended for which financial statements have been delivered to first lien Indebtedness (exclusive of certain revolver borrowings) is less than or equal to 3.5 to 1.0, such certificate being conclusive absent manifest error;

(6)    the Company and its Subsidiaries shall have no debt for borrowed money other than (a) the First Lien Notes and the Second Lien Notes (or any New PIK Notes issued in lieu of Second Lien Notes pursuant to the Plan), (b) the Credit Agreement and (c) up to $2 million of general debt for borrowed money; and

(7)    receipt of (a) customary legal opinions and (b) customary Officers' Certificates in connection with the Escrow Release.

The Indenture will provide that to the extent the Company or any Restricted Subsidiary has incurred Indebtedness (treating Indebtedness not discharged pursuant to the Reorganization Plan and remaining outstanding on the Release Date as having been incurred as of the Release Date), made any Restricted Payments, consummated any Asset Sale or otherwise taken any action or engaged in any activities during the period beginning on the Issue Date and ending on the Release Date, such actions and activities shall be treated and classified under the Indenture (including but not limited to impacting relevant baskets and determining whether a Default or Event of Default would have occurred as of the Release Date for purposes of the release conditions above), as if the Indenture and the covenants set forth therein had applied to the Company and the Restricted Subsidiaries during such period. For purposes of the foregoing, (i) the Company will be deemed to have been the direct or indirect owner of all of the Restricted Subsidiaries of the Company for all relevant periods and (ii) all Subsidiaries of the Company shall be deemed to be Restricted Subsidiaries for the period from the Issue Date through the Release Date.

### *Special mandatory redemption*

The First Lien Notes will be subject to a mandatory redemption (a "*Special Mandatory Redemption*") in the event that either (i) the Release Date has not occurred on or prior to the Escrow End Date or (ii) prior to the Escrow End Date, the Company has determined, in its reasonable discretion, that the escrow conditions cannot be satisfied by such date (any such date, a "*Trigger Date*"). The Company will cause the notice of Special Mandatory Redemption to be mailed to the Escrow Agent, the First Lien Trustee and the Holders of the First Lien Notes no later than the next Business Day following the Trigger Date and will redeem the First Lien Notes no later than five Business Days following the date of the notice of Special Mandatory Redemption (the "*Special Mandatory Redemption Date*"). The redemption price for any Special Mandatory Redemption will be 100% of the issue price of the First Lien Notes as set forth on the cover of the final offering memorandum, together with accrued and unpaid interest on the First Lien Notes from the Issue Date up to but not including the Special Mandatory Redemption Date.

If the Escrow Agent receives a notice of a Special Mandatory Redemption pursuant to the terms of the First Lien Notes and the Escrow Agreement, the Escrow Agent will liquidate all Escrow Proceeds then held by it not later than the last Business Day prior to the Special Mandatory Redemption Date. Concurrently with release of the amounts necessary to fund the Special Mandatory Redemption to the paying agent, the Escrow Agent will release any excess of Escrow Proceeds over the mandatory redemption price to the Company, and the Company will be permitted to use such excess Escrow Proceeds at its discretion.

## Paying agent and registrar for the first lien notes

The Company will maintain one or more paying agents for the First Lien Notes. The initial paying agent for the First Lien Notes will be the First Lien Trustee.

The Company will also maintain a registrar for the First Lien Notes. The initial registrar will be the First Lien Trustee. The registrar will maintain a register reflecting ownership of the First Lien Notes outstanding from time to time and will make payments on and facilitate transfer of First Lien Notes on behalf of the Company.

The Company may change the paying agents or the registrars without prior notice to the Holders. The Company or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and exchange

A Holder may transfer or exchange First Lien Notes in accordance with the Indenture. The registrar and the First Lien Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of First Lien Notes. Holders will be required to pay all taxes due on transfer. The Company will not be required to transfer or exchange any First Lien Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Sale Offer. Also, the Company will not be required to transfer or exchange any First Lien Note for a period of 15 days before a selection of First Lien Notes to be redeemed. The registered Holder of a First Lien Note will be treated as the owner of the First Lien Notes for all purposes.

## Principal, maturity and interest

The Company will issue $385.0 million in aggregate principal amount of First Lien Notes on the Issue Date. The First Lien Notes will mature on December 15, 2017. After the Release Date, subject to compliance with the covenant described below under the caption "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock," the Company may issue additional First Lien Notes from time to time after the original issuance under the Indenture ("*Additional Notes*"). The First Lien Notes originally issued by the Company and any Additional Notes subsequently issued under the Indenture will be treated as a single class for all purposes under the Indenture and the Security Documents, including waivers, amendments, redemptions and offers to purchase. Unless the context requires otherwise, references to "First Lien Notes" for all purposes of the Indenture and this "Description of notes" include any Additional Notes that are actually issued. The First Lien Notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000.

Interest on the First Lien Notes will accrue at the rate of 11.50% per annum and be payable semi-annually in arrears on June 15 and December 15 of each year, commencing on June 15, 2011, to the Holders of record on the immediately preceding June 1 and December 1. In addition, we will also pay any accrued and unpaid interest on the maturity date. Interest on the First Lien Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the First Lien Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

## Security for the notes

Prior to release of Escrow Proceeds (either on the Release Date or in connection with the Special Mandatory Redemption), the Indebtedness and Obligations under the First Lien Notes will be secured only by a pledge of the Escrow Proceeds.

Upon release of the Escrow Proceeds from escrow on the Release Date, the First Lien Notes and the Guarantees and all obligations with respect thereto under the Indenture will be secured equally and ratably with the obligations of the Company and the Guarantors under any other Pari Passu Lien Indebtedness and Priority Payment Lien Obligations by first-priority security interests (subject to Permitted Liens) in the Collateral. The Collateral includes accounts, chattel paper, instruments, letter of credit rights, documents, equipment, general intangibles, inventory, cash and cash accounts, investment properties (including Capital Stock of domestic Subsidiaries owned by the Company and the Guarantors and 65% of the Capital Stock of Foreign Subsidiaries owned by the Guarantors), certain owned real property and proceeds of the foregoing, but in any event not including Excluded Assets.

"*Excluded Assets*" means (a) any contract or agreement to which the Company or a Guarantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the unenforceability of any right of the Company or a Guarantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the New York UCC or any other applicable law or principles of equity), *provided, however,* that such security interest shall attach immediately at such time as the condition causing such unenforceability shall be remedied and, to the extent severable, shall attach immediately to any portion of such contract or agreement that does not result in any of the consequences specified in (i) or (ii) including, without limitation, any proceeds of such contract or agreement, (b) assets securing Purchase Money Debt or Capitalized Lease Obligations permitted to be incurred under the Indenture to the extent the documentation relating to such Purchase Money Debt or Capitalized Lease Obligations prohibits such assets from being Collateral, (c) any leasehold interest in any real property of the Company or any Guarantor, as tenant and (d) certain other customary exceptions described in the Security Documents.

The Company and the Guarantors are and will be able to incur additional Indebtedness in the future that could share in the Collateral, including additional Pari Passu Lien Indebtedness that would be secured on a first-priority basis with the First Lien Notes. The amount of such additional Pari Passu Lien Indebtedness is and will be limited by the covenants described under "—Certain covenants—Liens" and "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock." Under certain circumstances, the amount of such additional Pari Passu Lien Indebtedness could be significant.

### Limitations on pledged equity interests

The Equity Interests of a Restricted Subsidiary will constitute Collateral only to the extent that such Equity Interests can secure the First Lien Notes without Rule 3-16 of Regulation S-X under the Securities Act (or any other law, rule or regulation) requiring separate financial statements of such Restricted Subsidiary to be filed with the SEC (or any other governmental agency). In the event that Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Restricted Subsidiary due to the fact that such Restricted Subsidiary's Equity Interests secure the First Lien Notes, then the Equity Interests of such Restricted Subsidiary shall automatically be deemed not to be part of the Collateral. In such event, the Security Documents may be amended or modified, without the

consent of any Holder, to the extent necessary to release the Liens for the benefit of the First Lien Notes on the Equity Interests that are so deemed to no longer constitute part of the Collateral, all at the written request and certification of the Company upon which the First Lien Trustee may conclusively rely.

In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would permit) such Restricted Subsidiary's Equity Interests to secure the First Lien Notes without the filing with the SEC (or any other governmental agency) of separate financial statements of such Restricted Subsidiary, then the Equity Interests of such Restricted Subsidiary shall automatically be deemed to be a part of the Collateral. In such event, the Security Documents may be amended or modified, without the consent of any Holder, to the extent necessary to subject such Equity Interests to the Liens under the Security Documents.

### After-acquired collateral

From and after the Release Date and subject to certain limitations and exceptions (including the exclusion of any securities or other equity interests of any of the Company's Subsidiaries), if the Company or any Guarantor creates any additional security interest upon any property or asset to secure any Pari Passu Lien Obligations (which include Obligations in respect of the Credit Agreement), it must concurrently grant a first-priority security interest (subject to Permitted Liens) upon such property as security for the Indebtedness and Obligations under the First Lien Notes. Also, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent with respect to the first-priority security interest for the benefit of Wilmington Trust FSB, as Collateral Agent. If such third party does not consent to the granting of the first-priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest.

### Information regarding collateral

The Company will furnish to the Collateral Agent, with respect to the Company or any Guarantor, prompt written notice of any change in such Person's (i) legal name, (ii) jurisdiction of organization or formation, (iii) identity or corporate structure or (iv) Organizational Identification Number. The Company and the Guarantors will agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

Each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year, the Company shall deliver to the First Lien Trustee a certificate of a financial officer setting forth the information required pursuant to the schedules required by the Security Documents or confirming that there has been no change in such information since the date of the prior annual financial statements.

### Further assurances

The Company and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under

applicable law, or that the Collateral Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Security Documents in the Collateral. In addition, from time to time, the Company will reasonably promptly secure the obligations under the Indenture, Security Documents and First Lien Intercreditor Agreement by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral. Such security interests and Liens will be created under the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents as may be reasonably required.

### *Security documents and intercreditor agreements*

On the Release Date, the Company, the Guarantors and the Collateral Agent will enter into one or more Security Documents defining the terms of the security interests that secure the First Lien Notes and the Guarantees. The First Lien Notes will be secured by the Collateral on a first lien basis pari passu with the obligations under the Credit Agreement (such Collateral referred to herein as the "*Shared Collateral*"). These security interests will secure the payment and performance when due of all of the Obligations of the Company and the Guarantors under the First Lien Notes, the Indenture, the Guarantees and the Security Documents, as provided in the Security Documents and the Priority Payment Lien Obligations.

### *First lien intercreditor agreement*

On the Release Date, the administrative agent for the Revolving Facility (the "*Agent*"), the collateral agent for the Revolving Facility (the "*Revolving Collateral Agent*"), the First Lien Trustee and the Collateral Agent will enter into the First Lien Intercreditor Agreement (to be acknowledged by the Company and the Guarantors on terms as described below). Following the Release Date, additional collateral agents for the holders of other classes of Pari Passu Lien Indebtedness (other than the First Lien Notes and the Credit Agreement) may become party to the First Lien Intercreditor Agreement subject to compliance with certain procedural requirements in the First Lien Intercreditor Agreement. The First Lien Notes and other obligations secured by the Liens in favor of the Collateral Agent, the Priority Payment Lien Obligations secured by Liens in favor of the Revolving Collateral Agent and the obligations in respect of any Pari Passu Lien Indebtedness secured by Liens in favor of any other collateral agent that becomes party to the Intercreditor Agreement are each referred to as a "class" of Pari Passu Lien Indebtedness in this section.

(i)     Each of the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent and any other collateral agent on behalf of any Additional Pari Passu Lien Indebtedness shall be permitted to (i) enforce any rights and exercise any remedies with respect to any Shared Collateral available under the documents related to the Revolving Facility, the First Lien Notes and any Additional Pari Passu Lien Indebtedness or applicable law or (ii) commence any action or proceeding with respect to such rights or remedies; *provided* that, notwithstanding the foregoing, (a) the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent and any other collateral agent on behalf of any Additional Pari Passu Lien Indebtedness and the related secured parties shall remain subject to, and bound by, all covenants or agreements made in the First Lien Intercreditor Agreement, (b) each of the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent and any other collateral agent on

behalf of any Additional Pari Passu Lien Indebtedness will agree, on behalf of itself and its related secured parties, that, prior to the commencement of any enforcement of rights or any exercise of remedies with respect to any Shared Collateral by such collateral agent or any of its related secured parties, such collateral agent or its related secured parties, as the case may be, shall provide written notice thereof to each other collateral agent as far in advance of such commencement as reasonably practicable, and shall consult with each collateral agent on a regular basis in connection with such enforcement or exercise, and (c) each of the Agent, the Collateral Agent, the First Lien Trustee, the Collateral Agent and any other collateral agent on behalf of any Additional Pari Passu Lien Indebtedness will agree, on behalf of itself and its related secured parties, that such collateral agent and its related secured parties shall cooperate in a commercially reasonable manner with each other collateral agent and its related secured parties in any enforcement of rights or any exercise of remedies with respect to any Shared Collateral.

(ii)     With respect to any Shared Collateral on which a Lien can be perfected by the possession or control of such Shared Collateral or of any deposit, securities or other account in which such Shared Collateral is held, then the applicable collateral agent in respect of the Priority Payment Lien Obligations, First Lien Notes or Additional Pari Passu Lien Indebtedness that holds or controls such Shared Collateral shall also hold such Shared Collateral as gratuitous bailee and sub-agent for each other collateral agent in respect of the Priority Payment Lien Obligations, First Lien Notes and Additional Pari Passu Lien Indebtedness, as the case may be. Any such collateral agent that holds Shared Collateral as gratuitous bailee and sub-agent shall be entitled to deal with the applicable pledged or controlled Shared Collateral as if the liens thereon of the collateral agent or secured parties of the Priority Payment Lien Obligations, First Lien Notes or Additional Pari Passu Lien Indebtedness did not exist; *provided* that any proceeds arising from or other payments or distributions made upon such pledged or controlled Shared Collateral shall be subject to the waterfall provisions set forth in the First Lien Intercreditor Agreement (as described below). Until the payment in full of the Priority Payment Lien Obligations, the Revolving Collateral Agent shall hold all such Collateral which can be perfected by control or possession and, after the payment in full of such obligations, the collateral agent with respect to the class of Pari Passu Lien Indebtedness, including the First Lien Notes, of the largest principal amount at such time shall hold such Collateral (and, after giving effect to any subsequent repayment of Pari Passu Lien Indebtedness, the collateral agent with respect to the class of Pari Passu Lien Indebtedness of the largest principal amount at such time shall hold such Collateral).

(iii)    Notwithstanding the date, time, method, manner or order of grant, attachment or perfection of any liens on any Shared Collateral, the security interests of the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent and any collateral agent on behalf of any Additional Pari Passu Lien Indebtedness will rank equal in priority; *provided* that the Priority Payment Lien Obligations will have priority as set forth below to the proceeds of or other payments or distributions on Shared Collateral upon a foreclosure or in an Insolvency or Liquidation Proceeding including without limitation all adequate protection payments made in any Insolvency or Liquidation Proceeding in respect of the Shared Collateral and will be repaid in full prior to the repayment of the First Lien Notes and any Additional Pari Passu Lien Indebtedness. With respect to each class of Pari Passu Lien Indebtedness, the collateral agent for such class shall bear the risk of any determination by a court of competent jurisdiction that (i) any Pari Passu Lien Indebtedness of such class is unenforceable under applicable law or is subordinated to any other obligations, (ii) such collateral agent does not have a valid and perfected lien on any of the Collateral securing any of the Pari Passu Lien Indebtedness of any

other class and/or (iii) any third party (other than the Collateral Agent or any other collateral agent for any class of Pari Passu Lien Indebtedness; such third party is referred to herein, with respect to any Intervening Lien (as defined below) for the benefit of such third party, as an "*Intervening Creditor*") has a lien on any Shared Collateral that is senior in priority to the lien of such collateral agent on such Shared Collateral, but junior to the lien on such Shared Collateral securing any other class of Priority Payment Lien Obligations or Pari Passu Lien Indebtedness (any such lien being referred to as an "*Intervening Lien*") (any condition with respect to Pari Passu Lien Indebtedness of any class being referred to as an "*Impairment*" with respect to such class). In furtherance of the foregoing, in the event Pari Passu Lien Indebtedness of any class shall be subject to an Impairment in the form of an Intervening Lien, the value of any Shared Collateral or proceeds that are allocated to such Intervening Creditor shall be deducted solely from the Shared Collateral or proceeds to be distributed in respect of Pari Passu Lien Indebtedness of such class.

(iv)     If (i) an event of default under any document governing the Priority Payment Lien Obligations, the First Lien Notes or any Additional Pari Passu Lien Indebtedness shall have occurred and be continuing and any of the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent or any other collateral agent for any class of Additional Pari Passu Lien Indebtedness or any secured party in respect of the Priority Payment Lien Obligations, the First Lien Notes or any class of Additional Pari Passu Lien Indebtedness is taking action to enforce rights or exercise remedies in respect of any Shared Collateral, (ii) any distribution, payment, compromise or settlement of any kind (under a confirmed plan of reorganization or otherwise) is made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding of the Company or any Guarantor or (iii) the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent or any other such collateral agent or any such secured party receives any payment with respect to any Shared Collateral pursuant to any intercreditor agreement (other than the First Lien Intercreditor Agreement), then the cash and non-cash payments, distributions or the proceeds of any sale, collection or other liquidation of any Shared Collateral obtained by such collateral agent or any such secured party in respect of the Priority Payment Lien Obligations, the First Lien Notes or any Additional Pari Passu Lien Indebtedness on account of such enforcement of rights or exercise of remedies, and any such cash and non-cash distributions or payments received by such Collateral Agent, any other such collateral agent or any such secured party in respect of the Priority Payment Lien Obligations, the First Lien Notes or any Additional Pari Passu Lien Indebtedness, shall be applied as follows (v) *first*, (a) to the payment of all amounts owing to the collateral agent or the Agent for the Priority Payment Lien Obligations (in its capacity as such) pursuant to the terms of any document related to the Priority Payment Lien Obligations (b) in the case of any such enforcement of rights or exercise of remedies, to the payment of all costs and expenses incurred by the collateral agent or the Agent for the Priority Payment Lien Obligations in connection therewith and (c) in the case of any such payment pursuant to the First Lien Intercreditor Agreement, to the payment of all costs and expenses incurred by the collateral agent or the Agent for the Priority Payment Lien Obligations or any of its related secured parties in enforcing its rights thereunder to obtain such payment, (w) *second*, to the payment in full of any Priority Payment Lien Obligations (including, for the avoidance of doubt, an amount equal to the post-petition interest, fees, costs, and charges that would otherwise have accrued thereon under the terms of, and at the rates specified in, the Revolving Facility either (i) had the Company not been the subject of an Insolvency or Liquidation Proceeding or (ii) had the claims under the Revolving Facility been separately classified from those under the First Lien Notes in any Insolvency or Liquidation Proceeding (regardless of

whether any such claims may or may not be allowed or allowable in whole or in part as against the Company or the Guarantors or the Shared Collateral in the respective Insolvency or Liquidation Proceeding pursuant to Section 506(b) of the Bankruptcy Code or otherwise)) and the termination of any commitments under the Revolving Facility, (x) *third*, (a) to the payment of all amounts owing to such collateral agent (in its capacity as such) pursuant to the terms of any document related to the First Lien Notes or Additional Pari Passu Lien Indebtedness, as the case may be, (b) in the case of any such enforcement of rights or exercise of remedies, to the payment of all costs and expenses incurred by such collateral agent or any of its related secured parties in respect of First Lien Notes or Additional Pari Passu Lien Indebtedness, as the case may be, in connection therewith and (c) in the case of any such payment pursuant to the First Lien Intercreditor Agreement, to the payment of all costs and expenses incurred by such collateral agent or any of its related secured parties in enforcing its rights thereunder to obtain such payment, (y) *fourth*, to the payment in full of all First Lien Notes and any Additional Pari Passu Lien Indebtedness of each class secured by a valid and perfected lien on such Shared Collateral at the time due and payable (the amounts so applied to be distributed, as among the First Lien Notes and any classes of Additional Pari Passu Lien Indebtedness, ratably in accordance with the amounts of First Lien Notes and Additional Pari Passu Lien Indebtedness of each such class on the date of such application), and (z) *fifth* after payment in full of all the obligations secured by such Shared Collateral on a pari passu basis with the Priority Payment Lien Obligations, to the holders of junior liens on the Shared Collateral and thereafter, to the Company and the Guarantors or their successors or assigns or as a court of competent jurisdiction may direct.

(v)    The parties to the First Lien Intercreditor Agreement (including the Borrower and the Guarantors) shall irrevocably agree that the First Lien Intercreditor Agreement (including the provisions described in the foregoing paragraph) constitutes a "subordination agreement" within the meaning of both New York law and Section 510(a) of the Bankruptcy Code, and that the terms thereof will survive, and will continue in full force and effect and be binding upon each of the parties, in any Insolvency or Liquidation Proceeding.

(vi)    To further effectuate the intent, understanding, and agreement of the Agent on the one hand, and the First Lien Trustee and the other First Lien Secured Parties, on the other, if, as is contemplated, it is held (in the context of a confirmed plan of reorganization or otherwise) that the claims against the Company or any Guarantor under the Revolving Facility, the First Lien Notes or any Additional Pari Passu Lien Indebtedness in respect of the Shared Collateral constitute only one secured claim (rather than separate classes of senior and junior claims), then the First Lien Trustee, the Collateral Agent and, by virtue of accepting the First Lien Notes, the other First Lien Secured Parties, expressly acknowledge and agree that all distributions, payments, compromises, or settlements of any kind (under a confirmed plan of reorganization or otherwise) made in respect of any Shared Collateral in any Insolvency or Liquidation Proceeding of the Company or otherwise shall be deemed for all purposes with respect to the parties' First Lien Intercreditor Agreement and such Insolvency or Liquidation Proceedings to have been made as if there were separate classes of senior and junior secured claims against the Company in respect of the Shared Collateral, with the effect being that (and the First Lien Trustee and the other First Lien Secured Parties expressly acknowledge and agree) the Agent for the Priority Payment Lien Obligations (on behalf of itself and the lenders under the Credit Agreement) shall be entitled to and shall receive from the Shared Collateral, in addition to amounts distributed to them in respect of principal, pre-petition interest, and other claims, the amount of interest, fees, costs, and charges that would otherwise have accrued post-petition under the terms of, and at the rates specified in, the Revolving Facility as against the Company or with respect to the Shared

Collateral either (i) had the Company not been the subject of an Insolvency or Liquidation Proceeding or (ii) had the claims under the Revolving Facility been separately classified from those under the First Lien Notes in any Insolvency or Liquidation Proceeding (regardless of whether any such claims may or may not be allowed or allowable in whole or in part as against the Company or the Shared Collateral in the respective Insolvency or Liquidation Proceeding pursuant to Section 506(b) of the Bankruptcy Code or otherwise), before any distribution is or may be made in respect of the claims relating to the Shared Collateral or the Liens thereon securing the First Lien Notes held by the First Lien Trustee, on behalf of the First Lien Secured Parties, with the First Lien Trustee, the Collateral Agent and, by virtue of accepting the First Lien Notes, the other First Lien Secured Parties, further expressly acknowledging and agreeing to either turn over to, or direct the Company and the Guarantors to pay directly to, the holders of the Priority Payment Lien Obligations all amounts otherwise received or receivable by them from the Shared Collateral or in respect of the Liens thereon securing the First Lien Notes to the extent needed to effectuate the intent of this provision to ensure that the Priority Payment Lien Obligations (including, for the avoidance of doubt, those related to the post-petition interest, fees, costs, and charges that would otherwise have accrued thereon under the terms of, and at the rates specified in, the Revolving Facility either (i) had the Company not been the subject of an Insolvency or Liquidation Proceeding or (ii) had the claims under the Revolving Facility been separately classified from those under the First Lien Notes in any Insolvency or Liquidation Proceeding (regardless of whether such claims may or may not be allowed or allowable in whole or in part as against the Company or the Shared Collateral in the respective Insolvency or Liquidation Proceeding pursuant to Section 506(b) of the Bankruptcy Code or otherwise) are paid in full, even if such turnover of amounts has the effect of reducing the amount of the recovery and/or claims of the First Lien Secured Parties.

(vii)    The Intercreditor Agreement will provide that none of the Collateral Agent, the Agent, any additional collateral agent for the holders of other classes of Pari Passu Lien Indebtedness or any holders of Pari Passu Lien Indebtedness shall contest or support any person in contesting in any proceeding (including a bankruptcy proceeding) the perfection, priority, validity, attachment or enforceability of a lien held by or on behalf of any other collateral agent or any holders of Pari Passu Lien Indebtedness in the Shared Collateral; *provided* that the foregoing shall not impair the right of any collateral agent or holder of Pari Passu Lien Indebtedness to enforce the Intercreditor Agreement.

### Second lien intercreditor agreement

On the Release Date, the Agent, the Revolving Collateral Agent, the First Lien Trustee, the Collateral Agent, the Second Lien Trustee and the collateral agent for the holders of Second Lien Notes ("*Second Lien Collateral Agent*") will enter into the Second Lien Intercreditor Agreement. Pursuant to the terms of the Second Lien Intercreditor Agreement, at any time prior to the Discharge of First Lien Obligations, the First Lien Trustee will determine the time and method by which the security interests in the Collateral will be enforced. The Second Lien Trustee will not be permitted to enforce the security interests even if an Event of Default under the Second Lien Indenture has occurred and the Second Lien Notes have been accelerated except (a) in any Insolvency or Liquidation Proceeding, as necessary to file a proof of claim or statement of interest with respect to such Second Lien Notes or (b) as necessary to take any action in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and the perfection and priority of its Lien on, the Collateral securing the Second Priority Liens.

In addition, the Second Lien Intercreditor Agreement will provide that, prior to the Discharge of First Lien Obligations, (1) the First Lien Representative shall have the exclusive right to make determinations regarding the release of Collateral without the consent of the holders of the Second Lien Notes, (2) the Second Lien Intercreditor Agreement may be amended, without the consent of the First Lien Representative or the Second Lien Collateral Agent and the Holders of the First Lien Notes or the Second Lien Notes, to add additional secured creditors holding Additional Pari Passu Lien Indebtedness or other Permitted Second Lien Obligations so long as such other Permitted Second Lien Obligations are not prohibited by the provisions of the Credit Agreement, the Indenture or the Second Lien Indenture and (3) the holders of the First Lien Obligations may change, waive, modify or vary the Second Lien Security Documents without the consent of the Holders of the Second Lien Notes; *provided* that any such change, waiver or modification does not materially adversely affect the rights of the Holders of the Second Lien Notes unless the other secured creditors are treated in a like or similar manner. Any provider of additional extensions of credit shall be entitled to rely on the determination of officers that such modifications do not expressly violate the provisions of the Credit Agreement, the Indenture or the Second Lien Indenture if such determination is set forth in an Officers' Certificate delivered to such provider; *provided, however,* that such determination will not affect whether or not the Company has complied with its undertakings in the Indenture, the Security Documents or the Second Lien Intercreditor Agreement.

In addition, if the Company or any Guarantor is subject to any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent and the Holders of Second Lien Notes will agree that:

(1)    if the First Lien Representative shall desire to permit the use of cash collateral or to permit the Company or any Guarantor to obtain financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision in any bankruptcy law ("*DIP Financing*"), then the Second Lien Agent and the holders of the Second Lien Notes agree not to object to such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by clause (5) below) and, to the extent the Liens securing the First Lien Obligations are subordinated or *pari passu* with such DIP Financing, will subordinate its Liens in the Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as they are subordinated to the First Lien Obligations;

(2)    they will not object to, and will not otherwise contest any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the First Lien Obligations made by the First Lien Representative or any holder of such obligations;

(3)    they will not object to, and will not otherwise contest any order relating to a sale of assets of the Company or any Guarantor for which the First Lien Representative has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the First Lien Obligations and the Second Lien Notes will attach to the proceeds of the sale on the same basis of priority as the existing Liens in accordance with the Second Lien Intercreditor Agreement;

(4)    until the Discharge of First Lien Obligations, none of them will seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Representative;

(5) none of them shall contest (or support any other Person contesting) (a) any request by the First Lien Representative or the holders of First Lien Obligations for adequate protection or (b) any objection by the First Lien Representative or the holders of First Lien Obligations to any motion, relief, action or proceeding based on the First Lien Representative's or the holders of First Lien Obligations' claiming a lack of adequate protection. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the holders of First Lien Obligations (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of the Bankruptcy Code or any similar law, then the Second Lien Collateral Agent (A) may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the First Lien Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Notes are so subordinated to the Liens securing First Lien Obligations under the Intercreditor Agreement and (B) agrees that it will not seek or request, and will not accept, adequate protection in any other form, and (ii) in the event the Second Lien Collateral Agent seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent and the Holders of Second Lien Notes agree that the holders of the First Lien Obligations shall also be granted a senior Lien on such additional collateral as security for the applicable First Lien Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Lien Notes shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the holders of First Lien Obligations as adequate protection on the same basis as the other Liens securing the Second Lien Notes are so subordinated to such Liens securing First Lien Obligations under the Second Lien Intercreditor Agreement; and

(6) until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and each holder of Second Lien Notes, (i) will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens securing the First Lien Obligations for costs or expenses of preserving or disposing of any collateral, and (ii) will waive any claim it may have arising out of the election by any holder of First Lien Obligations of the application of Section 1111(b)(2) of the Bankruptcy Code.

### Release of Collateral

The Company and the Guarantors are entitled to the releases of property and other assets included in the Collateral from the Liens securing the First Lien Notes under any one or more of the following circumstances:

(1) to enable us to consummate the disposition of such property or assets to the extent not prohibited under the covenant described under "Limitation on asset sales";

(2) to release Excess Proceeds to the Company that remain unexpended after the conclusion of an Asset Sale Offer conducted in accordance with the Indenture and not required to be made part of the Collateral;

(3) in the case of a Guarantor that is released from its Guarantee with respect to the First Lien Notes, the release of the property and assets of such Guarantor; or

(4) as described under "—Amendment, supplement and waiver" below.

The first-priority security interests in all Collateral securing the First Lien Notes also will be released upon (i) payment in full of the principal of, together with accrued and unpaid interest on, the First Lien Notes and all other Obligations under the Indenture, the Guarantees and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid (including pursuant to a satisfaction and discharge of the Indenture as described below under "—Satisfaction and discharge") or (ii) a legal defeasance or covenant defeasance under the Indenture as described below under "—Defeasance."

To the extent certain security interests cannot be granted, filed and/or perfected on the Release Date, a covenant in the Indenture will require us to do or cause to be done all things that may be required under applicable law, or that the First Lien Trustee or the Collateral Agent from time to time may reasonably request, to grant, preserve, protect and perfect the validity and priority of the security interest in the Collateral.

## Compliance with Trust Indenture Act

The Indenture will provide that prior to the issuance of the Exchange Notes the Company will not be required to comply with the provisions of TIA § 314. To the extent applicable, the Company will cause TIA § 313(b), relating to reports to be complied with.

The Company must deliver an Officers' Certificate to the Collateral Agent annually, to the effect that all such releases and withdrawals during the preceding year in the ordinary course of the Company's or the Guarantors' business were not prohibited by the Indenture.

Any certificate or opinion required by Section 314(d) of the TIA may be made by an Officer of the Company, except in cases where Section 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert.

Notwithstanding anything to the contrary herein, the Company and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the TIA if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the TIA is inapplicable to the released Collateral.

Without limiting the generality of the foregoing, certain no action letters issued by the SEC have permitted an indenture qualified under the TIA to contain provisions permitting the release of collateral from Liens under such indenture in the ordinary course of the issuer's business without requiring the issuer to provide certificates and other documents under Section 314(d) of the TIA. The Company and the Guarantors may, subject to the provisions of the Indenture, among other things, without any release or consent by the First Lien Trustee, the Collateral Agent or Revolving Collateral Agent, conduct ordinary course activities with respect to the Collateral, including, without limitation:

- selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Security Documents that has become worn out, defective, obsolete or not used or useful in the business;

- abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of the Indenture or any of the Security Documents;

- surrendering or modifying any franchise, license or permit subject to the Lien of the Security Documents that it may own or under which it may be operating;

- altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances;

- selling, transferring or otherwise disposing of accounts receivable in the ordinary course of business;

- making cash payments (including for the repayment of Indebtedness or interest) from cash that is at any time part of the Collateral in the ordinary course of business that are not otherwise prohibited by the Indenture and the Security Documents; and

- abandoning any intellectual property that is no longer used or useful in the business of the Company or its Subsidiaries.

## Mandatory redemption; offers to purchase; open market purchases

The Company will not be required to make any mandatory redemption or sinking fund payments with respect to the First Lien Notes. However, under certain circumstances, the Company may be required to offer to purchase First Lien Notes as described under the caption "—Escrow of proceeds—Special mandatory redemption" and "—Repurchase at the option of holders." We may at any time and from time to time purchase First Lien Notes in the open market or otherwise.

## Optional redemption

The Company may on any one or more occasions prior to December 15, 2013 redeem up to 35% of the original principal amount of the First Lien Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 111.500% of the principal amount thereof plus accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* that

(1)    at least 65% of the original principal amount of the First Lien Notes remains outstanding after each such redemption; and

(2)    the redemption occurs within 90 days after the closing of such Equity Offering.

In addition, at any time prior to December 15, 2013 the Company may redeem all or a part of the First Lien Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of First Lien Notes, at a redemption price equal to 100% of the principal amount of the First Lien Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest thereon, if any, to the date of redemption (the "*Redemption Date*"), subject to the rights of Holders of First Lien Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after December 15, 2013, the Company may redeem the First Lien Notes, in whole or in part, upon notice as described under the heading "—Selection and notice," at the redemption prices (expressed as percentages of principal amount of the First Lien Notes to be redeemed) set forth below, plus accrued and unpaid interest thereon, if any, to the Redemption Date, subject to the right of Holders of First Lien Notes of record on the relevant record date to receive interest due on the relevant interest payment date, if redeemed during the twelve-month period beginning on December 15 of each of the years indicated below:

| Year | Percentage |
| --- | --- |
| 2013 | 108.625% |
| 2014 | 105.750% |
| 2015 | 102.875% |
| 2016 and thereafter | 100.000% |

In addition, during any 12-month period prior to December 15, 2013, the Company will be entitled to redeem up to 10% of the aggregate principal amount of the First Lien Notes issued under the Indenture at a redemption price equal to 103.000% of the aggregate principal amount thereof, plus accrued and unpaid interest thereon, if any, to the Redemption Date, subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment date.

### Selection and notice

If the Company is redeeming less than all of the First Lien Notes issued by it at any time, the First Lien Trustee will select the First Lien Notes to be redeemed on a pro rata basis to the extent practicable or by lot or such other similar method in accordance with the procedures of DTC.

Notices of purchase or redemption shall be mailed by the Company by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or redemption date to each Holder of First Lien Notes at such Holder's registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the First Lien Notes or a satisfaction and discharge of the Indenture. If any First Lien Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such First Lien Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed.

The Company will issue a new First Lien Note in a principal amount equal to the principal amount of the unredeemed portion of the original First Lien Note in the name of the Holder upon cancellation of the original First Lien Note. First Lien Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on First Lien Notes or portions of them called for redemption.

## Repurchase at the option of holders

### Change of control

The Indenture will provide that if, after the Release Date, a Change of Control occurs, unless the Company has previously or concurrently mailed a redemption notice with respect to all the outstanding First Lien Notes as described under "Optional redemption," the Company will make an offer to purchase all of the First Lien Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus, without duplication, accrued and unpaid interest, if any, to the date of purchase, subject to the right of Holders of the First Lien Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Company will send notice of such Change of Control Offer by first-class mail, with a copy to the First Lien Trustee, to each Holder of First Lien Notes to the address of such Holder appearing in the security register, with the following information:

(1)  that a Change of Control Offer is being made pursuant to the covenant entitled "Change of control," and that all First Lien Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Company;

(2)  the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3) that any First Lien Note not properly tendered will remain outstanding and continue to accrue interest;

(4) that unless the Company defaults in the payment of the Change of Control Payment, all First Lien Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5) that Holders electing to have any First Lien Notes purchased pursuant to a Change of Control Offer will be required to surrender such First Lien Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such First Lien Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6) that Holders will be entitled to withdraw their tendered First Lien Notes and their election to require the Company to purchase such First Lien Notes, *provided* that the paying agent receives, not later than the close of business on the Business Day prior to the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder of the First Lien Notes, the principal amount of First Lien Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered First Lien Notes and its election to have such First Lien Notes purchased;

(7) if such notice is mailed prior to the occurrence of a Change of Control, stating the Change of Control Offer is conditional on the occurrence of such Change of Control; and

(8) the other instructions, as determined by the Company, consistent with the covenant described hereunder, that a Holder must follow.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of First Lien Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Company will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

On the Change of Control Payment Date, the Company will, to the extent permitted by law,

(1) accept for payment all First Lien Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer,

(2) deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all First Lien Notes or portions thereof so tendered, and

(3) deliver, or cause to be delivered, to the First Lien Trustee for cancellation the First Lien Notes so accepted together with an Officers' Certificate to the First Lien Trustee stating that such First Lien Notes or portions thereof have been tendered to and purchased by the Company.

The terms of the Credit Agreement will prohibit or limit, and future Pari Passu Lien Indebtedness to which the Company becomes a party may prohibit or limit, the Company from purchasing any First Lien Notes as a result of a Change of Control. In the event a Change of Control occurs at a time when the Company is prohibited from purchasing the First Lien Notes, the Company could seek the consent of the holders of its Pari Passu Lien Indebtedness to permit the purchase of the First Lien Notes or could attempt to refinance the borrowings that contain such prohibition. If

the Company does not obtain such consent or repay such borrowings, the Company will remain prohibited from purchasing the First Lien Notes. In such case, the Company's failure to purchase tendered First Lien Notes would constitute an Event of Default under the Indenture. The Credit Agreement provides that certain change of control events with respect to the Company would constitute a default thereunder (including a Change of Control under the Indenture). Future Pari Passu Lien Indebtedness of the Company and its Restricted Subsidiaries may also contain prohibitions of certain events that would constitute a Change of Control. If we experience a change of control that triggers a default under our Pari Passu Lien Indebtedness, we could seek a waiver of such default or seek to refinance our Pari Passu Lien Indebtedness. In the event we do not obtain such a waiver or refinance our Pari Passu Lien Indebtedness, such default could result in amounts outstanding under our Pari Passu Lien Indebtedness being declared due and payable.

The Indenture will provide that in the event a Change of Control occurs at a time when the Company is prohibited by the terms of any Pari Passu Lien Indebtedness from purchasing First Lien Notes, then prior to the mailing of the notice of a Change of Control to Holders of First Lien Notes but in any event within 30 days following any Change of Control, the Company undertakes to (1) repay in full all Obligations, and terminate all commitments, under our Pari Passu Lien Indebtedness or offer to repay in full all Obligations, and terminate all commitments, under our Pari Passu Lien Indebtedness and to repay the Obligations owed to (and terminate all commitments of) each lender which has accepted such offer or (2) obtain the requisite consents under the agreements governing such Pari Passu Lien Indebtedness to permit the repurchase of the First Lien Notes. If such a consent is not obtained or borrowings repaid, the Company will remain prohibited from purchasing the First Lien Notes.

The Company shall first comply with the covenant in the immediately preceding paragraph before it shall be required to repurchase First Lien Notes pursuant to the provisions described above. The Company's failure to comply with the covenant described in the immediately preceding paragraph (and any failure to send a notice of Change of Control as a result of the prohibition in the preceding paragraph) would (with notice and lapse of time) constitute an Event of Default described in clause (3), but shall not constitute an Event of Default described in clause (1), under "Events of default" below.

Our ability to pay cash to the Holders of First Lien Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the First Lien Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Initial Purchasers and us. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and "Certain covenants—Liens." Such restrictions in the Indenture can be waived only with the consent of the Holders of a majority in principal amount of the First Lien Notes then outstanding. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford Holders of the First Lien Notes protection in the event of a highly leveraged transaction.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Indenture applicable to a Change of Control Offer made by us and purchases all First Lien Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of First Lien Notes may require the Company to make an offer to repurchase the First Lien Notes as described above.

The provisions under the Indenture relative to the Company's obligation to make an offer to repurchase the First Lien Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the First Lien Notes.

### Asset sales

The Indenture will provide that from and after the Release Date the Company will not, and will not permit any of its Restricted Subsidiaries to, cause, make or suffer to exist an Asset Sale, unless:

(1)   the Company or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (such fair market value to be determined in good faith by the Company on the date of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of; and

(2)   except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

(a)   any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent internal balance sheet or in the footnotes thereto) of the Company or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the First Lien Notes, that are assumed by the transferee of any such assets and for which the Company and all of its Restricted Subsidiaries have been validly released by all creditors in writing,

(b)   any securities received by the Company or such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash (to the extent of the cash received) within 90 days following the closing of such Asset Sale, and

(c)   any Designated Non-cash Consideration received by the Company or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) and assets (other than securities received and not yet liquidated pursuant to clause (b)) that

are at that time outstanding, not to exceed 3.0% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this provision and for no other purpose.

Within 12 months after the receipt of any Net Proceeds of any Asset Sale consummated after the Release Date (the "*Application Period*"), the Company or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1)    to permanently reduce:

(a)    Indebtedness constituting Pari Passu Lien Indebtedness (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) (*provided* that (x) to the extent that the terms of Pari Passu Lien Obligations other than the Obligations in respect of the First Lien Notes or the First Lien Indenture require that such Pari Passu Lien Obligations are repaid with the Net Proceeds of Asset Sales prior to repayment of other Indebtedness, the Company and its Restricted Subsidiaries shall be entitled to repay such other Pari Passu Lien Obligations prior to repaying the Obligations under the First Lien Notes and (y) subject to the foregoing clause (x), if the Company or any Guarantor shall so reduce Pari Passu Lien Obligations, the Company will equally and ratably reduce Obligations under the First Lien Notes through open-market purchases (*provided* that such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all holders to purchase at a purchase price equal to 100% of the principal amount thereof, plus accrued and unpaid interest and additional interest, if any, the pro rata principal amount of First Lien Notes); or

(b)    Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Company or another Restricted Subsidiary; or

(2)    to make (a) an Investment in any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Company or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets (other than current amounts), in each of (a), (b) and (c), used or useful in a Similar Business or that replace the businesses, properties and/or assets that are the subject of such Asset Sale ("*Replacement Assets*"); *provided* that, to the extent that the assets disposed of in such Asset Sale were Collateral, such assets are pledged as Collateral under the Security Documents with the Lien on such Collateral securing the First Lien Notes being of the same priority with respect to the First Lien Notes as the Lien on the assets disposed of.

Any Net Proceeds from the Asset Sale that are not invested or applied as provided and within the time period set forth in the first sentence of the preceding paragraph will be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $20.0 million, the Company shall make an offer to:

• in the case of Net Proceeds from Collateral, all Holders of First Lien Notes, and if required by the terms of any Additional Pari Passu Lien Indebtedness, the holders of such Pari Passu Lien Indebtedness;

- in the case of any other Net Proceeds, all Holders of First Lien Notes and all holders of other Indebtedness that ranks *pari passu* in right of payment with the First Lien Notes containing provisions similar to those set forth in the Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets ("*Pari Passu Indebtedness*"),

in each case (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the First Lien Notes and such Pari Passu Lien Indebtedness, as applicable, that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus (without duplication) accrued and unpaid interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Indenture. The Company will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $20.0 million by mailing the notice to the Holders required pursuant to the terms of the Indenture, with a copy to the First Lien Trustee. The Company may satisfy the foregoing obligations with respect to any Excess Proceeds from an Asset Sale by making an Asset Sale Offer with respect to such Excess Proceeds prior to the expiration of the Application Period.

To the extent that the aggregate principal amount of First Lien Notes and such Pari Passu Lien Indebtedness or Pari Passu Indebtedness, as applicable, tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for general corporate purposes, subject to the other covenants contained in the Indenture. If the aggregate principal amount of First Lien Notes and Pari Passu Lien Indebtedness (in the case of Net Proceeds from Collateral) and such Pari Passu Indebtedness (in the case of any other Net Proceeds) surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Company shall select the First Lien Notes and such Pari Passu Lien Indebtedness or Pari Passu Indebtedness, as applicable, to be purchased on a pro rata basis based on the principal amount of the First Lien Notes, Pari Passu Lien Indebtedness or such Pari Passu Indebtedness, as applicable, tendered. Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

Pending the final application of any Net Proceeds pursuant to this covenant, the Company or such Restricted Subsidiary shall either apply such Net Proceeds temporarily to reduce Indebtedness outstanding under a revolving credit facility that constitutes Pari Passu Lien Indebtedness or provide such Net Proceeds to the Collateral Agent to be held in trust in an account maintained with, or subject to the dominion of, the Collateral Agent subject to terms and conditions usual and customary for accounts of the type contemplated hereby and otherwise satisfactory to the Collateral Agent (such account, an "*Asset Sale Proceeds Account*"), for application in accordance with this covenant provided that Net Proceeds need not be provided to the Collateral Agent to be held in an Asset Sale Proceeds Account except to the extent that the aggregate amount of Net Proceeds from Asset Sales not held therein or otherwise previously applied in accordance with this covenant exceed $20.0 million.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the First Lien Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Indenture, the Company will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Indenture by virtue thereof.

## Certain covenants

Set forth below are summaries of certain covenants that will be contained in the Indenture, which will bind the Company and its Restricted Subsidiaries on and after the Release Date. For the avoidance of doubt, the covenants described below will not bind the Company and its Restricted Subsidiaries prior to the Release Date, and references in this section to obligations of the Company and its Restricted Subsidiaries, refer to the period beginning on and after the Release Date.

Beginning on the first day after the Release Date of a Covenant Suspension and ending on a Reversion Date (such period a "*Suspension Period*"), the covenants specifically listed under the following captions in this "Description of first lien notes" will not be applicable to the First Lien Notes:

- "—Limitation on restricted payments,"

- "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock,"

- "—Transactions with affiliates,"

- "—Dividend and other payment restrictions affecting restricted subsidiaries,"

- "—Repurchase at the option of holders—Asset sales,"

- "—Limitation on guarantees of indebtedness by restricted subsidiaries," and

- clause (4) of the first paragraph of "—Merger, consolidation or sale of all or substantially all assets."

On each Reversion Date, all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been incurred or issued pursuant to the first paragraph of "—Limitation on incurrence of Indebtedness and issuance of disqualified stock and preferred stock" below or one of the clauses set forth in the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" below (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be so permitted to be incurred or issued pursuant to the first or second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock," such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Release Date, so that it is classified as permitted under clause (3) of the second paragraph under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock." Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—Limitation on restricted payments" will be made as though the covenant described under "—Limitation on restricted payments" had been in effect since the Release Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph of "—Limitation on restricted payments." As described above, however, no Default or Event of Default will be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions taken or the performance of obligations under agreements

entered into by the Company or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

In addition, for purposes of the covenant described under "—Transactions with affiliates," all agreements and arrangements entered into by the Company or any Restricted Subsidiary with an Affiliate of the Company during the Suspension Period prior to the Reversion Date will be deemed to have been entered into on or prior to the Release Date and for purposes of the covenant described under "—Dividend and other payment restrictions affecting restricted subsidiaries," all contracts entered into during the Suspension Period prior to such Reversion Date that contain any of the restrictions contemplated by such covenant will be deemed to have been existing on the Release Date. For purposes of "—Repurchase at the option of holders—Asset sales", on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

During the Suspension Period, no Restricted Subsidiary may be designated as an Unrestricted Subsidiary by the Board of Directors of the Company.

There can be no assurance that the First Lien Notes will ever achieve or maintain Investment Grade Ratings.

### Activities of Escrow Issuer prior to the Release Date and Assumption

Prior to the Release Date and Assumption, the Company will be a corporation whose primary activities are restricted to issuing the First Lien Notes and the Second Lien Notes (if offered prior to the Release Date), issuing capital stock to, and receiving capital contributions from its direct or indirect parent, performing its obligations in respect of the First Lien Notes under the Indenture, the Second Lien Notes under the Second Lien Indenture, the Escrow Agreement and the Purchase Agreement, consummating the Assumption or redeeming the First Lien Notes and the Second Lien Notes (if offered prior to the Release Date) in connection with any Special Mandatory Redemption, and conducting such other activities as are necessary or appropriate to carry out the activities described in this sentence and maintain its corporate existence (including the payment of customary director's fees). Prior to the Assumption, the Company will not issue any debt other than the First Lien Notes and the Second Lien Notes or own, hold or otherwise have any interest in any assets other than the Escrow Account and the Escrow Proceeds therein.

### Limitation on restricted payments

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I)    declare or pay any dividend or make any payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

(a)    dividends, payments or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or

(b)    dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, the Company or a Restricted Subsidiary receives at least its pro rata share of such dividend payment or distribution in accordance with its Equity Interests in such class or series of securities;

(II)     purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company, including in connection with any merger or consolidation, other than purchases, redemptions, defeasances and other acquisitions and retirements of Equity Interests of the Company or any direct or indirect parent of the Company held by a Restricted Subsidiary of the Company;

(III)     make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value or give any irrevocable notice of redemption with respect thereto, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Indebtedness, other than:

      (a)     Indebtedness permitted under clauses (7) and (8) of the second paragraph of the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

      (b)     the payment, redemption, repurchase, defeasance or other acquisition or retirement for value of Indebtedness made in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance or other acquisition or retirement for value;

      (c)     the giving of an irrevocable notice of redemption with respect to the transactions described in clauses (a) and (b) above and (2) and (3) of the next paragraph; or

      (d)     Pari Passu Lien Indebtedness; or

(IV)     make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) (other than any exception thereto in clauses (I) and (III)) above being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1)     no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)     immediately after giving effect to such transaction on a *pro forma* basis, the Company could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test described in the first paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; and

(3)     such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the Release Date (including Restricted Payments permitted by clauses (1) and (10) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

      (a)     EBITDA of the Company and its Restricted Subsidiaries on a consolidated basis for the period (taken as one accounting period) beginning on the first day of the first fiscal quarter beginning after the Release Date, to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, less the product of 1.4 times the Consolidated Interest Expense of the Company and its Restricted Subsidiaries for the same period; *provided* the amount, if positive, of this clause (a) shall only be included in the calculation for this clause (3) when the First Lien Leverage Ratio for the Company and its Restricted

Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction would have been less than 2.75 to 1.00; *plus*

(b)   100% of the aggregate net cash proceeds and the fair market value of marketable securities or other property or assets received by the Company since immediately after the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock") from the sale of:

(i)(A)   Equity Interests of the Company, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value of marketable securities or other property or assets received from the sale of Equity Interests to members of management, directors or consultants of the Company, any direct or indirect parent company of the Company and the Company's Subsidiaries after the Release Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(B)   to the extent such net cash proceeds are actually contributed to the Company, Equity Interests of the Company's direct or indirect parent companies (excluding contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

(ii)   debt securities of the Company that have been converted into or exchanged for such Equity Interests of the Company (or any direct or indirect parent company of the Company);

*provided*, *however*, that this clause (b) shall not include the proceeds from (X) Equity Interests or convertible debt securities of the Company sold to a Restricted Subsidiary, (Y) Disqualified Stock or debt securities that have been converted into Disqualified Stock or (Z) Excluded Contributions; *plus*

(c)   100% of the aggregate amount of cash and the fair market value of marketable securities or other property contributed to the capital of the Company following the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock") (other than by a Restricted Subsidiary and other than by any Excluded Contributions); *plus*

(d)   100% of the aggregate amount received in cash and the fair market value of marketable securities or other property received after the Release Date by means of:

(i)   the sale or other disposition (other than to the Company or a Restricted Subsidiary) of Restricted Investments made by the Company or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Company or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Company or its Restricted Subsidiaries, in each case after the Release Date; or

    (ii)    the sale (other than to the Company or a Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary (other than in each case to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment) or a dividend from an Unrestricted Subsidiary after the Release Date; *plus*

    (e)    in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Release Date, the fair market value of the Investment in such Unrestricted Subsidiary (which, if the fair market value of such Investment may exceed $50.0 million, shall be set forth in writing by an Independent Financial Advisor) at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary, other than an Unrestricted Subsidiary to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder.

The foregoing provisions will not prohibit:

(1)    the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration thereof or the giving of the irrevocable redemption notice, as applicable, if at the date of declaration or notice such payment would have complied with the provisions of the Indenture;

(2)    the redemption, repurchase, defeasance, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Indebtedness that is not Pari Passu Lien Indebtedness of the Company or a Guarantor in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Company or any of its direct or indirect parent companies (in each case, other than any Disqualified Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement or other acquisition will be excluded from clause (3)(b) of the preceding paragraph;

(3)    the redemption, repurchase, defeasance or other acquisition or retirement of Indebtedness that is not Pari Passu Lien Indebtedness of the Company or a Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Indebtedness that is not Pari Passu Lien Indebtedness of the Company or a Guarantor, as the case may be, which is incurred in compliance with "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" so long as:

    (a)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, if any, on the Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value, plus the amount of any reasonable premium paid (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness;

    (b)    such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Indebtedness being so redeemed, repurchased, defeased, acquired or retired; and

    (c)    such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Indebtedness being so redeemed, repurchased, defeased, acquired or retired;

(4)    a Restricted Payment to pay for the repurchase, redemption, defeasance or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Company or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Company, any of its Subsidiaries or any of its direct or indirect parent companies (or any permitted transferee of any of the foregoing) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement; *provided*, however, that the aggregate amounts paid under this clause (4) do not exceed in any calendar year $5.0 million (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $10.0 million in any calendar year); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a)    the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Company and, to the extent contributed to the Company, Equity Interests of any of the Company's direct or indirect parent companies, in each case to members of management, directors or consultants of the Company, any of its direct or indirect parent companies or any of its Subsidiaries that occurs after the Release Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; *plus*

(b)    the cash proceeds of key man life insurance policies received by the Company or its Restricted Subsidiaries after the Release Date; *less*

(c)    the amount of any Restricted Payments made in any prior fiscal year pursuant to clauses (a) and (b) of this clause (4);

(5)    the declaration and payment of dividends to holders of, and any redemption or repurchase at maturity or upon any mandatory redemption event of, any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries or any class or series of Preferred Stock of a Restricted Subsidiary issued in accordance with the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" to the extent such dividends are included in the definition of "Consolidated Interest Expense";

(6)    repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(7)    the declaration and payment of dividends on the Company's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on the Company's common stock), following the consummation of the first public offering of the Company's common stock or the common stock of any of its direct or indirect parent companies after the Release Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Company in or from any such public offering, other than public offerings with respect to the Company's common stock registered on Form S-8 and other than any public sale constituting an Excluded Contribution;

(8)    other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (8) not to exceed $15.0 million;

(9)    Restricted Payments that are made with Excluded Contributions;

(10)  the payment, repurchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness required in accordance with provisions applicable thereto similar to those described under the captions "Repurchase at the option of holders—Change of control" and "Repurchase at the option of holders—Asset sales"; *provided* that all First Lien Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(11)  any Restricted Payments in connection with the Emergence Transactions; and

(12)  the declaration and payment of dividends by the Company or a Restricted Subsidiary to, or the making of loans to, any of their respective direct or indirect parents in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a)  franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b)  federal, foreign, state and local income taxes to the extent such income taxes are attributable to the income of the Company and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries; *provided* that, in each case the amount of such payment in any fiscal year does not exceed the amount that the Company and its Restricted Subsidiaries would be required to pay in respect of federal, foreign, state and local income taxes for such fiscal year were the Company, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any parent entity at the highest combined applicable, federal, foreign, state and local tax rate for such fiscal year;

(c)  customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of the Company and its Restricted Subsidiaries to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Company and its Restricted Subsidiaries;

(d)  general corporate operating and overhead costs and expenses of any direct or indirect parent company of the Company and its Restricted Subsidiaries to the extent such costs and expenses are attributable to the ownership or operation of the Company and its Restricted Subsidiaries; and

(e)  fees and expenses other than to Affiliates of the Company related to any unsuccessful equity or debt offering of such parent entity;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (8) and (10), no Default shall have occurred and be continuing or would occur as a consequence thereof.

As of the Release Date, all of the Company's Subsidiaries will be Restricted Subsidiaries. The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Investments in an amount determined as set forth in the last sentence of the definition of "Investment." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this

covenant or under clause (8) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Indenture.

### *Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock*

From and after the Release Date, the Company will not, and will not permit any of the Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness) and the Company will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided, however*, that the Company may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any Restricted Subsidiary may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Consolidated Leverage Ratio on a consolidated basis for the Company and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or such Disqualified Stock or Preferred Stock is issued would have been less than 4.50 to 1.00, determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that the amount of Indebtedness (including Acquired Indebtedness) that may be incurred and Disqualified Stock or Preferred Stock that may be issued pursuant to this paragraph by Restricted Subsidiaries that are not Guarantors shall not exceed $10.0 million at any one time outstanding.

The foregoing limitations will not apply to:

(1) Indebtedness under the Credit Agreement incurred in an aggregate principal amount not to exceed $40.0 million outstanding at any one time;

(2) the incurrence by the Company and any Guarantor of Indebtedness represented by (a) the First Lien Notes (excluding Additional Notes), (b) the Second Lien Notes and (c) any guarantee by a Guarantor of any of the foregoing in this clause (2);

(3) Indebtedness of the Company and its Restricted Subsidiaries in existence on the Release Date after giving effect to the consummation of the Reorganization Plan (other than Indebtedness described in clauses (1) and (2));

(4) Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock and Preferred Stock incurred by the Company or any of its Restricted Subsidiaries to finance the purchase, lease or improvement of property (real or personal) or equipment (other than software) that is used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, *provided* that the aggregate amount of Indebtedness, Disqualified Stock and Preferred Stock incurred pursuant to this clause (4) when aggregated with then outstanding amount of Indebtedness under clause (13) incurred to refinance Indebtedness initially incurred in reliance on this clause (4) does not exceed $15.0 million at anytime outstanding;

(5)   Indebtedness incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims; *provided*, *however*, that such letters of credit are not drawn;

(6)   Indebtedness arising from agreements of the Company or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided*, *however*, that the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by the Company and its Restricted Subsidiaries in connection with such disposition;

(7)   Indebtedness of the Company to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not a Guarantor is expressly subordinated in right of payment to the First Lien Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8)   Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the First Lien Notes of such Guarantor; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9)   shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Company or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock or Disqualified Stock not permitted by this clause (9);

(10)  Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) for the purpose of limiting interest rate risk, exchange rate risk or commodity pricing risk;

(11)  obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(12)  (a) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount or liquidation preference equal to 100.0% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Release Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company or a Restricted Subsidiary) or cash contributed to the capital of the Company (in each case, other than proceeds of Disqualified Stock or sales of Equity Interests or contributions received from the Company or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph of "—Limitation on restricted payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph of "—Limitation on restricted payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of the Company and Indebtedness, Disqualified Stock or Preferred Stock of the Company or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $25.0 million;

(13)  the incurrence by the Company or any Restricted Subsidiary of the Company of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance (whether by payment, purchase, redemption, defeasance or other acquisition or retirement) any Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding as permitted under the first paragraph of this covenant and clauses (2), (3), (4), (6), (10) and (12)(a) above and this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock including additional Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding to pay accrued interest; premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided, however,* that such Refinancing Indebtedness:

(a)  has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b)  to the extent such Refinancing Indebtedness refinances (i) Unsecured Indebtedness or constitutes Permitted Second Lien Obligations, such Refinancing Indebtedness also constitutes Unsecured Indebtedness or constitutes Permitted Second Lien Obligations, as the case may be, or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c)  shall not include:

(i)  Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Company that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Company;

    (ii)    Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Company, that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

    (iii)    Indebtedness, Disqualified Stock or Preferred Stock of the Company or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary;

and *provided, further* that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any Pari Passu Lien Indebtedness;

(14)    Indebtedness, Disqualified Stock or Preferred Stock of a Person incurred and outstanding on or prior to the date on which such Person was acquired by the Company or any Restricted Subsidiary or merged into the Company or a Restricted Subsidiary in accordance with the terms of the Indenture; *provided* that such Indebtedness, Disqualified Stock or Preferred Stock is not incurred in connection with or in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, such acquisition or merger; and *provided, further*, that after giving effect to such acquisition or merger, either

    (a)    the First Lien Leverage Ratio for the Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 2.75 to 1.0, or

    (b)    (i) the First Lien Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger;

(15)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16)    Indebtedness of the Company or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(17)(a)    any guarantee by the Company or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Indenture, or

    (b)    any guarantee by a Restricted Subsidiary of Indebtedness of the Company; *provided* that such guarantee is incurred in accordance with the covenant described below under "—Limitation on guarantees of indebtedness by restricted subsidiaries";

(18)    Indebtedness of the Company or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business;

(19)    Indebtedness consisting of Indebtedness issued by the Company or any of the Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company, a Restricted Subsidiary or any of their direct or indirect

parent companies to the extent described in clause (4) of the second paragraph under the caption "—Limitation on restricted payments";

(20)    customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(21)    Indebtedness owed on a short term basis of no longer than 30 days to banks and other financial institutions incurred in the ordinary course of business of the Company and the Restricted Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances of the Company and the Restricted Subsidiaries.

For purposes of determining compliance with this covenant:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (21) above or is entitled to be incurred pursuant to the first paragraph of this covenant, the Company, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; *provided* that all Indebtedness outstanding under the Credit Agreement on the Release Date will be treated as incurred on the Release Date under clause (1) of the preceding paragraph; and

(2)    at the time of incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above.

Accrual of interest, the accretion of accreted value or original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Indenture will not treat (1) Unsecured Indebtedness as subordinated to Secured Indebtedness merely because it is unsecured, (2) senior Indebtedness that is Secured Indebtedness as subordinated to any other senior Indebtedness that is Secured Indebtedness merely because it has a junior priority with respect to the same collateral, (3) any Indebtedness as subordinated to any other Indebtedness merely because of maturity date, order of payment or order of application of funds or (4) Indebtedness that is not guaranteed as subordinated to Indebtedness that is guaranteed merely because of such guarantee.

### Liens

After the Release Date, the Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, affirm or suffer to exist any Lien of any kind upon any of its property or assets (including any intercompany notes) constituting Collateral, now owned or acquired after the Release Date, or any income or profits therefrom, securing Indebtedness excluding, however, from the operation of the foregoing any Permitted Liens. Additionally, the Company will not, and will not permit any of its Restricted Subsidiaries to, incur or suffer to exist any Lien (the "*Initial Lien*") on any property or assets that are not Collateral securing Indebtedness unless (a) the Company or such Restricted Subsidiary (i) equally and ratably secures the First Lien Notes (or on a senior basis to) the obligations secured by such Initial Lien or (ii) provides that such Initial Lien is expressly junior in ranking relative to the First Lien Notes and related Guarantees pursuant to a Second Lien Intercreditor Agreement or (b) such Initial Lien is a Permitted Lien; *provided*, *however*, that any such Lien created to secure the First Lien Notes pursuant to this sentence shall provide by its terms that upon the release and discharge of the Initial Lien on such assets by the collateral agent for the Indebtedness secured by such Initial Lien, the Lien on such assets securing the First Lien Notes shall be automatically and unconditionally released and discharged and the Company may take any action necessary to effectuate such release or discharge.

### Merger, consolidation or sale of all or substantially all assets

After the Release Date, the Company may not consolidate or merge with or into or wind up into (whether or not the Company is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)     the Company is the surviving corporation or limited liability company or the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation or limited liability company organized or existing under the laws of the jurisdiction of organization of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2)     the Successor Company, if other than the Company, expressly assumes all the obligations of the Company under the First Lien Notes pursuant to supplemental indentures, Security Documents and any other documents or instruments in form reasonably satisfactory to the First Lien Trustee;

(3)     immediately after such transaction, no Default exists;

(4)    immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period, either

    (i)    the First Lien Leverage Ratio for the Successor Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 2.75 to 1.0, or

    (ii)    (i) the First Lien Leverage Ratio is equal to or less than such ratio immediately prior to such transaction and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such transaction; and

(5)    the Company shall have delivered to the First Lien Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and Security Documents comply with the Indenture.

The Successor Company will succeed to, and be substituted for the Company, as the case may be, under the Indenture, the Guarantees and the First Lien Notes, as applicable. Notwithstanding the foregoing clauses (3), (4) and (5),

(1)    any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Company; and

(2)    the Company may merge with an Affiliate of the Company solely for the purpose of reincorporating the Company in a State of the United States so long as the amount of Indebtedness of the Company and its Restricted Subsidiaries is not increased thereby.

Subject to certain limitations described in the Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, no Guarantor will, and the Company will not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Company or Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)(a)    such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

    (b)    the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under the Indenture and Security Documents and such Guarantor's related Guarantee pursuant to supplemental indentures, Security Documents or other documents or instruments in form reasonably satisfactory to the First Lien Trustee;

    (c)    immediately after such transaction, no Default exists; and

    (d)    the Company shall have delivered to the First Lien Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and Security Documents comply with the Indenture; or

(2)  the transaction is made in compliance with the covenant described under "Repurchase at the option of holders—Asset sales."

In the case of clause (1) above, the Successor Person will succeed to, and be substituted for, such Guarantor under the Indenture and such Guarantor's guarantee. Notwithstanding the foregoing, any Guarantor may merge into or transfer all or part of its properties and assets to another Guarantor or the Company.

Notwithstanding the foregoing, (i) the Assumption and related transactions shall be permitted under the Indenture and (ii) the merger of AMI with and into the Company with the Company being the surviving corporation on the Release Date in connection with the Emergence Transactions shall be permitted under the Indenture.

### Transactions with affiliates

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $2.0 million, unless:

(1)  such Affiliate Transaction is on terms that are not materially less favorable to the Company or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(2)  the Company delivers to the First Lien Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $10.0 million, a resolution adopted by the majority of the board of directors of the Company approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) above; and

(3)  the Company delivers to the First Lien Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $40.0 million, a written opinion to the Company or such Restricted Subsidiary from an Independent Financial Advisor stating that the terms of such transaction are not materially less favorable to the Company or the Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Company or such Restricted Subsidiary at such time with an unrelated Person on an arm's-length basis.

The foregoing provisions will not apply to the following:

(1)  transactions between or among the Company or any of its Restricted Subsidiaries;

(2)  Restricted Payments permitted by the provisions of the Indenture described above under the covenant "—Limitation on restricted payments" and transactions constituting "Permitted Investments";

(3)  [Reserved];

(4)  the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Company, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5)    transactions in which the Company or any Restricted Subsidiary, as the case may be, delivers to the First Lien Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Company or such Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6)    any agreement or arrangement as in effect as of the Release Date, or any amendment thereto (so long as any such amendment is not materially disadvantageous to the Holders when taken as a whole as compared to the applicable agreement or arrangement as in effect on the Release Date);

(7)    the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which the Company or any such Restricted Subsidiary is a party as of the Release Date and any similar agreements which it may enter into thereafter; *provided, however,* that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Release Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise materially disadvantageous to the Holders when taken as a whole;

(8)    transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Indenture which are fair to the Company and its Restricted Subsidiaries, in the reasonable determination of the board of directors of the Company or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(9)    the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person and any contribution to the capital of the Company;

(10)   payments by the Company or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which payments are approved by a majority of the board of directors of the Company in good faith;

(11)   the Emergence Transactions, including the payment of fees and expenses in connection therewith;

(12)   payments or loans (or cancellation of loans) to employees or consultants of the Company, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Company in good faith;

(13)   transactions between the Company or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Company or any direct or indirect parent of the

Company; *provided, however*, that such director abstains from voting as a director of the Company or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(14)   transactions permitted by, and complying with, the provisions of the covenant described under "—Merger, consolidation or sale of all or substantially all assets";

(15)   the pledge of Equity Interests of an Unrestricted Subsidiary to lenders of such Unrestricted Subsidiary to support the Indebtedness of such Unrestricted Subsidiary owed to such lenders; and

(16)   any transaction with (or for the benefit of) a Person that would constitute an Affiliate Transaction solely because the Company or a Restricted Subsidiary owns an equity interest in or otherwise controls such Person.

### *Dividend and other payment restrictions affecting restricted subsidiaries*

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary that is not a Guarantor to:

(1)(a)   pay dividends or make any other distributions to the Company or any of the Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

   (b)   pay any Indebtedness owed to the Company or any of the Restricted Subsidiaries;

(2)   make loans or advances to the Company or any of the Restricted Subsidiaries; or

(3)   sell, lease or transfer any of its properties or assets to the Company or any of the Restricted Subsidiaries,

except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a)   contractual encumbrances or restrictions in effect on the Release Date, including pursuant to the Credit Agreement, the Second Lien Notes and the related documentation;

(b)   the Indenture, the First Lien Notes and the Guarantees;

(c)   Purchase Money Obligations for property acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired and related assets;

(d)   applicable law or any applicable rule, regulation or order;

(e)   any agreement or other instrument of a Person acquired by the Company or any of its Restricted Subsidiaries in existence at the time of such acquisition or at the time it merges with or into the Company or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or the property or assets so assumed and related assets;

(f)    contracts for the sale of assets or Capital Stock, including customary restrictions with respect to a Subsidiary of the Company pursuant to an agreement that has been entered into for the sale or disposition of the Capital Stock or assets of such Subsidiary, that impose restrictions on the assets to be sold or the assets of such Subsidiary;

(g)    Secured Indebtedness otherwise permitted to be incurred pursuant to the covenants described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and "—Liens" that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(h)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(i)    other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Release Date pursuant to the provisions of the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" that imposes restrictions solely on Foreign Subsidiaries or their Subsidiaries party thereto;

(j)    customary provisions in joint venture agreements and other similar agreements or arrangements relating solely to such joint venture;

(k)    customary provisions contained in leases or licenses of intellectual property and other agreements, in each case, entered into in the ordinary course of business;

(l)    other Indebtedness or Disqualified Stock of the Company or any of its Restricted Subsidiaries or Preferred Stock of any Restricted Subsidiary that is incurred subsequent to the Release Date and permitted pursuant to the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided* that such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the First Lien Notes (as determined in good faith by senior management or the board of directors of the Company);

(m)    any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (k) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; and

(n)    restrictions or conditions of the type contained in clause (3) above contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Company or any Restricted Subsidiary is a party entered into in the ordinary course of business; *provided* that such agreement prohibits the encumbrance of solely the property or assets of the Company or such Restricted Subsidiary that is the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of such Restricted Subsidiary or the assets or property of the Company or any other Restricted Subsidiary.

*Limitation on guarantees of indebtedness by restricted subsidiaries*

After the Release Date, the Company will not permit any of its Restricted Subsidiaries, other than a Guarantor, to guarantee the payment of any Indebtedness of the Company or any other Guarantor unless:

(1)    such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to the Indenture providing for a Guarantee by such Restricted Subsidiary, except, if such Indebtedness is by its express terms subordinated in right of payment to the First Lien Notes or such Guarantor's Guarantee, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the First Lien Notes or such Guarantor's Guarantee;

(2)    such Restricted Subsidiary within 30 days executes and delivers a joiner to the applicable Security Documents or new Security Documents and takes all actions necessary to perfect the Liens created thereunder (to the extent required by such Security Documents), all of such Liens to be junior to the liens in favor of the holders of the Pari Passu Lien Indebtedness and to be subject to the First Lien Intercreditor Agreement; and

(3)    such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Company or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee;

*provided* that this covenant shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

Each Guarantee shall be released in accordance with the provisions of the Indenture described under "—Note guarantees."

### Reports and other information

From and after the Release Date, whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company will file with the SEC (subject to the next sentence) and provide the First Lien Trustee and holders with such annual and other reports as are specified in Sections 13 and 15(d) of the Exchange Act and applicable to a U.S. corporation subject to such Sections, such reports to be so filed and provided within the times specified for the filings of such reports for non-accelerated filers under such Sections and containing, in all material respects, all the information, audit reports and exhibits required for such reports. If at any time, the Company is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing the reports specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such a filing. The Company agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Company will post the reports specified in the preceding sentence on its website within the time periods that would apply for non-accelerated filers if the Company were required to file those reports with the SEC (it being expressly understood that prior to the effectiveness of the Exchange Offer Registration Statement or the Shelf Registration Statement that the SEC will not accept such filings by the Company and that

the Company shall therefor be able to satisfy its obligations under this covenant by posting such reports on a publicly accessible page on its website). Notwithstanding the foregoing, the Company may satisfy such requirements prior to the effectiveness of a registration statement (the "*Exchange Offer Registration Statement*") filed with the SEC with respect to a registered offer to exchange the First Lien Notes for new notes of the Company having terms substantially identical in all material respects to the First Lien Notes exchanged therefor (except that the Exchange Notes will not contain terms with respect to transfer restrictions) or a shelf registration statement (a "*Shelf Registration Statement*") filed with the SEC covering resales of First Lien Notes or Exchange Notes, as the case may be, by filing with the SEC the Exchange Offer Registration Statement or Shelf Registration Statement, to the extent that any such Registration Statement contains substantially the same information as would be required to be filed by the Company if it were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, and by providing the First Lien Trustee and holders with such Registration Statement (and any amendments thereto) promptly following the filing thereof.

In addition, in the event that:

(a)    the rules and regulations of the SEC permit a parent entity that becomes a Guarantor to report at such parent entity's level on a consolidated basis; and

(b)    such parent entity is not engaged in any business in any material respect other than incidental to its ownership of the capital stock of the Company,

such consolidated reporting by such parent entity in a manner consistent with that described in this covenant for the Company will satisfy this covenant.

Notwithstanding the foregoing, prior to the effectiveness of the exchange offer registration statement or shelf registration statement with respect to the First Lien Notes, the Company will not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K or Item 3-10 of Regulation S-X.

In addition, the Company will furnish to the holders and to prospective investors, upon the requests of such holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the First Lien Notes are not freely transferable under the Securities Act. In addition, such requirements shall be deemed satisfied prior to the commencement of the exchange offer or the effectiveness of the shelf registration statement required by the Registration Rights Agreement by the filing with the SEC of the exchange offer registration statement and/or shelf registration statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act and such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in the first paragraph of this covenant.

Notwithstanding anything herein to the contrary, the Company will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under "Events of default and remedies" until 120 days after the date any report hereunder is required to be made available to the First Lien Trustee and the Holders pursuant to this covenant.

## Non-Impairment of security interest

From and after the Release Date and subject to the rights of the holders of Permitted Liens that are existing on the Release Date or incurred after the Release Date, the Company will not, and

will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission could reasonably be expected to have the result of materially impairing the Lien with respect to the Collateral in favor of the holders of First Lien Obligations; provided that this covenant shall not prohibit the release of Guarantors as set forth herein under "—Guarantees," or the release of Collateral as set forth herein under "Certain covenants—Liens," "Security for the notes—Limitations on pledged equity interests," or "Security for the notes—Release of Collateral."

## Events of default and remedies

The Indenture will provide that each of the following is an Event of Default:

(1)   default in payment when due and payable, upon redemption, upon Special Mandatory Redemption, upon acceleration or otherwise, of principal of or premium, if any, on the First Lien Notes;

(2)   default for 30 days or more in the payment when due of interest on or with respect to the First Lien Notes;

(3)   failure by the Company or any Guarantor for 60 days after receipt of written notice by the First Lien Trustee or the Holders of not less than 25% in principal amount of the First Lien Notes to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) contained in the Indenture or the First Lien Notes;

(4)   default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries, other than Indebtedness owed to the Company or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the First Lien Notes, if both:

   (a)   such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

   (b)   the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $35.0 million or more at any one time outstanding;

(5)   failure by the Company or any Significant Subsidiary (or group of Restricted Subsidiaries that taken together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $35.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)   certain events of bankruptcy or insolvency with respect to the Company or any Significant Subsidiary;

(7)    the Guarantee of any Significant Subsidiary (or group of Guarantors that taken together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of such Guarantor, as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of the Indenture or the release of any such Guarantee in accordance with the Indenture; or

(8)    (x) with respect to any Collateral having a fair market value in excess of $20.0 million, individually or in the aggregate, (a) the security interest under any Security Document, at any time, ceases to be in full force and effect for any reason other than in accordance with the terms of the Indenture, the Security Documents and the First Lien Intercreditor Agreement or (b) any security interest created thereunder or under the Indenture is declared invalid or unenforceable by a court of competent jurisdiction or (y) the Company or any Guarantor asserts, in any pleading in any court of competent jurisdiction, that any security interest in any Collateral is invalid or unenforceable.

If any Event of Default (other than of a type specified in clause (6) above with respect to the Company) occurs and is continuing under the Indenture, the First Lien Trustee or the Holders of at least 25% in principal amount of the then total outstanding First Lien Notes may declare the principal, premium, if any (without duplication), interest and any other monetary obligations on all the then outstanding First Lien Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest will be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of the first paragraph of this section with respect to the Company, all outstanding First Lien Notes will become due and payable without further action or notice. The Indenture will provide that the First Lien Trustee may withhold from the Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest, if it determines that withholding notice is in their interest.

The Indenture will provide that the Holders of a majority in aggregate principal amount of the then outstanding First Lien Notes by notice to the First Lien Trustee may on behalf of the Holders of all of the First Lien Notes waive any existing Default and its consequences under the Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any First Lien Note held by a non-consenting Holder. In the event of any Event of Default specified in clause (4) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the First Lien Notes) shall be annulled, waived and rescinded, automatically and without any action by the First Lien Trustee or the Holders, if within 20 days after such Event of Default, arose:

(1)    the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2)    holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3)    the default that is the basis for such Event of Default has been cured.

Subject to the provisions of the Indenture relating to the duties of the First Lien Trustee thereunder, in case an Event of Default occurs and is continuing, the First Lien Trustee will be under no obligation to exercise any of the rights or powers under the Indenture at the request or

direction of any of the Holders of the First Lien Notes unless the Holders have offered to the First Lien Trustee indemnity or security against any loss, liability or expense satisfactory to the First Lien Trustee. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder of a First Lien Note may pursue any remedy with respect to the Indenture or the First Lien Notes unless:

(1)     such Holder has previously given the First Lien Trustee notice that an Event of Default is continuing;

(2)     Holders of at least 25% in principal amount of the total outstanding First Lien Notes have requested the First Lien Trustee to pursue the remedy;

(3)     Holders of the First Lien Notes have offered the First Lien Trustee security or indemnity against any loss, liability or expense satisfactory to the First Lien Trustee;

(4)     the First Lien Trustee has not complied with such request within 60 days after the receipt thereof and the offer of such satisfactory security or indemnity; and

(5)     Holders of a majority in principal amount of the total outstanding First Lien Notes have not given the First Lien Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, under the Indenture the Holders of a majority in principal amount of the total outstanding First Lien Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the First Lien Trustee or of exercising any trust or power conferred on the First Lien Trustee. The First Lien Trustee, however, may refuse to follow any direction that conflicts with law or the Indenture or that the First Lien Trustee determines is unduly prejudicial to the rights of any other Holder of a First Lien Note or that would involve the First Lien Trustee in personal liability.

The Indenture will provide that the Company is required to deliver to the First Lien Trustee annually a statement regarding compliance with the Indenture, and the Company is required, within five Business Days after becoming aware of any Default or Event of Default, to deliver to the First Lien Trustee a statement specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

## No personal liability of directors, officers, employees and stockholders

No director, officer, employee, incorporator or stockholder, member or limited partner of the Company or any Guarantor or any of their parent companies shall have any liability for any obligations of the Company or the Guarantors under the First Lien Notes, the Guarantees or the Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting First Lien Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the First Lien Notes.

## Defeasance

The obligations of the Company and the Guarantors under the Indenture will terminate (other than certain obligations) and will be released upon payment in full of all of the First Lien Notes. The Company may, at its option and at any time, elect to have all of its obligations discharged with respect to the First Lien Notes, the Indenture and the Security Documents and cause the

release of all Liens on the Collateral granted under the Security Documents and have the Company and each Guarantor's obligation discharged with respect to its Guarantee, the Indenture and the Security Documents ("*Legal Defeasance*") and cure all then-existing Events of Default except for:

(1)    the rights of Holders of First Lien Notes to receive payments in respect of the principal of, premium, if any, and interest on the First Lien Notes when such payments are due solely out of the trust created pursuant to the Indenture;

(2)    the Company's obligations with respect to First Lien Notes concerning issuing temporary First Lien Notes, registration of the transfer or exchange of First Lien Notes, replacement of mutilated, destroyed, lost or stolen First Lien Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3)    the rights, powers, trusts, duties and immunities of the First Lien Trustee, and the Company's obligations in connection therewith; and

(4)    the Legal Defeasance provisions of the Indenture.

In addition, the Company may, at its option and at any time, elect to have its obligations and those of each Guarantor released with respect to certain covenants in the Indenture and the Liens on the Collateral granted under the Security Documents ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations shall not constitute a Default with respect to the First Lien Notes. In the event Covenant Defeasance occurs (i) any event described in clause (3), (4), (5), (7) or (8) of "Events of default and remedies" will no longer constitute an Event of Default with respect to the First Lien Notes and (ii) any event described in clause (1), (2) or (6) of "Events of default and remedies" will continue to constitute an Event of Default with respect to the First Lien Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the First Lien Notes:

(1)    the Company must irrevocably deposit with the First Lien Trustee, in trust, for the benefit of the Holders of the First Lien Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants (or, if two or more nationally recognized firms of independent public accountants decline to issue such opinion as a matter of policy, in the opinion of the Company's chief financial officer), to pay the principal amount of, premium, if any, and (without duplication) interest due on the First Lien Notes on the stated maturity date or on the redemption date, as the case may be, of such principal amount of, premium, if any, or interest on such First Lien Notes and the Company must specify whether such First Lien Notes are being defeased to maturity or to a particular redemption date;

(2)    in the case of Legal Defeasance, the Company shall have delivered to the First Lien Trustee an Opinion of Counsel reasonably acceptable to the First Lien Trustee confirming that, subject to customary assumptions and exclusions,

   (a)    the Company has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

   (b)    since the issuance of the First Lien Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the First Lien Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of Covenant Defeasance, the Company shall have delivered to the First Lien Trustee an Opinion of Counsel reasonably acceptable to the First Lien Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the First Lien Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)    no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)    such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any Pari Passu Lien Indebtedness or any other material agreement or instrument (other than the Indenture) to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make such deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6)    the Company shall have delivered to the First Lien Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of Title 11 of the United States Code;

(7)    the Company shall have delivered to the First Lien Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or any Guarantor or others; and

(8)    the Company shall have delivered to the First Lien Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

## Satisfaction and discharge

The Indenture will be discharged and will cease to be of further effect as to all First Lien Notes, when either:

(1)    all First Lien Notes theretofore authenticated and delivered, except lost, stolen or destroyed First Lien Notes which have been replaced or paid and First Lien Notes for whose payment money has theretofore been deposited in trust, have been delivered to the First Lien Trustee for cancellation; or

(2)(a) all First Lien Notes not theretofore delivered to the First Lien Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, will become due and payable within one year or are to be called for redemption and redeemed within one year under arrangements satisfactory to the First Lien Trustee for the giving of notice of redemption by the First Lien Trustee in the name, and at the expense, of the Company and the Company or any Guarantor have irrevocably deposited or caused to be deposited with the First Lien Trustee as trust funds in trust solely for the benefit of the Holders of the First Lien Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the First Lien Notes not theretofore delivered to the First Lien Trustee for cancellation for principal amount, premium, if any, and (without duplication) accrued interest to the date of maturity or redemption;

(b) no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to the Indenture or the First Lien Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under any Pari Passu Lien Indebtedness or any other material agreement or instrument (other than the Indenture) to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(c) the Company has paid or caused to be paid all sums payable by it under the Indenture; and

(d) the Company has delivered irrevocable instructions to the First Lien Trustee to apply the deposited money toward the payment of the First Lien Notes or the redemption date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the First Lien Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## Amendment, supplement and waiver

Except as provided in the next three succeeding paragraphs, the Indenture, the Security Documents, the Intercreditor Agreements, any Guarantee and the First Lien Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the First Lien Notes then outstanding, including, so long as the Indenture has not been qualified under the TIA, any First Lien Notes beneficially owned by the Company's Affiliates (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, First Lien Notes), and any existing Default or compliance with any provision of the Indenture, the Security Documents or the First Lien Notes issued thereunder may be waived with the consent of the Holders of a majority in principal amount of the then outstanding First Lien Notes (including consents obtained in connection with a purchase of or tender offer or exchange offer for the First Lien Notes).

The Indenture will provide that without the consent of each affected Holder of First Lien Notes, an amendment or waiver may not, with respect to any First Lien Notes held by a non-consenting Holder:

(1)    reduce the principal amount of such First Lien Notes whose Holders must consent to an amendment, supplement or waiver;

(2)    reduce the principal amount of or change the fixed final maturity of any such First Lien Note or alter or waive the provisions with respect to the redemption of such First Lien Notes (other than provisions relating to the covenants described above under the caption "Repurchase at the option of holders");

(3)    reduce the rate of or change the time for payment of interest on any First Lien Note;

(4)    waive a Default in the payment of principal of or premium, if any, or (without duplication) interest on the First Lien Notes, except a rescission of acceleration of the First Lien Notes by the Holders of at least a majority in aggregate principal amount of the First Lien Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in the Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5)    make any First Lien Note payable in a currency other than U.S. dollars;

(6)    make any change in the provisions of the Indenture relating to the rights of Holders to receive payments of principal of or premium, if any, or (without duplication) interest on the First Lien Notes including in connection with a defeasance or discharge;

(7)    make any change in these amendment and waiver provisions;

(8)    impair the right of any Holder to receive payment of principal of or interest on such Holder's First Lien Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's First Lien Notes;

(9)    make any change to or otherwise modify the ranking of the First Lien Notes that would adversely affect the Holders; or

(10)   except as expressly permitted by the Indenture, modify the Guarantee of any Guarantor in any manner adverse to the Holders of the First Lien Notes.

Without the consent of the holders of at least 75% in aggregate principal amount of the First Lien Notes then outstanding, no amendment or waiver may make any change to, or extend the time for performance under, the escrow release provisions described under "—Escrow of Proceeds—Release Conditions" or the Special Mandatory Redemption provisions described under "—Escrow of Proceeds—Special Mandatory Redemption."

Notwithstanding the foregoing, the Company, any Guarantor (with respect to a Guarantee or the Indenture to which it is a party) and the First Lien Trustee may amend or supplement the Indenture, the Security Documents, the First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement and any Guarantee or First Lien Notes without the consent of any Holder:

(1)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    to provide for uncertificated First Lien Notes in addition to or in place of certificated First Lien Notes;

(3) to provide for the Assumption and to comply with the covenant relating to mergers, consolidations and sales of assets;

(4) to make the assumption of the Company's or any Guarantor's obligations to the Holders;

(5) to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights under the Indenture of any such Holder;

(6) to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Company or any Guarantor;

(7) to comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the TIA;

(8) to evidence and provide for the acceptance and appointment (x) under the Indenture of a successor First Lien Trustee thereunder pursuant to the requirements thereof or (y) under the Security Documents of a successor Collateral Agent thereunder pursuant to the requirements thereof;

(9) to make changes related to the transfer and legending of the First Lien Notes as permitted by the Indenture or applicable law;

(10) to add a Guarantor under the Indenture;

(11) to conform the text of the Indenture, Guarantees, the First Lien Notes, the Security Documents, the First Lien Intercreditor Agreement or the Second Lien Intercreditor Agreement to any provision of this "Description of first lien notes";

(12) to make any amendment to the provisions of the Indenture relating to the transfer and legending of First Lien Notes as permitted by the Indenture, including, without limitation, to facilitate the issuance and administration of the First Lien Notes; *provided*, *however*, that (i) compliance with the Indenture as so amended would not result in First Lien Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer First Lien Notes;

(13) to provide for the issuance of Exchange Notes in accordance with the terms of the Indenture and the Registration Rights Agreement;

(14) to add security to or for the benefit of the First Lien Notes and, in the case of the Security Documents, to or for the benefit of the other secured parties named therein or to confirm and evidence the release, termination or discharge of any Guarantee of or Lien securing the First Lien Notes when such release, termination or discharge is permitted by the Indenture and the Security Documents or as required by the First Lien Intercreditor Agreement; or

(15) to modify the Security Documents, the First Lien Intercreditor Agreement and/or Second Lien Intercreditor Agreement to secure additional extensions of credit and additional secured creditors holding Additional Pari Passu Lien Indebtedness or Permitted Second Lien Obligations, as applicable, so long as such Additional Pari Passu Lien Indebtedness or Permitted Second Lien Obligations, as applicable, are not prohibited by the Indenture or the Credit Agreement.

In addition, any amendment to, or waiver of, the provision of the Indenture, any Security Document, the First Lien Intercreditor Agreement or any Second Lien Intercreditor Agreement

that has the effect of releasing all or substantially all of the Collateral or modifies such documents insofar as such documents relates to Collateral in a manner adverse to Holders in any material respect will require consent of the Holders of at least 75% in aggregate principal amount of the First Lien Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the First Lien Notes).

The Indenture shall expressly provide that, prior to the qualification of the Indenture under the TIA, First Lien Notes owned by Holders (including direct and indirect beneficial owners) that directly or indirectly control, or are controlled by or under direct or indirect common control with, the Company will not be disregarded for purposes of voting with respect to amendments, waivers, directions and consents. If and when the Indenture is qualified under the TIA, then First Lien Notes owned by Holders (including direct and indirect beneficial owners) that directly or indirectly control, or are controlled by or under direct or indirect common control with, the Company will be disregarded for purposes of voting with respect to amendments, waivers, directions and consents.

The consent of the Holders is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

No amendment of, or supplement or waiver to, the Indenture, the First Lien Notes or the Security Documents (other than the First Lien Intercreditor Agreement) shall be permitted to be effected which is in violation of or inconsistent with the terms of the First Lien Intercreditor Agreement. No amendment of, or supplement to, the First Lien Intercreditor Agreement shall be permitted to be effected without the consent of the Collateral Agent and the Revolving Collateral Agent.

Prior to the payment in full of the Priority Payment Lien Obligations, (i) the First Lien Intercreditor Agreement may be amended, without the consent of the holders of the First Lien Notes, the Collateral Agent, the Revolving Collateral Agent or the First Lien Trustee (collectively, the "*First Lien Secured Parties*") or the Credit Agreement Lenders or Agent, to add additional secured creditors holding any Additional Pari Passu Lien Indebtedness permitted by the Credit Agreement and the Indenture and (ii) the Agent (with the requisite consent of the Credit Agreement Lenders) may change, waive, modify or vary the security documents without the consent of the First Lien Secured Parties; *provided* that any such change, waiver or modification does not materially adversely affect the rights of the First Lien Secured Parties and the additional secured creditors holding Additional Pari Passu Lien Indebtedness. Any consent to the use of cash collateral satisfactory to the Agent or debtor–in–possession financing on a priming basis (whether or not provided by the holders of Priority Payment Lien Obligations) not to exceed twenty percent of the aggregate secured debt subject to the First Lien Intercreditor Agreement shall not be deemed to be materially adverse to the rights of the First Lien Secured Parties or the additional secured creditors holding Additional Pari Passu Lien Indebtedness. Any provider of Additional Pari Passu Lien Indebtedness shall be entitled to rely on the determination of officers of the Company that such modifications do not expressly violate the provisions of the Credit Agreement or the Indenture if such determination is set forth in an Officers' Certificate signed by an officer of the Company and meeting the requirements set forth in the Indenture delivered to such provider; *provided, however*, that such determination will not affect whether or not the Company has complied with its undertakings in the Credit Agreement, the Indenture, any agreement governing any Additional Pari Passu Lien Indebtedness, any related security documents or the First Lien Intercreditor Agreement.

## Notices

Notices given by publication will be deemed given on the first date on which publication is made and notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing.

## Concerning the trustee

The Indenture will contain certain limitations on the rights of the First Lien Trustee thereunder, should it become a creditor of the Company, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The First Lien Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Indenture will provide that the Holders of a majority in principal amount of the outstanding First Lien Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the First Lien Trustee, subject to certain exceptions. The Indenture will provide that in case an Event of Default shall occur (which shall not be cured), the First Lien Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his own affairs. Subject to such provisions, the First Lien Trustee will be under no obligation to exercise any of its rights or powers under the Indenture at the request of any Holder of the First Lien Notes, unless such Holder shall have offered to the First Lien Trustee security and indemnity satisfactory to it against any loss, liability or expense.

## Governing law

The Indenture, the Security Documents, the First Lien Notes and any Guarantee will be governed by and construed in accordance with the laws of the State of New York.

## Certain definitions

Set forth below are certain defined terms used in the Indenture. For purposes of Indenture, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries, and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"*Acquired Indebtedness*" means, with respect to any specified Person,

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Notes*" has the meaning set forth in the first paragraph under "—Principal, maturity and interest."

"*Additional Pari Passu Lien Indebtedness*" means Indebtedness permitted to be incurred under the covenant described under "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and under the Credit Agreement which is by its terms intended to be secured on a *pari passu* basis with the Liens securing the First Lien Notes; *provided* such Lien is permitted to be incurred under the Indenture and the Credit Agreement and such Indebtedness has a stated maturity that is no earlier than the stated maturity of the First Lien Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*AMI*" means American Media, Inc., a Delaware corporation, and its successors and assigns.

"*AMO*" means American Media Operations, Inc., a Delaware corporation, and its successors and assigns.

"*Applicable Premium*" means, with respect to any First Lien Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such First Lien Note; and

(2)    the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such First Lien Note at December 15, 2013 (such redemption price being set forth in the table appearing above under the caption "Optional redemption"), plus (ii) all required interest payments due on such First Lien Note through December 15, 2013 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such First Lien Note.

"*Asset Sale*" means:

(1)    the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-back Transaction) of the Company or any of the Restricted Subsidiaries (each referred to in this definition as a "*disposition*"); or

(2)    the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with the covenant described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock");

in each case, other than:

(a)    any disposition of Cash Equivalents or obsolete or worn out equipment in the ordinary course of business or any disposition of inventory or goods (or other assets) in the ordinary course of business;

(b)    the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to the provisions described above under "Certain covenants—Merger, consolidation or sale of all or substantially all assets" or any disposition that constitutes a Change of Control pursuant to the Indenture;

(c)    the making of any Restricted Payment or any Permitted Investment that is permitted to be made, and is made, under the covenant described above under "Certain covenants—Limitation on restricted payments";

(d)    any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $7.5 million;

(e)    any disposition of property or assets or issuance of securities (i) by a Guarantor to the Company or by the Company or a Guarantor to another Guarantor or (ii) by a Restricted Subsidiary that is not a Guarantor to the Company, a Guarantor or to another Restricted Subsidiary that is not a Guarantor;

(f)    to the extent allowable under Section 1031 of the Internal Revenue Code of 1986, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g)    the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(h)    any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary other than to the extent that the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder;

(i)    solely for the purposes of clauses (1) and (2) of the first paragraph under "Repurchase at the option of holders—Asset sales," foreclosures, condemnation or any similar action on assets;

(j)    the granting of Liens not prohibited by the Indenture;

(k)    the licensing or sublicensing of intellectual property or other general intangibles in the ordinary course of business; and

(l)    solely for the purposes of clauses (1) and (2) of the first paragraph under "Repurchase at the option of holders—Asset sales," any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business.

"*Assumption*" means the consummation of the transactions whereby (a) the Company will assume all of the obligations of the Escrow Issuer under the Indenture, the Registration Rights Agreement, the Security Documents and the Intercreditor Agreements, (b) each of the Guarantors will guarantee the First Lien Notes and become a party to the Registration Rights Agreement, the Security Documents and the Intercreditor Agreements and (c) to the extent the Company assumes the obligations of the Escrow Issuer other than by merger, the Escrow Issuer is released from the obligations under the Indenture.

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

(1)   in the case of a corporation, corporate stock;

(2)   in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)   in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)   any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Equivalents*" means:

(1)   United States dollars;

(2)(a)   euro, or any national currency of any participating member of the EMU; or

(b)   in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

(3)   securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or issued by any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(4)   certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(5)   repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6)   commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7)   marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8)   investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)    Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)    Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above, *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Cash Management Bank*" means any Credit Agreement Lender or an Affiliate of a Credit Agreement Lender (together with its successors and assigns) providing Cash Management Services to the Company or any Guarantor.

"*Cash Management Obligations*" means all obligations owing by the Company or any Guarantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documents governing the Cash Management Services, whether or not a claim for post-petition interest or fees is allowed or allowable in any such Insolvency or Liquidation Proceeding), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Company or such Guarantor with the terms, conditions and agreements of such Cash Management Services.

"*Cash Management Services*" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

"*Change of Control*" means the occurrence of any of the following:

(1)    the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, other than to a Permitted Holder or to a Person with respect to which the Permitted Holders have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of such Person or any direct or indirect holding company of such Person;

(2)    (A) the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), other than the Permitted Holders, has become the "beneficial owner" (as defined in Rules 13d-3 of the Exchange Act, or any successor provision), by way of merger, consolidation or other business combination or purchase, of 50% or more of the total voting power of the Voting Stock of the Company or any direct or

indirect parent company holding directly or indirectly 100% of the total voting power of the Voting Stock of the Company and (B) the Permitted Holders do not have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of the Company or such parent company; or

(3)   the adoption by the stockholders of the Company of a plan or proposal for the liquidation or dissolution of the Company.

"*Collateral*" means all of the property and assets whether now owned or hereafter acquired, in each case, in which Liens are, from time to time, purported to be granted to secure the First Lien Notes and the Guarantees pursuant to the Security Documents, other than Excluded Assets.

"*Collateral Agent*" has the meaning set forth under the caption "Security for the notes—After-acquired collateral."

"*Company*" has the meaning set forth in the first paragraph under "General."

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries (other than with respect to interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense), plus, to the extent incurred by the Company and its Restricted Subsidiaries in such period but not included in such interest expense:

(a)   interest expense attributable to Capitalized Lease Obligations and the interest expense attributable to leases constituting part of a Sale and Lease-back Transaction,

(b)   amortization of debt discount and debt issuance costs,

(c)   capitalized interest,

(d)   commissions, discounts and other fees and charges attributable to letters of credit and bankers' acceptance financing,

(e)   interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is guaranteed by (or secured by the assets of) the Company or any Restricted Subsidiary,

(f)   net costs associated with Hedging Obligations,

(g)   dividends in respect of all Disqualified Stock of the Company and all Preferred Stock of any of the Restricted Subsidiaries of the Company, to the extent held by Persons other than the Company or a Wholly Owned Subsidiary,

(h)   interest incurred in connection with investments in discontinued operations, and

(i)   the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Company) in connection with Indebtedness incurred by such plan or trust.

Notwithstanding anything to the contrary contained herein, commissions, discounts, yield and other fees and charges incurred in connection with any transaction pursuant to which the Company or any Subsidiary of the Company may sell, convey or otherwise transfer or grant a security interest in any accounts receivable or related assets shall be included in Consolidated Interest Expense.

"*Consolidated Leverage Ratio*" as of any date of determination means the ratio of:

(a)    Total Consolidated Indebtedness as of the date of determination to

(b)    the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters ending at the end of the most recent fiscal quarter for which internal financial statements are available,

*provided, however*, that

(i)    if the Company or any Restricted Subsidiary has incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is an incurrence of Indebtedness, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been incurred on the first day of such period and the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the date of such calculation will be deemed to be (i) the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation, in each case, *provided* that such average daily balance shall take into account any repayment of Indebtedness under such facility as provided in clause (ii)),

(ii)    if the Company or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Leverage Ratio, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such period and as if the Company or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness,

(iii)    if since the beginning of such period the Company or any Restricted Subsidiary shall have made any Asset Sale, EBITDA for such period shall be reduced by an amount equal to EBITDA (if positive) directly attributable to the assets that were the subject of such Asset Sale for such period or increased by an amount equal to EBITDA (if negative) directly attributable thereto for such period and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries in connection with such Asset Sale for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted

Subsidiary to the extent the Company and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale),

(iv)  if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period, and

(v)   if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by the Company or a Restricted Subsidiary during such period, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets had occurred on the first day of such period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness incurred in connection therewith, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Company; *provided* that any such pro forma calculations with respect to cost savings, operating expense reductions or synergies for such period shall be limited to those resulting from the transaction which is being given pro forma effect that in the reasonable determination of a responsible financial or accounting Officer of the Company (a) are reasonably identifiable and factually supportable and (b) such actions have been realized or for which the steps necessary for realization have been taken or are reasonably expected to be taken within twelve months following any such transaction, including, but not limited to, the execution or termination of any contracts, the termination of any personnel or the closing (or approval by the board of directors of any closing) of any facility, as applicable. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness).

"*Consolidated Net Income*" means, for any period, the net income (excluding non-controlling interest) of the Company and its Restricted Subsidiaries for such period; *provided*, *however*, that there shall not be included in such Consolidated Net Income:

(a)  any net income of any Person (other than the Company) if such Person is not a Restricted Subsidiary, except that

(i)   subject to the limitations contained in clause (d) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Person during such period to the Company or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a

dividend, debt repayment or other distribution made to a Restricted Subsidiary (other than a Guarantor), to the limitations contained in clause (b) below) and

(ii)    the Company's equity in a net loss of any such Person for such period shall be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Company or a Restricted Subsidiary;

(b)    except for the purposes of calculating Consolidated Leverage Ratio, any net income (or loss) of any Restricted Subsidiary (other than any Guarantor) if such Restricted Subsidiary is not permitted by restrictions, directly or indirectly, to pay dividends or make distributions (unless legally waived) to the Company, except that

(i)    the net income of any such Restricted Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Restricted Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend, debt repayment or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to another Restricted Subsidiary (other than a Guarantor), to the limitation contained in this clause) and

(ii)    the net loss of any such Restricted Subsidiary for such period shall be included in determining such Consolidated Net Income;

(c)    any gain (loss) realized (less all fees and expenses related thereto) upon the sale or other disposition of any asset of the Company or its consolidated Subsidiaries (including pursuant to any Sale and Lease-back Transaction) that is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(d)    any extraordinary, non-recurring or unusual gain or loss or expense (less all fees and expenses related thereto);

(e)    the cumulative effect of a change in accounting principles;

(f)    effects of adjustments (including the effects of such adjustments pushed down to the Company and its Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill and other intangible assets and in process research and development, deferred revenue and debt line items in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes;

(g)    any net after-tax income (loss) from the early extinguishment of (i) Indebtedness, (ii) Hedging Obligations or (iii) other derivative instruments;

(h)    any net after-tax income or loss from abandoned, closed or discontinued operations and any net after-tax gains or losses on disposal of abandoned, closed or discontinued operations;

(i)    any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in the law or regulation, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP; and

(j)    any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, disposition, recapitalization Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any other such transaction consummated prior to the Release Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1)    to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)    to advance or supply funds

    (a)    for the purchase or payment of any such primary obligation, or

    (b)    to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covenant Suspension*" means, during any period of time following the issuance of the First Lien Notes, that (i) the First Lien Notes have Investment Grade Ratings from both Rating Agencies, and (ii) no Default has occurred and is continuing under the Indenture.

"*Credit Agreement*" means the credit agreement to be entered into on or about the Release Date, among AMI, the Company, the lenders and the administrative agent for such lenders, including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" above).

"*Credit Agreement Lenders*" means the "Lenders" from time to time party to, and as defined in, the Credit Agreement, together with their respective successors and assigns; *provided* that the term "Credit Agreement Lender" shall in any event also include each letter of credit issuer and swingline lender under the Credit Agreement, including, without limitation, the "Issuing Bank," the "Swingline Lender" and any "Agent" under (and each as defined in) the Credit Agreement.

"*Debt Coverage EBITDA*" has the meaning set forth in the Offering Memorandum.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by the Company or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Company, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Discharge of First Lien Obligations*" means, subject to any reinstatement of First Lien Obligations in accordance with the Intercreditor Agreement, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective First Lien Document, whether or not such interest would be allowed in any such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness under the First Lien Documents and termination of all commitments of the Credit Agreement Lenders to lend or otherwise extend credit under the First Lien Documents, (b) payment in full in cash of all other First Lien Obligations (including letter of credit reimbursement obligations) that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest, and premium are paid (other than Cash Management Obligations and Secured Hedge Obligations so long as arrangements satisfactory to the applicable Cash Management Bank or Hedge Bank shall have been made), and (c) termination or cash collateralization (in an amount and manner, and on terms, reasonably satisfactory to the First Lien Representative) of all letters of credit issued under the First Lien Credit Documents.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date 91 days after the earlier of the maturity date of the First Lien Notes or the date the First Lien Notes are no longer outstanding; *provided*, *however*, that if such Capital Stock is issued to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Capital Stock held by any future, current or former employee, director, manager or consultant (or their respective trusts, estates, investment funds, investment vehicles or immediate family members) of the Company, any of its Subsidiaries or any direct or indirect parent entity of the Company in each case upon the termination of employment or death of such person pursuant to any stockholders' agreement, management equity plan, stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or its Subsidiaries.

"*EBITDA*" for any period means the Consolidated Net Income of the Company and its Restricted Subsidiaries for such period, *plus*, without duplication, the following to the extent deducted in calculating such Consolidated Net Income:

(a)    Consolidated income tax expense,

(b)    Consolidated Interest Expense,

(c)    Consolidated depreciation expense,

(d)    Consolidated amortization expense (including amortization associated with capitalized or short-term display rack costs and the recognition of such costs as a deferred cost asset amortized as contra-revenue),

(e)    any interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense,

(f)    any expenses or charges related to any Equity Offering, Permitted Investment, acquisition or Indebtedness permitted to be incurred by the Indenture (whether or not successful),

(g)    any expense or charge incurred or recorded by the Company or any of its Subsidiaries in connection with (i) Asset Sales or (ii) reorganization and other cost cutting efforts, including, without limitation, expenses and charges relating to severance, relocation and the discontinuation of titles,

(h)    any non-cash charges (including any non-cash compensation charge or expense) reducing Consolidated Net Income for such period (excluding any such charge which consists of or requires an accrual of, or cash reserve for, any anticipated cash charges for any prior or in any future period),

(i)    any charges or credits relating to the adoption of fresh start accounting principles; and

(j)    solely for purposes of calculating the Consolidated Leverage Ratio, the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income.

"*Emergence Transactions*" means all transactions relating to the Reorganization Plan and the Company's emergence from Chapter 11 of the Bankruptcy Code, including, but not limited to, closing of the Exit Financing.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of the Company or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)    public offerings with respect to the Company's or any direct or indirect parent company's common stock registered on Form S-8;

186

(2)    issuances to any Subsidiary of the Company; and

(3)    any such public or private sale that constitutes an Excluded Contribution.

"*Escrow Agent*" means Wilmington Trust Company, as escrow agent under the Escrow Agreement or any successor escrow agent as set forth in the Escrow Agreement.

"*Escrow Agreement*" means the Escrow Agreement to be dated as of the Issue Date, among the Escrow Issuer, AMO, the First Lien Trustee and the Escrow Agent, as amended, supplemented, modified, extended, renewed, restated or replaced in whole or in part from time to time.

"*Escrow End Date*" means the 60th day following the Issue Date; provided that the Escrow Issuer may elect to extend the Escrow End Date for an additional 35 days on no more than one occasion so long as, not later than five Business Days prior to the scheduled Escrow End Date, (i) it provides prior written notice to the Escrow Agent and the First Lien Trustee and has issued a press release stating that it has extended the Escrow End Date and (ii) AMO or the Escrow Issuer has deposited cash or Escrow Investments into escrow with the Escrow Agent, to be held pursuant to the terms of the Escrow Agreement, in an amount sufficient to fund the redemption price due on the latest permitted date for the revised Special Mandatory Redemption in respect of all outstanding First Lien Notes and has certified that such amounts will be satisfactory for such purpose.

"*Escrow Investment*" means (1) Government Securities, (2) investments in time deposit accounts, certificates of deposit and money market deposits maturing no later than the Escrow End Date in each case, entitled to U.S. Federal deposit insurance for the full amount thereof or issued by a bank or trust company (including the Escrow Agent or an affiliate of the Escrow Agent) which is organized under the laws of the United States of America or any State thereof having capital, surplus and undivided profits aggregating in excess of $500.0 million and (3) repurchase obligations maturing no later than the Escrow End Date entered into with a nationally recognized broker-dealer, with respect to which the purchase securities are Obligations issued or guaranteed by the United States government or any agency thereof, which repurchase Obligations shall be entered into pursuant to written agreements.

"*Escrow Issuer*" means AMO Escrow Corporation.

"*Escrow Proceeds*" has the meaning ascribed to such term under "—Release Conditions."

"*euro*" means the single currency of participating member states of the EMU.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Exchange Notes*" means any notes issued in exchange for notes pursuant to the Registration Rights Agreement or similar agreement.

"*Excluded Contribution*" means the amount of net cash proceeds, marketable securities or Qualified Proceeds received by the Company after the Release Date from (1) contributions to its common equity capital and (2) the sale (other than to a Subsidiary of the Company or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Company or any of its direct or indirect parents) of Capital Stock (other than Disqualified Stock) of the Company, in each case designated as an Excluded Contribution pursuant to an Officers' Certificate on the date such capital contributions are made or the date

such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of the first paragraph under "Certain covenants—Limitation on restricted payments."

"*Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be comprised of the Credit Agreement, the First Lien Notes and the Second Lien Notes.

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Company in good faith; *provided* that if the fair market value is equal to or exceeds $25.0 million, such determination shall be made by the board of directors of the Company.

"*First Lien Credit Documents*" means the Credit Agreement, the other Loan Documents (as defined in the Credit Agreement), and each of the other agreements, documents, and instruments providing for or evidencing any other First Lien Obligation and any other document or instrument executed or delivered at any time in connection with any First Lien Obligation (including any intercreditor or joinder agreement among holders of First Lien Obligations but excluding Secured Hedge Agreements and the documents governing the Cash Management Obligations), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from time to time.

"*First Lien Documents*" means the First Lien Credit Documents, the Secured Hedge Agreements, and any and all documents governing the Cash Management Obligations.

"*First Lien Intercreditor Agreement*" means the First Lien Intercreditor Agreement dated on or about the Release Date among the Collateral Agent, the collateral agent in respect of the Credit Agreement, the Company, AMI and each other Guarantor named therein, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*First Lien Leverage Ratio*" means the ratio of (1) the aggregate principal amount of Pari Passu Lien Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of the Company and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "Consolidated Leverage Ratio" in performing a calculation thereof.

"*First Lien Notes*" has the meaning set forth in the second paragraph under the caption "—General."

"*First Lien Obligations*" means (i) all Obligations arising under (and as defined in) the Credit Agreement of the Company and the Guarantors, under any other document relating to the Credit Agreement incurred under clause (1) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock", (ii) all Obligations under the Indenture, (iii) all Secured Hedging Obligations and (iv) all Cash Management Obligations; *provided* that the aggregate principal amount of, without duplication, revolving credit loans, letters of credit, term loans, other loans, notes or similar instruments (excluding, in any event, Cash Management Obligations and Secured Hedging Obligations) provided for under the Credit Agreement or any other document relating to the Credit Agreement (or any refinancing thereof) in excess of the amount permitted under clause (1) of the second paragraph under "Certain Covenants—Limitation on incurrence of indebtedness and

issuance of disqualified stock and preferred stock" and any interest relating to such excess amount, shall not constitute First Lien Obligations for purposes of the Indenture. "First Lien Obligations" shall in any event include (a) all interest accrued or accruing, or which would accrue, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), on or after the commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Document, whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the First Lien Representative and the First Lien Secured Parties on or after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed or allowable under Section 502 or 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors as a claim in such Insolvency or Liquidation Proceeding, and (c) all obligations and liabilities of the Company and each Guarantor under each First Lien Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due and payable.

"*First Lien Representative*" means, as between collateral agents representing different series of First Lien Obligations, the collateral agent representing the series of First Lien Obligations with the greatest outstanding principal amount.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Issue Date. At any time after the Issue Date, the Company may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP shall thereafter be construed to mean IFRS (except as otherwise provided in the Indenture); *provided* that any such election, once made, shall be irrevocable; *provided*, *further*, any calculation or determination in the Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Company's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Company shall give written notice of any such election made in accordance with this definition to the First Lien Trustee and the Holders of First Lien Notes.

"*Government Securities*" means securities that are:

(1)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such

custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Company's Obligations under the Indenture.

"*Guarantor*" means each Restricted Subsidiary that guarantees the First Lien Notes in accordance with the terms of the Indenture.

"*Hedge Bank*" means any Person that is a Credit Agreement Lender or an Affiliate of a Credit Agreement Lender at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, and such Person's successors and assigns.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate or currency risks either generally or under specific contingencies.

"*Holder*" means the Person in whose name a First Lien Note is registered on the registrar's books.

"*Indebtedness* " means, with respect to any Person, without duplication:

(1)    any indebtedness (including principal and premium) of such Person, whether or not contingent:

    (a)    in respect of borrowed money;

    (b)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

    (c)    representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

    (d)    representing any Hedging Obligations;

    if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)    to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the

such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3)    to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person but only to the extent of the fair market value of the assets subject to such Lien;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include Contingent Obligations incurred in the ordinary course of business.

"*IFRS*" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board.

"*Indenture*" has the meaning set forth in the second paragraph under the caption "—General."

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Company, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means J.P. Morgan Securities LLC, Deutsche Bank Securities Inc and Credit Suisse Securities (USA) LLC.

"*Insolvency or Liquidation Proceeding*" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to the Company or any Guarantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to the Company or any Guarantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of the Company or any Guarantor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Company or any Guarantor.

"*Intercreditor Agreements*" means the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's Investors Service, Inc. and BBB- (or the equivalent) by Standard & Poor's Ratings Group, Inc., in each case, with a stable or better outlook, or an equivalent rating by any other Rating Agency.

"*Investments* " means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "Certain covenants—Limitation on restricted payments":

(1) "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

    (a) the Company's "Investment" in such Subsidiary at the time of such redesignation; less

    (b) the portion (proportionate to the Company equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2) any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

"*Issue Date*" means the date the First Lien Notes are first issued under the Indenture.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the States of New York, Minnesota and Delaware.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for informational purposes); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale, including any cash received upon the sale of sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale, net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness required (other than required by clause (1) of the second paragraph of "Repurchase at the option of holders—Asset sales") to be paid as a result of such transaction, amounts required to be paid to minority interest holders in Restricted Subsidiaries as a result of such Asset Sale, any portion of the purchase price from such Asset Sale placed in escrow as a requirement of such Asset Sale (but only for the duration of such escrow), and any deduction of appropriate amounts to be provided by the Company or any of the Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company or any of the Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Obligations*" means any principal (including any accretion), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal (including accretion), interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the Offering Memorandum dated November 16, 2010 with respect to the First Lien Notes.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Company.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by any two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements set forth in the Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the First Lien Trustee. The counsel may be an employee of or counsel to the Company.

"*Pari Passu Lien Indebtedness*" means (i) the First Lien Notes, (ii) Indebtedness under the Credit Agreement and (iii) Additional Pari Passu Lien Indebtedness.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Company or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the "Repurchase at the option of holders—Asset sales" covenant.

"*Permitted Holders*" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Management II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) Regiment Capital Management, LLC, (vi) [reserved], (vii) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any successor provision) of which any of the Permitted Holders specified in clauses (i)-(v) are members, and (viii) the respective Affiliates of each of the foregoing; *provided* that in the case of any group specified in clause (vii) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(v) and their respective Affiliates must collectively beneficially own a greater amount of the total voting power of the Voting Stock of AMI than the amount of the total voting power of the Voting Stock of AMI beneficially owned by any other member of such group.

"*Permitted Investments*" means:

(1)     any Investment in the Company or any of its Restricted Subsidiaries;

(2)     any Investment in cash and Cash Equivalents;

(3)  any Investment by the Company or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

   (a)  such Person becomes a Restricted Subsidiary; or

   (b)  such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary,

   and, in each case, any Investment held by such Person; *provided*, that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4)  any Investment in securities or other assets not constituting cash or Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of "Repurchase at the option of holders—Asset sales" or any other disposition of assets not constituting an Asset Sale;

(5)  any Investment existing on the Release Date;

(6)  any Investment acquired by the Company or any of its Restricted Subsidiaries:

   (a)  in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

   (b)  as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)  Hedging Obligations permitted under clause (10) of the covenant described in "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(8)  any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed the greater of (x) $25.0 million and (y) 3.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)  Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Company, or any of its direct or indirect parent companies; *provided, however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described in "Certain covenants—Limitation on restricted payments";

(10)  guarantees of Indebtedness permitted under the covenant described in "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(11)  any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under

"Certain covenants—Transactions with affiliates" (except transactions described in clauses (2), (5) and (16) of such paragraph);

(12)  additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (12) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed the greater of (x) $40.0 million and (y) 5.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(13)  loans and advances to, or guarantees of Indebtedness of, officers, directors and employees in an amount not to exceed $5.0 million at any time outstanding;

(14)  loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business; and

(15)  prepaid expenses, deposits, advances, loans or extensions of trade credit in the ordinary course of business by the Company or any Restricted Subsidiaries.

"*Permitted Liens*" means, with respect to any Person:

(1)  pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(2)  Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)  Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)  Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)  minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental, to the conduct of the business of such Person or to the ownership of its

properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6) (i)  Liens securing Indebtedness under the Credit Agreement incurred under clause (1) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" (and the related guarantees) and (ii) Liens securing Indebtedness permitted to be incurred pursuant to clause (4) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" covering only the property (real or personal) or equipment (other than software), whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, in each case, financed by or acquired with such Indebtedness;

(7)  Liens existing on the Release Date (other than Liens in favor of secured parties under the Credit Agreement) including Liens securing the Second Lien Notes issued on or prior to the Release Date; *provided* that the Second Lien Notes are subject to the Second Lien Intercreditor Agreement;

(8)  Liens on property or shares of stock or other assets of a Person at the time such Person becomes a Subsidiary; *provided, however,* such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided, further, however,* that such Liens may not extend to any other property or assets owned by the Company or any of its Restricted Subsidiaries;

(9)  Liens on property or other assets at the time the Company or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger or consolidation with or into the Company or any of its Restricted Subsidiaries; *provided, however,* that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided, further, however,* that the Liens may not extend to any other property owned by the Company or any of its Restricted Subsidiaries;

(10)  Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(11)  Liens securing Hedging Obligations;

(12)  Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)  leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries and do not secure any indebtedness;

(14)  Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business;

(15)     Liens in favor of the Company or any Guarantor;

(16)     Liens on equipment of the Company or any of its Restricted Subsidiaries granted in the ordinary course of business to the Company's clients not related to Indebtedness;

(17)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9); *provided*, *however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8) and (9) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any accrued interest and fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(18)     deposits made in the ordinary course of business to secure liability to insurance carriers;

(19)     other Liens that are not on Collateral securing obligations incurred in the ordinary course of business which obligations do not exceed $10.0 million at any one time outstanding;

(20)     Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under the caption "Events of default and remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(21)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(22)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or any comparable or successor provision) on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business, and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(23)     Liens deemed to exist in connection with Investments in repurchase agreements permitted under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(24)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(25)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Company or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the

ordinary course of business of the Company and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(26)    any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(28)    Liens arising under the Indenture in favor of the First Lien Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred or outstanding under the Indenture, *provided* that such Liens are solely for the benefit of the trustees, agents and representatives in their capacities as such and not for the benefit of the holders of such Indebtedness;

(29)    Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under the covenant described under "Certain covenants—Limitation on restricted payments";

(30)    Liens on the Equity Interests of Unrestricted Subsidiaries;

(31)    Liens on the Collateral securing the First Lien Notes issued on the Issue Date, the Guarantees thereof and other Obligations under the Indenture and in respect thereof and any obligations owing to the First Lien Trustee or the Collateral Agent under the Indenture or the Security Documents;

(32)    Liens on assets of Foreign Subsidiaries to secure Indebtedness of Foreign Subsidiaries;

(33)    Liens on the Collateral securing Additional Pari Passu Lien Indebtedness; *provided* that (x) at the time of incurrence of such Additional Pari Passu Lien Indebtedness and on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction is equal to or less than 2.75 to 1.0; and (y) if at the time of incurrence of such Additional Pari Passu Lien Indebtedness and on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction exceeds 2.75 to 1.0, such Additional Pari Passu Lien Indebtedness does not exceed $5.0 million at any time outstanding; and

(34)    Liens on the Collateral securing on a junior priority basis Indebtedness incurred pursuant to the first paragraph of the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided* that any such Indebtedness and guarantees shall be subject to a Second Lien Intercreditor Agreement.

In each case set forth above, notwithstanding any stated limitation on the assets that may be subject to such Lien, a Permitted Lien on a specified asset or group or type of assets may include

Liens on all improvements, additions and accessions thereto and all products and proceeds thereof, including dividends, distributions, interest and increases in respect thereof.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Permitted Second Lien Obligations*" means the Second Lien Notes and any Indebtedness secured by a Lien incurred under clause (34) of the definition of Permitted Liens.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"*Priority Payment Lien Obligations*" means (i) any Indebtedness incurred pursuant to clause (1) of the second paragraph under "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock", (ii) Cash Management Obligations with a Cash Management Bank and (iii) Secured Hedging Obligations, in each case, so designated by the Company.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Company in good faith.

"*Rating Agencies*" means Moody's and S&P or, if Moody's or S&P or both shall not make a rating on the First Lien Notes publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Company which shall be substituted for Moody's or S&P or both, as the case may be.

"*Registration Rights Agreement*" means the Registration Rights Agreement in respect of the First Lien Notes, to be dated as of the Issue Date, among the initial purchasers and the Escrow Issuer, as supplemented by the joinder to the Registration Rights Agreement to be dated as of the Release Date, among the Company and the Guarantors.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business, *provided* that any assets received by the Company or a Restricted Subsidiary in exchange for assets transferred by the Company or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Release Date*" has the meaning ascribed to such term under "—Release Conditions."

"*Reorganization Plan*" means the Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code of AMI and its debtor Subsidiaries (which does not include the Escrow Issuer and its direct parent) substantially consistent with the description of the Plan (as set forth in the Offering Memorandum).

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Company (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*Reversion Date*" means, during any period of time during which the Company and the Restricted Subsidiaries are not subject to the covenants listed in the first paragraph under "Description of notes—Certain covenants" (the "Suspended Covenants") as a result of a Covenant Suspension, the date on which one or both of the Rating Agencies withdraws its Investment Grade Rating or downgrades the rating assigned to the First Lien Notes below an Investment Grade Rating or a Default or Event of Default occurs and is continuing, and after which date the Suspended Covenants will thereafter be reinstated.

"*Revolving Facility*" means the Company's $40,000,000 senior secured first lien revolving credit facility pursuant to the Credit Agreement dated as of the Release Date.

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-back Transaction*" means any arrangement providing for the leasing by the Company or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Company or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Second Lien Collateral Agent*" has the meaning ascribed to such term under "—Security for the notes—Second lien intercreditor agreement."

"*Second Lien Indenture*" means the indenture in respect of the Second Lien Notes dated as of a date on or before the Release Date among the Company and the Second Lien Trustee, as amended or supplemented from time to time.

"*Second Lien Intercreditor Agreement*" means an intercreditor agreement dated as of the Release Date among the Collateral Agent, the Revolving Collateral Agent, the Company, AMI and each other Guarantor and the Second Lien Collateral Agent.

"*Second Lien Notes*" means the up to $140,000,000 in aggregate principal amount of the Company's Second Lien Secured Notes due 2018 issued on or prior to the Release Date pursuant to the Second Lien Indenture.

"*Second Lien Trustee*" means Wilmington Trust FSB, as trustee for the holders of Second Lien Notes.

"*Secured Hedge Agreements*" means each agreement that governs Hedging Obligations by and between the Company or any Guarantor, on the one hand, and any Hedge Bank from time to time, but only to the extent such agreement is permitted under the Credit Agreement and constitutes an "Obligation" (as such term is defined under the Credit Agreement); *provided*, *however*, that such Hedging Obligations shall not, solely by virtue of constituting an "Obligation" (as so defined), also constitute Indebtedness under the Credit Agreement.

"*Secured Hedging Obligations*" means (i) obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective Secured Hedge Agreement, whether or not a claim for post-petition interest or fees is allowed in any such Insolvency or Liquidation Proceeding), of the Company or any Guarantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising out of or in connection with, any Secured Hedge Agreement (including all such obligations and indebtedness under any guarantee of any such Secured Hedge Agreement to which the Company or such Guarantor is a party) and (ii) all performance and compliance obligations by the Company or any Guarantor under any Secured Hedge Agreement.

"*Secured Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Security Documents*" means the security documents granting a security interest in any assets of any Person to secure the Obligations under the First Lien Notes and the Guarantees as each may be amended, restated, supplemented or otherwise modified from time to time.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Release Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Company and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Special Mandatory Redemption*" has the meaning ascribed to such term under "—Special Mandatory Redemption."

"*Special Mandatory Redemption Date*" has the meaning ascribed to such term under "—Special Mandatory Redemption."

"*Subsidiary* " means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

(2)    any partnership, joint venture, limited liability company or similar entity of which

(x)    more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries

of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y)    such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Total Assets*" means the total consolidated of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Company.

"*Total Consolidated Indebtedness*" means the aggregate amount of all Indebtedness of the Company and its Restricted Subsidiaries, outstanding as of such date of determination, determined on a Consolidated basis, after giving effect to any incurrence of Indebtedness and the application of the proceeds therefrom giving rise to such determination (but excluding Indebtedness of the type described in clause (d) of the definition thereof and Indebtedness issued in payment of interest obligations), less up to $20.0 million of unrestricted cash and Cash Equivalents of the Company and its Restricted Subsidiaries as of such date of determination.

"*Trade Payables*" means, with respect to any Person, any accounts payable or any indebtedness or monetary obligation to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 15, 2013; *provided*, *however*, that if the period from the Redemption Date to December 15, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Unrestricted Subsidiary*" means:

(1)    any Subsidiary of the Company which at the time of determination is an Unrestricted Subsidiary (as designated by the Company, as provided below); and

(2)    any Subsidiary of an Unrestricted Subsidiary.

The Company may designate any Subsidiary of the Company (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or holds any Lien on, any property of, the Company or any Subsidiary of the Company (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1)    any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Company;

(2)    such designation complies with the covenants described under "Certain covenants—Limitation on restricted payments"; and

(3)     each of:

    (a)     the Subsidiary to be so designated; and

    (b)     its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any Restricted Subsidiary (other than a pledge of the Equity Interests of such Unrestricted Subsidiary).

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and the Company could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test described in the first paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock."

Any such designation by the Company shall be notified by the Company to the First Lien Trustee by promptly filing with the First Lien Trustee a copy of the resolution of the board of directors of the Company or any committee thereof giving effect to such designation (which resolution must be certified by the Secretary or an Assistant Secretary of the Company) and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*Unsecured Indebtedness*" means Indebtedness that is not Secured Indebtedness.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)     the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2)     the sum of all such payments.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

# Description of second lien notes

## General

On or before the Release Date, AMO Escrow Corporation (the "*Escrow Issuer*"), or the Company, as applicable, will issue up to $140.0 million aggregate principal amount of second lien senior secured notes due 2018 (the "*Second Lien Notes*") under an indenture to be dated as of a date on or before the Release Date (as such may be amended from time to time, the "*Second Lien Indenture*"), between the Escrow Issuer, or the Company, as applicable, and Wilmington Trust FSB, as trustee (the "*Second Lien Trustee*") and as collateral agent (the "*Second Lien Collateral Agent*"). On the Release Date, the Company will issue at least $25.0 million of the Second Lien Notes to the 2009 Term Facility Lenders (including the Backstop Parties) in accordance with the Plan. The balance of the Second Lien Notes may be issued in accordance with the Plan or may be issued in one or more private placement offerings by the Escrow Issuer prior to the Plan Effective Date.

Definitions of certain capitalized terms used in this "Description of second lien notes" may be found under the heading "—Certain definitions." For purposes of this section, prior to the consummation of the Assumption, references to the Company in this description refer only to the Escrow Issuer. After the consummation of the Assumption, the terms "Company," "we," "us" and "our" refer only to American Media Operations, Inc. and not any of its Subsidiaries. Each of the Subsidiaries of the Company that guarantees the Second Lien Notes is referred to in this section as a "Guarantor." Each such guarantee is termed a "Guarantee."

The Second Lien Notes will have the benefit of certain collateral security as provided in the Second Lien Security Documents. The Second Lien Collateral Agent will enter into, on behalf of and binding as to all present and future Holders of the Second Lien Notes, the Second Lien Intercreditor Agreement, which will contain, for the benefit of the Second Lien Secured Parties, provisions relating to (x) the junior status of the Liens in favor of the Holders of the Second Lien Notes and various related limitations on the rights of the Holders of the Second Lien Notes with respect to the Collateral (as defined below) and (y) turn-over requirements with respect to certain payments to the Second Lien Trustee or Holders of the Second Lien Notes from proceeds of Collateral. See "Security documents and intercreditor agreement."

To the extent any Second Lien Notes are issued by the Escrow Issuer prior to the Release Date in one or more separate private transactions, the Escrow Issuer may enter into escrow arrangements and registration rights agreements relating to such Second Lien Notes, on terms substantially consistent with those entered into in connection with the First Lien Notes on their Issue Date.

The Second Lien Indenture contains provisions which define your rights under the Second Lien Notes. In addition, the Second Lien Indenture governs the obligations of the Company and of each Guarantor under the Second Lien Notes. The terms of the Second Lien Notes will include those stated in the Second Lien Indenture. The terms of the Second Lien Notes will include those stated in the Second Lien Indenture and, if and when the Second Lien Notes have been registered and the Second Lien Indenture has been qualified under the TIA, those terms expressly made part of the Second Lien Indenture by reference to the TIA. Prior to registration and qualification under the TIA, the Second Lien Indenture will contain certain provisions, such as permitting affiliates of the Company that hold Second Lien Notes to consent to amendments and waivers that will not be available if and when the Second Lien Indenture is so qualified.

The following description is meant to be only a summary of certain provisions of the Second Lien Indenture, the Second Lien Security Documents and the Second Lien Intercreditor Agreement. It

does not restate the terms of each of the Second Lien Indenture, the Second Lien Escrow Agreement, the Second Lien Security Documents and the Second Lien Intercreditor Agreement in their entirety. We urge that you carefully read the Second Lien Indenture, the Second Lien Escrow Agreement, the Second Lien Security Documents and the Second Lien Intercreditor Agreement as they, and not this description, govern your rights as Holders.

## Brief description of notes

After the Release Date and the Assumption, the Second Lien Notes:

- will be general senior obligations of the Company;

- will be effectively junior to any obligations of the Company that are either (i) secured by a Lien on the Collateral that is senior or prior to the second priority Liens securing the Second Lien Notes, including the first priority Liens securing obligations under the Credit Agreement and the First Lien Notes referred to below, and potentially any Permitted Liens, or (ii) secured by assets that are not part of the Collateral securing the Second Lien Notes, in each case, to the extent of the value of the assets securing such obligations;

- will rank *pari passu* in right of payment with all existing and future Indebtedness of the Company that is not subordinated in right of payment to the Second Lien Notes;

- will be senior in right of payment to all existing and future Indebtedness of the Company that is, by its terms, expressly subordinated in right of payment to the Second Lien Notes;

- will be effectively senior, together with any other Permitted Second Lien Obligations on an equal and ratable basis, to all Unsecured Indebtedness of the Company to the extent that the value of the Collateral owned by the Company exceeds the amount of the First Lien Obligations;

- will be unconditionally guaranteed by the Guarantors; and

- will be structurally subordinated to the Indebtedness and other obligations of Subsidiaries of the Company that do not guarantee the Second Lien Notes.

## Guarantees

Upon release of the Escrow Proceeds from escrow on the Release Date as described under "—Release Conditions", the Guarantors, as primary obligors and not merely as sureties, will initially jointly and severally, fully and unconditionally guarantee, on a senior secured basis, the performance and full and punctual payment when due, whether at maturity, by acceleration or otherwise, of all obligations of the Company under the Second Lien Indenture and the Second Lien Notes, whether for payment of principal of, premium, if any, or interest on the Second Lien Notes, expenses, indemnification or otherwise, on the terms set forth in the Second Lien Indenture by executing the Second Lien Indenture or a supplement thereto.

Each of the Restricted Subsidiaries (other than as detailed below) will initially guarantee the Indebtedness and Obligations under the Second Lien Notes. Each of the Guarantees:

- will be a senior obligation of such Guarantor;

- will be effectively junior to any obligations of such Guarantor that are either (i) secured by a Lien on the Collateral that is senior or prior to the second priority Liens securing the Guarantees, including the first priority Liens securing obligations of the Guarantors under the

Credit Agreement and the First Lien Notes, or (ii) secured by assets that are not part of the Collateral securing the Second Lien Notes, in each case, to the extent of the value of the assets securing such obligations;

- will rank *pari passu* in right of payment with all existing and future Indebtedness of such Guarantor that is not subordinated in right of payment to such Guarantee;

- will be senior in right of payment to all existing and future Indebtedness of such Guarantor that is, by its terms, expressly subordinated in right of payment to the Guarantees;

- will be effectively senior, together with any other Permitted Second-Lien Obligations on an equal and ratable basis, to all Unsecured Indebtedness of such Guarantor to the extent that the value of the Collateral owned by such Guarantor exceeds the amount of the obligations under its Guarantee of the First Lien Obligations; and

- will be structurally subordinated to the Indebtedness and other obligations of Subsidiaries of the Company that do not guarantee the Second Lien Notes.

Not all of the Company's Subsidiaries will guarantee the Second Lien Notes. In the event of a bankruptcy, liquidation or reorganization of any of these non-guarantor Subsidiaries, the non-guarantor Subsidiaries will pay the holders of their debt, their trade creditors and the holders of their Preferred Stock, if any, before they will be able to distribute any of their assets to the Company. The Second Lien Notes will not be guaranteed by our current or future Foreign Subsidiaries. As of September 30, 2010, these non-guarantor Subsidiaries (including Foreign Subsidiaries) had (i) approximately $8.3 million of total liabilities (including Trade Payables), (ii) revenues of approximately $5.7 million for the six months ended September 30, 2010 and (iii) approximately $9.5 million of total assets. For the six months ended September 30, 2010, the non-guarantor subsidiaries had Adjusted EBITDA of $1.4 million.

The obligations of each Guarantor under its Guarantee will be limited as necessary to prevent the Guarantee from constituting a fraudulent conveyance under applicable law.

Any entity that makes a payment under its Guarantee will be entitled upon payment in full of all guaranteed obligations under the Second Lien Indenture to a contribution from each other Guarantor in an amount equal to such other Guarantor's pro rata portion of such payment based on the respective net assets of all the Guarantors at the time of such payment determined in accordance with GAAP.

If a Guarantee were rendered voidable, it could be subordinated by a court to all other indebtedness (including guarantees and other contingent liabilities) of the Guarantor, and, depending on the amount of such indebtedness, a Guarantor's liability on its Guarantee could be reduced to zero. See "Risk factors—Risks related to this offering."

A Guarantee by a Guarantor will provide by its terms that it shall be automatically and unconditionally released and discharged upon:

(a)   any sale, exchange or transfer (by merger or otherwise) of the Capital Stock of such Guarantor (including any sale, exchange or transfer), after which the applicable Guarantor is no longer a Restricted Subsidiary or all or substantially all the assets of such Guarantor which sale, exchange or transfer is made in compliance with the applicable provisions of the Second Lien Indenture;

(b)    the release or discharge of the guarantee by such Guarantor of all First Lien Obligations or such other guarantee that resulted in the creation of such Guarantee, except a discharge or release by or as a result of payment under such guarantee;

(c)    the proper designation of any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary; or

(d)    the Company exercising its legal or covenant defeasance options as described under "—Defeasance" or the Company's obligations under the Second Lien Indenture being discharged in accordance with the terms of the Second Lien Indenture.

## Ranking

The Indebtedness evidenced by the Second Lien Notes will be senior Indebtedness of the Company, will be equal in right of payment to all existing and future senior Indebtedness of the Company (including First Lien Obligations and any Permitted Second Lien Obligations), will have the benefit of the second-priority security interest in the Collateral described below under "—Security for the notes" and will be senior in right of payment to all existing and future Indebtedness of the Company that is, by its terms, expressly subordinated in right of payment to the Second Lien Notes.

The Indebtedness evidenced by the Guarantees will be senior Indebtedness of the applicable Guarantor, will be equal in right of payment to all existing and future senior Indebtedness of such Guarantor (including its guarantee of First Lien Obligations and any Permitted Second Lien Obligations), will have the benefit of the second-priority security interest in the Collateral described below under "—Security for the notes" and will be senior in right of payment to all existing and future Indebtedness of such Guarantor that is, by its terms, expressly subordinated in right of payment to the Guarantees. Pursuant to the Second Lien Security Documents and the Second Lien Intercreditor Agreement, the security interests securing the Guarantees will be second in priority (subject to Permitted Liens, including exceptions described under "—Security for the notes") to all security interests at any time granted to secure First Lien Obligations.

Although the Second Lien Indenture will limit the incurrence of Indebtedness by and the issuance of Preferred Stock of our Restricted Subsidiaries, such limitation is subject to a number of significant qualifications.

We currently conduct a significant portion of our operations through our Subsidiaries. To the extent such Subsidiaries are not Guarantors, creditors of such Subsidiaries, including trade creditors, and preferred stockholders, if any, of such Subsidiaries generally will have priority with respect to the assets and earnings of such Subsidiaries over the claims of creditors of the Company, including Holders. The Second Lien Notes, therefore, will be structurally subordinated to the claims of creditors, including trade creditors, and preferred stockholders, if any, of Subsidiaries of the Company that are not Guarantors. For example, the Company's Foreign Subsidiaries will not guarantee the Second Lien Notes.

On an adjusted basis, assuming that we had completed the Emergence Transaction, as of September 30, 2010, there would have been outstanding:

- $385.0 million in aggregate principal amount of first lien Secured Indebtedness of the Company, consisting of the First Lien Notes;

- up to $140.0 million in aggregate principal amount of second lien Secured Indebtedness of the Company, consisting of the Second Lien Notes;

- no senior Indebtedness of the Guarantors (excluding their guarantees of our Indebtedness under our Credit Agreement, the First Lien Notes and the Second Lien Notes);

- no subordinated Indebtedness of the Guarantors; and

- $8.3 million of liabilities, and no Preferred Stock, of our Subsidiaries that are not Guarantors.

Although the amount of additional Indebtedness the Company and its Restricted Subsidiaries can incur is limited, the Company and its Restricted Subsidiaries may be able to incur substantial amounts of additional Indebtedness in certain circumstances. Such Indebtedness may be senior Indebtedness. See "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" below.

## Paying agent and registrar for the second lien notes

The Company will maintain one or more paying agents for the Second Lien Notes. The initial paying agent for the Second Lien Notes will be the Second Lien Trustee.

The Company will also maintain a registrar for the Second Lien Notes. The initial registrar will be the Second Lien Trustee. The registrar will maintain a register reflecting ownership of the Second Lien Notes outstanding from time to time and will make payments on and facilitate transfer of Second Lien Notes on behalf of the Company.

The Company may change the paying agents or the registrars without prior notice to the Holders. The Company or any of its Subsidiaries may act as a paying agent or registrar.

## Transfer and exchange

A Holder may transfer or exchange Second Lien Notes in accordance with the Second Lien Indenture. The registrar and the Second Lien Trustee may require a Holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Second Lien Notes. Holders will be required to pay all taxes due on transfer. The Company will not be required to transfer or exchange any Second Lien Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Sale Offer. Also, the Company will not be required to transfer or exchange any Second Lien Note for a period of 15 days before a selection of Second Lien Notes to be redeemed. The registered Holder of a Second Lien Note will be treated as the owner of the Second Lien Notes for all purposes.

## Principal, maturity and interest

The Company will issue up to $140.0 million in aggregate principal amount of the Second Lien Notes on or prior to the Release Date pursuant to the Plan or in separate private transactions. The Second Lien Notes will mature on June 15, 2018. After the Release Date, subject to compliance with the covenant described below under the caption "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock," the Company may issue additional Second Lien Notes from time to time after the original issuance under the Second Lien Indenture ("*Additional Notes*"). The Second Lien Notes originally

issued by the Company and any Additional Notes subsequently issued under the Second Lien Indenture will be treated as a single class for all purposes under the Second Lien Indenture and the Second Lien Security Documents, including waivers, amendments, redemptions and offers to purchase but may not trade fungibly. Unless the context requires otherwise, references to "Second Lien Notes" for all purposes of the Second Lien Indenture and this "Description of second lien notes" include any Additional Notes that are actually issued. The Second Lien Notes will be issued in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000.

Interest on the Second Lien Notes will have a yield to maturity not to exceed 13.5% per annum and interest will be payable semi-annually in arrears on June 15 and December 15 of each year, commencing on June 15, 2011, to the Holders of record on the immediately preceding June 1 and December 1. In addition, we will also pay any accrued and unpaid interest on the maturity date. Interest on the Second Lien Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from and including the Issue Date. Interest on the Second Lien Notes will be computed on the basis of a 360-day year comprised of twelve 30-day months.

## Security for the notes

Prior to release of Escrow Proceeds (either on the Release Date or in connection with the Special Mandatory Redemption), the Indebtedness and Obligations under the Second Lien Notes offered prior to the Release Date, if any, will be secured only by a pledge of the Escrow Proceeds.

Upon release of the Escrow Proceeds from escrow on the Release Date, the Second Lien Notes and the Guarantees and all obligations with respect thereto under the Second Lien Indenture will be secured by second-priority security interests (subject to Permitted Liens) in the Collateral. The Collateral includes accounts, chattel paper, instruments, letter of credit rights, documents, equipment, general intangibles, inventory, cash and cash accounts, investment properties (including Capital Stock of domestic Subsidiaries owned by the Company and the Guarantors and 65% of the Capital Stock of Foreign Subsidiaries owned by the Guarantors), certain owned real property and proceeds of the foregoing, but in any event not including Excluded Assets. The security interests securing the Second Lien Notes will be second in priority to any and all security interests at any time granted to secure the First Lien Obligations and will also be subject to all other Permitted Liens. The First Lien Obligations include the First Lien Notes, our Credit Agreement and related obligations, as well as certain Secured Hedging Obligations and certain Cash Management Obligations. A Person holding such First Lien Obligations may have rights and remedies with respect to the property subject to such Liens that, if exercised, could adversely affect the value of the Collateral or the ability of the First Lien Representative to realize or foreclose on the Collateral on behalf of Holders of the First Lien Notes.

"*Excluded Assets*" means (a) any contract or agreement to which the Company or a Guarantor is a party or any of its rights or interests thereunder if and for so long as the grant of such security interest shall constitute or result in (i) the unenforceability of any right of the Company or a Guarantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such contract or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the New York UCC or any other applicable law or principles of equity), *provided, however,* that such security interest shall attach immediately at such time as the condition causing such unenforceability shall be remedied and, to the extent severable, shall attach immediately to any portion of such contract or agreement

that does not result in any of the consequences specified in (i) or (ii) including, without limitation, any proceeds of such contract or agreement, (b) assets securing Purchase Money Debt or Capitalized Lease Obligations permitted to be incurred under the Second Lien Indenture to the extent the documentation relating to such Purchase Money Debt or Capitalized Lease Obligations prohibits such assets from being Collateral, (c) any leasehold interest in any real property of the Company or any Guarantor, as tenant and (d) certain other customary exceptions described in the Second Lien Security Documents.

The Company and the Guarantors are and will be able to incur additional Indebtedness in the future that could share in the Collateral, including additional First Lien Obligations and additional Permitted Second Lien Obligations that would be secured on a second-priority pari passu basis with the Second Lien Notes. The amount of such First Lien Obligations and additional Permitted Second Lien Obligations is and will be limited by the covenants described under "—Certain covenants—Liens" and "—Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock." Under certain circumstances, the amount of such First Lien Obligations and additional Permitted Second Lien Obligations could be significant.

### Limitations on pledged equity interests

The Equity Interests of a Restricted Subsidiary will constitute Collateral only to the extent that such Equity Interests can secure the Second Lien Notes without Rule 3-16 of Regulation S-X under the Securities Act (or any other law, rule or regulation) requiring separate financial statements of such Restricted Subsidiary to be filed with the SEC (or any other governmental agency). In the event that Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, that would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Restricted Subsidiary due to the fact that such Restricted Subsidiary's Equity Interests secure the Second Lien Notes, then the Equity Interests of such Restricted Subsidiary shall automatically be deemed not to be part of the Collateral. In such event, the Second Lien Security Documents may be amended or modified, without the consent of any Holder, to the extent necessary to release the Liens for the benefit of the Second Lien Notes on the Equity Interests that are so deemed to no longer constitute part of the Collateral, all at the written request and certification of the Company upon which the Second Lien Trustee may conclusively rely.

In the event that Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would permit) such Restricted Subsidiary's Equity Interests to secure the Second Lien Notes without the filing with the SEC (or any other governmental agency) of separate financial statements of such Restricted Subsidiary, then the Equity Interests of such Restricted Subsidiary shall automatically be deemed to be a part of the Collateral. In such event, the Second Lien Security Documents may be amended or modified, without the consent of any Holder, to the extent necessary to subject such Equity Interests to the Liens under the Second Lien Security Documents.

### After-acquired collateral

From and after the Release Date and subject to certain limitations and exceptions (including the exclusion of any securities or other equity interests of any of the Company's Subsidiaries), if the

Company or any Guarantor creates any additional security interest upon any property or asset to secure any First Lien Obligations (which include Obligations in respect of the Credit Agreement and the First Lien Notes), it must concurrently grant a second-priority security interest (subject to Permitted Liens) upon such property as security for the Indebtedness and Obligations under the Second Lien Notes. Also, if granting a security interest in such property requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent with respect to the second-priority security interest for the benefit of Wilmington Trust FSB, as Second Lien Collateral Agent. If such third party does not consent to the granting of the first-priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest.

### *Information regarding collateral*

The Company will furnish to the Second Lien Collateral Agent, with respect to the Company or any Guarantor, prompt written notice of any change in such Person's (i) legal name, (ii) jurisdiction of organization or formation, (iii) identity or corporate structure or (iv) Organizational Identification Number. The Company and the Guarantors will agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code or otherwise that are required in order for the Second Lien Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

Each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year, the Company shall deliver to the Second Lien Trustee a certificate of a financial officer setting forth the information required pursuant to the schedules required by the Second Lien Security Documents or confirming that there has been no change in such information since the date of the prior annual financial statements.

### *Further assurances*

The Company and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, and take all further action that may be required under applicable law, or that the Second Lien Agent may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests and Liens created or intended to be created by the Second Lien Security Documents in the Collateral. In addition, from time to time, the Company will reasonably promptly secure the obligations under the Second Lien Indenture, Second Lien Security Documents and Second Lien Intercreditor Agreement by pledging or creating, or causing to be pledged or created, perfected security interests and Liens with respect to the Collateral. Such security interests and Liens will be created under the Second Lien Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents as may be reasonably required.

### *Security documents and intercreditor agreement*

On the Release Date, the Company, the Guarantors and the Second Lien Collateral Agent will enter into one or more Second Lien Security Documents defining the terms of the security interests that secure the Second Lien Notes and the Guarantees. The Second Lien Notes will be secured by the Collateral on a second-priority basis. These security interests will secure the payment and performance when due of all of the Obligations of the Company and the

Guarantors under the Second Lien Notes, the Second Lien Indenture, the Guarantees and the Second Lien Security Documents, as provided in the Second Lien Security Documents.

### Second lien intercreditor agreement

On the Release Date, the administrative agent for the Revolving Facility (the "*Agent*"), the collateral agent for the Revolving Facility (the "*Revolving Collateral Agent*"), the First Lien Trustee, the Collateral Agent, the Second Lien Trustee and the Second Lien Collateral Agent will enter into the Second Lien Intercreditor Agreement. Pursuant to the terms of the Second Lien Intercreditor Agreement, at any time prior to the Discharge of First Lien Obligations, the First Lien Trustee will determine the time and method by which the security interests in the Collateral will be enforced. The Second Lien Trustee will not be permitted to enforce the security interests even if an Event of Default under the Second Lien Indenture has occurred and the Second Lien Notes have been accelerated except (a) in any Insolvency or Liquidation Proceeding, as necessary to file a proof of claim or statement of interest with respect to such Second Lien Notes or (b) as necessary to take any action in order to create, prove, perfect, preserve or protect (but not enforce) its rights in, and the perfection and priority of its Lien on, the Collateral securing the Second Priority Liens.

In addition, the Second Lien Intercreditor Agreement will provide that, prior to the Discharge of First Lien Obligations, (1) the First Lien Representative shall have the exclusive right to make determinations regarding the release of Collateral without the consent of the holders of the Second Lien Notes, (2) the Second Lien Intercreditor Agreement may be amended, without the consent of the First Lien Representative or the Second Lien Collateral Agent and the Holders of the First Lien Notes or the Second Lien Notes, to add additional secured creditors holding Additional First Lien Indebtedness or other Permitted Second Lien Obligations so long as such other Permitted Second Lien Obligations are not prohibited by the provisions of the Credit Agreement, the Second Lien Indenture or the Second Lien Indenture and (3) the holders of the First Lien Obligations may change, waive, modify or vary the Second Lien Security Documents without the consent of the Holders of the Second Lien Notes; *provided* that any such change, waiver or modification does not materially adversely affect the rights of the Holders of the Second Lien Notes unless the other secured creditors are treated in a like or similar manner. Any provider of additional extensions of credit shall be entitled to rely on the determination of officers that such modifications do not expressly violate the provisions of the Credit Agreement, the First Lien Indenture or the Second Lien Indenture if such determination is set forth in an Officers' Certificate delivered to such provider; *provided*, *however*, that such determination will not affect whether or not the Company has complied with its undertakings in the Second Lien Indenture, the Second Lien Security Documents or the Second Lien Intercreditor Agreement.

In addition, if the Company or any Guarantor is subject to any Insolvency or Liquidation Proceeding, the Second Lien Collateral Agent and the Holders of Second Lien Notes will agree that:

(1)    if the First Lien Representative shall desire to permit the use of cash collateral or to permit the Company or any Guarantor to obtain financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision in any bankruptcy law ("*DIP Financing*"), then the Second Lien Agent and the holders of the Second Lien Notes agree not to object to such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by clause (5) below) and, to

the extent the Liens securing the First Lien Obligations are subordinated or *pari passu* with such DIP Financing, will subordinate its Liens in the Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as they are subordinated to the First Lien Obligations;

(2)   they will not object to, and will not otherwise contest any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the First Lien Obligations made by the First Lien Representative or any holder of such obligations;

(3)   they will not object to, and will not otherwise contest any order relating to a sale of assets of the Company or any Guarantor for which the First Lien Representative has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the First Lien Obligations and the Second Lien Notes will attach to the proceeds of the sale on the same basis of priority as the existing Liens in accordance with the Second Lien Intercreditor Agreement;

(4)   until the Discharge of First Lien Obligations, none of them will seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, without the prior written consent of the First Lien Representative;

(5)   none of them shall contest (or support any other Person contesting) (a) any request by the First Lien Representative or the holders of First Lien Obligations for adequate protection or (b) any objection by the First Lien Representative or the holders of First Lien Obligations to any motion, relief, action or proceeding based on the First Lien Representative's or the holders of First Lien Obligations' claiming a lack of adequate protection. Notwithstanding the foregoing, in any Insolvency or Liquidation Proceeding, (i) if the holders of First Lien Obligations (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of the Bankruptcy Code or any similar law, then the Second Lien Collateral Agent (A) may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the First Lien Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Notes are so subordinated to the Liens securing First Lien Obligations under the Intercreditor Agreement and (B) agrees that it will not seek or request, and will not accept, adequate protection in any other form, and (ii) in the event the Second Lien Collateral Agent seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then the Second Lien Collateral Agent and the Holders of Second Lien Notes agree that the holders of the First Lien Obligations shall also be granted a senior Lien on such additional collateral as security for the applicable First Lien Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Second Lien Notes shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the holders of First Lien Obligations as adequate protection on the same basis as the other Liens securing the Second Lien Notes are so subordinated to such Liens securing First Lien Obligations under the Second Lien Intercreditor Agreement; and

(6)   until the Discharge of First Lien Obligations has occurred, the Second Lien Collateral Agent, on behalf of itself and each holder of Second Lien Notes, (i) will not assert or enforce any

claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens securing the First Lien Obligations for costs or expenses of preserving or disposing of any collateral, and (ii) will waive any claim it may have arising out of the election by any holder of First Lien Obligations of the application of Section 1111(b)(2) of the Bankruptcy Code.

### Release of Collateral

The Company and the Guarantors are entitled to the releases of property and other assets included in the Collateral from the Liens securing the Second Lien Notes under any one or more of the following circumstances:

(1)    upon the Discharge of First Lien Obligations and concurrent release of all other Liens on such property or assets securing First Lien Obligations (including all commitments and letters of credit thereunder); *provided*, *however*, that if the Company or any Guarantor subsequently incurs First Lien Obligations that are secured by Liens on property or assets of the Company or any Guarantor of the type constituting the Collateral and the related Liens are incurred in reliance on clauses 6(i) or 33(b) of the definition of "Permitted Liens," then the Company and its Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to the Collateral in favor of the Second Lien Notes, which, in the case of any such subsequent First Lien Obligations, will be second priority Liens on the Collateral securing such First Lien Obligations to the same extent provided by the Second Lien Security Documents and on the terms and conditions of the security documents relating to such First Lien Obligations, with the second priority Lien held either by the administrative agent, collateral agent or other representative for such First Lien Obligations or by a collateral agent or other representative designated by the Company to hold the second priority Liens for the benefit of the Holders of the Second Lien Notes and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Second Lien Intercreditor Agreement;

(2)    to release Excess Proceeds to the Company that remain unexpended after the conclusion of an Asset Sale Offer conducted in accordance with the Second Lien Indenture and not required to be made part of the Collateral;

(3)    to enable us to consummate the disposition of such property or assets to the extent not prohibited under the covenant described under "Limitation on asset sales";

(4)    in the case of a Guarantor that is released from its Guarantee with respect to the Second Lien Notes, the release of the property and assets of such Guarantor; or

(5)    as described under "—Amendment, supplement and waiver" below.

If an Event of Default under the Second Lien Indenture exists on the date of Discharge of First Lien Obligations, the Second-Priority Liens on the Collateral securing the Second Lien Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Lien Obligations secured by the Collateral, and thereafter the Second Lien Agent (or another designated representative acting at the direction of the Holders of a majority of outstanding principal amount of the Second Lien Notes and other Permitted Second Lien Obligations) will have the right to direct the First Lien Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Second Lien Notes will be released

when such Event of Default and all other Events of Default under the Second Lien Indenture cease to exist).

The second-priority security interests in all Collateral securing the Second Lien Notes also will be released upon (i) payment in full of the principal of, together with accrued and unpaid interest on, the Second Lien Notes and all other Obligations under the Second Lien Indenture, the Guarantees and the Second Lien Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, is paid (including pursuant to a satisfaction and discharge of the Second Lien Indenture as described below under "—Satisfaction and discharge") or (ii) a legal defeasance or covenant defeasance under the Second Lien Indenture as described below under "—Defeasance." To the extent certain security interests cannot be granted, filed and/or perfected on the Release Date, a covenant in the Second Lien Indenture will require us to do or cause to be done all things that may be required under applicable law, or that the Second Lien Trustee or the Second Lien Collateral Agent from time to time may reasonably request, to grant, preserve, protect and perfect the validity and priority of the security interest in the Collateral.

## Compliance with Trust Indenture Act

The Second Lien Indenture will provide that prior to the issuance of the Exchange Notes the Company will not be required to comply with the provisions of TIA § 314. To the extent applicable, the Company will cause TIA § 313(b), relating to reports to be complied with.

The Company must deliver an Officers' Certificate to the Second Lien Agent annually, to the effect that all such releases and withdrawals during the preceding year in the ordinary course of the Company's or the Guarantors' business were not prohibited by the Second Lien Indenture.

Any certificate or opinion required by Section 314(d) of the TIA may be made by an Officer of the Company, except in cases where Section 314(d) requires that such certificate or opinion be made by an independent engineer, appraiser or other expert.

Notwithstanding anything to the contrary herein, the Company and its Subsidiaries will not be required to comply with all or any portion of Section 314(d) of the TIA if they determine, in good faith based on advice of counsel, that under the terms of that section and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or any portion of Section 314(d) of the TIA is inapplicable to the released Collateral.

Without limiting the generality of the foregoing, certain no action letters issued by the SEC have permitted an indenture qualified under the TIA to contain provisions permitting the release of collateral from Liens under such indenture in the ordinary course of the issuer's business without requiring the issuer to provide certificates and other documents under Section 314(d) of the TIA. The Company and the Guarantors may, subject to the provisions of the Second Lien Indenture, among other things, without any release or consent by the Second Lien Trustee or the Second Lien Collateral Agent, conduct ordinary course activities with respect to the Collateral, including, without limitation:

- selling or otherwise disposing of, in any transaction or series of related transactions, any property subject to the Lien of the Second Lien Security Documents that has become worn out, defective, obsolete or not used or useful in the business;

215

- abandoning, terminating, canceling, releasing or making alterations in or substitutions of any leases or contracts subject to the Lien of the Second Lien Indenture or any of the Second Lien Security Documents;

- surrendering or modifying any franchise, license or permit subject to the Lien of the Second Lien Security Documents that it may own or under which it may be operating;

- altering, repairing, replacing, changing the location or position of and adding to its structures, machinery, systems, equipment, fixtures and appurtenances;

- selling, transferring or otherwise disposing of accounts receivable in the ordinary course of business;

- making cash payments (including for the repayment of Indebtedness or interest) from cash that is at any time part of the Collateral in the ordinary course of business that are not otherwise prohibited by the Second Lien Indenture and the Second Lien Security Documents; and

- abandoning any intellectual property that is no longer used or useful in the business of the Company or its Subsidiaries.

## Mandatory redemption; offers to purchase; open market purchases

The Company will not be required to make any mandatory redemption or sinking fund payments with respect to the Second Lien Notes. However, under certain circumstances, the Company may be required to offer to purchase Second Lien Notes as described under the caption "—Escrow of proceeds—Special mandatory redemption" and "—Repurchase at the option of holders." We may at any time and from time to time purchase Second Lien Notes in the open market or otherwise.

## Optional redemption

The Company may on any one or more occasions prior to December 15, 2013 redeem up to 35% of the original principal amount of the Second Lien Notes (calculated after giving effect to any issuance of Additional Notes) with the net cash proceeds of one or more Equity Offerings at a redemption price of 100% of the principal amount thereof plus a premium equal to the stated coupon of the Second Lien Notes and accrued and unpaid interest, if any, to the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date); *provided* that

(1) at least 65% of the original principal amount of the Second Lien Notes remains outstanding after each such redemption; and

(2) the redemption occurs within 90 days after the closing of such Equity Offering.

In addition, at any time prior to December 15, 2013 the Company may redeem all or a part of the Second Lien Notes, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to the registered address of each Holder of Second Lien Notes, at a redemption price equal to 100% of the principal amount of the Second Lien Notes redeemed plus the Applicable Premium as of, and accrued and unpaid interest thereon, if any, to the date of redemption (the

"*Redemption Date*"), subject to the rights of Holders of Second Lien Notes on the relevant record date to receive interest due on the relevant interest payment date.

On and after December 15, 2013, the Company may redeem the Second Lien Notes, in whole or in part, upon notice as described under the heading "—Selection and notice," at the redemption

price of 100% of the principal amount of the Second Lien Notes to be redeemed plus a premium equal to one half of the stated coupon on such Second Lien Notes, which premium shall decline ratably on each subsequent anniversary of the Issue Date to zero on the date that is two years prior to the maturity of the Second Lien Notes, plus accrued and unpaid interest thereon, if any, to the Redemption Date, subject to the right of Holders of Second Lien Notes of record on the relevant record date to receive interest due on the relevant interest payment date.

### Selection and notice

If the Company is redeeming less than all of the Second Lien Notes issued by it at any time, the Second Lien Trustee will select the Second Lien Notes to be redeemed on a pro rata basis to the extent practicable or by lot or such other similar method in accordance with the procedures of DTC.

Notices of purchase or redemption shall be mailed by the Company by first-class mail, postage prepaid, at least 30 but not more than 60 days before the purchase or redemption date to each Holder of Second Lien Notes at such Holder's registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Second Lien Notes or a satisfaction and discharge of the Second Lien Indenture. If any Second Lien Note is to be purchased or redeemed in part only, any notice of purchase or redemption that relates to such Second Lien Note shall state the portion of the principal amount thereof that has been or is to be purchased or redeemed.

The Company will issue a new Second Lien Note in a principal amount equal to the principal amount of the unredeemed portion of the original Second Lien Note in the name of the Holder upon cancellation of the original Second Lien Note. Second Lien Notes called for redemption become due on the date fixed for redemption. On and after the redemption date, interest ceases to accrue on Second Lien Notes or portions of them called for redemption.

## Repurchase at the option of holders

### Change of control

The Second Lien Indenture will provide that if, after the Release Date, a Change of Control occurs, unless the Company has previously or concurrently mailed a redemption notice with respect to all the outstanding Second Lien Notes as described under "Optional redemption," the Company will make an offer to purchase all of the Second Lien Notes pursuant to the offer described below (the "*Change of Control Offer*") at a price in cash (the "*Change of Control Payment*") equal to 101% of the aggregate principal amount thereof plus, without duplication, accrued and unpaid interest, if any, to the date of purchase, subject to the right of Holders of the Second Lien Notes of record on the relevant record date to receive interest due on the relevant interest payment date. Within 30 days following any Change of Control, the Company will send notice of such Change of Control Offer by first-class mail, with a copy to the Second Lien Trustee,

to each Holder of Second Lien Notes to the address of such Holder appearing in the security register, with the following information:

(1)  that a Change of Control Offer is being made pursuant to the covenant entitled "Change of control," and that all Second Lien Notes properly tendered pursuant to such Change of Control Offer will be accepted for payment by the Company;

(2)  the purchase price and the purchase date, which will be no earlier than 30 days nor later than 60 days from the date such notice is mailed (the "*Change of Control Payment Date*");

(3)  that any Second Lien Note not properly tendered will remain outstanding and continue to accrue interest;

(4)  that unless the Company defaults in the payment of the Change of Control Payment, all Second Lien Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest on the Change of Control Payment Date;

(5)  that Holders electing to have any Second Lien Notes purchased pursuant to a Change of Control Offer will be required to surrender such Second Lien Notes, with the form entitled "Option of Holder to Elect Purchase" on the reverse of such Second Lien Notes completed, to the paying agent specified in the notice at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

(6)  that Holders will be entitled to withdraw their tendered Second Lien Notes and their election to require the Company to purchase such Second Lien Notes, *provided* that the paying agent receives, not later than the close of business on the Business Day prior to the Change of Control Payment Date, a telegram, telex, facsimile transmission or letter setting forth the name of the Holder of the Second Lien Notes, the principal amount of Second Lien Notes tendered for purchase, and a statement that such Holder is withdrawing its tendered Second Lien Notes and its election to have such Second Lien Notes purchased;

(7)  if such notice is mailed prior to the occurrence of a Change of Control, stating the Change of Control Offer is conditional on the occurrence of such Change of Control; and

(8)  the other instructions, as determined by the Company, consistent with the covenant described hereunder, that a Holder must follow.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of Second Lien Notes pursuant to a Change of Control Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Second Lien Indenture, the Company will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Second Lien Indenture by virtue thereof.

On the Change of Control Payment Date, the Company will, to the extent permitted by law,

(1)  accept for payment all Second Lien Notes issued by it or portions thereof properly tendered pursuant to the Change of Control Offer,

(2)  deposit with the paying agent an amount equal to the aggregate Change of Control Payment in respect of all Second Lien Notes or portions thereof so tendered, and

(3)  deliver, or cause to be delivered, to the Second Lien Trustee for cancellation the Second Lien Notes so accepted together with an Officers' Certificate to the Second Lien Trustee stating that such Second Lien Notes or portions thereof have been tendered to and purchased by the Company.

The terms of the Credit Agreement and First Lien Indenture will prohibit or limit, and future First Lien Obligations to which the Company becomes a party may prohibit or limit, the Company from purchasing any Second Lien Notes as a result of a Change of Control. In the event a Change of Control occurs at a time when the Company is prohibited from purchasing the Second Lien Notes, the Company could seek the consent of the holders of its First Lien Obligations to permit the purchase of the Second Lien Notes or could attempt to refinance the borrowings that contain such prohibition. If the Company does not obtain such consent or repay such borrowings, the Company will remain prohibited from purchasing the Second Lien Notes. In such case, the Company's failure to purchase tendered Second Lien Notes would constitute an Event of Default under the Second Lien Indenture. The Credit Agreement provides that certain change of control events with respect to the Company would constitute a default thereunder (including a Change of Control under the Second Lien Indenture). Future First Lien Obligations of the Company and its Restricted Subsidiaries may also contain prohibitions of certain events that would constitute a Change of Control. If we experience a change of control that triggers a default under our First Lien Obligations, we could seek a waiver of such default or seek to refinance our First Lien Obligations. In the event we do not obtain such a waiver or refinance our First Lien Obligations, such default could result in amounts outstanding under our First Lien Obligations being declared due and payable.

The Second Lien Indenture will provide that in the event a Change of Control occurs at a time when the Company is prohibited by the terms of any First Lien Obligations from purchasing Second Lien Notes, then prior to the mailing of the notice of a Change of Control to Holders of Second Lien Notes but in any event within 30 days following any Change of Control, the Company undertakes to (1) repay in full all Obligations, and terminate all commitments, under our First Lien Obligations or offer to repay in full all Obligations, and terminate all commitments, under our First Lien Obligations and to repay the Obligations owed to (and terminate all commitments of) each lender which has accepted such offer or (2) obtain the requisite consents under the agreements governing such First Lien Obligations to permit the repurchase of the Second Lien Notes. If such a consent is not obtained or borrowings repaid, the Company will remain prohibited from purchasing the Second Lien Notes.

The Company shall first comply with the covenant in the immediately preceding paragraph before it shall be required to repurchase Second Lien Notes pursuant to the provisions described above. The Company's failure to comply with the covenant described in the immediately preceding paragraph (and any failure to send a notice of Change of Control as a result of the prohibition in the preceding paragraph) would (with notice and lapse of time) constitute an Event of Default described in clause (3), but shall not constitute an Event of Default described in clause (1), under "Events of default" below.

Our ability to pay cash to the Holders of Second Lien Notes following the occurrence of a Change of Control may be limited by our then-existing financial resources. Therefore, sufficient funds may not be available when necessary to make any required repurchases.

The Change of Control purchase feature of the Second Lien Notes may in certain circumstances make more difficult or discourage a sale or takeover of us and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between the Initial Purchasers and us. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, refinancings or other recapitalizations, that would not constitute a Change of Control under the Second Lien Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. Restrictions on our ability to incur additional Indebtedness are contained in the covenants described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and "Certain covenants—Liens." Such restrictions in the Second Lien Indenture can be waived only with the consent of the Holders of a majority in principal amount of the Second Lien Notes then outstanding. Except for the limitations contained in such covenants, however, the Second Lien Indenture will not contain any covenants or provisions that may afford Holders of the Second Lien Notes protection in the event of a highly leveraged transaction.

We will not be required to make a Change of Control Offer following a Change of Control if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in the Second Lien Indenture applicable to a Change of Control Offer made by us and purchases all Second Lien Notes validly tendered and not withdrawn under such Change of Control Offer. Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

The definition of "Change of Control" includes a disposition of all or substantially all of the assets of the Company to any Person. Although there is a limited body of case law interpreting the phrase "substantially all," there is no precise established definition of the phrase under applicable law. Accordingly, in certain circumstances there may be a degree of uncertainty as to whether a particular transaction would involve a disposition of "all or substantially all" of the assets of the Company. As a result, it may be unclear as to whether a Change of Control has occurred and whether a Holder of Second Lien Notes may require the Company to make an offer to repurchase the Second Lien Notes as described above.

The provisions under the Second Lien Indenture relative to the Company's obligation to make an offer to repurchase the Second Lien Notes as a result of a Change of Control may be waived or modified with the written consent of the Holders of a majority in principal amount of the Second Lien Notes.

### Asset sales

The Second Lien Indenture will provide that from and after the Release Date the Company will not, and will not permit any of its Restricted Subsidiaries to, cause, make or suffer to exist an Asset Sale, unless:

(1)    the Company or such Restricted Subsidiary, as the case may be, receives consideration at the time of such Asset Sale at least equal to the fair market value (such fair market value to be determined in good faith by the Company on the date of contractually agreeing to such Asset Sale) of the assets sold or otherwise disposed of; and

(2)   except in the case of a Permitted Asset Swap, at least 75% of the consideration therefor received by the Company or such Restricted Subsidiary, as the case may be, is in the form of cash or Cash Equivalents; *provided* that the amount of:

    (a)   any liabilities (as shown on the Company's or such Restricted Subsidiary's most recent internal balance sheet or in the footnotes thereto) of the Company or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the Second Lien Notes, that are assumed by the transferee of any such assets and for which the Company and all of its Restricted Subsidiaries have been validly released by all creditors in writing,

    (b)   any securities received by the Company or such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash (to the extent of the cash received) within 90 days following the closing of such Asset Sale, and

    (c)   any Designated Non-cash Consideration received by the Company or such Restricted Subsidiary in such Asset Sale having an aggregate fair market value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (c) and assets (other than securities received and not yet liquidated pursuant to clause (b)) that are at that time outstanding, not to exceed 3.0% of Total Assets at the time of the receipt of such Designated Non-cash Consideration, with the fair market value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value,

shall be deemed to be cash for purposes of this provision and for no other purpose.

Within 12 months after the receipt of any Net Proceeds of any Asset Sale consummated after the Release Date (the "*Application Period*"), the Company or such Restricted Subsidiary, at its option, may apply the Net Proceeds from such Asset Sale,

(1)   to permanently reduce:

    (a)   Indebtedness constituting First Lien Obligations (and, if the Indebtedness repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto); or

    (b)   Obligations under other Permitted Second Lien Obligations (and to correspondingly reduce commitments with respect thereto); *provided* that the Company shall equally and ratably (based on the aggregate principal amounts) reduce Obligations under the Second Lien Notes as provided under "Optional redemption," through open-market purchases (to the extent such purchases are at or above 100% of the principal amount thereof) or by making an offer (in accordance with the procedures set forth below for an Asset Sale Offer) to all Holders to purchase their Second Lien Notes at 100% of the principal amount thereof, plus the amount of accrued but unpaid interest, if any, on the amount of Second Lien Notes that would otherwise be prepaid; or

    (c)   Indebtedness of a Restricted Subsidiary that is not a Guarantor, other than Indebtedness owed to the Company or another Restricted Subsidiary; or

(2)   to make (a) an Investment in any one or more businesses, *provided* that such Investment in any business is in the form of the acquisition of Capital Stock and results in the Company or another of its Restricted Subsidiaries, as the case may be, owning an amount of the Capital

Stock of such business such that it constitutes a Restricted Subsidiary, (b) capital expenditures or (c) acquisitions of other assets (other than current amounts), in each of (a), (b) and (c), used or useful in a Similar Business or that replace the businesses, properties and/or assets that are the subject of such Asset Sale ("*Replacement Assets*"); *provided* that, to the extent that the assets disposed of in such Asset Sale were Collateral, such assets are pledged as Collateral under the Second Lien Security Documents with the Lien on such Collateral securing the First Lien Notes being of the same priority with respect to the First Lien Notes as the Lien on the assets disposed of.

Any Net Proceeds from the Asset Sale that are not invested or applied as provided and within the time period set forth in the first sentence of the preceding paragraph will be deemed to constitute "*Excess Proceeds*." When the aggregate amount of Excess Proceeds exceeds $20.0 million, the Company shall make an offer to:

- in the case of Net Proceeds from Collateral, all Holders of Second Lien Notes, and if required by the terms of any other Permited Second Lien Obligations, the holders of such Permitted Second Lien Obligations;

- in the case of any other Net Proceeds, all Holders of Second Lien Notes and all holders of other Indebtedness that ranks *pari passu* in right of payment with the Second Lien Notes containing provisions similar to those set forth in the Second Lien Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets ("*Pari Passu Indebtedness*"),

in each case (an "*Asset Sale Offer*"), to purchase the maximum aggregate principal amount of the Second Lien Notes and such other Permitted Second Lien Obligations that may be purchased out of the Excess Proceeds at an offer price in cash in an amount equal to 100% of the principal amount thereof, plus (without duplication) accrued and unpaid interest, if any, to the date fixed for the closing of such offer, in accordance with the procedures set forth in the Second Lien Indenture. The Company will commence an Asset Sale Offer with respect to Excess Proceeds within ten (10) Business Days after the date that Excess Proceeds exceed $20.0 million by mailing the notice to the Holders required pursuant to the terms of the Second Lien Indenture, with a copy to the Second Lien Trustee. The Company may satisfy the foregoing obligations with respect to any Excess Proceeds from an Asset Sale by making an Asset Sale Offer with respect to such Excess Proceeds prior to the expiration of the Application Period.

To the extent that the aggregate principal amount of Second Lien Notes and such other Permitted Second Lien Obligations or Pari Passu Indebtedness, as applicable, tendered pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use any remaining Excess Proceeds for general corporate purposes, subject to the other covenants contained in the Second Lien Indenture. If the aggregate principal amount of Second Lien Notes and other Permitted Second Lien Obligations (in the case of Net Proceeds from Collateral) and such Pari Passu Indebtedness (in the case of any other Net Proceeds) surrendered by such holders thereof exceeds the amount of Excess Proceeds, the Company shall select the Second Lien Notes and such other Permitted Second Lien Obligations or Pari Passu Indebtedness, as applicable, to be purchased on a pro rata basis based on the principal amount of the Second Lien Notes or such other Permitted Second Lien Obligations or Pari Passu Indebtedness, as applicable, tendered. Upon completion of any such Asset Sale Offer, the amount of Excess Proceeds shall be reset at zero.

Pending the final application of any Net Proceeds pursuant to this covenant, the Company or such Restricted Subsidiary may apply such Net Proceeds temporarily to reduce Indebtedness

outstanding under a revolving credit facility or otherwise invest such Net Proceeds in any manner not prohibited by the Second Lien Indenture (including investing in a trust account maintained by the First Lien Collateral Agent).

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent such laws or regulations are applicable in connection with the repurchase of the Second Lien Notes pursuant to an Asset Sale Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of the Second Lien Indenture, the Company will comply with the applicable securities laws and regulations and shall not be deemed to have breached its obligations described in the Second Lien Indenture by virtue thereof.

The terms of the Credit Agreement and First Lien Indenture limit, and future First Lien Obligations to which the Company becomes a party may prohibit or limit, the Company from purchasing any Second Lien Notes pursuant to this Asset Sales covenant and may also provide that certain asset sale events with respect to the Company would constitute a default under such agreement. In the event the Company is prohibited from purchasing the Second Lien Notes, the Company could seek the consent of its lenders to the purchase of the Second Lien Notes or could attempt to refinance the borrowings that contain such prohibition. If the Company does not obtain such consent or repay such borrowings, it will remain prohibited from purchasing the Second Lien Notes. In such case, the Company's failure to purchase tendered Second Lien Notes would constitute an Event of Default under the Second Lien Indenture, which would, in turn, create a default under such other Indebtedness.

## Certain covenants

Set forth below are summaries of certain covenants that will be contained in the Second Lien Indenture, which will bind the Company and its Restricted Subsidiaries on and after the Release Date. For the avoidance of doubt, the covenants described below will not bind the Company and its Restricted Subsidiaries prior to the Release Date, and references in this section to obligations of the Company and its Restricted Subsidiaries, refer to the period beginning on and after the Release Date.

Beginning on the first day after the Release Date of a Covenant Suspension and ending on a Reversion Date (such period a "*Suspension Period*"), the covenants specifically listed under the following captions in this "Description of second lien notes" will not be applicable to the Second Lien Notes:

- "—Limitation on restricted payments,"

- "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock,"

- "—Transactions with affiliates,"

- "—Dividend and other payment restrictions affecting restricted subsidiaries,"

- "—Repurchase at the option of holders—Asset sales,"

- "—Limitation on guarantees of indebtedness by restricted subsidiaries," and

- clause (4) of the first paragraph of "—Merger, consolidation or sale of all or substantially all assets."

On each Reversion Date, all Indebtedness incurred, or Disqualified Stock or Preferred Stock issued, during the Suspension Period will be classified as having been incurred or issued pursuant to the first paragraph of "—Limitation on incurrence of Indebtedness and issuance of disqualified stock and preferred stock" below or one of the clauses set forth in the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" below (to the extent such Indebtedness or Disqualified Stock or Preferred Stock would be permitted to be incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness or Disqualified Stock or Preferred Stock would not be permitted to be incurred or issued pursuant to the first or second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock," such Indebtedness or Disqualified Stock or Preferred Stock will be deemed to have been outstanding on the Release Date, so that it is classified as permitted under clause (3) of the second paragraph under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock." Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under "—Limitation on restricted payments" will be made as though the covenant described under "—Limitation on restricted payments" had been in effect since the Release Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under the first paragraph of "—Limitation on restricted payments." As described above, however, no Default or Event of Default will be deemed to have occurred as a result of the Reversion Date occurring on the basis of any actions taken or the continuance of any circumstances resulting from actions taken or the performance of obligations under agreements entered into by the Company or any of the Restricted Subsidiaries during the Suspension Period (other than agreements to take actions after the Reversion Date that would not be permitted outside of the Suspension Period entered into in contemplation of the Reversion Date).

In addition, for purposes of the covenant described under "—Transactions with affiliates," all agreements and arrangements entered into by the Company or any Restricted Subsidiary with an Affiliate of the Company during the Suspension Period prior to the Reversion Date will be deemed to have been entered into on or prior to the Release Date and for purposes of the covenant described under "—Dividend and other payment restrictions affecting restricted subsidiaries," all contracts entered into during the Suspension Period prior to such Reversion Date that contain any of the restrictions contemplated by such covenant will be deemed to have been existing on the Release Date. For purposes of "—Repurchase at the option of holders—Asset sales", on the Reversion Date, the unutilized Excess Proceeds amount will be reset to zero.

During the Suspension Period, no Restricted Subsidiary may be designated as an Unrestricted Subsidiary by the Board of Directors of the Company.

There can be no assurance that the Second Lien Notes will ever achieve or maintain Investment Grade Ratings.

### *Activities of Escrow Issuer prior to the Release Date and Assumption*

Prior to the Release Date and Assumption, the Company will be a corporation whose primary activities are restricted to issuing the Second Lien Notes (to the extent offered prior to the Release Date) and the First Lien Notes, issuing capital stock to, and receiving capital contributions from its direct or indirect parent, performing its obligations in respect of such Second Lien Notes under the Second Lien Indenture, the Second Lien Escrow Agreement and the Purchase

Agreement, the First Lien Notes under the First Lien Indenture, consummating the Assumption or redeeming the First Lien Notes or such Second Lien Notes in connection with any Special Mandatory Redemption, and conducting such other activities as are necessary or appropriate to carry out the activities described in this sentence and maintain its corporate existence (including the payment of customary director's fees). Prior to the Assumption, the Company will not issue any debt other than the First Lien Notes and such Second Lien Notes or own, hold or otherwise have any interest in any assets other than the Escrow Account and the Escrow Proceeds therein.

### *Limitation on restricted payments*

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(I)     declare or pay any dividend or make any payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests, including any dividend or distribution payable in connection with any merger or consolidation other than:

    (a)     dividends, payments or distributions by the Company payable solely in Equity Interests (other than Disqualified Stock) of the Company; or

    (b)     dividends, payments or distributions by a Restricted Subsidiary so long as, in the case of any dividend, payment or distribution payable on or in respect of any class or series of securities issued by a Restricted Subsidiary that is not a Wholly Owned Subsidiary, the Company or a Restricted Subsidiary receives at least its pro rata share of such dividend payment or distribution in accordance with its Equity Interests in such class or series of securities;

(II)    purchase, redeem, defease or otherwise acquire or retire for value any Equity Interests of the Company or any direct or indirect parent of the Company, including in connection with any merger or consolidation, other than purchases, redemptions, defeasances and other acquisitions and retirements of Equity Interests of the Company or any direct or indirect parent of the Company held by a Restricted Subsidiary of the Company;

(III)   make any principal payment on, or redeem, repurchase, defease or otherwise acquire or retire for value or give any irrevocable notice of redemption with respect thereto, in each case, prior to any scheduled repayment, sinking fund payment or maturity, any Unsecured Indebtedness, other than:

    (a)     Indebtedness permitted under clauses (7) and (8) of the second paragraph of the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

    (b)     the payment, redemption, repurchase, defeasance or other acquisition or retirement for value of Unsecured Indebtedness made in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of such payment, redemption, repurchase, defeasance or other acquisition or retirement for value; or

    (c)     the giving of an irrevocable notice of redemption with respect to the transactions described in clauses (a) and (b) above and (2) and (3) of the next paragraph;

(IV)   make any Restricted Investment

(all such payments and other actions set forth in clauses (I) through (IV) (other than any exception thereto in clauses (I) and (III)) above being collectively referred to as "*Restricted Payments*"), unless, at the time of such Restricted Payment:

(1)   no Default shall have occurred and be continuing or would occur as a consequence thereof;

(2)   immediately after giving effect to such transaction on a *pro forma* basis, the Company could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test described in the first paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; and

(3)   such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the Release Date (including Restricted Payments permitted by clauses (1) and (10) of the next succeeding paragraph, but excluding all other Restricted Payments permitted by the next succeeding paragraph), is less than the sum of (without duplication):

(a)   EBITDA of the Company and its Restricted Subsidiaries on a consolidated basis for the period (taken as one accounting period) beginning on the first day of the first fiscal quarter beginning after the Release Date, to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment, less the product of 1.4 times the Consolidated Interest Expense of the Company and its Restricted Subsidiaries for the same period; *provided* the amount, if positive, of this clause (a) shall only be included in the calculation for this clause (3) when the Consolidated Secured Leverage Ratio for the Company and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction would have been less than 4.0 to 1.00; *plus*

(b)   100% of the aggregate net cash proceeds and the fair market value of marketable securities or other property or assets received by the Company since immediately after the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock") from the sale of:

(i)(A)   Equity Interests of the Company, including Treasury Capital Stock (as defined below), but excluding cash proceeds and the fair market value of marketable securities or other property or assets received from the sale of Equity Interests to members of management, directors or consultants of the Company, any direct or indirect parent company of the Company and the Company's Subsidiaries after the Release Date to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph; and

(B)   to the extent such net cash proceeds are actually contributed to the Company, Equity Interests of the Company's direct or indirect parent companies (excluding contributions to the extent such amounts have been applied to Restricted Payments made in accordance with clause (4) of the next succeeding paragraph); or

    (ii)   debt securities of the Company that have been converted into or exchanged for such Equity Interests of the Company (or any direct or indirect parent company of the Company);

*provided*, *however*, that this clause (b) shall not include the proceeds from (X) Equity Interests or convertible debt securities of the Company sold to a Restricted Subsidiary, as the case may be, (Y) Disqualified Stock or debt securities that have been converted into Disqualified Stock or (Z) Excluded Contributions; *plus*

(c)   100% of the aggregate amount of cash and the fair market value of marketable securities or other property contributed to the capital of the Company following the Release Date (other than net cash proceeds to the extent such net cash proceeds have been used to incur Indebtedness, Disqualified Stock or Preferred Stock pursuant to clause (12)(a) of the second paragraph of "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock") (other than by a Restricted Subsidiary and other than by any Excluded Contributions); *plus*

(d)   100% of the aggregate amount received in cash and the fair market value of marketable securities or other property received after the Release Date by means of:

    (i)   the sale or other disposition (other than to the Company or a Restricted Subsidiary) of Restricted Investments made by the Company or its Restricted Subsidiaries and repurchases and redemptions of such Restricted Investments from the Company or its Restricted Subsidiaries and repayments of loans or advances, and releases of guarantees, which constitute Restricted Investments by the Company or its Restricted Subsidiaries, in each case after the Release Date; or

    (ii)   the sale (other than to the Company or a Restricted Subsidiary) of the Equity Interests of an Unrestricted Subsidiary or a distribution from an Unrestricted Subsidiary (other than in each case to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment) or a dividend from an Unrestricted Subsidiary after the Release Date; *plus*

(e)   in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary after the Release Date, the fair market value of the Investment in such Unrestricted Subsidiary (which, if the fair market value of such Investment may exceed $50.0 million, shall be set forth in writing by an Independent Financial Advisor) at the time of the redesignation of such Unrestricted Subsidiary as a Restricted Subsidiary, other than an Unrestricted Subsidiary to the extent the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder.

The foregoing provisions will not prohibit:

(1)   the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of declaration thereof or the giving of the irrevocable redemption notice, as applicable, if at the date of declaration or notice such payment would have complied with the provisions of the Second Lien Indenture;

(2)   the redemption, repurchase, defeasance, retirement or other acquisition of any Equity Interests ("*Treasury Capital Stock*") or Unsecured Indebtedness of the Company or a Guarantor in exchange for, or out of the proceeds of the substantially concurrent sale (other than to a Restricted Subsidiary) of, Equity Interests of the Company or any of its direct or

indirect parent companies (in each case, other than any Disqualified Stock); *provided* that the amount of any such net cash proceeds that are utilized for any such redemption, repurchase, retirement or other acquisition will be excluded from clause (3)(b) of the preceding paragraph;

(3)    the redemption, repurchase, defeasance or other acquisition or retirement of Unsecured Indebtedness of the Company or a Guarantor made by exchange for, or out of the proceeds of the substantially concurrent sale of, new Unsecured Indebtedness of the Company or a Guarantor, as the case may be, which is incurred in compliance with "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" so long as:

(a)    the principal amount (or accreted value, if applicable) of such new Indebtedness does not exceed the principal amount (or accreted value, if applicable) of, plus any accrued and unpaid interest, if any, on the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired for value, plus the amount of any reasonable premium paid (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Unsecured Indebtedness;

(b)    such new Indebtedness has a final scheduled maturity date equal to or later than the final scheduled maturity date of the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired; and

(c)    such new Indebtedness has a Weighted Average Life to Maturity equal to or greater than the remaining Weighted Average Life to Maturity of the Unsecured Indebtedness being so redeemed, repurchased, defeased, acquired or retired;

(4)    a Restricted Payment to pay for the repurchase, redemption, defeasance or other acquisition or retirement for value of Equity Interests (other than Disqualified Stock) of the Company or any of its direct or indirect parent companies held by any future, present or former employee, director or consultant of the Company, any of its Subsidiaries or any of its direct or indirect parent companies (or any permitted transferee of any of the foregoing) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement; *provided*, however, that the aggregate amounts paid under this clause (4) do not exceed in any calendar year $5.0 million (with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $10.0 million in any calendar year); *provided further* that such amount in any calendar year may be increased by an amount not to exceed:

(a)    the cash proceeds from the sale of Equity Interests (other than Disqualified Stock) of the Company and, to the extent contributed to the Company, Equity Interests of any of the Company's direct or indirect parent companies, in each case to members of management, directors or consultants of the Company, any of its direct or indirect parent companies or any of its Subsidiaries that occurs after the Release Date, to the extent the cash proceeds from the sale of such Equity Interests have not otherwise been applied to the payment of Restricted Payments by virtue of clause (3) of the preceding paragraph; *plus*

(b)    the cash proceeds of key man life insurance policies received by the Company or its Restricted Subsidiaries after the Release Date; *less*

(c)  the amount of any Restricted Payments made in any prior fiscal year pursuant to clauses (a) and (b) of this clause (4);

(5)  the declaration and payment of dividends to holders of, and any redemption or repurchase at maturity or upon any mandatory redemption event of, any class or series of Disqualified Stock of the Company or any of its Restricted Subsidiaries or any class or series of Preferred Stock of a Restricted Subsidiary issued in accordance with the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" to the extent such dividends are included in the definition of "Consolidated Interest Expense";

(6)  repurchases of Equity Interests deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(7)  the declaration and payment of dividends on the Company's common stock (or the payment of dividends to any direct or indirect parent entity to fund a payment of dividends on the Company's common stock), following the consummation of the first public offering of the Company's common stock or the common stock of any of its direct or indirect parent companies after the Release Date, of up to 6% per annum of the net cash proceeds received by or contributed to the Company in or from any such public offering, other than public offerings with respect to the Company's common stock registered on Form S-8 and other than any public sale constituting an Excluded Contribution;

(8)  other Restricted Payments in an aggregate amount taken together with all other Restricted Payments made pursuant to this clause (8) not to exceed $15.0 million;

(9)  Restricted Payments that are made with Excluded Contributions;

(10)  the payment, repurchase, redemption, defeasance or other acquisition or retirement for value of any Unsecured Indebtedness required in accordance with provisions applicable thereto similar to those described under the captions "Repurchase at the option of holders— Change of control" and "Repurchase at the option of holders— Asset sales"; *provided* that all Second Lien Notes tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(11)  any Restricted Payments in connection with the Emergence Transactions; and

(12)  the declaration and payment of dividends by the Company or a Restricted Subsidiary to, or the making of loans to, any of their respective direct or indirect parents in amounts required for any direct or indirect parent companies to pay, in each case without duplication,

(a)  franchise taxes and other fees, taxes and expenses required to maintain their corporate existence;

(b)  federal, foreign, state and local income taxes to the extent such income taxes are attributable to the income of the Company and its Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries; *provided* that, in each case the amount of such payment in any fiscal year does not exceed the amount that the Company and its Restricted Subsidiaries would be required to pay in respect of federal, foreign, state and local income taxes for such fiscal

year were the Company, its Restricted Subsidiaries and its Unrestricted Subsidiaries (to the extent described above) to pay such taxes separately from any parent entity at the highest combined applicable, federal, foreign, state and local tax rate for such fiscal year;

(c)    customary salary, bonus and other benefits payable to officers and employees of any direct or indirect parent company of the Company and its Restricted Subsidiaries to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Company and its Restricted Subsidiaries;

(d)    general corporate operating and overhead costs and expenses of any direct or indirect parent company of the Company and its Restricted Subsidiaries to the extent such costs and expenses are attributable to the ownership or operation of the Company and its Restricted Subsidiaries; and

(e)    fees and expenses other than to Affiliates of the Company related to any unsuccessful equity or debt offering of such parent entity;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clauses (8) and (10), no Default shall have occurred and be continuing or would occur as a consequence thereof.

As of the Release Date, all of the Company's Subsidiaries will be Restricted Subsidiaries. The Company will not permit any Unrestricted Subsidiary to become a Restricted Subsidiary except pursuant to the definition of "Unrestricted Subsidiary." For purposes of designating any Restricted Subsidiary as an Unrestricted Subsidiary, all outstanding Investments by the Company and its Restricted Subsidiaries (except to the extent repaid) in the Subsidiary so designated will be deemed to be Investments in an amount determined as set forth in the last sentence of the definition of "Investment." Such designation will be permitted only if a Restricted Payment in such amount would be permitted at such time, whether pursuant to the first paragraph of this covenant or under clause (8) of the second paragraph of this covenant, or pursuant to the definition of "Permitted Investments," and if such Subsidiary otherwise meets the definition of an Unrestricted Subsidiary. Unrestricted Subsidiaries will not be subject to any of the restrictive covenants set forth in the Second Lien Indenture.

### Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock

From and after the Release Date, the Company will not, and will not permit any of the Restricted Subsidiaries to, directly or indirectly, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise (collectively, "*incur*" and collectively, an "*incurrence*") with respect to any Indebtedness (including Acquired Indebtedness) and the Company will not issue any shares of Disqualified Stock and will not permit any Restricted Subsidiary to issue any shares of Disqualified Stock or Preferred Stock; *provided*, *however*, that the Company may incur Indebtedness (including Acquired Indebtedness) or issue shares of Disqualified Stock, and any Restricted Subsidiary may incur Indebtedness (including Acquired Indebtedness), issue shares of Disqualified Stock and issue shares of Preferred Stock, if the Consolidated Leverage Ratio on a consolidated basis for the Company and its Restricted Subsidiaries' most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is incurred or

such Disqualified Stock or Preferred Stock is issued would have been less than 4.50 to 1.00, determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred, or the Disqualified Stock or Preferred Stock had been issued, as the case may be, and the application of proceeds therefrom had occurred at the beginning of such four-quarter period; *provided, further*, that the amount of Indebtedness (including Acquired Indebtedness) that may be incurred and Disqualified Stock or Preferred Stock that may be issued pursuant to this paragraph by Restricted Subsidiaries that are not Guarantors shall not exceed $10.0 million at any one time outstanding.

The foregoing limitations will not apply to:

(1)    Indebtedness under the Credit Agreement incurred in an aggregate principal amount not to exceed $40.0 million outstanding at any one time;

(2)    the incurrence by the Company and any Guarantor of Indebtedness represented by (a) the First Lien Notes, (b) the Second Lien Notes (excluding Additional Notes) and (c) any guarantee by a Guarantor of any of the foregoing in this clause (2);

(3)    Indebtedness of the Company and its Restricted Subsidiaries in existence on the Release Date after giving effect to the consummation of the Reorganization Plan (other than Indebtedness described in clauses (1) and (2));

(4)    Indebtedness (including Capitalized Lease Obligations and Purchase Money Obligations), Disqualified Stock and Preferred Stock incurred by the Company or any of its Restricted Subsidiaries to finance the purchase, lease or improvement of property (real or personal) or equipment (other than software) that is used or useful in a Similar Business, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, *provided* that the aggregate amount of Indebtedness, Disqualified Stock and Preferred Stock incurred pursuant to this clause (4) when aggregated with then outstanding amount of Indebtedness under clause (13) incurred to refinance Indebtedness initially incurred in reliance on this clause (4) does not exceed $15.0 million at anytime outstanding;

(5)    Indebtedness incurred by the Company or any of its Restricted Subsidiaries constituting reimbursement obligations with respect to letters of credit issued in the ordinary course of business, including letters of credit in respect of workers' compensation claims, or other Indebtedness with respect to reimbursement type obligations regarding workers' compensation claims; *provided, however*, that such letters of credit are not drawn;

(6)    Indebtedness arising from agreements of the Company or its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, incurred or assumed in connection with the disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness incurred by any Person acquiring all or any portion of such business, assets or a Subsidiary for the purpose of financing such acquisition; *provided, however*, that the maximum assumable liability in respect of all such Indebtedness shall at no time exceed the gross proceeds including non-cash proceeds (the fair market value of such non-cash proceeds being measured at the time received and without giving effect to any subsequent changes in value) actually received by the Company and its Restricted Subsidiaries in connection with such disposition;

(7)    Indebtedness of the Company to a Restricted Subsidiary; *provided* that any such Indebtedness owing to a Restricted Subsidiary that is not a Guarantor is expressly

subordinated in right of payment to the Second Lien Notes; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (7);

(8)    Indebtedness of a Restricted Subsidiary to the Company or another Restricted Subsidiary; *provided* that if a Guarantor incurs such Indebtedness to a Restricted Subsidiary that is not a Guarantor, such Indebtedness is expressly subordinated in right of payment to the Guarantee of the Second Lien Notes of such Guarantor; *provided further* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except to the Company or another Restricted Subsidiary or any pledge of such Indebtedness constituting a Permitted Lien) shall be deemed, in each case, to be an incurrence of such Indebtedness not permitted by this clause (8);

(9)    shares of Preferred Stock or Disqualified Stock of a Restricted Subsidiary issued to the Company or another Restricted Subsidiary; *provided* that any subsequent issuance or transfer of any Capital Stock or any other event which results in any such other Restricted Subsidiary ceasing to be a Restricted Subsidiary or any other subsequent transfer of any such shares of Preferred Stock or Disqualified Stock (except to the Company or another of its Restricted Subsidiaries) shall be deemed in each case to be an issuance of such shares of Preferred Stock or Disqualified Stock not permitted by this clause (9);

(10)    Hedging Obligations (excluding Hedging Obligations entered into for speculative purposes) for the purpose of limiting interest rate risk, exchange rate risk or commodity pricing risk;

(11)    obligations in respect of performance, bid, appeal and surety bonds and completion guarantees provided by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(12)    (a) Indebtedness or Disqualified Stock of the Company or any Restricted Subsidiary of the Company in an aggregate principal amount or liquidation preference equal to 100.0% of the net cash proceeds received by the Company and its Restricted Subsidiaries since immediately after the Release Date from the issue or sale of Equity Interests of the Company or any direct or indirect parent entity of the Company (which proceeds are contributed to the Company or a Restricted Subsidiary) or cash contributed to the capital of the Company (in each case, other than proceeds of Disqualified Stock or sales of Equity Interests or contributions received from the Company or any of its Subsidiaries) as determined in accordance with clauses (3)(b) and (3)(c) of the first paragraph of "—Limitation on restricted payments" to the extent such net cash proceeds or cash have not been applied pursuant to such clauses to make Restricted Payments or to make other Investments, payments or exchanges pursuant to the second paragraph of "—Limitation on restricted payments" or to make Permitted Investments (other than Permitted Investments specified in clauses (1) and (3) of the definition thereof) and (b) Indebtedness or Disqualified Stock of the Company and Indebtedness, Disqualified Stock or Preferred Stock of the Company or any Restricted Subsidiary not otherwise permitted hereunder in an aggregate principal amount or

liquidation preference which, when aggregated with the principal amount and liquidation preference of all other Indebtedness, Disqualified Stock and Preferred Stock then outstanding and incurred pursuant to this clause (12)(b), does not at any one time outstanding exceed $25.0 million;

(13)  the incurrence by the Company or any Restricted Subsidiary of the Company of Indebtedness, Disqualified Stock or Preferred Stock which serves to refund or refinance (whether by payment, purchase, redemption, defeasance or other acquisition or retirement) any Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding as permitted under the first paragraph of this covenant and clauses (2), (3), (4), (6), (10) and (12)(a) above and this clause (13) and clause (14) below or any Indebtedness, Disqualified Stock or Preferred Stock issued to so refund or refinance such Indebtedness, Disqualified Stock or Preferred Stock including additional Indebtedness, Disqualified Stock or Preferred Stock incurred or outstanding to pay accrued interest; premiums (including reasonable tender premiums), defeasance costs and fees in connection therewith (the "*Refinancing Indebtedness*") prior to its respective maturity; *provided, however*, that such Refinancing Indebtedness:

(a)  has a Weighted Average Life to Maturity at the time such Refinancing Indebtedness is incurred which is not less than the remaining Weighted Average Life to Maturity of the Indebtedness, Disqualified Stock or Preferred Stock being refunded or refinanced,

(b)  to the extent such Refinancing Indebtedness refinances (i) Unsecured Indebtedness or constitutes other Permitted Second Lien Obligations, such Refinancing Indebtedness also constitutes Unsecured Indebtedness or constitutes other Permitted Second Lien Obligations, as the case may be, or (ii) Disqualified Stock or Preferred Stock, such Refinancing Indebtedness must be Disqualified Stock or Preferred Stock, respectively, and

(c)  shall not include:

(i)  Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Company that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of the Company;

(ii)  Indebtedness, Disqualified Stock or Preferred Stock of a Subsidiary of the Company, that is not a Guarantor that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Guarantor; or

(iii)  Indebtedness, Disqualified Stock or Preferred Stock of the Company or a Restricted Subsidiary that refinances Indebtedness, Disqualified Stock or Preferred Stock of a Restricted Subsidiary;

and *provided*, *further* that subclause (a) of this clause (13) will not apply to any refunding or refinancing of any First Lien Obligations;

(14)  Indebtedness, Disqualified Stock or Preferred Stock of a Person incurred and outstanding on or prior to the date on which such Person was acquired by the Company or any Restricted Subsidiary or merged into the Company or a Restricted Subsidiary in accordance with the terms of the Second Lien Indenture; *provided* that such Indebtedness, Disqualified Stock or

Preferred Stock is not incurred in connection with or in contemplation of, or to provide all or any portion of the funds or credit support utilized to consummate, such acquisition or merger; and *provided, further*, that after giving effect to such acquisition or merger, either

(a) the Consolidated Secured Leverage Ratio for the Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 4.0 to 1.0, or

(b) (i) the Consolidated Secured Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger and (ii) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such acquisition or merger;

(15) Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, *provided* that such Indebtedness is extinguished within two Business Days of its incurrence;

(16) Indebtedness of the Company or any of its Restricted Subsidiaries supported by a letter of credit issued pursuant to the Credit Agreement, in a principal amount not in excess of the stated amount of such letter of credit;

(17) (a) any guarantee by the Company or a Restricted Subsidiary of Indebtedness or other obligations of any Restricted Subsidiary so long as the incurrence of such Indebtedness incurred by such Restricted Subsidiary is permitted under the terms of the Second Lien Indenture, or

(b) any guarantee by a Restricted Subsidiary of Indebtedness of the Company; *provided* that such guarantee is incurred in accordance with the covenant described below under "—Limitation on guarantees of indebtedness by restricted subsidiaries";

(18) Indebtedness of the Company or any of its Restricted Subsidiaries consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements in each case, incurred in the ordinary course of business;

(19) Indebtedness consisting of Indebtedness issued by the Company or any of the Restricted Subsidiaries to current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests of the Company, a Restricted Subsidiary or any of their direct or indirect parent companies to the extent described in clause (4) of the second paragraph under the caption "—Limitation on restricted payments";

(20) customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(21) Indebtedness owed on a short term basis of no longer than 30 days to banks and other financial institutions incurred in the ordinary course of business of the Company and the Restricted Subsidiaries with such banks or financial institutions that arises in connection with ordinary banking arrangements to manage cash balances of the Company and the Restricted Subsidiaries.

For purposes of determining compliance with this covenant:

(1)    in the event that an item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) meets the criteria of more than one of the categories of permitted Indebtedness, Disqualified Stock or Preferred Stock described in clauses (1) through (21) above or is entitled to be incurred pursuant to the first paragraph of this covenant, the Company, in its sole discretion, will classify or reclassify such item of Indebtedness, Disqualified Stock or Preferred Stock (or any portion thereof) and will only be required to include the amount and type of such Indebtedness, Disqualified Stock or Preferred Stock in one of the above clauses; *provided* that all Indebtedness outstanding under the Credit Agreement on the Release Date will be treated as incurred on the Release Date under clause (1) of the preceding paragraph; and

(2)    at the time of incurrence, the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness described in the first and second paragraphs above.

Accrual of interest, the accretion of accreted value or original issue discount and the payment of interest or dividends in the form of additional Indebtedness, Disqualified Stock or Preferred Stock, as applicable, will not be deemed to be an incurrence of Indebtedness, Disqualified Stock or Preferred Stock for purposes of this covenant.

For purposes of determining compliance with any U.S. dollar-denominated restriction on the incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was incurred, in the case of term debt, or first committed, in the case of revolving credit debt; *provided* that if such Indebtedness is incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced plus the amount of any reasonable premium (including reasonable tender premiums), defeasance costs and any reasonable fees and expenses incurred in connection with the issuance of such new Indebtedness.

The principal amount of any Indebtedness incurred to refinance other Indebtedness, if incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on the currency exchange rate applicable to the currencies in which such respective Indebtedness is denominated that is in effect on the date of such refinancing.

The Second Lien Indenture will not treat (1) Unsecured Indebtedness as subordinated to Secured Indebtedness merely because it is unsecured, (2) senior Indebtedness that is Secured Indebtedness as subordinated to any other senior Indebtedness that is Secured Indebtedness merely because it has a junior priority with respect to the same collateral, (3) any Indebtedness as subordinated to any other Indebtedness merely because of maturity date, order of payment or order of application of funds or (4) Indebtedness that is not guaranteed as subordinated to Indebtedness that is guaranteed merely because of such guarantee.

*Liens*

After the Release Date, the Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, incur, affirm or suffer to exist any Lien of any kind upon any of its property or assets (including any intercompany notes) constituting Collateral, now owned or acquired after the Release Date, or any income or profits therefrom, securing Indebtedness excluding, however, from the operation of the foregoing any Permitted Liens. Additionally, the Company will not, and will not permit any of its Restricted Subsidiaries to, incur or suffer to exist any Lien (the "*Initial Lien*") on any property or assets that are not Collateral securing Indebtedness unless (a) the Company or such Restricted Subsidiary (i) equally and ratably secures the Second Lien Notes (or on a senior basis to) the obligations secured by such Initial Lien or (ii) provides that such Initial Lien is expressly junior in ranking relative to the Second Lien Notes and related Guarantees pursuant to a Junior Lien Intercreditor Agreement or (b) such Initial Lien is a Permitted Lien; *provided*, *however*, that any such Lien created to secure the Second Lien Notes pursuant to this sentence shall provide by its terms that upon the release and discharge of the Initial Lien on such assets by the collateral agent for the Indebtedness secured by such Initial Lien, the Lien on such assets securing the Second Lien Notes shall be automatically and unconditionally released and discharged and the Company may take any action necessary to effectuate such release or discharge.

*Merger, consolidation or sale of all or substantially all assets*

After the Release Date, the Company may not consolidate or merge with or into or wind up into (whether or not the Company is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)     the Company is the surviving corporation or limited liability company or the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation or limited liability company organized or existing under the laws of the jurisdiction of organization of the United States, any state thereof, the District of Columbia, or any territory thereof (such Person, as the case may be, being herein called the "*Successor Company*");

(2)     the Successor Company, if other than the Company, expressly assumes all the obligations of the Company under the Second Lien Notes pursuant to supplemental indentures, Second Lien Security Documents and any other documents or instruments in form reasonably satisfactory to the Second Lien Trustee;

(3)     immediately after such transaction, no Default exists;

(4)     immediately after giving *pro forma* effect to such transaction and any related financing transactions, as if such transactions had occurred at the beginning of the applicable four-quarter period, either

    (i)     the Consolidated Secured Leverage Ratio for the Successor Company and its Restricted Subsidiaries' on a consolidated basis for the most recently ended four fiscal quarters for which internal financial statements are available immediately preceding the date of such transaction does not exceed 4.0 to 1.0, or

(ii)    (a) the Consolidated Secured Leverage Ratio is equal to or less than such ratio immediately prior to such transaction and (b) the Consolidated Leverage Ratio is equal to or less than such ratio immediately prior to such transaction; and

(5)    the Company shall have delivered to the Second Lien Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and Second Lien Security Documents comply with the Second Lien Indenture.

The Successor Company will succeed to, and be substituted for the Company, as the case may be, under the Second Lien Indenture, the Guarantees and the Second Lien Notes, as applicable. Notwithstanding the foregoing clauses (3), (4) and (5),

(1)    any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Company; and

(2)    the Company may merge with an Affiliate of the Company solely for the purpose of reincorporating the Company in a State of the United States so long as the amount of Indebtedness of the Company and its Restricted Subsidiaries is not increased thereby.

Subject to certain limitations described in the Second Lien Indenture governing release of a Guarantee upon the sale, disposition or transfer of a Guarantor, no Guarantor will, and the Company will not permit any Guarantor to, consolidate or merge with or into or wind up into (whether or not the Company or Guarantor is the surviving corporation), or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in one or more related transactions, to any Person unless:

(1)    (a) such Guarantor is the surviving corporation or the Person formed by or surviving any such consolidation or merger (if other than such Guarantor) or to which such sale, assignment, transfer, lease, conveyance or other disposition will have been made is a corporation, partnership, limited partnership, limited liability company or trust organized or existing under the laws of the jurisdiction of organization of such Guarantor, as the case may be, or the laws of the United States, any state thereof, the District of Columbia, or any territory thereof (such Guarantor or such Person, as the case may be, being herein called the "*Successor Person*");

(b)    the Successor Person, if other than such Guarantor, expressly assumes all the obligations of such Guarantor under the Second Lien Indenture and Second Lien Security Documents and such Guarantor's related Guarantee pursuant to supplemental indentures, Second Lien Security Documents or other documents or instruments in form reasonably satisfactory to the Second Lien Trustee;

(c)    immediately after such transaction, no Default exists; and

(d)    the Company shall have delivered to the Second Lien Trustee an Officers' Certificate and an Opinion of Counsel, each stating that such consolidation, merger or transfer and such supplemental indentures, if any, and Second Lien Security Documents comply with the Second Lien Indenture; or

(2)    the transaction is made in compliance with the covenant described under "Repurchase at the option of holders— Asset sales."

In the case of clause (1) above, the Successor Person will succeed to, and be substituted for, such Guarantor under the Second Lien Indenture and such Guarantor's guarantee. Notwithstanding the foregoing, any Guarantor may merge into or transfer all or part of its properties and assets to another Guarantor or the Company.

Notwithstanding the foregoing, (i) the Assumption and related transactions shall be permitted under the Second Lien Indenture and (ii) the merger of AMI with and into the Company with the Company being the surviving corporation on the Release Date in connection with the Emergence Transactions shall be permitted under the Second Lien Indenture.

### *Transactions with affiliates*

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each of the foregoing, an "*Affiliate Transaction*") involving aggregate payments or consideration in excess of $2.0 million, unless:

(1)    such Affiliate Transaction is on terms that are not materially less favorable to the Company or its relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(2)    the Company delivers to the Second Lien Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $10.0 million, a resolution adopted by the majority of the board of directors of the Company approving such Affiliate Transaction and set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with clause (1) above; and

(3)    the Company delivers to the Second Lien Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate payments or consideration in excess of $40.0 million, a written opinion to the Company or such Restricted Subsidiary from an Independent Financial Advisor stating that the terms of such transaction are not materially less favorable to the Company or the Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Company or such Restricted Subsidiary at such time with an unrelated Person on an arm's-length basis.

The foregoing provisions will not apply to the following:

(1)    transactions between or among the Company or any of its Restricted Subsidiaries;

(2)    Restricted Payments permitted by the provisions of the Second Lien Indenture described above under the covenant "—Limitation on restricted payments" and transactions constituting "Permitted Investments";

(3)    [Reserved];

(4)    the payment of reasonable and customary fees paid to, and indemnities provided on behalf of, officers, directors, employees or consultants of the Company, any of its direct or indirect parent companies or any of its Restricted Subsidiaries;

(5) transactions in which the Company or any Restricted Subsidiary, as the case may be, delivers to the Second Lien Trustee a letter from an Independent Financial Advisor stating that such transaction is fair to the Company or such Restricted Subsidiary from a financial point of view or stating that the terms are not materially less favorable to the Company or such Restricted Subsidiary than those that would have reasonably been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person on an arm's-length basis;

(6) any agreement or arrangement as in effect as of the Release Date, or any amendment thereto (so long as any such amendment is not materially disadvantageous to the Holders when taken as a whole as compared to the applicable agreement or arrangement as in effect on the Release Date);

(7) the existence of, or the performance by the Company or any of its Restricted Subsidiaries of its obligations under the terms of, any stockholders agreement (including any registration rights agreement or purchase agreement related thereto) to which the Company or any such Restricted Subsidiary is a party as of the Release Date and any similar agreements which it may enter into thereafter; *provided*, *however*, that the existence of, or the performance by the Company or any of its Restricted Subsidiaries of obligations under any future amendment to any such existing agreement or under any similar agreement entered into after the Release Date shall only be permitted by this clause (7) to the extent that the terms of any such amendment or new agreement are not otherwise materially disadvantageous to the Holders when taken as a whole;

(8) transactions with customers, clients, suppliers, or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the Second Lien Indenture which are fair to the Company and its Restricted Subsidiaries, in the reasonable determination of the board of directors of the Company or the senior management thereof, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party;

(9) the issuance of Equity Interests (other than Disqualified Stock) of the Company to any Person and any contribution to the capital of the Company;

(10) payments by the Company or any of its Restricted Subsidiaries to any of the Permitted Holders made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities, including, without limitation, in connection with acquisitions or divestitures which payments are approved by a majority of the board of directors of the Company in good faith;

(11) the Emergence Transactions, including the payment of fees and expenses in connection therewith;

(12) payments or loans (or cancellation of loans) to employees or consultants of the Company, any of its direct or indirect parent companies or any of its Restricted Subsidiaries and employment agreements, stock option plans and other similar arrangements with such employees or consultants which, in each case, are approved by the Company in good faith;

(13) transactions between the Company or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Company or any direct or indirect parent of the Company; *provided*, *however*, that such director abstains from voting as a director of the

239

Company or such direct or indirect parent, as the case may be, on any matter involving such other Person;

(14) transactions permitted by, and complying with, the provisions of the covenant described under "—Merger, consolidation or sale of all or substantially all assets";

(15) the pledge of Equity Interests of an Unrestricted Subsidiary to lenders of such Unrestricted Subsidiary to support the Indebtedness of such Unrestricted Subsidiary owed to such lenders; and

(16) any transaction with (or for the benefit of) a Person that would constitute an Affiliate Transaction solely because the Company or a Restricted Subsidiary owns an equity interest in or otherwise controls such Person.

### *Dividend and other payment restrictions affecting restricted subsidiaries*

After the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary that is not a Guarantor to:

(1)  (a) pay dividends or make any other distributions to the Company or any of the Restricted Subsidiaries on its Capital Stock or with respect to any other interest or participation in, or measured by, its profits, or

    (b) pay any Indebtedness owed to the Company or any of the Restricted Subsidiaries;

(2)  make loans or advances to the Company or any of the Restricted Subsidiaries; or

(3)  sell, lease or transfer any of its properties or assets to the Company or any of the Restricted Subsidiaries,

except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a) contractual encumbrances or restrictions in effect on the Release Date, including pursuant to the Credit Agreement, the First Lien Notes and the related documentation;

(b) the Second Lien Indenture, the Second Lien Notes and the Guarantees;

(c) Purchase Money Obligations for property acquired in the ordinary course of business and Capitalized Lease Obligations that impose restrictions of the nature discussed in clause (3) above on the property so acquired and related assets;

(d) applicable law or any applicable rule, regulation or order;

(e) any agreement or other instrument of a Person acquired by the Company or any of its Restricted Subsidiaries in existence at the time of such acquisition or at the time it merges with or into the Company or any Restricted Subsidiary or assumed in connection with the acquisition of assets from such Person (but, in any such case, not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets

of the Person and its Subsidiaries, so acquired or the property or assets so assumed and related assets;

(f)    contracts for the sale of assets or Capital Stock, including customary restrictions with respect to a Subsidiary of the Company pursuant to an agreement that has been entered into for the sale or disposition of the Capital Stock or assets of such Subsidiary, that impose restrictions on the assets to be sold or the assets of such Subsidiary;

(g)    Secured Indebtedness otherwise permitted to be incurred pursuant to the covenants described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and "—Liens" that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(h)    restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(i)    other Indebtedness, Disqualified Stock or Preferred Stock of Foreign Subsidiaries permitted to be incurred subsequent to the Release Date pursuant to the provisions of the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" that imposes restrictions solely on Foreign Subsidiaries or their Subsidiaries party thereto;

(j)    customary provisions in joint venture agreements and other similar agreements or arrangements relating solely to such joint venture;

(k)    customary provisions contained in leases or licenses of intellectual property and other agreements, in each case, entered into in the ordinary course of business;

(l)    other Indebtedness or Disqualified Stock of the Company or any of its Restricted Subsidiaries or Preferred Stock of any Restricted Subsidiary that is incurred subsequent to the Release Date and permitted pursuant to the covenant described under "—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided* that such encumbrances and restrictions contained in any agreement or instrument will not materially affect the Company's ability to make anticipated principal or interest payments on the First Lien Notes (as determined in good faith by senior management or the board of directors of the Company);

(m)    any encumbrances or restrictions of the type referred to in clauses (1), (2) and (3) above imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (k) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Company, not materially more restrictive with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; and

(n)    restrictions or conditions of the type contained in clause (3) above contained in any trading, netting, operating, construction, service, supply, purchase or other agreement to which the Company or any Restricted Subsidiary is a party entered into in the ordinary course of business; *provided* that such agreement prohibits the encumbrance of solely the property or

assets of the Company or such Restricted Subsidiary that is the subject of such agreement, the payment rights arising thereunder or the proceeds thereof and does not extend to any other asset or property of such Restricted Subsidiary or the assets or property of the Company or any other Restricted Subsidiary.

### Limitation on guarantees of indebtedness by restricted subsidiaries

After the Release Date, the Company will not permit any of its Restricted Subsidiaries, other than a Guarantor, to guarantee the payment of any Indebtedness of the Company or any other Guarantor unless:

(1)    such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to the Second Lien Indenture providing for a Guarantee by such Restricted Subsidiary, except, if such Indebtedness is by its express terms subordinated in right of payment to the Second Lien Notes or such Guarantor's Guarantee, any such guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to such Guarantee substantially to the same extent as such Indebtedness is subordinated to the Second Lien Notes or such Guarantor's Guarantee;

(2)    such Restricted Subsidiary within 30 days executes and delivers a joinder to the applicable Second Lien Security Documents or new Second Lien Security Documents and takes all actions necessary to perfect the Liens created thereunder (to the extent required by such Second Lien Security Documents), all of such Liens to be junior to the liens in favor of the holders of the Second Lien Obligations and to be subject to the Second Lien Intercreditor Agreement; and

(3)    such Restricted Subsidiary waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Company or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its Guarantee;

*provided* that this covenant shall not be applicable to any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary.

Each Guarantee shall be released in accordance with the provisions of the Second Lien Indenture described under "—Note guarantees."

### Reports and other information

From and after the Release Date, whether or not the Company is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, the Company will file with the SEC (subject to the next sentence) and provide the Second Lien Trustee and holders with such annual and other reports as are specified in Sections 13 and 15(d) of the Exchange Act and applicable to a U.S. corporation subject to such Sections, such reports to be so filed and provided within the times specified for the filings of such reports for non-accelerated filers under such Sections and containing, in all material respects, all the information, audit reports and exhibits required for such reports. If at any time, the Company is not subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing the reports

specified in the preceding sentence with the SEC within the time periods required unless the SEC will not accept such a filing. The Company agrees that it will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, the SEC will not accept such filings for any reason, the Company will post the reports specified in the preceding sentence on its website within the time periods that would apply for non-accelerated filers if the Company were required to file those reports with the SEC (it being expressly understood that prior to the effectiveness of the Exchange Offer Registration Statement or the Shelf Registration Statement that the SEC will not accept such filings by the Company and that the Company shall therefor be able to satisfy its obligations under this covenant by posting such reports on a publicly accessible page on its website). Notwithstanding the foregoing, the Company may satisfy such requirements prior to the effectiveness of a registration statement (the "*Exchange Offer Registration Statement*") filed with the SEC with respect to a registered offer to exchange the Second Lien Notes for new notes of the Company having terms substantially identical in all material respects to the Second Lien Notes exchanged therefor (except that the Exchange Notes will not contain terms with respect to transfer restrictions) or a shelf registration statement (a "*Shelf Registration Statement*") filed with the SEC covering resales of Second Lien Notes or Exchange Notes, as the case may be, by filing with the SEC the Exchange Offer Registration Statement or Shelf Registration Statement, to the extent that any such Registration Statement contains substantially the same information as would be required to be filed by the Company if it were subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act, and by providing the Second Lien Trustee and holders with such Registration Statement (and any amendments thereto) promptly following the filing thereof.

In addition, in the event that:

(a)    the rules and regulations of the SEC permit a parent entity that becomes a Guarantor to report at such parent entity's level on a consolidated basis; and

(b)    such parent entity is not engaged in any business in any material respect other than incidental to its ownership of the capital stock of the Company,

such consolidated reporting by such parent entity in a manner consistent with that described in this covenant for the Company will satisfy this covenant.

Notwithstanding the foregoing, prior to the effectiveness of the exchange offer registration statement or shelf registration statement with respect to the Second Lien Notes, the Company will not be required to furnish any information, certificates or reports required by Items 307 or 308 of Regulation S-K or Item 3-10 of Regulation S-X.

In addition, the Company will furnish to the holders and to prospective investors, upon the requests of such holders, any information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act so long as the Second Lien Notes are not freely transferable under the Securities Act. In addition, such requirements shall be deemed satisfied prior to the commencement of the exchange offer or the effectiveness of the shelf registration statement required by the Registration Rights Agreement by the filing with the SEC of the exchange offer registration statement and/or shelf registration statement in accordance with the provisions of such Registration Rights Agreement, and any amendments thereto, with such financial information that satisfies Regulation S-X of the Securities Act and such registration statement and/or amendments thereto are filed at times that otherwise satisfy the time requirements set forth in the first paragraph of this covenant.

Notwithstanding anything herein to the contrary, the Company will not be deemed to have failed to comply with any of its obligations hereunder for purposes of clause (3) under "Events of default and remedies" until 120 days after the date any report hereunder is required to be made available to the Second Lien Trustee and the Holders pursuant to this covenant.

## Non-Impairment of security interest

From and after the Release Date and subject to the rights of the holders of Permitted Liens that are existing on the Release Date or incurred after the Release Date, the Company will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission could reasonably be expected to have the result of materially impairing the Lien with respect to the Collateral in favor of the holders of Permitted Second Lien Obligations; provided that this covenant shall not prohibit the release of Guarantors as set forth herein under "—Guarantees," or the release of Collateral as set forth herein under "Certain covenants—Liens," "Security for the notes—Limitations on pledged equity interests," or "Security for the notes—Release of Collateral."

### *Events of default and remedies*

The Second Lien Indenture will provide that each of the following is an Event of Default:

(1)   default in payment when due and payable, upon redemption, upon Special Mandatory Redemption, upon acceleration or otherwise, of principal of or premium, if any, on the Second Lien Notes;

(2)   default for 30 days or more in the payment when due of interest on or with respect to the Second Lien Notes;

(3)   failure by the Company or any Guarantor for 60 days after receipt of written notice by the Second Lien Trustee or the Holders of not less than 25% in principal amount of the Second Lien Notes to comply with any of its obligations, covenants or agreements (other than a default referred to in clauses (1) and (2) above) contained in the Second Lien Indenture or the Second Lien Notes;

(4)   default under any mortgage, indenture or instrument under which there is issued or by which there is secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries, other than Indebtedness owed to the Company or a Restricted Subsidiary, whether such Indebtedness or guarantee now exists or is created after the issuance of the Second Lien Notes, if both:

   (a)   such default either results from the failure to pay any principal of such Indebtedness at its stated final maturity (after giving effect to any applicable grace periods) or relates to an obligation other than the obligation to pay principal of any such Indebtedness at its stated final maturity and results in the holder or holders of such Indebtedness causing such Indebtedness to become due prior to its stated maturity; and

   (b)   the principal amount of such Indebtedness, together with the principal amount of any other such Indebtedness in default for failure to pay principal at stated final maturity (after giving effect to any applicable grace periods), or the maturity of which has been so accelerated, aggregate $35.0 million or more at any one time outstanding;

(5)    failure by the Company or any Significant Subsidiary (or group of Restricted Subsidiaries that taken together would constitute a Significant Subsidiary) to pay final judgments aggregating in excess of $35.0 million, which final judgments remain unpaid, undischarged and unstayed for a period of more than 60 days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(6)    certain events of bankruptcy or insolvency with respect to the Company or any Significant Subsidiary;

(7)    the Guarantee of any Significant Subsidiary (or group of Guarantors that taken together would constitute a Significant Subsidiary) shall for any reason cease to be in full force and effect or be declared null and void or any responsible officer of such Guarantor, as the case may be, denies that it has any further liability under its Guarantee or gives notice to such effect, other than by reason of the termination of the Second Lien Indenture or the release of any such Guarantee in accordance with the Second Lien Indenture; or

(8)    (x) with respect to any Collateral having a fair market value in excess of $20.0 million, individually or in the aggregate, (a) the security interest under any Second Lien Security Document, at any time, ceases to be in full force and effect for any reason other than in accordance with the terms of the Second Lien Indenture, the Second Lien Security Documents and the First Lien Intercreditor Agreement or (b) any security interest created thereunder or under the Second Lien Indenture is declared invalid or unenforceable by a court of competent jurisdiction or (y) the Company or any Guarantor asserts, in any pleading in any court of competent jurisdiction, that any security interest in any Collateral is invalid or unenforceable.

If any Event of Default (other than of a type specified in clause (6) above with respect to the Company) occurs and is continuing under the Second Lien Indenture, the Second Lien Trustee or the Holders of at least 25% in principal amount of the then total outstanding Second Lien Notes may declare the principal, premium, if any (without duplication), interest and any other monetary obligations on all the then outstanding Second Lien Notes to be due and payable immediately.

Upon the effectiveness of such declaration, such principal and interest will be due and payable immediately. Notwithstanding the foregoing, in the case of an Event of Default arising under clause (6) of the first paragraph of this section with respect to the Company, all outstanding Second Lien Notes will become due and payable without further action or notice. The Second Lien Indenture will provide that the Second Lien Trustee may withhold from the Holders notice of any continuing Default, except a Default relating to the payment of principal, premium, if any, or interest, if it determines that withholding notice is in their interest.

The Second Lien Indenture will provide that the Holders of a majority in aggregate principal amount of the then outstanding Second Lien Notes by notice to the Second Lien Trustee may on behalf of the Holders of all of the Second Lien Notes waive any existing Default and its consequences under the Second Lien Indenture except a continuing Default in the payment of interest on, premium, if any, or the principal of any Second Lien Note held by a non-consenting Holder. In the event of any Event of Default specified in clause (4) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Second Lien Notes) shall be annulled, waived and rescinded, automatically

and without any action by the Second Lien Trustee or the Holders, if within 20 days after such Event of Default, arose:

(1)     the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or

(2)     holders thereof have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or

(3)     the default that is the basis for such Event of Default has been cured.

Subject to the provisions of the Second Lien Indenture relating to the duties of the Second Lien Trustee thereunder, in case an Event of Default occurs and is continuing, the Second Lien Trustee will be under no obligation to exercise any of the rights or powers under the Second Lien Indenture at the request or direction of any of the Holders of the Second Lien Notes unless the Holders have offered to the Second Lien Trustee indemnity or security against any loss, liability or expense satisfactory to the Second Lien Trustee. Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder of a Second Lien Note may pursue any remedy with respect to the Second Lien Indenture or the Second Lien Notes unless:

(1)     such Holder has previously given the Second Lien Trustee notice that an Event of Default is continuing;

(2)     Holders of at least 25% in principal amount of the total outstanding Second Lien Notes have requested the Second Lien Trustee to pursue the remedy;

(3)     Holders of the Second Lien Notes have offered the Second Lien Trustee security or indemnity against any loss, liability or expense satisfactory to the Second Lien Trustee;

(4)     the Second Lien Trustee has not complied with such request within 60 days after the receipt thereof and the offer of such satisfactory security or indemnity; and

(5)     Holders of a majority in principal amount of the total outstanding Second Lien Notes have not given the Second Lien Trustee a direction inconsistent with such request within such 60-day period.

Subject to certain restrictions, under the Second Lien Indenture the Holders of a majority in principal amount of the total outstanding Second Lien Notes are given the right to direct the time, method and place of conducting any proceeding for any remedy available to the Second Lien Trustee or of exercising any trust or power conferred on the Second Lien Trustee. The Second Lien Trustee, however, may refuse to follow any direction that conflicts with law or the Second Lien Indenture or that the Second Lien Trustee determines is unduly prejudicial to the rights of any other Holder of a Second Lien Note or that would involve the Second Lien Trustee in personal liability.

The Second Lien Indenture will provide that the Company is required to deliver to the Second Lien Trustee annually a statement regarding compliance with the Second Lien Indenture, and the Company is required, within five Business Days after becoming aware of any Default or Event of Default, to deliver to the Second Lien Trustee a statement specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

## No personal liability of directors, officers, employees and stockholders

No director, officer, employee, incorporator or stockholder, member or limited partner of the Company or any Guarantor or any of their parent companies shall have any liability for any obligations of the Company or the Guarantors under the Second Lien Notes, the Guarantees or the Second Lien Indenture or for any claim based on, in respect of, or by reason of such obligations or their creation. Each Holder by accepting Second Lien Notes waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Second Lien Notes.

## Defeasance

The obligations of the Company and the Guarantors under the Second Lien Indenture will terminate (other than certain obligations) and will be released upon payment in full of all of the Second Lien Notes. The Company may, at its option and at any time, elect to have all of its obligations discharged with respect to the Second Lien Notes, the Second Lien Indenture and the Second Lien Security Documents and cause the release of all Liens on the Collateral granted under the Second Lien Security Documents and have the Company and each Guarantor's obligation discharged with respect to its Guarantee, the Second Lien Indenture and the Second Lien Security Documents ("*Legal Defeasance*") and cure all then-existing Events of Default except for:

(1)    the rights of Holders of Second Lien Notes to receive payments in respect of the principal of, premium, if any, and interest on the Second Lien Notes when such payments are due solely out of the trust created pursuant to the Second Lien Indenture;

(2)    the Company's obligations with respect to Second Lien Notes concerning issuing temporary Second Lien Notes, registration of the transfer or exchange of Second Lien Notes, replacement of mutilated, destroyed, lost or stolen Second Lien Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3)    the rights, powers, trusts, duties and immunities of the Second Lien Trustee, and the Company's obligations in connection therewith; and

(4)    the Legal Defeasance provisions of the Second Lien Indenture.

In addition, the Company may, at its option and at any time, elect to have its obligations and those of each Guarantor released with respect to certain covenants in the Second Lien Indenture and the Liens on the Collateral granted under the Second Lien Security Documents ("*Covenant Defeasance*") and thereafter any omission to comply with such obligations shall not constitute a Default with respect to the Second Lien Notes. In the event Covenant Defeasance occurs (i) any event described in clause (3), (4), (5), (7) or (8) of "Events of default and remedies" will no longer constitute an Event of Default with respect to the Second Lien Notes and (ii) any event described in clause (1), (2) or (6) of "Events of default and remedies" will continue to constitute an Event of Default with respect to the Second Lien Notes.

In order to exercise either Legal Defeasance or Covenant Defeasance with respect to the Second Lien Notes:

(1)    the Company must irrevocably deposit with the Second Lien Trustee, in trust, for the benefit of the Holders of the Second Lien Notes, cash in U.S. dollars, Government Securities, or a

combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants (or, if two or more nationally recognized firms of independent public accountants decline to issue such opinion as a matter of policy, in the opinion of the Company's chief financial officer), to pay the principal amount of, premium, if any, and (without duplication) interest due on the Second Lien Notes on the stated maturity date or on the redemption date, as the case may be, of such principal amount of, premium, if any, or interest on such Second Lien Notes and the Company must specify whether such Second Lien Notes are being defeased to maturity or to a particular redemption date;

(2)     in the case of Legal Defeasance, the Company shall have delivered to the Second Lien Trustee an Opinion of Counsel reasonably acceptable to the Second Lien Trustee confirming that, subject to customary assumptions and exclusions,

    (a)     the Company has received from, or there has been published by, the United States Internal Revenue Service a ruling, or

    (b)     since the issuance of the Second Lien Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, subject to customary assumptions and exclusions, the Holders of the Second Lien Notes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)     in the case of Covenant Defeasance, the Company shall have delivered to the Second Lien Trustee an Opinion of Counsel reasonably acceptable to the Second Lien Trustee confirming that, subject to customary assumptions and exclusions, the Holders of the Second Lien Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to such tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     no Default (other than that resulting from borrowing funds to be applied to make such deposit and the granting of Liens in connection therewith) shall have occurred and be continuing on the date of such deposit;

(5)     such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any First Lien Obligations or any other material agreement or instrument (other than the Second Lien Indenture) to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than that resulting from any borrowing of funds to be applied to make such deposit required to effect such Legal Defeasance or Covenant Defeasance and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(6)     the Company shall have delivered to the Second Lien Trustee an Opinion of Counsel to the effect that, as of the date of such opinion and subject to customary assumptions and exclusions following the deposit, the trust funds will not be subject to the effect of Section 547 of Title 11 of the United States Code;

(7)    the Company shall have delivered to the Second Lien Trustee an Officers' Certificate stating that the deposit was not made by the Company with the intent of defeating, hindering, delaying or defrauding any creditors of the Company or any Guarantor or others; and

(8)    the Company shall have delivered to the Second Lien Trustee an Officers' Certificate and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

## Satisfaction and discharge

The Second Lien Indenture will be discharged and will cease to be of further effect as to all Second Lien Notes, when either:

(1)    all Second Lien Notes theretofore authenticated and delivered, except lost, stolen or destroyed Second Lien Notes which have been replaced or paid and Second Lien Notes for whose payment money has theretofore been deposited in trust, have been delivered to the Second Lien Trustee for cancellation; or

(2)  (a)  all Second Lien Notes not theretofore delivered to the Second Lien Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise, will become due and payable within one year or are to be called for redemption and redeemed within one year under arrangements satisfactory to the Second Lien Trustee for the giving of notice of redemption by the Second Lien Trustee in the name, and at the expense, of the Company and the Company or any Guarantor have irrevocably deposited or caused to be deposited with the Second Lien Trustee as trust funds in trust solely for the benefit of the Holders of the Second Lien Notes, cash in U.S. dollars, Government Securities, or a combination thereof, in such amounts as will be sufficient without consideration of any reinvestment of interest to pay and discharge the entire indebtedness on the Second Lien Notes not theretofore delivered to the Second Lien Trustee for cancellation for principal amount, premium, if any, and (without duplication) accrued interest to the date of maturity or redemption;

     (b)  no Default (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith) with respect to the Second Lien Indenture or the Second Lien Notes shall have occurred and be continuing on the date of such deposit or shall occur as a result of such deposit and such deposit will not result in a breach or violation of, or constitute a default under any First Lien Obligations or any other material agreement or instrument (other than the Second Lien Indenture) to which the Company or any Guarantor is a party or by which the Company or any Guarantor is bound (other than that resulting from borrowing funds to be applied to make such deposit and any similar and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

     (c)  the Company has paid or caused to be paid all sums payable by it under the Second Lien Indenture; and

     (d)  the Company has delivered irrevocable instructions to the Second Lien Trustee to apply the deposited money toward the payment of the Second Lien Notes or the redemption date, as the case may be.

In addition, the Company must deliver an Officers' Certificate and an Opinion of Counsel to the Second Lien Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied.

## Amendment, supplement and waiver

Except as provided in the next three succeeding paragraphs, the Second Lien Indenture, the Second Lien Security Documents, the Second Lien Intercreditor Agreement, any Guarantee and the Second Lien Notes may be amended or supplemented with the consent of the Holders of at least a majority in principal amount of the Second Lien Notes then outstanding, including, so long as the Second Lien Indenture has not been qualified under the TIA, any Second Lien Notes beneficially owned by the Company's Affiliates (including consents obtained in connection with a purchase of, or tender offer or exchange offer for, Second Lien Notes), and any existing Default or compliance with any provision of the Second Lien Indenture, the Second Lien Security Documents or the Second Lien Notes issued thereunder may be waived with the consent of the Holders of a majority in principal amount of the then outstanding Second Lien Notes (including consents obtained in connection with a purchase of or tender offer or exchange offer for the Second Lien Notes).

The Second Lien Indenture will provide that without the consent of each affected Holder of Second Lien Notes, an amendment or waiver may not, with respect to any Second Lien Notes held by a non-consenting Holder:

(1)   reduce the principal amount of such Second Lien Notes whose Holders must consent to an amendment, supplement or waiver;

(2)   reduce the principal amount of or change the fixed final maturity of any such Second Lien Note or alter or waive the provisions with respect to the redemption of such Second Lien Notes (other than provisions relating to the covenants described above under the caption "Repurchase at the option of holders");

(3)   reduce the rate of or change the time for payment of interest on any Second Lien Note;

(4)   waive a Default in the payment of principal of or premium, if any, or (without duplication) interest on the Second Lien Notes, except a rescission of acceleration of the Second Lien Notes by the Holders of at least a majority in aggregate principal amount of the Second Lien Notes and a waiver of the payment default that resulted from such acceleration, or in respect of a covenant or provision contained in the Second Lien Indenture or any Guarantee which cannot be amended or modified without the consent of all Holders;

(5)   make any Second Lien Note payable in a currency other than U.S. dollars;

(6)   make any change in the provisions of the Second Lien Indenture relating to the rights of Holders to receive payments of principal of or premium, if any, or (without duplication) interest on the Second Lien Notes including in connection with a defeasance or discharge;

(7)   make any change in these amendment and waiver provisions;

(8)   impair the right of any Holder to receive payment of principal of or interest on such Holder's Second Lien Notes on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Holder's Second Lien Notes;

(9)    make any change to or otherwise modify the ranking of the Second Lien Notes that would adversely affect the Holders; or

(10)    except as expressly permitted by the Second Lien Indenture, modify the Guarantee of any Guarantor in any manner adverse to the Holders of the Second Lien Notes.

Without the consent of the holders of at least 75% in aggregate principal amount of the Second Lien Notes then outstanding, no amendment or waiver may make any change to, or extend the time for performance under, the escrow release provisions described under "—Escrow of Proceeds—Release Conditions" or the Special Mandatory Redemption provisions described under "—Escrow of Proceeds—Special Mandatory Redemption."

Notwithstanding the foregoing, the Company, any Guarantor (with respect to a Guarantee or the Second Lien Indenture to which it is a party) and the Second Lien Trustee may amend or supplement the Second Lien Indenture, the Second Lien Security Documents and the Second Lien Intercreditor Agreement and any Guarantee or Second Lien Notes without the consent of any Holder:

(1)    to cure any ambiguity, omission, mistake, defect or inconsistency;

(2)    to provide for uncertificated Second Lien Notes in addition to or in place of certificated Second Lien Notes;

(3)    to provide for the Assumption and to comply with the covenant relating to mergers, consolidations and sales of assets;

(4)    to provide the assumption of the Company's or any Guarantor's obligations to the Holders;

(5)    to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the rights under the Second Lien Indenture of any such Holder;

(6)    to add covenants for the benefit of the Holders or to surrender any right or power conferred upon the Company or any Guarantor;

(7)    to comply with requirements of the SEC in order to effect or maintain the qualification of the Second Lien Indenture under the TIA;

(8)    to evidence and provide for the acceptance and appointment (x) under the Second Lien Indenture of a successor Second Lien Trustee thereunder pursuant to the requirements thereof or (y) under the Second Lien Security Documents of a successor Second Lien Collateral Agent thereunder pursuant to the requirements thereof;

(9)    to make changes related to the transfer and legending of the Second Lien Notes as permitted by the Second Lien Indenture or applicable law;

(10)    to add a Guarantor under the Second Lien Indenture;

(11)    to conform the text of the Second Lien Indenture, Guarantees, the Second Lien Notes, the Second Lien Security Documents or the Second Lien Intercreditor Agreement to any provision of this "Description of second lien notes";

(12)    to make any amendment to the provisions of the Second Lien Indenture relating to the transfer and legending of Second Lien Notes as permitted by the Second Lien Indenture,

including, without limitation, to facilitate the issuance and administration of the Second Lien Notes; *provided*, *however*, that (i) compliance with the Second Lien Indenture as so amended would not result in Second Lien Notes being transferred in violation of the Securities Act or any applicable securities law and (ii) such amendment does not materially and adversely affect the rights of Holders to transfer Second Lien Notes;

(13)  to provide for the issuance of Exchange Notes in accordance with the terms of the Second Lien Indenture and the Registration Rights Agreement;

(14)  to add security to or for the benefit of the Second Lien Notes and, in the case of the Second Lien Security Documents, to or for the benefit of the other secured parties named therein or to confirm and evidence the release, termination or discharge of any Guarantee of or Lien securing the Second Lien Notes when such release, termination or discharge is permitted by the Second Lien Indenture and the Second Lien Security Documents or as required by the Second Lien Intercreditor Agreement; or

(15)  to modify the Second Lien Security Documents and/or the Second Lien Intercreditor Agreement to secure additional extensions of credit and additional secured creditors holding First Lien Obligations and other Permitted Second Lien Obligations so long as such First Lien Obligations and other Permitted Second Lien Obligations are not prohibited by the Second Lien Indenture, the First Lien Indenture or the Credit Agreement.

In addition, any amendment to, or waiver of, the provision of the Second Lien Indenture, any Second Lien Security Document or the Second Lien Intercreditor Agreement that has the effect of releasing all or substantially all of the Collateral or modifies such documents insofar as such documents relates to Collateral in a manner adverse to Holders in any material respect will require consent of the Holders of at least 75% in aggregate principal amount of the Second Lien Notes then outstanding (including consents obtained in connection with a tender offer or exchange offer for the Second Lien Notes).

The Second Lien Indenture shall expressly provide that, prior to the qualification of the Second Lien Indenture under the TIA, Second Lien Notes owned by Holders (including direct and indirect beneficial owners) that directly or indirectly control, or are controlled by or under direct or indirect common control with, the Company will not be disregarded for purposes of voting with respect to amendments, waivers, directions and consents. If and when the Second Lien Indenture is qualified under the TIA, then Second Lien Notes owned by Holders (including direct and indirect beneficial owners) that directly or indirectly control, or are controlled by or under direct or indirect common control with, the Company will be disregarded for purposes of voting with respect to amendments, waivers, directions and consents.

The consent of the Holders is not necessary under the Second Lien Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

Until the Discharge of First Lien Obligations has occurred, the holders of the First-Priority Liens may change, waive, modify or vary the security documents of such holders and, pursuant to the Second Lien Intercreditor Agreement, such changes will automatically apply to the Second Lien Security Documents; *provided* that any such change, waiver, modification or variance that is prejudicial to the rights of the Holders of the Second Lien Notes and does not affect the holders of the First-Priority Liens in a like or similar manner shall not apply to the Second Lien Security

Documents without the consent of the Second Lien Agent and the Second Lien Trustee (acting at the direction of the Holders of a majority of the aggregate principal amount of the Second Lien Notes). Notice of such amendment, waiver or consent shall be given to the Second Lien Trustee by the Company, but any failure to provide such notice will not affect the validity or effectiveness of any such amendment, waiver or consent.

No amendment of, or supplement or waiver to, the Second Lien Indenture, the Second Lien Notes or the Second Lien Security Documents (other than the Second Lien Intercreditor Agreement) shall be permitted to be effected which is in violation of or inconsistent with the terms of the Second Lien Intercreditor Agreement. No amendment of, or supplement to, the Second Lien Intercreditor Agreement shall be permitted to be effected without the consent of the Second Lien Collateral Agent and the Revolving Collateral Agent.

## Notices

Notices given by publication will be deemed given on the first date on which publication is made and notices given by first-class mail, postage prepaid, will be deemed given five calendar days after mailing.

## Concerning the trustee

The Second Lien Indenture will contain certain limitations on the rights of the Second Lien Trustee thereunder, should it become a creditor of the Company, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The Second Lien Trustee will be permitted to engage in other transactions; however, if it acquires any conflicting interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue or resign.

The Second Lien Indenture will provide that the Holders of a majority in principal amount of the outstanding Second Lien Notes will have the right to direct the time, method and place of conducting any proceeding for exercising any remedy available to the Second Lien Trustee, subject to certain exceptions. The Second Lien Indenture will provide that in case an Event of Default shall occur (which shall not be cured), the Second Lien Trustee will be required, in the exercise of its power, to use the degree of care of a prudent person in the conduct of his own affairs. Subject to such provisions, the Second Lien Trustee will be under no obligation to exercise any of its rights or powers under the Second Lien Indenture at the request of any Holder of the Second Lien Notes, unless such Holder shall have offered to the Second Lien Trustee security and indemnity satisfactory to it against any loss, liability or expense.

## Governing law

The Second Lien Indenture, the Second Lien Security Documents, the Second Lien Notes and any Guarantee will be governed by and construed in accordance with the laws of the State of New York.

## Certain definitions

Set forth below are certain defined terms used in the Second Lien Indenture. For purposes of the Second Lien Indenture, unless otherwise specifically indicated, the term "consolidated" with respect to any Person refers to such Person consolidated with its Restricted Subsidiaries, and excludes from such consolidation any Unrestricted Subsidiary as if such Unrestricted Subsidiary were not an Affiliate of such Person.

"*Acquired Indebtedness*" means, with respect to any specified Person,

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, including Indebtedness incurred in connection with, or in contemplation of, such other Person merging with or into or becoming a Restricted Subsidiary of such specified Person, and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Notes*" has the meaning set forth in the first paragraph under "—Principal, maturity and interest."

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*" (including, with correlative meanings, the terms "*controlling*," "*controlled by*" and "*under common control with*"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"*AMI*" means American Media, Inc., a Delaware corporation, and its successors and assigns.

"*AMO*" means American Media Operations, Inc., a Delaware corporation, and its successors and assigns.

"*Applicable Premium*" means, with respect to any Second Lien Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Second Lien Note; and

(2)    the excess, if any, of (a) the present value at such Redemption Date of (i) the redemption price of such Second Lien Note at December 15, 2013 (such redemption price being set forth in the table appearing above under the caption "Optional redemption"), plus (ii) all required interest payments due on such Second Lien Note through December 15, 2013 (excluding accrued but unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate as of such Redemption Date plus 50 basis points; over (b) the principal amount of such Second Lien Note.

"*Asset Sale*" means:

(1)    the sale, conveyance, transfer or other disposition, whether in a single transaction or a series of related transactions, of property or assets (including by way of a Sale and Lease-back Transaction) of the Company or any of the Restricted Subsidiaries (each referred to in this definition as a "*disposition*"); or

(2) the issuance or sale of Equity Interests of any Restricted Subsidiary, whether in a single transaction or a series of related transactions (other than Preferred Stock or Disqualified Stock of Restricted Subsidiaries issued in compliance with the covenant described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock");

in each case, other than:

(a) any disposition of Cash Equivalents or obsolete or worn out equipment in the ordinary course of business or any disposition of inventory or goods (or other assets) in the ordinary course of business;

(b) the disposition of all or substantially all of the assets of the Company in a manner permitted pursuant to the provisions described above under "Certain covenants—Merger, consolidation or sale of all or substantially all assets" or any disposition that constitutes a Change of Control pursuant to the Second Lien Indenture;

(c) the making of any Restricted Payment or any Permitted Investment that is permitted to be made, and is made, under the covenant described above under "Certain covenants—Limitation on restricted payments";

(d) any disposition of assets or issuance or sale of Equity Interests of any Restricted Subsidiary in any transaction or series of related transactions with an aggregate fair market value of less than $7.5 million;

(e) any disposition of property or assets or issuance of securities (i) by a Guarantor to the Company or by the Company or a Guarantor to another Guarantor or (ii) by a Restricted Subsidiary that is not a Guarantor to the Company, a Guarantor or to another Restricted Subsidiary that is not a Guarantor;

(f) to the extent allowable under Section 1031 of the Internal Revenue Code of 1986, any exchange of like property (excluding any boot thereon) for use in a Similar Business;

(g) the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(h) any issuance or sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary other than to the extent that the Investment in such Unrestricted Subsidiary constituted a Permitted Investment hereunder;

(i) solely for the purposes of clauses (1) and (2) of the first paragraph under "Repurchase at the option of holders—Asset sales," foreclosures, condemnation or any similar action on assets;

(j) the granting of Liens not prohibited by the Second Lien Indenture;

(k) the licensing or sublicensing of intellectual property or other general intangibles in the ordinary course of business; and

(l) solely for the purposes of clauses (1) and (2) of the first paragraph under "Repurchase at the option of holders—Asset sales," any surrender or waiver of contract rights or the settlement, release or surrender of contract rights or other litigation claims in the ordinary course of business.

255

"*Assumption*" means the consummation of the transactions whereby (a) the Company will assume all of the obligations of the Escrow Issuer under the Second Lien Indenture, the Registration Rights Agreement, the Second Lien Security Documents and the Second Lien Intercreditor Agreement, (b) each of the Guarantors will guarantee the Second Lien Notes and become a party to the Registration Rights Agreement, the Second Lien Security Documents and the Second Lien Intercreditor Agreement and (c) to the extent the Company assumes the obligations of the Escrow Issuer other than by merger, the Escrow Issuer is released from the obligations under the Second Lien Indenture.

"*Bankruptcy Code*" means Title 11 of the United States Code.

"*Business Day*" means each day which is not a Legal Holiday.

"*Capital Stock*" means:

(1)    in the case of a corporation, corporate stock;

(2)    in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person.

"*Capitalized Lease Obligation*" means, at the time any determination thereof is to be made, the amount of the liability in respect of a capital lease that would at such time be required to be capitalized and reflected as a liability on a balance sheet (excluding the footnotes thereto) in accordance with GAAP.

"*Cash Equivalents*" means:

(1)    United States dollars;

(2)  (a)  euro, or any national currency of any participating member of the EMU; or

(b)    in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

(3)    securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or issued by any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(4)    certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks;

(5)    repurchase obligations for underlying securities of the types described in clauses (3) and (4) entered into with any financial institution meeting the qualifications specified in clause (4) above;

(6)    commercial paper rated at least P-1 by Moody's or at least A-1 by S&P and in each case maturing within 24 months after the date of creation thereof;

(7)    marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 24 months after the date of creation thereof;

(8)    investment funds investing 95% of their assets in securities of the types described in clauses (1) through (7) above;

(9)    readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 24 months or less from the date of acquisition;

(10)   Indebtedness or Preferred Stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 24 months or less from the date of acquisition; and

(11)   Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's.

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clauses (1) and (2) above, *provided* that such amounts are converted into any currency listed in clauses (1) and (2) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"*Cash Management Bank*" means any Credit Agreement Lender or an Affiliate of a Credit Agreement Lender (together with its successors and assigns) providing Cash Management Services to the Company or any Guarantor.

"*Cash Management Obligations*" means all obligations owing by the Company or any Guarantor to any Cash Management Bank in respect of any Cash Management Services (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective documents governing the Cash Management Services, whether or not a claim for post-petition interest or fees is allowed or allowable in any such Insolvency or Liquidation Proceeding), now existing or hereafter incurred under, arising out of or in connection with such Cash Management Services, and the due performance and compliance by the Company or such Guarantor with the terms, conditions and agreements of such Cash Management Services.

"*Cash Management Services*" means treasury, depository, bank product and/or cash management services or any automated clearing house transfer services.

"*Change of Control*" means the occurrence of any of the following:

(1)    the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, other than to a Permitted Holder or to a Person with respect to which the Permitted Holders have the right or ability, by voting power, contract or otherwise, to elect or designate for election a

majority of the board of directors of such Person or any direct or indirect holding company of such Person;

(2)    (A) the Company becomes aware of (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision), other than the Permitted Holders, has become the "beneficial owner" (as defined in Rules 13d-3 of the Exchange Act, or any successor provision), by way of merger, consolidation or other business combination or purchase, of 50% or more of the total voting power of the Voting Stock of the Company or any direct or indirect parent company holding directly or indirectly 100% of the total voting power of the Voting Stock of the Company and (B) the Permitted Holders do not have the right or ability, by voting power, contract or otherwise, to elect or designate for election a majority of the board of directors of the Company or such parent company; or

(3)    the adoption by the stockholders of the Company of a plan or proposal for the liquidation or dissolution of the Company.

"*Collateral*" means all of the property and assets whether now owned or hereafter acquired, in each case, in which Liens are, from time to time, purported to be granted to secure the Second Lien Notes and the Guarantees pursuant to the Second Lien Security Documents, other than Excluded Assets.

"*Company*" has the meaning set forth in the first paragraph under "General."

"*Consolidated Interest Expense*" means, for any period, the total interest expense of the Company and its consolidated Restricted Subsidiaries (other than with respect to interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense), plus, to the extent incurred by the Company and its Restricted Subsidiaries in such period but not included in such interest expense:

(a)    interest expense attributable to Capitalized Lease Obligations and the interest expense attributable to leases constituting part of a Sale and Lease-back Transaction,

(b)    amortization of debt discount and debt issuance costs,

(c)    capitalized interest,

(d)    commissions, discounts and other fees and charges attributable to letters of credit and bankers' acceptance financing,

(e)    interest accruing on any Indebtedness of any other Person to the extent such Indebtedness is guaranteed by (or secured by the assets of) the Company or any Restricted Subsidiary,

(f)    net costs associated with Hedging Obligations,

(g)    dividends in respect of all Disqualified Stock of the Company and all Preferred Stock of any of the Restricted Subsidiaries of the Company, to the extent held by Persons other than the Company or a Wholly Owned Subsidiary,

(h)    interest incurred in connection with investments in discontinued operations, and

(i)    the cash contributions to any employee stock ownership plan or similar trust to the extent such contributions are used by such plan or trust to pay interest or fees to any Person (other than the Company) in connection with Indebtedness incurred by such plan or trust.

Notwithstanding anything to the contrary contained herein, commissions, discounts, yield and other fees and charges incurred in connection with any transaction pursuant to which the Company or any Subsidiary of the Company may sell, convey or otherwise transfer or grant a security interest in any accounts receivable or related assets shall be included in Consolidated Interest Expense.

"*Consolidated Leverage Ratio*" as of any date of determination means the ratio of:

(a)    Total Consolidated Indebtedness as of the date of determination to

(b)    the aggregate amount of EBITDA for the period of the most recent four consecutive fiscal quarters ending at the end of the most recent fiscal quarter for which internal financial statements are available,

*provided, however*, that

(i)    if the Company or any Restricted Subsidiary has incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determination or if the transaction giving rise to the need to calculate the Consolidated Leverage Ratio is an incurrence of Indebtedness, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving effect on a *pro forma* basis to such Indebtedness as if such Indebtedness had been incurred on the first day of such period and the discharge of any other Indebtedness repaid, repurchased, defeased or otherwise discharged with the proceeds of such new Indebtedness as if such discharge had occurred on the first day of such period (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the date of such calculation will be deemed to be (i) the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation, in each case, *provided* that such average daily balance shall take into account any repayment of Indebtedness under such facility as provided in clause (ii)),

(ii)    if the Company or any Restricted Subsidiary has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case other than Indebtedness incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Leverage Ratio, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such period and as if the Company or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness,

(iii)    if since the beginning of such period the Company or any Restricted Subsidiary shall have made any Asset Sale, EBITDA for such period shall be reduced by an amount equal to EBITDA

(if positive) directly attributable to the assets that were the subject of such Asset Sale for such period or increased by an amount equal to EBITDA (if negative) directly attributable thereto for such period and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expense directly attributable to any Indebtedness of the Company or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discharged with respect to the Company and its continuing Restricted Subsidiaries in connection with such Asset Sale for such period (or, if the Capital Stock of any Restricted Subsidiary is sold, the Consolidated Interest Expense for such period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Company and its continuing Restricted Subsidiaries are no longer liable for such Indebtedness after such sale),

(iv)    if since the beginning of such period the Company or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto (including the incurrence of any Indebtedness) as if such Investment or acquisition had occurred on the first day of such period, and

(v)    if since the beginning of such period any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (iii) or (iv) above if made by the Company or a Restricted Subsidiary during such period, EBITDA and, for the purpose of calculating EBITDA, Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets had occurred on the first day of such period.

For purposes of this definition, whenever pro forma effect is to be given to a transaction, the amount of income or earnings relating thereto and the amount of Consolidated Interest Expense associated with any Indebtedness incurred in connection therewith, the pro forma calculations shall be determined in good faith by a responsible financial or accounting Officer of the Company; *provided* that any such pro forma calculations with respect to cost savings, operating expense reductions or synergies for such period shall be limited to those resulting from the transaction which is being given pro forma effect that in the reasonable determination of a responsible financial or accounting Officer of the Company (a) are reasonably identifiable and factually supportable and (b) such actions have been realized or for which the steps necessary for realization have been taken or are reasonably expected to be taken within twelve months following any such transaction, including, but not limited to, the execution or termination of any contracts, the termination of any personnel or the closing (or approval by the board of directors of any closing) of any facility, as applicable. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Obligation applicable to such Indebtedness).

"*Consolidated Net Income*" means, for any period, the net income (excluding non-controlling interest) of the Company and its Restricted Subsidiaries for such period; *provided*, *however*, that there shall not be included in such Consolidated Net Income:

(a)    any net income of any Person (other than the Company) if such Person is not a Restricted Subsidiary, except that

(i)    subject to the limitations contained in clause (d) below, the Company's equity in the net income of any such Person for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Person during such period to the Company or a Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to a Restricted Subsidiary (other than a Guarantor), to the limitations contained in clause (b) below) and

(ii)    the Company's equity in a net loss of any such Person for such period shall be included in determining such Consolidated Net Income to the extent such loss has been funded with cash from the Company or a Restricted Subsidiary;

(b)    except for the purposes of calculating Consolidated Leverage Ratio, any net income (or loss) of any Restricted Subsidiary (other than any Guarantor) if such Restricted Subsidiary is not permitted by restrictions, directly or indirectly, to pay dividends or make distributions (unless legally waived) to the Company, except that

(i)    the net income of any such Restricted Subsidiary for such period shall be included in such Consolidated Net Income up to the aggregate amount of cash (or other assets to the extent converted into cash) actually distributed by such Restricted Subsidiary during such period to the Company or another Restricted Subsidiary as a dividend, debt repayment or other distribution (subject, in the case of a dividend, debt repayment or other distribution made to another Restricted Subsidiary (other than a Guarantor), to the limitation contained in this clause) and

(ii)    the net loss of any such Restricted Subsidiary for such period shall be included in determining such Consolidated Net Income;

(c)    any gain (loss) realized (less all fees and expenses related thereto) upon the sale or other disposition of any asset of the Company or its consolidated Subsidiaries (including pursuant to any Sale and Lease-back Transaction) that is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sale or other disposition of any Capital Stock of any Person;

(d)    any extraordinary, non-recurring or unusual gain or loss or expense (less all fees and expenses related thereto);

(e)    the cumulative effect of a change in accounting principles;

(f)    effects of adjustments (including the effects of such adjustments pushed down to the Company and its Restricted Subsidiaries) in the inventory, property and equipment, software, goodwill and other intangible assets and in process research and development, deferred revenue and debt line items in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to any consummated acquisition or the amortization or write-off of any amounts thereof, net of taxes;

(g)     any net after-tax income (loss) from the early extinguishment of (i) Indebtedness, (ii) Hedging Obligations or (iii) other derivative instruments;

(h)     any net after-tax income or loss from abandoned, closed or discontinued operations and any net after-tax gains or losses on disposal of abandoned, closed or discontinued operations;

(i)     any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write-downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in the law or regulation, in each case, pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP; and

(j)     any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, disposition, recapitalization Investment, Asset Sale, issuance or repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any debt instrument (in each case, including any other such transaction consummated prior to the Release Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction.

"*Consolidated Secured Leverage Ratio*" means the ratio of (1) the aggregate principal amount of Secured Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of the Company and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "Consolidated Leverage Ratio" in performing a calculation thereof.

"*Contingent Obligations* " means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent,

(1)     to purchase any such primary obligation or any property constituting direct or indirect security therefor,

(2)     to advance or supply funds

    (a)     for the purchase or payment of any such primary obligation, or

    (b)     to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Covenant Suspension*" means, during any period of time following the issuance of the Second Lien Notes, that (i) the Second Lien Notes have Investment Grade Ratings from both Rating Agencies, and (ii) no Default has occurred and is continuing under the Second Lien Indenture.

"*Credit Agreement*" means the credit agreement to be entered into on or about the Release Date, among AMI, the Company, the lenders and the administrative agent for such lenders,

262

including any guarantees, collateral documents, instruments and agreements executed in connection therewith, and any amendments, supplements, modifications, extensions, renewals, restatements, refundings or refinancings thereof and any indentures or credit facilities or commercial paper facilities with banks or other institutional lenders or investors that replace, refund or refinance any part of the loans, notes, other credit facilities or commitments thereunder, including any such replacement, refunding or refinancing facility or indenture that increases the amount borrowable thereunder or alters the maturity thereof (*provided* that such increase in borrowings is permitted under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" above).

"*Credit Agreement Lenders*" means the "Lenders" from time to time party to, and as defined in, the Credit Agreement, together with their respective successors and assigns; *provided* that the term "Credit Agreement Lender" shall in any event also include each letter of credit issuer and swingline lender under the Credit Agreement, including, without limitation, the "Issuing Bank," the "Swingline Lender" and any "Agent" under (and each as defined in) the Credit Agreement.

"*Debt Coverage EBITDA*" has the meaning set forth in the Offering Memorandum.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Designated Non-cash Consideration*" means the fair market value of non-cash consideration received by the Company or a Restricted Subsidiary in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an Officers' Certificate, setting forth the basis of such valuation, executed by the principal financial officer of the Company, less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Discharge of First Lien Obligations*" means, subject to any reinstatement of First Lien Obligations in accordance with the Intercreditor Agreement, (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective First Lien Document, whether or not such interest would be allowed in any such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness under the First Lien Documents and termination of all commitments of the Credit Agreement Lenders to lend or otherwise extend credit under the First Lien Documents, (b) payment in full in cash of all other First Lien Obligations (including letter of credit reimbursement obligations) that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest, and premium are paid (other than Cash Management Obligations and Secured Hedge Obligations so long as arrangements satisfactory to the applicable Cash Management Bank or Hedge Bank shall have been made), and (c) termination or cash collateralization (in an amount and manner, and on terms, reasonably satisfactory to the First Lien Representative) of all letters of credit issued under the First Lien Credit Documents.

"*Disqualified Stock*" means, with respect to any Person, any Capital Stock of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely as a result of a change of control or asset sale) pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than solely as a result of a change of control or asset sale), in whole or in part, in each case prior to the date

91 days after the earlier of the maturity date of the Second Lien Notes or the date the Second Lien Notes are no longer outstanding; *provided*, *however*, that if such Capital Stock is issued to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Capital Stock held by any future, current or former employee, director, manager or consultant (or their respective trusts, estates, investment funds, investment vehicles or immediate family members) of the Company, any of its Subsidiaries or any direct or indirect parent entity of the Company in each case upon the termination of employment or death of such person pursuant to any stockholders' agreement, management equity plan, stock option plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or its Subsidiaries.

"*EBITDA*" for any period means the Consolidated Net Income of the Company and its Restricted Subsidiaries for such period, *plus*, without duplication, the following to the extent deducted in calculating such Consolidated Net Income:

(a)   Consolidated income tax expense,

(b)   Consolidated Interest Expense,

(c)   Consolidated depreciation expense,

(d)   Consolidated amortization expense (including amortization associated with capitalized or short-term display rack costs and the recognition of such costs as a deferred cost asset amortized as contra-revenue),

(e)   any interest paid in kind by the issuance of additional Indebtedness and other non-cash interest expense,

(f)   any expenses or charges related to any Equity Offering, Permitted Investment, acquisition or Indebtedness permitted to be incurred by the Second Lien Indenture (whether or not successful),

(g)   any expense or charge incurred or recorded by the Company or any of its Subsidiaries in connection with (i) Asset Sales or (ii) reorganization and other cost cutting efforts, including, without limitation, expenses and charges relating to severance, relocation and the discontinuation of titles,

(h)   any non-cash charges (including any non-cash compensation charge or expense) reducing Consolidated Net Income for such period (excluding any such charge which consists of or requires an accrual of, or cash reserve for, any anticipated cash charges for any prior or in any future period),

(i)   any charges or credits relating to the adoption of fresh start accounting principles, and

(j)   solely for purposes of calculating the Consolidated Leverage Ratio, the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly owned Subsidiary deducted (and not added back) in such period in calculating Consolidated Net Income.

"*Emergence Transactions*" means all transactions relating to the Reorganization Plan and the Company's emergence from Chapter 11 of the Bankruptcy Code, including, but not limited to, closing of the Exit Financing.

"*EMU*" means the economic and monetary union as contemplated in the Treaty on European Union.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock, but excluding any debt security that is convertible into, or exchangeable for, Capital Stock.

"*Equity Offering*" means any public or private sale of common stock or Preferred Stock of the Company or any of its direct or indirect parent companies (excluding Disqualified Stock), other than:

(1)   public offerings with respect to the Company's or any direct or indirect parent company's common stock registered on Form S-8;

(2)   issuances to any Subsidiary of the Company; and

(3)   any such public or private sale that constitutes an Excluded Contribution.

"*Escrow Agent*" means Wilmington Trust Company, as escrow agent under the Second Lien Escrow Agreement or any successor escrow agent as set forth in the Second Lien Escrow Agreement.

"*Escrow End Date*" means the 60th day following the Issue Date; provided that the Escrow Issuer may elect to extend the Escrow End Date for an additional 35 days on no more than one occasion so long as, not later than five Business Days prior to the scheduled Escrow End Date, (i) it provides prior written notice to the Escrow Agent and the Second Lien Trustee and has issued a press release stating that it has extended the Escrow End Date and (ii) AMO or the Escrow Issuer has deposited cash or Escrow Investments into escrow with the Escrow Agent, to be held pursuant to the terms of the Escrow Agreement, in an amount sufficient to fund the redemption price due on the latest permitted date for the revised Special Mandatory Redemption in respect of all outstanding Second Lien Notes and has certified that such amounts will be satisfactory for such purpose.

"*Escrow Investment*" means (1) Government Securities, (2) investments in time deposit accounts, certificates of deposit and money market deposits maturing no later than the Escrow End Date in each case, entitled to U.S. Federal deposit insurance for the full amount thereof or issued by a bank or trust company (including the Escrow Agent or an affiliate of the Escrow Agent) which is organized under the laws of the United States of America or any State thereof having capital, surplus and undivided profits aggregating in excess of $500.0 million and (3) repurchase obligations maturing no later than the Escrow End Date entered into with a nationally recognized broker-dealer, with respect to which the purchase securities are Obligations issued or guaranteed by the United States government or any agency thereof, which repurchase Obligations shall be entered into pursuant to written agreements.

"*Escrow Issuer*" means AMO Escrow Corporation.

"*Escrow Proceeds*" has the meaning ascribed to such term under "—Release Conditions."

"*euro*" means the single currency of participating member states of the EMU.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Exchange Notes*" means any notes issued in exchange for notes pursuant to the Registration Rights Agreement or similar agreement.

"*Excluded Contribution*" means the amount of net cash proceeds, marketable securities or Qualified Proceeds received by the Company after the Release Date from (1) contributions to its common equity capital and (2) the sale (other than to a Subsidiary of the Company or to any management equity plan or stock option plan or any other management or employee benefit plan or agreement of the Company or any of its direct or indirect parents) of Capital Stock (other than Disqualified Stock) of the Company, in each case designated as an Excluded Contribution pursuant to an Officers' Certificate on the date such capital contributions are made or the date such Equity Interests are sold, as the case may be, which are excluded from the calculation set forth in clause (3) of the first paragraph under "Certain covenants—Limitation on restricted payments."

"*Exit Financing*" means that certain financing to finance the Reorganization Plan expected to be comprised of the Credit Agreement, the First Lien Notes and the Second Lien Notes.

"*fair market value*" means, with respect to any asset or liability, the fair market value of such asset or liability as determined by the Company in good faith; *provided* that if the fair market value is equal to or exceeds $25.0 million, such determination shall be made by the board of directors of the Company.

"*First Lien Credit Documents*" means the Credit Agreement, the other Loan Documents (as defined in the Credit Agreement), and each of the other agreements, documents, and instruments providing for or evidencing any other First Lien Obligation and any other document or instrument executed or delivered at any time in connection with any First Lien Obligation (including any intercreditor or joinder agreement among holders of First Lien Obligations but excluding Secured Hedge Agreements and the documents governing the Cash Management Obligations), to the extent such are effective at the relevant time, as each may be amended, modified, restated, supplemented, replaced or refinanced from time to time.

"*First Lien Documents*" means the First Lien Credit Documents, the Secured Hedge Agreements, and any and all documents governing the Cash Management Obligations.

"*First Lien Indebtedness*" means (i) the First Lien Notes, (ii) Indebtedness under the Credit Agreement and (iii) additional Indebtedness that is secured by a Lien senior to the Lien securing the Second Lien Notes.

"*First Lien Indenture*" means the indenture in respect of the First Lien Notes dated as of the issue date of the First Lien Notes among the Company and the First Lien Trustee, as amended or supplemented from time to time.

"*First Lien Intercreditor Agreement*" means the First Lien Intercreditor Agreement dated on or about the Release Date among the Collateral Agent, the collateral agent in respect of the Credit Agreement, the Company, AMI and each other Guarantor named therein, as such agreement may be amended, restated, supplemented or otherwise modified from time to time.

"*First Lien Leverage Ratio*" means the ratio of (1) the aggregate principal amount of First Lien Indebtedness (calculated net of up to $20.0 million of unrestricted cash and Cash Equivalents of

the Company and its Restricted Subsidiaries as of such date of determination) to (2) EBITDA for the most recently ended four fiscal quarters for which financial statements are available immediately preceding the date of determination, with such pro forma adjustments to EBITDA as would be required under the proviso to the definition of "Consolidated Leverage Ratio" in performing a calculation thereof.

"*First Lien Notes*" means the $385.0 million in aggregate principal amount of the Company's First Lien Secured Notes due 2017 issued on the date of the Second Lien Indenture.

"*First Lien Obligations*" means (i) all Obligations arising under (and as defined in) the Credit Agreement of the Company and the Guarantors, under any other document relating to the Credit Agreement incurred under clause (1) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock", (ii) all Obligations under the First Lien Indenture, (iii) all Secured Hedging Obligations and (iv) all Cash Management Obligations; *provided* that the aggregate principal amount of, without duplication, revolving credit loans, letters of credit, term loans, other loans, notes or similar instruments (excluding, in any event, Cash Management Obligations and Secured Hedging Obligations) provided for under the Credit Agreement or any other document relating to the Credit Agreement (or any refinancing thereof) in excess of the amount permitted under clause (1) of the second paragraph under "Certain Covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" and any interest relating to such excess amount, shall not constitute First Lien Obligations for purposes of the Second Lien Indenture. "First Lien Obligations" shall in any event include (a) all interest accrued or accruing, or which would accrue, absent commencement of an Insolvency or Liquidation Proceeding (and the effect of provisions such as Section 502(b)(2) of the Bankruptcy Code), on or after the commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Document, whether or not the claim for such interest is allowed or allowable as a claim in such Insolvency or Liquidation Proceeding, (b) any and all fees and expenses (including attorneys' and/or financial consultants' fees and expenses) incurred by the First Lien Representative and the First Lien Secured Parties on or after the commencement of an Insolvency or Liquidation Proceeding, whether or not the claim for fees and expenses is allowed or allowable under Section 502 or 506(b) of the Bankruptcy Code or any other provision of the Bankruptcy Code or any similar federal, state or foreign law for the relief of debtors as a claim in such Insolvency or Liquidation Proceeding, and (c) all obligations and liabilities of the Company and each Guarantor under each First Lien Document to which it is a party which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due and payable.

"*First Lien Representative*" means, as between collateral agents representing different series of First Lien Obligations, the collateral agent representing the series of First Lien Obligations with the greatest outstanding principal amount.

"*First Lien Trustee*" means Wilmington Trust FSB, as trustee for the Holders of First Lien Notes.

"*Foreign Subsidiary*" means, with respect to any Person, any Restricted Subsidiary of such Person that is not organized or existing under the laws of the United States, any state thereof or the District of Columbia and any Restricted Subsidiary of such Foreign Subsidiary.

"*GAAP*" means generally accepted accounting principles in the United States which are in effect on the Issue Date. At any time after the Issue Date, the Company may elect to apply IFRS accounting principles in lieu of GAAP and, upon any such election, references herein to GAAP

shall thereafter be construed to mean IFRS (except as otherwise provided in the Second Lien Indenture); *provided* that any such election, once made, shall be irrevocable; *provided, further*, any calculation or determination in the Second Lien Indenture that requires the application of GAAP for periods that include fiscal quarters ended prior to the Company's election to apply IFRS shall remain as previously calculated or determined in accordance with GAAP. The Company shall give written notice of any such election made in accordance with this definition to the Second Lien Trustee and the Holders of Second Lien Notes.

"*Government Securities*" means securities that are:

(1)    direct obligations of the United States of America for the timely payment of which its full faith and credit is pledged; or

(2)    obligations of a Person controlled or supervised by and acting as an agency or instrumentality of the United States of America the timely payment of which is unconditionally guaranteed as a full faith and credit obligation by the United States of America,

which, in either case, are not callable or redeemable at the option of the issuers thereof, and shall also include a depository receipt issued by a bank (as defined in Section 3(a)(2) of the Securities Act), as custodian with respect to any such Government Securities or a specific payment of principal of or interest on any such Government Securities held by such custodian for the account of the holder of such depository receipt; *provided* that (except as required by law) such custodian is not authorized to make any deduction from the amount payable to the holder of such depository receipt from any amount received by the custodian in respect of the Government Securities or the specific payment of principal of or interest on the Government Securities evidenced by such depository receipt.

"*guarantee*" means a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner (including letters of credit and reimbursement agreements in respect thereof), of all or any part of any Indebtedness or other obligations.

"*Guarantee*" means the guarantee by any Guarantor of the Company's Obligations under the Second Lien Indenture.

"*Guarantor*" means each Restricted Subsidiary that guarantees the Second Lien Notes in accordance with the terms of the Second Lien Indenture.

"*Hedge Bank*" means any Person that is a Credit Agreement Lender or an Affiliate of a Credit Agreement Lender at the time it enters into a Secured Hedge Agreement, in its capacity as a party thereto, and such Person's successors and assigns.

"*Hedging Obligations*" means, with respect to any Person, the obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement providing for the transfer or mitigation of interest rate or currency risks either generally or under specific contingencies.

"*Holder*" means the Person in whose name a Second Lien Note is registered on the registrar's books.

"*Indebtedness*" means, with respect to any Person, without duplication:

(1)    any indebtedness (including principal and premium) of such Person, whether or not contingent:

    (a)    in respect of borrowed money;

    (b)    evidenced by bonds, notes, debentures or similar instruments or letters of credit or bankers' acceptances (or, without duplication, reimbursement agreements in respect thereof);

    (c)    representing the balance deferred and unpaid of the purchase price of any property (including Capitalized Lease Obligations), except (i) any such balance that constitutes a trade payable or similar obligation to a trade creditor, in each case accrued in the ordinary course of business and (ii) any earn-out obligations until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP; or

    (d)    representing any Hedging Obligations;

    if and to the extent that any of the foregoing Indebtedness (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(2)    to the extent not otherwise included, any obligation by such Person to be liable for, or to pay, as obligor, guarantor or otherwise, on the obligations of the type referred to in clause (1) of a third Person (whether or not such items would appear upon the balance sheet of the such obligor or guarantor), other than by endorsement of negotiable instruments for collection in the ordinary course of business; and

(3)    to the extent not otherwise included, the obligations of the type referred to in clause (1) of a third Person secured by a Lien on any asset owned by such first Person, whether or not such Indebtedness is assumed by such first Person but only to the extent of the fair market value of the assets subject to such Lien;

*provided*, *however*, that notwithstanding the foregoing, Indebtedness shall be deemed not to include Contingent Obligations incurred in the ordinary course of business.

"*IFRS*" means the International Financial Reporting Standards as adopted by the International Accounting Standards Board.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant to Persons engaged in Similar Businesses of nationally recognized standing that is, in the good faith judgment of the Company, qualified to perform the task for which it has been engaged.

"*Initial Purchasers*" means J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Credit Suisse Securities (USA) LLC.

"*Insolvency or Liquidation Proceeding*" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to the Company or any Guarantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to the Company or any Guarantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of the Company or any Guarantor,

whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of the Company or any Guarantor.

"*Intercreditor Agreements*" means the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's Investors Service, Inc. and BBB- (or the equivalent) by Standard & Poor's Ratings Group, Inc., in each case, with a stable or better outlook, or an equivalent rating by any other Rating Agency.

"*Investments*" means, with respect to any Person, all investments by such Person in other Persons (including Affiliates) in the form of loans (including guarantees), advances or capital contributions (excluding accounts receivable, trade credit, advances to customers, commission, travel and similar advances to officers and employees, in each case made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person and investments that are required by GAAP to be classified on the balance sheet (excluding the footnotes) of the Company in the same manner as the other investments included in this definition to the extent such transactions involve the transfer of cash or other property. For purposes of the definition of "Unrestricted Subsidiary" and the covenant described under "Certain covenants—Limitation on restricted payments":

(1)    "Investments" shall include the portion (proportionate to the Company's equity interest in such Subsidiary) of the fair market value of the net assets of a Subsidiary of the Company at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Company shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to:

(a)    the Company's "Investment" in such Subsidiary at the time of such redesignation; less

(b)    the portion (proportionate to the Company equity interest in such Subsidiary) of the fair market value of the net assets of such Subsidiary at the time of such redesignation; and

(2)    any property transferred to or from an Unrestricted Subsidiary shall be valued at its fair market value at the time of such transfer.

"*Issue Date*" means the date the Second Lien Notes are first issued under the Second Lien Indenture.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which commercial banking institutions are not required to be open in the States of New York, Minnesota and Delaware.

"*Lien*" means, with respect to any asset, any mortgage, lien (statutory or otherwise), pledge, hypothecation, charge, security interest, preference, priority or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to give any financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction (other than a filing for informational purposes); *provided* that in no event shall an operating lease be deemed to constitute a Lien.

"*Moody's*" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale, including any cash received upon the sale of sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale, net of the direct costs relating to such Asset Sale and the sale or disposition of such Designated Non-cash Consideration, including legal, accounting and investment banking fees, and brokerage and sales commissions, any relocation expenses incurred as a result thereof, taxes paid or payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), amounts required to be applied to the repayment of principal, premium, if any, and interest on Indebtedness required (other than required by clause (1) of the second paragraph of "Repurchase at the option of holders—Asset sales") to be paid as a result of such transaction, amounts required to be paid to minority interest holders in Restricted Subsidiaries as a result of such Asset Sale, any portion of the purchase price from such Asset Sale placed in escrow as a requirement of such Asset Sale (but only for the duration of such escrow), and any deduction of appropriate amounts to be provided by the Company or any of the Restricted Subsidiaries as a reserve in accordance with GAAP against any liabilities associated with the asset disposed of in such transaction and retained by the Company or any of the Restricted Subsidiaries after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Obligations*" means any principal (including any accretion), interest (including any interest accruing subsequent to the filing of a petition in bankruptcy, reorganization or similar proceeding at the rate provided for in the documentation with respect thereto, whether or not such interest is an allowed claim under applicable state, federal or foreign law), penalties, fees, indemnifications, reimbursements (including reimbursement obligations with respect to letters of credit and banker's acceptances), damages and other liabilities, and guarantees of payment of such principal (including accretion), interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities, payable under the documentation governing any Indebtedness.

"*Offering Memorandum*" means the Offering Memorandum dated November 16, 2010 with respect to the First Lien Notes.

"*Officer*" means the Chairman of the Board, the Chief Executive Officer, the President, any Executive Vice President, Senior Vice President or Vice President, the Treasurer or the Secretary of the Company.

"*Officers' Certificate*" means a certificate signed on behalf of the Company by any two Officers of the Company, one of whom must be the principal executive officer, the principal financial officer, the treasurer or the principal accounting officer of the Company, that meets the requirements set forth in the Second Lien Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel who is acceptable to the Second Lien Trustee. The counsel may be an employee of or counsel to the Company.

"*Permitted Asset Swap*" means the concurrent purchase and sale or exchange of Related Business Assets or a combination of Related Business Assets and cash or Cash Equivalents between the Company or any of its Restricted Subsidiaries and another Person; *provided*, that any cash or Cash Equivalents received must be applied in accordance with the "Repurchase at the option of holders—Asset sales" covenant.

"*Permitted Holders*" means (i) Angelo, Gordon & Co., L.P., (ii) Avenue Capital Management II, L.P., (iii) Capital Research and Management Company, Capital Guardian Trust Company and Capital International, Inc., (iv) Credit Suisse Securities (USA) LLC, (v) Regiment Capital Management, LLC, (vi) [reserved], (vii) any group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act or any successor provision) of which any of the Permitted Holders specified in clauses (i)-(v) are members, and (viii) the respective Affiliates of each of the foregoing; *provided* that in the case of any group specified in clause (vii) above, without giving effect to such group, Permitted Holders specified in clauses (i)-(v) and their respective Affiliates must collectively beneficially own a greater amount of the total voting power of the Voting Stock of AMI than the amount of the total voting power of the Voting Stock of AMI beneficially owned by any other member of such group.

"*Permitted Investments*" means:

(1)    any Investment in the Company or any of its Restricted Subsidiaries;

(2)    any Investment in cash and Cash Equivalents;

(3)    any Investment by the Company or any of its Restricted Subsidiaries in a Person that is engaged in a Similar Business if as a result of such Investment:

(a)    such Person becomes a Restricted Subsidiary; or

(b)    such Person, in one transaction or a series of related transactions, is merged or consolidated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary,

and, in each case, any Investment held by such Person; *provided*, that such Investment was not acquired by such Person in contemplation of such acquisition, merger, consolidation or transfer;

(4)    any Investment in securities or other assets not constituting cash or Cash Equivalents and received in connection with an Asset Sale made pursuant to the provisions of "Repurchase at the option of holders—Asset sales" or any other disposition of assets not constituting an Asset Sale;

(5)    any Investment existing on the Release Date;

(6)    any Investment acquired by the Company or any of its Restricted Subsidiaries:

(a)    in exchange for any other Investment or accounts receivable held by the Company or any such Restricted Subsidiary in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization of the issuer of such other Investment or accounts receivable; or

(b)    as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)    Hedging Obligations permitted under clause (10) of the covenant described in "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(8)    any Investment in a Similar Business having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (8) that are at that time outstanding, not to exceed the greater of (x) $25.0 million and (y) 3.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(9)    Investments the payment for which consists of Equity Interests (exclusive of Disqualified Stock) of the Company, or any of its direct or indirect parent companies; *provided*, *however*, that such Equity Interests will not increase the amount available for Restricted Payments under clause (3) of the first paragraph under the covenant described in "Certain covenants—Limitation on restricted payments";

(10)   guarantees of Indebtedness permitted under the covenant described in "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(11)   any transaction to the extent it constitutes an Investment that is permitted and made in accordance with the provisions of the second paragraph of the covenant described under "Certain covenants—Transactions with affiliates" (except transactions described in clauses (2), (5) and (16) of such paragraph);

(12)   additional Investments having an aggregate fair market value, taken together with all other Investments made pursuant to this clause (12) that are at that time outstanding (without giving effect to the sale of an Unrestricted Subsidiary to the extent the proceeds of such sale do not consist of cash or marketable securities), not to exceed the greater of (x) $40.0 million and (y) 5.0% of Total Assets at the time of such Investment (with the fair market value of each Investment being measured at the time made and without giving effect to subsequent changes in value);

(13)   loans and advances to, or guarantees of Indebtedness of, officers, directors and employees in an amount not to exceed $5.0 million at any time outstanding;

(14)   loans and advances to officers, directors and employees for business related travel expenses, moving expenses and other similar expenses, in each case incurred in the ordinary course of business; and

(15)   prepaid expenses, deposits, advances, loans or extensions of trade credit in the ordinary course of business by the Company or any Restricted Subsidiaries.

"*Permitted Liens*" means, with respect to any Person:

(1)    pledges or deposits by such Person under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, contracts (other than for the payment of Indebtedness) or leases to which such Person is a party, or deposits to secure public or statutory obligations of such Person or deposits of cash or U.S. government bonds to secure surety or appeal bonds to which such Person is a party, or deposits as security for contested taxes or import duties or for the payment of rent, in each case incurred in the ordinary course of business;

(2)    Liens imposed by law, such as carriers', warehousemen's and mechanics' Liens, in each case for sums not yet overdue for a period of more than 30 days or being contested in good faith by appropriate proceedings or other Liens arising out of judgments or awards against

such Person with respect to which such Person shall then be proceeding with an appeal or other proceedings for review if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(3)     Liens for taxes, assessments or other governmental charges not yet overdue for a period of more than 30 days or payable or subject to penalties for nonpayment or which are being contested in good faith by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of such Person in accordance with GAAP;

(4)     Liens in favor of issuers of performance and surety bonds or bid bonds or with respect to other regulatory requirements or letters of credit issued pursuant to the request of and for the account of such Person in the ordinary course of its business;

(5)     minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights-of-way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real properties or Liens incidental, to the conduct of the business of such Person or to the ownership of its properties which were not incurred in connection with Indebtedness and which do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of such Person;

(6)(i)  Liens securing Indebtedness under the Credit Agreement incurred under clause (1) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" (and the related guarantees) and (ii) Liens securing Indebtedness permitted to be incurred pursuant to clause (4) of the second paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock" covering only the property (real or personal) or equipment (other than software), whether through the direct purchase of assets or the Capital Stock of any Person owning such assets, in each case, financed by or acquired with such Indebtedness;

(7)     Liens existing on the Release Date (other than Liens securing secured parties under the Credit Agreement and Liens under clause (33) of this definition);

(8)     Liens on property or shares of stock or other assets of a Person at the time such Person becomes a Subsidiary; *provided*, *however*, such Liens are not created or incurred in connection with, or in contemplation of, such other Person becoming such a Subsidiary; *provided*, *further*, *however*, that such Liens may not extend to any other property or assets owned by the Company or any of its Restricted Subsidiaries;

(9)     Liens on property or other assets at the time the Company or a Restricted Subsidiary acquired the property or such other assets, including any acquisition by means of a merger or consolidation with or into the Company or any of its Restricted Subsidiaries; *provided*, *however*, that such Liens are not created or incurred in connection with, or in contemplation of, such acquisition; *provided*, *further*, *however*, that the Liens may not extend to any other property owned by the Company or any of its Restricted Subsidiaries;

(10)    Liens securing Indebtedness or other obligations of a Restricted Subsidiary owing to the Company or another Restricted Subsidiary permitted to be incurred in accordance with the covenant described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock";

(11)    Liens securing Hedging Obligations;

(12)    Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(13)    leases, subleases, licenses or sublicenses granted to others in the ordinary course of business which do not materially interfere with the ordinary conduct of the business of the Company or any of its Restricted Subsidiaries and do not secure any indebtedness;

(14)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company and its Restricted Subsidiaries in the ordinary course of business;

(15)    Liens in favor of the Company or any Guarantor;

(16)    Liens on equipment of the Company or any of its Restricted Subsidiaries granted in the ordinary course of business to the Company's clients not related to Indebtedness;

(17)    Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancing, refunding, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien referred to in the foregoing clauses (6), (7), (8) and (9) and the succeeding clause (33) (provided, that, with respect to Liens incurred to refinance Liens under clause (33), the Lien pursuant to such refinancing shall have the same relative priority as the Lien being refinanced); *provided*, *however*, that (a) such new Lien shall be limited to all or part of the same property that secured the original Lien (plus improvements on such property), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clauses (6), (7), (8), (9) and (33) at the time the original Lien became a Permitted Lien under the Second Lien Indenture, and (ii) an amount necessary to pay any accrued interest and fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement;

(18)    deposits made in the ordinary course of business to secure liability to insurance carriers;

(19)    other Liens that are not on Collateral securing obligations incurred in the ordinary course of business which obligations do not exceed $10.0 million at any one time outstanding;

(20)    Liens securing judgments for the payment of money not constituting an Event of Default under clause (5) under the caption "Events of default and remedies" so long as such Liens are adequately bonded and any appropriate legal proceedings that may have been duly initiated for the review of such judgment have not been finally terminated or the period within which such proceedings may be initiated has not expired;

(21)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(22)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code (or any comparable or successor provision) on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts

incurred in the ordinary course of business, and (iii) in favor of banking institutions arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(23)   Liens deemed to exist in connection with Investments in repurchase agreements permitted under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided* that such Liens do not extend to any assets other than those that are the subject of such repurchase agreements;

(24)   Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(25)   Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Company or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Company and its Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(26)   any encumbrance or restriction (including put and call arrangements) with respect to Capital Stock of any joint venture or similar arrangement pursuant to any joint venture or similar agreement;

(27)   Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(28)   Liens arising under the Second Lien Indenture in favor of the Second Lien Trustee for its own benefit and similar Liens in favor of other trustees, agents and representatives arising under instruments governing Indebtedness permitted to be incurred or outstanding under the Second Lien Indenture, *provided* that such Liens are solely for the benefit of the trustees, agents and representatives in their capacities as such and not for the benefit of the holders of such Indebtedness;

(29)   Liens arising from the deposit of funds or securities in trust for the purpose of decreasing or defeasing Indebtedness so long as such deposit of funds or securities and such decreasing or defeasing of Indebtedness are permitted under the covenant described under "Certain covenants—Limitation on restricted payments";

(30)   Liens on the Equity Interests of Unrestricted Subsidiaries;

(31)   Liens on assets of Foreign Subsidiaries to secure Indebtedness of Foreign Subsidiaries;

(32)   Liens incurred to secure other First Lien Obligations or Permitted Second Lien Obligations permitted to be incurred pursuant to the first paragraph or clause (12)(b) of the second paragraph, in each case of the covenant described under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock"; *provided*, that such Indebtedness may only be First Lien Obligations if on a pro forma basis immediately after giving effect thereto, the First Lien Leverage Ratio for the Company and its Restricted Subsidiaries on a consolidated basis for the most recently ended four fiscal

quarters for which internal financial statements are available immediately preceding the date of such transaction is equal to or less than 2.75 to 1.0 *provided further*, that such Indebtedness may be Permitted Second Lien Obligations if, at the time of incurrence and after giving pro forma effect thereto, the Consolidated Secured Debt Ratio would be no greater than 4.0 to 1.00; and

(33)    Liens on the Collateral securing:

    (a)    the Second Lien Notes (other than Additional Notes), the Guarantees thereof and other Obligations under the Second Lien Indenture and in respect thereof and any obligations owing to the Second Lien Trustee or the Second Lien Agent under the Second Lien Indenture or the Second Lien Security Documents; and

    (b)    obligations under the First Lien Notes outstanding on the Issue Date and under clause (iii) or clause (iv) of the definition of "First Lien Obligations".

In each case set forth above, notwithstanding any stated limitation on the assets that may be subject to such Lien, a Permitted Lien on a specified asset or group or type of assets may include Liens on all improvements, additions and accessions thereto and all products and proceeds thereof, including dividends, distributions, interest and increases in respect thereof.

For purposes of this definition, the term "Indebtedness" shall be deemed to include interest on such Indebtedness.

"*Permitted Second Lien Obligations*" means the Second Lien Notes and any Indebtedness secured by a Lien incurred under clause (32) of the definition of Permitted Liens.

"*Person*" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"*Preferred Stock*" means any Equity Interest with preferential rights of payment of dividends or upon liquidation, dissolution, or winding up.

"*Purchase Money Obligations*" means any Indebtedness incurred to finance or refinance the acquisition, leasing, construction or improvement of property (real or personal) or assets (other than Capital Stock), and whether acquired through the direct acquisition of such property or assets, or otherwise.

"*Qualified Proceeds*" means assets that are used or useful in, or Capital Stock of any Person engaged in, a Similar Business; *provided* that the fair market value of any such assets or Capital Stock shall be determined by the Company in good faith.

"*Rating Agencies*" means Moody's and S&P or, if Moody's or S&P or both shall not make a rating on the Second Lien Notes publicly available, a nationally recognized statistical rating agency or agencies, as the case may be, selected by the Company which shall be substituted for Moody's or S&P or both, as the case may be.

"*Related Business Assets*" means assets (other than cash or Cash Equivalents) used or useful in a Similar Business, *provided* that any assets received by the Company or a Restricted Subsidiary in exchange for assets transferred by the Company or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

"*Release Date*" has the meaning ascribed to such term under "—Release Conditions."

"*Reorganization Plan*" means the Joint Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code of AMI and its debtor Subsidiaries (which does not include the Escrow Issuer and its direct parent) substantially consistent with the description of the Plan (as set forth in the Offering Memorandum).

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" means, at any time, any direct or indirect Subsidiary of the Company (including any Foreign Subsidiary) that is not then an Unrestricted Subsidiary; *provided*, *however*, that upon the occurrence of an Unrestricted Subsidiary ceasing to be an Unrestricted Subsidiary, such Subsidiary shall be included in the definition of "Restricted Subsidiary."

"*Reversion Date*" means, during any period of time during which the Company and the Restricted Subsidiaries are not subject to the covenants listed in the first paragraph under "Description of notes—Certain covenants" (the "Suspended Covenants") as a result of a Covenant Suspension, the date on which one or both of the Rating Agencies withdraws its Investment Grade Rating or downgrades the rating assigned to the Second Lien Notes below an Investment Grade Rating or a Default or Event of Default occurs and is continuing, and after which date the Suspended Covenants will thereafter be reinstated.

"*Revolving Facility*" means the Company's $40,000,000 senior secured first lien revolving credit facility pursuant to the Credit Agreement dated as of the Release Date.

"*S&P*" means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"*Sale and Lease-back Transaction*" means any arrangement providing for the leasing by the Company or any of its Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Company or such Restricted Subsidiary to a third Person in contemplation of such leasing.

"*SEC*" means the U.S. Securities and Exchange Commission.

"*Second Lien Collateral Agent*" has the meaning set forth in the first paragraph under the caption "—General."

"*Second Lien Escrow Agreement*" means the Second Lien Escrow Agreement dated as of the Issue Date of any Second Lien Notes issued prior to the Release Date, among the Escrow Issuer, AMO, the Second Lien Trustee and the Escrow Agent, as amended, supplemented, modified, extended, renewed, restated or replaced in whole or in part from time to time.

"*Second Lien Indenture*" has the meaning set forth in the first paragraph under the caption "—General."

"*Second Lien Intercreditor Agreement*" means an intercreditor agreement dated as of the Release Date among the Collateral Agent, the Revolving Collateral Agent, the Company, AMI and each other Guarantor and the Second Lien Collateral Agent.

"*Second Lien Notes*" has the meaning set forth in the first paragraph under the caption "—General."

"*Second Lien Security Documents*" means the security documents granting a security interest in any assets of any Person to secure the Obligations under the Second Lien Notes and the Guarantees as each may be amended, restated, supplemented or otherwise modified from time to time.

"*Second Lien Trustee*" has the meaning set forth in the first paragraph under the caption "—General."

"*Secured Hedge Agreements*" means each agreement that governs Hedging Obligations by and between the Company or any Guarantor, on the one hand, and any Hedge Bank from time to time, but only to the extent such agreement is permitted under the Credit Agreement and constitutes an "Obligation" (as such term is defined under the Credit Agreement); *provided, however*, that such Hedging Obligations shall not, solely by virtue of constituting an "Obligation" (as so defined), also constitute Indebtedness under the Credit Agreement.

"*Secured Hedging Obligations*" means (i) obligations (including obligations which, but for the automatic stay under Section 362(a) of the Bankruptcy Code, would become due) and liabilities, whether now existing or hereafter arising (including, without limitation, indemnities, fees and interest thereon and all interest and fees that accrue on or after the commencement of any Insolvency or Liquidation Proceeding at the rate provided for in the respective Secured Hedge Agreement, whether or not a claim for post-petition interest or fees is allowed in any such Insolvency or Liquidation Proceeding), of the Company or any Guarantor owing to any Hedge Bank, now existing or hereafter incurred under, or arising out of or in connection with, any Secured Hedge Agreement (including all such obligations and indebtedness under any guarantee of any such Secured Hedge Agreement to which the Company or such Guarantor is a party) and (ii) all performance and compliance obligations by the Company or any Guarantor under any Secured Hedge Agreement.

"*Secured Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries secured by a Lien.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"*Significant Subsidiary*" means any Restricted Subsidiary that would be a "significant subsidiary" as defined in Article 1, Rule 1-02 of Regulation S-X, promulgated pursuant to the Securities Act, as such regulation is in effect on the Release Date.

"*Similar Business*" means any business conducted or proposed to be conducted by the Company and its Restricted Subsidiaries on the Issue Date or any business that is similar, reasonably related, incidental or ancillary thereto.

"*Special Mandatory Redemption*" has the meaning ascribed to such term under "—Special Mandatory Redemption."

"*Special Mandatory Redemption Date*" has the meaning ascribed to such term under "—Special Mandatory Redemption."

"*Subsidiary* " means, with respect to any Person:

(1)    any corporation, association, or other business entity (other than a partnership, joint venture, limited liability company or similar entity) of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any

contingency) to vote in the election of directors, managers or trustees thereof is at the time of determination owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof or is consolidated under GAAP with such Person at such time; and

(2)   any partnership, joint venture, limited liability company or similar entity of which

(x)   more than 50% of the capital accounts, distribution rights, total equity and voting interests or general or limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof whether in the form of membership, general, special or limited partnership or otherwise, and

(y)   such Person or any Restricted Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Total Assets*" means the total consolidated of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of the Company.

"*Total Consolidated Indebtedness*" means the aggregate amount of all Indebtedness of the Company and its Restricted Subsidiaries, outstanding as of such date of determination, determined on a Consolidated basis, after giving effect to any incurrence of Indebtedness and the application of the proceeds therefrom giving rise to such determination (but excluding Indebtedness of the type described in clause (d) of the definition thereof and Indebtedness issued in payment of interest obligations), less up to $20.0 million of unrestricted cash and Cash Equivalents of the Company and its Restricted Subsidiaries as of such date of determination.

"*Trade Payables*" means, with respect to any Person, any accounts payable or any indebtedness or monetary obligation to trade creditors created, assumed or guaranteed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services.

"*Treasury Rate*" means, as of any Redemption Date, the yield to maturity as of such Redemption Date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the Redemption Date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the Redemption Date to December 15, 2013; *provided*, *however*, that if the period from the Redemption Date to December 15, 2013 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Unrestricted Subsidiary*" means:

(1)   any Subsidiary of the Company which at the time of determination is an Unrestricted Subsidiary (as designated by the Company, as provided below); and

(2)   any Subsidiary of an Unrestricted Subsidiary.

The Company may designate any Subsidiary of the Company (including any existing Subsidiary and any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary unless such Subsidiary or any of its Subsidiaries owns any Equity Interests or Indebtedness of, or owns or

holds any Lien on, any property of, the Company or any Subsidiary of the Company (other than solely any Subsidiary of the Subsidiary to be so designated); *provided* that

(1)    any Unrestricted Subsidiary must be an entity of which the Equity Interests entitled to cast at least a majority of the votes that may be cast by all Equity Interests having ordinary voting power for the election of directors or Persons performing a similar function are owned, directly or indirectly, by the Company;

(2)    such designation complies with the covenants described under "Certain covenants—Limitation on restricted payments"; and

(3)    each of:

(a)    the Subsidiary to be so designated; and

(b)    its Subsidiaries

has not at the time of designation, and does not thereafter, create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable with respect to any Indebtedness pursuant to which the lender has recourse to any of the assets of the Company or any Restricted Subsidiary (other than a pledge of the Equity Interests of such Unrestricted Subsidiary).

The Company may designate any Unrestricted Subsidiary to be a Restricted Subsidiary; *provided* that, immediately after giving effect to such designation, no Default shall have occurred and be continuing and the Company could incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Leverage Ratio test described in the first paragraph under "Certain covenants—Limitation on incurrence of indebtedness and issuance of disqualified stock and preferred stock."

Any such designation by the Company shall be notified by the Company to the Second Lien Trustee by promptly filing with the Second Lien Trustee a copy of the resolution of the board of directors of the Company or any committee thereof giving effect to such designation (which resolution must be certified by the Secretary or an Assistant Secretary of the Company) and an Officers' Certificate certifying that such designation complied with the foregoing provisions.

"*Unsecured Indebtedness*" means Indebtedness that is not Secured Indebtedness.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness, Disqualified Stock or Preferred Stock, as the case may be, at any date, the quotient obtained by dividing:

(1)    the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Disqualified Stock or Preferred Stock multiplied by the amount of such payment; by

(2)    the sum of all such payments.

"*Wholly Owned Subsidiary*" of any Person means a Subsidiary of such Person, 100% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

# Registration rights; exchange offer

The Escrow Issuer will enter into a registration rights agreement ( the "*registration rights agreement*"), with the initial purchasers on the closing date. On the Release Date, we and the guarantors will become a party to the registration rights agreement pursuant to a joinder agreement.

Pursuant to the registration rights agreement, Escrow Issuer will agree and, on the Release Date, we and the guarantors will agree, for the benefit of the holders of the notes to use commercially reasonable efforts to file with the SEC and cause to become effective a registration statement relating to an offer to exchange the notes for an issue of SEC-registered notes with terms identical to the notes (except that the exchange notes will not be subject to restrictions on transfer or to any increase in annual interest rate as described below).

When the SEC declares the exchange offer registration statement effective, we will offer the exchange notes (and related guarantees) in return for the notes. The exchange offer will remain open for at least 20 business days after the date we mail notice of the exchange offer to noteholders. For each note surrendered to us under the exchange offer, the noteholder will receive an exchange note of equal principal amount. Interest on each exchange note will accrue from the last interest payment date on which interest was paid on the notes or, if no interest has been paid on the notes, from the closing date.

If applicable interpretations of the staff of the SEC do not permit us to effect the exchange offer, we will use our commercially reasonable efforts to cause to become effective a shelf registration statement relating to resales of the notes and to keep that shelf registration statement effective until the one year anniversary of the date it becomes effective, or such shorter period that will terminate when all notes covered by the shelf registration statement became eligible for resale without regard to volume, manner of sale or other requirements contained in Rule 144 under the Securities Act (such period, the "*shelf registration period*"). We will, in the event of such a shelf registration, provide to each noteholder copies of a prospectus, notify each noteholder when the shelf registration statement has become effective and take certain other actions to permit resales of the notes. A noteholder that sells notes under the shelf registration statement generally will be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under the Securities Act in connection with those sales and will be bound by the provisions of the registration rights agreement that are applicable to such a noteholder (including certain indemnification obligations).

If (i) the exchange offer is not completed (or, if required, the shelf registration statement is not declared effective) on or before the date that is 450 days after the closing date, (ii) the exchange offer registration statement or shelf registration statement, if required, becomes effective and ceases to be usable for more than 60 days (whether or not consecutive) in any 12-month period, or (iii) a shelf registration statement covering resales of the notes has not been declared effective by the SEC within 450 days after the closing date or, subject to limited exceptions, such shelf registration statement ceases to be effective during the shelf registration period (each of clauses (i), (ii) and (iii), a "*registration default*"), the annual interest rate borne by the notes will be increased by 0.25% per annum, with respect to the first 90 days after the applicable registration default, and, if the applicable registration default has not been cured prior to the end of such 90-day period, by an additional 0.25% per annum for each subsequent 90-day period (up to a

maximum additional interest rate of 1.0% per annum), in each case, until the applicable registration default has been cured.

If we effect the exchange offer, we will be entitled to close the exchange offer 20 business days after its commencement, provided that we have accepted all notes validly surrendered in accordance with the terms of the exchange offer. Notes not tendered in the exchange offer shall bear interest at the rate set forth on the cover page of this offering memorandum and be subject to all the terms and conditions specified in the indenture, including transfer restrictions.

This summary of the provisions of the registration rights agreement does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the registration rights agreement, copies of which are available from us upon request.

# Book-entry settlement and clearance of notes

The notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A ("*Rule 144A Notes*"). The notes also may be offered and sold to persons other than U.S. persons in offshore transactions in reliance on Regulation S ("*Regulation S Notes*"). Except as set forth below, the notes will be issued in registered, global form in minimum denominations of $2,000 and integral multiples of $1,000 in excess of $2,000. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Each series of Rule 144A Notes initially will be represented by one or more global notes in registered form (collectively, "*Rule 144A Global Notes*"). The Regulation S Notes initially will be represented by one or more temporary global notes in registered form without interest coupons (collectively, the "*Regulation S Temporary Global Notes*"). Rule 144A Global Notes and Regulation S Global Notes are collectively referred to herein as "*Global Notes.*"

Global Notes will be deposited upon issuance with the trustee as custodian for The Depositary Trust Company ("*DTC*"), and registered in the name of DTC or in the name of Cede & Co., its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below. Through and including the 40th day after the later of the commencement of this offering and the closing of this offering (the "*Distribution Compliance Period*"), beneficial interests in the Regulation S Global Notes may be held only through the Euroclear System ("*Euroclear*") and Clearstream Banking, S.A. ("*Clearstream*") (as indirect participants in DTC), unless transferred to a person that takes delivery through a Rule 144A Global Note in accordance with the certification requirements described below under "—Exchanges Among Global Notes." Beneficial interests in Rule 144A Global Notes may not be exchanged for beneficial interests in Regulation S Global Notes at any time except in the limited circumstances described below. See "—Exchanges among Global Notes."

Except as set forth below, Global Notes may be transferred only to another nominee of DTC or to a successor of DTC or its nominee, in whole and not in part. Except in the limited circumstances described below, beneficial interests in Global Notes may not be exchanged for definitive notes in certificated form and owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of notes in certificated form. See "—Exchange of Global Notes for Certificated Notes."

Rule 144A Global Notes and Regulation S Global Notes (including beneficial interests in the securities they represent) will be subject to certain restrictions on transfer and will bear restrictive legends as described under "Transfer restrictions." In addition, transfers of beneficial interests in Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

## Depository procedures

The following description of the operations and procedures of DTC, Euroclear and Clearstream is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. The Company takes no responsibility for these operations and procedures and urges investors to contact the system or their participants directly to discuss these matters.

DTC has advised the us that DTC is a limited-purpose trust company organized under the laws of the State of New York, a "*banking organization*" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "*clearing corporation*" within the meaning of the Uniform Commercial Code and a "*clearing agency*" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC was created to hold securities for its participating organizations (collectively, the "*Participants*") and to facilitate the clearance and settlement of transactions in those securities between Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchaser), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "*Indirect Participants*"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

- upon deposit of the Global Notes, DTC will credit the accounts of Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of these interests in Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in Global Notes).

Investors in 144A Global Notes who are Participants in DTC's system may hold their interests therein directly through DTC. Investors in 144A Global Notes who are not Participants may hold their interests therein indirectly through organizations (including Euroclear and Clearstream) that are Participants in DTC. All interests in a Global Note may be subject to the procedures and requirements of DTC. Investors in Regulation S Global Notes must initially hold their interests therein through Euroclear or Clearstream, if they are participants in those systems, or indirectly through organizations that are participants. After the expiration of the Distribution Compliance Period (but not earlier), investors may also hold interests in Regulation S Global Notes through Participants in the DTC system other than Euroclear and Clearstream. Euroclear and Clearstream will hold interests in Regulation S Global Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositories, which are Euroclear Bank S.A./N.V., as operator of Euroclear, and Citibank, N.A., as operator of Clearstream, which in turn hold such interests in customers' securities accounts in the depositaries' names on the books of DTC. Interests in a Global Note held through Euroclear or Clearstream may be subject to the procedures and requirements of those systems (as well as to the procedures and requirements of DTC). The laws of some states require that certain persons take physical delivery in definitive form of securities that they own and the ability to transfer beneficial interests in a Global Note to Persons that are subject to those requirements will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge those interests to Persons that do not participate in the DTC system, or otherwise take actions in respect of those interests, may be affected by the lack of a physical certificate evidencing those interests.

Except as described below, owners of an interest in Global Notes will not have notes registered in their names, will not receive physical delivery of definitive notes in registered certificated form ("*Certificated Notes*") and will not be considered the registered owners or "Holders" thereof under the indenture for any purpose.

Payments in respect of the principal of and premium, interest and additional interest, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered Holder under the indenture. Under the terms of the indenture, the Company and the trustee will treat the persons in whose names notes, including Global Notes, are registered as the owners of such notes for the purpose of receiving payments and for all other purposes. Consequently, neither the Company, the trustee nor any agent of the Company or the trustee has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interests in Global Notes or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised the Company that its current practice, upon receipt of any payment in respect of securities such as the notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on that payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the trustee or the Company. Neither the Company nor the trustee will be liable for any delay by DTC or any of its Participants in identifying the beneficial owners of any notes, and the Company and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer restrictions," transfers between Participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same-day funds and transfers between participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the notes described herein, cross-market transfers between the Participants, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; however, such cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note from DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear participants and Clearstream participants may not deliver instructions directly to the depositories for Euroclear or Clearstream.

DTC has advised the Company that it will take any action permitted to be taken by a Holder of the notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of the portion of the aggregate principal amount of the notes as to which that Participant or those Participants has or have given the relevant direction. However, if there is an Event of Default under the notes, DTC reserves the right to exchange the applicable Global Notes for legended notes in certificated form, and to distribute those notes to its Participants.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures in order to facilitate transfers of interests in Global Notes among Participants, they are under no obligation to perform those procedures, and may discontinue or change those procedures at any time. Neither the Company nor the trustee nor any of their respective agents will have any responsibility for the performance by DTC, Euroclear, Clearstream or their respective Participants or Indirect Participants of their respective obligations under the rules and procedures governing their operations.

## Exchange of Global Notes for Certificated Notes

A Global Note is exchangeable for a Certificated Note if:

- DTC (a) notifies us that it is unwilling or unable to continue as depositary for the applicable Global Notes or (b) has ceased to be a clearing agency registered under the Exchange Act and, in each case, a successor depositary is not appointed; or
- there has occurred and is continuing a Default with respect to any of the notes.

In addition, beneficial interests in a Global Note may be exchanged for Certificated Notes upon prior written notice given to the trustee by or on behalf of DTC in accordance with the indenture. In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests in a Global Note will be registered in the names, and issued in any approved denominations, requested by or on behalf of the depositary (in accordance with its customary procedures) and will bear the restrictive legend referred to in "Transfer restrictions," unless that legend is not required by applicable law.

## Exchange of Certificated Notes for Global Notes

If Certificated Notes are issued in the future, they will not be exchangeable for beneficial interests in any Global Note unless the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the transfer will comply with the appropriate transfer restrictions applicable to the notes being transferred. See "Transfer restrictions."

## Exchanges among Global Notes

Prior to the expiration of the Distribution Compliance Period, beneficial interests in a Regulation S Global Note may be exchanged for beneficial interests in a Rule 144A Global Note of the same series only if:

- the exchange occurs in connection with a transfer of the notes pursuant to Rule 144A; and

- the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the notes are being transferred to a person:

- whom the transferor reasonably believes to be a qualified institutional buyer within the meaning of Rule 144A

- who is purchasing for its own account or the account of a qualified institutional buyer in a transaction meeting the requirements of Rule 144A; and

- in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Beneficial interests in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Note of the same series, whether before or after the expiration of the Distribution Compliance Period, only if the transferor first delivers to the trustee a written certificate (in the form provided in the indenture) to the effect that the transfer is being made in accordance with Rule 903 or Rule 904 of Regulation S or Rule 144.

Transfers involving exchanges of beneficial interests between a Regulation S Global Note and a Rule 144A Global Note will be effected in DTC. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect the changes in the principal amounts of the Regulation S Global Note and the Rule 144A Global Note, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a Person who takes delivery in the form of an interest in the other Global Note will, upon transfer, cease to be an interest in the original Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interest in the other Global Note.

## Same day settlement and payment

We will make payments in respect of notes represented by Global Notes, including payments of principal, premium, if any, and interest by wire transfer of immediately available funds to the accounts specified by the DTC or its nominee. We will make all payments of principal of and premium, if any, and interest on Certificated Notes by wire transfer of immediately available funds to the accounts specified by the Holders of the Certificated Notes or, if no account is specified, by mailing a check to each Holder's registered address. See "Description of notes—Principal, maturity and interest." Notes represented by Global Notes are expected to be eligible to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in securities represented by Global Notes will, therefore, be required by DTC to be settled in immediately available funds. Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant will be credited, and any such crediting will be reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised us that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a Euroclear or Clearstream participant to a Participant will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following DTC's settlement date.

# Transfer restrictions

The notes are subject to restrictions on transfer as summarized below. By purchasing the notes, you will be deemed to have made the following acknowledgements, representations to and agreements with us and the initial purchasers:

You acknowledge that:

- the notes will not be registered when issued under the Securities Act or any other securities laws and are being offered for resale in transactions that do not require registration under the Securities Act or any other securities laws; and

- unless registered, the notes may not be offered, sold or otherwise transferred except under an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act or any other applicable securities laws, and in each case in compliance with the conditions for transfer set forth below.

You represent that you are not acting on our behalf and that either:

- you are a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and are purchasing notes for your own account or for the account of another qualified institutional buyer, and you are aware that the initial purchasers are selling the notes to you in reliance on Rule 144A;

- you are not a "U.S. person" (as defined in Regulation S under the Securities Act) or purchasing for the account or benefit of a U.S. person, other than a distributor, and you are purchasing the notes in an offshore transaction in accordance with Regulation S; or

You acknowledge that neither we nor the initial purchasers nor any person representing us or the initial purchasers have made any representation to you with respect to us or the offering of the notes, other than the information contained in this offering memorandum. You represent that you are relying only on this offering memorandum in making your investment decision with respect to the notes. You agree that you have had access to such financial and other information concerning us and the notes as you have deemed necessary in connection with your decision to purchase the notes, including an opportunity to ask questions of and request information from us.

You represent that you are purchasing the notes for your own account, or for one or more investor accounts for which you are acting as a fiduciary or agent, in each case not with a view to, or for offer or sale in connection with, any distribution of the notes in violation of the Securities Act, subject to any requirement of law that the disposition of your property or the property of that investor account or accounts be at all times within your or their control and subject to your or their ability to resell the notes pursuant to Rule 144A or any other available exemption from registration under the Securities Act. You agree on your own behalf and on behalf of any investor account for which you are purchasing the notes and each subsequent holder of the notes by its acceptance of the notes will agree, that until the end of the Resale Restriction Period (as defined below), the notes may be offered, sold or otherwise transferred only:

(a)    to us;

(b)    under a registration statement that has been declared effective under the Securities Act;

(c)    for so long as the notes are eligible for resale under Rule 144A, to a person the seller reasonably believes is a qualified institutional buyer that is purchasing for its own account or for the account of another qualified institutional buyer and to whom notice is given that the transfer is being made in reliance on Rule 144A; or

(d)    through offers and sales that occur outside the United States within the meaning of Regulation S under the Securities Act.

The transfer restrictions do not permit resales in reliance on Rule 144 even if such exemption might otherwise be available.

Subject in each of the above cases to any requirement of law that the disposition of the seller's property or the property of an investor account or accounts be at all times within the seller or account's control.

You also acknowledge that:

- the above restrictions on resale will apply, with respect to the securities, from the closing date of the original issuance of the securities until the date that is one year (in the case of Rule 144A Notes) or 40 days (in the case of Regulation S Notes) after the later of the closing date of the original issuance of the notes and the last date that we or any of our affiliates was the owner of the notes or any predecessor of the notes (the "*Resale Restriction Period*"), and will not apply after the applicable Resale Restriction Period ends;

- if a holder of notes proposes to resell or transfer notes under clause (e) above before the applicable Resale Restriction Period ends, the seller must deliver to us and the trustee a letter from the purchaser in the form set forth in the indenture which must provide, among other things, that the purchaser is an institutional accredited investor that is acquiring the notes not for distribution in violation of the Securities Act;

- we reserve the right to require in connection with any offer, sale or other transfer of notes under clauses (d) and (e) above the delivery of an opinion of counsel, certifications and/or other information satisfactory to us;

- each note will contain a legend substantially to the following effect:

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR OR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE (THE "*RESALE RESTRICTION TERMINATION DATE*") THAT IS 40 DAYS IN THE CASE OF REGULATION S SECURITIES, AFTER THE LATER OF THE ORIGINAL ISSUE DATE OF THE SECURITIES AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY), ONLY (A) TO THE ISSUER, (B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, (C) FOR SO LONG AS THE SECURITIES

ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, TO A PERSON IT REASONABLY BELIEVES IS A "*QUALIFIED INSTITUTIONAL BUYER*" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A OR (D) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING OF REGULATION S UNDER THE SECURITIES ACT, SUBJECT TO THE ISSUER'S AND THE TRUSTEE'S RIGHT PRIOR TO ANY SUCH OFFER, SALE, ASSIGNMENT, TRANSFER OR OTHER DISPOSITION TO REQUIRE THE DELIVERY OF AN OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM. THIS LEGEND WILL BE REMOVED UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE.

You acknowledge that we, the initial purchasers and others will rely upon the truth and accuracy of the above acknowledgments, representations and agreements. You agree that if any of the acknowledgments, representations or agreements you are deemed to have made by your purchase of notes is no longer accurate, you will promptly notify us and the initial purchasers. If you are purchasing any notes as a fiduciary or agent for one or more investor accounts, you represent that you have sole investment discretion with respect to each of those accounts and that you have full power to make the above acknowledgments, representations and agreements on behalf of each account.

In addition, each purchaser and subsequent transferee of the notes (or any interest therein) will be deemed to have represented and warranted that either (i) no portion of the assets used by such purchaser or transferee to acquire and hold the notes constitutes assets of any employee benefit plan subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), any plan, individual retirement account or other arrangement that is subject to Section 4975 of the Code or provisions under any federal, state, local, non-U.S. or other laws, rules or regulations that are similar to such provisions of ERISA or the Code (collectively, "*Similar Laws*") or any entity whose underlying assets are considered to include "plan assets" of such plans, accounts and arrangements or (ii) the purchase and holding of the notes by such purchaser or transferee will not constitute a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or any similar violation under any applicable Similar Law.

You agree that you will give to each person to whom you transfer the notes notice of any restrictions on transfer of such notes including those described in the indenture under which such notes were issued and in this offering memorandum. No representation is being made as to the availability of the exemption provided by Rule 144 for resales of the notes.

# Certain U.S. federal income tax considerations

EACH NOTEHOLDER SHOULD CONSULT ITS TAX ADVISOR AS TO THE PARTICULAR TAX CONSEQUENCES TO SUCH HOLDER OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE NOTES, INCLUDING THE APPLICABILITY OF U.S. FEDERAL, STATE, OR LOCAL TAX LAWS OR NON-U.S. TAX LAWS.

The following summary describes certain U.S. federal income tax consequences of the purchase, ownership and disposition of the notes. Unless otherwise stated, this summary applies only to holders that purchase notes in the initial offering at their issue price and hold the notes as capital assets for tax purposes. The U.S. federal income tax treatment of a holder may vary depending on such holder's particular situation. This summary does not address all of the tax consequences that may be relevant to holders subject to special tax treatment such as, for example, insurance companies, expatriates, broker dealers, tax-exempt organizations, regulated investment companies, persons holding notes as part of a straddle, hedge, conversion transaction or other integrated investment, U.S. Holders (as defined below) subject to the alternative minimum tax or the unearned income Medicare tax partnership and their partners, and U.S. Holders whose functional currency is not the U.S. dollar. This summary is based on U.S. federal income tax law in effect as of the date hereof, which is subject to change or differing interpretation, possibly on a retroactive basis. This summary does not address any aspects of U.S. federal tax law other than income tax law, or any aspects of state, local, or foreign tax laws.

For purposes of this summary, a "*U.S. Holder*" means a beneficial owner of notes who or that is for U.S. federal income tax purposes: (i) an individual that is a citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if (x) a court within the United States is able to exercise primary supervision over its administration and (y) one or more United States persons have the authority to control all of the substantial decisions of such trust.

For purposes of this summary, a "*Non-U.S. Holder*" means a beneficial owner of notes that is neither a partnership (or other entity treated as a partnership for U.S. federal income tax purposes) nor a U.S. Holder. Each holder of notes that is a partnership or any partner in such a partnership is urged to consult its tax advisor about the U.S. federal income tax consequences of the purchase, ownership and disposition of the notes.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER OF A NOTE IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY A HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDER UNDER THE INTERNAL REVENUE CODE OF 1986; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY US OF THE NOTES; AND (C) A HOLDER OF A NOTE SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## Effect of certain contingencies

In certain circumstances, we may be obligated to pay amounts in excess of stated interest or principal on the notes or to redeem the notes in advance of their stated maturity. See,

"Description of first lien notes—Optional redemption—Repurchase at the option of holders," "Description of second lien notes—Optional redemption—Repurchase of the option of holders" and "Registration rights; exchange offer." Our obligation to pay such excess amounts or redeem the notes in advance of their stated maturity may implicate the provisions of the Treasury regulations relating to "contingent payment debt instruments." If the notes were characterized as contingent payment debt instruments, holders might, among other things, be required to accrue interest income at a higher rate than the stated interest rate on the notes and to treat any gain recognized on the sale or other disposition of a note as ordinary income rather than as capital gain.

Under the contingent payment debt instrument regulations, however, one or more contingencies will not cause a debt instrument to be treated as a contingent payment debt instrument if, as of the issue date, each such contingency is "remote" or is considered to be "incidental." We believe and intend to take the position that the foregoing contingencies should be treated as remote and/or incidental. Our position is binding on a holder, unless the holder discloses in the proper manner to the IRS that it is taking a different position. However, this determination is inherently factual and we can give you no assurance that our position would be sustained if challenged by the IRS. A successful challenge of this position by the IRS could require a holder to currently accrue income on the notes at a rate in excess of the stated interest and could cause the gain from the sale or other disposition of a note to be treated as ordinary income, rather than capital gain. In the event a contingency occurs, it would affect the amount and timing of income recognized by holders. If any contingent amounts are in fact paid, holders will be required to recognize such amounts as income.

This disclosure assumes that the notes will not be considered contingent payment debt instruments. Holders are urged to consult their own tax advisors regarding the potential application of the contingent payment debt regulations to the notes and the consequences thereof.

## Tax consequences of escrow arrangement

The notes will be issued by the Escrow Issuer. If the escrow release conditions are satisfied, the Escrow Issuer will merge with and into AMO and AMO will assume all of the obligations of the Escrow Issuer. See the cover of this offering memorandum and "Description of first lien notes—Escrow of proceeds—Release conditions" and "Description of second lien notes—Escrow of proceeds—Release conditions." Although the matter is not free from doubt, we intend to take the position that the assumption of the notes by AMO will not constitute a "significant modification" of the notes and therefore there should be no tax consequences to holders. The IRS could, however, seek to treat the assumption as resulting in a taxable exchange by a holder of its notes for new notes, as described below under "U.S. Holders—Disposition of the notes. The "amount realized" for the "new" notes would equal the "issue price" of the "new" notes, which would be (i) the fair market value of the "new" notes if the "new" notes or the old notes are treated as "publicly traded" for United States federal income tax purposes and (ii) the stated principal amount of the "new" notes if neither the "new" notes nor the old notes are "publicly traded" for United States federal income tax purposes. In addition, a holder could be treated as acquiring the "new" notes with original issue discount for U.S. federal income tax purposes. Holders should consult with their own tax advisors regarding the tax consequences to them of the assumption by AMO of the Escrow Issuer's obligations under the notes. The remainder of this

discussion assumes that the foregoing merger will not result in a significant modification of the notes for U.S. federal income tax purposes.

### Exchange of notes for exchange notes

The exchange of a note for an exchange note pursuant to the exchange offer (see "Registration rights; exchange offer") will not constitute a taxable exchange for U.S. federal income tax purposes. Holders will not recognize any gain or loss upon the receipt of an exchange note, and holders will be required to continue to include interest on the exchange note in gross income in the manner and to the extent described herein. A holder's holding period for an exchange note will include the holding period for the note exchanged therefor. A holder's basis in the exchange note immediately after the exchange will be the same as its basis in such note immediately before the exchange.

## U.S. Holders

### Interest

Stated interest on the notes generally will be taxable to U.S. Holders as ordinary income at the time that such payments are received or accrued, in accordance with such U.S. Holder's method of tax accounting.

### Disposition of the notes

Upon the sale, exchange, redemption retirement or other taxable disposition of a note, a U.S. Holder generally will recognize capital gain or loss in an amount equal to the difference between (1) the sum of cash and the fair market value of all other property received on such disposition (other than an amount attributable to accrued stated interest, which will be taxable as ordinary income to the extent not previously included in income) and (2) such U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a note will, in general, be its initial basis in the note. Any gain or loss a U.S. Holder recognizes will be capital gain or loss and will be long-term capital gain or loss if at the time of sale, exchange, retirement or other disposition, the note has been held for more than one year. Capital gains of non-corporate U.S. holders (including individuals) derived with respect to capital assets held for more than one year are eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### Medicare contribution tax on unearned income

For taxable years beginning after December 31, 2012, a 3.8% Medicare tax will generally be imposed on the "net investment income" of U.S. Holders that are individuals, estates or trusts. Net investment income includes, among other things, interest income or capital gains not derived from the conduct of a nonpassive trade or business. Payments of interest on, and the recognition of capital gain from the disposition of, the notes are expected to constitute net investment income.

### Information reporting and backup withholding for U.S. holders

Information reporting requirements generally will apply to payments to U.S. Holders (other than certain exempt recipients) within the United States of interest (including any OID) on the notes

and proceeds from the sale, exchange, retirement, redemption or other taxable disposition of a note, including payments made by wire transfer from outside the United States to an account the holder maintains in the United States and to the payment of proceeds from the sale of a note effected at a United States office of a broker.

Backup withholding will apply to such reportable amounts if such U.S. Holders fail (i) to furnish a proper taxpayer identification number, (ii) to certify that such holders are not subject to backup withholding, or (iii) to otherwise comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules generally may be claimed as a credit against the U.S. Holder's U.S. federal income tax liability and may entitle such U.S. Holder to a credit or refund provided that the required information is furnished to the IRS. U.S. Holders should consult their own tax advisors regarding their qualification for exemption from backup withholding and the procedure for obtaining any applicable exemption.

## Non-U.S. Holders

U.S. federal income or withholding tax generally will not apply to a payment of interest on a note to a Non-U.S. Holder, provided that (i) such interest is not effectively connected with the conduct of a trade or business in the United States by such Non-U.S. Holder and (ii) such Non-U.S. Holder (A) does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote, (B) is not a controlled foreign corporation related to us, directly or indirectly, through stock ownership, and (C) is not considered a bank receiving interest pursuant to a loan agreement entered into in the ordinary course of its trade or business for purposes of the applicable U.S. federal income tax rules and (D) satisfies certain certification requirements. Such certification requirements generally will be fulfilled if the Non-U.S. Holder provides to the Debtors or their paying agent an IRS Form W-8BEN (or successor form), signed under penalties of perjury, which includes the Non-U.S. Holder's name and address and a certification as to the Non-U.S. Holder's non-U.S. status, or a securities clearing organization or certain other financial institutions holding the Note on behalf of the Non-U.S. Holder certifies on IRS Form W-8IMY (or successor form), under penalties of perjury, that such certification has been received by it, and furnishes us or our paying agent with a copy thereof. Other methods might be available to satisfy the certification requirements described above, depending on a Non-U.S. Holder's particular circumstances. In addition, we or our paying agent must not have actual knowledge or reason to know that the beneficial owner of the note is a United States person. If all of the foregoing requirements are not met, the gross amount of payments of interest that do not qualify for the exception from withholding described above will be subject to U.S. withholding tax at a rate of thirty (30) percent (or lower applicable treaty rate, provided that certain certification requirements are met) subject to the discussion below regarding Non-U.S. Holders that are engaged in a trade or business in the United States.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax , unless on the receipt of payments of principal on a note, or on any gain realized on the sale, exchange, retirement or other disposition of such note, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purpose sand, if a treaty applies (and the holder complies with applicable certification requirements to claim treaty benefits) is attributable to a permanent establishment maintained by the Non-U.S. Holder within the United States, or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

If a Non-U.S. Holder is engaged in a trade or business in the U.S. and if interest on the notes or gain or loss realized on the disposition are "effectively connected" with the conduct of such U.S. trade or business, any such interest or gain realized by the Non-U.S. Holder will be subject to full net-basis U.S. federal income tax in the same manner as if the Non-U.S. Holder were a U.S. Holder, unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a foreign corporation, the Non-U.S. Holder may also be subject to a "branch profits tax" on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Even though any such effectively connected income would be subject to income tax, and might also be subject to branch profits tax, it would not be subject to withholding tax if the Non-U.S. Holder satisfied the applicable certification requirements described above. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules with their tax advisors.

If a Non-U.S. Holder is described in clause (ii) above, such Non-U.S. Holder will be subject to U.S. federal income tax at a 30% rate (or, if applicable, a lower treaty) on capital gains from U.S. sources, which may be offset by certain capital losses.

### *Information reporting and backup withholding for Non-U.S. holders*

In general, payments of interest and the proceeds of the sale, exchange, retirement or other disposition of the notes payable by a United States paying agent or other United States intermediary to a Non-U.S. Holder will be subject to information reporting. Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides. In addition, backup withholding will generally apply to these payments to a Non-U.S. Holder if such Non-U.S. Holder fails to provide the certification on IRS Form W-8BEN (or IRS Form W-8ECI, if applicable) or otherwise does not provide evidence of exempt status. Any amount paid as backup withholding will be creditable against such Non-U.S. Holder's U.S. federal income tax liability, provided that the required information is timely furnished to the IRS.

Withholding and backup withholding are not an additional taxes. Any amounts withheld from a payment to a Non-U.S. Holder under the withholding or backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting, withholding and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

# Plan of distribution

Subject to the terms and conditions in the purchase agreement between the Escrow Issuer and the initial purchasers, the Escrow Issuer has agreed to sell to the initial purchasers, and the initial purchasers, severally and not jointly, have agreed to purchase from the Escrow Issuer, the entire principal amount of the notes. The purchase agreement provides that the initial purchasers will purchase all of the notes if any of them are purchased.

The initial purchasers initially propose to offer the notes for resale at the issue price that appears on the cover of this offering memorandum. After the initial offering, the initial purchasers may change the offering price and any other selling terms. The initial purchasers may offer and sell notes through certain of their affiliates.

In the purchase agreement, we have agreed that:

- we will not offer or sell any of our debt securities for a period of 90 days after the Release Date without the prior consent of J.P. Morgan Securities LLC; and

- we will indemnify the initial purchasers against certain liabilities, including liabilities under the Securities Act, or contribute to payments that the initial purchasers may be required to make in respect of those liabilities.

The notes have not been registered under the Securities Act or the securities laws of any other place. Accordingly, the notes are subject to restrictions on resale and transfer as described under "Transfer restrictions." In the purchase agreement, the initial purchasers have agreed that:

- the notes may not be offered or sold within the United States or to U.S. persons except pursuant to an exemption from the registration requirements of the Securities Act or in transactions not subject to those registration requirements; and

- during the initial distribution of the notes, it will offer or sell securities only to qualified institutional buyers in compliance with Rule 144A and outside the United States in compliance with Regulation S.

In addition, until 40 days following the commencement of this offering, an offer or sale of notes within the United States by a dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act unless the dealer makes the offer or sale in compliance with Rule 144A or another exemption from registration under the Securities Act.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "*Relevant Member State*"), each initial purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "*Relevant Implementation Date*") it has not made and will not make an offer of the notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time:

- to legal entities which are authorized or regulated to operate in the financial markets, or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year, (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

- In any other circumstances which do not require the publication by us of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "*offer of securities to the public*" in relation to any of the securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe for the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, and the expression "*Prospectus Directive*" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

In the purchase agreement, each initial purchaser has also agreed that:

- It has complied and will comply with all applicable provisions of the Financial Services Act 2000 with respect to anything done by them in relation to the notes in, from or otherwise involving the United Kingdom; and

- It has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000) received by them in connection with the issue or sale of any notes in circumstances in which Section 21(1) of the Financial Services and Markets Act 2000 does not apply to us.

The notes are new issues of securities, and there is currently no established trading market for the notes. In addition, the notes are subject to certain restrictions on resale and transfer as described under "Transfer restrictions." We do not intend to apply for the notes to be listed on any securities exchange or to arrange for the securities to be quoted on any quotation system. The initial purchasers have advised us that they intend to make a market in the notes, but that they are not obligated to do so. The initial purchasers may discontinue any market making in the notes at any time in their sole discretion. Accordingly, we cannot assure you that a liquid trading market will develop for the notes, that you will be able to sell your notes at a particular time or that the prices that you receive when you sell will be favorable.

You should be aware that the laws and practices of certain countries require investors to pay stamp taxes and other charges in connection with purchases of securities.

In connection with the offering of the notes, the initial purchasers may engage in overallotment, stabilizing transactions and syndicate covering transactions. Overallotment involves sales in excess of the offering size, which creates a short position for the initial purchasers. Stabilizing transactions involve bids to purchase the notes in the open market for the purpose of pegging, fixing or maintaining the price of the notes. Syndicate covering transactions involve purchases of the notes in the open market after the distribution has been completed in order to cover short positions. Stabilizing transactions and syndicate covering transactions may cause the price of the notes to be higher than it would otherwise be in the absence of those transactions. If the initial purchasers engage in stabilizing or syndicate covering transactions, they may discontinue them at any time.

We expect that delivery of the securities will be made to investors on or about December 1, 2010, which will be the tenth business day following the time of sale. Under Rule 15c6-1 of the Exchange Act, trades in secondary markets generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers will need to make appropriate arrangements to deliver funds on the tenth business day following the date of this offering memorandum in order to prevent a failed settlement.

The initial purchasers and their affiliates perform various investment banking, financial advisory and commercial banking services for us and our affiliates from time to time, for which they receive customary fees. JPMorgan Chase Bank, N.A., an affiliate of J.P. Morgan Securities LLC, is expected to be the administrative agent and a lender our new revolving credit facility and affiliates of each of the other initial purchasers are expected to be lenders under our new revolving credit facility. Affiliates of certain of the initial purchasers are lenders under our pre-petition credit agreement and will be receiving a portion of the proceeds of this offering in connection with the repayment of that credit agreement upon our emergence from bankruptcy.

# Legal matters

The validity of the notes will be passed upon for us by Akin Gump Strauss Hauer & Feld LLP, New York, New York. Certain legal matters relating to the notes will be passed upon for the initial purchasers by Cahill Gordon & Reindel LLP, New York, New York.

# Independent auditors

The consolidated balance sheets of American Media Operations, Inc. and subsidiaries as of March 31, 2010 and 2009, and the related consolidated statements of income (loss), stockholder's deficit and comprehensive income (loss), and cash flows for each of the three fiscal years in the period ended March 31, 2010, included in this offering memorandum have been audited by Deloitte & Touche LLP, independent auditors, as stated in their report appearing herein which report expresses an unqualified opinion on the consolidated financial statements and includes an explanatory paragraph referring to the substantial doubt regarding the Company's ability to continue as a going concern.

# American Media Operations, Inc.
# Index to consolidated financial statements

**Audited consolidated financial statements**

Independent auditors' report ................................................................................................................................ F-2

Consolidated balance sheets as of March 31, 2010 and 2009 ................................................................................ F-3

Consolidated statements of income (loss) for the three fiscal years in the period ended March 31, 2010 ................ F-4

Consolidated statements of stockholder's deficit and comprehensive income (loss) for the three fiscal years in the period ended March 31, 2010 ................................................................................................................................ F-5

Consolidated statements of cash flows for the three fiscal years in the period ended March 31, 2010 ..................... F-6

Notes to consolidated financial statements .......................................................................................................... F-7

**Unaudited consolidated financial statements**

Unaudited condensed consolidated balance sheets as of September 30, 2010 and March 31, 2010 ........................ F-50

Unaudited condensed consolidated statements of income (loss) for the fiscal quarters ended September 30, 2010 and 2009 ............................................................................................................................................................... F-51

Unaudited condensed consolidated statements of cash flows for the six months ended September 30, 2010 and 2009 ............................................................................................................................................................... F-52

Notes to unaudited condensed consolidated financial statements .......................................................................... F-53

# Independent auditors' report

To the Board of Directors and Stockholder of American Media Operations, Inc.:
Boca Raton, Florida

We have audited the accompanying consolidated balance sheets of American Media Operations, Inc., a wholly owned subsidiary of American Media, Inc., and subsidiaries (the "Company") as of March 31, 2010 and 2009, and the related consolidated statements of income (loss), stockholder's deficit and comprehensive income (loss), and cash flows for each of the three fiscal years in the period ended March 31, 2010. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of March 31, 2010 and 2009, and the results of its operations and its cash flows for each of the three fiscal years in the period ended March 31, 2010, in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements for the year ended March 31, 2010 have been prepared assuming that the Company will continue as a going concern. As discussed in Note 19 to the consolidated financial statements, the Company's intention to engage in a financial restructuring through solicitation of a prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code raises substantial doubt about its ability to continue as a going concern. Management's plans concerning these matters are also discussed in Note 19 to the consolidated financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ DELOITTE & TOUCHE LLP
Certified Public Accountants

Boca Raton, Florida
June 9, 2010 (October 29, 2010 as to Note 19)

# American Media Operations, Inc. and subsidiaries
# Consolidated balance sheets

| (in thousands, except share information) | | March 31, 2010 | March 31, 2009 |
|---|---|---|---|
| **ASSETS** | | | |
| **CURRENT ASSETS:** | | | |
| Cash and cash equivalents | $ | 6,606 | $ 18,995 |
| Trade receivables, net of allowance for doubtful accounts of $5,359 and $7,050, respectively | | 48,503 | 61,276 |
| Inventories | | 13,448 | 18,263 |
| Prepaid expenses and other current assets | | 20,232 | 15,782 |
| Total current assets | | 88,789 | 114,316 |
| **PROPERTY AND EQUIPMENT, NET:** | | | |
| Leasehold improvements | | 1,824 | 1,818 |
| Furniture, fixtures and equipment | | 31,799 | 28,876 |
| Less—accumulated depreciation | | (27,129) | (24,432) |
| Total property and equipment, net | | 6,494 | 6,262 |
| **OTHER ASSETS:** | | | |
| Deferred debt costs, net | | 10,938 | 13,803 |
| Deferred rack costs, net | | 8,461 | 6,686 |
| Other long-term assets | | 3,257 | 2,311 |
| Total other assets | | 22,656 | 22,800 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | | |
| Goodwill | | 230,885 | 245,448 |
| Other identified intangibles, net of accumulated amortization of $104,786 and $158,606, respectively | | 271,635 | 278,017 |
| Total goodwill and other identified intangible assets | | 502,520 | 523,465 |
| **TOTAL ASSETS** | $ | 620,459 | $ 666,843 |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | | | |
| **CURRENT LIABILITIES:** | | | |
| Term loan | $ | 4,500 | $ 4,500 |
| Senior subordinated notes, net (including $32.0 million and $15.5 million in future interest payments as of March 31, 2010 and March 31, 2009—See Note 7) | | 39,458 | 29,542 |
| Accounts payable | | 15,679 | 27,399 |
| Accrued expenses and other liabilities | | 38,555 | 51,796 |
| Accrued interest | | 1,433 | 5,068 |
| Deferred revenues | | 36,929 | 37,742 |
| Total current liabilities | | 136,554 | 156,047 |
| **NON-CURRENT LIABILITIES:** | | | |
| Term loan and revolving credit facility | | 449,371 | 482,871 |
| Senior subordinated notes, net (including $166.4 million and $216.7 million in future interest payments as of March 31, 2010 and March 31, 2009—See Note 7) | | 521,151 | 545,078 |
| Other non-current liabilities | | 9,083 | 6,174 |
| Deferred income taxes | | 82,734 | 58,376 |
| Total liabilities | | 1,198,893 | 1,248,546 |
| **COMMITMENTS AND CONTINGENCIES (Note 11)** | | | |
| **STOCKHOLDER'S DEFICIT:** | | | |
| Common stock, $0.0001 par value; 7,500,000 shares authorized; 6,284,360 issued and outstanding as of March 31, 2010; 5,994,411 shares issued and outstanding as sof March 31, 2009 | | 1 | 1 |
| Additional paid-in capital | | 282,747 | 282,695 |
| Accumulated deficit | | (861,002) | (864,220) |
| Accumulated other comprehensive loss | | (180) | (179) |
| Total stockholder's deficit | | (578,434) | (581,703) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S DEFICIT** | $ | 620,459 | $ 666,843 |

*The accompanying notes to the consolidated financial statements are an integral part of these consolidated financial statements.*

# American Media Operations, Inc. and subsidiaries
# Consolidated statements of income (Loss)
### For the three fiscal years in the period ended March 31, 2010

| (in thousands) | March 31, 2010 | March 31, 2009 | March 31, 2008 |
|---|---|---|---|
| | | Fiscal year ended | |
| OPERATING REVENUES: | | | |
| Circulation | $246,214 | $ 254,959 | $271,717 |
| Advertising | 134,281 | 171,127 | 181,494 |
| Other | 31,935 | 35,563 | 37,563 |
| Total operating revenues | 412,430 | 461,649 | 490,774 |
| OPERATING EXPENSES: | | | |
| Editorial | 44,307 | 48,779 | 51,527 |
| Production | 119,660 | 141,997 | 138,251 |
| Distribution, circulation and other cost of sales | 71,893 | 86,225 | 86,859 |
| Selling, general and administrative | 71,365 | 84,756 | 103,398 |
| Depreciation and amortization | 6,633 | 9,573 | 12,588 |
| Provision for impairment of intangible assets and goodwill | 17,595 | 217,350 | 31,097 |
| Total operating expenses | 331,453 | 588,680 | 423,720 |
| OPERATING INCOME (LOSS) | 80,977 | (127,031) | 67,054 |
| OTHER (EXPENSE) INCOME: | | | |
| Interest expense | (50,601) | (85,251) | (99,042) |
| Senior subordinated notes issued (Note 7) | — | — | (17,109) |
| Amortization of deferred debt costs | (3,893) | (9,849) | (10,926) |
| Other income, net | — | 537 | 2,522 |
| Gain on extinguishment of debt (Note 7) | — | 4,858 | — |
| Total other expense | (54,494) | (89,705) | (124,555) |
| INCOME (LOSS) BEFORE PROVISION (BENEFIT) FOR INCOME TAXES AND INCOME (LOSS) FROM DISCONTINUED OPERATIONS | 26,483 | (216,736) | (57,501) |
| PROVISION (BENEFIT) FOR INCOME TAXES | 22,756 | (33,339) | 3,284 |
| INCOME (LOSS) FROM CONTINUING OPERATIONS | 3,727 | (183,397) | (60,785) |
| INCOME (LOSS) FROM DISCONTINUED OPERATIONS, NET OF INCOME TAXES | — | 500 | (685) |
| NET INCOME (LOSS) | 3,727 | (182,897) | (61,470) |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (509) | (426) | (424) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC AND SUBSIDIARIES | $ 3,218 | $ (183,323) | $ (61,894) |

*The accompanying notes to the consolidated financial statements are an integral part of these consolidated financial statements.*

# American Media Operations, Inc. and subsidiaries
# Consolidated statements of stockholder's deficit
# and comprehensive income (Loss)
### For the three fiscal years in the period ended March 31, 2010

| (in thousands, except share information) | Common stock | | Additional paid-in capital | Accumulated deficit | Accumulated other comprehensive income (Loss) | Total stockholder's deficit | Comprehensive income (Loss) |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balances, March 31, 2007 | 7,508 | $ 2 | $ 281,671 | $(616,258) | $ 168 | $ (334,417) | |
| Net loss | — | — | — | (61,470) | — | (61,470) | $ (61,470) |
| Foreign currency translation | — | — | — | — | (26) | (26) | (26) |
| Impact of adoption of ASC 740 on accumulated deficit on April 1, 2007 | — | — | — | (2,745) | — | (2,745) | — |
| Comprehensive loss | — | — | — | — | — | — | (61,496) |
| Comprehensive income attributable to the noncontrolling interest | — | — | — | 424 | — | 424 | 424 |
| Comprehensive loss attributable to American Media Operations, Inc. and Subsidiaries | | | | | | | $ (61,920) |
| Balances, March 31, 2008 | 7,508 | 2 | 281,671 | (680,897) | 142 | (399,082) | |
| Net loss | — | — | — | (182,897) | — | (182,897) | $(182,897) |
| Foreign currency translation | — | — | — | — | (321) | (321) | (321) |
| Retirement of common stock | (7,508) | (2) | — | — | — | (2) | — |
| Issuance of common stock | 5,994,411 | 1 | 1,024 | — | — | 1,025 | |
| Comprehensive loss | — | — | — | — | — | — | (183,218) |
| Comprehensive income attributable to the noncontrolling interest | — | — | — | 426 | — | 426 | 426 |
| Comprehensive loss attributable to American Media Operations, Inc. and Subsidiaries | | | | | | | $(183,644) |
| Balances, March 31, 2009 | 5,994,411 | 1 | 282,695 | (864,220) | (179) | (581,703) | |
| Net income | — | — | — | 3,727 | — | 3,727 | $ 3,727 |
| Foreign currency translation | — | — | — | — | (1) | (1) | (1) |
| Issuance of common stock | 289,949 | — | 52 | — | — | 52 | |
| Comprehensive income | — | — | — | — | — | — | 3,726 |
| Comprehensive income attributable to the noncontrolling interest | — | — | — | 509 | — | 509 | 509 |
| Comprehensive income attributable to American Media Operations, Inc. and Subsidiaries | | | | | | | $ 3,217 |
| Balances, March 31, 2010 | 6,284,360 | $ 1 | $ 282,747 | $(861,002) | $ (180) | $ (578,434) | |

*The accompanying notes to the consolidated financial statements are an integral part of these consolidated financial statements.*

# American Media Operations, Inc. and subsidiaries
# Consolidated statements of cash flows
### For the three fiscal years in the period ended March 31, 2010

| (in thousands) | March 31, 2010 | March 31, 2009 | Fiscal year ended March 31, 2008 |
|---|---|---|---|
| Cash Flows from Operating Activities: | | | |
| Net income (loss) | $ 3,727 | $ (182,897) | $ (61,470) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation of property and equipment | 3,283 | 2,973 | 4,233 |
| Amortization of other identified intangibles | 3,350 | 6,600 | 8,355 |
| Gain on extinguishment of debt (Note 7) | — | (4,858) | — |
| Provision for impairment of intangible assets and goodwill | 17,595 | 217,350 | 31,097 |
| Senior subordinated notes issued (Note 7) | — | — | 17,109 |
| Provision for bad debts | 1,612 | 2,248 | 2,898 |
| Amortization of deferred debt costs | 3,893 | 9,849 | 10,926 |
| Amortization of deferred rack costs | 5,892 | 11,232 | 10,810 |
| Net income attributable to the noncontrolling interest | (509) | (426) | (424) |
| Write-off of deferred rack costs and property and equipment | — | — | 195 |
| Provision for excess and obsolete inventory | — | 94 | 24 |
| Deferred income tax provision (benefit) | 22,273 | (31,225) | 2,490 |
| Management fee payable | — | (4,000) | — |
| Other | (1,121) | 280 | (296) |
| Decrease (increase) in operating assets: | | | |
| Trade receivables | 11,161 | (6,450) | (11,470) |
| Inventories | 4,815 | 10,272 | (5,128) |
| Prepaid expenses and other current assets | (4,450) | (1,553) | 508 |
| Deferred rack costs | (7,667) | (10,169) | (6,916) |
| Other long-term assets | (946) | 439 | (142) |
| Increase (decrease) in operating liabilities: | | | |
| Accounts payable | (11,720) | (15,112) | 9,322 |
| Accrued expenses and other current liabilities | (9,140) | (10,689) | 1,130 |
| Accrued interest | (3,635) | 18,897 | (7,489) |
| Deferred revenues | (813) | (3,924) | (953) |
| Other non-current liabilities | 2,650 | 833 | — |
| Management fee payable | — | — | 2,000 |
| Total adjustments and changes in operating assets and liabilities | 36,523 | 192,661 | 68,279 |
| Net cash provided by operating activities | 40,250 | 9,764 | 6,809 |
| Cash Flows from Investing Activities: | | | |
| Purchases of property and equipment | (4,571) | (2,972) | (2,350) |
| Proceeds from sale of assets | 649 | 45 | 408 |
| Proceeds from sale of discontinued operations | — | 500 | — |
| Investment in Mr. Olympia, LLC | (300) | (300) | (300) |
| Net cash used in investing activities | (4,222) | (2,727) | (2,242) |
| Cash Flows from Financing Activities: | | | |
| Proceeds from revolving credit facility | 6,000 | 74,000 | — |
| Term loan and revolving credit facility principal repayments | (39,500) | (96,629) | — |
| Payment of consent fees | — | (6,624) | — |
| Payment to retire senior subordinated indebtedness | (14,025) | — | — |
| Payment of restructuring costs, net | — | (407) | — |
| Payment of debt costs | (1,685) | (22,517) | (942) |
| Net cash used in financing activities | (49,210) | (52,177) | (942) |
| Effect of exchange rate changes on cash | 793 | (31) | 127 |
| Net (Decrease) Increase in Cash and Cash Equivalents | (12,389) | (45,171) | 3,752 |
| Cash and Cash Equivalents, Beginning of Period | 18,995 | 64,166 | 60,414 |
| Cash and Cash Equivalents, End of Period | $ 6,606 | $ 18,995 | $ 64,166 |
| Supplemental Disclosures of Cash Flow and Non-Cash Financing Activities Information: | | | |
| Cash paid during the period for- | | | |
| Income taxes | $ 1,934 | $ 528 | $ 534 |
| Interest | $ 53,473 | $ 63,983 | $106,057 |
| Non-cash property and equipment (incurred but not paid) | $ 75 | $ 1,134 | $ — |
| Non-cash debt costs (incurred but not paid) | $ 650 | $ 7,610 | $ 148 |
| Non-cash portion of debt extinguishment | $ — | $ 112,159 | $ — |
| Non-cash portion of debt issuance | $ 33,791 | $ 12,058 | $ — |

*The accompanying notes to the consolidated financial statements are an integral part of these consolidated financial statements.*

# American Media Operations, Inc. and subsidiaries
# Notes to consolidated financial statements

## (1) Description of business, basis of presentation and summary of significant accounting policies

### Description of business and basis of presentation

The Consolidated Financial Statements include the accounts of American Media Operations, Inc. and its subsidiaries (collectively, the "Company"). The Company is a wholly owned subsidiary of American Media, Inc. ("Media"). The Company consolidates all majority owned subsidiaries and investments in entities in which it has a controlling influence. Non-majority owned investments are accounted for using the equity method when the Company has the ability to significantly influence the operating decisions of the issuer. When the Company does not have the ability to significantly influence the operating decisions of an issuer, the cost method is used. All intercompany accounts and transactions have been eliminated in consolidation.

The accompanying Consolidated Financial Statements have been prepared assuming that the Company is a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business. See Note 19, "Subsequent Events."

On January 30, 2009, the Company successfully completed its cash tender offers and receipt of requisite consents in the related consent solicitations in respect of its then outstanding senior subordinated notes, consisting of (1) $414.5 million aggregate principal amount of 10 $1/4$% Series B Senior Subordinated Notes due 2009 (the "2009 Notes") and (2) $155.5 million aggregate principal amount of 8 $7/8$% Senior Subordinated Notes due 2011 (the "2011 Notes" and, together with the 2009 Notes, the "Prior Notes"). $400.5 million of the 2009 Notes and $148.0 million of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes.

On December 31, 2008, the Company amended and restated its Credit Agreement dated as of January 30, 2006 (the "2006 Credit Agreement"), among the Company, Media, the lenders party thereto, JPMorgan Chase Bank, N.A., as Administrative Agent, and Deutsche Bank Securities Inc., as Syndication Agent (the "2009 Credit Agreement"). On January 30, 2009, concurrently with the consummation of its cash tender offers, the 2009 Credit Agreement became effective.

On January 29, 2009, the Company amended and restated its articles of incorporation to increase the number of shares authorized to be issued from 10,000 to 7,500,000 and changed the par value of such common stock from $0.20 to $0.0001. In addition, the Company exchanged 5,994,411 shares of common stock (the "Common Stock") for 7,508 shares common stock previously owned by Media.

On January 30, 2009, the Company issued (i) $21.2 million aggregate principal amount of 9% Senior PIK Notes due 2013 (the "Senior PIK Notes") under an indenture governing the Senior PIK Notes (the "Senior PIK Notes Indenture") and (ii) $299.7 million aggregate principal amount of 14% Senior Subordinated Notes due 2013 (the "Senior Subordinated Notes") under an indenture governing the Senior Subordinated Notes (the "Senior Subordinated Notes Indenture" and, together with the Senior PIK Notes Indenture, the "Indentures"). (The Senior PIK Notes and the Senior Subordinated Notes are referred herein as the "New Notes.") Also on January 30, 2009, Media sold 5,688,891 shares of Common Stock (valued at approximately $1.0 million) (and, together with the New Notes, the "Securities") for an aggregate purchase price of $126.0 million,

pursuant to a purchase agreement dated January 29, 2009, among Media, the Company, the other parties named therein and J.P. Morgan Securities Inc. The cash proceeds from the offering of the Securities (the "Offering"), together with the Company's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to the Offering and the tender offers and consent solicitations. In addition, on January 30, 2009, Media issued 305,520 shares of Common Stock to Media's equityholders prior to the financial restructuring (the "Prior Equityholders") in exchange for the Common Stock they owned prior to the restructuring.

As a result of the restructuring of the Company's capital structure and the issuance of Common Stock by Media to the bondholders who participated in the cash tender offers completed on January 30, 2009 and receipt of requisite consent solicitations (the "Tendering Bondholders"), the Tendering Bondholders acquired 94.9% of Media's Common Stock on January 30, 2009. The Prior Equityholders retained 5.1% of Media's Common Stock.

These transactions were accounted for as a troubled debt restructuring and are referred to collectively as the "Restructuring" in this Annual Report.

As of March 31, 2010, the Company published seven weekly publications: *National Enquirer, Star, Globe, National Examiner, Country Weekly, Mira!* and *Sun*; three monthly publications: *Muscle & Fitness, Shape* and *Flex*; two bi-monthly publications: *Fit Pregnancy* and *Muscle & Fitness Hers*; and two publications which are published ten times per year: *Men's Fitness* and *Natural Health*. Distribution Services, Inc. ("DSI"), the Company's wholly owned subsidiary, arranges for the placement of the Company's publications and third-party publications with retailers, and monitors through its regional managers and merchandising staff that our publications and third-party publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great A&P Tea Company and Winn Dixie. DSI also coordinates (also known as acting as a "category manager/front-end advisor") the racking of magazine fixtures for selected retailers. In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients.

### *Revenue recognition*

The Company's revenues are primarily comprised of single copy, subscription and advertising. Single copy, subscription and advertising revenue and related expenses for the Company's publications are recognized on the on-sale date.

Revenues from single copy sales are recognized net of expected sales returns, after considering such factors as sales history and available market information. All of the Company's publications are sold with full return privileges. The Company's major U.S. and Canadian distributor provides the Company weekly reporting on the actual returns by publication and by issue of each publication. The Company also receives sales data from certain retailers that sell its publications. The Company utilizes these data sources as well as the Company's long-term history of sales data by publication to estimate the actual anticipated sale of the Company's publications and the Company's experience has demonstrated that the actual sale of each issue of each magazine can be reasonably estimated based on this information. The Company's in-house circulation department has developed financial models which the Company utilizes when projecting the anticipated sale of magazines. Revenues are also presented net of deferred rack cost

amortization, terminal rack promotions, product placement costs ("retail display allowances and pockets") paid to the retailers and sales taxes.

Other revenues, primarily from marketing services performed for third parties by DSI, are recognized when the service is performed.

### Wholesaler concentrations

As of March 31, 2010, single copy revenue consisted of copies distributed to newsstands primarily by three wholesalers, which the Company estimates represented 81% of the newsstand distribution market, as well as several smaller wholesalers who represented the remaining 19%. Operating revenue generated by these wholesalers is included in the Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications, and Corporate/Other segments. In fiscal year 2010, two wholesalers each accounted for greater than 10% of the Company's total operating revenue and in the aggregate accounted for approximately 45% of the Company's total operating revenue. In fiscal year 2009, three wholesalers each accounted for greater than 10% of the Company's total operating revenue and in the aggregate accounted for approximately 36% of the Company's total operating revenue. In fiscal year 2008, three wholesalers each accounted for greater than 10% of the Company's total operating revenue and in the aggregate accounted for approximately 37% of the Company's total operating revenue. The Company has service agreements with these wholesalers, which provide incentives to maintain certain levels of service. The Company's operating results could be materially affected by disruption of the distribution of its magazines through the wholesalers. See Note 11, "Commitments and Contingencies—Litigation," for a description of litigation filed by former wholesalers.

### Barter transactions

The Company trades advertisements in its publications in exchange for advertising and goods and services. Revenue and related expenses from barter transactions are recorded at fair value. Revenue from barter transactions is recognized in accordance with the Company's revenue recognition policies. Expense from barter transactions is recognized as incurred. Revenue and expense from barter transactions for the fiscal years 2010, 2009 and 2008 were not significant.

### Editorial costs

External editorial costs relating to photos, artwork and text are expensed as the issue relating to each specific cost is recognized as revenue. Internal editorial costs are expensed as incurred.

### Product placement costs

Product placement costs include retail display allowance ("RDA"), which is based on a percentage of a publication's cover price and paid directly to retailers, and retail display pockets ("RDP"), which is a fixed per pocket fee paid directly to retailers. The Company pays either RDA or RDP to a particular retailer, but not both. Product placement costs are expensed and are recorded as a reduction to revenue as the issue relating to each specific cost is recognized as revenue.

### Cash and cash equivalents

Cash and cash equivalents include cash on hand or deposited in demand deposit accounts with financial institutions and highly liquid investments with an original maturity of three months or less.

### Trade receivables and allowance for doubtful accounts

Substantially all of the Company's trade receivables are from single copy distributors, subscriptions and advertising customers. The Company maintains allowances for doubtful accounts for estimated losses resulting from its customers not making required payments. The Company makes estimates of the collectibility of trade receivables. The Company critically reviews trade receivables and analyzes historical bad debts, past-due accounts, customer credit-worthiness and current economic trends when evaluating the adequacy of the allowance for doubtful accounts.

### Inventories

Inventories are stated at the lower of cost or market. Cost is determined on the first-in, first-out (FIFO) method. The Company writes down inventory for estimated obsolescence and/or excess or damaged inventory. During fiscal years 2009 and 2008, the Company wrote down $0.1 million and $24 thousand of inventory, respectively. There were no such write-downs in fiscal year 2010. This write down is included in production expense in the accompanying Consolidated Statements of Income (Loss). Inventories are comprised of the following at March 31 (in thousands):

| | 2010 | 2009 |
|---|---|---|
| Raw materials—paper | $ 9,785 | $15,669 |
| Finished product—paper, production and distribution costs of future issues | 3,663 | 2,594 |
| Total inventory | $13,448 | $18,263 |

### Prepaid expenses and other current assets

Prepaid expenses and other current assets are comprised of the following at March 31 (in thousands):

| | 2010 | 2009 |
|---|---|---|
| Direct-response advertising costs | $ 3,886 | $ 4,897 |
| Other receivables | 3,013 | 4,131 |
| Prepaid insurance | 1,628 | 1,712 |
| Prepaid postage | 396 | 370 |
| Other prepaid expenses | 5,353 | 3,398 |
| Other current assets | 5,956 | 1,274 |
| Total prepaid expenses and other current assets | $20,232 | $15,782 |

### Direct-response advertising costs

Direct-response advertising costs that are intended to solicit subscriptions and are expected to result in probable future benefits are capitalized. These costs are amortized over the period during which future benefits are expected to be received, which is generally the related one-year subscription period. Amortization of these costs was $6.3 million, $6.4 million and $6.6 million for fiscal years 2010, 2009 and 2008, respectively, and is included in subscription costs, which is part of distribution, circulation and other costs of sales in the accompanying Consolidated Statements of Income (Loss).

The asset balance of the capitalized direct-response advertising costs is reviewed quarterly to ensure the amount is realizable. Any write-downs resulting from this review are expensed as subscription acquisition advertising costs in the current period. Capitalized direct-response

advertising costs were $3.9 million and $4.9 million at March 31, 2010 and 2009, respectively, and are included in prepaid expenses and other current assets in the accompanying Consolidated Balance Sheets. There were no material write-downs of capitalized direct-response advertising costs in any of the three fiscal years in the period ended March 31, 2010.

### Long-lived assets

The Company reviews long-lived and finite-lived intangible assets for impairment whenever a significant event occurs or circumstances change, such as those affecting general market conditions or pertaining to a specific industry or an asset category, which indicates that the carrying amount of such assets may not be fully recoverable. When such factors, events or circumstances indicate that long-lived assets should be evaluated for possible impairment, the Company uses an estimate of cash flows (undiscounted and without interest charges) over the remaining lives of the assets to measure recoverability. If the estimated undiscounted cash flows are less than the carrying value of the asset, the loss is measured as the amount by which the carrying value of the asset exceeds fair value. For a detailed description of impairment charges, see Note 2, "Goodwill and Other Identified Intangible Assets."

### Property and equipment

The Company uses the straight-line depreciation method for financial reporting. The estimated lives used in computing depreciation for financial reporting purposes are 1 to 5 years for leasehold improvements, and 3 to 10 years for all other depreciable fixed assets. Depreciation for leasehold improvements is provided using the straight-line method over the shorter of the lease term or the estimated useful lives of the respective assets. Maintenance and repair costs are charged to expense as incurred. Significant improvements and betterments are capitalized.

The Company expenses internal use software costs incurred in the preliminary project stage and thereafter capitalizes costs incurred in developing or obtaining internal use software and includes them in property and equipment, net. Certain costs, such as maintenance and training, are expensed as incurred. Capitalized costs are amortized over a period of not more than three years using the straight-line method. The Company capitalizes certain costs, which generally include hardware, software, and payroll-related costs for employees who are directly associated with and who devote time to the development of internal use computer software. Costs capitalized as of March 31, 2010, 2009 and 2008 were not significant.

### Deferred debt costs

Debt issuance costs are amortized under the effective-interest method over the terms of the related indebtedness which range from 3 to 5 years.

### Deferred rack costs

Rack costs are capitalized and amortized as a reduction of circulation revenue in accordance with the terms of the relevant agreements (typically 36 months). The Company performs periodic and timely reviews to determine if impairment charges are required due to market conditions including store closings or store bankruptcies.

### Other long-term assets

Other long-term assets primarily consist of deposits on leased facilities and a deposit with the Company's largest national distributor.

### Goodwill and intangible assets

The Company's reporting units and related indefinite-lived intangibles are tested annually on the first day of the fourth quarter of each fiscal year to determine whether their carrying value exceeds their fair value. Goodwill and other indefinite-lived intangible assets are also tested for impairment on an interim basis if an event occurs or circumstances change between annual tests that would indicate that impairment exists. Impairment losses, if any, are reflected in operating income or loss in the Consolidated Statements of Income (Loss). The Company's reporting units consist of each of its publications and other consolidated subsidiaries.

The Company reviews finite-lived intangible assets for impairment whenever an event occurs or circumstances change which indicates that the carrying amount of such assets may not be fully recoverable. Determination of recoverability is based on an estimate of undiscounted future cash flows resulting from the use of the asset and its eventual disposition. Measurement of an impairment loss is based on the fair value of the asset compared to its carrying value. Impairment losses, if any, are reflected in operating income or loss in the Consolidated Statements of Income (Loss).

In assessing goodwill and intangible assets for impairment, the Company makes estimates of fair value which are based on its projection of revenues, operating costs, and cash flows of each reporting unit considering historical and anticipated future results, general economic and market conditions, as well as the impact of planned business or operational strategies. The valuations employ a combination of present value techniques to measure fair value and consider market factors. Changes in the Company's judgments and projections could result in a significantly different estimate of the fair value of the reporting units and could result in an impairment of goodwill or other intangible assets. For a detailed description of impairment charges, see Note 2, "Goodwill and Other Identified Intangible Assets."

### Accrued expenses and other liabilities

Accrued expenses and other liabilities are comprised of the following at March 31 (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| Retail display pockets and allowances | $ 6,536 | $ 11,771 |
| Income and other taxes(1) | 7,479 | 9,476 |
| Personnel and related costs | 5,948 | 8,643 |
| Rack costs | 3,971 | 4,113 |
| Mr. Olympia, LLC (see Note 10) | 4,200 | 4,500 |
| Production costs | 2,795 | 1,940 |
| Reserve for wholesaler claims | — | 2,700 |
| Other | 7,626 | 8,653 |
| Accrued expenses and other liabilities—current | 38,555 | 51,796 |
| Other non-current liabilities(2) | 9,083 | 6,174 |
| Accrued expenses and other liabilities—non-current | 9,083 | 6,174 |
| Total accrued expenses and other liabilities—current and non-current | $ 47,638 | $ 57,970 |

(1) The Company has accrued $2.6 million and $2.9 million for contingent liabilities for non-income related taxes at March 31, 2010 and 2009, respectively.

(2) Other non-current liabilities primarily consist of deferred amendment fees (the "Deferred Fees") accrued as of the effective date of the Restructuring and related accrued interest. The Company will pay (a) the Deferred Fees (including all accrued

interest thereon) in cash on the Company's $60.0 million revolving credit facility under the 2009 Credit Agreement (the "Revolving Facility") maturity date (or any such earlier date as the Revolving Facility terminates), and (b) the Deferred Fees (including all accrued interest thereon) in cash on the $450.0 million term loan under the 2009 Credit Agreement (the "Term Facility") maturity date (or any such earlier date as the Term Facility is repaid in full); provided that all Deferred Fees (including all accrued interest thereon) will be due and payable in cash at the time that any prepayment of the Term Facility is required pursuant to the 2009 Credit Agreement in respect of any fiscal year in which Excess Cash Flow (as defined in the 2009 Credit Agreement) exceeds $27.5 million. The Company does not expect to achieve Excess Cash Flow of $27.5 million or higher within the next twelve months, and therefore classified these fees as non-current liabilities. See Note 6, "Credit Agreement," for further details.

### Deferred revenues

Deferred revenues are comprised of the following at March 31 (in thousands):

|  | 2010 | 2009 |
| --- | --- | --- |
| Subscriptions | $35,723 | $36,928 |
| Advertising | 940 | 622 |
| Other | 266 | 192 |
| Total deferred revenues | $36,929 | $37,742 |

### Income taxes

Income taxes are accounted for using the asset and liability method. Deferred tax assets and liabilities are recognized for future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and tax credit carry forwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The asset and liability method of accounting for deferred income taxes requires a valuation against deferred tax assets, if based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. The effect on any changes in deferred tax assets and liabilities as a result of a change in tax rates is recognized in income. All tax positions taken by the Company in its income tax returns that are recognized in the financial statements must satisfy a more-likely-than-not threshold.

The Company reports the penalties and tax-related interest expense as a component of income tax expense in its Consolidated Statement of Income (Loss). See Note 5, "Income Taxes."

### Accumulated other comprehensive income

Accumulated other comprehensive income consists of cumulative foreign currency translation adjustments.

### Translation of Non-U.S. currency amounts

The net assets and operations of entities outside of the United States are translated into U.S. dollars. Assets and liabilities are translated at fiscal year-end exchange rates and income and expense items are translated at average exchange rates prevailing during the year. Translation adjustments are included in accumulated other comprehensive income. Gains and losses arising from intercompany foreign currency transactions that are of a long-term investment nature are reported in the same manner as translation adjustments.

### Use of estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and

assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

### Contingent liabilities

The Company has certain contingent liabilities that arise in the ordinary course of its business activities. The Company accrues for contingent liabilities when it is probable that future expenditures will be made and such expenditures can be reasonably estimated. Reserves for contingent liabilities are reflected in the Company's Consolidated Financial Statements based on management's assessment, along with legal counsel, of the expected outcome of the contingencies. If the final outcome of the contingencies differs from that currently expected, it would result in a change to earnings in the period determined. See Note 11, "Commitments and Contingencies—Litigation," for a description of litigation.

### Subsequent events

The Company has evaluated all subsequent events through June 9, 2010, which is the date this Annual Report was available to be issued.

### Recent accounting pronouncements

In September 2006, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 157, "*Fair Value Measurements"* ("SFAS No. 157"), which enhances existing guidance for measuring assets and liabilities at fair value. SFAS No. 157 defines fair value, establishes a framework for measuring fair value and expands disclosure about fair value measurements. The provisions of SFAS No. 157 were effective on April 1, 2008. The adoption of this statement did not have a material impact on the Company's results of operations, financial position, cash flows or disclosures. In February 2008, the FASB issued FASB Staff Position No. 157-2, which delays the effective date of SFAS No. 157 for non-financial assets and liabilities to fiscal years beginning after November 15, 2008. SFAS 157 and FASB Staff Position No. 157-2 were codified under the Fair Value Measurements and Disclosures Topic of the FASB Accounting Standards Codification ("ASC") (the Fair Value Measurements and Disclosures Topic). The adoption of this standard did not have a significant impact on the Company's results of operation, financial position, cash flows and disclosures.

In June 2009, the FASB issued new authoritative guidance under ASC Topic 810, "*Consolidation*", previously FASB Interpretation No. 46-R ("ASC 810"), "*Consolidation of Variable Interest Entities—An Interpretation of ARB No. 51.*" This new guidance under ASC 810 amends certain requirements of FASB Interpretation No. 46 (revised December 2003), "*Consolidation of Variable Interest Entities*", to improve financial reporting by enterprises involved with variable interest entities and to provide more relevant and reliable information to users of financial statements. The provisions of this new guidance are effective as of the beginning of each reporting entity's first annual reporting period that begins after November 15, 2009, for interim periods within that first annual reporting period, and for interim and annual reporting periods thereafter. Earlier application is prohibited. The Company currently is assessing the impact of the adoption of this new guidance on its results of operations, financial position, cash flows and disclosures.

In August 2009, the FASB issued Accounting Standards Update ("ASU") No. 2009—05, "*Measuring Liabilities at Fair Value*" ("ASU 2009—05"). ASU 2009—05 amends ASC Topic 820, "*Fair Value Measurements and Disclosures*" ("ASC 820"), previously SFAS No. 157, "*Fair Value*

*Measurements*", by providing clarification that in circumstances in which a quoted price in an active market for the identical liability is not available, a reporting entity is required to measure fair value using one or more of the following methods: (i) a valuation technique that uses the quoted price of the identical liability when traded as an asset or quoted prices for similar liabilities, or similar liabilities when traded as assets, or (ii) a valuation technique that is consistent with the principles of ASC 820 (i.e., income approach or market approach). ASU 2009—05 also clarifies that when estimating the fair value of a liability, a reporting entity is not required to include inputs relating to the existence of transfer restrictions on that liability. The provisions of this new guidance are effective for the first reporting period after issuance. The adoption of this standard did not have any impact on the Company's results of operation, financial position, cash flows and disclosures.

In October 2009, the FASB issued ASU No. 2009—13, "*Multiple—Deliverable Revenue Arrangements*" ("ASU 2009—13"). ASU 2009—13 amends existing revenue recognition accounting pronouncements that are currently within the scope of FASB ASC Subtopic 605-25. The consensus in Emerging Issues Task Force Issue No. 08—1, "*Revenue Arrangements with Multiple Deliverables*", provides accounting principles and application guidance on whether multiple deliverables exist, how the arrangement should be separated, and the consideration allocated. This guidance eliminates the requirement to establish the fair value of undelivered products and services and also eliminates the residual method of allocating arrangement consideration. The new guidance provides for separate revenue recognition based upon management's estimate of the selling price for an undelivered item when there is no other means to determine the fair value of that undelivered item. Under the previous guidance, if the fair value of all of the elements in the arrangement was not determinable, then revenue was deferred until all of the items were delivered or fair value was determined. This new approach is effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. The Company is currently assessing the impact of the adoption of this new guidance on its results of operations, financial position, cash flows and disclosures.

## (2) Goodwill and other identified intangible assets

As of March 31, 2010 and 2009, the Company had goodwill with carrying values of $230.9 million and $245.4 million, respectively. Other identified intangible assets not subject to amortization had a carrying value of $255.3 million and $258.4 million as of March 31, 2010 and 2009, respectively, and consist of trade names with indefinite lives.

Identified intangible assets with finite lives subject to amortization consist of the following at March 31 (in thousands):

| | | 2010 | | | | 2009 | |
| | Range of lives | Gross carrying amount | Accumulated amortization | Net | Gross carrying amount | Accumulated amortization | Net |
|---|---|---|---|---|---|---|---|
| Tradenames(a) | 8 -27 | $ 10,610 | $ (3,192) | $ 7,418 | $ 14,186 | $ (6,325) | $ 7,861 |
| Covenants not to compete(a)(b) | 5 -10 | 12,500 | (12,500) | — | 21,571 | (20,842) | 729 |
| Subscriber lists(a)(c) | 3 -15 | 32,682 | (23,785) | 8,897 | 60,361 | (49,286) | 11,075 |
| Non-subscriber customer relationships(d) | 8 | — | — | — | 6,913 | (6,913) | — |
| | | $ 55,792 | $(39,477) | $16,315 | $103,031 | $ (83,366) | $19,665 |

(a) During fiscal year 2010, the Company removed $5.8 million, $9.1 million, $27.7 million, $6.9 million and $7.7 million of fully amortized tradenames, covenants not to compete, non-subscriber lists, subscriber lists and advertising relationships, respectively, along with their respective accumulated amortization, from its books. Non-subscriber customer relationships had a zero net carrying value as of March 31, 2010.

(b) During the third quarter of fiscal year 2009, the Company wrote off $0.5 million and $0.4 million of covenants not to compete related to the Women's Health and Fitness Publications and Corporate/Other segments, respectively, based on its impairment test.

(c) During the third quarter of fiscal year 2009, the Company wrote off $5.7 million of subscriber lists related to the Celebrity Publications segment based on its impairment test.

(d) During the third quarter of fiscal year 2009, the Company wrote off $1.5 million and $1.1 million of customer relationships related to the Women's Health and Fitness Publications and Corporate/Other segments, respectively, based on its impairment test.

Amortization expense of intangible assets for fiscal years 2010, 2009 and 2008 was $3.4 million, $6.6 million and $8.4 million, respectively. Based on the carrying value of identified intangible assets recorded at March 31, 2010, and assuming no subsequent impairment of the underlying assets, the annual amortization expense is expected to be as follows (in thousands):

| Fiscal year | Amortization expense |
|---|---|
| 2011 | 2,622 |
| 2012 | 2,622 |
| 2013 | 2,622 |
| 2014 | 2,622 |
| 2015 | 2,622 |
| Thereafter | 3,205 |
| | $16,315 |

*Impairment charges*

As a result of the Company's impairment testing, non-cash impairment charges for fiscal years 2010, 2009 and 2008 by reportable segment are as follows (in thousands):

| | Celebrity publications | Tabloid publications | Women's Health and Fitness publications | Corporate/ other | Total |
|---|---|---|---|---|---|
| **Fiscal 2010 Impairments** | | | | | |
| Tradenames | $ — | $ — | $ 3,032 | $ — | $ 3,032 |
| Goodwill | — | — | 14,563 | — | 14,563 |
| Provision for impairment of intangible assets and goodwill | $ — | $ — | $ 17,595 | $ — | $ 17,595 |
| **Fiscal 2009 Impairments** | | | | | |
| Tradenames | $ 42,193 | $ 31,930 | $ 13,019 | $ 6,778 | $ 93,920 |
| Goodwill | 15,182 | 51,317 | 47,021 | 695 | 114,215 |
| Other Identified Intangibles | 5,697 | — | 1,981 | 1,537 | 9,215 |
| Provision for impairment of intangible assets and goodwill | $ 63,072 | $ 83,247 | $ 62,021 | $ 9,010 | $217,350 |
| **Fiscal 2008 Impairments** | | | | | |
| Tradenames | $ 3,216 | $ — | $ — | $ — | $ 3,216 |
| Goodwill | 8,173 | — | — | 19,627 | 27,800 |
| Other Identified Intangibles | 81 | — | — | — | 81 |
| Provision for impairment of intangible assets and goodwill | $ 11,470 | $ — | $ — | $19,627 | $ 31,097 |

The Company recorded the fiscal year 2010 non-cash impairment charges detailed above in the first fiscal quarter ended June 30, 2009. The non-cash impairment charges were primarily the result of a change in management's expectations of long-term cash flows resulting from declining profitability in certain of the Company's reporting units.

The Company recorded the fiscal year 2009 non-cash impairment charges detailed above in the third fiscal quarter ended December 31, 2008, and adjusted the goodwill impairment for certain publications during the fourth fiscal quarter ended March 31, 2009, based upon finalizing its impairment test. These non-cash impairment charges were recorded as a result of the continued decline in profitability in certain of the Company's reporting units during the fiscal quarters in which the impairment charges were recorded. The non-cash impairment charges were primarily the result of a change in management's expectations of cash flows resulting from declining profitability in fiscal year 2009 as a result of the continued overall market weakness due to the current economic slowdown.

The Company recorded the fiscal year 2008 non-cash impairment charges detailed above in the fourth fiscal quarter ended March 31, 2008, as a result of the continued decline in profitability in certain of the Company's reporting units during the fiscal quarters in which the impairment charges were recorded. The non-cash impairment charges were primarily the result of a change in management's expectations of long-term cash flows resulting from declining profitability in fiscal year 2008.

### Impairment charge assumptions

The estimate of fair value of the Company's tradename and goodwill reporting units was based on the Company's projection of revenues, operating costs, and cash flows considering historical and anticipated future results, general economic and market conditions as well as the impact of planned business and operational strategies. The valuation employed a combination of present value techniques to measure fair value and considered market factors. The key assumptions used to determine the fair value of the Company's tradename and goodwill reporting units during the fiscal years 2010, 2009 and 2008 impairment tests were:

a)   expected cash flow periods of five years;

b)   terminal values based upon terminal growth rates ranging from:

   - 0% to 4% for fiscal year 2010;
   - 0% to 4% for fiscal year 2009; and
   - 1.5% to 4% for fiscal year 2008;

c)   implied multiples used in the business enterprise value income and market approaches ranging from:

   - 4.1 to 9.5 for fiscal year 2010;
   - 3.5 to 7.4 for fiscal year 2009; and
   - 0.0 to 8.0 for fiscal year 2008;

d)   discount rates ranging from 12.0% to 15.0% which were based on the Company's best estimate of the weighted-average cost of capital adjusted for risks associated with the reporting units for each of fiscal years 2010, 2009 and 2008, respectively.

Management believes the rates used are consistent with the risks inherent in the Company's current business model and with industry discount rates. Changes in management's judgments and estimates could result in a significantly different estimate of the fair value of the reporting

units and could result in a change in the impairment of tradenames and goodwill. A variance in the assumptions used could have had a significant impact on the amount of tradename and goodwill impairment charges recorded. For example:

a) a 100 basis point change in the discount rate would have caused an increase or decrease in the existing tradename impairment charges recognized by approximately $2.7 million, $16.1 million and $0 in fiscal years 2010, 2009 and 2008, respectively;

b) a 100 basis point change in the discount rate would have changed the estimated fair value of tradenames in the Company's other reporting units and may have caused those reporting units to incur tradename impairment charges in each of fiscal years 2010, 2009 and 2008, respectively;

c) a 5% decrease in the enterprise value may have caused goodwill impairment of no other publications in fiscal year 2010, one other publication in fiscal year 2009, and no other publications in fiscal year 2008; and

d) a 5% increase in enterprise value would:

- have reduced the goodwill impairment charge to the Women's Health and Fitness Publications segment by $2.8 million in fiscal year 2010;

- have caused no goodwill impairment charge to the Celebrity Publications segment and would have reduced the goodwill impairment charges in the other reportable segments by $12.4 million in fiscal year 2009; and

- have reduced the goodwill impairment charge to the Corporate/Other segment by $1.1 million, but would not have reduced the goodwill impairment charge in the Celebrity Publications segment in fiscal year 2008.

The gross carrying amount and accumulated impairment losses of goodwill by reportable segment are as follows (in thousands):

| | Celebrity publications | Tabloid publications | Women's Health and Fitness publications | Corporate/ other | Total |
|---|---|---|---|---|---|
| Balances as of March 31, 2008 | | | | | |
| Goodwill .......................................... | $ 179,937 | $ 241,570 | $ 83,649 | $137,340 | $642,496 |
| Accumulated impairment losses ................. | (94,064) | (97,579) | — | (91,190) | (282,833) |
| Goodwill, net of impairment losses ................. | 85,873 | 143,991 | 83,649 | 46,150 | 359,663 |
| Impairment charges in fiscal year 2009 .......... | (15,182) | (51,317) | (47,021) | (695) | (114,215) |
| Balance as of March 31, 2009 | | | | | |
| Goodwill ...................................... | $ 179,937 | $ 241,570 | $ 83,649 | $137,340 | $642,496 |
| Accumulated impairment losses ................. | (109,246) | (148,896) | (47,021) | (91,885) | (397,048) |
| Goodwill, net of impairment losses ................. | 70,691 | 92,674 | 36,628 | 45,455 | 245,448 |
| Impairment charges in fiscal year 2010 .......... | — | — | (14,563) | — | (14,563) |
| Balance as of March 31, 2010 | | | | | |
| Goodwill ...................................... | $ 179,937 | $ 241,570 | $ 83,649 | $137,340 | $642,496 |
| Accumulated impairment losses ................. | (109,246) | (148,896) | (61,584) | (91,885) | (411,611) |
| Goodwill, net of impairment losses ................. | 70,691 | 92,674 | 22,065 | 45,455 | 230,885 |

## (3) Discontinued operations

During the second quarter of fiscal year 2008 the Company discontinued the publication of *Weekly World News* and subsequently sold it in fiscal year 2009. Operating results of this publication have been classified as discontinued operations for all periods presented. This publication was previously included in the Corporate/Other segment.

The following table sets forth total operating revenues, pre-tax income (loss) from discontinued operations, income taxes and income (loss) from discontinued operations for fiscal years 2010, 2009 and 2008, respectively (in thousands):

|  | 2010 | 2009 | 2008 |
|---|---|---|---|
| Total operating revenues ..................................................... | $ — | $ — | $ 932 |
| Pre-tax income (loss) from discontinued operations............................. | $ — | $ 500 | $ (685) |
| Income taxes................................................................ | — | — | — |
| Income (loss) from discontinued operations ...................................... | $ — | $ 500(a) | $ (685) |

(a)    Represents a gain on the proceeds form the sale of *Weekly World News.*

## (4) Fair value of financial instruments

The fair value of the Company's financial instruments is estimated based on the most recent quoted market prices for the same or similar issues. The estimated fair value of the Company's financial instruments is as follows at March 31 (in thousands):

|  | 2010 | | 2009 | |
|---|---|---|---|---|
|  | Carrying amount | Fair value | Carrying amount | Fair value |
| Term loan ......................................................... | $432,871 | $ 418,153 | $437,371 | $ 215,755 |
| Revolving credit facility..................................... | 21,000 | 19,163 | 50,000 | 23,750 |
| 2009 Notes ...................................................... | —(b) | — | 14,025(a) | 4,488(b) |
| 2011 Notes ...................................................... | 7,502(a) | 7,216 | 7,502(a) | 2,701 |
| Senior Subordinated Notes ................................. | 332,051(c) | 215,833 | 299,722(c) | 150,236 |
| Senior PIK Notes .............................................. | 22,701(c) | 14,756 | 21,240(c) | 10,647 |

(a)    Amount does not include the bond premium or bond discount.

(b)    The Company retired the outstanding $14.0 million of 2009 Notes on May 1, 2009.

(c)    Amounts do not include future interest reflected in the carrying amount of our senior subordinated notes in the accompanying Consolidated Balance Sheets.

FASB ASC Topic 820, "*Fair Value Measurements and Disclosures*" ("ASC 820"), (previously SFAS No. 157, "*Fair Value Measurements*"), established a three-tier fair value hierarchy, which prioritizes the use of inputs used in measuring fair value as follows:

Level 1  Observable inputs such as quoted prices in active markets for identical assets and liabilities;

Level 2  Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and

Level 3  Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

As of March 31, 2010 and March 31, 2009, the Company did not have financial assets or liabilities that would require measurement on a recurring basis based on the guidance in ASC 820. The carrying amount for cash and cash equivalents, accounts receivable, accounts payable and accrued expenses approximates fair value due to the short maturity of these items.

In addition to financial assets and liabilities that are recorded at fair value on a recurring basis, the Company is required to record non-financial assets and liabilities at fair value on a nonrecurring basis. During the fiscal year ended March 31, 2010, certain assets were recorded at fair value on a nonrecurring basis as a result of a non-cash impairment charge relating to its goodwill and tradenames. In accordance with ASC 350 (previously SFAS No. 142), the Company recorded a provision for impairment of intangible assets and goodwill of approximately $17.6 million for the Women's Health and Fitness Publications segment during the fiscal year ended March 31, 2010.

The following table reflects the fair values measurement of certain assets measured at fair value on a non-recurring basis (in thousands):

| | | Fair value measurements using | | | Impairment recognized in earnings |
|---|---|---|---|---|---|
| | March 31, 2010 | Level 1 | Level 2 | Level 3 | |
| Goodwill.......................................................... | $ 230,885 | $ — | $ — | $230,885 | $ 14,563 |
| Tradenames ................................................. | 255,320 | — | — | 255,320 | 3,032 |
| | | | | | $ 17,595 |

In accordance with ASC 350, goodwill and tradenames with carrying amounts of $245.4 million and $258.4 million, respectively, were written down to their implied value of $230.9 million and $255.3 million, respectively, resulting in a non-cash impairment charge of $17.6 million during the fiscal year ended March 31, 2010. For a detailed description of this impairment charge, including the methods used to determine the fair value of the Company's goodwill and other intangible assets, see Note 2, "Goodwill and Other Identified Intangible Assets."

## (5) Income taxes

The Company files a consolidated Federal income tax return with Media and calculates the Company's income tax on a separate return basis. The (benefit) provision for income taxes from continuing operations consists of the following (in thousands):

| | Fiscal year ended March 31, | | |
|---|---|---|---|
| | 2010 | 2009 | 2008 |
| Current: | | | |
| Federal.......................................................................................... | $ (917) | $ (2,122) | $ 262 |
| State............................................................................................... | 559 | (909) | (229) |
| Foreign........................................................................................... | 841 | 902 | 761 |
| Total current provision (benefit)....................................................... | 483 | (2,129) | 794 |
| Deferred: | | | |
| Federal.......................................................................................... | 19,630 | (28,808) | 4,192 |
| State............................................................................................... | 2,643 | (2,402) | (1,687) |
| Foreign........................................................................................... | — | — | (15) |
| Total deferred (benefit) provision ................................................... | 22,273 | (31,210) | 2,490 |
| Provision (benefit) for income taxes................................................ | $22,756 | $(33,339) | $ 3,284 |

A reconciliation of the federal statutory tax rate with the Company's effective tax rate is as follows:

|  | Fiscal year ended March 31, | | |
|---|---|---|---|
|  | **2010** | **2009** | **2008** |
| U.S. statutory tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal benefit | (1.5) | (0.6) | 2.1 |
| Meals and entertainment | 1.1 | (0.2) | (0.9) |
| Goodwill impairment | — | (10.7) | (4.2) |
| Valuation allowance on deferred tax assets | (80.9) | (25.8) | (37.9) |
| Debt restructuring | 131.5 | 17.7 | — |
| Other, net | 0.7 | — | 0.2 |
| Effective tax rate | 85.9% | 15.4% | (5.7%) |

The tax effected net deferred tax assets and liabilities are comprised of the following at March 31 (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| **Deferred Income Tax Assets—Current** | | |
| Reserves and accruals | $ 3,239 | $ 2,981 |
| Revenue recognition | 1,307 | 1,344 |
| Inventory | 13 | 13 |
| Senior subordinated notes | 11,850 | 5,770 |
| Other current deferred tax assets | 692 | 744 |
| Gross deferred income tax assets—current | 17,101 | 10,852 |
| Valuation allowance | (15,894) | (10,221) |
| Deferred income tax assets—current | $ 1,207 | $ 631 |
| **Deferred Income Tax Liabilities—Current** | | |
| Circulation expenses | $ (2,653) | $ (3,366) |
| Other current deferred tax liabilities | (1,916) | (2,712) |
| Deferred income tax liabilities—current | $ (4,569) | $ (6,078) |
| **Net deferred income tax liabilities—current** | $ (3,362) | $ (5,447) |
| **Deferred Income Tax Assets—Non-Current** | | |
| Net operating losses | $ 21,248 | $ 9,046 |
| Senior subordinated notes | 98,257 | 123,471 |
| Goodwill and other intangibles | 3,620 | 22,597 |
| Other non-current deferred tax assets | 10,926 | 10,732 |
| Gross deferred income tax assets—non-current | 134,051 | 165,846 |
| Valuation allowance | (119,963) | (147,900) |
| Deferred income tax assets—non-current | $ 14,088 | $ 17,946 |
| **Deferred Income Tax Liabilities—Non-Current** | | |
| Goodwill and other intangibles | $ (91,940) | $ (70,289) |
| Circulation expenses | (3,497) | (4,959) |
| Property and equipment | (469) | (239) |
| Other non-current deferred tax liabilities | (917) | (835) |
| Deferred income tax liabilities—non-current | $ (96,823) | $ (76,322) |
| **Net deferred income tax liabilities—non-current** | $ (82,735) | $ (58,376) |

The net deferred income tax liabilities—current of $3.4 million and $5.4 million as of March 31, 2010 and 2009, respectively, are included in accrued expenses and other liabilities in the accompanying Consolidated Balance Sheets. The net deferred income tax liabilities—non-current of $82.7 million and $58.4 million as of March 31, 2010 and 2009, respectively, are included in deferred income taxes in the accompanying Consolidated Balance Sheets.

At March 31, 2010 and 2009, the Company had gross U.S. federal and state net operating loss carryforwards as follows (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| Federal | $52,141 | $ 18,260 |
| State | 57,490 | 11,167 |

The federal net operating loss carryforwards at March 31, 2010 expire beginning in 2028 through 2030. The state net operating loss carryforwards at March 31, 2010 expire beginning in 2011 through 2030.

As of March 31, 2009, the Company recognized taxable cancellation of indebtedness income and utilized a significant portion of previously valued net operating loss carry-forwards. In addition, pursuant to Internal Revenue Code ("IRC") Section 108, a portion of the discharge of indebtedness income was not taxable. The amount excluded from taxable income was applied to reduce certain tax attributes, including the tax basis of depreciable and amortizable assets. As a result of the Tendering Bondholders acquiring 94.9% of Media's Common Stock, the Company underwent an ownership change under Internal Revenue Code Section 382 ("Section 382"). Since the majority of the Company's pre-acquisition net operating losses were reduced as a result of attribute reduction, only $19.4 million of net operating losses remain subject to the consolidated net operating loss Section 382 limitation.

As of December 31, 2009, the Company recorded a change in estimated income taxes due to the filing of its federal income tax return for the fiscal year ended March 31, 2009 wherein the Company elected, under IRC Section 108(b)(5), to apply a portion of the debt discharge amount to first reduce the basis of depreciable and amortizable assets. The election resulted in additional tax expense of $24.8 million due to the reduction of basis on the Company's indefinite lived intangible assets, which are deferred tax liabilities and could not be used as a future source of income to support the realization of the Company's previously valued deferred tax assets.

The asset and liability method of accounting for deferred income taxes requires a valuation allowance against deferred tax assets if, based on the weight of available evidence, it is more likely than not that some or all of the deferred tax assets will not be realized. The Company's valuation allowance related to its deferred tax assets, which was $158.1 million at March 31, 2009, was decreased by $22.3 million to $135.8 million at March 31, 2010. The valuation allowance reserves all deferred tax assets that will not be offset by reversing taxable temporary differences. The Company intends to maintain a valuation allowance until sufficient positive evidence exists to support its reversal.

The valuation allowance was provided against the portion of the net deferred tax assets not offset by the deferred tax liability for indefinite-lived intangibles. The Company's deferred tax liabilities related to indefinite-lived intangibles are not considered a future source of income to support the realization of deferred tax assets within the net operating loss carryforward period.

As of March 31, 2010 and 2009, the Company's accrued liabilities for uncertain tax positions related to federal and state income taxes, including interest and penalties, amounted to $1.2 million and $1.2 million, respectively, and were included in accrued expenses and other liabilities in the accompanying Consolidated Balance Sheets.

On April 1, 2007, the Company recognized a $10.2 million increase in the liability for unrecognized tax benefits, as well as accrued interest and penalties amounted to approximately $1.1 million and $0.1 million, respectively. These items were accounted for as an increase of the April 1, 2007 balance of accumulated deficit.

The total amount of unrecognized tax benefits as of March 31, 2009 was $3.8 million. Approximately $3.8 million of this amount would, if recognized, have an effect on the effective income tax rate. In addition to the unrecognized tax benefits, the Company released interest of $0.3 million and recognized $0.1 million of penalty expense for fiscal year 2009 and had accrued interest and penalties of $0.9 million and $0.2 million, respectively, as of March 31, 2009.

The total amount of unrecognized tax benefits as of March 31, 2010 was $3.6 million. Approximately $3.6 million of this amount would, if recognized, have an effect on the effective income tax rate. In addition to the unrecognized tax benefits, the Company recognized no net interest expense and no penalty expense for fiscal year 2010 and had accrued interest and penalties of $0.9 million and $0.2 million, respectively, as of March 31, 2010.

The reduction of unrecognized tax benefits in fiscal year 2009 primarily relates to settlements with taxing authorities that will result in refunds of federal income taxes previously paid. Accordingly, the Company has recorded a receivable of $1.2 million as of March 31, 2009. In addition, as a result of the Worker, Homeownership, and Business Assistance Act of 2009 amendment to §§ 172(b)(1)(H) and 810(b) of the IRC allowing taxpayers to elect to carry back an applicable net operating loss (NOL) for a period of 3, 4, or 5 years, to offset taxable income in those preceding taxable years, the Company will receive additional refunds of federal income taxes previously paid. The Company recorded an additional receivable of $1.8 million, resulting in a receivable of $3.0 million as of March 31, 2010 which was included in prepaid expenses and other current assets in the accompanying Consolidated Balance Sheets.

The Company has identified its "major" tax jurisdictions to include the U.S. government, and the states of California, Florida and New York. In January 2008, the Company received notice that the Joint Committee on Taxation has accepted the Internal Revenue Service examination of its fiscal 2004 federal tax return and has taken no exception to the Company's carryback of its fiscal years 2005 and 2006 net operating losses to prior years. The Company's federal tax returns subject to examination are those filed for the fiscal years ended 2003 and 2005 through 2008. The Company's fiscal years ended 2003 through 2008 federal tax returns remain open by statute. The Company's major state tax jurisdictions subject to examination are the fiscal years ended 2003 through 2009.

While it is reasonably possible that the Company's unrecognized tax benefits could change, an estimate of such an increase or decrease is not possible.

A reconciliation of the change in the unrecognized tax benefits from April 1, 2008 to March 31, 2010 is as follows (in thousands):

| | Unrecognized income tax benefits |
|---|---:|
| Balance at April 1, 2008 ................................................................................................... | $    8,337 |
| Increases for tax positions taken during a prior period ........................................................ | 81 |
| Decreases for tax positions taken during a prior period ...................................................... | (479) |
| Increases for tax positions taken during the current period................................................. | 1,514 |
| Decreases relating to settlements ...................................................................................... | (5,434) |
| Decreases resulting from the expiration of the statute of limitations ................................... | (230) |
| Balance at March 31, 2009 ................................................................................................. | 3,789 |
| Increases for tax positions taken during a prior period........................................................ | 130 |
| Decreases for tax positions taken during a prior period ...................................................... | (17) |
| Increases for tax positions taken during the current period................................................. | 13 |
| Decreases for tax positions taken during the current period ............................................... | (344) |
| Decreases relating to settlements ...................................................................................... | (12) |
| Balance at March 31, 2010 ................................................................................................. | $    3,559 |

## (6) Credit agreement

On January 30, 2006, the Company entered into the 2006 Credit Agreement, which replaced its then existing credit agreement dated as of January 23, 2003. On December 31, 2008, the Company entered into the 2009 Credit Agreement, which replaced the 2006 Credit Agreement. The 2009 Credit Agreement became effective on January 30, 2009 (the "Effective Date"), concurrently with the consummation of the Company's cash tender offers. The 2009 Credit Agreement includes the $60.0 million Revolving Facility and the $450.0 million Term Facility. The Revolving Facility matures in January 2012 and the Term Facility matures in January 2013.

During fiscal year 2010, the Company made required quarterly principal payments aggregating $4.5 million on the 2009 Credit Agreement Term Facility. The Company paid down $35.0 million and borrowed $6 million on its Revolving Facility during fiscal year 2010. The balance of the Term Facility and Revolving Facility under the 2009 Credit Agreement was $432.9 million and $21.0 million, respectively, on March 31, 2010. The Revolving Facility had $39.0 million available to be borrowed as of March 31, 2010. The 2009 Credit Agreement requires, and the 2006 Credit Agreement required, the Company to pay a commitment fee of 1% and 1/2%, respectively, of the unused portion of the revolving commitment. There were no commitment fee payments in fiscal year 2008, as the revolving commitment under the 2006 Credit Agreement was fully drawn during the entire fiscal year. Commitment fee payments under the 2006 Credit Agreement and 2009 Credit Agreement were insignificant during fiscal year 2009 as the revolving commitments on the 2006 Credit Agreement and 2009 Credit Agreement were fully drawn during the entire fiscal year 2009 with the exception of a few days. There were $185,000 of commitment fee payments under the 2009 Credit Agreement in fiscal year 2010.

The effective interest rate under the 2009 Credit Agreement, including amounts borrowed under the Term Facility and Revolving Facility, as of March 31, 2010 and 2009, was 10.0%. The effective weighted-average interest rate under the 2006 Credit Agreement for fiscal year 2008 was 8.5%. The effective weighted-average interest rate under the 2009 Credit Agreement and 2006 Credit Agreement for fiscal year 2010 and 2009 was 10% and 7.1%, respectively. The decrease in the

effective weighted-average interest rate between fiscal years 2008 and 2009 is tied to the decrease in the London interbank offering rate ("LIBOR"). The increase in the effective weighted-average interest rate between fiscal years 2010 and 2009 is due to the Company being required to: (i) pay a margin of 6.5% on all loans based on LIBOR under the 2009 Credit Agreement as compared to a margin of 3.5% on all loans based on LIBOR ("LIBOR Loans") under the 2006 Credit Agreement, and (ii) being subject to a floor equal to 3.5% on all LIBOR Loans under the 2009 Credit Agreement.

On January 7, 2009, the Company and Media entered into a forbearance agreement with lenders representing a majority of outstanding amounts and commitments under the 2006 Credit Agreement and the administrative agent under the 2006 Credit Agreement, pursuant to which such lenders and the administrative agent agreed, subject to certain termination events, to forbear until the earliest of (i) February 4, 2009, (ii) the date on which any of the Prior Notes became or were declared to be due and payable and (iii) the commencement of an insolvency proceeding with respect to the Company, Media or any of their subsidiaries, from exercising any rights and remedies under the 2006 Credit Agreement as a result of the Company's failure (a) to pay the interest payment due on the 2009 Notes on November 1, 2008, (b) to comply with the reporting requirements in the 2006 Credit Agreement, (c) to comply with the corresponding reporting requirements in the indentures governing the Prior Notes and (d) to comply with the requirements of the indentures governing the Prior Notes in connection with its failure to meet a specified leverage ratio. The forbearance agreement ended on January 30, 2009 when we successfully completed our cash tender offers and consent solicitations with respect to the Prior Notes.

Under the 2009 Credit Agreement, the Company has the option to pay interest based on a floating base rate option equal to the greater of the JPMorgan Chase Bank, N.A. ("JPMorgan") prime rate or the federal funds effective rate plus 0.5% ("base rate loans") (subject to a floor equal to 4.50%) or based on LIBOR Loans, in each case plus a margin. The margin on all base rate loans is 5.5% and the margin on all LIBOR Loans is 6.5%. The Company is required to repay $1.1 million of principal on its term loans on a quarterly basis. In addition, the Company is required to make Excess Cash Flow payments (as defined in the 2009 Credit Agreement), which will be applied to the then outstanding term loans. Excess Cash Flow payments are due no later than 90 days after the end of the fiscal year. The Company does not expect to be required to make a fiscal year 2010 Excess Cash Flow payment (as defined in the 2009 Credit Agreement). As of March 31, 2010, the Company's borrowings under the Term Facility and Revolving Facility were based on the JPMorgan prime rate.

Under the 2006 Credit Agreement, the Company had the option to pay interest based on a floating base rate option equal to the greater of the JPMorgan prime rate or the federal funds effective rate plus 0.5% or based on LIBOR, in each case plus a margin. The margin on all base rate borrowings was 2.5% and the margin on all LIBOR borrowings was 3.5% if the Company's corporate ratings were below Caa1 or CCC+. Otherwise, the margins under the term loan commitment were 2.25% for base rate borrowings and 3.25% for LIBOR borrowings, and the margins under the revolving commitment were based on the Company's leverage ratio and ranged from 0.75% to 2.25% for base rate borrowings and 1.75% to 3.25% for LIBOR borrowings. The Company was required to repay $1.1 million of principal on its term loan commitment borrowings on a quarterly basis, commencing on June 30, 2008. In addition, the Company was required to make an $8.1 million Excess Cash Flow payment (as defined in the 2006 Credit Agreement) on June 30, 2008, which was applied to the then outstanding term loans.

The 2009 Credit Agreement includes certain representations and warranties, conditions precedent, affirmative covenants, negative covenants and events of default customary for agreements of this type. The negative covenants include financial maintenance covenants comprised of a leverage ratio, a senior secured leverage ratio, a consolidated interest expense coverage ratio, and capital expenditure limits. The 2009 Credit Agreement also contains certain covenants that, subject to certain exceptions, restrict paying dividends, incurring additional indebtedness, creating liens, making acquisitions or other investments, entering into certain mergers or consolidations and selling or otherwise disposing of assets. The 2009 Credit Agreement includes a broadening of the circumstances that would give rise to prepayment of the loans and the introduction of more restrictive covenants, particularly relating to indebtedness, investments, restricted payments and capital expenditures. As of March 31, 2010, the Company is in compliance with all financial covenants under the 2009 Credit Agreement.

Although there can be no assurances, management anticipates that, based on current projections (including projected borrowings and repayments under the Revolving Facility), its operating results for fiscal year 2011 will be sufficient to satisfy the financial covenants under the 2009 Credit Agreement. The Company's ability to satisfy such financial covenants is dependent on its business performing in accordance with its projections. If the performance of the Company's business deviates from its projections, the Company may not be able to satisfy such financial covenants, including the senior secured leverage ratio. The Company's projections are subject to a number of factors, many of which are events beyond its control, which could cause the Company's actual results to differ materially from its projections. If the Company does not comply with these or other covenants and restrictions contained in the 2009 Credit Agreement, the Company could default under the 2009 Credit Agreement. The outstanding debt under the 2009 Credit Agreement could then be declared immediately due and payable. Moreover, the instruments governing almost all of the Company's other debt contain cross-acceleration provisions so that an acceleration under any of the Company's debt may result in a default under the Company's other debt. If a cross-acceleration occurs, the maturity of the Company's other debt could be accelerated and become immediately due and payable.

The indebtedness under the 2009 Credit Agreement is guaranteed by Media and the domestic subsidiaries of the Company and is secured by liens on substantially all of the assets of Media, the Company and its domestic subsidiaries. In addition, the Company's obligations are secured by a pledge of all of the issued and outstanding shares of, or other equity interests in, the Company and all of its existing or subsequently acquired or organized domestic subsidiaries and a percentage of the capital stock of, or other equity interests in, certain of its existing or subsequently acquired or organized foreign subsidiaries.

Payments of principal due under the 2009 Credit Agreement for future fiscal years are as follows (in thousands):

| Fiscal year | Principal amount |
|---|---|
| 2011 | $ 4,500 |
| 2012 | 25,500 |
| 2013 | 423,871 |
| 2014 | — |
| 2015 | — |
| | $ 453,871 |

## (7) Senior subordinated indebtedness

On May 7, 1999, the Company issued $250.0 million in aggregate principal amount of the 2009 Notes. On February 14, 2002, the Company issued $150.0 million in aggregate principal amount of the 2009 Notes. On January 23, 2003, the Company issued $150.0 million aggregate principal amount of the 2011 Notes.

The Prior Notes were unconditionally guaranteed, on a senior subordinated basis, by all of the Company's domestic subsidiaries. Prior Note guarantees were joint and several, full and unconditional and general unsecured obligations of the Prior Note guarantors. The Prior Note guarantees were subordinated in right of payment to all existing and future senior debt of the Prior Note guarantors, including the 2006 Credit Agreement, and were also effectively subordinated to all secured obligations of Note guarantors to the extent of the assets securing such obligations, including the 2006 Credit Agreement. Furthermore, the indentures governing the Prior Notes permitted the Prior Note guarantors to incur additional indebtedness, including senior debt, subject to certain limitations. See Note 18, "Supplemental Condensed Consolidating Financial Information."

Under the indentures governing the 2011 Notes, after January 15, 2010, the 2011 Notes are redeemable at par, plus accrued and unpaid interest.

The indentures governing the Prior Notes contained a number of covenants that, among other things, limited the Company's ability and that of its restricted subsidiaries, subject to important exceptions and qualifications, to: borrow money; guarantee other indebtedness; use assets as security in other transactions; pay dividends on stock, redeem stock or redeem subordinated debt; make investments; enter into agreements that restrict the payment of dividends by subsidiaries; sell assets; enter into affiliate transactions; sell capital stock of subsidiaries; enter into new lines of business; and merge or consolidate. In addition, these indentures imposed certain requirements as to future subsidiary guarantors and contained certain customary events of default.

The Company failed to meet a specified leverage ratio of 8:1 as of September 30, 2007, and as a result, the Company issued $20.0 million aggregate principal amount of additional 2009 Notes and 2011 Notes to the existing holders of the Prior Notes (the "December 2007 Issuance"). As of September 30, 2007, the Company recorded a liability at a fair market value of $17.3 million for such Prior Notes. The Company reduced this liability to reflect the fair market value of $17.1 million on December 13, 2007, the issuance date, and a related expense of $17.1 million is reflected for the issuance of the senior subordinated notes in the accompanying Consolidated Statement of Loss for the fiscal year ended March 31, 2008.

We failed to make the required semi-annual interest payment with respect to the 2009 Notes when due on November 1, 2008. Such failure resulted in an event of default pursuant to the terms of the indenture governing the 2009 Notes. We also failed to make the required semi-annual interest payment with respect to the 2011 Notes when due on January 15, 2009. In addition, we failed to file our quarterly report on Form 10-Q for the period ended September 30, 2008 when due on November 14, 2008. We also failed to comply with the requirements of indentures governing the Prior Notes relating to our failure to meet a specified leverage ratio as of September 30, 2008. As a result, we entered into forbearance agreements with existing holders of approximately 81% of the then outstanding aggregate principal amount of 2009 Notes and approximately 69% of the then outstanding aggregate principal amount of 2011

Notes, pursuant to which such holders agreed to forbear from exercising any remedies under the indentures governing the Prior Notes as a result of our aforementioned failures until we successfully completed our cash tender offers and consent solicitations with respect to the Prior Notes.

On January 29, 2009, the Company executed the following supplemental indentures which eliminated substantially all of the restrictive covenants, certain events of default and other related provisions in the indentures governing the Prior Notes: (i) the Ninth Supplemental Indenture among the Company, the Guarantors named therein and HSBC Bank USA, National Association, as trustee, with respect to the 2009 Notes, and (ii) the Seventh Supplemental Indenture among the Company, the Guarantors named therein and HSBC Bank USA, National Association, as trustee, with respect to the 2011 Notes.

On January 30, 2009, the Company issued: (i) $21.2 million aggregate principal amount of Senior PIK Notes and (ii) $299.7 million aggregate principal amount of Senior Subordinated Notes. Also on January 30, 2009, Media sold 5,688,891 shares of Common Stock (valued at approximately $1.0 million) for an aggregate purchase price of $126.0 million, pursuant to a purchase agreement dated January 29, 2009, among Media, the Company, the other parties named therein and J.P. Morgan Securities Inc. In addition, on January 30, 2009, Media issued 305,520 shares of Common Stock to the Prior Equityholders in exchange for the Common Stock they owned prior to the restructuring.

On January 30, 2009, $400.5 million of the 2009 Notes and $148.0 million of the 2011 Notes were validly tendered and accepted for payment and consents were delivered with respect to the Prior Notes. The cash proceeds received from the Offering, together with the Company's cash on hand, were used to purchase the tendered portion of the Prior Notes in the tender offers and to pay approximately $35.0 million of fees and expenses related to the Offering and the tender offers and consent solicitations.

The Senior PIK Notes are unsecured senior obligations of the Company and are effectively subordinated to all of the Company's existing and future secured debt, including obligations under the 2009 Credit Agreement. The Senior PIK Notes will mature on May 1, 2013. Interest on the Senior PIK Notes will accrue at the rate of 9% per annum based upon the outstanding principal amount. The 2009 Credit Agreement prohibits the payment of cash interest on the Senior PIK Notes.

The Senior Subordinated Notes are unsecured senior subordinated obligations of the Company and are subordinated in right of payment to the Company's existing and future senior debt, including obligations under the 2009 Credit Agreement and the Senior PIK Notes. The Senior Subordinated Notes will mature on November 1, 2013. Interest on the Senior Subordinated Notes will accrue at the rate of 14% per annum based upon the outstanding principal amount of the Senior Subordinated Notes (with (i) 10% per annum payable in cash, (ii) 2% per annum payable, at the Company's option, either in cash or by the issuance of additional Senior Subordinated Notes, and (iii) 2% per annum payable (x) in cash when the Company's Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is greater than $27.5 million and (y) at the Company's option, either in cash or by the issuance of additional Senior Subordinated Notes when the Company's Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is less than or equal to $27.5 million).

The New Notes are unconditionally guaranteed, on a senior subordinated basis, by all of the Company's domestic subsidiaries. The New Notes guarantees are joint and several, full and

unconditional and general unsecured obligations of the New Notes guarantors. The New Notes guarantees are subordinated in right of payment to all existing and future senior debt of the New Notes guarantors, including the 2009 Credit Agreement, and are also effectively subordinated to all secured obligations of New Notes guarantors to the extent of the assets securing such obligations, including the 2009 Credit Agreement. Furthermore, the indentures governing the New Notes permit the New Notes guarantors to incur additional indebtedness, including senior debt, subject to certain limitations. See Note 18, "Supplemental Condensed Consolidating Financial Information."

As of the date hereof, the 2009 Credit Agreement does not permit the payment of cash interest on the Senior Subordinated Notes (i) at a rate in excess of 10% per annum when the Company's Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is less than or equal to $27.5 million and (ii) at a rate in excess of 12% per annum when the Company's Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is greater than $27.5 million.

The Company pays interest on the New Notes semi-annually in arrears on May 1 and November 1 of each year, commencing on May 1, 2009. To date, interest with respect to (a) the Senior PIK Notes has been paid entirely by the issuance of additional Senior PIK Notes and (b) the Senior Subordinated Notes has been paid at the rate of 14% per annum in the form of additional Senior Subordinated Notes of $10.6 million on May 1, 2009 and $21.7 million on November 1, 2009.

Pursuant to the Indentures, beneficial owners of the New Notes, who together beneficially owned more than 75% in aggregate principal amount of the outstanding New Notes, consented on behalf of all holders of the New Notes that the $16.6 million interest payment due May 1, 2010 be deferred until June 15, 2010.

Under the Senior PIK Notes Indenture and the Senior Subordinated Notes Indenture, the Company is permitted to redeem some or all of the New Notes, at its option, at redemption prices set forth below.

| Year | Percentage |
|------|-----------|
| November 1, 2009 to October 31, 2010 | 102.00% |
| November 1, 2010 to October 31, 2011 | 101.00% |
| November 1, 2011 and thereafter | 100.00% |

The Indentures contain a number of covenants that, among other things, limit the Company's ability and that of its restricted subsidiaries, subject to important exceptions and qualifications, to: borrow money; guarantee other indebtedness; use assets as security in other transactions; pay dividends on stock, redeem stock or redeem subordinated debt; make investments; enter into agreements that restrict the payment of dividends by subsidiaries; sell assets; enter into affiliate transactions; sell capital stock of subsidiaries; enter into new lines of business; and merge or consolidate. In addition, the Indentures impose certain requirements as to future subsidiary guarantors and contain certain customary events of default.

As of March 31, 2010, the Company's total principal amount of senior subordinated debt was approximately $362.3 million, consisting of $7.5 million principal amount of 2011 Notes, $22.7 million principal amount of Senior PIK Notes and $332.1 million principal amount of Senior Subordinated Notes. The accompanying Consolidated Balance Sheet includes $198.4 million in future interest payments on the New Notes reflected in the carrying amount of our Senior Subordinated Indebtedness.

On May 1, 2009, the Company retired $14.0 million aggregate principal amount of the 2009 Notes then outstanding with cash on hand.

As part of the Restructuring, the Company recorded a gain on extinguishment of debt of $4.9 million in fiscal year 2009. This gain is comprised of $548.5 million of tendered Prior Notes and $38.1 million of forfeited interest on our Prior Notes, less: (i) $320.9 million principal amount of New Notes, (ii) $232.2 million in future interest payments on the New Notes reflected in the carrying amount of the Company's Senior Subordinated Notes in the accompanying Consolidated Balance Sheet, (iii) consent fees of $12.0 million, (iv) issuance costs of $10.1 million, (v) write-off of deferred costs related to the Prior Notes of $4.6 million, (vi) issuance of $1.0 million of Common Stock, and (vii) a write-off of discount associated with the Prior Notes of $0.9 million.

## (8) Deferred debt costs

Deferred debt costs, net are comprised of the following at March 31 (in thousands):

|  | 2010 | 2009 |
|---|---|---|
| 2009 Credit Agreement | $14,936 | $14,132 |
| Prior Notes | 406 | 951 |
| Consent and waiver fees | 156 | 447 |
| Less—accumulated amortization | (4,560) | (1,727) |
|  | $10,938 | $13,803 |

In connection with the amendment and restatement of the 2006 Credit Agreement in January 2009, the Company deferred approximately $14.1 million associated with these obligations. In the current year, the Company capitalized an additional $0.8 million in debt costs associated with the 2009 Credit Agreement. In connection with waiver agreements with respect to the 2006 Credit Agreement and consent agreements with respect to the Prior Notes that the Company entered into in April 2007 and May 2007, the Company deferred approximately $0.9 million associated with these obligations. In May 2009 the Company retired the remaining aggregate principal amount of the 2009 Notes and the deferred debt costs associated with the notes were fully amortized and written-off.

## (9) Related party transactions

In April 2003, Media, THL Managers V, LLC, an affiliate of Thomas H. Lee Partners L.P. ("T.H. Lee"), and Evercore Advisors L.P., an affiliate of Evercore Partners LLP ("Evercore"), entered into a management agreement (the "Management Agreement") pursuant to which THL Managers V, LLC and Evercore Advisors L.P. provided certain management and advisory services to Media and its subsidiaries for an annual fee of $1.0 million each. Management fees of $1.0 million were paid to each of Evercore and T.H. Lee in fiscal year 2006. Pursuant to certain of the supplemental indentures the Company entered into in fiscal year 2007, such fees for fiscal years 2007, 2008 and 2009 were accrued and payments for such fees were not made beginning in fiscal year 2007 or thereafter. As required by the 2009 Credit Agreement, the Management Agreement was terminated as of January 30, 2009 and unpaid management fees totaling $6.0 million were waived.

Prior to the Restructuring, certain affiliates of T.H. Lee owned 59.0% of the Class A units of EMP Group L.L.C. (the "LLC"), and certain affiliates of Evercore owned 21.8% of the Class A units of

the LLC. Evercore and T.H. Lee and their affiliates beneficially owned approximately 10% and 62%, respectively, of Vertis, Inc. ("Vertis") until Vertis emerged from a pre-packaged bankruptcy on August 26, 2008. As of August 26, 2008, Vertis ceased to be a related party.

As a result of the Restructuring, Vertis again became a related party effective January 30, 2009 due to the new shareholders of Media holding significant equity interests in Vertis following its emergence from bankruptcy.

Vertis performs significant portions of the Company's Tabloid Publications pre-press operations. Purchases of this service from Vertis totaled $2.6 million, $3.1 million and $3.0 million for fiscal years 2010, 2009 and 2008, respectively. At March 31, 2010 and 2009, the Company had payables due to Vertis of $285,000 and $301,000, respectively.

## (10) Investments in joint ventures

### Mr. Olympia, LLC

In April 2005, the Company entered into a limited liability company agreement (the "Olympia Agreement") to form a joint venture ("Mr. Olympia, LLC") to manage and promote the Mr. Olympia fitness events. At any time prior to the tenth anniversary of the execution date of the Olympia Agreement the other limited liability company member may require the Company to purchase all of the limited liability company units ("Put Option") for a cash purchase price of $3.0 million. In the event that the other limited liability company member does not exercise the Put Option, for a period of 120 days following the tenth anniversary of the date of execution of the Olympia Agreement, the Company may require the other limited liability company member to sell all of its limited liability company units ("Call Option") for a sale price of $3.0 million.

In April 2005, the other limited liability company member licensed certain trademarks related to the Mr. Olympia fitness events (collectively, the "Olympia Trademarks") to Mr. Olympia, LLC in exchange for the Company paying $3.0 million over a ten year period. In the event that the Put Option or Call Option is exercised, the Olympia Trademarks will be transferred and owned by Mr. Olympia, LLC. Any remaining balance of the $3.0 million license fee will become due and payable upon such exercise. In the event that the Put Option or Call Option is not exercised, Mr. Olympia, LLC retains the right to the Olympia Trademarks in perpetuity once the $3.0 million license fee is paid.

The Company has concluded that it is the primary beneficiary of the limited liability company and, consequently, the Company accounts for the limited liability company as a consolidated subsidiary. The Company has recorded the $3.0 million Put/Call Option and the $3.0 million Olympia Trademarks as an indefinite lived intangible asset in the accompanying Consolidated Balance Sheets as of March 31, 2010 and 2009. In addition, the Company has recorded $4.2 million of accrued expenses and other liabilities at March 31, 2010 which represents the remaining obligation for the Put/Call Option and the license fee associated with the Olympia Trademarks.

### Radar Online, LLC

In October 2008, the Company entered into a limited liability company agreement (the "Radar Online Agreement") to form a joint venture ("Radar Online, LLC") to manage the RadarOnline.com website. The Company owns 50% of Radar Online, LLC and accounts for this joint venture using the equity method, and therefore does not consolidate Radar Online, LLC in its Consolidated Financial Statements. The impact of Radar Online, LLC to the Company's

Consolidated Financial Statements for fiscal year 2010 is insignificant. Radar Online, LLC management fees receivable totaled $716,000 and $216,000 as of March 31, 2010 and 2009, respectively. The management fees are included in the Consolidated Balance Sheet within other long-term assets.

# (11) Commitments and contingencies

### Litigation

On March 10, 2009, Anderson News, L.L.C. and Anderson Services, L.L.C., magazine wholesalers (collectively, "Anderson"), filed a lawsuit against Media, DSI and various magazine publishers, wholesalers and distributors in the Federal District Court for the Southern District of New York (the "Anderson Action"). Anderson's complaint alleges that the defendants violated Section 1 of the Sherman Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Plaintiffs also purport to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint does not specify the amount of damages sought. While it is not possible to predict with certainty the outcome of the Anderson Action or to estimate the impact on the Company, if any, Media and DSI have been, and intend to continue to, vigorously defend the case.

In addition, because the focus of some of the Company's publications often involves celebrities or controversial subjects, the risk of defamation or invasion of privacy litigation exists. The Company's experience indicates that the claims for damages made in such lawsuits are usually defensible and heavily inflated and, in any event, any reasonably foreseeable material liability or settlement would likely be covered by insurance.

The Company periodically evaluates and assesses the risks and uncertainties associated with litigation disregarding the existence of insurance that would cover liability for such litigation. At present, in the opinion of management, after consultation with outside legal counsel, the liability resulting from such litigation, even if insurance was not available, is not expected to have a material effect on the Company's Consolidated Financial Statements.

### Printing agreement

The Company has a printing agreement expiring in fiscal year 2018 with R.R. Donnelley & Sons Company ("RR Donnelley") to print *National Enquirer, Globe, Shape, Men's Fitness, Fit Pregnancy, Muscle & Fitness, Muscle & Fitness Hers, Flex, Natural Health, National Examiner, Sun, Mira!* and *Country Weekly.* Additionally, the Company has printing agreements with Quad/Graphics, Inc. to print *Star* expiring in fiscal year 2015, Trend Offset Printing, Inc. to print *Star* expiring in fiscal year 2012 and Arti Grafiche Boccia, S.p.A. ("AGB") to print certain of its European publications expiring in fiscal year 2011. These contracts, with the exception of the contract with AGB, require pricing adjustments based on the Consumer Price Index. Based on current pricing and production levels, these contracts are estimated to cost approximately $377.0 million over their remaining life as follows (in thousands):

| Fiscal year | |
| --- | --- |
| 2011 | $ 57,642 |
| 2012 | 57,711 |
| 2013 | 48,313 |
| 2014 | 49,659 |
| 2015 | 42,145 |
| Thereafter | 121,553 |
| | $377,023 |

### Pre-press agreement

The Company has a pre-press agreement expiring in its fiscal year 2018 with RR Donnelley for *Shape*, *Men's Fitness*, *Muscle & Fitness Hers*, *Fit Pregnancy*, *Muscle & Fitness*, *Flex*, and *Natural Health*. All other titles are under a pre-press agreement with Vertis, expiring in the Company's fiscal year 2013. Based on current pricing and production levels, these contracts, one of which requires pricing adjustments based on changes in the Consumer Price Index, are estimated to cost approximately $26.1 million over their remaining life. See Note 9, "Related Party Transactions," for a discussion of the Company's pre-press relationship with Vertis. Commitments under these agreements at March 31, 2010 are as follows (in thousands):

| Fiscal year | |
| --- | ---: |
| 2011 | $ 4,911 |
| 2012 | 4,978 |
| 2013 | 3,159 |
| 2014 | 2,601 |
| 2015 | 2,674 |
| Thereafter | 7,751 |
| | $26,074 |

### Transportation agreement

The Company has a transportation agreement expiring in fiscal year 2018 with RR Donnelley to transport *Star, National Enquirer, Globe, National Examiner, Sun, Country Weekly and Mira!* to wholesalers within the continental United States and Canada. Commitments under this agreement at March 31, 2010 are as follows (in thousands):

| Fiscal year | |
| --- | ---: |
| 2011 | $ 6,548 |
| 2012 | 6,730 |
| 2013 | 6,918 |
| 2014 | 7,110 |
| 2015 | 7,308 |
| Thereafter | 21,185 |
| | $55,799 |

### Subscription agreement

The Company has a subscription agreement with CDS Global, Inc. expiring in the Company's fiscal year 2015 for subscription fulfillment services for *National Enquirer, Globe, Shape, Men's Fitness, Fit Pregnancy, Muscle & Fitness, Muscle & Fitness Hers, Flex, Natural Health, National Examiner and Sun*. Commitments under this agreement at March 31, 2010 are as follows (in thousands):

| Fiscal year | |
| --- | ---: |
| 2011 | $ 7,615 |
| 2012 | 7,441 |
| 2013 | 7,270 |
| 2014 | 7,104 |
| 2015 | 5,205 |
| Thereafter | — |
| | $34,635 |

### Operating leases

Minimum annual commitments under non-cancelable operating leases at March 31, 2010 are as follows (in thousands):

| Fiscal year | |
| --- | --- |
| 2011 | $4,948 |
| 2012 | 2,474 |
| 2013 | 593 |
| 2014 | 90 |
| 2015 | 74 |
| Thereafter | 218 |
| | $8,397 |

Rent expenses under real property and equipment leases were $5.7 million, $5.8 million and $5.4 million for fiscal years 2010, 2009 and 2008, respectively, and are included in selling, general and administrative expense in the accompanying Consolidated Statements of Income (Loss).

### Other agreements

The Company has a consulting agreement expiring in fiscal year 2012 with an unrelated company to assist with the marketing of its brands. The Company has a consumer marketing agreement expiring in fiscal year 2011 with an unrelated company for the printing of consumer marketing materials. These contracts are estimated to cost approximately $7.8 million over their remaining life.

### Trademark license agreement

As part of the acquisition of the Weider publications in January 2003, the Company entered into a trademark license agreement with Weider Health and Fitness which grants the Company the exclusive right to use the Weider trademarks on the cover and in the editorial content of *Shape*, *Muscle & Fitness*, *Muscle & Fitness Hers*, *Men's Fitness*, *Flex*, *Natural Health* and *Fit Pregnancy* and in any future healthy living or fitness-related publications in any media. The Company was also given the non-exclusive right to use the trade name Joe Weider on products and services other than publications. The Company pays Weider Health and Fitness $0.2 million per year pursuant to the trademark license agreement and has estimated that such payments will continue through 2017. The Company also has the right to use the Weider, Team Weider and Joe Weider trademarks in most other countries in the world.

## (12) Selected quarterly financial data (Unaudited)

Quarterly financial data for fiscal years 2010 and 2009 is as follows (in thousands):

| | Operating revenues | Gross profit | Operating income (Loss) | Net (Loss) income |
|---|---|---|---|---|
| **2010** | | | | |
| Q1 2010(a) | $103,096 | $41,700 | $ 3,476(b) | $ (8,279)(b) |
| Q2 2010(a) | 108,634 | 46,678 | 27,678 | 10,803 |
| Q3 2010(a) | 94,853 | 38,530 | 19,399 | (18,837) |
| Q4 2010 | 105,847 | 49,662 | 30,424 | 19,531 |
| **2009** | | | | |
| Q1 2009 | $118,822 | $51,884 | $ 25,552 | $ 388 |
| Q2 2009 | 128,799 | 53,960 | 28,968 | 623 |
| Q3 2009 | 101,288 | 33,905 | (209,216)(c) | (190,741)(c) |
| Q4 2009 | 112,740 | 44,899 | 27,665(d) | 6,407(d) |

(a) Amounts as reported in the Company's fiscal quarters ended June 30, 2009 (Q1 fiscal year 2010), September 30, 2009 (Q2 fiscal year 2010), and December 31, 2009 (Q3 fiscal year 2010) Quarterly Reports.

(b) Operating income and net loss for the first quarter of fiscal year 2010 includes a provision for impairment of tradenames, goodwill and other identified intangibles of $17.6 million.

(c) Operating loss and net loss for the third quarter of fiscal year 2009 includes a provision for impairment of tradenames, goodwill and other identified intangibles of $217.8 million.

(d) Operating income and net income for the fourth quarter of fiscal year 2009 includes a reduction to the provision for impairment of tradenames, goodwill and other identified intangibles of $0.5 million. Net income for the fourth quarter of fiscal year 2009 includes a gain on extinguishment of debt of $4.9 million.

## (13) Business segment information

The Company has aggregated its business into five reporting segments: Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications, Distribution Services and Corporate/Other. The aggregation of the Company's business is based upon the Company's publications having the following similarities: economic characteristics, types of products and services, types of production processes, type or class of customers, and method of distribution.

The Celebrity Publications segment aggregation includes *Star* and *Country Weekly*.

The Tabloid Publications segment aggregation includes *National Enquirer, Globe,* and *National Examiner*.

The Women's Health and Fitness Publications segment aggregation includes *Shape* and *Fit Pregnancy*.

The Distribution Services segment is comprised of DSI, which arranges for the placement of the Company's publications and third-party publications with retailers and monitors through its regional managers and merchandising staff that the Company's publications and third-party publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great A&P Tea Company and Winn Dixie. DSI also coordinates (also known as acting as a "category manager/front-end advisor") the racking of magazine fixtures for selected retailers. In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients.

The Corporate/Other segment aggregation includes the following publications: *Muscle & Fitness*, *Men's Fitness, Muscle & Fitness Hers, Flex, UFC Magazine, Natural Health, Sun,* and *Mira!*. In addition, the Corporate/Other segment also includes publishing services, ancillary sales and corporate overhead. Ancillary sales primarily relate to licensing, syndication and new media. Corporate expenses not allocated to other segments include production and circulation department costs, and executive staff support departments such as information technology, accounting, legal, human resources and administration. While most of the publications aggregated in the Corporate/Other segment have certain similar products and services, production processes, type or class of customers, and method of distribution as some of the other publications which are aggregated into the other reporting segments (Celebrity Publications, Tabloid Publications and Women's Health and Fitness Publications), their economic characteristics are dissimilar with such other publications. Accordingly, the Company has aggregated those publications into the Corporate/Other reporting segment.

The Company's accounting policies are the same for all reportable segments.

## Segment data

The following table presents the results of and assets employed in the Company's five reporting segments for fiscal years 2010, 2009 and 2008, respectively. The information includes certain intersegment transactions and is, therefore, not necessarily indicative of the results had the operations existed as stand-alone businesses. Intersegment transactions represent intercompany advertising and other services, which are billed at what management believes are prevailing market rates. These intersegment transactions, which represent transactions between operating units in different business segments, are eliminated in consolidation. The results of operations exclude the results of our discontinued operations for all periods presented. See Note 3, "Discontinued Operations," for a discussion regarding discontinued operations.

| | Segment (in thousands) | | | | | | (in thousands) |
|---|---|---|---|---|---|---|---|
| | Celebrity publications | Tabloid publications | Women's Health and Fitness publications | Distribution services | Corporate/ other(1) | Elimination entries | Consolidated total |
| **Operating revenues** | | | | | | | |
| Fiscal year ended 2010 .......... | $102,172 | $131,715 | $ 63,753 | $29,215 | $ 93,762 | $(8,187)(2) | $ 412,430 |
| Fiscal year ended 2009 .......... | $113,731 | $134,064 | $ 78,337 | $32,931 | $111,129 | $(8,543)(2) | $ 461,649 |
| Fiscal year ended 2008 .......... | $127,667 | $140,667 | $ 85,533 | $32,956 | $112,649 | $(8,698)(2) | $ 490,774 |
| **Operating income (loss)** | | | | | | | |
| Fiscal year ended 2010(3)...... | $ 26,843 | $ 63,323 | $    (634) | $ 5,949 | $(14,504) | $    — | $  80,977 |
| Fiscal year ended 2009(4)...... | $ (42,038) | $ (24,600) | $(40,709) | $ 6,831 | $(26,515) | $    — | $(127,031) |
| Fiscal year ended 2008(5)...... | $ 20,747 | $ 64,832 | $ 29,248 | $ 8,666 | $(56,439) | $    — | $  67,054 |
| **Depreciation and amortization** | | | | | | | |
| Fiscal year ended 2010 .......... | $       18 | $   2,622 | $     — | $   865 | $  3,128 | $    — | $   6,633 |
| Fiscal year ended 2009 .......... | $   1,297 | $   2,622 | $     — | $   176 | $  5,478 | $    — | $   9,573 |
| Fiscal year ended 2008 .......... | $   1,916 | $   2,628 | $     — | $   173 | $  7,871 | $    — | $  12,588 |
| **Amortization of deferred rack costs** | | | | | | | |
| Fiscal year ended 2010 .......... | $   1,850 | $   2,962 | $   304 | $     — | $    776 | $    — | $   5,892 |
| Fiscal year ended 2009 .......... | $   3,072 | $   4,934 | $   452 | $     — | $  2,774 | $    — | $  11,232 |
| Fiscal year ended 2008 .......... | $   2,164 | $   4,786 | $   610 | $     — | $  3,099 | $    — | $  10,659 |
| **Provision for impairment of intangible assets and goodwill** | | | | | | | |
| Fiscal year ended 2010 .......... | $       — | $       — | $ 17,595 | $     — | $     — | $    — | $  17,595 |
| Fiscal year ended 2009 .......... | $ 63,072 | $ 83,247 | $ 62,021 | $     — | $  9,010 | $    — | $ 217,350 |
| Fiscal year ended 2008 .......... | $ 11,470 | $       — | $     — | $     — | $ 19,627 | $    — | $  31,097 |
| **Total Assets** | | | | | | | |
| At March 31, 2010 .................. | $111,508 | $249,588 | $ 76,550 | $15,645 | $167,168 | $    — | $ 620,459 |
| At March 31, 2009 .................. | $112,355 | $248,776 | $ 98,054 | $18,155 | $189,503 | $    — | $ 666,843 |

(1)    Income tax expense of $22.8 million, income tax benefit of $33.3 million, income tax expense of $3.3 million, interest expense of $50.6 million, $85.3 million and $99.0 million, other expense related to senior subordinated notes issued of $0, $0 and $17.1 million, and amortization of deferred debt costs of $3.9 million, $9.8 million and $10.9 million for fiscal years 2010, 2009 and 2008, respectively, are included in the Corporate/Other segment.

(2)    Substantially all of the amount represents revenues from transactions with the Distribution Services segment.

(3)    Operating (loss) income includes the provision for impairment of tradenames and other identified intangibles of $3.0 million for Women's Health and Fitness Publications and the provision for impairment of goodwill of $14.6 million for Women's Health and Fitness Publications.

(4)    Operating (loss) income includes the provision for impairment of tradenames and other identified intangible assets of $47.9 million for Celebrity Publications, $31.9 million for Tabloid Publications, $15.0 million for Women's Health and Fitness Publications and $8.3 million for Corporate/Other and the provision for impairment of goodwill of $15.2 million for Celebrity Publications, $51.3 million for Tabloid Publications, $47.0 million for Women's Health and Fitness Publications and $0.7 million for Corporate/Other.

(5)    Operating (loss) income includes the provision for impairment of tradenames and other identified intangibles of $3.3 million for Celebrity Publications and the provision for impairment of goodwill of $8.2 million for Celebrity Publications and $19.6 million for Corporate/Other.

## (14) Severance charges

The Company incurred severance charges related to the closures and re-launch of publications for each of fiscal years 2010, 2009 and 2008. The Company also incurred severance charges in connection with the implementation of initiatives related to cost savings opportunities during the fourth fiscal quarter of fiscal year 2009 when it terminated approximately 113 employees. Severance charges for fiscal years 2010, 2009 and 2008 were approximately $1.0 million, $3.9 million and $1.5 million, respectively. At March 31, 2010 and 2009, the Company had accrued severance charges of $0.4 million and $1.1 million, respectively.

## (15) Benefit plans

The Company maintains a 401(k) plan covering all eligible employees. Subject to certain dollar limits, eligible employees may contribute up to 20% of their pre-tax annual compensation to the plan. The Company may make discretionary contributions on an annual basis. During part of fiscal year 2009 and all of fiscal year 2008, the Company made matching contributions of 100% of the first 2% of participating employee's eligible contributions. Effective December 31, 2008, the Company suspended its matching contributions due to the current economic downturn. The Company's matching contributions were approximately $0 million, $0.5 million and $0.6 million in fiscal years 2010, 2009 and 2008, respectively.

## (16) *Men's Fitness* international licensing

On September 19, 2009, the Company received $0.2 million from a licensee (the "Former Licensee") for the termination of its *Men's Fitness* license agreement in the United Kingdom and Ireland (the "Termination Agreement"). Simultaneously with the Termination Agreement, the Former Licensee also paid the Company $0.6 million to purchase the trademarks, domain names and the exclusive and sub-licensable right to publish *Men's Fitness* in the United Kingdom and Ireland, which amount has been reflected as gain on sale of assets in fiscal year ended March 31, 2010.

Under a separate agreement also entered into on September 19, 2009, the Company also received $2.0 million from the Former Licensee (the "Licensing Cooperation Agreement") to publish licensed editions of *Men's Fitness* in five new countries. The $2.0 million received from the Former Licensee is included in other non-current liabilities in the accompanying Consolidated Balance Sheets. The Former Licensee may terminate the Licensing Cooperation Agreement upon one year's written notice if the Company fails to begin publishing *Men's Fitness* in its existing locations, which exclude the United Kingdom and Ireland, within the one-year period. The Company may terminate the Licensing Cooperation Agreement upon one year's written notice if the Former Licensee fails to begin publishing *Men's Fitness* in the new countries within the one-year period.

## (17) License agreement and publishing services

### UFC Magazine

In August 2009, the Company entered into a magazine publishing and license agreement with Zuffa, LLC ("UFC"). Under this agreement, the Company licensed from UFC the right to publish, produce, market and distribute a publication titled *UFC Magazine.* The first bi-monthly issue of *UFC Magazine* under this agreement went on sale in November 2009. In consideration for the

licensing rights, the Company will make quarterly payments to UFC based on the net profit generated by *UFC Magazine*. The impact of *UFC Magazine* to the Company's Consolidated Financial Statements for fiscal year 2010 is insignificant.

### Playboy

In November 2009, the Company entered into a publishing services agreement with Playboy Enterprises, Inc. ("Playboy"). Under this agreement, the Company assumed responsibility for *Playboy* magazine's advertising sales and marketing, circulation and production management, newsstand distribution and back office financial services as of January 2010. In consideration for these services, Playboy makes payments to the Company for certain service fees, certain cost savings and subscription revenue incentives. In addition, the Company provides advertising services to Playboy.com and management for certain Playboy events. The impact of *Playboy* to the Company's Consolidated Financial Statements for fiscal year 2010 is insignificant.

### World Wrestling Entertainment

In November 2009, the Company entered into a publishing services agreement with World Wrestling Entertainment, Inc. ("WWE") to provide advertising sales and other related support services for both *WWE* magazine and *WWE Kids* magazine as of February 2010. In consideration for these services, WWE pays the Company certain service fees. The impact of *WWE* to the Company's Consolidated Financial Statements for fiscal year 2010 is insignificant.

## (18) Supplemental condensed consolidating financial information

The following tables present condensed consolidating financial information of (a) the parent company, American Media Operations, Inc., as issuer of the Prior Notes and New Notes, (b) on a combined basis, the subsidiary guarantors of the Prior Notes and New Notes, and (c) on a combined basis, the subsidiaries that are not guarantors of the Prior Notes and New Notes. Separate financial statements of the subsidiary guarantors are not presented because each of the subsidiary guarantors is 100% owned by the parent company issuer, and the guarantee by each subsidiary guarantor is full and unconditional and joint and several. As a result and in accordance with Rule 3-10(f) of Regulation S-X under the Securities Exchange Act of 1934, as amended, the Company includes the following:

# Supplemental condensed consolidating balance sheet
## As of March 31, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS:** | | | | | |
| Cash and cash equivalents | $   274 | $   4,624 | $ 1,708 | $   — | $   6,606 |
| Trade receivables, net | — | 46,705 | 1,798 | — | 48,503 |
| Inventories | — | 12,972 | 476 | — | 13,448 |
| Prepaid expenses and other current assets | 94 | 25,026 | 599 | (5,487) | 20,232 |
| Total current assets | 368 | 89,327 | 4,581 | (5,487) | 88,789 |
| **PROPERTY AND EQUIPMENT, NET:** | | | | | |
| Leasehold improvements | — | 1,824 | — | — | 1,824 |
| Furniture, fixtures and equipment | — | 31,347 | 452 | — | 31,799 |
| Less—accumulated depreciation | — | (26,780) | (349) | — | (27,129) |
| Total property and equipment, net | — | 6,391 | 103 | — | 6,494 |
| **OTHER ASSETS:** | | | | | |
| Deferred debt costs, net | 10,938 | — | — | — | 10,938 |
| Deferred rack costs, net | — | 8,461 | — | — | 8,461 |
| Other long-term assets | — | 3,257 | — | — | 3,257 |
| Investment in subsidiaries | 457,200 | 983 | — | (458,183) | — |
| Total other assets | 468,138 | 12,701 | — | (458,183) | 22,656 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | | | | |
| Goodwill | — | 226,376 | 4,509 | — | 230,885 |
| Other identified intangibles, net | 6,000 | 265,635 | — | — | 271,635 |
| Total goodwill and other identified intangible assets | 6,000 | 492,011 | 4,509 | — | 502,520 |
| **TOTAL ASSETS** | $ 474,506 | $ 600,430 | $ 9,193 | $(463,670) | $  620,459 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | | | | | |
| Term loan | $   4,500 | $   — | $   — | $   — | $   4,500 |
| Senior subordinated notes, net | 39,458 | — | — | — | 39,458 |
| Accounts payable | 2 | 14,688 | 989 | — | 15,679 |
| Accrued expenses and other liabilities | 4,413 | 38,564 | 445 | (4,867) | 38,555 |
| Accrued interest | 1,433 | — | — | — | 1,433 |
| Deferred revenues | 266 | 36,182 | 481 | — | 36,929 |
| Total current liabilities | 50,072 | 89,434 | 1,915 | (4,867) | 136,554 |
| **NON-CURRENT LIABILITIES:** | | | | | |
| Term loan and revolving credit facility | 449,371 | — | — | — | 449,371 |
| Senior subordinated notes, net | 521,151 | — | — | — | 521,151 |
| Other non-current liabilities | 7,083 | 2,000 | — | — | 9,083 |
| Deferred income taxes | — | 83,428 | (74) | (620) | 82,734 |
| Due (from) to affiliates | 25,263 | (31,632) | 6,369 | — | — |
| Total liabilities | 1,052,940 | 143,230 | 8,210 | (5,487) | 1,198,893 |
| **STOCKHOLDER'S (DEFICIT) EQUITY:** | | | | | |
| Total stockholder's (deficit) equity | (578,434) | 457,200 | 983 | (458,183) | (578,434) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | $ 474,506 | $ 600,430 | $ 9,193 | $(463,670) | $  620,459 |

# Supplemental condensed consolidating balance sheet
## As of March 31, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS:** | | | | | |
| Cash and cash equivalents | $ 388 | $ 16,891 | $1,716 | $ — | $ 18,995 |
| Trade receivables, net | — | 59,478 | 1,798 | — | 61,276 |
| Inventories | — | 17,848 | 415 | — | 18,263 |
| Prepaid expenses and other current assets | 67 | 20,668 | 535 | (5,488) | 15,782 |
| Total current assets | 455 | 114,885 | 4,464 | (5,488) | 114,316 |
| **PROPERTY AND EQUIPMENT, NET:** | | | | | |
| Leasehold improvements | — | 1,818 | — | — | 1,818 |
| Furniture, fixtures and equipment | — | 28,495 | 381 | — | 28,876 |
| Less—accumulated depreciation | — | (24,097) | (335) | — | (24,432) |
| Total property and equipment, net | — | 6,216 | 46 | — | 6,262 |
| **OTHER ASSETS:** | | | | | |
| Deferred debt costs, net | 13,803 | — | — | — | 13,803 |
| Deferred rack costs, net | — | 6,686 | — | — | 6,686 |
| Other long-term assets | — | 2,304 | 7 | — | 2,311 |
| Investment in subsidiaries | 437,218 | 1,177 | — | (438,395) | — |
| Total other assets | 451,021 | 10,167 | 7 | (438,395) | 22,800 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | | | | |
| Goodwill | — | 240,938 | 4,510 | — | 245,448 |
| Other identified intangibles, net | 6,000 | 272,017 | — | — | 278,017 |
| Total goodwill and other identified intangible assets | 6,000 | 512,955 | 4,510 | — | 523,465 |
| **TOTAL ASSETS** | $ 457,476 | $ 644,223 | $9,027 | $(443,883) | $ 666,843 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | | | | | |
| Term loan | $ 4,500 | $ — | $ — | $ — | $ 4,500 |
| Senior subordinated notes, net | 29,542 | — | — | — | 29,542 |
| Accounts payable | 4 | 26,476 | 919 | — | 27,399 |
| Accrued expenses and other liabilities | 4,633 | 43,088 | 407 | 3,668 | 51,796 |
| Accrued interest | 5,067 | 1 | — | — | 5,068 |
| Deferred revenues | 176 | 37,146 | 420 | — | 37,742 |
| Total current liabilities | 43,922 | 106,711 | 1,746 | 3,668 | 156,047 |
| **NON-CURRENT LIABILITIES:** | | | | | |
| Term loan and revolving credit facility | 482,871 | — | — | — | 482,871 |
| Senior subordinated notes, net | 545,078 | — | — | — | 545,078 |
| Other non-current liabilities | 6,174 | — | — | — | 6,174 |
| Deferred income taxes | — | 67,797 | (265) | (9,156) | 58,376 |
| Due (from) to affiliates | (38,866) | 32,497 | 6,369 | — | — |
| Total liabilities | 1,039,179 | 207,005 | 7,850 | (5,488) | 1,248,546 |
| **STOCKHOLDER'S (DEFICIT) EQUITY:** | | | | | |
| Total stockholder's (deficit) equity | (581,703) | 437,218 | 1,177 | (438,395) | (581,703) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | $ 457,476 | $ 644,223 | $9,027 | $(443,883) | $ 666,843 |

# Supplemental condensed consolidating statement of income
# For the fiscal year ended March 31, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| OPERATING REVENUES: | | | | | |
| Circulation | | $ 241,636 | $ 4,578 | $ — | $ 246,214 |
| Advertising | — | 128,283 | 5,998 | — | 134,281 |
| Other | 3,384 | 27,391 | 1,160 | — | 31,935 |
| Total operating revenues | 3,384 | 397,310 | 11,736 | — | 412,430 |
| OPERATING EXPENSES: | | | | | |
| Editorial | — | 43,290 | 1,017 | — | 44,307 |
| Production | 2,043 | 114,393 | 3,224 | — | 119,660 |
| Distribution, circulation and other cost of sales | — | 69,762 | 2,131 | — | 71,893 |
| Selling, general and administrative | 328 | 68,507 | 2,530 | — | 71,365 |
| Depreciation and amortization | — | 6,603 | 30 | — | 6,633 |
| Provision for impairment of intangible assets and goodwill | — | 17,595 | — | — | 17,595 |
| Total operating expenses | 2,371 | 320,150 | 8,932 | — | 331,453 |
| OPERATING INCOME (LOSS) | 1,013 | 77,160 | 2,804 | — | 80,977 |
| OTHER (EXPENSE) INCOME: | | | | | |
| Interest expense | (50,731) | 130 | — | — | (50,601) |
| Amortization of deferred debt costs | (3,893) | — | — | — | (3,893) |
| Other (expense) income, net | — | — | — | — | — |
| Gain on extinguishment of debt | — | — | — | — | — |
| Total other (expense) income | (54,624) | 130 | — | — | (54,494) |
| INCOME (LOSS) BEFORE PROVISION (BENEFIT) FOR INCOME TAXES, AND EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | (53,611) | 77,290 | 2,804 | — | 26,483 |
| PROVISION (BENEFIT) FOR INCOME TAXES | (37,356) | 59,272 | 840 | — | 22,756 |
| EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | 19,982 | 1,964 | — | (21,946) | — |
| NET INCOME (LOSS) | 3,727 | 19,982 | 1,964 | (21,946) | 3,727 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (509) | — | — | — | (509) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC AND SUBSIDIARIES | $ 3,218 | $ 19,982 | $ 1,964 | $(21,946) | $ 3,218 |

# Supplemental condensed consolidating statement of loss
# For the fiscal year ended March 31, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | |
| Circulation | $    — | $ 249,864 | $  5,095 | $    — | $ 254,959 |
| Advertising | — | 164,616 | 6,511 | — | 171,127 |
| Other | 3,305 | 31,009 | 1,249 | — | 35,563 |
| Total operating revenues | 3,305 | 445,489 | 12,855 | — | 461,649 |
| **OPERATING EXPENSES:** | | | | | |
| Editorial | — | 48,000 | 779 | — | 48,779 |
| Production | 2,252 | 136,196 | 3,549 | — | 141,997 |
| Distribution, circulation and other cost of sales | — | 83,946 | 2,279 | — | 86,225 |
| Selling, general and administrative | 275 | 81,186 | 3,295 | — | 84,756 |
| Depreciation and amortization | — | 9,533 | 40 | — | 9,573 |
| Provision for impairment of intangible assets and goodwill | — | 217,350 | — | — | 217,350 |
| Total operating expenses | 2,527 | 576,211 | 9,942 | — | 588,680 |
| OPERATING INCOME (LOSS) | 778 | (130,722) | 2,913 | — | (127,031) |
| **OTHER (EXPENSE) INCOME:** | | | | | |
| Interest expense | (85,042) | (209) | — | — | (85,251) |
| Amortization of deferred debt costs | (9,849) | — | — | — | (9,849) |
| Other (expense) income, net | 39 | 405 | 93 | — | 537 |
| Gain on extinguishment of debt | 4,858 | — | — | — | 4,858 |
| Total other (expense) income | (89,994) | 196 | 93 | — | (89,705) |
| (LOSS) INCOME BEFORE PROVISION (BENEFIT) FOR INCOME TAXES, EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES AND INCOME FROM DISCONTINUED OPERATIONS | (89,216) | (130,526) | 3,006 | — | (216,736) |
| (BENEFIT) PROVISION FOR INCOME TAXES | — | (34,241) | 902 | — | (33,339) |
| (LOSSES) EQUITY IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | (93,681) | 2,104 | — | 91,577 | — |
| (LOSS) INCOME FROM CONTINUING OPERATIONS | (182,897) | (94,181) | 2,104 | 91,577 | (183,397) |
| INCOME FROM DISCONTINUED OPERATIONS, NET OF INCOME TAXES | — | 500 | — | — | 500 |
| NET (LOSS) INCOME | (182,897) | (93,681) | 2,104 | 91,577 | (182,897) |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (426) | — | — | — | (426) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC AND SUBSIDIARIES | $(183,323) | $  (93,681) | $  2,104 | $91,577 | $ (183,323) |

# Supplemental condensed consolidating statement of loss
# For the fiscal year ended March 31, 2008

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| OPERATING REVENUES: | | | | | |
| Circulation ................................... | $ — | $265,575 | $ 6,142 | $ — | $ 271,717 |
| Advertising ................................. | — | 174,316 | 7,178 | — | 181,494 |
| Other ......................................... | 2,848 | 33,414 | 1,301 | — | 37,563 |
| Total operating revenues........................ | 2,848 | 473,305 | 14,621 | — | 490,774 |
| OPERATING EXPENSES: | | | | | |
| Editorial ..................................... | — | 50,269 | 1,258 | — | 51,527 |
| Production................................... | 1,880 | 132,434 | 3,937 | — | 138,251 |
| Distribution, circulation and other cost of sales ...... | — | 84,431 | 2,428 | — | 86,859 |
| Selling, general and administrative.............. | 144 | 99,240 | 4,014 | — | 103,398 |
| Depreciation and amortization .................... | — | 12,529 | 59 | — | 12,588 |
| Provision for impairment of intangible assets and goodwill ................ | — | 31,097 | — | — | 31,097 |
| Total operating expenses ........................ | 2,024 | 410,000 | 11,696 | — | 423,720 |
| OPERATING INCOME.......................... | 824 | 63,305 | 2,925 | — | 67,054 |
| OTHER (EXPENSE) INCOME: | | | | | |
| Interest expense ........................................ | (98,718) | (324) | — | — | (99,042) |
| Senior subordinated notes issued .............. | (17,109) | — | — | — | (17,109) |
| Amortization of deferred debt costs............. | (10,926) | — | — | — | (10,926) |
| Other (expense) income, net ...................... | 4 | 2,337 | 181 | — | 2,522 |
| Total other (expense) income.................. | (126,749) | 2,013 | 181 | — | (124,555) |
| (LOSS) INCOME BEFORE PROVISION (BENEFIT) FOR INCOME TAXES, EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES AND INCOME FROM DISCONTINUED OPERATIONS ................................... | (125,925) | 65,318 | 3,106 | — | (57,501) |
| (BENEFIT) PROVISION FOR INCOME TAXES ........................................... | (28,694) | 31,234 | 744 | — | 3,284 |
| EQUITY IN EARNINGS (LOSSES) OF CONSOLIDATED SUBSIDIARIES ............. | 35,761 | 2,362 | — | (38,123) | — |
| (LOSS) INCOME FROM CONTINUING OPERATIONS ................................... | (61,470) | 36,446 | 2,362 | (38,123) | (60,785) |
| LOSS FROM DISCONTINUED OPERATIONS, NET OF INCOME TAXES ........................................... | — | (685) | — | — | (685) |
| NET (LOSS) INCOME.................................. | (61,470) | 35,761 | 2,362 | (38,123) | (61,470) |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST ... | (424) | — | — | — | (424) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC AND SUBSIDIARIES ................................... | $ (61,894) | $ 35,761 | $ 2,362 | $ (38,123) | $ (61,894) |

## Supplemental condensed consolidating statement of cash flows
## For the fiscal year ended March 31, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| Cash Flows from Operating Activities: | | | | | |
| Net cash (used in) provided by operating activities | $(52,112) | $ 92,282 | $ 2,236 | $(2,156) | $ 40,250 |
| Cash Flows from Investing Activities: | | | | | |
| Purchases of property and equipment | — | (4,483) | (88) | — | (4,571) |
| Proceeds from sale of assets | — | 649 | — | — | 649 |
| Investment in Mr. Olympia, LLC | (300) | — | — | — | (300) |
| Net cash used in investing activities | (300) | (3,834) | (88) | — | (4,222) |
| Cash Flows from Financing Activities: | | | | | |
| Due to (from) affiliates | 101,508 | (101,508) | — | — | — |
| Proceeds from revolving credit facility | 6,000 | — | — | — | 6,000 |
| Term loan and revolving credit facility principal payments | (39,500) | — | — | — | (39,500) |
| Dividend paid to parent | — | — | (2,156) | 2,156 | — |
| Payment to retire senior subordinated indebtedness | (14,025) | — | — | — | (14,025) |
| Payment of deferred debt costs | (1,685) | — | — | — | (1,685) |
| Net cash provided by (used in) financing activities | 52,298 | (101,508) | (2,156) | 2,156 | (49,210) |
| Effect of exchange rate changes on cash | — | 793 | — | — | 793 |
| Net Decrease in Cash and Cash Equivalents | (114) | (12,267) | (8) | — | (12,389) |
| Cash and Cash Equivalents, Beginning of Period | 388 | 16,891 | 1,716 | — | 18,995 |
| Cash and Cash Equivalents, End of Period | $    274 | $    4,624 | $  1,708 | $     — | $   6,606 |

## Supplemental condensed consolidating statement of cash flows
## For the fiscal year ended March 31, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | |
| Net cash (used in) provided by operating activities | $(65,182) | $ 76,651 | $(1,705) | $— | $ 9,764 |
| **Cash Flows from Investing Activities:** | | | | | |
| Purchases of property and equipment | — | (2,948) | (24) | — | (2,972) |
| Proceeds from sale of assets | — | 45 | — | — | 45 |
| Proceeds from sale of discontinued operations | — | 500 | — | — | 500 |
| Investment in Mr. Olympia, LLC | (300) | — | — | — | (300) |
| Net cash used in investing activities | (300) | (2,403) | (24) | — | (2,727) |
| **Cash Flows from Financing Activities:** | | | | | |
| Due to (from) affiliates | 117,891 | (117,891) | — | — | — |
| Proceeds from revolving credit facility | 74,000 | — | — | — | 74,000 |
| Term loan and revolving credit facility principal payments | (96,629) | — | — | — | (96,629) |
| Payment of consent fees | (6,624) | — | — | — | (6,624) |
| Payment of restructuring costs | (407) | — | — | — | (407) |
| Payment of deferred debt costs | (22,517) | — | — | — | (22,517) |
| Net cash provided by (used in) financing activities | 65,714 | (117,891) | — | — | (52,177) |
| Effect of exchange rate changes on cash | — | — | (31) | — | (31) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 232 | (43,643) | (1,760) | — | (45,171) |
| Cash and Cash Equivalents, Beginning of Period | 156 | 60,534 | 3,476 | — | 64,166 |
| Cash and Cash Equivalents, End of Period | $ 388 | $ 16,891 | $ 1,716 | $— | $ 18,995 |

## Supplemental condensed consolidating statement of cash flows
## For the fiscal year ended March 31, 2008

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| Cash Flows from Operating Activities: | | | | | |
| Net cash (used in) provided by operating activities | $(104,067) | $ 109,365 | $1,511 | $— | $  6,809 |
| Cash Flows from Investing Activities: | | | | | |
| Purchases of property and equipment ... | — | (2,296) | (54) | — | (2,350) |
| Proceeds from sale of assets | — | 408 | — | — | 408 |
| Investment in Mr. Olympia, LLC | (300) | — | — | — | (300) |
| Net cash used in investing activities | (300) | (1,888) | (54) | — | (2,242) |
| Cash Flows from Financing Activities: | | | | | |
| Due to (from) affiliates | 105,465 | (105,465) | — | — | — |
| Payment of deferred debt costs | (942) | — | — | — | (942) |
| Net cash provided by (used in) financing activities | 104,523 | (105,465) | — | — | (942) |
| Effect of exchange rate changes on cash | — | — | 127 | — | 127 |
| Net Increase in Cash and Cash Equivalents | 156 | 2,012 | 1,584 | — | 3,752 |
| Cash and Cash Equivalents, Beginning of Period | — | 58,522 | 1,892 | — | 60,414 |
| Cash and Cash Equivalents, End of Period | $    156 | $  60,534 | $3,476 | $— | $ 64,166 |

## (19) Subsequent events

On July 15, 2010, the Company launched an exchange offer for the Subordinated Notes (the "Exchange Offer"), and a cash tender offer for the PIK Notes (the "Tender Offer"). In the Exchange Offer, holders of Subordinated Notes were offered $269.52 in cash and 335.62 shares of the Company Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, the Company offered to purchase each $1,000 principal amount of outstanding PIK Notes for $1,020.

On October 12, 2010, AMO commenced a separate consent solicitation (the "Interest Deferral Consent Solicitation") to solicit consents from eligible holders of Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Subordinated Notes to January 3, 2011 (such deferred payment of interest, the "Deferred Interest Payment"). Holders of more than 75% of the aggregate outstanding principal amount of Subordinated Notes delivered their consents to the Deferred Interest Payment in the Interest Deferral Consent Solicitation on October 28, 2010. The Company executed a supplemental indenture to the Subordinated Note Indenture to effect the Deferred Interest Payment, and such supplemental indenture became operative immediately upon execution.

The Exchange Offer and the Tender Offer were initially scheduled to expire on August 11, 2010, and were subsequently extended to November 1, 2010. Neither the Exchange Offer nor the Tender Offer is expected to be successfully consummated. The Company's Board of Directors has approved a financial restructuring through solicitation of a prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"). Management has informed its investors that if the Company receives the requisite number of votes from its creditors in favor of the Plan by November 15, 2010 (unless extended), it will initiate a prepackaged Chapter 11 Filing in order to confirm and consummate the Plan. The Company's reorganization is premised around a debt-for-equity exchange with holders of the Subordinated Notes, approximately 78% of which have agreed to support the restructuring by executing a restructuring support agreement with the Company. Accordingly, as a result of the anticipated Chapter 11 Filing, there is substantial doubt regarding the Company's ability to continue as a going concern.

Management plans to address the issue of substantial doubt by the consummation of the Plan. However, there can be no assurance that the Company will receive the requisite consents to consummate the Plan and emerge from Chapter 11.

As a result of the substantial doubt regarding the Company's ability to continue as a going concern, management concluded that the Company was not in compliance with a financial statement covenant of the 2009 Credit Agreement for the year ended March 31, 2010. As a result of not complying with the covenant, the Company will be required to reflect the long-term portion of 2009 Credit Agreement debt as current portion of long-term debt for the quarterly period ended September 30, 2010 unless a waiver of the covenant violation is obtained.

Further, if the amounts due under the 2009 Credit Agreement were to accelerate as a result of the covenant violation, then a cross-acceleration of the Subordinated Notes may occur which would cause the Company to reflect the long-term portion of the Subordinated Notes as current portion of long-term debt for the quarterly period ended September 30, 2010.

The following is a summary of the pro-forma impact on the Company's term loan and revolving credit facility outstanding at March 31, 2010 presented as if the Company was not in compliance with the covenant at March 31, 2010:

|  | As reported | Adjustments | Pro-forma balance |
|---|---|---|---|
| **CURRENT LIABILITIES:** | | | |
| Term loan and revolving credit facility ................................................. | $    4,500 | $  449,371 | $453,871 |
| **NON-CURRENT LIABILITIES:** | | | |
| Term loan and revolving credit facility ................................................ | $449,371 | $(449,371) | $        — |

# American Media Operations, Inc. and subsidiaries
# Unaudited condensed consolidated balance sheets

| (in thousands, except share information) | September 30, 2010 | March 31, 2010 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents................................................................. | $ 42,842 | $ 6,606 |
| Trade receivables, net of allowance for doubtful accounts of $4,793 and $5,359, respectively................ | 44,924 | 48,503 |
| Inventories.......................................................................................... | 16,500 | 13,448 |
| Prepaid expenses and other current assets........................................ | 32,801 | 20,232 |
| Total current assets................................................................ | 137,067 | 88,789 |
| **PROPERTY AND EQUIPMENT, NET:** | | |
| Leasehold improvements..................................................................... | 1,824 | 1,824 |
| Furniture, fixtures and equipment....................................................... | 31,575 | 31,799 |
| Less—accumulated depreciation......................................................... | (26,385) | (27,129) |
| Total property and equipment, net ........................................ | 7,014 | 6,494 |
| **OTHER ASSETS:** | | |
| Deferred debt costs, net...................................................................... | 8,985 | 10,938 |
| Deferred rack costs, net....................................................................... | 10,298 | 8,461 |
| Other long-term assets........................................................................ | 3,537 | 3,257 |
| Total other assets.................................................................... | 22,820 | 22,656 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | |
| Goodwill.............................................................................................. | 230,885 | 230,885 |
| Other identified intangibles, net of accumulated amortization of $106,097 and $104,786, respectively .... | 270,324 | 271,635 |
| Total goodwill and other identified intangible assets ........... | 501,209 | 502,520 |
| **TOTAL ASSETS** ............................................................................... | $ 668,110 | $ 620,459 |
| **LIABILITIES AND STOCKHOLDER'S DEFICIT** | | |
| **CURRENT LIABILITIES:** | | |
| Term loan and revolving credit facility (Notes 1 and 6)....................... | $ 465,621 | $ 4,500 |
| Senior subordinated notes, net (including $175.2 million and $32.0 million in future interest payments as of September 30, 2010 and March 31, 2010—See Note 7) | 562,657 | 39,458 |
| Accounts payable................................................................................. | 14,725 | 15,679 |
| Accrued expenses and other liabilities................................................ | 45,426 | 38,555 |
| Accrued interest.................................................................................. | 1,956 | 1,433 |
| Deferred revenues............................................................................... | 34,750 | 36,929 |
| Total current liabilities............................................................ | 1,125,135 | 136,554 |
| **NON-CURRENT LIABILITIES:** | | |
| Term loan and revolving credit facility (Notes 1 and 6)....................... | — | 449,371 |
| Senior subordinated notes, net (including $166.4 million in future interest payments as of March 31, 2010—See Note 7) | — | 521,151 |
| Other non-current liabilities................................................................. | 2,000 | 9,083 |
| Deferred income taxes......................................................................... | 101,961 | 82,734 |
| Total liabilities........................................................................ | 1,229,096 | 1,198,893 |
| **COMMITMENTS AND CONTINGENCIES (Note 8)** | | |
| **STOCKHOLDER'S DEFICIT:** | | |
| Common stock, $0.0001 par value; 7,500,000 shares authorized; 6,284,360 shares issued and outstanding........ | 1 | 1 |
| Additional paid-in capital..................................................................... | 282,747 | 282,747 |
| Accumulated deficit.............................................................................. | (843,575) | (861,002) |
| Accumulated other comprehensive loss................................................ | (159) | (180) |
| Total stockholder's deficit....................................................... | (560,986) | (578,434) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S DEFICIT**............................ | $ 668,110 | $ 620,459 |

*The accompanying Notes to the Unaudited Condensed Consolidated Financial Statements are an integral part of these Unaudited Condensed Consolidated Financial Statements.*

# American Media Operations, Inc. and subsidiaries
# Unaudited condensed consolidated statements of income

| (in thousands) | Three months ended September 30, | | Six months ended September 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| OPERATING REVENUES: | | | | |
| Circulation | $ 59,476 | $ 62,389 | $117,147 | $126,501 |
| Advertising | 33,823 | 35,505 | 67,562 | 68,104 |
| Other | 11,059 | 10,740 | 18,161 | 17,125 |
| Total operating revenues | 104,358 | 108,634 | 202,870 | 211,730 |
| OPERATING EXPENSES: | | | | |
| Editorial | 11,233 | 11,225 | 22,317 | 22,447 |
| Production | 28,585 | 31,872 | 54,825 | 63,578 |
| Distribution, circulation and other cost of sales | 17,975 | 18,859 | 35,379 | 37,327 |
| Selling, general and administrative | 19,633 | 17,210 | 39,068 | 36,123 |
| Depreciation and amortization | 1,572 | 1,790 | 3,099 | 3,506 |
| Provision for impairment of intangible assets and goodwill | — | — | — | 17,595 |
| Total operating expenses | 78,998 | 80,956 | 154,688 | 180,576 |
| OPERATING INCOME | 25,360 | 27,678 | 48,182 | 31,154 |
| OTHER EXPENSE: | | | | |
| Interest expense | (12,712) | (12,767) | (25,402) | (25,463) |
| Amortization of deferred debt costs | (994) | (931) | (1,953) | (2,040) |
| Other income, net | (5) | (2) | — | — |
| Total other expense | (13,711) | (13,700) | (27,355) | (27,503) |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 11,649 | 13,978 | 20,827 | 3,651 |
| PROVISION FOR INCOME TAXES | 1,100 | 2,726 | 2,880 | 678 |
| NET INCOME | 10,549 | 11,252 | 17,947 | 2,973 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (520) | (449) | (520) | (449) |
| NET INCOME ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC. AND SUBSIDIARIES | $ 10,029 | $ 10,803 | $ 17,427 | $ 2,524 |

*The accompanying Notes to the Unaudited Condensed Consolidated Financial Statements are an integral part of these Unaudited Condensed Consolidated Financial Statements.*

# American Media Operations, Inc. and subsidiaries
# Unaudited condensed consolidated statements of cash flows

| (in thousands) | Six months ended September 30, 2010 | 2009 |
|---|---:|---:|
| Cash Flows from Operating Activities: | | |
| Net income | $17,947 | $ 2,973 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation of property and equipment | 1,789 | 1,570 |
| Amortization of other identified intangibles | 1,310 | 1,936 |
| Provision for impairment of intangible assets and goodwill | — | 17,595 |
| Provision for bad debts | 1,133 | 991 |
| Amortization of deferred debt costs | 1,953 | 2,040 |
| Amortization of deferred rack costs | 3,443 | 3,112 |
| Deferred income tax provision (benefit) | 3,171 | (108) |
| Net income attributable to the noncontrolling interest | (520) | (449) |
| Other | 1,293 | (699) |
| (Increase) decrease in operating assets: | | |
| Trade receivables | 3,162 | 9,541 |
| Inventories | (3,052) | 536 |
| Prepaid expenses and other current assets | 113 | (3,500) |
| Deferred rack costs | (5,280) | (4,168) |
| Other long-term assets | (996) | (245) |
| Increase (decrease) in operating liabilities: | | |
| Accounts payable | (954) | (5,044) |
| Accrued expenses and other liabilities | 3,432 | (2,369) |
| Accrued interest | 1,299 | 7,827 |
| Deferred revenues | (2,179) | 331 |
| Other non-current liabilities | 351 | 2,318 |
| Total adjustments and changes in operating assets and liabilities | 9,468 | 31,215 |
| Net cash provided by operating activities | 27,415 | 34,188 |
| Cash Flows from Investing Activities: | | |
| Purchases of property and equipment | (2,383) | (2,821) |
| Proceeds from sale of assets | 35 | 636 |
| Investment in Mr. Olympia, LLC | (300) | (300) |
| Net cash used in investing activities | (2,648) | (2,485) |
| Cash Flows from Financing Activities: | | |
| Term loan and revolving credit facility principal repayments | (65,250) | (12,250) |
| Payment to retire subordinated indebtedness | — | (14,025) |
| Proceeds from revolving credit facility | 77,000 | — |
| Payment of debt costs | — | (929) |
| Net cash provided by (used in) financing activities | 11,750 | (27,204) |
| Effect of exchange rate changes on cash | (281) | 180 |
| Net Increase in Cash and Cash Equivalents | 36,236 | 4,679 |
| Cash and Cash Equivalents, Beginning of Period | 6,606 | 18,995 |
| Cash and Cash Equivalents, End of Period | $42,842 | $23,674 |
| Supplemental Disclosures of Non-Cash Activities Information: | | |
| Non-cash debt costs (incurred but not paid) | $   351 | $   358 |
| Non-cash property and equipment (incurred but not paid) | $    — | $   105 |
| Non-cash portion of debt issuance | $24,727 | $11,090 |

*The accompanying Notes to the Unaudited Condensed Consolidated Financial Statements are an integral part of these Unaudited Condensed Consolidated Financial Statements.*

# American Media Operations, Inc. and subsidiaries
# Notes to unaudited condensed consolidated financial statements
### September 30, 2010

## (1) Basis of presentation

The Unaudited Condensed Consolidated Financial Statements include the accounts of American Media Operations, Inc. and its subsidiaries (collectively, the "Company"). The Company is a wholly owned subsidiary of American Media, Inc. ("Media"). The Company consolidates all majority owned subsidiaries and investments in entities in which it has a controlling influence. Non-majority owned investments are accounted for using the equity method when the Company has the ability to significantly influence the operating decisions of the issuer. When the Company does not have the ability to significantly influence the operating decisions of an issuer, the cost method is used. All intercompany accounts and transactions have been eliminated in consolidation.

The accompanying Unaudited Condensed Consolidated Financial Statements have been prepared assuming that the Company is a going concern, which contemplates the realization of assets and the liquidation of liabilities in the normal course of business.

In the opinion of management, the accompanying Unaudited Condensed Consolidated Financial Statements reflect all normal and recurring adjustments which are necessary for a fair presentation of the Company's financial position, results of operations, and cash flows as of the dates and for the periods presented. The Company has evaluated all subsequent events through November 9, 2010, which is the date this Quarterly Report was available to be issued. The Unaudited Condensed Consolidated Financial Statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") regarding interim financial reporting. Accordingly, these statements do not include all the disclosures normally required by accounting principles generally accepted in the United States of America for annual financial statements and should be read in conjunction with the financial statements and notes thereto for the year ended March 31, 2010 included in the Company's Annual Report for the fiscal year ended March 31, 2010 (the "March 31, 2010 Annual Report"), including the summary of significant accounting policies set forth in Note 1 thereof. The operating results for the three and six months ended September 30, 2010 are not necessarily indicative of the results to be expected for any future period or for the full fiscal year.

On July 15, 2010, the Company launched an exchange offer (the "Exchange Offer") for the 14% Senior Subordinated Notes due 2013 (the "Subordinated Notes"), and a cash tender offer (the "Tender Offer") for the 9% Senior PIK Notes due 2013 (the "Senior PIK Notes"). In the Exchange Offer, holders of Subordinated Notes were offered $269.52 in cash and 335.62 shares of the Company's Common Stock for each $1,000 of principal amount exchanged. In the Tender Offer, the Company offered to purchase each $1,000 principal amount of outstanding Senior PIK Notes for $1,020.

On October 12, 2010, the Company commenced a separate consent solicitation (the "Interest Deferral Consent Solicitation") to solicit consents from eligible holders of Subordinated Notes to defer the payment of the November 1, 2010 scheduled interest payment on the Subordinated Notes to January 3, 2011 (such deferred payment of interest, the "Deferred Interest Payment"). Holders of

more than 75% of the aggregate outstanding principal amount of Subordinated Notes delivered their consents to the Deferred Interest Payment in the Interest Deferral Consent Solicitation on October 28, 2010. The Company executed a supplemental indenture to the Subordinated Note Indenture to effect the Deferred Interest Payment, and such supplemental indenture became operative immediately upon execution.

The Exchange Offer and the Tender Offer were initially scheduled to expire on August 11, 2010, and were subsequently extended to November 1, 2010. Neither the Exchange Offer nor the Tender Offer was successfully consummated. The Company's Board of Directors has approved a financial restructuring through solicitation of a prepackaged plan of reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"). Management has informed its investors that if the Company receives the requisite number of votes from its creditors in favor of the Plan by November 15, 2010 (unless extended), it will initiate a prepackaged Chapter 11 Filing in order to confirm and consummate the Plan. The Company's reorganization is premised around a debt-for-equity exchange with holders of the $299.7 million aggregate principal amount of Subordinated Notes, approximately 78% of which have agreed to support the restructuring by executing a restructuring support agreement with the Company. The Company will be offering a total aggregate principal of approximately $525.0 million of new first and second lien notes in connection with the Plan. The proceeds from the offering will primarily be used to refinance the Company's bank credit agreement (the "2009 Credit Agreement"). The new first and second lien notes will be issued after the Company files for Chapter 11, and the Company will only proceed with the Plan if the offering is successful. As a result of the anticipated Chapter 11 Filing and the launch of the solicitation of the Plan, there is substantial doubt regarding the Company's ability to continue as a going concern.

Management plans to address the issue of substantial doubt by the consummation of the Plan. However, there can be no assurance that the Company will receive the requisite consents to consummate the Plan and emerge from Chapter 11.

As a result of the substantial doubt regarding the Company's ability to continue as a going concern and the launch of the solicitation of the Plan, management concluded that the Company was not in compliance with certain covenants of the 2009 Credit Agreement, which includes a $60.0 million revolving credit facility (the "Revolving Facility") and a $450.0 million term loan commitment (the "Term Facility") for the year ended March 31, 2010. On November 5, 2010, the Company entered into an Amendment and Waiver Agreement with respect to certain provisions of the 2009 Credit Agreement (the "Waiver"). The Waiver provided, among other things, temporary relief from certain events of default under the 2009 Credit Agreement as a result of the Plan, including the going concern qualification and launch of the solicitation of the Plan.

The outstanding debt under the 2009 Credit Agreement could be declared immediately due and payable after the Waiver period expires. As the Waiver expires after 35 days, for accounting purposes, the Company has accelerated the obligations under the 2009 Credit Agreement and classified the entire principal amount associated with the 2009 Credit Agreement as current as of September 30, 2010. The Company has also classified as current the deferred fees associated with the 2009 Credit Agreement. Additionally, the Subordinated Notes and the Senior PIK Notes contain cross-acceleration provisions with respect to the 2009 Credit Agreement. Accordingly, the Company has also classified the Subordinated Notes and the Senior PIK Notes as current as of September 30, 2010.

As a result of classifying the 2009 Credit Agreement, Subordinated Notes and the Senior PIK Notes as current as of September 30, 2010, the Company has also classified $16.0 million of deferred taxes as current as of September 30, 2010.

## (2) Comprehensive income

The change in the components of other comprehensive income (loss) is comprised of foreign currency translation adjustments and is reported as follows (in thousands):

| | Three months ended September 30, | | Six months ended September 30, | |
|---|---|---|---|---|
| | 2010 | 2009 | 2010 | 2009 |
| Net income ....................................... | $ 10,549 | $ 11,252 | $17,947 | $2,973 |
| Foreign currency translation adjustments, net of tax ............................ | 30 | (44) | 21 | 37 |
| Comprehensive income attributable to the noncontrolling interest........ | (520) | (449) | (520) | (449) |
| Comprehensive income attributable to American Media Operations, Inc. and Subsidiaries ......................................................... | $ 10,059 | $ 10,759 | $17,448 | $2,561 |

## (3) Inventories

Inventories are stated at the lower of cost or market. Cost is determined on the first-in, first-out (FIFO) method. Inventories are comprised of the following (in thousands):

| | September 30, 2010 | March 31, 2010 |
|---|---|---|
| Raw materials—paper........................................................... | $12,105 | $ 9,785 |
| Finished product—paper, production and distribution costs of future issues ........ | 4,395 | 3,663 |
| Total inventory ......................................................... | $16,500 | $13,448 |

## (4) Goodwill and other identified intangible assets

As of September 30, 2010 and March 31, 2010, the Company had goodwill with carrying values of $230.9 million and other identified intangible assets not subject to amortization with carrying values of $255.3 million. The other identified intangible assets not subject to amortization consist of tradenames with indefinite lives.

Identified intangible assets with finite lives subject to amortization consist of the following at September 30, 2010 and March 31, 2010 (in thousands):

| | | September 30, 2010 | | | March 31, 2010 | | |
|---|---|---|---|---|---|---|---|
| | Range of lives | Gross carrying amount | Accumulated amortization | Net | Gross carrying amount | Accumulated amortization | Net |
| Tradenames ............ | 8 - 27 | $ 10,610 | $ (3,414) | $ 7,196 | $ 10,610 | $ (3,192) | $ 7,418 |
| Covenants not to compete .............. | 5 - 10 | 12,500 | (12,500) | — | 12,500 | (12,500) | — |
| Subscriber lists........ | 3 - 15 | 32,682 | (24,873) | 7,809 | 32,682 | (23,785) | 8,897 |
| | | $ 55,792 | $(40,787) | $15,005 | $ 55,792 | $ (39,477) | $16,315 |

Amortization expense of intangible assets was $0.7 million and $0.9 million for the three months ended September 30, 2010 and 2009, respectively, and $1.3 million and $1.9 million for the six months ended September 30, 2010 and 2009, respectively. Based on the carrying value of

identified intangible assets recorded at September 30, 2010, and assuming no subsequent impairment of the underlying assets, the amortization expense for the remainder of fiscal year 2011 and future fiscal years is expected to be as follows (in thousands):

| Fiscal year | Amortization expense |
|---|---|
| 2011 | $ 1,310 |
| 2012 | 2,622 |
| 2013 | 2,622 |
| 2014 | 2,622 |
| 2015 | 2,622 |
| Thereafter | 3,207 |
| | $15,005 |

The gross carrying amount and accumulated impairment losses of goodwill by reportable segment are as follows (in thousands):

| | Celebrity publications | Tabloid publications | Women's health and fitness publications | Corporate/ other | Total |
|---|---|---|---|---|---|
| Balance as of March 31, 2010 | | | | | |
| Goodwill | $ 179,937 | $ 241,570 | $ 83,649 | $137,340 | $ 642,496 |
| Accumulated impairment losses | (109,246) | (148,896) | (61,584) | (91,885) | (411,611) |
| Goodwill, net of impairment losses | 70,691 | 92,674 | 22,065 | 45,455 | 230,885 |
| Impairment charges in fiscal year 2011 | — | — | — | — | — |
| Balance as of September 30, 2010 | | | | | |
| Goodwill | $ 179,937 | $ 241,570 | $ 83,649 | $137,340 | $ 642,496 |
| Accumulated impairment losses | (109,246) | (148,896) | (61,584) | (91,885) | (411,611) |
| Goodwill, net of impairment losses | 70,691 | 92,674 | 22,065 | 45,455 | 230,885 |

The Company has not tested goodwill and other identified intangible assets for impairment as of September 30, 2010 as management does not believe that it is more likely than not the carrying value exceeds the fair value of the respective goodwill and other identified intangible assets. The Company will continually evaluate this conclusion in future periods as events occur or circumstances change, including the impact of the Plan, and as a result there could be material impairment charges in the future.

## (5) Fair value of financial instruments

The fair value of the Company's financial instruments is estimated based on the most recent quoted market prices for the same or similar issues. The estimated fair value of the Company's financial instruments is as follows (in thousands):

| | September 30, 2010 | | March 31, 2010 | |
| --- | --- | --- | --- | --- |
| | Carrying amount | Fair value | Carrying amount | Fair value |
| Term loan ............................................................ | $430,621 | $421,190 | $432,871 | $418,153 |
| Revolving credit facility..................................... | 35,000 | 32,200 | 21,000 | 19,163 |
| 8 7/8% Senior Subordinated Notes due 2011..................... | 7,502(a) | 7,412 | 7,502(a) | 7,216 |
| 14% Senior Subordinated Notes due 2013....................... | 355,756(b) | 231,686 | 332,051(b) | 215,833 |
| 9% Senior PIK Notes due 2013 ........................................ | 23,723(b) | 24,197 | 22,701(b) | 14,756 |

(a)  Amount does not include the bond premium or bond discount.

(b)  Amounts do not include future interest reflected in the carrying amount of our senior subordinated notes in the accompanying Consolidated Balance Sheets.

Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") Topic 820, "*Fair Value Measurements and Disclosures*" ("ASC 820"), establishes a three-tier fair value hierarchy, which prioritizes the use of inputs used in measuring fair value as follows:

Level 1 Observable inputs such as quoted prices in active markets for identical assets and liabilities;

Level 2 Inputs, other than quoted prices in active markets, that are observable either directly or indirectly; and

Level 3 Unobservable inputs in which there is little or no market data, which require the reporting entity to develop its own assumptions.

As of September 30, 2010 and March 31, 2010, the Company did not have financial assets or liabilities that would require measurement on a recurring basis based on the guidance in ASC 820. The carrying amount for cash and cash equivalents, accounts receivable, accounts payable and accrued expenses approximates fair value due to the short maturity of these items.

In addition to financial assets and liabilities that are recorded at fair value on a recurring basis, the Company is required to record certain non-financial assets and liabilities at fair value on a nonrecurring basis.

The following table reflects the fair values measurement of certain assets measured at fair value on a non-recurring basis (in thousands):

| | | Fair value measurements using | | | Impairment recognized in earnings |
| --- | --- | --- | --- | --- | --- |
| | September 30, 2009 | Level 1 | Level 2 | Level 3 | |
| Goodwill................................................ | $ 230,885 | $— | $ — | $ 230,885 | $ — |
| Tradenames ........................................... | 255,320 | — | — | 255,320 | — |
| | | | | | $ — |

During the three and six months ended September 30, 2010, the Company did not measure at fair value any nonfinancial assets or liabilities.

Goodwill with a carrying amount of $245.5 million was written down to its implied value of $230.9 million during the quarter ended June 30, 2009. The Company recorded a preliminary impairment charge of $14.6 million during the quarter ended June 30, 2009, which was included in earnings for the six months ended September 30, 2009. The Company finalized the impairment charge during the quarter ended December 31, 2009 and no adjustment was required.

Tradenames with a carrying amount of $258.3 million were written down to their implied value of $255.3 million, resulting in impairment charges of $3.0 million during the quarter ended June 30, 2009, which was included in earnings for the six months ended September 30, 2009.

## (6) Credit agreement

On December 31, 2008, the Company entered into the 2009 Credit Agreement, which replaced its then existing credit agreement dated as of January 30, 2006 (the "2006 Credit Agreement"). The 2009 Credit Agreement became effective on January 30, 2009 (the "Effective Date"). The 2009 Credit Agreement includes a $60.0 million revolving credit facility and a $450.0 million term loan commitment. The Revolving Facility matures in January 2012 and the Term Facility matures in January 2013.

During the six months ended September 30, 2010, the Company made the required quarterly principal payments on its Term Facility of $2.3 million and paid down $63.0 million and borrowed $77.0 million under its Revolving Facility. The balance of the Term Facility and the Revolving Facility was $430.6 million and $35.0 million, respectively, on September 30, 2010. The Revolving Facility had $25.0 million available to be borrowed as of September 30, 2010. On October 1, 2010, the Company borrowed the remaining $25.0 million available on the Revolving Facility.

The 2009 Credit Agreement requires the Company to pay, from the Effective Date until the termination of commitments under the Revolving Facility, a commitment fee equal to 1.0% of the unused portion of the revolving commitments. Commitment fee payments during the six months ended September 30, 2010 were approximately $0.3 million. Commitment fee payments under the 2009 Credit Agreement were insignificant during the six months ended September 30, 2009 as the revolving commitments on the 2009 Credit Agreement were almost fully drawn during the entire six months.

The effective weighted-average interest rate under the 2009 Credit Agreement, including amounts borrowed under the Term Facility and Revolving Facility, as of September 30, 2010 and 2009, was 10.0%.

The 2009 Credit Agreement includes certain representations and warranties, conditions precedent, affirmative covenants, negative covenants and events of default customary for agreements of this type. The negative covenants include financial maintenance covenants comprised of a leverage ratio, a senior secured leverage ratio, a consolidated interest expense coverage ratio, and capital expenditure limits. The 2009 Credit Agreement also contains certain covenants that, subject to certain exceptions, restrict paying dividends, incurring additional indebtedness, creating liens, making acquisitions or other investments, entering into certain mergers or consolidations and selling or otherwise disposing of assets. The 2009 Credit Agreement includes a broadening from the 2006 Credit Agreement of the circumstances that would give rise to prepayment of the loans and the introduction of more restrictive covenants, particularly relating to indebtedness, investments, restricted payments and capital expenditures. As of September 30, 2010, the Company is in compliance with all financial covenants under the 2009 Credit Agreement; however, as disclosed in

Note 1, management concluded that the Company was not in compliance with certain covenants of the 2009 Credit Agreement. Accordingly, the Company has classified the entire principal amount associated with the 2009 Credit Agreement as current as of September 30, 2010.

Although there can be no assurances, the Company anticipates that, based on current projections (including projected borrowings and repayments under the Revolving Facility), its operating results for the next twelve months will be sufficient to satisfy the financial covenants under the 2009 Credit Agreement even if the Company does not proceed with the Plan. The Company's ability to satisfy such financial covenants is dependent on its business performing in accordance with its projections. If the performance of the Company's business deviates from its projections, the Company may not be able to satisfy such financial covenants. The Company's projections are subject to a number of factors, many of which are events beyond its control, which could cause the Company's actual results to differ materially from its projections. If the Company does not comply with these financial covenants, the Company would default under the 2009 Credit Agreement.

For a further description of the 2009 Credit Agreement, see Note 6 to the Consolidated Financial Statements included in the March 31, 2010 Annual Report.

For a description of the Company's Plan, the Waiver and the balance sheet classification of the 2009 Credit Agreement, see Note 1, "Basis of Presentation," to these Unaudited Condensed Consolidated Financial Statements.

## (7) Senior subordinated indebtedness

The Senior PIK Notes are unsecured senior obligations of the Company and are effectively subordinated to all of the Company's existing and future secured debt, including obligations under the 2009 Credit Agreement. The Senior PIK Notes will mature on May 1, 2013. Interest on the Senior PIK Notes accrues at the rate of 9% per annum based upon the outstanding principal amount. The 2009 Credit Agreement prohibits the payment of cash interest on the Senior PIK Notes.

The Senior Subordinated Notes are unsecured senior subordinated obligations of the Company and are subordinated in right of payment to the Company's existing and future senior debt, including obligations under the 2009 Credit Agreement and the Senior PIK Notes. The Senior Subordinated Notes will mature on November 1, 2013. Interest on the Senior Subordinated Notes accrues at the rate of 14% per annum based upon the outstanding principal amount of the Senior Subordinated Notes (with (i) 10% per annum payable in cash, (ii) 2% per annum payable, at the Company's option, either in cash or by the issuance of additional Senior Subordinated Notes, and (iii) 2% per annum payable (x) in cash when the Company's Excess Cash Flow (as defined in the 2009 Credit Agreement) for the most recently completed fiscal year ended prior to an interest payment date is greater than $27.5 million and (y) at the Company's option, either in cash or by the issuance of additional Senior Subordinated Notes when the Company's Excess Cash Flow for the most recently completed fiscal year ended prior to an interest payment date is less than or equal to $27.5 million).

Interest on the Notes is payable semi-annually in arrears on May 1 and November 1 of each year.

Pursuant to the indenture governing the Senior Subordinated Notes, beneficial owners of the Senior Subordinated Notes, who together beneficially owned more than 75% in aggregate principal amount of the outstanding Senior Subordinated Notes, consented on behalf of all

holders of the Senior Subordinated Notes that the $23.7 million interest payment, including $16.6 million of cash interest due May 1, 2010 be deferred until June 21, 2010. Although interest with respect to the Senior Subordinated Notes is payable at a rate of 10% per annum in cash and 4% per annum in the form of additional Senior Subordinated Notes, in accordance with the terms of the indenture governing the Senior Subordinated Notes and at the request of the requisite holders of Senior Subordinated Notes, the full amount of the May 1, 2010 interest payment was paid entirely in the form of additional Senior Subordinated Notes on June 21, 2010. In addition, as disclosed in Note 1, "Basis of Presentation," to these Unaudited Condensed Consolidated Financial Statements, the November 1, 2010 interest payment was deferred until January 3, 2011.

As of September 30, 2010, the Company's total principal amount of senior subordinated debt was approximately $387.0 million, consisting of $7.5 million principal amount of 8-7/8% Senior Subordinated Notes due 2011 (the "2011 Notes"), $23.7 million principal amount of Senior PIK Notes and $355.8 million principal amount of Senior Subordinated Notes. The accompanying Unaudited Condensed Consolidated Balance Sheet includes $175.2 million in future interest payments on the Notes reflected in the carrying amount of the Company's Senior Subordinated Indebtedness. Therefore, the Company does not recognize interest expense on the Notes.

As disclosed in Note 1, the Subordinated Notes and the Senior PIK Notes contain cross-acceleration provisions with respect to the 2009 Credit Agreement. Accordingly, the Company has classified the Subordinated Notes and the Senior PIK Notes as current as of September 30, 2010.

For a further description of the Notes, see Note 7 to the Consolidated Financial Statements included in the March 31, 2010 Annual Report.

For a description of the Company's Plan, the Interest Deferral Consent Solicitation and the balance sheet classification of the Senior Subordinated Notes and Senior PIK Notes, see Note 1, "Basis of Presentation," to these Unaudited Condensed Consolidated Financial Statements.

## (8) Litigation

On March 10, 2009, Anderson News, L.L.C. and Anderson Services, L.L.C., magazine wholesalers (collectively, "Anderson"), filed a lawsuit against Media, Distribution Services, Inc., a subsidiary of the Company ("DSI"), and various magazine publishers, wholesalers and distributors in the Federal District Court for the Southern District of New York (the "Anderson Action"). Anderson's complaint alleged that the defendants violated Section 1 of the Sherman Act by engaging in a purported industry-wide conspiracy to boycott Anderson and drive it out of business. Plaintiffs also purported to assert claims for defamation, tortious interference with contract, and civil conspiracy. The complaint did not specify the amount of damages sought. On August 2, 2010, the District Court dismissed the action in its entirety with prejudice and without leave to replead and, on October 25, 2010, denied Anderson's motion for reconsideration of the dismissal decision. Anderson has until November 24, 2010 to file an appeal, and it has publicly stated that it intends to do so. While it is not possible to predict with certainty the outcome of an appeal, if any, of the Anderson Action or to estimate the impact on the Company of a final judgment against Media and DSI (if that were to occur) Media and DSI will continue to vigorously defend the case.

In addition, because the focus of some of the Company's publications often involves celebrities and controversial subjects, the risk of defamation or invasion of privacy litigation exists. The Company's experience indicates that the claims for damages made in such lawsuits are usually

inflated and the lawsuits are usually defensible and, in any event, any reasonably foreseeable material liability or settlement would likely be covered by insurance. The Company also periodically evaluates and assesses the risks and uncertainties associated with such litigation disregarding the existence of insurance that would cover liability for such litigation. At present, in the opinion of management, after consultation with outside legal counsel, the liability resulting from such litigation, even if insurance was not available, is not expected to have a material effect on the Company's Unaudited Condensed Consolidated Financial Statements.

## (9) Business segment information

The Company has aggregated its business into five reporting segments: Celebrity Publications, Tabloid Publications, Women's Health and Fitness Publications, Distribution Services and Corporate/Other. The aggregation of the Company's business is based upon the Company's publications having the following similarities: economic characteristics including types of products and services, types of production processes, type or class of customer, and method of distribution.

The Celebrity Publications segment aggregation includes *Star* and *Country Weekly.*

The Tabloid Publications segment aggregation includes *National Enquirer, Globe,* and *National Examiner.*

The Women's Health and Fitness Publications segment aggregation includes *Shape* and *Fit Pregnancy.*

The Distribution Services segment is comprised of DSI, which arranges for the placement of the Company's publications and third-party publications with retailers and monitors through its regional managers and merchandising staff that the Company's publications and third-party publications are properly displayed in stores, primarily national and regional supermarket chains and major retail chains such as Wal-Mart, Kroger Companies, Safeway, Super Valu/Albertsons, Stop & Shop/Giant Food, Publix, H.E. Butt, Food Lion/Sweetbay, Great A&P Tea Company and Winn Dixie. DSI also coordinates (also known as acting as a "category manager/front-end advisor") the racking of magazine fixtures for selected retailers. In addition, DSI provides marketing, merchandising and information gathering services to third parties including non-magazine clients.

The Corporate/Other segment aggregation includes the following publications: *Muscle & Fitness*, *Men's Fitness, Muscle & Fitness Hers, Flex, UFC Magazine, Natural Health, Sun,* and *Mira!.* In addition, the Corporate/Other segment also includes publishing services, ancillary sales and corporate overhead. Ancillary sales primarily relate to licensing, syndication and new media. Corporate expenses not allocated to other segments include production and circulation department costs, and executive staff support departments such as information technology, accounting, legal, human resources and administration. While most of the publications aggregated in the Corporate/Other segment have certain similar products and services, production processes, type or class of customers, and method of distribution as some of the other publications which are aggregated into the other reporting segments (Celebrity Publications, Tabloid Publications and Women's Health and Fitness Publications), their economic characteristics are dissimilar with such other publications. Accordingly, the Company has aggregated those publications into the Corporate/Other reporting segment.

The Company's accounting policies are the same for all reportable segments.

## Segment data

The following table presents the results of, and assets employed in, the Company's five reporting segments for the three and six months ended September 30, 2010 and 2009. The information includes certain intersegment transactions and is, therefore, not necessarily indicative of the results had the operations existed as stand-alone businesses. Intersegment transactions represent intercompany advertising and other services, which are billed at what management believes are prevailing market rates. These intersegment transactions, which represent transactions between operating units in different business segments, are eliminated in consolidation.

| | | Segment (in thousands) | | | | | (in thousands) | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Celebrity publications | Tabloid publications | Women's health and fitness publications | Distribution services | Corporate/ other(1) | Elimination entries | Consolidated total |
| **Operating revenues** | | | | | | | | |
| Three Months ended September 30,........ | 2010 | $ 24,893 | $ 32,394 | $ 16,602 | $ 7,719 | $ 24,738 | $ (1,988) | $ 104,358 |
| | 2009 | $ 26,918 | $ 33,675 | $ 17,755 | $ 7,576 | $ 24,749 | $ (2,039)(2) | $ 108,634 |
| Six Months ended September 30,........ | 2010 | $ 49,936 | $ 64,152 | $ 33,712 | $ 14,542 | $ 44,494 | $ (3,966) | $ 202,870 |
| | 2009 | $ 54,050 | $ 66,535 | $ 31,602 | $ 14,652 | $ 49,138 | $ (4,247)(2) | $ 211,730 |
| **Operating income (loss)** | | | | | | | | |
| Three Months ended September 30,........ | 2010 | $ 7,375 | $ 16,644 | $ 3,840 | $ 1,704 | $ (4,130) | $ (73) | $ 25,360 |
| | 2009 | $ 7,513 | $ 16,037 | $ 5,235 | $ 1,549 | $ (2,656) | $ — | $ 27,678 |
| Six Months ended September 30,........ | 2010 | $ 15,111 | $ 31,846 | $ 7,984 | $ 2,811 | $ (9,415) | $ (155) | $ 48,182 |
| | 2009(3) | $ 14,322 | $ 31,063 | $ (9,837) | $ 2,650 | $ (7,044) | $ — | $ 31,154 |
| **Depreciation and amortization** | | | | | | | | |
| Three Months ended September 30,........ | 2010 | $ 2 | $ 655 | $ — | $ 286 | $ 629 | $ — | $ 1,572 |
| | 2009 | $ 5 | $ 655 | $ — | $ 215 | $ 915 | $ — | $ 1,790 |
| Six Months ended September 30,........ | 2010 | $ 5 | $ 1,311 | $ — | $ 555 | $ 1,228 | $ — | $ 3,099 |
| | 2009 | $ 10 | $ 1,311 | $ — | $ 368 | $ 1,817 | $ — | $ 3,506 |
| **Provision for impairment of intangible assets and goodwill** | | | | | | | | |
| Three Months ended September 30,........ | 2010 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| | 2009 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| Six Months ended September 30,........ | 2010 | $ — | $ — | $ — | $ — | $ — | $ — | $ — |
| | 2009 | $ — | $ — | $ 17,595 | $ — | $ — | $ — | $ 17,595 |
| **Amortization of deferred rack costs** | | | | | | | | |
| Three Months ended September 30,........ | 2010 | $ 532 | $ 936 | $ 98 | $ — | $ 72 | $ — | $ 1,638 |
| | 2009 | $ 449 | $ 718 | $ 76 | $ — | $ 145 | $ — | $ 1,388 |
| Six Months ended September 30,........ | 2010 | $ 1,122 | $ 1,905 | $ 198 | $ — | $ 218 | $ — | $ 3,443 |
| | 2009 | $ 959 | $ 1,528 | $ 156 | $ — | $ 469 | $ — | $ 3,112 |
| **Total Assets** | | | | | | | | |
| At September 30, 2010...................... | | $ 112,035 | $247,800 | $ 74,772 | $16,259 | $217,398 | $ (154) | $ 668,110 |
| At March 31, 2010 ....... | | $ 111,508 | $249,588 | $ 76,550 | $15,645 | $167,168 | $ — | $ 620,459 |

(1)    Income tax provision of $1.1 million and $2.7 million, interest expense of $12.7 million and $12.8 million and amortization of deferred debt costs of $1.0 million and $0.9 million, respectively, for the three months ended September 30, 2010 and 2009

are included in the Corporate/Other segment. Income tax provision of $2.9 million and $0.7 million, interest expense of $25.4 million and $25.5 million and amortization of deferred debt costs of $2.0 million and $2.0 million, respectively, for the six months ended September 30, 2010 and 2009 are included in the Corporate/Other segment.

(2)    Substantially all of the amount represents revenues from transactions with the Distribution Services segment.

(3)    Operating income (loss) for the six months ended September 30, 2009 includes the provision for impairment of tradenames and goodwill of $3.0 million and $14.6 million, respectively, for the Women's Health and Fitness Publications segment.

## (10) Recent accounting pronouncements

In October 2009, the FASB issued Accounting Standards Update ("ASU") No. 2009–13, "*Multiple–Deliverable Revenue Arrangements*" ("ASU 2009–13"). ASU 2009–13 amends existing revenue recognition accounting pronouncements that are currently within the scope of FASB ASC Subtopic 605-25. The Emerging Issues Task Force Issue No. 08–1, "*Revenue Arrangements with Multiple Deliverables*", provides accounting principles and application guidance on whether multiple deliverables exist, how the arrangement should be separated, and the consideration allocated. This guidance eliminates the requirement to establish the fair value of undelivered products and services and also eliminates the residual method of allocating arrangement consideration. The new guidance provides for separate revenue recognition based upon management's estimate of the selling price for an undelivered item when there is no other means to determine the selling price of that undelivered item. Under the previous guidance, if the fair value of all of the elements in the arrangement was not determinable, then revenue was deferred until all of the items were delivered or fair value was determined. This new approach is effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning on or after June 15, 2010. The Company is currently assessing the impact of the adoption of this new guidance on its results of operations, financial position, cash flows and disclosures.

In January 2010, the FASB issued ASU No. 2010-06, "*Improving Disclosures about Fair Value Measurements*" ("ASU 2010-06"). ASU 2010-06 amends the Fair Value Measurements and Disclosures Topic to require additional disclosures regarding fair value measurements. The amended guidance requires entities to disclose additional information regarding assets and liabilities that are transferred between levels of the fair value hierarchy. Entities are also required to disclose information in the Level 3 rollforward about purchases, sales, issuances and settlements on a gross basis. In addition to these new disclosure requirements, ASU 2010-06 clarifies existing guidance pertaining to the level of disaggregation at which fair value disclosures should be made and the requirements to disclose information about the valuation techniques and inputs used in estimating Level 2 and Level 3 fair value measurements. The guidance in ASU 2010-06 is effective for interim and annual reporting periods beginning after December 15, 2009, except for the requirement to separately disclose purchases, sales, issuances and settlements in the Level 3 rollforward, which becomes effective for fiscal years (and for interim periods within those fiscal years) beginning after December 15, 2010. The Company's adoption of ASU 2010-06, effective January 1, 2010, did not have a material impact on its results of operations, financial position, cash flows and disclosures. The Company does not expect the deferred portion of the adoption of ASU 2010-06 to have a material impact on its results of operations, financial position, cash flows and disclosures.

In September 2010, the FASB published Concepts Statement (CON) No. 8 ("CON No. 8"), Conceptual Framework for Financial Reporting: Chapter 1, *The Objective of General Purpose Financial Reporting*, and Chapter 3, *Qualitative Characteristics of Useful Financial Information*. FASB CON No. 8 replaces CON No. 1, *Objectives of Financial Reporting by Business Enterprises*,

and CON No. 2, *Qualitative Characteristics of Accounting Information*. The Company's adoption of CON No. 8 did not have a material impact on its results of operations, financial position, cash flows and disclosures.

## (11) Variable interest entities

### Mr. Olympia, LLC

In April 2005, the Company entered into a limited liability company ("LLC") agreement (the "Olympia Agreement") to form a joint venture ("Mr. Olympia, LLC") to manage and promote the Mr. Olympia fitness events. At any time prior to the tenth anniversary of the execution date of the Olympia Agreement the other limited liability company member may require the Company to purchase all of the limited liability company units ("Put Option") for a cash purchase price of $3.0 million. In the event that the other limited liability company member does not exercise the Put Option, for a period of 120 days following the tenth anniversary of the date of execution of the Olympia Agreement, the Company may require the other limited liability company member to sell all of its limited liability company units ("Call Option") for a sale price of $3.0 million.

In April 2005, the other limited liability company member licensed certain trademarks related to the Mr. Olympia fitness events (collectively, the "Olympia Trademarks") to Mr. Olympia, LLC in exchange for the Company paying $3.0 million over a ten year period. In the event that the Put Option or Call Option is exercised, the Olympia Trademarks will be transferred and owned by Mr. Olympia, LLC. Any remaining balance of the $3.0 million license fee will become due and payable upon such exercise. In the event that the Put Option or Call Option is not exercised, Mr. Olympia, LLC retains the right to the Olympia Trademarks in perpetuity once the $3.0 million license fee is paid.

Effective April 1, 2010, the Company adopted new accounting guidance which modified the consolidation model in previous guidance and expanded disclosures related to variable interest entities ("VIE"). An entity is considered to be a VIE when its total equity investment at risk is not sufficient to permit the entity to finance its activities without additional subordinated financial support or its equity investors, as a group, lack the characteristics of having a controlling interest. A company is required to consolidate a VIE if it is determined to be the primary beneficiary as a result of having both the power to direct the most significant activities of the VIE and it has the obligation to absorb losses or receive benefits that are significant to the VIE. The Company has concluded that the LLC is a VIE and that it is the primary beneficiary because of the fact that (1) the other LLC member has the ability to exercise the Put Option, which if exercised, would cause the Company to absorb Mr. Olympia, LLC's potential losses and (2) the Company controls Mr. Olympia, LLC's most significant operating activities. The Company accounts for the limited liability company as a consolidated subsidiary. The Company has recorded the $3.0 million Put/Call Option and the $3.0 million Olympia Trademarks as indefinite lived intangible assets in the accompanying Consolidated Balance Sheets as of September 30, 2010 and March 31, 2010. In addition, the Company has recorded $3.9 million of accrued expenses and other liabilities at September 30, 2010 which represents the remaining obligation for the Put/Call Option and the license fee associated with the Olympia Trademarks.

## (12) Supplemental condensed consolidating financial information

The following tables present condensed consolidating financial information of (a) the parent company, American Media Operations, Inc., as issuer of the Notes, the 2011 Notes and the $10^1/_4\%$

Series B Senior Subordinated Notes due 2009 (the "2009 Notes"), (b) on a combined basis, the subsidiary guarantors of the 2011 Notes and 2009 Notes, and (c) on a combined basis, the subsidiaries that are not guarantors of the 2011 Notes and 2009 Notes. Separate financial statements of the subsidiary guarantors are not presented because each of the subsidiary guarantors is 100% owned by the parent company issuer and the guarantee by each subsidiary guarantor is full and unconditional and joint and several. As a result and in accordance with Paragraph S99-1 of ASC Section 470-10-S99 (and Rule 3-10(f) of Regulation S-X under the Securities Exchange Act of 1934), the Company includes the following:

# Supplemental condensed consolidating balance sheet
## As of September 30, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS:** | | | | | |
| Cash and cash equivalents | $ 1,416 | $ 39,794 | $1,632 | $ — | $ 42,842 |
| Trade receivables, net | — | 43,043 | 1,881 | — | 44,924 |
| Inventories | — | 15,993 | 507 | — | 16,500 |
| Prepaid expenses and other current assets | 1,441 | 36,003 | 844 | (5,487) | 32,801 |
| Total current assets | 2,857 | 134,833 | 4,864 | (5,487) | 137,067 |
| **PROPERTY AND EQUIPMENT, NET:** | | | | | |
| Leasehold improvements | — | 1,824 | — | — | 1,824 |
| Furniture, fixtures and equipment | — | 31,098 | 477 | — | 31,575 |
| Less—accumulated depreciation | — | (25,999) | (386) | — | (26,385) |
| Total property and equipment, net | — | 6,923 | 91 | — | 7,014 |
| **OTHER ASSETS:** | | | | | |
| Deferred debt costs, net | 8,985 | — | — | — | 8,985 |
| Deferred rack costs, net | — | 10,298 | — | — | 10,298 |
| Other long-term assets | — | 3,537 | — | — | 3,537 |
| Investment in subsidiaries | 485,131 | 1,129 | — | (486,260) | — |
| Total other assets | 494,116 | 14,964 | — | (486,260) | 22,820 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | | | | |
| Goodwill | — | 226,376 | 4,509 | — | 230,885 |
| Other identified intangibles, net | 6,000 | 264,324 | — | — | 270,324 |
| Total goodwill and other identified intangible assets | 6,000 | 490,700 | 4,509 | — | 501,209 |
| **TOTAL ASSETS** | $ 502,973 | $647,420 | $9,464 | $ (491,747) | $ 668,110 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | | | | | |
| Term loan and revolving credit facility | $ 465,621 | $ — | $ — | $ — | $ 465,621 |
| Senior subordinated notes, net | 562,657 | — | — | — | 562,657 |
| Accounts payable | — | 13,773 | 952 | — | 14,725 |
| Accrued expenses and other liabilities | 13,843 | 49,499 | 591 | (18,507) | 45,426 |
| Accrued interest | 1,956 | — | — | — | 1,956 |
| Deferred revenues | — | 34,259 | 491 | — | 34,750 |
| Total current liabilities | 1,044,077 | 97,531 | 2,034 | (18,507) | 1,125,135 |
| **NON-CURRENT LIABILITIES:** | | | | | |
| Other non-current liabilities | — | 2,000 | — | — | 2,000 |
| Deferred income taxes | — | 84,890 | (67) | 17,138 | 101,961 |
| Due (from) to affiliates | 19,882 | (22,132) | 6,368 | (4,118) | — |
| Total liabilities | 1,063,959 | 162,289 | 8,335 | (5,487) | 1,229,096 |
| **STOCKHOLDER'S (DEFICIT) EQUITY:** | | | | | |
| Total stockholder's (deficit) equity | (560,986) | 485,131 | 1,129 | (486,260) | (560,986) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | $ 502,973 | $647,420 | $9,464 | $ (491,747) | $ 668,110 |

# Supplemental condensed consolidating balance sheet
# As of March 31, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS:** | | | | | |
| Cash and cash equivalents | $ 274 | $ 4,624 | $1,708 | $ — | $ 6,606 |
| Trade receivables, net | — | 46,705 | 1,798 | — | 48,503 |
| Inventories | — | 12,972 | 476 | — | 13,448 |
| Prepaid expenses and other current assets | 94 | 25,026 | 599 | (5,487) | 20,232 |
| Total current assets | 368 | 89,327 | 4,581 | (5,487) | 88,789 |
| **PROPERTY AND EQUIPMENT, NET:** | | | | | |
| Leasehold improvements | — | 1,824 | — | — | 1,824 |
| Furniture, fixtures and equipment | — | 31,347 | 452 | — | 31,799 |
| Less—accumulated depreciation | — | (26,780) | (349) | — | (27,129) |
| Total property and equipment, net | — | 6,391 | 103 | — | 6,494 |
| **OTHER ASSETS:** | | | | | |
| Deferred debt costs, net | 10,938 | — | — | — | 10,938 |
| Deferred rack costs, net | — | 8,461 | — | — | 8,461 |
| Other long-term assets | — | 3,257 | — | — | 3,257 |
| Investment in subsidiaries | 457,200 | 983 | — | (458,183) | — |
| Total other assets | 468,138 | 12,701 | — | (458,183) | 22,656 |
| **GOODWILL AND OTHER IDENTIFIED INTANGIBLE ASSETS:** | | | | | |
| Goodwill | — | 226,376 | 4,509 | — | 230,885 |
| Other identified intangibles, net | 6,000 | 265,635 | — | — | 271,635 |
| Total goodwill and other identified intangible assets | 6,000 | 492,011 | 4,509 | — | 502,520 |
| **TOTAL ASSETS** | $ 474,506 | $ 600,430 | $9,193 | $ (463,670) | $ 620,459 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | | | | | |
| Term loan | $ 4,500 | $ — | $ — | $ — | $ 4,500 |
| Senior subordinated notes, net | 39,458 | — | — | — | 39,458 |
| Accounts payable | 2 | 14,688 | 989 | — | 15,679 |
| Accrued expenses and other liabilities | 4,413 | 38,564 | 445 | (4,867) | 38,555 |
| Accrued interest | 1,433 | — | — | — | 1,433 |
| Deferred revenues | 266 | 36,182 | 481 | — | 36,929 |
| Total current liabilities | 50,072 | 89,434 | 1,915 | (4,867) | 136,554 |
| **NON-CURRENT LIABILITIES:** | | | | | |
| Term loan and revolving credit facility | 449,371 | — | — | — | 449,371 |
| Senior subordinated notes, net | 521,151 | — | — | — | 521,151 |
| Other non-current liabilities | 7,083 | 2,000 | — | — | 9,083 |
| Deferred income taxes | — | 83,428 | (74) | (620) | 82,734 |
| Due (from) to affiliates | 25,263 | (31,632) | 6,369 | — | — |
| Total liabilities | 1,052,940 | 143,230 | 8,210 | (5,487) | 1,198,893 |
| **STOCKHOLDER'S (DEFICIT) EQUITY:** | | | | | |
| Total stockholder's (deficit) equity | (578,434) | 457,200 | 983 | (458,183) | (578,434) |
| **TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY (DEFICIT)** | $ 474,506 | $ 600,430 | $9,193 | $ (463,670) | $ 620,459 |

# Supplemental condensed consolidating statement of income
# For the three months ended September 30, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | |
| Circulation | $ — | $ 58,401 | $1,075 | $ — | $ 59,476 |
| Advertising | — | 32,431 | 1,392 | — | 33,823 |
| Other | 3,385 | 7,444 | 230 | — | 11,059 |
| Total operating revenues | 3,385 | 98,276 | 2,697 | — | 104,358 |
| **OPERATING EXPENSES:** | | | | | |
| Editorial | — | 10,970 | 263 | — | 11,233 |
| Production | 2,016 | 25,807 | 762 | — | 28,585 |
| Distribution, circulation and other cost of sales | — | 17,492 | 483 | — | 17,975 |
| Selling, general and administrative | 348 | 18,695 | 590 | — | 19,633 |
| Depreciation and amortization | — | 1,554 | 18 | — | 1,572 |
| Total operating expenses | 2,364 | 74,518 | 2,116 | — | 78,998 |
| **OPERATING INCOME** | 1,021 | 23,758 | 581 | — | 25,360 |
| **OTHER (EXPENSE) INCOME:** | | | | | |
| Interest expense | (12,738) | 26 | — | — | (12,712) |
| Amortization of deferred debt costs | (994) | — | — | — | (994) |
| Other (expense) income, net | 2 | (2) | (5) | — | (5) |
| Total other (expense) income | (13,730) | 24 | (5) | — | (13,711) |
| INCOME (LOSS) BEFORE PROVISION (BENEFIT) FOR INCOME TAXES AND EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | (12,709) | 23,782 | 576 | — | 11,649 |
| PROVISION (BENEFIT) FOR INCOME TAXES | (8,380) | 9,307 | 173 | — | 1,100 |
| EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | 14,878 | 403 | — | (15,281) | — |
| NET INCOME (LOSS) | 10,549 | 14,878 | 403 | (15,281) | 10,549 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (520) | — | — | — | (520) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC. AND SUBSIDIARIES | $10,029 | $ 14,878 | $ 403 | $ (15,281) | $ 10,029 |

F-69

# Supplemental condensed consolidating statement of income
# For the six months ended September 30, 2010

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | |
| Circulation | $     — | $ 114,941 | $ 2,206 | $     — | $ 117,147 |
| Advertising | — | 64,608 | 2,954 | — | 67,562 |
| Other | 3,385 | 14,279 | 497 | — | 18,161 |
| Total operating revenues | 3,385 | 193,828 | 5,657 | — | 202,870 |
| **OPERATING EXPENSES:** | | | | | |
| Editorial | — | 21,768 | 549 | | 22,317 |
| Production | 2,016 | 51,266 | 1,543 | — | 54,825 |
| Distribution, circulation and other cost of sales | — | 34,399 | 980 | | 35,379 |
| Selling, general and administrative | 348 | 37,488 | 1,232 | — | 39,068 |
| Depreciation and amortization | — | 3,081 | 18 | — | 3,099 |
| Total operating expenses | 2,364 | 148,002 | 4,322 | — | 154,688 |
| OPERATING INCOME (LOSS) | 1,021 | 45,826 | 1,335 | — | 48,182 |
| **OTHER (EXPENSE) INCOME:** | | | | | |
| Interest expense | (25,453) | 51 | — | — | (25,402) |
| Amortization of deferred debt costs | (1,953) | — | — | — | (1,953) |
| Other (expense) income, net | 2 | — | (2) | — | — |
| Total other (expense) income | (27,404) | 51 | (2) | — | (27,355) |
| INCOME (LOSS) BEFORE PROVISION (BENEFIT) FOR INCOME TAXES AND EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | (26,383) | 45,877 | 1,333 | — | 20,827 |
| PROVISION (BENEFIT) FOR INCOME TAXES | (16,311) | 18,791 | 400 | — | 2,880 |
| EQUITY (LOSSES) IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | 28,019 | 933 | — | (28,952) | — |
| NET INCOME (LOSS) | 17,947 | 28,019 | 933 | (28,952) | 17,947 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (520) | — | — | — | (520) |
| NET INCOME (LOSS) ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC. AND SUBSIDIARIES | $ 17,427 | $ 28,019 | $   933 | $ (28,952) | $ 17,427 |

# Supplemental condensed consolidating statement of income
# For the three months ended September 30, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **OPERATING REVENUES:** | | | | | |
| Circulation | $ — | $ 61,229 | $1,160 | $ — | $ 62,389 |
| Advertising | — | 34,082 | 1,423 | — | 35,505 |
| Other | 3,332 | 7,128 | 280 | — | 10,740 |
| Total operating revenues | 3,332 | 102,439 | 2,863 | — | 108,634 |
| **OPERATING EXPENSES:** | | | | | |
| Editorial | — | 10,974 | 251 | — | 11,225 |
| Production | 2,110 | 28,982 | 780 | — | 31,872 |
| Distribution, circulation and other cost of sales | — | 18,359 | 500 | — | 18,859 |
| Selling, general and administrative | 289 | 16,330 | 591 | — | 17,210 |
| Depreciation and amortization | — | 1,781 | 9 | — | 1,790 |
| Provision for impairment of intangible assets and goodwill | — | — | — | — | — |
| Total operating expenses | 2,399 | 76,426 | 2,131 | — | 80,956 |
| OPERATING INCOME | 933 | 26,013 | 732 | — | 27,678 |
| **OTHER (EXPENSE) INCOME:** | | | | | |
| Interest (expense) income | (12,796) | 29 | — | — | (12,767) |
| Amortization of deferred debt costs | (931) | — | — | — | (931) |
| Other expense, net | (2) | — | — | — | (2) |
| Total other (expense) income | (13,729) | 29 | — | — | (13,700) |
| (LOSS) INCOME BEFORE (BENEFIT) PROVISION FOR INCOME TAXES AND EQUITY IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | (12,796) | 26,042 | 732 | — | 13,978 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (9,922) | 12,428 | 220 | — | 2,726 |
| EQUITY IN EARNINGS OF CONSOLIDATED SUBSIDIARIES | 14,126 | 512 | — | (14,638) | — |
| NET INCOME | 11,252 | 14,126 | 512 | (14,638) | 11,252 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST | (449) | — | — | — | (449) |
| NET INCOME ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC. AND SUBSIDIARIES | $10,803 | $ 14,126 | $ 512 | $ (14,638) | $ 10,803 |

# Supplemental condensed consolidating statement of income
# For the six months ended September 30, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| OPERATING REVENUES: | | | | | |
| Circulation....................................................... | $ — | $124,170 | $2,331 | $ — | $126,501 |
| Advertising ...................................................... | — | 65,188 | 2,916 | — | 68,104 |
| Other .............................................................. | 3,332 | 13,194 | 599 | — | 17,125 |
| Total operating revenues............................ | 3,332 | 202,552 | 5,846 | — | 211,730 |
| OPERATING EXPENSES: | | | | | |
| Editorial .......................................................... | — | 21,944 | 503 | — | 22,447 |
| Production........................................................ | 2,114 | 59,873 | 1,591 | — | 63,578 |
| Distribution, circulation and other cost of sales ............................................................ | — | 36,310 | 1,017 | — | 37,327 |
| Selling, general and administrative................ | 289 | 34,632 | 1,202 | — | 36,123 |
| Depreciation and amortization ....................... | — | 3,490 | 16 | — | 3,506 |
| Provision for impairment of intangible assets and goodwill.................................................. | — | 17,595 | — | — | 17,595 |
| Total operating expenses ........................... | 2,403 | 173,844 | 4,329 | — | 180,576 |
| OPERATING INCOME......................................... | 929 | 28,708 | 1,517 | — | 31,154 |
| OTHER (EXPENSE) INCOME: | | | | | |
| Interest (expense) income ............................. | (25,521) | 58 | — | — | (25,463) |
| Amortization of deferred debt costs............... | (2,040) | — | — | — | (2,040) |
| Other expense, net ........................................ | — | — | — | — | — |
| Total other (expense) income................... | (27,561) | 58 | — | — | (27,503) |
| (LOSS) INCOME BEFORE (BENEFIT) PROVISION FOR INCOME TAXES AND EQUITY IN EARNINGS OF CONSOLIDATED SUBSIDIARIES ............... | (26,632) | 28,766 | 1,517 | — | 3,651 |
| (BENEFIT) PROVISION FOR INCOME TAXES | (10,352) | 10,575 | 455 | — | 678 |
| EQUITY IN EARNINGS OF CONSOLIDATED SUBSIDIARIES............................................. | 19,253 | 1,062 | — | (20,315) | — |
| NET INCOME........................................................ | 2,973 | 19,253 | 1,062 | (20,315) | 2,973 |
| LESS: NET INCOME ATTRIBUTABLE TO THE NONCONTROLLING INTEREST ..... | (449) | — | — | — | (449) |
| NET INCOME ATTRIBUTABLE TO AMERICAN MEDIA OPERATIONS, INC. AND SUBSIDIARIES ...................................... | $ 2,524 | $ 19,253 | $1,062 | $ (20,315) | $ 2,524 |

# Supplemental condensed consolidating statement of cash flows For the six months ended September 30, 2010

| (In thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | |
| Net cash (used in) provided by operating activities | $ (33,346) | $ 60,837 | $  1,124 | $ (1,200) | $ 27,415 |
| **Cash Flows from Investing Activities:** | | | | | |
| Purchases of property and equipment | — | (2,383) | — | — | (2,383) |
| Proceeds from sale of assets | — | 35 | — | — | 35 |
| Investment in Mr. Olympia, LLC | (300) | — | — | — | (300) |
| Net cash used in investing activities | (300) | (2,348) | — | — | (2,648) |
| **Cash Flows from Financing Activities:** | | | | | |
| Due to (from) affiliates | 23,038 | (23,038) | — | — | — |
| Term loan and revolving credit facility principal repayments | (65,250) | — | — | — | (65,250) |
| Dividend paid to parent | — | — | (1,200) | 1,200 | — |
| Proceeds from revolving credit facility | 77,000 | — | — | — | 77,000 |
| Net cash provided by (used in) financing activities | 34,788 | (23,038) | (1,200) | 1,200 | 11,750 |
| Effect of exchange rate changes on cash | — | (281) | — | — | (281) |
| Net Increase (Decrease) in Cash and Cash Equivalents | 1,142 | 35,170 | (76) | — | 36,236 |
| Cash and Cash Equivalents, Beginning of Period | 274 | 4,624 | 1,708 | — | 6,606 |
| Cash and Cash Equivalents, End of Period | $   1,416 | $ 39,794 | $  1,632 | $    — | $ 42,842 |

# Supplemental condensed consolidating statement of cash flows For the six months ended September 30, 2009

| (in thousands) | Parent | Guarantors | Non-guarantors | Eliminations | Condensed consolidated |
|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | |
| Net cash (used in) provided by operating activities | $ (14,947) | $ 50,551 | $ (1,416) | $ — | $ 34,188 |
| **Cash Flows from Investing Activities:** | | | | | |
| Purchases of property and equipment | — | (2,803) | (18) | — | (2,821) |
| Proceeds from sale of assets | — | 636 | — | — | 636 |
| Investment in Mr. Olympia, LLC | (300) | — | — | — | (300) |
| Net cash used in investing activities | (300) | (2,167) | (18) | — | (2,485) |
| **Cash Flows from Financing Activities:** | | | | | |
| Due to (from) affiliates | 43,613 | (43,613) | — | — | — |
| Term loan principal repayments | (12,250) | — | — | — | (12,250) |
| Payment to retire subordinated indebtedness | (14,025) | — | — | — | (14,025) |
| Payment of debt costs | (929) | — | — | — | (929) |
| Net cash provided by (used in) financing activities | 16,409 | (43,613) | — | — | (27,204) |
| Effect of exchange rate changes on cash | — | (26) | 206 | — | 180 |
| Net Increase (Decrease) in Cash and Cash Equivalents | 1,162 | 4,745 | (1,228) | — | 4,679 |
| Cash and Cash Equivalents, Beginning of Period | 388 | 16,891 | 1,716 | — | 18,995 |
| Cash and Cash Equivalents, End of Period | $ 1,550 | $ 21,636 | $ 488 | $ — | $ 23,674 |

